No. 3:14-CV-4556-K

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

MARK ANTHONY SOLIZ,
*Petitioner,*

v.

WILLIAM STEPHENS,

Director, TDCJ,
*Respondent.*

_____

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the 413th District of Johnson County, Texas

_____

**PETITION FOR WRIT OF HABEAS CORPUS**

_____

**SETH KRETZER**                          **CARLO D'ANGELO**
SBN: 24043764                            SBN: 24052664

The Lyric Center                         100 East Ferguson, Suite 1210
440 Louisiana Street; Suite 200          Tyler, Texas 77018

Houston, TX 77056
(713) 775-3050 (office)                  (903) 595-6776 (Office)
(713) 224-2815 (fax)                     (903) 407-4119 (fax)
*email: seth@kretzerfirm.com*            *e-mail:* [carlo@dangelolegal.com](mailto:carlo@dangelolegal.com)

Court-Appointed Attorneys for Petitioner Soliz

1

---

## PETITION FOR WRIT OF HABEAS CORPUS

---

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, **MARK ANTHONY SOLIZ**, the Petitioner, and respectfully submits his Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the Institutional Division of the Texas Department of Criminal Justice.  This application follows his conviction and death sentence in the 413th District Court of Johnson County, Texas, cause number F45059, styled *State v. Mark Anthony Soliz.*

Soliz is illegally restrained of his liberty by the Director of the Texas Department of Criminal Justice – Institutional Division, by virtue of a sentence and judgment imposing the penalty of death rendered in cause number F45059, styled *State v. Mark Anthony Soliz.*

## <u>CERTIFICATE OF INTERESTED PARTIES</u>

The undersigned counsel of record for Petitioner, MARK ANTHONY

SOLIZ, certifies that the following listed persons have an interest in the outcome

of this case.  These representations are made in order that this court may evaluate

possible disqualifications or recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| *Petitioner* | | |
| Mr. Mark Soliz | Polunsky Unit | Petitioner |
| Mr. Seth Kretzer | The Lyric Center<br>440 Louisiana Street<br>Suite 200<br>Houston, TX 77002<br>(713) 775-3050 (direct)<br>(713) 224-2815 (fax) | Appointed attorney for current federal habeas |
| Mr. Carlo D'Angelo | Carlo D'Angelo<br>100 East Ferguson, Suite 1210<br>Tyler, Texas 75702<br>(903) 595-6776 (work)<br>(903) 407-4119 (fax) | Appointed attorney for current federal habeas |

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Mr. Michael Heiskell | Johnson, Vaughn, & Heiskell<br><br>5601 Bridge Street, Suite 220<br><br>Fort Worth, Texas 76112<br><br>(817) 457-2999  (direct)<br><br>(817) 496-1102  (fax) | Trial Counsel |
| Mr. Gregory Westfall | The Westfall Firm<br><br>4200 West Vickery Blvd., Second Floor<br><br>Ft. Worth, TX 76107<br><br>Phone: (817) 928-4222 | Trial Counsel |
| Mr. Brad Levenson<br>Mr. Derek Verhagen<br>Jeremy Schepers | Office of Capital Writs<br><br>1700 N. Congress Ave; Suite 460<br><br>Austin, TX 78701<br><br>(512) 463-8600 (direct)<br><br>(512) 463-8590 (fax) | state writ lawyers |
| Mr. John Stickles | 770 North Fielder Road, Arlington, TX 76012<br><br>(817) 330-6655 (direct) | State direct appellate lawyer |
|  |  |  |
|  |  |  |
| Respondent | | |
| The Hon. Mr. Ken Paxton |  | Texas Attorney General |

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Mr. Jefferson David Clendenin | Office of the Attorney General<br>Capital Litigation Division<br>P.O. Box 12548<br>Austin, TX 78748 | Asst. Attorney General |
| *Judges* | | |
| Honorable William Bosworth<br>413th District Court of Johnson County, TX | 413th District Court of Johnson County, Texas<br>204 S Buffalo Ave<br>Cleburne, Texas 76033 | Trial Judge |

## DESIGNATION OF ABBREVIATIONS and EXPLANATION OF THE TRIAL RECORD

"RR" refers to reporter's record from the state trial court.  "CR" refers to clerk's record from state trial court.

### STATEMENT OF JURISDICTION

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and amendments five, six, eight, and fourteen, of the United States Constitution, and section nine, clause two of the United States Constitution (habeas corpus).

## SOLIZ'S AEDPA DEADLINE IS SATISFIED WITH LEAVE TO AMEND

Soliz's direct appeal to the Court of Criminal Appeals (CCA) was denied in an opinion dated June 18, 2014.  *Soliz v. Texas*, 432 S.W.3d 895 (Tex. Crim. App. 2014).

Solizs's state writ was filed on May 6, 2014.  The state writ was pending until December 17, 2014, when the CCA ruled.  *Ex parte Soliz*, 2014 Tex. Crim. App. Unpub. LEXIS 1128.

Soliz's AEDPA deadline was satisfied by the original writ which was filed December 11, 2015. 28 U.S.C. 2244(d)(2); *see also Fields v. Johnson*, 159 F.3d 914, 916 (5th Cir. 1998).

In its initial scheduling order, this Court ordered that, "Soliz shall file an amended petition within sixty (60) days of the filing of the original petition." (Doc. No. 6).  The sixty-day deadline is satisfied by this supplemental writ which is filed February 5, 2016.

## EXHAUSTION

Soliz states that all of the federal constitutional claims alleged herein have been exhausted in proceedings before the Texas courts, with the exception of the *Martinez/Trevino* claim he presents as Claim 1(A) (see pages 26).[1]

## PROCEDURAL HISTORY IN STATE COURT

Mark Anthony Soliz is confined under a sentence of death pursuant to the judgment of the 413th District Court, Johnson County, Texas, in cause number F45059, which was rendered on March 23, 2012 (57 RR at 95), and entered on March 26, 2012 (CR at 2195).

### A.  Trial Court Proceedings

#### 1.    Indictment

On December 16, 2010, a grand jury indicted Soliz with capital murder for intentionally causing the death of Nancy Weatherly while committing the offenses of robbery or burglary.  (CR at 38.)

#### 2.    Trial

The Court appointed Michael Heiskell and Greg Westfall to represent Soliz during his capital trial.  Tarrant County Assistant District Attorney Christy Jack

---

[1]The burden is on Respondents to demonstrate that Soliz failed to exhaust a particular claim.  *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994); *Brown v. Maass*, 11 F.3d 914, 914-15 (9th Cir. 1993); *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992).

was sworn in as an Assistant District Attorney in Johnson County to assist in the prosecution, along with the Johnson County District Attorney's Office. (CR at 49.)

*Voir dire* began on January 10, 2012, and concluded on February 20, 2012. (7 RR at 4; 36 RR at 28.) Soliz was arraigned on February 27, 2012, and entered a plea of not guilty. (38 RR at 19-20.) Later that day, the State gave its opening statement and called its first witness. (*Id.* at 21, 47.) The State rested its case for guilt on March 8, 2012. (46 RR at 28.) Defense counsel did not present any witnesses. (*Id.*) Both sides gave closing arguments the following day, and the case was submitted to the jury for deliberation. (47 RR at 23-76.) The jury returned with a verdict finding Soliz guilty of capital murder that same day. (*Id.* at 77.)

The punishment phase began on March 12, 2012, with the State and the defense giving opening statements. (48 RR at 8-32.) The State then presented its case over the course of three days. (*Id.* at 3 to 50 RR at 135.) Defense counsel called a number of witnesses over the course of six days, before resting on March 21, 2012. (50 RR at 136 to 55 RR at 281.) In rebuttal, the State presented five witnesses, primarily to provide victim impact testimony. (56 RR at 6-59.) On March 23, 2012, both sides presented closing arguments before the case was given to the jury for deliberation. (57 RR at 14-92.) Later that day, the jury returned with a verdict, answering "Yes" to Special Issue One, "Yes" to Special Issue Two,

and "No" to Special Issue Three.  (*Id.* at 94-95.)  Soliz was then formally

sentenced to death by the Court.  (*Id.* at 95.)

### B.  State Appellate Proceedings

Soliz was notified of his right to appeal on March 23, 2012.  (CR at 2194.)

Soliz was declared indigent, and, on April 9, 2012, John Stickles was appointed as

direct appeal counsel.  (*Id.* at 2308.)  A motion for new trial was filed on April 12,

2012, which was never ruled on and thus denied by operation of law.  (*Id.* at 2312-

16.)

Appellate counsel then filed an opening appellate brief in *Mark Anthony*

*Soliz v. The State of Texas*, Cause Number AP-76,768, on October 8, 2013.  (brief

available at: 2013 WL 5758241).  The State submitted a brief in response on

December 23, 2013.  (brief available at: 2013 WL 6912481).  Oral argument was

waived; the CCA denied relief in an opinion dated June 18, 2014.  *Soliz v. Texas*,

432 S.W.3d 895 (Tex. Crim. App. 2014).  The Supreme Court denied certiorari on

January 20, 2015.  *Soliz v. Texas,* 135 S.Ct. 1154 (2015).

### C.  State Habeas Proceedings

On March 23, 2012, the 413th District Court appointed the Office of Capital

Writs ("OCW") to represent Soliz in filing an application for a writ of habeas

corpus pursuant to the Code of Criminal Procedure, Article 11.071.  (CR at 2201.)

The Application was filed on May 6, 2014, presenting eighteen (18) allegations in

which Soliz challenged the validity of his conviction and sentence. The trial court did not hold a live evidentiary hearing. As to all of these allegations, Judge Bosworth entered his Findings of Fact and Conclusions of Law on November 6, 2014.  This order simply signed off on the State's Proposed Findings; the caption reads, "Respondent's Proposed Findings of Fact and Conclusions of Law."  The CCA denied relief on December 17, 2014.  *Ex parte Soliz*, 2014 Tex. Crim. App. Unpub. LEXIS 1128.

## PROCEDURAL HISTORY IN FEDERAL COURT

This Court appointed Seth Kretzer and Carlo D'Angelo to represent Soliz in his federal habeas proceedings.  On March 12, 2015, this Court entered a scheduling order setting a briefing deadline of December 11, 2015, with leave to amend within sixty days.  ("Soliz shall file an amended petition within sixty (60) days of the filing of the original petition."). (Doc. No. 6).  The original petition was filed on December 11, 2015.

## STATEMENT OF FACTS

### A.    Guilt/Innocence Phase Presentation

Before the trial, defense counsel challenged the admissibility of oral and written statements Soliz gave to police at a pretrial suppression hearing.  (5-6 RR.) That motion was denied.  (CR at 1746-48.)

During the guilt/innocence phase of Soliz's trial, the prosecution presented evidence and testimony to show that Soliz shot and killed Nancy Weatherly on June 29, 2012, while in the course of committing robbery or burglary. Much of the testimony presented by the State related to various offenses Soliz committed in the week prior to his arrest. The first three witnesses called by the State testified about various extraneous offenses Soliz committed against them leading up to his arrest; two other witnesses were later called for the same purpose. (38 RR at 47-159, 201-40; 44 RR at 141-66.) A number of police officers, crime scene technicians, and lab analysts were called to testify regarding the Weatherly crime and the variety of other offenses Soliz was accused of committing, most of which were alleged to have been committed alongside his codefendant, Jose Ramos. (38-46 RR.) Soliz's statements to police were admitted into evidence, in which he admitted involvement in these offenses. One type-written statement included a handwritten addition where Soliz admitted shooting Weatherly. (41 RR at 148-51.) Fort Worth Police Officer Jesus Alaniz also testified about his knowledge of gangs in the area and that he believed Soliz was a member of the Texas Syndicate and Varrio North Side gangs. (39 RR at 40-125.)

One of the witnesses called by the State was Elizabeth Estrada. Estrada was arrested along with Soliz, Ramos, and others on June 29, 2010. (44 RR at 208.) As a term of her probation for an unrelated incident, Estrada agreed to cooperate

and testify against Soliz; however, she claimed to have no deal with the State for a separate pending charge.  (*Id*. at 213-14.)  She testified that Soliz had admitted to her that he had killed Weatherly, that he shot Ruben Martinez while robbing him, and that he was involved in a number of other criminal incidents prior to his arrest. (*Id.* at 174-215.)  Estrada also demonstrated in the courtroom how Soliz showed her that he had shot Weatherly.  (*Id*. at 197-98.)  The final two witnesses called by the State provided victim-impact evidence about Weatherly.  (46 RR at 6-27.) The defense rested without presenting any witnesses.  (46 RR at 28.)

## B.    Punishment Phase Presentation

A significant portion of the State's punishment phase presentation entailed jail employees testifying about infractions that Soliz committed while in jail awaiting trial.  This included possession of contraband, damaging property, use of tobacco products, flooding his cell, and threatening officers, among other violations.  (See, e.g., 48 RR at 52-54, 57-59, 70.)  Due to Soliz's behavior, the jail purchased a special type of handcuff with a lock box to control him.  (Id. at 137-39.)

The second major theme of the State's punishment phase regarded the injuries caused by Soliz and Ramos during the incidents culminating in the shooting of Weatherly.  (See, e.g., 48 RR at 155-65; 49 RR at 6-71; 50 RR at 5-29.)  The State's final witness was Stephen Rogers, who testified extensively about

12

the classification system and how, in his belief, the Texas Department of Criminal Justice ("TDCJ") might struggle to control Soliz if he received a life sentence. (50 RR at 29-116.)

The defense case at punishment focused on two main issues: Soliz's difficult childhood and that he suffered from partial fetal alcohol syndrome ("PFAS"). Two of Soliz's cousins testified about the Soliz family. They described a home environment of poverty, crowded living conditions, rampant drug use, paint sniffing, and drinking. (50 RR at 143-47, 247-50.) The weekly routine for the adults living in the home involved partying five nights a week and ignoring the children and their needs. (Id. at 149.) Soliz's mother, Donna, was addicted to drugs and paint sniffing and worked as a prostitute to support her habits. (Id. at 172-73, 179.) Soliz's life of crime began at age nine or ten, including breaking into parking meters, stealing cars, and drug abuse. (Id. at 176-83.) Soliz also witnessed his aunt being stabbed to death at a young age. (Id. at 194-95; 51 RR at 10-13.) Defense counsel also presented a psychiatrist and two case workers who interacted with Soliz during his childhood and witnessed his struggles. (51 RR at 39 to 52 RR at 70.)

Defense counsel presented three experts regarding Soliz's diagnosis of PFAS. (53 RR at 36-215; 54 RR at 13-70; 55 RR at 4-280.) They provided the jury with background information regarding Fetal Alcohol Spectrum Disorder

13

("FASD"), Fetal Alcohol Syndrome ("FAS"), and PFAS.  FASD is an umbrella

term that encompasses five different diagnoses, including FAS and PFAS.  (53 RR

at 60-61.)  To diagnose FAS, there must be confirmed prenatal alcohol exposure,

specific facial abnormalities, central nervous system abnormalities, and growth

problems.  (Id. at 61-63.)  If the facial abnormalities are not as severe, a person can

be diagnosed with PFAS, which can have cognitive abnormalities just as severe.

(Id. at 66-67, 91-92.)  The experts confirmed the prenatal alcohol exposure and

cognitive abnormalities, and Soliz was diagnosed with PFAS because his facial

abnormalities were mild.  However, it was clear that he suffered from the disorder,

and his was the most serious case the experts had ever seen.  (Id. at 86-90, 109-10,

115.)

The defense also presented classification expert Larry Fitzgerald to opine

that the TDCJ would be able to control Soliz if he was sentenced to life, contrary to

what the State expert believed.  (52 RR at 74-144.)

The State presented five witnesses in rebuttal.  The first witness, a jail

officer, testified primarily regarding letters that Soliz had written while in jail.  (56

RR at 6-30.)  The final four witnesses presented victim impact testimony regarding

Nancy Weatherly and an extraneous offense against Ruben Martinez.  (*Id.* at 30-

59.).

## GENERAL DISCUSSION OF CAPITAL PUNISHMENT LAW IN TEXAS

The following is an overview of capital punishment law in Texas. This summary is provided simply as a general guide; not all capital murder trials follow this pattern.

The Texas Legislature has designated certain types of murders as eligible for the death penalty. To warrant the death penalty, the defendant must have committed another serious crime in addition to committing a murder. For instance, kidnaping and then killing a person is a capital offense. So is killing two people, rather than one, which happened in the present case.

In recent years, once a person is indicted for capital murder and the State decides to pursue the death penalty, the defendant is assigned two attorneys. One of the lawyers is the lead attorney; the other is the second chair attorney. Both attorneys are charged with investigating the case, filing motions, selecting the jury, and arguing as forcefully as possible for a not guilty verdict or a lesser conviction than capital murder, or if all else fails, for a life sentence.

The district attorney's office will equally prepare, usually assigning two, sometimes three, prosecutors to the case, along with one or two investigators and paralegals.

Lawyers for the defendant will usually file a large number of pretrial motions. The reason for this is because the state and federal law requires all issues raised on appeal to be first presented to the trial judge. Death penalty jurisprudence is thick with constitutional and statutory issues. All unsettled challenges to death penalty procedures must be raised. Failure to do so means that the issues are waived for direct appeal. Moreover, because the Supreme Court has insisted that effective assistance of counsel requires attorneys who are knowledgeable about death penalty litigation, the failure of trial lawyers to raise important issues at trial for later review on appeal can lead to accusations that the trial lawyers were ineffective.

In a capital case, the trial judge will hold several pretrial hearings on motions by the State and defense. The judge will address motions to suppress, constitutional challenges, and hearings on the qualifications of experts. Any defense requests denied by the judge are preserved for appeal.

Texas adheres to individual voir dire of potential jurors. Generally, a large number of veniremen are summoned to the courthouse, around 600 or 700. Many jurors exercise certain allowable rights not to serve; others cannot be found. On appearance day, about 300 jurors or so will show.

The trial judge will perform the initial qualification of the jury panel. Either side may ask for the jury to be shuffled at this point. Jurors will be seated

16

randomly in numerical order.   Beginning with juror number one, the first twelve jurors who are not struck or removed for cause will constitute the jury.

The judge will screen out those who cannot speak and write English, who have felony or moral turpitude convictions, and those who are entitled to legitimate legal exemptions from service.   In addition, the judge will hear explanations about physical disability, business conflicts, general biases, or other personal issues which might disqualify a juror.   The judge may excuse some jurors but not others. At this stage, the attorneys for both sides have minimal input, other than a few questions for individual jurors called to the bench.   Frequently, the lawyers for both sides will agree to excuse a juror for some reason.   There is a certain Texas statutory provision which allows lawyers on both sides to agree to excuse a juror.

Qualifying the jury to this point is a difficult day-long affair.   Once the venire is qualified for general jury service, they are scheduled for individual voir dire examination.   Generally in groups of five to ten, they are instructed to return to court over the next three to four weeks, for individual questioning about their views on the death penalty.

When each juror arrives on his designated day, each side is generally allowed approximately forty-five minutes to question the juror.   After the juror leaves, each side is permitted to challenge for cause.   If granted, the juror is finally excused and deleted from the pool.   If challenges for cause are denied, the juror

17

remains in the pool and subject to a peremptory challenge or to become part of the twelve-member petit jury.

There are two methods in Texas for permitting peremptory challenges. For many years, judges required peremptory challenges to be exercised immediately after the juror is questioned individually and challenges for cause denied. This is sometimes called the sequential method of selecting the jury. The State goes first. If the State strikes the juror, the juror is gone. If the State declines to strike the juror, then the right passes to the defense. If the defense strikes the juror, the juror is eliminated. If the defense does not strike the juror, then the juror joins the twelve-member petit jury. This process is repeated until twelve jurors and two alternates are seated. Each side has ten peremptory challenges. This form of jury selection was used in Soliz's trial.

Once the jury is selected and sworn, trial proceeds in the usual fashion. If the defendant is found guilty of capital murder, the sentencing phase begins. In response to the Supreme Court's insistence that the jury decision-making process be guided, Texas has constructed three questions, called special issues. The questions have varied over the years. In Soliz's case, only two questions were asked: the future dangerousness question and the mitigation question.

The method of answering the special issues is complicated. If the jurors unanimously answer both questions in the State's favor, as they did here, then the

judge sentences the defendant to death automatically.   If the jurors answer *unanimously* any one of the questions in the defendant's favor, then the judge will sentence the defendant to life in prison.

Jurors are also told that in order to answer any special issue in the defendant's favor, at least ten of the jurors must agree.

The jurors are *not* told certain outcomes.  It is possible that the jurors might fail to agree *unanimously* on the answer in the State's favor to any special issue.  If this occurs, then the defendant is sentenced automatically to life in prison.  There is no retrial.  Unlike in any non-capital case, a hung jury does not result in a retrial in the sentencing phase of a capital case.  The result is always either a life sentence or a death sentence.  Jurors, however, are not told this.

As a corollary, jurors are also not told that a single juror can decide in favor of a life sentence.  Unanimity is required for a death sentence.  A life sentence is the result otherwise, the result of a single juror's decision.

Moreover, jurors are not told what occurs if fewer than twelve jurors agree on an answer to a special issue in the State's favor, but fewer than ten jurors agree on an answer in the defendant's favor.   Again, the answer is that the defendant receives an automatic life sentence.

Once the judge pronounces the death sentence and signs the judgment, appeal is automatic to the Texas Court of Criminal Appeals ("CCA").  At the same

time that the trial judge appoints an appellate lawyer, the judge will also appoint an attorney to file the defendant's state article 11.071 application for state writ of habeas corpus.  The state writ must be filed shortly after the state direct appeal brief is filed, before the CCA decides the appeal.  If the direct appeal is affirmed, the defendant has the right to appeal to the United States Supreme Court.  Once the CCA denies the direct appeal and the state writ application, the inmate must proceed to federal district court.

## ARGUMENT AND AUTHORITIES

### Overview of Claims for Relief

### DETAILED ARGUMENTS

I.  **CLAIM ONE: TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO PRESENT EVIDENCE FROM A FALSE CONFESSION EXPERT TO CHALLENGE SOLIZ'S CONFESSION (RAISED AS CLAIM NUMBER ONE IN THE STATE WRIT)**

**Exhaustion:**

**The State District Court resolved Soliz's Claim One as follows:**

**Applicant fails to show deficient performance or harm concerning defense counsel's decision not to hire, and call to testify at the suppression hearing, an expert on false confession.  First, the totality of the circumstances surrounding Applicant's confession**

20

**indicates that said confession was given voluntarily and truthfully. As such, the hiring of an expert on false confession would not have affected the outcome of the suppression hearing.  Thus, it was sound trial strategy for defense counsel not to spend financial resources on an expert on false confessions.  Secondly, there was significant evidence adduced at trial that Applicant's mother used illegal drugs, inhalants, and alcohol during her pregnancy with Applicant. Consequently, it was also sound trial strategy to spend financial resources to hire experts on Fetal Alcohol Spectrum Disorder to examine Applicant and evaluate whether or not he suffered from this affliction.  The result of defense counsel's strategy was a diagnosis of Fetal Alcohol Spectrum which, in turn, gave defense counsel a legitimate argument concerning Special Issue Number Three that Applicant should not be sentenced to the death penalty because this disorder reduced his moral blameworthiness.**

FFCL, at p. 21-22.

**ISSUE RESTATED:** The trial court's finding that trial counsel's failure to call a false/coerced confession expert witness during the suppression hearing was reasonable and based upon sound strategy was the product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of *Strickland*.

## A.    Soliz's Interrogation and Confession

Soliz was arrested around 11:00 p.m. on June 29, 2010.[2]  He was interrogated by Detectives Boetcher and Paine, beginning at 5:14 a.m. the following morning. The detectives began the interview by repeatedly telling Soliz that he needed to wake up before reading him his rights. *Id.*  Soliz initially denied involvement in any of the crimes that they accused him of committing. The detectives attempted to minimize the actions they accused Soliz of, suggesting that

---

2 The following facts were culled from Mr. Soliz's State Habeas Writ at pages 15-23.

he could help himself by showing remorse or blaming it on drugs.  After the detectives told Soliz that everyone else had identified him as the shooter in these incidents, Soliz described his involvement in the robberies leading up to the shooting of Ruben Martinez, but he denied shooting him. The detectives again told him that the other arrestees had said that he was the shooter, and then suggested that it was an accident, which Soliz agreed with. After about an hour of questioning, the detectives took Soliz to type up a statement regarding the robbery and shooting of Martinez. They asked further clarifying questions while Soliz's statement was being typed.

Soliz and the detectives returned to the interview room at 6:47 a.m. to discuss the death of Nancy Weatherly.  Soliz stated that he and Jose Ramos broke into her home and that during the course of the robbery he left the gun on a table in front of Weatherly.  According to Soliz, Ramos went into the room, picked up the gun, and shot Weatherly while Soliz was outside getting into his car.  The detectives told Soliz that they did not believe that Ramos was the shooter. They brought Soliz out of the interrogation room to type a second statement, in which he identified Ramos as the shooter.

Detective Boetcher re-entered the interview room with Soliz at 7:48 a.m. and reassured him that, despite what he had done, he was not a bad person.  Detective Boetcher continued to quiz him about who shot Weatherly, and told him that it was

no worse than the shooting of Ruben Martinez that he had already admitted.  Soliz told him that "[t]he truth is . . . I didn't do it . . . but . . . just to get this over with . . . okay . . . I did it" and continued on to say "fuck it . . . I did it then . . . case closed . . . shit . . . I'll plead guilty."  He then agreed to handwrite that onto his second statement, contradicting the typed content.

## B.     Soliz's Suppression Hearing

Trial counsel filed a motion to suppress Soliz's oral and written statements (CR at 264-67).  The State's first witness at the suppression hearing was Detective Paine of the Fort Worth Police Department (5 RR at 19).  He described his role in the investigation into crimes allegedly committed by Soliz culminating in his arrest on June 29, 2010. *Id.* at 26-57.  He testified that Soliz was taken to the police department after his arrest and questioned by himself and Detective Boetcher the following morning.  *Id.* at 59-83.  Defense counsel examined Paine regarding his training and the techniques used in Soliz's interrogation.  *Id.* at 83-156.

The State's second witness was Detective Boetcher of the Fort Worth Police Department (5 RR at 172-73).  He described his training and his role in the Soliz investigation and interrogation, including that Soliz added a handwritten annotation to his second statement *Id.* at 173-201.  He returned the next day to provide additional information, including that he had to ask Soliz to wake up at the start of the interview (6 RR at 4-66).  The State's final witness was Caroline Fralia,

an office assistant with the Fort Worth Police Department. *Id.* at 76. She

described typing both of Soliz's written statements. *Id.* at 76-110.

The defense rested without putting on any affirmative evidence. *Id.* at 110.

During argument, trial counsel's position was that Soliz did not give a knowing,

intelligent, and voluntary waiver of his rights under *Miranda v. Arizona*, 384 U.S.

436 (1966) (6 RR at 115-20). The defense motion was denied three days later (CR

at 1746-48).

### D. Trial Counsel's Failure to Utilize an Expert Witness on the Issue of False and Coerced Confessions

Although Mr. Soliz's trial team did file a motion to suppress his confession,

they failed to present any expert testimony during the suppression hearing

regarding both the prevalence of false confessions and specific risk factors relevant

to Soliz's confession, such as his FASD, suggestibility, and sleep deprivation. In

order for Mr. Soliz to have had any chance to suppress his confession, a false

confession expert was essential. Such an expert could have highlighted the tactics

used by the police interrogators, including repeated minimizing of Mrs.

Weatherly's death and insistence that Soliz was lying, and how that would have

influenced Soliz.

In addition, trial counsel failed to specifically challenge the handwritten

annotation that Soliz added to his second statement in which he claimed to have

shot Weatherly. This annotation was particularly suspect because it contradicted

the typed statement and was only added after repeated, insistent prodding by the interrogators.

Based on these failures, trial counsel performed ineffectively and Soliz's sentence of death was unlawfully and unconstitutionally imposed in violation of his Constitutional rights and United States Supreme Court case law.  The appropriate remedy is a new trial.

For Soliz to establish a violation of his Sixth Amendment right to effective assistance of counsel, he must show (1) that his counsel's performance fell below an objective standard of reasonableness and (2) there was a reasonable probability that but for his counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 692-694 (1984).   Courts are "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir.1999); *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992) (noting that "whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny" and that this "crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court").

Counsel's performance in this case "did not measure up to the standard required under the holding of *Strickland*. As noted by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 389 (2000):

> [t]he statute directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody-or, as in this case, his sentence of death-violates the Constitution, that independent judgment should prevail.

In addition to falling below professional standards, counsel's failure to effectively contest the voluntariness and reliability of Soliz's confession invites a "reasonable probability" that the outcome of this case would have been different had his confession been inadmissible. Therefore, the failure of trial counsel to utilize the services of a false confession expert deprived Soliz of his Sixth Amendment right to the effective assistance of counsel.

**I(A).**

> **CLAIM 1(A):   STATE HABEAS COUNSEL WAS INEFFECTIVE UNDER *MARTINEZ V. RYAN* FOR FAILING TO RAISE THE ISSUE OF WHETHER TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY OPENING THE DOOR AT TRIAL TO ADMISSIBILITY OF THE VERY CONFESSION THAT THEY SOUGHT TO SUPPRESS.**

Mr. Soliz hereby reiterates the facts set out in Claim One for relief and hereby incorporates them by reference in support of this claim.

State habeas counsel failed to raise this issue in Mr. Soliz's State habeas writ. As a consequence, the claim is raised here under the Supreme Court's holding in *Trevino*.   In *Trevino v. Thaler,* the Supreme Court held that the holding of *Martinez* applies to Texas: "[A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Trevino v. Thaler*, 133 S. Ct. 1911 (U.S. 2013) (*citing Martinez v. Ryan*, 132 S. Ct. 1309 (2012)).  Soliz submits that State habeas counsel was ineffective for failing to present this claim in his State writ of habeas corpus.

It should have been obvious to state habeas counsel that trial counsel, by opening the door at trial to the very confession that they previously sought exclude in the suppression motion, all but doomed the issue on appeal.   During cross examination of Detective Paine, trial counsel offered into evidence the very same video-taped confession that they previously sought to exclude in the suppression motion (41 RR at 134, 135 and 75 RR at Defense Ex. 8).

> The record establishes that at trial, defense counsel offered the audiovisual recording of appellant's oral statement without qualification and for all purposes while cross-examining one of the detectives who interviewed appellant. The prosecutor did not object, and the recording was published to the jury. By offering his oral statement into evidence, appellant waived error concerning the trial court's ruling on his motion to suppress this statement.

*Soliz v. State*, 432 S.W.3d 895, 903 (Tex. Crim. App. 2014) *cert. denied*, 135 S. Ct. 1154, 190 L. Ed. 2d 915 (2015).  By offering Mr. Soliz's confession into evidence during cross-examination, trial counsel abandoned the suppression issue at trial and waived any future review of this claim on appeal. *See Decker v. State,* 717 S.W.2d 903, 908 (Tex. Crim. App. 1986) (stating that, when appellant offered his confession into evidence before the jury and the trial court admitted it as a defense exhibit, appellant waived his objection to the admission of his confessions); *see also Ex parte Moore,* 395 S.W.3d 152, 157 (Tex. Crim. App. 2013) (stating that when a defendant affirmatively asserts during trial that he has "no objection" to the admission of evidence, he waives any error in its admission despite a pre-trial ruling denying his motion to suppress). As a consequence of trial counsel's actions, Texas Court of Criminal Appeals summarily disposed of Mr. Soliz's suppression claim on appeal. *See Soliz*, 432 S.W.3d at 895.   There can be no tactical justification whatsoever for trial counsel offering the Soliz's confession into evidence. Furthermore, there can be no doubt that by offering the confession into evidence, trial counsel waived all future review of the suppression issue thereby irrevocably impacting the outcome of Mr. Soliz's case.  Yet, State habeas counsel failed to raise this viable ineffectiveness claim.

Under the principles established in *Trevino,* this claim is not barred from this court's review. *Trevino* pointed out that generally, "if a convicted state criminal

defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." *Trevino*, 133 S. Ct. at 1911.  Of course, there are many traps for the unwary defendant, one being the general requirement that claims first be presented to the state courts. *Id.*  However, the Supreme Court has pointed out that "the doctrine barring procedurally defaulted claims from being heard is not without exceptions.  A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Id.* (internal quotations omitted).

To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, Mr. Soliz must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez,* 132 S.Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.; Trevino,* 133 S.Ct. at 1921. *See Preyor v. Stephens*, 12-70024, 2013 WL 3830160 (5th Cir. July 25, 2013).

Mr. Soliz's confession was a powerful and ultimately devastating piece of evidence in his trial. Accordingly, State habeas counsel's failure to raise trial counsel's waiver of the suppression issue on appeal resulted in a total deprivation

of Mr. Soliz's right to counsel under the Sixth Amendment.  This claim therefore meets the "substantial" requirement set forth in *Martinez* because such a fundamental deprivation of counsel at both the trial and habeas levels shakes the very "bedrock" of our justice system.

To demonstrate prejudice, Mr. Soliz must also show that there is a reasonable probability that, but for counsel's  errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. 86 (2013).   In the present case, Mr. Soliz meets this very high burden of prejudice. State habeas counsel further compounds this inequity by failing to raise this issue in Soliz's State writ.

Accordingly, Mr. Soliz has established that the cause for the default of his ineffective assistance of trial counsel was the result of his State habeas counsel's ineffectiveness.  He is therefore entitled to consideration by this Court of the merits of this otherwise procedurally defaulted claim.  *Martinez,* 132 S.Ct. at 1320.

II.   **CLAIM TWO: TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE 6TH AMENDMENT WHEN THEY FAILED TO IMPEACH ELIZABETH ESTRADA WITH HER PRIOR INCONSISTENT STATEMENT (RAISED AS CLAIM TWO IN THE STATE WRIT)**

**Exhaustion:**

**The State District Court resolved Soliz's Claim Two as follows:**

Applicant fails to show deficient performance or harm concerning defense counsel's failure to impeach Elizabeth Estrada's trial testimony in guilt/innocence with a     prior inconsistent statement that she had given on June 29, 2010, to Detective Thomas Boetcher of the Fort Worth Police Department Homicide Unit.   During the prosecution's case-in-chief, Estrada established that she made the inconsistent statement because 1) she did not want to get involved in Applicant's criminal activities, 2) Applicant had threatened her life if she said anything to the police that would incriminate him, and 3) she was worried that her knowledge of Applicant's criminal activities would affect the welfare of her two young sons.   As such, because Estrada had adequately addressed the prior inconsistent statement, it had little to no impeachment value.   Therefore, it was plausible trial strategy for the defense not to revisit it.

FFCL, at p. 22-23.

**ISSUE RESTATED:** The FFCL's analysis suffers the outcome-determinative proposition that the state had removed the sting from Estrada's prior inconsistent statement. The trial court's finding that these actions by trial counsel were reasonable and based upon sound strategy was the product of an unreasonable analysis of the facts of this case and how those facts apply against the backdrop of *Strickland*.

Soliz contends that no reasonable jurist could countenance the state district judge's conclusion that the state had effectively removed the sting of Estrada's prior inconsistent statement by talking about it during direct examination.   The

problem is that this is an outcome determinative analysis; the fact that the state

chose to mention the prior inconsistent statement during direct hardly impinges on

the IAC/*Strickland* impact about trial counsel's decision to abandon this vital line

of cross-examination. The trial court's finding that these actions by trial counsel

were reasonable and based upon sound strategy was the product of an unreasonable

analysis of the facts of this cause and how those facts apply against the backdrop of

*Strickland*.

### A.      Background

Elizabeth Estrada was arguably the most important witness called by the

State during Soliz's trial.  She testified that Soliz told her that he shot Nancy

Weatherly and Ruben Martinez, and Estrada performed an in-court reenactment of

Soliz demonstrating how he claimed to have done so.  (44 RR at 196-98.)  Trial

counsel cross-examined Estrada on a number of areas, including her pending

charges, her prior offenses, and her relationship with codefendant Jose Ramos.

However, they failed to challenge Estrada on a number of key inconsistencies in

her courtroom testimony compared to a recorded interview she gave to the State on

October 28, 2010.  These inconsistencies should have been used to discredit

Estrada's testimony and to counter the State's improper bolstering of Estrada's

testimony, as it was asserted that her testimony matched the prior interview.  (*Id.* at

212.)  Because trial counsel provided ineffective assistance by failing to do so,

Soliz's conviction was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, state statutory law, and United States Supreme Court and state case law, and the appropriate remedy is a new trial.

## B.  Elizabeth Estrada's Involvement with Soliz, Ramos, and the State Prior to Her Trial Testimony

To truly grasp the importance of Estrada's testimony, background information regarding her involvement with Soliz, Ramos, and the State is necessary.  Estrada first met Jose Ramos when she was eighteen years old—three years before she met Soliz, and about four years prior to Ramos and Soliz being arrested for capital murder.  (44 RR at 173, 229.)  Of the two, she knew Ramos better than she did Soliz.  (Id. at 189.)  Estrada was arrested on June 29, 2010, along with Soliz, Ramos, and others.  (44 RR at 176.)  She was taken to the police station where she was questioned by Detective Boetcher.  (Id. at 250.)  Her interview culminated in her signing a statement the next morning saying that Soliz "never told me anything about the dirt he was doing."  (Ex. 5 at 1 [Elizabeth Estrada Statement].)

Estrada was subpoenaed to appear before the grand jury determining whether to charge Soliz with capital murder.  She failed to appear and an attachment was filed on October 15, 2010.  (Ex. 6 [Elizabeth Estrada Attachment].)

She was booked into jail on October 20, 2010, for that and an unrelated charge, interference with public duties.  (Ex. 7 [Elizabeth Estrada Booking Sheet].)  On October 28, 2010—while she was in custody—Estrada was again interviewed, this time by the assistant district attorney prosecuting Soliz, and provided a dramatically different version of events compared to her prior statement.  (See 44 RR at 270.)  In this statement, she claimed that Soliz was engaged in a number of offenses leading up to his arrest and that he told her that he had shot Nancy Weatherly.  (Ex. 8 at 4 [Elizabeth Estrada Interview Transcript].)  Estrada also stated that Soliz had demonstrated how he had killed Weatherly.  (Id. at 4-5.)

Two weeks after providing this information, Estrada was placed on probation in Tarrant County for two pending misdemeanor cases.  (44 RR at 212-13.)  As a condition of her probation, Estrada was to cooperate in the prosecution of Soliz and Ramos. (Id. at 213.)  However, she violated her probation and disappeared.  (Id.)  Estrada was booked back into the Tarrant County Jail on August 1, 2011, for a theft of a firearm charge—a state jail felony that had occurred on March 21, 2011.  (Ex. 7 [Elizabeth Estrada Booking Sheet]; Ex. 9 [Elizabeth Estrada Theft of a Firearm Judgment].)  The charge was prosecuted by the same Tarrant County assistant district attorney who was assigned as a special prosecutor in Johnson County in Soliz's case and who had conducted Estrada's October 28, 2010, interview.  (Ex. 9 [Elizabeth Estrada Theft of a Firearm Judgment].)

Estrada was held in jail until Soliz's trial.  On March 5, 2012, she was transferred to Johnson County to testify against Soliz on March 6, 2012. (44 RR at 167-284.)  She was held in Johnson County until the conclusion of Soliz's trial on March 23, 2012, at which point she was transferred back to Tarrant County Jail.

Estrada pled guilty to her pending theft of a firearm charge in Tarrant County on April 2, 2012—ten days after Soliz was sentenced to death. The agreement was for a seven-month sentence with credit for time served.  *Id*.  Based on this time served credit, Estrada's sentence had expired on February 21, 2012.

## C.   Estrada's Testimony at Soliz's Trial

According to Estrada, there was no deal in place for her pending charge when she testified against Soliz.  (44 RR at 214.)  She explained to the jury how she knew Soliz and also provided background information regarding gangs and gang terminology.  (*Id.* at 167-75.)  Estrada testified about her knowledge of the crimes Ramos and Soliz were accused of committing.  (*Id.* at 176-215.)  She said that Soliz told her that he shot Weatherly and demonstrated how he had done so, and Estrada mimicked this demonstration in court.  (*Id.* at 196-98.)  The State elicited an agreement from her that her testimony was the same information that she had told the State during the interview on October 28, 2010.  (*Id.* at 212.)

Trial counsel cross-examined Estrada in an attempt to discredit her testimony.  She was repeatedly asked about her potential desire to testify against

Soliz to receive favorable treatment for her pending theft of a firearm charge. (44 RR at 217, 225, 280.) Trial counsel highlighted how she was better friends with Ramos than Soliz and may have been attempting to protect Ramos at Soliz's expense. (*Id.* at 225-29) Her credibility was attacked because of her prior offenses and drug abuse. (*Id.* at 218-25.) Trial counsel also noted that none of Estrada's testimony matched the initial statement that she gave to police after she was arrested with Soliz. (*Id.* at 230.)

The State's closing argument frequently referenced Estrada's testimony and its importance to the case. (47 RR at 27-28, 32-33, 35, 38-39, 66, 72.)

## D. Trial Counsel Were Ineffective When They Failed to Impeach Estrada with the Inconsistencies Between Her October 28, 2010 Statement and Her Trial Testimony

To establish that trial counsel provided ineffective assistance, Soliz must show both that trial counsel performed deficiently and that he was prejudiced by that deficiency. *Strickland*, 466 U.S. at 687. Deficient performance is established when it is shown that trial counsel's performance "fell below an objective standard of reasonableness . . . under prevailing professional norms." *Id.* at 687-88. The 2003 ABA Guidelines, the prevailing profession norms at the time of Soliz's trial, instruct counsel to "investigate all sources of possible impeachment of defense and prosecution witness." ABA Guidelines, Guideline 10.7, cmt. Prejudice requires a showing that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."

*Strickland,* 466 U.S. at 694.

While trial counsel attempted to discredit Estrada's testimony through other means, they failed to use readily-available impeachment evidence to do so—her statement given to the State on October 28, 2010. The State attempted to bolster Estrada's trial testimony by highlighting how her testimony was consistent with the prior statement. (44 RR at 212.) In fact, there were numerous, important discrepancies that trial counsel could have shown to the jury that would have discredited the remainder of Estrada's testimony, and these discrepancies were admissible under the Texas Rules of Evidence. *See* TEX. R. EVID. 613(a) (permitting impeachment through a prior inconsistent statement after the witness is told the contents of the statement and when and where the statement was made). This failure constituted ineffective assistance, and the appropriate remedy is a new trial.

**1. Trial Counsel's Failure to Impeach Estrada with the Significant Differences in Her Trial Testimony and the October 28, 2010, Statement Constituted Deficient Performance**

**A. Conflicts With Trial Testimony**

Estrada's trial testimony conflicted with her October 28, 2010, statement in a number of ways:

(1) Soliz telling her about the Ruben Martinez incident in a phone call changed to an in-person telling at Rosie Medina's home. (Compare Ex. 8 at 2 [Elizabeth Estrada Interview Transcript], with (44 RR at 194).)

(2) Soliz telling her that Ramos was sitting in the driver's seat of the car as a lookout for the Ruben Martinez incident changed to Ramos getting out of the car with Soliz during the incident. (Compare Ex. 8 at 2-3 [Elizabeth Estrada Interview Transcript], with (44 RR at 192, 267).)

(3) Soliz and Ramos going to the Texaco to get cigarettes changed to them going to Texaco because they were "gonna get Ruben." (Compare Ex. 8 at 2 [Elizabeth Estrada Interview Transcript], with (44 RR at 191).)

(4) Soliz telling her that he shot Ruben Martinez in the head changed to him telling her that he shot Martinez in the neck. (Compare Ex. 8 at 3 [Elizabeth Estrada Interview Transcript], with (44 RR at 192, 268).)

(5) Soliz telling her about the Ruben Martinez and Nancy Weatherly incidents in two separate conversations changed to Soliz telling her in one conversation. (Compare Ex. 8 at 3 [Elizabeth Estrada Interview Transcript], with (44 RR at 194).)

(6) Soliz telling Ramos to get a horse at Weatherly's house changed to Soliz saying that they had killed a horse. (Compare Ex. 8 at 4 [Elizabeth Estrada Interview Transcript], with (44 RR at 196).

(7) Soliz "bust[ing] in the door" at Nancy Weatherly's home changed to him knocking at the door. (Compare Ex. 8 at 4 [Elizabeth Estrada Interview Transcript], with (44 RR at 195).)

(8) Estrada knowing someone named "Tat Man" as a person who lived on the west side of Forth Worth in an apartment who did tattoos—and who was supposed to tattoo Soliz the day of the arrest—changed to her not knowing "Tat Man" at all. (Compare Ex. 8 at 25-26 [Elizabeth Estrada Interview Transcript], with (44 RR at 199).)

(9) Soliz not saying who the shooter at the Pearl Street incident was and her specifically saying Soliz only said "they shot" changed to Soliz stating that he was

the shooter at the Pearl Street Incident.   (Compare Ex. 8 at 28-29 [Elizabeth Estrada Interview Transcript], with (44 RR at 193-94).)

### B.    Legal Argument

The failure to question key witnesses can constitute ineffective assistance of counsel. *Higgins v. Renico*, 362 F. Supp. 2d 904, 918 (E.D. Mich. 2005), aff'd, 470 F.3d 624 (6th Cir. 2006). In *Higgins*, defense counsel requested additional time to prepare for the prosecution's star witness at trial, but the judge denied his request, so counsel declined to cross-examine the witness. *Id*. The court strongly criticized his choice, finding that it fell below an objective standard of reasonableness: "[Counsel] blithely forfeited his client's right to confront [the witness] and subject his direct testimony to cross-examination, 'the greatest legal engine ever invented for the discovery of truth.' " *Id*. (citing *California v. Green*, 399 U.S. 149, 158 (1970)). Henrico noted that its decision did not fall prey to *Strickland*'s concern about the warping effects of hindsight: "Finding that this decision on [Counsel's] part was unreasonable creates no danger of trenching upon sound trial strategy after the fact" because counsel's failure "to participate in a critical phase of the trial, and to subject the State's case to meaningful adversarial testing, on the sole ground of lack of preparation, was not a reasonable strategic decision entitled to deference." *Id*. at 917 (citing *Moss*, 286 F.3d at 864).

*Moss v. Hofbauer* presented substantially similar facts, and the Sixth Circuit found that counsel's choice not to the question the prosecution's witness was unreasonable and not entitled to *Strickland* deference. 286 F.3d 851 (6th Cir. 2002). In that case, Kim Moss and Keith Gould were convicted of felony firearm possession and first-degree murder. *Id*. at 855. At trial, one of the prosecution's key eyewitnesses, Nicole Purdie, testified that she saw Moss shoot the victim, but that she did not see Gould at the scene of the crime. *Id*. at 865. Gould's counsel cross-examined Purdie, but Moss's counsel neglected to ask her a single question. This Court found that Moss's counsel's choice not to question the important witness "was not a reasonable strategic decision entitled to deference." *Id*. (*citing Groseclose v. Bell*, 130 F.3d 1161, 1170 (6th Cir. 1997). "Purdie testified that she did not see Gould at the scene of the crime. Gould's counsel would therefore have had no incentive to challenge Purdie's credibility." *Id.* "Moss and Gould would have benefitted from different trial strategies." *Id*.

Soliz submits that the logic of these cases (to wit, when a defense lawyer declines to cross-examine a witness at all or in near entirety) applies with equal valence to lawyers such as his who cross-examined a witness but omitted a vitally important dimension which every lawyer would have done under the prevailing professional norms.

**C.     Conclusion**

40

Trial counsel failed to impeach Estrada with any of these inconsistencies between her October 28, 2010, interview and the testimony that she gave at trial. This failure was particularly problematic because the State elicited an agreement from Estrada that her testimony at trial matched her October 28, 2010 interview. (44 RR at 212.)  Trial counsel's failure to impeach Estrada with these inconsistencies allowed the State to improperly bolster her testimony and left the jury with the incorrect belief that Estrada was merely relaying exactly what she previously told the State in the prior interview. The trial court's finding that these actions by trial counsel were reasonable and based upon sound strategy was the product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of *Strickland*.

### 2.    Soliz was Prejudiced by Trial Counsel's Failure to Impeach Estrada

There is a reasonable probability that trial counsel's failure to impeach Estrada affected the guilt phase of Soliz's trial.  *Strickland*, 466 U.S. at 696. Estrada was one of—if not, the—most important witnesses that the State presented as shown by the repeated mention of her testimony during closing argument.  (47 RR at 27-28, 32-33, 35, 38-39, 66, 72.)  Estrada's testimony was critical, as she claimed that Soliz had told her that he shot Weatherly and also provided an in-court demonstration of how he claimed to have done so.  (44 RR at 196-98.)

41

Furthermore, trial counsel's failure to impeach Estrada left the jury with the incorrect belief that the testimony was in fact consistent with what she told the State in her October 28, 2010, interview.  (Id. at 212.)  Had trial counsel impeached Estrada with these inconsistencies, it would have discredited her otherwise damaging testimony.

**III.   CLAIM THREE: TRIAL COUNSEL WERE INEFFECTIVE UNDER THE 6TH AMENDMENT FOR FAILING TO OBJECT TO HEARSAY TESTIMONY OF STATEMENTS MADE BY SOLIZ'S CO-DEFENDANTS IN VIOLATION OF THE CONFRONTATION CLAUSE (RAISED AS CLAIM THREE OF THE STATE WRIT)**

**Exhaustion:**

**The State District Court resolved Soliz's Claim Three as follows:**

Applicant fails to show deficient performance or harm concerning defense counsel's failure to object in guilt/innocence to testimony from Detective Danny Paine on the grounds that information he received from co-defendant Jose Ramos (during Paine's July 30, 2010 interview of Ramos) linking Applicant to the underlying offense violated the Confrontation Clause of the Sixth Amendment and constituted impermissible hearsay.  Concerning the Confrontation Clause, it does not apply to the use of testimonial statements     for purposes other than the truth of the matter asserted.  Here, the purpose of Detective Paine's testimony was to establish why he sent Detectives Pate and Cedillo to Haskell Street in Fort Worth to look for a parked, green Toyota pickup truck.  Thus, because the testimony did not offend the Confrontation Clause, defense counsel's performance was not deficient under the first prong in Strickland in not lodging an objection on this basis.  As for defense counsel's failure to object to Detective Paine's testimony on impermissible hearsay grounds, such an objection, although technically correct in the academic sense, would not have affected the outcome of the case under the second

prong of *Strickland*. Such objections are routinely made at trial and merely result (after the objection is sustained) in the proponent of the achieving its objective by rephrasing the question in a more proper form.   Therefore, defense counsel was not ineffective as alleged in Ground of Review Number Three.

FFCL, p. 23-24.

**ISSUE RESTATED:** Soliz's core contention is that no reasonable juris could countenance the state district judge's conclusion because the evidential impact of Paine's testimony went far beyond the mere non-hearsay purpose (to wit, why officers took a certain action) ascribed by the district court. The trial court's finding that these actions by trial counsel were reasonable and based upon sound strategy was the product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of *Strickland*.

### A. Testimonial Hearsay Statements During Detective Paine's Testimony

During the guilt/innocence phase of trial, the State called to the stand Fort

Worth Police Department Detective William Paine, who had interrogated both

Soliz and his codefendant, Ramos, following their arrests.  During direct

examination of Detective Paine, the State elicited the following testimony

regarding Detective Paine's custodial interview of Ramos:

> During an interview with Jose Ramos, I was reviewing the offenses that we have listed here with him, and I had the individual reports that I was going over and just determining was he being—was he involved in this offense, was he involved in that offense, because he had already mentioned that he had been involved in at least one of them. So I wanted to find out, okay, was he involved in any of the other ones.
>
> As I was going through the reports, Jose Ramos would tell me, no, I wasn't there, or yes, I was there, this is what I did.  I came to a specific report, which is the one at 6:40 p.m. on the twenty—yes, on

the 24th, I'm sorry, which involved the—a truck being taken, and I believe that was on East Belknap, the 3400 block of East Belknap. I asked Ramos if he was involved when that truck was taken. And he responded yes. And he also indicated that it was wrong that—how it ended, it didn't have to end that way.

I was reviewing the report, which was not assigned to me, but I was reviewing the details of the report, and I didn't see that anything had actually—nobody was hurt. And I said, okay, I said, so you were there, what happened.

(41 RR at 26-27).

At this point, trial counsel objected to the narrative response, and the trial court sustained the objection. (41 RR at 27.) Detective Paine's testimony continued:

Q.     (By prosecutor) Let me ask you a question. The truck that was stolen in the Jorge Contreras case, what color was that truck?

A.     Green.

Q.     And what kind of truck was that?

A.     I believe it was a Dodge.

Q.     Okay. So it's a green Dodge. And to your knowledge, was anyone shot or killed in that offense?

A.     No.

Q.     Okay. And so did it kind of pique your interest when Ramos is talking about how something ended badly?

A.     It actually began to confuse me and wasn't really sure what he was talking about.

Q.     Okay. And at some point in your conversation, not just with him but in your whole investigation of this case, did you come to find out that there was another green truck that was intermingled in this?

A.     Yes.

Q.     Okay. And what kind of truck was that?

44

A.     I believe it was a Tundra.

Q.     Okay.  And whenever you know that there is another truck and you get some information about a crime, what do you do to try to find that truck and figure out what that's about?

A.     In this case, I just began asking him to tell me, okay, you know, I guess I'm confused, why don't you just tell me what you're talking about, tell me what happened.  And at that point, he began talking about a truck and indicated that it was parked on Hutchins.

Q.     And so you're trying to ask about a robbery of a green truck involving a person by the name of Jorge Contreras, and he's going on about a different green truck?

A.     Yes.  He indicated that he thought we were talking about the same truck, but he kept saying "she".  He kept referring to a female, which looking at the report, there were no females listed in the report. So again, that raised my interest to think he was talking about a crime maybe that we didn't know about.

Q.     And at that point you would have known that there's a crime you didn't know about involving a separate truck and that one had ended badly?

A.     Yes.

Q.     Okay.  And so did you make it a point to find out as much as you could about that situation?

A.     Yes.  I began asking Jose Ramos to tell me where the vehicle was located, how they obtained it, how he came in contact with it, what he did with it.

Q.     Okay.  And were you able to find where the vehicle had been left?

A.     I was not.  I instructed Detective Pate and Detective Cedillo—I provided them with the information that I obtained during the interview.  They were ultimately able to locate the vehicle based on those directions.

Q.     And you said something about Hutchins Street?

A.     Yes.

Q.     Is that information that you learned that would be a good place to look for this vehicle?

45

A.     Yes.  Ramos had indicated that that was the last known location
of the vehicle to him.

(Id. at 27-30.)

## B. Trial Counsel Performed Ineffectively by Failing to Object

The Supreme Court has recognized that "the right to counsel is the right to

the effective assistance of counsel." *Strickland*, 466 U.S. at 686.  To prevail on a

claim of ineffective assistance of counsel, an applicant must show that trial counsel

performed deficiently and that the deficient performance prejudiced him.  *Id*. at

687.  In order to show ineffective assistance for failure to object, an applicant must

show a reasonable probability that the objection would have been sustained.  *Id*. At

694 ("A reasonable probability is a probability sufficient to undermine confidence

in the outcome.").

### 1.     Trial Counsel's Failure to Object Constituted Deficient Performance

Trial counsel performed deficiently by failing to object to Detective Paine's

testimony regarding testimonial statements made by Soliz's codefendant, Jose

Ramos.  This testimony was not only inadmissible hearsay under Texas Rule of

Evidence 802, but it also violated Soliz's right to confrontation under the Sixth

Amendment.  The Sixth Amendment's Confrontation Clause guarantees criminal

defendants "the right . . . to be confronted with the witnesses against him."  U.S.

Const. amend. VI.  In *Crawford v. Washington*, the Supreme Court held that

testimonial out-of-court statements are inadmissible under the Confrontation

46

Clause unless the witness is unavailable and the defendant had a prior opportunity

for cross-examination.  541 U.S. 36, 68 (2004).  In defining what constitutes a

testimonial statement, the Court held that "[s]tatements taken by police officers in

the course of interrogations are also testimonial under even a narrow standard."

*Crawford*, 541 U.S. at 52.

Codefendant Ramos's statements were thus clearly testimonial.  Because

there was no showing that Ramos was unavailable and Soliz had no prior

opportunity to cross-examine Ramos regarding the statements he made to

Detective Paine, this testimony violated Soliz's right to confrontation under

clearly-established law.

Had trial counsel objected to Detective Paine's testimony either on hearsay

or Confrontation Clause grounds, the trial court would have erred in overruling the

objection.  Because there is a reasonable probability that the  objection would have

been sustained, trial counsel's failure to object constituted deficient performance.

*Strickland*, 466 U.S. at 694.  Trial counsel's only objection during this testimony

was to the narrative response, not to hearsay or violation of the Confrontation

Clause.  This objection did not preserve the Constitutional issue, nor did it lead to a

jury instruction to disregard the statements, and the objectionable testimony

continued unchecked after the objection.  Trial counsel's failure to object on

hearsay or Confrontation Clause grounds was objectively unreasonable and constituted deficient performance.

### 2.  Trial Counsel's Performance Prejudiced Soliz

Trial counsel's failure to object to the testimonial out-of-court statements of Soliz's codefendant Ramos prejudiced Soliz.  It is clear under *Crawford* that the statements of accomplices are normally particularly harmful.  541 U.S. at 59 (citing *Lee v. Illinois*, 476 U.S. 530 (1986).  Evidence of Ramos's out-of-court statements was highly prejudicial under *Strickland* because they provided the first link by which investigators were able to tie Soliz to the charged offense. Furthermore, Ramos's statement "that it was wrong that—how it ended, it didn't have to end that way" implied that it was Soliz, not Ramos, who had shot Weatherly—a central fact issue at both the guilt/innocence and punishment phases of trial.  Additionally, Soliz's inability to cross-examine Ramos was particularly damaging given the fact that Ramos was an accomplice to the charged offense and had arranged a plea deal with prosecutors based on his cooperation, and his statements were therefore unreliable.  For these reasons, there is a reasonable probability that Ramos's testimonial out-of-court statements contributed to the jury's verdict of guilt.  Because trial counsel's deficient performance prejudiced Soliz, no reasonable jurist can countenance the state district court's logic in rejecting this claim. The trial court's finding that these actions by trial counsel

were reasonable and based upon sound strategy was the product of an unreasonable

analysis of the facts of this cause and how those facts apply against the backdrop of

*Strickland*.

**IV.   CLAIM FOUR: APPELLATE COUNSEL WAS INEFFECTIVE UNDER THE 6TH AMENDMENT FOR FAILING TO RAISE ON DIRECT APPEAL THE DENIAL OF SOLIZ'S RIGHT TO CROSS-EXAMINE ON BIAS (RAISED AS CLAIM FOUR IN THE STATE WRIT)**

**Exhaustion:**

**The State District Court resolved Soliz's Claim Four as follows:**

Applicant fails to show deficient performance or harm concerning appellate counsel's failure to raise the issue of whether the trial court erred in denying defense counsel's request to cross-examine Detective Paine (under TEX. R. EVID. 806) concerning the speculation of potential bias that Jose Ramos may have had in the giving of his voluntary statement to Paine on June 30, 2010 (i.e., that Ramos entered into a plea-bargain agreement with the prosecution almost two years after   Ramos's statement to Paine).   First, because there was no evidence introduced that Paine  was  aware  of  the  plea  bargain agreement eventually reached between Ramos and the State, Paine could not testify concerning this matter under TEX. R. EVID. 602 because he lacked personal knowledge.   Secondly, the existence of the plea-bargain lacked relevance because it occurred nearly two years after Ramos's June 30, 2010 voluntary statement and therefore, it had no bearing on the truthfulness of the statement or his credibility at the time that he made it.   Therefore, appellate counsel was not ineffective for failing to raise this issue on direct appeal.

FFCL, at p. 24.

**ISSUE RESTATED:** During the guilt phase of Soliz's trial, Fort Worth Police Department Detective William Paine testified to out-of-court statements made by Soliz's codefendant, Jose Ramos. Trial counsel requested permission of the court to cross-examine Detective Paine on the issue of Ramos's bias, as provided under Texas Rule of Evidence 806. The trial court denied the request. Although the trial court's ruling was erroneous under clearly-established law, appellate counsel failed to raise this properly-preserved issue on direct appeal. Appellate counsel's failure constituted deficient performance and prejudiced Soliz in violation of his rights under the state and federal Constitutions, applicable state law, and United States Supreme Court and state case law. The trial court's finding that these actions by appellate counsel were reasonable and based upon sound strategy was the product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of *Strickland*. For these reasons, Soliz's conviction should be overturned.

### A.    Denial of the Request to Cross-Examine on Bias

On direct examination, Detective Paine testified extensively to statements made by Soliz's codefendant Ramos during custodial interrogation. (41 RR at 26-30.) While Detective Paine was on the stand, trial counsel asked permission of the court to cross-examine Detective Paine under Texas Rule of Evidence 806 as to Ramos's bias based on the plea agreement he had reached with the State. (42 RR at 5.) The trial court denied the request. (*Id.* at 11.)

### B.    Appellate Counsel Performed Ineffectively by Failing to Raise the Issue in His Brief

The standard for determining ineffective assistance of appellate counsel is the same as that announced in *Strickland*: a showing that counsel's performance was objectively unreasonable and that counsel's performance prejudiced the applicant. *Robbins*, 528 U.S. at 285. To show that appellate counsel's

performance was objectively unreasonable, the applicant must demonstrate that

counsel failed to discover and raise a nonfrivolous issue on appeal.  *Id.*  To

demonstrate prejudice on a claim of ineffective assistance of appellate counsel, an

applicant must show a reasonable probability that, but for counsel's failure to raise

the issue, he would have prevailed on appeal. *Robbins*, 528 U.S. at 285.

### 1.      Appellate Counsel Rendered Deficient Performance

Appellate counsel performed unreasonably by failing to raise on direct

appeal the issue of the denial of Soliz's request to cross-examine Detective Paine

as to Ramos's bias.  (*See* Ex. 14 [Opening Brief Table of Contents].)  In Texas,

"[w]hen a hearsay statement . . . has been admitted in evidence, the credibility of

the declarant may be attacked, and if attacked may be supported by any evidence

which would be admissible for those purposes if declarant had testified as a

witness." TEX. R. EVID. 806.  Had Ramos himself testified, Soliz certainly would

have been permitted to attack his credibility by showing bias.  "Proof of bias is

almost always relevant because the jury, as finder of fact and weigher of

credibility, has historically been entitled to assess all evidence which might bear on

the accuracy and truth of a witness' testimony." *United States v. Abel*, 469 U.S.

45, 52 (1984).  Evidence that the declarant is facing criminal charges is particularly

probative of bias. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (finding

that the trial court's ruling prohibiting defendant's cross-examination of a witness

on his possible bias as a result of the State's dismissal of pending criminal charges

violated the defendant's rights under the Confrontation Clause).  Soliz was thus

entitled under clearly-established law to cross-examine Detective Paine as to

Ramos's bias based on the plea agreement that he reached with the State.  Trial

counsel's request to cross-examine Detective Paine accordingly preserved the issue

for appeal.  Appellate counsel rendered deficient performance by failing to raise

this issue on direct appeal.

### 2.  Appellate Counsel's Performance Prejudiced Soliz

Appellate counsel's failure to raise this issue on direct appeal prejudiced

Soliz.  Soliz's inability to cross-examine Detective Paine regarding Ramos's bias

harmed his case and constituted reversible error.  Detective Paine's testimony to

Ramos's out-of-court statements was highly prejudicial because it provided the

link by which investigators were able to tie Soliz to the charged offense.

Furthermore, Ramos's statement "that it was wrong that—how it ended, it didn't

have to end that way" implied that it was Soliz, not Ramos, who had shot

Weatherly—a central fact at issue in both the guilt/innocence and punishment

phases of trial.  (41 RR at 27.)  The trial court's denial of Soliz's request to cross-

examine on the issue of bias prevented Soliz from introducing evidence that

Ramos had arranged a plea deal with the State and that his statements were

therefore unreliable.  There is a reasonable probability that, but for appellate

counsel's failure to raise this issue, Soliz's conviction would have been overturned on appeal.  Because appellate counsel's deficient performance prejudiced Soliz, no reasonable jurist could countenance the state district court's conclusion.

**V.    CLAIM FIVE: TRIAL COUNSEL WERE INEFFECTIVE UNDER THE 6TH AMENDMENT BY FAILING TO OBJECT TO GANG EVIDENCE AT THE GUILT/INNOCENCE PHASE OF SOLIZ'S TRIAL (RAISED AS CLAIM FIVE IN THE STATE WRIT)**

**Exhaustion:**

**The State District Court resolved Soliz's Claim Five as follows:**

Applicant fails to show deficient performance or harm concerning defense counsel's  failure to object in guilt/innocence to evidence that he was associated with a gang on the grounds that the that the evidence was not relevant to Nancy Weastherly. First, Applicant's association with Fort Worth Street gangs was relevant under Rule 401 because it was through his gang name "Kilo" that he was identified by police as a suspect in the rash of criminal activity in Fort Worth. Secondly, Applicant's gang activity had relevance in that it was through the environment of gang life that he was raised, his character was formed, and where he met Jose Ramos.  Together, Applicant and Ramos would commit the rash of criminal offenses in Fort Worth that would ultimately result in 1) Nancy Weatherly's death (i.e., the Hi Point 9mm  gun that killed Weatherly was taken by Applicant and Ramos in their June 22, 2010 burglary of Vincent Cercilli's Fort Worth habitation) and 2) the discovery of her murder (i.e., an unintended consequence of Fort Worth law enforcement's investigation into the crimes committed by Applicant and Ramos in that city.  Finally, evidence of Applicant's association with gangs had relevance in that it supported  defense  counsel's  overarching  theme (i.e., that Fetal Alcohol Syndrome,     the lack of parental supervision, and the influence of the gang environment explained Applicant's criminal behavior and reduced his moral blameworthiness).  As such, defense counsel was not ineffective for failing to lodge an objection to this testimony.

FFCL, at p. 26-27.

**ISSUE RESTATED:** No reasonable jurist could countenance the district judge's conclusion, because there was no evidence that Nancy Weatherly's murder was a gang-related offense.  Hence. this evidence bore no relevance to Soliz's guilt of the charged offense and was, therefore, inadmissible.  In fact, Soliz and his codefendant, Jose Ramos, were in different gangs, and not acting to further the interests of either gang.  In other words, the district court's legal conclusion was predicated on plainly erroneous facts. The trial court's finding that these actions by trial counsel were reasonable and based upon sound strategy was the product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of *Strickland*.

### A.    Gang Evidence Presented at the Guilt/Innocence Phase

During the guilt/innocence phase of Soliz's trial, the state called Jesus Alaniz, a Fort Worth police officer, to the stand.  Alaniz testified that he had located the stolen Dodge Stratus in which Soliz was ultimately arrested and that he made the traffic stop of the Jeep Liberty that was traveling with the Stratus and in which Soliz's codefendant, Jose Ramos, was a passenger.  (39 RR at 65, 68, 70.) However, Alaniz's testimony went far beyond the circumstances of Soliz and Ramos being located and arrested.  Alaniz testified generally about street gangs in north Fort Worth, which he described as "predominantly Hispanic," as well as about "Hispanic-based" gangs in the prison system.  (*Id.* at 44-45.)  Alaniz testified that he found Soliz's name by searching the department's Gang Intelligence files.  (*Id.* at 55.)  He testified that, through searching the Gang Intelligence files, he

discovered that Soliz was a member of the Varrio North Side and Texas Syndicate gangs and that Texas Syndicate is a Texas Department of Corrections prison gang. (*Id.* at 63, 75-76.)

The State then introduced into evidence photographs of Soliz's tattoos.  (*Id.* at 78.)  Rather than object to the photographs, trial counsel stipulated to them.  (*Id.*) Alaniz testified that Soliz's tattoos indicated affiliation with the Varrio North Side and Texas Syndicate gangs.  (*Id.* at 80-82.)  He further testified that the tattoo indicating Texas Syndicate affiliation appeared to be filled in; that someone would fill in a gang tattoo in order to cease affiliation with that gang; and that having ceased gang affiliation would change someone's classification in prison.  (*Id.* at 82.)  Alaniz then described a tattoo of a smiling face and a frowning face that says "live now, die later," often seen on known gang members.  (*Id.* at 83-84.)  Alaniz explained that the significance of this tattoo is that "you're laughing about what's going on right now and enjoying what you're doing now but you're gonna end up paying the penalty and crying later."  (*Id.* at 84.)

On redirect examination, Alaniz further agreed that if there are 700,000 people and only 3,000 gang members in the Fort Worth area, "that means 667,000 [sic] people in Fort Worth chose not to be in a gang."  (39 RR at 113.)  He also testified that he himself grew up on the north side of Fort Worth and that there

were gang members in his school and in his neighborhood, but he chose not to be in a gang. (*Id.* at 113-15.)

The State also elicited the following testimony on redirect:

> Q.     Okay.  And are there certain offenses that are actually enhanced or taken to a higher grade because of someone's gang membership?
>
> A.     That's correct.     That's an enhancement of engaging in organized crime.
>
> Q.     So the law in the State of Texas doesn't see gang membership as an excuse; it sees it as something to make punishment worse.  Is that correct?
>
> A.     That's correct.

(39 RR at 116.)

Trial counsel did not make a single objection during Alaniz's testimony.

## B.     Counsel Performed Ineffectively by Failing to Object to Gang Evidence at the Guilt/Innocence Phase of Soliz's Trial

The Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel." *Strickland*, 466 U.S. at 686 (quoting *McMann v. Richards*, 397 U.S. 759, 771, n.14 (1970)).  To prevail on a claim of ineffective assistance of counsel, an applicant must show that trial counsel performed deficiently and that the deficient performance prejudiced him.  *Id.* at 687.

### 1.     Trial Counsel Performed Deficiently by Failing to Object

Trial counsel performed deficiently by failing to object to evidence of Soliz's gang affiliation at the guilt/innocence stage of Soliz's trial.  Evidence of Soliz's alleged gang affiliation was inadmissible under Rules 402 and 404 of the

Texas Rules of Evidence.  *See* TEX. R. EVID. 402 ("Evidence which is not relevant is inadmissible."); TEX. R. EVID. 404 (a), (b) ("Evidence of a person's character or character trait is not admissible for the purpose of proving action in conformity therewith . . . .  Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.").  Texas courts have held that, under limited circumstances, evidence of gang affiliation may nevertheless be admissible.  "Gang membership evidence is admissible under Rule 404(b) (and Rule 402) if it is relevant to show a non-character purpose that in turn tends to show commission of the crime."  *Ortiz v. State*, 93 S.W.3d 79, 94 (Tex. Crim. App. 2002); *see also Vasquez v. State*, 67 S.W.3d 229, 239 (Tex. Crim. App. 2002) ("gang-affiliation is relevant to show a motive for a gang-related crime").  In this case, the State introduced evidence of gang simply as an attempt to connect Soliz to gangs and bad character, and there is ample state and federal caselaw barring such evidence.  *See, e.g., United States v. Hamilton*, 723 F.3d 542 (5th Cir. 2013) and *Pondexter v. State*, 942 S.W.2d 577, 584 (Tex. Crim. App. 1996).

Rather than objecting to the inadmissible gang-affiliation evidence, trial counsel merely attempted to minimize the damage of Alaniz's testimony through cross-examination.  For instance, trial counsel elicited from Alaniz that gangs prey upon young, vulnerable people and that certain risk factors may lead a young

person to join a gang, such as a lack of a father or mother, an older brother who is in a gang, childhood neglect, and the fact that the person is looking to form an attachment due to lack of attachment at home.  (39 RR at 89-90.)  Rather than simply trying to do damage control, trial counsel should have objected in order to exclude this testimony altogether.  The evidence of Soliz's alleged gang membership was both inadmissible and highly prejudicial.  Trial counsel could have had no reasonable strategy for failing to object to this evidence. This failure thus constituted deficient performance.

## 2.    Trial Counsel's Performance Prejudiced Soliz

Trial counsel's failure to object to inadmissible gang-membership evidence prejudiced Soliz.  Trial counsel's omission allowed the jury to view Soliz as a dangerous gang member and to presume that he acted in conformity with his bad character by killing Nancy Weatherly.  This is precisely the type of harm that Rule 404 is intended to avoid.  *See* TEX. R. EVID. 404; *Hamilton*, 723 F.3d at 546. Alaniz's testimony about his own upbringing in north Fort Worth and how he himself had chosen not to join a gang served only to demonstrate Soliz's moral blameworthiness in allegedly joining a gang—testimony that may be appropriate for the punishment phase, but not the guilt/innocence phase of trial. And Alaniz's testimony regarding enhanced sentencing for gang members and the implications of gang membership for classification in the Texas prison system sent to the jury

58

the message that Soliz's guilt was a foregone conclusion.  In fact, the State's case rested substantially on an unreliable confession and the testimony of a witness of questionable credibility.  The gang-membership evidence was thus highly prejudicial to Soliz's case at the guilt/innocence phase of trial.  Because trial counsel's deficient performance prejudiced Soliz under both prongs of Strickland, this Court cannot countenance the state district court's conclusion to the contrary.

**VI.  CLAIM SIX: TRIAL COUNSEL WERE INEFFECTIVE UNDER THE 6TH AMENDMENT FOR FAILING TO EXCLUDE EVIDENCE OF EXTRANEOUS OFFENSES INTRODUCED DURING THE GUILT/INNOCENCE PHASE OF THE TRIAL (RAISED AS CLAIM SIX IN THE STATE WRIT)**

**Exhaustion:**

**The State District Court resolved Soliz's Claim Six as follows:**

**Applicant fails to show deficient performance or harm concerning defense counsel's failure in guilt/innocence to exclude extraneous-offenses evidence (i.e., evidence concerning various other crimes that Applicant had committed in Tarrant County within an eight-day period just prior to Nancy Weatherly's murder.)  First, this evidence was admissible as an exception to Rule 404(b)'s prohibition against propensity evidence (i.e., same-transaction-contextual evidence) in that it was so interwoven with evidence of the underlying offense  that the underlying offense  that the underlying offense could not have been explained without a discussion of the evidence of these extraneous offenses. As  such, defense counsel was not deficient in failing to object to this evidence on Rule 404(b) grounds.  Secondly, evidence of these extraneous offenses served to underscore  defense  counsel's major mitigation point (i.e., that the effects of Fetal Alcohol Spectrum Disorder and the lack of parental supervision had a devastating effect  on  Applicant's  physical,  mental,  and**

**psychological development and, as such, reduced his moral blameworthiness). Consequently, defense counsel's decision to not challenge the extraneous-offense evidence was plausible trial strategy and, as such, did not constitute ineffective assistance of counsel under *Strickland*.**

FFCL, at 27-28.

**ISSUE RESTATED**: Soliz's core argument is that no reasonable jurist could countenance the district court's conclusion because extraneous offenses bore no relevance to the question of Soliz's guilt of the charged offense and allowed the jury to base its verdict on Soliz's perceived propensity to commit violent crimes. The trial court's finding that these actions by trial counsel were reasonable and based upon sound strategy was the product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of *Strickland*.

### A.    Introduction of Extraneous Offense Evidence at the Guilt Stage

The jury first became aware of extraneous offenses allegedly committed by Soliz through the jury questionnaire.  In a section entitled "Knowledge About the Case," the questionnaire informed potential jurors that Soliz "is accused of having participated with Jose Clemente Ramos in a six day crime spree beginning in Tarrant County and ending with the alleged capital murder of Nancy Weatherly . . . ."  (Ex. 18 [Excerpt From Blank Questionnaire].)  Trial counsel agreed to this framing without objection.  (5 RR at 14.)  Thus, the jury panel was made aware of the extraneous offenses before even being called for individual questioning.

Prior to the trial beginning, trial counsel stipulated that three offenses would be admissible as same-transaction contextual evidence:  the burglary of the Circelli home, the theft of Sammy Abu-Lughod's car, and Soliz evading arrest on the night

of his arrest.  (38 RR at 12-13.)  However, over the course of the proceedings trial

counsel opened the door to a significant number of additional extraneous offenses.

During opening argument at the guilt/innocence phase of trial, trial counsel

told the jury that Soliz "went on a crime spree."  (38 RR at 42.)

> Not just Nancy Weatherly; he went on a crime spree, folks.  Ruben
> Martinez, Fort Worth,    shot and killed, June 29th, 2010.   Others
> robbed, homes burglarized.  Others shot at.  Others shot.  He and Jose
> Ramos, his cohort, his partner in crime, rummaging through the
> streets of Tarrant County, and unfortunately came down to Johnson
> County.

(*Id*. at 42-43.)

Early on in its case-in-chief, the State called to the stand Sammy Abu-

Lughod.  (38 RR at 201.)  Abu-Lughod testified that on June 24, 2010, he stopped

at the Discount Food Store to make a purchase.  (*Id*. at 208-09.)  He stated that as

he was leaving the parking lot, a man approached the driver side window and

asked for fifty or sixty dollars.  (Id. at 210-13.)  Abu-Lughod identified Soliz as the

man who approached his car.  (Id. at 213.)  Abu-Lughod testified that when he

refused, Soliz pointed a gun in his face and demanded his wallet and his car.  (Id.

at 213-14.)  He testified that he got out of his car and dropped his wallet on the

ground; Soliz then picked up the wallet, got in the car, and drove away.  (Id. at

216.)

The State also called Forth Worth Police Department police officer Jerry Cedillo to testify.  (38 RR at 253.)  Officer Cedillo described responding to the scene of the shooting of Ruben Martinez and going to the hospital to see another robbery victim, Enrique Samaniego.  (Id. at 254-55.)  Officer Cedillo stated that when he first went to see Samaniego in the hospital, he was unable to speak because he had a tracheostomy tube in his throat.  (*Id*. at 255-56.)

On cross-examination, trial counsel elicited information about several extraneous offenses: the robbery of Justin Morris at Ridgmar Mall, the shooting of Luis Luna, the car-jacking of Jorge Contreras, the car-jacking of Sammy Abu-Lughod, the shooting of Enrique Samaniego, the attempted robbery of Kenny Dodgin at Lowe's, a drive-by shooting of a home, and a robbery at a parking lot of a bar.  (39 RR at 15-24).  With the exception of the car-jacking of Sammy Abu-Lughod, these events were not included in the pre-trial agreement with the State.  Trial counsel asked:

> For the most part, in each of these cases we have the participation of suspect of [sic] Mark Anthony Soliz and Jose Clemente Ramos; is that correct?  And it may not be in each and every one, but for the most part is what I'm saying.  He was—I know this is the    exception. Soliz and the others. Am I correct, Detective?
>
> A.   For the most part, yes, sir.
>
> *    *    *

> Q.    Okay.  And so we have, in essence, from the 24th to the—all the way to the 29th, seven or eight—counting right, eight separate alleged offenses; is that correct, sir?
>
> A.    Yes, sir.

(*Id*. at 19, 21.)

After trial counsel had opened the door to these offense, the State began submitting additional evidence regarding them.   On redirect, Officer Cedillo described these extraneous offenses in more detail.  Regarding the shooting of Luis Luna, Officer Cedillo testified as follows:

> A.    Mr. Soliz asked the other individual that was with him if he wanted to get Mr. Luna wet, which from street terms that means wet with blood.  At that time, Mr. Luna was shot.
>
> Q.    And who is alleged to have shot Mr. Luna?
>
> A.    Mr. Soliz.

(39 RR at 28-29.)

Regarding the robbery that took place outside of a bar, Officer Cedillo testified:

> A.    My knowledge of this is that there was [sic] two couples, two males/females were outside of a bar.  It was closing time.  Two Hispanic males approached them,      demanded money.  One point, one of the suspects pistol-whipped one of the males and took their wallet which contained U.S. currency.
>
> Q.    Were both, both Ramos and Soliz involved or allegedly involved in this one?
>
> A.    I believe so, yes, sir.

(*Id*. at 30-31.)

Regarding the shooting of Enrique Samaniego, Officer Cedillo testified that he was "shot in the chest, stomach, torso area" and that both Soliz and Ramos were tied to the case. (*Id.* at 31.)  Officer Cedillo also testified that the shooting of Ruben Martinez was a capital murder case and that while Ramos was "in the area" at the time of the shooting, Soliz was alleged to have been the shooter. (Id. at 32-33.)

Officer Cedillo then described the attempted robbery of Kenny Dodgin at Lowe's.  He testified that Dodgin was approached by a Hispanic male armed with a handgun, who demanded his wallet and money. (39 RR at 33.)  Dodgin ran away and was fired upon multiple times. (Id.)  Officer Cedillo testified that Ramos was "in the vehicle," but Soliz was believed to have been the shooter. (Id.)  Officer Cedillo additionally testified to two home burglaries in Benbrook, Texas. (Id. at 34.)  Officer Cedillo testified that, in total, there were thirteen separate events. (Id.)  The State then introduced into evidence a timeline of the crimes as a demonstrative aid. (Id. at 35-36.)

The State called several additional witnesses to testify to the extraneous offenses.  The State called Robert Presney, a police officer in the Fort Worth Police Department Crime Scene Unit. (39 RR at 240-42.)  Officer Presney testified that he reported to the scene of Jose Contreras's vehicle when it was recovered and identified photographs of the vehicle, which were introduced into

evidence.  (*Id*. at 248-54.)  He testified that he also responded to the house where the drive-by shooting occurred and identified projectiles he recovered from the scene, which were also admitted into evidence.  (*Id*. at 256-62.)  Officer Presney also testified that he responded to the scene of the attempted robbery of Kenny Dodgin.  (40 RR at 26-27.)  He identified shell casings he recovered from the scene and photographs he took, which were introduced into evidence.  (*Id*. at 27-30.)  He also testified that he was called to conduct gunshot residue tests on the Dodge Stratus in which Soliz had been arrested.  (Id. at 30-31.)  The State noted that "we've already heard testimony regarding Sammy Abu-Lughod that that vehicle was taken from at gunpoint."  (*Id*. at 31.)  Officer Presney identified the "dobbers" from the gunshot residue tests, which were offered and admitted into evidence.  (*Id*. at 32-38.)  He testified that he also worked on the capital murder case of Ruben Martinez and identified clothing that he collected from Soliz and his codefendant, Jose Ramos, in that case, which was introduced into evidence.  (*Id*. at 39-47.)

The State next called Jim Varnon, also a police officer in the Fort Worth Police Department Crime Scene Unit.  (40 RR at 69-70.)  Varnon testified that he responded to the scene of the attempted robbery of Enrique Samaniego.  (*Id*. at 72-73.)  Varnon testified that he located shell casings in the driveway, bloodstains on the front porch, bullet holes in the front of the house, and a fired bullet near the

front door.   (*Id*. at 74.)   He identified photographs of the scene, including photographs of the front porch with a blood stain on it and of a bloodstained T-shirt and wallet, which were admitted into evidence.  (*Id*. at 75-79.)

Next, the State called Fort Worth Police Department Detective William Paine to the stand.  (40 RR at 143-44.)   Detective Paine testified that over the course of Soliz's crime spree, there were nine different Fort Worth Police Department case numbers associated with him. (Id. at 165.)   Detective Paine testified that the other cases included the shootings of Enrique Samaniego and Ruben Martinez, the aggravated robbery of Kenny Dodgin, the drive-by shooting, the car-jacking of Sammy Abu-Lughod, and the shooting of Luis Luna.  (*Id*. at 167-80.)   He also testified that Soliz was involved in two burglaries in Benbrook and the robbery of Justin Morris.  (41 RR at 6-7.)   The State had Detective Paine read to the jury Soliz's first written statement, in which he admitted to his participation in the carjacking of Sammy Abu-Lughod, the carjacking of Jorge Conteras, the shooting of Luis Luna, the robbery of Justin Morris at Ridgmar Mall, the robbery in the parking lot of the bar, the shooting of Ruben Martinez, and the attempted robbery of Kenny Dodgin at Lowe's.  (42 RR at 13-23.)

The State also called Jennifer Nollkamper, a forensic scientist with the Fort Worth Police Department crime lab, to testify.  (42 RR at 99.)  She identified shell

casings and projectiles from the drive-by shooting, the attempted robbery at Lowe's, and the Enrique Samaniego shooting.  (*Id*. at 117-20.)

State's witness Elizabeth Estrada testified that Soliz told her that he and Ramos had shot Ruben Martinez.  (44 RR at 190-92.)  She also testified that Soliz told her he "kicked some doors" and did a drive-by shooting on Pearl Street.  (*Id*. at 93-94.)

The State also called Lannie Emanuel, a firearm and tool marks examiner.  (45 RR at 124-25.)  He testified that the casings from the drive-by shooting, the Enrique Samaniego shooting, and the attempted robbery of Kenny Dodgin matched the casing recovered from the Nancy Weatherly murder scene.  (*Id*. at 136-39.)  He also testified that a fired bullet from the drive-by shooting matched the fired bullet from the Nancy Weatherly murder scene and that they were fired from the same gun.  (*Id*. at 150-55.)

Next, the State called David Wallace, a police officer with the Benbrook Police Department.  (45 RR at 166.)  Officer Wallace testified that he responded to the scene of a burglary in the early morning of June 29, 2010, in which the front door had been kicked in.  (*Id*. at 167-72.)  Officer Wallace identified photographs of the house following the burglary, which were admitted into evidence.  (*Id*. at 175-76.)

The State then called John Lewallen, a detective with the Benbrook Police Department, who testified that he also responded to the burglary with Officer Wallace and collected evidence from the scene.  (45 RR at 190-98.)

### B.   Trial Counsel's Failure to Exclude Extraneous Offense Evidence Constituted Ineffective Assistance of Counsel

The Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel."  *Strickland*, 466 U.S. at 686.  To prevail on a claim of ineffective assistance of counsel, an applicant must show that trial counsel performed deficiently and that the deficient performance prejudiced him.  *Id.* at 687, 694.

### 1.   Trial Counsel Performed Deficiently by Failing to Exclude Extraneous Offense Evidence

Trial counsel's deficient performance was twofold.  First, they allowed the State to introduce evidence regarding a number of extraneous offenses and did not object.  Second, they introduced additional evidence of extraneous offenses themselves.  Evidence of these extraneous offenses at the guilt phase would have been prohibited under Rules 402, 403, and 404(b) of the Texas Rules of Evidence. See TEX. R. EVID. 402 ("Evidence which is not relevant is inadmissible."); TEX. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."); TEX. R. EVID. 404(b) ("Evidence of other crimes,

wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith."). The evidence of these extraneous offenses bore no relevance to the question of Soliz's guilt for the murder of Nancy Weatherly, but instead was impermissible character evidence. Trial counsel proceeded to compound their error in failing to object to this evidence by affirmatively introducing evidence of other extraneous offenses.

Even if the court were to consider this evidence relevant, it would have to be admissible for some reason other than establishing that Soliz was acting in conformity with his character. *See* TEX. R. EVID. 404(b). One such exception is same-transaction contextual evidence. *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993). Trial counsel operated under the incorrect belief that the extraneous offenses would be admissible as same-transaction contextual evidence. (38 RR at 12-14.) They did not object to the admission of the extraneous offenses based on their reading of *Devoe v. State*, 354 S.W.3d 457 (Tex. Crim. App. 2011). (*Id*. at 13.) However, *Devoe* does not stand for the proposition that offenses committed in close temporal proximity are automatically admissible. Instead, it held that it was "within the zone of reasonable disagreement to find the various offenses to be contextual evidence," and as such it was within the trial court's discretion to exclude or allow the evidence. *Id*. at 470.

There is no reasonable justification for allowing in highly prejudicial, inadmissible evidence of extraneous offenses.  When no reasonable strategy can justify counsel's conduct, counsel's performance falls below an objective standard of reasonableness regardless of what trial counsel's reasons for doing so were. Trial counsel's failure to exclude otherwise inadmissible extraneous offenses thus constituted deficient performance.

### 2.    The Failure to Exclude Extraneous Offense Evidence Prejudiced Soliz

Trial counsel's deficient performance prejudiced Soliz by infecting the guilt/innocence phase of trial with irrelevant and highly prejudicial information. The jury was presented with information that Soliz had gone on a "crime spree" before the trial even began, through the jury questionnaires.

At trial, the extraneous offense evidence was a central part of the evidence presented at the guilt/innocence phase.  The State called numerous witnesses to testify extensively to the extraneous offenses, shifting the jury's focus from the charged offense to Soliz's general propensity for violence.  The State emphasized the extraneous offenses in closing argument, stating that Soliz "embarked on a mission" and "began a crime wave, the likes of which even Fort Worth has never seen before."  (47 RR at 23.)  Specifically, the State discussed the robbery at Ridgmar Mall, the shooting of Luis Luna, the carjacking of Jorge Contreras, the

carjacking of Sammy Abu-Lughod, the drive-by shooting, the killing of Ruben Martinez, the attempted robbery at Lowe's, and the two home burglaries, all of which bore no relevance to the charged offense. (Id. at 30-36.) The evidence of these extraneous offenses would invariably have led the jury to base its verdict on an improper basis. Rather than deciding Soliz's guilt of Nancy Weatherly's murder based on evidence relevant to that crime, the jury was permitted to judge his guilt of the charged offense in the context of an extensive and violent crime spree.

Under *Strickland*, a court views the "totality of the evidence before the judge or jury," keeping in mind that "[s]ome errors [ ] have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture . . . ." 466 U.S. at 695-96. Trial counsel's introduction of evidence of extraneous offenses "alter[ed] the entire evidentiary picture" before the jury. Trial counsel's deficient performance thus prejudiced Soliz. Accordingly, no reasonable jurist can countenance the state district court's conclusion to the contrary.

### VII. CLAIM SEVEN: TRIAL COUNSEL WERE INEFFECTIVE UNDER THE 6TH AMENDMENT FOR FAILING TO OBJECT TO THE STATE'S IMPROPER ARGUMENTS DURING CLOSING STATEMENTS AT THE GUILT/INNOCENCE PHASE (RAISED AS CLAIM SIX SEVEN IN THE STATE WRIT)

**Exhaustion:**

**The State District Court resolved Soliz's Claim Seven as follows:**

**Applicant fails to show deficient performance or harm concerning defense counsel's failure to object in guilt/innocence to comments made by the prosecution in its closing argument on the basis that said comments urged a guilty verdict based on community expectations, argued facts outside the record, and inflamed the jury against Applicant by dehumanizing him.   First, the prosecution's comment to Applicant's crime spree that spilled from Tarrant County into Johnson County, the collaboration between the two counties to investigate and prosecute these crimes, and       why a guilty verdict in the in the underlying case was appropriate was a proper plea for law enforcement in that the prosecution never gave an impression to the jury that the community expects or demands a guilty verdict.   Second, the prosecution's comment, "Stolen cars, and I imagine sadly like girls, get passed around [gang members] like party favors," was both a summation of the evidence presented at trial and a reasonable deduction drawn from the evidence.   Finally, the prosecution's two comments where if referenced Applicant as "that" was a reasonable deduction from the record in that it implied a sentiment (i.e., that Applicant had done a monstrous act) that was supported by evidence adduced at trial.   As such, defense counsel was not ineffective for failing to lodge the aforementioned objections to the complained-of-comments.**

FFCL, at 28-29.

**The State District Court resolved Soliz's Claim Thirteen as follows:**

**Applicant fails to show deficient performance or harm concerning defense counsel's failure to object in punishment to comments made by the prosecution during its closing argument on grounds that the comments indicated that community expectations demanded a sentence of death.   The prosecution's comments to the jury (i.e, that everyone awaits their verdict and that they [the jury] should send a message of deference to the street and prison gang members in Fort Worth that committing a capital offense in Johnson County will not be tolerated and will result in the ultimate sentence) did not state to the jury that the citizens of**

**Johnson County expect, demand, or require the death penalty in this case. Instead, the comments by the prosecution were a proper plea for law enforcement in that they referenced the message that the jury's sentence would send and its deterrent effect. Therefore, defense counsel was not ineffective as alleged in Ground of Review Number Thirteen.**

FFCL, p. 35-36.

Unfortunately, the Prosecutor's closing statements went far beyond reminding the jury that he was "the representative not of an ordinary party to a controversy." Instead, the Prosecutor's closing statements were contaminated with prosecutorial misconduct. Soliz submits that these violations of core precepts are the sum and substance of misapplication of Constitutional law which clears the AEDPA hurdle. As such, no reasonable jurist could countenance the state district court's conclusion to the contrary

### A.     Trial Counsel was Ineffective for Failing to Preserve Error by Making Proper Objections

An ineffective assistance of counsel claim requires a showing that trial counsel's performance was deficient and that the deficiency prejudiced Soliz. *Strickland*, 466 U.S. at 687. To establish deficiency, Soliz must show that his counsel's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. The reasonableness of counsel's performance is measured by the prevailing professional norms at the time of trial as reflected in

American Bar Association standards and the like.  *Strickland*, 466 U.S. at 688.  To establish prejudice, Soliz must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.

Trial counsel has a duty to object to inadmissible evidence or improper argument and establish a record reflecting adverse rulings by the court.  *See ABA Guidelines*, Guideline 10.8, cmt. ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review . . ."); ABA Standards for Criminal Justice*, Defense Function*, 4-7.1(d) ("defense counsel has a duty to have the record reflect adverse rulings").  In order to establish that counsel was ineffective for failure to object, Soliz must show that there is a reasonable probability that the objection would have been sustained.  *Strickland*, 466 U.S. at 694. .  In Texas, proper jury argument is limited to four permissible categories: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement.  *Alejandro v. State*, 493 S.W.2d 230, 231-32 (Tex. Crim. App. 1973). Arguments that go beyond these four categories "too often place before the jury unsworn, and most times believable, testimony of the attorney."  *Id.* at 232.

1.   **Trial Counsel Failed to Object to the State's Call for the Jury to Meet the Expectations of the Community and the Victim's Family During Guilt/Innocence Closing Argument**

During its closing argument at the guilt/innocence phase of Soliz's trial, the

State called on the jury to consider the community's expectations and desires, as

well as those of the victim's family, in reaching its verdict:

> This is a problem for Tarrant County.  This is a problem for Johnson County; a problem for everyone to have something horrific like this happen in both counties. . . . As soon as you're put on that Jury, it becomes your problem as well.  . . .  It's become a problem; this thing is a horrible nightmare for the family and a problem for the entire county and Tarrant County both.  . . .  Because you're on this Jury, it's your problem too.  Because you're Johnson County citizens, it's your problem too.  And the question is going to be, what are you going to do about this problem.  . . .  It's time for some justice for Nancy Weatherly and her family.

(47 RR at 69, 74.)

The State in essence asked the jury to lend its ear to the community and the

victim's family in determining whether to convict Soliz, yet trial counsel failed to

object and preserve the issue for appeal.  *See Cortez v. State*, 683 S.W.2d 419, 421

(Tex. Crim. App. 1984) (finding it improper for the State to "ask[] the jury to lend

its ear to the community").  Jury argument by a prosecuting attorney designed to

induce the jury to convict or assess punishment based on the desires of the

community is "manifestly improper, harmful and prejudicial to the defendant and

will not be countenanced by [the Court of Criminal Appeals]." *Id.* at 420.  In

particular, references to the desires of the community are considered to be outside

the record testimony on the part of the State.  *Id.* at 421 ("arguments [based on the

desires of the community] have been disapproved by this Court because the effect

of the language used was to ask the jury to convict or punish the defendant upon

public sentiment or desire rather than upon the evidence that the jury had

received").  Here, the State identified Soliz as a "problem" to the people of

Johnson and Tarrant Counties and "a horrible nightmare" for the victim's family.

It then called on the jury to solve the problem for the people of those counties and

the victim's family.  Such argument is based on evidence outside the record.

Nevertheless, counsel did not object; hence, the point was not preserved for appeal.

### 2. Trial Counsel Failed to Object to the State Arguing Facts Outside the Record and Engaging in Arguments Calculated to Inflame the Passions or Prejudices of the Jury During Guilt/Innocence Closing Argument

The State also went on to offer outside-the-record testimony that was

intended to inflame the passions and prejudices of the jury during its

guilt/innocence phase closing argument.  First, the State speculated as to Soliz's

and others' treatment of women in the context of attempting to explain why Arturo

Gonzales's DNA was found inside the victim's vehicle.  The State argued, "Stolen

cars, and I imagine sadly like girls, get passed around like party favors."  (47 RR at

33.)  At no point during the trial were Soliz's sexual relationships with women at

issue, nor was it relevant to the capital charge.  However, trial counsel allowed the

76

State to make the argument.  There can be no reasonable trial strategy for allowing the State to argue before the jury that Soliz was a womanizer, especially considering that the victim was female and Soliz's general treatment of women was not actually at issue in the case.  The State's argument could only have been made in an attempt to inflame the minds of the jurors in order to secure a favorable verdict.  Arguments for that purpose are clearly improper and therefore should be objected to by counsel.  *See Jackson v. Johnson*, 194 F.3d 641, 655 (5th Cir. 1999) ("the prosecution may not appeal to the jury's passions and prejudices"); *Turrentine v. State*, 536 S.W.2d 219, 220 (Tex. Crim. App. 1976) (finding that State's exaggeration of amount of marijuana found in defendant's possession was "an attempt to inflame the minds of the jurors" and was reversible error); *see also* ABA Standards for Criminal Justice*, Prosecution Function*, 3-5.8(c) ("The prosecutor should not make arguments calculated to appeal to the prejudices of the jury.").

The State continued to engage in inflammatory argument throughout closing statements.  On two separate occasions, the State attempted to dehumanize Soliz before the jury by referring to him as "that" instead of his given name, "defendant," or "accused."  (47 RR at 72, 74.)  The State described Weatherly's life, including details about her tenure at Lockheed Martin and her relationships with her son, daughter-in-law, and grandchildren.  (*Id.* at 71-72.)  The prosecution

then stated, "The perfect time in [Weatherly's] life, and 'that' killed her for her

TV." (*Id.* at 72.) Shortly thereafter, the State returned to the argument, spending

several lines explaining that Weatherly was not one to fight back in such a

situation. (*Id.* at 74.) Rather, she was one to pray and beg for her life. (*Id.*) The

State rounded out the argument with, "And what she got instead was 'that'

laughing at her and shooting her." (*Id.*) This juxtaposition was clearly intended to

portray Soliz as somehow sub-human, but counsel again failed to object.

Arguments intended to dehumanize the defendant are improperly inflammatory

and do not aid jurors in their task of making a decision based on the evidence

presented. *See Alexander v. State*, 1996 WL 382984, at *4 (Tex. App.—San

Antonio July 10, 1996, pet. ref'd) (unpublished) ("Caustic arguments which de-

humanize an accused do not aid jurors in their task; rather, they discredit a criminal

justice system founded on the basic beliefs that an accused stands before a jury as

an equal peer and that the State's prosecutors seek as their first goal justice, not

convictions at any cost."). Despite the numerous improper and prejudicial

arguments made by the State, trial counsel objected only twice during closing

statements at the guilt/innocence phase of trial. Both objections were in response

to a perceived mischaracterization of the law. (47 RR at 24, 26.) The repeated

calls for the jury to meet the expectations of the community and the victim's

family and the unfounded and inflammatory comments about Soliz, on the other hand, went completely unchecked.

### B.     Soliz was Prejudiced by Counsel's Failure to Object to the State's Improper Guilt/Innocence Phase Jury Arguments

Soliz was prejudiced by counsel's failure to object in two different ways. First, counsel's failure to object and the trial court's failure to intervene allowed the State to repeatedly engage in improper jury argument with impunity. Failure to object to the State's improper argument only encouraged the State to continue to push the boundaries.  Second, the repeated improper arguments during closing statements at the guilt/innocence phase of trial were consistent and pervasive and there is a reasonable probability that they affected the jury's decision.  The State's improper argument inflamed the passions of a jury that could not otherwise be sure who the triggerman was in this case.  Considering the significant infirmities in Soliz's confession and the credibility issues with Elizabeth Estrada's testimony, there is a reasonable probability that, had the State not been able to repeatedly make improper argument to the jury and divert its attention from the true task at hand, the result of the trial would have necessarily been different.  Trial counsel's failure to object constituted deficient performance under the prevailing professional norms at the time of trial and prejudiced Soliz under *Strickland*.  No

reasonable jurist could countenance the state district court's conclusion to the contrary.

**C.   Trial Counsel Failed to Object to the State Calling on the Jury to Meet the Expectations of the Community During Punishment Phase Closing Argument**

**1.   Deficient Performance**

During its closing argument at the punishment phase of trial, the State again improperly encouraged the jury to sentence Soliz to death in order to meet the expectations and desires of the community. Once again, counsel failed to object. In the first instance, the State argued, "This room is full of police officers and citizens and friends and family members who loved Nancy Weatherly, who loved Ruben Martinez , and they await your justice and your verdict." (57 RR at 30.) Later in jury argument, the State went on to tell the jury that "[t]he world is watching." (Id. at 90.) By that point, not only had the jury been reminded that Tarrant and Johnson Counties desired a conviction of Soliz, but also that police officers, members of the victim's family, family members of the victim of an uncharged offense, and "the world" expected a sentence of death. Trial counsel's failure to object to such arguments constituted deficient performance and could not have been based on a reasonable trial strategy.

**2.   Soliz was Prejudiced by Counsel's Failure to Object to the State's Improper Jury Arguments**

Soliz was prejudiced by counsel's failure to object in two different ways. First, counsel's failure to object allowed the State to repeatedly engage in improper jury argument with impunity.  Failure to object to the State's improper argument only encouraged the State to continue to push the boundaries.  Second, the repeated improper arguments during closing statements at both phases of trial were consistent and pervasive and there is a reasonable probability that they impacted the jury's decisions.  At the punishment phase, trial counsel put on an extensive presentation of Soliz's struggles from FASD as well as other mitigating information regarding his troubled childhood.  There is a reasonable probability that had the jury not been called on to meet the expectations of the victim's family, the local police force, and the world at large, the result of the punishment phase would have been different as well.  Trial counsel's failure to object constituted deficient performance under the prevailing professional norms at the time of trial and prejudiced Soliz.  As such, the AEDPA hurdle is cleared because no reasonable jurist could countenance the state district court's conclusion to the contrary.

### VIII. CLAIM EIGHT: APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE IMPROPER ADMISSION OF VICTIM IMPACT EVIDENCE AT THE GUILT/INNOCENCE PHASE (RAISED AS CLAIM EIGHT IN THE STATE WRIT)

**Exhaustion:**

**The State District Court resolved Soliz's Claim Eight as follows:**

Applicant fails to show deficient performance or harm concerning Appellate counsel's failure to raise the issue of whether the trial court erred in guilt/innocence by admitting testimony from Mary Smith and Kila Davis because it allegedly constituted improper victim-impact evidence. First, the issue was not preserved for appellate review in that defense counsel did not raise this complaint at trial. Secondly, the complained-of testimony did not constitute improper victim-impact evidence in that did not speak of the effect that Nancy Weatherly's murder had, and would continue to have, on others. Smith's and Davis's testimony essentially established their qualifications to testify under Rule 602 by noting how and how long they were acquainted with Weatherly and shed light on the circumstances surrounding the underlying offense (describing property that was stolen and giving evidence that indicated Applicant's entry into Weatherly's home was without her consent). Thus, appellate counsel was not ineffective for failing to raise this issue on direct appeal.

FFCL, at 29-30.

**The State District Court resolved Soliz's Claim Ten as follows:**

Applicant fails to show deficient performance or harm concerning defense counsel's failure to object in punishment to testimony of Arnold Dominguez and Lisa Martinez on the ground that their testimony constituted impermissible extraneous-offense evidence and victim-impact evidence. In the punishment phase of a capital offense in which the State seeks the death penalty, evidence may be presented by either the State or the defense as to any matter the court deems relevant to sentencing. Victim-impact evidence may be admissible at the   punishment phase of a criminal trial when that evidence was some bearing on the defendant's personal responsibility and moral culpability. The vast majority of Dominguez's testimony focused on the circumstances surrounding the killing of Ruben Martinez and, as such, was relevant to the issue of mitigation and moral blameworthiness (i.e., Special Issue Number Three) in that it demonstrated that a person like Dominguez, raised in a similar neighborhood as Applicant, can become a productive member of society and

does not necessarily have to turn to a life of crime and violence as
Applicant did. The remainder of Dominguez's testimony offered a small
glimpse into the uniqueness of Martinez's life (establishing that he was a
hard worker and a dedicated family man) and informed the jury of
specific harm caused by Applicant's actions. As such, Dominguez's
testimony was relevant to Special Issue Number Three and the jury's
determination of blameworthiness. Similarly, Lisa Martinez's
testimony was relevant to Special Issue Number Three in that it concentrated
on Applicant's moral blameworthiness (by highlighting the callousness
of his character) and rebutted defensive evidence that Applicant's
behavior was somehow excusable as being a product of a morally
bankrupt environment. Moreover, Lisa Martinez's testimony was not I
nadmissible in that it offered only a brief glimpse into her deceased
husband's life and uniqueness without focusing on the impact that his death
would have on others. Therefore, defense counsel was not ineffective as
alleged in Ground of Relief Number Ten.

FFCL, at 30-32.

## A.      Victim Impact Evidence is Inadmissible during the Guilt/Innocence Phase of Trial

"Victim impact" evidence is testimony "about the victim and the impact of

the murder on the victim's family." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).

The Supreme Court lifted the *per se* bar against victim impact evidence under the

Eighth Amendment and delegated the decision to the states as to whether to admit

such evidence at sentencing. *Id.* Since then, in Texas, victim impact evidence has

been found to be generally admissible during the sentencing phase of a trial

because evidence of the specific harm caused by the defendant may assist the jury

in assessing the defendant's moral culpability and blameworthiness. *Ford v. State*, 919 S.W.2d 107, 114 (Tex. Crim. App. 1996) (citing Payne, 501 U.S. at 825).

However, victim impact evidence is not admissible during the guilt phase of a criminal trial because it fails to meet the relevancy requirements under the evidentiary rules. Victim impact evidence does not have "any tendency to make more or less probable the existence of any fact of consequence at the guilt stage of trial." *Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990) (citing TEX. R. EVID. 401 for the finding that victim impact evidence is irrelevant at the guilt/innocence phase). As noted in *Mosely v. State*, victim impact evidence is relevant only insofar as it relates to the mitigation special issue at punishment because that particular issue greatly broadens the scope of relevant evidence. 983 S.W.2d 249, 263 (Tex. Crim. App. 1998). However, victim impact evidence is "patently irrelevant" to other issues at trial, even including the future dangerousness issue at punishment. *Id.*

### B.     Victim Impact Evidence Presented at Guilt/Innocence Phase of Soliz's Trial

At the close of its guilt/innocence case-in-chief, the State presented two witnesses to describe their relationships with the victim and the victim's family and the impact that the offense had on them. First, the State presented witness Mary Smith. Smith is the aunt of Kila Davis, who is married to Nancy

84

Weatherly's son, Ben Davis.  (46 RR at 6-7.)  Smith testified that she knew

Weatherly for over twenty-four years and saw her roughly every other week.  (Id.

at 7.)  She described Weatherly as being very fond of her animals and recalled

seeing Weatherly hand-feed her horses.  (Id. at 8.)  Smith described pulling up to

Weatherly's house on June 30, 2010, to find emergency vehicles and crime scene

tape.  (Id. at 8-9.)  At that point in Smith's testimony, trial counsel objected to

relevancy.  (Id. at 9.)  The trial court overruled but granted a running objection.

(Id.)  Smith went on to explain that Weatherly's son and daughter-in-law—Ben

and Kila Davis—were out of town on a vacation at the time of Weatherly's death,

making Smith the closest friend to Weatherly in the area.  (Id.)  Smith described

calling the Davis family to inform them that Weatherly was deceased.  (Id. at 10-

11.)  She even described cleaning up the blood where Weatherly's body had lain so

that the Davis family would not have to walk into the scene when they got back

from their vacation.  (Id. at 13.)  Smith completed her testimony by describing how

close Weatherly had been with her thirteen- and eighteen-year-old grandsons.  (Id.

at 15.)  Trial counsel declined to cross-examine Smith.  (Id. at 16.)

The next victim impact witness that the State presented at the

guilt/innocence phase of Soliz's trial was Kila Davis, daughter-in-law of Nancy

Weatherly.  Davis testified that she knew Weatherly for thirty years and considered

Weatherly to be her "best friend."  (46 RR at 17.)  Trial counsel again objected to

relevance.  (Id.)  The trial court overruled but granted a running objection.  (Id.)

Davis told the jury that Weatherly had moved to her Godley residence in order to

be closer to her grandchildren.  (Id. at 18.)  Davis testified that she saw Weatherly

several times a week and would talk to her at least once a day if not more and even

recalled her last words to Weatherly.  (Id. at 22-23.)  Next she described in detail

how she received the news of Weatherly's death while she and her family were on

a cruise and stated that her husband "dissolved" when he heard it.  (Id. at 23-24.)

She then identified State Exhibit 267 as Weatherly's cassette case and one of

Weatherly's most prized possessions in the home.  (Id. at 25)  While crying on the

witness stand, Davis explained that the case contained a number of cassettes that

Weatherly and her son, Ben Davis, enjoyed listening to when Davis was a child.

(Id.)  Davis closed her testimony by identifying a photograph of Weatherly with

her two grandchildren taken around Christmas in 2008 or 2009.  (Id. at 26.)  Again,

trial counsel declined to cross-examine the witness.  (Id. at 27.)

### C. Appellate Counsel's Failure to Challenge the Admissibility of Victim Impact Evidence at the Guilt/Innocence Phase Constituted Deficient Performance

On direct appeal, Soliz's appellate counsel raised eighteen points of error but

did not challenge the trial court's clearly erroneous decision to admit victim impact

evidence at the guilt/innocence phase of trial.  Instead, the points of error focused

on the admissibility of Soliz's statement to the police, argument that Soliz is

ineligible for the death penalty because he suffers from FASD, and stock

constitutional arguments against the death penalty generally.  While appellate

counsel is not required to raise all non-frivolous points of error, he is required to

research relevant law and raise solid, meritorious arguments that are based directly

on controlling precedent.  *Williamson*, 183 F.3d at 462-63.  Here, a review of trial

counsel's objections and controlling precedent on the issues would have revealed

to appellate counsel that victim impact evidence is irrelevant during the

guilt/innocence phase of trial and only potentially relevant during sentencing.

However, appellate counsel failed to challenge the admissibility of Mary Smith

and Kila Davis's clearly inadmissible testimony despite the fact that it was

properly preserved by trial counsel, plainly meritorious, and would have resulted in

the reversal of Soliz's conviction.

Trial counsel contemporaneously objected and preserved the record near the

beginning of both witnesses' testimony, recognizing that victim impact evidence

was inadmissible at the guilt/innocence phase of trial and would likely serve as a

strong argument on appeal.  The testimony of Mary Smith provided the jury with

information relating only to Nancy Weatherly's relationships with her animals and

family (46 RR at 8, 15), the presumed impact on Weatherly's family when they

heard the news (id. at 10-11, 13), and the impact on Smith herself including when

she later cleaned up the crime scene (id. at 8-9, 13).  Likewise, Kila Davis's

testimony revealed only that Nancy Weatherly cared for her family (id. at 18-19,

23) and the impact that Weatherly's death had on Davis and her own family (id. at

17, 23-24).  The testimony of Smith and Davis had no "tendency to make more or

less probable the existence of any fact of consequence at the guilt stage of trial,"

namely whether Soliz was guilty of capital murder.  *Miller-El*, 782 S.W.2d at 895.

A professionally competent brief would have addressed the inadmissibility of

victim impact evidence at guilt, especially considering that trial counsel flagged

the issue by requesting running objections to the relevancy of both testimonies.

This failure on the part of appellate counsel constituted deficient performance.

### D.     Appellate Counsel's Failure to Challenge the Admissibility of Victim Impact Evidence at the Guilt/Innocence Phase Prejudiced Soliz

There is a reasonable probability that if appellate counsel had raised the

admission of victim impact evidence at the guilt/innocence phase of Soliz's trial as

a point of error that the outcome of Soliz's direct appeal would be different.  It

cannot be argued that appellate counsel's failure to raise this point of error

foreclosed Soliz's opportunity to be granted direct appeal relief on the issue.  Mary

Smith's testimony to the good character of Weatherly and her account of cleaning

up the crime scene provided the jury with inappropriate bases on which to render a

guilty verdict.  Likewise, Kila Davis's verbatim recount of Weatherly's last words to her as well as her description of Ben Davis's reaction to finding out that his mother had died were extremely powerful pieces of testimony and likely affected the jury's decision at a time when such evidence was clearly irrelevant and inadmissible.  Controlling precedent does not contemplate allowing such victim impact evidence to be presented during the guilt/innocence phase of trial.  As such, appellate counsel's failure to raise the point of error on appeal meant that Soliz was foreclosed from this argument which would have certainly prevailed.  Counsel's deficient performance prejudiced Soliz in violation of his rights under the federal Constitution and United States Supreme Court case law.  Accordingly, no reasonable jurist could countenance the state district court's conclusions.

### E.     Extraneous Offense Victim Impact Evidence During the Punishment Phase

During the punishment phase of Soliz's trial, the State offered evidence of several extraneous offenses, including the fatal shooting of Ruben Martinez.  The State called to the stand Arnold Dominguez, a coworker and friend of Martinez's who was present at the gas station when Martinez was shot.  (49 RR at 72.)  In his testimony, Dominguez described the shooting of Martinez; however, the State also elicited from him victim impact evidence based on his personal relationship with Martinez.  Dominguez testified that he had known Martinez his entire life; that

they had grown up together in the Diamond Hill neighborhood of Fort Worth; that they were very good friends and spent all day together, side by side; and that he knew Martinez's wife and son and that they were expecting another child. (49 RR at 73-75.)  He further testified that Martinez and his wife were very close, that he was constantly on the phone with her, and that family was his main priority. (*Id.* at 76.)  Dominguez stated that, after Martinez was shot, he went to visit him in the hospital every day, and that he would spend hours with Martinez and his wife at the hospital, where Martinez was unable to move and could communicate with them only by blinking. (*Id.* at 83-85.)  Dominguez concluded his testimony by stating that Martinez was a young, healthy man and that there was no reason to believe he would not have lived a long and happy life had it not been for Soliz. (*Id.* at 92-93.)

After the defense rested its case at the punishment phase, the State called Lisa Martinez, Ruben Martinez's wife, to testify in rebuttal.  When Ms. Martinez took the witness stand, she began crying before she could say a word. (56 RR at 30.)  Trial counsel objected to her testimony as being improper rebuttal, was overruled, and then obtained a running objection to her testimony. (*Id.* at 31.)  Ms. Martinez testified that she and her husband had been childhood sweethearts; that they had had one child together and that she was eight months pregnant with their second child when her husband was killed; and that Ruben's mother, father, and

90

brothers were also in the courtroom.  (*Id.* at 31-33.)  Ms. Martinez described

finding out from her mother-in-law that her husband had been shot, going to see

him in the ICU, and feeling "just numb."  (*Id.* at 34-35.)  She explained that her

husband was unable to move or touch her stomach and that he could communicate

only by raising his eyebrows or blinking his eyes.  (*Id.* at 35-36.)

She also testified that her husband grew up in Diamond Hill and did not

have much, that he worked forty or more hours a week, and that the most important

thing to him was his wife and child.  (56 RR at 37.)  During Ms. Martinez's

testimony, the State also entered into evidence a photograph of their family the

night before her husband was killed.  (*Id.*)  The State concluded its questioning of

Ms. Martinez by asking, "Do you miss him?"  Ms. Martinez responded, "Every

day."  (*Id.* at 38.)

### F. Trial Counsel Performed Ineffectively by Failing to Properly Object to Extraneous Offense Victim Impact Testimony

#### 1. Trial Counsel Performed Deficiently by Failing to Make the Additional Objection of Extraneous Offense Victim Impact Evidence

Trial counsel performed deficiently by failing to object to extraneous offense

victim impact testimony at the punishment phase of Soliz's trial.  Had trial counsel

also objected to the evidence as being third-party victim impact evidence, it would

have been excluded.

The Supreme Court has left it to individual states to decide what, if any, extraneous victim impact statements may be made during the punishment phase of a capital trial, and Payne v. Tennessee, 501 U.S. 808 (1991), and Texas forbids it. *Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997). "'Victim impact' evidence is evidence of the effect of an offense on people other than the victim." *Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007). While the victim of an extraneous offense may testify at the punishment phase of a capital trial, victim impact evidence of an extraneous offense is not admissible. *Cantu*, 939 S.W.2d at 637. In Texas, it is recognized that extraneous offense victim impact evidence "serves no purpose other than to inflame the jury . . . . The danger of unfair prejudice to a defendant inherent in the introduction of 'victim impact' evidence with respect to a victim not named in the indictment on which he is being tried is unacceptably high." *Id*.

Furthermore, even if the state court were correct that the Ruben Martinez incident constituted same-transaction contextual evidence, that does not permit third-party victim impact evidence in Texas. "[T]hat testimony falls into a class of evidence this court has traditionally disfavored: third-party testimony about the impact of an extraneous offense (even one occurring during the same transaction) involving a victim not named in the indictment." *Mays v. State*, 318 S.W.3d 368,

393 (Tex. Crim. App. 2010) (footnote omitted).  There is no permissible theory under which such inherently prejudicial testimony could be offered.

The shooting of Ruben Martinez was not a charged offense in Soliz's capital trial.  Therefore, under the federal Constitution, victim impact evidence from Martinez's wife and coworker were not admissible at the punishment phase of Soliz's trial.  *See Mays*, 318 S.W.3d at 393; *Cantu*, 939 S.W.2d at 637.  Trial counsel failed to lodge any objection to Dominguez's victim impact testimony, and, although trial counsel did object to Ms. Martinez's testimony on relevance grounds as being improper rebuttal, they failed to object with sufficient specificity to draw the trial court's attention to the fact that this testimony was impermissible extraneous offense victim impact evidence.  (56 RR at 31.)  To properly raise an objection, "the complaining party must have done everything necessary to bring the relevant evidentiary rule and its precise and proper application to the trial court's attention."  *Resendez v. State*, 306 S.W.3d 308, 313 (Tex. Crim. App. 2009).  By arguing only that Ms. Martinez's testimony was improper rebuttal, rather than inadmissible extraneous offense victim impact testimony, trial counsel failed to bring the relevant rule and its proper application to the trial court's attention.

The extraneous offense victim impact testimony of Lisa Martinez and Arnold Dominguez was both clearly inadmissible and highly prejudicial.  Trial

counsel could have had no reasonable strategy for failing to properly object to this evidence.  This failure thus constituted deficient performance.

### 2.    Trial Counsel's Performance Prejudiced Soliz

Trial counsel's failure to properly object to the inadmissible victim impact testimony prejudiced Soliz.  The introduction of third party victim impact evidence is not harmless where the State, as it did here, emphasizes the evidence in argument to the jury.  *Haley*, 173 S.W.3d 510, 519 (Tex. Crim. App. 2005).  The State at Soliz's trial made inadmissible extraneous offense victim impact testimony a central part of its case at punishment.  The State highlighted Lisa Martinez's testimony for the jury by saving her testimony for rebuttal after the defense had rested its case.  Ms. Martinez's tearful testimony was therefore one of the last things the jury heard before retiring to deliberate on the special issues.

The State further highlighted the inadmissible extraneous offense victim impact testimony by emphasizing it in closing argument.  One prosecutor concluded his closing argument with these words:

> When I think of Ruben Martinez, and you heard from his—from Lisa yesterday.  Oh, what hard testimony to listen to.  You saw the video. The word I think of when I think of Ruben, "Daddy", "Dad."  A daddy, dad, father.   You know there was no chance to really effectively say goodbye.  You know that he was locked in, encased in that body that didn't work anymore.  You recognize, I know, the agonizing, suffering that took place, trying so hard to communicate, just being able to blink.  But Daddy.  You know those children.  You know there are two.  Daddy.  They'll never be able to run to the hugs of their daddy.   They will never be able to see his proud smile.

94

> They'll never be able to hear his words of comfort.  They'll never be able to learn from his words of wisdom.
>
> All because of this man over there.  His choices.  A thief who comes in the night.  A coward, a bully, who comes to steal, a few pieces of silver, a few dollars.  Thank you.

(57 RR at 28-29.)  Another prosecutor went on to state, in her closing argument, that the friends and family members "who loved Ruben Martinez . . . await your justice and they await your verdict." (57 RR at 30.)

The State in closing argument thus directly referenced and emphasized the inadmissible victim impact testimony, drawing the jury's attention to the effect that Martinez's death had on his friends and family.  This testimony was inadmissible and "serve[d] no purpose other than to inflame the jury."  *See Cantu*, 939 S.W.2d at 637.  Soliz contends that to a legal certainty, but-for counsel's failure to properly object, the jury would not have heard this inflammatory testimony and would have voted in favor of a life sentence.  Trial counsel's failure to properly object to inadmissible extraneous offense victim impact evidence constituted deficient performance and prejudiced Soliz.  As such, no reasonable jurist could countenance the state district court's conclusion and the AEDPA hurdle is cleared.

## IX.   CLAIM NINE: TRIAL COUNSEL'S CUMULATIVE DEFICIENT PERFORMANCE (RAISED AS CLAIM NINE IN THE STATE WRIT)

### Exhaustion:

**The State District Court resolved Soliz's Claim Nine as follows:**

> As previously noted, Applicant's Grounds of Review Numbers
> One, Two,   Three, Five, Six, and Seven have no merit.  Thus,
> Applicant fails to show that the cumulative effect of these alleged
> errors violated his constitutional rights and/or that they resulted
> in an unlawful conviction.

FFCL, at p. 30.

Instances of ineffective assistance of counsel should not only be individually

analyzed under *Strickland* but also evaluated cumulatively with other instances

where counsel's performance was deficient and prejudiced the defendant's case.

*See United States v. Cervantes*, 706 F.3d 603, 619 (5th Cir. 2013) ("The

cumulative error doctrine provides for reversal when an aggregation of non-

reversible errors, *i.e.*, plain and harmless errors that do not individually warrant

reversal, cumulatively deny a defendant's constitutional right to a fair trial."); *Ex

parte Welborn*, 785 S.W.2d 391, 396 (Tex. Crim. App. 1990) ("Although, no one

instance in the present case standing alone is sufficient proof of ineffective

assistance of counsel, counsel's performance taken as a whole does compel such a

holding.").

As noted in Claims One, Two, Three, Five, Six, and Seven, trial counsel

performed deficiently in failing to present and/or rebut vital evidence to challenge

the prosecution's case against Soliz.  Each case of deficient performance

individually prejudiced Soliz at trial.  Moreover, when viewed collectively these

errors create a cumulative effect that deprived Soliz of a constitutionally sound

96

trial. *See Strickland*, 466 U.S. at 686. The cumulative prejudice of counsel's deficiencies during the guilt/innocence phase of Soliz's trial violated Soliz's rights under the state and federal Constitutions, state statutory law, and United States Supreme Court and state case law. Accordingly, Soliz's conviction must be reversed.

First, trial counsel failed to call a false confession expert who could have provided relevant testimony regarding the combination of these factors with tactics employed by the police interrogators, allowing trial counsel to specifically challenge the handwritten annotation in which Soliz claimed to have shot Nancy Weatherly.

Second, trial counsel failed to impeach the testimony of Elizabeth Estrada with her prior inconsistent statement given to the State on October 28, 2010. Contrary to the State's assertion, this interview contained numerous discrepancies with Estrada's trial testimony—none of which were used by trial counsel to impeach her testimony. (*See* 44 RR at 212.) Had trial counsel used this information to impeach Estrada it would have discredited the remainder of her testimony in which she implicated Soliz in dramatic fashion.

Third, trial counsel failed to object to Detective Paine testifying to the content of codefendant Ramos's statement to police. *See* Claim Three, *ante*. Detective Paine was able to testify about what Ramos told him during his

interrogation, which provided police with the first information they received regarding the death of Nancy Weatherly. (41 RR at 26-30.) Had trial counsel objected to the statement being either hearsay or a Confrontation Clause violation, the court would have erred in overruling the objection. Thus, this failure to object constituted deficient performance by trial counsel. *Strickland*, 466 U.S. at 694.

Fourth, trial counsel failed to object to gang evidence admitted during the guilt/innocence phase. The State presented the testimony of Fort Worth Police Officer Jesus Alaniz, who testified that Soliz was a gang member and what the implications of his gang membership were. (39 RR at 40-125.) However, because there was no evidence presented that the death of Nancy Weatherly was gang-related—and, in fact, Soliz and Ramos were members of different gangs—such testimony was not relevant during the guilt phase of Soliz's trial. *See Vasquez*, 67 S.W.3d at 239. Counsel's failure to object to this inadmissible testimony constituted deficient performance.

Fifth, trial counsel failed to exclude evidence of extraneous offenses admitted during the guilt phase. Soliz should have been on trial for the capital murder that he was indicted for; instead, trial counsel's failure to object to the extraneous offenses committed by Soliz prior to the death of Nancy Weatherly allowed the jury to consider inadmissible character evidence. This failure impermissibly clouded the jury's view of Soliz.

98

Sixth, trial counsel failed to object to an improper argument by the State during closing argument.  *See* Claim Seven, *ante*.  The State made multiple objectionable statements during closing argument, including calling for the jury to meet the expectations of the community, attempting to inflame the prejudice of the jury, and dehumanizing Soliz.  *See Alejandro*, 493 S.W.2d at 231-32.  Counsel's failure to object to this impermissible argument constituted deficient performance.

Taken together, trial counsel's errors cumulatively denied Soliz the right to effective assistance of counsel in violation of the Sixth Amendment.  Considering these instances of deficient performance in conjunction, there is a reasonable probability that, taken as a whole, they affected the outcome of Soliz's trial.  *See Strickland*, 466 U.S. at 686.  Thus, even if the court were to determine that Soliz was not prejudiced by any of these failures, their combined effect should clear the hurdle of AEDPA deference because no reasonable jurist could have reached a contrary conclusion.

### ** CLAIM TEN WAS ARGUED IN COMBINATION WITH CLAIM EIGHT**

### XI. CLAIM ELEVEN: TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO PROPERLY OBJECT TO THE LETTER SOLIZ WROTE TO A MEMBER OF THE PANEL OF PROSPECTIVE JURORS

**Exhaustion:**

**The State District Court resolved Soliz's Claim Eleven as follows:**

Applicant fails to show deficient performance or harm concerning defense counsel's failure to object in punishment (on the basis of Rule 403) to rebuttal evidence proffered by the prosecution (i.e., a letter written by Applicant during the voir dire process to a female prospective juror). Had defense counsel made such an objection, the evidence would still have survived a Rule 403 analysis. The letter was written to the prospective juror (i.e., L. Vela) was highly relevant to Special Issue Number One in that it demonstrated Applicant's resourcefulness and resolve to contact and attempt to influence a prospective jury member in a capital murder trial. Thus, it carried significant probative   force concerning Applicant's potential as a future danger to society. In contrast, it cannot be said that there was a clear disparity between the degree of prejudice of the letter and  its probative value. Given that future dangerousness was one of the main issues in punishment, it was unlikely that the letter had any tendency to confuse or distract the jury as to its determination of Special Issue Number One. Moreover, considering the facts of the underlying case, and the enormity of the extraneous offenses and/or bad acts committed by Applicant and properly before the jury, it is extremely doubtful that the letter had any tendency to be given undue weight by the jury. Finally, this evidence did not consume an inordinate amount of time. As such, because the complained-of evidence was admissible under Rule 403, an objection on that basis would have been a futile act. Therefore, defense counsel was not ineffective as alleged in Ground of Relief Number Eleven.

FFCL, at p. 32-33.

Soliz wrote a letter to a member of the panel of prospective jurors. This letter was redacted and admitted during the punishment phase of Soliz's trial. Despite the redactions made to it, the contents of the letter and associated contextual clues made it easily identifiable as being written by Soliz to a potential juror. Post-conviction investigation has revealed that the jury was actually aware that it was written to a prospective juror. This awareness of who the letter was

written to invariably created a high, unjustifiable risk that the jury would make its

sentencing decision based on fear and emotion rather than the evidence before it.

Trial counsel failed to object to the admission of the letter as being unfairly

prejudicial pursuant to Rule 403 of the Texas Rules of Evidence.  Due to this

failure, Soliz's sentence of death was unlawfully and unconstitutionally imposed in

violation of his applicable state and federal Constitutional rights, state statutory

law, and United States Supreme Court and state case law, and the appropriate

remedy is a new punishment phase.

### A.    Introduction

Jury selection began on January 10, 2012.  (7 RR at 4.)  Potential Juror Vela
was individually questioned on February 9, 2012, and both parties agreed to excuse
her after the State conducted its voir dire.  (29 RR at 140, 166.)  On February 13,
2012, Soliz wrote a letter to Vela that was intercepted by jail staff in the outgoing
mail. RR at 9-17.

### 1.    Contents of the Letter

Soliz dated his letter February 13, 2013.  After a generic greeting, Soliz told

Vela that "as you know, you don't know me but my name is Mark Anthony Soliz."

(*Id.*)  He explained that he was the defendant on trial for capital murder and that he

knew her because she had been called as a potential juror.  (*Id.*)  Soliz told her that

he liked her smile, noticed she had waved her hand a lot, and inquired whether she

was single.  (*Id.*)  He recalled how she had spoken about being a missionary and he

asked questions regarding what work she had done.  (*Id.*)  He also claimed that,

like Vela had done, he was considering leaving the Catholic Church and asked for advice on the matter.  (*Id.*)  Soliz concluded his letter by asking her to send him religious information and that he hoped to begin a correspondence with her.  (*Id.* at 3.)  It was signed "In God [sic] name!  Mark Anthony Soliz." (*Id.*)  The envelope was also admitted as part of the exhibit, which included the jail's address and Soliz's inmate number.  (*Id.* at 1.)  Both the envelope and the letter itself included annotations added by jail staff for the date and time it was reviewed.  (*Id.* at 1-2.)

## 2.    Trial Court Proceedings Regarding the Letter

The State attempted to offer the letter as rebuttal evidence through a jail officer.  The State explained that "the purpose of offering this letter is that [it] directly refutes the testimony . . . [that] this Defendant has cognizant [sic] deficits and he has a disability or cannot engage in executive functions."  (56 RR at 11.)  Due to its sensitive nature, defense counsel requested to take up the matter outside of the presence of the jury.  (*Id.* at 10.)  Trial counsel was concerned that there would be questions about how Soliz obtained L. Vela's address and that they would have to take the stand and testify, thus forcing their withdrawal from the case.  They also briefly noted that the letter could make the jury fear the same happening to them—that Soliz could possibly contact them.  (*Id.* at 10-12.)

The State argued that, regardless of how Soliz came into possession of the information, it refuted the "whole memory issue" and that there were ways of

working around defense counsel needing to testify; they also mentioned that the letter additionally showed that Soliz was a future danger.  (*Id.* at 11-12.)  The parties discussed whether Soliz memorized the information or whether he was able to obtain a document with her name and address.  (*Id.* at 12-13.)  At this point, the State informed the court that it would be calling another witness to establish who L. Vela was and that she was a potential juror.  (*Id.* at 15.)

Defense counsel proceeded to clarify that their objection was not to the fact that Soliz wrote the letter, but instead to the State proving that it was written to a prospective juror—which would force them to take the witness stand.  (56 RR at 15-16.)  In light of this clarification, the State agreed not to call the second witness to establish who L. Vela was.  (*Id.* at 16.)  Having made trial counsel's objection moot, the parties then came to an agreement in redacting the letter.  (*Id.* at 17.)  The redactions were removing a few sentences that directly referenced L. Vela being called as a juror and the notations added by jail staff as to the date and time that it was reviewed, but left the date and the majority of the content intact.  (Ex. 12 [Redacted Letter to L. Vela].)  After the redaction, defense counsel stated that they had no further objection and the letter was admitted.  (56 RR at 17, 19.)  The State also elicited testimony from the jail officer that "there was a rather large amount of correspondence either by [Soliz] or to him" during his time in jail.  (*Id.* at 29.)

During deliberations, the jury specifically requested to see the letter Soliz wrote to L. Vela and it was sent to the jury room along with three other letters.  (57 RR at 92-93).

### B.    Ineffective Assistance of Counsel for Failure to Properly Object

Criminal defendants have a Sixth Amendment right to the effective assistance of counsel.  U.S. CONST. amend. VI. To show that trial counsel was ineffective, Soliz must establish both that trial counsel performed deficiently and that the deficiency prejudiced him.  *Strickland*, 466 U.S. at 687.  Deficient performance is established when it is shown that trial counsel's performance "fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 687-88).  Prejudice requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 696).

According to the Supreme Court, "counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work." *Strickland*, 466 U.S. at 690.  One key component of subjecting the state's case to adversarial testing is making objections to inadmissible evidence.  *Polk County v. Dodson*, 454 U.S. 312, 320 (1981); *see also ABA Guidelines*, Guideline 10.8, cmt. (outlining as a duty of capital defense counsel to make proper objections to preserve the record).  To succeed in establishing that trial counsel provided

ineffective assistance for failing to object, Soliz must show a reasonable

probability that the objection would have been sustained. *Strickland,* 466 U.S.

694.

### C. Trial Counsel Provided Ineffective Assistance by Failing to Object to the Letter Pursuant to Texas Rules of Evidence 403

Trial counsel was aware of and referenced the prejudicial effect that the jury

being aware of Soliz's writing letters to a potential juror would have. (56 RR at

11-12.) However, once the letter was redacted, counsel dropped their objection.

(*Id.* at 17.) Because the letter was easily identifiable as being written to a potential

juror by Soliz, trial counsel should have made an objection pursuant to Texas

Rules of Evidence 403 because the redaction failed to cure the prejudicial effect

that the letter would have on the jury.

### 1.      Trial Counsel's Performance was Deficient

To prove ineffective assistance of counsel, Soliz must establish a reasonable

probability that trial counsel could have successfully objected to the letter.

*Strickland*, 466 U.S.. at 694..  Trial counsel would have succeeded in objecting

pursuant to Texas Rules of Evidence 403.  It states that evidence can be excluded

when, "[a]lthough relevant . . . its probative value is substantially outweighed by

the danger of unfair prejudice . . . ."  TEX. R. EVID. 403.  This test requires a

balancing analysis between the probative value and the danger of unfair prejudice.

When conducting this balancing analysis, the probative value goes beyond simply

relevance and refers to "how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006).  This is weighed against the unfair prejudicial effect of the evidence, the "tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.*  Trial counsel's failure to advise the court of the prejudicial, inflammatory nature of this letter and object under Texas Rules of Evidence 403 constituted deficient performance as it fell below an objective standard of reasonableness.

### a. The L. Vela Letter Had Weak Probative Value and the Volume of Letters that Soliz Wrote Establishes that the State Could Have Used a Number of Other Letters for the Same Purpose

The first step in analyzing the probative value of a piece of evidence is the strength of the evidence itself as it relates to a fact of consequence.  *Gigliobianco*, 210 S.W.3d at 641.  The letter written to L. Vela by Soliz provided weak support for the State's offered purpose of refuting the mental health evidence of Soliz's deficits in executive and cognitive functioning.  (56 RR at 11, 13-14.)  As noted by defense counsel, the State assumed, without any proof, that Soliz had memorized Vela's address.  (*Id.* at 13.)  In fact, as the trial court noted, there were other ways in which he could have obtained the address.  (*Id.*)  Furthermore, the letter itself

contains numerous grammatical errors and spelling mistakes.  (*See* Ex. 11 [Original Letter to L. Vela].)

At one point, the State additionally noted to the judge that "the fact that he's able to memorize this information just goes to show how dangerous he is and . . . that he's absolutely a future threat to this community." (56 RR at 12.)  However, a person's ability to memorize information, or ability to write a letter, is not indicative of a possibility of violence—nor do Soliz's memory skills make him a threat to the community.  The letter also does not suggest in any way a threat of violence, and it is not probative of future dangerousness.  (Ex. 11 [Original Letter to L. Vela].)

The second part of the analysis regarding how probative a piece of evidence is entails the need by a party to use that specific piece of evidence.  *Gigliobianco*, 210 S.W.3d at 641.  The need for using this specific letter was low.  Pursuant to county policy, all of Soliz's non-legal incoming and outgoing mail was read, searched, and a copy forwarded to the District Attorney's Office.  (56 RR at 7-8.) Soliz sent and received a large amount of mail.  (*Id.* at 29.)  The State could have offered any number of other letters written by Soliz to attempt to rebut the defense presentation that Soliz had executive functioning deficits.  As by their own account they had a large quantity of letters to work with, they could have selected any of the others without the unfairly prejudicial impact of the letter that was admitted.

### b. Because the Letter Was Written to a Prospective Juror, the Danger of Unfair Prejudice Was Extremely High

Contrasting the low probative value is an enormous risk of unfair prejudice.

Despite the non-threatening and cordial nature of the letter, if the jury recognized

that Soliz had written a potential juror, it would create a high, unjustifiable risk of

the jury making its punishment phase decision on an emotional, rather than

rational, basis. *See Gigliobianco*, 210 S.W.3d at 641. Knowledge of the fact that

Soliz was able to contact a potential juror would, to a near certainty, create a panic

within the jury about Soliz's ability to contact them in retaliation for their service.

This would invariably prejudice them in their deliberative process. *See Reyes v.

State*, 30 S.W.3d 409, 410-12 (Tex. Crim. App. 2000) (holding that a juror who

knew the defendant and feared retaliation for the verdict was rightfully discharged

from the jury).

### i. Despite Redactions, It Is Clear From Its Face That the Letter Was Sent to a Prospective Juror

Problematically, reading the redacted version of the letter shows that it was

easily identifiable as being written to a potential juror. Both the envelope itself—

which was submitted along with the letter—and the contents of the letter point to it

being written to a member of the panel of prospective jurors; no other logical

answer exists as to whom it would have been written.

The envelope itself has three important identifying characteristics. First,

Soliz wrote his inmate number after his name on the return address, F047939. (Ex.

12 at 3 [Redacted Letter to L. Vela].)  Second, the return address is for the Johnson County Jail, 1800 Ridgemar Dr., Cleburne, TX 76031.  (*Id.*)  These two facts would remind the jury, or at least reinforce, that the correspondence occurred while Soliz was in jail awaiting trial.  (*See* 56 RR at 7-9.)  The third important clue that can be gleaned from the envelope is its being addressed to an apartment, "Unit H." (Ex. 12 at 3 [Redacted Letter to L. Vela].)  This told the jury that it was addressed to a person in their individual capacity—rather than, for example, someone Soliz may have seen on television.

The contents of the letter point to it being written to a potential juror.  It is dated February 13, 2012. The initial calling of the jury panel occurred on January 10, 2012 and the jury was seated on February 20, 2012.  (7 RR to 36 RR.)  Thus, the jurors would have been aware of the fact that the letter was written during the jury selection process.  Importantly, Soliz makes it clear in his letter that L. Vela does not know him.  However, it is obvious that Soliz had been listening to her speak, about private matters, for a lengthy amount of time.  He described how her smile drew his attention and how she was frequently waving her hand around while she was speaking.  (*Id.*)  Soliz wrote about how he was intrigued by her decision to leave the Catholic Church, and that he was considering doing the same.  (*Id.*)  Soliz also noted how he was interested in hearing more about her work as a missionary. (*Id.*)

109

Reading the contents of the letter to L. Vela, Soliz was obviously sitting somewhere and listening to her.  It was somewhere where he could see her—as evidenced by him mentioning her smile and hand gestures—ruling out him listening to her on the radio.  It could not be someone he saw on television, as the letter was written to an apartment.  It could not be someone who visited him in jail, as Soliz stated that she did not know him.  Considering all the contextual clues— including that the letter was written during jury selection and Soliz was listening to someone describe personal events in her life—the only logical answer would be that it was during Vela's individual voir dire.

It is important to note that the jury actually read the letter and would have been able to observe the points made above.  A note was sent out during the punishment phase asking to read this and three other letters that Soliz had written, and the evidence was sent into the jury room.  (57 RR at 92-93; Ex. 13 at 1 [Jury Note].)  The jury's specific request to view—and presumably read—the letter during deliberations, combined with the variety of contextual clues contained in the letter's redacted version, shows that they would have been aware that it was written to a potential juror.

## 2.        The Failure to Object to the Letter Prejudiced Soliz

Trial counsel's acquiescence to the admission of the redacted letter prejudiced Soliz.  Even a single piece of evidence, if the prejudicial effect is strong

enough, can require the reversal of a conviction.  *See Erazo*, 144 S.W.3d at 496.

The letter written to L. Vela, based on her status a member of the panel of

prospective jurors, created a high, unjustifiable risk of prejudice—and a risk that

was not properly explained to the court when it was determining whether to admit

the letter into evidence.  This error creates a reasonable probability that the

admission of the letter affected the punishment phase proceeding.  *See Strickland*,

466 U.S. at 694.  As soon as the jury became aware of Soliz's perceived ability to

contact them, it invariably would have created an irrational fear of retaliation, and

influenced the deliberative process impermissibly.  In fact, it made the jury believe

that Soliz was more dangerous.  (Ex. 2 at ¶4 [Aff. of Juror J. U.].)  The letter

encouraged the jury to make its decision on an emotional basis, not one driven by

the facts or evidence.  *See Gigliobianco*, 210 S.W.3d at 641.  As such, counsel's

error requires that Soliz be granted a new punishment hearing because no

reasonable jurist could countenance the district court's misspplication of federal

Constitutional law.

### XII.   CLAIM TWELVE: TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO PRESENT EVIDENCE FROM AN EXPERT TO EXPLAIN THE EFFECTS OF THE FOSTER CARE SYSTEM ON SOLIZ AND EXPOUND ON THE VOLUMINOUS CPS RECORDS INTRODUCED

**Exhaustion:**

The State District Court resolved Soliz's Claim Twelve at FFCL, p. 33-35.

Trial counsel should have hired an expert in the foster care system to inform the jury about the harrowing aspects of foster care that lead foster youth to suffer from Post-traumatic Stress Disorder ("PTSD") later in life at nearly five times the rate of the general population, even exceeding the rate of United States combat veterans. TEXAS APPLESEED, IMPROVING THE LIVES OF CHILDREN IN LONG-TERM FOSTER CARE: THE ROLE OF TEXAS' COURTS & LEGAL SYSTEM 49 (2010) [hereinafter "APPLESEED STUDY"]. Specifically, an expert could have described the effects of moving frequently between placements, the existence and effects of substandard foster facilities, including abuse and neglect in care, and the realities of "aging out"[3] of the foster care system. Additionally, an expert could have explained that these hardships must be considered in the light of the already traumatic life of the child that led him to being removed from his family in the first place. Trial counsel's failure to present an expert in the foster care system left the jury with little or no explanation of how this traumatic time in Soliz's life affected him. At the very least, counsel should have called Soliz's former CPS caseworker, Laura Flores, to explain the contents of the CPS records to the jury. The failure to do either of these constituted deficient performance and prejudiced Soliz in violation of his rights under the state and federal Constitutions, applicable state

---

3 Foster youth "age out" of the system when they reach the age of eighteen and leave the care of the state. TEXAS FOSTER CARE TRANSITIONS PROJECT, ALL GROWN UP, NOWHERE TO GO 1 (2001)

law, and United State Supreme Court and state case law. The appropriate remedy is a new punishment phase.

## D. Trial Counsel's Obligation to Present Experts

To establish that trial counsel were ineffective for failing to call an expert, Soliz must establish both that trial counsel's performance was deficient and that Soliz was harmed by that deficiency. *Strickland*, 466 U.S. at 687. Deficient performance is established by showing that trial counsel's performance "fell below an objective standard of reasonableness . . . under prevailing professional norms." *Martinez*, 330 S.W.3d at 900 (quoting *Strickland*, 466 U.S. at 687-88). Prejudice requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quoting *Strickland*, 466 U.S. at 694, 696).

### 1. Deficient Performance

Under the *ABA Guidelines*, trial counsel has a duty to consider and investigate the basis for all possible legal claims and to present them as forcefully as possible. *ABA Guidelines*, Guideline 10.8.; *see also id.* at cmt. ("Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case."). Counsel's failure to present an expert on the foster care system constituted ineffective assistance under prevailing professional norms.

113

Trial counsel should have called an expert to describe the negative aspects of the foster care system and what effects those might have on a foster child, as Soliz's chaotic childhood in the foster care system was mitigating. *See, e.g.*, *Wiggins*, 539 U.S. at 535. Specifically, an expert could have provided relevant information about the effects on foster youth of frequent moves from home to home, the existence and effects of substandard facilities, including abuse and neglect in care, and the realities of aging out of the foster care system.

## 2. Prejudice

Soliz must also show that the result of the proceeding would have been different but for this deficiency. *Strickland*, 466 U.S. at 694, 696. Trial counsel presented a detailed mitigation case centered on Soliz's diagnosis with PFAS. While the PFAS presentation explained Soliz's cognitive deficits, it failed to tell his complete story. In fact, counsel all but ignored Soliz's experiences from the time he was fifteen years old until his early adulthood. Over the course of a few years, Soliz was placed in at least six different facilities, was abused at one of them, underwent the painful process of aging out of the foster care system, and split time between being homeless and incarcerated. Soliz's jury was deprived of hearing about the negative effects that such experiences had on him and the impact it had on his life trajectory thereafter. Had the jury been so apprised, there is a reasonable probability that the trial would have ended differently. Because Soliz

114

was prejudiced by trial counsel's deficient performance, the appropriate remedy is a new punishment phase.

### E. Foster Care Evidence Presented at Trial

During the punishment phase of trial, counsel presented evidence regarding Soliz's time in foster care, including: (1) Buckner Children's Home records (1451 pages); (2) Soliz's CPS records (1488 pages); (3) live testimony of former juvenile probation officer Leanna Judd; and (4) live testimony of a former orderly at the psychiatric unit of John Peter Smith Hospital, Kevin Walling.  Counsel presented both sets of records as self-authenticating and both were admitted.  Judd and Walling testified to limited portions of the Buckner records but no witness testified to the contents of the CPS records.  As a result, the jury was not presented with testimony regarding Soliz's formative teenage years in foster care.  While the CPS records were admitted, they were never synthesized or contextualized for the jury.

### F. Foster Care Expert

There are a number of negative consequences associated with being raised in the Texas foster care system.  While the jury was likely aware of the general emotional difficulties that emerge when a child is removed from his family's care, it is less likely that they were knowledgeable of the longer-term effects.  Trial counsel should have called an expert in the foster care system to explain how frequent moves between placements can hinder social and educational

development as well as lead to behavioral and emotional problems; discuss the

prevalence of abuse and neglect in foster care and the effects it has on foster youth;

and detail the difficulties of aging out of the foster care system, including the high

incidence of homelessness and incarceration associated with it.

### 1. Frequent Moves

At trial, counsel presented testimony regarding Soliz's early childhood with

his mother as well as his time at the Buckner Children's Home.  However, the jury

did not hear testimony that Soliz lived in at least six other placements after

Buckner before aging out of foster care.  (Ex. 15 [Excerpts from Soliz CPS

Records].)4Soliz's near constant moves while in foster care had a significant

impact on his development during his teenage years.

Following his time at Buckner Children's Home, Soliz was placed in at least

six different foster homes and attended numerous schools.  First, he spent

approximately nine weeks split between City House Shelter in Plano, Texas and

the Dallas County Juvenile Detention Center.  (Ex. 15 at 4-14 [Excerpts from Soliz

CPS Records].)  City House was considered an "emergency shelter," meaning

foster youth are only intended to spend thirty days before finding more permanent

placement.  *See While Your Child Is In Our Care: A Handbook for Parents*, TEXAS

DEP'T OF FAMILY AND PROTECTIVE SERVICES.  Next, Soliz was placed at Azleway

---

4 Exhibit 15 is a collection of excerpts from Soliz's CPS records, which were admitted in full at trial as Defense
Exhibits 64-1A through 64-1D.

Boys Ranch in Tyler, Texas.  (Ex. 15 at 14 [Excerpts from Soliz CPS Records].)

Although the original plan was to have him stay at Azleway for approximately one

year, Soliz was only there for six-and-a-half months before being discharged.  (*Id.*

at 14-21.)  From there, Soliz moved on to the Choices Facility in Marshall, Texas,

where he spent only six weeks before running away and being detained.  (*Id.* at 21-

24.)  Thereafter, Soliz was placed at Desert Hills of Texas in College Station.  (*Id.*

at 25.)  He spent a difficult nine months at Desert Hills before the facility was

eventually closed down and Soliz was again moved to an emergency shelter hosted

by CASA and the YMCA.  (*Id.* at 24-55.)  Approximately three weeks after

entering the emergency shelter, Soliz was moved to his final placement, the

Contreras Group Foster Home. (*Id.* at 55-61.)  Soliz would spend about nine

months at the Contreras Home before running away and getting arrested at the age

of seventeen.  (*Id.* at 61-92.)  While there were attempts to place Soliz after that,

none were successful.  He finally aged out of foster care in January 2000 and

entered adult life ill-prepared due to his unstable childhood. (*Id.* at 92-107.)

Life in foster care often involves frequent moves from one placement to

another, causing disruptions to a child's social and educational development.  Each

time a foster youth is moved to a new placement, he changes schools, is introduced

to a new group of peers, and "must establish new relationships with a new set of

adults who exert control over [his life]."  APPLESEED STUDY at 58.  Perhaps the

117

most difficult of these challenges is changing schools.  Foster youth change

schools much more often than normal, sometimes attending several different

schools in a single year.  *Id.* at 45.  A 2000 study—revised in 2006 and 2008, and

conducted by TeamChild, a civil legal services program for youth in

Washington—determined that children lose an average of four to six months of

educational progress when they move to a new school.  TEAMCHILD, MAKE A

DIFFERENCE IN A CHILD'S LIFE: A MANUAL FOR HELPING CHILDREN AND YOUTH

GET WHAT THEY NEED IN SCHOOL 1 (2008).  Naturally, these children then tend to

fall behind in their academics and experience more learning deficits than non-

foster youth.  APPLESEED STUDY at 46.  Children routinely lose credits due to

incomplete educational records and are sometimes forced to repeat a course or

even an entire grade.  *Id.*  It is also common for special education evaluations to be

lost or transferred in an untimely manner, meaning that there may be a delay in

placing foster youth in the appropriate classes.  *Id.* at 47; MASON BURLEY & MINA

HALPERN, WASH. ST. INST. FOR PUB. POL'Y, EDUCATIONAL ATTAINMENT OF FOSTER

YOUTH: ACHIEVEMENT AND GRADUATION OUTCOMES FOR CHILDREN IN STATE

CARE 9 (2001).  Because poor academic achievement tends to have the most

detrimental consequences to foster youth in the future, frequent moves have a

major impact on their adult life. APPLESEED STUDY at 46. This includes

employment, housing, and involvement with the criminal justice system.5

Moving frequently and changing schools has a detrimental effect on a

child's social development as well. It can be difficult for foster youth to form new

relationships in the short time that they spend at any particular location. The

instability and isolation that this breeds can lead to a child's emotional and

behavioral problems. APPLESEED STUDY at 46. Moreover, research indicates that

abused and neglected children often struggle with social interactions. *Id.* at 47

(citing JANE BURSTAIN, CENTER FOR PUBLIC POLICY PRIORITIES, THE TEXAS

SCHOOL DISCIPLINARY SYSTEM AND FOSTER CARE CHILDREN 1 (2009)). They tend

to interpret neutral situations as threatening and suffer from poor impulse control.

*Id.* It is not uncommon for abused foster children to engage in delinquent behavior

and substance abuse and to experience a higher rate of expulsion and/or

incarceration. *Id.*

In Soliz's case, each of the new placements following his time at Buckner

Children's Home were located in different school districts across the state and

therefore required Soliz to transfer. Based on Soliz's transfer history between

placements, he would have gone to two different schools in Spring 1997, three

different schools in Fall 1997, one school in Spring 1998, three schools in Fall

---

5 *See* Claim Twelve, C.3, *post.*

1998, and one school in Spring 1999.  In addition, Soliz's limited education records indicate that he was enrolled in special education courses throughout and that he had been held back in school at least once.  (*See* Ex. 17 [Keene ISD Education Records].)  An expert in the foster care system could have explained to the jury that each time Soliz changed schools he lost an average of four to six months of educational progress.  *See* TEAMCHILD at 1.  For example, Soliz's student data sheet from his time at Keene ISD shows that Soliz was not provided with an Individual Education Plan at Keene High School until seven months after he enrolled in the school.  (*Id.* at 2.)  That means Soliz spent the better half of a year completing coursework that was not tailored to his learning disability.  *See* APPLESEED STUDY at 47 (explaining the importance of an IEP in placing the student in the appropriate classes).

Such setbacks were clearly detrimental to Soliz's educational development and would continue to affect him long after he left foster care.  Studies have indicated that high rates of grade retention among foster youth can hinder their successful transition into adult life.  *See* APPLESEED STUDY at 46.  Moreover, an expert could have explained to the jury how Soliz's transient childhood hindered his ability to form trusting relationships, thus stifling his social development and leading to emotional and behavioral problems that would continue throughout his life.  *See* APPLESEED STUDY at 46-47.

### 2.  Substandard Facilities and Abuse and Neglect in Care

In addition to the negative effects of having to move frequently, there is evidence that Soliz was placed in substandard foster facilities and there subjected to abuse and neglect.  The most marked example of this comes from Soliz's time at the Desert Hills facility in College Station.  In 1996 the Desert Hills facility, where Soliz was housed from December 1997 until August 1998, was placed on a corrective action plan by the Department of Family and Protective Services ("DFPS") due to "a pattern of restraint [] which resulted in a number of injuries." (Ex. 15 at 32 [Excerpts from Soliz CPS Records].)  One of the problems was that children who were brought back from running away were "treated in ways similar to 'hazing' or being in a boot camp."  (*Id.* at 32-33.)  During Soliz's time at Desert Hills he was physically restrained on several occasions for seemingly harmless offenses, such as "eating an apple in his room" and "hanging his arm over the bed."  (*Id.* at 26.)

In late April 1998, Soliz reported to his CPS caseworker, Laura Flores, that a staff member at the facility had pushed him by the throat when other staff were not looking.  (*Id.* at 39.)  Flores attempted to contact the facility regarding the incident numerous times but her calls were not returned.  (*Id.* at 39-42.)  Approximately two weeks later, Soliz again called Flores to report that a staff member put his hands around Soliz's neck and rubbed his face into the bed.  (*Id.* at 42.)  The staff

member then pressed his thumb into Soliz's throat so as to choke him.  (*Id.*)  Flores again tried to call the facility several times before finally making contact nearly a month later.  (*Id.* at 42-47.)  The case manager at the facility confirmed Soliz's report of the improper restraint and stated that the staff member had been dismissed and criminal charges had been filed.  (*Id.* at 47.)  Desert Hills was placed on a Corrective Action Plan due to the incident.  (*Id.* at 44, 48.)  Not long after the episode, the clinical director at the facility reported that Soliz was "extremely depressed."  (*Id.* at 48.)  Soliz's CPS records indicate that there was a high rate of turnover at Desert Hills following the incident, and several of the staff members were fired.  (*Id.* at 54.)  In August 1998, the DFPS refused to renew its contract with Desert Hills and all children were removed from the facility within the month. (*Id.* at 55.)

In 1995, the Office of Inspector General for the Department of Health and Human Services issued an audit report on the Texas Department of Protective and Regulatory Services—the predecessor to DFPS—finding that the Texas foster care system provided "no assurance that the quality of care being given to foster children placed by child-placing agencies was adequate."  DEP'T OF HEALTH & HUMAN SERVICES, OFFICE OF INSPECTOR GENERAL, IMPROVEMENTS NEEDED IN MONITORING CHILD PLACING AGENCIES IN THE TEXAS FOSTER CARE PROGRAM 1 (1995).  The report, which focused on a random selection of 100 foster homes in

Texas, found "many cases" where children were living "in potentially harmful situations." *Id.* at 5. Deficiencies included inadequate fire or health services, failure to conduct criminal background checks on staff, and even cases of foster homes littered with garbage. (*Id.* at 6, 8).

A similar report was issued by the Texas State Auditor's Office in 2000. OFFICE OF THE STATE AUDITOR OF TEXAS, AN AUDIT REPORT ON THE DEPARTMENT OF REGULATORY SERVICES' ADMINISTRATION OF FOSTER CONTRACTS (2000) [hereinafter "AUDITOR'S REPORT"]. In a memorandum that preceded the report, the Office of the Inspector General for the Department of Health and Human Services, which partnered with the Texas State Auditor's Office on the project, noted that the report identified "serious gaps in the oversight of foster care contractors" and recognized that those gaps might undermine the ability to ensure the safety of children in foster care. Memorandum from Tex. State Auditor's Office on Administration of Foster Care Contracts to Dep't of Health & Human Servs., Inspector General (Oct. 23, 2000). In a response to the report, the Department of Protective and Regulatory Services acknowledged the "urgent need" for improvements in contract monitoring. AUDITOR'S REPORT at 3. This lack of oversight on behalf of the DFPS and its predecessor led to substandard living conditions for many foster youth in Texas.

Despite the fact that foster youth are removed from their families in order to protect them from neglect and abuse, they often find themselves in an abusive and neglectful environment.  The National Foster Care Education Project found in 1986, and confirmed in 1990, that foster children were ten times more likely to be abused than children in the general public.  Michael B. Mushlin, *Unsafe Havens: The Case for Constitutional Protection of Foster Children from Abuse & Neglect*, 23 HARV. C.R.-C.L. L. REV. 199, 206 (1988) (citing P. RYAN & E. MCFADDEN, NATIONAL FOSTER CARE EDUCATION PROJECT: PREVENTING ABUSE IN FAMILY FOSTER CARE 11, 14 (1986)); *see also* Rebecca E. Baneman, Comment, *Who Will Speak for the Children?: Finding a Constitutional Right to Counsel for Children in Foster Care*, 9 U. PA. J. CONST. L. 545, 548 (2007).  While statistics on the rate of abuse in Texas foster care are not readily available, these studies indicate the prevalence of abuse and neglect within the foster system overall is alarmingly high. An expert in foster care could have relayed these statistics to the jury as well as pointed out Soliz's own experience with abuse in care that is noted in Soliz's CPS records.  While Soliz was removed from his family in an attempt to avoid the abuse and neglect he experienced at home, the remedy was merely to send him to a faraway facility monitored by unknown adults, some of whom abused him.  Worse still, Soliz's only consistent caretaker throughout the process, Flores, was ignored by representatives of the facility when she attempted to help Soliz.

### 3. Aging Out of the Foster Care System

The process of "aging out" of foster care can be very difficult for young adults. Although services are sometimes available to aid in the process, many foster youth spend at least some time homeless after leaving care. TEXAS FOSTER CARE TRANSITIONS PROJECT, ALL GROWN UP, NOWHERE TO GO 28 (2001) (Forty percent of foster youth interviewed had been homeless at least once since leaving care) [hereinafter "FCTP STUDY"]. Soliz spent nine-and-a-half months at his last shelter, the Contreras Group Foster Home, before completing his final seven months of foster care on runaway status. (Ex. 15 at 61, 92, 98, 107 [Excerpts from Soliz CPS Records].) Soliz's CPS caseworker attempted to place Soliz with his aunt for his remaining months as a minor in order to remove him from runaway status. (*Id.* at 95.) However, Soliz's aunt backed out of the commitment prior to the home study being completed. (*Id.* at 98-99.) As CPS intensive placement worker Dick Nabors stated in an email to Laura Flores in September 1999, "[The aunt's] commitment to the placement seemed to be about one notch above zero." (*Id.*) After that option fell through, Soliz bounced around between relatives and friends for the remaining four months of his minority before entering the adult world without a home, job, or reliable support system. (*Id.* at 102-05.)

The Texas Foster Care Transitions Project ("FCTP")—a research effort conducted by the Center for Public Policy Priorities—issued a report in 2001

discussing the challenges and successes of former foster youth in Travis and Bexar Counties, Texas.  FCTP STUDY.  The Project synthesized existing literature on the aging out process as well as conducted over 500 interviews covering two different cohorts: those that aged out of the Texas foster care system in 1990 and those who did so in 1999.  *Id.* at 19. Among other things, the study found that foster youth that age out are "at extreme risk of poverty and homelessness, victimization and criminal involvement, illness, early childbearing, and low educational attainment." *Id.* at 37; *see also* APPLESEED STUDY at 6 ("young people who 'age out' of long-term foster care are more likely to become homeless and addicted to drugs or alcohol").  Moreover, the Appleseed Study found that foster youth aging out of the system often experience symptoms of PTSD associated with the abuse and neglect they faced before entering foster care—and sometimes during—as well as the "upheavals and losses associated with the traumas and frequent moves and transitions." APPLESEED STUDY at 2.

Upon aging out of the system, foster youth are faced with enormous challenges in finding housing and employment to establish a strong foundation for adulthood, yet they have few or none of the resources that most transitioning teens have and need.  *Id.* at 2.  "The transition to self-sufficiency is often very rapid, sometimes unplanned for and unexpected, and results in [foster youth] feeling 'dumped' by the system that cared for them." FCTP STUDY at 11.  The minimal

support system that was available to them throughout their minority is removed, abruptly leaving them to develop coping strategies to deal with the challenges of adulthood. *Id.* at 33. The strategies that they develop to address the challenges are often self-sabotaging and dysfunctional, however. *Id.* The implementation of the misguided strategies only compounds the problems and they find themselves spiraling into worse situations. *Id.* One common dysfunctional strategy that transitioning youth tend to implement is removing themselves from foster care in the months before they are set to age out. *Id.* The FCTP study found that 41% of the roughly 500 foster youth they interviewed left foster care before turning eighteen. *Id.* In an act of defiance to the system that they now consider too controlling, foster youth tend to bypass the little help that may still be available to them. *Id.* Unfortunately for the foster youth, the transitional years are the time when they most need relationships with people who care and who are consistently there for them. *Id.* at 12.

The negative effects of this difficult and rapid transition are vast. Past studies on transitioning foster youth have revealed that anywhere from ten to forty percent experience homeless after aging out. FCTP STUDY at 28 (40% of foster youth interviewed had been homeless at least once since leaving care); Mark E. Courtney et al., *Foster Youth Transitions to Adulthood: A Longitudinal View of Youth Leaving Care*, 80 CHILD WELFARE JOURNAL 685, 710 (2001) (14% of males and

10% of females studied had been homeless at least once and 22% had lived in four or more places in the 12-18 months after leaving care); WESTAT, INC., A NATIONAL EVALUATION OF TITLE IV-E FOSTER CARE INDEPENDENT LIVING PROGRAMS FOR YOUTH (1991) (25% of youth studied had been homeless at least one night between two-and-a-half to four years after leaving care).  Homelessness falls within the larger pattern of residential instability that foster youth experience throughout their childhoods.  FCTP STUDY at 13.  Many foster youth spend much of their lives moving between foster families, foster group homes, residential treatment centers, and emergency shelters.  *Id.*  This lack of residential stability and the impacts that has on educational achievement make it difficult for transitioning youth to avoid homelessness.

Transitioning foster youth also face high incarceration rates.  The FCTP found that former foster youth from Travis and Bexar Counties were incarcerated at nearly twice the rate of the rest of the population.  FCTP STUDY at 25.  Other studies have found even higher rates of incarceration.  One found that roughly 42% of transitional youth have been arrested since leaving care.  *Id.* (citing G. ALEXANDER & T.J. HUBERTY, CARING FOR TROUBLED CHILDREN: THE VILLAGES FOLLOW-UP STUDY (1993)).  Another found that 31% had been arrested and 26% had served jail time.  *Id.* (citing R.P. Barth, *On Their Own: The Experience of Youth after Foster Care*, 7 CHILD & ADOLESCENT SOC. WORK 419, 440 (1990)).

The high incarceration and homelessness rates can be attributed in part to the fact that transitioning foster youth have difficulty holding employment.  Their employment rate is significantly lower than the national average for that age group, and over 33% of former foster youth live below the poverty line.  APPLESEED STUDY at 50; *see also* PETER J. PECORA, ET AL., CASEY FAMILY PROGRAMS, IMPROVING FAMILY FOSTER CARE: FINDINGS FROM NORTHWEST FOSTER CARE ALUMNI STUDY 37 (2005).

As the research suggests, and an expert could have explained, Soliz's experiences with homelessness and arrests after aging out were relatively predictable based on his time in the Texas foster care system.  Not only did he deal with abuse and neglect as a child in his family's care, but he also spent years at substandard foster facilities without the individualized attention he needed and deserved.  The trauma that came from that lack of care was magnified and put to the test once Soliz was abruptly thrust into an independent life.  Soliz's mitigation story did not end during his time at Buckner Children's Home as trial counsel's punishment phase case would lead one to believe.  Rather, Soliz's latter teenage years explain much about the chaotic path that Soliz took as an adult.  By failing to present a foster care expert, and instead opting to admit Soliz's CPS records wholesale without explanation, the jury was deprived of the opportunity to understand the true effect that the foster care system had in shaping who Soliz is

today.  Counsel's failure to call an expert to provide this explanation to the jury constituted deficient performance and prejudiced Soliz's rights.  As such, Soliz's sentence must be vacated.

### G. Trial Counsel Should Have Called Soliz's Former Caseworker to Explain the CPS Records to the Jury

Aside from presenting an expert on the foster care system, trial counsel should have at least called Soliz's former CPS caseworker to the stand to testify to the contents of the nearly 1500 pages of records that were admitted.  Flores acted as Soliz's primary caseworker from the time Soliz left Buckner Children's Home until the time he aged out of care and consistently maintained records of Soliz's experience in foster care over that period.  (Ex. 19 at ¶¶ 3-4 [Aff. of Laura Flores].) Flores was available to testify to the contents and accuracy of those records during Soliz's trial and would have done so if she had been asked.  (*Id.* at ¶ 4.)  By calling a live witness to explain the records, counsel could have humanized Soliz's experience during his teenage years in care.  Instead, the jury was left to parse voluminous records that were not properly contextualized.  Counsel's failure to call Flores constituted deficient performance and prejudiced Soliz in violation of his rights under the state and federal Constitutions, applicable state law, and United State Supreme Court and state case law.  As such, Soliz's sentence must be vacated because of the misapplication of federal constitutional law.

### H.    Conclusion

In sum, the State court's failure to find IAC on this claim is result of

unreasonable application of these facts to *Strikland*.

**\*\*CLAIM THIRTEEN WAS ARGUED IN COMBINATION WITH CLAIM SEVEN\*\***

### XIV.  CLAIM FOURTEEN: SOLIZ'S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT (RAISED AS CLAIM FOURTEEN IN THE STATE WRIT, AND POINTS SEVEN TO TEN OF THE DIRECT APPEAL)

**Exhaustion:**

**The State District Court resolved Soliz's Claim Fourteen as follows:**

Applicant is procedurally barred from advancing his habeas claim (i.e., that his death sentence violates the Eighth Amendment due to his suffering Fetal Alcohol Spectrum Disorder) because this claim was raised on direct appeal and decided adversely to Applicant's position.  Generally, habeas corpus should not be used to re-litigate matters which were addressed on appeal.

Rejecting this claim, the CCA held as follows:

**Appellant points out that three states have implemented programs to identify and assist juvenile offenders who suffer from fetal-alcohol-spectrum disorders. This development does not demonstrate an emerging national consensus in favor of barring  the execution of adult offenders convicted of capital murder who are  not mentally retarded but who have permanent brain damage resulting from partial fetal- alcohol syndrome. *See, e.g.,  Mays v. State*, 318 S.W.3d 368, 379- 80 (Tex. Crim. App. 2010); *see also Roper v. Simmons*, 543 U.S. 551, 564-68, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005);**

> ***Atkins v. Virginia***, 536 U.S. 304, 312-16, 122 S. Ct. 2242, 153 L. Ed.
> 2d 335 (2002). At the punishment phase of a death-penalty case,
> evidence of brain damage resulting from  partial fetal-alcohol
> syndrome is relevant evidence that may be considered by the jury along
> with other relevant evidence. The weighing of this type of evidence is
> a subjective determination undertaken by each  individual juror.  *See*
> ***Broussard v. State,*** 910  S.W.2d 952, 956   (Tex. Crim. App. 1995).
>
> In this case, the jurors weighed appellant's evidence of brain
> damage and partial fetal-alcohol syndrome along with other
> relevant evidence and made a normative judgment that the  evidence
> did not warrant a life sentence. This Court will not second-guess the
> jury's determination. Points of error seven through ten are overruled.

432 S.W.3d, at 904.

The ultimate penalty of death is reserved for the worst and most culpable of

offenders, while those whose cognitive impairments render them less culpable for

their actions are categorically prohibited from execution.  *See Atkins v. Virgina*,

536 U.S. 304, 321 (2002).   Soliz suffers from FASD because of his mother's

drinking during her pregnancy, which has resulted in a number of behavioral and

cognitive impairments—including impulsivity, learning problems, and serious

adaptive deficits.   FASD renders Soliz less culpable for his actions and

categorically excludes him from a sentence of death.  As such, Soliz's conviction

and sentence of death were unlawfully and unconstitutionally imposed in violation

of his applicable state and federal Constitutional rights and United States Supreme

Court case law.

### A.    Soliz Suffers From FASD, Lowering His Moral Culpability

Three experts were called by the defense during the punishment phase to explain to the jury that Soliz suffered from FASD and how that impacted his life and actions—Dr. Richard Adler, Dr. Paul Connor, and Dr. Natalie Novick Brown. FASD is a medical diagnosis that requires both medical and neuropsychological testing to accurately diagnose. (53 RR at 76-79.) The disorder can be responsible for a host of cognitive, behavioral, and developmental problems which vary from individual to individual. (Id. at 68-82.) These issues include higher rates of psychiatric disorders, inappropriate social behavior, learning problems, increased risk for criminal behavior and substance abuse, among other problems. (Id.) In conjunction, the experts diagnosed Soliz with Partial Fetal Alcohol Syndrome ("PFAS") and noted that they had never seen "a case of this kind of seriousness, severity, neglect, [and] abuse" in their years of practice. (Id. at 115.)

FASD is caused by a mother drinking during pregnancy. (53 RR at 54-57, 80.) It is an umbrella term that encompasses five different diagnoses, including Fetal Alcohol Syndrome ("FAS") and PFAS. To diagnose FAS, there must be confirmed prenatal alcohol exposure, specific facial abnormalities, central nervous system abnormalities, and growth problems. (Id. at 61-63.) If the facial abnormalities are not as severe, a person can be diagnosed with PFAS. (Id. at 66-67.) PFAS should not be considered a lessened version of FAS; instead, PFAS can actually cause more serious problems than FAS because it is more likely to go

undetected but the person will still have cognitive abnormalities that can be as serious as those of someone with FAS.  (Id. 91-93.)

FASD can be the root cause of a wide variety of cognitive, behavioral, and adaptive problems.  Deficits vary because the alcohol damages the area of the brain that is developing when it is consumed by the mother.  (55 RR at 148.)  It can cause problems in executive functioning, decision making, behavior control, and cause a lack of empathy for others.  (Id. at 152-54.)  People with FASD are generally followers and their impairment makes it difficult, if not impossible, for them to take responsibility for their actions.  (Id. at 153-57.)  Additionally, they are generally extremely impulsive and have problems applying what they have learned to real-life scenarios, in addition to displaying a variety of other adaptive functioning deficits.  (54 RR at 18-19.)

Cognitive impairments caused by FASD are also varied.  While persons with FASD frequently have IQ's above 70, their functioning places them in the mentally retarded range.  (53 RR at 101.)  On average, someone with FASD functions at the same level as the average seven year old. (Id. at 98, 101.)  Not surprisingly, people afflicted with FASD have difficulty learning and retaining information.  (54 RR at 18.)   A person afflicted with FASD is expected to have poor academic achievement, particularly in the area of mathematics.  (Id. at 28.)

Dr. Adler testified as a psychiatrist specializing in FASD.  (53 RR at 36, 42.)
He conducted a physical examination of Soliz, took photographs of his face and
hands, and reviewed testing done by other members of the diagnostic team.  (*Id.* at
78-79.)   Based on Soliz's confirmed prenatal exposure to alcohol, facial
abnormalities, and cognitive abnormalities, Dr. Adler diagnosed him with partial
FAS.  (*Id.* at 86-90.)  The diagnosis was PFAS because Soliz's facial abnormalities
were mild.  (*Id*. at 109-10.)  Soliz clearly suffered from PFAS and it was the most
serious case Dr. Adler had ever seen.  (*Id*. at 115.)

Dr. Connor, a neuropsychologist, tested Soliz to determine whether he had
cognitive deficits consistent with FASD.  (54 RR at 21.)  Soliz's twenty-eight point
difference between his verbal and nonverbal IQ score was extremely rare; only
approximately two percent of the population has such a disparity.  (Id. at 37; see
also 55 RR at 44-46 (noting that Soliz's Full Scale IQ score of 90 would not be an
accurate representation of his cognitive functioning because of the disparity).)
This disparity was consistent with prior IQ testing of Soliz.  (*Id.* at 37-38.)  Soliz
scored extremely low in many academic areas: the second percentile in reading and
pronunciation, the fifth percentile in sentence comprehension, the second
percentile in spelling, and in the eighth percentile in math.  (Id. at 37-43.)  In total,
Soliz was deficient in seven of the nine domains of cognitive functioning—and a
FASD diagnosis only requires deficits in three domains.  (Id. at 68-69.)  Soliz also

had serious adaptive deficits, as measured by the Vineland Adaptive Behavior Scale. (*Id*. at 62-67.)

Dr. Brown testified in her capacity as a forensic and clinical psychologist. (55 RR at 133.) Her role was to conduct a lifelong assessment of Soliz to determine whether there was anything that would contradict a PFAS diagnosis, such as sophisticated behavior or success in important domains. (*Id*. at 141-42.) Dr. Brown found that Soliz's prior IQ testing, his academic functioning—including being in special education classes—and his behavior history all were consistent with FASD. (*Id*. at 158-74.) Soliz's records showed that, at age six, he was having problems with concentration and school performance—prior to his documented drug and inhalant abuse, so that could not be its cause. (*Id*. at 166.) Dr. Brown also administered the Gudjonsson Suggestibility Scale, which showed that Soliz was hyper-suggestible, a common trait of those with FASD. (*Id*. at 216-20.) Studies indicate that protective factors can mitigate against the deleterious effects of FASD. (55 RR at 183-86.) The most important factor is a quality, well-structured home life—one without abuse, neglect, and poverty. (Id. at 184.) A chaotic, unsupportive home life allows the negative effects of FASD to flourish because there is nothing moderating them. (Id. at 184-85.) Another protective factor is an early diagnosis of the disorder, which can facilitate treatment through developmental disabilities services. (Id. at 185-86.) Soliz had neither of these

protective factors.  (Id. at 184-86.)  The combination of extreme neglect at home and the deficits from PFAS made Soliz's story particularly tragic.  (Id. at 214-15.)

All of Soliz's testing and life history were consistent with PFAS.  Soliz's life story is that of a person afflicted with cognitive and behavioral deficits due to his mother's decisions during her pregnancy with him.  These problems were then compounded by a chaotic and unsupportive home environment.  His mother's actions and the effect of those choices on Soliz lower his moral culpability for his actions.  The ultimate penalty of death cannot be constitutionally applied in light of this diminished culpability.

## B.  *Atkins v. Virginia* and Diminished Culpability

In *Atkins v. Virginia*, the Supreme Court held that the Eighth Amendment's ban on cruel and unusual punishment prohibited the execution of mentally retarded individuals.  536 U.S. at 321.  The Court determined that society recognized the lesser moral culpability of criminal offenders with mental retardation, as evidenced by a national consensus prohibiting the execution of persons with mental retardation.  *Id*. at 320-21.  Because of their diminished culpability, the execution of a person with mental retardation would not serve any valid retributive or deterrent function.  *Id*.  It also highlighted several factors indicating that persons with mental retardation were at much greater risk of wrongfully receiving a sentence of death.  *Id.*

137

The underlying rationale behind the national consensus observed by the Court was the lowered individual culpability of a person with mental retardation. In *Atkins*, the Court noted that persons with mental retardation, by definition, have "diminished capacities to understand and process information, . . . to engage in logical reasoning, [and] to control their impulses." *Atkins*, 536 U.S. at 318. Recognizing these cognitive deficits, the Court then held that "the large number of States prohibiting the execution of mentally retarded persons . . . provides powerful evidence that . . . our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id*. at 315-16. The Court has subsequently reaffirmed the importance of decision-making and impulse control on culpability when it extended immunity from execution to juveniles in *Roper v. Simmons*. 543 U.S. 551, 571 (2005).

The Court also observed that the reduced capacity of mentally retarded offenders increases the risk that "the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . ." *Atkins,* 536 U.S. at 320 (internal quotation omitted). Mentally retarded individuals are less able to "make a persuasive showing of mitigation[,] . . . . are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse . . . ." *Id.* a 320-21. Mental retardation is often inaccurately viewed by juries as an aggravating factor, rather than as mitigating. Such defendants are also less able to

give meaningful assistance to their counsel.  Each of these factors demonstrated that persons with mental retardation "face a special risk of wrongful execution." *Id.* at 321.

### C.   Similar to Intellectual Disability, Persons with FASD Have Diminished Moral Culpability

The concerns highlighted by the Supreme Court in *Atkins* regarding the culpability of intellectually disabled individuals apply with equal force to those afflicted with FASD.  Both the intellectually disabled and those with FASD have serious problems in learning and processing information.  (Atkins, 536 U.S. at 318; 53 RR at 68-82; 54 RR at 37-39.)  Both have difficulty in logical reasoning and problem solving.  (Atkins, 536 U.S. at 318; 54 RR at 18-19.)  Both have a diminished capacity to control their impulses.  (Atkins, 536 U.S. at 318; 53 RR at 94-95; 54 RR at 18-19.)  Problematically, both may display characteristics that increase the risk of an inappropriate death sentence, such as their demeanor making them look unremorseful.  (Atkins, 536 U.S. 320-21; 55 RR at 152-53.)

There are striking parallels between the diagnostic criteria for intellectual disability and FASD.  See American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 33 (5th ed. 2013) ("DSM-5").  Intellectual disability requires a showing of deficits in intellectual and adaptive functioning whose onset occurs during the developmental period.  *Id.*

Regarding intellectual functioning, clinicians evaluate possible deficits in "reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding." *Id.* at 37. Deficits in adaptive functioning are measured in the academic, social, and practical domains. *Id.* They include competence in basic subjects such as math, reading, and writing, as well as the ability to empathize, social skills, and communication skills. *Id.* The DSM notes that gullibility is one of the most common features of intellectual disability. *Id.* at 38.

Similar signs are looked for when diagnosing a person with FASD. Neuropsychological testing is conducted, similar to the testing done to determine whether a person is intellectually disabled. (53 RR at 101; 54 RR at 21.) This testing showed that Soliz had significant cognitive deficits and problems in numerous academic areas. (54 RR at 37-43, 68-69.) Adaptive functioning tests are administered—both in testing for intellectual disability and FASD—and again Soliz scored poorly. (54 RR at 62-67.) Furthermore, testing showed that Soliz was "hyper-suggestible," one of the most common features of the intellectually disabled. (55 RR at 216-20; DSM-5 at 38.)

The difficulties faced by the intellectually disabled and those with FASD are similar, reducing the moral culpability of those with either affliction. While those with FASD often have an IQ score that disqualifies them from receiving a

diagnosis of intellectual disability, their actual functioning places them in that range.  (53 RR at 101.)

### D.    Atkins should be expanded to include FASD

Those afflicted with FASD should be categorically ineligible for the death penalty just as the intellectually disabled are. As a consequence, Soliz's death sentence violates his Eighth Amendment protection against cruel and unusual punishment. *See Atkins*, 536 U.S. at 321.

Although the Court in *Atkins* was very clear in holding that it is unconstitutional to execute a mentally retarded person, they reserved the power to define and determine mental retardation in the individual states. *Id.* at 320-21. Instead of adopting a definition of mental retardation, explaining a multi-step test for determining mental retardation, or even listing a number of factors to consider that could guide the states in their determinations, the Court simply left it to the states to enforce this constitutional limitation on the death penalty. *Id.* The Court did, however, point to clinical definitions of mental retardation from the American Association of Mental Retardation and the American Psychiatric Association. *Id.* at note 22. Both definitions require (1) sub-average intellectual functioning, and (2) limited adaptive skills in at least two areas of functioning. *Id.* at note 3.

The explanations for overturning *Penry* illustrate rational justifications for

exempting mentally retarded defendants. However, by vesting the power to define "mental retardation" in the states and supplying them with definitions to guide this determination, the Court may have inadvertently undermined the larger policy concerns that they clearly expressed in the *Atkins* decision.

## 1. The case of Brandy Holmes

The following is an excerpt from a law journal article discussing the case of *Holmes v. Louisiana*, 5 So.3d 42, 49 (La. 2008). *See* Christopher Fanning, *Defining Intellectual Disability: Fetal Alcohol Spectrum Disorders and Capital Punishment*, 38 RUTGERS L. REV. 1 (2010-11).

> On New Year's Day in 2003, Brandy Aileen Holmes and her boyfriend, Robert Coleman, forcefully entered the home of Julian Brandon, a 70 year-old retired minister, and his 68 year-old wife, Alice. After the pair entered, they shot Reverend Brandon in the head, demanded that Mrs. Brandon give them credit cards, cash and other valuables, and then shot Mrs. Brandon in the head as well. When the pair discovered that Mr. Brandon appeared to have survived his gunshot wound, they retrieved knives from the kitchen and proceeded to slash and stab Mr. Brandon all over his body. The victims were discovered four days later by a family friend and the Sheriff's Office initiated a search for Holmes and Coleman. The pair was eventually discovered and questioned by the Sheriff's Office after nearby residents reported that Holmes "had been bragging about killing an elderly couple ... [and] was trying to sell their jewelry." Holmes admitted to the police, over the course of six statements, that she had been involved in the killing and also revealed that she had returned to the Brandon's home two days after the incident with her young nephews because she had dreamed that Mrs. Brandon was still alive.

On February 14, 2006, a unanimous jury convicted **6** Holmes of first-degree murder for her role in the killing of Reverend Brandon and, two days later, she was sentenced to death.

During the penalty phase of the trial, the defense argued that Brandy Holmes suffered from Fetal Alcohol Syndrome and that her condition diminished her mental capacity and adversely affected her ability to make decisions. Brandy Holmes' mother revealed that she had regularly used alcohol while she was pregnant with Holmes' and, in fact, that she named her daughter after her favorite alcoholic drink that she would consume during that pregnancy. Her mother also testified that, as a child, her daughter had been in special education classes, had been institutionalized, and "had a propensity for eating rocks." Furthermore, a psychology expert, Dr. Mark Vigan, an expert in psychiatry and addiction disorders, Dr. Richard Williams, and an expert in functional neuroimaging, Dr. James Patterson, testified to Holmes' mental limitations and intellectual disorders.   Dr. Vigan conducted neuropsychological tests on Brandy Holmes that examined five major areas and, based on these tests, he testified that, although she is responsible for her actions and has a full-scale IQ of 77, Holmes functions mentally at a seventh grade level, suffers from organic brain impairment, lacks empathy for other people, and does not "learn well from her prior punishment."   Dr. Vigan described Brandy Holmes as "impulsive" and "emotionally reactive" and explained that she didn't appear to take the proceedings seriously.   Also, Dr. Vigan claimed that Holmes disliked him because he had attempted to convince her to appreciate the seriousness of her situation but that she misinterpreted it as evidence that he wanted her to be executed.   Similarly, Dr. Williams testified that Holmes "has a diminished capacity for her responsibility" because she suffers from brain damage that was caused by the toxicity of alcohol and, accordingly, "has a diminished capacity in accepting responsibility for her behavior."   Additionally, Dr. Patterson reviewed an MRI scan of Holmes' brain and testified that it revealed significant structural abnormalities that are "consistent with published reports on brain findings in fetal alcohol syndrome." Despite the expert testimony and other evidence, Brandy Holmes was sentenced to death.

On appeal to the Supreme Court of Louisiana, Brandy Holmes'

attorney argued, among other things, that the court erred by denying a motion that would have labeled Holmes' ineligible for the death penalty, due to her intellectual disabilty. *Holmes*, 5 So.3d at 60-61. The court relied on La. Code Crim. Proc. Art. 905.5.1, which says that:

Any defendant in a capital case making a claim of mental retardation shall prove the allegation by a preponderance of the evidence. The jury shall try the issue of mental retardation of a capital defendant during the capital sentencing hearing unless the state and the defendant agree that the issue is to be tried by the Judge. If the state and the defendant agree, the issue of mental retardation of a capital defendant may be tried prior to trial by the judge alone.

Due to the fact that there was no agreement between the state and the defense, the court on appeal found that the trial court had not erred in leaving the determination of Holmes' mental retardation to the jury. *Holmes*, 5 So.3d at 61.

In the *Holmes* case, as in the present case, the State court hardly even considered evidence of mental impairments in their decision to uphold her death sentence. Before the trial even began, Holmes' attorneys produced the expert testimony to attempt to show that her condition made her ineligible for the death penalty. *Holmes*, 5 So.3d at 61 However, the state court pointed out that, according to Louisiana criminal procedure, the issue of mental retardation is supposed to be argued before the jury during the capital sentencing phase and can only be argued in front of the judge before the trial if both sides agree to such a stipulation. *Id.* A similar ruling by the trial court occurred in Soliz.

144

Additionally, pursuant to the Louisiana Code of Criminal Procedure and the Louisiana Supreme Court rules, the Supreme Court of Louisiana reviewed Holmes' death sentence and considered, among other things, the proportionality of the sentence in relation to the offense and the offender. *Id.* at 94. Surprisingly, the court determined that a sentence of death for Brandy Holmes was proportionate because (1) the crime happened in the victim's home; (2) there were multiple victims; and (3) the age of the victims. *Id.* Although the court stated that they considered the offense and the offender, there appears to be little consideration of Brandy Holmes' intellectual disabilities within this section of the court's opinion.

The most problematic result of the *Atkins* decision was that the Supreme Court reserved the ability to define "mentally retarded" as it pertains to capital punishment in the individual states. *Atkins*, 536 U.S. at 317. Although they cited two similar definitions, the Supreme Court did not provide definite guidance and apparently assumed that the state's definitions would reflect contemporary definitions of intellectual disabilities *Id.* This decision appears to have overlooked the very real possibility of disparities between definitions of mental retardation. By not emphasizing the reasoning for finding that executing the mentally handicapped is unconstitutional, the Supreme Court inadvertently allowed states to adopt definitions that may overlook certain individuals with intellectual disabilities who should not face the death penalty.

In *Atkins*, the Court identified two definitions of mental retardation from the American Association of Mental Retardation and the American Psychiatric Association that both contained three criteria to establish a diagnosis of mental retardation. *Id.* at n.3. The definitions characterize mental retardation as (1) sub-average intellectual functioning, coupled with (2) limitations in at least two adaptive skill areas, all of which must (3) manifest before the age of eighteen years. Generally speaking, the various definitions of mental retardation amongst the individual states share the same qualities as the two definitions that were cited in the *Atkins* decision. To qualify as mentally retarded, most states require that the defendant demonstrate sub-average intellectual function and limitations with adaptive skills before a certain age.  Although each state is different, a common characteristic amongst the individual definitions is an IQ requirement or guideline.6 For example, in order to qualify as suffering from "significantly sub average general intellectual functioning," Arizona requires that a defendant have an IQ of seventy or below. Conversely, Illinois' statute does not have an IQ requirement to demonstrate mental retardation, but does state that an IQ of seventy-five or less is "presumptive evidence of mental retardation." Although, on

---

6 *See, e.g.*, ARIZ. REV. STAT. ANN. § 13-753 (2011) (requiring an IQ of seventy or lower); 725 ILL. COMP. STAT. 5/114-15 (2011) ("(d) In determining whether the defendant is mentally retarded, the mental retardation must have manifested itself by the age of 18. IQ tests and psychometric tests administered to the defendant must be the kind and type recognized by experts in the field of mental retardation. In order for the defendant to be considered mentally retarded, a low IQ must be accompanied by significant deficits in adaptive behavior in at least 2 of the following skill areas: communication, self-care, social or interpersonal skills, home living, self-direction, academics, health and safety, use of community resources, and work. An intelligence quotient (IQ) of 75 or below is presumptive evidence of mental retardation.").

its face, IQ may seem like a suitable measure of whether someone suffers from mental retardation, it is not a fool-proof standard. *See Timing Of IQ Test Can Be A Life Or Death Matter*, SCIENCE DAILY Dec. 4, 2003, http://www.sciencedaily.com/releases/2003/12/031204073317.htm. Researchers at Cornell University recognized that a failure to make changes to the standard IQ test on a more regular basis may have lead to higher scores for certain test-takers. *Id.* Every fifteen to twenty years the IQ tests have to be rewritten to be more difficult than previous tests in order to compensate for changes from generation to generation. *Id.* According to the Cornell study, individuals who took an IQ test shortly before the test was rewritten scored higher than they would have if they had taken the newer test. *Id.* Thus, "some borderline death row inmates or capital murder defendants who were not classified as mentally retarded in childhood because they took an older version of an IQ test might have qualified as retarded if they had taken a more recent test." *Id.* Although this does not mean that IQ is entirely irrelevant, it does demonstrate that it is not as concrete as definitions of mental retardation would suggest. Also, IQ is not terribly reliable or informative in determining or recognizing impulsiveness, gullibility, or inability to conform to social norms. As will be explained later, by requiring a certain IQ score, states are ignoring the very real possibility that certain individuals with FASD or other disorders may be able to meet some intellectual hurdles, but should still be less

147

culpable for their actions than someone with the same IQ. *See* Albert E. Chudley et. al., *Challenges of Diagnosis in Fetal Alcohol Syndrome and Fetal Alcohol Spectrum Disorder in the Adult*, 145 AM. J. OF MED. GENETICS 261, 262 (2007); Ann Pytkowicz Streissguth, Jon M. Aase, et. al., *Fetal Alcohol Syndrome in Adolescents and Adults*, 265 J. OF THE AM. MED. ASSOC. 1961, 1965 (1991).

Additionally, states that have an IQ requirement in order to show sub-average intellectual functioning disregard the fact that IQ alone is not demonstrative of mental retardation. Both definitions that were cited in the *Atkins* decision explained that, by itself, a low IQ score is not sufficient to lead to a classification of mental retardation. *Atkins*, 536 U.S. at 309. There must also be limitations in adaptive behavior. *Id.* The Supreme Court of Pennsylvania has recognized this important point and refused to "adopt a cutoff IQ score for determining mental retardation ... since it is the interaction between limited intellectual functioning and deficiencies in adaptive skills that establish mental retardation." *Commonwealth v. Miller*, 585 Pa. 144, 155 (Pa. 2005). Under state definitions that have an IQ cutoff, a person who has suffered from significantly impaired adaptive skills in multiple areas throughout their entire life, but who has an IQ that is slightly above the cut-off point would not qualify as mentally retarded. Accordingly, any definition that establishes a strict cut-off point for IQ

ignores the inherent balancing test that is necessary for determining a person's intellectual capacity.

Furthermore, the overwhelming majority of states require that the defendant be able to demonstrate that their mental disabilities be documented before a certain age. *Id.* Although this may be an important classification criteria in the medical profession, within the realm of capital punishment age requirements pay no attention to the possibility that someone may suffer some other catastrophic injury or the reality that some people will suffer from intellectual disabilities  that remain undiagnosed until they are much older. For those people, although they would not necessarily meet the clinical definition of mental retardation, they nonetheless suffer from the limitations that the Supreme Court cited in *Atkins* and should be exempt from capital punishment.

A person who has their intellectual faculties damaged after the age of eighteen could potentially experience similar limitations and symptoms as someone who was born with intellectual disabilities. However, according to a definition of mental retardation that requires that the symptoms manifest before the age of 18, they would still be eligible for the death penalty. This could create problems, for example, where a defendant has suffered a traumatic brain injury. *See* Martin J. McMorrow, Brain Injury Association of America, Behavioral Challenges after Brain Injury, *available at* http://www.biausa.org/_

literature_43279/behavioral_challenges.According to the Brain Injury Association of America, people who suffer traumatic brain injuries can suffer from a range of behavioral problems including "mild personality changes or periods of disorientation to persistent difficulties controlling emotions, lack of inhibition (an inability to block or manage drives and impulses), and generally managing one's behavior." *Id.* Furthermore, "people with milder brain injuries may also experience behavioral problems ... although these may be more difficult to identify and it is less likely that these individuals will receive organized support related to their difficulties." *Id.* For these people, it is often the case that they are incapable of controlling their behavior or the effects of the brain injury. *Id.* Certainly an individual who sustains a traumatic brain injury in their adult life that creates mental disabilities that are similar to someone with organic mental disabilities should be afforded the same protection from unusual punishment. It is possible that there are many disorders or conditions that have yet to be discovered or understood that can create the same situation. Until we unravel all of the intricacies of the human brain, the law's approach should be cautious so that hindsight may be easier to swallow.

The other significant problem with requiring that the intellectual disability manifest before a certain age is that there is no guarantee that the problem will be noticed, diagnosed or treated. For example, in *Commonwealth v. VanDivner*, the

Supreme Court of Pennsylvania determined the appellant did not prove his mental impairments had manifested before the age of eighteen despite expert testimony that he functioned within the mild range of mental retardation, was deficient in social skills, read at a second grade level, spelled at a first grade level, had problems with impulse control, and had been enrolled in special education classes until he dropped out of school in the tenth grade. *Commonwealth v. VanDivner*, 962 A.2d 1170, 1184 (Pa. 2009). In determining that there was not enough evidence to show that his disabilities manifested before the age of eighteen, the Court cited the fact that there had been no testing done on Mr. VanDivner before he was eighteen and that, although he had been in special education classes, he could have been placed in those classes simply for behavioral problems. *Id.* Certainly the system should take some precautions to protect against abuse from people claiming mental problems that do not actually exist, but the approach in *VanDivner* would essentially require a juvenile with borderline or sub-average intellectual abilities to seek diagnosis of their problem before they reached eighteen years of age. Furthermore, if the already over-burdened school that the youth is attending places the student in special education classes, but fails to specify the reason for that placement as intellectual disabilities, there still may not be enough proof to legally recognize what could potentially be a very serious problem. Finally, by requiring proof that the disabilty existed before a certain age,

151

definitions of mental retardation ignore people who have intellectual limitations that go undiagnosed until they are much older. Stephen Neafcy, for example, has suffered from FASD from the time he was born, but did not receive a diagnosis until he was 43-years-old. Stephen Neafcy, *A Ray of Hope*, FASLINK *Fetal Alcohol Disorder Society*, http://www.acbr.com/fas/stephen%20Neafcy.htm Accordingly, the age limitations that may serve some classification purpose in the medical field seem arbitrary when placed in a legal context.

An unfortunate consequence of the Supreme Court's holding in *Akins* that allows the state's to retain some control over how they enforce their laws, is that it has created a situation where the majority of states, including Texas, have overlooked characteristics of certain intellectually-challenged people. For those individuals, although they do not fit within these specific clinically-based definitions of mental retardation, they nevertheless struggle with the same problems that the Court cited in *Atkins* as reasons for exempting other individuals from capital punishment. This problem is especially apparent in the case of FASD.

In *Soliz*, the state court failed to consider his mental handicap before sending the case to the jury for deliberation on the issue whether he deserved to die for his crimes. The state court's blind adherence, and refusal to extend *Atkins* to cases involving FASD amounts to cruel and unusual punishment under the Eighth

Amendment. This action by the state court is the direct result of a misapplication of the facts of this case to well established federal law under *Akins*.

### XV.   CLAIM FIFTEEN: SOLIZ'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN THE TRIAL COURT WAS PROHIBITED FROM INSTRUCTING THE JURY THAT A VOTE BY ONE JUROR WOULD RESULT IN A LIFE SENTENCE (RAISED AS CLAIM FIFTEEN IN THE STATE WRIT, AND CLAIMS THIRTEEN AND FOURTEEN IN THE STATE DIRECT APPEAL)

**EXHAUSTION:**

The State District Court denied Soliz's claim 15 because the CCA had decided the issue adversely to him.  FFCL, at p. 37.  On direct appeal, the CCA held:

> In points of error thirteen and fourteen, appellant asserts that the trial court erred in    overruling   his   motion   to   declare   the   "10-12   rule" unconstitutional on the ground that it creates   an   impermissible   risk   of arbitrary imposition of the death penalty, and in refusing  to  instruct  the  jury that  if  a  single  juror  "holds  out"  for  life,  the  defendant  will  receive  a sentence  of  life  imprisonment  by  operation  of  law.  Appellant  argues  that  the jury   instructions  set  forth  in  Article  37.071,  sections  2(d)(2)  and  2(g), affirmatively  create  confusion  in  the  minds  of  jurors  about  what  will happen  if  the  jury  is  unable  to  reach  the  minimum  number  of  votes required to answer the special issues. He further asserts that      Section  2(a) specifically prohibits informing the jury of the result of a failure to agree on the answer to any special issue. *Citing Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860,  100  L.  Ed.  2d  384  (1988),  appellant  states  that  these instructions violate the Eighth   Amendment because they lead an individual juror to believe that his vote in favor   of a   life  sentence   is   meaningless unless a certain number of other jurors are persuaded to vote      along    with him.

We have previously rejected these claims, and we are not persuaded to reconsider them.    *See Williams v. State*, 301 S.W.3d 675, 694 (Tex. Crim. App. 2009); *see also Druery*,    225 S.W.3d at 509. Points of error thirteen and fourteen are overruled.

432 S.W.3d 895, 904-905.

Soliz argues that Texas's capital sentencing scheme, by affirmatively misleading jurors about their individual ability to give effect to their personal belief regarding mitigation, violates the Eighth and Fourteenth Amendments. This claim is based on *Mills v. Maryland*, where the Court ruled that the petitioner's sentence could not stand where it was *possible* that some "jurors were prevented from considering factors which may call for a less severe penalty [than death.]" 486 U.S. 367, 376 (1988). As the Fifth Circuit has repeatedly recognized, "[s]ubsequent to *Mills*, the Supreme Court has explained that '*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death.'" *See, e.g., Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir. 2000) (*citing McKoy v. North Carolina*, 494 U.S. 433, 442–43, 110 S.Ct. 1227, 1233 (1990)); *Jacobs v. Scott,* 31 F.3d 1319, 1328 (5th Cir. 1994).

The constitutional defect with Texas' current jury instructions is that they, by statute and as applied in Soliz's case, mislead jurors about their individual ability to give effect to mitigating circumstances. Although Texas's sentencing

154

statute gives individual jurors the power to prevent the death penalty if they believe mitigating circumstances call for a sentence of life, that same statute also misleads jurors into believing their individual belief is immaterial unless they are able to persuade nine of their fellow jurors that their view of the evidence is correct. *See* TEX. CODE CRIM. PRO. ART. 37.071.[7]   Soliz does not argue that it is necessary to instruct jurors about the consequences of a single holdout juror although that would give meaning to Texas Code of Criminal Procedure art. 37.071 Sec. 2 (g) (if the jury is unable to answer either of the special issues the court shall sentence the defendant to life in prison).[8] Rather, Soliz argues that Texas's sentencing scheme misleads jurors about their individual ability to "give effect to mitigating evidence when deciding the ultimate question whether to vote for a death sentence." *McKoy*, 494 U.S. at 442-43.

Soliz concedes that numerous Fifth Circuit opinions have denied this claim on the grounds that this Court has "repeatedly held that Texas's 12-10 Rule does not run afoul of *Mills.* (*citing Reed v. Stephens,* 739 F.3d 753,779 (5th Cir. 2014); *Parr v. Thaler,* 481 F. App'x 872, 878(5th Cir. 2012); *Druery v. Thaler,* 647 F.3d

---

7 In judging the constitutionality of the of a capital sentencing statute, a court must ask how a reasonable juror could view his or her role under the statutory scheme. *California v. Brown,* 479 U.S. 538, 541 (1985).

8 Soliz understands that the Eighth Amendment does not require that the jurors be instructed as to the consequences of their failure to agree. *Jones v. United States*, 527 U.S. 373, 381 (1999). However, a jury cannot be "affirmatively misled regarding its role in the sentencing process." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). The "12-10" rule produces this type of misleading effect. In fact, it misleads and diminishes the individual role of each juror in the assessment of punishment by suggesting that a life sentence cannot be assessed unless ten jurors believe a life sentence is appropriate.

535, 542-43 (5th Cir. 2011); *Greer v. Thaler,* 380 F. App'x 373, 389 (5th Cir. 2010)).

However, Soliz submits that the Fifth Circuit's prior decisions rejecting the *Mills* and *McKoy* argument have never addressed whether or not the 1991 change in capital sentencing laws brought Texas's sentencing scheme within the purview of clearly established Supreme Court Precedent.[9] Soliz  argues that the 1991 change to Texas's sentencing law brought *Mills* into play, and requests this Court to grant a certificate of appealability so that this issue can be fully briefed.

## A.   Texas's Enigmatic 12-10 Rule

Before a defendant may be sentenced to death in Texas, the jury must answer statutory special issues in a certain way. *See* TEX. CODE CRIM. PRO. art. 37.071 (Art. 37.071). This was true during Soliz's trial and remains so today. In Soliz's case two special issues were submitted to the Jury. *See* C.R. at p 567-576. Pursuant to Art. 37.071, sec. 2(b), the jury was first asked the following question: "Do you find beyond a reasonable doubt that there is a probability that the defendant, Mark Anthony Soliz, would commit criminal acts of violence that would constitute a continuing threat to society?" *Id.* at 574. The state was required to prove this special issue beyond a reasonable doubt, and the jury was instructed

---

9 This idea is based on the research conducted by undersigned counsel, which has not uncovered a case discussing the effect of the 1991 law change on the *Mills* argument. Soliz does recognize this Court addressed the law change in *Blue v. Thaler*, 665 F.3d 647, 662 (5th Cir. 2011), however, *Blue* involved a challenge to the 12-10 brought pursuant to *Romano v. Oklahoma,* not *Mills* and *McCoy.*

that they could not answer this special issue "yes" unless they agreed unanimously. *See* Art. 37.071(d)(2); Further, the jurors were instructed that they could not answer this special issue "no" unless ten or more jurors agreed. *Id.*

More relevant to this issue is the second special issue submitted in Soliz's case. The jury was instructed that they could answer special issue no. 2 only if they answered special issue no. 1 "yes." CR at 568. Because the jury answered special issue no. 1 in the affirmative they moved on to special issue no. 2 which asked: "Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Mark Anthony Soliz, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentenced be imposed?" CR at 575; *see also* Art. 37.071(e)(1). However, the jury was also instructed that they may not answer special issue no. 2 "no" unless they agreed unanimously, and that they may not answer special issue no. 2 "yes" unless ten or more of them agreed to do so. CR at 568.

The verdict form used in Soliz's case gave the jury two options in answering each special issue. *Id.* at 574, 575. They could only answer yes or no. *Id.* Further, the jury was instructed that "should you return an affirmative finding on Special Issue No. 1 and a negative finding on Special Issue No. 2 the court will sentence

the defendant to death." *Id.* at 569. The Jury was never told what would happen if the requisite number of jurors failed to agree on either issue, or if it was possible to return a verdict without reaching an agreement on one of the special issues.

Quite strikingly, Texas jurors are never informed that the Code of Criminal Procedure specifically states that "[i]f the jury returns a negative finding on any issue submitted under Subsection (b) of this article [future dangerousness] or an affirmative finding on an issue submitted under Subsection (e) [mitigation] of this article *or is unable to answer any issue submitted under Subsection (b) or (e)* of this article, the court shall sentence the defendant to confinement in the institutional division of the Texas Department of Criminal Justice for life." Art. 37.071 sec. 2(g). This is because "[t]he court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on issues submitted under Subsection (c) or (e) of this article." *Id.*at sec. 2(a)(1). Thus, the Texas 12-10 rule hides from jurors the fact that one or more jurors who believe that a life sentence is proper have the power to follow their belief, and that the end result will be a life sentence.

### B.   Clearly Established Supreme Court Precedent

The Supreme Court's ruling in *Mills v. Maryland* has been described by that court as follows:

> [In *Mills v. Maryland*] we reversed a death sentence imposed under Maryland's capital punishment scheme because the jury instructions and verdict form created "a substantial probability that reasonable jurors ... well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." We reasoned that allowing a "holdout" juror to prevent the other jurors from considering mitigating evidence violated the principle established in *Lockett v. Ohio,* 438 U.S. 586 (1978), that a sentencer may not be precluded from giving effect to all mitigating evidence.

*McKoy v. North Carolina,* 494 U.S. 433, 439-440 (1990).

The *Mills* court ruled that the petitioner's sentence could not stand where it was *possible* that some "jurors were prevented from considering factors which may call for a less severe penalty [than death.]" *Mills v. Maryland,* 486 U.S. 367, 376 (1988) (internal quotations removed). Petitioner Mill's death sentence was overturned because of the possibility that individual jurors were prevented from giving effect to mitigating evidence on the ground that the jury as a whole did not agree on the existence of particular mitigating evidence. The principle established from this ruling is that all jurors in capital cases must be able to give weight to any mitigating evidence presented, and that requiring unanimous agreement that certain evidence mitigates in favor of a life sentence violates the Eighth and Fourteenth Amendments.

This principle is applicable to Texas' 12-10 rule. While Texas' scheme does not require unanimous agreement by the jurors before a life sentence can be

imposed, it does affirmatively mislead jurors into believing that their independent belief that a life sentence is proper is irrelevant unless nine other jurors agree with them. Texas capital jurors, and the jurors in the applicant's case, are explicitly told that they cannot return a "yes" verdict on special issue no. 2 unless ten or more of them agree to do so. Further, by statute, Texas capital jurors are precluded from being told that a single juror's refusal to answer "no" on special issue no. 2 will result in a life sentence. Thus, *individual* jurors in Texas are denied the ability to give weight to mitigating evidence they believe calls for a life sentence unless they can convince nine other jurors to agree with them.

The statutory mandate that jurors must be affirmatively misled about their individual ability to give effect to mitigating evidence only exasperates the problem. *See* Art. 37.071 Sec. 2(a). The Supreme Court in *Mills* pointed out that "common sense and what little extrinsic evidence we possess suggest that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation unless they are expressly instructed to do so." *Mills v. Maryland,* 486 U.S. 367, 383 (1988). As Texas' jurors are not instructed to do so, and indeed are instructed that death will be imposed unless 10 or more jurors disagree with that decision, a single hold out juror will clearly be pressured to set aside his conscience and vote with his remaining jurors. After all,

the verdict form provided to jurors only allows one of two answers to the special issues, yes or no. The pressure this rule puts on a single holdout juror is obvious.

That *Mills* requires each individual juror be able to give effect to any mitigating evidence they personally deem relevant was made clear in *McKoy v. North Carolina*, 494 U.S. 433, 442-443 (1990) (emphasis added). Once again, the Texas Statute at issue violates this clearly established federal principle by instructing jurors that they cannot give effect to mitigating evidence which calls for life in prison unless nine of their counterparts agree with them.

Any contention to the contrary is diametrically opposed to the Seventh Circuit's decision in *Kubat v. Thieret*.[10] In *Kubat*, the trial court erroneously instructed the jury in a capital case that it must "*unanimously* conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence" before a life sentence would be imposed. *Kubat v. Thieret,* 867 F.2d 351, 369 (7th Cir. 1989). The *Kubat* Court, relying on *Mills*, held that the death sentence imposed in that case must be overturned "on the grounds that one or more of the jurors might have been precluded from considering mitigating factors." *Id.* at 373. The court explained as follows:

_____

[10] Soliz understands *Kubat* "does not supersede intervening Fifth Circuit precedent regarding challenges to Texas' 12–10 rule." *Druery v. Thaler*, 647 F.3d 535, 543 (5th Cir. 2011). However, as explained below, *Druery* is distinguishable from Soliz's case because it relied on cases discussing the pre-1991 formulation of capital punishment in Texas.

The same analysis applies in Kubat's case. Kubat's jurors were never expressly informed in plain and simple language that if even one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death. On the contrary, the instructions emphasized unanimity. As discussed in part III, A., 2., above, there is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

*Id.* at 372.

While the jurors in Soliz's case were not instructed that they had to be unanimous in their decision that mitigating circumstances called for life in prison, they were instructed that at least ten jurors must agree before a life sentence would be imposed. For this reason, Texas's 12-10 rule creates a substantial possibility that one or more of the petitioner's jurors might have been precluded from granting mercy because of their mistaken belief that sufficient mitigating factors had to be found by ten or more jurors.

In *Davis v. Mitchell*, the Sixth Circuit granted relief to a habeas petitioner on similar grounds, reversing the ruling of the district court. *Davis v. Mitchell,* 318 F.3d 682 (6th Cir. 2003). In that case, "[i]mmediately following the trial court's instruction regarding mitigating circumstances, the trial judge . . . gave the jury a unanimity instruction, stating, '[n]ow, as you know, since this is a criminal case, the law requires that in order for you to reach a decision all 12 of you must be in agreement.'" *Id.* at 684. In addition, the "judge gave the jury a so-called 'acquittal-

first' instruction stating that it must first analyze whether the elements allowing the death penalty were present, and only if they were not present, should the jury move on to consider life imprisonment." *Id.* In reaching their decision the Sixth Circuit noted that "[i]nstructions that leave a jury with the impression that juror unanimity was required to mitigate the punishment from death to life imprisonment clearly violate the Eighth Amendment, and therefore the writ of habeas corpus must issue setting aside the death sentence."

In analyzing the issue in *Davis* the Sixth Circuit reviewed the Federal Death Penalty Act enacted in 1994. The court noted that under this act "[a]ny one or more jurors may find the existence of a mitigating factor and may then consider that factor in weighing the aggravating and mitigating factors even though other jurors may not agree that the particular mitigating factor has been established. This weighing decision must be made by *each juror giving individual consideration to the aggravating factors unanimously found by all of the jurors and such mitigating factors as may be found by each juror*." *Id.* at 686-687 (emphasis added). The court then went onto note that the reason for adopting this language in the Federal Death Penalty Act was to "bring us into conformity with Tuesday's Supreme Court decision in Maryland versus Mills" which held that "even if one juror says there was mitigating circumstances of any sort, the death penalty cannot be imposed." *Id.* The Sixth Circuit then agreed with congress that the Eight Amendment and

163

"*Mills* require[] that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *Id.* (internal citation omitted).

These cases show that clearly established federal law requires that capital jurors be made aware of their individual "power to prevent the death penalty by giving effect to mitigating circumstances absent an agreement of the other jurors regarding the presence of those mitigating circumstances." *Id.* at 690. Texas capital jurors are given this power by statute, but they are also affirmatively misled about this power, as required by the same statute. Art. 37.071, sec. 2(a), (g). Finally, it is because reasonable jurors, upon receiving instructions identical to those provided to the jury in Soliz's case may have believed they did not individually have the power to stop the infliction of the death penalty that the Texas 12-10 rule violates the 8th and 14th Amendment's as interpreted by *Mills* and *McKoy*.

### C.    The Fifth Circuit Has Not Addressed How the 1991 Change Affects the *Mills* and *McKoy* Arguments

Soliz concedes that this claim has been consistently rejected by this Court on two grounds: both on the merits and because the argument is *Teague* barred. However, the Fifth Circuit in rejecting similar claims has repeatedly relied upon cases decided before Texas Code of Criminal Procedure 37.071 was drastically changed in September of 1991, even when denying similar claims for post-1991 cases. In so doing this Court has not specifically addressed the fact that the Texas

Sentencing Scheme has changed, or how this change affects the *Mills* and *McCoy* analysis.

Before 1991, Texas's death penalty sentencing scheme consisted of asking jurors a series of three questions:

> "(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

> "(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

> "(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."

Art. 37.071(b) (Supp.1975-1976). If the jurors unanimously agreed that each of these questions had been proven beyond a reasonable doubt a sentence of death would result. *Id.* If the jury answered any of these questions 'no,' then life imprisonment would result. *Id.* Much like today, a yes answer had to be unanimous and a no answer had to be supported by ten of the jurors. *Id.*

Although the pre-1991 sentencing statute failed to specifically allow consideration of mitigation evidence, the Supreme Court upheld the statute because the Texas Court of Criminal Appeals "indicated that it will interpret this second question so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show." *Jurek v. Texas*, 428 U.S. 262,

272 (1976). Thus, juries in Texas were allowed to consider mitigation evidence, although they were never told so.   Of course, the infirmities of the pre-1991 sentencing scheme were brought to light when the Supreme Court held that Johnny Paul Penry had been sentenced to death in violation of the Eighth Amendment because his jury had not been adequately instructed with respect to mitigating evidence. *See Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*); *Penry v. Johnson*, 532 U.S. 782 (2001). As a result, the Texas death penalty sentencing scheme was changed to expressly allow juries to consider mitigation evidence.

In 1991, the Texas legislature amended Code of Criminal Procedure art. Tex. Code Crim. Pro. Art. 37.071 to include a true "mitigation special issue." *See* 1991 Tex. Sess. Law Service Ch. 838 (S.B. 880). Related to Soliz's case, the two special issues in question became the following:

> 1) "Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;
>
> 2) "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentenced be imposed.

*Id.*; *See* TEX. CODE CRIM. PRO. art. 37.071 (Vernon Supp. 1993-present). The jury could not answer special issue no. 2 "no" unless they agreed unanimously, and

they could not answer special issue no. 2 "yes" unless ten or more of them agreed that mitigation called for a life sentence. *Id.*

The Fifth Circuit has repeatedly held that *Mills* did not apply to the pre-1991 sentencing scheme because "*Mills* involve[d] statutory schemes different from the Texas sentencing statute and different legal standards." *See, e.g., Webb v. Collins*, 2 F.3d 93, 96 (5th Cir. 1993). This was true, as the pre-1991 sentencing scheme did not actually involve a mitigation special issue. However, the post-1991 sentencing scheme does include a mitigation special issue and is therefore much closer to the sentencing scheme discussed in *Mills*. The problem is that this Court, in its decisions related to the post-1991 sentencing scheme, has relied on decisions based on pre-1991 sentencing schemes. Soliz warrants to this Court that he has not discovered cases which address whether or not the change in the sentencing scheme affects the analysis of this issue.

For example, in *Druery v. Thaler*, the Court held that *Teague* bars review of this claim and that *Mills* does not apply to Texas's sentencing scheme. 647 F.3d 535, 543 (5th Cir. 2011) *cert. denied*, 132 S. Ct. 1550 (U.S. 2012)). *Druery* cites *Miller v. Johnson* for the idea that "*Mills* is not applicable to the capital sentencing scheme in Texas." *Id.* (*citing Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir.2000)). *Miller* however is not applicable to the issue currently before this Court for many reasons. First, "the jury at [Miller's] trial was instructed what to do if they did not

reach agreement as set forth in the charge. The jury instructions provided that if there was any special issue on which the vote of the jurors was not unanimously 'yes' or not at least ten in favor of an answer of 'no,' there should be no answer for that special issue and the presiding juror should not sign his or her name to any answer form for that special issue." *Miller,* 200 F.3d at 288. Further, the *Miller* case concerned the pre-1991 jury capital sentencing scheme which was not used in Soliz's case. *Id.* However, it is important that the *Miller* Court did recognize that, "*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *Id.* Soliz argues that the post-1991 sentencing scheme does not allow each juror to consider and give effect to mitigating evidence.

*Druery* also cited *Hughes v. Dretke,* 412 F.3d 582, 593–94 (5th Cir.2005) for the idea that the instant claim is *Teague* barred. *Druery*, 647 F.3d at 543. Although *Hughes* involved a crime committed after 1991, the Fifth Circuit's decision only discusses the application of the "future dangerousness" special issue. *Hughes,* 412 F.3d at 594. No mention was made of the mitigation special issue. *Id.* Further, the Fifth Circuit in *Hughes* ruled only that the claim was *Teague*-barred, relying on *Miller* (discussed above) and *Jacobs v. Scott*, 31 F.3d 1319, 1328–29 (5th Cir.1994). *Jacobs* was decided based on the pre-1991 sentencing scheme. *Jacobs,* 31 F.3d at 1328-29. Although *Jacobs* ruled that the 12-10 claim in that case was

168

procedurally defaulted, The Court went on to explain that the substantive argument was meritless because "[t]he [pre-1991] law in Texas is completely different from that in *Mills*." *Id.* at 1328.  This is true, because the pre-1991 law in Texas did not involve a mitigation special issue. Also, much like the *Miller* case, the jurors in *Jacobs* were "instructed that each juror was to make his or her decision independently." *Id.* at 1329. No such instruction was given in Soliz's case. Finally, this Court once again pointed out that *Mills* has been interpreted to mean "'each juror [must] be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death.'" *Id.* (*citing McKoy v. North Carolina*, 494 U.S. 433, 442–43 (1990)).[11]

Soliz asserts that Texas's post-1991 capital sentencing scheme, as applied in his case, violates the Eighth and Fourteenth Amendments. The distinction between the pre-1991 and post-1991 sentencing schemes, as related to *Mills*, has apparently not been addressed by the Fifth Circuit, and therefore Fifth Circuit precedent does not dictate the outcome of this claim.

As applied to the post-1991 sentencing statute, this claim is not *Teague*-barred. Under Teague, new rules of constitutional criminal procedure will not be announced on federal habeas review unless an exception applies. *Webb v. Collins*,

---

[11] Cases often cited for the idea that the Texas 12-10 Rule does not run afoul of *Mills* also suffer from the same defect. *See, e.g. Reed v. Stephens,* 739 F.3d 753,779 (5th Cir. 2014) (relying on cases which do not discuss the 1991 change in law) ; *Parr v. Thaler,* 481 F. App'x 872, 878(5th Cir. 2012) (relying on a pre-1991 case, *Jacobs v. Scott,* 31 F.3d 1319, 1329 (5th Cir.1994), and *Druery*)*; Druery v. Thaler,* 647 F.3d 535, 542-43 (5th Cir. 2011) (discussed above); *Greer v. Thaler,* 380 F. App'x 373, 389 (5th Cir. 2010) (based on the pre-1991 law).

2 F.3d 93, 95 (5th Cir. 1993) (*citing Teague v. Lane*, 489 U.S. 288, 316 (1989). However, Soliz asserts that applying *Mills* as interpreted by *McKoy* to Texas's post-1991 sentencing scheme does not create a new rule. "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government.... To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301.

That jury instructions which mislead individual jurors about their ability to give effect to mitigating evidence are in violation of the Eight and Fourteenth Amendments does not break new ground. The Supreme Court has long held that "*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy*, 442–43. This well-recognized Supreme Court rule dictates that the current Texas sentencing scheme is unconstitutional because it requires jury instructions which mislead individual jurors to believe that their individual vote for life is meaningless unless at least nine more of their follow jurors agree.

### D.  Conclusion

At the minimum, this Court should grant a Certificate of Appealability to address whether the 1991 change to Texas's sentencing scheme alters the legal foundations of earlier opinions decided in the old paradigm.

This issue is especially important in Soliz's case, because the jury instructions made it clear that the jury could return no answer except for yes or no to the special issues. Although clear, this instruction was both an incorrect statement of Texas law and in violation of the United States Constitution.

### XVI.  CLAIM SIXTEEN: SOLIZ'S DEATH SENTENCE IS UNCONSTITUTIONAL BECAUSE IT WAS ASSIGNED BASED ON TEXAS' ARBITRARY SYSTEM OF ADMINISTERING THE DEATH PENALTY (RAISED AS CLAIM SIXTEEN IN THE STATE WRIT)

## EXHAUSTION:

The state district court dismissed Soliz's Claim 16 as procedurally barred because it had been resolved adversely to him on the state direct appeal.  FFCL, at p. 38.

### A.    Introduction

*Texas Code of Criminal Procedure*, Art. 26.052 requires county funds to be used to pay court costs, investigative fees, and attorney's fees for capital defendants. Of course, these costs are not the only costs associated with capital cases. Capital prosecution also imposes substantial cost on a county in the form of prosecutorial and investigative resources, and by tying up district courts for weeks

at a time. After a grand jury has determined that probable cause exists that a defendant committed a capital offense, and after the prosecuting attorney determines that there is sufficient evidence upon which to seek a death penalty, he or she must decide whether the county coffers have sufficient funds to proceed with a death penalty prosecution. A capital murder case, in which the State is seeking the death penalty, is extremely expensive. This financial factor is a necessary, practical consideration in each of the 254 counties in Texas when a capital murder indictment is returned. The result of this financial factor is that counties with large budgets are more likely to pursue a death sentence in any given case than smaller counties with smaller budgets, resulting in an arbitrary selection of which cases will be tried as death cases.

Texas's statute defining capital murder restricts the homicides subject to the death penalty, and the statutory special issues submitted to the jury determine which capital murder defendants receive the death penalty. If every similarly situated capital murder defendant in every county in Texas faced the death penalty whenever the district attorney felt the evidence warranted seeking the death penalty, the only variable would be the normal discretion given the prosecuting attorney in any criminal case. However, the financial burden placed upon each county changes the equation dramatically. This is demonstrated by the lopsided statistics showing which counties send people to death row. It is logical that district

attorneys' offices in counties with large tax bases will have larger budgets than those in smaller and more rural counties. As shown by the discussion above, district attorneys in counties with large budgets are free to pursue the death penalty in circumstances where district attorneys in smaller counties could not. Therefore, the decision to prosecute a death penalty case in Texas is not determined solely by the nature of the offense or the offender himself or by the discretion of the district attorney, but also by financial resources available to the district attorneys in Texas's 254 counties. This factor renders the administration of the death penalty in Texas arbitrary and capricious in the Constitutional sense.

### B.   Injecting a Funding Consideration Into The Selection Process Creates Unconstitutional Arbitrariness Into The Selection Process

That the risk of facing the death penalty is greater in the Texas counties with the largest budgets is clear. This violates the Eighth and Fourteenth Amendments to the United States Constitution. Further, it goes without saying that "[w]hen a defendant's life is at stake, the [Supreme] Court has been particularly sensitive to insure that every [constitutional] safeguard is observed." *Gregg,* 428 U.S. at 187 (*citing Powell v. Alabama*, 287 U.S. 45, 71 (1932); *Reid v. Covert*, 354 U.S. 1, 77 (Harlan, J., concurring in result)).

"As the Court recognizes, a single general directive animates and informs our capital-punishment jurisprudence: '[t]he death penalty [may not] be imposed under sentencing procedures that creat[e] a substantial risk that [the death penalty]

would be inflicted in an arbitrary and capricious manner.'" *Sawyer v. Whitley,* 505 U.S. 333, 367 (1992) (Stevens, J., concurring) (*citing Gregg v. Georgia,* 428 U.S. 153, 188 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.). Based on this principle the Court has insisted "upon general rules that ensure consistency in determining who receives a death sentence." *Kennedy v. Louisiana,* 554 U.S. 407, 436 (2008); *See also California v. Brown,* 479 U.S. 538, 541 ("The Constitution instead requires that death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion.").

In explaining that the state court's decision on this issue was unreasonable, Allen cited the holding in *Gregg v. Georgia,* 428 U.S. 153, 199 (1976). The main holding of *Gregg* was that the "punishment of death does not invariably violate the Constitution." *Id.* at 169. However, the petitioner in that case also argued that the death penalty was arbitrarily applied in Georgia because of "the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law." *Id.* at 199. The Supreme Court addressed this argument as follows:

> The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman,* in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. *Furman held only that, in order to minimize the risk that the death penalty would be*

*imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.*

*Gregg* therefore stands for the idea that the capital sentencing decision should be based on the considerations of the crime and the defendant, not on how much money exists in a particular county's coffers. *See, e.g., Proffitt v. Florida*, 428 U.S. 242, 251 (1976) (upholding Florida's capital sentencing law because it "requires the trial judge to focus on the circumstances of the crime and the character of the individual defendant."); *McCleskey v. Kemp*, 481 U.S. 279, 308 (1987) ("Because McCleskey's sentence was imposed under Georgia sentencing procedures that focus discretion 'on the particularized nature of the crime and the particularized characteristics of the individual defendant,' we lawfully may presume that McCleskey's death sentence was not 'wantonly and freakishly' imposed.")

The problem with the death penalty as administered in Texas is that individual county funding injects arbitrariness into the selection process. Many counties in Texas are reluctant to pursue the death penalty because of the high cost associated with doing so, and because they lack the resources to consistently seek the death penalty. However, counties like Harris County, where the District Attorney enjoys a huge budget, have the capability to pursue the death penalty at

will. This creates a situation where similarly situated defendants, charged with similar murders, will be treated differently simply because they are accused of committing their crimes in different counties.

The Texas funding scheme flies in the face of the Supreme "Court's insistence that capital punishment be imposed fairly, and with reasonable consistency, or not at all." *Eddings v. Oklahoma,* 455 U.S. 104, 112 (1982). The harm to Soliz is clear; because he was charged in a small county, his chances of being sentenced to death were greater than a similarly situated defendant who was charged in a larger county where death penalty prosecutions are more common.

"It would seem to be incontestable that the death penalty inflicted on one defendant is 'unusual' if it discriminates against him by reason of his race, religion, wealth, social position, or class, or if it is imposed under a procedure that gives room for the play of such prejudices." *Furman v. Georgia*, 408 U.S. 238, 242 (1972) (Douglas, J. concurring). It would seem equally incontestable that the penalty of death inflicted upon one defendant would be 'unusual' if it would not have been inflicted upon another similar defendant who committed a similar crime in another jurisdiction. *See, e.g. Kennedy v. Louisiana,* 554 U.S. 407, 436 (2008) opinion modified on denial of reh'g, 129 S. Ct. 1, 171 L. Ed. 2d 932 (U.S. 2008) ("To date the Court has sought to define and implement this principle, for the most part, in cases involving capital murder. One approach has been to insist upon

general rules that ensure consistency in determining who receives a death sentence.")

The question presented to both this Court and the state courts below is: does a capital system which treats defendants differently based solely on the jurisdiction where they are prosecuted inject arbitrariness into the capital sentencing scheme? Allen submits that based on clearly established Federal Law it does.

## C.    Conclusion

Soliz urges this Court to grant a COA on this issue because he has made a substantial showing that his conviction was secured in violation of the Eighth and Fourteenth Amendments, and because he has shown that reasonable jurists could debate whether this claim should have been resolved in a different manner.

### XVII. CLAIM SEVENTEEN: SOLIZ'S DEATH SENTENCE SHOULD BE VACATED BECAUSE THE PUNISHMENT PHASE JURY INSTRUCTION RESTRICTED THE EVIDENCE THAT THE JURY COULD DETERMINE WAS MITIGATING (RAISED AS CLAIM SEVENTEEN IN THE STATE WRIT, AND CLAIMS ELEVEN AND TWELVE IN THE DIRECT APPEAL )

## EXHAUSTION

### The State Court resolved Soliz's Claim 18 with two sentences:

Art. 37.071 2(f)(4) V.A.C.C.P., in effect, defines "mitigating evidence" to be "evidence   that a juror *might* regard as reducing the defendant's moral blameworthiness. *Shannon v.   State*, 942 S.W.2d 591, 597 (Tex. Crim. App. 1996).

Because the consideration and weighing of mitigating evidence is an open-ended, subjective determination engaged by each individual juror… V.A.C.C.P. does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness. *Id.*

FFCL, at p. 38-39.

## A.     Baseline Legal Principles

"Mitigating evidence concerning a particular defendant's character or background plays a constitutionally important role in producing an individualized sentencing determination that the death penalty is appropriate in any given case." *Moore v. Johnson*, 194 F.3d 586, 612 (5th Cir. 1999). Capital juries must be afforded the opportunity to consider and give effect to all evidence in mitigation of a death sentence. *See, e.g., Skipper v. South Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality opinion). Jury instructions that may reasonably be construed to limit the jury's consideration of relevant mitigating evidence accordingly violate the Eighth Amendment.[12] *See, e.g., Tennard v. Dretke*, 524 U.S. 274, 284-85 (2004); *Penry v. 127 Johnson,* 532 U.S. 782, 797 (2001); *Hitchcock v. Dugger,* 481 U.S. 393 (1987). This is so because "it is only when the jury is given a 'vehicle for

---

[12] In capital cases, the Supreme Court has "addressed the relevance standard applicable to mitigating evidence... in the most expansive terms.... 'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard*, 524 U.S. 274, 284 (2004) (citations omitted). "[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Id*. at 285 (citations omitted). *See, e.g., Coble v. Quarterman*, 496 F.3d 430, 444-45 (5th Cir. 2007).

expressing its "reasoned moral response" to that evidence in rendering its sentencing decision,'... that we can be sure that the jury 'has treated the defendant as a "uniquely individual human being" and has made a reliable determination that death is the appropriate sentence ....' " *Penry*, 532 U.S., at 797 (citations omitted).

### B.    Issue Overviewed

"[T]he relevant inquiry [is] whether there was a reasonable likelihood that the jury would interpret [the jury instructions and verdict forms] in a manner that precluded it from fully considering and giving full effect to all of the defendant's mitigating evidence." *Nelson v. Quarterman*, All F.3d 287, 293 (5th Cir. 2006) (en banc) (citing *Tennard*, 542 U.S., at 288-89, and *Smith v. Texas*, 543 U.S. 37, 38 (2004) (per curiam)). Here, there is an unacceptable risk that one or more jurors was unable "to express his reasoned moral response to evidence that has mitigating relevance," *id.*, because he or she reasonably construed the jury instructions and verdict forms to require that he find that each and every prong of the court's composite mitigating factors was both true and worthy of weight in order to consider any aspect of those factors in deciding Soliz's sentence. *Cf. McCoy v. North Carolina*, 494 U.S. 433, 440 (1990) ("it would be the 'height of arbitrariness to allow or require the  imposition of the death penalty" where 1 juror was able to prevent the other 11 from giving effect to mitigating evidence" because of instructions that could reasonably be construed to require jury unanimity regarding

mitigating factors) (quoting *Mills v. Maryland*, 486 U.S. 367, 374 (1988)). Here, it would be the "height of arbitrariness" to permit or require Soliz's jurors to ignore mitigating evidence they found to exist because it had been inextricably linked by the instructions and verdict forms to evidence they concluded had not been proved by a preponderance of the evidence.13

### C.    The Texas Statute and Soliz's Jury Instructions

Article 37.071 of the Texas Code of Criminal Procedure governs the instructions given to Texas capital juries.  The statute requires a trial court to submit at least two issues to the jury: (1) whether there is a probability that the defendant constitutes a continuing threat to society; and (2) whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole.  TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1), (e)(1).  With respect to the mitigating circumstances special issue, the court must instruct the jury that, if it answers that a circumstance warrants a sentence of life imprisonment without parole rather than a sentence of death, the defendant will receive a life sentence and will not be ineligible for parole.  *Id.* at § 2(e)(2)(A)-(B).  Furthermore, the court must instruct the jury to answer this special issue "Yes" or "No," that it may not answer "No" unless by unanimous agreement,

---

13 Soliz does not contend that the Constitution or FDPA require a district court to instruct the jury on the specific mitigating factors alleged in any given case. The Supreme Court has held that such instructions are not generally required under the Eighth Amendment, *Buchanan v. Angelone*, 522 U.S. 269 (1998).

that it may not answer "Yes" unless ten or more jurors agree,14 and that the jurors need not agree on which evidence in particular is mitigating. *Id.* at § 2(f)(1)-(3).

In addition to these procedural instructions, Texas law requires the court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard *as reducing the defendant's moral blameworthiness*." TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(4) (emphasis added). No definition of "moral blameworthiness" is provided, nor are additional instructions given as to the relationship between this instruction and the demands of the special issue itself.

As directed by the statute, the trial court in Soliz's case gave the statutorily required instructions during the punishment phase of trial and before the jury retired to deliberate. (*See* CR at 2125-29.) In particular, the court's charge included the following:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

(*Id.* at 2126.) Further tracking Article 37.071, the charge included the following paragraph: "In deliberating on Special Issue Number 3, you shall consider mitigating evidence to be evidence that a juror might regard *as reducing the defendant's moral blameworthiness*." (*Id.* at 2127 (emphasis added).

---

14 This instruction is itself unconstitutional. *See* Claim Fifteen, *ante*.

### C. Texas's Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and to Warrant a Life Sentence

The Supreme Court requires that a jury "be permitted to 'consider fully' []
mitigating evidence" that provides a basis for a sentence of life rather than death."
*Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007).   "[S]uch consideration,"
the Court has explained, "would be meaningless unless the jury not only [has] such
evidence available to it, but also [is] permitted to give that evidence meaningful,
mitigating effect in imposing the ultimate sentence."   *Id*. (internal quotations
omitted).   Each juror is entitled to broad discretion in assessing the import of that
mitigating evidence which the defense proffers; at the same time, the State may not
limit this evidence to those categories which the State deems as mitigating.   As
said the Court in *Tennard v. Dretke*:

> [A] State cannot bar the consideration of . . . evidence if the sentencer could
> reasonably   find that it warrants a sentence less than death.

542 U.S. 274, 285 (2004) (internal quotations omitted).

*See also McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution
limits a State's ability to narrow a sentencer's discretion to consider relevant
evidence that might cause it to decline to impose the death sentence.").

Consistent with this jurisprudence, the avenues of mitigation open to a
capital jury cannot be limited to evidence that relates solely to the defendant's

culpability, the nature of his crime, or what the crime says about that individual defendant. *See Abdul-Kabir*, 550 U.S. at 246 (establishing a low threshold for what constitutes "mitigating evidence," viz., that which "might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future"). For example, evidence that a defendant has adjusted well in prison prior to his trial qualifies as mitigating evidence because "there is no question but that [inferences drawn from the evidence] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (quoting Lockett, 438 U.S. at 604).

Importantly, the *Skipper* Court observed that the proffered evidence—the testimony of two guards and a prison visitor—"would not relate specifically to petitioner's culpability for the crime he committed." *Id*. at 4. Even still, it could "hardly be disputed" that the evidence's exclusion "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." *Id*. at 4. *See also Abdul-Kabir*, 550 U.S. at 259 ("Like *Penry*'s evidence, Cole's evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence.").

Like the defendant in *Skipper*, Soliz presented evidence to the jury regarding his background and character as mitigating evidence. Some of this evidence related to the conceptualization of mitigation—affirmed in *Penry v. Lynaugh*—that "defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." 492 U.S. 302 (1989) (*Penry I*) (internal quotations omitted), overruled on other grounds by *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). This evidence bolstered the argument that, although legally and morally to blame for the crime, Soliz nevertheless was a worthwhile person undeserving of a death sentence. The evidence that Soliz's background contributed to his committing the crime held meaningful potential for jurors to decide against a sentence of death. *See Penry I*, 492 U.S. at 327 ("[S]o long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant.").

Texas's statutorily-mandated instruction fatally undermines the jury's capacity to give effect to this broader type of mitigating evidence by calling upon jurors to "consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(4) (emphasis added). (See also CR at 2127.) Put differently, this instruction precluded jurors from considering mitigating evidence unrelated to

Soliz's "moral blameworthiness," a limitation wholly at odds with three decades of U.S. Supreme Court precedent.   Were any of Soliz's jurors to credit such evidence—that is, evidence they found to warrant a life sentence but that did not reduce Soliz's moral blameworthiness for the crime—that juror necessarily and untenably would violate the court's instructions.   *Penry II*, 532 U.S. at 800. Because "[w]e generally presume that jurors follow their instructions," there exists a reasonable probability that the result of Soliz's trial would have been different had a constitutionally adequate instruction been given. *Id*. at 799.

### D.   Conclusion

"[W]hen the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed." *Abdul-Kabir*, 550 U.S. at 264.   At Soliz's trial, the jury was prohibited from giving effect—meaningful or otherwise—to mitigating evidence falling outside the boundaries specified in its instructions, and this prohibition thereby unconstitutionally limited the jury's ability to give its "reasoned moral response." *See also Skipper*, 476 U.S. at 8 ("The exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender.").

Although the U.S. Supreme Court has upheld Texas's capital punishment statute, it did so "on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present." *Penry I*, 492 U.S. at 318. Since then, the Court has repeatedly expressed its concerns "regarding the extent to which the jury must be allowed not only to consider such evidence, or to have such evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death." *Brewer v. Quarterman*, 550 U.S. 286, 296 (2007).  In this case, application of the Texas capital punishment statute impaired Soliz's right to have all mitigating evidence considered by the jurors as they assessed whether he deserved a life or death sentence.  *Penry I*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence [the defendant] introduced.").  Therefore, no reasonable jurist could countenance the state district court's conclusion that, "Because the consideration and weighing of mitigating evidence is an open-ended, subjective determination engaged by each individual juror… V.A.C.C.P. does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness."

XVIII.     **CLAIM EIGHTEEN: SOLIZ'S DEATH SENTENCE WAS ARBITRARILY AND CAPRICIOUSLY ASSIGNED BASED ON THE JURY'S ANSWER TO THE UNCONSTITUTIONALLY VAGUE FUTURE DANGEROUSNESS ISSUE**

## EXHAUSTION:

Special Issue Number One contains several key terms (i.e., "probability," "criminal acts of violence," and "continuing threat to society") that are not defined. Because these terms are simple and or ordinary meaning, Art. 37.07 section 2(b) is not unconstitutionally vague for failing to define said terms. Moreover, Applicant fails to      show that the language of the special issues is unconstitutional for failing to further      narrow the class of murders eligible for the death penalty. The narrowing function contemplated by the Eighth Amendment occurs at the guilt/innocence stage of a capital murder; the fact that the jury may have to find additional aggravation at punishment is not "part of the constitutionally required narrowing process."

FFCL, at p. 39.

Texas employs a unique sentencing scheme which requires the jury to

predict "whether there is a probability that the defendant would commit criminal

acts of violence that would constitute a continuing threat to society." TEX. CODE

CRIM. PROC. art. 37.071 § 2(b)(1).15  The American Bar Association ("ABA") has

long recognized the problems with this future dangerousness special issue. *See*

*Barefoot v. Estelle*, 463 U.S. 880, 930 (1983) (Blackmun, J., dissenting) (citing the

ABA amicus brief for the claim that jurors are not well-suited to predict future

dangerousness). Most recently, the ABA released The Texas Capital Punishment

---

15 If jurors answer this question, referred to as Special Issue One, with a "Yes," jurors are asked to answer another Special Issue.  If the jurors answer "No" to this question, the defendant is automatically sentenced to a term of life without the possibility of parole.

Assessment Report which called on Texas to "abandon altogether the use of the 'future dangerousness' special issue" as it and other aspects of the Texas sentencing scheme "place limits on a juror's ability to give full consideration to any evidence that might serve as a basis for a sentence less than death."  ABA, THE TEXAS CAPITAL PUNISHMENT ASSESSMENT REPORT, at viii, xxxix .

Among the ABA's concerns with the Texas scheme is that the key terms of the future dangerousness issue are undefined.  *See* ABA Texas Assessment Report at 308.  Additionally, the ABA notes that juries must unanimously find a probability of future dangerousness before reaching the question of mitigation, thus placing future dangerousness "at the center of the jury's punishment decision." ABA, THE TEXAS CAPITAL PUNISHMENT ASSESSMENT REPORT, at 307.

The concerns raised by the ABA are consistent with violations of Soliz's Eighth and Fourteenth Amendment rights as articulated in Supreme Court doctrine. The future dangerousness special issue is unconstitutionally vague, fails to narrow the class of death-eligible defendants, leads to the arbitrary and capricious imposition of the death penalty, and limits the jury's ability to give full consideration to evidence that may serve as a basis for a sentence less than death. As such, Soliz's death sentence was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights and United States Supreme Court and state case law, and must therefore be reversed.

Article 37.071, section 2(b)(1) of the Texas Code of Criminal Procedure is unconstitutionally vague in that it fails to define any of the key terms in the future dangerousness special issue.  As a result, "[j]urors are left to comprehend [these terms] so broadly that a death sentence would be deemed warranted in virtually every capital murder case."  ABA, THE TEXAS CAPITAL PUNISHMENT ASSESSMENT REPORT, at viii.

The Supreme Court has long held that juror discretion must be channeled in capital cases.  *Gregg*, 428 U.S. at 189 (citing *Furman*, 408 U.S. at 238 ("Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.").  In *Godfrey v. Georgia*, the Court held that a state's aggravating factors must not be defined in such a way that people of ordinary sensibilities could find that nearly every murder met the stated criteria.  446 U.S. at 428-29.  In order to avoid the arbitrary and capricious imposition of the death penalty struck down in *Furman*, states must narrow the class of death-eligible defendants "by providing specific and detailed guidance to the sentencer."  *McCleskey*, 481 U.S. at 303 (internal citations and quotation omitted); *see also Maynard v. Cartwright*, 486 U.S. 356, 362 (1988) ("Since *Furman*, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a

189

fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action.").

While the Texas future dangerousness issue is not presented to the jury until the punishment phase of trial, it must be found beyond a reasonable doubt before mitigating evidence may be considered. TEX. CODE CRIM. PROC. art. 37.071 § 2(b)–(e). Accordingly, it acts as a de facto determinant of death-eligibility and therefore must meaningfully narrow the class of death-eligible defendants.

Texas does not statutorily define the key terms in the future dangerousness special issue. Rather, the terms are left to be interpreted according to their ordinary meaning. *See Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007). Absent a statutory definition to the contrary, the term "probability" is reasonably understood to mean some "likelihood of the occurrence of any particular form of an event." *Granviel v. State*, 552 S.W.2d 107, 117 n. 6 (Tex. Crim. App. 1976); *see also Jurek*, 522 S.W.2d at 945 (Odom, J., dissenting) ("The statute does not require a particular degree of probability but only directs that some probability need be found."). The degree of violence is not specified and could realistically range from capital murder down to simple assault. *See* Christopher Slobogin, *Capital Punishment and Dangerousness*, *in* MENTAL DISORDER AND CRIMINAL LAW: RESPONSIBILITY AND COMPETENCE 119, 121, 125 (Robert F. Schopp et al. eds., 2009) (questioning what qualifies as "dangerousness" and

"criminal acts of violence").  Essentially, the jury is asked to determine whether there is any likelihood that Soliz might commit any act of violence in the future that poses a continuing threat to society.  Psychiatrists, however, are unable to completely rule out the possibility of *any* person committing future acts of violence, much less a person that was just convicted of a violent crime.  *See* Michael L. Radelet & James W. Marquart, *Assessing Nondangerousness During Penalty Phases of Capital Trials*, 54 ALB. L. REV. 845, 849 (1989-1990) ("Predictions of violent behavior are difficult because the probabilities considered in the prediction are conditional.  That is, each of us, given certain circumstances, might engage in violent behavior in the future; thus, each of us has a non-zero probability of killing another.").  Even when predictions are based on actuarial data, which are now considered to be slightly more accurate than clinical determinations, a defendant's risk of future dangerousness is phrased in terms of non-zero probabilities.  *See, e.g.*, Laura S. Guy, et al., *Assessing Risk of Violence Using Structured Professional Judgment Guidelines*, J. FORENSIC PSYCHOL. PRAC., May 2012, at 272 ("[Mental health professionals] are encouraged to communicate level of risk using categorical levels of low, moderate, and high.").

The fact that every person has a non-zero probability of committing future acts of violence shows that the future dangerousness special issue does nothing to narrow the class of death-eligible defendants.  Moreover, the fact that any capital

defendant is found *not* to be a future danger is evidence that the determination is based on caprice rather than reason.  In Soliz's case, the fact that this dubious determination had to be made beyond a reasonable doubt before the jury was presented with the mitigation special issue limited the jury's ability to give full consideration to evidence that might serve as a basis for a sentence less than death. *See Tennard*, 542 U.S. at 278 ("It is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence in imposing the sentence.").

As a result, Soliz's death sentence was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, and therefore must be reversed.

**Claim Nineteen: The Eighth Amendment and Fourteenth Amendment's Due Process Clauses Are Violated By The Execution of A Person With Fetal Alcohol Syndrome e (Raised as Claims 7, 8, 9, and 10 in State Direct Appeal)**

The prohibitions embodied within the Eighth and Fourteenth Amendment to the United States Constitution include the prohibition against the infliction of a Cruel and Unusual punishment. Article 1, Section 13 of the Texas Constitution provides even greater protection in that this section bars the infliction of a "cruel or unusual punishment" (emphasis added). The protections afforded by the United States Constitution provide a floor of protections. Those protections provided by

the Texas Constitution cannot be less. *Cooper v. California*, 386 U.S. 58 (1967). This is also true of the guarantees contained in the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. U. S. Const. Amend. V; U. S. Const. Amend. VI; U. S., Const. Amend. XIV; Tex. Const. Art. § 13.

As a result of this exposure to alcohol while in his mother's womb, Mr. Soliz, through no choice of his own, suffers from brain damage resulting in a condition that is known as Fetal Alcohol Spectrum Disorder (FASD). This permanent brain damage impairs the cognitive ability of Mr. Soliz, which means that his brain does not work properly in the following areas:

(a) Executive functioning skills, including planning, sensory processing, decision making, and response inhibition.

(b) Self-regulation or emotional modulation in high-stress situations.

(c) Adaptive functioning, including communication, daily living, and social skills.

Mr. Soliz does not have an I.Q. that would be associated with a person diagnosed as having intellectual and developmental disabilities or mental retardation. However, the damage to his brain caused by the alcohol to which he was exposed in the womb has damaged his brain and "executive functioning" to the same extent as one who is intellectually and developmentally disabled. According to the literature the IQ/functional disparity found in Mr. Soliz is typical

for individuals with Fetal Alcohol Spectrum Disorders. Streissguth, A. P., Barr, H. M., Kogan, J. & Bookstein, F. L. (1996). *Understanding The Occurrence of Secondary Disabilities in Clients with Fetal Alcohol Syndrome (FAS) and Fetal Alcohol Effects (FAE)*

> **CLAIM 20: The Fourth, Fifth, and Fifteenth Amendments Are Violated By the Introduction of Soliz's Involuntary Confession (Raised as Claims 3, 4, 5, and 6 of the Direct Appeal)**

Soliz filed a Motion for Hearing on Admissibility of any Statement by Defendant Whether Written or Oral or Evidence Resulting from Same/Motion to Suppress [C.R. 264] wherein he requested the court to suppress any and all statements given to agents of the Fort Worth Police Department on or about June 29, 2010. The trial court held a pre-trial hearing on January 5th and 6th, 2011. [R.R. Vol. 5 and 6]. The following facts are taken from the pre-trial hearing:

Soliz filed a Motion for Hearing on Admissibility of any Statement by Defendant Whether Written or Oral or Evidence Resulting from Same/Motion to Suppress [C.R. 264] wherein he requested the court to suppress any and all statements given to agents of the Fort Worth Police Department on or about June 29, 2010. In this Motion, Appellant alleged that the statements given to agents of the Fort Worth Police Department on June 29, 2010 were obtained subsequent to Appellant's arrest and/or at a time after Appellant had been detained for the offense. Appellant further alleged the statements were taken after arrest and

without the proper warnings and admonitions first being given to him. The statements were not voluntarily given and were obtained in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, Article I and the requirements of *Jackson* v. *Denno*, 378 U.S. 368 (1963). [CR. 264].

Soliz's video-taped and written statements given to the Fort Worth Police Department was admitted in the suppression hearing. The video-taped statement was admitted as State's Exhibit No. 1, and the transcript of the videotape was admitted as State's Exhibit No. 1A. The type written statements were admitted as State's Exhibit Nos. 3 and 4. The trial court overruled Appellant's Motion to Suppress these items. [R.R. Vol. 6, pg. 122, CR 1746].

The United States Supreme Court has held that the determination as to whether a confession was voluntarily rendered must be analyzed by examining the totality of the circumstances. *Arizona v. Fulminante*, 499 U.S. 279, 285-86, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). While in *Arizona* v. *Fulminante* the Supreme Court affirmed that the totality-of-the-circumstances standard is applicable to confessions given by adults, the Court has also extended this measure of review to encompass juveniles. *Fare v. Michael C*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (holding that the "totality-of-the-circumstances approach is

adequate to determine whether there has **\*36** been a waiver even where interrogation of juveniles is involved"). In *Fare*, the Court explained that it could see no reason why any other standard would be more appropriate, considering that "[t]he totality approach ... mandates inquiry into all the circumstances surrounding the interrogation[,] includ[ing] evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him." *Fare*, 442 U.S. at 725, 99 S.Ct. 2560. In Texas, it is well established that confessions given by adults are to be evaluated with the totality of the circumstances standard. Following the Supreme Court's lead in *Fare*, Texas courts have also recognized that the totality-of-the-circumstances standard is sufficiently broad to cover juveniles who, because of their minority, lack of education, lesser reasoning capacity, etc., may be more susceptible to persuasion or underhanded interrogation tactics. *Griffin v. State*, 765 S.W.2d 422, 427 (Tex. Crim. App. 1989) (affirming the judgment of a trial court that a juvenile appellant's confession was voluntary under the totality of the circumstances); *In Interest of R.D.,* 627 S.W.2d 803, 807 (Tex. App.-Tyler 1982, no writ) (analyzing a juvenile appellant's confession based on the totality of the circumstances in which the statements were made). *Delao* v. *State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007).

### *ERROR IN ADMITTING STATEMENT AND EVIDENCE*

Soliz was in custody at the time he was interrogated by the Fort Worth police officers. Therefore, the 5th, 6th, 8th, and 14th Amendments to the U.S. Constitution, and require that Appellant should have been given his *Miranda* warnings prior to any custodial interrogation. For Appellant's confession to be valid and admissible, he had to waive his Miranda rights prior to any questioning. *Jackson* v. *Denno*, 378 U.S. 368 (1963).

A failure to cut off custodial questioning after a suspect invokes his right to remain silent violates his rights and renders any subsequently obtained statementsinadmissible. *Michigan* v. *Mosley*, 423 U.S. 96, 100 (1975). A law enforcement officer may not continue to question the suspect until the officer succeeds in persuading the suspect to change his mind and talk. But an officer need not stop his questioning unless the suspect's invocation of his right is unambiguous, and the officer is not required to clarify ambiguous remarks. *Davis v. United States*, 512 U.S. 452, 458-61 (1994).

Fort Worth Police Detectives Paine and Boetcher interviewed Soliz in the homicide room of the Fort Worth Police Department after his warrantless arrest on June 29, 2010. [R.R. Vol. 5, pg. 59-60]. Appellant was brought into the homicide room by a uniformed police officer. But, only Detective Paine and Boetcher were in the room once Appellant's interview began. [R.R. Vol. 5, pg. 63]. Appellant appeared nervous, alert, but tired because it was early in the morning of June 29,

2010. [R.R. Vol. 5, pg. 64].

Detective Boetcher began the interview by advising Appellant of his rights (*Miranda* rights).   Specifically, Detective Paine testified that Detective Boetcher advised Soliz that he had the right to an attorney, the right to remain silent, the right to have an attorney present prior to and during any questioning, the right to have an attorney appointed if he could not afford one, and the right to terminate the interview at any time. [R.R. Vol. 5, pg. 65]. This conversation was recorded on State's Exhibit 1, the video-tape. [R.R. Vol. 5, pg. 65; SX. 1].

According to Detective Paine, Soliz indicated he understood and waived his rights. [R.R. Vol. 5, pg. 66]. However, according to the video-tape, even though Appellant stated he understood his rights and wanted to talk to the detective, he did not state that he waived his rights. [SX. 1; SX. 1A, p. 1-2]. Thus, Appellant did not waive his rights as required for his video-taped confession to be admissible.

In addition, Soliz requested several times for his interview to stop and these requests were ignored by the detectives. Specifically, at the bottom of page 14 of the Exhibit 1A transcript, Appellant stated: "I wish I could get up and leave ... but I can't ... guys got me shackled here..." [SX 1;1A, pg. 14]. It stands to reason that Appellant wanted to terminate the interview because it was very late at night or early in the morning, he was very tired, and had been sleeping by slumping over in his chair. [R.R. Vol. 6, pg. 42]. Obviously, Appellant wanted to terminate the

interview because he stated he would leave except that he was shackled.

This request to leave and thereby terminate the interview was not granted by the Detectives. In fact, the Detective Boetcher talked Soliz out of terminating the interview by ignoring his request and continuing to question him. This occurred when the Detective stated to Appellant: "Am gonna get up here and leave ... because I don't waste time on people that don't feel sorry ... so ...we'll start with ...the house on Pearl." [SX 1;1A, pg. 15]. Detective Boetcher did not even acknowledge that Appellant requested to terminate the interview. This violated Soliz's right to terminate the interview at any time.

Under all of these circumstances, Soliz urges this Court to find that the interrogation was a custodial interrogation and that his rights under *Mira*nda and U.S. Const. Amend. V; U.S. Const. Amend. VIII; and U. S. Const. Amend. XIV.

### *HARM ANALYSIS*

The harm to Soliz resulting from the trial court's wrongful overruling of his Motion for Hearing on Admissibility of any Statement by Defendant WhetherWritten or Oral or Evidence Resulting from Same/Motion to Suppress [C.R. 264] is obvious. The jury heard Appellants' illegally obtained statement and it was the evidence the State used to tie Appellant to the crime thereby harming Appellant and led to his conviction. Admittedly, erroneously admitted confessions

do not always cause harm to the accused. *Arizona* v. *Fulminante*, 499 U.S. 279, 309-310, 111 S.Ct. 1246, 1264-65, 113 L.Ed.2d 302 (1991). However, a confession by its nature creates more potential for harm at trial than other types of evidence. When a trial court erroneously admits a confession into evidence, usually the only implication that may be drawn is that of the defendant's guilt.

Because Soliz was harmed by the illegally obtained confession conduct, no reasonable jurist could countenance the Court of Criminal Appeals disposition of these suppression claims.

## CONCLUSION

As this petition demonstrates, Petitioner Soliz's rights under the federal constitution were violated, unremedied by the Texas courts.

## RELIEF REQUESTED

Prayer for Relief

WHEREFORE, Petitioner respectfully prays this Court:

1.   Order that Petitioner be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Soliz to utilize the processes of

discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondents' Answer;

2.     Order that upon completion of discovery, Petitioner be granted leave to amend his petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery and that Soliz be granted to leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the petition;

3.     Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition;

4.     Issue a writ of habeas corpus to have Soliz brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

5.     In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have

Soliz brought before it to the end that he may be relieved of his unconstitutional sentences;

6.   Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

WHEREFORE, PREMISES CONSIDERED, the Applicant Soliz asks this Court to hold hearings, make its findings of fact and conclusions of law, and find that he was denied rights.  He requests the Court to vacate his conviction and issue a writ to the Respondent, or the warden of the Polunsky Unit, ordering release of Soliz from custody, or alternatively, to reverse Soliz's conviction and order a new trial, or alternatively, to vacate his sentence of death and order a new trial on sentencing.

Respectfully submitted,

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street
Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (FAX)

seth@kretzerfirm.com

/s/ Carlo D'Angelo
_____

Carlo D'Angelo
100 East Ferguson, Suite 1210
Tyler, Texas 75702
(903) 595-6776 (work)
(903) 407-4119 (FAX)

carlo@dangelolegal.com

COURT APPOINTED LAWYERS FOR
PETITIONER SOLIZ

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Petition for Writ of

Habeas Corpus was served on all counsel of record by filing on the ECF System on

this 5th day of February, 2016.

_____
Seth Kretzer

### VERIFICATION

As a representative for the petitioner, I verify that the foregoing is true and

correct to the best of my knowledge.

Respectfully submitted,

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street
Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (FAX)

seth@kretzerfirm.com


/s/ Carlo D'Angelo
_____
Carlo D'Angelo
100 East Ferguson, Suite 1210
Tyler, Texas 75702
(903) 595-6776 (work)
(903) 407-4119 (FAX)

carlo@dangelolegal.com