1       REPORTER'S RECORD

2       VOLUME 20 OF 75 VOLUMES

3       TRIAL COURT CAUSE NO. F45059

4   COURT OF CRIMINAL APPEALS NO. AP-76,768

5   STATE OF TEXAS          )       IN THE DISTRICT COURT
                            )
6   VS.                     )       JOHNSON COUNTY, TEXAS
                            )
7   MARK ANTHONY SOLIZ      )       413TH JUDICIAL DISTRICT

8

9   ------------------------------------------------------

10              INDIVIDUAL VOIR DIRE

11               JURY SELECTION

12  ------------------------------------------------------

13

14

15          On the 30th day of January, 2012, the

16  following proceedings came on to be heard in the

17  above-entitled and numbered cause before the Honorable

18  Phillip Vick, Judge presiding, held in Cleburne, Johnson

19  County, Texas:

20          Proceedings reported by Machine Shorthand and

21  Computer-Aided Transcription.

22          **FILED IN**
            **COURT OF CRIMINAL APPEALS**
23
                                          ORIGINAL
24          JAN 2 2 2013

25          Abel Acosta, Clerk

```
 1                     A P P E A R A N C E S

 2  DALE HANNA
    SBOT NO. 08919500
 3  LARRY CHAMBLESS
    SBOT NO. 04086320
 4  MARTIN STRAHAN
    SBOT NO. 00797765
 5  District Attorney's Office
    Johnson County
 6  204 S. Buffalo
    Cleburne, Texas 76033
 7  (817) 556-6801

 8  ELIZABETH CHRISTINA JACK
    SBOT NO. 10445200
 9  Tarrant County District Attorney's Office
    401 W. Belknap Street
10  Fort Worth, Texas 76102-1913
    817-884-1366
11
    ATTORNEYS FOR THE STATE OF TEXAS
12

13  MICHAEL P. HEISKELL
    SBOT NO. 09383700
14  Johnson, Vaughn & Heiskell
    5601 Bridge Street
15  Suite 220
    Fort Worth, Texas 76112-2305
16  817-457-2999

17  GREGORY B. WESTFALL
    SBOT NO. 00788646
18  Hill Gilstrap, P.C.
    1400 W. Abram Street
19  Arlington, Texas 76013
    817-276-4931
20
    ATTORNEYS FOR DEFENDANT
21

22

23

24

25
```

I N D E X

VOLUME 20

INDIVIDUAL VOIR DIRE

JANUARY 30, 2012                                    PAGE        VOL.

Proceedings.................................. 5           20

PROSPECTIVE JUROR          STATE'S      DEFENSE
                          VOIR DIRE    VOIR DIRE          VOL.

RICKARD NICKELL, NO. 50      --          --               20
Venireperson Excused by Agreement............ 5           20

TRACEY MICKELS, NO. 55      --          --               20
Venireperson Excused by Agreement............ 5           20

KAYE BEALL, NO. 53          8           --               20
Venireperson Excused by Agreement............ 14          20

HUNTER CONNELL, NO. 52     18           --               20
Venireperson Excused by Agreement............ 38          20

WILLIAM WOOLF, NO. 54      42           97               20
Venireperson Accepted.......................144          20

CHERRY ALLEN, NO. 61      150          169               20
Venireperson Excused.......................172           20

MARY WHITWORTH, NO. 56    176          184               20
State's Challenge for Cause.................188          20
Defendant's Response.......................189           20
Court's Ruling.............................190           20
Venireperson Excused.......................191           20

Adjournment................................191           20

Court Reporter's Certificate...............192           20

STATE VS. MARK ANTHONY SOLIZ          JANUARY 30, 2012          4

ALPHABETICAL VENIREPERSON INDEX

| PROSPECTIVE JUROR | STATE'S VOIR DIRE | DEFENSE VOIR DIRE | VOL. |
|---|---|---|---|
| CHERRY ALLEN, NO. 61 | 150 | 169 | 20 |
| KAYE BEALL, NO. 53 | 8 | -- | 20 |
| HUNTER CONNELL, NO. 52 | 18 | -- | 20 |
| TRACEY MICKELS, NO. 55 | -- | -- | 20 |
| RICKARD NICKELL, NO. 50 | -- | -- | 20 |
| MARY WHITWORTH, NO. 56 | 176 | 184 | 20 |
| WILLIAM WOOLF, NO. 54 | 42 | 97 | 20 |

STATE VS. MARK ANTHONY SOLIZ  JANUARY 30, 2012

5

1    PROCEEDING
2    (Defendant not present.)
3    THE COURT:  On the record.  Okay.  Let me
4  see, there's been an agreement regarding two different
5  jurors.
6    MR. HEISKELL:  Yes, Your Honor.  Juror No.
7  51, Mr. Richard Nickell --
8    MR. WESTFALL:  50.
9    MR. HEISKELL:  50, excuse me.  Sorry.
10    MR. WESTFALL:  And 55.
11    MR. HEISKELL:  And -- 50, Richard Nickell,
12  and 55, Tracey --
13    MR. WESTFALL:  Tracey Mickels.
14    MR. HEISKELL:  -- Mickels, to excuse both of
15  those jurors.  And I have just conferred with our client,
16  Mr. Soliz, and he's agreed to that, excusing 50 and 55.
17    MR. STRAHAN:  That's the agreement of the
18  State, Judge.
19    THE COURT:  Okay.  Then I'll approve the
20  agreement.  We'll excuse Jurors No. 50 and 55.
21    (Recess taken.)
22    (Defendant present.)
23    (Venireperson Beall present.)
24    THE COURT:  Come on up this way.  If you'll
25  raise your right hand.

6

1    (Juror sworn.)
2    THE COURT:  Thank you, ma'am.  If you'll go
3  and have a seat in the second chair in the front row of
4  the jury box.
5    Okay.  Would you state your name.
6    VENIREPERSON:  Kaye Beall, B-E-A-L-L.
7    THE COURT:  Okay.  Ms. Beall, you filled out
8  a juror questionnaire a while back.  Were the answers you
9  put on there true and correct?
10    VENIREPERSON:  Yes, sir.
11    THE COURT:  Since that time, has anything
12  happened in your life that would change any of those
13  answers?
14    VENIREPERSON:  No, sir.
15    THE COURT:  My name is Phillip Vick.  I'm the
16  Judge presiding of this proceeding.  Judge William
17  Bosworth, Judge of the 413th District Court, will be
18  trying this case when it goes to trial.
19    The attorneys representing the State are
20  Mr. Dale Hanna and Ms. Christy Jack.
21    MS. JACK:  Good morning.
22    THE COURT:  Also helping them and not here in
23  the courtroom right now are Larry Chambless and Martin
24  Strahan.
25    The attorneys representing the Defendant are

7

1  Mr. Michael Heiskell.
2    MR. HEISKELL:  Morning.
3    VENIREPERSON:  Morning.
4    THE COURT:  And Mr. Greg Westfall.
5    MR. WESTFALL:  Morning.
6    THE COURT:  And seated with them at the
7  counsel table is the Defendant, Mark Anthony Soliz.
8    THE DEFENDANT:  Morning, ma'am.
9    THE COURT:  They'll have questions for you,
10  but I'll ask a couple first.  Is there anything we should
11  know about you that we didn't ask on the questionnaire?
12    VENIREPERSON:  Pardon me?
13    THE COURT:  Is there anything we should know
14  about you that we didn't ask?
15    VENIREPERSON:  No, sir.
16    THE COURT:  Okay.  You're going to be asked a
17  lot of questions, I suspect.  It's not a test.  There's no
18  right or wrong answers.  The only thing we require is that
19  you be truthful.  You need to say "yes" and "no" when you
20  can.  If you say "maybe" or "I think so," that will create
21  about three other questions figuring out why you didn't
22  say "yes" or "no" instead of "I think so."  Also, don't
23  answer a question unless you're sure you understand it.
24  If you don't understand it, get them to restate it or
25  explain it or something.

8

1    VENIREPERSON:  Okay, sir.
2    THE COURT:  We think this trial is going to
3  begin the end of February, maybe the last week in
4  February.  When it does start, we think it will last about
5  three days -- no, three weeks.  I'm sorry.  And there is a
6  chance the Jury will be sequestered during that period of
7  time.  So are you okay on those dates or is there anything
8  happening in your life that we need to know about that
9  would interfere?
10    VENIREPERSON:  I have a dental appointment
11  but I -- it could probably be changed.
12    THE COURT:  Okay.  Okay.  Good enough then.
13  I'll recognize the State.
14    KAYE BEALL,
15    Venireperson No. 53, testified as follows:
16    VOIR DIRE EXAMINATION
17  BY MR. HANNA:
18    Q.  Good morning to you, ma'am.
19    A.  Morning.
20    Q.  I was reading the questionnaire you filled out
21  the other day.  Do you remember that?
22    A.  Yes, sir.
23    Q.  26 pages of questions that you hadn't thought
24  about before you walked in the courtroom that morning.
25    A.  Right.

9

1    Q. Filled that out along with 300 of your closest
2  friends. It does give us an idea of what's going on. It
3  looks like you were born and -- kind of born and raised in
4  Fort Worth, so to speak; is that --
5    A. No, I was born and raised in Kansas.
6    Q. Kansas. Okay. All right. And I was trying to
7  -- are you a retired pharmacist or?
8    A. Yes, but I also retired from Pier One. I got out
9  of the pharmacy.
10    Q. Okay. Okay. Okay. All right. And you retired
11  from Pier One in '08, correct?
12    A. Yes.
13    Q. Okay. And your husband is also retired, correct?
14    A. Yes, sir.
15    Q. A couple things jumped off the page at me.
16  Were you aware of the fact, I guess you were when you
17  filled the questionnaire out, that this is a capital
18  murder case?
19    A. Yes, sir.
20    Q. And the death penalty is the penalty that is
21  being sought by the State of Texas.
22    A. Yes, sir.
23    Q. I guess you knew that?
24    A. Yes.
25    Q. All right. Now, first thing we've got to, I

10

1  guess, get out on the table is your views about the death
2  penalty.
3    A. Yes.
4    Q. And I kind of think when you fill these things
5  out, you know, you walk in off the street and you fill
6  them out, you've not thought about this in years or days.
7  All the sudden, you've got to answer these questions. And
8  I guess the thing we've got to figure out is; could you be
9  a fair and impartial juror on the capital murder case.
10  That's where we're heading. What I want to do is to see
11  about your views and see if we can think through some of
12  these issues and see if you can.
13    Now, on the one hand, you checked a box that
14  said if the person is convicted of murder and the death
15  penalty is requested, I will always vote to impose it
16  regardless of the facts and the law in the case. Then at
17  another place, it asks the question about views on life in
18  prison without the possibility of parole, and you said
19  that should be assessed in all cases where someone has
20  been murdered as opposed to the death penalty. I'm kind
21  of -- both ways. You see what I'm saying?
22    A. Yes, sir.
23    Q. Then I saw also that you are a member of the
24  Disciples of Christ Church?
25    A. Yes, sir.

11

1    Q. And that you're not necessarily a regular
2  attender, but that is -- they are opposed to the death
3  penalty, kind of. And I guess what I'm trying to figure
4  out is could you be a fair and impartial juror on a death
5  penalty case?
6    And let me, before you answer that, let me
7  just give you a brief little synopsis. The State is
8  seeking the death penalty. When the Jury goes back to
9  determine the punishment, if they have found the person
10  guilty, Ms. Beall, they don't just go back there and say
11  life or death. That's not the way it works. There's
12  three questions they answer about future dangerousness,
13  was the person the trigger man or accomplice, did he
14  actually intend for the person to be killed, and is there
15  some reason to spare his life. We're going to go over
16  those a little later. Does that make sense?
17    A. Yes, sir.
18    Q. All right. Now, the question is, could you, with
19  11 other jurors, listen to this evidence and then decide
20  the issues. And I also got on the back page where it
21  asked a question, do you want to do this, or words to that
22  effect, and I think you said you would rather not sit in
23  judgment of another person's life. You know, I totally
24  get that. I understand that completely. And I just
25  expect that whoever 11 other people we get are probably

12

1  going to have similar views that nobody really wants to do
2  this necessarily.
3    But now I've been talking too much and I
4  haven't let you talk much. So the question is, could you
5  sit on a capital murder case and listen to the evidence,
6  listen to it impartially and make the decisions about
7  guilty, not guilty, capital murder, and then life or
8  death based on the facts and the evidence that's
9  presented to you?
10    A. I have been thinking about this since the
11  questionnaire.
12    Q. I figured you had.
13    A. And I don't think I -- no, sir, I could not.
14    Q. Okay. And can you kind of expand on that just a
15  little?
16    A. I've decided that I just would not feel right
17  going that much against church teachings and the things I
18  was brought up to believe.
19    Q. Okay. Now, that's the Disciples of Christ
20  Church?
21    A. Yes, sir, Christian Church is how it's known.
22    Q. Christian Church, okay.
23    A. Yeah.
24    Q. In a capital murder case, the facts of the case
25  might show that in any type of situation, somebody is the

13

1  actual trigger man and somebody can be the helper,
2  accomplice, so to speak.
3      A. Right.
4      Q. Does that make sense?
5      A. Yes, sir.
6      Q. All right. In other words, and then the decision
7  would be made if the person was guilty of capital murder,
8  whether his participation in the crime called for the
9  death penalty or whether or not his history called for his
10 life to be spared, that kind of thing. Question is, could
11 you sit in and listen to this and decide it impartially?
12     A. I don't think -- no, sir.
13     Q. The Judge, when he gave you that little spiel at
14 the front, he said if you say "I don't think so" it's
15 going to call for about a umpteen other questions.
16     A. Yes, sir.
17     Q. Okay. And this is something you've thought about
18 for the past week or ten days?
19     A. Yes, sir.
20     Q. If -- have you talked to your husband about this
21 at all? How does he feel, do you know?
22     A. He believes in the death penalty but he's never
23 actually said if he would want to sit on this kind of
24 Jury.
25         MR. HANNA: Okay. Give me just a half second

14

1  here, Judge.
2          I think we've reached an agreement, Judge.
3          THE COURT: Ms. Beall, I'll ask you to step
4  outside for just a minute.
5          VENIREPERSON: Okay. Back out that way?
6          THE COURT: Yeah, just right outside.
7          (Venireperson Beall not present.)
8          THE COURT: Okay. Is there an agreement as
9  to Kaye Beall, Number --
10         MS. JACK: Yes, Your Honor.
11         THE COURT: What is that agreement?
12         MR. HEISKELL: Yes, Your Honor, we agree that
13 Ms. Beall should be excused in light of her opinion that
14 she could not sit on a case of this magnitude.
15         MR. HANNA: That's correct, Judge.
16         THE COURT: Okay. I'll approve the
17 agreement. We'll excuse Ms. Beall. You can tell her
18 she's excused. Thank you.
19         (Venireperson Beall excused.)
20         (Off the record.)
21         THE COURT: Okay. We're ready to talk to
22 Mr. Hunt.
23         MS. JACK: Mr. Hunt?
24         THE COURT: Hunter.
25         MR. WESTFALL: Hunter Connell.

15

1          MS. JACK: Oh, Hunter.
2          THE COURT: Oh, it's Connell. Mr. Connell.
3  Okay.
4          (Venireperson Connell present.)
5          THE COURT: Come on up here. If you'll raise
6  your right hand.
7          (Juror sworn.)
8          THE COURT: Have a seat in the second chair
9  of that jury box.
10         Okay. Sir, would you state your name.
11         VENIREPERSON: Hunter Connell.
12         THE COURT: Okay. You pronounce your name
13 Connell?
14         VENIREPERSON: Yes, sir.
15         THE COURT: Mr. Connell, you filled out a
16 juror questionnaire a while back. Were the answers you
17 put on there true and correct?
18         VENIREPERSON: Yes, sir.
19         THE COURT: Has anything happened in your
20 life since you filled that out that would change any of
21 the answers?
22         VENIREPERSON: I've kind of read online how
23 many people are in prison and stuff and they're full, but
24 not really anything else.
25         THE COURT: You read how many people are in

16

1  prison?
2          VENIREPERSON: Yeah, and like people that are
3  waiting to be murdered or whatever, or to -- on death row,
4  so many of them.
5          THE COURT: Okay. You've read that since you
6  were in court?
7          VENIREPERSON: Yes, sir.
8          THE COURT: Okay. Okay. My name is Phillip
9  Vick. I'm the Judge presiding at this proceeding. When
10 this case goes to trial, Judge William Bosworth, Judge of
11 the 413th District Court, will be trying the case.
12         The attorneys representing the State are
13 Mr. Dale Hanna, Ms. Christy Jack.
14         MS. JACK: Good morning.
15         THE COURT: And sometimes in and out will be
16 Larry Chambless and Martin Strahan.
17         The attorneys representing the Defendant are
18 Mr. Michael Heiskell.
19         MR. HEISKELL: Morning.
20         THE COURT: Mr. Greg Westfall.
21         MR. WESTFALL: Morning.
22         THE COURT: Seated with them at counsel table
23 is the Defendant, Mark Anthony Soliz.
24         THE DEFENDANT: Morning.
25         THE COURT: And they'll have questions for

17

1 you, but I'll ask first. Is there anything we should know
2 about you that we didn't ask on the questionnaire?
3 VENIREPERSON: No, sir.
4 THE COURT: Okay. You'll need to answer
5 "yes" or "no". This lady has to write down everything you
6 say, and she can't get a nod. So if you'll answer loud
7 enough that she can hear you.
8 VENIREPERSON: Okay.
9 THE COURT: You're going to be asked a lot of
10 questions. It's not a test. There's no right or wrong
11 answers. We only require that you be truthful. You need
12 to say "yes" and "no" when you can. If you say things
13 like "I think" or "maybe," you're going to get other
14 questions asking to explain that, those answers. So don't
15 answer a question unless you are sure you understand it.
16 And if you don't, just get the lawyers to explain it to
17 you or restate it or tell them you -- tell them you don't
18 understand.
19 We think trial is going to start probably
20 last week in February. We think it will last about three
21 weeks when it does start. When it does start, we --
22 there's a good chance that the Jury may be sequestered
23 during that period of time. That means you won't be going
24 home or anything else. You would be in a hotel with other
25 jurors for those three weeks.

18

1 VENIREPERSON: Yes, sir.
2 THE COURT: We're not sure about that, but
3 that could happen. Is there anything in your life that
4 would interfere with you being a juror during that period
5 of time?
6 VENIREPERSON: Just work.
7 THE COURT: Okay.
8 VENIREPERSON: I guess that wouldn't matter.
9 THE COURT: It probably doesn't matter. Do
10 you get paid when you're off?
11 VENIREPERSON: No, sir.
12 THE COURT: Okay.
13 VENIREPERSON: I don't think. I haven't ever
14 been on jury duty, but I don't know if they pay me if I'm
15 up here or not.
16 THE COURT: Who do you work for?
17 VENIREPERSON: Buffalo Oil Field Supply.
18 THE COURT: Okay. Okay. I'll recognize the
19 State.
20 MS. JACK: Thank you very much.
21 HUNTER CONNELL,
22 Venireperson No. 52, testified as follows:
23 VOIR DIRE EXAMINATION
24 BY MS. JACK:
25 Q. Good morning, Mr. Connell. How are you doing?

19

1 A. Morning. Pretty good.
2 Q. All right. My name is Christy Jack. And I'm
3 going to visit with you this morning on behalf of the
4 State. All right. And we're going to talk about your
5 feelings, talk about the Constitution, and we're going to
6 talk about the law that applies. Okay. And I want to
7 begin where the Judge left off, and that is your job. All
8 right?
9 A. Yes, ma'am.
10 Q. And while ordinarily somebody not being paid or
11 someone who it might inconvenience a job or your ability
12 to go to a job, that's not a disqualification. But if you
13 say, for instance, that you would be unable to give this
14 trial your full attention because you would be missing
15 work, because you would be missing your paycheck, that
16 kind of thing, then that can be a way that you would not
17 have to serve. All right. So let's talk about your job.
18 Okay?
19 A. Okay.
20 Q. All right. And I'm going to ask you to speak up
21 real loudly and clearly. Can you do that for me?
22 A. Yes, ma'am.
23 Q. All right. Thank you. Okay. Are you paid
24 hourly or are you paid salary?
25 A. Hourly.

20

1 Q. Hourly. How much do you get paid an hour?
2 A. 12.
3 Q. 12 dollars an hour?
4 A. Yes, ma'am.
5 Q. How long have you been at this company?
6 A. Started in July or the end of June.
7 Q. Okay. So you've been there a matter of months?
8 A. Uh-huh.
9 Q. Less than a year?
10 A. Yes, ma'am.
11 Q. Do you have any vacation saved up?
12 A. I don't get vacation till after a year.
13 Q. So you don't have any vacation saved up?
14 A. No, ma'am.
15 Q. So you couldn't even take vacation?
16 A. No, ma'am.
17 Q. All right. And I don't mean to be impersonal --
18 or I don't mean to get in your personal business, but do
19 you live by yourself?
20 A. No, ma'am.
21 Q. Okay. The person with whom you live -- who do
22 you live with?
23 A. My parents.
24 Q. Your parents. Okay. And do you help contribute
25 or help pay anything to your parents while you stay there

STATE VS. MARK ANTHONY SOLIZ  JANUARY 30, 2012

**21**

1  with them?

2      A.  No, ma'am.

3      Q.  Okay.  So while you're serving on jury duty, if

4  you're paid hourly, you're probably not going to get

5  paid.

6      A.  No, ma'am.

7      Q.  Okay.  And so that would be three weeks without

8  pay.  Have you thought about that?

9      A.  Yes, ma'am.  It's not going to be good because I

10  just -- I don't have any money now.  My pickup was -- my

11  tire fell off.  I had to buy a lot of stuff for that, so.

12      Q.  Okay.  So you've got a pickup?

13      A.  Yes, ma'am.

14      Q.  Got a car and you pay for the car?

15      A.  Yes, ma'am.

16      Q.  Your parents don't pay for the car?

17      A.  No, ma'am.

18      Q.  I'm guessing you pay for your insurance?

19      A.  Uh-huh.

20      Q.  You've got to say out loud "yes" or "no".

21      A.  Yes, ma'am.  Sorry.

22      Q.  You make payments on your truck?

23      A.  Yes, ma'am.

24      Q.  You didn't buy it outright?

25      A.  No, ma'am.

**22**

1      Q.  How much are your payments?

2      A.  They're 218 a month.

3      Q.  218 a month.  How much do you get paid a week?

4      A.  Without -- without call, I get about a grand.

5      Q.  Get a grand a week?

6      A.  Yes, ma'am.

7      Q.  Okay.  How much of that do you get to take home?

8      A.  About nine -- about 900.

9      Q.  So about 900, you're talking about basically

10  missing out on 2700 dollars.

11      A.  Yes, ma'am.

12      Q.  At your job; is that right?

13      A.  Yes, ma'am.

14      Q.  Okay.  And you're paying your truck.  What else

15  do you pay for?

16      A.  Just food and other stuff that I want.  Basically

17  it.

18      Q.  Okay.  So about how much do you spend on all

19  that?

20      A.  Depends on what I want that month.

21      Q.  I get it.  If you're going out, depends on if

22  you're staying home with your parents.

23      A.  Yeah, I don't hardly stay home.

24      Q.  So you would be missing out on 2700 dollars?

25      A.  Yes, ma'am.

**23**

1      Q.  At a minimum.  Okay.  And you just put a bunch of

2  money in to your truck?

3      A.  Yes, ma'am.

4      Q.  All right.  Now, there -- did you see how many

5  people we had in here the other day?

6      A.  Yes, ma'am.

7      Q.  Why do you think we have that many people?

8      A.  Because there's a lot of people that can't miss

9  work.

10      Q.  Exactly.  There's a lot of people who have no

11  issue with the death penalty, they're fine with the death

12  penalty.  They understand it's appropriate in some cases,

13  not appropriate in other cases.  There are lots of people

14  who are salary workers.  You know what I mean by that?

15      A.  Yes, ma'am.

16      Q.  In other words, they're going to get paid.

17      A.  No matter what.

18      Q.  No matter what.  And it is not any kind of

19  financial hardship for them to come in and give this trial

20  the full attention, unlike yourself.

21      A.  Yes, ma'am.

22      Q.  Because it would be a sacrifice for you, wouldn't

23  it?

24      A.  Yes, ma'am.

25      Q.  You would be missing almost $3,000?  Is that

**24**

1  right?

2      A.  Yes, ma'am.

3      Q.  Okay.  Because you shook your head "yes", and I

4  can see that, but Pam here, she's got to type down what

5  you say.  Okay?

6      A.  Yes, ma'am.

7      Q.  And so for those people who are sitting there

8  thinking, "I've got bills to pay; I have responsibilities;

9  I have a car, and I can't give this trial my full

10  attention knowing I'm not gonna be able to make those

11  payments."

12      A.  Yes, ma'am.

13      Q.  Is that you?  Is that how you feel?

14      A.  Um, I'm going to be pressed, but I could probably

15  do it if -- if I got picked.

16      Q.  Okay.  I want you to think about that.  Okay.

17  Because you've also said a couple of other things in the

18  questionnaire about kind of how you personally feel about

19  the death penalty.

20      A.  Yes, ma'am.

21      Q.  All right.  And if your job or missing your job

22  makes it difficult to give this trial your full attention,

23  you're not going to have to put yourself in the position

24  of even making a decision on the death penalty.

25      A.  Yes, ma'am.

STATE VS. MARK ANTHONY SOLIZ   JANUARY 30, 2012

**25**

1  Q. See how that works?
2  A. Yes, ma'am.
3  Q. You follow me?
4  A. Yes, ma'am.
5  Q. All you would have to do is say, "You know what,
6  I can't give this trial my full attention. I'm not like
7  those other 200 people. It isn't gonna cost them a cent
8  to serve on the Jury."
9  A. Yes, ma'am.
10  Q. You're not gonna have to put yourself in a
11  position of -- Have you ever had to do something you
12  didn't think was right?
13  A. Yes, ma'am.
14  Q. How did you feel about that?
15  A. I didn't want to do it.
16  Q. Okay. Did it make you feel good inside?
17  A. No, ma'am.
18  Q. Did it make you feel bad inside?
19  A. Yes, ma'am.
20  Q. Did you think about it for days after that?
21  A. Yes, ma'am.
22  Q. And I'm not going to ask you what that was, but
23  do you still know -- do you still think about that
24  occasionally when you did something that wasn't right?
25  A. Yes, ma'am.

**26**

1  Q. Did it bother your conscience?
2  A. Yes, ma'am.
3  Q. Kind of go against how you personally feel about
4  what's right and what's wrong?
5  A. Yes, ma'am.
6  Q. Okay. Now, I don't know what that was, but
7  that's kind of the way I gather you feel about the death
8  penalty.
9  A. Yes, ma'am.
10  Q. That's how you feel about it, isn't it?
11  A. Yes, ma'am.
12  Q. Well, and if your feelings about doing what's
13  right and what's wrong, kind of who you are, what makes
14  you who you are, are the kind that, "You know what, I
15  can't ever sit in a position on a Jury and decide whether
16  somebody lives or dies", you know, if that's how you feel,
17  then you don't have to do that.
18  A. Yes, ma'am.
19  Q. Okay. But the time for you to decide that is
20  right now. Okay?
21  A. Yes, ma'am.
22  Q. Do we understand?
23  A. Yes, ma'am.
24  Q. Okay. Because make no mistake about it, that's
25  exactly what I'm going to be asking you to do.

**27**

1  A. Yes, ma'am.
2  Q. All right. Have you thought about what it would
3  feel like to serve on a Jury like this?
4  A. Yes, ma'am.
5  Q. Okay. And I understand you did some reading. I
6  want to tell me about the reading you did.
7  A. I -- it was just that -- and I've been hearing,
8  like, over the years, not really paying attention, but you
9  can just -- prisons are getting crowded. And like I don't
10  want -- like I say, somebody that didn't do it, I don't
11  think that they should be up for -- die for it, you know.
12  But if somebody that you know that did it and stuff,
13  there's no reason for them to be just sitting in prison,
14  you know.
15  Q. What do you mean? Tell me what you're thinking.
16  A. Like if they're on death row and it takes years,
17  they're in there 20 years before they -- sentenced.
18  Q. Uh-huh.
19  A. They shouldn't be -- they shouldn't take that
20  long, you know what I mean.
21  Q. So you think it should take less time?
22  A. Yes, ma'am.
23  Q. Okay. How does Texas carry out the death
24  penalty? Do you know that? Do you know how they do it?
25  A. Lethal injection.

**28**

1  Q. That's right. How do you feel about that?
2  A. It kind of depends on, to me, what they did, you
3  know.
4  Q. Okay.
5  A. I mean if it's just capital, then -- like no
6  reason for it, then I think they -- I think they should --
7  probably electric chair like it used to be.
8  Q. Oh, so you actually think lethal injection is
9  too --
10  A. Is too easy.
11  Q. Too easy. You'd prefer it to be the electric
12  chair? Actually some states, they do that.
13  A. I think they should pay for it. I think they
14  should pay for, really, however they did that to somebody,
15  they should have the same thing done to them.
16  Q. Okay. Okay. All right. Then I want you to be
17  thinking about that. I want you to be thinking how you
18  feel if you serve on a Jury with that decision, because
19  right now as you sit here, we have lots of people who will
20  come in, and some will say, "I have no problem with the
21  death penalty"; others may say, "I don't want to do this,
22  I don't agree with the death penalty". And they're
23  excused. They don't have to do it. Okay. So I want you
24  to be sitting there thinking as we go through this kind of
25  which -- You know what I mean when I say which camp you

29

1  fall into?
2      A.  Yes, ma'am.
3      Q.  Okay.
4      A.  I feel like I couldn't -- I feel I couldn't be
5  part of somebody actually dying.
6      Q.  Okay.
7      A.  I think they should pay for what they did, but I
8  just don't know that I could be the deciding factor --
9      Q.  Okay.
10     A.  -- that they -- to be sentenced.
11     Q.  Okay.  You don't think you could participate in a
12  Jury in deciding whether or not somebody lives or dies?
13     A.  No, ma'am.
14     Q.  Okay.  And you know how the Judge said at the
15  beginning if you say things like "I think" or "I believe"
16  or "I don't believe," how many more questions do you get?
17     A.  More.
18     Q.  More.  Exactly.  So the easiest way through this
19  is when I ask you a question about your feelings about the
20  death penalty --
21     A.  "Yes" and "no".
22     Q.  "Yes" or "no".
23     A.  Yes, ma'am.
24     Q.  And the same thing is true when they ask you
25  questions, because they're going to have questions right

30

1  behind me.  And if you change your mind or if you're
2  wishy-washy -- You know what it means when somebody is
3  wishy-washy?  They go back and forth.
4      A.  Yes, ma'am, back and forth.
5      Q.  You get a whole lot more questions.
6      A.  Yes, ma'am.
7      Q.  So I want you to really be thinking, because I
8  think I know how you feel looking at your questionnaire,
9  and you're kind of repeating that to me this morning.
10  Let's try to stick with "yes" or "no", provided that's
11  really how you feel.
12     A.  Yes, ma'am.
13     Q.  Okay.  So while you're okay with the death
14  penalty as long as someone else does it --
15     A.  Yes, ma'am.
16     Q.  Is that right?
17     A.  Yes, ma'am.
18     Q.  You don't want to be one of those people that
19  does it?
20     A.  No, ma'am.
21     Q.  You don't want to participate?
22     A.  No, ma'am.
23     Q.  In a Jury that decides whether or not somebody
24  lives or dies?
25     A.  No, ma'am.

31

1      Q.  I mean, you're 19 years old, aren't you?
2      A.  Yes, ma'am.
3      Q.  Do you feel like you're old enough to do
4  something like that or do you think that maybe people a
5  little bit older ought to do that?
6      A.  People little bit older ought to do that.
7      Q.  Maybe people that have a little more life behind
8  them?
9      A.  Yes, ma'am.
10     Q.  People with gray hair and wrinkles maybe?  Just
11  kidding.  But you're relatively young.
12     A.  Yes, ma'am.
13     Q.  Agree with me?
14     A.  Yes, ma'am.
15     Q.  And you don't want that kind of decision on you
16  as a 19-year-old?
17     A.  No, ma'am.
18     Q.  Okay.  And you're not going to sit in judgment of
19  someone else and decide whether or not they live or die?
20     A.  Yes, ma'am.
21     Q.  All right.  And as -- and I just want to tell you
22  something else because I want to be completely fair with
23  you.  Do you want me to be fair with you?
24     A.  Yes, ma'am.
25     Q.  Tell you what might happen if you change your

32

1  mind?  Not only might you sit on the Jury, but you might
2  be elected foreman.  Do you know what that means?
3      A.  No, ma'am.
4      Q.  You might potentially be the leader of the Jury.
5  And you just made a look with your face.  I'm guessing you
6  don't you want to do that even less?
7      A.  Yes, ma'am.
8      Q.  As the leader of the Jury, as the foreman,
9  whatever decision that Jury makes, you have to sign your
10  name to.  You all the sudden got very serious.  And I'm
11  guessing you would never be able to sign your name to a
12  Jury decision that calls to take someone's life?
13     A.  No, ma'am.
14     Q.  You could never do that, could you?
15     A.  No, ma'am.
16     Q.  And you know what, Mr. Connell, there's nothing
17  wrong with that.  I'll tell you at 19, I couldn't have
18  either.  Okay.
19     A.  Yes, ma'am.
20     Q.  So we kind of understand what we're talking
21  about.  And when you were asked these questions about the
22  death penalty, you indicated several different ways how
23  you felt.  You said that you didn't know if you could
24  sentence someone to death, and you've thought about it
25  since then, right?

33

1   A.  Yes, ma'am.
2   Q.  And you can't do it, can you?
3   A.  No, ma'am.
4   Q.  And you were asked the question, are your views
5   about the death penalty so strong that they would prevent
6   your ability or interfere with your ability to do your job
7   as a juror.
8   A.  Yes, ma'am.
9   Q.  And you said "yes".  Do you remember that?  In
10  other words, your personal beliefs about the death penalty
11  would make it impossible for you to serve on a Jury.
12  A.  Yes, ma'am.
13  Q.  And that's how you feel, isn't it?
14  A.  Yes, ma'am.
15  Q.  And then you asked -- you were asked about life
16  without parole.  And you said that should be the answer in
17  all cases where somebody has been murdered or committed a
18  capital murder?
19  A.  Yes, ma'am.
20  Q.  And that's how you feel, isn't it?
21  A.  Yes, ma'am.
22  Q.  And you're always going to vote so that someone
23  gets a life sentence rather than the death penalty?
24  A.  Yes, ma'am.
25  Q.  And there's nothing wrong with that.  Do you

34

1   understand there's nothing wrong with that?  There's
2   nothing wrong with you saying that today.  Okay?
3   A.  Yes, ma'am.
4   Q.  Don't put yourself in that position where you end
5   up on a Jury.
6   A.  Yes, ma'am.
7   Q.  And as long as your answers remain the same and
8   you don't change your mind, you won't have to serve on the
9   Jury.  Okay?
10  A.  Yes, ma'am.
11  Q.  All right.  And then the other thing was you were
12  asked at the very end about serving on the Jury and was
13  there anything that prevented it, your ability to serve on
14  the Jury.  And you brought up again your feelings about
15  the death penalty and sentencing someone to die.
16  A.  Yes, ma'am.
17  Q.  And I think also you know the grandsons in this
18  case, don't you?
19  A.  I know Riley Davis.
20  Q.  You know Riley Davis?
21  A.  Yes, ma'am.
22  Q.  And how do you know Riley?
23  A.  My girlfriend goes to school with him.
24  Q.  Your girlfriend goes to school with him?
25  A.  Yes, ma'am.

35

1   Q.  Okay.
2   A.  They've been to school since they were little
3   kids.
4   Q.  They've gone to school since y'all were little
5   kids?
6   A.  Yes, ma'am.
7   Q.  Okay.  So your girlfriend and Riley have been
8   childhood friends?
9   A.  Yes, ma'am.
10  Q.  And you know Riley?
11  A.  Yes, ma'am.
12  Q.  You've known him for years?
13  A.  Not years, but two, two years or so.
14  Q.  You've known him for two years.  Have you seen
15  him out and about in town?
16  A.  Yes, ma'am, basketball games and --
17  Q.  Okay.
18  A.  -- football games and stuff.
19  Q.  Sporting events?
20  A.  Yes, ma'am.
21  Q.  How often do you think you see him?
22  A.  I -- here lately I haven't been going to any of
23  the games, but last year I seen him at least once a week.
24  Q.  And your girlfriend is very fond of him?
25  A.  Yes, ma'am.

36

1   Q.  As a friend would be?
2   A.  Yeah.
3   Q.  I get it.  She's only got eyes for you.  I get
4   that.  Okay.
5   A.  Yes, ma'am.
6   Q.  But as a childhood friend?
7   A.  Yes, ma'am.
8   Q.  She's been friends with him since she was little?
9   A.  Yes, ma'am.
10  Q.  Okay.  And obviously you would know there's a
11  good chance he's going to testify in this case?
12  A.  Yes, ma'am.
13  Q.  Did you know that?
14  A.  I didn't know that, but...
15  Q.  That's okay.  That's okay.  And another way that
16  somebody would not be on a Jury is if you -- if you know a
17  witness.
18  A.  Yes, ma'am.
19  Q.  And because of your relationship with that
20  witness or because of your girlfriend's relationship,
21  you're going to give that witness -- he's going to be
22  more important than other witnesses because you know
23  him outside of the courtroom?
24  A.  Yes, ma'am.
25  Q.  And that's how you feel, isn't it?

37

1    A.  Yes, ma'am.

2    Q.  And because you know how fond your girlfriend is

3  of him?

4    A.  Yes, ma'am.

5    Q.  Okay.  All right.  Now, I'm -- when you filled

6  out this questionnaire, I would imagine that you filled it

7  out thinking when we were talking about capital murder in

8  the context -- Do you know what I mean when I say "in the

9  context"?  You were thinking of someone that was actually

10 the killer?

11   A.  Yes, ma'am.

12   Q.  Okay.  Well, actually when we talk about capital

13 murder, when we talk about capital murder, did you know

14 that someone who is not the trigger man could actually get

15 the death penalty?

16   A.  Not really.  I didn't know that.

17   Q.  Okay.  So when you were thinking about the death

18 penalty, you were simply thinking of --

19   A.  Just the --

20   Q.  -- just the killer?

21   A.  Yes, ma'am.

22       MS. JACK:  Okay.  Now --

23       Okay.  Judge, I believe we've reached an

24 agreement.

25       MR. WESTFALL:  Mercy.

38

1        MR. HEISKELL:  Yes.

2        THE COURT:  Okay.  Mr. Connell, if you'll

3  step outside for just a minute.

4        (Venireperson Connell not present.)

5        THE COURT:  Okay.  What agreement do y'all

6  have?  Just take him.

7        MS. JACK:  I believe we've agreed to excuse

8  Mr. Connell.

9        MR. HEISKELL:  That's correct, Your Honor.

10 We've agreed to excuse him in light of his responses to

11 the questions, and also I've conferred with my client,

12 Mr. Soliz.  He's agreed as well.

13       THE COURT:  Okay.  I will approve that

14 agreement.  We'll excuse him, Hunter Connell, Juror No.

15 52.  You can tell him he's excused.

16       (Venireperson Connell excused.)

17       (Off the record.)

18       (Venireperson Woolf present.)

19       THE COURT:  If you'll raise your right hand.

20       (Juror sworn.)

21       THE COURT:  Thank you, sir.  If you'll have a

22 seat in the second chair in the first row of the jury

23 box.

24       Would you state your name.

25       VENIREPERSON:  William Franklin Woolf, Jr.

39

1        THE COURT:  Mr. Woolf, I'll ask the first

2  questions.  You filled out a juror questionnaire a while

3  back.  Were the answers you put on there true and

4  correct?

5        VENIREPERSON:  Yes, sir.

6        THE COURT:  That's been a couple weeks,

7  several weeks.  Is there anything that's changed in your

8  life that would change any of those answers?

9        VENIREPERSON:  No, sir.

10       THE COURT:  First off, thanks for coming

11 early.  We kind of piled up this afternoon, so you let us

12 get a quick start.

13       VENIREPERSON:  Yes, sir.

14       THE COURT:  My name is Phillip Vick.  I'm the

15 Judge presiding of this proceeding.  When this case goes

16 to trial, Judge William Bosworth, Judge of the 413th

17 District Court of Johnson County, will be the one trying

18 the case.

19       The attorneys representing the State in this

20 case are Mr. Dale Hanna, Ms. Christy Jack.

21       MS. JACK:  Good afternoon.

22       VENIREPERSON:  Afternoon.

23       THE COURT:  With them at some points will be

24 maybe Larry Chambless and Martin Strahan.

25       The attorneys representing the Defendant are

40

1  Mr. Michael Heiskell.

2        MR. HEISKELL:  Good afternoon.

3        VENIREPERSON:  Good afternoon.

4        THE COURT:  Mr. Greg Westfall.

5        MR. WESTFALL:  Hello.

6        THE COURT:  Seated with them at the counsel

7  table is the Defendant, Mark Anthony Soliz.

8        THE DEFENDANT:  Good afternoon.

9        THE COURT:  They'll have questions for you,

10 but I'll ask first.  Is there anything we should know

11 about you that we didn't ask on the questionnaire?

12       VENIREPERSON:  No, sir.

13       THE COURT:  Okay.  I will tell you it's not a

14 test.  You are going to be asked a lot of questions.

15 There's no right or wrong answers.  The only thing you can

16 do -- we require of you is that you be truthful.

17       VENIREPERSON:  Yes, sir.

18       THE COURT:  You need to say "yes" or "no" if

19 you possibly can.  If you say things like "perhaps" or "I

20 think so" or something like that, you'll get several

21 questions asking to explain that answer.  So it will go

22 faster if you can say "yes" or "no".

23       VENIREPERSON:  Okay.

24       THE COURT:  Also, don't answer a question if

25 you don't understand it.  Make sure they explain it to you

STATE VS. MARK ANTHONY SOLIZ   JANUARY 30, 2012

41

1   or rephrase it or tell you what they're looking for.
2       VENIREPERSON:  Yes, sir.
3       THE COURT:  We think this trial is going to
4   start probably the last week in February.  When it does
5   start, we think it will last about three weeks.  There's
6   even a chance the Jury would be sequestered during those
7   three weeks.  That means put up in a fancy hotel with good
8   food and -- hopefully.  And the question is, do you have
9   anything happening in your life that would interfere
10  with that period of time?
11      VENIREPERSON:  I have a vacation going to
12  Vegas for my company on February 24th.
13      THE COURT:  For how long?
14      VENIREPERSON:  It's for four days.
15      THE COURT:  Well, that might interfere.  We
16  don't know.
17      VENIREPERSON:  And I also have some vacation
18  coming up on March 12th on my birthday that we were going
19  out of town that weekend, so that would be within the
20  three weeks also, I would think.
21      THE COURT:  Do you have plane tickets already
22  purchased, that kind of thing?
23      VENIREPERSON:  Yes, sir, my company has
24  already purchased the tickets.
25      THE COURT:  Okay.  Okay.  I'll let the

42

1   lawyers talk to you about that then.
2       I guess I'll recognize the State.
3       MR. HANNA:  Thank you, Judge.
4           WILLIAM WOOLF,
5   Venireperson No. 54, testified as follows:
6           VOIR DIRE EXAMINATION
7   BY MR. HANNA:
8       Q.  Well, that kind of thing threw me for a loop,
9   Mr. Woolf.  I read your questionnaire.  I saw you had some
10  vacation for February and April.
11      A.  Yes, sir.
12      Q.  But that has changed evidently?
13      A.  Yes, sir.  I actually had one of the days added
14  for the 12th.
15      Q.  Of March?
16      A.  Yes, sir.
17      Q.  Now, is that a company vacation or is it a
18  personal?
19      A.  No, sir, it's a personal vacation.
20      Q.  Okay.  Are you going somewhere?
21      A.  No, I was staying in town.
22      Q.  Okay.
23      A.  Okay.
24      Q.  Well, okay.  That's why I'm trying to find out.
25  The February, from the 24th to the 28th?

43

1       A.  Yes, sir.
2       Q.  You're going to Las Vegas for your company?
3       A.  Yes.
4       Q.  All right.  And the March 12th?
5       A.  12th.
6       Q.  Is just a vacation day for you?
7       A.  Correct.  I've got -- also have some other
8   personal things that I have to take care of pertaining to
9   one of the questions in my --
10      Q.  Okay.  Okay.  Well, I guess we need to talk about
11  that first.  I read the questionnaire.
12      A.  Yes, sir.
13      Q.  And I kind of think I know a lot about it.  What
14  is that on the 12th now?
15      A.  It's my birthday.
16      Q.  Yes, sir.
17      A.  And that's the day that I have --
18      Q.  The registration thing?
19      A.  Yes.
20      Q.  Okay.  So you've got to register on that day?
21      A.  Yeah, that's the end of it.  Actually that's the
22  end of it.  I'm done, completely done with that at that
23  point.
24      Q.  Is there something you have to do that day?
25      A.  No, that is what I have to do.  I have to go see

44

1   Detective K.D. Wrenn.
2       Q.  Okay.  With the Sheriff's Department?
3       A.  With the Sheriff's Department.
4       Q.  Okay.
5       A.  At 9 a.m.
6       Q.  Okay.  All right.  But that's all you have to do
7   that day?
8       A.  Yes, that's it.
9       Q.  Okay.  Well, all right.  I think I get that.  And
10  the other vacation is in April?
11      A.  Yes, sir.  That would not -- this would not
12  affect that whatsoever.
13      Q.  Okay.  So that -- that visit with Detective Wrenn
14  on the 12th --
15      A.  Uh-huh.
16      Q.  -- would likely be a relatively short visit,
17  I'm --
18      A.  Yes.
19      Q.  Okay.
20      A.  I go in and get my release and everything like
21  that.
22      Q.  Okay.  And, of course, what we're talking about
23  on this situation is you were on juvenile probation?
24      A.  Yes, sir.
25      Q.  I think for like --

STATE VS. MARK ANTHONY SOLIZ   JANUARY 30, 2012

45

1    A. Till I was 18 years old.

2    Q. Okay.

3    A. Once I was 18 years old, I had to register for

4  ten years after that till I was 28 years old.

5    Q. Yes, sir. You'll be 28, so this is fixing to be

6  behind you?

7    A. It will be behind me.

8    Q. Okay. Now, as the Judge told you, my name is

9  Dale Hanna. I'm the District Attorney here.

10    A. Yes, sir.

11    Q. This is what I need to know just right off the

12  bat. Is there anything about that situation that's going

13  to affect your deliberations on this case if you were

14  selected?

15    A. No, sir.

16    Q. Okay. You understand why I would ask that?

17    A. Yes, sir.

18    Q. Okay. And you're telling me, absolutely would

19  not?

20    A. It would not.

21    Q. Okay. And I was looking at your questionnaire,

22  and it's amazing what you find out reading this.

23    A. Right.

24    Q. Couple things that jumped off the page at me. I

25  was -- if I can find this.

46

1    THE COURT: Let me ask you. If you didn't

2  get to make that trip to Las Vegas, what does that do to

3  you?

4    VENIREPERSON: It, I mean, it just affects my

5  company.

6    THE COURT: Okay.

7    VENIREPERSON: The money they've already

8  spent, so, I mean, to me, either I go or I don't.

9    THE COURT: Okay. So you could serve as a

10  juror?

11    VENIREPERSON: Yes.

12    THE COURT: Okay. Wrong answer now.

13    VENIREPERSON: I'm willing to.

14    THE COURT: Good enough.

15    Q. (BY MR. HANNA) And back to this other thing, we

16  started out about this probation.

17    A. Yes, sir.

18    Q. That wasn't in this county, was it?

19    A. No, sir.

20    Q. Okay. And you wouldn't hold that against the

21  State on this case, would you?

22    A. No, sir.

23    Q. Nor my table here?

24    A. No, sir.

25    Q. Okay. I can be assured of that, can't I?

47

1    A. I swear to you.

2    Q. Good enough. What I was fixing to point out is

3  this questionnaire, you can learn a lot about people.

4  First of all, I was disappointed to see that when you

5  said what you thought about District Attorney, it was

6  they're not always honest, but then I was heartened to

7  see that defense attorneys, you said they're not always

8  truthful.

9    A. Right.

10    Q. So I kind of felt like I was in a equal

11  situation.

12    A. It is.

13    Q. Okay. And I'm making light of it because we kind

14  of do that in a serious situation, but what I need to

15  know, defense attorneys at that table --

16    A. You're equal.

17    Q. District Attorney at this table, we're equal?

18    A. Yes, sir.

19    Q. Neither one of us leaning one way or the other?

20    A. No, sir.

21    Q. Okay. And I also saw that Tombstone, Wyatt Earp

22  is one of your heroes?

23    A. Yes, sir.

24    Q. You ever seen that Tombstone movie?

25    A. Yes, sir.

48

1    Q. I bet you have.

2    A. My son is named after Wyatt Earp.

3    Q. Really?

4    A. Yes, sir.

5    Q. What's his name?

6    A. Wyatt. Wyatt Lee.

7    Q. He's 1 year old?

8    A. Yes, sir, he's a little over 1 now.

9    THE COURT: Did you think he was named Earp?

10    VENIREPERSON: I tried that. My wife

11  wouldn't let me do the middle name Earp.

12    Q. That just lets you go so far.

13    A. Yes, sir.

14    Q. All right. Well, I guess the long and short of

15  what I'm asking, are you willing to serve on this Jury if

16  selected?

17    A. Yes, sir. Yes, sir. The -- and I guess my only

18  question to, I mean, either of you guys and ma'am, is I do

19  not want my situation that I had when I was a kid to

20  affect any of the outcome, whether it be one way or the

21  other. I don't want the other half to be -- or able to

22  come back and say, you know, "Well, this person was on

23  here", because I don't think that would be fair to the

24  Defendant nor would I think it would be fair to you.

25    Q. Couldn't agree with you any more. Absolutely I

49

1 could not agree with you any more. And I think they'll
2 say the same thing. You've brought it out. It's here on
3 the table.
4    A. Yes, sir.
5    Q. Everybody knows about it. You're telling us it's
6 not going to affect anything?
7    A. No, sir.
8    Q. We're starting out even, both sides?
9    A. Yes, sir.
10    Q. You're not going to hold it against the District
11 Attorney's Office in this county because it was in a
12 different county?
13    A. Right. I wouldn't hold it against them either.
14 That was so...
15    Q. Sure. Okay. Now, one last thing before we get
16 to the issues involved. You said you were generally in
17 favor of the death penalty but your decision to impose it
18 would be based strictly on the facts and the law?
19    A. Yes.
20    Q. Is that true?
21    A. Yes, sir.
22    Q. Okay. And you believe that the death penalty is
23 good only if the crime is proven beyond a shadow of a
24 doubt, right?
25    A. Yes, sir.

50

1    Q. Okay. And you, talking about life in prison
2 without parole, you're opposed to it at every possible
3 case of capital murder, and you wrote down there if a
4 party is found guilty, he or she should receive the death
5 penalty. I'll bet you you've never given a lot of thought
6 to the procedure in Texas for capital murder trials before
7 you filled this out.
8    A. No, sir.
9    Q. I didn't figure you had. Nobody has. It's one
10 thing to go in and fill out this 26-page questionnaire
11 with 300 of your closest friends. I'm being a little
12 sarcastic.
13    A. I know.
14    Q. But they ask you what you think about things.
15 It's one thing to think this way, but it's something else
16 to get in the jury box and have the Judge tell you, "You
17 will go by these rules and you will follow this law". Do
18 you see the difference?
19    A. Yes, sir.
20    Q. You may think this about the death penalty, but
21 can you get in the jury box and follow the law and then
22 call it like you see it based on the evidence?
23    A. Yes, sir.
24    Q. Can you do that?
25    A. Yes, sir.

51

1    Q. You understand what I'm saying?
2    A. Yes, sir.
3    Q. Okay. All right. Let's go through this. This
4 is the State of Texas versus Mark Anthony Soliz. This is
5 the title of the case. You know it's a capital murder
6 case.
7    A. Yes, sir.
8    Q. I figure that you know from the tenor of the
9 questions that capital murder cases are only two
10 punishments?
11    A. Yes, sir.
12    Q. Only two, life without parole, death by lethal
13 injection.
14    A. Yes, sir.
15    Q. You're aware of that?
16    A. Yes, sir.
17    Q. Mark Anthony Soliz is the Defendant. He's here
18 in the courtroom. He was pointed out to you today and I
19 think the other day also. Right?
20    A. Yes, sir.
21    Q. All right. Let's talk about you've never served
22 on a criminal Jury before, have you?
23    A. No, sir.
24    Q. Never served on a Jury at all?
25    A. No, sir.

52

1    Q. You live in the Godley, Joshua area, don't you?
2    A. Yes, sir.
3    Q. Generally just where is it?
4    A. It's where 2331 is, and Sky, Sky Road.
5    Q. Okay.
6    A. It's Godley school district, Joshua address.
7    Q. How long have you lived up there?
8    A. I've lived there for three or four years now.
9    Q. That's with your wife, and she's a massage
10 therapist?
11    A. Therapist, yes, sir.
12    Q. Her views are about like yours?
13    A. Yes, sir.
14    Q. And you've got a 1-year-old son named Wyatt.
15    A. Yes, sir.
16    Q. Pretty cool. Let's talk about principles. Jury
17 service, Judge told you about the length of the trial.
18 And we talked about you can have all the strong feelings
19 that you want, and you put those down on the
20 questionnaire. But when you walk in that jury box, you've
21 got to follow the law, right?
22    A. Yes, sir.
23    Q. You can do that?
24    A. Yes, sir.
25    Q. Okay. You watch much television, CSI, those

53

1  kinds of things?
2      A.  Don't watch CSI.  I watch the two crime shows
3  that I put on there.  One was Justified.
4      Q.  Okay.
5      A.  And, dog-gone it, I don't remember what the other
6  one is.
7      Q.  Watch a western movie ever now and then?
8      A.  Oh, yeah, when I get a chance.
9      Q.  All right.  This, criminal trials are not
10  necessarily like they are on television.  You know, you
11  don't get DNA in an hour-and-a-half like they do in 60
12  minutes on television.  In trying to determine if you can
13  sit on this Jury, a couple of key things.
14      A.  Okay.
15      Q.  Follow the law the Judge gives you.  And nothing
16  is automatic.
17      A.  Okay.
18      Q.  Does that make sense?
19      A.  Yes, sir.
20      Q.  The Judge will give you a set of written
21  instructions, the Jury, at the end of each phase of the
22  trial, Guilt/Innocence and Punishment.  Those written
23  instructions will have all the law that will guide you in
24  your deliberations.  It will tell you what you can
25  consider, what you can't consider, what to do here, what

54

1  to do there.  Does that make sense?
2      A.  Yes, sir.
3      Q.  Do you think you can do that?
4      A.  Yes, sir.
5      Q.  All right.  Let's talk about constitutional
6  principles.  These are the principles that apply in every
7  criminal case in the United States.  I don't care if it's
8  a shoplifting at Walmart, if it's a capital murder case,
9  an indictment is no evidence of guilt.  An indictment is a
10  piece of paper.  It's a piece of paper that the Grand Jury
11  foreman signs that charges the person with a particular
12  crime and sets out exactly what they did.  Does that make
13  sense?
14      A.  Yes, sir.
15      Q.  Okay.  If I confuse you in any of this, I want
16  you to stop me.
17      A.  No.
18      Q.  Make me go back over it.
19      A.  I sure will.
20      Q.  Can you do that?
21      A.  Yes, sir.
22      Q.  I don't know what you know about Grand Juries in
23  Texas.  Grand Jury in Texas is a body of 12 people that is
24  selected by the District Judge that goes into a room and
25  listen to evidence.  And if 9 of those 12 people agree

55

1  that a case should be indicted or true billed, it goes out
2  into one of the trial courts for a trial.  Does not have
3  to be unanimous.
4      A.  Okay.
5      Q.  And the defense attorneys are not entitled to go
6  in to the Grand Jury.  It's simply a procedure to decide
7  was a crime committed, did this person do it, does it
8  warrant a full blown trial.  Not unanimous.
9      A.  Okay.
10      Q.  Okay.  That's what comes out, an indictment.  The
11  charging instrument, the Judge will charge you, he will
12  instruct you an indictment is no evidence of guilt.  Just
13  because a person has been charged does not mean they're
14  guilty.  You can identify with that, can't you?
15      A.  Yes, sir.
16      Q.  You could abide by that, couldn't you?
17      A.  Yes, sir.
18      Q.  All right.  Presumption of innocence.  And I'm up
19  here on the board kind of looking at that because I know
20  what's coming.  Every person is presumed to be innocent in
21  the United States of America.
22      A.  Yes, sir.
23      Q.  And you even wrote on one of your questionnaires
24  that you had kind of a doubt or you didn't like the way
25  that was because a lot of people are perceived to be

56

1  guilty.
2      A.  Yes, sir.
3      Q.  I understand that because of your situation.  But
4  you wouldn't let that affect this case, would you?
5      A.  No, sir.
6      Q.  And that presumption of innocence applies in
7  every case?
8      A.  Yes, sir.
9      Q.  You agree with that, don't you?
10      A.  I sure do.
11      Q.  You would give the Defendant the presumption of
12  innocence the law entitles them to, wouldn't you?
13      A.  Yes, sir.
14      Q.  And as Mr. Soliz sits over there right now, he is
15  innocent, he is presumed to be innocent by the law.  Now,
16  it doesn't mean that he actually is because the facts may
17  change that when they're presented, but he's entitled to
18  that presumption of innocence.  Right?
19      A.  Yes, sir.
20      Q.  If you had to go back in that jury room right now
21  and vote, you would have to vote not guilty, wouldn't you?
22      A.  Yes, sir.
23      Q.  Because he's presumed to be innocent and you
24  haven't heard anything.
25      A.  That's correct.

57

1    Q. Just because he's here doesn't mean he's a little
2 bit guilty. Means he's presumed to be innocent, right?
3    A. Yes, sir.
4    Q. You're going to wait to see what happens?
5    A. Yes, sir.
6    Q. You're going to keep an open mind about it?
7    A. Yes, sir.
8    Q. Burden of proof in the state on -- is on the
9 State of Texas. That means at this table.
10    A. Yes, sir.
11    Q. Proof beyond a reasonable doubt.
12    A. Yes, sir.
13    Q. And you wrote something, I think, on your
14 information sheet that said if it was proved beyond a
15 shadow of a doubt.
16    A. Yes, sir.
17    Q. And I understand that. Those are words that we
18 use out in general society about proving somebody guilty
19 beyond a shadow of a doubt. But the burden of proof is to
20 prove beyond a reasonable doubt.
21    A. Yes, sir.
22    Q. Those are different things to my mind. How could
23 I -- how could somebody prove to your satisfaction that I
24 had on a pink tie today? Let's think through this a
25 minute. If you saw it with your own eyes, you would know

58

1 it, wouldn't you?
2    A. Yes, sir.
3    Q. If you didn't see it with your own eyes, you
4 wouldn't know it beyond all doubt.
5    A. Yes, sir.
6    Q. Do you see what I'm getting at? If you saw it
7 with your own eyes, you would be a witness.
8    A. Right.
9    Q. You wouldn't be on a Jury, would you?
10    A. Correct.
11    Q. Illustrates the point perhaps proving guilt
12 beyond a reasonable doubt.
13    A. Right.
14    Q. But if you're going to prove it beyond all doubt,
15 you saw it yourself.
16    A. Correct.
17    Q. That's the way I would be. Would you agree with
18 that?
19    A. Yes, sir.
20    Q. You would require us to prove guilt beyond a
21 reasonable doubt, wouldn't you?
22    A. Yes, sir.
23    Q. Not beyond a shadow of a doubt?
24    A. Right.
25    Q. Not beyond all doubt?

59

1    A. Right.
2    Q. Beyond a reasonable doubt?
3    A. Beyond a reasonable.
4    Q. That burden, Mr. Woolf, is at this table right
5 here. It never leaves this table. We have to prove guilt
6 beyond a reasonable doubt, State does.
7    A. Yes, sir.
8    Q. You'll buy that, won't you?
9    A. Yes, sir.
10    Q. You'll hold us to that, won't you?
11    A. I sure will.
12    Q. If we don't do it, you're going to go back there
13 with your 11 other jurors and say "not guilty"?
14    A. Correct.
15    Q. Because we don't prove the case. That's the way
16 the system works.
17    A. Yes, sir.
18    Q. Fifth Amendment of the United States
19 Constitution, ever heard of somebody taking the Fifth?
20    A. Yes, sir.
21    Q. That means that a person does not have to give
22 testimony against themselves at a trial.
23    A. Correct.
24    Q. They have a right to remain silent. The other
25 table over there, those gentlemen, they do not have to say

60

1 one word. Mr. Soliz does not have to say one word the
2 whole trial. They don't have to ask a question. They
3 don't have to do anything. They have a right to remain
4 silent.
5    A. Yes, sir.
6    Q. Mr. Soliz has that right. Okay?
7    A. Yes, sir.
8    Q. The reason that is is because we have the burden
9 to prove guilt beyond a reasonable doubt, this table.
10    A. Correct.
11    Q. Never changes, does it?
12    A. No, sir.
13    Q. Never leaves?
14    A. No.
15    Q. Always right here. That's why our system works.
16 Can you abide by that?
17    A. Yes, sir.
18    Q. Would you require us to prove guilt beyond a
19 reasonable doubt?
20    A. I sure would.
21    Q. And I expect before you found somebody guilty of
22 a capital murder case, you would require it and demand it
23 from our side, wouldn't you?
24    A. Yes, sir.
25    Q. Because you're not taking a death penalty case

61

1  lightly, are you?
2      A.  No, no, sir, not at all.
3      Q.  If we don't prove it, you would go back there and
4  say "not guilty", wouldn't you?
5      A.  That is correct.
6      Q.  See what I'm getting at?
7      A.  Yes, sir.
8      Q.  All right.  Let's talk about murder, not capital
9  murder, murder.  Capital murder.  Murder.
10     A.  Yes, sir.
11     Q.  Capital murder, we know there's only two
12 punishments, don't we?
13     A.  Yes, sir.
14     Q.  What are they?
15     A.  That's the death penalty and life in prison
16 without the possibility of parole.
17     Q.  Exactly.  Murder is from -- let's talk about
18 this, but punishment on murder, 5 to 99 years or life.
19     A.  Yes, sir.
20     Q.  That's different than capital murder
21 punishment-wise.  You see what I'm saying?
22     A.  Yes, sir.
23     Q.  Because this punishment for murder, 5 to 99 years
24 or life, that is subject to parole.
25     A.  Correct.

62

1      Q.  Death penalty is not, is it?
2      A.  No, sir.
3      Q.  Okay.  Let's talk about definition of murder.
4  Person commits the offense of murder if he intentionally
5  causes the death of an individual.
6      A.  Yes, sir.
7      Q.  Not capital murder, but murder.  If I turn around
8  right now in this courtroom and I've got a gun in my
9  pocket and I turn around and I put a hole in Christy's
10 head because I don't like the way things are going, that
11 is murder.  I've intentionally caused the death of another
12 individual.
13     A.  Yes, sir.
14     Q.  Do you see that?
15     A.  Yes, sir.
16     Q.  That is 5 to 99 years.  Can -- do you see that?
17     A.  Yes, sir.
18     Q.  Okay.  Let's go ahead and talk about the
19 difference between murder and capital murder.  Capital
20 murder is murder plus something; murder committed during
21 the course of the commission or attempted commission of
22 robbery or burglary.  Now do you see the difference?
23     A.  Yes, sir.
24     Q.  What is it?
25     A.  It's a second act.

63

1      Q.  Yeah.  It's murder plus something, isn't it?
2      A.  Correct.
3      Q.  It's a murder committed in the course of another
4  felony such as robbery, murder, kidnapping, aggravated
5  sexual assault, that kind of thing, murder of a police
6  officer, murder of a child under 10, several ways you can
7  commit capital murder.
8      A.  Yes, sir.
9      Q.  But the one we're dealing with is murder in the
10 course of robbery or a burglary.  That's what's called
11 murder plus.  That's what makes it capital murder as
12 opposed to murder.  Do you understand that?
13     A.  Yes, sir.
14     Q.  Punishment for murder, again we're back at
15 ordinary murder with me turned around and shooting my
16 trial partner, 5 to 99 years or life.  One example seems
17 like a pretty aggravated situation, maybe a life sentence
18 would be called for for me.  Now you contrast that with a
19 situation where a man and wife have been married for 50
20 years and she's dying of cancer, agonizing death,
21 horrible, painful, month after month.  She wants her life
22 ended.  She begs her husband, "Take my life, get me out of
23 this misery".  He won't do it.  One morning she is really
24 having a bad day.  He just succumbs to the temptation and
25 gives her an extra shot of morphine and she dies.  Well, I

64

1  think you would agree with me, a person commits the
2  offense of murder if he intentionally causes the death of
3  another individual.  That's murder, isn't it?
4      A.  Yes, sir.
5      Q.  Okay.  But that might be a 5-year case as opposed
6  to a life case, punishment-wise.  Does that make sense?
7      A.  Yes, sir.
8      Q.  Do you agree with that?
9      A.  Yes, sir.
10     Q.  Okay.  In other words, the legislature in this
11 state, Mr. Woolf, has given a real wide range from 5 years
12 to 99.  That's a wide range.
13     A.  Yes, sir.
14     Q.  And then you set the punishment in there
15 according to the crime, let the facts fit the crime, let
16 the punishment fit the crime.  Could you do that?
17     A.  Yes, sir.
18     Q.  Could you consider the minimum?
19     A.  Yes, sir.
20     Q.  Could you consider the maximum?
21     A.  Yes, sir.
22     Q.  It would depend on what?
23     A.  The evidence that's shown.
24     Q.  Exactly.  Depends on the facts, wouldn't it?
25     A.  Yes, sir.

65

1 Q. All right. All right. We've talked about
2 capital murder, murder plus. We've talked about there's
3 only two punishments in capital murder case, and that's
4 what this is. Elements of a crime, these are the things
5 that are up there with these little bullet points. Those
6 are the elements that are contained in the indictment.
7 These are the things we, this table, the State of Texas,
8 at this table, the District Attorney's Office and the
9 Assistant D.A.s have to prove each element beyond a
10 reasonable doubt. Right?
11 A. Correct.
12 Q. You would require that, wouldn't you?
13 A. Yes, sir.
14 Q. You're not about to take somebody's capital
15 murder case and let us off with anything less than proof
16 beyond a reasonable doubt on every element, correct?
17 A. That is correct.
18 Q. Let's talk about these elements. We've got to
19 prove that the Defendant, Mr. Soliz, on or about June
20 29th, 2010, in Johnson County, Texas, intentionally caused
21 the death of an individual by a manner and means, such as
22 beating with a tire tool or beating with a 2-by-4, running
23 over with a car, or whatever the -- a firearm or knife or
24 something like that. That's manner and means. Does that
25 make sense?

66

1 A. Yes, sir.
2 Q. We've got to prove that it was in the course of
3 committing or attempting to commit a robbery or a
4 burglary. If we don't prove one of those elements, not
5 guilty.
6 A. Correct.
7 Q. Okay. Now, I want to use one of these elements
8 to illustrate a point, to make sure you, if you were on
9 this Jury, could do the hard and the difficult thing. If
10 we don't prove one of these elements, you've got to say
11 what?
12 A. Not guilty.
13 Q. Not guilty. If you hear the evidence and the
14 evidence does not show you it happened in Johnson County,
15 it shows you it happened, and it shows you that the
16 Defendant did it. He did it on or about. He
17 intentionally caused the death by the manner and means in
18 the course of robbery and everything else. But we leave
19 out Johnson County. We didn't prove it was in Johnson
20 County, or it happened 500 yards in to Tarrant County.
21 A. Not guilty.
22 Q. Not guilty. I would grit my teeth if I was on a
23 Jury and that happened and I had to come out and say "not
24 guilty", but I would do it. Can you do it?
25 A. Yes, sir.

67

1 Q. Wouldn't like it, would you?
2 A. No, sir.
3 Q. I imagine you would have some words to say to the
4 Prosecutor, wouldn't you?
5 A. Yes, sir.
6 Q. There you go. All right. Let's talk about
7 intent, because one of the elements up here is
8 intentionally, isn't it?
9 A. Yes, sir.
10 Q. This is what intentionally is: A person acts
11 intentionally with respect to the result of his conduct
12 when it is his conscious objective or desire to cause the
13 result. Seems like a pretty common sense definition of
14 intentionally to me.
15 A. Yes, sir.
16 Q. You don't have to memorize that because I'll get
17 back to what I told you earlier. The Judge would give you
18 a set of written instructions for the Jury to take back to
19 guide their deliberations, and it would have terms
20 defined. And it would have all these elements, and it
21 would tell you what intentionally is. But we would have
22 to prove the person intentionally caused the death of
23 another individual, intended to kill them.
24 A. Yes, sir.
25 Q. In the course of a robbery or burglary. And if

68

1 we prove that, all the elements beyond a reasonable doubt,
2 we would expect your verdict to be what?
3 A. Guilty.
4 Q. Okay. Intent, many people think intent has to be
5 plotted out and planned out, but that's really
6 premeditation. That's something different than intent.
7 If I turn around right now and take a gun out and shoot my
8 trial partner, I've got the intent to do it. Bang. And I
9 might have formed that intent in three seconds, five
10 seconds. See that?
11 A. Correct.
12 Q. And intent can be inferred from the actions, does
13 not have to be planned or premeditated. Now, in certain
14 crimes, I think you could see how they may plan it out?
15 A. Yes, sir.
16 Q. But that's not something we have to prove, do we,
17 because it's not one of those elements, is it?
18 A. No, sir, it's not.
19 Q. Have to prove it's intentionally, but we don't
20 have to prove it's planned or premeditated, do we?
21 A. That's correct.
22 Q. Could you hold us to that?
23 A. Yes, sir.
24 Q. Okay. Now, you are going to find each one of
25 these things we go through, Mr. Woolf, it gets a little

STATE VS. MARK ANTHONY SOLIZ  JANUARY 30, 2012

**69**

1  more complicated every time. As you look down at the
2  bottom of this particular slide, it talks about "or is a
3  party to a capital murder". Have you ever heard the word
4  "accomplice"?
5      A. Yes, sir.
6      Q. Kind of a helper, so to speak. Christy Jacks and
7  I decide to rob the 7-Eleven down here. And I go in with
8  a gun to rob it, and she's in the getaway car. She drives
9  a fast car. She's got the engine warmed up, ready to go.
10  I'm going to come running out. She is a party to the
11  crime.
12      A. Correct.
13      Q. "Party" sounds like a strange word, but that's
14  what the law calls it, party to a crime. Let's talk about
15  this. Person is responsible for the conduct of another --
16  Well, let's back up. Person is responsible for an offense
17  committed by another if acting with the intent to promote
18  or assist the commission of the offense, he solicits or
19  encourages or directs or aids or attempts to aid the other
20  person to commit the offense. That's kind of our little
21  example.
22      A. Yes, sir.
23      Q. I'm going in to rob it; she's the getaway
24  driver.
25      A. Yes, sir.

**70**

1      Q. She's a party because she is acting with the
2  intent to promote or assist the commission of the offense,
3  the robbery, and she's encouraging, soliciting, aiding,
4  attempts to aid. She's a party.
5      A. Yes, sir.
6      Q. See that she's a helper?
7      A. Yes.
8      Q. I like that word "helper" because it's a little
9  more down to earth than party. It makes a little more
10  sense to me. Can you see how somebody can be a party to a
11  crime even though they didn't go in to the store?
12      A. Yes, sir.
13      Q. Okay. That's something you could abide by?
14      A. Yes, sir.
15      Q. Okay. Now, there's another way somebody can be a
16  party to a crime. Let's read this because this thing is
17  really a pretty convoluted definition. "If in the attempt
18  to carry out a conspiracy to commit one felony, another
19  felony is committed by one of the conspirators, all the
20  conspirators are guilty of the felony actually committed
21  though having no intent to commit it if the offense was
22  committed in the furtherance of the unlawful purpose and
23  was one that should have been anticipated as a result of
24  carrying out the conspiracy." Conspiracy is an agreement
25  to commit a crime. Fancy word, fancy legal word,

**71**

1  agreement to commit a crime.
2      A. Yes, sir.
3      Q. Ms. Jacks and I have an agreement to go in and
4  rob the 7-Eleven, we're in a conspiracy.
5      A. Yes, sir.
6      Q. Does that make sense?
7      A. Yes, sir.
8      Q. She's going to be the getaway driver. I'm gonna
9  go in, do the robbing. We've got an agreement to commit a
10  felony. If I go in there and she knows I've got a gun in
11  my waistband when I go in, she can be guilty of the crime
12  that I commit even though she had no actual intent to
13  commit it. If my actions, my offense inside that store,
14  if it was committed in furtherance of the unlawful
15  purpose; that is, being the robbery of the store, and
16  down there at the bottom, "and was one that should have
17  been anticipated as a result of the carrying out of the
18  conspiracy". If she saw me with a pistol stuck in my
19  waistband when I got out of the car to walk in there to
20  rob it, maybe she should have anticipated --
21      A. Correct.
22      Q. -- that a capital murder could occur. Does that
23  make sense?
24      A. Yes, sir.
25      Q. Do you agree with that?

**72**

1      A. Yes, sir.
2      Q. Could you abide by that law if the Judge
3  instructed you?
4      A. Yes, sir.
5      Q. Because she could be responsible for the capital
6  murder that I commit inside that store if she should have
7  anticipated it.
8      A. Yes, sir.
9      Q. Okay. This talks about basically what we're
10  talking about. Conspiracy is an agreement to commit a
11  robbery or burglary, a murder is committed, the murder was
12  committed in furtherance of the unlawful purpose and was
13  one that should have been anticipated. I want you to look
14  at that word "should". See that? Because that's going to
15  be important later on. I told you the further we go, the
16  more complicated it gets. If she sees that gun in my
17  waistband, maybe she should have anticipated. Right?
18      A. Yes, sir.
19      Q. Maybe she should, maybe she shouldn't, but that's
20  something a Jury could look at and determine if she should
21  be held responsible for the capital murder I committed
22  when I went in that store, even though she's the getaway
23  driver. See that?
24      A. Yes, sir.
25      Q. That brings me to something else. In your

73

1  questionnaire that you filled out before you got into
2  this jury box, you was talking about your views on
3  capital punishment in general. You said, "Well, if
4  somebody is guilty of a crime beyond a shadow of a doubt,
5  they should get the death penalty." But in this
6  situation, Ms. Jacks would be the getaway driver. She's
7  the non-trigger man. Maybe she should get the death
8  penalty, maybe she shouldn't. It would depend on the
9  what?
10  A. The facts.
11  Q. There you go. Do you see that?
12  A. Yes, sir.
13  Q. In other words, you can't just cover everything
14  with a blanket and say, "Well, this is the way it all
15  ought to be", because every one of these things is
16  different, isn't it?
17  A. Yes, sir.
18  Q. Facts are always different. Have I lost you up
19  to this point?
20  A. Not yet.
21  Q. Okay. Let's keep going. I want to point out one
22  more time that "should have been anticipated". This is
23  the Guilt/Innocence part of the trial. And I should have
24  brought this to your attention earlier. I think I kind of
25  did. Each criminal trial in Texas, Mr. Woolf, has two

74

1  parts, two stages, two halves, kind of like a football
2  game.
3  A. Yes, sir.
4  Q. First half is Guilt/Innocence. The Jury's
5  function is to look at what happened on this offense,
6  guilty, not guilty. Second half is Punishment,
7  determine -- capital murder case, we know there's only two
8  ways to go, right?
9  A. Correct.
10  Q. So it's a two-stage trial, first stage,
11  Guilt/Innocence, second stage, Punishment. Sound okay?
12  A. Yes, sir.
13  Q. All right. You notice in these elements over
14  here, I'm going to back up if I can, those elements,
15  doesn't say anything about motive, does it?
16  A. No, sir.
17  Q. Okay. Motive may be something that's obvious.
18  In my little 7-Eleven example, I'm going in to rob the
19  place, money, that's the motive. Pretty obvious from the
20  facts. Do you see that?
21  A. Yes, sir.
22  Q. But we don't have to prove necessarily what it
23  was. Have to prove it was a robbery?
24  A. Right.
25  Q. But the motive for a particular crime is not

75

1  something we have to prove. Don't have to prove
2  premeditation. We talked about that earlier, didn't we?
3  A. Yes, sir.
4  Q. Scientific evidence, we might have it, we might
5  not. If we didn't, you would judge it based on what?
6  A. The facts.
7  Q. Yeah. What you did have.
8  A. Correct.
9  Q. Okay. Now, you remember us talking about the
10  manner and means back here, one of the elements? Down
11  there, the manner and means we talked about could be with
12  a tire iron or 2-by-4 or car or knife or a gun.
13  A. Yes, sir.
14  Q. We have to prove how it was committed, but we
15  don't have to prove or we don't have to show you the
16  murder weapon. Now, we may know how it was committed,
17  with a knife or a gun, but we may not have that murder
18  weapon. The criminal may have thrown it away. We may not
19  ever get it, but we still have to prove how it was done.
20  But we may not have the murder weapon, but we don't have
21  to show you physically the murder weapon. Does that make
22  sense?
23  A. Yes, sir.
24  Q. Who would have control over what happened to the
25  murder weapon?

76

1  A. The Defendant.
2  Q. Yeah. May have thrown it away or something. We
3  don't know, do we?
4  A. No, sir.
5  Q. May not ever get it.
6  A. Correct.
7  Q. Some of those crime shows you watch, I guess
8  sometimes they have it, sometimes they don't?
9  A. Correct.
10  Q. Okay. Eyewitness testimony, may have it, may
11  not. You think all these crimes are committed on the
12  courthouse steps?
13  A. No, sir.
14  Q. There you go. If you didn't have an eyewitness
15  to a case, you would judge the case based on what?
16  A. Facts presented.
17  Q. What you did have presented. Exactly. Maybe
18  there's an eyewitness, maybe there's not. You agree?
19  A. Yes, sir.
20  Q. Let's talk about witnesses. Witnesses are going
21  to sit right up in that chair next to -- between the Judge
22  and the Court Reporter. See that?
23  A. Yes, sir.
24  Q. We call that the witness chair, the witness box.
25  And it's close to that jury box so the Jury can hear every

77

1  word they say. That's the reason it's set up like that.
2      A. Yes, sir.
3      Q. People would get on the witness stand, they would
4  be sworn in, they would give evidence, testimony. Some of
5  those witnesses might be police officers in a criminal
6  case. That's no shock.
7      A. Right.
8      Q. Some of them might be criminals, people with
9  criminal records. Do you see that?
10     A. Yes, sir.
11     Q. Okay. Some of the witnesses you might like and
12 some of them you might not like if you were on the Jury.
13 Do you see that?
14     A. Yes, sir.
15     Q. But it's not a matter of whether you like or
16 dislike. It's a matter, could you keep an open mind and
17 judge what they say and how they say it and then decide
18 whether you believe it or not?
19     A. Yes, sir.
20     Q. See that?
21     A. Yes, sir.
22     Q. We've had jurors in the past that says, you know,
23 "If a police officer gets on that -- gets on the stand and
24 he's got his uniform on, he's looking, you know, pretty
25 sharp, I'm gonna believe whatever he says because he's a

78

1  police officer and I've got a high regard for the law."
2  But the truth of the matter is, Mr. Woolf, we got bad
3  police officers and we got good ones.
4      A. That is correct.
5      Q. You know, we got good -- you're not an
6  investigator, you're a --
7      A. Safety coordinator.
8      Q. Coordinator. We got good safety coordinators and
9  I bet you we got bad ones.
10     A. Yes, sir.
11     Q. Depends on what they say and how they say it, and
12 not who they are. Do you agree with that?
13     A. Correct, yes, sir.
14     Q. You would wait and judge their testimony based on
15 what they said, wouldn't you?
16     A. Yes, sir.
17     Q. Not who they are?
18     A. No, sir.
19     Q. You're not automatically believing a police
20 officer, are you?
21     A. No, sir.
22     Q. Likewise, let's go to the other end of the
23 spectrum. You get a person up there that's maybe an
24 accomplice. You know in our little example, maybe Christy
25 Jacks is going to testify against me. Maybe the State has

79

1  made her a deal, which we are entitled to do under the
2  law, District Attorneys I'm talking about. We're entitled
3  to make somebody a deal if they give testimony. Maybe she
4  gets a deal made and she testifies. And maybe she's got a
5  prior record and that comes out, well, you wouldn't
6  automatically disbelieve her. You would wait and see what
7  she said and then decide, wouldn't you?
8      A. Yes, sir.
9      Q. Could you do that?
10     A. Yes, sir.
11     Q. The Judge would instruct you that the 12 jurors
12 are the exclusive judges of the credibility of the
13 witnesses. Exclusive judges. Nobody is going to tell
14 you who to believe, who not to believe. You're going to
15 listen to them and decide if you believe them. Could you
16 do that?
17     A. Yes, sir.
18     Q. Whether they were a police officer or whether
19 they were a person with a criminal record or whoever they
20 were, you're going to wait and see what they say and then
21 decide if you believe them. Right?
22     A. Yes, sir.
23     Q. Then judge the case and base your decision on the
24 facts of the case as presented to you, right?
25     A. Yes, sir.

80

1      Q. Okay. Now, again, we're still in
2  Guilt/Innocence. Remember that one half and second half?
3      A. Yes, sir.
4      Q. We're still in Guilt/Innocence, which is the
5  first half of the trial. Okay?
6      A. Yes, sir.
7      Q. All right. Talking about accomplice testimony,
8  we talked about Christy Jacks, she's going to get a deal
9  from the District Attorneys to testify against me as an
10 accomplice because she's my helper. She was the getaway
11 driver, right?
12     A. Yes, sir.
13     Q. The law says accomplice testimony, which would be
14 what she gave, must be corroborated by evidence that tends
15 to connect the Defendant to the crime. That's me. Just
16 because she gets up and says Dale Hanna robbed that store,
17 that will not cut the muster. That will not get it.
18     A. Correct, yes, sir.
19     Q. Do you see that? Got to be what? Corroborated
20 by evidence that tends to connect.
21     A. Yes, sir.
22     Q. They got to have some other evidence to connect
23 me with it.
24     A. Yes, sir.
25     Q. Does that make sense?

81

1  A. Yes, sir.

2  Q. That's a pretty good way to run a lawsuit, don't

3  you think?

4  A. Yes, sir.

5  Q. Just because one person says it, if they've got

6  something to gain or lose, you've got to connect the

7  person being tried with other evidence, don't you?

8  A. Yes, sir.

9  Q. Sound okay?

10  A. Yes, sir.

11  Q. Okay. We talked earlier -- I'm talking while

12  you're trying to read. That's not right.

13  A. No, no.

14  Q. Go ahead. Let's do that, because that's a bad

15  habit I've got. I start talking before you get a chance

16  to read.

17  Statements, the Judge's instruction, beyond a

18  reasonable doubt, Miranda Warnings, knowing, intelligent,

19  voluntary waiver. Disregard the statement if not

20  convinced beyond a reasonable doubt.

21  Let me see if I can illustrate this. In a

22  criminal trial, you would expect maybe police officers to

23  testify at some point?

24  A. Yes, sir.

25  Q. Okay. In a criminal investigation, you would

82

1  expect maybe police officers to investigate what they do?

2  A. Yes.

3  Q. Investigate what happened. In some of these

4  criminal cases, police will talk to the person that is

5  suspect and get their side of it, their version of it,

6  hear what they've got to say about it. That's what they

7  do.

8  A. Yes, sir.

9  Q. Okay. Now, in some of these criminal TV shows

10  you watch, sometimes there is a statement, maybe a written

11  statement that the defendant gives, maybe a audio

12  statement, maybe a video statement, where the defendant

13  says this is what happened. Now, this is what all this

14  means up there. Have you ever heard of Miranda?

15  A. Yes, sir.

16  Q. You have the right to remain silent, not make any

17  statement at all. Any statement that you make may be used

18  in evidence against you at your trial. You have the right

19  to have a lawyer. If you don't have a lawyer, you'll get

20  one appointed. You have the right to terminate the

21  interview at any time. You've heard that?

22  A. Yes, sir.

23  Q. That's Miranda Warnings. The law says that a

24  police officer must warn the defendant of his rights when

25  he is taken into custody. And one of those is he has the

83

1  right to remain silent and not make any statement -- not

2  make any statement at all.

3  MR. HANNA: I know I'm talking too fast. I'm

4  sorry, Pam.

5  Q. And he has the right to terminate that interview

6  at any time he gets ready. And if they don't tell him

7  those rights and they get a statement from him, that

8  statement is not worth a plug nickel.

9  A. That's correct.

10  Q. Can't be used. Cannot be considered by the Jury

11  as any evidence of his guilt for any purpose if we don't

12  prove and convince you beyond a reasonable doubt that the

13  police went by all the rules, they warned him, he knew

14  what his rights were, he intelligently and voluntarily

15  waived those rights and gave that statement. Does that

16  make sense?

17  A. Yes, sir.

18  Q. And if they don't warn him and we don't prove

19  beyond a reasonable doubt that all those rules were

20  complied with, the Jury cannot consider it and they can't

21  use that as any evidence of his guilt. And you would have

22  to judge the case then based on what?

23  A. The facts that are presented.

24  Q. Exactly. That statement might be presented

25  to you, and even though he -- maybe he said he did it,

84

1  if they didn't go by the rules, you can't use it, can

2  you?

3  A. No, sir.

4  Q. And that gets back to that in the wrong county,

5  you know we talked about that earlier.

6  A. Yes, sir.

7  Q. Tarrant County. And you would grit your teeth on

8  the way out, but come out and say, "Not guilty. You

9  didn't prove that, Mister District Attorney." Right?

10  A. Yes, sir.

11  Q. Same thing about this statement. If that's the

12  only evidence you had, the Jury I'm talking about, and you

13  had to disregard it because the rules weren't followed,

14  you would have to come back and say, "Not guilty. That's

15  all you had, Mister District Attorney, and that was not

16  taken in accordance with the rules and there was no other

17  evidence, and I'm finding him not guilty."

18  A. Yes, sir.

19  Q. Do you see that?

20  A. Yes, sir.

21  Q. You wouldn't like it?

22  A. Wouldn't like it.

23  Q. But you would do it?

24  A. Yes, sir.

25  Q. Because Judge told you to go by the law.

85

1    A. Yes, sir.

2    Q. Now, this is a -- I started to use some smart

3  aleck word, but it's pretty common sense. Voluntary

4  intoxication does not constitute a defense to the

5  commission of a crime. If it did, what do you think

6  everybody would say? They would say, "I was drunk".

7    A. Yeah, "I was drunk".

8    Q. So that's pretty common sense. Now let's talk

9  about this trial.

10         MR. HANNA: How much time have I got,

11  Christy?

12         (Sotto voce discussion.)

13    Q. We talked about two stages of trials, didn't we?

14    A. Yes.

15    Q. First stage is what we call the Guilt/Innocence

16  stage. And the way that thing works, evidence is

17  presented to you, these jurors. Both sides get up and

18  argue about it, what it means. You go back into that room

19  behind you with 12 -- 11 other jurors, and you come out

20  with a verdict. It's either guilty or not guilty.

21    A. Correct.

22    Q. And to kind of rehash, it's got to be guilt

23  beyond a reasonable doubt.

24    A. Correct.

25    Q. All the elements. Burden of proof on this table

86

1  right here, right?

2    A. Yes, sir.

3    Q. Other side doesn't have to do one thing.

4    A. Correct.

5    Q. Because the burden of proof is here and stays

6  here and never changes.

7    A. Yes, sir.

8    Q. Okay. Now, if it was a not guilty verdict, trial

9  is over. Everybody goes to the house. Okay?

10    A. Yes, sir.

11    Q. If it's a guilty verdict, we go into the second

12  part of the trial, don't we?

13    A. Yes, sir.

14    Q. Second part of the trial, we call it the

15  Punishment part of the trial. Okay?

16    A. Yes, sir.

17    Q. Same kind of thing, evidence, argument, but then

18  it gets a little different. And we probably haven't

19  talked about this yet. I really don't remember because

20  we've talked to a lot of jurors over the last couple

21  weeks.

22    A. Yes, sir.

23    Q. But the Jury does not go back there, Mr. Woolf,

24  and say, okay -- we're gonna to listen to some more

25  evidence at the second part of the trial, but they don't

87

1  go back there and say "life" or "death". Not the way it

2  works. They go back there and they answer three

3  questions. And these three questions determine whether it

4  is a life sentence without parole or a death sentence.

5  That make sense?

6    A. Yes, sir.

7    Q. It's not just go back there and say, "Okay, we're

8  gonna all vote and it's either life or death." That's not

9  the way it works. Answer three questions. Now, at this

10  second part of the trial, there could be evidence

11  presented besides that that was presented in the first

12  half of the trial. The first half of the trial kind of

13  focuses on the day, this is what happened this particular

14  day.

15    A. Correct.

16    Q. Second half of the trial kind of focuses on the

17  life of the Defendant.

18    A. Yes, sir.

19    Q. One day, whole life, okay?

20    A. Yes, sir.

21    Q. Now, I want to try to talk about these

22  questions. The questions are really pretty common sense.

23  And we have kind of boiled these questions down. "Is the

24  Defendant a future danger?" Maybe he is, maybe he isn't.

25  Did he, the Defendant, "did he kill or did he intend to

88

1  kill, or did he anticipate the victim would be killed?"

2  Yes or no. Last one, "Does the Defendant deserve a life

3  sentence rather than a death penalty sentence?" Those are

4  the questions. Maybe they're "yes", maybe they're "no".

5         We have boiled them down a little, but let's

6  read them, what the actual words are. "Do you find from

7  the evidence beyond a reasonable doubt that there is a

8  probability that the Defendant would commit criminal acts

9  of violence that would constitute a continuing threat to

10  society?" Key words in that thing -- first of all, it's

11  the same burden of proof, Mr. Woolf. Do you find from the

12  evidence beyond a reasonable doubt, we have to prove the

13  same way we had to prove guilt beyond a reasonable doubt,

14  we have to prove that first question beyond a reasonable

15  doubt.

16    A. Yes, sir.

17    Q. Do you see that?

18    A. Yes, sir.

19    Q. Okay. Now, other key words, probability

20  Defendant would commit criminal acts of violence,

21  constitute a continuing threat to society. Probability,

22  not a certainty, more than a possibility. Does that make

23  sense?

24    A. Yes, sir.

25    Q. We could never know if somebody is going to

89

1  absolutely do something in the future, could we?
2    A.  No, sir.
3    Q.  Probability.  Criminal acts of violence that
4  would constitute a continuing threat to society.  Now,
5  we're over here in the Punishment part of this trial, and
6  we know there's only two punishments, isn't there?
7    A.  Yes, sir.
8    Q.  What are they?
9    A.  Death penalty and life in prison without the
10  possibility of parole.
11    Q.  Without the possibility of parole.  Well, how is
12  he gonna be a future danger if it's life without the
13  possibility of parole?  Well, wait a minute.
14    A.  There's other people.
15    Q.  Society, maybe society is out here in the free
16  world, maybe society is in that prison setting.  See that?
17    A.  Yes, sir.
18    Q.  There's guards and clerks and medical people and
19  other inmates in the prison.  Maybe that's a society.
20  Maybe it is, maybe it isn't.  Does that make sense?
21    A.  Yes, sir.
22    Q.  So, first question, future danger, maybe he is,
23  maybe he isn't.  You could have a situation where Christy
24  and I were going in to rob that 7-Eleven.  Still back
25  there at the 7-Eleven.  Okay?

90

1    A.  Yes, sir.
2    Q.  I go in, I pull the gun, I kill the clerk.  He's
3  not going to let me have the money so I had to kill him.
4  But before I kill him, he gets off a shot at me, shoots me
5  right through the spine and I'm paralyzed the rest of my
6  life, cannot move an eyelid.  That could happen.
7    A.  Yes, sir.
8    Q.  Maybe that person would be a future danger, maybe
9  they wouldn't.  Do you remember me saying earlier nothing
10  is automatic?
11    A.  Correct.
12    Q.  Nothing is automatic.  Just because you found a
13  person guilty of capital murder, he might be a future
14  danger, he might not.
15    A.  Correct.
16    Q.  But he wouldn't automatically be a future danger,
17  would he?
18    A.  No, sir.
19    Q.  It would depend on what?
20    A.  The evidence.
21    Q.  Depends on the facts.  Depends on what his
22  situation in life was, right?
23    A.  Yes, sir.
24    Q.  He could be, he could not be.  Right?
25    A.  Yes, sir.

91

1    Q.  Wouldn't automatically do it, would you?
2    A.  No, sir.
3    Q.  You know what this really takes, these three
4  questions?  It takes a fresh look at each question, based
5  upon?
6    A.  The facts.
7    Q.  The facts and the evidence presented.  Right?
8    A.  Yes, sir.
9    Q.  Just because you found him guilty doesn't mean
10  he's a future danger?
11    A.  No, sir.
12    Q.  Just because you found him guilty doesn't mean
13  Question No. 2 -- let's talk about Question No. 2.
14  Nothing is automatic.  It takes a fresh look each time
15  based on the evidence presented to you.  Right?
16    A.  Yes, sir.
17    Q.  Okay.  This Question No. 2, did the Defendant
18  kill or intend to kill.  Well, if I was the one being
19  tried, and I was the one that fired the shot, killed the
20  clerk, that's pretty obvious.  I killed her, intended to
21  kill.  But if they were trying Christy Jacks as the person
22  in the car, did she anticipate the victim would be
23  killed.  Now, before I got out, if I said, "Look, I got
24  this gun, if I don't get that money very easily, I'm gonna
25  kill the clerk", maybe then she anticipated.  Get that?

92

1    A.  Yes, sir.
2    Q.  And when it says anticipate, it's not "should
3  have anticipated".  Because back at the first part of that
4  trial, it was "should have anticipated".  This is actually
5  anticipated the victim would be killed.  See that?
6    A.  Yes, sir.
7    Q.  These two questions here, Mr. Woolf, beyond a
8  reasonable doubt.
9    A.  Yes, sir.
10    Q.  Just like it was at Guilt/Innocence.  If I don't
11  prove one of these beyond a reasonable doubt, your answer
12  is going to be?
13    A.  No.
14    Q.  No.  If the first one is no, life without
15  parole.  Not a death sentence.
16    A.  Correct.
17    Q.  If the second one is no, no death sentence, life
18  without parole.  Does that make sense?
19    A.  Yes, sir.
20    Q.  Okay.  Now let's talk about the third question.
21  "Taking into consideration all the evidence, including the
22  circumstances of the offense, the Defendant's character
23  and background and moral, personal moral culpability of
24  the Defendant, do you find there is a sufficient
25  mitigating circumstance or circumstances to warrant that a

93

1  sentence of life in prison rather than a death sentence be
2  imposed?"
3         And we boil it down right over here.  Does
4  the Defendant deserve a life sentence rather than a death
5  penalty sentence.  Now, this question right here,
6  Mr. Woolf, is different.  These two, we had to prove
7  beyond a?
8      A.  Reasonable doubt.
9      Q.  Reasonable doubt.  This one, no burden of proof.
10 Because you look at that question, it doesn't start off
11 like that other one did with beyond a reasonable doubt,
12 does it?
13     A.  No, sir.
14     Q.  Okay.  Now, one of these questions you were
15 asked --
16         (Sotto voce discussion.)
17     Q.  You were asked this question.  A convicted
18 murderer's childhood and background may be relevant
19 factors in deciding his or her punishment.  You kind of
20 agreed with that.
21     A.  Yes, sir.
22     Q.  Does that make sense?  That's really what this
23 question is asking, the Defendant's character and his
24 background, his personal moral culpability.  Is there
25 sufficient mitigating circumstance or circumstances.  Not

94

1  just is there mitigating circumstance or circumstances; is
2  it sufficient.  Do you see that?
3      A.  Yes, sir.
4      Q.  And again, we're not in this first half.  We're
5  over here in the second half.  And you might have
6  additional evidence presented to you.  You see?
7      A.  Yes, sir.
8      Q.  And some of that additional evidence might be
9  about his character or his background, his personal moral
10 culpability.  Do you see that?
11     A.  Yes, sir.
12     Q.  And it might be that you would say, "You know,
13 based upon all that, I think there's sufficient mitigating
14 circumstance or circumstances to warrant that a life
15 sentence and not a death sentence be imposed."  But that
16 would be the Jury's decision, wouldn't it?
17     A.  Yes, sir.
18     Q.  It would be based upon what?
19     A.  The facts.
20     Q.  Facts and the evidence.  Now, if you said yes,
21 based upon all the evidence, there is a reason to give him
22 a life sentence rather than a death sentence, you would
23 say "yes".  And that would mean life without parole,
24 wouldn't it?
25     A.  Yes, sir.

95

1      Q.  If you said yes, he's a future danger, yes, he
2  either killed or anticipated the person would be killed,
3  and no, there is no mitigation, death sentence, isn't it?
4      A.  Yes, sir.
5      Q.  It's pretty heavy stuff?
6      A.  Yes, sir.
7      Q.  And I can see that you take it very seriously,
8  don't you?
9      A.  Yes, sir.
10     Q.  Here's the question.  We talked earlier about
11 nothing being automatic.  Every one of those questions
12 takes a fresh look, doesn't it?
13     A.  Yes, sir.
14     Q.  Just because you answered one, you wouldn't
15 necessarily answer the other one the same way?
16     A.  No, sir.
17     Q.  Fresh look at the evidence?
18     A.  Yes, sir.
19     Q.  Now, here's the real question.  Can you do this?
20     A.  Yes, sir.
21     Q.  Have you got questions of me?  You have got a big
22 dose of the law here in about an hour.  I didn't hear your
23 answer a minute ago.  Can you do this?
24     A.  Yes, sir.
25     Q.  Any questions of me?

96

1      A.  No, sir.
2      Q.  Do you know anything about the facts of this case
3  as you sit there right now?
4      A.  No, sir.
5      Q.  Have you read anything about it?
6      A.  No, sir.  I did see it on the news.  I don't
7  recall what all.
8      Q.  Sure.  That's the question.  You know, a lot of
9  people in the United States of America watch the news at 6
10 or 10, and they may see a blurb, okay, I'm going to work
11 the next day.  Nothing you saw on the news would affect
12 your decision-making in this thing, would it?
13     A.  No, sir.
14     Q.  Any questions of me whatsoever?
15     A.  No, sir.
16     Q.  All right.  I've got about five minutes left and
17 I'm going to stop asking you questions at this point, and
18 the other side is going to ask you some questions.  I want
19 to leave this with you, though.  This 26-page
20 questionnaire you filled out before you ever got up in
21 this box --
22     A.  Yes, sir.
23     Q.  -- you're entitled to have strong feelings as a
24 citizen of this country.
25     A.  Yes, sir.

97

Q. But when you get over here in this box, the Judge is going to swear you to go by the rules, and your feelings are kind of left outside the box, right?

A. Yes, sir.

Q. You've got to judge it based upon the what?

A. The facts and evidence presented.

MR. HANNA: All right. Judge, we're going to pass the Venireperson.

THE COURT: I'll recognize the Defense.

MR. HEISKELL: Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MR. HEISKELL:

Q. Mr. Woolf, how are you?

A. Doing good. How about you?

Q. I'm fine. My name is Mike Heiskell. I was introduced to you earlier.

A. Yes, sir.

Q. Me, along with Greg Westfall over here who's going to help me set this PowerPoint up, represent Mark Soliz. And I have some questions for you. Quite frankly, we're gonna tread over some of the same ground Mr. Hanna, the Prosecutor, did with you, but from a different perspective, a little different spin, if you will.

A. Okay.

Q. I guess you're familiar with that term, are you

98

not?

A. Yes, sir.

Q. And if I ask you something you don't understand, just as the Judge told you earlier, please don't hesitate to stop me and I'll start over, or ask it a different way to make sure you understand what we're talking about. All right?

A. Yes, sir.

Q. I want to first of all start out with what the Prosecutor asked you about just a minute ago, and that is the news clipping that you said you saw in this case some time ago; is that right?

A. Yes, sir.

Q. Was that right after this allegedly took place? This happened June of 2010.

A. Yeah, it was right around that, yes.

Q. And I believe --

A. It was back then.

Q. I believe you said you lived near Godley or next to Godley?

A. Yes, I actually live in Joshua but it's Godley school district.

Q. Godley school district?

A. Yes, sir.

Q. And you read and heard and, in fact, you read on

99

the questionnaire that this happened in Godley.

A. Yes, sir.

Q. And did that -- was that one of the reasons to have your interest sparked when you heard it on the news because it was in Godley?

A. No, sir.

Q. Did you know anything about or did you follow up -- let me ask it that way -- on the news clip at any --

A. No, sir.

Q. -- later time?

A. No, sir.

Q. Okay. Okay. Now, we've gone through your questionnaire, and you answered this questionnaire two or three weeks ago as you recall, and the Prosecutor talked about this before. And you read the instructions on the question to give us some true answers to those questions, the 99 questions that were asked of you.

A. Yes, sir.

Q. I believe you did your best in answering those questions. You did a pretty good job of telling us how you truly feel about things. Would you agree with that?

A. Yes, sir.

Q. That includes the death penalty, and we're going to talk about that momentarily. Now, you also stated in that questionnaire that you had talked or you know your

100

wife's feelings about -- her feelings about the death penalty; is that correct?

A. Correct.

Q. And I take it you had talked with her before about death penalty and death being an issue before you came down that particular day?

A. Yes, before, yeah.

Q. Can you tell us a bit more about that, how that conversation was started and the end result of that conversation?

A. The one that I can remember in particular?

Q. Yes, sir.

A. As it asked on the questionnaire about the Casey Anthony case that happened down in Florida.

Q. Right.

A. Okay. She said her belief was she should have got the death penalty. My belief was, well, if they didn't prove it, you know, and didn't have all the evidence, then you can't take someone's life if they haven't given you the -- the full story or you don't understand the, you know, or don't have all the facts and it wasn't linked together.

Q. All right. I believe, I guess that's what also prompted you to put in your answer about your feelings on the death penalty, if it's proven beyond what you term a

101

1 shadow of a doubt, then the person should be given the
2 death penalty. Remember that answer --
3    A.  Yes, sir.
4    Q.  -- to that question. So that was a result of a
5 conversation you and your wife had about the Casey Anthony
6 case where she was found not guilty; is that right?
7    A.  No, that questionnaire had nothing to do with
8 that.
9    Q.  Okay. Well, I guess your conversation with your
10 wife, that's when you knew about her feelings about the
11 death penalty?
12    A.  Correct.
13    Q.  Talking -- I'm sorry I got mixed up. All right.
14 You've indicated, sir, that you felt this way all along
15 about the death penalty, that you've never changed your
16 opinion about that; is that right?
17    A.  That is correct.
18    Q.  And has this been something, even before you and
19 your wife discussed it, you've discussed it perhaps with
20 other family members or friends, or something you just
21 came up on your own? Or can you tell me the beginnings of
22 that?
23    A.  Well, I mean, my father, I spoke with my father.
24 You know, we've spoke about it. And that's just something
25 that I believe that if you're a threat to society, either

102

1 you're going to give the man a chance to rehabilitate his
2 self.
3    Q.  Uh-huh.
4    A.  You know, and he's going to be able to live among
5 his peers regardless of where his peers may be; and if he
6 can't do that, then that's when the death penalty comes
7 in.
8    Q.  Okay. All right. So you've talked about this
9 and discussed it with your father, and he's helped you to
10 develop a feeling, at least a core belief about the death
11 penalty. Is that a fair statement?
12    A.  Yes, sir.
13    Q.  And that's certainly fair. And a lot of people,
14 I think, do that when you talk about some issue and you
15 hear other different sides and you come to a conclusion
16 after hearing the different side, after you think it over,
17 then that's how you feel and that's how you express
18 yourself and express those feelings. Is that a fair
19 statement?
20    A.  Yes, sir.
21    Q.  Now, let me ask you something about that. And
22 you indicated that a life without parole sentence,
23 remember checking that, said you were opposed to that in
24 every instance in which a person is convicted of capital
25 murder?

103

1    A.  Yes.
2    Q.  I guess that feeling also came as a result of
3 conversations like with your father or you came up with
4 your own or conversations with others. Is that a fair
5 statement too, Mr. Woolf?
6    A.  Yes.
7    Q.  Now, you seem like a person who has some strong
8 convictions and strong feelings about certain aspects of
9 our law. Is that also fair?
10    A.  Yes.
11    Q.  And I believe you indicated that you were a very
12 conservative person and that you have a strong faith in
13 God too?
14    A.  Yes.
15    Q.  You have a young baby boy, he's what, a year old?
16    A.  Little over a year.
17    Q.  And I take it when Wyatt grows up, you'll be able
18 to teach him certain things about right and wrong, what's
19 good and bad and taking the right direction and wrong
20 direction. Is that a fair statement too?
21    A.  Yes, sir. I will not -- I mean, those are his
22 choices, though.
23    Q.  Sure.
24    A.  He's going to make those choices.
25    Q.  Okay. Right. I've got kids too. You have to.

104

1    A.  I just --
2    Q.  You have to lay that foundation, though, to help
3 them make the right choice. Is that a fair statement too?
4    A.  Right, yes, sir.
5    Q.  Before we start talking about certain aspects of
6 our law, I want to ask you something. And I don't know if
7 you've ever thought about this; maybe you have. What in
8 your mind would be the worst sentence, a death sentence or
9 life without the possibility of parole? Life in the
10 penitentiary where a person is literally taken out in a
11 box. What is the worst?
12    A.  The worst, probably be the death penalty.
13    Q.  Okay. Why do you say that?
14    A.  Because it's someone's life.
15    Q.  That's the end of their life?
16    A.  Yes.
17    Q.  And I take it conversely that the life sentence
18 is a lesser sentence, if you will, because that person
19 will be able to function in life and perhaps do some
20 things even when he's in prison to help himself. Is that
21 a fair statement too?
22    A.  Yes, sir.
23    Q.  Okay. Good. On the same page here then as far
24 as your feelings, now, I want to ask you, when you
25 consider these two options of life or death, you've told

105

1 the Prosecutor you've got to consider certain evidence and
2 look at the facts; is that right?
3    A. Yes, sir.
4    Q. Now we're going to talk about certain facts and
5 things. I'm not going to give you any facts. We can't do
6 that about this case. We can only talk to you about the
7 elements of a crime. All right. That's what I'm going to
8 do with you. And before I move on with that, you know,
9 the Prosecutor gave an example of something a few minutes
10 ago about a person paralyzed. Remember that?
11    A. Yes, sir.
12    Q. Couldn't even move his eyelids and being
13 prosecuted for a death penalty and looking at these
14 questions, especially Question No. 1. Do you remember
15 that?
16    A. Yes, sir.
17    Q. Have you ever heard of such person, a paralyzed
18 person, can't even move his eyelids, prosecuted for trying
19 to get the death penalty?
20    A. No, not as far as eyelids, but I never actually
21 heard the Prosecutor say that either, the eyelid thing.
22 I'm just deciphering here.
23    Q. Okay. He said something about a person paralyzed
24 and can't move his eyelids, or maybe he said could move
25 his eyelids --

106

1    A. He couldn't move his body.
2    Q. Body.
3    A. Correct.
4    Q. Have you heard anybody prosecuted for death to
5 that extent who was paralyzed? You ever heard of that
6 before?
7    A. The person --
8    Q. Any person prosecuted for whom was paralyzed,
9 have you ever heard of that before?
10    A. No.
11    Q. Okay. The Jury oath, and one of the things, you
12 will be sworn in, just as the Judge told you, to give us
13 true answers when you walked in the door and when you
14 were here a couple weeks ago. If you're selected as a
15 member of the Jury, we ask you to take a second oath
16 which deals with true verdict based upon the law and the
17 evidence.
18       Now, your situation some years ago when you
19 were a juvenile, you were, what I take it from reading
20 your questionnaire, wrongly accused of this offense; is
21 that correct?
22    A. Correct.
23    Q. And how did that make you feel when that
24 happened?
25    A. At that point in time, I was scared.

107

1    Q. You were 14?
2    A. Uh-huh.
3    Q. And I think you said you had a court appointed
4 attorney who didn't represent you well; is that right?
5    A. Right.
6    Q. Also the prosecution kind of stampeded over you
7 and you felt you had no choice but to plead guilty to
8 this?
9    A. Well, at 14 years old when you're told that
10 you're looking at a determinate sentence of four years if
11 you don't, you know, admit to something, at 14 years old,
12 yeah, I admitted to it.
13    Q. Okay. And even though it went against every
14 fiber in your body, you admitted to that just to get that
15 behind you so you won't have to face the harsher,
16 potential harsh punishment; is that right?
17    A. Correct.
18    Q. Did you also have the advice of your parents
19 during this whole process?
20    A. My mother passed away a month before.
21    Q. Sorry. So I guess that was weighing heavily on
22 your mind too?
23    A. Correct.
24    Q. All right. Was that in Dallas County?
25    A. Yes.

108

1    Q. And right now do you still harbor any ill will
2 toward the prosecution and defense attorney as a result of
3 what happened to you some 14 years ago?
4    A. No, sir.
5    Q. Been able to forgive and forget, kind of?
6    A. Yes.
7    Q. Somewhat, I guess not all the way.
8    A. I actually look at it as, you know, who knows how
9 it would have turned out if that didn't happen. It may
10 have given me a better chance at life.
11    Q. All right.
12    A. So...
13    Q. The true verdict based upon the law and evidence,
14 and what we look at here is these principles are based
15 upon the founding fathers and writing and passing our
16 Constitution, that iconic lithograph you've probably seen
17 before in civics class, history class; is that right?
18    A. Yes, sir.
19    Q. These folks came over to give us a good
20 foundation for the best criminal justice system in the
21 country.
22    A. Yes, sir.
23    Q. And it's the best, and I think everyone would
24 agree with that, it's because we are able to draw from
25 people who have varying experiences and varied

109

1  backgrounds in order to make a decision in a situation in
2  which it may or may not present a conflict in how you
3  feel about certain things, may or may not present a
4  conflict about how you feel about certain laws and so
5  forth; because one of the reasons we had all those people
6  here a couple weeks ago is we have to pull from a pool of
7  a number of people to find out if this is the type of
8  case that a person could sit on, if this is the -- be the
9  type of case that a person can give good and fair
10 consideration too. Would you agree with that?
11     A. Yes, sir.
12     Q. And we look at the founding fathers and the
13 basis for some of our principles, our guiding principles
14 in the law. That presumption of innocence, it's
15 sufficient to acquit the Defendant alone. And I believe
16 you agreed with that before.
17         Now, here is what the Grand Jury did in this
18 case in returning an indictment, all right, against Mark
19 Soliz, our client. It says in Johnson County, Texas,
20 Mark Soliz, on or about June 29th, 2010 -- and that goes
21 back to that time we talked about a minute ago when you
22 read it on the news or saw the news clip -- intentionally
23 caused the death of Nancy Weatherly, by shooting her with
24 a deadly weapon, to wit, a firearm, in the course of
25 committing or attempting to commit the offense of robbery

110

1  of Nancy Weatherly. Those are the elements that the State
2  of Texas must prove beyond a reasonable doubt. All
3  right?
4      A. Okay.
5      Q. Now, one of the things we look at when you look
6  at an offense such as capital murder, you have to look at
7  those elements not only individually but at the end as a
8  whole to see whether or not the State has met its burden
9  of proof. Now, proof beyond a reasonable doubt is the
10 highest proof in our law. I want to talk to you about
11 that before you come to -- back to those elements. As
12 the Prosecutor told you, they have the burden of proof
13 throughout this whole process, and that burden is beyond
14 a reasonable doubt. Now, you've never sat on a Jury
15 before, correct?
16     A. No, sir.
17     Q. Mr. Woolf, look at this stair step of the levels
18 of proof we have in our law. It starts from reasonable
19 suspicion. The next one is probable cause. The next up
20 from there is preponderance of the evidence. And you'll
21 find that if you were ever called in a civil case, those
22 others deal with investigations and so forth, even Grand
23 Jury, that probable cause has to be the standard the Grand
24 Jury would look at in deciding even to return an
25 indictment. But now we're getting into a situation where

111

1  people are called upon to make a decision based upon the
2  facts and law they see, and that is preponderance of the
3  evidence. It's a greater weight and degree of credible
4  evidence, what we call the 51 percent rule.
5          The next one after that is clear and
6  convincing evidence. And clear and convincing evidence
7  has its own definition in our law. It says the measure or
8  degree of proof that will produce in the mind of the trier
9  of fact a firm belief or conviction as to the truth of the
10 allegations sought to be established. You find that in
11 parental rights cases where a person's -- a parent's rights
12 are sought to be terminated and in order to take the child
13 away from him or her. That's the standard of proof that
14 must be shouldered by the moving party to be -- to make
15 that happen.
16         And then we have that beyond a reasonable
17 doubt. And beyond a reasonable doubt is more than
18 having a firm belief or conviction, what we saw earlier.
19 Okay?
20     A. Yes, sir.
21     Q. And that's that standard of proof we talked about
22 when we look at the elements in the case. Now, these
23 elements, Prosecutor told you, which is exactly true,
24 you've got to be able -- they've got to be able to prove
25 each and every one of them, whether it deals with what

112

1  county it happened in or the element of the intent, state
2  of mind. And here I want to go back and talk to you about
3  this.
4          (Pause in proceeding.)
5          MR. HEISKELL: See who's really in control
6  here. Pam is. She's taking everything down. All right.
7      Q. Mr. Woolf.
8      A. Yes, sir.
9      Q. In order for the government to prevail as a
10 prosecution in a criminal case, we've got these standards,
11 the standard of proof, proof beyond a reasonable doubt,
12 and these elements that must be proven. When a person
13 acts "intentionally" is with that conscious objective or
14 desire to cause a result. Intentionally is the highest
15 defined mental state in our law.
16         Right under intentionally you have knowing, a
17 knowing mental state. Then you have a reckless mental
18 state. Then you have a criminal negligence mental state.
19 That's the lowest. Okay?
20     A. Yes, sir.
21     Q. Now, in a murder case or capital murder case,
22 it's -- the highest mental state is reserved for the
23 highest crime. Would you agree with that?
24     A. Yes, sir.
25     Q. And the highest crime in our law is capital

113

1  murder, that conscious objective or desire to cause the
2  result. Now, in order to prove that, the State of
3  Texas -- let's say right over here, you've got that
4  presumption of innocence. Okay?
5     A. Yes, sir.
6     Q. And I'm looking at the far end of the rail here.
7  And in order for that presumption to be removed, the
8  State's got to put that evidence on and build that
9  evidence up to get to that level of proof beyond a
10 reasonable doubt that may be, you know, down at the other
11 end. All right?
12    A. Yes, sir.
13    Q. They've got to in -- on intentional mental state,
14 show you that, prove to you the conscious objective or
15 desire to cause result, that it was done voluntarily,
16 can't be done involuntarily. All right?
17    A. Correct.
18    Q. In other words, not an accident, plus there's no
19 legal excuse in the law, such as sanity. You know, I was
20 insane and therefore I should be excused. That's removed
21 by virtue of what proof is established, that mental
22 state. Then you've got to have no legal justification.
23 And that is it was not done in self-defense or defense of
24 a third person or defense of property, so forth. Like in
25 your home, your castle, and someone breaks in, you're

114

1  going to defend your home, defend yourself and your
2  family, and you shoot and kill the person, there's no
3  issue there. Because when you -- they're building this
4  up, in order to prove that intent to cause the death, and
5  that's what that intent must be focused on, to cause
6  death, not to seriously injure anyone, but to cause the
7  death of an innocent person. All right? Without any
8  legal justification or any legal excuse.
9             Now, if you take that away, the -- I'm
10 sorry. If you take that last bullet point, you will have
11 a murder as opposed to a capital murder. And you can also
12 add, when you have a murder, that intentionally, you can
13 also -- that can be done knowingly as well, the second
14 highest mental state in our law.
15    A. Yes, sir.
16    Q. You may have seen the Prosecutor when they put up
17 their bullet point, a murder is intentionally and
18 knowingly causing the death of a human being. And there
19 again, it has to be without any legal excuse, legal
20 justification, sane, no self-defense, the person did it,
21 thought about it, knew it was wrong and did it anyway kind
22 of thing, on-purpose killing. All right?
23    A. Okay.
24    Q. You said in your questionnaire to us earlier that
25 in addition to capital murder being -- the death penalty

115

1  being reserved for capital murder, that you also thought
2  that murder, people convicted of murder should receive the
3  death penalty. Do you remember that?
4     A. Yes, sir.
5     Q. Talk to me about that. Why did you put down
6  murder as well?
7     A. If they intentionally killed someone.
8     Q. Yes, sir.
9     A. And took their life from them.
10    Q. Yes.
11    A. Then I believe that depending upon the
12 circumstances --
13    Q. Uh-huh.
14    A. -- that they should receive the death penalty
15 also.
16    Q. Okay. And that's because of the life being
17 taken, is that the reason behind that, sir?
18    A. If -- yes, if a life is taken and they're, again,
19 a threat to society or their peers --
20    Q. Okay.
21    A. -- then, yes, they should, in my opinion, I would
22 give them the death penalty.
23    Q. All right. And is that going back to that long
24 standing belief that you have based upon forming your own
25 opinions and discussions with others and perhaps reading

116

1  something or hearing about something and you came to that
2  conclusion? Is that a fair statement?
3     A. Yes.
4     Q. And that's something, again, that's part of your
5  value system, if you will, or core belief that you have?
6     A. As far as?
7     Q. As far as believing that a person taking a life
8  of another.
9     A. Uh-huh.
10    Q. As I said before, has to be sane, no legal
11 justification, legal excuse.
12    A. Correct.
13    Q. Then you think death penalty is appropriate also
14 if you find that the person is a future danger to
15 himself -- I'm sorry, to the community or something along
16 those terms?
17    A. Yes, sir.
18    Q. Am I saying that right?
19    A. Yes, sir.
20    Q. Okay. Now, you heard and saw for -- and we're
21 talking again about murder, not moved to capital murder
22 yet.
23    A. Yes, sir.
24    Q. We had those elements we talked about, and you
25 saw earlier the range of punishment for murder from the

117

1   minimum of 5 years up to 99 years or life in prison.  What
2   I want to ask you, in light of your belief, because I find
3   you a person, you're self-described as honest,
4   hardworking, other people describe you that way.
5        A.  Yes, sir, other people.
6        Q.  And I said, well, I'm sure there's a reason for
7   that because you're honest.
8        A.  Yes.
9        Q.  Would you, in a situation where you have elements
10  and a person convicted of murder, be able to give fair
11  consideration to as low as 5 years in prison for a person
12  convicted of murder?
13       A.  Depending upon the circumstances, yes.
14       Q.  As well as being able to give the full
15  consideration of 99 years or life?
16       A.  Yes, sir.
17       Q.  All right.  Now, when we talk about the capital
18  murder aspect, remember that last bullet point that's up
19  here?
20       A.  Yes, sir.
21       Q.  On that, here you have a second offense, second
22  action, I think is what you said.
23       A.  Yes.
24       Q.  And you're exactly correct.  And that is, not
25  only has that person acted with that much intent to cause

118

1   death, now they've been convicted or must be convicted by
2   proof beyond a reasonable doubt from these folks of having
3   an intentional or knowing mental state to cause robbery,
4   commit a robbery, commit a burglary.  Do you see the
5   difference between those two offenses, sir, robbery and
6   burglary?
7        A.  Yes, sir.
8        Q.  And burglary, of course, come into a home without
9   a person's consent to appropriate property or commit some
10  other felony.  A robbery then you unlawfully -- theft.
11       A.  Correct.
12       Q.  You use or exhibit a deadly weapon in that.  I
13  think you understand those; is that right?
14       A.  Yes, sir.
15       Q.  And in that situation where you have those two
16  crimes together, murder plus, as was put up by the bullet
17  point earlier, here you only have the two considerations
18  of life without parole or death; is that right?
19       A.  Yes, sir.
20       Q.  Now, from what I read to you earlier and what you
21  put down in these terms, that if a person is convicted of
22  that offense, you would tend to lean more toward a death
23  sentence based upon your own feelings about the death
24  penalty.  Is that a fair statement?
25       A.  Depending upon what is presented is going to make

119

1   my decision.
2        Q.  Okay.  And when we say "depending upon what is
3   presented", you're talking about these?
4        A.  The evidence.
5        Q.  Other factors, future danger and all that stuff;
6   is that right?
7        A.  Yes.
8        Q.  We're going to walk through that momentarily.
9        A.  Okay.
10       Q.  The reason I ask that is because you had
11  indicated that in a capital murder prosecution, that you
12  are opposed to a life sentence in all respects.  Do you
13  remember that?
14       A.  Yes, sir.
15       Q.  And I take it now you've changed your opinion
16  about that in light of what the Prosecutor told you?
17       A.  Yes, sir.
18       Q.  All right.  Okay.  And we're going to walk
19  through that as well.  Okay?
20       A.  Yes, sir.
21       Q.  When we look at a person convicted of capital
22  murder, obviously then you just have those two punishments
23  and you have to then look at these questions that are
24  presented after the Punishment Phase is concluded.  All
25  right?

120

1        A.  Yes, sir.
2        Q.  Follow me?  And some of the things that sometimes
3   happens in these type of cases is that there could be
4   additional evidence presented.  Could.  There may be
5   none.  I don't know.  It just depends, of course, on a
6   particular situation.  You follow me?
7        A.  Yes, sir.
8        Q.  And as the Prosecutor told you, the first focus
9   is on the crime itself, the Guilt/Innocence, where you
10  look back at those elements and facts to make up those
11  elements to determine whether, in fact, a person is guilty
12  or not guilty.  Do you follow me?
13       A.  Yes, sir.
14       Q.  And that's something you told us that you could
15  do?
16       A.  Yes, sir.
17       Q.  And when you look at this situation of these
18  Special Issues or questions that are propounded to you,
19  and I'm going to get -- my question is going to be similar
20  to this.  Bare with me as I roll through these.
21       A.  Yes, sir.
22       Q.  Before I get -- you know that jurors have to
23  decide credibility of witnesses.  And, well, the
24  Prosecutor explained to you that's why you sit next to the
25  jury box and so forth.

121

1    A. Yes, sir.
2    Q. And you deal with these, this type of evidence:
3 witnesses, photos, videos, audios as well, scientific
4 testimony, accomplice witness testimony, statements by the
5 accused.
6    A. Yes, sir.
7    Q. That accomplice witness thing you heard the
8 Prosecutor talk about earlier where there are two ways a
9 person can be an accomplice; when you act with intent to
10 promote the commission of the offense, you encourage, aid,
11 abet a person. And I believe part of what he put up there
12 is what I've put up here as well, and you cannot convict
13 unless there's other evidence tending to connect.
14 Remember we talked about that?
15    A. Yes, sir.
16    Q. And here we see again those distinctions between
17 offenses we just discovered -- we just discussed. Is that
18 correct, Mister --
19    A. Yes.
20    Q. Now let's get on to the Punishment questions.
21 And this must be proven beyond a reasonable doubt in order
22 to be "yes". Do you see that second bullet point that
23 sets that out? Whether there's a probability that the
24 Defendant would commit criminal acts of violence that
25 would constitute a continuing threat to society. That, I

122

1 take it from your answers earlier, that's very important
2 to you; is that right?
3    A. Yes, sir.
4    Q. And why is that important to you?
5    A. Just my personal beliefs that, you know, if
6 someone is not -- if they're unable to function with
7 society and there's a chance that they're going to take
8 someone else's life, then I -- that's where I get my
9 beliefs from.
10    Q. Okay. So once you have found a person guilty of
11 capital murder, then you understand that the burden falls
12 again on these folks to present sufficient evidence to you
13 in that regard?
14    A. Yes, that is correct.
15    Q. And then if you're convinced of that beyond a
16 reasonable doubt, you know you must answer that question
17 "yes". You understand that?
18    A. Yes, sir.
19    Q. Now, let me stop you here at this point, at this
20 juncture.
21    A. Okay.
22    Q. Having found a person guilty of capital murder,
23 which is the highest crime in our law, would you agree?
24    A. Yes, sir.
25    Q. Would you agree it's a heinous crime?

123

1    A. Yes, sir.
2    Q. And then if you hear the evidence at the second
3 phase, Punishment Phase, and you now find in that very
4 first question that you're confronted with once you began
5 your deliberations, and then you find, okay, is the person
6 a future danger, you say, "You know, they've proven to me
7 beyond a reasonable doubt this guy is a future danger",
8 and you check that yes. You follow what I'm saying so
9 far?
10    A. Yes, sir.
11    Q. Now, at that point, Mr. Woolf, is it fair to say
12 that you think a person who has been convicted, is a
13 future danger, deserves death?
14    A. No, sir. If I haven't answered both of those
15 questions --
16    Q. All right.
17    A. -- and within the guidelines, once again, just
18 because I believe something doesn't mean that, you know,
19 that's what it -- you know, what the facts are.
20    Q. Well, let me ask you, because you know reading
21 this --
22    A. Yes, sir.
23    Q. -- and you tell us your beliefs, and then I guess
24 you're saying at this juncture you can -- what do you do
25 with those beliefs? I guess you say you put them aside or

124

1 something like the Prosecutor said to do; is that right?
2    A. Yes, sir, you put them to the side. You have to
3 go -- in my line of work --
4    Q. Uh-huh.
5    A. I sit, I have to do accident investigations,
6 everything like that, okay. I've got friends that I've
7 made up there that I have to make decisions with.
8    Q. Uh-huh.
9    A. Okay. If they went out, they've done something,
10 and I had proof that they've done it, well, they did it.
11 There's no leniency towards them just because they're
12 somebody I know.
13    Q. Okay.
14    A. Okay. Everybody is equal.
15    Q. Okay.
16    A. So everybody deserves a fair shake. So I give --
17 it doesn't matter. Whatever the evidence is, whatever the
18 facts are is what I'm going to go off, what I'm going to
19 base my decision off of.
20    Q. Okay. And do you think -- you have these strong
21 beliefs, as you stated earlier, and sometimes people say,
22 "I kind of put that in the back of my mind." You heard
23 people say that before, right?
24    A. Yes.
25    Q. Is that something that you would do, I guess, try

125

1  to do in that situation?
2      A.  That would be something that I do in that
3  situation.
4      Q.  And I just wonder, you know, when people say
5  that, it's still in your mind, right?
6      A.  Well, it's always in your mind.
7      Q.  And sometimes, you know, people say and believe
8  that, you know, it's in the back of your mind about what
9  you're trying to do, the right thing and fair and just and
10 so forth, then you start hearing some facts and heinous
11 facts and finding people may be future danger.  Does it
12 stay back there or kind of come seeping out somewhere?
13 I mean, I'm just asking you, is that the type of person
14 Mr. Woolf is or are you able to keep all that
15 compartmentalized in the back of your mind is what
16 I'm asking.
17     A.  I'm able to set my emotions aside and go off
18 what the facts are.  I'm assuming that's what you are
19 asking me.
20     Q.  Yes, sir, exactly right.
21     A.  Yes, I can do that.
22     Q.  Good.  Now, question -- Oh, I'm sorry.  In order
23 to answer that one "no", only 10 must agree as opposed to
24 unanimous.
25     A.  Yes, sir.

126

1      Q.  Follow that?  And here, the question, the first
2  question, probability to commit criminal acts, those
3  criminal acts must be violent acts.  Okay?
4      A.  Okay.
5      Q.  And constitute the continuing threat to society.
6  And that society can, of course, be a prison society.
7  You've heard that before, right?
8      A.  Yes, sir.  Yes, sir.
9      Q.  That second question, law of parties, criminal
10 responsibility.  And that's the part that was shown
11 earlier by the Prosecution.  A person is criminally
12 responsible if by his own conduct or conduct of -- is
13 committed by his own conduct or conduct of another for
14 which he is criminally responsible.  And that second
15 paragraph bullet point, if acting with intent to promote
16 or assist the commission of the offense, he solicits,
17 encourages, directs, aids or attempts to aid the other
18 person to commit the offense.  Okay?
19     A.  Yes, sir.
20     Q.  That's a conspiracy.  That's the second way, as
21 the Prosecutors told you, that a person can be a party to
22 an offense.
23     A.  Yes, sir.
24     Q.  Here, whether Defendant actually caused the death
25 of deceased or did not actually cause the death but

127

1  intended to kill the deceased or another, anticipated that
2  another would be -- a life would be taken.  You see that?
3      A.  Yes, sir.
4      Q.  And here, of course, you go back and examine the
5  conduct on the part of the person on trial, whether that
6  person is the trigger person or the helper or the party,
7  as Mr. Hanna stated earlier.
8      A.  Yes, sir.
9      Q.  And you have to determine whether -- what level
10 did that person act.  And you would have found at this
11 juncture that that person at least acted to the extent
12 where capital murder was caused and the person was
13 convicted of capital murder.  You understand that?
14     A.  Yes, sir.
15     Q.  Now, here again, what was not shown earlier, and
16 I'll go back to you, has to be unanimous, proved beyond a
17 reasonable doubt, and 10 can agree on the "no" answer.
18 All right?
19     A.  Yes, sir.
20     Q.  Here, when you look at a person who acts with the
21 intent to promote or assist the commission of offense, he
22 encourages, solicits, directs, aids or attempts to aid,
23 and you found that beyond a reasonable doubt, that's that
24 first law of parties we talked about earlier.  You see
25 that, Mr. Woolf?

128

1      A.  Yes, sir.
2      Q.  Okay.  Here that Question No. 2 is whether the
3  Defendant actually caused the death of the deceased or did
4  not actually cause the death but intended to kill the
5  deceased or another or anticipated a human life would be
6  taken.  If you found here that that person did act with
7  the intent to promote a capital murder, that he
8  encouraged, aided, directed that person to doing it, and
9  then you get to here, Question No. 2, on the penalty, look
10 at the Question 2 in the penalty phase, excuse me, about
11 answering that question whether that person, in fact,
12 caused death, intended the death result or anticipated the
13 death would result.  Now, would you have to have found
14 this first law of parties to be applicable and true beyond
15 a reasonable doubt?  Think that the Question No. 2 should
16 be answered "yes" because you have found that beyond a
17 reasonable doubt?
18         MS. JACK:  Judge, I'm going to object to the
19 form of that.  I think that's very confusing because the
20 second question does incorporate something, finding
21 something beyond a reasonable doubt.
22         MR. WESTFALL:  Object to the side bar, Your
23 Honor.
24         THE COURT:  Okay.
25         MR. HEISKELL:  Judge, I don't want to say I'm

129

1  confusing because a valid objection at this stage when
2  trying to --
3      THE COURT: I'll overrule the objection at
4  this point.
5      MR. HEISKELL: Thank you, Judge.
6  Q. (BY MR. HEISKELL) Have you followed me thus far,
7  Mr. Woolf?
8  A. Okay. You're asking me just because I answered
9  this one one way I should answer this one?
10  Q. No, I'm asking, do you think you should always
11  answer another one the second way because you have found
12  that one "yes"?
13  A. No, not always.
14  Q. Okay. And that is because of what, sir?
15  A. Depending upon the facts and circumstances
16  provided.
17  Q. Okay. Now, you're two-thirds of the way, would
18  you agree on Question 3, Questions 1 and 2, if you found
19  that beyond a reasonable doubt?
20  A. Yes.
21  Q. Yes. Okay. Question No. 3 deals with that
22  mitigating circumstance and so forth. Remember that long
23  question?
24  A. Yes.
25  Q. It's boiled down right here. Does he deserve

130

1  life rather than death. Okay?
2  A. Correct.
3  Q. And you told us in your questionnaire that you
4  felt that a person's upbringing was not that important
5  in their life choices made. Do you remember saying that?
6  A. I'm not sure I said it exactly that way.
7  Q. Let me show it to you, Mister -- Here we go. A
8  person's responsibility for his own conduct regardless of
9  the upbringing, you strongly agree. Do you see that?
10  A. Yes.
11  Q. What did you mean by that?
12  A. What I mean by that is everyone has a choice.
13  Obviously, when you grow -- when you grow up, you see
14  things, you know, as a kid, yes, it's going to have an
15  impact upon your life.
16  Q. Uh-huh.
17  A. But at the same time, you have a responsibility
18  to make choice -- make the choice of to go ahead and go
19  with what you know or try to do something else. If you
20  know that it's different or if you know that it's a -- it
21  wasn't right, you've grown up, then you know that it
22  wasn't right at that point in time. Well, you've made the
23  conscious choice to go ahead and do the wrong thing, so
24  you've made that choice yourself. And I don't believe
25  that it should be used as an excuse.

131

1  Q. Okay. And then again, right above that one, one
2  who was abused as a child accepts responsibility for his
3  own actions committed as an adult. You circled you
4  disagree with that.
5  A. Right. They're still, I mean, responsible for
6  their own decisions that they made.
7  Q. Okay. So what you termed and I believe some
8  folks term as an excuse, for instance, my upbringing,
9  being abused as a child, that's something that is not
10  important to you in making the decision such as this on
11  whether to give life or death at the time that you have
12  found that person to be a convicted capital murderer?
13  A. Uh-huh.
14  Q. Future danger and finding that he killed,
15  intended to kill or anticipated that a person would be
16  killed, the victim would be killed. Did you?
17  A. So what's your question?
18  Q. I'm sorry. Appreciate you doing that for me.
19  Once you have found a person guilty --
20  A. Uh-huh.
21  Q. -- and you found that person to be a future
22  danger, killed, intended to kill or anticipated a person
23  would be killed --
24  A. Yes, sir.
25  Q. -- the person's upbringing or any, as you say,

132

1  excuse such as being abused as a child is not important to
2  you at that juncture?
3  A. I wouldn't say that it wasn't important, but at
4  the same time, they did have a choice to do the right
5  thing or the wrong thing.
6  Q. I guess what I'm asking is based upon what
7  you're telling me, you said is they had a choice, it's
8  not that important, so is it fair to say that you could
9  give fair consideration to that, their abuse as a child
10  and the upbringing when you consider whether that
11  convicted capital murderer should receive a life or
12  death sentence?
13  A. It depends on what I'm shown as far as the
14  evidence, what the situation was, I mean, that I would
15  take into consideration.
16  Q. Uh-huh.
17  A. Okay. Again, I can't -- I wouldn't make a
18  decision based on solely my beliefs, you know, the way I
19  think. Unless it's -- if it's there, and I've got proof
20  of it, then you know, I can look at it and make my
21  determination from that point. Again, I mean, I said what
22  I can set my -- what I think and my beliefs to the back
23  based upon the facts that are presented to me.
24  Q. Well, and the reason I'm probing in such a
25  manner, and I think you can understand this, because you

**133**

1 look to be a very sincere person, you looking me in the
2 eye and telling me exactly how you feel, I appreciate
3 that. One of the things that, obviously, when we, me and
4 Mr. Westfall and my client, we listen to you and look at
5 some of these questions, you can see where there's a
6 concern?
7     A. Yes, sir, I do.
8     Q. All right. And that's why I'm probing in such a
9 fashion because, you know, some people who have such
10 strong feelings are not able to put those feelings aside.
11 It's going to come out one way or another. And they say,
12 "Well, this is not the case for me, I would rather sit on
13 something else because my feelings about that aspect of
14 the law". And then there are others who say, "Well, I
15 don't have such strong feelings but I can still follow the
16 law." You follow what I'm saying, Mr. Woolf?
17     A. Yes, sir.
18     Q. And you were about to say something?
19     A. Yeah, I was just going to, you know, tell you
20 whenever I, you know, read through the questions and
21 stuff, and I put my answers down.
22     Q. Uh-huh.
23     A. Okay. Gentleman come up here, explained to me,
24 you know, a little bit more about it, obviously that
25 changes the way I think from -- just from a legal term to

**134**

1 be able to help me to understand more on how the process
2 is. Then, yes, I'm willing to, you know, consider it.
3     Q. Okay. And let's say, Mr. Woolf, you have your
4 baby Wyatt, he's a year old.
5     A. Little over a year.
6     Q. Little over a year. Your wife, both nurture your
7 baby, do you not?
8     A. Yes, sir.
9     Q. And does that entail, you know, cuddling and
10 holding and touching and feeding and doing all those
11 things --
12     A. Yes, sir.
13     Q. -- a parent is supposed to do?
14     A. Of course, yes, sir.
15     Q. Why do you think that's important?
16     A. I think that it's important for the sole purpose
17 it helps them, gives them a foundation, you know, lets
18 them to know what they're supposed to do. I mean, I'll be
19 quite honest with you, I didn't have that when I grew up,
20 but my son will have that.
21     Q. Okay.
22     A. So, and it's providing for your child, you know.
23     Q. You say you didn't have that when you grew up; is
24 that right?
25     A. I didn't have a whole lot of it.

**135**

1     Q. Whole lot of it. I think you told us as well,
2 Mr. Woolf, that you, in fact, had sought some type of
3 counseling and treatment as a younger man; is that
4 right?
5     A. Yes, that was part of the deal whenever --
6     Q. Oh, with the --
7     A. Yes, sir.
8     Q. Oh, that offense. Okay. But before then, I
9 mean, growing up, not having that, did you see where, I
10 guess, you missed some of that as part of being nurtured
11 by your family?
12     A. Right. And at that point in time, I didn't see
13 it, you know, that way. I see it now as an adult, you
14 know, that understands a little bit more. I do, you
15 know, see that, you know, that may have been absent, or
16 some of it, a lot of it may have been absent at the time.
17     Q. Yes, sir.
18     A. But at the same time, I, you know, knew right
19 from wrong and surrounded myself with the people that, you
20 know, would --
21     Q. Who helped you out?
22     A. Yes.
23     Q. So I take it that when your parents didn't step
24 in or were not there for whatever reason, you had others
25 to kind of help out along the way, whether they be other

**136**

1 relatives or family friends or whatever?
2     A. Yes, sir.
3     Q. That's good. Were those the uncles and aunts and
4 cousins and things like that?
5     A. They were, yes.
6     Q. At what age did that all happen to you,
7 Mr. Woolf?
8     A. When I was approximately 10.
9     Q. 10?
10     A. 10, 9, 10.
11     Q. And were there instances in which you were having
12 difficulties adjusting in school and things like that? Or
13 tell me how that happened where these folks kind of
14 stepped in.
15     A. I mean, for instance, you know, we lost our
16 house, you know, as a child, we moved in there. Or we
17 didn't have food, we would go get it, get some from them,
18 but they would feed us. If that's what you're asking.
19     Q. Yes, that's what I'm asking.
20     A. Yes.
21     Q. So you're fortunate to have those folks step in
22 to help you out and guide you along the way?
23     A. Yes, sir, yes, sir.
24     Q. Okay. You know, do you want to serve as a juror
25 in this case?

137

1   A. Yes, sir.

2   Q. And just a simple why? Knowing that life or

3   death that -- and you know that if death is given, then he

4   will be killed at some point.

5   A. Yes, sir.

6   Q. In fact, you made some -- you had a concern you

7   stated about the long years of appeals that happen.

8   A. Yes, sir.

9   Q. And you understand those long years of appeals

10  can be very costly, do you not?

11  A. Yes, sir.

12  Q. And some people think that, you know, that is

13  an issue in and of itself. Does that have any bearing

14  on your feelings about death versus life without parole?

15  A. No.

16  Q. So knowing that that -- do you think that's a

17  difficult decision if you were serving as a juror in this

18  case to --

19  A. Yes.

20  Q. -- sit with 11 other folks and make that

21  decision?

22  A. It sure is.

23  Q. And I guess this may sound kind of funny and

24  crazy. I hate to ask it anyway. What do you get out of

25  it, serving on a case like this?

138

1   A. The fact of knowing that either the right thing

2   was done, okay, based on what was presented.

3   Q. Okay. And you sitting here right now, your own

4   mind processes --

5   A. Yes, sir.

6   Q. -- what we've talked about at length, if you were

7   on trial for something as serious as this, would you want

8   you on this Jury?

9   A. Yes.

10  Q. And why?

11  A. Because I believe that I'm a fair person. I'm

12  going to look at what the facts were presented and base my

13  decision off of that.

14  Q. Does any of that have to do with your -- I'm

15  going to, for lack of a better term, call it a learning

16  experience from that juvenile history of yours?

17  A. Yes, sir.

18  Q. Does that help to shape and mold your opinions

19  about being fair and just and impartial and all that?

20  A. Yes, sir.

21  Q. Because of what you went through?

22  A. Yes, sir. But that, again, that's a totally

23  separate situation.

24  Q. Oh, yeah, yeah.

25  A. I just -- I don't want you to think that just

139

1   because of that situation I'm going to take that into

2   this.

3   Q. Well --

4   A. It's just helped me understand that, hey, there's

5   right things, there's wrong things, and everything has to

6   be presented, you know, appropriately, facts have to be

7   brought out to make a good decision.

8   Q. And you had a -- what I recall in this

9   questionnaire, a pretty high opinion of mental health

10  professionals; is that right?

11  A. Yes.

12  Q. And you think they do good jobs and the things

13  that they do are good for people?

14  A. Yes.

15       MR. HEISKELL: Okay. Let me talk to my

16  co-counsel for a second. I'll be right back.

17       VENIREPERSON: Okay.

18       (Pause in proceeding.)

19       MR. HEISKELL: Thank you. You've got me a

20  couple of good questions. That's why we have to work in

21  tandem.

22       VENIREPERSON: Yes, sir.

23  Q. Has your religious underpinnings, background

24  helped you to become a good father?

25  A. Yes.

140

1   Q. And what do you think makes a good father?

2   A. Someone that's there for, you know, for their

3   child, that provides a good life for them. You're asking

4   me what makes a good father, right?

5   Q. Yes, sir.

6   A. Okay. Someone that's not there -- how do I say

7   this. Someone that's there to provide for their child.

8   Q. Uh-huh.

9   A. Their needs, you know, their wants. Okay. Or

10  some part of wants, but their needs for sure.

11  Q. Sure.

12  A. And that's in their child's life.

13  Q. And you -- go ahead.

14  A. No, go ahead.

15  Q. You said something to the effect that you didn't

16  have that, at least part of that in your life as a

17  youngster. Am I saying that right?

18  A. My father didn't come around till I was 10 years

19  old.

20  Q. Okay. That's tough. Because, you know, when you

21  look at a situation where you are trying to be fair and

22  judging people, I take it then that type of character,

23  background, upbringing, those are kind of things you would

24  look at?

25  A. Yes.

141

1    Q. Is that right?

2    A. Yes.

3    Q. Okay. Do you think we have a tough job,

4  Mr. Woolf, me and Mr. Westfall?

5    A. Yes, sir.

6    Q. Would you --

7    A. I think both of you have a tough job.

8    Q. Okay. If you were defending Mark Soliz, do you

9  think that's something that you could do?

10   A. Yes, sir.

11   Q. You consider yourself a -- I think you said

12 earlier an honest and strong person, firm in your beliefs?

13   A. Yes, sir.

14   Q. If you were selected as a member of the Jury in

15 this case --

16   A. Yes, sir.

17   Q. -- you would be back there with 11 other people.

18 You understand that, right?

19   A. Yes, sir.

20   Q. And you as a juror would have to come to your own

21 individual decision, in addition to trying to reach a

22 decision with the 11 other individuals, but especially

23 when if you got to that point, Question No. 3, that's your

24 own personal moral judgment in that, in working right

25 there.

142

1    A. Yes, sir.

2    Q. And if you felt strongly about something, are you

3  the type person to hold on to your own beliefs?

4    A. Again, it goes back to what's, I mean --

5    Q. I didn't say that right. If you felt strongly

6  about, after you heard the evidence --

7    A. Uh-huh.

8    Q. -- that it should go one way or the other, are

9  you the type of person that will be able to hold on to

10 your own true beliefs in order to render a true verdict?

11   A. Yes, I mean, if everything that was presented and

12 I believe that the person deserved a life sentence or --

13 rather than the death penalty, yes, I would hold to that,

14 if that's what you're asking.

15   Q. Yes, sir, it sure is.

16   A. Yes, sir.

17        MR. HEISKELL: Thanks, Mr. Woolf.

18        VENIREPERSON: Yes, sir.

19        MR. HEISKELL: That's all. Wait, hold on,

20 Judge. I'm sorry.

21        (Sotto voce discussion.)

22   Q. One more area, Mr. Woolf, and I'll let you go.

23   A. Yes, sir.

24   Q. You are a registered sex offender until March

25 12th of this year?

143

1    A. Yes, sir.

2    Q. And when you brought that up initially, when the

3  Prosecutor was talking to you, I guess we need to know why

4  did you think that was an issue that we should consider or

5  you should even think about in determining whether you

6  could be fair and impartial in this case?

7    A. Well, because I know, you know, that first off,

8  people, obviously, whenever they first, you know, see

9  that, registered sex offender, okay, they're not gonna go

10 back, they're not gonna look at, you know, when it was or

11 any of that stuff. They just -- people's thoughts. But I

12 did not want that to affect one way or the other. If

13 there is an issue, that I wanted to be fair across the

14 board for the Defendant, for the Prosecutor. Okay.

15   Q. Okay.

16   A. And I did not want any possibility that if that

17 was in any way going to interfere with this case, I did

18 not want to be on the case.

19   Q. Okay. Fair enough.

20   A. Because I don't think it's fair for the Defendant

21 nor do I think it's fair for the Prosecutor.

22        MR. HEISKELL: Okay. Thank you.

23        VENIREPERSON: Yes, sir.

24        MR. HEISKELL: That's all.

25        THE COURT: Thank you, Mr. Woolf. If you'll

144

1  step outside for just a minute.

2        VENIREPERSON: Yes, sir.

3        (Venireperson Woolf not present.)

4        THE COURT: Okay. Does state have any

5  challenges?

6        MR. HANNA: We do not, Judge.

7        THE COURT: Does Defense?

8        MR. HEISKELL: No, Your Honor.

9        THE COURT: If you'll ask him to come back

10 in.

11        (Venireperson Woolf present.)

12        THE COURT: I just need to talk to you just a

13 minute.

14        VENIREPERSON: Yes, sir.

15        THE COURT: First off, you are not on the

16 Jury yet, but you are on the panel the Jury is going to be

17 selected from. What's going to happen, you'll get a call

18 from the Jury Administrator and you'll be told you have to

19 be back in court. We don't know exactly when that is. It

20 will be -- we think it will be mid to late February.

21        VENIREPERSON: Okay.

22        THE COURT: And you'll have to come one day.

23 When you come, you'll be told you're on the Jury or you'll

24 be released. We'll give you as much notice as we can, but

25 I'm not sure how much notice that will be. But that day

145

1  you'll know you're on the Jury or not.
2          VENIREPERSON: Yes, sir.
3          THE COURT: In the meantime, we're going to
4  get a picture of you before you leave. And we're doing
5  that because this process is going to take about a month,
6  and we'll put faces with answers.
7          VENIREPERSON: Okay.
8          THE COURT: In the meantime, don't read
9  anything about the case. Don't go to work and ask anybody
10  if they know about it. Don't go to church and ask anybody
11  if they know about it. Don't -- if it's in the newspaper,
12  on TV, don't watch it, don't read it. Don't let anybody
13  tell you what was said. And whatever you do, don't get on
14  the Internet, start looking up anything about the case.
15          VENIREPERSON: Yes.
16          THE COURT: With that, we'll let you go and
17  see you in a few weeks.
18          MS. JACK: Judge, I think -- okay.
19          THE COURT: I think it's going to be in that
20  back corner where we've been taking it.
21          (Venireperson Woolf not present.)
22          (Recess taken.)
23          (Venireperson Cherry present.)
24          THE COURT: Hi. Come on up. If you'll raise
25  your right hand.

146

1          (Juror sworn.)
2          THE COURT: Thank you, ma'am. If you'll have
3  a seat over there in the jury box, second one on the front
4  row would be good.
5          Okay. Would you state your name.
6          VENIREPERSON: Cherry Lynn Allen.
7          THE COURT: Ms. Allen, first off, you came in
8  early, we appreciate it very much. We were going to have
9  a rest period if you couldn't make it in, so thanks for
10  doing that.
11          VENIREPERSON: Uh-huh.
12          THE COURT: You filled out a juror
13  questionnaire. Were the answers you put on there true and
14  correct?
15          VENIREPERSON: Yes.
16          THE COURT: Okay. You did that several weeks
17  ago. Has there been any changes in your life that would
18  change any of the answers you put on that questionnaire?
19          VENIREPERSON: No.
20          THE COURT: Okay. My name is Phillip Vick.
21  I'm the Judge presiding of this proceeding. When this
22  case goes to trial, Judge William Bosworth, Judge of the
23  -- Judge of the 413th District Court of Johnson County,
24  will be the one trying the case. The attorneys
25  representing the State in this case are Mr. Dale Hanna,

147

1  Ms. Christy Jack.
2          MS. JACK: Good afternoon.
3          THE COURT: With them sometimes, and they're
4  out right now, would be Larry Chambless and Martin
5  Strahan.
6          The attorneys representing the Defendant are
7  Mr. Michael Heiskell.
8          MR. HEISKELL: Good afternoon.
9          THE COURT: Mr. Greg Westfall.
10          MR. WESTFALL: Hello.
11          THE COURT: Seated with them at the counsel
12  table is the Defendant, Mark Anthony Soliz.
13          THE DEFENDANT: Good afternoon, ma'am.
14          THE COURT: And they'll have questions for
15  you, but I'll ask first. Is there anything we should know
16  about you that we didn't ask on the questionnaire?
17          VENIREPERSON: Well, I have phlebitis in my
18  knee for sitting so long. I can't sit no length of time.
19          THE COURT: Okay. Well, tell us about that.
20  If you -- say you're -- you're in a trial, can you stand
21  up without walking? Can you just stand up?
22          VENIREPERSON: Usually when I sit so long, my
23  leg swells on me.
24          THE COURT: Right. But if we had you seated
25  somewhere where you could just stand up when you wanted

148

1  to.
2          VENIREPERSON: Oh, yeah, probably could.
3          THE COURT: Would that be okay?
4          VENIREPERSON: Yeah.
5          THE COURT: You wouldn't have to walk, you
6  could just stand up?
7          VENIREPERSON: Stand up, yeah.
8          THE COURT: Okay. You're going to be asked
9  some questions. I'll tell you it's not a test. There's
10  no right or wrong answers. The only thing we require of
11  you is that you be truthful.
12          VENIREPERSON: Okay.
13          THE COURT: Say "yes" and "no" when you can.
14  If you say things like "maybe" or "I think so," you'll get
15  about three other questions to explain that answer. So
16  answer -- don't answer a question unless you understand
17  it. If you don't understand it, make sure they rephrase
18  it or explain it to you.
19          VENIREPERSON: Okay.
20          THE COURT: We think trial is going to begin
21  probably the last -- somewhere around the last week in
22  February. When it does start, we think it will last about
23  three weeks. There is a chance that the Jury could be
24  sequestered during that period of three weeks. Is there
25  anything happening in your life that -- that you -- that

149

1  that time period would interfere with?

2          VENIREPERSON: Going to the doctor. I go.

3          THE COURT: Okay. You have doctor's

4  appointments?

5          VENIREPERSON: Uh-huh.

6          THE COURT: Do you mind telling us what for?

7  Is it for your leg?

8          VENIREPERSON: For my leg and I have high

9  blood pressure and all that, diabetes.

10          THE COURT: Okay. When you start talking

11  about health questions, we can't answer those. Only you

12  can.

13          VENIREPERSON: Oh, okay.

14          THE COURT: You can. You can tell us how

15  you -- do you think you're physically able to serve on a

16  Jury?

17          VENIREPERSON: I don't think so. I don't.

18          THE COURT: Okay. Do you -- you said

19  diabetes. What kind of effect -- do you have to eat at

20  certain times?

21          VENIREPERSON: Yeah.

22          THE COURT: Okay.

23          VENIREPERSON: Some medicine I have to take

24  twice, three times, both times a day.

25          THE COURT: Does any of the medicine you take

150

1  do things to your memory or attention span, anything like

2  that?

3          VENIREPERSON: No. Some of them makes me

4  sleepy, though.

5          THE COURT: Ah-oh.

6          VENIREPERSON: I'm not going to lie.

7          THE COURT: Okay.

8          VENIREPERSON: It does.

9          THE COURT: I'll let the lawyer talk to you

10  about that.

11          I'll recognize the State.

12              CHERRY ALLEN,

13  Venireperson No. 61, testified as follows:

14          VOIR DIRE EXAMINATION

15  BY MS. JACK:

16  Q. Hello, Ms. Allen.

17  A. Hi.

18  Q. How are you doing this afternoon?

19  A. I'm doing okay.

20  Q. My name is Christy Jack, and I'm going to visit

21  with you this afternoon on behalf of the State. And I'm

22  going to talk to you for about an hour.

23  A. Okay.

24  Q. Okay?

25  A. Okay.

151

1  Q. Does that seem like a long time?

2  A. No.

3  Q. Sometimes it feels like a long time from over

4  here. I'm going to ask you several questions. And the

5  reason why, did you notice how many people we had come in

6  the other day?

7  A. Uh-huh.

8  Q. How many people do you think we had coming in?

9  A. Over a hundred and something, all I know. I

10  didn't...

11  Q. You know, in reality, we probably had close to

12  400.

13  A. Really?

14  Q. For the entire day come in. And you know why we

15  have that many people come in?

16  A. Huh-uh.

17  Q. Because everybody has a different situation.

18  Some people, it's a financial sacrifice to serve on a

19  Jury. For some people, it is a sacrifice to their family

20  for them to serve on a Jury. Some, for some people, it is

21  a sacrifice health-wise for them to serve on a Jury. And

22  so for several people, this is just not the right time,

23  and it can be a combination of all of those reasons. You

24  know, they have -- and you're shaking your head "yes" at

25  each one of those. Because for some people, it's a

152

1  sacrifice, and for others, it's no big deal at all. And

2  so the reason why we bring people in individually is to

3  talk to them about their unique situation. Because for

4  you, it sounds like this would be a tremendous sacrifice.

5  You're shaking your head up and down "yes"?

6  A. To me.

7  Q. Okay. So I want to talk to you first about

8  that. I want to pick up kind of where the Judge left

9  off. And I think one of the first questions he asked you

10  was, is there anything that's going on in your unique

11  situation, your life, that would make it difficult to

12  serve on a Jury. And you mentioned, and I apologize

13  because I know -- I do not know very much about medical

14  terms. So you said there's something that affects your

15  leg?

16  A. Uh-huh.

17  Q. Can you tell me what that is?

18  A. It's called phlebitis. All I know is my leg

19  swells like if I sit a length of time. Usually if I'm

20  home, I elevate it up.

21  Q. Phlebitis, is that what you're saying?

22  A. It's called phlebitis.

23  Q. Do you, by any chance, know how to spell that?

24  A. No.

25  Q. I'm trying to help our Court Reporter right

153

1  here.  She's going to ask me that at the break.  Trust
2  me.  Okay.  So if I mispronounce it, I'm sorry, but you're
3  calling it phlebitis?
4      A.  Phlebitis.
5      Q.  You've been diagnosed with that?
6      A.  Yeah.
7      Q.  When were you diagnosed with that?
8      A.  I had to quit work in '82.
9      Q.  1982?
10     A.  '87, '87.
11     Q.  1987.  Okay.  So I'm going to sit here, try to do
12  the math.  24 years ago?
13     A.  Uh-huh.
14     Q.  Is that about right?
15     A.  Uh-huh.
16     Q.  So you have been dealing with this for 27 years?
17     A.  Uh-huh.  Didn't know I had it until they been
18  checking me and going on, and that's what they came to
19  determine that's what it was, so I didn't know.
20     Q.  Okay.  So what took you to the doctor for them to
21  diagnosis you with that?
22     A.  Well, I worked at a sewing plant here in
23  Cleburne, Walls Industrial, and I stood on my foot all the
24  time moving around different places and stuff.
25     Q.  Okay.

154

1      A.  I kept -- every time I -- sometimes they'd have
2  to help me out of there because my leg would swell up and
3  I couldn't walk on it.
4      Q.  Right.
5      A.  Put pressure on it, it hurt so bad.
6      Q.  Okay.
7      A.  Then I went to the doctor, kept going back and
8  forth.  I told them something was wrong because my leg
9  just kill -- hurts, hurts and swells and swells.  And he
10  told me if I didn't stop -- he stopped me from working.
11  He said make that be your last day.  And I was like,
12  what?  And I went and they stopped me from working
13  because they said that every time -- like I worked all --
14  I worked for 24 years at Walls, but they closed, though,
15  now.  And he said, "You gonna keep having trouble,
16  trouble, put you in the hospital", and I said I don't
17  want to go in the hospital, so I said I better do what
18  they say.  That's what I did.
19     Q.  I think you indicated on your questionnaire you
20  were physically disabled?
21     A.  Yeah, I am.
22     Q.  So you are physically unable to work at this
23  time?
24     A.  Uh-huh.
25     Q.  And I'm -- okay.  I'm going to tell you something

155

1  else, too.  This is kind of an unnatural process.  The
2  young lady to your -- I have to think about this -- to
3  your right is typing out our responses.  So if you can,
4  when I ask you a question -- I can tell and I can hear you
5  say "uh-huh", but if you can say "yes", that would be a
6  big help to her.
7      A.  Okay.
8      Q.  Do you mind?
9      A.  Uh-huh.  Huh-uh, I don't mind.
10     Q.  You just did it again.
11     A.  I'm sorry.
12     Q.  That's okay.  That's all right.  So you have been
13  struggling with this for roughly 27 years?
14     A.  Uh-huh.  Yes.
15     Q.  Okay.  There you go.  For 27 years.  And as I
16  understand it, when you sit for lengths of time, it causes
17  your leg to swell?
18     A.  Yes.
19     Q.  And when your leg swells, that causes you pain?
20     A.  Yes.
21     Q.  And it causes you a lot of pain?
22     A.  Yes.
23     Q.  All right.  And I'm guessing on a scale of 1 to
24  10, that's some pretty severe pain?
25     A.  Yes.

156

1      Q.  And how long a time do you have to sit before
2  that pain sets in, or do you even know?
3      A.  No.
4      Q.  Okay.  So some days it can be a short amount of
5  time?  Don't let me put words in your mouth.  But as I
6  understand, so some days, it's unpredictable.  Do you know
7  what I mean when I say that?  Some days it's a short
8  amount of time, some days it may be a little bit longer
9  period of time?
10     A.  Yes.
11     Q.  Okay.  Okay.  And you understand that jury
12  service, by and large, there are 12 seats for people to
13  sit and listen.  And you can stand, but I think from what
14  you're telling me, standing for a long period of time can
15  also cause your leg to swell?
16     A.  Yes.
17     Q.  So no matter what, this is going to be a physical
18  hardship for you to serve on this Jury?
19     A.  Yes.
20     Q.  Okay.  Am I right?
21     A.  Yes.
22     Q.  Okay.
23     A.  You're right.
24     Q.  This is going to be something that is going to be
25  tremendously painful for you?

157

1    A.  Yes.
2    Q.  Is that right?
3    A.  Yes.
4    Q.  Okay.  Um, and you take several medications on
5  top of that; is that right?
6    A.  Yes.
7    Q.  Let me ask you this.  When you're in pain, what
8  happens?
9    A.  I have a pill that I could take called Cipros or
10  something like that for the -- try to help it go down.
11    Q.  For the swelling?
12    A.  If I stay off of it -- uh-huh.  If I stay off of
13  it, just keep it elevated up.  Mostly I have to go to the
14  bathroom, I have to hop.
15    Q.  You have to hop to the bathroom, it gets so bad?
16    A.  Uh-huh.
17    Q.  And then your leg starts swelling and you have to
18  elevate it?
19    A.  Elevate, yes, ma'am.
20    Q.  Okay.  I would imagine out of those other 3 to
21  400 people, not everybody is going to have as tough a time
22  as you physically to serve on this Jury.  Would you agree
23  with me?
24    A.  Yes.
25    Q.  Okay.  Because I'll just tell you, you're the

158

1  first person we've talked to that has had this serious a
2  health problem.  Now, you -- you're shaking your head
3  "yes".
4    A.  Yes.
5    Q.  Okay.
6    A.  Sorry.
7    Q.  No, no, you're not doing anything wrong.  I just
8  need to -- I'm just telling her so she can write it down
9  as we go.  And you take quite a few medications to help
10  you with all this.  You take a painkiller; is that right?
11    A.  Yes, ma'am.
12    Q.  And are there days that you have to take more
13  than one painkiller?
14    A.  Uh-huh.
15    Q.  Yes, ma'am?
16    A.  Yes.
17    Q.  Is that "yes"?  Okay.  Are there days that you
18  may have to take multiple painkillers?
19    A.  I don't want to but sometime I have to.
20    Q.  I understand.  How many painkillers sometimes do
21  you have to take in one day?
22    A.  They like 2 or 300 milligrams, and I don't like
23  really taking them --
24    Q.  I understand.
25    A.  -- but I have to, being in pain, you hurting.

159

1    Q.  Sure.  Nobody wants to be in pain.
2    A.  Huh-uh.
3    Q.  So two or three, maybe four sometimes you have to
4  take?
5    A.  Sometimes.
6    Q.  A day?
7    A.  I have to limit it.  Don't let it go up.
8    Q.  What's the most you've ever taken in a day?
9    A.  Four.
10    Q.  Four?
11    A.  Uh-huh.
12    Q.  Okay.  Has that been recently?
13    A.  Yes.
14    Q.  Okay.  How recent?
15    A.  About two weeks ago.
16    Q.  Okay.  So it's that bad?
17    A.  Bad, yes.
18    Q.  And right now, are you -- I mean is it
19  progressively getting worse?
20    A.  Yes, it does.  He said probably the older I get,
21  the more -- I had a birthday just here recently, I said,
22  oh, no.
23    Q.  That's not much fun to celebrate your birthday
24  when your health is getting like that.  So can you tell me
25  all the medications you take just for your leg, the

160

1  painkillers?
2    A.  Just one pill that I take for that.
3    Q.  And when you take painkillers, does it affect
4  your ability to kind of know what's going on?
5    A.  Uh-huh.
6    Q.  Is that "yes"?
7    A.  Yes.
8    Q.  Okay.
9    A.  Yes.
10    Q.  It affects your ability.  And if you were serving
11  on a Jury, what that would mean is it would affect your
12  ability, try as you might to listen to everything that's
13  going on?  You're shaking your head "yes"?
14    A.  Yes.
15    Q.  That's okay.  Is that a "yes"?
16    A.  Yes.
17    Q.  Okay.  And does that affect your ability to focus
18  on something?
19    A.  Really to me it is because it makes me want to go
20  just rest, sleep.
21    Q.  Right.  Makes you want to go to sleep?
22    A.  Uh-huh.
23    Q.  Yes?
24    A.  Yes.
25    Q.  Okay.  And so obviously the more painkillers you

161

1  take, the more it affects your ability to pay attention to
2  what's going on?  And there's no slide -- you're shaking
3  your head "yes".  Okay.  And you know what, there's
4  nothing wrong with that.  You're not doing anything
5  wrong.  You're just coming in here saying, "You know,
6  folks, this is my unique situation".  Is that what you're
7  saying?
8     A.  Yes.
9     Q.  So you're taking painkillers when you're in pain
10  and then you've got a whole slew of other medications
11  you're taking as well?
12    A.  Yes.
13    Q.  Okay.  You take "Dietbra"?  What is that?
14    A.  It's a -- what?
15    Q.  Well, I've just -- and I'll come over there.
16  That's okay.  I should have come over there to begin
17  with.
18    A.  That's all right.
19    Q.  What is this right here?
20    A.  It's a -- I'm a diabetic.
21    Q.  You're diabetic.
22    A.  Uh-huh.  High blood pressure.
23    Q.  So you have high blood pressure and you're
24  diabetic?
25    A.  Um-hum.  I have sleep apnea too.

162

1     Q.  You have sleep apnea.
2     A.  Um-hum.
3     Q.  You have heart trouble?
4     A.  Trouble.
5     Q.  You take water pills?
6     A.  Uh-huh.
7     Q.  You take Plavix?
8     A.  Yeah, I have.
9     Q.  The heart trouble, what's the heart trouble?
10    A.  I have heart trouble.  I had a heart attack last
11  year.
12    Q.  Oh, my goodness.  I'm so sorry.
13    A.  I didn't know I had it myself.
14    Q.  Okay.  So, so I'm guessing when your blood
15  pressure goes up, that really tends to make you upset?
16    A.  Yeah.
17    Q.  And you have to take -- do you take
18  nitroglycerin?
19    A.  No, not yet.  I hope I don't have to.
20    Q.  Well, knock on wood.  All right.  What medicines
21  do you take for your heart problems?
22    A.  Plavix and a aspirin, it's called Eco -- Ecotrin,
23  every morning.
24    Q.  Okay.  And are you supposed to be in stressful
25  situations?

163

1     A.  No.
2     Q.  Is this kind of stressful for you?
3     A.  Um-hum.
4     Q.  Okay.
5     A.  Yes.
6     Q.  Is that yes, ma'am?  Okay.  Do you think that
7  serving on a -- on a Jury where you were talking about
8  life and death would be a stressful situation?
9     A.  Yes, yes.
10    Q.  Do you think that might make your blood pressure
11  go up?
12    A.  Yes.
13    Q.  Do you think sitting in a Jury seat --
14    A.  Make, uh-huh.
15    Q.  -- even if you could stand up, do you think that
16  would make your leg swell?
17    A.  Yeah.
18    Q.  Might make you need to take painkillers?
19    A.  Yes.
20    Q.  All right.  And then you also take -- is it
21  "furmosie"?
22    A.  Furmide -- it's a Lasix pill, water pill, try to
23  help my leg, keeping my fluid getting in my -- on my leg.
24    Q.  Okay.  You take that every day?
25    A.  Uh-huh, I have to take one every day.

164

1     Q.  And you take "cardavil"?
2     A.  Yeah, it's a blood pressure pill.
3     Q.  How many of those do you take?
4     A.  I have to take it twiced a day, and then I have
5  two pills I take at nighttime, like another blood pressure
6  pill.  It's called -- I couldn't write all them medicine.
7  I didn't write it all.
8     Q.  Oh, you didn't even write all your medications
9  down?
10    A.  I know, I didn't write it all down because I --
11  it's called gem -- gem something, but it's a blood
12  pressure, like two -- two more blood pressure pills I
13  take.  So I have high blood pressure bad.  So I have to
14  take two pills at night.
15    Q.  Do you take your blood pressure every day?
16    A.  Yeah, I have to check it at home, and when I go
17  up there they check it again.
18    Q.  How many times a day are you checking?
19    A.  Check it three times daily.
20    Q.  How many times you check your blood?
21    A.  I check my blood three times daily, stick my
22  finger every morning, noon and night.
23    Q.  Okay.  So diabetic, you're checking your blood
24  sugar?
25    A.  Uh-huh.

165

1    Q.  With your heart trouble, you're checking your
2  blood pressure three times a day?
3    A.  Uh-huh.
4    Q.  And you also take "Excortin"; is that right?
5    A.  Um-hum, that's a aspirin that I take with my
6  Plavix.
7    Q.  Is that a prescription aspirin?
8    A.  No, that's over the counter that you can buy at
9  the drugstore.
10   Q.  What is the "glipside"?
11   A.  That's a -- my blood -- uh, diabetic pill called
12 glipizide.
13   Q.  Oh, I know what you're talking about.
14   A.  Uh-huh.
15   Q.  Okay.  And that's to kind of regulate your blood
16 sugar?
17   A.  Blood sugar, yeah.  I have to take it two times
18 like at nighttime and then in the morning.
19   Q.  Okay.  And you take "Hylane"?
20   A.  Uh-huh, hydra -- hydraco -- hyrda -- not clodine,
21 hydra -- it's H-Y-L -- I was writing.  I was so nervous.
22   Q.  That's okay.
23   A.  It's for my kidneys, for my -- having trouble
24 with my kidneys.
25   Q.  Okay.

166

1    A.  Uh-huh.  I have to take it four times a day.
2    Q.  Four times a day.  All right.  Let me get an
3  idea, how many prescriptions are you taking on a daily
4  basis?
5    A.  It's eight altogether, but I take that aspirin.
6  It's not no prescription.  It's just over the counter.
7    Q.  So you take eight pills a day?
8    A.  Uh-huh.
9    Q.  Sometimes do you --
10   A.  Like --
11   Q.  -- take more if you're -- what were you going to
12 say?
13   A.  I take more sometime because of how my leg.
14   Q.  Okay.  Did you take your blood pressure this
15 morning?
16   A.  Yes.
17   Q.  Okay.  Was it a little high knowing you were
18 coming in here?
19   A.  Yes.
20   Q.  I'll try not to take that personally.  What else
21 do you take?
22   A.  And I take -- I take all of them except I take
23 two pills at night, it's a blood pressure, and then it's
24 called gem -- G-E something, but it's at home, so all my
25 medicine.

167

1    Q.  What's that for?
2    A.  It's for my leg too.
3    Q.  Okay.  And you indicated, one of the questions
4  you were asked was, is there -- are you taking any
5  medications that would affect your ability to sit
6  comfortably.  And that's when you told us about your
7  leg.
8    A.  Yeah.
9    Q.  And give the case your full attention, or that
10 might interfere with your ability to concentrate on the
11 trial.  And that's when you just listed all of these
12 medications?
13   A.  Um-hum.
14   Q.  And actually you ran out of room?
15   A.  I did.
16   Q.  You did run out of room.  Okay.  And so each of
17 these medications and all of these medications would make
18 it impossible for you to give this trial your full
19 concentration?
20   A.  Yes.
21   Q.  Any question in your mind about that?
22   A.  No.
23   Q.  Kind of sounds to me like with all these
24 medications, you're having a tough enough time just
25 functioning every day?

168

1    A.  Um-hum.
2    Q.  Is that a "yes"?
3    A.  Yes.  I'm sorry.
4    Q.  Let alone sitting here on something as serious as
5  a life and death case?
6    A.  Uh-huh.
7    Q.  And if that is the case, if you cannot give this
8  trial your full attention because of your -- your unique
9  situation, your health problems, okay, you don't have to,
10 but now is the time for you to tell us that.  Is that what
11 you're telling the Court, that because of all your
12 medications -- and you're shaking your head "yes"?
13   A.  Yes.  I rather not be on.
14   Q.  Because of all your medications and all your
15 health situations, you're asking the Court and you're
16 telling the Court that you cannot give this trial your
17 full attention?
18   A.  Yes, I couldn't.
19   Q.  Okay.  Am I putting any words in your mouth?
20   A.  No, you're not putting, no, just how I feel.  I
21 couldn't really -- to me, I couldn't give y'all, you know
22 what I'm saying, have to jump up or somebody have to help
23 me out of here or something.
24   Q.  Yeah.  You could have a heart attack?
25   A.  Anything, yes.

169

1    Q.  You might have to go to the hospital, and that's
2  on one of your best days?
3    A.  I know it.  That's tough.
4        THE COURT:  Ms. Jack, let's see if the
5  Defense has any questions real quick.
6        MR. WESTFALL:  We do, Your Honor, just for a
7  second.
8              VOIR DIRE EXAMINATION
9  BY MR. WESTFALL:
10   Q.  Ma'am, my name is Greg Westfall.  How are you?
11   A.  I'm okay.
12   Q.  Have you ever been on a Jury before?
13   A.  Hum-um.
14   Q.  No?
15   A.  No.
16   Q.  This is kind of a new process.  Well, I'm
17 gonna -- I'm gonna let you look behind the curtain a
18 little bit.  Okay.  You remember that from Wizard of Oz,
19 how you saw behind the curtain and saw the wizard in
20 there doing it?
21   A.  Uh-huh.
22   Q.  This here is what they call an adversarial
23 process, and it's kind of like a competition.
24       MS. JACK:  Judge, I'm going to object.  This
25 is improper.  I thought we were going to talk about her

170

1  unique situation.
2        THE COURT:  Mr. Westfall, I really thought
3  we were talking about the question whether or not she's
4  physically able to serve.
5        MR. WESTFALL:  Sure.
6        THE COURT:  Is that where you're going?
7        MR. WESTFALL:  Yes, it is.  That's exactly
8  where I'm going, Your Honor.
9        THE COURT:  Okay.
10   Q.  (BY MR. WESTFALL)  And the particular type of
11 questions can change depending on whether someone wants
12 you on the Jury or not.  And what I've heard so far is
13 basically you agree with what she has said, so --
14       MS. JACK:  Well, Judge, I'm going to object
15 because I just simply went by her questionnaire which were
16 her answers.
17       THE COURT:  Okay.  I'll overrule the
18 objection.  This is voir dire.
19   Q.  (BY MR. WESTFALL)  Does that make sense?  All I
20 want to do is just hear from you, because I looked at your
21 questionnaire.
22   A.  Yes, I -- I'd rather not be on it because --
23   Q.  I understand.
24   A.  Yep.
25   Q.  I understand.  Tell me about your choir, the

171

1  choir.  You lead the choir?
2    A.  No, I don't lead the choir.  I'm president of the
3  choir.
4    Q.  President.  What does that do?
5    A.  Take care of my business at church.
6    Q.  Uh-huh.
7    A.  Uh-huh.
8    Q.  Okay.  Well, all I want is just to hear from
9  you.  I can tell you that this case is going to probably
10 go three weeks.  You'll have to sit.  You'll have to sit,
11 you know, for various periods all day long.
12 Accommodations can be made where you can stand.
13 Accommodations can be made where you can go to the
14 bathroom.  It depends on whether or not you want to be on
15 the Jury, you know.  And basically the power's in your
16 hands, and I just want you to know that.  If you don't
17 want to be on the Jury, then you just say, "I don't want
18 to be on the Jury".  If you want to be on the Jury, then
19 we talk about how maybe accommodations might be made to
20 deal with your, you know, your physical issues.  Because
21 it ain't the worst we've ever seen.  So just tell us, I
22 mean, do you want to be on the Jury or not?
23   A.  And another thing, I have a 11-year-old
24 daughter.  I'd rather not be on it.
25   Q.  And are you the sole caretaker for the

172

1  11-year-old daughter?
2    A.  Yes, yes.
3    Q.  What's your 11-year-old daughter doing right now?
4    A.  She's in school.
5    Q.  She's in school.
6    A.  Uh-huh.
7    Q.  But when she gets out of school?
8    A.  I have to have her, yes.
9    Q.  Well, you see, that's what's called a legal
10 exemption.  That gets you off immediately.  Do you want to
11 assert it?
12   A.  No, I don't want to be on it.
13       MR. WESTFALL:  I think you do.
14       THE COURT:  Okay.  Thank you.  I think
15 we've -- you've decided you don't think your health would
16 let you serve?
17       VENIREPERSON:  No.
18       THE COURT:  Plus you're eligible for the
19 exemption.  You want to claim your exemption; is that
20 correct?
21       VENIREPERSON:  Yes.
22       THE COURT:  Okay.  We're going to go ahead
23 and let you go.  Is that okay?
24       VENIREPERSON:  Okay.  Yes.  Thank you.
25       THE COURT:  Yes, ma'am.

173

1  MS. JACK: Thank you very much, Ms. Allen.
2  VENIREPERSON: Um-hum.
3  THE COURT: We do appreciate you coming in
4  early, though. Thank you.
5  MR. WESTFALL: Thank you, Ms. Allen.
6  (Venireperson Allen excused.)
7  (Pause in proceeding.)
8  (Venireperson Whitworth present.)
9  THE COURT: If you'll raise your right hand.
10  (Juror sworn.)
11  THE COURT: Thank you, ma'am. If you'll have
12  a seat in the second chair, that first row of the jury
13  box.
14  VENIREPERSON: Okay.
15  THE COURT: Okay. Would you state your name.
16  VENIREPERSON: Mary Suzanne Whitworth.
17  THE COURT: Ms. Whitworth, you filled out a
18  juror questionnaire a while back. Were the answers you
19  put on there true and correct?
20  VENIREPERSON: Yes.
21  THE COURT: That's been a few weeks. Has
22  anything happened in your life that change -- would change
23  any of those answers?
24  VENIREPERSON: No, not that I know of.
25  THE COURT: My name is Phillip Vick. I'm the

174

1  Judge presiding in this proceeding. When this case goes
2  to trial, Judge William Bosworth, Judge of the 413th
3  District Court in Johnson County, will be the one trying
4  the case.
5  VENIREPERSON: Okay.
6  THE COURT: The attorneys representing the
7  state in this case are Mr. Dale Hanna.
8  MR. HANNA: Good afternoon, ma'am.
9  VENIREPERSON: Hello.
10  THE COURT: Ms. Christy Jack.
11  MS. JACK: Good afternoon.
12  THE COURT: And with them sometimes will be
13  Larry Chambless and Martin Strahan.
14  The attorneys representing the Defendant are
15  Mr. Greg Westfall.
16  MR. WESTFALL: Hello.
17  THE COURT: Mr. Michael Heiskell.
18  MR. HEISKELL: Hi.
19  VENIREPERSON: Hello.
20  THE COURT: Seated with them at the counsel
21  table is the Defendant, Mark Anthony Soliz.
22  VENIREPERSON: Okay.
23  THE DEFENDANT: How you doing, ma'am.
24  THE COURT: They'll have questions for you,
25  but I'll ask a few. Is there anything we should know

175

1  about you that we didn't ask on the questionnaire?
2  VENIREPERSON: I can't think of anything.
3  THE COURT: Okay. You're going to be asked a
4  lot of questions, but it's not a test. There's no right
5  or wrong answers. The only thing we require is that you
6  be truthful.
7  VENIREPERSON: Okay.
8  THE COURT: You need to answer "yes" or "no"
9  when you can. If you say things like "maybe" or "I think
10  so" or "perhaps", you're going to get about four questions
11  to explain that answer. And if you don't understand a
12  question, make sure you do. Don't answer it until you
13  do. They'll explain it or rephrase it or something.
14  VENIREPERSON: Okay.
15  THE COURT: We think trial is going to
16  start probably, best guess right now, is the last week
17  in February. If it -- when it does start, we think it
18  will last about three weeks. There's even a chance the
19  Jury will be sequestered during that period of time or
20  a portion maybe of that time. Is there anything
21  happening in your life that would interfere with you
22  being a juror?
23  VENIREPERSON: The only thing I know of is
24  that my mother-in-law is terminally ill. I would like to
25  go to her funeral if she dies. She could die in one week

176

1  or three weeks or six weeks. It is -- it is unknown.
2  Q. Where does she live?
3  A. She lives in Fort Smith, Arkansas, but is ill in
4  Little Rock, Arkansas. She's about six hours away. I do
5  not know if that will be 30 minutes from now or three
6  weeks or -- I don't know.
7  THE COURT: Yeah. Okay.
8  VENIREPERSON: I wrote -- that's all on the
9  questionnaire.
10  THE COURT: Okay. The lawyers may want to
11  talk to you about that, but I'll recognize the State.
12  MS. JACK: Thank you very much.
13  MARY WHITWORTH,
14  Venireperson No. 56, testified as follows:
15  VOIR DIRE EXAMINATION
16  BY MS. JACK:
17  Q. Good afternoon, Dr. Whitworth. How are you
18  doing?
19  A. Good.
20  Q. My name is Christy Jack, and I'm going to be
21  visiting with you on behalf of the State this afternoon.
22  I'm going to talk to you for about an hour, and then the
23  Defense is going to have the opportunity to talk to you
24  as well.
25  A. Okay.

177

1    Q. I want to pick up where the Judge left off, and
2  that is with the issue of your mother-in-law.
3    A. Okay.
4    Q. And you did write that on the questionnaire, and
5  I think you indicated that in a couple of different
6  places. You wrote that -- one of the questions you were
7  asked, and I'll show it to you. I know it was a very
8  thorough questionnaire. You filled it out about three
9  weeks ago. Were there any medical, psychological or
10 personal issues that would interfere with your ability to
11 be a fair and impartial juror in this case or would
12 interfere with your service as a juror in this case, or
13 any other reason why you should not serve as a juror in
14 this case. And you wrote -- you checked "yes"?
15   A. Uh-huh.
16   Q. That's because of your personal situation with
17 regard to your mother-in-law?
18   A. Yes.
19   Q. And I understand that. And that is actually why
20 we brought in almost 400 people the other day. You were
21 there, I don't recall whether it was the morning or the
22 afternoon.
23   A. Uh-huh, morning.
24   Q. Okay.
25   A. I think.

178

1    Q. We brought in an equally large group for the
2  afternoon as well, just to give you an idea. And I think
3  you can imagine why we bring in that many people.
4  Everybody has their own unique situation. And for some
5  people, it's going to be a great time for them to serve as
6  a juror, not that anyone volunteers for jury duty,
7  certainly not in something as serious as a capital murder
8  case.
9    A. Uh-huh.
10   Q. But there are certainly individuals for whom it
11 is not the sacrifice that it perhaps might be for you.
12 Okay?
13   A. Uh-huh.
14   Q. Now, personal situations are -- they kind of fall
15 into a different category. Okay. Some individuals have a
16 personal situation that they can remedy before the trial
17 ever starts, you know. And there are different degrees
18 of how serious that is.
19   A. Uh-huh.
20   Q. Okay. And then there are others for whom their
21 personal situation, it might be that there is another time
22 in your life that would be a great time for you to serve
23 as a juror because you would not be managing your
24 mother-in-law's situation and taking care of your husband,
25 I'm sure, and your family.

179

1    A. Uh-huh.
2    Q. And the question becomes, knowing that, I'm sure
3  you're checking on your mother-in-law maybe daily?
4    A. Uh-huh.
5    Q. Either by phone?
6    A. Or in person.
7    Q. Or in person. And is that family that's going by
8  to check on her or is that because your husband is there
9  now and y'all alternate?
10   A. We're doing a lot of traveling back and forth. I
11 was there Tuesday through Thursday last week. I was there
12 ten days before that. He's in and out. So there's a fair
13 amount of travel.
14   Q. So if you were there Tuesday through Thursday,
15 you were there three days last week and then ten days?
16   A. Ago.
17   Q. Ago before that or ten -- for some time before
18 that. So it sounds like -- and I understand that. I have
19 parents that are in failing health as well. And you,
20 everyone takes their turn to help and take care of that
21 person and love that person till the end.
22   A. Uh-huh.
23   Q. And my guess is, and I don't want to put words in
24 your mouth, but my guess is when you're not with her,
25 you're worried about her?

180

1    A. I am worried about her, yes. I know that other
2  people are with her.
3    Q. Sure.
4    A. Other caregivers, but, yes, I'm -- we're checking
5  on her two or three times a day.
6    Q. Two or three times a day. And you're probably
7  also worried about your husband as well?
8    A. Uh-huh.
9    Q. You're shaking your head "yes". The reason I say
10 that --
11   A. I know. Yes.
12   Q. Yes. There's a Court Reporter right there.
13      And obviously no one knows when that time may
14 come. I understand it can come 30 minutes from now and it
15 could come six months from now perhaps or maybe not even
16 that long.
17   A. Not that long.
18   Q. Okay. So 30 minutes from now or maybe --
19   A. Within weeks.
20   Q. Within weeks. And you understand that we're
21 getting ready to start this trial, under the best or worst
22 of circumstances, within weeks?
23   A. Right.
24   Q. Understanding your unique situation -- and
25 there's nothing wrong with this. Some people feel like,

STATE VS. MARK ANTHONY SOLIZ   JANUARY 30, 2012

181

1 "You know what, Christy, I can't give this trial my full
2 attention, because for me personally, I have my own unique
3 situation that I am dealing with, my family, my loved
4 one. I am happy to serve on a Jury --"
5           MR. WESTFALL: Your Honor, I'm having a hard
6 time hearing. Can I move my chair over there again?
7           THE COURT: Sure.
8      Q. (BY MS. JACK) I'm happy to serve on a Jury at
9 another time, but for me right now, I could not give a
10 trial my full attention. And you would certainly not be
11 the first person to say that. You're shaking your head
12 "yes"?
13     A. I would say if she dies while I'm being a juror
14 on a trial, it will be hard for me to give it my full
15 attention.
16     Q. Sure. Absolutely. And so that is why we
17 actually bring jurors in individually. Death penalty
18 cases are different, because it is a very different
19 sacrifice that we're asking of people. Okay.
20 Understanding that, if you cannot give this trial your
21 full attention, that's fine. All you have to do is say,
22 "You know what, given my personal situation right now, I
23 cannot give this trial my full attention." And there is
24 no shame in that. That is why we bring in 400 people.
25     A. If she dies during this trial, I cannot give it

182

1 my full attention.
2      Q. Okay. And that's fine.
3      A. There's a very good chance of that.
4      Q. And as you sit here right now, it seems like
5 you're a little bit preoccupied with that, and that's
6 fine. Okay. And all you have to do is tell the Court
7 that I cannot give this trial my full attention because
8 I'm going to be checking on her, I'm going to be
9 traveling to check on her, and there are 300-some-odd
10 people who can do this instead of me. Is that --
11     A. That is the truth.
12     Q. Okay. So are you saying that you cannot?
13 Because I don't want to put words in your mouth, but you
14 don't have to serve if you cannot give this your full
15 attention.
16     A. I cannot give this my full attention if she dies
17 in the next three weeks and I'm preoccupied with that
18 during the beginning of this trial.
19     Q. Okay.
20     A. If -- so...
21     Q. Okay. And are you so preoccupied that it is
22 going to affect your ability to be a juror whether she
23 has passed or whether you're worried about her passing?
24 Do you see what I'm saying?
25     A. Uh-huh. In truth, if she passes very soon and

183

1 this is behind me and the trial is three or four weeks
2 from now, I think I would be able to give it my full
3 attention, but it's totally unknown about when that's
4 going to happen.
5      Q. Sure. Sure. Okay. So as you sit here right
6 now, obviously nobody knows, no one knows when or if that
7 may happen. As you sit here right now, I think what
8 you're telling me is you cannot give this trial your full
9 attention.
10     A. I don't think I can give this my full attention
11 while she's alive.
12     Q. I understand that. And you remember how the
13 Judge said "I don't think", if you say "I don't think",
14 you're going to get four more questions?
15     A. Okay.
16     Q. Can you give this trial your full attention?
17     A. No.
18     Q. Okay. Are you asking to serve as a juror on
19 another case at some other time in the future?
20     A. Sure.
21     Q. Are you going to be so preoccupied with her
22 health, whether it is leading to the end or it is the
23 end, that you're not going to be able to pay attention
24 to witnesses or the evidence in the case?
25     A. Yes.

184

1      Q. Try as you might. You understand what I'm
2 saying?
3      A. Uh-huh.
4           MS. JACK: Okay. Judge, I would ask --
5           THE COURT: Okay. Does the Defense want to
6 take the witness on voir dire?
7           MR. WESTFALL: Yes, Your Honor.
8           THE COURT: Okay.
9                VOIR DIRE EXAMINATION
10 BY MR. WESTFALL:
11     Q. Hello, Doctor. I'm Greg Westfall. What I heard
12 you saying was that if your mother-in-law died, you would
13 not be able to give the trial your full consideration.
14     A. Yes.
15     Q. And I didn't hear you saying that you couldn't
16 do it in any event. So are you still going to work at
17 the hospital right now?
18     A. Yes.
19     Q. Are you able to give that your full attention?
20     A. Yes.
21     Q. And how many people are there to care for your
22 mother-in-law right now?
23     A. In the hospital or?
24     Q. Well, just in -- in general. How big is the
25 group that cares for your mother-in-law?

185

1    A. She has three children that are in and out at
2  various times.
3    Q. Okay. And your husband is one of them?
4    A. Uh-huh, yes.
5    Q. This trial could start the end of February,
6  last week of February, first week in March, and go for
7  about three weeks. There's always -- of course, none
8  of us can ever predict when something is going to
9  happen.
10    A. I know.
11    Q. That's why we have alternate jurors, and this
12  trial will be no exception to that. But, you know, if
13  you could give the evidence your full -- if we leave
14  aside the question of your mother-in-law dying.
15    A. Okay.
16    Q. Okay. Let's say she dies six weeks from now,
17  of course, we have no idea when it's going to happen,
18  but let's say it's six weeks from now, eight weeks from
19  now or two months from now. Would you be able to give
20  the trial your full attention if -- if we're not talking
21  about her dying in the immediate aftermath of that. If
22  we're talking -- like if we started the trial right now,
23  would you be able to give the evidence your full
24  attention?
25    A. Here's the problem.

186

1    Q. Okay.
2    A. Can I just tell you?
3    Q. Yes, please do.
4    A. When we start a trial, and she dies in the
5  middle of it, it's going to be very difficult for me not
6  to leave and go to that funeral and to pay attention
7  while my husband is burying his mother.
8    Q. Okay. Thank you for that. And everybody, no
9  one would be able to pay attention. And, in fact, like
10  I said, there's a mechanism for releasing you from the
11  Jury; that is, we have alternates.
12    A. Okay.
13    Q. Even if you're on the Jury, something like that
14  happens, then something, some arrangements are going to
15  be made.
16    A. Okay.
17    Q. If you're going to be off the Jury or everyone
18  is going to take a break so you can go take care of
19  business and come back.
20    A. Okay.
21    Q. But not being able to pay attention to the
22  evidence, and see, you said again if she dies, you will
23  not be able to pay attention. And I'm thinking that's
24  because you've got to go to Arkansas and take care of
25  business?

187

1    A. And my husband will be gone and my kids will
2  need taken care of.
3    Q. Yes.
4    A. All of those logistics.
5    Q. Absolutely. I understand.
6    A. Okay.
7    Q. I understand. But the -- you know, the -- sort
8  of the money question here is the circumstances that
9  exist in your life right now with your mother-in-law --
10    A. Yes.
11    Q. -- are they such to where as we sit right now
12  you could not pay attention to evidence?
13    A. Today I can pay attention to evidence.
14    Q. And that would only change if she actually died
15  and that would be because of all the stuff you would have
16  to do?
17    A. If -- it would change if she deteriorated again
18  to the point that my husband is rushing out to Little
19  Rock and I've got children to take care of and he's gone,
20  or if I'm sequestered and my husband is out of town, that
21  would make it very difficult for me to sit here and not
22  think of anything else.
23    Q. I understand. I understand. But that's -- it
24  still sounds like there's a contingency there in that as
25  we sit here right now, you could pay attention to the

188

1  evidence.
2    A. Today.
3    MR. WESTFALL: Okay. Thank you so much.
4    THE COURT: Okay. I'm going to ask that you
5  step outside for just a minute.
6    VENIREPERSON: Okay.
7    (Venireperson Whitworth not present.)
8    THE COURT: Okay. I'm assuming the State
9  is going to indicate a challenge.
10    MS. JACK: Yes, Your Honor. We believe she
11  would be preoccupied by her personal situation. She
12  indicated it on her questionnaire, specifically on
13  Question No. 95, "Are there any medical, psychological,
14  or personal issues that would interfere with your ability
15  to be a fair and impartial juror in this case, or would
16  interfere with your service as a juror in this case, or
17  any other reason why you should not serve as a juror in
18  this case?" And she indicated "yes".
19    And she also indicated on Question No. 99,
20  "Do you want to serve as a juror in this case?" She
21  indicated "no". And in response, when she said to look
22  at her explanation page -- page, excuse me, Your Honor,
23  she said, "My mother-in-law has a brain tumor with a poor
24  prognosis and we do not know how long she will live,
25  perhaps a few weeks or a few months. We are traveling

189

1 frequently to spend time with her and I would like to be
2 available if she has surgery or passes" -- or "dies".
3 Excuse me.
4 　　　　We've excused other jurors that have had ill
5 family members, terminally ill. And we would ask the
6 same courtesy be extended to her.
7 　　　　THE COURT: Okay.
8 　　　　MR. WESTFALL: And, Your Honor, I
9 disagree with that. But just as for this Juror here,
10 Your Honor, it's her mother-in-law and the issue is
11 logistics. If she passes away, you know, she's gonna
12 have to take care of business with the kids and helping
13 her husband and whatnot. And, of course, I mean, she
14 said that today she can pay attention. And so it's this
15 contingency.
16 　　　　And also, you know, I would like to
17 represent, Your Honor, that this Juror, and the
18 questionnaire will bear this out, is not one of
19 these -- I mean, it's not an attractive Juror for the
20 State anyway. The State wants to be rid of her. And
21 I think this is an insufficient excuse. I think she
22 has said she can pay attention unless her mother-in-law
23 dies.
24 　　　　THE COURT: She said today, not tomorrow or
25 the next day.

190

1 　　　　MR. WESTFALL: Unless her mother-in-law dies
2 or severely deteriorates. The reason why she couldn't
3 pay attention would be because of logistics. She's not
4 sitting here, Your Honor, all wrought because her
5 mother-in-law is fixing to die. She's worried about the
6 steps that will have to take place after she dies and
7 what her part is going to be in that. And I think,
8 Your Honor, that's -- that's why we have alternates. I
9 think she is suitable for service. And we object to her
10 being dismissed.
11 　　　　MS. JACK: I would also add, Your Honor,
12 she's indicated that she was present for three days at
13 her mother-in-law's side last week, and that she was
14 there for a time period close in time prior to that as
15 well. This was a -- there were at least one or two other
16 jurors who simply called in to the Court and indicated
17 they had a terminally ill family member and we released
18 them without even looking at their questionnaire. Yes,
19 she's a very composed professional. She is a doctor.
20 But I think it's very clear that she is distracted and
21 concerned about her mother-in-law's health and her
22 potential passing in the next few days or weeks.
23 　　　　THE COURT: I think everything about this
24 woman has said she -- everything from she can't pay
25 attention, everything else, too many events in her life

191

1 right now. I'm gonna go ahead and excuse her.
2 　　　　MR. WESTFALL: And, Your Honor, I would
3 like to correct the record. Two people called in about
4 cancer; one of them was here the following Monday to be
5 voir dired. So what she said is not true. And once
6 again, we object to the dismissal.
7 　　　　THE COURT: Okay. You can tell her we're --
8 she's excused.
9 　　　　THE BAILIFF: Okay. Thank you, sir.
10 　　　　(Venireperson Whitworth excused.)
11 　　　　(Court adjourned.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  THE STATE OF TEXAS )

2  COUNTY OF JOHNSON  )

3           I, Pamela K. Waits, Official Court Reporter

4  in and for the 413th District Court of Johnson County,

5  State of Texas, do hereby certify that the above and

6  foregoing contains a true and correct transcription of all

7  portions of evidence and other proceedings requested in

8  writing by counsel for the parties to be included in the

9  volume of the Reporter's Record, in the above-styled and

10 numbered cause, all of which occurred in open court or in

11 chambers and were reported by me.

12          I further certify that this Reporter's Record

13 of the proceedings truly and correctly reflects the

14 exhibits, if any, admitted by the respective parties.

15          WITNESS MY OFFICIAL HAND this the 3/__ day

16 of _December_, 2012.

17

18      _____
        Pamela K. Waits, Texas CSR #4991

19      Expiration Date:  12/31/13
        Official Court Reporter

20      413th Judicial District
        Johnson County, Texas

21      204 S. Buffalo Avenue
        Cleburne, Texas 76033

22      (817) 556-6041

23

24

25

```
 1                    REPORTER'S RECORD

 2                 VOLUME 21 OF 75 VOLUMES

 3              TRIAL COURT CAUSE NO. F45059

 4         COURT OF CRIMINAL APPEALS NO. AP-76,768

 5  STATE OF TEXAS            )      IN THE DISTRICT COURT
                              )
 6  VS.                       )      JOHNSON COUNTY, TEXAS
                              )
 7  MARK ANTHONY SOLIZ        )      413TH JUDICIAL DISTRICT

 8

 9  -----------------------------------------------------

10                  INDIVIDUAL VOIR DIRE

11                     JURY SELECTION

12  -----------------------------------------------------

13

14

15          On the 31st day of January, 2012, the

16  following proceedings came on to be heard in the

17  above-entitled and numbered cause before the Honorable

18  Phillip Vick, Judge presiding, held in Cleburne, Johnson

19  County, Texas:

20              Proceedings reported by Machine Shorthand and

21  Computer-Aided Transcription.

22

23                              ORIGINAL

24

25
```

STATE VS. MARK ANTHONY SOLIZ          JANUARY 31, 2012          2

```
 1                    A P P E A R A N C E S

 2  DALE HANNA
    SBOT NO. 08919500
 3  LARRY CHAMBLESS
    SBOT NO. 04086320
 4  MARTIN STRAHAN
    SBOT NO. 00797765
 5  District Attorney's Office
    Johnson County
 6  204 S. Buffalo
    Cleburne, Texas 76033
 7  (817) 556-6801

 8  ELIZABETH CHRISTINA JACK
    SBOT NO. 10445200
 9  Tarrant County District Attorney's Office
    401 W. Belknap Street
10  Fort Worth, Texas 76102-1913
    817-884-1366
11
    ATTORNEYS FOR THE STATE OF TEXAS
12

13  MICHAEL P. HEISKELL
    SBOT NO. 09383700
14  Johnson, Vaughn & Heiskell
    5601 Bridge Street
15  Suite 220
    Fort Worth, Texas 76112-2305
16  817-457-2999

17  GREGORY B. WESTFALL
    SBOT NO. 00788646
18  Hill Gilstrap, P.C.
    1400 W. Abram Street
19  Arlington, Texas 76013
    817-276-4931
20
    ATTORNEYS FOR DEFENDANT
21

22

23

24

25
```

STATE VS. MARK ANTHONY SOLIZ          JANUARY 31, 2012          3

```
 1              I N D E X

 2              VOLUME 21

 3         INDIVIDUAL VOIR DIRE

 4  JANUARY 31, 2012                    PAGE    VOL.

 5  Proceedings.................................  4      21

 6                    STATE'S    DEFENSE
    PROSPECTIVE JUROR   VOIR DIRE  VOIR DIRE        VOL.
 7
    PAULA WAFER, NO. 57       --        --          21
 8  Venireperson Excused by Agreement...........  4    21

 9  HAROLD BUCKNER, NO. 58      8        56          21
    Defendant's Challenge for Cause.............. 95    21
10  Court's Ruling............................... 96    21
    Venireperson Accepted........................ 96    21
11
    THOMAS HATCH, NO. 59       100      129         21
12  Venireperson Accepted.......................148     21

13  CAROLYN STROM, NO. 60      152      193         21
    Venireperson Accepted.......................224     21
14
    Proceedings recessed at 3:07 p.m. and
15  continue at 3:23 p.m. in Volume 22..........225     21

16  Court Reporter's Certificate.................226     21

17         ALPHABETICAL VENIREPERSON INDEX

18                    STATE'S    DEFENSE
    PROSPECTIVE JUROR   VOIR DIRE  VOIR DIRE        VOL.
19
    HAROLD BUCKNER, NO. 58      8        56          21
20  THOMAS HATCH, NO. 59       100      129         21
    CAROLYN STROM, NO. 60      152      193         21
21  PAULA WAFER, NO. 57        --        --          21

22

23

24

25
```

**4**

1  PROCEEDING

2  (Defendant not present.)

3  MR. HEISKELL: If we can go on the record

4  real quick. I want to announce that we've agreed to

5  excuse Ms. Wafer, Juror No. 57. I've also conferred with

6  my client, Mr. Soliz, and he's agreed to it as well.

7  MR. STRAHAN: That's the State's agreement as

8  well.

9  THE COURT: Okay. I'll approve the

10  agreement. We'll excuse Paula Wafer.

11  (Recess taken.)

12  (Defendant present.)

13  (Venireperson Buckner present.)

14  THE COURT: If you'll raise your right hand.

15  (Juror sworn.)

16  THE COURT: If you'll have a seat in the

17  second chair in the jury box.

18  Okay. Sir, would you state your name.

19  VENIREPERSON: My name is Harold Dan

20  Buckner, II.

21  THE COURT: You filled out a juror

22  questionnaire a while back. Were the answers you put on

23  there true and correct?

24  VENIREPERSON: Yes, sir. Yes, sir.

25  THE COURT: You -- that's been a couple,

**5**

1  three weeks. Has anything changed in your life that would

2  change any of those answers?

3  VENIREPERSON: No.

4  THE COURT: My name is Phillip Vick. I'm the

5  Judge presiding in this proceeding. When this case goes

6  to trial, Judge William Bosworth, Judge of the 413th

7  District Court of Johnson County will be the one trying

8  the case.

9  The attorneys representing the State are

10  Mr. Dale Hanna, who is out -- is out right now, Mr. Larry

11  Chambless, Mr. Martin Strahan.

12  MR. STRAHAN: Hi there.

13  THE COURT: Ms. Christy Jack.

14  MS. JACK: Good morning.

15  VENIREPERSON: Morning.

16  THE COURT: The attorneys representing the

17  Defendant are Mr. Michael Heiskell.

18  MR. HEISKELL: Morning.

19  VENIREPERSON: Morning.

20  THE COURT: And Mr. Greg Westfall.

21  MR. WESTFALL: Morning.

22  THE COURT: And seated with them at the

23  counsel table is the Defendant Mark Anthony Soliz.

24  THE DEFENDANT: Morning, sir.

25  VENIREPERSON: Morning.

**6**

1  THE COURT: They'll have questions for you,

2  but I'll ask first. Is there anything we should know

3  about you that we didn't ask on the questionnaire?

4  VENIREPERSON: Not that I know of. It was

5  pretty thorough.

6  THE COURT: Okay. You're going to be asked a

7  lot of questions. It's not a test. There's no right or

8  wrong answers. We only require that you be truthful.

9  VENIREPERSON: Okay.

10  THE COURT: You need to answer yes or no if

11  you can. If you say "perhaps" or "I think" or "maybe",

12  you'll get about four other questions about why you

13  answered it that way.

14  VENIREPERSON: All right.

15  THE COURT: I'll also ask that you don't

16  answer a question you don't understand, or if you -- you

17  get them to rephrase it or explain it or something.

18  VENIREPERSON: Okay.

19  THE COURT: Just make sure you understand it

20  before you answer it. We think trial in this case is

21  probably going to start the last week in February. When

22  it does start, we think it will last about two weeks. And

23  there's even a chance the Jury could be sequestered for

24  part or all of that time. So my question is, is there

25  anything happening in your life that would interfere with

**7**

1  you being a juror during that period of time?

2  VENIREPERSON: Possibly, yes.

3  THE COURT: Okay. What? What -- what are

4  you thinking?

5  VENIREPERSON: I'm being moved to a new team

6  in my company. We're meeting in Phoenix on the 13th

7  through the 16th for orientation, and immediately

8  thereafter we start a new project, so that's...

9  THE COURT: You're talking about this -- of

10  February?

11  VENIREPERSON: That's correct, yes. So

12  it's -- I don't know that it would -- it's a big deal, but

13  it's kind of a transitional time.

14  THE COURT: Right. I guess the question then

15  is if you happen to be on the Jury, would that so

16  preoccupy your mind that you wouldn't be able to pay

17  attention to the evidence and do your duty?

18  VENIREPERSON: It would certainly be in the

19  back of my mind, but I don't think that would stop me.

20  THE COURT: Okay. I think most people have

21  things in the back of their mind.

22  VENIREPERSON: Yeah, everybody's got

23  something going on.

24  THE COURT: Right. Okay. Thank you, sir.

25  I'll recognize the State.

STATE VS. MARK ANTHONY SOLIZ   JANUARY 31, 2012

8

1   MS. JACK:  Thank you.
2   HAROLD BUCKNER, II,
3   Venireperson No. 58, testified as follows:
4   VOIR DIRE EXAMINATION
5   BY MS. JACK:
6   Q.  Good morning.  Is it Mr. Buckner?
7   A.  That's correct.
8   Q.  Okay.  My name is Christy Jack, and I'm going to
9   be visiting with you for roughly 45 minutes.
10   MS. JACK:  Is that what we start this
11   morning?
12   THE COURT:  Actually we're starting it
13   tomorrow, but it would be good practice.
14   MS. JACK:  Very good.  Very good.
15   Q.  We've had an hour, so I'll tell you this, you're
16   lucky because you get 15 minutes less, but you also have
17   one of the Defense attorneys to talk to you for about 45
18   minutes when I'm concluded.  I'm going to talk to you this
19   morning.  I'm going to talk to you about your
20   questionnaire.  I'm sure you're sitting there thinking,
21   how in the world do you have anymore questions when we've
22   already asked you basically 99 to a hundred questions.
23   Believe it or not, there are some more questions.  We're
24   going to talk about how trial works in a capital case, and
25   we're going to talk about the Constitution and the law

9

1   that would apply in this case if you're selected to serve
2   on a Jury.
3   Okay.  Now, before I get in to all that
4   though, I just kind of want to go back over or touch on
5   where the Judge left off, and that is, your job.  And I'll
6   tell you the way that this works, we're scheduled to begin
7   either the week of the 20th or the week of the 27th of
8   trial.
9   A.  Okay.
10   Q.  And there's some debate whether the trial will
11   take, in fact, two to -- two or three weeks.  You served
12   on jury duty before, so you know it's not an exact
13   science.
14   A.  Right.
15   Q.  We never know exactly how long a witness may take
16   to testify, and as a result, we don't know how long the
17   trial will last.  As we sit here right now, I don't think
18   that there's any problem with you going on your trip to
19   meet with your new team, if that's the case, but if you
20   are selected to serve on a Jury, can you promise this
21   Court and all the attorneys that you would give it your
22   full attention?
23   A.  Sure.  Absolutely.
24   Q.  Okay.  Because you can understand why this is so
25   serious.  And that's why we bring in as many people as we

10

1   do, because some people -- we had a woman yesterday who
2   has a terminally ill loved one and she was not able to
3   serve because she couldn't say she would give the trial
4   her full attention.  And so we're just asking people if
5   that's the kind of situation, you can promise the Court
6   that you, if you're selected to serve on the Jury, you'll
7   give it your full attention.  Okay.
8   Something else.  There's a little bit of an
9   unnatural situation in that there's a Court Reporter
10   typing down our exchanges.  When you're sitting there
11   shaking your head, I can see that you're shaking your
12   head, but there's nothing for her to write.
13   A.  It's a head shake.
14   Q.  So, if you wouldn't mind, as you're shaking your
15   head --
16   A.  Sure.
17   Q.  -- if you could just say "yes", or just say
18   "yes", either way.  Okay?  Is that okay?
19   A.  I understand.  Yes.
20   Q.  That's why I say it's a little unnatural because
21   nobody talks like that.  If at any point my explanation is
22   not satisfactory to you or you have any questions,
23   Mr. Buckner, I would love it if you would stop me down and
24   say, hang on.
25   A.  Okay.

11

1   Q.  Because as you can understand, this is a very
2   serious situation, and I want to make sure that I do
3   everything that I can to kind of let you know what's
4   expected of you.
5   A.  Okay.
6   Q.  And talk about the law and answer any questions
7   you may have.
8   A.  Right.
9   Q.  Okay.  Is that fair?
10   A.  That's fair.
11   Q.  Okay.  I want to ask you real quick before we get
12   in to this, you mentioned that you served on a Jury
13   before?
14   A.  That's correct.
15   Q.  It was a criminal case?
16   A.  Yes, I believe it was.
17   Q.  Okay.  And you said technically under the law he
18   was guilty, but you -- do you remember what I'm talking
19   about?
20   A.  Uh-huh.
21   Q.  Can you tell me a little bit about that?
22   A.  Yes.  It involved an elderly lady that owned a
23   dog kennel.  I believe she had one employee, if I remember
24   correctly.
25   Q.  Okay.

STATE VS. MARK ANTHONY SOLIZ  JANUARY 31, 2012

12

1  A. She was traveling to Fort Worth and had a heart
2  attack while she was driving to Fort Worth. They took her
3  to the hospital. She was in intensive care for a week or
4  so. During that period of time, her employee quit.
5  Q. There was no one caring for the dogs?
6  A. No one caring for the dogs.
7  Q. Okay.
8  A. So under the circumstances, what was she going to
9  do?
10  Q. Right.
11  A. She didn't know what was going on. But under the
12  law, we had to find her guilty. And she lost her license,
13  lost her livelihood. And I just didn't -- I didn't agree
14  with the whole thing.
15  Q. And you felt like that there should have been
16  room --
17  A. Absolutely.
18  Q. -- for extenuating circumstances?
19  A. Right.
20  Q. And actually that will play a big part as we talk
21  about the law when we get to the Punishment Phase of a
22  capital murder case.
23  A. Right.
24  Q. So that makes sense. But I think you said that
25  your experience though was a satisfactory one. How do you

13

1  feel about it? Let me just ask you that way, your jury
2  service.
3  A. I'm sorry, what?
4  Q. How did you feel about your jury service as a
5  whole?
6  A. Other than that, it was fine.
7  Q. Okay. Okay. All right. Well, some of the same,
8  many of the same principles, as a matter of fact, apply in
9  this case. In every criminal case, these are the
10  principles that will apply as far as the Constitution is
11  concerned.
12        Number one, an indictment is no evidence.
13  It's simply a piece of paper that lays out, as in your
14  case, what the Defendant is charged with, what Mr. Soliz,
15  what we've accused Mr. Soliz of doing. Okay. I think you
16  understand that it's not any evidence.
17  A. Right.
18  Q. I'm guessing in your case no one marked the
19  indictment and put it into evidence.
20  A. I don't recall. It's been a long time ago.
21  Q. Well, it is no evidence. The fact that a
22  Grand Jury has indicted someone can't be considered for
23  any purpose.
24  A. Right.
25  Q. It's just really the means to get into a

14

1  criminal court and have the opportunity for the State
2  to present its evidence. And as Mr. Soliz sits here in
3  the courtroom with us, can you give him that presumption
4  of innocence?
5  A. Yes.
6  Q. And you understand that as he sits over here,
7  while he may not be, in fact, innocent, the law gives him
8  that presumption of innocence and makes me at my table, my
9  team, prove his guilt?
10  A. Right.
11  Q. And as he sits here right now, can you afford him
12  that presumption?
13  A. Yes, ma'am.
14  Q. You make me prove my case?
15  A. Yes.
16  Q. All right. When we talk about the burden of
17  proof, just like in that case, it's exactly the same.
18  It's how much I must prove my case by, okay. I can't
19  prove it a hundred percent. How would you ever know
20  something 100 percent? You know, if you saw it yourself?
21  A. Right.
22  Q. That would probably be the only way someone would
23  know something beyond all possible doubt 100 percent
24  certainty. And if you saw it yourself, what would that
25  make you?

15

1  A. An eyewitness.
2  Q. An eyewitness, exactly. Well, and the law is not
3  going to put on me an impossible standard of having 12
4  eyewitnesses. And, in fact, if you were an eyewitness,
5  you would be a witness and you could not be a juror.
6  Okay? The law doesn't allow witnesses to be jurors. So
7  the law doesn't put on me a 100 percent standard. It is
8  the highest legal standard though in the land, but it's
9  also the same standard as a traffic ticket. Have you ever
10  had a traffic ticket?
11  A. Oh, yes.
12  Q. I have too. And it's the same legal standard of
13  proof. Okay. The Prosecutors in that case -- I don't
14  know if you went through a trial. I always just pay
15  mine. But the Prosecutors, it's the same amount of
16  evidence they would have to prove to a Jury of someone's
17  guilt. Okay?
18  A. Okay.
19  Q. Are you comfortable with that --
20  A. Yes.
21  Q. -- responsibility?
22  A. Sure.
23  Q. Now, and I will tell you who the only people or
24  the only side that ever has a responsibility to prove
25  something, Mr. Buckner, is this table right here.

16

1    A. Right.
2    Q. The State of Texas. At no time, whether it's
3  Guilt/Innocence, first part of the trial, or Punishment,
4  the second part of the trial, at no time does the Defense
5  table have to do anything.
6    A. Okay.
7    Q. They have no obligation to prove Mr. Soliz's
8  innocence. They don't have an obligation to put up an
9  alibi. They don't have an obligation. All they would
10  have to do -- all they have to do is just be here, just be
11  available. That's it. Now, he's got two very fine
12  attorneys, and I'm assuming they'll do more than that, but
13  the only ones who have an obligation or a duty is this
14  table right here.
15    A. Okay.
16    Q. Okay. We're the only ones. All right. Now,
17  kind of as a part of all this, a defendant has a right not
18  to testify. Probably in your case, I don't know if
19  your -- the defendant testified.
20    A. I believe she did.
21    Q. You think she did? She probably explained "I was
22  in the hospital", her unique situation. Okay. There's a
23  lot of reasons why somebody may not testify. Their
24  attorneys may not -- their attorneys may advise them,
25  look, I don't think the State's proved the case, there's

17

1  no reason for you to testify. In the end, a defendant has
2  the right not to testify and a defendant has the right to
3  testify. It is his decision. He has attorneys, very wise
4  attorneys to advise him, but in the end, it's his
5  decision.
6    A. Okay.
7    Q. If a defendant chooses not to testify, you can't
8  consider that for any purpose.
9    A. Okay.
10    Q. You can't say, you know what, Ms. Jack was really
11  close on proving someone's guilt, and because he didn't
12  testify, we're going to go ahead and just find him
13  guilty. You just put it out of your mind. I'm
14  guessing -- you're a vice president of a bank?
15    A. Yes.
16    Q. Okay. Have you ever had to compartmentalize
17  something?
18    A. Sure. Everyone has.
19    Q. All right. So the Fifth Amendment is a very good
20  example of that. You just compartmentalize it and you
21  just look at the evidence and see did the State prove its
22  case. Does that make sense?
23    A. That makes sense.
24    Q. If a defendant chooses not to testify, will you
25  promise the Court you won't consider it for any purpose?

18

1    A. Yes.
2    Q. See how that works?
3    A. Yeah.
4    Q. Okay. And I'm gonna be asking you a lot of times
5  as we go through this, "Does that law make sense?", "Do
6  you agree with that law?", "Is that a law that you can
7  follow?"
8    A. That's fine.
9    Q. Some jurors come in and they have their own
10  personal feeling and they're not -- they can't follow the
11  law. And they're obviously not qualified to serve on a
12  Jury. You would understand that only jurors that agree to
13  follow the law are qualified, just like you did in that
14  other case.
15    All right. When we talk about capital
16  murder, we have to begin with an understanding of what
17  constitutes murder. Murder is simply -- and I don't mean
18  to minimize the seriousness of it. It's the intentional
19  taking of another life.
20    A. Yes.
21    Q. Okay. Can't be by accident, can't be by mistake,
22  can't be done in self defense. It has to be sanely,
23  consciously --
24    A. Yes.
25    Q. -- intentionally done. Okay?

19

1    A. Okay.
2    Q. But there's a lot of ways murder can occur. And
3  there's a lot of motivations or a lot of motives behind
4  why a murder can occur. Sometimes -- not to say there are
5  good motives, but maybe not quite as bad motives as
6  others.
7    And I'm going to use myself as an example. I
8  hope this doesn't alarm you. But I drive home at the end
9  of the day. It's been a tough day, jury selection. It's
10  been a long day. Someone cuts me off in traffic. I
11  decide I've had it. I pull out my concealed handgun
12  license, I shoot them and I kill them. Okay. Did I
13  intentionally cause their death?
14    A. Absolutely.
15    Q. Absolutely. As opposed to say, for instance,
16  someone molests my child. Well, I've seen the criminal
17  justice system and worked for 20 years --
18    MR. HEISKELL: Excuse me, Your Honor. Excuse
19  me, Ms. Jack.
20    Your Honor, I'm going to object at this time
21  since motivation is not an element that has to be proved.
22  For Ms. Jack to offer that there may be different
23  motivations is an improper application of the law that
24  she's attempting to bind this Juror to. Since motivation
25  is not an issue and not an element, we object to any

**20**

1  examples of motivation.
2        THE COURT: Okay. I'll overrule the
3  objection.
4        Q. (BY MS. JACK) Okay. Somebody molests a child,
5  the mother of that child calmly, sanely loads her gun and
6  shoots the individual responsible. Okay. Well, it wasn't
7  done in insanity. They very sanely did it, very calmly
8  did it. But maybe perhaps different motivation than
9  someone cutting me off in traffic. I say that because
10  there's a lot of ways that murder can occur, and our
11  legislature has given a really broad penalty range for the
12  offense of murder. And it's really done to let jurors let
13  the punishment fit the crime.
14        A. Right.
15        Q. Okay. And the penalty range is anywhere from
16  5 years all the way to life. Okay. And you would agree
17  with me that a 5-year sentence for murder is pretty
18  unusual. Have to be some pretty unusual facts that would
19  tell you, Mr. Buckner, that a 5-year sentence is
20  appropriate.
21        A. Yes.
22        Q. But if those facts present itself, are you the
23  type of man that can say I think five years is appropriate
24  and that's the sentence I'm going to give?
25        A. Yes.

**21**

1        Q. By the same token, if you see a life case for
2  murder, not capital murder, we're talking about murder
3  now. And when I say simple murder, I'm not trying to
4  minimize the seriousness, just to make a legal
5  distinction. If you see a case for murder and you
6  believe that life is appropriate, I assume you could
7  equally --
8        A. Yes.
9        Q. -- return a life sentence. Now, the difference,
10  there is a difference, and it's an important difference.
11  For the offense of murder, if you were to give a -- return
12  a life sentence, well, actually any sentence in there,
13  there is a possibility of parole.
14        A. Okay.
15        Q. There is a possibility of parole. Some
16  individuals are given a life sentence or a 25-year
17  sentence or a 50-year sentence, anywhere in that range,
18  and they never get paroled.
19        A. Okay.
20        Q. But some do.
21        A. Okay.
22        Q. And our law changed and they let jurors know that
23  now. Okay?
24        A. Okay.
25        Q. That's different than a capital murder life

**22**

1  sentence. All right. Because a life sentence for the
2  offense of capital murder has no possibility of parole.
3        A. Okay.
4        Q. Someone will serve, if they receive that
5  sentence, they will stay in prison the rest of their
6  life.
7        A. Could you define capital murder for me?
8        Q. Yes. We're going to get there in a second.
9        A. All right.
10        Q. Can I wait and do it in just a second?
11        A. Yes.
12        Q. All right. Because I want to talk to you about
13  aggravated robbery. You know, once again, there's a lot
14  of motivations why and how an aggravated robbery can
15  occur. Take an older sibling raising three or four little
16  brothers and sisters. They're hungry. They don't have a
17  house over their head. And they go -- got an old gun in
18  their pocket, and they say, you know what, this is the
19  last time my brothers and sisters are going to be hungry.
20  They go buy -- or they go rob a loaf of bread and a jar of
21  peanut butter, show the clerk a gun. Well, that's an
22  aggravated robbery under our law.
23        A. Yes.
24        Q. Somebody goes into a bank, very callously says "I
25  got this gun, you know what I'll do with it. Give me all

**23**

1  the money." Okay. Two different examples of aggravated
2  robbery?
3        A. Right.
4        Q. Same penalty range. And that is to let our
5  jurors let the punishment fit the crime.
6        A. Right.
7        Q. Can you consider as little as 5 years for the
8  offense of aggravated robbery and let the punishment fit
9  the crime?
10        A. Yes.
11        Q. Can you consider as much as a life sentence for
12  the offense of aggravated robbery?
13        A. Yes.
14        Q. And let the punishment fit the crime. Now, you
15  asked me, what's the difference between murder and capital
16  murder. I'm going to let you look at that.
17        A. Okay.
18        Q. Okay. It's not just murder. It's not just
19  intentional taking of a life. It is murder plus something
20  else.
21        A. Yes.
22        Q. The law we're going to talk about in this case is
23  murder in the course of someone trying to rob someone else
24  or trying to burglarize. Doesn't mean they have to be
25  successful. I come up to someone, I decide being a public

**24**

1  servant doesn't pay, I pull out my gun. I know they're
2  wealthy. I say, "Give me all your money." The police
3  drive up. I don't get their money. I know at least not
4  to leave witnesses. I shoot them dead. What offense have
5  I committed?
6      A. Capital murder.
7      Q. Absolutely. You see the distinction?
8      A. Yeah.
9      Q. It's murder plus something else, the attempted
10  commission of something else. Okay. Now, the indictment
11  sets out what I have to prove -- what I have to prove to your
12  satisfaction, Mr. Buckner, beyond a reasonable doubt is
13  entitled to a verdict of guilty. I have to prove it's the
14  Defendant. I've got to prove it's Mr. Soliz, this man
15  down here at the other end of the table. I have to prove
16  that it happened on or about a certain day. Okay. I
17  don't have to be exact because you don't get a pass on a
18  crime just because we don't know the exact day it occurs.
19  You can see how that works. I have to prove it's in
20  Johnson County. If I prove everything but I prove it's in
21  Tarrant County or I just miss Johnson County, you know
22  what your verdict has to be? Has to be not guilty.
23      A. Okay.
24      Q. Okay. Is that a law you can follow?
25      A. Yes.

**25**

1      Q. You might be mad. You might say, "You know, Dale
2  Hanna, I'm going to talk to you about this. You've got a
3  Prosecutor who's sloppy. She didn't do her job." I have
4  to prove it's intentional. Can't be an accident. I have
5  to prove he caused the death of someone else, and that it
6  was done -- when it says by manner and means, I have to
7  show it happened a particular way.
8      A. Okay.
9      Q. If I, on the indictment, say it happened with a
10  knife, and my evidence is it happened with a rock or a gun
11  or a baseball bat, it's different, my proof is different
12  from what I said in the indictment --
13      A. Okay.
14      Q. -- the law says you would have to find somebody
15  not guilty. Because when I charge somebody with capital
16  murder, I by God better know what my proof is. All
17  right. Some people say, "You know what, if that's -- I
18  understand that's the law, Christy. I can't follow that
19  law, doesn't matter." Some people say, "As difficult as
20  it will be, I will do it. I understand the law and I
21  understand my oath as a juror."
22      A. Okay.
23      Q. Okay. If my -- if I miss the manner and means, I
24  get it wrong, are you the type of Juror that has the
25  discipline to say that Defendant is not guilty under the

**26**

1  indictment?
2      A. Yes.
3      Q. Okay. You see how that works?
4      A. Yes.
5      Q. All right. And I have to prove that it happened
6  in the midst of an attempted robbery or burglary. Okay?
7      A. Okay.
8      Q. Now, I'll tell you this real quick. I don't have
9  to get the property. Okay. On a burglary, a burglary can
10  include something like an attached garage. All right.
11  Let's say, for instance, I'm going into someone's garage
12  because I know they got a deep freeze in there and there's
13  food in there for my brother and sister. Homeowner comes
14  out. All right. I panic and I shoot them, but I sanely
15  do it, I intentionally do it, and I'm trying to steal from
16  their deep freeze in the garage.
17      A. Right.
18      Q. What offense have I committed?
19      A. Capital murder.
20      Q. See how that works?
21      A. Right.
22      Q. All right. Now, when we talk about
23  intentionally, we mean they have to do it on purpose.
24  Okay. Doesn't mean premeditation. I don't have to
25  prove --

**27**

1      A. Right.
2      Q. -- someone thought about it. As quickly as you
3  and I can form a thought, if someone were to form the
4  thought to kill, that's all the law requires.
5      A. Okay.
6      Q. All right. Now, when we talk about capital
7  murder, I lay out these elements here. There's a couple
8  ways somebody can be guilty of capital murder. I can act
9  alone.
10      A. Okay.
11      Q. All right. I can have a partner.
12      A. Okay.
13      Q. And my partner is in it for the whole thing.
14      A. Right.
15      Q. Or I can simply have a helper. All right. And
16  the law gives, you know, like everything else, the law is
17  going to give complicated names to something. All right.
18  And the law says if someone is a partner or a helper,
19  they're my party. They're a party to what I do.
20      A. Okay.
21      Q. And as a Juror, you may be trying -- you may be
22  listening to evidence of someone's guilt as the trigger
23  man.
24      A. Okay.
25      Q. You might be listening to evidence where we're

28

1  trying the partner.

2  A.  Okay.

3  Q.  You might be listening to evidence where we're

4  simply trying a helper.

5  A.  Okay.

6  Q.  Does that make sense?

7  A.  Yes.

8  Q.  You don't know which one of those you're trying

9  until you actually get to sit on the Jury.

10  A.  Right.

11  Q.  So you may be called upon to make a decision,

12  number one, is that person guilty of capital murder, and

13  number two, does that person deserve the death penalty.

14  A.  Okay.

15  Q.  Okay.  Do you think that someone who is a partner

16  or simply a helper should be eligible for the death

17  penalty?

18  A.  Yes.

19  Q.  All right.  So does the law.  When we talk about

20  parties to a crime, you have to help someone be a partner

21  with the intent that they're helping them commit a crime.

22  Ever watch Ocean's Eleven?

23  A.  No.

24  Q.  Okay.  Striking out on that example.  Have you

25  seen a show where two or more people are involved in

29

1  committing a crime?

2  A.  Sure.

3  Q.  What comes to mind?  Anything come to mind?

4  A.  Not particularly, but I have seen.

5  Q.  You don't have to be present to be a party to a

6  crime.  Let's say that Martin and I decide being public

7  servants for 20 years doesn't pay, doesn't pay enough

8  after 20 years.

9  A.  Sorry.

10  Q.  Well, that's life.  And Martin and I say, you

11  know what, we're gonna go hit a lick, which is slang for

12  commit a robbery.  All right.  I'm gonna go hit a lick.

13  You in?  All right.  And Martin says, "Well, I can't go

14  but use my car", tosses me the keys to my car.  All

15  right.  The law says at a minimum, he knows I'm going to

16  commit a crime.  All right.  He tosses me the keys to

17  his car.  What has he done, under that bottom part?

18  A.  He solicits or encourages or directs or aids or

19  attempts to aid.

20  Q.  He probably encouraged me.  Some people can say

21  he's encouraged me.  He's aided me.  And he's certainly

22  more than attempted to aid me.  So if you help me or you

23  try to help me, okay, the law says he stands in my shoes

24  in terms of guilt.  Okay.  And you never know whether

25  you're trying me or whether you're trying my lazy partner

30

1  who tosses me the keys.

2  A.  Okay.

3  Q.  Okay.  See how that works?  Now, now, let's say

4  that -- and there's a whole lot of words up there that

5  discusses an agreement to commit a crime.  Let's say --

6  I'll let you read that for a second.

7  (Pause in proceeding.)

8  A.  I didn't know that.

9  Q.  No one would.  No one would.  Normal people don't

10  know that.  I'm not sure what that says about me, but I do

11  know that.

12  A.  So are you -- are you saying if he loaned you the

13  keys thinking that you were going to go --

14  Q.  Cash a check?

15  A.  -- park in somebody's garage and steal some meat

16  out of their freezer and you actually kill somebody, he

17  would be a party to the murder?

18  Q.  Yes.  Now, if -- here's the key part, "if".  You

19  see that bottom part down there?  If killing the

20  homeowner, if you as a juror believe that killing the

21  homeowner was a furtherance of that unlawful purpose, so

22  in other words, was it in the furtherance of my trying to

23  rob the meat out of the deep freezer.

24  A.  Yes.

25  Q.  Okay.  And was one that should have been

31

1  anticipated.  Okay.  Now, I can get into a million fact

2  scenarios, but it comes down to this.  If Martin should

3  have known that I carry a gun, I don't go anywhere without

4  a gun, to see Christy is to see Christy with a gun.

5  Okay.  Well, a Juror might say, you know what, when a gun

6  comes to a crime, it's likely it's going to be used, or it

7  should, they should have anticipated --

8  A.  Right.

9  Q.  -- I may use the gun.  See how that works?  You

10  have children?

11  A.  Yes.

12  Q.  Okay.  How old are your children?

13  A.  40.

14  Q.  Okay.  I'm glad you didn't say they're older,

15  but, okay.  Did you ever tell your kids when they were

16  growing up, they got themselves in a bad situation, over

17  their head -- do you have daughters or son?

18  A.  Daughter.

19  Q.  Daughter.  Okay.  Did your daughter ever find

20  herself in a situation she had no business being in and

21  really didn't think of when she got in that situation?

22  A.  No, not really.  Pretty good daughter.

23  Q.  Well, that doesn't mean she's a bad daughter.

24  A.  That's right, yeah.

25  Q.  And, in fact, normally the good ones that get

32

1  themselves in this situation. The bad ones know exactly
2  what they're walking into.
3      A. She makes pretty good decisions.
4      Q. Did you ever tell her though at any point, you
5  should have known better? Did you ever tell employees
6  that?
7      A. Oh, absolutely.
8      Q. Okay. Same kind of thing. You should have known
9  better. When they go "I didn't know this was going to
10 happen", and you say, "You should have known better."
11     A. Right.
12     Q. You should have known this could happen. That's
13 what the law says. All right. And the question is, if
14 Martin should have anticipated, not that he actually did
15 anticipate, just that he should have anticipated I pulled
16 the gun, I could pull the gun, then the law says he's
17 going to be guilty of the felony that's actually
18 committed, which in that case would be capital murder.
19 See how that works?
20     A. I see.
21     Q. Okay. Now, depending on the facts, do you think
22 that someone who is involved in the conspiracy should be
23 eligible for the death penalty?
24     A. That's a tough question. It depends on the
25 circumstances.

33

1      Q. And that's all that's asked of a juror. There
2  are going to be some facts, a juror says, you know what,
3  he should have anticipated that. And the law -- you're
4  exactly right. We're going to get to another question in
5  Punishment and you're going to be asked to re-evaluate
6  this whole issue, because it's enough to be guilty of
7  capital murder if you should have anticipated. Marty
8  should have known better.
9          To get the death penalty -- I'm going to jump
10 ahead for just a second --
11     A. Okay.
12     Q. -- because it seems like a good point. These are
13 the three questions in Punishment. Okay. See this second
14 question? See the difference?
15     A. Uh-huh.
16     Q. It's actually anticipated. In other words, it's
17 not enough that they should have known better. The
18 difference is they did know better.
19     A. Yeah.
20     Q. See how that works? You say you have a child,
21 they've done something wrong, not your daughter, but
22 they've done something wrong. The first time you punish
23 them, you say, "You should have known better". Second
24 time, you say, "You know what, you did know better".
25     A. Right.

34

1      Q. See how that works? Should have known better is
2  enough to be guilty of capital murder. Did know better is
3  what you must find as a juror to give someone the death
4  penalty. See the difference?
5      A. Yes.
6      Q. So the law absolutely agrees with you. That
7  isn't enough to get the death penalty. Okay.
8      A. Okay.
9      Q. Now, so here it is boiled down. You have an
10 agreement to commit a robbery or burglary. Do you think
11 the criminals sit there and sign contracts? "Are you
12 going to be involved in this? Let's talk about your --
13 let's divide up the roles." Or do you think they go, "You
14 in?"
15     A. Right.
16     Q. Okay. So it can be verbal. It can just simply
17 be someone's conduct. If I say, "You in for the lick?"
18 and they hop in my car, would you agree with me that's an
19 agreement?
20     A. Yes.
21     Q. All right. A murder is committed and it's
22 committed in furtherance of the unlawful purpose and
23 should have been anticipated. Okay. In that case, really
24 talking about the helper.
25     A. Right.

35

1      Q. Okay. Let's say that Martin goes with me.
2  Change it up just a little bit. Martin goes with me.
3  He's my driver. He looks at me and he says, "Don't leave
4  any witnesses." Okay?
5      A. Okay.
6      Q. But I'm the trigger man.
7      A. Right.
8      Q. Do you see how Martin, my partner in that one?
9      A. Yeah.
10     Q. Okay. He didn't pull the trigger, but he didn't
11 want any witnesses left.
12     A. Right.
13     Q. So it just kind of depends on what the facts
14 are.
15     A. Yes.
16     Q. All right. Now, what's not required, I think you
17 understand this. You understand that in real life we're
18 not going to have, necessarily have evidence of this.
19     A. Right.
20     Q. Okay. You've got a murder in a park with a
21 through-and-through shot, what DNA is there going to be?
22     A. Right.
23     Q. Do you think somebody's going to leave the gun
24 there for the police to help them solve the crime?
25     A. No.

**36**

1  Q. Do you think crimes always occur with
2  eyewitnesses?
3  A. No.
4  Q. Do you think they ever occur with eyewitnesses?
5  A. Yes.
6  Q. Okay. And that's true. But do you see how in
7  real life this isn't CSI?
8  A. Oh, yeah.
9  Q. Do you ever watch CSI?
10  A. Yeah, sometimes.
11  Q. I don't because it's kind of the vein of my
12  existence. I wish I had that kind of evidence. I wish I
13  could solve a murder by a fragrance molecule --
14  A. -- actually used it.
15  Q. -- yes, yes, it does. And they have a much
16  better wardrobe. But when we talk about witnesses, let's
17  say, for instance, I'm going to try -- or Martin and I get
18  caught. Okay.
19  A. Okay.
20  Q. Who is going to know the most about the crime?
21  A. Both of y'all.
22  Q. Us, right?
23  A. Right.
24  Q. All right. So is Martin -- the law would call
25  Martin my accomplice. Now, let me give you another

**37**

1  example, throw something in there. Let's say we have our
2  wing man in the car. He doesn't participate in the
3  robbery. He's just there.
4  A. Okay.
5  Q. Is he guilty of capital murder?
6  A. Appears under the law he is.
7  Q. Well, think about it this way. Did he help in
8  any way?
9  A. Yes.
10  Q. How did he help?
11  A. He was in the car driving.
12  Q. No. We put him -- a third person in the car. I
13  put another person in the car. They don't do anything.
14  They're just there. Because the law says mere presence
15  alone does not make you guilty.
16  A. Okay.
17  Q. Okay. And sadly enough, sadly enough, the law is
18  not where if you know a crime is occurring you have some
19  kind of duty to stop it. Okay?
20  A. Okay.
21  Q. All right. So mere presence alone is not going
22  to make you guilty. You have to do, like, encourage or
23  aid or solicit or attempt to aid, you know, one of those
24  ways.
25  A. Okay.

**38**

1  Q. As a partner or as a helper. Okay. So we might
2  have the individual in the car, the criminal in the car,
3  the third guy in the car. Okay. He might be a witness.
4  He might get some kind of plea offer in exchange for his
5  testimony. All right? Do you like the fact that
6  witnesses sometimes get plea offers to testify, they get
7  some kind of leniency to testify?
8  A. It doesn't bother me.
9  Q. I don't really like it. I wish I didn't have to
10  do it, but sometimes you can see it's a necessary
11  business?
12  A. Sure.
13  Q. Now, if I cut a deal with the driver, for
14  instance, in the case, the law is going to say if he's the
15  driver and helping me commit that crime, he's what's
16  called an accomplice. The law says there has to be some
17  evidence outside of his testimony that tends to connect
18  the person I'm trying with the crime.
19  A. Okay.
20  Q. And isn't that really fair?
21  A. True.
22  Q. Because if I was just going to go on my driver's
23  word --
24  A. Right.
25  Q. -- anybody could get up there and say, "Oh, I

**39**

1  wasn't the trigger man."
2  A. Yes.
3  Q. Okay?
4  A. True.
5  Q. If you don't have any other evidence that tends
6  to connect the Defendant to the crime, you have to find
7  him not guilty.
8  A. Okay.
9  Q. You see how that works?
10  A. Yes.
11  Q. If you don't have any other evidence that tends
12  to connect him to the crime, then you look at the rest of
13  the case.
14  A. Okay.
15  Q. Okay. You look at the rest of the case because
16  there may be other evidence.
17  A. Okay.
18  Q. Compartmentalize that accomplice's testimony and
19  look at the rest of the case.
20  A. Right.
21  Q. See how that works?
22  A. Yes.
23  Q. Now, if I bring the bad guy in the back seat who
24  didn't stop the crime --
25  A. Right.

40

1    Q. -- they don't have to be corroborated.
2    A. Okay.
3    Q. Okay. Because they're not an accomplice. The
4  law doesn't look at them the same. Does that make sense?
5    A. Yes, makes sense.
6    Q. I know I'm giving you a crash course in the law.
7  Okay. Police officers. Lots of types of witnesses
8  testify, police officers in particular when a crime
9  occurs. The thing about police officers is you're not
10 entitled to give them automatic credibility just because
11 they're a police officer.
12   A. Okay.
13   Q. They're just like everyone else.
14   A. All right.
15   Q. You've got to listen to their testimony and
16 decide, do I think it's believable, do I find them
17 credible. Now, you can take into account they have
18 experience that you and I don't necessarily have.
19   A. Right.
20   Q. But you can't sit there and say because they wear
21 a uniform, because they have a gun, they have a leg up or
22 a head start in credibility.
23   A. Right.
24   Q. Okay. See how that works?
25   A. Yeah.

41

1    Q. Will you look at police officers like you look at
2  everybody else?
3    A. Yes.
4    Q. Now, statements, many times a defendant will give
5  a statement. Many times a defendant will give a
6  statement. Sometimes they tell the truth, sometimes they
7  don't. But either way, there are rules that have to be
8  followed.
9    A. Okay.
10   Q. The police have to follow the rules. They have
11 to give them Miranda Warnings; you have the right to
12 remain silent, that line.
13   A. Right.
14   Q. Constitutional rights.
15   A. Yes.
16   Q. Doesn't mean it has to be a pleasant
17 environment. The police officers don't have to give them
18 a cheeseburger and fries.
19   A. Right.
20   Q. They don't have to sit there and give them an
21 engraved invitation to participate in a homicide
22 interview. But there are minimum rules the police have to
23 follow. If you don't think those rules are followed, you
24 have to compartmentalize that statement and look at the
25 rest of the case --

42

1    A. Okay.
2    Q. -- if you even have a doubt about whether their
3  statement was taken in conjunction with or in accordance
4  with the rules.
5    A. Okay.
6    Q. Does that make sense?
7    A. Yes.
8    Q. If there's other evidence proving his guilt,
9  that's fine. If there's not other evidence proving his
10 guilt, what do you think the law tells you you have to do?
11   A. Find them not guilty.
12   Q. Absolutely. Can you do that?
13   A. Yes.
14   Q. All right. Now, when we talk about trial, we're
15 really talking about two potential times, kind of like two
16 mini trials. All right?
17   A. Okay.
18   Q. First part is Guilt/Innocence.
19   A. Okay.
20   Q. Okay. At the end of that phase, then the end of
21 that part -- like we use a football game. And I don't
22 mean this is a football game; just as an illustration. At
23 halftime, you're given the question, did the State prove
24 his guilt beyond a reasonable doubt to your satisfaction,
25 Mr. Buckner.

43

1    A. Okay.
2    Q. Okay. If I have, if you are convinced of that,
3  then you return a verdict of guilty.
4    A. Okay.
5    Q. You come back out in the courtroom as a practical
6  matter to potentially hear more evidence.
7    A. Okay.
8    Q. But you may not hear more evidence. Okay. You
9  may hear good things about a defendant. You may hear,
10 as an example, he cured cancer. You might hear he was a
11 decorated war veteran, that he saved his battalion. You
12 can hear any kind of evidence that a juror might think
13 is relevant to decide whether or not someone lives or
14 dies.
15   A. Okay.
16   Q. Okay. You might hear, for instance, about an
17 existence of a criminal record. It just -- I could give
18 you mounds of different types of evidence you might
19 hear.
20   A. Right.
21   Q. You might hear about an individual's background.
22 Okay. And then at the end of the Punishment Phase, if you
23 found him guilty of capital murder, you get the three
24 questions.
25   A. Okay.

44

1   Q. All right. So you kind of understand
2 Guilt/Innocence is --
3   A. Yes.
4   Q. -- one phase? Punishment is the end of the --
5 the end of the game, if you look at it that way. You've
6 seen how football games, obviously who is winning at
7 halftime isn't always the same person. It may not look
8 like the same team at the end of the game.
9         All right. How does the Jury decide? These
10 are really long questions. They don't look really long
11 because I boiled them down here. Okay.
12   A. Okay.
13   Q. You don't write in the life or death, obviously.
14   A. Pardon?
15   Q. You don't write in life or death.
16   A. You don't write in?
17   Q. There's not a blank --
18   A. Oh, okay, yeah, yeah.
19   Q. -- you just fill in the blank. I didn't say that
20 very well. Okay. These questions are answered yes or
21 no. All right?
22   A. Okay.
23   Q. And it's the way that you answer these questions
24 that determines whether or not someone gets a life
25 sentence without parole or the death penalty.

45

1   A. Okay.
2   Q. All right. First two questions -- and you're
3 going to get a handout. You don't have to memorize this.
4 Okay. I know you're probably going, "Thank God". First
5 two questions, I have a responsibility to prove to you
6 what the answer should be.
7   A. Okay.
8   Q. All right. The last question, I don't have a
9 responsibility. Who is the only table that ever has a
10 responsibility in this trial? My table. Mine.
11   A. Yeah.
12   Q. So let's look at these questions. No. 1, in
13 other words, are you convinced beyond a reasonable doubt
14 that the Defendant -- that there's a probability that the
15 Defendant would commit criminal acts of violence that
16 would constitute a continuing threat to society.
17   A. Right.
18   Q. You would agree with me that society, when we
19 talk about society, we're talking about wherever the
20 Defendant finds himself?
21   A. Correct.
22   Q. Because obviously at this juncture, you know at a
23 minimum he's going to be in prison for the rest of his
24 life.
25   A. Uh-huh.

46

1   Q. See how that works?
2   A. Yes.
3   Q. So where would society be that you're looking at?
4   A. I would guess in the prison.
5   Q. Absolutely. Do you think guards are entitled to
6 be safe?
7   A. Yes.
8   Q. Do you think that other inmates are entitled to
9 be safe? Do you think everybody that goes to prison is
10 the same level of violence?
11   A. No.
12   Q. And there's some individuals that think, "Well,
13 you know what, you shouldn't commit a felony because
14 then you go to prison and you get what you get." You
15 know, somebody that commits a credit card abuse or
16 someone that steals habitually to support their family --
17   A. Right.
18   Q. -- you know, they may not be violent, certainly
19 not as violent as a capital murderer.
20   A. Right.
21   Q. Okay?
22   A. Okay.
23   Q. I can give you some other examples. Let's say
24 when Martin and I go rob the bank, we go rob the bank, I
25 come running out and I am met with a hail of gunfire.

47

1   A. Okay.
2   Q. All right. I may not be the same person I was
3 after that moment.
4   A. Probably wouldn't be.
5   Q. Okay. I may not be a future threat to society
6 after having committed that capital murder. I may be
7 every bit of dangerous as I ever was. Okay. I'll take
8 the example of someone who molests a child and the mother
9 goes and kills the individual responsible. They walk in
10 someone's house to kill them. You know the example that I
11 gave. They walk in their house and they're going in to
12 assault them because they're going in to kill them, know
13 exactly what they're doing. That's actually capital
14 murder. Okay. For some jurors, they may say I don't
15 believe that person would be a future threat.
16   A. Right.
17   Q. Because barring that exact same set of
18 circumstances ever occurring again. Two people killed in
19 the same criminal episode is a capital murder. My husband
20 cheats on me. I don't take kindly to cheating. I go in
21 calmly, I wait till they're rendezvousing, and I kill them
22 both. Okay. That's a capital murder. I could go on and
23 give you 50 other examples, but the point is, you can see
24 how there are different sets of facts?
25   A. Right.

48

1  Q. And depending on what those facts are and
2  depending on what you hear in punishment --
3  A. Uh-huh.
4  Q. -- the answer may be yes or the answer may be no.
5  A. Right.
6  Q. Okay. What is most important is that you look at
7  this question and each of the questions that follow with a
8  new eye.
9  A. Okay.
10  Q. Because there may be evidence -- you can't say
11  just because I found someone guilty of capital murder,
12  they're always going to be a future danger.
13  A. Right.
14  Q. You see how it depends on what the facts of the
15  capital murder are?
16  A. Yes.
17  Q. And what evidence you may hear at punishment?
18  A. Right.
19  Q. From whatever source. Okay. You have a nephew
20  and uncle, and the nephew -- the uncle got him drunk, got
21  him high, enlisted his help. The uncle is a career
22  criminal.
23  A. Okay.
24  Q. Okay. But you may not hear about the fact that
25  he's high or drunk until Punishment.

49

1  A. Right.
2  Q. And you might think, "You know what, what they
3  did was bad. He shouldn't have been a getaway driver for
4  his uncle robbing that bank, but a life sentence without
5  parole is enough." And I'm not telling you. I'm just
6  kind of giving you some examples to illustrate.
7  A. Sure.
8  Q. All right. So do you see how you're asked this
9  question, you could have the trigger man, you could have
10  the partner, and for all of it, or you could simply have
11  the helper that was in for the robbery but not the capital
12  murder?
13  A. Right.
14  Q. See how that works? See how you can answer it
15  yes or no depending on the facts?
16  A. Yes.
17  Q. That Special Issue No. 2, we talked about. Once
18  again, are you convinced beyond a reasonable doubt one of
19  those three things: Did he actually cause the death? Do
20  I have the trigger man? That's easy. All right. Did he
21  actually cause the death? If he didn't actually cause the
22  death, he meant to kill the deceased. Could be the driver
23  in the car that said don't leave any witnesses.
24  A. Yeah.
25  Q. Okay. I don't have to be the one pulling the

50

1  trigger to mean for someone to die.
2  A. Right.
3  Q. Or did he actually anticipate that a human life
4  would be taken.
5  A. Okay.
6  Q. Now, you might think, "Well, I found him guilty
7  of capital murder, yes." But do you see how it just
8  depends on when you're answering this question at this
9  point?
10  A. Yes.
11  Q. How it could be "yes" or it could be "no"? You
12  have the nephew high and drunk. You think, "You know
13  what, he should have known better. But I get here to
14  Punishment, I don't think he did know better."
15  A. Yeah.
16  Q. I don't think he knew a life was going to be
17  taken. See how that works?
18  A. I see.
19  Q. So would you agree, would you promise the Court
20  that just because you found someone guilty of capital
21  murder -- I mean, obviously you found them guilty or you
22  wouldn't be right here -- that you're not automatically
23  going to answer this question "yes"?
24  A. Right.
25  Q. Do you see how it just depends on whatever the

51

1  facts are and the evidence is at this point in time?
2  A. Yes, I understand.
3  Q. Have you ever sat there and said to somebody,
4  "I'm going to sleep on it"?
5  A. Yeah.
6  Q. You have a decision to make, when you wake up the
7  next morning, you think, "You know what, I'm gonna make a
8  different decision."
9  A. Yes.
10  Q. There's a reason that there is time that
11  separates our decision process.
12  A. Right.
13  Q. Because once we have had an opportunity to
14  reflect, sometimes we have a different answer.
15  A. Yes.
16  Q. See how that works?
17  A. Yeah.
18  Q. All right. But once again, I have a job to prove
19  to you what this question should be.
20  A. I understand.
21  Q. I've got something else to prove. I've got to
22  prove that and prove that first question. Then we get to
23  the third issue. You'll see it's very different. I'm
24  going to let you read that for a second.
25  (Pause in proceeding.)

52

1    A. Okay.

2    Q. What does that question mean to you?

3    A. It means that, just like it says, character, his
4 background may have influenced what he did, and I guess
5 we take that into consideration when we do the sentencing.

6    Q. Absolutely. And most importantly, you consider
7 all the evidence.

8    A. Right.

9    Q. And it's up to you as a Juror what weight you
10 give it, what significance you give it.

11    A. Right.

12    Q. For instance, somebody is high when they commit a
13 crime. One juror may say, "I think that's mitigating. I
14 think that reduces his moral blameworthiness, how much
15 we're going to blame him morally, because I don't think he
16 would have done it had he not been high." Another juror
17 says, "I think it's aggravating. That's why we have laws
18 against drugs, and he voluntarily took the drug, so I
19 don't consider it mitigating." It's really the collective
20 wisdom of the Jury. Don't you think that's the way it
21 should be?

22    A. Yes.

23    Q. I want to point out something to you. Do you see
24 what the very first thing is to consider?

25    A. All the evidence.

53

1    Q. All the evidence. But then they list out what
2 the evidence is that you're to consider. What's the very
3 first thing that's listed right under all the evidence?

4    A. Circumstances of offense.

5    Q. Absolutely. Because you take into consideration,
6 you balance what he did.

7    A. Right.

8    Q. Against whatever mitigating circumstances there
9 are. Do you see that this question is not asking you are
10 there mitigating circumstances?

11    A. Right.

12    Q. Because the key word right in front of that is
13 what?

14    A. Sufficient.

15    Q. Enough.

16    A. Enough, yeah.

17    Q. On balance. The worse crime, perhaps to a
18 juror, the bigger there ought to be mitigating
19 circumstances.

20    A. Right.

21    Q. It's up to you. Okay. Do you understand it's
22 not asking are there any, do they exist; it is are they
23 enough?

24    A. Yes.

25    Q. To warrant that a life sentence rather than the

54

1 death penalty be imposed, a life sentence without parole.

2    A. Right.

3    Q. Okay. And you have to consider all these things,
4 character, background, moral culpability.

5    A. Right.

6    Q. Do you see how that works?

7    A. Yes.

8    Q. It's a very subjective question.

9    A. Yes.

10    Q. Can you do that?

11    A. Yes.

12    Q. Can you make a balancing or an evaluation?

13    A. Yes.

14    Q. Okay. I skipped over something. That first
15 question, the very first question in Punishment asked you
16 whether there's a probability.

17    A. Okay.

18    Q. It's not a certainty. It's certainly not a
19 possibility. I have to prove it's more likely than not.

20    A. Right.

21    Q. Okay. You see the difference? I can't ever tell
22 you exactly what someone is going to do.

23    A. Sure.

24    Q. You take the past and try to extrapolate into the
25 future.

55

1    A. Right.

2    Q. Can you do that?

3    A. Yes.

4    Q. Do you see how the way these questions are set
5 up, someone may get a life sentence and someone may get a
6 death sentence depending on the facts?

7    A. Sure.

8    Q. And I ask this question, I'm about to ask you,
9 not to be morbid, not because I take any pleasure out of
10 it. I ask it because I want you to be fair to yourself.
11 If I prove what I need to prove, can you vote in such a
12 way that Mr. Soliz dies?

13    A. Yes.

14    Q. Okay. You see what I'm asking of you?

15    A. Yes.

16    Q. If I prove what I need to prove on Question 1 and
17 Question No. 2, but in looking at the evidence, you're
18 convinced there is a sufficient mitigating circumstance,
19 can you give him a life sentence?

20    A. Yes.

21    Q. Do you see how that works?

22    A. Yes.

23    Q. Do you have any questions for me?

24    A. No.

25    Q. Have I explained everything to your satisfaction?

STATE VS. MARK ANTHONY SOLIZ   JANUARY 31, 2012

56

1    A.  Yes, you have.

2         MS. JACK:  I appreciate very much your

3    attention and your time.  Thank you very much.

4         I'll tender the Venireman to the Court.

5         THE COURT:  I'll recognize the Defense.

6         MR. HEISKELL:  Thank you, Judge.

7         VOIR DIRE EXAMINATION

8    BY MR. HEISKELL:

9    Q.  Morning, Mr. Buckner.  How are you?

10   A.  Doing great.  How are you?

11   Q.  I'm fine.  Thank you.  My name is Mike Heiskell.

12   Alongside Greg Westfall, we represent Mark Soliz.  I'm

13   going to talk to you, ask you some questions, and quite

14   frankly tread over some of the same ground Ms. Jack went

15   over, but from a different perspective obviously.

16   A.  Yes.

17   Q.  At this point do you have any questions swirling

18   around in your mind about the ability to serve in a case

19   of this nature?

20   A.  No, not really.

21   Q.  You had checked on there that you didn't want to

22   serve.  That's why I asked that.

23   A.  Well, that's only because of my job situation

24   because of this new project I'm going on.  I didn't know

25   what the time frame was for the trial, so there was -- it

57

1    was a difficult time in my life.

2    Q.  Sure.  And will you be moving, transferring to

3    Phoenix?

4    A.  No, no.  I'm going out there -- we're going out

5    there for some orientation, what all this involves.  And

6    immediately after that, the next week we go in full, full

7    speed ahead mode.

8    Q.  Full speed ahead at some other location?

9    A.  Well, I'll still be here.

10   Q.  You'll be here.  Okay.  All right.  Maybe I

11   misunderstood that.  You had the chance before you walked

12   in to look at the list of witnesses that may be called in

13   this case.  Did you have a chance to do that?

14   A.  Yes, sir, I did.

15   Q.  Did you recognize any names?

16   A.  No, I didn't.  Well, when you say did I recognize

17   some of the last names, I'm familiar with some of the last

18   names but I don't know that's the person I know because it

19   just didn't have the first name.

20   Q.  Sure.  Were they police officers or -- or --

21   A.  Oh, I don't know.  I just recognized some of the

22   names, some of the last names, somebody I could possibly

23   have known sometime in the past, but...

24   Q.  And the reason I ask that is because you've lived

25   in Johnson County --

58

1    A.  I've lived here --

2    Q.  -- 51 years?

3    A.  -- all my life just about.

4    Q.  Well, you did indicate that you know Dale Hanna,

5    the D.A.

6    A.  That's correct.

7    Q.  And how long have you known Mr. Hanna?  He's

8    right over here.

9    A.  Since I was a kid.  He lived down the street from

10   me.

11   Q.  Really.  So most of your life, is that a fair

12   statement, that you've known Dale?

13   A.  Yeah.  We weren't friends or anything like that.

14   I just knew of him.  He had a '57 Chevrolet that everybody

15   admired.

16   Q.  Oh, okay.

17   A.  He was a little bit older, so we didn't have any

18   interactions as kids, but everybody knew he lived down the

19   street and drove nice cars.

20   Q.  All right.  Okay.

21        MR. HANNA:  Watch what you say.

22   Q.  All right.  Let me ask you about that,

23   Mr. Buckner, because what I need to know, obviously you've

24   known him for a number of years and known he's been a D.A.

25   here in Johnson County as well as Somervell County for a

59

1    number of years as well.  I take it that you know and

2    respect Mr. Hanna because of who he is and what he does;

3    is that correct?

4    A.  That's right.

5    Q.  And you obviously know as well that he, along

6    with the three other Prosecutors at this table, are

7    seeking a conviction of capital murder --

8    A.  Right.

9    Q.  -- in this case.  And if that happens, then, of

10   course, seeking the death penalty against Mark Soliz, our

11   client.  Okay?

12   A.  Okay.

13   Q.  Knowing how you feel about Mr. Hanna, your

14   knowledge of him over the years and your respect for him

15   as you've indicated that you have for him, do you think

16   that if he was asking you to do something along this

17   nature that's very important that you would have a

18   tendency to follow him because of your knowledge of him,

19   your respect of him, your admiration perhaps of him?

20   A.  When you say "follow him"?

21   Q.  Yes, yes.

22   A.  Not anymore than anybody else in position.

23   Q.  Well, you can understand why I ask that question?

24   A.  Yes, absolutely.

25   Q.  You know him and you've known him for years and

60

1  know him to be the D.A. here.
2      A.  That's correct.
3      Q.  If he stakes out a particular position, takes a
4  position, I just need to know how that affects you.  Would
5  you tend to say, "Okay, you know, I've known Mr. Hanna for
6  years.  I respect him and admire him.  I think he knows
7  what's right, the right thing to do in this case, and I'm
8  gonna go along with him"?
9      A.  That wouldn't be -- I wouldn't be biased in that
10 direction because of that.
11     Q.  All right.  You listed a number of things in your
12 life and it's your religious beliefs, spiritual beliefs
13 are underpinned by a number of things that you do in which
14 you contribute your time to these different ministries.
15     A.  Okay.
16     Q.  The Kenneth Copeland Ministry, the Creflo Dollar
17 Ministry and a number of others that you listed in your
18 questionnaire.  And I take it that that takes up a lot of
19 time in donating to those ministries and being an active
20 part of the development of those ministries; is that
21 correct?
22     A.  It doesn't take up a lot of my time, no.  Some of
23 it.
24     Q.  Some of it.  Okay.  And has that been a -- I
25 guess a field of yours to be that interested in the

61

1  ministry and how these gentlemen conduct their ministerial
2  affairs?  Has that been something that's long standing
3  with you or just over the last couple years or so?
4      A.  Probably for at least 25, 30 years.
5      Q.  All right.  And so this is something that's kind
6  of been a rock solid belief of yours that you follow; is
7  that right?
8      A.  Sure, that's correct.
9      Q.  All right.  That prior case that you served on
10 with the cruelty to animals --
11     A.  Yes.
12     Q.  -- accusation, was that here in Johnson County?
13     A.  Yes, it was.
14     Q.  And was that in -- how long ago was that, if you
15 recall, Mr. Buckner?
16     A.  I'm guessing it was back in the Seventies maybe.
17     Q.  Oh, long time ago?
18     A.  Long time ago.
19     Q.  And you didn't necessarily like the way the case
20 turned out, from what I read in this questionnaire?
21     A.  That's correct.
22     Q.  Because of -- I think you said your hand was kind
23 of forced, you along with other jurors, to find this
24 person guilty?
25     A.  Right.

62

1      Q.  When you really wanted to do something else.  Is
2  that a fair statement?
3      A.  That's correct.
4      Q.  Have you ever been called to serve on Grand Jury
5  here in Johnson County?
6      A.  No.
7      Q.  You indicated, sir, you visited a person in jail,
8  a friend of yours who was in jail.  How long ago was that?
9      A.  That was probably October.
10     Q.  Of last year?
11     A.  Yes.
12     Q.  Okay.  And was that here in Johnson County --
13     A.  That's correct, yes.
14     Q.  -- or some other place?  And this person, what
15 was he accused of?
16     A.  I'm not sure what the exact charge was.  It was a
17 domestic dispute between him and his wife.
18     Q.  Okay.  And what was that experience like,
19 visiting him in the jail here?
20     A.  Well, I didn't get to actually visit him.  I went
21 out there to visit him, but apparently you have to be on a
22 list he puts together, and I wasn't on -- he didn't know
23 anything about a list and I didn't know anything about a
24 list, so I never got to actually see him.
25     Q.  All right.  Okay.  And what's one other -- oh.

63

1  You've indicated that you've felt strong enough regarding
2  some governmental action that's taken place over the years
3  that you engaged in some letter writing in the past; is
4  that right?
5      A.  That's correct, yes, sir.
6      Q.  And can you tell us about that a bit more?  When
7  was this and what was the nature of the action that you
8  were against?
9      A.  It's been several over the years, mostly
10 financial type situations where the government would
11 enact a law that I didn't agree with or were -- had some
12 potential bills coming up that might financially impact
13 me.
14     Q.  Okay.  All right.  And when was the last occasion
15 that you did so, Mr. Buckner?
16     A.  Oh, gosh, it's probably been at least a year ago
17 or more.
18     Q.  All right.  And when you say a law you didn't
19 agree with, I take it you're the type of person if you
20 disagree with some aspect of the law, that you don't have
21 any problems speaking up and letting people know; is that
22 right?
23     A.  I don't have a problem.
24     Q.  And there are some people who feel that there are
25 laws in the books that are unjust.  And some feel, of

64

1  course, that all the laws in the books are just. And
2  there are some who feel that, "Well, you know, I'm not
3  gonna follow some unjust law just because it's on the
4  books, and I'm gonna, you know, raise my voice and speak
5  out against that law." Are you that type of person?
6     A.  No.  If it's a law, then I'm -- I believe it's my
7  duty to follow it, whether I agree with it or not.
8     Q.  Okay.  And if you disagree with some aspect of
9  the law, that if it's on the books, then you're going to
10 follow it regardless?
11    A.  That's correct, yes.
12    Q.  Okay.  All right.  Now, we're going to talk about
13 some laws here, as I said before, treading over some of
14 the same ground that Prosecutor went over, and I have a
15 PowerPoint too, Mr. Buckner.  And you will take a second
16 oath to render a true verdict based upon the law and the
17 evidence if you are selected as a member of the Jury in
18 this case.  You gave us a first oath a couple weeks or so
19 ago to give true answers, and some of these answers you
20 gave us in this questionnaire, you understood you were
21 sworn to give us the whole truth?
22    A.  Yes.
23    Q.  And you did so and we appreciate that.  And some
24 of the things I'm talking about, we'll talk about has to
25 do -- to go back to your answers on the questionnaire as

65

1  well.  Now, our Constitution's founding fathers, you're
2  familiar with this iconic photo and probably seen it
3  before in history and civics classes.  And it talks about
4  some of these principles of law which is the presumption
5  of innocence.  You think --
6     A.  Right.
7     Q.  -- from what I saw that you have a strong opinion
8  about that?  Do you strongly believe in the presumption of
9  innocence?
10    A.  Yes.
11    Q.  I take it that that situation in the Seventies on
12 that prior jury service had something to do with that, or
13 maybe not?
14    A.  Well, yeah, we presumed her innocent until they
15 did prove her guilty.
16    Q.  All right.  Then there's an indictment in this
17 case, and this is what the indictment charges:  That Mark
18 Soliz, in Johnson County, Texas, on or about June 29th of
19 2010, intentionally -- which is a conscious objective and
20 desire to cause the result.  You saw that in the
21 definition the Prosecutor showed you earlier -- caused the
22 death of Nancy Weatherly by shooting her with a deadly
23 weapon, a firearm.  Okay.  And that last bullet point
24 makes it a capital murder because it occurred in the
25 course of committing or attempting to commit the offense

66

1  of robbery of Nancy Weatherly.
2     A.  Okay.
3     Q.  This comprises a capital murder.  Okay.  That
4  murder plus --
5     A.  Yes.
6     Q.  -- what the Prosecutor correctly told you about a
7  little bit ago.  Now, you will agree with me, would you
8  not, Mr. Buckner, that this type of crime, elements of
9  intentional causing of death in the course of committing a
10 robbery or a burglary, for purposes of our discussion,
11 we're going to stick strictly to robbery is a violent
12 crime?
13    A.  Yes, I would agree.
14    Q.  And, in fact, it being a violent crime that you
15 understand this is the type of crime in our law, of
16 course, where the person can only receive a death sentence
17 or a life without parole sentence?
18    A.  Yes, sir.
19    Q.  And these are elements that the government must
20 shoulder and prove to you.
21    A.  Right.
22    Q.  That intentional conduct is the highest defined
23 mental state in our law.
24    A.  Right.
25    Q.  There are others that come up under it,

67

1  knowledge, knowing mental state, a reckless mental state,
2  and criminal negligence mental state.  And intentional is
3  the highest.  They must prove that beyond a reasonable
4  doubt.  And in doing so, you would also find that that
5  conduct was voluntary; it was not an accident, involuntary
6  act on that person's part.  A person on purpose meant to
7  do it, thought about it, knew it was wrong and did it
8  anyway.
9     A.  Yes.
10    Q.  And you also would eliminate any legal excuse; in
11 other words, that the person was, in fact, sane, he was
12 not insane, because that's a legal excuse under the law
13 that, you know, we have legal excuses and other excuses.
14 A legal excuse, I was insane, didn't know right from
15 wrong, didn't know what I was doing, so forth.  Then we
16 have what's called legal justification, such as self
17 defense.
18    A.  Right.
19    Q.  Or defense of a third person, defense of
20 property, et cetera.  Those elements are out the window,
21 so to speak, the legal justification, legal excuse, the
22 person was sane, intended to do it and did it.
23    A.  Right.
24    Q.  All right.  And that, again, is proof beyond a
25 reasonable doubt and that makes up the capital murder.

68

1  Now, you've indicated in your questionnaire, Mr. Buckner,
2  that you felt that the death penalty was imposed too
3  seldom.  Do you remember that?
4      A.  Yes.
5      Q.  Can you tell us why?
6      A.  Why so seldom used?  I have no idea.
7      Q.  Why you think it's too seldom.
8      A.  Oh, I really don't know.  I know a lot of times I
9  see cases where I thought the death penalty should have
10  been imposed but it wasn't.  A lot of states don't even
11  have the death penalty, so.  But why, I couldn't tell you
12  that, I mean, it's...
13      Q.  Well, that tells me a part of your thought
14  process that at least at the time you were filling this
15  out and you were being as honest as you could, I take it
16  at that point, correct, sir?
17      A.  That's correct.
18      Q.  And for some reason you think that a death
19  sentence or an appropriate case for a death sentence maybe
20  in some instances was not imposed, you felt it should have
21  been imposed, and that's what caused you to check that box
22  to a certain degree?
23      A.  Right.
24      Q.  Any other reasons that you can recall at this
25  point as to why you checked that as too seldom used?

69

1      A.  No, not really.
2      Q.  In addition to that, you checked when it came to
3  your thoughts about the life without parole sentence --
4      A.  Yes.
5      Q.  -- that you indicated it should -- a person
6  should only be paroled in cases where new evidence shows
7  them to be innocent.
8      A.  Right.
9      Q.  And can you expand on that a little bit for me,
10  sir?
11      A.  Well, just my thought process is that if you
12  sentence a person to five years, they should serve five
13  years.
14      Q.  Okay.
15      A.  That's it.
16      Q.  What triggered my question here is with that last
17  phrase, they should only be paroled when they're
18  innocent.  That's how I read that.
19      A.  Well, that's just like -- my opinion is that if
20  they're sentenced for five years for whatever crime they
21  did, unless there's new evidence, they should serve the
22  full five years.
23      Q.  Okay.  All right.
24      A.  If they do come back and find some new evidence
25  and say, hey, he's innocent, they ought to -- he ought to

70

1  be paroled immediately.
2      Q.  Okay.  All right.  I think I understand you.
3      A.  Just a little confusing for, I guess, the general
4  public when they say, hey, they got a 20-year sentence,
5  and two years later they're out on parole, you know.
6      Q.  You understand that the life without parole on a
7  capital murder case --
8      A.  Yes.
9      Q.  -- means just that.  I think everyone in here
10  would agree that person would stay in prison for the rest
11  of his or her natural life.
12      A.  Okay.
13      Q.  Only come out in a box.
14      A.  Okay.
15      Q.  Okay?
16      A.  Yeah.
17      Q.  In a murder case, not a capital murder case, a
18  person can be eligible for parole.
19      A.  Okay.
20      Q.  After a certain number of years in.  But in
21  a capital murder case, it's life without parole and
22  that --
23      A.  I wasn't aware of that.
24      Q.  It's a relatively new law, but it's one on the
25  books and one that will be applicable in this case.  All

71

1  right.  Now, knowing that, how do you feel about that
2  being in the -- a sentence available for a person
3  convicted of capital murder?  Life without parole.
4      A.  I don't have a problem with that.
5      Q.  Okay.  Now, when we talk about these elements
6  again --
7      A.  Yes, sir.
8      Q.  -- of capital murder, that again is what the
9  State must prove to you beyond a reasonable doubt.  And I
10  think you answered this before when the Prosecutor asked
11  you.  I want to talk now about this burden of proof.  And
12  you know it's -- rests with the four folks at this table
13  here to my left.
14      A.  Right.
15      Q.  And that is beyond a reasonable doubt.  Now,
16  beyond a reasonable doubt is the highest standard of proof
17  in our law.
18      A.  Right.
19      Q.  And there are other standards.  My PowerPoint
20  jumped ahead of me here.  You can see that little stair
21  step as an illustration.  It starts at the bottom with
22  reasonable suspicion.  It goes to the probable cause, and
23  preponderance of the evidence.  Reasonable suspicion, I
24  think you have a father-in-law and nephew who are in law
25  enforcement, correct?

72

1     A.  That's correct.

2     Q.  And for instance, if they were out patrolling and

3   see someone weaving or whatever, that gives them

4   reasonable suspicion to stop that vehicle to further

5   investigate and perhaps issue a citation or anything that

6   may lead them to issue.  Probable cause is what a Grand

7   Jury would listen to, make its determination on in

8   returning an indictment.

9     A.  Okay.

10    Q.  That standard of proof.  Preponderance is found

11  in a civil case.  You were involved in a civil case

12  before; is that right?

13    A.  I don't recall if it was civil or criminal.

14    Q.  Okay.

15    A.  It's been so long ago.  I don't know what it was.

16    Q.  I thought maybe it was something about a civil

17  case I read in here.

18    A.  There could have been.

19    Q.  But that is a 51 percent rule, the greater weight

20  and degree of credible evidence.  That's what that

21  standard is about.  Then we have clear and convincing.

22  That's -- deals with termination of parental rights where

23  you sever the parent/child relationship.

24    A.  Okay.

25    Q.  Now, you can see that particular standard is high

73

1   in our law.  And right under beyond a reasonable doubt,

2   because you're dealing with, in that situation, that

3   termination of parental rights.

4     A.  Right.

5     Q.  And this is the definition of clear and

6   convincing.  The measure or degree of proof that produce

7   in the mind of the trier of fact a firm belief or

8   conviction as to the truth of the allegation sought to be

9   established.

10    A.  Right.

11    Q.  All right.  And beyond a reasonable doubt is more

12  than clear and convincing.

13    A.  Right.

14    Q.  So it's more than that firm belief.

15    A.  Yes.

16    Q.  Okay.  So at some point when we look at the

17  standards, when you look at the elements of a capital

18  murder case, you literally would start out with that

19  presumption of innocence.

20    A.  Right.

21    Q.  And then as the Prosecution produces its

22  evidence, you have to look at that evidence and sift

23  through it.  You may hear, you know, witnesses,

24  photographs, videotape, audio tape, things of that

25  nature.

74

1     A.  Yes.

2     Q.  To make that determination if they've proven it

3   beyond a reasonable doubt.

4     A.  Right.

5     Q.  Okay.  And this type of offense, the violent

6   crime of capital murder, if they prove it, then you would

7   move into what was called a second phase.

8     A.  Right.

9     Q.  But before we do that, I do want to talk to you

10  about something else, and that is -- these are some of the

11  things we just talked about, that is, accomplice.

12    A.  Okay.

13    Q.  The Prosecutor told you about the partner in

14  crime and the helper person who solicits, encourages and

15  aids and abets and so forth.

16    A.  Yes.

17    Q.  There are two ways that can happen.

18    A.  Okay.

19    Q.  One is conspiracy that you heard her talk about

20  before that deals with, you know, should have anticipated

21  that a -- the result would occur, such as in a murder case

22  or capital murder case, life being taken, that type

23  thing.  Then you have the other part of it dealing with

24  the person acting with the intent to promote the

25  commission of the offense, promote a capital murder, that

75

1   you encourage and solicit and aided and --

2     A.  Yes.

3     Q.  -- whatever.

4     A.  Okay.

5     Q.  All right.  And this is what these definitions

6   are, basically tell you in how you would look at the

7   testimony of a person in which the State may make a deal

8   with.

9     A.  Okay.

10    Q.  Now, have you ever thought about a situation

11  which the State would make a deal or plea agreement with a

12  person involved in a crime so that person can testify

13  against another?  Have you ever thought about that before,

14  had any consideration of that?

15    A.  Never did give it a lot of thought.

16    Q.  What do you think about that?

17    A.  I think that's sometimes what they have to do to

18  get the evidence they need.

19    Q.  And you understand that only the State of Texas

20  can do that, that me and Mr. Westfall as defense attorneys

21  don't have that power and authority?

22    A.  Right, yes.

23    Q.  And it only rests with them to make that

24  determination.

25    A.  Yes.

76

1    Q. Is it fair to say that in a situation like that,
2 that you would trust the judgment of Prosecutors who would
3 do something like that?
4    A. Yes, sir.
5    Q. And why do you say that?
6    A. I don't know why I say that. I would think that
7 would just be a normal course of business for them, to do
8 that kind of thing.
9    Q. Okay. And when I say "trust the judgment", of
10 course, you know that is a judgment call on their part to
11 do that, right?
12    A. Yes.
13    Q. And in trusting that judgment, for them to do
14 that, it's fair to state that when you hear about
15 something along those lines and see that they've made
16 deals like that or a deal, doesn't necessarily have to be
17 plural.
18    A. True.
19    Q. I just say a deal at this point, that you would
20 think in your own mind that they perhaps know something
21 about the -- that particular situation and with that
22 accomplice, that you would trust them to make such a deal
23 and have them come in and testify?
24    A. Yes, sir.
25    Q. Now, this goes back to what I was asking before

77

1 about your knowledge of Mr. Hanna.
2    A. Okay.
3    Q. This is a person you trusted; is that correct?
4    A. Well, I -- I trust everybody.
5    Q. Okay.
6    A. Unless they prove me different.
7    Q. Unless they prove you different. But in the --
8 of course, I'm asking about him because you know him; you
9 and I don't know each other and I don't think you know
10 Mister --
11    A. Well, when you say -- when I say I know him, I
12 know of him. Something else came to mind. We did take a
13 canoe trip together. We were in the same car. I believe
14 you were studying your -- for the bar exam maybe. We went
15 down the Guadalupe.
16    Q. Okay.
17    A. He was busy studying all the time so I don't
18 think he -- he didn't socialize a whole lot. Or he was on
19 a case or something. He was in the same car with us.
20    Q. All right.
21    A. Spruce Griffith.
22         MR. HANNA: Maybe, yeah.
23    A. Eddy Birdwell.
24         MR. HANNA: Could be.
25    A. That was 30 years ago.

78

1    Q. 30 years ago. Okay. You've got a pretty good
2 memory.
3    A. Well, I remember some things.
4    Q. Okay. Well, back to the point at hand. And
5 here's what I'm trying to find out from you, Mr. Buckner,
6 how you feel in your heart and gut and soul. When you're
7 looking at a situation where you indicate you would trust
8 the Prosecutor to make deals, and you've known Mr. Hanna
9 for 30 plus years, and not intimately, of course, from
10 the standpoint you telling me, but knowing his position
11 as a Prosecutor, would you in that situation tend to look
12 at an accomplice's testimony in a more favorable light
13 because you've trusted the Prosecutors to make that deal
14 and give that person a bargain because of what this
15 person may have been involved in? Do you follow what
16 I'm asking?
17    A. Not exactly. Can you say that one more time?
18    Q. Sure. What I'm asking is if you indicated you
19 trust a Prosecutor to make such a deal with an
20 accomplice --
21    A. Okay.
22    Q. Okay. Would that in turn indicate to you or make
23 you feel that you would be more trusting of that person's
24 testimony because you know that they've made such a deal
25 with him in that manner?

79

1    A. No.
2    Q. Why do you say that?
3    A. Well, just because they made a deal doesn't mean
4 the witness is credible. I mean, like anybody else, they
5 can say whatever they wanted to say to get out of
6 punishment.
7    Q. And --
8    A. Whatever they wanted to hear. I mean, it's
9 always a possibility.
10    Q. Okay.
11    A. So just because they had made a deal with
12 somebody doesn't necessarily mean that their testimony
13 would be true.
14    Q. Okay. That testimony, of course, has to -- a
15 person cannot be convicted on the accomplice testimony
16 alone. There has to be some other evidence that tends to
17 connect the crime to the accused. Now, again, these --
18 the offenses you were told about earlier, the capital
19 murder, and then right under that is what we'd call lesser
20 included offenses, murder and aggravated robbery. You've
21 indicated in your questionnaire as well that you felt that
22 the death penalty should be available for other offenses
23 in our law.
24    A. Yes, that's correct.
25    Q. Child molestation?

80

1    A. Yes.
2    Q. And kidnapping?
3    A. Yes.
4    Q. And why do you say that, Mr. Buckner?
5    A. That's just my personal belief. I think those
6  crimes are heinous enough that deserves the maximum
7  penalty.
8    Q. Okay. And obviously knowing that capital murder
9  itself is a heinous crime, I guess?
10    A. Yes.
11    Q. You equate that; is that right?
12    A. Yes.
13    Q. And when you are looking at a child molestation
14  and kidnapping, now, a kidnapping can be in connection
15  with a murder to be a capital murder.
16    A. Sure.
17    Q. That could be another one. I think she may have
18  told you that, I can't recall at this juncture. But child
19  molestation case in and of itself does not provide for a
20  capital sentence.
21    A. I understand that.
22    Q. You understand that? But if you were a
23  legislator for a day, I take it you would be the type of
24  person to go in and say let's make this a --
25    A. That's correct.

81

1    Q. -- capital crime where the person could receive a
2  death penalty if convicted?
3    A. Yes, I would.
4    Q. Is that right?
5    A. That's right.
6    Q. Have you felt that way for a long time as well?
7    A. Yes.
8    Q. Now, when we look at this offense, capital
9  murder, only two possible punishments, and that is the
10  death penalty or life in prison without the possibility of
11  parole.
12    A. Okay.
13    Q. And at that stage of the proceeding, you would
14  have found that that person is a convicted murderer.
15    A. Okay.
16    Q. And that that person had done so to the extent it
17  was proven to you beyond any and all reasonable doubt.
18    A. Right.
19    Q. By the State of Texas. You follow me so far?
20    A. Yes, sir.
21    Q. And at this point we have what's called -- I call
22  it a narrowing process, if you will, kind of like a
23  funnel.
24    A. Right.
25    Q. That you look at matters and then you begin to

82

1  funnel down to the core, if you will, question up there at
2  the bottom.
3    A. Yes.
4    Q. Now, starting out, is it fair to say,
5  Mr. Buckner, from your own shared beliefs in this
6  questionnaire, from what you told us, if a person is
7  convicted of capital murder, you told us earlier by your
8  question here that you -- it's appropriate, that it's
9  imposed too seldom. Is it fair to say that at that point
10  you would be more inclined to give death as opposed to a
11  life sentence?
12    A. No.
13    Q. And why do you say that?
14    A. Well, I'm the type person that would look at the
15  evidence, look at the circumstances and base my decision
16  on that.
17    Q. Okay. You then would go to these questions?
18    A. Yes.
19    Q. Starting at the funneling process I spoke of a
20  little bit earlier, and that is the statutory punishment
21  questions. First one, whether there is a probability that
22  the Defendant would commit criminal acts of violence that
23  would constitute a continuing threat to society.
24    A. Yes.
25    Q. You probably seen that too many times already.

83

1  You understand that?
2    A. Yes, sir.
3    Q. And what I'm going to do -- and that's how the
4  process works. In order to answer yes, you must be
5  convinced by that high standard of proof.
6    A. Right.
7    Q. A "no" answer only requires 10 jurors to agree to
8  that. And they need not agree on the particular evidence
9  to support the negative answer for those who would do
10  that. Here it's broken down whether there's a
11  probability, which is more than the possibility, of
12  course, that this person will commit criminal acts. Those
13  acts must be violent acts that will constitute a
14  continuing threat to society. Now, you think that's a
15  good question to be posed to the jurors right off the bat
16  after -- at the end of the Punishment Phase or trial?
17    A. Yeah.
18    Q. And what makes you say that, Mr. Buckner?
19    A. Well, it's what you have to answer to determine
20  the punishment.
21    Q. Yes. I mean, I guess here's what I'm getting at,
22  and you tell me where you fall.
23    A. All right.
24    Q. Some people think, you know, I need to know
25  whether that person is a future danger, that summary

84

1  question that -- that question asked you, so that I can --
2  it can help me make a decision down the road as to death
3  or life.
4     A. Right.
5     Q. Is that how you feel?
6     A. Yes.
7     Q. Okay. So you see that it's talking about that
8  probability of criminal acts of violence?
9     A. Right.
10    Q. And constituting -- and those violent acts must
11 constitute a continuing threat.
12    A. Right.
13    Q. When we say "continuing", wouldn't you agree that
14 means kind of an ongoing, constant kind of threat?
15    A. Yeah.
16    Q. And is that the type of question you think you
17 can answer?
18    A. Yes.
19    Q. If given enough evidence?
20    A. Yes.
21    Q. And of course that "enough evidence" must be
22 beyond a reasonable doubt.
23    A. Right.
24    Q. You understand that; is that right?
25    A. I understand.

85

1     Q. Now, at this juncture, if you answer yes, that
2  this person not only is a convicted capital murderer, this
3  person has now been deemed to be a future danger beyond
4  any and all reasonable doubt, then you would move on to
5  that next question. Okay? You understand that?
6     A. Yes.
7     Q. And that next question is -- deals with the laws
8  of parties. And again, here we have that first law of
9  parties that you were talked to about earlier, that is
10 acting with the intent to promote or assist in the
11 commission of the offense, and that offense is capital
12 murder in this instance, he solicits, encourages, directs
13 aids or attempts to aid the other person to commit that
14 capital murder, that offense.
15    A. Yes.
16    Q. And that's the conspiracy which is a second or
17 different type of way a person can be guilty as a party to
18 an offense; where, here, that person should have
19 anticipated the result. Now, when we look at that second
20 question of law of parties, you have to determine whether
21 the person actually caused the death, did not actually
22 cause but intended to kill the deceased or another; in
23 other words, another human life would be taken.
24    A. Yes, sir.
25    Q. And that again must be proven beyond a reasonable

86

1  doubt, as you understood.
2     A. Uh-huh.
3     Q. Again, that funneling process?
4     A. Right.
5     Q. You would agree with that?
6     A. Yes, sir.
7     Q. Now, do you think that's something that just as
8  that first question is important to you, that the second
9  one is just as important or equally so or less so or how
10 does it fall within --
11    A. I would say all of them are equally -- should be
12 equally weighed.
13    Q. Okay. And again, that same scenario, in order to
14 answer yes, it must be unanimous; no, only 10 and they
15 don't have to agree on a particular --
16    A. Yes.
17    Q. -- evidence. That question on the parties, you
18 see over here that first instance we talked about?
19    A. Yes, sir.
20    Q. And that is what I just went over a few minutes
21 ago. This is not the conspiracy part of it. This is the
22 law of parties under our Penal Code. One way in which a
23 person can be convicted as a party to an offense in which
24 he solicited, encourages, aids, in other words, he has to
25 be active, if you will, in the commission of a capital

87

1  murder.
2     A. Okay.
3     Q. And then you are confronted with that question
4  whether the Defendant actually caused the death of the
5  deceased or did not actually cause the death but intended
6  to kill the deceased or another, or anticipated that a
7  human life would be taken. Okay. Now, if you have found
8  a person to have committed an offense under this law of
9  parties, which he's encouraged and so forth, you see that,
10 directs, aids or attempts to aid, solicits, et cetera, the
11 other person to commit the offense, and then you are
12 confronted here and you found that beyond a reasonable
13 doubt, do you see where again you are looking at the same
14 type of mental state on that person's part, what role he
15 or she may have played?
16    A. Yes.
17    Q. Is that right?
18    A. Yes, sir.
19    Q. Okay. And here when we look at that type of
20 question, you would at this stage -- oh, to the third
21 question. Okay. Now, here it talks about mitigation.
22 And I want to ask you, Mr. Buckner, what's your
23 understanding of or idea of mitigation or mitigating
24 circumstances?
25    A. To me that -- well, mitigation to me is deferring

88

1 the risk to something else.
2     Q. Okay. Under our law, it talks about where it
3 reduces a person's moral culpable -- or moral
4 responsibility. That's what it really gets to, where it
5 reduces a sentence, okay. And it reduces it, for
6 instance, in a capital case from a death sentence to life
7 without parole sentence.
8     A. Right.
9     Q. All right. Mitigating circumstance or
10 circumstances. And that's what that implies.
11     A. Okay.
12     Q. Okay. Now, at this point you would have found a
13 person guilty of capital murder, found him to be a -- this
14 convicted murderer to be a future danger beyond any and
15 all reasonable doubt, found him to have killed, intended
16 to kill, anticipation of a murder taking place beyond a
17 reasonable doubt.
18         And here's asking you to this third
19 question. You've told us in your questionnaire that -- a
20 couple things. And obviously I take your word at this and
21 I want to ask you about it.
22     A. Okay.
23     Q. That you don't feel that a person's character and
24 background for a convicted murderer is relevant in
25 punishment. Do you remember that?

89

1     A. Yes.
2     Q. And what did you mean by that?
3     A. Well, regardless of what a person has been, like
4 I say, if they're a military hero, I mean, that's great
5 in itself, but if they come back and they commit a
6 heinous crime of some sort, to me, it doesn't matter
7 what they did in the past, it's what they did in this
8 particular instance.
9     Q. Okay. And there are some other questions too
10 along the same lines. You were asked about if a child was
11 abused.
12     A. Yeah.
13     Q. And was that relevant. I think you said no as
14 well to that as far as --
15     A. Right.
16     Q. -- that person being responsible for his or her
17 own conduct.
18     A. That's correct.
19     Q. I take it that's kind of a core belief that you
20 have --
21     A. That's right.
22     Q. -- Mr. Buckner? And you've indicated in your
23 questionnaire that you are a very conservative person?
24     A. Yes.
25     Q. And I know in situations when I've talked to

90

1 people who are very conservative, they have some very
2 strong core beliefs and values.
3     A. Yes, sir.
4     Q. That they don't normally compromise or surrender
5 because it's part of them, who they are, their makeup. Is
6 that you?
7     A. I'm -- I have some very deep convictions, yes.
8 Um, in a case like this when the question is part of the
9 consideration I have to make, if that is part of it, then
10 I'll make that consideration.
11     Q. Well, I want to talk to you about that because,
12 see, this mitigation question comes from a Supreme Court
13 decision a few years back.
14     A. Yeah.
15     Q. Which is mandated that this mitigation be
16 considered.
17     A. Right.
18     Q. And when you tell me that, for instance, that war
19 hero or whatever --
20     A. Yeah, whatever.
21     Q. -- comes in and, you know, you -- that doesn't
22 concern you as much as the fact that you want to look at
23 what the crime was and circumstances surrounding the
24 crime; is that --
25     A. Yeah.

91

1     Q. -- what you just stated? And I take it from that
2 that you believe that the person is convicted of capital
3 murder, future danger, that party charge, intended to
4 kill, did kill, anticipated to kill, that heinous crime,
5 that tells you a lot in and of itself about that person,
6 does it not?
7     A. Right.
8     Q. And it telling you a lot about that person, then
9 you're the type of person, as I read this and look at it,
10 examine it, that that upbringing, abused childhood or
11 character and background is not a consideration of yours
12 to the extent that you're going to give it fair
13 consideration because of how you feel about this type of
14 case and what you believe even the death penalty is
15 imposed too seldom. Is that a fair statement?
16     A. That's a fair statement, yes.
17     Q. You have a chance in your work life and in your
18 support of the ministries over the years to build up these
19 core beliefs and value systems that you hold near and
20 dear. Is that a fair statement as well?
21     A. Yes, sir.
22     Q. And when we look at, honestly and fairly, inside
23 the heart and soul of Mr. Buckner, that consideration of
24 character, background, abused childhood or things of that
25 nature, upbringing --

92

1    A.  Yes, yes.

2    Q.  -- is something that is not important to you from

3  the standpoint if a person is convicted of this heinous

4  crime of capital murder?

5        MS. JACK:  And, Judge, I'm going to object to

6  the form of the question.  The Juror has already said that

7  that's the law, he'd consider it.

8        MR. HEISKELL:  No, I'm asking the question,

9  Judge.

10       THE COURT:  Well, okay, I'll overrule the

11  objection.  You can answer the question.

12   A.  Outside of this context, yes.

13   Q.  (BY MR. HEISKELL)  What do you mean "outside of

14  this context"?

15   A.  Well, you're saying this is the third question

16  that has to be considered.

17   Q.  Yes, sir.

18   A.  If that's part of the consideration, then I would

19  think you would have to consider it.

20   Q.  Well, sure.  But you, Mr. Buckner --

21   A.  Yeah.

22   Q.  -- you are saying those considerations, I mean,

23  it has to be a fair consideration.

24   A.  Right.

25   Q.  Okay.  And a fair consideration, you know, is

93

1  not -- we're not talking a fleeting consideration, "okay,

2  oh, yeah, I'll look at that".  It has to be a fair

3  consideration.

4    A.  Right.

5    Q.  Here in that funneling process, I see you as that

6  person, given this answer from the questionnaire, this is

7  what you gave a few minutes ago, that that character and

8  background and upbringing is not a fair consideration in

9  your mind.

10       MS. JACK:  Same objection.

11   Q.  (BY MR. HEISKELL)  Is that right?

12   A.  Well, it certainly wouldn't hold the weight that

13  everything else would.

14   Q.  Okay.  All right.  So in other words, it's down

15  the totem pole, so to speak?  And I may not be using the

16  correct term.

17   A.  Well, that makes sense, yeah.

18   Q.  Yeah.  And that your main considerations, if you

19  will, would be more so the facts of the case and the

20  circumstances surrounding the offense itself.  Is that a

21  fair statement?

22   A.  Yeah, that's a fair statement.

23   Q.  And especially if you already found the person

24  to be a future danger in answering this second question

25  yes?

94

1    A.  Yes.

2    Q.  At that point in which you found the person

3  guilty of capital murder, and in looking at these

4  considerations we were talking about, the first question

5  and the second question, you've indicated that the best

6  argument -- again, I'm quoting from your questionnaire.

7    A.  Okay.

8    Q.  Against the death penalty is that the new

9  evidence would find that the person is innocent.  Now, I'm

10  not sure if that goes back to what that life without

11  parole question is or not.  I want to ask you about that.

12  Let me show it to you.

13   A.  What was the question?

14   Q.  Yes, sir.  "What is the best argument against the

15  death penalty in your opinion?"

16   A.  Oh, okay, against the death penalty, yeah.

17   Q.  Yes, sir.

18   A.  Right.

19   Q.  Can you kind of elaborate on that answer for me?

20   A.  If I understood the question correctly, the best

21  argument that I could think of against the death penalty

22  would be that somebody was convicted that was innocent and

23  so you would be sentencing an innocent person to death.

24   Q.  Okay.  And here's what I wanted to ask you,

25  because what that causes me to think about from my

95

1  standpoint, me and Mr. Westfall's standpoint, when we

2  defend Mark Soliz in a case like this, is that you perhaps

3  would expect that we produce some type of evidence to show

4  his innocence.  That's -- that was my initial --

5    A.  No, I would expect the Prosecution to prove

6  beyond a reasonable doubt that he was guilty.

7    Q.  Okay.  And when we talk here about -- here it's

8  asking you about the death penalty, of course, as opposed

9  to the argument against it, you talk about innocence and

10  that's a concern with you when you're looking at that

11  death penalty versus life sentence; is that right?

12   A.  Uh-huh.

13       MR. HEISKELL:  Okay.  Let me talk to my

14  co-counsel for a second, Mister --

15       That's all I have, Judge.

16       Thank you, Mr. Buckner.

17       THE COURT:  Mr. Buckner, if you'll step

18  outside for just a minute.

19       VENIREPERSON:  All right.

20       (Venireperson Buckner not present.)

21       THE COURT:  Okay.  Does State have any

22  challenges?

23       MS. JACK:  No, Your Honor.

24       THE COURT:  Does Defense have any?

25       MR. HEISKELL:  Yes, Your Honor.  Under 35.16

96

1  (a)9 and (c)2, we challenge Mr. Buckner in that he cannot
2  give fair consideration to the Question No. 3 regarding
3  consideration of a person's character and background as
4  part of the -- all of the evidence in assessing or
5  answering that question either yes or no. His answers
6  that he stated on the record, his answers that he
7  confirmed in his questionnaire indicates he's unable to
8  give any type of fair consideration to any type of
9  mitigation because of his concern that a person's
10 upbringing, background, character is not that important
11 and he's only concerned with the facts of the offense and
12 this is a deeply held and strong belief of his. And we
13 challenge for that reason.
14       THE COURT: Okay. I'll deny the challenge
15 for cause. Go ahead and bring Mr. Buckner back.
16       (Venireperson Buckner present.)
17       THE COURT: Mr. Buckner, come on back up a
18 little bit. I'm going to talk to you for just a second.
19 You're not on the Jury yet, but you are on the panel the
20 Jury is going to be selected from.
21       VENIREPERSON: Okay.
22       THE COURT: What's going to happen, you're
23 going to get a call from the coordinator -- from the
24 Administrator that you have to be here on a certain day,
25 and you will have to be here.

97

1        VENIREPERSON: Okay.
2        THE COURT: You'll be here with about 50
3  other people.
4        VENIREPERSON: Okay.
5        THE COURT: That day you'll be told you're on
6  the Jury and told when the trial is going to start, that
7  kind of thing, or you'll be released.
8        VENIREPERSON: Okay.
9        THE COURT: Before you leave today, we're
10 going to get a picture of you. This lady is going to take
11 a picture against the back wall over there because this
12 process is going to last about a month.
13       In the meantime, don't look up anything about
14 the case. Don't start asking anybody at work if they've
15 ever heard of it.
16       VENIREPERSON: Okay.
17       THE COURT: There may very well be something
18 in the newspaper or on TV about the case. Don't watch it,
19 don't listen, don't read it.
20       VENIREPERSON: Okay.
21       THE COURT: Whatever you do, don't get on the
22 Internet, start researching this case.
23       VENIREPERSON: Okay.
24       THE COURT: All right. Thank you, sir. If
25 you'll pose back there, she'll get your picture.

98

1        (Venireperson Buckner not present.)
2        (Recess taken.)
3        (Venireperson Hatch present.)
4        THE COURT: Come on up, Mr. Hatch. If you'll
5  raise your right hand.
6        (Juror sworn.)
7        THE COURT: Thank you, sir. If you'll have a
8  seat in the jury box. In the second chair right there
9  would be good.
10       Okay. If you'll state your name.
11       VENIREPERSON: Thomas Monroe Hatch.
12       THE COURT: Mr. Hatch, you filled out a juror
13 questionnaire a while back. Were the answers you put on
14 there true and correct?
15       VENIREPERSON: Yes, sir.
16       THE COURT: It's been a couple, three weeks.
17 Has anything changed in your life that would change any of
18 the answers on the questionnaire?
19       VENIREPERSON: No, sir.
20       THE COURT: My name is Phillip Vick. I'm the
21 Judge presiding at this proceeding. When this case goes
22 to trial, Judge William Bosworth, Judge of the 413th
23 District Court of Johnson County will be the one trying
24 the case.
25       The attorneys representing the State are

99

1  Mr. Dale Hanna, who has stepped out right now. Mr. Larry
2  Chambless, Mr. Martin Strahan.
3        MR. STRAHAN: Morning.
4        THE COURT: Ms. Christy Jack.
5        MS. JACK: Good morning.
6        THE COURT: The attorneys representing the
7  Defendant are Mr. Michael Heiskell.
8        MR. HEISKELL: Morning.
9        VENIREPERSON: Morning.
10       THE COURT: Mr. Greg Westfall.
11       MR. WESTFALL: Morning.
12       THE COURT: Seated with them at the counsel
13 table is the Defendant, Mark Anthony Soliz.
14       THE DEFENDANT: Morning, sir.
15       THE COURT: And they'll have questions for
16 you, but I'll ask first. Is there anything we should know
17 about you that we didn't ask on the questionnaire?
18       VENIREPERSON: Not to my knowledge. Your
19 questionnaire was very thorough.
20       THE COURT: Okay. You're going to be asked a
21 lot of questions. I will tell you it's not a test.
22 There's no right or wrong answers to anything. We only
23 require that you be truthful.
24       VENIREPERSON: Yes, sir.
25       THE COURT: If you can answer a question

100

1  "yes" or "no", it will save time, because if you don't
2  answer it "yes" or "no", they'll want you to explain why
3  you did answer.
4        VENIREPERSON:  Yes, sir.
5        THE COURT:  And don't answer a question
6  unless you're sure you understand it.  If not, get them
7  to rephrase it or explain it.  We think trial is going to
8  start probably the last week in February, best guess right
9  now.  When it does start, we think it will last about
10 three weeks.  There's even a chance that a Jury could be
11 sequestered part or all of those three weeks.  And the
12 question is, if there's anything happening in your life
13 right now that would interfere with you being a juror
14 during that period of time.
15       VENIREPERSON:  No, sir.
16       THE COURT:  Good enough.  Thank you, sir.
17 I'll recognize the State.
18       MR. CHAMBLESS:  Thank you, Your Honor.
19            THOMAS HATCH,
20     Venireperson No. 59, testified as follows:
21          VOIR DIRE EXAMINATION
22 BY MR. CHAMBLESS:
23       Q.  Mr. Hatch, I'm Larry Chambless, one of the
24 Assistant District Attorneys here.  You and I will
25 have a chance to visit here approximately 45 minutes,

101

1  then the Defense attorneys will have a chance to do
2  the same.  We have the questionnaire.  We've read your
3  answers, and appreciate the time that you're spending
4  with us.
5        A.  Okay.
6        Q.  You indicated in the questionnaire that you were
7  willing to serve.  Or is that what you answered?
8        A.  Yes, sir.
9        Q.  Tell us what prompted you to say that.  Some say
10 yes, some say no.
11       A.  Well, I think it's a civic duty.
12       Q.  Okay.
13       A.  Something that's requested of all of us.  Someone
14 has to make up a Jury to decide issues, and I have no
15 objection to being one of those people.
16       Q.  Okay.  Thank you very much.  Appreciate your
17 answer.  This is -- we're going to go through some slides,
18 PowerPoint slides.  It will be actually on this thing in
19 front of you.  We're going to talk about what the law is
20 with regard to this process, whether or not you could
21 follow those rules and keep an open mind at each point of
22 the process.
23       There are potentially up to four separate
24 independent decisions you might have to make in a case
25 such as this.  It is a capital murder case.  There's a

102

1  distinction or a difference between murder and capital
2  murder.  I don't know if you knew that before today.  Did
3  you?
4        A.  Not specifically, no, sir.
5        Q.  We'll get into that in just a minute, because a
6  murder is not a type of case, just a intentional killing
7  of another, unless there's something additional, and
8  we'll get into that in a minute.  This is a capital
9  murder case.  If a person is found guilty of capital
10 murder, there are only two punishments possible; one is
11 life without parole, the other is a death penalty.  The
12 first decision is whether or not that crime was committed
13 and whether a defendant, a particular defendant committed
14 that crime, the Guilt/Innocence decision.
15       The law envisions that these are the
16 beginning rules that each juror would begin the process
17 with an open mind, neither for nor against the State,
18 neither for nor against a defendant, not leaning one way
19 or the other.  Here's four rules to look at.  One, the
20 indictment, the fact that a person is charged with a piece
21 of paper, that's what an indictment is, a piece of paper.
22 The fact that we're in court this morning, the fact that
23 there are lawyers here, none of that should indicate in
24 your mind, in the thinking of a juror's mind that that's
25 evidence or any -- it shouldn't cause you to be swayed one

103

1  way or the other.  Do you see that?
2        A.  I follow you, yes, sir.
3        Q.  Just simply a piece of paper that indicate what
4  the charge is and what the State has to prove.  Do you
5  think you could follow that rule?
6        A.  Yes, sir.
7        Q.  The second, presumption of innocence.  Each
8  juror, I think the law envisions that each juror would
9  begin there in your mind that you -- any, every defendant
10 in a criminal case is presumed to be innocent.  And that
11 goes along with this indictment is no evidence.  I think
12 the mindset of a juror would be, "I don't think one way
13 or the other.  I have no thoughts on that."  Just because
14 we're in court, just because a defendant has lawyers
15 around him or her doesn't mean anything.  The State has
16 to prove the case.  I expect the State to prove the
17 case.  Put no burden on a defendant whatsoever.  The
18 only person in a criminal case is -- with the burden
19 is the State.  If the State doesn't prove its case,
20 the presumption of innocence alone is enough to acquit
21 a hypothetical defendant.  Do you think you could follow
22 that rule?
23       A.  Yes, sir.
24       Q.  The third burden of proof goes along with that,
25 not only is a defendant presumed innocent as you start

**104**

1  the process, the complete and total burden is on us, the

2  State of Texas. There is no burden at any time on a

3  defendant to prove anything, so if you'd keep that in

4  mind. Could you hold us to our burden and require us to

5  prove what we're required to prove, which in the first

6  part as to this first decision are the elements of a

7  crime? Would you hold us to that burden?

8      A.  Yes.

9      Q.  Okay. Have you heard of the Fifth Amendment or

10  the right to remain silent?

11     A.  Yes, sir.

12     Q.  In a criminal case, a defendant may testify or

13  may choose not to testify. That is a defendant's choice.

14  The application is this, and here's the rule. If a

15  defendant in a criminal case chooses not to testify, then

16  you as a juror, along with your other jurors, would need

17  to disregard that, not hold that or consider that in any

18  way against a defendant. In other words, you would have

19  to -- I've heard the term used, "compartmentalize" this

20  from that you would have to look at, what evidence is

21  before you, and decide did the State prove its case

22  beyond a reasonable doubt or not, and not speculate on

23  what might have been said or could have, you know, that

24  thing. Do you see that difference?

25     A.  Yes, sir.

**105**

1      Q.  How do you feel about that?

2      A.  I think it's appropriate.

3      Q.  Okay. Could you follow that law?

4      A.  Yes, sir.

5      Q.  All right. This is where we begin. Murder is

6  this. Take a minute, if you would, just read that.

7          So a murder is anytime a person intentionally

8  causes the death of another, any allegation and by -- it

9  might be by hitting with a tire iron. It might be

10  shooting with a gun. It might be stabbing with a knife.

11  But if I have a conscious objective in my mind to cause

12  the death of another, and I complete that action, then

13  that is murder. It might -- it could take a zillion forms

14  factually.

15         It might be something, I'm on the road this

16  afternoon and it's been a long day in court, and I look

17  over and somebody cuts me off. So I pull up beside them

18  and pull out a gun. And with that thought in mind, I

19  shoot them. That might be one fact scenario. Another

20  fact scenario might be I think about shooting someone, I

21  plan it out over a period of time, much more, you know,

22  intense, a thing like that, premeditated thing. Another

23  thing might be two elderly people, one is dying of cancer,

24  the other, the husband or wife, chooses to give the dying

25  patient enough to cause the death, intentionally cause the

**106**

1  death. I had that conscious objective.

2      I just say that to say this. There's just a

3  lot of variations in the evidence. Do you see that

4  possibility?

5      A.  Yes.

6      Q.  And it's important at each phase of

7  decision-making in a criminal case to wait and not make

8  up your mind in advance, wait until whatever the evidence

9  is comes before you, and then at the appropriate time make

10  the decision. Do you see how that works?

11     A.  Yes, sir.

12     Q.  Okay. The range of punishment for murder, this

13  is not capital murder, we're making -- we're gonna --

14  building this distinction here. If it's just murder, as

15  if that was not serious enough, if it's murder, the range

16  is 5 years to 99 years or life. And in this sentence, a

17  life sentence would have a parole eligibility, unlike

18  capital murder which is life without parole. Here, this,

19  if you were seated as a juror, in order to serve as a

20  juror, you would have to keep an open mind and give fair

21  consideration to the low end, 5 years, all the way up to

22  99 years or life, depending on what the facts were. In

23  other words, going in, it would be, you know, the

24  postulate would be that you would have to give fair

25  consideration, you would be able to think about, talk

**107**

1  about with your fellow jurors the whole range of

2  punishment. Do you think you could do that?

3      A.  Yes, sir.

4      Q.  The same is true for aggravated robbery.

5  What's that? Aggravated robbery is -- would be, for

6  example, if I chose to go into a 7-Eleven, and I had a

7  weapon, a deadly weapon with me, a gun, and I stole --

8  robbery is stealing property -- I stole property by

9  displaying a deadly weapon, using that threat. That would

10  be aggravated robbery. Again, there could be a lot of

11  different contextual backgrounds to that type of offense,

12  and the law envisions that if you were a juror, you could

13  give fair consideration to both the low end and the high

14  end, 5 to 99 years or life. If you were -- served as a

15  juror, do you think you could keep an open mind as to that

16  range of punishment?

17     A.  Yes, sir.

18     Q.  The point is, it just -- the process is such that

19  it envisions that you would wait and not make up your mind

20  or make any decision until you've heard the evidence. And

21  it's unfair for us to say what would you do. The point

22  is, you've got to keep an open mind at each point in the

23  process. Do you think you could do that?

24     A.  Yes, sir.

25     Q.  This is a death penalty case. And when you first

108

1   recognized that, what were your thoughts about that, if I
2   could ask?
3      A.  This is a new experience for me having never
4   served on a Jury before.  I understand the seriousness of
5   the question at hand.
6      Q.  Okay.
7      A.  It's gonna be potentially difficult to do, but I
8   still see it as something that I could do.
9      Q.  Okay.  Well, we'll talk about your feelings and
10  your thoughts as we go through this.  Here we go.  We're
11  making the transition from murder to whatever capital
12  murder is.  Okay?
13     A.  Okay.
14     Q.  And here it says capital murder.  This different
15  offense is murder committed during the course of the
16  commission or attempted commission of either robbery or
17  burglary.  So the added fact is murder during the course
18  of a -- either a robbery or a burglary.  That elevates
19  that, takes it to this other level where the only
20  punishment options are life without parole or death
21  sentence.
22         And if a person is found guilty of capital
23  murder, the Jury does not just go back there and decide
24  life or death.  There are a series of up to three
25  additional questions that you would independently and

109

1   separately consider in punishment.  So remember, there's
2   up to four questions potentially in a case like this.
3   First question is Guilt/Innocence.  Did the person commit
4   that.  Did the State prove its case.  Then we go into
5   Punishment.
6          Now, here, this is one classification of
7   capital murder.  A -- an intentional murder committed
8   during the course of robbery or burglary.  There are other
9   types of capital murder, for example, murder of a peace
10  officer, the additional element of a peace officer, or two
11  persons in the same transaction.  They are different.
12  Here, the additional factor is it occurs in the course of
13  robbery or burglary.  Do you think that's an appropriate
14  classification to bump it up from murder to capital
15  murder, in your mind?
16     A.  Yes.
17     Q.  Okay.  These are the elements.  "Elements" is a
18  word simply to mean or indicate what the State has to
19  prove.  And these are the pieces of information that we
20  have to prove in a capital murder case.  Have you had a
21  chance to look at those?
22     A.  Yes, sir.
23     Q.  If the State were to prove each of those elements
24  beyond a reasonable doubt, then under the law, you
25  would -- can you vote for a verdict of guilty?

110

1      A.  Yes.
2      Q.  If the State missed on any one of those elements,
3   we did not prove that, we had the wrong county, for
4   example, or a different mental state as what the evidence
5   suggests, do you see it would have to be -- if we didn't
6   meet our proof, what would you have to do?
7      A.  Find that person non-guilty.
8      Q.  Not guilty.
9      A.  Yes.
10     Q.  That's exactly right.  Are you holding us to our
11  burden, and either we got there or we didn't?
12     A.  Yes, sir.
13     Q.  If we didn't, we want to do the right thing.  Do
14  you agree with that?
15     A.  Yes, sir.
16     Q.  All right.  This is a statement about what this
17  intent means.  It's having a conscious objective or
18  desire to cause the result.  It's having a thought
19  process; however, it doesn't have to be premeditated.
20  Murder in a capital murder can occur intentionally, but
21  it does not require that it be thought out in advance.
22  It can be intentional even though it's right then and
23  there, as long as it's a conscious objective or desire
24  to cause the result.  How do you feel about that?
25     A.  I agree.

111

1      Q.  Are you okay with that?
2      A.  Yes, sir.
3      Q.  All right.  This introduces an additional feature
4   to a capital murder allegation.  Those are all the
5   elements that we looked at before.  Do you recall that?
6      A.  Yes, sir.
7      Q.  But at the bottom, it adds "or is a party to
8   capital murder".  This is Dale Hanna.  I'm Larry
9   Chambless.  Suppose there's two people who are
10  participating in a crime, and we are the two people.  Just
11  imagine in your mind that scenario.  We become -- if I'm
12  the -- say in a robbery, using a gun, if I'm the one with
13  the gun and he could be my helper.  Do you see how that
14  could work?
15     A.  Certainly.
16     Q.  Okay.  We'll talk more about that.  There are
17  ways in which a party, he, as my helper, could also
18  become guilty of capital murder under certain statements
19  of the law.  And we're going to get in to that here.
20  This is one way in which he could become responsible for
21  my conduct.  Take a minute to read that.
22         In other words, suppose I'm talking with my
23  friend, Mr. Hanna here, and we talk about going in to that
24  7-Eleven.  And you see in the third paragraph, one example
25  might be he says -- he solicits me.  He says, "Why don't

112

1  you go in and I'll stay out here and be the lookout". Do
2  you see how that works?
3      A. Yes, sir.
4      Q. He might -- he was not only there, be soliciting,
5  but he also encourages and aids me by being the lookout.
6  So if he's fully in for the robbery and he solicits and
7  aids me, he could be responsible for what I did in
8  stealing the money, even though he didn't go in. How do
9  you feel about that?
10     A. I agree.
11     Q. You agree with that?
12     A. I think that's appropriate.
13     Q. Okay. All right. There's a different scenario
14 here. And this is a lot of words, but take a minute to
15 read that.
16         A lot of words, a lot of legalese, but
17 basically let me illustrate. Suppose again we're talking
18 about this robbery of a 7-Eleven. Same illustration.
19 It's decided that I'm going in to do the robbery, the
20 stealing of the money. He's going to be the helper. It
21 might be a lookout or a getaway driver, whatever form it
22 takes, or he might be the person, whatever form it takes.
23 Now, if you can imagine, here is a conspiracy. Conspiracy
24 is just an agreement. That's all it is. It can be, look,
25 you can imagine, you can find an agreement by conduct, by

113

1  words, by whatever you choose.
2          But let's suppose we have this hypothetical
3  conversation. And yes, yes, I'm going to go in, steal the
4  money. I have my gun. He knows I have a gun. He knows I
5  always have a loaded gun on my person. We don't talk
6  about killing anybody, but he knows I have a loaded gun.
7  Now, as a Jury looks at that, what becomes critical is
8  this last phrase down here. Even though he -- we didn't
9  talk about the murder, even though Mr. Hanna had no intent
10 that I commit it, was the murder inside in furtherance of
11 the unlawful purpose. In other words, our decision to do
12 the robbery, and was the murder one that the killing, one
13 that should have been anticipated. Well, that would be
14 for a Jury to decide. Do you see how that might work?
15     A. Yes, sir.
16     Q. In other words, a Jury would have to look at that
17 and think about and decide whether or not Mr. Hanna should
18 have thought about it, should have anticipated that a
19 murder would have occurred or should have anticipated that
20 it could have occurred in the course of that robbery. And
21 if the Jury says yeah, he should have anticipated that,
22 then the accomplice, the helper, can be also guilty of
23 capital murder under this scenario. Do you see how that
24 works?
25     A. Yes, sir.

114

1      Q. Under the first scenario, both sides are fully
2  in to everything. Under the second scenario, don't
3  really have a conversation about the murder, but if it
4  should have been anticipated, then the helper, the other
5  party can become liable. Do you feel that's appropriate
6  or not?
7      A. Yes, sir, I do.
8      Q. Do you? Okay. This is just a recap of what we
9  just said. Those are the elements in order for a party to
10 become also responsible for capital murder. This is an
11 observation. What's not required is -- are these things.
12 Might be surprising to you. I don't know. You know, if
13 you look at a lot of TV, do you see a -- watch a lot of
14 TV?
15     A. Not too much.
16     Q. Good for you. All right.
17     A. Most of it is boring.
18     Q. All right. What's not required -- you remember
19 we have to prove the elements. What is not required, it
20 doesn't say anything about premeditation or motive or
21 even -- doesn't even require scientific evidence. As long
22 as we convince you beyond a reasonable doubt, then that's
23 what we have to do. Sometimes there may be a murder
24 weapon, sometimes not. Sometimes there may be a
25 eyewitness, sometimes not.

115

1          We do have an obligation to prove our case
2  beyond a reasonable doubt. Now, beyond a reasonable doubt
3  will -- will not be a definition given to you of that,
4  what that means. But I would suggest this. It doesn't
5  mean beyond all doubt. It doesn't mean beyond a shadow of
6  doubt. If it had to be beyond all doubt, then probably
7  each juror would have to -- would want to feel like,
8  "Well, I didn't see it." You know, all cases, all
9  criminal cases, whether it be from traffic up to capital
10 murder, are tried all over the country based on the
11 testimony of witnesses. And so it's up to the Jury to
12 listen and consider that kind of evidence and decide if
13 the case, if that particular feature that you're
14 interested in or need to know has been proven beyond a
15 reasonable doubt. Do you see how that works?
16     A. Yes, sir.
17     Q. Okay. Any of this bother you any? Do you have
18 any concern about that?
19     A. No.
20     Q. Okay. All kinds of witnesses in a criminal
21 case. This is an observation that it could vary,
22 anywhere from police officers, criminals, preachers and
23 prostitutes, what a pairing, what a coupling of types.
24 The -- I guess the point of this slide is that you as a
25 juror need to evaluate, if you're to serve, each witness

116

1  fairly and openly, as you see it, not giving anyone
2  automatic believability.  For example, police officers are
3  not entitled to be believed just because they come in with
4  a badge.  The same, by the same token, a person might
5  have a criminal history, and they're not to -- they don't
6  deserve being automatically disbelieved just because of
7  that.  It's a juror's role to determine the credibility of
8  each witness.  Do you think you could do that?
9      A.  Yes, sir.
10     Q.  Okay.  All right.  Sometimes there's testimony by
11 an accomplice.  Remember this same thing where we talked
12 about parties, accomplice.  Sometimes a deal is made in
13 criminal cases if there are two or more people involved.
14 Has that ever -- has that crossed your mind?
15     A.  Certainly.
16     Q.  Yeah.  You've heard that.  Plea bargains, have
17 you heard that term?
18     A.  Yes, sir.
19     Q.  Sometimes, for example, if we had committed this
20 aggravated robbery and the Prosecutor approached the
21 lawyer for Mr. Hanna there and said, "If you testify and
22 tell the truth, this is the punishment we recommend."  It
23 would be something like that.  If that occurred in a case,
24 you would know that that had occurred.
25          And so there might be accomplice testimony

117

1  sometime in a criminal case.  This is an observation about
2  that.  Says that if in that event, you can't use just
3  accomplice testimony to convict.  There has to be other
4  evidence.  And that's common sense, I guess.
5      A.  Yes, sir.
6      Q.  That's -- must be other evidence that tends to
7  connect the one on trial, it would be me, if he testifies
8  as an accomplice.
9          This is another feature of the law.  In a
10 criminal case, sometimes a defendant may give a statement
11 to the police.  It would be up to each juror to follow the
12 Judge's instructions.  And these are some features of the
13 law.  Basically the Judge would instruct you unless it was a
14 knowing, intelligent and voluntary statement, unless the
15 warnings were properly given, all that sort of thing, you
16 must disregard it.
17     A.  Yes, sir.
18     Q.  And if you were to serve as a juror, do you feel
19 like you could do that?
20     A.  Yes, sir.
21     Q.  Okay.  And it could be as serious as this.  For
22 example, if -- and again, goes back to that thought of
23 compartmentalizing this from that.  If the evidence came
24 in, but you, looking at it, felt like it should be
25 disregarded, then you would have to disregard it and look

118

1  at whatever other evidence, if any, is there.  Sometimes
2  there may not be.  There may be other evidence, sometimes
3  there might not be.  Some might feel that, "You know, I
4  don't know about that, that I could, you know, do that."
5  But as a juror, could you do that?
6      A.  I think so, yes, sir.
7      Q.  Think so?
8      A.  Yes, sir.
9      Q.  All right.  Separate this from that?
10     A.  Yes.
11     Q.  All right.  Do you recall at the beginning we
12 said there are potentially how many decisions that would
13 be made in a case like this?  I don't know if you
14 remember, up to --
15     A.  Capital murder?
16     Q.  In a capital murder case.
17     A.  Two.
18     Q.  Okay.  Actually four.
19     A.  Or four, yeah, four questions.
20     Q.  One in the first part, and the decision is as to
21 guilty or not guilty.
22     A.  Yes.
23     Q.  Okay.  And that's the -- on the left side of this
24 slide.  You see that.  Evidence presented, the lawyers get
25 up and make an argument, then you go back and decide is he

119

1  or she guilty or not guilty.  And if you decide not
2  guilty, that ends the process, of course.  If you decide
3  guilty, then we go on to this other part, the punishment
4  part.  If you can envision that as two separate parts.
5          And in the second part, there are potentially
6  three decisions that you would have to make, each
7  independent of the other.  Each you need to take just a --
8  the fact that you make one decision doesn't dictate the
9  other.  It's taking a look at whatever evidence there is
10 at that point, not leaning towards one punishment
11 automatically.  It's just simply basing your decision on
12 the evidence, whatever there is at that time.  Do you see
13 how that works?
14     A.  Yes, sir.
15     Q.  So as you go into this, do you think you would
16 be leaning towards life or death or could you base your
17 decision on the evidence as it comes up according to
18 these questions?
19     A.  I think I would have to wait to hear the
20 evidence.
21     Q.  Okay.  Very good.  And here they are.  These,
22 this is the shorthand version of these questions.  Take a
23 minute, if you would, to read that:
24          So again, in the second part of the trial --
25 remember, first part is Guilt/Innocence.  It doesn't

STATE VS. MARK ANTHONY SOLIZ   JANUARY 31, 2012

**120**

1  determine your answer to these questions.

2      A.  Right.

3      Q.  Okay.  There may be additional evidence in the

4  second part.  The only side with any burden of proving

5  anything and presenting evidence is who?

6      A.  Prosecution.

7      Q.  Prosecution.  Never, in either Guilt/Innocence or

8  Punishment, any, never any responsibility on the

9  Defendant.

10      A.  Yes.

11      Q.  So the first question is, the shorthand version,

12  is the Defendant a future danger.  The second is three

13  questions:  Did the Defendant kill the victim or intend to

14  kill the victim, or in a different twist from the

15  Guilt/Innocence thing about parties, actually anticipate

16  instead of should have anticipated.  And Issue No. 3,

17  does the Defendant deserve a life sentence rather than

18  the death penalty.  Now, these are the full, this is the

19  full version.  There's a lot of words there.

20      A.  Yes.

21      Q.  Yes, sir.

22      A.  If, in fact, that did occur, then there is a

23  possibility of continuing threat to society, yes.

24      Q.  Well, I see where you're thinking.  But here's an

25  observation.  The fact that a person has been found guilty

**121**

1  of capital murder does not determine necessarily the

2  answer "yes" or "no".

3      A.  That's true.

4      Q.  It depends on what the evidence is.

5      A.  Right.

6      Q.  Okay.  In other words, even if you found a person

7  guilty of capital murder, would you automatically say yes,

8  that person is a future danger?  And it -- if -- you know,

9  you wouldn't know.  You don't know the facts yet, do you?

10      A.  That's right.  That's correct.

11      Q.  Now, let me throw out a --

12      A.  Your car accident thing a minute ago is a good

13  example.

14      Q.  Okay.  The road rage?

15      A.  Yes.  That doesn't tell us that he would be apt

16  to do that again at all, or she.

17      Q.  All right.  At each point in the process, here's

18  the key thing.  You have to wait until the evidence is

19  before you.

20      A.  Right.

21      Q.  That would be after all the evidence in

22  Guilt/Innocence and whatever evidence there is in

23  Punishment.  Just because you found a person guilty of

24  capital murder does not necessarily determine your answer

25  to any one of these three questions.  None of them are

**122**

1  automatic.

2      A.  Yes.

3      Q.  Each needs a separate look at that time based on

4  whatever the evidence is.  If you remember nothing else,

5  if you could remember that, "I need to hear the evidence

6  and it's not automatic".  Okay?

7      A.  Right.

8      Q.  All right.  Now, here's some observations, some

9  key words in here.  Do you find from the evidence beyond

10  a reasonable doubt, that means as to this question we

11  have to prove, again, beyond a reasonable doubt that

12  there is a -- here's a key word:  Probability.  I would

13  suggest to you that means more than just a possibility

14  but less than a certainty, that there is a probability

15  that the Defendant will commit criminal acts of violence

16  that would constitute a continuing threat to society.

17  Now, going in to this, you know that there are only two

18  punishments.  Do you remember what they were?

19      A.  Yes, sir.

20      Q.  What were they?

21      A.  Life without parole or the death penalty.

22      Q.  Okay.  Now, very good.  Thank you.  Now, you

23  would look at all of the evidence from Guilt/Innocence and

24  all of the evidence in Punishment, whatever it may be, and

25  then make a decision.

**123**

1          A person might have -- for example, let me

2  just throw another scenario out here.  A defendant kills

3  my wife, shoots my wife.  And I think about that.  And I'm

4  not patient enough to let the criminal justice system take

5  its duty, what needs to be done.  And so I enter the home

6  of that person who shot my wife.  I consciously and sanely

7  do that, and I go in with the intent and I commit the

8  murder of that person.  That's a capital murder.  Suppose

9  in that hypothetical, that person, me or someone else,

10  doesn't have any prior criminal history.  You know, a Jury

11  might look at that and they might decide on this issue one

12  way or the other.  I don't know how they would decide.  Do

13  you see how there might be different facts?

14      A.  Yes.

15      Q.  And it would all depend on whatever evidence

16  you heard.  There might be a case where there is prior

17  criminal history, might be a case where there isn't

18  prior criminal history.  You would just have to wait

19  and see what the evidence is.  Do you agree with that?

20      A.  Yes, sir.

21      Q.  Okay.  Society, here is a word that's in there,

22  and it would be any place that a defendant finds himself.

23  And for example, it might be free society, it might be

24  prison society.  Now, do you think, can you envision in

25  your mind's eye that in prison, the prison world, there

124

1 are those who work in a prison, other inmates also, family
2 who is visiting? Do you think that those deserve to be in
3 a position of safety?
4  A. Yes.
5  Q. Okay. Can you consider all of that as you base
6 your decision, whatever it is, on the evidence?
7  A. Yes.
8  Q. Can you go in to this with an open mind and
9 answer it either "yes" or "no" depending on what the facts
10 are?
11  A. Yes.
12  Q. Okay. The second issue is also the
13 responsibility of the State. That's that gold part. Do
14 you find from the evidence beyond a reasonable doubt. And
15 in this case, you would answer, you would look at the
16 facts, whatever they are, and decide if there is -- you
17 know, this would only come up if there is more than one
18 person involved. Did that person actually cause the
19 death, or did that person intend to kill the deceased, or
20 the last piece here is at the bottom, actually anticipated
21 that a human life would be taken.
22   Go back to this example. Remember we talked
23 about we're committing the robbery of the 7-Eleven. He
24 knew that I had a gun. Do you remember that example?
25  A. Yes.

125

1  Q. Okay. Imagine just a hypothetical just in your
2 mind, not only did he know that I had a gun, that it was
3 loaded, that I always had a gun, but we talked further and
4 there were some words and agreement amongst us, we leave
5 no witnesses. And we high-five. In that situation, I
6 don't know what a Jury would decide, but a Jury might
7 decide that that person, Mr. Hanna, actually anticipated.
8 Do you see even though he wasn't the trigger man, he was
9 just the helper?
10  A. Yes.
11  Q. It would depend on the evidence, wouldn't it?
12  A. Yes.
13  Q. Can't decide any of this in advance.
14  A. No.
15  Q. Okay. And this is the third and final question
16 that a Jury would reach potentially in a capital murder
17 case. It's a lot of words. Mitigation, mitigating
18 circumstance. Mitigation, I'll represent to you will be
19 defined for you, something that reduces a Defendant's
20 moral blameworthiness. I don't know if that helps or
21 hurts, but that's -- that is a thing. And it says here,
22 it's a opportunity for -- even if you found a person
23 guilty of capital murder, and you struggled through
24 Special Issue 1 and said yes, future danger, and you got
25 to Question 2, yes, did intend to kill or killed or

126

1 actually anticipated, now you're here. What the law
2 envisions is that you would come into this part of the
3 trial still willing to give fair consideration to life as
4 well as death. Do you think you could do that?
5  A. Yes, sir.
6  Q. And it envisions that you would, if you look
7 at this, that you would take into consideration all of
8 the evidence, everything, just kind of step back,
9 including the circumstances of the offense, Defendant's
10 character and background and the personal moral
11 culpability of the Defendant. And here it asks, do
12 you find that there is a sufficient mitigating
13 circumstance or circumstances to warrant that a sentence
14 of life rather than death be imposed. It asks you to
15 step back. Do you think you could do that and give
16 fair consideration to each point, to either life or
17 death, depending on what the facts are?
18  A. Yes, sir.
19  Q. And even if you reach this third point, because
20 you wouldn't have reached this third point unless you
21 had found guilty capital murder, yes to 1, yes to 2.
22 Do you see that?
23  A. Yes, sir.
24  Q. Do you think you could give fair consideration
25 to both life as well as death if you were on this Jury?

127

1  A. Yes, sir.
2  Q. Okay. And I don't want to ask you this to be
3 morbid or anything or -- but I need to ask you this.
4 If the State proved what we had needed to prove in a
5 capital murder case, could you sign a verdict that
6 resulted in a death sentence?
7  A. Yes, sir.
8  Q. By the same token, if the evidence as presented
9 in a capital murder case, if you felt even as you reached
10 Special Issue No. 3 that there was a -- and this is a key
11 word, sufficient mitigating circumstance, sufficient, do
12 you think you could give fair consideration to a life
13 sentence?
14  A. Yes, sir.
15  Q. My mother was an unusual person. She always
16 thought that when when she saw life, everything was
17 wonderful, and if a glass was half full, she thought
18 it was overflowing. I see it and I think it's nearly
19 empty. Everybody looks at life differently. Do you
20 agree?
21  A. Yes, sir.
22  Q. Okay. Some people think that there's always --
23 and this may be, very well be true -- there's always
24 something good that can be said. Here, the law puts a
25 key word in here. And it says, you know, there may be

128

1 mitigating circumstance.  What -- you know, let me just
2 throw out some ideas.  For some people, one juror might
3 think, you know, youth, another person might think poor
4 education, another person might think drug abuse, another
5 juror might disagree with the drug abuse or the youth.
6 It just depends.  What weight or significance you give to
7 a particular feature is up to you and your other jurors.
8 And do you see how that works?
9     A.  Yes, sir.
10    Q.  So there may be a mitigating circumstance, but
11 it might not be sufficient.  So that's the question.
12 And it envisions you step back, look at everything.
13 Can you consider and give fair consideration to all of
14 the evidence?
15    A.  Yes, sir.
16    Q.  Including the circumstances of the offense, would
17 you be able to do that?
18    A.  Yes, sir.
19    Q.  Would you give fair consideration to the
20 Defendant's character and background?
21    A.  Yes, sir.
22    Q.  Okay.  And the third aspect that it talks about
23 is the personal moral culpability of the Defendant.  Do
24 you see that?
25    A.  Yes.

129

1     Q.  I think one observation here is there is nothing
2 automatic.  Even if you find a person guilty, you've got
3 to separately and independently consider each of these
4 decisions because they're important.  And do you have any
5 questions as you -- we've covered an awful lot of ground
6 here.
7     A.  No.
8         MR. CHAMBLESS:  Okay.  Pass the Juror.
9         THE COURT:  Okay.  I'll recognize the
10 Defense.
11        MR. WESTFALL:  Thank you, Your Honor.
12        VOIR DIRE EXAMINATION
13 BY MR. WESTFALL:
14    Q.  Hello, Mr. Hatch.  I'm Greg Westfall.
15    A.  Good afternoon.
16    Q.  Good afternoon.  Would you give me just one
17 second to turn this off?
18    A.  Sure.
19    Q.  What do you think of the process so far?
20    A.  It's not exactly what I expected, but I'm not too
21 surprised.
22    Q.  What did you expect?
23    A.  I had no idea, having never done this before.
24    Q.  Well, there is no other kind of jury selection
25 like this.  This is unique.  The individual voir dire,

130

1 it's only done in death penalty cases.
2     A.  I see.
3     Q.  So, you know, your first experience, you went
4 right to the top.
5     A.  I suppose.
6     Q.  You work at -- what's the name of the place you
7 work?
8     A.  AutoZone.
9     Q.  AutoZone.  What do you do?
10    A.  I'm the commercial sales manager for that store
11 here in town.
12    Q.  And what is that?
13    A.  My job entails pretty much conversation on the
14 telephone with the different garages and shops across
15 town.  I take their orders over the phone, look up parts
16 on the computer, generate invoicing for that customer,
17 have the parts pulled, and my drivers deliver.  My
18 responsibility also encompasses going out and calling on
19 the different garages that open in town to try and
20 generate business, open accounts, maintain accounts, so on
21 and so forth.
22    Q.  Okay.
23    A.  Sales.
24    Q.  So you're in direct competition with like the
25 dealerships?

131

1     A.  More the retail aftermarkets, the O'Reilly, the
2 Napa, that sort of thing.
3     Q.  Okay.
4     A.  And we do compete with the dealers too because of
5 our pricing.  Aftermarket pricing is usually cheaper than
6 dealer price.
7     Q.  Right, right, and the O.E.M.
8     A.  Yes.
9     Q.  You enjoy doing that?
10    A.  Sure.  I've been with AutoZone a little over 10
11 years.  I was at Chief Auto Parts for about ten years
12 before that.
13    Q.  Kind of doing the same thing?
14    A.  About 20 years in the car parts business.
15    Q.  Excellent.  You don't like to watch TV.  Do you
16 like to read?
17    A.  I do.
18    Q.  What do you like to read?
19    A.  All sorts of things.  I subscribe to Sports
20 Afield, Outdoor Life, several different magazines like
21 that.  I like to hunt and fish, to go along with the
22 reading.  I like to ride a motorcycle.
23    Q.  What kind of motorcycle?
24    A.  I own two motorcycles.  I have a Kawasaki Vulcan
25 and a Honda Goldwing.

STATE VS. MARK ANTHONY SOLIZ   JANUARY 31, 2012

132

1   Q. Those are both street bikes?
2   A. Yes, sir.
3   Q. So you like to do the long distance?
4   A. Oh, yes, I love it.
5   Q. Good. Well, this is a good winter to be doing
6   that, isn't it?
7   A. It has been. It has been.
8   Q. What do you like to hunt?
9   A. Deer mostly.
10   Q. Deer?
11   A. We have turkey on the deer lease. We've been on
12   the same deer lease for about 16 years consecutively, so
13   we're pretty much entrenched.
14   Q. And you like to shoot a lot?
15   A. Yes, sir.
16   Q. What do you like to shoot?
17   A. I used to target practice quite a bit with
18   friends. Don't do that too much anymore. But when we go
19   to the deer lease, we carry a 22 or 22 rifle, something
20   like that, target practice out there. It's lots of fun,
21   pass time.
22   Q. Yeah. You ever tried ARs?
23   A. No.
24   Q. They're a lot of fun.
25   A. Never had any interest in --

133

1   Q. Yeah, for target practice and whatnot, those are
2   a lot of fun.
3   A. Yeah.
4   Q. Well, very nice. Well, I'm gonna speak to you
5   for probably about the same amount of time, but I want
6   to -- my questions gonna be a little bit different. I
7   want to -- I mean, it's going to seem probably kind of
8   philosophical. Are you okay with that?
9   A. Sure.
10   Q. Excellent. You moved in to Johnson County at 6?
11   A. Yes, sir.
12   Q. Did you move to Alvarado at that time?
13   A. Yes. Yes, when I was 6, my parents bought a farm
14   south of Alvarado. I grew up there, graduated Alvarado
15   High School. Still own the farm. My mother is still
16   alive, but I'm the executor of the estate, so I still see
17   about it.
18   Q. So did your father die recently?
19   A. No, about 15 years ago.
20   Q. Okay. Okay. So the estate has just been left
21   open, right?
22   A. Well, she's, like I say, still alive. She lived
23   on the farm until about six years ago when she had a
24   stroke. She's in a nursing home here in town now. So we
25   still have cows and so on and so forth over there.

134

1   Q. Yeah. How was your childhood?
2   A. I probably had as pleasant a childhood as anyone
3   could ask for. Both parents, I have a sibling, one
4   sibling, a brother 11 months older than I am. And growing
5   up in a small town was all you could ask for, I guess.
6   Q. Yeah. How many acres is your farm?
7   A. Started out 36 when I was a child, and my dad
8   sold half of it, so still have about 17 acres.
9   Q. Okay. Did y'all run cattle while you were
10   growing up?
11   A. Yes, sir.
12   Q. So you got to do all that?
13   A. Oh, yeah.
14   Q. Did you have horses too?
15   A. No, my father wouldn't let us have horses because
16   they eat the grass too close to the ground was his theory,
17   but we rode the neighbors' horses whenever we had that
18   urge.
19   Q. Okay. Okay. Well, good. How much thought have
20   you really given to the death penalty?
21   A. Oh, I guess during life it comes up in
22   conversations with people as to what they know of an
23   incident, and I guess everyone ponders what they might
24   have done under the circumstances, based on what they
25   know, which may or may not be the full story, of course.

135

1   I, of course, have never been put in that position. I was
2   in the military for about 10 years, but never was in a
3   combat circumstance, so I never had firsthand exposure to
4   the danger.
5   Q. Uh-huh. You know, that's something I forgot to
6   ask you. I see your son is in the Army.
7   A. Yes, he is now.
8   Q. Is he here in the United States or is he away?
9   A. He's presently in the United States, yes, sir.
10   He did Afghanistan.
11   Q. Is he all right?
12   A. Yes, he's fine. Unwounded.
13   Q. Is he going to have to go back?
14   A. I don't know. He doesn't know at this time.
15   Q. What does he do in the Army?
16   A. I don't know specifically right this moment.
17   He started out in the Air Force. He did a partial hitch
18   in the Air Force, was discharged, and then re-enlisted
19   and went back into the Army, so he has had various and
20   sundry jobs. He started out as a nuclear missile
21   electrician in Minot, North Dakota, of all places, but
22   he's in the infantry now in the Army, so it's a totally
23   different scenario.
24   Q. That is -- that is not a tech job.
25   A. No.

136

1    Q. You were in the military. Were you drafted?
2    A. No.
3    Q. Did you join the Navy, I guess?
4    A. I received a draft notice, I should --
5    Q. And joined the Navy?
6    A. -- I should state that correctly. I joined the
7 Naval Aviation in 1969 and was in till 1975, was out 14
8 years, went back in in 1994 and stayed till 2008,
9 thereabouts.
10   Q. In the Reserves or?
11   A. Reserves.
12   Q. Or active?
13   A. Reserves. I only accomplished or fulfilled about
14 three years of active duty all told.
15   Q. And were you at E4 when you retired?
16   A. Well, I didn't retire. I just did 10 years. I
17 had a 14-year break.
18   Q. Okay.
19   A. Six years the first time, little over four years
20 the second time.
21   Q. I got you. I was thinking 14 years the first
22 time.
23   A. No, no, 14-year break.
24   Q. All right. Well, very good. Well, I was sitting
25 over there figuring it up. And I joined the Army 28 years

137

1 ago. Time does fly, doesn't it?
2    A. It does. It does. I look back, I wish I had
3 stayed in the military long enough to retire.
4    Q. Uh-huh.
5    A. That was my intent when I went back in the second
6 time, but Desert Storm had just ended and the military was
7 going through a cutback, so even though I took the
8 advancement exam every six months successfully and
9 attended all the drills and so forth, there were just
10 simply no slot to move into, so it was pass but not
11 advance, pass but not advance. So there I went.
12   Q. On the death penalty, first of all, which do you
13 think is worse, life in prison without possibility of
14 parole or death?
15   A. I would say the death penalty is worse, simply
16 because in taking a person's life, there is no more. When
17 you are life without parole, you are still a person, you
18 are still functional, you still have an opportunity to
19 live.
20   Q. Uh-huh. And what do you think is the role of the
21 death penalty in our society?
22   A. That is philosophical. I would say the death
23 penalty as it relates to what we're talking about is a
24 deterrent to crime, the final major deterrent. And in
25 addition, obviously, to being punishment for having

138

1 committed that level of crime.
2    Q. Uh-huh. Okay. When you picture prison, I mean,
3 have you ever been to a prison?
4    A. Yes.
5    Q. Did you go see the rodeo?
6    A. I've been to the Huntsville State Rodeo. And
7 years ago when I was a teenager, I went to Oklahoma State
8 Prison one time. My father was a contractor.
9    Q. Uh-huh.
10   A. And he did floor coatings, so he took me along as
11 a visit and I went inside the prison with him on a single
12 visit to Oklahoma State Penitentiary.
13   Q. All right. And what did you think?
14   A. Everyone was nice. I -- it wasn't an unpleasant
15 experience. It's different, obviously.
16   Q. Right. And was this a maximum security prison?
17   A. I have no idea.
18   Q. Okay. Well, in Huntsville, I guess they don't
19 have that rodeo anymore. Where do you go see the rodeo in
20 Huntsville?
21   A. It was just -- it was within the perimeter of the
22 prison grounds.
23   Q. The Walls Unit, right?
24   A. Yes, yes, there in Huntsville, yeah. It was a
25 very good rodeo.

139

1    Q. Oh, yeah, before I forget, you looked at the list
2 of witnesses?
3    A. Yes, I did.
4    Q. Did you see any on there you recognized?
5    A. No, sir, I did not.
6    Q. Okay. Back to philosophical questions.
7    A. Okay.
8    Q. You know, as far as I know, in fact, I checked
9 the statute after you said this, and it's true. There is
10 no definition of society. Society is whatever you believe
11 society is. And if you believe society is prison, fine;
12 if you don't, then fine. Could you be open to the
13 possibility that prison society, quote, unquote, would not
14 be the same as society out here?
15   A. Absolutely.
16   Q. And that folks in prison know how to control
17 people and know how to lock people down?
18   A. Yes.
19   Q. And the reason, I mean, so much of this is kind
20 of left up to you as a juror, and the reason for that, and
21 the statute says this, it's a moral decision. It is a
22 moral decision what you decide is sufficient mitigation.
23 And no one else has to agree with it. In fact, no one
24 else has to even know. You see?
25   A. Yes, sir.

140

1  Q. And, you know, here's the -- the elements, and
2  you already know beyond a reasonable doubt, you're
3  familiar with that phrase?
4  A. Yes, sir.
5  Q. In the -- in the law, in the criminal law
6  particularly, there's several different burdens of
7  proof. And they go, you know, from low to high
8  generally. Reasonable suspicion, which is what it
9  takes for a police officer to pull you over. Probable
10  cause, which is what it takes for a police officer to
11  arrest you or for the Grand Jury to indict a case.
12  And then preponderance of the evidence, which is the
13  civil standard, you know, 51 percent. After that is
14  what's called clear and convincing evidence. And you
15  knew that the State could take away someone's children
16  if they think they're a bad parent?
17  A. Yes, sir.
18  Q. That's the standard that they use for that, for
19  taking away someone's kids. And it's actually defined,
20  firm conviction or belief, that the person is an unfit
21  parent. So the Jury has to have a firm conviction or
22  belief to make that decision. Proof beyond a reasonable
23  doubt is beyond that. It's beyond a firm conviction or
24  belief. How do you feel about that?
25  A. I think it's appropriate, the more serious the

141

1  crime, the more difficult it is to determine a guilt or
2  innocence.
3  Q. Okay. And what goes along with the burden of
4  proof is what's called the presumption of innocence.
5  And you know, you've studied history, you know about the
6  reasons why we left England.
7  A. Certainly.
8  Q. And the court system was one of them.
9  A. Right.
10  Q. We sort of, when we got started here, we sort of
11  cherry-picked the best of the English law and made it our
12  law, including a presumption of innocence instead of a
13  presumption of guilt, public trials instead of star
14  chambers and, you know, impartial juries instead of the
15  king making the decision.
16  A. Right.
17  Q. And so the presumption of innocence springs from
18  that. Well, if you were to find a Defendant guilty of
19  capital murder as it is stated here, you would have
20  overcome that presumption of innocence.
21  A. Yes, sir.
22  Q. Do you see that?
23  A. Yes, sir.
24  Q. And you would have found beyond any reasonable
25  doubt the Defendant, on or about the date specified, in

142

1  Johnson County, intentionally caused the death of an
2  individual by a firearm in the course of committing a
3  robbery or a burglary of somebody's house. And by
4  finding that person guilty beyond any reasonable doubt,
5  you've necessarily done away with all the defenses. You
6  see that?
7  A. Yes, sir.
8  Q. At that point, a person is convicted of capital
9  murder. Now, when we start with the Special Issue 1,
10  this is that probability that the Defendant will commit
11  criminal acts of violence that would constitute a
12  continuing threat to society. You see these words here,
13  "do you find the evidence beyond a reasonable doubt",
14  every time you see that, that means there's a presumption
15  at work.
16  A. Innocence.
17  Q. Right, well, in this case, the presumption that
18  the person wouldn't be a future danger.
19  A. Right.
20  Q. You see that?
21  A. Yes.
22  Q. And the State can only overcome that with proof
23  beyond any reasonable doubt.
24  A. Yes, sir.
25  Q. There is a probability, and let's say you found

143

1  that to be true, okay. Further, once again, here's those
2  words, that you have found beyond any reasonable doubt
3  that the Defendant intended to kill the deceased or
4  anticipated that the deceased would be killed. Okay.
5  So are you there with me?
6  A. Yes, sir.
7  Q. It is at that point that you would get this
8  instruction. Now, what I want to know is once you have
9  found those things, to your mind, could there ever be a
10  sufficient mitigating circumstance for a life sentence?
11  A. I think so.
12  Q. Mitigation is defined as anything a juror might
13  think reduces the Defendant's moral responsibility. Did
14  you hear that last word?
15  A. Yes, sir.
16  Q. Moral responsibility. I heard the cough. When
17  you make a decision like this, where do you go? Where do
18  you go for, I guess, the wisdom?
19  A. I think you have to consider your life
20  experiences, you have to look in your heart, you have to,
21  um, weigh in your mind carefully the issues at hand to
22  reach a decision. It's not a -- it's not a simple process
23  by any means. Religion is an issue for a lot of people,
24  including myself, the value of human life.
25  Q. Thank you. Thank you very much. I can't

144

1  remember how you answered this on your questionnaire, but
2  do you -- first of all, do you think anyone is born bad?
3      A.  No.
4      Q.  Tell me, tell me more.
5      A.  I'm a believer that no matter what your
6  circumstances are, as you are raised up, we're all given
7  an opportunity to see right from wrong.
8      Q.  Uh-huh.
9      A.  We make conscious choices every day, each one of
10  us, about right and wrong.  You can see as an individual
11  the result of making the wrong decision.  We all make
12  wrong decisions periodically, and we learn by them.  So we
13  have an opportunity to mold our lives in the right
14  direction if we see fit.  There are circumstances
15  sometimes, mitigating circumstances that we talked about
16  that could have an impact on doing the right thing or not,
17  but by and large, we are conscious individuals, we do make
18  conscious choice.  We do the right thing because we know
19  it's the right thing to do.
20     Q.  Uh-huh.  Is there a -- is there an age at which
21  we have that knowledge?
22     A.  Oh, I think, I hope we get better at it as we
23  get a little older, more mature.  I don't think there's
24  a magic age.  I think even as a child we teach our
25  children right from wrong.  Discipline, you know, is the

145

1  purpose of that, no matter how it comes in whatever form.
2  But it's a learning process, I think from infancy all
3  the way through our lives.  Sometimes we do better than
4  others.
5      Q.  We ourselves, for sure.  You mentioned something,
6  teaching our children?
7      A.  Uh-huh.
8      Q.  Isn't teaching our children that discipline and
9  those boundaries one of the greatest expressions of love
10  that we can give?
11     A.  Absolutely.
12     Q.  Because that means that we're spending time with
13  our kids?
14     A.  Absolutely.
15     Q.  And if they don't have that, we're hurting them?
16     A.  Absolutely.
17     Q.  How do you show kids that you love them?
18     A.  By word and deed and example.  The example is as
19  important as the discipline that you give them.  If you
20  live your life in a positive, straightforward manner, you
21  set the example.  You know, they talk about how children
22  may not say anything but they are always watching and
23  listening what's going on around them.
24     Q.  Uh-huh.
25     A.  And then, of course, the discipline portion of it

146

1  is -- is the correction when they go astray a little bit,
2  either verbally or by taking away some privilege or, you
3  know, whatever, corporal punishment, depends on the
4  parent.  It's a combination of things.
5      Q.  That's -- I agree.  I agree.  And what I hear you
6  saying in all of that is time.
7      A.  Oh, absolutely.  It's a hourly, moment-by-moment
8  process, yes.  Children are always -- our children, no
9  matter what their age, and hopefully they're still
10  watching and listening when they reach young adulthood to
11  see that mom and dad, you know, halfway knew what they
12  were talking about.
13     Q.  Excellent.  Thank you so much for that.
14     A.  You're welcome.
15     Q.  You think life in prison is a -- without parole,
16  that that is a hard punishment?
17     A.  Absolutely.  To take away a person's freedom,
18  to literally turn their lives upside down and to control
19  their every moment by incarceration is -- I don't see how
20  anyone could consider that less than severe.
21     Q.  Uh-huh.  Could I have just one second?
22     A.  Sure.
23     Q.  What's a favorite book you've ever read?
24     A.  That's difficult.  Let's see, I have the
25  collection of Mark Twain at home.  I like to read Mark

147

1  Twain.  Several books.  I like to read a great deal, so
2  I've read quite a few different things.  But I like Mark
3  Twain.
4      Q.  Mark Twain is fantastic.  He wrote some of the
5  funniest stuff out there.
6      A.  Absolutely.
7      Q.  You know what, I love talking with you, but I've
8  kind of run out of material.
9      A.  That's fine.
10     Q.  Do you have any questions of me?
11     A.  No, sir.
12         MR. WESTFALL:  Okay.  Thank you so much.
13         VENIREPERSON:  Thank you.
14         MR. WESTFALL:  You're extremely thoughtful
15  and you went through the effort to articulate it and I
16  really appreciate it.
17         VENIREPERSON:  Okay.
18         MR. WESTFALL:  Your Honor, we'll pass the
19  Juror.
20         THE COURT:  Okay.  Mr. Hatch, if you'll step
21  outside for just a minute.
22         VENIREPERSON:  Yes.
23         (Venireperson Hatch not present.)
24         THE COURT:  Does State have any challenges?
25         MR. CHAMBLESS:  No, Your Honor.

148

1 THE COURT: Does Defense have any?

2 MR. WESTFALL: No, Your Honor.

3 THE COURT: Will you ask him to come in.

4 (Venireperson Hatch present.)

5 THE COURT: Mr. Hatch, I just need to talk to

6 you a minute.

7 VENIREPERSON: Yes, sir.

8 THE COURT: You're not on the Jury yet, but

9 you are on the panel the Jury is going to be selected

10 from.

11 VENIREPERSON: Yes, sir.

12 THE COURT: What's going to happen, you're

13 going to get a call from the Jury Administrator that you

14 have to be in court on a certain day. We don't know that

15 date yet, somewhere latter part of February, all we can

16 tell you. We'll give you as much notice as we can.

17 VENIREPERSON: That's good.

18 THE COURT: When you come that day, you'll

19 come with about 50 other people. And that day, you'll be

20 told you're either on the Jury or you'll be excused.

21 Before you leave today, we're going to get a picture of

22 you. This lady is going to take it in that back corner,

23 and we're doing that because this is going to last about a

24 month.

25 VENIREPERSON: Okay.

149

1 THE COURT: In the meantime, don't go to work

2 and ask anybody if they know anything about this case.

3 Don't -- it could very well be in the newspaper or even on

4 TV when it gets closer. Don't watch it. Don't listen to

5 it. Don't let anybody tell you what was said. If you

6 hear anybody start to talk about it, make them be quiet or

7 go away or you go away.

8 VENIREPERSON: Yes, sir.

9 THE COURT: Also, whatever you do, don't get

10 on the Internet and start looking up anything about the

11 case.

12 VENIREPERSON: Okay.

13 THE COURT: We'll -- thanks for coming.

14 We'll see you back in that back corner and we'll see you

15 in about a month.

16 VENIREPERSON: All right, sir.

17 THE COURT: Thank you. We're in recess until

18 1:30.

19 (Recess taken.)

20 THE COURT: Carolyn Strom.

21 (Venireperson Strom present.)

22 THE COURT: Hi. If you'll raise your right

23 hand.

24 (Juror sworn.)

25 THE COURT: Thank you, ma'am. If you'll have

150

1 a seat in the second seat on the jury box. Would you

2 state your name.

3 VENIREPERSON: Carolyn Strom.

4 THE COURT: Ms. Strom, you filled out a juror

5 questionnaire a while back. Were the answers you put on

6 there true and correct?

7 VENIREPERSON: Yes.

8 THE COURT: Okay. And it's been about three

9 weeks since you did that. Has anything happened in your

10 life that would change any of those answers?

11 VENIREPERSON: No.

12 THE COURT: My name is Phillip Vick. I'm the

13 Judge presiding in this proceeding. When this case goes

14 to trial, Judge William Bosworth, Judge of the 413th

15 District Court of Johnson County, will be trying the

16 case.

17 The attorneys representing the State are

18 Mr. Dale Hanna.

19 MR. HANNA: Good morn -- good afternoon, I

20 should say.

21 THE COURT: Mr. Larry Chambless, Mr. Martin

22 Strahan.

23 MR. STRAHAN: Hi, there.

24 THE COURT: And Ms. Christy Jack.

25 MS. JACK: Good afternoon.

151

1 THE COURT: The attorneys representing the

2 Defendant are Mr. Greg Westfall.

3 MR. WESTFALL: Hello.

4 THE COURT: Mr. Michael Heiskell. And seated

5 with them at the counsel table is the Defendant, Mark

6 Anthony Soliz.

7 THE DEFENDANT: How you doing?

8 THE COURT: And they'll have questions for

9 you, but I'll ask first. Is there anything we should know

10 about you that we didn't ask on the questionnaire?

11 VENIREPERSON: I don't think so.

12 THE COURT: Okay. You're going to be asked a

13 lot of questions, I suspect. There's no right or wrong

14 answers. It's not a test. The only thing we require of

15 you is that you be truthful. Answer "yes" and "no" if you

16 can. If you say things like "I think so" or "maybe",

17 you're going to get about four other questions explaining

18 that answer.

19 VENIREPERSON: Okay.

20 THE COURT: And don't answer a question

21 unless you understand it. If you don't understand it,

22 make them rephrase it or explain it somehow. We think

23 trial is expected to begin, we think, the last week in

24 February, our best guess right now. And when it does

25 start, we think it will last up to three weeks. There

152

1  is a chance that the Jury could be sequestered for all
2  or part of that time.  And my question is, is there
3  anything happening in your life that would interfere
4  with you being a juror during that time?
5          VENIREPERSON:  No, no.
6          THE COURT:  Okay.  Good enough.  Now I have
7  to turn you over to the State.
8          I'll recognize the State.
9          MR. STRAHAN:  Thank you, Your Honor.
10             CAROLYN STROM,
11     Venireperson No. 60, testified as follows:
12         VOIR DIRE EXAMINATION
13 BY MR. STRAHAN:
14     Q.  My name is Martin.  How are you doing today?
15     A.  Good.  Thank you.
16     Q.  Now, you're a little bit soft-spoken, which
17 is okay, but this nice lady right here is taking down
18 everything we say, you know, for future records.  And
19 so for every answer we can give, if you could speak up
20 a little bit so everyone in the room can hear you.
21 Okay?
22     A.  Okay.
23     Q.  Can you do that for me?
24     A.  Yes.
25     Q.  Let me ask you this.  What was the first thought

153

1  in your head, first of all, when you got your notice just
2  to show up in Johnson County for Jury?
3      A.  Um, I, just, okay, well, I haven't been called
4  before so I guess I didn't really know what to think.
5      Q.  Okay.  And you could, I guess, imagine that
6  there's a huge, wide variety of possible cases that a
7  person could be called for jury service on, everything
8  from a traffic ticket all the way up to capital murder?
9      A.  Uh-huh.
10     Q.  Does that make sense?
11     A.  Yes.
12     Q.  Okay.  And how did you react, what was your
13 thought process when you, I guess, started to fill out the
14 questionnaire and realized this is a capital murder, death
15 penalty case?
16     A.  I took it very seriously, I mean, and kind of
17 think really hard about the questions and the answers that
18 I was putting down.
19     Q.  Right.  So you could automatically figure out the
20 gravity of the situation, and so I guess what you're
21 telling me is you knew that even as you were filling out
22 this questionnaire?
23     A.  Yes.
24     Q.  Okay.  And so you took quite a bit of time.  I
25 know it was kind of long, not a whole lot of fun, but

154

1  you spent a lot of time, you were very thoughtful in your
2  answers; is that right?
3      A.  Yes.
4      Q.  Okay.  If it's okay with you, I would like to
5  go through some of the answers that you have in your
6  questionnaire, and then go over some of the law on
7  capital murder, okay, and other laws that are going to
8  be important.  First of all, you are -- you live in
9  Venus; is that right?
10     A.  Yes, sir.
11     Q.  And you teach school in Waxahachie?
12     A.  Yes.
13     Q.  And you're a Spanish teacher?
14     A.  Yes.
15     Q.  Okay.  Well, tell me a little bit about that.
16 Where -- where did you go to school and how did you decide
17 to be a Spanish teacher?
18     A.  I went to school in Ohio for two years.  And I
19 transferred to Dallas Baptist University here.  I was
20 originally an English teacher, but my parents were
21 missionaries so I grew up in South America where I
22 learned Spanish.  Then a job opened in Waxahachie, so
23 I decided to teach Spanish.
24     Q.  Wow.  Now, where in South America were y'all?
25     A.  Columbia.

155

1      Q.  Columbia.  Okay.  All right.  Wow, that's really
2  interesting.  And how old were you during those times of
3  your life?
4      A.  I was 11 to 18.
5      Q.  Okay.  Wow.  Okay.  So you are fluent in both
6  languages, so much so that you can teach others.
7      A.  Yes.
8      Q.  Wow.  Okay.  That's great.  And are you -- you're
9  a married person?
10     A.  Yes.
11     Q.  Okay.  And what does your husband do?
12     A.  He is a calibration technician in Irving.
13     Q.  Okay.  All right.  Now, does he seem to enjoy
14 that kind of work?
15     A.  Um, yes.  He was in the Marines also, so that's
16 what they trained him to do.  And now he's looking into
17 other options also.
18     Q.  So I guess when y'all get up in the morning,
19 y'all go two completely separate directions?
20     A.  Yes.
21     Q.  And then meet up sometime in the evening?
22     A.  Uh-huh.
23     Q.  And do you have any children yet?
24     A.  No.
25     Q.  Okay.  Good for you.  All right.  Now, you also

156

1   listed here that somebody in your family had worked, I
2   guess, for the D/FW Airport P.D.; is that right?
3       A.  No, my husband applied to it but he was never
4   working there.
5       Q.  Okay.  All right.  And you have strong Christian
6   beliefs; is that correct?
7       A.  Yes, sir.
8       Q.  Raised by missionary folks in Columbia and doing
9   that kind of work.  Good.  Good.  Now, whenever we get to
10  the death penalty specific questions, you can imagine
11  that -- I would imagine both sides are going to have a lot
12  of questions regarding that.  Because a lot of people will
13  have their own opinions, which is great, about the death
14  penalty, how it's used, and just in everyday
15  conversations.  It may not come up, you know, every single
16  day, but a lot of people have considered that before on a
17  lot of political issues, you know, whether they're ever
18  faced with those conditions in their own life, they would
19  have considered them.  Are you a person that prior to
20  coming in that day had already had feelings about the
21  death penalty and its use?
22      A.  Yes.
23      Q.  Okay.  What -- tell me what shaped your personal
24  opinions about the death penalty.
25      A.  Um, I guess just my belief in justice, I guess,

157

1   and the idea of fairness in what is right.
2       Q.  Okay.  All right.  Well, I guess one question is
3   being that you have the religious background that you
4   have, do you see any problem -- and let me make one thing
5   absolutely clear.  I'm never, ever going to try to get
6   you to answer a certain way or try to change whatever
7   opinions you already have.  I'm just asking because I
8   want to know.  Do you see any conflict with your Christian
9   beliefs versus maybe having to sit on a Jury that signs
10  someone's death warrant?
11      A.  No, I don't think that would be an issue.
12      Q.  Okay.  All right.  And you say you would never
13  lightly support a death penalty decision; if a person has
14  committed horrible crimes, I'd favor it, and I don't
15  think a dangerous person should be allowed to reside in
16  prison where they can still be harmful to others.  I tell
17  you, that's a really good answer.  And you'll see a little
18  bit that that's kind of one of the considerations that
19  people make whenever they're deciding on a death penalty.
20          And I will just tell you that what the law
21  says is after someone has been found guilty of capital
22  murder, there's actually a three-question analysis that
23  has to be done after that.  There is no check life or
24  check death box and there's an analysis that goes with
25  it.  Okay.

158

1          You also said that life without the
2   possibility of parole could also be appropriate in some
3   cases and inappropriate in other cases.  So as you sit
4   here today, without, I guess, really knowing all the law
5   based on this, do you think you're the type of person who
6   could fairly consider, given the right evidence, could
7   consider evidence that would lead you to make a permanent
8   decision on whether someone gets life without parole
9   versus the death penalty?
10      A.  With the right evidence, yes, I could decide.
11      Q.  Okay.  Because I guess the one thing that I want
12  to impress upon you which, again, obviously you're taking
13  this very, very seriously, is that it's very real.  In
14  the State of Texas, if somebody gets the death penalty,
15  they will eventually get put to death.  And so -- and
16  everything is based on the analysis, the evidence, and
17  there's a long way to go.  And one thing is we don't
18  really -- we're not entitled, we're not allowed to discuss
19  specifics of this case.  We have to get your basic
20  feelings and try to get an understanding of that.  But I
21  will tell you that anybody who is put on a Jury in a
22  capital murder case where the State is seeking the death
23  penalty like this one, may be faced with a very real
24  situation based on facts and evidence, where they are
25  going to sign off on a piece of paper if they're presiding

159

1   juror that literally ends someone's life.  And that's a
2   lot to kind of think about, this is very real, does that
3   make sense?
4       A.  Yes.  Absolutely.
5       Q.  And how do you feel whenever I say something like
6   that to you?
7       A.  I mean, it's just -- I think I put somewhere on
8   there like it's just -- that's a lot.  I don't know if I
9   would, you know, be able to say, to decide if someone can
10  live or not, but I mean, if, again, given the right
11  evidence, yes, I think I could, but it would be definitely
12  very scary decision at the same time.
13      Q.  You understand how it would be the one thing
14  about a person to serve on a capital murder case is that,
15  you know, you think, "Well, I don't know if I could or I
16  couldn't do this."  And definitely going to try to pin you
17  down to an answer because ultimately -- and I want you to
18  think about this for a second.  This is the State of Texas
19  versus Mark Anthony Soliz.  And he's the guy sitting over
20  there in the chair.  And so the State is seeking the death
21  penalty.  And so, you know, at some point we would be
22  asking you to make a decision after sitting in here today,
23  in the same room with him, and maybe sitting in a two or
24  three week trial, breathing the same air as him, making a
25  decision that effectively ends his life.  And I guess what

160

1   I'm getting at is, are you capable of doing that if the
2   evidence supports it? I'm not asking what you're going to
3   do.
4       A. Right.
5       Q. But if you are a person that says, you know,
6   that's just -- I'm not in it, I can't do that, then we
7   would need to know that as well. Can you think about that
8   for just a second and let me know how you feel?
9       A. I think I -- well, yes. I was going to say I
10  think I could. Given the right evidence, yes, I could.
11      Q. Okay. Now, there's also -- one of the questions
12  here was, "What is the best argument in favor of the death
13  penalty?" And you said, "Many murders are unrepentant and
14  would kill again if given the opportunity; it is best to
15  rid the world of evil people." And the second thing is,
16  which is, "What is the best argument against the death
17  penalty in your opinion?", is "We, as humans, do not have
18  the right to judge if a person should live or die and take
19  the sanctity of life into our own hands."
20          And I guess I need to know, how do you
21  feel about -- you're making arguments for it, which is
22  what the question asks.
23      A. Right.
24      Q. But again, are you a person that really leans
25  towards or do you feel that maybe the death penalty is a

161

1   right verdict out there but maybe it's better for someone
2   else to do? The example that I can give you is, you know,
3   fifth grade, there's a bully. Fifth grade, there's a
4   bully on the playground. He runs around making all the
5   second graders' lives feel guilty. Every single second
6   grader feels like somebody ought to take that bully down,
7   he's a fifth grader, but nobody raises their hand to do
8   it. You know, everybody can agree that it's the right
9   thing, but some people, for whatever reasons,
10  philosophically says that may be the right thing to do,
11  I just can't do that. And I guess I'm wondering how do
12  you feel about that?
13      A. With -- again, that -- I know that I could stand
14  up because I know there are cases that I have heard of
15  personally or, you know, you see, hear experiences, and
16  you think if I had a choice on that, I think I would
17  have decided differently and maybe that person should
18  have received a different verdict or punishment.
19      Q. Okay. All right. So I guess just so that I'm
20  clear and I'll get off this, what you're saying is based
21  on the evidence, whatever that happens to be, you could
22  fairly and truly consider giving him a death sentence or
23  a life sentence without parole if that's what the evidence
24  said that you should do?
25      A. Yes.

162

1       Q. Do you have any question in your mind about
2   that? I mean now is the time to tell us.
3       A. No.
4       Q. Okay. One of the things you also said is that
5   I guess some -- your sister-in-law and her husband were
6   charged with crimes for which your sister-in-law was
7   innocent and her case was dismissed. Can you tell me a
8   little bit about that?
9       A. It was a -- he was involved in some child
10  pornography things and had kind of roped her into it
11  without her knowledge. And he's still -- they're still
12  waiting trial on his and her case, but her side of it
13  has been dismissed.
14      Q. What county did that occur in?
15      A. That was in Ellis County.
16      Q. Oh, in Ellis County. Okay. All right. And I
17  think -- you think that was a complicated case but you
18  believe it was handled very well; is that right?
19      A. Uh-huh.
20      Q. Okay. Let's try to go over some of the law, and
21  I'm going to have to go kind of quickly. But I will see
22  if we can go over some of this and get your feelings about
23  certain things. First of all, there's some constitutional
24  principles that we have to consider.
25          Number one, an indictment is no evidence

163

1   against someone. The way somebody gets to a felony trial
2   is a Grand Jury has to find that there is enough evidence
3   to have a trial. Doesn't mean they're guilty of
4   anything. Okay. The indictment is never offered into
5   evidence. And either the State proves its case or it does
6   not, but the indictment itself is no evidence of guilt.
7   Okay.
8           There's a presumption of innocence. As he
9   sits over there right now, Mr. Soliz is not guilty of
10  anything until such time as the State proves that he is
11  guilty. Okay. The burden of proof is beyond a reasonable
12  doubt. That burden is solely on the State of Texas which
13  means the only people responsible for putting on this
14  evidence are people right at this table. Okay. The
15  Defense has no burden whatsoever. And it is beyond a
16  reasonable doubt. Now, can you imagine a situation that
17  you would know something beyond all possible doubt?
18      A. I'm not sure I understand exactly.
19      Q. What if you had actually -- okay. I'm going to
20  tell you that her shirt is pink.
21      A. Okay.
22      Q. Okay. You see that her shirt is pink. I could
23  either testify that her shirt is pink without you having
24  seen it and you could say, okay, I believe his
25  credibility, what he's saying. Okay. You could believe

164

1 that beyond a reasonable doubt if you believe my
2 testimony, correct?
3    A.   Uh-huh.
4    Q.   Now that you're sitting here and you see it,
5 you're a hundred percent sure, correct?
6    A.   Yes.
7    Q.   Okay.  And if in any criminal case, if somebody
8 were a hundred percent sure, they would probably be
9 sitting in that chair as a witness versus this chair as a
10 juror.
11    A.   Right.
12    Q.   Okay.  So it's beyond a reasonable doubt, not
13 beyond all possible doubt.
14    A.   Okay.
15    Q.   Do you agree with that law?
16    A.   Yes.
17    Q.   Can you hold us to that standard?
18    A.   Yes.
19    Q.   Nothing more, but nothing less.  Okay.  Also, the
20 Defendant has a Fifth Amendment right not to testify if he
21 so chooses.  And I think in your questionnaire you
22 disagreed with the idea of a person having the ability to
23 remain silent; is that correct?  See if I can find it.
24 Well, tell me how you feel about that.  In a -- a
25 defendant in a criminal case has the right to remain

165

1 silent, and you put you disagree.  Can you explain that to
2 me a little bit?
3    A.   Well, I think for anybody to judge properly,
4 every bit of evidence or experience or viewpoint should be
5 presented that's possible.  And if the Defendant isn't
6 giving their viewpoint, I think it might be -- just
7 doesn't seem like everything is presented.
8    Q.   Okay.  And would there be some part in your mind
9 where you would hold that against the Defendant if they
10 didn't?  If you wanted to know and that's the person who
11 knew, is that how you would feel about it?
12    A.   Possibly, possibly.
13    Q.   "Possibly" is a terrible answer.
14    A.   I'm sorry.
15    Q.   And I'll just tell you because, you know, and I'm
16 not saying that to be ugly to you.
17    A.   Right.
18    Q.   That's one of those things where we just have to
19 know how you really feel.
20    A.   Well, I mean, if you're asked a question in court
21 and you don't want to answer it, you're either going to be
22 trying to hide something or there's some other reason why
23 you won't answer it.  And without knowing what that reason
24 is, you know, or why you won't speak or -- it doesn't seem
25 really fair.

166

1    Q.   Okay.  All right.  Well, the law says that's
2 something that you cannot consider as a juror, but some
3 people, "Hey, you know, I would."  And if it's an honest
4 answer, that's fine.  And so I guess what I need to know
5 is how do you feel really about that.  The law says a
6 person has that right and that you should set it aside
7 and not consider that for any purpose.  If you feel
8 differently, that's okay.  We just need to know.
9    A.   You just have to look at the other evidence and
10 everything else that's presented.  I mean, it's the law.
11    Q.   So where does that -- where does that
12 leave you on the issue?
13    A.   It -- I'm not going to change it personally, I
14 just -- I can't, obviously, but I think that's just -- you
15 have to work around that.
16    Q.   Okay.
17    A.   And judge on what you can.
18    Q.   Okay.  All right.  Now, murder, you can't really
19 understand what capital murder is without understanding
20 what murder is.  And very simply, a person commits the
21 offense of murder if he intentionally causes the death
22 of an individual, and pretty simple to understand.  And
23 it could be as many possible ways as the human mind can
24 think of are unfortunately possible ways to kill another
25 person.  Have you ever heard of that show, A Thousand

167

1 Ways To Die?
2    A.   Yeah.
3    Q.   Okay.  And that's usually people doing dumb
4 things to hurt themselves, isn't it?
5    A.   Uh-huh.
6    Q.   But you can say that's called A Thousand Ways To
7 Die, and it's, I guess, kind of interesting because things
8 people get themselves into.  But also, just with the way
9 life is, based on that definition of murder, there's an
10 unlimited possibility of ways that people could commit a
11 murder.  Okay?
12    A.   Uh-huh.
13    Q.   And, I mean, there's -- I can give you a million
14 examples.  One example might be, you know what, I've had a
15 really bad day in court.  I don't feel very good.  The
16 Judge ruled against me all day and it's just horrible.
17 I'm driving home.  Somebody cuts me off in traffic.  I
18 pull out my gun, I blast them just because I'm not a very
19 nice person, if that's the case.  Okay.  If I do that,
20 what have I done?  Have I intentionally killed someone
21 else?  Yes, right?
22    A.   Yes.
23    Q.   Other situation might be a married couple in
24 their eighties, been married for 50 years, 60 years, whole
25 lives have been spent together.  And the husband and the

168

1 wife, one of them is suffering from a really debilitating
2 cancer, very painful. And say it's the wife that's doing
3 that. The husband decides that he's going to end her
4 life, not out of meanness or mean-spirited like the first
5 example, but really as an act of love and mercy. If he
6 puts an end to her life, again, has he intentionally
7 caused the death of another individual?
8     A. Yes.
9     Q. Okay. And so there's a big, wide range.
10 Anything is theoretically possible. And so one of the
11 things that you have to do as a juror, if you can, is
12 keep your mind open to all possibilities until you've
13 heard all of the evidence.
14         Now, the punishment range in the State of
15 Texas for murder is between 5 years and 99 years or life.
16 Okay. And that's a huge, wide range of punishment. Would
17 you agree with that?
18     A. Yes.
19     Q. Okay. And you can also see how there would be a
20 enormous range of possibilities for someone having
21 committed murder. Okay. And so the question I have for
22 you is, could you fairly consider, based on evidence, if
23 murder was proved to you beyond a reasonable doubt, could
24 you fairly consider a sentence from 5 years all the way
25 up to 99 years or life?

169

1     A. Yes.
2     Q. And that would be based on evidence you haven't
3 even heard yet. Is that fair to say?
4     A. Yes.
5     Q. Okay. I will also tell you that for aggravated
6 robbery in the State of Texas, I don't have a slide for
7 it, but aggravated robbery, there's also the exact same
8 range of punishment, from 5 years up to 99 years or life.
9 And as many possibilities as you can think of for somebody
10 killing someone else, there would be as many for somebody
11 committing a robbery. Does that make sense?
12     A. Uh-huh.
13     Q. It could be the classic situation where somebody
14 goes into a bank, puts a gun right to the face of a teller
15 and says, "Give me all your money or I'll kill you." That
16 right there is an aggravated robbery with a handgun.
17     A. Uh-huh.
18     Q. Does that make sense?
19     A. Yes.
20     Q. All the way down to a possibility where, you
21 know, a teenage kid, 17 years old is orphaned and caring
22 for three brothers and sisters, living on the street. And
23 he could go into a convenience store and steal some, you
24 know, bread and some peanut butter, and he could have an
25 old gun that he shows, "Hey, I'm taking this", and takes

170

1 off. Could still be an aggravated robbery, but very
2 different. Does that make sense?
3     A. Yes.
4     Q. For the same reasons, the State of Texas has the
5 exact same punishment range from 5 to 99 years or life.
6 And I guess the question for you is, because you don't
7 know what evidence would be in that case, could you fairly
8 consider all the way from 5 to 99 years or life for an
9 aggravated robbery case?
10     A. Yes.
11     Q. Okay. Now, capital murder is -- now that you
12 know, I guess, what murder is, what capital murder is,
13 what takes it to that next level is what we call murder
14 plus. Murder committed during the course of the
15 commission or attempted commission of robbery or
16 burglary. Now, do you think that that's the type of an
17 offense that capital punishment, the death penalty should
18 be available under the law for?
19         You can give that some thought because,
20 again, there's a ton of ways that the statute defines
21 capital murder. Could be killing a child under 10 years
22 old, multiple homicides in the same criminal action, you
23 know, things like that. There's other ways. Do you
24 think that a murder committed during the commission or
25 even attempted commission of a burglary or robbery is

171

1 something that we ought to have the death penalty
2 available for?
3     A. Yes.
4     Q. Okay. Now, what the -- what we would be
5 required to prove in a capital murder case is that a
6 Defendant, on or about a certain day, in Johnson County,
7 Texas, intentionally caused the death of an individual by
8 manner and means, which is just how that person did it, in
9 the course of committing or attempting to commit robbery
10 or burglary. And one of the things that the law says is
11 the State has to prove its case beyond a reasonable doubt
12 on each and every one of those elements. Now, looking at
13 that at a glance, you may see some of these elements may
14 have more importance in your own mind than others. For
15 instance, if we got the Defendant wrong, that would be a
16 big deal, wouldn't it?
17     A. Yeah.
18     Q. Okay. But if we got something that seems a lot
19 more minor, like Johnson County, you know, maybe it's
20 across the Tarrant County line or, you know, whatever, you
21 understand the law would still require us to prove that
22 beyond a reasonable doubt. And so even if it were, you
23 know what, we proved up our entire case, and you're
24 absolutely sure beyond a reasonable doubt that the State
25 has proved every single element except we messed up, we

172

1 got sloppy and didn't prove Johnson County, what would you
2 have to do as a juror?
3    A. I would have to not, um, say that they were
4 guilty if that's everything you have to prove.
5    Q. Right. If every single thing on that list was
6 not proved, you would have to find him not guilty. And
7 you may be very annoyed with me about that, you know. You
8 had one other thing to prove and you didn't do it, and I
9 believed everything else, so now I've got to let someone I
10 feel pretty confident is a murderer go free because I
11 messed up.
12    A. Uh-huh.
13    Q. Okay. Question is, would you still hold us to
14 that burden? Could you do that?
15    A. Yes.
16    Q. Okay. Now, one thing is that these things have
17 to be done intentionally. Intent can be formed in an
18 instant. It can be inferred from actions and it does not
19 have to be planned or premeditated. A lot of people think
20 capital murder is capital murder because somebody thought
21 it out and planned it and prepared it. That really has
22 nothing to do with it. The fact is you have to intend to
23 do some action, and we're going to get into other ways
24 that people can be found guilty of a capital murder
25 without even killing anyone. But you have to intend

173

1 that.
2            And one example would be -- the intent can be
3 just immediate, as long as it's formed. When you walked
4 in this room, did you know which chair you were going to
5 sit in?
6    A. No.
7    Q. Okay. You saw this man sitting up there, he's
8 the Judge, and you -- he's talking to you and you listened
9 for direction, right? He said, "Can you sit in the second
10 chair." How long did it take you to decide, "I'm going to
11 sit in the second chair"?
12    A. Not very long.
13    Q. Just a second after he said it. That seemed like
14 a reasonable thing to do. And there was some sort of
15 thought process. "Okay. He says it. I'm going to sit in
16 the chair." That long. But you decided, you intended,
17 once you made up your mind, you intended to sit in that
18 chair. And it can be the same way with murder. If you
19 decide I'm on the road and somebody cuts me off and
20 immediately, you know, I start shooting, I didn't plan on
21 shooting anybody that day. I was just mad. And guess
22 what, somebody got in my way. So you see how intent can
23 be formed immediately?
24            Another thing about capital murder, and
25 again, we were just talking about a situation where

174

1 somebody could be held accountable for a capital murder
2 even though they were not the trigger man, the killer.
3 Okay. And so these are all the exact same elements that
4 we just talked about, but the only added one is all these
5 are true, or if a person is a party to capital murder,
6 which means they may not have pulled the trigger at all
7 but they could still be held accountable for capital
8 murder depending on the facts and how a Jury answers
9 questions all the way up to the death penalty.
10            Now, would you agree with that law just based
11 on having just heard it?
12    A. Yes.
13    Q. Okay. What do you think it means to be a party
14 to a crime?
15    A. That you were there, obviously, you contributed
16 to it.
17    Q. Contributed. Good word. State agrees with you,
18 the State of Texas does. A person is responsible for an
19 offense committed by another if acting with intent to
20 promote or assist the commission of the offense, he
21 solicits or encourages or directs or aids or attempts to
22 aid the other person to commit the offense. Okay. And
23 so that can be -- if you are helping someone, if you are
24 the helper, then you can be guilty of the exact same
25 crime that they're doing. Does that make sense to you?

175

1    A. Yes.
2    Q. And in the State of Texas, a person who is a
3 party to capital murder can be held accountable all the
4 way to the death penalty. And, again, you've said you
5 agree with that, and I guess you had some hesitation.
6 You had to give some thought whether you were a person
7 who could actually -- given the basis for all of the
8 evidence and considering everything, would this give
9 you even more pause or do you think that you could
10 follow that law as well?
11    A. I could follow that law. Definitely would think
12 about it heavily, but I could follow.
13    Q. You should think about it heavily. This is not
14 something, you know -- but you believe that you could
15 follow that law; is that correct?
16    A. Yes.
17    Q. Okay. Now, conspiracy is a different step. So
18 if you take a look at capital murder, what about the
19 person who -- and we'll just say it's a shooting. A
20 person who shoots someone in the course of a robbery or
21 burglary, guilty of capital murder. Pretty easy, right?
22            The person who says, "You know, hey, I'm
23 gonna -- I'm gonna help you in any way, shape or form," I
24 don't pull the trigger. I can give you the gun and say
25 "Go ahead, do it." I haven't shot anyone. I encouraged

176

1 and solicited you to do it or someone to do it. Does that
2 make sense? And I'm just as guilty. That's the actual
3 person and then a party, the helper person.
4        The law also contemplates another situation
5 where somebody could be held accountable for capital
6 murder even if they had no intent to commit the offense
7 itself. Because what we've talked about is somebody who
8 actually did it having intent. Somebody who was helping
9 them or encouraging them also intending that it be done.
10 But a third category is if somebody is involved in one
11 felony, and they're all on board with one felony, and
12 their coconspirator, another person actually commits the
13 murder in the course of that felony, if they should have
14 known better -- and this is a lot. It's all on the
15 board. I'll give you a chance to read it. But if they
16 should have known better, that last part, it was one that
17 should have been anticipated, that, the murder, just
18 should have known better, they could be held accountable
19 too.
20        Let me give you an example. Me and my good
21 friend Larry here decide we're going to go commit a
22 robbery because, you know, the County doesn't pay all
23 that well. Prosecutors are like teachers, underpaid.
24 County doesn't pay all that well. We're going to go
25 commit a robbery. Larry says, "Hey, you know what, I'll

177

1 be your getaway driver." Okay. So would he be, if he --
2 he drives me over there. I get out. He waits for me.
3 He looks around, you know. If I go in there and commit
4 a robbery, you could see how he didn't commit a robbery,
5 but he would be a party because he's helping me, right?
6    A. Uh-huh.
7    Q. If he also knew that I, you know, I carry a gun,
8 and you know what, just the nature of an armed robbery, he
9 knows I have a gun with bullets in it. He should have,
10 he's smart, he should have anticipated that something real
11 bad could happen in there. Okay. He didn't agree to a
12 capital murder. He didn't say that's a good thing for you
13 to do. He didn't even want me to do it, but he jumps in
14 on the burglary. He's in for the burglary, and he should
15 have known better on the capital murder because it's a
16 possibility and he should have, should have anticipated
17 it.
18    A. Uh-huh.
19    Q. That's a lot to soak in, but does that make sense
20 to you?
21    A. Yes.
22    Q. Okay. Do you see how he could still be held
23 accountable for the offense of capital murder because he
24 jumped in with me on the one felony, robbery, and should
25 have known better? Or, you know, should have

178

1 anticipated. Should have anticipated, because there's
2 another distinction that's coming later. I mean, should
3 have known, does that make sense to you?
4    A. Yes.
5    Q. And do you think that's a good law?
6    A. Yes. .
7    Q. Okay. So he could still be held accountable all
8 the way to a capital murder conviction based on that
9 amount of help potentially. Okay? Does that make sense
10 to you?
11    A. Uh-huh.
12    Q. All right. Do you think that's a good law?
13    A. Yes.
14    Q. Okay. And in those situations where you get to
15 that point, then if someone is found guilty of capital
16 murder, there is a new consideration. And depending on
17 how you answer the questions from there, that same person
18 who was in for the robbery could ultimately, if the right
19 things are proved to you, could actually be given the
20 death penalty. Now, how do you feel about that?
21        See, the way the law works, someone without
22 even having intended to -- we're going to get into the
23 specific law on that in just a second, but I want you to
24 think about that for a second, because it's one thing for
25 the shooter, one thing for a party who is encouraging him,

179

1 but the law also contemplates a situation where someone
2 didn't even intend that, and if everything is proved a
3 certain way and the Jury believes it beyond a reasonable
4 doubt, person could still get the death penalty.
5        MR. WESTFALL: Your Honor, that really is
6 kind of a misstatement of the law. Special Issue 2 says
7 they have to know or anticipate.
8        THE COURT: Okay. I'm gonna ask you to
9 rephrase it. I'll sustain objection.
10        MR. STRAHAN: Okay. Well, I'll just move on
11 to the next.
12        THE COURT: Okay.
13    Q. (BY MR. STRAHAN) So a conspiracy then would
14 be agreement to commit robbery or burglary, a murder is
15 committed, the murder was committed in furtherance of the
16 unlawful purpose and was one that should have been
17 anticipated, equals a capital murder. Does that make
18 sense to you?
19    A. Uh-huh.
20    Q. Do you understand that?
21    A. Yes.
22    Q. You understand how that's the person who jumps
23 in on one thing and then something bad happens but he
24 should have anticipated it. And do you see how that
25 person could be held accountable and be found guilty

180

1  of a capital murder?

2  A.  Yes.

3  Q.  Okay.  What is not required is premeditation,

4  motive, scientific evidence.  These things the State does

5  not have to prove.  They are not in that list.  You might

6  be curious as to why somebody did something, but the State

7  has no burden to prove that to you.  Okay.  May or may not

8  be scientific evidence in any case.  Do you watch CSI?

9  A.  Not very much, a little bit.

10  Q.  Okay.  Have you seen those shows?

11  A.  Yes.

12  Q.  Where they miraculously find this incredible

13  scientific evidence that no one has ever even heard about

14  before.  The reason no one has ever heard about it before

15  is because it doesn't exist.  Okay.  So it's not in the

16  real world.  So there may be and there may not be, but the

17  State does not have to do that.  Okay?

18  A.  Okay.

19  Q.  Also, a murder weapon.  Do you think criminals,

20  you know, in a lot of cases, you go kill someone, you

21  wouldn't maybe throw your gun or your knife into the

22  lake?  I mean, that would make sense to me is get rid of

23  it, right?  State doesn't even have to prove, you know,

24  has to show you a murder weapon.  Okay.

25  May or may not be eyewitnesses.  If it's one

181

1  person killing another one, the other person is dead,

2  right?  No eyewitness for that, correct, but other

3  evidence could substantiate that person's guilt.  You

4  agree with all that?

5  A.  Yes.

6  Q.  Okay.  There's all types of witnesses that you

7  can encounter in any criminal case, everything from police

8  officers, criminals, lawyers, preachers, prostitutes.  And

9  I think the point is, is that every single witness, your

10  job as a juror is to determine their credibility all on

11  your own, which means that, you know -- do you think

12  there's good police and bad police?

13  A.  Yes.

14  Q.  Do you think there are?

15  A.  Yes.

16  Q.  Okay.  And so you would have to, just because

17  somebody is wearing a badge, you would still have to

18  listen to what they say, determine their credibility, and,

19  you know, base that on everything else you're hearing too,

20  correct?

21  A.  Yes.

22  Q.  Can you do that?

23  A.  Yes.

24  Q.  Okay.  And one type of witness that you may hear

25  from is accomplice testimony.  You may even hear -- have

182

1  you ever heard of somebody turning State's evidence?

2  You ever heard that phrase used before where one of the

3  coconspirators or somebody who could be a party to a

4  crime actually testifies for the State?  And a lot of

5  those cases, they have got some sort of a deal for maybe

6  a lesser sentence or something in order to have them

7  testify.  Do you understand that you would have to also

8  weigh their credibility and decide whether they're

9  telling you the truth or not as well?

10  A.  Yes.

11  Q.  And just one example may be where you -- if you

12  had somebody who was charged with a drug case, bottom of

13  the line, lowest possible level drug case, and the State

14  really wanted to know where he got his drugs from because

15  the higher person is a bigger dealer.  And you would

16  really want to get that person because it does the world

17  more good.  And if you got to that person, you may want

18  to know who got the really big quantities.  You ever see

19  those shows where some guy who was busted says, "Okay,

20  I'll give you something.  There's a big shipment coming in

21  on Thursday."  That's kind of what I'm talking about.  So

22  there was always a possibility that the people who were

23  less involved or less guilty or didn't do this could

24  possibly be asked to testify against a defendant, and

25  they may be cut a deal.  It's not something I'm crazy

183

1  about, but, you know, in order to get the big fish,

2  sometimes that happens in life.  How do you feel about

3  that?

4  A.  I think it -- if it's needed on a -- based, you

5  know, case-to-case basis, I think that's a good tool.

6  Q.  Okay.  Also there is the accomplice testimony,

7  which is somebody who could actually be held accountable

8  for the same crime, could come in and testify as well.

9  And what the law says is if it's the accomplice testimony,

10  it has got to be corroborated by evidence that tends to

11  connect the Defendant to the crime.  Okay.  And so it's

12  not just one person's word, period, and we have a

13  conviction.  You would also have to have something else

14  in addition to that.

15  A.  Okay.

16  Q.  Okay.  Something more.  You could take that into

17  consideration, you could believe it a hundred percent, but

18  there better be something else in the evidence that tends

19  to connect the Defendant to the crime.  Okay.  Does that

20  make sense to you?

21  A.  Yes.

22  Q.  All right.  Now, there's also situations where

23  there may be a statement given by a defendant in any

24  case.  And what the law says is, is that the Miranda

25  Warnings, you have a right to an attorney, all that,

184

1  that has to be given to that person, and they have to
2  make a knowing, intelligent and voluntary waiver. And
3  if that stuff is not done by the police, and you don't
4  find that it was done, then you're to disregard that
5  statement and not consider it for any purpose.
6       Okay. Now, one thing that is -- you have
7  a little bit of trouble, and I don't want to put words
8  in your mouth, but you know, somebody not testifying for
9  themselves. You know, that bothers you. And this is a
10 situation where somebody may have given a statement, but
11 you know what, on some technicality, it was not, you
12 know, obtained exactly right. You would have to set
13 that aside and base your decision on all the other
14 evidence. Okay. Does that make sense to you?
15      A. Yes.
16      Q. Is that something you think you can do?
17      A. Yes.
18      Q. Okay. Voluntary intoxication is not a defense
19 to a crime. Very simple statement. I can get drunk as
20 Cooter Brown over there, and it doesn't mean that I'm not
21 guilty. Because if that weren't the case, everybody who
22 was charged with a crime would say what?
23      A. Yeah.
24      Q. I was drunk?
25      A. Yeah.

185

1       Q. Okay. So that is not the case. There are two
2  phases to a criminal case. There's the Guilt/Innocence
3  Phase. And in the guilt phase, if -- a Jury decides that
4  one question. Did that person do it, did they not,
5  beyond a reasonable doubt, has the State proved their
6  case. And that's it. If you say not guilty, the case is
7  over. Everybody walks away.
8       If you are guilty on a capital murder case,
9  then you go to the Punishment Phase. And that, again, is
10 where you may hear additional evidence. And the State
11 actually has more to prove to you at that point, which is
12 a independent consideration from the Guilt/Innocence.
13 And that's kind of where we get into what was that
14 person's involvement specifically, you know, where we're
15 talking about the parties and conspirators, what was his
16 actual involvement.
17      Anyway, there's three Special Issues that
18 you would have to answer before you could render a
19 verdict. And depending on your answers to those
20 questions, that's how a life or death sentence is done.
21      So how does the Jury decide? There are three
22 questions. No. 1, is the Defendant a future danger. And
23 these are kind of the shortened version of that. Okay.
24 So is that person a future danger. No. 2, did the
25 Defendant kill the victim, which is that actual person,

186

1  right, who did it, intend to kill the victim, or
2  anticipate that the victim would be killed.
3       Now, this is anticipate. The first
4  Guilt/Innocence, someone could be held accountable like
5  we were talking about as a coconspirator if they should
6  have anticipated it. Should have known better. Okay?
7       A. Uh-huh.
8       Q. This is a situation with the question where
9  there's two or more people involved, did that person
10 actually know better. Did they anticipate. Okay. So
11 it requires a little more knowledge on that person's
12 part than it would just to find them guilty of capital
13 murder. Okay. Because this is where the life and death
14 decisions are made in these three questions.
15      And then the third issue is, does the
16 Defendant deserve a life sentence rather than a death
17 penalty after you've already answered the other two
18 questions.
19      So Special Issue No. 1 -- and again, if you
20 see, anywhere you see "do you find from the evidence
21 beyond a reasonable doubt" tells you that the State has a
22 burden. Okay. And it's our burden to prove that. So you
23 see how that's different at least in this example from
24 Guilt/Innocence? A burden in Guilt/Innocence is beyond a
25 reasonable doubt to prove to you he did it the way we says

187

1  he did -- the way we say he did. Okay. You, at this
2  point, would have said, "Yeah, I believe he's guilty of
3  the offense."
4       Then you go to, in Punishment, Special Issue
5  No. 1. State has to prove beyond a reasonable doubt that
6  there is a probability that the Defendant will commit
7  criminal acts of violence that would constitute a
8  continuing threat to society. Future dangerous. Okay.
9  And can you see situations where that's not necessarily --
10 it's not necessarily an automatic jump? And there's a
11 million scenarios, again, that I could probably show you
12 where somebody could be guilty of capital murder, and the
13 you know, some of these people who are helpers and in the
14 wrong place at the wrong time made a bad decision. And
15 maybe that's somebody who no other situation would ever do
16 that again. You know, something for a Jury to decide.
17 Does that make sense to you?
18      A. Yes.
19      Q. So you can see how that would be an independent
20 consideration. Okay. If you were to answer that question
21 yes, you would have to move on to the second question. If
22 you answered it no, it is a life without parole for the
23 Defendant. Okay.
24      If you answered that yes, you move on to the
25 next one, Special Issue No. 2. And again you see that

188

1  same language, do you find from the evidence beyond a
2  reasonable doubt that the Defendant actually caused the
3  death of the deceased, or did not actually cause the
4  death of the deceased but intended to kill the deceased
5  or another, or anticipated that a human life would be
6  taken. Can you see how that -- and again, it's kind of
7  abstract, but do you see how in the Guilt/Innocence Phase,
8  the question you would ask for a coconspirator, this is
9  someone who is not the killer, not the shooter. The
10 question you answer is should he have anticipated that,
11 should he have known better.
12         This is a step further that says now he's
13 guilty as a coconspirator. And the question would be,
14 did he actually anticipate that a human life would be
15 taken, so it's a different evaluation.
16    A. Okay.
17    Q. Does that make sense to you?
18    A. Yes.
19    Q. Okay. And so if you go through that and you
20 answer that question yes, then you would move on to the
21 third question. Again, even to this point if you've
22 answered the first one yes and move on to the second
23 one, answer the second one no, still life without parole
24 for the Defendant. Does all this make sense to you?
25    A. Uh-huh.

189

1    Q. I know we're moving fast.
2    A. No.
3    Q. It makes sense to you. Okay. So if it's a no
4  answer, life without parole. If it's a yes answer, you
5  would move to --
6         (Interruption in proceedings.)
7    Q. If that answer -- if you answer that question
8  yes, then you would move on to Special Issue No. 3.
9  Special Issue No. 3, you notice that there is no burden
10 of proof there on the State. This is exactly what it
11 says, which is taking into consideration all of the
12 evidence, everything that you had to that point, including
13 the circumstances of the offense itself. The first thing
14 listed there, the Defendant's character and background,
15 whatever information you have on that, because you have to
16 understand that usually the Guilt/Innocence phase is about
17 an event. That's about did this happen or did this not.
18 You get to the Punishment stage, it's not only about the
19 event but it's also about the person who did it. Right?
20 And so all of that information would be available to you
21 to consider this.
22         Okay. So based on the Defendant's character
23 and background and the personal moral culpability of the
24 Defendant, do you find that there is a sufficient
25 mitigating circumstance or circumstances to warrant that a

190

1  sentence of life imprisonment rather than a death sentence
2  be imposed. And that's a big bunch of stuff, but do you
3  see what that's asking you to do is consider the actual
4  circumstances of the offense, Defendant's character and
5  background, and the Defendant's personal moral
6  culpability, is there sufficient mitigating circumstances
7  to warrant that a sentence of life in prison be imposed
8  instead of death. What that means is sufficient, because
9  you can imagine nobody has had the perfect childhood.
10 Everybody has had their own issues. Some people have
11 criminal records, some people don't. Some capital
12 murderers, you know, have this particular set of facts,
13 some would have this. And so all of that would be all
14 independent in every single case. And that's something
15 you would have to look at.
16         The question is not whether there are
17 mitigating circumstances. The question is going to be
18 at that point are there sufficient mitigating
19 circumstances based on everything else to warrant a life
20 sentence versus a death sentence. Does that make sense
21 to you?
22    A. Yes.
23    Q. And there's no burden on anyone and there's no
24 burden on the State, there's -- you know, that's just
25 something that you look at as a Jury and you decide.

191

1  Okay?
2    A. Uh-huh.
3    Q. Do you understand everything that I've kind of
4  talked to you about?
5    A. Yes.
6    Q. Sometimes I'm not that clear, and but you're okay
7  with all that?
8    A. Yes, yes.
9    Q. And so ultimately you answer those questions, is
10 the Defendant a future danger. No; life without parole.
11 Yes; we move on to Question 2. Did the Defendant kill or
12 intend to kill or anticipate the victim would be killed.
13 No; life without parole. And again, that's the
14 coconspirator question. That's -- the question is not
15 even given to you unless there's two people involved.
16 Because at the point you have to really make a decision
17 on what that person's actual role was.
18    A. Uh-huh.
19    Q. Okay. And if you answer that question yes, and
20 in a coconspirator case, yes, they anticipated, then you
21 would go to that Question 3, and really does the Defendant
22 deserve a life sentence rather than the death penalty
23 based on all of that. And if your answer is no, then it
24 is a death penalty and this Defendant is put to death.
25 Okay. Do you have any questions about any of that?

192

1    A. No.

2    Q. And the point is, it's a lot to throw at you.

3   All these questions are without any specific facts and you

4   don't, you know, you can't make a determination. You just

5   have to be able to consider, understand all the law and

6   follow all the law. Okay. So we've talked about it for

7   quite a bit of time and you've sat and listened to how

8   it's -- you know, what the questions are, what the

9   considerations are.

10    A. Uh-huh.

11    Q. So I guess the final real question that I have

12   for you is, as you sit here today, based on your own life

13   experience, your religious beliefs, your personal beliefs,

14   and understanding what the law of capital murder is, if

15   the evidence and the facts support it, can you, if you

16   think it's the right thing to do, are you a person that

17   can actually say yes and vote for the death penalty?

18    A. Yes.

19    Q. Okay. And you understand that this is a real

20   life case and a real life person. You're going to be

21   sitting there, if you're on this Jury, breathing the same

22   air as him. Okay. And at some point, you could very well

23   be asked by the State to sign off or vote with others and

24   agree that the right thing to do is to actually end his

25   life. Can you do that if that's what the evidence calls

193

1   for?

2    A. Yes.

3    Q. Or life without parole, if that's what the

4   evidence calls for?

5    A. Uh-huh.

6    Q. Do you have any questions of me?

7    A. No.

8        MR. STRAHAN: I've gone over a lot of stuff.

9   Okay. I appreciate your time and attention. I'll pass

10   the Juror.

11        THE COURT: Recognize the Defense.

12        MR. HEISKELL: Thank you, Your Honor. May it

13   please the Court.

14            VOIR DIRE EXAMINATION

15   BY MR. HEISKELL:

16    Q. Ms. Strom; is that correct?

17    A. Yes.

18    Q. My name is Mike Heiskell. Along with Greg

19   Westfall, the gentleman that's gonna help me put this

20   PowerPoint together, represent Mark Soliz, the person at

21   the end of the table there. I've got some questions for

22   you, and quite frankly, I'm going to tread over some of

23   the same grounds Mr. Strahan did, but from a different

24   perspective. If at any time I ask you something you

25   don't understand, please stop me and I'll start over or

194

1   rephrase the question. Okay?

2    A. Uh-huh.

3    Q. When I first saw your questionnaire, my face kind

4   of lit up when I saw that you worked in Blooming Grove

5   Independent School District.

6    A. Yes.

7    Q. Navarro County?

8    A. Uh-huh.

9    Q. I went to Frost High School.

10    A. Oh, okay.

11    Q. Frost Polar Bears. Back in the old days, we used

12   to beat up on Blooming Grove each and every year.

13   Blooming Grove Lions, right?

14    A. Um-hum.

15    Q. How long were you there?

16    A. Two years.

17    Q. How did you like it?

18    A. I liked it a lot. It was a good place, just too

19   far.

20    Q. Did you live in Blooming Grove?

21    A. No.

22    Q. Where did you live?

23    A. We were from -- commuting from Venus.

24    Q. Oh, you did. Okay. And what grade did you teach

25   in Blooming Grove I.S.D.?

195

1    A. High school.

2    Q. Just high school? And did you teach Spanish?

3    A. English and Spanish.

4    Q. English and Spanish. And if you had your

5   druthers, I guess you would say, would you still be

6   there? Is that right or not?

7    A. Um, I'm glad I made the move to Waxahachie.

8    Q. Okay. And in Blooming Grove, I mean, that's --

9   community is about 5 or 600 people; is that right?

10    A. Uh-huh.

11    Q. High school kind of small?

12    A. (Venireperson nods.)

13    Q. The community is a small community. Most

14   everyone knows one another; is that right?

15    A. Yes.

16    Q. And you have all sorts of different students that

17   you taught; is that correct?

18    A. Yes.

19    Q. From every background, I guess imaginable, and

20   different races and cultures, et cetera; is that right?

21    A. Yes.

22    Q. Okay. Now, I want to back up before we talk some

23   more about Blooming Grove and Frost. You were living in

24   Columbia from age 11 to 18?

25    A. Yes.

196

1   Q. And your parents were missionaries?

2   A. Yes.

3   Q. What denomination was that?

4   A. Baptist.

5   Q. And both your parents are missionaries or just

6   one or?

7   A. It was like a team effort, yes.

8   Q. A team. And do you have any siblings, any

9   brothers or sisters with you?

10   A. I have an older sister and a younger brother.

11   Q. And were they living there as well?

12   A. Yes.

13   Q. At the time you were. And where do you fit in?

14   Were you the oldest --

15   A. I'm the middle child.

16   Q. Middle child.

17   A. Yes.

18   Q. Where in Columbia were you?

19   A. In Bogota, the capital.

20   Q. Bogota. And did you also go out into the

21   countryside?

22   A. A little bit, not too much.

23   Q. And was this area in Bogota, was it more of a

24   poverty-stricken area or more lower class, middle class?

25   How would you describe it?

197

1   A. Lower-middle probably. I mean, we would visit

2   it. I was in all the different areas and been to all the

3   different areas, but where we lived was probably

4   lower-middle.

5   Q. And I take it that you saw all sorts of different

6   people and backgrounds. That experience that you had in

7   Columbia was a good one for you?

8   A. Absolutely.

9   Q. And what did you think it taught you the most?

10   A. Just the view -- my view on everything is a

11   little wider, I think, than a lot of people who haven't

12   seen life in different avenues, I guess. People kind of

13   get stuck in their one view on life, and I was able to

14   see, you know, different countries and different people.

15   Q. Okay. And you think your other siblings also

16   share your view, that they were able to experience that

17   and gain from that?

18   A. Absolutely.

19   Q. You've also indicated that your father is a

20   person you admire; is that right?

21   A. Yes.

22   Q. And what does he do now?

23   A. He's pastoring a church in Miami right now.

24   Q. In Miami?

25   A. Uh-huh.

198

1   Q. Are all of your family, all of you fluent in

2   Spanish?

3   A. Yes, yes.

4   Q. All right. You indicated that your parents, very

5   helpful to you, they helped form your beliefs and helped

6   show you the right way?

7   A. Uh-huh.

8   Q. Can you expound on that a little bit more,

9   Ms. Strom?

10   A. They were just always constantly active in our --

11   in my childhood. And whenever I had questions about

12   anything or was, you know, trying to find answers on my

13   own, they would encourage me to find my own answers and,

14   you know, not, I guess, tell me what I had to believe or

15   why, and just kind of encourage me. And they were always

16   there for me, no matter what I did.

17   Q. Sounds like you came from a very loving home.

18   A. Yes.

19   Q. And a loving home is, I think, the best of all

20   the worlds, everyone would have a loving home. Would you

21   agree?

22   A. Yes.

23   Q. I want to ask you now about that situation with

24   your brother-in-law and your -- was it your

25   brother-in-law; is that right?

199

1   A. My sister-in-law and her husband.

2   Q. Sister-in-law, I'm sorry, charged with this child

3   porn in Ellis County?

4   A. Uh-huh.

5   Q. You said the case was just -- he was just charged

6   with it recently or how long ago was that?

7   A. It -- he was charged maybe a little over a year

8   ago, almost two years now. And her case was just recently

9   dismissed about a month ago. And he's still waiting on

10   trial.

11   Q. Okay. And do you have an idea if it's going to

12   go to trial this year or anytime later?

13   A. I'm not sure. I know he said something about

14   him taking some sort of plea, so I'm not sure exactly

15   what.

16   Q. If it goes to trial, is there a plan for you and

17   the rest of the family to attend to offer support at all?

18   A. Probably.

19   Q. Probably.

20   A. Just for support reasons.

21   Q. Support.

22   A. Uh-huh.

23   Q. And how long have you known your brother-in-law

24   now?

25   A. Five years.

200

1  Q. Okay. Now, your husband, where is he from
2  originally?
3  A. He was born in Columbia, actually.
4  Q. Oh, really.
5  A. His family is from the Chicago area.
6  Q. So he's a Columbian native -- Columbian native,
7  if you will?
8  A. Yeah, you could say that. I mean, he was raised,
9  you know, American, you could say, but he was born there
10 and lived most of his childhood there, would go back and
11 forth.
12 Q. Is that where you met him?
13 A. Yes.
14 Q. Originally in Columbia?
15 A. Yes.
16 Q. Okay. And what type of work does he do now?
17 A. It's -- I guess it's kind of like electronic
18 engineering. That's the closest I can get without, you
19 know.
20 Q. Okay. And for what company, again, is that?
21 A. Calibration Specialty, Incorporated.
22 Q. And is that in Venus area or Waxahachie? Where
23 is that?
24 A. It's in Irving.
25 Q. In Irving. So y'all kind of go opposite ways

201

1  then?
2  A. Yes.
3  Q. Plans to have children, I take it?
4  A. Eventually.
5  Q. And obviously you would, having a child, want
6  that child to grow up in a loving home?
7  A. Yes.
8  Q. Try to provide everything you can for the baby?
9  A. Yes, absolutely.
10 Q. Those formative years as a child, you, of course,
11 have grown from that and plus you've taught kids, high
12 schoolers. Did you teach any other grades other than high
13 school?
14 A. I did a little bit in junior high.
15 Q. Junior high. There you're talking about 13,
16 14-year-olds, for the most part?
17 A. Uh-huh.
18 Q. And did you -- could you tell a difference for
19 kids who came from a good home versus a poor home as to
20 how those kids were developed and how they did
21 academically, things of that nature?
22 A. Yes, for the most part.
23 Q. Was there a marked difference or slight
24 difference or how would you describe it overall?
25 A. It really depends on the student. Usually just

202

1  how they interact with others, you can tell a difference
2  on how they've been taught to -- how they interact and how
3  they feel they have to interact usually.
4  Q. A lot of those kids also, Ms. Strom, were they
5  ADHD, have to take medications daily, a lot of those kids?
6  A. Some of them.
7  Q. Some of them. What percentage would you say?
8  A. I'm not -- I don't know. I couldn't answer.
9  Q. Okay. But that's nothing that was foreign to
10 you. You saw this on a routine basis?
11 A. Yes.
12 Q. I take it that you intend on making this a career
13 and doing it until you retire?
14 A. Most likely, yes.
15 Q. Now, you're fluent in Spanish. You see Mark
16 Soliz, Spanish surname. And if you're selected as a Juror
17 in this case, there may very well be evidence of -- in
18 Spanish, the Spanish language, in which there could very
19 well be translators to be sworn in and, you know,
20 interpreters, if you will, to translate from English to
21 Spanish -- I'm sorry, Spanish to English. Excuse me. My
22 apology. And with your background and experience in
23 Spanish, of course, you would probably have an advantage
24 over most, if not all other jurors. But I think you would
25 understand that you would have to follow the translation

203

1  that is given to all the other jurors as opposed to what
2  you may hear and detect from the translation. Do you
3  follow what I'm saying?
4  A. Yes, yes.
5  Q. Is that something you would be able to do if you
6  were selected as a member of the Jury, to follow along
7  with the translator, to put words interpreted by him or
8  her?
9  A. Yes, yes.
10 Q. Okay. All right. Okay. We're going to talk
11 about some law now. All right?
12 A. Okay.
13 Q. And what we have here is a PowerPoint similar to
14 what the State has. And you will take an oath if you're
15 sworn in as a Juror to render a true verdict according to
16 the law and the evidence. And that is something that you
17 would have to follow. And when we look at that term, true
18 verdict, you would strictly look at the law, the evidence
19 as presented to you from the witness stand right here,
20 because a witness stand is closer to the jury box so that
21 you can look at those witnesses to determine the
22 credibility, whether you believe some, all or none of what
23 that person or persons may say, and that's why you're
24 close to them. And also, you would have a chance to
25 examine the exhibits, photographs, listen to videos or

204

1 watch videos, listen to audios, things of that nature.
2 That's the way it will go in a criminal case. That's
3 something you said you can do; is that right?
4     A.  Yes, sir.
5     Q.  Now, when we talk about the Constitution, some of
6 these constitutional privileges, you see that iconic
7 lithograph. You've probably seen this at a lot of
8 schools. Our founding fathers who drafted our
9 Constitution, passed our Constitution. And that
10 presumption of innocence is one of those founding
11 principles that you think -- at first said you have a
12 bit of difficulty in because you said if a person is
13 charged with a crime, that you want to hear the whole
14 story.
15     A.  Uh-huh.
16     Q.  And you understand now what the Prosecutor
17 told you, which was correct, entirely correct, that
18 part of what he said to you, and that is that the burden
19 of proof rests with this table right here, these four
20 Prosecutors. Okay?
21     A.  Okay.
22     Q.  Now, in that connection, I want to ask you
23 something that's kind of a little off the beaten path
24 here. We've got four Prosecutors right here, including a
25 special Prosecutor. Some people may think that, you know,

205

1 with these Prosecutors, that this many, that there must
2 be a lot of evidence that exists against the Defendant.
3 So that presumption of innocence may be a little bit
4 lower, shrunken, if you will, because you see those
5 folks right over here. What do you think about that?
6     A.  Hadn't really crossed my mind.
7     Q.  Okay. You understand that when we talk about
8 these laws and rules and instructions that the Court
9 will give you, that has to be a living, breathing
10 principle here that you have to be guided by. You
11 understand that?
12     A.  Yes.
13     Q.  And are you able to look at Mark Soliz and tell
14 him that you presume him innocent?
15     A.  Yes.
16     Q.  All right. Now, this is what the indictment
17 says, Ms. Strom. That is, that Mark Soliz, in Johnson
18 County, Texas, on or about June 29th of 2010, did
19 intentionally, which is a conscious objective and desire,
20 cause the death of Nancy Weatherly, by shooting her with
21 a deadly weapon, a firearm. And this third or sixth or
22 seventh bullet point, the last one, in the course of
23 committing or attempting to commit the robbery. There's
24 another count that says exactly the same thing except it
25 has burglary as opposed to robbery. That's one of the

206

1 reasons the Prosecutor was talking to you about them
2 both. But for purposes of our discussion, we're going
3 to stick strictly to robbery, and this must be proven
4 beyond a reasonable doubt.
5     Now, when we talk about right now, I think
6 you understand -- let me back up a second. If you have
7 to vote right now, how would you vote?
8     A.  I would have to say not guilty. I don't have any
9 evidence.
10     Q.  Okay. Right. And there's a burden of proof that
11 the Prosecutor talked to you about. I want to talk to you
12 a bit more about that so you can have a understanding as
13 to how high this burden of proof is that they must
14 shoulder in this case. And because they have the burden,
15 if they're doing the accusing, they must do the proving.
16 And that burden is beyond a reasonable doubt. And that
17 burden is stair step illustrated here from a reasonable
18 suspicion to a probable cause to a preponderance to clear
19 and convincing to beyond a reasonable doubt.
20     Now, reasonable suspicion is, for instance,
21 if you're driving, a police officer sees you weaving down
22 the road, he has that reasonable suspicion to stop you to
23 investigate further and may issue a citation or not, just
24 depends on what he finds out.
25     Probable cause is that standard, for

207

1 instance, when a Grand Jury returns an indictment. Has to
2 be by probable cause for an indictment to be returned.
3 And you have probable cause for warrants or search
4 warrants, arrest warrants, so forth as well.
5     Preponderance is -- you see that in a civil
6 case. I don't think you've sat on a Jury before, right?
7     A.  No.
8     Q.  And you should know that that only applies in a
9 civil case dealing with monetary damages, car wrecks,
10 things of that nature, people suing each other.
11     A.  Okay.
12     Q.  It's called the 51 percent rule, which is the
13 greater weight and degree of credible evidence.
14     Then you've got that clear and convincing
15 standard. That's defined in our law as measure or degree
16 of proof that will produce in the mind of a trier of fact
17 a firm belief or conviction as to the truth of the
18 allegation sought to be established. That applies in
19 cases of termination of parental rights, when you seek
20 to sever those rights and take the child away from the
21 parent. Now, you can understand why the burden will be
22 so high in those type situations because you're dealing
23 literally with people's lives, children's lives, the
24 parents even, of course. So you understand that?
25     A.  Yes.

208

1  Q.  And beyond a reasonable doubt is more than having
2  the firm belief. It's more than clear and convincing, so
3  that's how strong and high that is when you look at a
4  criminal case. And in a capital murder case, it has to
5  apply to those elements, including that intentional
6  element.
7       The Prosecutor asked you a minute ago about,
8  well, the Judge had you come and sit down, told you to
9  sit in the second chair and you did so kind of in an
10  instant. Remember that?
11  A.  Yes.
12  Q.  In a -- when we talk about an intentional murder,
13  conscious objective or desire to cause death, can you see
14  how that would be a different thought process than simply
15  taking a seat in the chair when you decide to murder
16  somebody?
17  A.  Yes.
18  Q.  You see a difference?
19  A.  Yes.
20  Q.  And so when we talk about that intentional, see,
21  intentional was the highest mental state in our law. It
22  is followed by other mental states that -- defined in our
23  law, from a knowing mental state to a criminal
24  negligence. At the very bottom is knowing -- reckless.
25  Excuse me. At the very bottom is criminal negligence, but

209

1  intentional is the highest, and that's even more focused
2  in a capital murder case, even more strictly defined as
3  conscious objective or desire to cause the result. And
4  you can understand why in a -- the highest crime in our
5  law that would apply, because here you're talking about
6  a crime in which a person intends to cause death, thought
7  about it, on purpose, intended to do it, knew it was wrong
8  but did it anyway death. Okay?
9  A.  Uh-huh.
10  Q.  And so when we look at that, you have to hold
11  the State to that high burden of proof to make sure that
12  all of these factors are proved, these elements, excuse
13  me, are proven because they've got to prove 100 percent
14  of those elements I showed you there before; Johnson
15  County, Texas, on or about June 29th, intentionally and
16  knowingly, intentionally, excuse me, causing the death of
17  Nancy Weatherly, shooting her, killing her with a firearm
18  in the course of the commission of a robbery.
19       Okay. Now, these are things that must be
20  proven in the court that you -- when you take that oath
21  that you have to render a true verdict, and that's the
22  first part of a trial. And as the Prosecutor said, told
23  you, which was correct, if you find that they ever so
24  slightly failed in that burden of proof, then it's your
25  duty to find a person not guilty. You understand that,

210

1  correct?
2  A.  Yes.
3  Q.  And that's something you can do, ma'am?
4  A.  Yes.
5  Q.  Now, we have to talk to you about this next
6  phase because we don't know what's going to happen. Our
7  position is, that is, me and Mr. Westfall, is that no
8  he's not guilty of capital murder and therefore the death
9  penalty is not an appropriate sentence. But this is the
10  only time we can talk. Okay. So that's why we have to
11  talk about that because we can't stop a trial in the
12  middle, you know, say Judge, time out, we want to talk
13  to them now about death penalty. We can't do that, so
14  this is the time to do it.
15  A.  Okay.
16  Q.  All right. Your thoughts of death penalty, you
17  said that death penalty, you could do it, it would be
18  hard. And I think that's what the law intended that it be
19  hard. It's not a light thing or easy thing. It has to be
20  hard.
21  A.  Uh-huh.
22  Q.  Because if you look at it, when you talk about
23  those Special Issues, those three questions he showed
24  you up there, the burden of proof as to the first two
25  the State has to shoulder, because there is a presumption

211

1  of life until and unless they remove that presumption
2  with those answers to the first two questions. Okay.
3  You indicated that a life sentence is something in which
4  a person who is an unrepentive murderer, in other words,
5  a person who could possibly do it again and again and
6  again, that's a concern as well as, I think as you put
7  it, Ms. Strom, that a lot of resources spent on housing
8  that person in the life sentence; is that right?
9  A.  Yes.
10  Q.  What were you thinking there when you talk
11  about a lot of resources being expended?
12  A.  I think with just a lot of money, for some
13  people, you know, life in prison isn't that much of a
14  punishment for certain individuals, and you're spending
15  money on housing them and feeding them and, you know,
16  giving them some comforts that really is -- there's no
17  point to it.
18  Q.  Is that something that you glean from having read
19  something or heard from other people or, you know, watched
20  some special on TV?
21  A.  Just in general discussion.
22  Q.  General discussion?
23  A.  Uh-huh.
24  Q.  Have you ever been to a prison, ma'am?
25  A.  No.

212

1    Q.  Have you been to a jail --
2    A.  Yes.
3    Q.  -- to visit?  Okay.  Was that involving your
4  brother-in-law's situation or someone, something else?
5    A.  Something else.
6    Q.  What -- when was that?  How long ago was that?
7    A.  It was quite a while ago.
8    Q.  Was that here in Texas or Columbia or some other
9  place?
10   A.  That was in Florida.
11   Q.  In Florida.  Was that a friend or relative?
12   A.  A friend.
13   Q.  Friend.  Okay.  What was that experience like?
14   A.  It was a little unnerving.  I mean, I hadn't
15  been in a jail for any reason, but, I mean...
16   Q.  Okay.  It was just a county jail; it was not a
17  prison itself?
18   A.  Right, right.
19   Q.  Excuse me.  Well, let me ask you, what do you
20  think is worse, life without the possibility of parole --
21  because that's what it means.  Everyone will agree that
22  a person who would receive such a sentence would have to
23  serve the rest of his or her natural born life in prison
24  and come out in a box.
25   A.  Uh-huh.

213

1    Q.  What's the harshest penalty to you, life without
2  parole or the death penalty?
3    A.  I think the death penalty is harsher.
4    Q.  Okay.  And why do you say that, Ms. Strom?
5    A.  Because I think as people, we all just want to
6  live, just that common desire to live, so I think knowing
7  that you are going to be put to death for something you've
8  done, I think is a lot harsher than saying, well, your
9  life is going to change dramatically, but you still have a
10  chance to live.
11   Q.  Okay.  All right.  So that our instinct to live
12  and want to live is a strong enough desire that you think
13  that taking that away by killing the person is more
14  harsher punishment; is that right?
15   A.  Yes.
16   Q.  The reason I ask that, some people think that,
17  well, if you lock them up for the rest of their life in
18  prison, they're going to be in these more horrid
19  conditions, could be subject to assaulting themselves and
20  other folks and having to live with what you did and so
21  forth; and others who feel like you do, that termination
22  of that life is more harsher.  So that's why I asked that
23  question.  Do you see that?
24   A.  Yes.
25   Q.  Okay.  A -- when you -- we talk about these hard

214

1  decisions and that's something that you would have to go
2  back once you get these questions and look at the evidence
3  and examine, and I want to talk to you now about some of
4  these issues.  And as I scroll through that, because the
5  things that the Prosecutor covered with you on accomplice
6  testimony, for instance, and party, that is, in fact, the
7  correct application of the law in many respects except for
8  that one time when my partner objected.  And you heard
9  that objection being sustained.  In other words, the Judge
10  thought we were right.
11        But let me take you to this next phase real
12  quickly, that first question.  A probability that the
13  Defendant would commit criminal acts of violence that
14  would constitute a continuing threat to society.  Here
15  the Jury has to answer it unanimously before it can be
16  yes.
17   A.  Okay.
18   Q.  If it's going to be answered no, only 10 jurors
19  are required to do so without having to give a reason as
20  to, you know, what they based that upon.  That's the way
21  the law is.  When you look at that question, it's really
22  broken down into whether there is a probability, and
23  that's, of course, not a possibility.  It's more than
24  that.  It's a probability.  You see that?
25   A.  Yes.

215

1    Q.  That the Defendant will commit criminal acts, and
2  these criminal acts, not just general criminal acts, they
3  have to be violent criminal acts.  So you see you have to
4  look at whether they produced enough evidence to determine
5  you -- for you to determine sufficiently whether there's a
6  probability that these criminal acts would be committed on
7  a ongoing or continuing basis to be a threat to society.
8  All right.  So do you think that's an appropriate inquiry,
9  question to be made?
10   A.  Yes.
11   Q.  And the fact, you kind of hit on it during your
12  questionnaire, about a person being in prison, that
13  unrepentive person who could potentially do harm to
14  others --
15   A.  Yes.
16   Q.  -- I think is what you said; is that right?
17   A.  Yes.
18   Q.  You would want to know that.  And you would want
19  to see evidence of that.  You understand you have to be
20  able to be convinced of that by the State?  Otherwise --
21        THE COURT:  You need to answer out loud.
22   A.  Yes.
23        THE COURT:  You're shaking your head.  This
24  lady --
25   Q.  All right.  I should've reminded you.  The Judge

216

1  is right.
2       So when you answer that, if you answer it
3  yes, and you move on.  If you answer it no, then it's a
4  life sentence, life without parole, if you don't find
5  that --
6     A.  Okay.
7     Q.  -- beyond a reasonable doubt.  Okay.  Now, this
8  second question, law of parties, and you've gone -- we've
9  gone over that, and I have a limited amount of time so I'm
10  just gonna glide through this pretty quickly because what
11  I want to do is get to this third question.  Because if
12  you answer that second one yes, now you're confronted with
13  a decision that you have to make really based upon your
14  own moral judgment, look within yourself to make that very
15  difficult, hard determination as to whether a person lives
16  or dies.  Okay?
17     A.  Right.
18     Q.  You are a pretty -- still a pretty religious
19  person; is that right, Ms. Strom?
20     A.  Yes, you could say so.
21     Q.  And do you -- are you guided by, in addition to
22  your family who have helped to form you, your beliefs and
23  where you go in life, are you also guided by your
24  religious or spiritual beliefs as well?
25     A.  Yes.

217

1     Q.  Is it more so now or less so than in the past?
2  How would you say?
3     A.  It's about the same.
4     Q.  About the same?
5     A.  Yes.
6     Q.  And do you think in making a decision such as
7  whether you look -- in looking at the third question, let
8  me skip through to that third question.  This is sort of
9  a -- you'll be given an instruction like this, before I
10  get to the third question.  You shall consider all
11  evidence in deliberating on Questions 1 and 2.  Okay.
12  And when you look at Question 3, it talks about that
13  Defendant's background and character and circumstances
14  of the offense to warrant that a sentence of life rather
15  than death be imposed.
16       Mitigating circumstances, what is your
17  understanding of that, Ms. Strom?
18     A.  Just I think the -- if the Defendant, I mean,
19  just looking at the character and background, kind of
20  that same idea, if they're going to be repentive, if that,
21  you know, life without parole is actually going to be a
22  punishment for them, that they're going to be, you know,
23  "I shouldn't have done this and I know I shouldn't have
24  done this", you know.
25     Q.  Okay.  All right.

218

1     A.  And you have those circumstances to prove that.
2     Q.  Okay.  Well, mitigating circumstances talks about
3  lessening, in other words, that person's moral
4  responsibility, if you will, or the lack to -- of to -- to
5  at least reduce their punishment, mitigate, to lessen.
6     A.  Okay.
7     Q.  Okay.  And that is, looking at all those factors
8  and facts.  I think you've indicated in your questionnaire
9  that a person's upbringing or character and background is
10  relevant in determining the person's punishment; is that
11  right?
12     A.  Yes.
13     Q.  And you also told us in this questionnaire that
14  you felt that any type of testimony from mental health
15  professionals is very good, would be useful to you?
16     A.  Yes.
17     Q.  Is that right?  And why do you say that?
18     A.  Well, I mean, it's another expert's view on
19  things, I think is helpful.
20     Q.  And you understand that other expert's view on
21  things, I take it that you would respect those views in
22  whatever degree because they are an expert?
23     A.  Yes.
24     Q.  Okay.  Before I wrap up, I've got some more
25  questions for you, but here, there's no burden of proof.

219

1  Again, you look at within yourself to make that
2  determination or decision, because you understand the
3  certainty, what happens, the consequences of that
4  decision, life or death.
5       Now, there's no requirement that the Jury
6  return a verdict in the Guilt/Innocence stage of the
7  trial, and there is no requirement as well to answer those
8  questions, but the law would expect you to try to work to
9  the best of your ability without violating your conscience
10  to make these hard decisions and answer these questions,
11  including the verdict.
12       We've talked about this, these things that
13  you've probably seen before or heard people make such
14  arguments about the death penalty.  That eye for an eye
15  especially, a lot of people who talked about that, you
16  know, you take one life, your life should be taken kind of
17  thing?
18     A.  Right.
19     Q.  How do you feel about that?
20     A.  I don't think it's always appropriate in -- I
21  mean, in some cases, yes, in some others, no.
22     Q.  Okay.  And here we talk about these type of
23  arguments, that's not a part of the law we were talking
24  about because you have to answer those questions in a
25  manner and be convinced in Question 1 and 2 by the State.

220

1  You understand that?
2      A.  Yes.
3      Q.  And my last PowerPoint is right here.  And just
4  take a moment to look at that.
5      A.  Do you want me to answer?
6      Q.  Yes.  Would you take you on this Jury?
7      A.  I guess not knowing what other options you have,
8  um, yes.
9      Q.  Okay.  Now, you had some very interesting
10  comments about our justice system.  I don't know if you
11  remember what you said.
12      A.  Not completely.
13      Q.  You said there were some loopholes and power
14  plays that can corrupt our system.  What do you mean by
15  that?
16      A.  I mean, I think in any system, there's going
17  to be people who are more powerful or can arrange things
18  maybe how they want, or people who are guilty who find
19  the right person to talk to or the right plea or bargain
20  or anything like that and get away with something that
21  they might have done.  Or sometimes, you know, evidence
22  is, um, confusing or people are convicted of things they
23  haven't completely -- or they didn't do.
24      Q.  But you said earlier that powerful people can
25  kind of manipulate things in your mind to get a desired

221

1  outcome.  Is that, one way, part of that too?
2      A.  Possibly, yes, yes.
3      Q.  And then the power -- the loopholes is something
4  that a person can get away with crime by exploiting a
5  loophole; is that what you meant by that?
6      A.  Yeah, yes.
7      Q.  Okay.
8      A.  I mean, I'm not completely familiar with a lot of
9  law rules, and there's a lot of language and laws and --
10      Q.  Sure.
11      A.  You know, circumstances that I think can be used
12  to certain people's advantages if they understand the ins
13  and outs of law.
14      Q.  Do you think about any particular cases or
15  instances --
16      A.  No, just --
17      Q.  -- when you gave that answer?
18      A.  No, just in general.
19      Q.  Again, let me ask you this.  Is that a result of
20  just general conversation with people about their life
21  experiences and what they may have read or heard or
22  experienced themselves?
23      A.  Yes, and I mean, somewhat I guess referring to
24  the case with my brother and sister-in-law,
25  brother-in-law.  He set it up to make her look guilty

222

1  even though she was the one who was completely innocent
2  and unaware of what was really happening.  So in that
3  case, you know, if they had not looked at that, you know,
4  thoroughly, she would have been convicted for something
5  that he did.
6      Q.  Okay.
7      A.  So which again, you know, justice system did
8  right in that case.
9      Q.  Okay.  You describe yourself as a kind person,
10  a fun person, an emotional person?
11      A.  Yes.
12      Q.  When I read that "kind," I think of
13  compassionate.  Would you describe yourself as a
14  compassionate person?
15      A.  Yes.
16      Q.  And have you -- I take it when you -- you know,
17  when people say that you've been described as such, kind,
18  emotional, compassionate maybe, they've seen you operate
19  and exhibit those type of qualities?
20      A.  Yes.
21      Q.  Is that a fair statement?
22      A.  Yes.
23      Q.  Okay.  Working with kids is a noble thing and I
24  believe a lot of people, if not everyone, would agree with
25  that.  And you probably don't get paid enough, but that's

223

1  something for another day and time.  But do you see that
2  as part of your everyday work to be kind, considerate,
3  compassionate in working with kids?
4      A.  Yes.
5      Q.  Have you seen others, perhaps even other parents
6  or maybe even other teachers who don't exhibit those same
7  qualities that you have that you exhibit?
8      A.  Yes.
9      Q.  How do you think it affects those kids when they
10  go through that?
11      A.  I don't think -- I mean, they're not going to be
12  as effective as a teacher to that student, and that
13  student may just not worry about it or may not learn from
14  them as much if they know that that teacher is not
15  approachable or going to help them in any way that they
16  could.
17          MR. HEISKELL:  Okay.  Let me have just a
18  second, Ms. Strom.
19          (Pause in proceeding.)
20          MR. HEISKELL:  Thank you, Ms. Strom.  I pass
21  the Juror, Your Honor.
22          THE COURT:  Ms. Strom, if you'll step outside
23  for just a minute.
24          (Venireperson Strom not present.)
25          THE COURT:  Okay.  State have any challenges

224

1  for cause?

2          MR. STRAHAN:  No, sir.

3          THE COURT:  Defense have any?

4          MR. HEISKELL:  No, Your Honor.

5          THE COURT:  Ask her to come back in.

6          (Venireperson Strom present.)

7          THE COURT:  Come up a little bit.  I'll talk

8  to you just a minute.  You're not on the Jury yet.

9          VENIREPERSON:  Okay.

10          THE COURT:  But you are on the panel the Jury

11  is gonna be selected from.  What's going to happen, you're

12  going to get a call from the Jury Administrator that you

13  have to be in court on a certain day.  We don't know

14  exactly when that is.  We'll give you as much notice as we

15  can.  That day won't take more than a couple hours at the

16  most, I don't think.  And that day you'll be told you're

17  either on the Jury or be released, one or the two.

18          Before you leave today, we're going to get a

19  picture of you against that back wall with -- this lady is

20  going to take it.  We're doing that because this process

21  is going to last about a month.

22          VENIREPERSON:  Okay.

23          THE COURT:  Also, in the meantime, don't

24  talk to anybody about the case.  Don't go to school and

25  ask anybody if they know anything or heard of it.  It may

225

1  be in the newspapers as trial gets closer, even on TV.

2  Don't watch it.  Don't listen to it.  Don't let anybody

3  tell you what was said.  And whatever you do, don't get

4  on Internet, start trying to do any research on this.

5          VENIREPERSON:  Okay.

6          THE COURT:  Thank you, ma'am.

7          VENIREPERSON:  Thank you.

8          THE COURT:  We'll take about a 10-minute

9  break.

10          (Venireperson Strom not present.)

11          (Recess taken from 3:07 to 3:23 p.m.)

12          (Proceedings continue in Volume 22 of the

13          Reporter's Record.)

14

15

16

17

18

19

20

21

22

23

24

25

1  THE STATE OF TEXAS )

2  COUNTY OF JOHNSON  )

3           I, Pamela K. Waits, Official Court Reporter

4  in and for the 413th District Court of Johnson County,

5  State of Texas, do hereby certify that the above and

6  foregoing contains a true and correct transcription of all

7  portions of evidence and other proceedings requested in

8  writing by counsel for the parties to be included in the

9  volume of the Reporter's Record, in the above-styled and

10 numbered cause, all of which occurred in open court or in

11 chambers and were reported by me.

12          I further certify that this Reporter's Record

13 of the proceedings truly and correctly reflects the

14 exhibits, if any, admitted by the respective parties.

15          WITNESS MY OFFICIAL HAND this the _31_ day

16 of _December_, 2012.

17

18          _____
            Pamela K. Waits, Texas CSR #4991

19          Expiration Date:  12/31/13
            Official Court Reporter

20          413th Judicial District
            Johnson County, Texas

21          204 S. Buffalo Avenue
            Cleburne, Texas 76033

22          (817) 556-6041

23

24                              ORIGINAL

25