```
1                    REPORTER'S RECORD

2               VOLUME 35 OF 75 VOLUMES

3             TRIAL COURT CAUSE NO. F45059

4        COURT OF CRIMINAL APPEALS NO. AP-76,768

5   STATE OF TEXAS          )      IN THE DISTRICT COURT
                            )
6   VS.                     )      JOHNSON COUNTY, TEXAS
                            )
7   MARK ANTHONY SOLIZ      )      413TH JUDICIAL DISTRICT

8

9   ------------------------------------------------------

10                 INDIVIDUAL VOIR DIRE

11                   JURY SELECTION

12  ------------------------------------------------------

13

14

15          On the 17th day of February, 2012, the

16  following proceedings came on to be heard in the

17  above-entitled and numbered cause before the Honorable

18  Phillip Vick, Judge presiding, held in Cleburne, Johnson

19  County, Texas:

20          Proceedings reported by Machine Shorthand and

21  Computer-Aided Transcription.

22

23

24                                      ORIGINAL

25
```

```
 1                    A P P E A R A N C E S

 2   DALE HANNA
     SBOT NO. 08919500
 3   LARRY CHAMBLESS
     SBOT NO. 04086320
 4   MARTIN STRAHAN
     SBOT NO. 00797765
 5   District Attorney's Office
     Johnson County
 6   204 S. Buffalo
     Cleburne, Texas 76033
 7   (817) 556-6801

 8   ELIZABETH CHRISTINA JACK
     SBOT NO. 10445200
 9   Tarrant County District Attorney's Office
     401 W. Belknap Street
10   Fort Worth, Texas 76102-1913
     817-884-1366
11
     ATTORNEYS FOR THE STATE OF TEXAS
12

13   MICHAEL P. HEISKELL
     SBOT NO. 09383700
14   Johnson, Vaughn & Heiskell
     5601 Bridge Street
15   Suite 220
     Fort Worth, Texas 76112-2305
16   817-457-2999

17   GREGORY B. WESTFALL
     SBOT NO. 00788646
18   Hill Gilstrap, P.C.
     1400 W. Abram Street
19   Arlington, Texas 76013
     817-276-4931
20
     ATTORNEYS FOR DEFENDANT
21

22

23

24

25
```

```
 1                      I N D E X

 2                     VOLUME 35

 3               INDIVIDUAL VOIR DIRE

 4  FEBRUARY 17, 2012                    PAGE        VOL.

 5  Proceedings..................................  5          35

 6                       STATE'S      DEFENSE
    PROSPECTIVE JUROR    VOIR DIRE    VOIR DIRE               VOL.
 7
    DERRICK TAYLOR, NO. 158    8          --
 8  Venireperson Excused by Agreement............ 13          35

 9  TIM FREELS, NO. 159        17          --
    Venireperson Excused by Agreement............ 22          35
10
    CHRISTOPHER GRIGGS, 160    25         37
11  State's Challenge for Cause.................. 37          35
    Court's Ruling............................... 40          35
12  Venireperson Excused by Agreement............ 40          35

13  DANNIE BULLARD, NO. 161    --          --
    Venireperson Excused by Agreement............ 41          35
14
    SANDRA HORNBROOK, NO. 163  --          --
15  Venireperson Excused by Agreement............ 41          35

16  JOHN WELLING, NO. 165      --          --
    Venireperson Excused by Agreement............ 44          35
17
    VERONICA COX, NO. 167      --          --
18  Venireperson Excused by Agreement............ 45          35

19  ROSA VELA, NO. 166         --          --
    Venireperson Excused by Agreement............ 45          35
20
    JUANITA NICHOLS, NO. 164   49         88
21  Venireperson Accepted....................... 109          35

22  GARY VOGEL, NO. 162        --          --
    Venireperson Excused by Agreement...........113          35
23
    BRANDON CLANTON, NO. 168   --          --
24  Venireperson Excused by Agreement...........115          35

25  Court Adjourned.............................115          35
```

1 | Court Reporter's Certificate.................116      35

2

ALPHABETICAL VENIREPERSON INDEX

3

| | STATE'S | DEFENSE | |
4 | PROSPECTIVE JUROR | VOIR DIRE | VOIR DIRE | VOL. |

| | | | |
|---|---|---|---|
| 5 DANNIE BULLARD, NO. 161 | -- | -- | 35 |
| BRANDON CLANTON, NO. 168 | -- | -- | 35 |
| 6 VERONICA COX, NO. 167 | -- | -- | 35 |
| TIM FREELS, NO. 159 | 17 | -- | 35 |
| 7 CHRISTOPHER GRIGGS, 160 | 25 | 37 | 35 |
| SANDRA HORNBROOK, NO. 163 | -- | -- | 35 |
| 8 JUANITA NICHOLS, NO. 164 | 49 | 88 | 35 |
| DERRICK TAYLOR, NO. 158 | 8 | -- | 35 |
| 9 ROSA VELA, NO. 166 | -- | -- | 35 |
| GARY VOGEL, NO. 162 | -- | -- | 35 |
| 10 JOHN WELLING, NO. 165 | -- | -- | 35 |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**5**

1  PROCEEDING
2  (Defendant present.)
3  (Venireperson Taylor present.)
4  THE COURT: Come on up, Mr. Taylor. If
5  you'll raise your right hand.
6  VENIREPERSON: Do what now?
7  THE COURT: If you'll raise your right hand.
8  (Juror oath.)
9  THE COURT: Have a seat in the chair No. 2
10  in the jury box.
11  Okay. Would you state your name.
12  VENIREPERSON: Derrick Taylor.
13  THE COURT: Mr. Taylor, you filled out a
14  juror questionnaire. Were the answers you put on there
15  true and correct?
16  VENIREPERSON: Best I could answer them,
17  yes.
18  THE COURT: Okay. That's been a couple
19  months or a month or something. Has anything changed in
20  your life that would change any of those answers?
21  VENIREPERSON: No.
22  THE COURT: Okay. My name is Phillip Vick.
23  I'm the Judge presiding in this proceeding. When this
24  case goes to trial, Judge William Bosworth, Judge of the
25  413th District Court of Johnson County, will be trying

---

**6**

1  the case.
2  The attorneys representing the State in this
3  case are Mr. Dale Hanna, who is not here this morning.
4  Mr. Larry Chambless.
5  MR. CHAMBLESS: Good morning, sir.
6  THE COURT: Mr. Martin Strahan.
7  MR. STRAHAN: Morning.
8  THE COURT: Ms. Christy Jack.
9  MS. JACK: Good morning.
10  THE COURT: The attorneys representing the
11  Defendant are Mr. Michael Heiskell.
12  MR. HEISKELL: Morning.
13  THE COURT: Mr. Greg Westfall.
14  MR. WESTFALL: Hello.
15  THE COURT: And seated with them at the
16  counsel table is the Defendant, Mark Anthony Soliz.
17  THE DEFENDANT: Morning, sir.
18  THE COURT: And they'll have questions for
19  you, but I'll ask first. Is there anything else you
20  know about you that we didn't ask on the questionnaire?
21  VENIREPERSON: No, not that I know of.
22  THE COURT: You're gonna be asked a lot of
23  questions. I will tell you it's not a test. There's not
24  any right or wrong answers. The only thing we require of
25  you is that you be truthful. Answer "yes" and "no" when

---

**7**

1  you can. If you say "maybe" or something like that,
2  you're gonna get a lot more questions to explain that
3  answer.
4  VENIREPERSON: Okay.
5  THE COURT: And don't answer a question
6  unless you're sure you understand it. If you don't, get
7  them to explain it or rephrase it or say something else
8  about it.
9  VENIREPERSON: Okay.
10  THE COURT: We -- trial is gonna start not
11  this next Monday, but the Monday week. When it does
12  start, it will last no longer than five week -- three
13  weeks, three weeks. There is a chance that the Jury
14  could be sequestered for part or all of that time. And
15  my question to you, is anything happening in your life
16  that would interfere with you being a juror during that
17  period of time?
18  VENIREPERSON: That would be a real tough
19  one for me because I run a transmission shop in Fort
20  Worth.
21  THE COURT: Okay.
22  VENIREPERSON: I have five guys that depend
23  on me being there every day.
24  THE COURT: Okay. Would you get paid if you
25  weren't there?

---

**8**

1  VENIREPERSON: No. I get paid on
2  commission, what I sell.
3  THE COURT: Okay. I guess the question is,
4  if you would be so distracted by -- you wouldn't even be
5  able to contact them or anything if you were
6  sequestered. Would you be so preoccupied and concerned
7  about what's happening at the shop that you couldn't pay
8  full attention to the evidence?
9  VENIREPERSON: I've been working for this
10  shop for 35 years. It's pretty much my shop. Yeah,
11  everything that happens on there goes through me.
12  THE COURT: Okay. Okay. I'll let the
13  lawyers talk to you and see if you want to tell them --
14  they'll probably ask about that.
15  VENIREPERSON: Okay.
16  THE COURT: So I'll recognize the State.
17  DERRICK TAYLOR,
18  Venireperson No. 158, testified as follows:
19  VOIR DIRE EXAMINATION
20  BY MS. JACK:
21  Q. Good morning, Mr. Taylor.
22  A. Morning.
23  Q. How are you doing?
24  A. I'm fine.
25  Q. All right. Let me just go ahead and pick up

9

1 where the Judge left off. I understand that you run a
2 shop. It's your shop. You've worked there for 35
3 years. And let me just explain from a practical
4 standpoint what jury service may entail. All right.
5 You understand that this is the most serious type of
6 case there is?
7     A. Uh-huh.
8     Q. And we need jurors who can give the evidence
9 and the witnesses their full attention. All right. And
10 I will say this. Have you ever read the newspaper and
11 said, "I have no idea why that Jury did that" or "Why did
12 they do that" or "I wish they hadn't done that"?
13     A. Yeah.
14     Q. And I will tell you, this is your chance to sit
15 on a Jury if you're qualified. Okay. What that means is
16 if you can follow the law and the instructions that the
17 Judge gives you. Okay. But that being said, if there
18 are things going on in your unique situation, your life,
19 that prevent you from giving this trial your full
20 attention -- because you understand this, it doesn't get
21 anymore serious than this?
22     A. Uh-huh.
23     Q. If you tell us you can't give this trial your
24 full attention, I understand that, and so will this
25 Court. If you tell us, "I know it's gonna be difficult,

10

1 but I'm willing to make that sacrifice", then you are
2 entitled to sit on the Jury. So you just tell us.
3     A. I'll be honest with you, there is -- my biggest
4 problem with the idea of sitting on a Jury like this, if
5 I sit still too long, I go to sleep.
6     Q. You're not -- that's not a comment on me, is it?
7     A. No, that's just --
8     Q. Okay.
9     A. -- that's just the way it is.
10     Q. All right. I can be entertaining. No.
11     A. I drink a lot of Monsters and --
12     Q. To stay awake?
13     A. Red Bull to try to stay awake through my day.
14 Sitting in the office at that shop, I have a tough time
15 doing that.
16     Q. Okay.
17     A. So sitting here all day long, somebody would be
18 nudging me.
19     Q. So there's really two issues; one is your work,
20 the second is medical issues?
21     A. Right.
22     Q. Both of those together would prevent you from
23 giving --
24     A. That would cause a problem, me sitting on a
25 Jury, yeah.

11

1     Q. So you don't think you would give the evidence
2 and witnesses your full attention?
3     A. Well, that, and from what they told me on the --
4 you know, when they -- we first came in, there was a
5 point in my life where I was shooting dope, and I was
6 given the choice of my dope or my daughter. I
7 cold-turkeyed it that day and haven't looked back.
8 Okay. So it's absolutely a choice.
9     Q. You should be very proud of yourself.
10     A. I am.
11     Q. For making that choice.
12     A. I raised my daughter, you know. And she went
13 to the Army. She's now a mother herself in Germany. You
14 know, I raised three other kids, step kids. All my kids
15 graduated from high school. I went, I used my experience
16 growing up and the things I went through to raise my
17 kids. None of my kids ever did drugs. They all are,
18 you know, contributing adults. I've got one kid left at
19 home, and she babysits for my oldest daughter. I'm
20 extremely proud of my kids.
21     Q. And you should be.
22     A. It's, you know, like I say, I wasn't the
23 greatest kid. Nobody believed I'd have made it past 30.
24     Q. But you did.
25     A. And here I am --

12

1     Q. And you turned your life around?
2     A. -- 20 years later, so.
3     Q. You turned your life around.
4     A. Exactly.
5     Q. And raised good kids as a result.
6     A. Uh-huh.
7     Q. All right. So let me just ask you this. Let's
8 go back to our original point. Can you sit on this Jury
9 and can you give it your full attention? If you can,
10 that's fine. If you can't, that's fine, too.
11     A. Well, like I say, my biggest -- the two main
12 issues is I don't know what would happen to my shop while
13 I was sitting here for three weeks. And the other side
14 is I don't even know if I can stay awake all day.
15     MS. JACK: I understand.
16     Judge, I believe we're gonna excuse this
17 Juror.
18     MR. HEISKELL: We agree, Your Honor.
19     THE COURT: Okay. We're gonna go ahead and
20 release you.
21     VENIREPERSON: Thank you.
22     MS. JACK: And you should be very proud of
23 yourself.
24     VENIREPERSON: I worked hard to get back
25 where I was.

13

```
1          THE COURT:  Thanks for coming in.
2          VENIREPERSON:  So we're done?
3          THE COURT:  You're done.
4          MR. WESTFALL:  Thank you.
5          MR. HEISKELL:  Good luck to you, sir.
6          (Venireperson Taylor excused.)
7          THE COURT:  For the record, Mr. Taylor was
8  disqualified -- for cause by agreement.  Okay.
9          (Venireperson Freels present.)
10         THE COURT:  Come on up.  If you'll raise
11  your right hand.
12         (Juror oath.)
13         THE COURT:  Thank you, sir.  If you'll have
14  a seat in the second chair in the jury box.
15         Okay.  Would you state your name.
16         VENIREPERSON:  My name is Timothy Scott
17  Freels.
18         THE COURT:  You pronounce it Freels?
19         VENIREPERSON:  Freels, F-R-E-E-L-S.
20         THE COURT:  You filled out a juror
21  questionnaire a while back.  Were the answers you put on
22  there true and correct?
23         VENIREPERSON:  Yes, sir, I believe so.  When
24  I say that, you know, sometimes you question later on, do
25  I really believe this or that, but, yes, to the best of
```

14

```
1  my ability, yes.
2          THE COURT:  That's been over a month.  Has
3  anything happened in your life that would change any of
4  those answers in the meantime?
5          VENIREPERSON:  No, sir, not that I can
6  think of.
7          THE COURT:  My name is Phillip Vick.  I'm
8  the Judge presiding in this proceeding.  When the case
9  goes to trial, Judge William Bosworth, Judge of the 413th
10  District Court of Johnson County, will be trying the
11  case.
12         The attorneys representing the State in this
13  case are Mr. Dale Hanna, who has stepped out.  Mr. Larry
14  Chambless.
15         MR. CHAMBLESS:  Hello.
16         THE COURT:  Mr. Martin Strahan.
17         MR. STRAHAN:  Hi, there.
18         VENIREPERSON:  How are you doing?
19         MR. STRAHAN:  Good.  Thanks.
20         THE COURT:  Ms. Christy Jack.
21         MS. JACK:  Good morning.
22         VENIREPERSON:  Christy.
23         THE COURT:  The attorneys representing the --
24  representing the Defendant are Mr. Greg Westfall.
25         MR. WESTFALL:  Hello.
```

15

```
1          THE COURT:  Mr. Michael Heiskell.
2          MR. HEISKELL:  Morning.
3          THE COURT:  And seated with them at the
4  counsel table is the Defendant, Mark Anthony Soliz.
5          THE DEFENDANT:  How you doing, sir?
6          VENIREPERSON:  Morning.
7          THE COURT:  They'll have questions for you,
8  but I'll ask first.  Is there anything we need to know
9  about you that we didn't ask on the questionnaire?
10         VENIREPERSON:  I have no idea.
11         THE COURT:  Okay.  You're gonna be asked a
12  lot of questions.  I will tell you it's not a test.
13  There are no right or wrong answers.  We only require
14  that you be truthful.
15         VENIREPERSON:  Okay.
16         THE COURT:  Answer "yes" and "no" if you
17  can.  If you say "maybe" or "probably" or "I think so"
18  or something, you'll get other questions to explain that
19  answer.  And don't answer a question unless you're sure
20  you understand it.  If you're not clear what's being
21  asked, get them to explain it or rephrase it.
22         VENIREPERSON:  Okay.
23         THE COURT:  Trial is gonna start not this
24  next Monday but the Monday after.  When it does start, it
25  will last not longer than three weeks.  There is a chance
```

16

```
1  that the Jury could be sequestered for part or all of
2  that time.
3          And the question to you, is anything
4  happening in your life that would interfere with you
5  being a juror?
6          VENIREPERSON:  Um, my -- my wife's involved
7  in selling at Canton.  Now, this is business, work
8  related.  I'm the guy that sets her up on Wednesday and
9  breaks her down on Sunday.  So Canton is a flea market
10  type scenario, first Mondays.  That is there.
11         Outside of that, just normal work concerns
12  that I'm sure everybody relates, you know, off work, no
13  pay, that kind of stuff.
14         THE COURT:  If you're on the Jury, could
15  that be worked around, the setting -- setting your wife
16  up?
17         VENIREPERSON:  I don't know.  I haven't done
18  it any other way, so I would have to, you know.
19         THE COURT:  That would be --
20         VENIREPERSON:  It's a display that involves
21  putting together, and which I built and put it together.
22  Nobody else has really helped me other than her.  So
23  that's -- that is just a side concern.
24         THE COURT:  Okay.  Okay.  I'll recognize the
25  State.
```

17

1   VENIREPERSON: You asked that, so...
2   THE COURT: Sure. Thanks.
3   I'll recognize the State.
4   MR. CHAMBLESS: All right. Thank you, Judge.
5   TIM FREELS,
6   Venireperson No. 159, testified as follows:
7   VOIR DIRE EXAMINATION
8   BY MR. CHAMBLESS:
9   Q. Mr. Freels, I just need to go over a couple of
10  things to begin with to establish where we are and if
11  you would be able to serve, potentially, as a juror in
12  this case. Okay. There's a couple of things. Let me
13  ask you this. Do you know anything about the case?
14  A. I don't know much. I did hear a little bit
15  through the news when it happened. It's been quite a
16  while ago.
17  Q. All right.
18  A. Not that I was involved in any conversations,
19  but around our church, there's definitely people who know
20  about it. Once they heard that a Jury is starting to be
21  picked, you know, I didn't go, "Hey, I'm one of those."
22  I didn't say anything. I backed away. My wife heard
23  more than I did. She's -- she's more involved.
24  Q. I think you would recognize that jurors would
25  need to base their decisions on evidence that's

18

1   presented in court and not from any other source. Do
2   you see that?
3   A. Yes.
4   Q. Okay. Have you formed any kind of opinion about
5   this case based on what you've heard or can you come in
6   here with an open mind? Just tell the Judge.
7   A. I don't think I've formed any opinions at this
8   point in time. I don't think I know enough about it.
9   Q. Okay. In fact, it would -- if you're -- I guess
10  if you're qualified to serve, you would have to be able
11  to mentally set that aside, anything you've heard outside
12  court, and base your decision only on what you hear and
13  see in this courtroom. Do you see that?
14  A. I believe so. I would like to think I would.
15  You know, to be honest, and that is what you want me to
16  be, sometimes you wonder, you know, I know what the right
17  answer is, but --
18  Q. Well, you just -- well.
19  A. Yeah.
20  Q. I'm not looking to -- for a certain answer.
21  We're just, Defense attorneys, us, we're just all asking
22  for your thoughts on it.
23  A. Sure. Okay. Yeah, it would be something I know
24  that's what I need to do, and I guess I would place it
25  that way, I know I need to listen to the facts and, you

19

1   know, make decisions based on those facts.
2   Q. Okay. Question number two. I know you, I know
3   your wife and children. We've known each other for some
4   years.
5   A. Yes, sir.
6   Q. Although I was -- I guess I should state on the
7   record, I was on staff there at Godley until a few years
8   ago. And then I haven't been at that church since that
9   time, but we still know each other.
10  A. Yes, sir.
11  Q. Now, if you're to serve as a juror on this case,
12  there are two of the finest attorneys over here, Mike
13  Heiskell, Greg Westfall, they need to know this, if you're
14  to serve on this Jury, it can't be a situation at all
15  where you would be inclined to play favorites, to give
16  credence to one side over another just because of a
17  relationship. You tell us, Mr. Freels, your thoughts on
18  that.
19  A. Um, and it's something I've pondered a lot, and,
20  you know, I do know you, I respect you, you being
21  associate pastor, and I wonder to myself -- again, I'm
22  trying to be honest myself.
23  Q. Sure.
24  A. Would that weigh anything. You know, again, I
25  know the right answer is "surely not", but I would say

20

1   there's just, you know, there's a possibility that, you
2   know, knowing your character, not that it affects, you
3   know, the trial itself, but I just have to say I question
4   just a little bit, you know, if I'm a little bit, little
5   bit swayed. I know that I don't need to be and I
6   shouldn't be, and, you know, I still need to be about
7   the facts and I think I would be glued to that.
8   Q. Okay. Well, maybe we'll come back to that as
9   you ponder that thought. You served on two jurors
10  before, I believe?
11  A. Yes. One many years ago in Tarrant County. I
12  don't remember a lot about it. When I was filling out
13  the questionnaire, you know, of course, this kind of
14  situation makes me nervous anyway, and that, too, I was
15  like, okay, what was that about. One, I believe, was an
16  indecent exposure. I don't remember a lot about it
17  because it was a six-man trial. Ultimately he was found
18  innocent by us.
19  Q. That was in here or Tarrant County?
20  A. No, that was Tarrant County. That was probably
21  when I was in my late twenties.
22  Q. Okay. Have you served on a Jury in --
23  A. And I did one here. I believe it was a
24  resisting arrest. I can't remember when I did it. I
25  guess this has to do with being over 50. I can't

---

21

1 remember the details. I believe it was also a six-man
2 trial, and he was also found innocent. I'm sure you
3 can find those records.
4     Q. Okay. Do you remember when that was?
5     A. No, sir.
6     Q. All right.
7     A. I -- seem like I get called for jury duty about
8 every two years or so, so I probably go two, four, six,
9 eight years ago maybe, maybe even up to 10 years ago.
10    Q. Okay.
11    A. It was an incident happened in Cleburne.
12    Q. Okay. Okay.
13    A. Don't remember the person's name.
14    Q. Okay.
15    A. Or much a whole lot about it.
16    Q. Okay. The -- I do want to go back for just a
17 second. So if you've had time to think about this, we
18 need to kind of, before we go more in depth to this
19 thing, and it really -- it's really, we just need to know
20 your heart on this. Do you think you could be fair to
21 both sides or you're not sure or could be or couldn't
22 be? You just tell us your heart on that.
23    A. Again, it's almost emotional to me because, you
24 know, I want, like I say, I want to do the right thing,
25 but I, honestly, I feel like I would be slightly swayed.

---

22

1     Q. Okay.
2     A. And that's what you're looking for is my first
3 thought, first opinion, what I think.
4     Q. Sure, sure.
5        MR. CHAMBLESS: Okay. Your Honor, Your
6 Honor, I believe we have an agreement.
7        THE COURT: Y'all are in agreement?
8        MR. HEISKELL: Yes.
9        THE COURT: Okay. Mr. Freels, we're gonna
10 let you go. We appreciate your honesty.
11       VENIREPERSON: Okay.
12       THE COURT: Thanks for coming in.
13       VENIREPERSON: I'm sorry.
14       THE COURT: That's all right. You did
15 exactly what you're supposed to do.
16       VENIREPERSON: Nice meeting all y'all.
17       MR. HEISKELL: Nice meeting you, too.
18       MR. WESTFALL: Take care, be safe.
19       (Venireperson Freels excused.)
20       (Recess taken.)
21       (Venireperson Griggs present.)
22       THE COURT: If you'll raise your right hand.
23       (Juror oath.)
24       VENIREPERSON: Yes, sir, I do.
25       THE COURT: Thank you, sir. If you'll have

---

23

1 a seat in the jury box, second chair there.
2        Okay. Would you state your name.
3        VENIREPERSON: My name is Christopher Shay
4 Griggs.
5        THE COURT: Mr. Griggs, you filled out a
6 juror questionnaire a while back. Were the answers you
7 put on there true and correct?
8        VENIREPERSON: Yes, sir.
9        THE COURT: That's been about a month ago.
10 Has anything changed in your life, changed, that would
11 change any of those answers?
12       VENIREPERSON: No, sir. The only thing I
13 guess you could say it would change is my girlfriend
14 moved in with me.
15       THE COURT: Okay. Okay. My name is Phillip
16 Vick. I'm the Judge presiding in this proceeding. When
17 this case goes to trial, Judge William Bosworth, Judge of
18 the 413th District Court of Johnson County, will be
19 trying the case.
20       The attorneys representing the State in this
21 case are Mr. Dale Hanna.
22       MR. HANNA: Good morning.
23       THE COURT: Mr. Larry Chambless.
24       MR. CHAMBLESS: Hi, sir.
25       THE COURT: Mr. Martin Strahan.

---

24

1        MR. STRAHAN: Morning.
2        THE COURT: Ms. Christy Jack.
3        MS. JACK: Good morning.
4        VENIREPERSON: Good morning.
5        THE COURT: The attorneys representing the
6 Defendant are Mr. Michael Heiskell.
7        MR. HEISKELL: Morning.
8        THE COURT: Mr. Greg Westfall.
9        MR. WESTFALL: Morning.
10       VENIREPERSON: Morning.
11       THE COURT: And seated with them at the
12 counsel table is the Defendant, Mark Anthony Soliz. And
13 they'll have questions for you, but I'll ask first. Is
14 there anything we should know about you that we didn't
15 ask on the questionnaire?
16       VENIREPERSON: No, sir.
17       THE COURT: I anticipate you're gonna be
18 asked a lot of questions. I would tell you it's not a
19 test. There's no right or wrong answers. We only require
20 that you be truthful.
21       VENIREPERSON: Yes, sir.
22       THE COURT: Answer "yes" or "no" if you can.
23 If you say like "maybe" or something like that, you'll get
24 some other questions because of that answer.
25       VENIREPERSON: Yes, sir.

**25**

1  THE COURT: Make sure you understand the
2  question before you do answer it. Get them to explain it
3  or clarify it or something else.
4  Trial is gonna start February 27th. That's
5  Monday week. When it does start, it will last no longer
6  than three weeks. There is a chance that the Jury would
7  be sequestered for part or all of that time. And my
8  question to you, is anything happening in your life that
9  would prevent you from being a juror during that period
10  of time?
11  VENIREPERSON: No, sir.
12  THE COURT: Good enough. Thank you, sir.
13  I'll recognize the State.
14  CHRISTOPHER GRIGGS,
15  Venireperson No. 160, testified as follows:
16  VOIR DIRE EXAMINATION
17  BY MS. JACK:
18  Q. Good morning, Mr. Griggs. How are you doing?
19  A. Good. Thank you.
20  Q. I want to ask you from a practical standpoint
21  if you know what sequestered entails?
22  A. No, I do not.
23  Q. Okay. You know what, you're not alone. Almost
24  everybody has said it won't cause a problem, but they
25  don't really know what all that means. What it means is

**26**

1  that you're put up in a hotel, your meals are provided,
2  typically you share a room with somebody, and it would
3  last for however long the Judge determines is appropriate
4  to sequester the Jury. "Sequester" is just a fancy word
5  for you don't get to go home, and for however long that
6  would be, potentially three weeks, you would not get to
7  go home. And furthermore, you wouldn't get to contact
8  or speak to your uncle or your girlfriend, because we've
9  had the benefit of reading your questionnaire, so I know
10  that you have taken on quite a responsibility.
11  A. Yes, I have.
12  Q. Okay. So knowing that you would not be able to
13  go home for three weeks and you wouldn't be able to talk
14  to your uncle or help care for him, how would that affect
15  you?
16  A. It would affect him more than it would me
17  because he's used to me being there every evening.
18  Granted, she's taken on the responsibility to help me
19  take care of him. There's still a lot that I have to do
20  that --
21  Q. Sure.
22  A. -- she does not. She could do it, but he
23  prefers me because of the simple fact of, you know, I've
24  been there so long and, you know, I'm the one that does
25  take care for him.

**27**

1  Q. Right. Let me ask you this. Do you mind if I
2  ask you some questions about that?
3  A. No, ma'am.
4  Q. Okay. And I have some experience with
5  individuals who are challenged. Is it -- was your uncle
6  born that way?
7  A. Yes, he was born that way.
8  Q. Is he mentally challenged?
9  A. Yes, he is.
10  Q. And so he's been that way his entire life?
11  A. Correct.
12  Q. He's 67 years old?
13  A. Correct.
14  Q. And has he lived in a home or with someone else
15  until you took over?
16  A. He's always lived with someone else.
17  Q. He's always lived with someone else. And has
18  that been someone else in your family?
19  A. Yes.
20  Q. Okay. And as I understand it, when did you
21  begin to care for him?
22  A. Last year.
23  Q. Last year. So you have been caring for him
24  for about a year?
25  A. Yes.

**28**

1  Q. And, in fact, you went so far as to buy a
2  house to be able to provide better care for him?
3  A. Correct.
4  Q. Okay. And you indicated on your questionnaire
5  that he is not able to cook?
6  A. No, he cannot. Like I said, I prepare his meals
7  every morning before I go to work and literally take
8  complete care of him.
9  Q. You prepare his meals every day before you go to
10  work?
11  A. Correct.
12  Q. Is that breakfast, lunch and dinner?
13  A. Breakfast and lunch.
14  Q. Breakfast and lunch. Then when you come home,
15  you make dinner for him?
16  A. Correct.
17  Q. He's not able to drive?
18  A. No.
19  Q. I'm taking it that if he needs to go see a
20  doctor, or just whatever routine errands that we all do
21  in our life, he could not do that by himself?
22  A. No. I have to do that.
23  Q. And you said that he cannot go to the grocery
24  store?
25  A. No, he cannot.

29

1  Q. Cannot go to a pharmacy. All those things you
2 do for him?
3  A. Correct.
4  Q. Do you financially provide for him as well?
5  A. Some. He is on --
6  Q. Disability?
7  A. Disability and, you know, he does draw Social
8 Security, but I take care of what he can't manage on his
9 own.
10  Q. Okay. And you indicated that he thinks like a
11 10-year-old?
12  A. Correct.
13  Q. So that's about the functional level?
14  A. That's about his mentality, yes.
15  Q. Is a 10-year-old. Have you dated your
16 girlfriend for quite a long time?
17  A. We've been seeing each other for about a year,
18 but she's lived down near Austin and just recently moved
19 here.
20  Q. So she's just -- how long ago did she move in?
21 I guess since you filled out the questionnaire?
22  A. Correct.
23  Q. How long ago was that?
24  A. About three weeks ago.
25  Q. About three weeks ago. And I'm sure she's fond

30

1 of your uncle?
2  A. Yes.
3  Q. And she -- and he, likewise, excuse me, is fond
4 of her?
5  A. Correct.
6  Q. But there's a certain comfort level with you?
7  A. Correct.
8  Q. Is that right?
9  A. Yes. That's why I was saying, you know, like
10 the medicine and stuff like that, he prefers me to make
11 sure that he gets his medicines and stuff over her.
12  Q. What kind of medications does he take?
13  A. Oh, I couldn't tell you. I know he takes
14 different ones for his allergies and just, you know,
15 normal things, you know. I know he has trouble
16 sleeping at night so he does take a sleeping pill.
17 You know, nothing life threatening.
18  Q. Okay. But it's something where, much like a
19 child looks to a parent, you are that parental role for
20 your uncle?
21  A. Yes?
22  Q. Because despite the fact he's in a 67-year-old
23 body, he has a child's mind?
24  A. Correct.
25  Q. Okay. I understand that. If you were not

31

1 there to help care for him -- let me ask you this.
2 Anytime you've had to work late, how has that affected
3 him?
4  A. Well, whenever I do, most the time my hours are
5 3 in the morning to 3 in the afternoon, so I very seldom
6 have to stay much later than 4:00 or so because I've
7 already exceeded the 12 hour limit at our job. So most
8 evenings I'm home by 5:30 at the latest, so I'm still able
9 to get the meals provided for him.
10  Q. Have you arranged your schedule so that you can
11 take care of your uncle?
12  A. Correct.
13  Q. So you have a certain job with a certain shift
14 that enables you to care for your uncle?
15  A. Correct.
16  Q. Okay. Have you ever, since you have taken on
17 caring for your uncle, have you ever been away from him
18 and been unable to care for him?
19  A. Whenever I'd go visit my girlfriend like on
20 weekends, I'd have it set up where my parents could take
21 care, you know, help take care of him, you know. Because,
22 like I said, it was her being out of town and stuff.
23  Q. Where do your parents live?
24  A. They live in Burleson as well.
25  Q. They live in Burleson. And is this your mom or

32

1 your dad's brother?
2  A. My mom's side.
3  Q. Your mother's side. Okay. I'm with you. You
4 and your uncle must have a very special relationship.
5  A. Yes, we do.
6  Q. And I'm taking it that the decision to care
7 for your uncle is not one you took lightly; it's
8 something you have made a commitment to?
9  A. Correct.
10  Q. If you were unable to care for your uncle for
11 three weeks, how would that affect him?
12  A. Honestly, I don't know how it would affect him.
13 I'm sure he would be --
14  Q. Anxious?
15  A. Anxious to see me again whenever I did return,
16 but at the same time, he would probably wonder why I
17 wasn't there, you know.
18  Q. He doesn't necessarily understand concepts like
19 "I will return after this period of time"?
20  A. Right. Well, a good example is telling him
21 times. Sunday mornings whenever we go to church, in the
22 morning time, you know, I tell him we're gonna leave at,
23 say, 9:00, to get -- to head to church. He'll be sitting
24 at the door at 8:30 ready to go because he's, you know,
25 he anticipates everything you say.

33

1    Q. And much like many individuals who are
2  challenged, routine is very important to them?
3    A. Correct.
4    Q. Structure is very important to them; is that
5  right?
6    A. Correct.
7    Q. Having a continuity of the individuals who care
8  for them is very important?
9    A. Yes.
10    Q. And there is a certain security that comes
11  from -- comes with that for someone who is mentally
12  challenged?
13    A. Correct.
14    Q. Okay. Knowing that your uncle would not have
15  you there, the person that he probably loves the most and
16  trusts the most and knows better than anyone to care for
17  him, would you be worried about your uncle?
18    A. Yes, I would.
19    Q. All right. And, you know, we bring in -- we
20  brought in 400 individuals, but 300 filled out the
21  questionnaire, so we've had many, many people here,
22  because everybody has their own unique life situation.
23  Okay. You are Juror No. 160, which means 159 people
24  before you have come in and visited with us, and many
25  of whom have situations that prevent them at this point

34

1  in their life, not forever, but at this point in time,
2  from giving a trial their full attention because they
3  would be worried about children, worried about loved
4  ones, worried about someone having surgery. They just
5  have their unique situation that makes this jury service
6  impossible for them to give their full attention to. And
7  it sounds like you fall into that category.
8    A. That would be correct.
9    Q. I'm sorry? I could barely hear you.
10    A. That would be correct.
11    Q. That would be correct. You could not give, try
12  as you might -- it's not a matter of --
13    A. Yeah.
14    Q. -- you wouldn't give it your best.
15    A. I would try my hardest, but at the same time, I
16  would have very much concerns as to taking care of him,
17  as to how he was doing while I would be away.
18    Q. Were his meals being prepared.
19    A. Correct.
20    Q. Was he getting his medicine. Was he worried
21  about you.
22    A. Correct.
23    Q. Was he wondering where you were.
24    A. Yes.
25    Q. And just his general insecurity that will come

35

1  from not seeing you for three weeks, potentially?
2    A. Correct.
3    Q. So you would not be able to give the evidence
4  your full attention; is that right?
5    A. Correct.
6    Q. I have to make a record of this. That's the
7  only reason why I keep kind of repeating myself. You
8  would not be able to give the evidence your full
9  attention because you would be worried about your
10  uncle?
11    A. Correct.
12    Q. You would not be able to give the witnesses
13  your full attention because you would be worried about
14  your uncle?
15    A. Correct.
16    Q. And in your job, are you an hourly employee?
17    A. Correct.
18    Q. Okay. Are you -- so you would not be paid
19  outside of whatever you're paid for jury duty?
20    A. Correct.
21    Q. I believe we all agree, jury duty does not pay
22  what our jobs pay?
23    A. Correct.
24    Q. I'm guessing in this economy that your -- the
25  payment that you get for working is probably also very

36

1  needed.
2    A. Yes, it is.
3    Q. And very necessary not only for yourself, but to
4  care for your girlfriend, and more importantly, your
5  uncle?
6    A. Correct.
7    Q. And so if you were not able to work, would that
8  also be an additional concern, especially since you just
9  bought a house?
10    A. Yes, it would.
11    Q. Would that also -- do you know what I mean when
12  I say impair your ability to focus on this trial?
13    A. Yes, I do.
14    Q. Because of your missing work, it would prevent
15  you from giving this trial your full attention?
16    A. Correct.
17    Q. Your full focus?
18    A. Yes.
19    Q. 100 percent?
20    A. Yes, it would.
21    Q. And nobody is gonna take that as a slight on
22  you. You're just saying at this point in my life, at
23  this moment, this is not a trial that I can give my full
24  attention.
25    A. That is correct.

37

1    MS. JACK:  All right.  I'll submit this Juror
2  for cause, Your Honor.
3        MR. HEISKELL:  Your Honor, I would like to
4  ask him a few questions.
5        THE COURT:  That's fine.
6             VOIR DIRE EXAMINATION
7  BY MR. HEISKELL:
8    Q.  Mr. Griggs, my name is Mike Heiskell.  I have
9  a few questions for you, ma'am -- sir.  I'm sorry.  You
10  indicated that your parents live in Burleson?
11    A.  Correct.  That is correct.
12    Q.  And, in fact, you list them as two of the most
13  admired people in your life?
14    A.  That's correct.
15    Q.  Along with your brother.  Where does your
16  brother live?
17    A.  He lives in Alvarado.
18    Q.  Alvarado, so pretty close by?
19    A.  Yes.
20    Q.  And is he a younger brother or older?
21    A.  Older brother.
22    Q.  Does he assist at all in the care of your
23  uncle?
24    A.  No, he has not.  He spends time with him and
25  stuff, but he does not assist in any way.

38

1    Q.  The times in which your mom and dad have come
2  over when you've gone to Austin to visit your girlfriend,
3  they've been able to care for him and provide meals and
4  necessities for him; is that correct?
5    A.  That is correct.
6    Q.  And your girlfriend who has been with you now
7  three weeks, she's voluntarily come on board to help you
8  out in that regard; is that right?
9    A.  That is correct.
10    Q.  I want to deal with that issue first, then we
11  can talk about the second issue here with the employment.
12  What arrangements or can arrangements be made with regard
13  to them coming in and stepping in to help you if, in
14  fact, this -- you were selected as a juror and you were
15  spending up to two to three weeks with us in this very
16  important case?  Because we have seen all sorts of
17  people, and you certainly have a right to serve on the
18  Jury more so than anyone.  We looked at your
19  questionnaire, and you seem to have some feelings and
20  thoughts about these issues that we certainly want to
21  explore with you.
22        And I just want to ask you, is that something
23  that arrangements, where it can be made with your parents,
24  perhaps, even with your brother who is in Alvarado, to
25  help care for your uncle?

39

1    A.  As far as what?  I don't understand your
2  question.
3    Q.  To help care for your uncle.
4    A.  Well, as far as that, my parents are elderly,
5  you know.  They are not in the best of health themselves.
6  That's the reason why I've taken on the role to take care
7  of him.
8    Q.  I see.
9    A.  And, you know, for a couple day, yes, they can
10  help, but I don't know if they could for three weeks.
11    Q.  And the employment situation is a, I guess,
12  equally overriding concern as well, what I heard, the
13  latter part of the Prosecutor's questions?
14    A.  Correct.
15    Q.  When did you purchase the home for your uncle?
16    A.  It was back in July.
17    Q.  Of last year?
18    A.  Yes, sir.
19    Q.  Okay.  And so how far is your -- does your uncle
20  live from where you are?
21    A.  He lives with me.
22    Q.  Oh, he lives with you?
23    A.  Yes.
24    Q.  Okay.  Oh, I was thinking it was a separate
25  home.

40

1    A.  No.
2    Q.  Okay.  I see.
3    A.  It was so hard driving back and forth day-to-day
4  to see him and take care of his needs, you know,
5  whenever he -- because at the time, other family members
6  that was taking care of him was no longer to take care of
7  him.  That's why I was doing it after work.  And that's
8  the reason why I purchased the house, to have him move in
9  with me.
10    Q.  And any other relatives in the area or is that
11  it?
12    A.  That's it?
13        MR. HEISKELL:  Your brother and parents.
14  Okay.  Okay.  Thank you, Mr. Griggs.
15        We agree.
16        THE COURT:  Okay.  I will grant the
17  challenge.  We're gonna go ahead and excuse you.  Looks
18  like you've got other things you need to be doing.  So
19  thanks for coming in.
20        VENIREPERSON:  Thank you.
21        MS. JACK:  Thank you very much.  Good luck.
22        MR. HEISKELL:  Good luck to you, sir.
23        VENIREPERSON:  Thank you.
24        (Venireperson Griggs excused.)
25        (Recess taken.)

---

**41**

1    THE COURT: On the record then, I understand
2  there's an agreement to excuse Juror No. 161 and 163?
3    MS. JACK: That's correct, Your Honor.
4    MR. HEISKELL: That's correct.
5    Correct, Mr. Soliz?
6    THE DEFENDANT: Yeah.
7    MR. HEISKELL: Yes, sir.
8    THE COURT: Okay. I'll approve that
9  agreement. We'll excuse 161 and 163.
10    (Off the record.)
11    (Venireperson Welling present.)
12    THE COURT: If you'll raise your right hand.
13    (Juror oath.)
14    THE COURT: Have a seat in the jury box over
15  there in the second chair.
16    Okay. Sir, would you state your name.
17    VENIREPERSON: John Welling.
18    THE COURT: Mr. Welling, you filled out a
19  juror questionnaire a while back. Were the answers you
20  put on there true and correct?
21    VENIREPERSON: Yes, sir.
22    THE COURT: That's been about a month. Has
23  anything changed in your life that would change any of
24  those answers?
25    VENIREPERSON: I don't think so.

---

**42**

1    THE COURT: Okay. My name is Phillip Vick.
2  I'm the Judge presiding in this proceeding. Judge --
3  when the case goes to trial, Judge William Bosworth,
4  Judge of the 413th District Court of Johnson County, will
5  be trying the case.
6    The attorneys representing the State in this
7  case are Mr. Dale Hanna, back there. Mr. Larry Chambless,
8  Mr. Martin Strahan, Ms. Christy Jack.
9    MS. JACK: Good morning.
10    VENIREPERSON: Morning.
11    THE COURT: The attorneys representing the
12  Defendant are Mr. Greg Westfall.
13    MR. WESTFALL: Morning.
14    THE COURT: Mr. Michael Heiskell.
15    MR. HEISKELL: Hidy.
16    VENIREPERSON: Morning.
17    THE COURT: And seated with them at the
18  counsel table is the Defendant, Mark Anthony Soliz.
19    THE DEFENDANT: How you doing?
20    THE COURT: And they'll have questions for
21  you, but I'll ask first. Is there anything we should
22  know about you that we didn't ask on the questionnaire?
23    VENIREPERSON: I don't think so.
24    THE COURT: Okay. You're gonna be asked
25  some questions, I think. You understand it's not a test.

---

**43**

1  There's no right or wrong answers. We only require that
2  you be truthful. Say "yes" and "no" when you can. If you
3  say "I think so" or "maybe", you'll get more questions out
4  of that. And, also, don't answer a question unless you're
5  sure you understand it. If you don't, get them to restate
6  it or rephrase it or explain it some way.
7    VENIREPERSON: All right.
8    THE COURT: We think trial is gonna start
9  not this next Monday but the Monday after. When it does
10  start, it will last up to three weeks. There is a chance
11  that the Jury could be sequestered, that is, put up in a
12  motel, hotel, very nice one with good food, hopefully,
13  for part or all of that time.
14    And my question is, do you have things going
15  on in your life that that would interfere with that you
16  couldn't serve as a juror?
17    VENIREPERSON: Yeah. I own a construction
18  company. We're trying to finish up a big job right now
19  in Alvarado. People are trying to move in to it. We did
20  the concrete, buildings and the finish-out. I work every
21  day with my crew, so, yeah, that's a problem.
22    THE COURT: Okay. Well, that's -- we saw
23  that on the questionnaire. And would that be such a
24  problem with you that you couldn't concentrate -- you
25  wouldn't be able to even contact them by phone if you

---

**44**

1  are sequestered.
2    VENIREPERSON: Yeah, that would be a huge
3  problem for me, yeah.
4    THE COURT: Would it be such a problem that
5  you couldn't pay attention, that you would be worried
6  about other things outside and couldn't pay attention?
7    VENIREPERSON: I would say yes, sir.
8    THE COURT: Okay.
9    MS. JACK: That's fine, Your Honor.
10    MR. HEISKELL: That's fine, Judge.
11    THE COURT: Okay. They're gonna agree to
12  excuse you.
13    VENIREPERSON: Thank you.
14    THE COURT: We appreciate you coming in
15  early.
16    VENIREPERSON: You bet.
17    THE COURT: We've run into a bad spot here.
18  Lot of people have things to do.
19    VENIREPERSON: Thank you.
20    THE COURT: Thanks for coming in.
21    VENIREPERSON: You bet. Thank you.
22    (Venireperson Welling excused.)
23    THE COURT: For the record, there was an
24  agreement to excuse him; is that correct?
25    MR. WESTFALL: Yes, Your Honor.

45

1   MR. HEISKELL: Yes, Your Honor.
2   THE COURT: I'll approve the agreement.
3   (Off the record.)
4   THE COURT: Is there an agreement to excuse
5   Ms. Cox?
6   MR. WESTFALL: There is, Your Honor.
7   MS. JACK: Yes, Your Honor.
8   MR. HEISKELL: Yes, Your Honor, we agree to
9   excuse.
10   Is that correct, Mr. Soliz?
11   THE DEFENDANT: Yep.
12   MR. HEISKELL: Yep.
13   THE COURT: I'll approve the agreement.
14   (Off the record.)
15   THE COURT: On the record now, I
16   understand there's an agreement to let No. 166 -- to
17   excuse No. 166?
18   MR. WESTFALL: Yes, Your Honor.
19   THE COURT: State said "yes" too?
20   MS. JACK: Yes, Judge, I think I said it
21   first, as a matter of fact.
22   THE COURT: You said it before the record.
23   MS. JACK: Oh, yes. I think I was finishing
24   your sentence.
25   THE COURT: Okay. We'll agree to let 166

46

1   go.
2   MR. WESTFALL: So then 167 we've already
3   agreed, right?
4   THE COURT: We're down to Vogel, Nichols
5   and --
6   MR. WESTFALL: 168.
7   THE COURT: -- Clanton.
8   (Off the record.)
9   (Recess taken.)
10   (Venireperson Nichols present.)
11   THE COURT: Hi. Come on up.
12   VENIREPERSON: Hi.
13   THE COURT: Thanks for coming early too, by
14   the way.
15   VENIREPERSON: Thank you.
16   THE COURT: If you'll raise your right hand.
17   (Juror oath.)
18   THE COURT: Thank you, ma'am. If you'll
19   have a seat in the jury box in the second chair there.
20   Okay. Would you state your name.
21   VENIREPERSON: Juanita Marie Nichols.
22   THE COURT: Ms. Nichols, you filled out a
23   juror questionnaire a while back. Were the answers you
24   put on there true and correct?
25   VENIREPERSON: Yes, sir.

47

1   THE COURT: It's been about a month. Has
2   anything happened in your life that would change any of
3   those answers.
4   VENIREPERSON: No, sir.
5   THE COURT: My name is Phillip Vick. I'm
6   the Judge presiding in this proceeding. When the case
7   goes to trial, Judge William Bosworth, Judge of the 413th
8   District Court of Johnson County, will be trying the
9   case.
10   The attorneys representing the State are
11   Mr. Dale Hanna, over here. They're gonna wave to you.
12   MR. HANNA: I'm over here.
13   THE COURT: Larry Chambless.
14   MR. CHAMBLESS: Hello.
15   THE COURT: Marty Strahan.
16   MR. STRAHAN: Hi.
17   THE COURT: And Christy Jack.
18   MS. JACK: Good afternoon.
19   VENIREPERSON: Good afternoon.
20   THE COURT: The attorneys representing the
21   Defendant are Mr. Greg Westfall.
22   MR. WESTFALL: Hello.
23   THE COURT: Mr. Michael Heiskell.
24   MR. HEISKELL: Hi.
25   VENIREPERSON: Hi.

48

1   THE COURT: And seated with them at the
2   counsel table is the Defendant, Mark Anthony Soliz.
3   THE DEFENDANT: How you doing?
4   THE COURT: And they'll have questions for
5   you, but I'll ask first. Is there anything we should
6   know about you that we didn't ask on the questionnaire?
7   VENIREPERSON: No, sir.
8   THE COURT: Okay. I anticipate you're gonna
9   be asked a lot of questions. I will tell you there's no
10   right or wrong answers. It's not a test of any kind. We
11   just require that you be truthful. Answer "yes" and "no"
12   if you can. If you say something like "maybe" or "I
13   think so", you'll probably get some more questions about
14   that. And also, don't answer a question unless you are
15   sure you understand it. If you don't, get them to
16   rephrase it, explain it or restate or tell you what
17   they're asking.
18   Trial is gonna start not this coming Monday
19   but the Monday after. When it does start, we think it
20   will last not more than three weeks. There is a chance
21   that the Jury could be sequestered during that three
22   weeks, part of the time or all of the time, in fact. And
23   my question, is there anything happening in your life
24   that would interfere with you being a juror during that
25   period of time?

49

1    VENIREPERSON: No, sir.

2    THE COURT: Great. Thank you.

3    I'll recognize the State.

4    MS. JACK: Thank you very much.

5    JUANITA NICHOLS,

6    Venireperson No. 164, testified as follows:

7    VOIR DIRE EXAMINATION

8  BY MS. JACK:

9    Q. Good afternoon, Ms. Nichols. My name is Christy

10 Jack, and I'm gonna talk to you today. I've got a bunch

11 of law to talk about and hopefully to kind of explain the

12 law that will apply in this case. If at any point you

13 would like me to put something a different way, or if I'm

14 being clear as mud, we've been doing this for several

15 weeks now and sometimes we inadvertently skip over

16 something and we don't realize it, so if I don't explain

17 something to your satisfaction, would you please stop and

18 let me know?

19   A. Yes, ma'am.

20   Q. Okay. You're not gonna hurt my feelings one

21 bit. You can give me a hand, you can say "hey", but if

22 you do that, I'd really appreciate it.

23   Okay. Now, can you see the board over there

24 okay?

25   A. Yes, ma'am.

50

1    Q. All right. Great. Because I don't have my

2  glasses, so I'm gonna have to squint just a little bit.

3    This is the State of Texas versus Mark

4  Anthony Soliz. All right. You know from coming in about

5  six weeks ago that this is a capital murder trial.

6    A. Yes, ma'am.

7    Q. And that this is a case where the State is

8  seeking the death penalty.

9    A. Yes, ma'am.

10   Q. Can you kind of give me, in a nutshell, what

11 your thoughts are about the death penalty?

12   A. Um, I'm for it if it's deserved.

13   Q. Okay.

14   MR. HEISKELL: Judge, could we -- I can't

15 hear.

16   THE COURT: You will need to speak up louder,

17 if you would. They're having trouble hearing.

18   A. I do believe in it if the evidence is there.

19   Q. (BY MS. JACK) Okay. If the evidence is there?

20   A. Yes.

21   Q. Then you think that it is appropriate?

22   A. Yes.

23   Q. Do you think that we should have a death penalty?

24   A. Yes.

25   Q. The type of capital murder that's gonna be

51

1  involved in this case is murder during the course of a

2  robbery or burglary. Do you think that is the kind of

3  crime that should carry the possibility of the death

4  sentence?

5    A. Yes.

6    Q. Okay. Now, let's talk about the constitutional

7  principles that apply in every criminal, every criminal

8  case across the United States. Okay?

9    A. Okay.

10   Q. The first of which is, the fact that someone is

11 indicted is no evidence. All right. Before any felony

12 case can be tried in a courtroom, a Grand Jury has to

13 have indicted a defendant. Okay?

14   A. Okay.

15   Q. That is simply a legal means for a case to come

16 to court. It's not any evidence of an individual's

17 guilt. You follow me?

18   A. Yes, ma'am.

19   Q. All right. The fact that Mr. Soliz has been

20 charged with an offense or has been indicted by a Grand

21 Jury is not -- it can't be considered as any evidence.

22 Does that make sense?

23   A. Yes, ma'am.

24   Q. You're never gonna see me take the indictment --

25 an indictment is just fancy language for a piece of paper

52

1  that lists out the parts of the crime. You're never

2  gonna see me put that into evidence. You're never gonna

3  see me offer it, because it's no evidence whatsoever.

4  Does that make sense?

5    A. Yes, ma'am.

6    Q. Hand in hand with that is the presumption of

7  innocence. And that is, every defendant begins with the

8  presumption of innocence. Okay?

9    A. Yes, ma'am.

10   Q. And that is, he is presumed innocent until I

11 or my team prove his guilt beyond a reasonable doubt.

12 Okay?

13   A. Yes, ma'am.

14   Q. Okay. If I don't prove his guilt beyond a

15 reasonable doubt, what must your verdict be?

16   A. Not guilty.

17   Q. Yes. You're really gonna have to speak up

18 because I'm close to you and I can barely hear you.

19   A. Sorry.

20   Q. That's okay. Unfortunately, it's a very

21 unnatural way of carrying on a conversation. And we try

22 for people to feel as comfortable as they can, but we

23 understand it's a little awkward at times. Okay.

24   So as Mr. Soliz sits here, can you give him

25 that -- can you presume him innocent and make me prove his

53

1  guilty beyond a reasonable doubt?
2  A. Yes, ma'am.
3  Q. All right. See how this kind of works?
4  A. Yes.
5  Q. All right. Now, how much I have to prove
6  someone's guilt is called the burden of proof. In other
7  words, how much the State has to prove someone's guilty.
8  Okay?
9  A. Yes, ma'am.
10  Q. You might have heard "beyond a shadow of a
11  doubt", you might have heard "beyond all possible doubt",
12  but the law says it's not that high. I have to prove
13  someone's guilt beyond a reasonable doubt. All right.
14  Let's talk for just a minute about the differences of
15  those. How would you ever know -- you've had -- you have
16  children?
17  A. Yes, ma'am.
18  Q. They're grown; is that right?
19  A. Yes, ma'am.
20  Q. All right. Can you think back, let's see, did
21  your children have curfews?
22  A. Yes, ma'am.
23  Q. All right. What was curfew?
24  A. 10:00.
25  Q. 10:00. You and my mother must have gone to the

54

1  same school. All right. Your kids had a 10:00 curfew.
2  How did you know beyond all possible doubt that they came
3  in before 10:00?
4  A. I was sitting there waiting.
5  Q. You were sitting there waiting. So what did
6  that mean? You sat there and witnessed them come in
7  before 10:00?
8  A. Yes.
9  Q. All right. You were an eyewitness. Does that
10  make sense?
11  A. Yes, ma'am.
12  Q. Okay. So the only way I could ever prove
13  someone's guilt beyond all possible doubt is if I had
14  12 eyewitnesses on the Jury. You can see that's never
15  gonna happen.
16  A. Yes.
17  Q. If you're a witness, where are you gonna sit in
18  a courtroom? On the witness seat?
19  A. Yes.
20  Q. Does that make sense?
21  A. Yes, ma'am.
22  Q. So the law doesn't impose upon me an impossible
23  standard. The law imposes "beyond a reasonable doubt",
24  because I could never convince you to the same level as an
25  eyewitness unless you saw it yourself. You -- does that

55

1  make sense to you?
2  A. Yes, ma'am.
3  Q. Or is it clear as mud?
4  A. It makes sense.
5  Q. Make sense. Okay. Now, are you gonna -- are
6  you gonna hold me to "beyond a reasonable doubt" and no
7  more than that?
8  A. Yes.
9  Q. Okay. Do you understand you're not gonna --
10  you're not gonna require the same kind of proof as if you
11  were an eyewitness?
12  A. Yes, ma'am.
13  Q. Okay. Does that make sense?
14  A. Yes, ma'am.
15  Q. I feel like I'm kind of flying through this
16  because I've done it so many times. I want to make sure
17  that we talk about things to your satisfaction.
18  A. I understand that, yes, ma'am.
19  Q. All right. Now, the Fifth Amendment, every
20  defendant has the right to testify and the right not to
21  testify. Okay. Every defendant, if they want, can take
22  that witness stand and tell their side of the story. The
23  Judge can't stop them. Wild horses can't stop them. All
24  right? By the same token, the flip side of that is every
25  defendant has the right not to testify. Okay. And if

56

1  someone chooses not to testify, that cannot be considered
2  for any purpose whatsoever. Does that make sense?
3  A. Yes, ma'am.
4  Q. Practically speaking, what that means is you
5  can't look at our table and say, "Well, I think he did
6  it. I'm not positive. I think he did it. Well, he
7  didn't testify so I'm gonna go ahead and find him
8  guilty." See how that works? You can't consider it in
9  any way. Okay?
10  A. Okay.
11  Q. If the Defendant chooses not to testify, can you
12  promise that you will not consider that for any purpose?
13  A. Yes, ma'am.
14  Q. All right. Now, when we talk about murder,
15  murder is the intentional taking of another life. That's
16  different from capital murder. Did you know that there
17  was a difference?
18  A. No.
19  Q. So when we talked about the death penalty or
20  when you talked about it in your questionnaire, were you
21  thinking for the offense simply of murder?
22  A. Yes.
23  Q. Okay. Okay. That's what I thought. Murder is
24  the intentional taking of a life. Can't be done in
25  accident. Can't be done in self defense. Okay. You mean

57

1  to do it and you do it. I'm gonna give you a couple of
2  examples.
3          I'm driving home today, the end of the day.
4  It's been a bad day. I keep stumbling over my words as I
5  have just now talking to you. And for whatever reason,
6  somebody cuts me off in traffic. I pull out my concealed
7  handgun, and I shoot them and I kill them. What offense
8  have I just committed?
9      A. Murder.
10     Q. That's right. By the same token, if someone
11 molests my child, all right, and that is my neighbor, I
12 may go shoot my neighbor and kill him because of what he
13 did. I did it sanely. I did it calmly. I knew exactly
14 what I was doing. All right. In both instances, those
15 are examples of murder. Would you agree with me?
16     A. Yes, ma'am.
17     Q. Very different motivations, very different
18 reasons behind the crime. You see that?
19     A. Yes, ma'am.
20     Q. So the law gives this broad of a penalty range.
21 It is anywhere from 5 years to 99 years or life. Okay.
22 And it's designed that way so that jurors can let the
23 punishment fit the crime. So if you have a case that you
24 believe is deserving of 5 years, could you give 5 years
25 as a juror?

58

1      A. Yes.
2      Q. And if you, by the same token, have a case that
3  is deserving of a life sentence, could you return a life
4  sentence?
5      A. Yes ma'am.
6      Q. Okay. Now, for the offense of aggravated
7  robbery, it has the same penalty range. An aggravated
8  robbery is just a legal way of saying someone takes
9  something that doesn't belong to them. It's by the use
10 of a weapon. Okay?
11     A. Yes, ma'am.
12     Q. It could be something as simple as an older
13 brother taking care of younger siblings. He has a gun
14 tucked in his waistband. He goes to a grocery store.
15 He demands peanut butter and a loaf of bread to feed his
16 hungry brothers and sisters, and he shows his gun when he
17 makes his demands. Okay?
18         Could be something on the other end where a
19 young man who has -- who has been born to privilege goes
20 into a bank, just for sport, and holds up the clerk. All
21 right?
22         You see, these are two very different
23 examples, both aggravated robbery though. Once again,
24 the legislature has given a broad penalty range. Okay?
25     A. Yes, ma'am.

59

1      Q. To encompass or to include and cover all
2  situations. If you believe that an aggravated robbery
3  deserved 5 years, the facts did, could you return a
4  5-year sentence?
5      A. Yes, ma'am.
6      Q. Same thing for life, if you believed that life
7  was appropriate, could you return a life sentence?
8      A. Yes, ma'am.
9      Q. Okay. Now, when we talk about capital murder,
10 and I mentioned this just a second ago, capital murder
11 is the intentional taking of a life in the course of
12 something else. So it's murder plus. And in this case,
13 it is murder plus someone trying to rob or someone trying
14 to burglarize another's house. Okay?
15     A. Yes, ma'am.
16     Q. That's what makes it capital murder. It's
17 murder plus someone trying to commit a robbery or a
18 burglary as well. Does that make sense?
19     A. Yes.
20     Q. Okay. And I think you already said that you
21 believe that that is the type of crime for which the
22 death penalty ought to be available?
23     A. Yes.
24     Q. All right. Now, here's -- it says up here, the
25 attempted commission, all right, which means somebody may

60

1  not be successful in that robbery or successful in that
2  burglary. And if they kill someone in the process, what
3  offense have they committed?
4      A. Attempted murder.
5      Q. Well, you would think that. I'm gonna need you
6  to speak up just a little bit more. But it's murder in
7  the course of an attempted robbery or attempted burglary.
8  So if I am trying to steal something from someone and I
9  kill them in the process, what offense have I committed?
10     A. Capital murder.
11     Q. Absolutely. Absolutely. Because it's that
12 intentional murder coupled with or plus me trying to
13 commit a robbery or me trying to commit a burglary.
14 That makes it capital murder. I didn't explain it very
15 well before, but does that make sense now?
16     A. Yes, ma'am!
17     Q. All right. Now, when we talk about capital
18 murder and we talk about -- remember me saying that
19 indictment is just a piece of paper? Okay. You're gonna
20 make me feel old if you keep saying "ma'am".
21     A. Sorry.
22     Q. That's okay. That's all right. Here are the
23 parts of an indictment that I have to prove. Okay. I
24 have to prove that it was the Defendant, I have the right
25 person. And I have to prove that it happened around a

**Page 61**

1 certain date, on or about June 29th of 2010. I have to
2 prove that it was done so intentionally, wasn't an
3 accident, was not done in self defense. All right. I
4 have to prove that the Defendant caused the death of
5 the victim, and he did it in a certain way. That's what
6 manner and means is defined, it's in a certain way.
7 And you'll see, if you served on this Jury,
8 you will see the language "to wit", and that just means
9 specifically how did he do it. Did he do it with a
10 knife? Did he do it with a gun? Did he do it with a
11 rock? Whatever the way is. So I have to prove he did
12 it a certain way. I have to prove that he did it --
13 remember that bottom language, while he was trying to rob
14 someone or burglarize their home. Okay?
15 A. Yes.
16 Q. That's all I have to prove. And if I prove each
17 one of those things -- there are seven things up there.
18 And if I prove it beyond a reasonable doubt to your
19 satisfaction, Ms. Nichols, what must your verdict be?
20 A. Guilty.
21 Q. You see that?
22 A. Yes.
23 Q. If I miss anything, have I proved everything?
24 A. No.
25 Q. So if I miss Johnson County, what does your

**Page 62**

1 verdict have to be?
2 A. Not guilty.
3 Q. Exactly. Do you see how that works?
4 A. Yes.
5 Q. Okay. Now, look up there for just a minute. Do
6 I have to prove someone's motive?
7 A. No.
8 Q. Do I have to prove premeditation?
9 A. No.
10 Q. Okay. Does it say up there how many witnesses I
11 have to prove it with?
12 A. No.
13 Q. Does it say I have to have DNA?
14 A. No.
15 Q. That's exactly right. However I do it, if I
16 prove those seven parts, and that's it, can't prove
17 anything less, but the law says I don't have to prove
18 anything more, then your verdict has to be guilty. Do
19 you see how that works?
20 A. Yes.
21 Q. Okay. Do you think that's fair?
22 A. Yes.
23 Q. Okay. Now, when we talk about capital murder,
24 obviously if I act alone in committing a crime, I'm
25 guilty. But what if I have someone that helps me; I have

**Page 63**

1 a helper when I commit a crime? All right. Are you with
2 me so far?
3 A. Uh-huh.
4 Q. If I have a helper, the law says that helper can
5 be guilty of what I do.
6 A. Yes.
7 Q. Do you agree with that?
8 A. Yes.
9 Q. Now, this is the definition of a helper. And
10 I'll just -- if you would rather read it or I can explain
11 it, you just tell me which one you'd rather.
12 A. I can just read it.
13 Q. You want to read it. Okay.
14 (Pause in proceeding.)
15 Q. Now, if someone is the getaway driver for me
16 when I commit a robbery, all right, and they did not know
17 that I was going in to rob someone, are they guilty of
18 what I do?
19 A. Yes.
20 Q. Okay. Well, the law says you would think that,
21 but they actually have to know they're helping me. See
22 that part right there that says "acting with the intent
23 to promote or assist the commission of the offense"?
24 They're trying to help me commit that robbery. Well, in
25 order to help me, they have to know they're helping me

**Page 64**

1 to be guilty of what I do. Does that make sense?
2 A. Yes.
3 Q. Okay. So let's go back to my example. Let's
4 say I have Martin over here driving the getaway car, and
5 he does not know that I'm gonna commit a robbery. He
6 drives me to the bank. I rob the bank. I get in the
7 car. We drive away. He did not know I was gonna go
8 commit a robbery. Is he helping me knowing that I'm
9 gonna commit a robbery in that example?
10 A. Yes.
11 Q. Okay. Remember, I said he did not know. So if
12 he does not know that --
13 A. He doesn't know, then no.
14 Q. Right. If he does not know that I'm gonna go
15 commit a crime, he is not guilty. He has to know that
16 I'm gonna go commit a crime. Okay?
17 A. Okay.
18 Q. Now, let's say that when I go into the bank,
19 that, in fact, I go into the bank and not only do I rob
20 the bank but I kill the clerk. Martin is my getaway
21 driver. And in this example, Martin knew we were gonna
22 go commit a robbery. Martin knew he was helping me
23 commit a robbery. Okay? The law says that if Martin
24 knew I was gonna go commit a robbery, and we had an
25 agreement -- it doesn't have to be in paper, doesn't

65

1 have to be a contract. Do you think that's how criminals
2 talk to each other, by contracts?
3   A. No.
4   Q. No. They have verbal contracts. "You in?"
5 "I'm in". Okay. Martin helps me. We have an agreement
6 to commit a robbery. All right. The law says if I kill
7 the clerk in the bank and Martin should have known -- or
8 should have anticipated that I would kill the clerk, then
9 he's guilty of what I do.
10   A. Yes.
11   Q. Okay. What do you think about that law?
12   A. I think that I agree with it.
13   Q. You agree with it. Even though, even though we
14 never talked about a murder, and even though we never
15 discussed a murder, if he should have known, under
16 whatever those facts are, just he should have known
17 better --
18   A. Yes.
19   Q. -- that I might kill somebody, all right, then
20 the law says he's gonna be guilty of what?
21   A. Murder.
22   Q. Well, of capital murder.
23   A. Yes.
24   Q. Remember, because murder is simply?
25   A. Yeah.

66

1   Q. Taking of a life. I think that's what you
2 meant.
3   A. Yeah.
4   Q. Capital murder is the murder plus. You with me?
5   A. Yes, ma'am.
6   Q. Okay. And you agree with that law?
7   A. Yes.
8   Q. Do you think that's a good law?
9   A. Yes.
10   Q. Even though he didn't know I was gonna commit a
11 murder, but he should have known I was gonna commit a
12 murder.
13   A. Yes.
14   Q. Do you think that's the way the law should be?
15   A. Yes.
16   Q. Now, let me ask you this. The law says that
17 someone who is a helper can get the death penalty; not
18 the actual killer. I mean, the actual killer can get the
19 death penalty. We know that. But someone who is a
20 helper is also -- do you know what I mean when I say
21 "eligible" for the death penalty?
22   A. Yes.
23   Q. Do you think that's a good law or bad law that
24 someone who was a helper could get the death penalty?
25   A. I think it's good.

67

1   Q. You think it's good. All right. Now, so for
2 conspiracy, this is what we would have to have. An
3 agreement to commit a robbery, remember, it doesn't have
4 to be in contract. Doesn't have to be in blood. Could
5 be something as simple as "You in?" Okay. Or an
6 understanding. We have an agreement to commit a robbery,
7 all right, and another crime occurs, that murder, a
8 murder is committed, and the murder is committed in
9 furtherance of the unlawful purpose. In other words, I
10 kill a clerk to leave no witnesses. Okay. That is
11 helping to effect or to complete my robbery. Does that
12 make sense?
13   A. Yes, ma'am.
14   Q. Or to help me get away. It was something that
15 should have been anticipated. He should have known
16 better. Okay?
17   A. Yes.
18   Q. The law says that my helper then my coconspirator
19 is guilty of capital murder. Okay.
20   A. Yes.
21   Q. Anything else you want to visit with about that
22 law?
23   A. No.
24   Q. No. All right. Have I explained it to your
25 satisfaction?

68

1   A. Yes.
2   Q. All right. Now, when we talk about accomplice
3 testimony, accomplice is kind of another way of saying
4 conspirator. You just saw the conspiracy language.
5 Accomplice is what the law would call my helper. All
6 right. Real simply put, someone -- a person cannot be
7 convicted exclusively or solely based on the testimony of
8 the helper. All right. Don't you think that's really
9 fair?
10   A. Yes.
11   Q. We're not just gonna let somebody point the
12 finger and convict them just based on pointing the
13 finger. All right?
14   A. Yes.
15   Q. The law says there has to be something else that
16 tends to connect the person on trial with the crime,
17 outside of that helper's testimony. Does that make
18 sense?
19   A. Yes, ma'am.
20   Q. Okay. The law goes further to say if you don't
21 find that there's any other evidence that tends to
22 connect that person on trial with the crime, you would
23 have to find him not guilty if the only evidence you had
24 was that helper's testimony.
25   A. Yes.

69

1   Q.  Okay.  It could be you have the helper's
2  testimony and mounds of other evidence, and it's not even
3  a problem.  Does that make sense?
4   A.  Yes.
5   Q.  But in the case where you only have an
6  accomplice, you only have the helper's testimony, the law
7  says there's got to be something else.  Doesn't have to
8  be big, doesn't tell you how much, just something that
9  tends to connect the person on trial with the crime.
10  Okay.  Can you follow that law?
11   A.  Yes.
12   Q.  All right.  Now, when we talk about statements,
13  have you ever seen on TV when police take statements?
14   A.  Yes.
15   Q.  It's not like TV.  Have you ever seen someone get
16  beaten on TV to get a statement or confession?
17   A.  Yeah.
18   Q.  Okay.  The police can't do that.  They cannot do
19  that.  The Constitution does not allow for it, and we, in
20  a civilized community, will not abide by that.  Okay.  So
21  the law says that there are rules that those police
22  officers have to follow.  Okay.  And the rules are, they
23  have to tell the suspect their rights:  You have the
24  right to remain silent.  Anything you say can and will be
25  used against you in a court of law.  You have the right to

70

1  have an attorney appointed to you, all right, to represent
2  you now during questioning and so on.  Okay?
3   A.  Yes.
4   Q.  Now, and you've heard those rights, heard them on
5  TV, okay?
6   A.  Uh-huh.
7   Q.  If the police do not follow those rights, if
8  they don't follow the rules, okay, then you would have to
9  set that statement aside and look at what other evidence
10  there is.  Okay.  If -- there may be tons of other
11  evidence, but there may not be.  If you don't think that
12  the police followed the rules or you just have a doubt,
13  you're not sure, and all you have is that statement that
14  was taken improperly, then you have to find the Defendant
15  not guilty.
16   A.  Yes, ma'am.
17   Q.  Could you do that?
18   A.  Yes.
19   Q.  Okay.  Now, when we talk about trial -- do you
20  watch football?
21   A.  No.  Well, my husband does.
22   Q.  No.  Your husband does.  Do you ever go in the
23  room when he's watching football?
24   A.  Yes.
25   Q.  You generally know how a football game works?

71

1   A.  Yes.
2   Q.  When I talk about this illustration, I don't
3  mean it in any way to diminish how serious this is.  I
4  think you know that.
5   A.  Yes, ma'am.
6   Q.  I do this to kind of illustrate or to show how
7  a trial works.  Have you ever sat on a Jury before?
8   A.  No.
9   Q.  Have you ever watched a trial before?
10   A.  Yes.
11   Q.  Okay.  Can you tell me a little bit about those
12  circumstances?
13   A.  It was a long time ago, but I used to watch the
14  court TV.
15   Q.  Okay.
16   A.  It's been a long time ago.  I can't remember what
17  it was or --
18   Q.  Okay.  Well, then you know what, you know kind
19  of what I'm about to talk about, and that is, that trials
20  potentially have two parts.  The first part is where the
21  Jury decides whether or not somebody is guilty or not
22  guilty.
23   A.  Yes.
24   Q.  Okay?  The second part is where the Jury
25  determines what the appropriate punishment is.

72

1   A.  Yes.
2   Q.  Okay.  So it's two -- it's kind of like two mini
3  trials, two small trials.  First part, there's evidence,
4  then the decision is made by the Jury as to whether or not
5  somebody's guilty or innocent.  Second part of the trial,
6  there may be additional evidence, and then the Jury at the
7  very end of everything, kind of the end of the football
8  game, determines what the appropriate punishment is.
9   So if you think about it, when you watch a
10  football game, have you ever been watching a game or come
11  through the room when your husband is watching the game,
12  and at half time, one team is ahead, and then by the end
13  of the game, it's a completely different game?
14   A.  Yes.
15   Q.  Okay.  Think of half time as where the Jury
16  determines someone's guilt, and the end of the game as
17  being when the Jury determines what the appropriate
18  punishment is.  You see that?
19   A.  Yes.
20   Q.  All right.  That's kind of how it works.  Guilt
21  would be the first half of the football game.  Punishment
22  would be the second half.  All right?
23   A.  Yes.
24   Q.  Now, in a capital murder case, the Punishment is
25  different.  Because at the beginning of Punishment, there

73

1  are two choices, life without parole and the death
2  sentence. You know how when I gave you the example of
3  range of punishment for murder?
4      A. Yes.
5      Q. There is not a range of punishment. It is either
6  life without parole, meaning life, okay, or the death
7  sentence. And it's the way in which these three questions
8  are answered that determines whether or not somebody gets
9  the life sentence or the death penalty.
10     A. Yes.
11     Q. Okay. It's not just a fill-in-the-blank "life"
12 or "death". Did you know that?
13     A. Yes.
14     Q. Okay. Special Issue No. 1, that's the first
15 question. And in a nutshell, it means is somebody a
16 future danger. The long version, this is the version the
17 Judge would give you, it starts out, "Do you find beyond
18 a reasonable doubt", because, Ms. Nichols, anytime you
19 see those words, that means I have a job to do. I do. I
20 have a job to prove to you, not beyond all possible doubt,
21 not beyond a shadow of a doubt, but simply beyond a
22 reasonable doubt. Okay. Same standard as in a traffic
23 ticket. If someone was prosecuted for a traffic ticket,
24 exact same legal standard. Okay. The law doesn't say
25 because this is something obviously much more serious,

74

1  that the State has to bring a much, much, much higher
2  amount of evidence.
3      A. Yes.
4      Q. Okay. It's the exact same standard. We don't
5  change the rules simply because it's a capital murder
6  case. Okay. So I have to prove beyond a reasonable doubt
7  that there is a probability, more likely than not, not a
8  certainty, not a guarantee, more than a possibility
9  though, that the Defendant will commit criminal acts of
10 violence. Okay. Doesn't say that he's going to commit
11 another murder, does it?
12     A. No.
13     Q. Doesn't say he's gonna go rape somebody, does it?
14     A. No.
15     Q. Doesn't say he's gonna go use a gun again, does
16 it?
17     A. No.
18     Q. However you define criminal acts of violence.
19 Because don't you think if they meant to make that a
20 murder, they could have written the word in there?
21     A. Yes.
22     Q. Okay. "That would constitute", in other words,
23 that would be a continuing threat to society. And society
24 is anywhere the Defendant finds himself. Okay?
25     A. Yes.

75

1      Q. So I have to prove to you, very simply, beyond a
2  reasonable doubt that the Defendant, wherever he is, is
3  gonna be a future danger. Okay?
4      A. Okay.
5      Q. Now, if you find that the Defendant is not gonna
6  be a future danger, what do you think is the sentence he
7  would receive?
8      A. Possibility of parole.
9      Q. No, ma'am, because at this point it's only life
10 without parole or the death penalty. Okay?
11     A. I guess life.
12     Q. That's exactly right. That's exactly right.
13 All right. Now, I want to ask you this. Knowing that
14 the Defendant could receive a life sentence without
15 parole, could you answer this question "yes" knowing that
16 he's one step future -- one step closer to the death
17 penalty?
18     A. Yes.
19     Q. Okay. So in other words, you're not gonna say,
20 "You know what, a life sentence without parole is the
21 easier option as a juror, I don't have to participate
22 in possibly giving someone a death sentence and I'm
23 gonna choose life."
24     A. Yes.
25     Q. Tell me a little bit more about what you're

76

1  thinking.
2      A. Just that, I mean -- can you repeat that? I'm
3  sorry.
4      Q. Absolutely. I think I asked it in a very
5  confusing way. I'm sorry.
6      A. I got lost.
7      Q. I'm sorry. Some people think because the options
8  are "life without parole" and a death sentence, if they
9  know somebody can be locked up forever, they're always
10 gonna choose that.
11     A. Yes.
12     Q. Okay. Do you think you would always choose
13 life without parole knowing that they would be locked up
14 forever or would you say, you know what though, some
15 cases, some crimes deserve the death sentence?
16     A. Some crimes deserve the death sentence.
17     Q. Okay. And so do you think some murders in the
18 course of robberies or burglaries deserve the death
19 sentence?
20     A. Yes.
21     Q. Okay. Do you see what I'm saying? Some people
22 just say, "You know what, if they're gonna be locked up
23 the rest of their life in prison, I'm always gonna choose
24 that."
25     A. Yeah.

77

1    Q. Is that what you're saying or are you saying
2  "No, that's not the case. I'm gonna let the facts
3  determine it"?
4    A. Let the facts determine it.
5    Q. All right. So do you see how this question can
6  be answered "yes" or "no" depending on whatever the facts
7  are?
8    A. Yes.
9    Q. I want to ask you about that definition of
10 society. Obviously, society may include prison. Can you
11 see that?
12   A. Yes.
13   Q. All right. Do you think that other individuals
14 who might share the prison with a capital murderer are
15 entitled to be safe?
16   A. Yes.
17   Q. Okay. Let's talk about Special Issue No. 2.
18 It begins the same way, that same set of words. "Do you
19 find from the evidence beyond a reasonable doubt --", and
20 what does that tell you, Ms. Nichols?
21   A. What was the first part of that?
22   Q. Those words, "Do you find from the evidence
23 beyond a reasonable doubt", anytime you see those words,
24 what does that signal to you?
25   A. That there has to be proof.

78

1    Q. Absolutely. That I have a job to do. And then
2  what follows is what I have to prove to you. I have to
3  prove to you that the Defendant actually killed the
4  victim. They were the real killer. They were the actual
5  one that pulled the trigger, wielded the knife, pounded
6  them with a rock, that it was their hand that caused the
7  death. Okay?
8    A. Yes.
9    Q. Or if they didn't actually cause the death, they
10 intended to kill the deceased. Okay. My helper said
11 don't leave witnesses. Okay. My helper fired the gun
12 but missed. All right. In those examples, certainly my
13 helper intended the victim to die even though they weren't
14 the one responsible for the actual killing.
15   A. Yes.
16   Q. Or the last way that they anticipated that a
17 human life would be taken and another way of saying that
18 is they knew a murder was gonna occur. Okay?
19   A. Yes.
20   Q. All right. So to be guilty of capital murder as
21 a coconspirator or a helper, all that they had to have
22 done in terms of their thinking, they should have known
23 a murder could occur, they should have known better. You
24 ever told your kids, you should have known better?
25   A. Yes, ma'am.

79

1    Q. Second time they do it or the second time they
2  find themselves in that situation, what do you say? You
3  did know better.
4    A. Yes.
5    Q. Do you see the difference?
6    A. Nods.
7    Q. For Guilt/Innocence, should have known better is
8  enough to find them guilty. For the death sentence, they
9  must have known better to get the death sentence. They
10 actually had to know better. See the difference?
11   A. Yes, ma'am.
12   Q. Okay. Don't you think that's the way the law
13 ought to be?
14   A. Yes.
15   Q. All right. Now, you've answered Special Issue
16 No. 1 and you've answered Special Issue No. 2. If you
17 answer this question no, the Defendant did not act in
18 one of those three ways, then what sentence will the
19 Defendant receive?
20   A. Life.
21   Q. Absolutely. You see how this works now?
22   A. Yes.
23   Q. Okay. I didn't explain it very well before, did
24 I? I'm sorry. I've been doing this so many times. If
25 you answer this question "yes", then you move on to the

80

1  third question. Okay. Third question is this. "Taking
2  into consideration all of the evidence", everything that
3  you've heard in the trial, and it begins with the
4  circumstances of the offense. And that means the offense
5  that the Defendant is on trial for, the capital murder
6  that he committed.
7        Okay. And then it tells you, you look at
8  the Defendant's character and background and the personal
9  moral culpability of the Defendant. I'll tell you,
10 culpability is just a fancy word for responsibility,
11 okay, how personally, morally responsible the Defendant
12 is. You look at all of that, and then you step back.
13 And then you say, are there any mitigating circumstances,
14 number one. And the law is gonna tell you or the Judge
15 is gonna tell you, a mitigating circumstance is kind of
16 like an extenuating circumstance. It's gonna be defined
17 as anything which reduces a defendant's moral
18 blameworthiness.
19        And I'll give you a real simple example
20 because my kids do this to me all the time. Have you
21 ever been in the position where you're disciplining a
22 child or talking to them about their behavior and they've
23 done something wrong, and then they say, "Yeah, mom,
24 but".
25   A. Yes.

81

1    Q.  And then whatever follows in everyday life is
2  kind of like the answer to this; what follows that may be
3  an extenuating circumstance.  Okay?
4    A.  Yes.
5    Q.  "Everybody else was doing it."  Okay.  "I didn't
6  smoke the pot", or "but I got straight A's."  I mean,
7  there's always something extenuating circumstance when
8  you're dealing with children.  See what I'm saying?
9    A.  Yes.
10    Q.  This question is the courtroom's version of it in
11  terms of the death penalty.  But it's not just "Are there
12  any mitigating circumstances?"  Because what's that key
13  word in front of "mitigating circumstances" in yellow?
14    A.  Significant.
15    Q.  Sufficient.
16    A.  Sufficient.
17    Q.  Sufficient.  Okay.  How do you -- what does
18  "sufficient" mean to you?
19    A.  Enough.
20    Q.  Enough.  Exactly.  Enough.  So it's not just
21  "Are there any mitigating circumstances?" or "Are there
22  any extenuating circumstances?"  It is, upon reflection,
23  in light of what the Defendant did, is it enough to spare
24  his life.  See how that question works?
25    A.  Yes.

82

1    Q.  If you answer this question "yes" -- it's a
2  little different from the other two questions -- what
3  sentence does the Defendant receive?
4    A.  Life.
5    Q.  Exactly.  If you answer this question "no", what
6  sentence does the Defendant receive?
7    A.  Death.
8    Q.  Exactly.  Now, do you think you're the kind of
9  person that can, on the one hand, look at everything a
10  Defendant has done?
11    A.  Yes.
12    Q.  And look at and determine, number one, are there
13  any mitigating circumstances, and then number two, are
14  they sufficient or enough to spare his life in light of
15  what he did?
16    A.  Yes.
17    Q.  Okay.  Do you think you can do that?
18    A.  Yes.
19    Q.  Do you think you can sit in judgment of another
20  person?
21    A.  Yes.
22    Q.  You paused for just a second.  Tell me what you
23  were thinking.
24    A.  Well, it would be hard, I mean, you know, to be
25  responsible for that decision.

83

1    Q.  Uh-huh.
2    A.  But I could do it.
3    Q.  Could you do it?
4    A.  Yes.
5    Q.  Could you do it?  Could you do it knowing that
6  it's not just -- Do you know how we talk about something
7  and it's never really affecting us personally, it's just
8  kind of talking about it like it's distant and away?  Do
9  you think you could do it if you sat in a courtroom for
10  three weeks with a man, living, breathing the same air
11  that you and I breathe, and could make the call if the
12  evidence was there to end his life?
13    A.  If I felt he was deserving of it, yes.
14    Q.  And that's all the law asks of you.  Do you have
15  any questions for me?
16    A.  No, ma'am.
17    Q.  Really?  None?  After all of this crash course
18  in the law?
19    A.  None that I can think of.
20    Q.  Do you think that we should have a death
21  penalty?
22    A.  Yes.
23    Q.  Why?
24    A.  Because I believe in a tooth for a tooth.
25    Q.  Okay.

84

1    A.  But also we can't just have people going around
2  doing things and then keep them locked up, and, you know,
3  there has to be -- I don't know how to explain it, but
4  they can't be out with us, you know, for their actions.
5    Q.  Uh-huh.
6    A.  But you're sitting over here and you've got
7  people paying taxes on you and things like that.  And if
8  you've taken another person's life --
9    Q.  Uh-huh.
10    A.  -- then it goes back to like an "eye for an eye"
11  thing.
12    Q.  Okay.  Okay.
13    A.  You just can't do that.
14    Q.  Just can't do it.  Okay.  In a civilized society,
15  we can't do that?
16    A.  Yes.
17    Q.  We can't accept that?
18    A.  Yes.
19    Q.  May I ask you a question about your ex-husband
20  and your dad?
21    A.  Yes.
22    Q.  All right.  Can you tell me a little bit about
23  their situations?
24    A.  Um, I'm sorry, which ex-husband, my first or
25  second?

85

1    Q. This question right here: "Have you ever visited
2  a county jail or state prison for any reason?"
3    A. Oh, yes.
4    Q. So I don't know which ex-husband.
5    A. I'm sorry.
6    Q. That's okay.
7    A. I'm on my third marriage. My ex-husband was in
8  for -- well, by the time I had met him, he had violated
9  his parole, but he was on parole for burglary of
10 habitation.
11   Q. Uh-huh.
12   A. And drugs. And then my daddy went to jail, I
13 just went and seen him at Tarrant County for car theft.
14   Q. Uh-huh.
15   A. So that's about all the experience I've had.
16   Q. How old is your dad?
17   A. My dad will be 73 in March.
18   Q. Okay. And is he awaiting trial?
19   A. No, he never -- it never did go that far.
20   Q. Okay. In your ex-husband's case, did he plead
21 guilty or was there a trial?
22   A. Um, to tell you the truth, I don't know.
23   Q. Okay. How about your dad?
24   A. My dad, there was no trial or nothing.
25   Q. Did he plead guilty?

86

1    A. I think so.
2    Q. Did you feel like he was treated fairly?
3    A. A little too fairly.
4    Q. A little too fairly. Okay. Well, tell me about
5  that.
6    A. Well, I didn't grow up with my dad so much. I
7  would say I raised my dad because when he got in trouble,
8  he called me.
9    Q. And you helped him?
10   A. To come get him and stuff. And I felt like he
11 deserved a whole lot more punishment because he'd steal
12 his girlfriend's cars and just take off.
13   Q. Uh-huh.
14   A. And he done that numerous times.
15   Q. Okay.
16   A. And somebody finally pressed charged on him but
17 never went through with it.
18   Q. Okay.
19   A. You know, and I just -- I've seen him do this to
20 these women, and I really feel like he got off easy.
21   Q. Okay. All right. But you're always there for
22 him?
23   A. Yes. I take care of him now. He lives with me.
24   Q. That's very sweet.
25   A. Thank you.

87

1    Q. You understand that this trial could entail
2  three weeks?
3    A. Yes.
4    Q. And you're okay with that time span?
5    A. Yes, ma'am.
6    Q. And you understand that that means you don't go
7  home for three weeks?
8    A. Yes.
9    Q. Potentially?
10   A. Yes.
11   Q. Okay.
12   A. The only thing is I do have a daughter-in-law
13 that my first grandbaby is due sometime within the next
14 45 days.
15   Q. The next 45 days?
16   A. Yes. That would be --
17   Q. I'm hoping we're done. I'm hoping we're done.
18   A. She's not due till March, but they're -- there's
19 a question there that she could go early, and that would
20 be my only concern.
21   Q. Okay. Okay. But for right now, everything is
22 okay. You're available and you can serve on this Jury if
23 you're called to?
24   A. Yes.
25       MS. JACK: All right. Thank you very much.

88

1  I hope I've answered all your questions.
2       VENIREPERSON: Thank you.
3       MS. JACK: I very much appreciate your time
4  and your attention. Thank you.
5       VENIREPERSON: Thank you.
6       THE COURT: And you're not gonna use your
7  last 20 seconds, huh?
8       MS. JACK: Shocking, I know.
9       THE COURT: I'll recognize the Defense.
10          VOIR DIRE EXAMINATION
11 BY MR. HEISKELL:
12   Q. Ms. Nichols, how are you doing, ma'am?
13   A. Fine.
14   Q. My name is Mike Heiskell. And I, along with
15 Greg Westfall --
16       MR. WESTFALL: Hello.
17   Q. -- represent Mark Soliz. See that young man at
18 the end of the table down there?
19   A. Yes, sir.
20   Q. I have some questions for you. And you seem to
21 have a pretty good understanding and grasp of the law as
22 the Prosecutor explained to you. We may tread over some
23 of those things, but I just want to talk to you about
24 your own background and life experiences and some of the
25 same things the Prosecutor did, in fact, ask you about up

**Page 89**

1 to the latter part of her presentation. Okay?

2     A. Okay.

3     Q. Now, we don't ask these questions, as you should

4 know, to try to pry for that sake alone or embarrass

5 anybody, but I think you understand this is a very

6 serious case, and we try to find out as much as we can

7 about people that we talk to who may sit just where

8 you're sitting right now and pass judgment. And if a

9 person is convicted in a capital murder and if Mark is

10 convicted, a ultimate decision having to be made, that

11 is death or life without parole. So I hope you

12 understand that when we ask you these kind of sensitive

13 questions, that we have to find out as much as we can.

14 Okay?

15     A. Yes, sir.

16     Q. And if you -- if I ask you something you don't

17 understand, please don't hesitate to stop me and I'll

18 start over, try to ask it a different way so I want to

19 make sure we're on the same page.

20         Where did you grow up?

21     A. I grew up in Rendon.

22     Q. In Rendon?

23     A. Yes, sir.

24     Q. Okay. And how would you describe your childhood,

25 Ms. Nichols?

**Page 90**

1     A. Good.

2     Q. Good. Brothers, sisters?

3     A. No, only child.

4     Q. You're the only child. Okay. And your parents

5 were together at a young age or not?

6     A. They were together in their twenties. They

7 divorced when I was 3.

8     Q. Okay.

9     A. So.

10     Q. So your mom raised you alone?

11     A. Yes, sir.

12     Q. And so it was just you and your mom for a while,

13 I guess; is that right?

14     A. Yes.

15     Q. And when did you leave home?

16     A. I left home probably 17.

17     Q. Okay. And is your mom still living, by the way?

18     A. No, sir.

19     Q. And when did she pass?

20     A. 1995.

21     Q. Okay. And I saw that you listed her as the most

22 influential person in your life.

23     A. Yes.

24     Q. Your mom. Because, I guess, she did raise you

25 and did the best she could under the circumstance; is

**Page 91**

1 that right?

2     A. Yes.

3     Q. Was she working as well while she was raising

4 you?

5     A. Yes, sir.

6     Q. So she was a working mom, single mom, working

7 mom?

8     A. Yes.

9     Q. You have two boys?

10     A. Yes, sir.

11     Q. And I see that people say that in describing

12 you, you're very proud of your boys and love your boys

13 very much?

14     A. Oh, yes, sir.

15     Q. One's in the Marine Corps, correct? And the

16 other one, I think you say, is in some type of business

17 school? Am I understanding that correctly?

18     A. He's currently attending BYU in Utah.

19     Q. Oh, BYU, Brigham Young?

20     A. Yes.

21     Q. Okay. All right. That's great.

22     A. Yes.

23     Q. So have you been to Utah to visit with him?

24     A. Not yet.

25     Q. Not yet, huh? What year is he?

**Page 92**

1     A. Um, does that mean when he's gonna graduate?

2     Q. Uh, yeah, kind of, sort of.

3     A. I don't know college, so.

4     Q. Is he first year or has he been there a while?

5     A. This is his second year.

6     Q. Second year.

7     A. Because he left to go on a mission and then he

8 went back, so.

9     Q. That's great. Where did he go on his mission

10 trip?

11     A. The Ukraine.

12     Q. Wow. And when was the last time he was home?

13     A. December. He left in January, the beginning of

14 January.

15     Q. Okay. And your youngest son, how long has he

16 been in the Marine Corps?

17     A. Since September, 2010.

18     Q. Okay. And where is he stationed currently?

19     A. Maryland.

20     Q. Maryland?

21     A. Yes.

22     Q. What was the last time you had a chance to visit

23 with him?

24     A. He was home in -- on December 17th, he got

25 married.

**93**

1    Q. Oh, good.
2    A. So.
3    Q. So you had the both boys home during the
4  Christmas holiday?
5    A. Yes. It was a blessing.
6    Q. Okay. Good. You indicated in your
7  questionnaire, and I want to move to some of that
8  sensitive area I made reference to earlier, that
9  alcoholism in your family caused a lot of problems and
10  disruptions.
11    A. Yes.
12    Q. With your grandparents and cousins, et cetera.
13  Can you give me a little more information about that,
14  Ms. Nichols?
15    A. Well, I don't know much about my grandparents.
16  I do know that my grandfather was an alcoholic. My -- I
17  don't know much about them, but like my cousins, which is
18  present day, they have a drug and alcohol problem.
19    Q. Okay.
20    A. And they continue to get in fights and the
21  police are called for domestic violence, and he has a
22  hard time holding a job and things like that.
23    Q. Now, where do they live?
24    A. They live in Arlington.
25    Q. In Arlington. To your knowledge, did any of

**94**

1  them receive any type of counseling or treatment for
2  their problem?
3    A. No.
4    Q. They did not, as far as you know?
5    A. As far as I know, no, sir.
6    Q. Okay. The next issue you referenced was
7  methamphetamine and pain pills.
8    A. Yes.
9    Q. As also being a disruptive force in your
10  family.
11    A. Yes.
12    Q. Can you tell us a little bit more about that,
13  please.
14    A. Well, that's my cousins.
15    Q. Your cousin. Okay. The same one you were
16  talking about before?
17    A. Yes.
18    Q. Okay. So he had kind of a double whammy, the
19  alcoholism and meth and pain pills; is that right?
20    A. Yes, yes.
21    Q. Did he act differently when he was under the
22  influence of those substances?
23    A. Yes.
24    Q. In what way?
25    A. From what I've seen when I'm around him, he

**95**

1  just -- he sleeps a lot. His language is slurred like
2  he's drunk, you know, you can't understand him. I'm not
3  around him that much. His brother, which has now passed
4  away, also had a drug and alcohol problem, but he also
5  was on medication for -- I forget what you call it, but
6  he heard the voices in his head and --
7    Q. Okay.
8    A. -- things like that. And then he would take --
9  take the medicine with the alcohol and drugs, and he was
10  just -- I don't know how to explain it, but out there.
11    Q. Out there?
12    A. You know, he didn't even know what he was doing
13  half the time.
14    Q. And did that contribute to his death as well?
15    A. Yes.
16    Q. How old was he when he passed?
17    A. 22.
18    Q. Oh. And how long ago was that?
19    A. Four years ago. He fell asleep with a
20  cigarette.
21    Q. Oh. And burned the house down or something?
22    A. Yes.
23    Q. Sorry. You, knowing that your family members
24  to that extent have gone through these problems, I see
25  that people also describe you, Ms. Nichols, as being a

**96**

1  very caring and giving person. I read that as based upon
2  your life experiences, that you've gone through a lot,
3  seen a lot, you can understand people who are in
4  different situations. Am I looking at that correctly?
5    A. Yes, sir, I believe so.
6    Q. Whether it's good or bad, you can always look to
7  find the other side of the coin, so to speak, to see what
8  led people to do those things?
9    A. Yes.
10    Q. Can you tell me a little bit more about that? Is
11  that a good explanation for that?
12    A. Yes, I believe so.
13    Q. Okay. One of the things you've told us in the
14  questionnaire, that when we asked you to list the
15  purposes of people of the criminal justice system in
16  enforcing the laws and punishing people who are accused
17  of those laws, victim of those laws, that rehabilitation
18  is number one for you?
19    A. Yes.
20    Q. Tell me why you say that.
21    A. Because I believe that some people with the
22  proper help and if they have -- if they have the "want
23  to" --
24    Q. Uh-huh.
25    A. -- to get better and become better, I believe

97

1 that that can make a big difference.

2 Q. In fact, your answer, you first said, as I

3 recall, if they have the right help and they want to and

4 they can overcome their difficulties?

5 A. Yes.

6 Q. Is that right? And I want to take it in two

7 parts. Okay. You first referenced the right help. And,

8 obviously, I take that to mean, well, if under the right

9 circumstances, they have the right, perhaps, support

10 system, therapists, counselors, people to help them guide

11 them in a certain way, that being the right help, and

12 then number two, if they have that "want to" in them

13 after receiving that right help, then that change can

14 happen?

15 A. Yes.

16 Q. Is that a fair statement?

17 A. Yes.

18 Q. And it's important to you, I guess, that that

19 person receive the right help when they have fallen down,

20 fallen short; is that right?

21 A. Yes.

22 Q. You indicated as well that with regard to the

23 mental health professionals, we asked you your opinion

24 about people who have those type of experiences and

25 degrees and what have you to come into court and give

98

1 testimony about what they have found, evaluated and

2 perhaps even recommend; that those are the type of people

3 who can look and find things other people may not find?

4 A. Yes.

5 Q. Okay. Is that -- am I saying that correctly?

6 A. Yes.

7 Q. As far as knowing people perhaps who have

8 received that type of professional help, whether it's

9 licensed professional counselor or some type of

10 psychiatrist or psychologist or, you know, some type of

11 treatment, I guess is what I'm asking; have you known

12 people to have gone through that and receive help that

13 way?

14 A. Yes.

15 Q. And were these family members as well?

16 A. No, friends.

17 Q. Just friends?

18 A. Yes.

19 Q. And at what age, if you recall, Ms. Nichols,

20 that they receive that help to enable them to help turn

21 their life around?

22 A. Different stages. Some from my younger days.

23 And I've seen a lot turn around through my church

24 counseling as old as 40 and 50, so it just differs.

25 Q. Now, you go to the Cowboy Church, too; is that

99

1 right?

2 A. Yes.

3 Q. Okay. You're about the fifth or sixth person

4 that we've talked to who attend one of the Cowboy

5 Churches in the area. Where is yours located?

6 A. On 917 in Alvarado.

7 Q. Okay. Is that a pretty big one or is that a

8 small --

9 A. It's a small one.

10 Q. And are you active in the church as far as

11 doing those type of things, reaching out to people who

12 may have some problems in their life and trying to

13 overcome certain obstacles?

14 A. No, sir.

15 Q. Okay. I didn't -- when you said that before,

16 I didn't know if your church had some type of outreach

17 program to do that.

18 A. They do, but I'm not involved in it.

19 Q. Okay. You said that you try, and I think you

20 underlined that word "try", to live your life according

21 to God's word and the Bible?

22 A. Yes, sir.

23 Q. Do you remember saying that?

24 A. Yes, sir.

25 Q. And when I looked at that, you know, it strikes

100

1 me as your recognition that we all fall short --

2 A. Yes.

3 Q. -- of God's ways and what God wills for us to

4 do. And is that how you see that as well?

5 A. Yes, sir.

6 Q. And we can try our best to meet that goal, if

7 you will, that's set forth in the scriptures, but we're

8 all sinners and oftentimes we fall short of that; is that

9 right?

10 A. Yes, sir.

11 Q. Your sons, when -- let me ask you this question.

12 When is it that a mother has a responsibility to a child?

13 When does that begin?

14 A. At the moment of conception.

15 Q. Conception. And why do you say that?

16 A. Because that's your child and you have made

17 actions to bring this child into the world, and your

18 responsibility is to take care of them, try to raise them

19 right, and do right by them.

20 Q. Okay. And you, obviously, have done a good job

21 with your sons.

22 A. Thank you.

23 Q. That you're very proud of. Have you known other

24 mothers to have not followed that concept?

25 A. Oh, yes, sir.

101

1    Q.  And what happens in that situation, from your
2  own observation?
3    A.  The children get hurt and they have problems,
4  like behavioral problems in school, and they just act
5  out, most of the time, not all of them, but most of the
6  time.
7    Q.  And you think that's one of the reasons for it
8  is because of the mother failing in -- to prepare and to
9  take care of the child in the way you've explained?
10   A.  The parents in general.
11   Q.  The parents in general?
12   A.  Yes, sir.
13   Q.  As your young boy -- as your boys were younger,
14 at the child age and moving up to adolescents, did you
15 have any particular rules, so to speak, in your household
16 to help guide them in the right direction?  Because
17 you've done an excellent job, I see.  Did you have any
18 particular rules that you enforce in your home?
19   A.  Just respect, and I tried to keep them in
20 church.
21   Q.  Okay.
22   A.  And I've showed them what can happen.
23   Q.  Okay.
24   A.  You know, if you choose to do this, then this,
25 because I've had plenty of examples.

102

1    Q.  Okay.
2    A.  You know, if you choose to do this, then this.
3    Q.  Can happen?
4    A.  Can happen.
5    Q.  I want to go back to that first word you
6  referenced, "respect".  I guess people can look at it a
7  different way.  You can restrict its interpretation or
8  also expand it.  When I think of teaching your sons
9  respect, respect for other people, respect for other
10 people's property, for instance, they don't take it,
11 respect for life in general?
12   A.  Yes, sir.
13   Q.  Is that what you're talking about?
14   A.  Yes, sir.
15   Q.  Do you think that's very important?
16   A.  Yes, sir, I do.
17   Q.  And if that type of respect lesson is not
18 taught in the home at a young age, do you think that
19 can be a problem for a child growing up?
20   A.  Yes.  I believe children live what they learn.
21   Q.  Okay.  Your Marine son, is he gonna make a
22 career out of it or does he know yet?
23   A.  He says no.  He's expecting his first baby, and,
24 of course, he's away from his wife and stuff, so right
25 now he says he wants out, but I'm kind of waiting to

103

1  see.
2    Q.  Okay.  And your son at BYU, was his major a
3  business major?
4    A.  Marketing.
5    Q.  Marketing.  Okay.  Good.  Is he married as well?
6    A.  No.
7    Q.  The Prosecutor talked to you about some aspect
8  of our law.  I want go over that briefly with you,
9  Ms. Nichols.  Remember when we talked about that burden
10 of proof beyond a reasonable doubt?
11   A.  Yes, sir.
12   Q.  One of the things I see from your questionnaire
13 is your concern about people who are -- have been found
14 innocent after they've been convicted of a crime.  You
15 made reference to that.  Do you remember that?
16   A.  Yes.
17   Q.  Something you saw, heard about in the news over
18 the last few year; is that correct?
19   A.  Yes.
20   Q.  And I took from that, that you were concerned
21 about people who had been convicted before under maybe a
22 similar standard and then later on they found out to be
23 innocent.  Is that a fair assessment of that?
24   A.  Uh, yes.  I know that I was thinking, you know,
25 back in the day before the DNA and all that, we do have

104

1  a lot of people that were wrongly convicted from like
2  eyewitnesses.
3    Q.  Okay.
4    A.  You know, and things like that, so that's what
5  I was referring to.
6    Q.  And you said eyewitnesses and you also said that
7  people see something but misinterpret what they see?
8    A.  Yes.
9    Q.  Right.  So that's an issue for you as well when
10 you look at those wrongful convictions; is that right?
11   A.  Yes.
12   Q.  Well, that burden of proof beyond a
13 reasonable doubt is, in fact, the highest burden in our
14 law.  Now, just because it's used in a traffic ticket
15 case, that doesn't diminish it at all.  It's still the
16 highest.  Okay.  We have what's called "reasonable
17 suspicion", the very lowest, which police officers use
18 when they make their investigative stops for traffic or
19 whatever.
20        We have "probable cause", the same standard
21 the Grand Jury has to return an indictment on.  Okay.
22 Then after that, we go into court with a "preponderance
23 of the evidence" standard, which is used in civil cases,
24 not a criminal case.  And civil cases are ones where
25 people sue each other over monetary damages, property

105

1 laws, things of that nature, car wrecks, the greater
2 weight and degree of credibility evidence.
3      And the next level above that is what's
4 called "clear and convincing evidence". That is defined
5 in our law as the trier of fact having a firm belief or
6 conviction in the truth of the matter asserted. In other
7 words, has to be a firm belief or conviction in order to
8 find that standard to be clear and convincing.
9      The highest standard is above that, "beyond
10 a reasonable doubt". It's more than a firm belief or
11 conviction. So you can see how high it is. And some
12 people, because it's not defined in our law, may think
13 that that level of proof is met somehow at a different
14 level than others. But you see how that level of proof
15 is so high and has to be so persuasive and convincing
16 that you have to be convinced beyond any and all
17 reasonable doubts of the elements of the crime alleged.
18 You follow me?
19    A. Yes.
20    Q. You put that high standard that the law requires
21 in the burden of proof of beyond a reasonable doubt and
22 apply it in a case, and especially in a capital murder
23 case where potentially life or death is involved. Would
24 you be able to do that, ma'am?
25    A. Yes, sir.

106

1    Q. You told us in your questionnaire that you
2 thought that a convicted murderer's character and
3 background is relevant in punishment, that that's
4 something that you would look at and consider. Do you
5 remember answering that?
6    A. Yes.
7    Q. Tell me what you meant by that.
8    A. Well, like if you grow up with violent, abusive
9 parents, that's really kind of all you know.
10    Q. Uh-huh.
11    A. You know, and um, so I think that does play a
12 role if you've never had a chance to have anything else
13 and that's all you've been accustomed to as growing up.
14    Q. Okay. And that's something that you would look
15 at in making that, of course, important judgment as to
16 punishment?
17    A. Yes.
18    Q. And that Special Issue No. 3, I want to show it
19 to you, not here, but here. If you can direct your
20 attention over here real quickly, Ms. Nichols.
21      As you know, before you get to this
22 question, you would have answered Question 1 and 2 "yes",
23 whether the person is a future danger, whether the person
24 intended to kill, actually killed or anticipated that a
25 life would be taken. Here, you're asked to and required

107

1 to under the law, to take into consideration all the
2 evidence of the crime, including the circumstance of the
3 offense, the Defendant's character and background. These
4 are some of the things we just talked about. And that's
5 something that will be important to you to look at is
6 what you're telling me; is that right?
7    A. Yes.
8    Q. And that's something obviously that you can and
9 would consider before you would answer this question
10 either "yes" or "no"?
11    A. Yes, sir.
12    Q. All right. If the Jury returned a verdict of
13 guilty, if the Jury said "yes, he's a future danger",
14 "yes, he killed, intended to kill or anticipated that
15 death would result", and "no, no sufficient mitigating
16 circumstance", then a death sentence is imposed.
17      And what that means, Ms. Nichols, is that
18 person would be taken down to Huntsville, put on Death
19 Row, and eventually, because you know in Texas death is
20 a -- sentence is a reality. It's carried out.
21    A. Yes.
22    Q. It may take a while, but it's carried out.
23 Eventually the person is taken to the death chamber,
24 strapped to a gurney, and chemicals are injected into
25 his veins until he dies. Then the family is called to

108

1 come pick up the body to take him.
2      The alternative to that is a life without
3 parole sentence, where the person literally would die
4 in a prison. There is no parole. Everyone in here
5 agrees that that's the law and that's what would bet
6 carried out.
7    A. Yes.
8    Q. What I want to ask you in that, when you look at
9 both of those choices, which to you is worse?
10    A. Probably life.
11    Q. And why do you say that?
12    A. Because you're just sitting behind bars with
13 very mean people. I know it's not a very nice place.
14 And to me, that would just be the ultimate worst, to
15 just be locked up and know you're never getting out.
16    Q. Some people have described it as a living hell.
17    A. Yes.
18    Q. How would you describe it?
19    A. The same way.
20    Q. Same way?
21    A. It would be for me.
22    Q. You visited your ex-husband and father in jail?
23    A. Yes.
24    Q. And was it prison as well that you visited them
25 or just in the jail?

## 109

1    A. Just jail.

2    Q. So you know that's a difference between jail and

3 a Texas prison?

4    A. Yes.

5    Q. Have any questions of me?

6    A. No, sir.

7    MR. HEISKELL: Okay. Ms. Nichols, thank you

8 so much for sharing with me. Thank you so much for

9 opening up, and we really appreciate it.

10    VENIREPERSON: Thank you.

11    MR. HEISKELL: You're welcome.

12    THE COURT: Thank you, ma'am. If you'll step

13 outside for just a minute.

14    (Venireperson Nichols not present.)

15    THE COURT: State have any challenges?

16    MS. JACK: No, Your Honor.

17    THE COURT: Defense have any?

18    MR. HEISKELL: No, Your Honor.

19    THE COURT: Why don't you ask her to come

20 back in.

21    (Venireperson Nichols present.)

22    THE COURT: Ms. Nichols, come on up. I'm

23 gonna talk to you for just a minute. You're not on the

24 Jury yet, but you are on the panel the Jury is gonna be

25 selected from. You're gonna have to come back at 10:00

## 110

1 Monday morning, this coming Monday. At that point,

2 you'll either be told you're on the Jury or you'll be

3 released, one or the two. If you're on the Jury, I will

4 tell you trial is -- you've got a week before trial

5 starts, but you do have to be here Monday. This is so

6 late, you're not gonna get anything in the mail saying

7 you need to be here Monday, so.

8    VENIREPERSON: Okay.

9    THE COURT: That's why I'm telling you now.

10    VENIREPERSON: So Monday at 10:00?

11    THE COURT: Monday at 10:00. And that won't

12 take long. That will take an hour, maybe two hours at

13 the most, but it won't take long.

14    VENIREPERSON: Okay.

15    THE COURT: Then you'll know. You'll either

16 be released or be on the Jury at that point.

17    VENIREPERSON: Okay.

18    THE COURT: This lady is gonna take a

19 picture of you. We're doing that because we've talked to

20 so many people, our minds are mush at this point.

21    In the meantime, when you go home, don't ask

22 anybody about the case. Don't talk to anybody about it.

23 If it's on TV or on -- in the newspaper, don't look at

24 it, don't listen. Don't let anybody tell you what was

25 said. Whatever you do, don't get on the Internet, start

## 111

1 doing research.

2    VENIREPERSON: Okay.

3    THE COURT: We'll see you Monday morning,

4 10:00. Okay. Thank you, ma'am. Thanks for coming in

5 early, too.

6    (Venireperson Nichols not present.)

7    (Off the record.)

8    MR. HEISKELL: I think we need to go on the

9 record. We have -- we have 49 Jurors currently

10 qualified. And both the State and the Defense feels that

11 that is sufficient for us to exercise our peremptories on

12 Monday. And it is Friday afternoon, five weeks of this,

13 and --

14    THE COURT: Okay.

15    MR. HEISKELL: I think we're both in

16 agreement, if I'm correct in my statement. We have --

17    MS. JACK: That's correct, Your Honor.

18    MR. HEISKELL: -- more than enough to

19 proceed.

20    THE COURT: I agree. Let's do one thing.

21 Let's talk to Mr. Vogel. He was in McKinney. We made

22 him come from there. He had to take a truck by. Let's

23 get him to come in and say he doesn't want to miss work.

24    MR. HEISKELL: Okay. That's fine.

25    MS. JACK: That's fine, Judge.

## 112

1    THE COURT: Do y'all mind doing that?

2    MR. HEISKELL: That's fine, so he won't be

3 upset.

4    (Off the record.)

5    (Venireperson Vogel present.)

6    THE COURT: Mr. Vogel, come on up. If

7 you'll raise your right hand.

8    (Juror oath.)

9    THE COURT: Okay. I'm gonna ask you some

10 questions here. We've reviewed your questionnaire.

11    VENIREPERSON: Okay.

12    THE COURT: And would you state your name.

13    VENIREPERSON: Gary Vogel.

14    THE COURT: Mr. Vogel, you said -- first

15 off, we apologize making you -- you were in McKinney, I

16 understand.

17    VENIREPERSON: Yes, sir.

18    THE COURT: Okay. We apologize making you

19 do this. We have to do this thing in a certain order is

20 the problem we have.

21    VENIREPERSON: Okay.

22    THE COURT: But you put on your

23 questionnaire that you really need to work for three

24 weeks instead of not get paid for three weeks.

25    VENIREPERSON: Say that again.

STATE VS. MARK ANTHONY SOLIZ - FEBRUARY 19, 2012

113

1   THE COURT: You've indicated on your
2   questionnaire that you need to work.
3       VENIREPERSON: Yes, sir.
4       THE COURT: If you were sequestered in a
5   hotel for three weeks, would that have a detrimental
6   affect on your life?
7       VENIREPERSON: Well, it would -- I've
8   made previous engagements and stuff like that to, you
9   know, soccer team, two soccer teams and work and stuff
10  like that, I mean, I --
11      THE COURT: Okay. So you've got some
12  things to do, plus you would be missing three weeks of
13  work?
14      VENIREPERSON: Yes, sir.
15      THE COURT: Would you be mad at us if we
16  let you go?
17      VENIREPERSON: No.
18      THE COURT: Even after making you come all
19  the way from McKinney to be here to say "let go"?
20      VENIREPERSON: No.
21      THE COURT: Okay. We're gonna let you go.
22      VENIREPERSON: Thank you, sir.
23      THE COURT: We apologize to you making you
24  drive.
25      (Venireperson Vogel excused.)

114

1       (Off the record.)
2       (Venireperson Clanton present.)
3       THE COURT: Come on up. Are you Mr. Clanton,
4   right?
5       VENIREPERSON: Yes, sir.
6       THE COURT: Mr. Clanton, I've got good news
7   for you. We've finished.
8       VENIREPERSON: Oh, okay.
9       THE COURT: I wanted you to come -- you came
10  early.
11      VENIREPERSON: Yes, sir.
12      THE COURT: We appreciate it. The reason
13  we're finished is because the last lady qualified.
14      VENIREPERSON: Okay.
15      THE COURT: So when she did, it -- we can --
16  we're at a point where we would not reach you if you
17  qualified.
18      VENIREPERSON: Okay.
19      THE COURT: But I wanted to thank you for
20  coming, because if she had not qualified, you would be
21  sitting there now being questioned. So thanks very much.
22      VENIREPERSON: Thank you.
23      THE COURT: And we're sorry we had to alert
24  you like this. We had to have one more.
25      VENIREPERSON: All right. Thank you.

115

1       MS. JACK: Thank you.
2       MR. WESTFALL: Thank you.
3       (Venireperson Clanton excused.)
4       (Court adjourned.)

1  THE STATE OF TEXAS )

2  COUNTY OF JOHNSON  )

3          I, Pamela K. Waits, Official Court Reporter

4  in and for the 413th District Court of Johnson County,

5  State of Texas, do hereby certify that the above and

6  foregoing contains a true and correct transcription of all

7  portions of evidence and other proceedings requested in

8  writing by counsel for the parties to be included in the

9  volume of the Reporter's Record, in the above-styled and

10 numbered cause, all of which occurred in open court or in

11 chambers and were reported by me.

12          I further certify that this Reporter's Record

13 of the proceedings truly and correctly reflects the

14 exhibits, if any, admitted by the respective parties.

15          WITNESS MY OFFICIAL HAND this the _31_ day

16 of __December__ 2012.

17

18 _____
   Pamela K. Waits, Texas CSR #4991
19 Expiration Date:  12/31/13
   Official Court Reporter
20 413th Judicial District
   Johnson County, Texas
21 204 S. Buffalo Avenue
   Cleburne, Texas 76033
22 (817) 556-6041

23

24

25

1              REPORTER'S RECORD

2          VOLUME 36 OF 75 VOLUMES

3        TRIAL COURT CAUSE NO. F45059

4     COURT OF CRIMINAL APPEALS NO. AP-76,768

5  STATE OF TEXAS           )      IN THE DISTRICT COURT
                            )
6  VS.                      )      JOHNSON COUNTY, TEXAS
                            )
7  MARK ANTHONY SOLIZ       )      413TH JUDICIAL DISTRICT

8

9  --------------------------------------------------------

10                JURY SELECTION

11            (PEREMPTORY STRIKES)

12 --------------------------------------------------------

13

14

15          On the 20th day of February, 2012, the

16 following proceedings came on to be heard in the

17 above-entitled and numbered cause before the Honorable

18 Phillip Vick, Judge presiding, held in Cleburne, Johnson

19 County, Texas:

20          Proceedings reported by Machine Shorthand and

21 Computer-Aided Transcription.

22

23

24                                    ORIGINAL

25

```
 1                    A P P E A R A N C E S

 2   DALE HANNA
     SBOT NO. 08919500
 3   LARRY CHAMBLESS
     SBOT NO. 04086320
 4   MARTIN STRAHAN
     SBOT NO. 00797765
 5   District Attorney's Office
     Johnson County
 6   204 S. Buffalo
     Cleburne, Texas 76033
 7   (817) 556-6801

 8   ELIZABETH CHRISTINA JACK
     SBOT NO. 10445200
 9   Tarrant County District Attorney's Office
     401 W. Belknap Street
10   Fort Worth, Texas 76102-1913
     817-884-1366
11
     ATTORNEYS FOR THE STATE OF TEXAS
12

13   MICHAEL P. HEISKELL
     SBOT NO. 09383700
14   Johnson, Vaughn & Heiskell
     5601 Bridge Street
15   Suite 220
     Fort Worth, Texas 76112-2305
16   817-457-2999

17   GREGORY B. WESTFALL
     SBOT NO. 00788646
18   Hill Gilstrap, P.C.
     1400 W. Abram Street
19   Arlington, Texas 76013
     817-276-4931
20
     ATTORNEYS FOR DEFENDANT
21

22

23

24

25
```

```
 1                         I N D E X

 2                         VOLUME 36

 3                     JURY SELECTION

 4   FEBRUARY 20, 2012                      PAGE        VOL.
```

```
 5   Proceedings.................................  4        36

 6   Venireperson Jenkins excused................  4        36

 7   Venireperson Lybbert statement..............  6        36

 8   Venireperson Conger discussion..............  7        36

 9   Peremptory Strikes..........................  8        36

10   Hearing re: Venireperson Buckley Nugent...... 17        36
     Court's Ruling.............................. 23        36
11
     Peremptory Strikes continued................ 24        36
12
     Jury Seated................................. 26        36
13
     Court Adjourned............................. 28        36
14
     Court Reporter's Certificate................ 29        36
15
```

```
16

17

18

19

20

21

22

23

24

25
```

**4**

```
1              P R O C E E D I N G
2         (Defendant present.)
3         THE COURT:  On the record.  We've got this
4  letter from Juror Number -- Juror Panel No. 2, and I think
5  everybody has read it.  Says she's had recent surgery and
6  her doctor says she's unable to serve, with lots of words
7  in here saying things would happen to her if we make her
8  serve.  I propose to excuse her.  Does anybody object to
9  it?
10        MS. JACK:  No, Your Honor.  I just want to
11 put something further on the record, that she's in a wheel
12 chair outside as well.
13        THE COURT:  She's in a wheelchair and having
14 trouble getting around, we understand that, too.
15        Any objection from the Defense?
16        MR. HEISKELL:  Well, reluctantly, Judge, in
17 light of her condition.
18        THE COURT:  We'll put the doctor's things
19 in as part of an exhibit.  I'll just mark it Court's
20 Exhibit No. 1.
21        MR. HEISKELL:  Okay.
22        THE COURT:  Okay.  Is there any problem with
23 excusing her now and telling her to go home?
24        MR. STRAHAN:  No, sir.
25        MR. HEISKELL:  No.
```

**5**

```
1         THE COURT:  Before we bring the Jury in?
2         MR. HEISKELL:  That's fine.
3         THE COURT:  I'd just soon not make her come
4  in.  She's evidently got a mad mother with her, too, so.
5  Okay.
6         (Off the record.)
7         (Venire Panel present.)
8         THE COURT:  Good morning, ladies and
9  gentlemen.  First off, thank you for coming in.  We -- I
10 understand a lot of you had to go through some personal
11 sacrifices to do it.  We appreciate you being on time.
12 This is one of those deals we can't start till you're all
13 here, and you were on time.  We appreciate that.
14        What's gonna happen now, I'm gonna have
15 to -- we wanted to see, see y'all one more time before we
16 do finish this, so I'm gonna have to send y'all outside
17 for a few minutes.  And when you come back in, you
18 wouldn't necessarily have to sit in any kind of order,
19 then we'll call the names of the people that serve as
20 Jurors.
21        So we thank you for coming.  Don't leave.
22 You can go outside, but -- and this should take, I don't
23 know how long, 10 or 15 minutes maybe, or maybe a little
24 longer, maybe a little less time, but we'll get you right
25 back in here.  And then as we do that, most of you will be
```

**6**

```
1  excused for the rest of the day and the others that are on
2  the Jury will be excused after a little while.
3         Okay.  Thank you.  If y'all will go outside,
4  we'll try to get you back as soon as we can.
5         (Venire panel not present.)
6         (Off the record.)
7         (Venireperson Lybbert present.)
8         THE COURT:  Why don't y'all have a seat.
9  Okay.  A potential juror has asked to talk to us.
10        Your name, what is your name, sir?
11        VENIREPERSON:  Blair Lybbert.
12        THE COURT:  Mr. Lybbert, I'll let you say
13 what you want to, but I'm not gonna let anybody question
14 you after you get through with this, so make your
15 statement.
16        VENIREPERSON:  One of the things that didn't
17 come up and it just really wasn't in the forefront of my
18 mind when I was interviewed last time, is that I did have
19 a family member that was murdered by a young Hispanic
20 man.  That was seven years ago.  And it just wasn't really
21 in the forefront of my mind.
22        My brother-in-law died February 8th, and I've
23 been the last two weeks in El Paso with my sister who is
24 69 years alone -- or 69 years old, and alone.  And it --
25 she's -- her husband is dead now, and I've been listening
```

**7**

```
1  for -- I've been in El Paso for the last week, and been
2  with her for almost two weeks and with her crying every
3  night about, you know, "My husband is gone and my son
4  is -- I lost my son and I lost my husband".  And I think
5  you should be aware of that.
6         THE COURT:  Okay.  Thank you, sir.
7         (Venireperson Lybbert not present.)
8         THE COURT:  Does that make a difference to
9  anybody?
10        MR. WESTFALL:  No, Your Honor.
11        THE COURT:  Okay.  We'll consider him part of
12 the panel.
13        THE SHERIFF:  Your Honor, may I approach?
14        THE COURT:  Okay.
15        (Pause in proceeding.)
16        THE COURT:  Okay.  We have a letter from
17 Joshua T. Smith, D.D.S.
18        "To whom it may concern:  Mary Conger is
19 scheduled for dental surgery on February 23rd --" I think
20 we knew that "-- including multiple extractions and
21 smoothing of the jawbones, followed by the placement of a
22 denture.  Recovery time is expected to be one to two
23 weeks, in addition to expected multiple visits to adjust
24 the fit of her new denture.  I would ask that you consider
25 this information in regards to Ms. Conger's jury duty
```

**8**

1  summons."

2          Anybody want to consider this in regard -- we

3  knew the surgery. She told us that. I remember that.

4  She acted like it wouldn't be a problem.

5          MR. WESTFALL: I don't think she should be

6  released, Your Honor.

7          THE COURT: Okay. Good enough. Let's do

8  it. Okay. I'll -- we'll go by -- I'll call the names.

9          (Pause in proceeding.)

10          THE COURT: Everybody ready? Okay.

11          Roger Collins, State -- does State have a

12  challenge to strike?

13          MR. STRAHAN: State accepts Mr. Collins.

14          THE COURT: Okay.

15          MR. WESTFALL: Your Honor, Defense accepts

16  Roger Collins.

17          THE COURT: Okay. He's a Juror.

18          Monica Jenkins has been excused.

19          Blair Lybbert. State accept Blair or have

20  any challenges to Blair Lybbert?

21          MR. STRAHAN: The State would use a challenge

22  on Mr. Lybbert, or strike.

23          THE COURT: That's State's strike number

24  one.

25          Okay. Robert Yubeta, State have any strike

**9**

1  to Robert Yubeta?

2          MR. STRAHAN: No, we accept Mr. Yubeta.

3          THE COURT: Defense?

4          MR. WESTFALL: We'll accept Mr. Yubeta, Your

5  Honor.

6          THE COURT: Okay. He's Juror No. 2.

7          Diania -- Diania Rogers, does State strike

8  Diania Rogers?

9          MR. STRAHAN: We accept Ms. Rogers.

10          MR. WESTFALL: Your Honor, we'll accept

11  Ms. Rogers.

12          THE COURT: Juror No. 3.

13          Cory McKinney, State strike Cory McKinney?

14          MR. STRAHAN: No, sir, we accept

15  Mr. McKinney.

16          THE COURT: Defense?

17          MR. WESTFALL: Your Honor, we'll strike Cory

18  McKinney.

19          THE COURT: Okay. Defense' strike number

20  one.

21          Rick Dalby.

22          MR. STRAHAN: State accepts Mr. Dalby.

23          MR. WESTFALL: Your Honor, the Defense will

24  strike Mr. Dalby.

25          THE COURT: George Kirkham.

**10**

1          MR. STRAHAN: State accepts Mr. Kirkham.

2          MR. WESTFALL: Your Honor, Defense will

3  strike George Kirkham.

4          THE COURT: Katricia Griffith.

5          MR. STRAHAN: State will strike Ms. Griffith.

6          THE COURT: Jo Poole.

7          MR. STRAHAN: State accepts Ms. Poole.

8          MR. WESTFALL: Your Honor, Defense will

9  strike Jo Ann Poole.

10          THE COURT: Okay. That's Defendant's fourth

11  strike, right?

12          MR. WESTFALL: Yes.

13          MS. JACK: Yes.

14          THE COURT: David Sanderford.

15          MR. STRAHAN: State accepts Mr. Sanderford.

16          MR. WESTFALL: Defense will strike

17  Mr. Sanderford, Your Honor.

18          THE COURT: Defense's strike number five.

19          Lee Click.

20          MR. STRAHAN: State accepts Mr. Click.

21          MR. WESTFALL: Defense will strike Mr. Click.

22          THE COURT: Defense number six.

23          Clifford Hendrick.

24          MR. STRAHAN: State will strike Mr. Hendrick.

25          THE COURT: State's number three.

**11**

1          Beverly Sherman.

2          MR. STRAHAN: State strikes Ms. Sherman.

3          THE COURT: State's number four.

4          Jimmye Cook.

5          MR. STRAHAN: We accept Mr. Cook.

6          MR. WESTFALL: Your Honor, Defense will

7  strike Mr. Cook.

8          MS. JACK: Judge, may we take a break for a

9  few minutes? May we take a break for a few minutes?

10          THE COURT: Okay. That's Defense number

11  seven.

12          (Recess taken.)

13          THE COURT: Okay. Are we ready to proceed?

14  I think we've gotten to Marie Bennett. Marie Bennett.

15          MR. STRAHAN: State will strike Ms. Bennett.

16          THE COURT: That's State's number four.

17          MS. JACK: Five.

18          MR. CHAMBLESS: Five.

19          THE COURT: Five, right.

20          Otto Keubler.

21          MR. STRAHAN: State will strike Mr. Keubler.

22          THE COURT: Number six.

23          Elizabeth Hunter.

24          MR. STRAHAN: State accepts Ms. Hunter.

25          MR. WESTFALL: What did you say?

**12**

1  MR. STRAHAN: State accepts Ms. Hunter.
2  MR. WESTFALL: Defense accepts Ms. Hunter
3  also.
4  THE COURT: Okay. That's Juror number --
5  MS. JACK: 4.
6  THE COURT: 4.
7  Sarah Roberson.
8  MR. STRAHAN: State will strike Ms. Roberson.
9  THE COURT: William Woolf.
10  MR. STRAHAN: State accepts Mr. Woolf.
11  MR. WESTFALL: Defense will strike Mr. Woolf,
12  Your Honor.
13  THE COURT: That's Defense number eight.
14  MS. JACK: Yes.
15  THE COURT: Harold Buckner.
16  MR. STRAHAN: State accepts Mr. Buckner.
17  MR. WESTFALL: And Defense will strike
18  Mr. Buckner.
19  THE COURT: Defense nine.
20  Thomas Hatch.
21  MR. STRAHAN: State accepts Mr. Hatch.
22  MR. WESTFALL: And the Defense will accept
23  Mr. Hatch.
24  THE COURT: He's Juror No. 5.
25  Carolyn Strom.

**13**

1  MR. STRAHAN: State accepts Ms. Strom.
2  MR. WESTFALL: And the Defense will accept
3  Ms. Strom, Your Honor.
4  THE COURT: Juror No. 6.
5  Phillip Hurlburt.
6  MR. STRAHAN: State accepts Mr. Hurlburt.
7  MR. WESTFALL: Defense will strike Phillip
8  Hurlburt.
9  MR. STRAHAN: Judge, can we have just a
10  couple more minutes, see how things have gone, so we can
11  discuss, please.
12  MR. WESTFALL: I imagine y'all were frankly
13  shocked that I struck Mr. Hurlburt.
14  (Off the record.)
15  (Recess taken.)
16  THE COURT: Okay. Margarita Sanderford.
17  MR. STRAHAN: State accepts.
18  MR. WESTFALL: Defense accepts.
19  THE COURT: Derek Kimes.
20  MR. STRAHAN: State will strike Mr. Kimes.
21  THE COURT: State's number eight, right?
22  MS. JACK: That's what I have, Judge.
23  THE COURT: Gary Jordan.
24  MR. STRAHAN: State accepts.
25  MR. WESTFALL: Defense will strike

**14**

1  Mr. Jordan, Your Honor.
2  THE COURT: Defense number 11.
3  Robert Hansen.
4  MR. STRAHAN: State will strike Mr. Hansen.
5  THE COURT: State's number nine.
6  Taylor Ward.
7  MR. HEISKELL: Wait. Hold on.
8  MR. WESTFALL: No, no, no.
9  THE COURT: Do y'all need a time-out?
10  (Sotto voce discussion.)
11  MS. JACK: Call the time-out.
12  MR. WESTFALL: Do you need a time-out?
13  MR. HEISKELL: No, no, we're fine.
14  THE COURT: We're okay. Taylor Ward.
15  MR. STRAHAN: State will accept Mr. Ward.
16  MR. WESTFALL: Defense will accept Mr. Ward,
17  Your Honor.
18  THE COURT: He's Juror No. 8.
19  Shelby Collins.
20  MR. STRAHAN: State will strike Mr. Collins.
21  THE COURT: State's number 10.
22  Ricky Martin.
23  MR. STRAHAN: State accepts Mr. Martin.
24  MR. WESTFALL: Defense will strike
25  Mr. Martin, Your Honor.

**15**

1  THE COURT: Defense number 12.
2  Jackey or -- Jackey Underwood.
3  MR. STRAHAN: State will accept
4  Mr. Underwood.
5  MR. WESTFALL: And the Defense will accept
6  Mr. Underwood as well.
7  THE COURT: Juror No. 9.
8  James Hudson.
9  MR. STRAHAN: State will accept Mr. Hudson.
10  MR. WESTFALL: The Defense will strike
11  Mr. Hudson.
12  THE COURT: Defense number 13.
13  Debbie Perkins.
14  MR. STRAHAN: State will accept Ms. Perkins.
15  MR. WESTFALL: Defense will strike
16  Ms. Perkins, Your Honor.
17  THE COURT: Defense number 14.
18  John Weeden.
19  MR. STRAHAN: State will strike Mr. Weeden.
20  THE COURT: State's number 11.
21  Holly Vest.
22  MR. STRAHAN: State will strike Ms. Vest.
23  THE COURT: Are we sure?
24  MR. STRAHAN: Yes.
25  THE COURT: Curtis Coston.

**16**

1    MR. STRAHAN: State will accept Mr. Coston.
2    MR. WESTFALL: And we'll strike Mr. Coston,
3 Your Honor.
4    THE COURT: You've used your last strike,
5 strike on Mr. Coston.
6    MR. WESTFALL: I think it was well used.
7    THE COURT: Okay. Lina Villania.
8    MR. STRAHAN: State will strike her.
9    THE COURT: State's number 13.
10   Ira Buckley.
11   MR. STRAHAN: State will strike her.
12   THE COURT: State's number 14.
13   MR. HEISKELL: Your Honor, we are gonna
14 request a hearing on this Ira Buckley Nugent pursuant to
15 35.261, Batson v. Kentucky as well.
16   THE COURT: Okay. That was our -- who are we
17 talking about? That's --
18   MR. HEISKELL: That's Ira Buckley Nugent.
19   THE COURT: Okay. Okay. I guess we need to
20 do that right now.
21   MR. HEISKELL: Yes, sir.
22   THE COURT: What number was she when we
23 talked to her?
24   MR. HEISKELL: She was No. 126.
25   THE COURT: Okay.

**17**

1    MR. HEISKELL: Your Honor, I will begin by
2 noting that Ms. Ira Buckley Nugent is of African-American
3 ethnicity, in addition, she is a female. The State has
4 exercised one of its peremptories as to Ms. Nugent, and we
5 deem that under Article 35.261, that is race based, as
6 well as under Batson v. Kentucky, gender based as well, so
7 a combination of race and gender base with regard to these
8 exercise of peremptory as to Ms. Nugent. And we're asking
9 the Court to inquire as to whether there exists any race
10 neutral grounds for the exercise of a peremptory on the
11 part of the State.
12   THE COURT: Okay. State has the burden at
13 this point.
14   MS. JACK: We deny specifically that this
15 strike was made based upon her race. And I will point out
16 to the Court just to remind the Court of this, at the
17 conclusion when we challenged her for cause, that the
18 court found on the record that this had nothing to do with
19 race at the time we challenged her for cause.
20   The reasons that she was challenged for
21 cause, specifically with regard to her questionnaire,
22 number one, she initially checked "while she generally
23 favored the death penalty", she went back and scratched it
24 and then she indicated than she had no specific views
25 about the death penalty; as well as the back page, page 25

**18**

1 of the questionnaire, when she was asked in the very last
2 question, "Do you want to serve as a juror in this case?",
3 she indicated "no", that she would be "afraid to know that
4 I would be a part of a death penalty sentence if that
5 person was convicted."
6    In the course of her questioning, she
7 indicated, number one, she did not want to be a part of a
8 trial in which a death penalty was a possible punishment,
9 and, in fact, she indicated in her questioning by the
10 State that she would not participate and ever vote in such
11 a way that a death penalty would be returned. She had a
12 hesitation about a non-killer getting the death penalty,
13 and then, in fact, she said that she could not return a
14 death penalty against someone who was not the actual
15 killer. She went on to indicate that the reasoning behind
16 this was her father's passing, and that -- that losing him
17 as she did and that being the end of his life and closing
18 the chapter would affect her beliefs about death and the
19 finality of such a decision and those would color her
20 decisions with regard to the death penalty.
21   She said repeatedly that she could not vote
22 in such a way that the Defendant would get the death
23 penalty, and that was true whether he was the actual
24 killer, a party, or a coconspirator. And those are all
25 laws upon which the State was entitled to rely. We

**19**

1 challenged her at the time and that challenge was denied.
2    MR. HEISKELL: Your Honor, first of all,
3 Miss -- the State's proffer regarding Ms. Nugent having
4 checked her questionnaire on the back page 25 that she
5 would be hesitant in sitting on the Jury of this nature
6 because it does involve the death penalty, is the same
7 answer given by Juror No. 6, who State did not exercise a
8 peremptory, Carolyn Strom, who indicated on the back page
9 that if she's chosen, she did not want to serve, if
10 chosen, she'll do her duty, however, it would be hard to
11 condemn a man to death. So that was a similar answer that
12 she had given.
13   In addition, we had a number of jurors who, I
14 think the record would reflect, indicated they initially
15 struck out one of the answers to the death penalty
16 question and then checked another box. That was certainly
17 nothing out of the ordinary from the standpoint of looking
18 at other jurors' questionnaires. However, she did
19 indicate that she could follow the law. She could impose
20 a death penalty if the law and the facts presented
21 themselves to that degree.
22   She was repeatedly asked by myself when --
23 during the process of rehabilitating her that she, in
24 fact, understood the law of parties. I would certainly
25 note that when the State first broached that topic with

**20**

1   her, the law of parties had not, at that time, been fully
2   explained. And when later given the full explanation as
3   to how the law of parties operates under 702 (a) and (b),
4   that she said she could, she understood the law, could
5   follow the law.
6         We think that she is well qualified, that she
7   deserves to be a member of this Jury, and simply because
8   that she had answered in a somewhat equivocating fashion
9   initially but later firmed up her answers and indicated
10  she could follow the law and impose a death sentence
11  certainly does not rise to the level of a race neutral
12  reason that the State has proffered at this point.
13        MS. JACK: May I -- may I supplement the
14  record, Your Honor?
15        THE COURT: Okay.
16        MS. JACK: Also in addition to that, while
17  that is true she initially expressed her opinions and her
18  reservations and her inability to participate in returning
19  a death sentence prior to my explanation of law, we then
20  went through a lengthy explanation of the law. I showed
21  her the actual law with regard to someone being the
22  primary killer acting alone, the law with regard to
23  parties, and the law with regard to conspiracy. And her
24  answers did not change. In fact, they became stronger
25  when we discussed the fact that someone who was not an

**21**

1   actual killer could receive the death penalty.
2         In addition to that, her son was prosecuted
3   for the offense of burglary of a habitation, and that is
4   the type of law that makes this case capital murder. In
5   addition, her son was not only prosecuted, her son was
6   prosecuted for the same type of law upon which the State
7   would be asking this Jury to convict this Defendant, but
8   he was prosecuted by this office, the Johnson County
9   District Attorney's office. So it's not any one
10  particular factor with regard to this venireman; it is a
11  -- it is the totality of her voir dire and her
12  questioning.
13        And I would add with regard to Ms. Strom's
14  questionnaire, what counsel for the Defense did not
15  include was that Ms. Strom said that she generally favored
16  the death penalty, which is in complete contradiction to
17  what Ms. Buckley Nugent said. And as a whole, looking at
18  Ms. Strom's questionnaire as compared to Ms. Buckley's
19  questionnaire, Ms. Strom's questionnaire indicates a much
20  higher degree of holding people accountable and a higher
21  degree of personal responsibility and a much more
22  conservative viewpoint than Ms. Buckley Nugent.
23        And in addition, Ms. Strom did not have any
24  family members that were prosecuted or were prosecuted by
25  this office. And in addition, Ms. Strom is married to a

**22**

1   D/FW airport police officer.
2         And so we think that as a total, Ms. Strom's
3   questionnaire is a much more desirable juror than the
4   totality of the questionnaire of Ms. Buckley Nugent's
5   questionnaire.
6         MR. HEISKELL: To respond to the latter
7   argument, Your Honor.
8         THE COURT: Okay.
9         MR. HEISKELL: The State has also chosen to
10  accept and not exercise a peremptory as to Jackey
11  Underwood, who has a brother prosecuted for pulling a gun
12  on a police officer, also for aggravated assault with a
13  deadly weapon.
14        Ms. Buckley had indicated that she had
15  totally separated from her son, a very difficult decision,
16  distanced herself from him from the standpoint of what he
17  had done, that it was a hard decision but something that
18  had to be done vis-a-vis tough love, if you will, from her
19  standpoint. She -- the rest of her questionnaire was very
20  conservative from the standpoint from her answers given to
21  all the questions propounded to her, so I see no
22  distinction between her answers to the questionnaire, her
23  relationship with a relative who has been prosecuted, when
24  we have the State already accepting one person similarly
25  situated. And we, again, would urge the Court to sit

**23**

1   Ms. Buckley Nugent.
2         THE COURT: Okay. As I recall, I think
3   didn't she have a son in prison even at this time?
4         MS. JACK: Yes, Your Honor.
5         MR. HEISKELL: That one was in prison,
6   Judge. That's the one that she --
7         THE COURT: That's the one she separated
8   from, but he's in prison right now?
9         MR. HEISKELL: Yes.
10        MS. JACK: Yes, Your Honor. And I would also
11  add that Mr. Underwood's questionnaire, he indicated
12  likewise that he generally favored the death penalty. And
13  when asked to explain his answer, he indicated that each
14  case was different, and that you have to take each one on
15  a case-by-case -- or on its merit. And so his
16  questionnaire as a whole was a much more conservative
17  questionnaire than Ms. Buckley Nugent's.
18        THE COURT: Okay. I recall Ms. Nugent and --
19  or Ms. Buckley. And she was very, not only very hesitant,
20  she several, several times said she could not vote for the
21  death penalty, but she was rehabilitated on Cross. I
22  think there's lots of reasons the State would exercise a
23  challenge to her, so I'll deny the -- I will find it's not
24  based, race or gender related, the strike. I'll deny the
25  motion.

STATE VS. MARK ANTHONY SOLIZ - PROSKE

**Page 24**

1    MR. WESTFALL: Your Honor, the way I see it
2  with Ms. Buckley Nugent, that's the State's 14th strike.
3    THE COURT: Okay.
4    MR. WESTFALL: Is that correct?
5    THE COURT: Yeah.
6    MR. WESTFALL: Okay.
7    THE COURT: Okay. Margo O'Connor.
8    MR. STRAHAN: State accepts Ms. O'Connor.
9    MR. WESTFALL: We'll accept her, Your Honor.
10    THE COURT: Is that No. 10.
11  John York.
12    MR. STRAHAN: State accepts Mr. York.
13    MR. WESTFALL: We'll accept him, Your Honor.
14    THE COURT: 11. Conger.
15    MR. STRAHAN: State accepts Ms. Conger.
16    MR. WESTFALL: We'll accept her also, Your
17  Honor.
18    THE COURT: Okay. That's our Jury. So at
19  this point, we'll go with the alternates.
20  Wanda Davis.
21    MR. WESTFALL: Starts at 43?
22    THE COURT: Yeah.
23    MR. WESTFALL: All right.
24    MR. STRAHAN: We each have one strike; is
25  that correct?

**Page 25**

1    THE COURT: Right.
2    MR. STRAHAN: To seat two?
3    THE COURT: To seat two.
4  Does State accept Ms. Davis?
5    MR. STRAHAN: No, sir, State will strike
6  Ms. Davis.
7    THE COURT: Ricky Totsch. State doesn't have
8  a strike.
9    MR. WESTFALL: We'll accept him, Your Honor.
10    THE COURT: Okay. He's Alternate No. 1.
11  Michael Castles. They don't have a strike.
12    MR. WESTFALL: We will -- we will strike
13  Mr. Castles.
14    THE COURT: So Brandon Lockwood is our
15  Alternate No. 2.
16    MR. WESTFALL: Yep.
17    THE COURT: Okay. Let me call the names,
18  make sure we're on the same page, we've got the same
19  people down as Jurors. Everybody ready for that?
20    MS. JACK: I'm sorry, Judge?
21    THE COURT: I'm gonna call the names of the
22  people I think are on the Jury.
23  Roger Collins, Robert Yubeta, Diania Rogers,
24  Elizabeth Hunter, Thomas Hatch, Carolyn Strom, Margarita
25  Sanderford, Taylor Ward, Jackey Underwood, Margo O'Connor,

**Page 26**

1  John York, Marilyn Conger, with her dental problems.
2  And first alternate will be Ricky Totsch.
3  Second alternate will be Brandon Lockwood.
4  Everybody agree with those?
5    MR. WESTFALL: Defense agrees, Your Honor.
6    MR. HANNA: Agree.
7    MR. STRAHAN: Yes, sir.
8    THE COURT: Okay. The plan now is to bring
9  them in, and I'll just call their names and have these
10  people sit in the jury box. I won't call them in order.
11  I'll call the first -- the -- I guess I'll start No. 7,
12  call the bottom seven.
13  (Off the record.)
14  (Venire panel present.)
15    THE COURT: Okay. I'm gonna call the names,
16  I'm gonna call 14 names for the Jury. And when I call
17  your name, if you'll have a seat in the jury box.
18  Margarita Sanderford, Taylor Ward, Jackey
19  Underwood, Margo O'Connor, John York, Marilyn Conger,
20  Ricky Totsch, Michael Castles --
21    MR. WESTFALL: Your Honor. Your Honor.
22    THE COURT: Wait, wait. No. I'm sorry, not
23  Michael Castles. I'm sorry.
24  Brandon Lockwood, Roger Collins, Robert
25  Yubeta, Diania Rogers, Elizabeth Hunter, Thomas Hatch,

**Page 27**

1  Carolyn Strom.
2  Okay. I'll be with y'all in just a minute.
3  First off, does the State or Defense have a
4  reason not to release the remaining jurors?
5    MR. HANNA: No, sir.
6    MR. WESTFALL: No, Your Honor.
7    THE COURT: Okay. Ladies and gentlemen, I'm
8  about to release you. You are excused from this case.
9  All the instructions you've received, you're released
10  from. You can talk to what -- whoever you want to about
11  the case. You are released. We appreciate it very much.
12  Y'all all did a great job, and we thank you for coming in
13  and coming in today. So with that, you're released.
14  (Venire panel excused.)
15    THE COURT: Okay. Ladies and gentlemen, you
16  are on the Jury at this point. I'm gonna release y'all.
17  The trial is gonna start -- Judge Bosworth walked out, but
18  I believe it's 9:00 next Monday.
19    THE SHERIFF: Yes, sir, 27th.
20    THE COURT: 9:00, Monday, the 27th. And
21  before you leave, we're gonna show you, the Sheriff is
22  gonna show you where -- where you go next Monday, where
23  you meet and where you come in. All that -- you're still
24  bound by all the instructions the Court has given you at
25  this point. I'll give you a few of them. Whatever you

1    do, don't talk to anybody about the case.  This -- y'all
2    are the ones that are gonna hear the evidence in the case,
3    so don't look up anything, don't do any research of any
4    kind.  It may be in the media some way.  Don't watch it,
5    don't listen to it, don't let anybody tell you what was
6    said.
7              And with that, I guess you will be told where
8    to park and that kind of thing.
9              THE SHERIFF:  Yes, sir.
10             THE COURT:  Okay.  Either side have any
11   additional instructions they're requesting?
12             MR. HANNA:  No, sir.
13             MR. HEISKELL:  No, Your Honor.  Thank you.
14             THE COURT:  Okay.  We thank you very much,
15   and we'll see y'all or the Judge will see y'all next
16   Monday at 9:00.  He'll show y'all where to go, where the
17   jury room is gonna be.
18             (Court adjourned.)
19
20
21
22
23
24
25

```
 1  THE STATE OF TEXAS )

 2  COUNTY OF JOHNSON  )

 3              I, Pamela K. Waits, Official Court Reporter

 4  in and for the 413th District Court of Johnson County,

 5  State of Texas, do hereby certify that the above and

 6  foregoing contains a true and correct transcription of all

 7  portions of evidence and other proceedings requested in

 8  writing by counsel for the parties to be included in the

 9  volume of the Reporter's Record, in the above-styled and

10  numbered cause, all of which occurred in open court or in

11  chambers and were reported by me.

12              I further certify that this Reporter's Record

13  of the proceedings truly and correctly reflects the

14  exhibits, if any, admitted by the respective parties.

15              WITNESS MY OFFICIAL HAND this the 31   day

16  of  December  , 2012.

17

18              _____
                Pamela K. Waits, Texas CSR #4991
19              Expiration Date:  12/31/13
                Official Court Reporter
20              413th Judicial District
                Johnson County, Texas
21              204 S. Buffalo Avenue
                Cleburne, Texas 76033
22              (817) 556-6041

23

24

25
```

REPORTER'S RECORD

VOLUME 37 OF 75 VOLUMES

TRIAL COURT CAUSE NO. F45059

COURT OF CRIMINAL APPEALS NO. AP-76,768

| | | |
|---|---|---|
| STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| VS. | ) | JOHNSON COUNTY, TEXAS |
| | ) | |
| MARK ANTHONY SOLIZ | ) | 413TH JUDICIAL DISTRICT |

------------------------------------------------------------

DEFENDANT'S MOTION FOR CONTINUANCE

------------------------------------------------------------

On the 24th day of February, 2012, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable William C. Bosworth, Jr., Judge presiding, held in Cleburne, Johnson County, Texas:

Proceedings reported by Machine Shorthand and Computer-Aided Transcription.

ORIGINAL

```
 1                    A P P E A R A N C E S

 2   DALE HANNA
     SBOT NO. 08919500
 3   LARRY CHAMBLESS
     SBOT NO. 04086320
 4   MARTIN STRAHAN
     SBOT NO. 00797765
 5   District Attorney's Office
     Johnson County
 6   204 S. Buffalo
     Cleburne, Texas 76033
 7   (817) 556-6801

 8   ATTORNEYS FOR THE STATE OF TEXAS

 9
     MICHAEL P. HEISKELL
10   SBOT NO. 09383700
     Johnson, Vaughn & Heiskell
11   5601 Bridge Street
     Suite 220
12   Fort Worth, Texas 76112-2305
     817-457-2999
13
     GREGORY B. WESTFALL
14   SBOT NO. 00788646
     Hill Gilstrap, P.C.
15   1400 W. Abram Street
     Arlington, Texas 76013
16   817-276-4931

17   ATTORNEYS FOR DEFENDANT

18

19

20

21

22

23

24

25
```

```
 1                         I N D E X

 2                      VOLUME 37

 3          DEFENDANT'S MOTION FOR CONTINUANCE

 4  FEBRUARY 24, 2012                      PAGE      VOL.
```

```
 5  Proceedings.................................  4       37

 6  Defendant's Motion for Continuance..........  4       37

 7  State's Response............................  9       37

 8  Defendant's Response........................ 13       37

 9  State's Final Response...................... 16       37

10  Court's Recommendations..................... 17       37
```

```
11  DEFENDANT'S WITNESS      DIRECT        CROSS        VOIR    VOL.
                                                       DIRE
12  MICHAEL GAUDET             32           47                   37
    TROY FULLER                51           --                   37
13  BOB ALFORD                 55           --                   37
```

```
14  Court's Rulings............................. 66       37

15  State's Response to Court's Inquiry......... 67       37

16  Defendant's Final Response.................. 69       37

17  Court Adjourned............................. 72       37

18  Court Reporter's Certificate................ 73       37
```

```
19

20

21

22

23

24

25
```

STATE VS. MARK ANTHONY SOLIZ - FEBRUARY 29, 2012

**Page 4**

1    P R O C E E D I N G
2         (Defendant not present.)
3         THE COURT: F45059, State verses Mark
4    Anthony Soliz. The State's attorneys are present. The
5    Defense attorneys are present. The Defendant is not
6    present. In front of me is the Defendant's Motion for a
7    One Month Continuance of Trial.
8         Do you wish to present your motion?
9         MR. HEISKELL: Yes, Your Honor. Judge --
10        THE COURT: First off, do you wish to -- to
11   have your client here? I can have this motion --
12        MR. HEISKELL: No, we do not, Your Honor.
13   I will represent to the Court that we do waive Mr.
14   Soliz's presence for this hearing. Obviously there are
15   some security concerns that the Court has, and in order
16   to facilitate this motion, we certainly would waive his
17   presence so that we can have the Court address this issue
18   immediately.
19        THE COURT: All right.
20        MR. HEISKELL: When the motion was filed,
21   Judge, yesterday, I think it, for the most part, speaks
22   for itself as to the status of discovery. However, after
23   I filed the motion yesterday, we received some additional
24   information that I did not have at the time that I filed
25   the motion.

**Page 5**

1         Number one, let me preface that by saying
2    that the motion addresses the apparently surreptitious
3    recording of the polygraph examination between Jose
4    Clemente Ramos, Jr., the co-defendant in this case, and
5    Richard Woods, the polygrapher out of the Tarrant County
6    area, Arlington, Pantego.
7         I have, since that time, discovered as well,
8    we, through an independent source, that there have been
9    some type of recordings of attorney/client matters.
10        And I will ask co-counsel, Mr. Westfall,
11   to divulge that information to the Court in a little
12   more detail, but that certainly has caused us some
13   concerns.
14        Greg, do you want to talk about what you
15   heard.
16        MR. WESTFALL: Sure. I have a -- a lawyer
17   in my office who is good friends with Richard Wood and
18   happened to be with him last night, and he came back to
19   the office to get his cell phone, and said Richard was
20   talking not only about the Johnson County Sheriff's
21   Department surreptitiously, without his knowledge and
22   without Ramos's knowledge, recording the -- the
23   polygraph, but also there had been some recording or
24   recordings made of attorney/client communications between
25   Ramos and one of his lawyers.

**Page 6**

1         My -- my -- the lawyer in my office was
2    under the impression it had been us and our client that
3    had been recorded when he told me the story, but
4    obviously something else has happened there. And if
5    this -- if this -- if this recording occurred at the
6    jail, then, you know, there's no reason to believe that
7    it didn't -- that there hadn't been recordings made of us
8    and our client as well.
9         And, you know, we had originally gotten all
10   these evaluations from experts and whatnot under seal,
11   and suddenly, you know, the orders show up in the
12   Prosecutors' hands. This sheriff, whoever he is, feels
13   at liberty to surreptitiously record phone conversations
14   and thereby -- or surreptitiously record conversations
15   without -- you know, two-party conversations without any
16   sort of legal ability to do so. In fact, he may have
17   committed a felony. And there's just no reason to
18   believe that we haven't been subject to the same thing,
19   whether back here in the holder or over at the jail, and
20   our experts as well, which would also be covered by the
21   attorney/client privilege.
22        We need to -- we need to find out what has
23   been done, what has been recorded. And it casts a new
24   light also on the orders being handed over and whatnot.
25   It's something we need to discover, Your Honor, and we

**Page 7**

1    just -- we need some time to do that.
2         MR. HEISKELL: Let me follow up on the order
3    matter. I think I may have brought this to the Court's
4    attention last fall. Martin Strahan, in his ethical duty
5    and obligation, immediately contacted me when the sealed
6    orders had been delivered to his office by the Sheriff's
7    Department. And he did the right thing in doing so,
8    contacted me, sent me a letter. And I believe I
9    addressed it with the Court briefly, and at that time did
10   not consider it anything intentional as I think I may
11   have characterized it as inadvertent, as did Martin.
12        However, in light of all this, Judge, that
13   certainly gives me pause and concern as to what my
14   co-counsel has stated, what recordings existed, what were
15   the circumstances, who was involved, who may have
16   sanctioned it or at some level approved it so that that
17   happened with Mr. Ramos and his counsel, and we have a
18   concern as to whether that has happened with us.
19        So we're asking the Court at this point
20   to convene an investigation or have an investigation
21   be conducted as to the activities of the Sheriff's
22   Department which led us to this point wherein we have a
23   surreptitious recording not only of a co-defendant but
24   the -- and the polygrapher, but a co-defendant and his
25   counsel, and whether that net has been cast that may

**8**

1  have included us as well as our experts during the
2  course of this pretrial matters.
3          So for that reason, in addition, Judge,
4  we ask that this matter be continued so that that
5  investigation can be undertaken to insure that the
6  sanctity of the attorney/client privilege and
7  confidential communications has not been violated as
8  well as to provide us adequate time to explore whether
9  any further investigation or perhaps a court of inquiry
10 be convened for the officer who apparently from on its
11 face violated the Penal Code by undertaking such
12 recording.
13          MR. WESTFALL:  And, Your Honor, one other
14 thing.  I mean, from what we're hearing and what we
15 suspect, I mean, this was not some, you know, brand new
16 deputy that did this.  This is somebody up in the
17 command, somebody in management in the office.  And if
18 that occurred, then, I mean, the first thing we need to
19 do is be able to investigate it, but then, I mean, if
20 there are criminal offenses that have been committed by
21 the command over in the Johnson County Sheriff's Office,
22 I don't think the Johnson County Sheriff's Office would
23 even be the appropriate agency to investigate felonious
24 conduct or possible felonious conduct on behalf of the
25 management.  So we might have to -- you know, first step

**9**

1  is to really see exactly what happened.  Second step may
2  be to speak with the Texas Rangers, or as he suggested,
3  ask the Court to conduct an inquiry.
4          THE COURT:  Did you intend to swear to your
5  Motion for Continuance?
6          MR. WESTFALL:  I thought we did, Your
7  Honor.  Isn't it verified?
8          MR. HEISKELL:  Yes, it is, Judge.
9          THE COURT:  It doesn't actually say who
10 subscribed and swore to.
11          MR. WESTFALL:  Oh, yeah, I see.
12          MR. HEISKELL:  Yes, we do, Judge.  I swear to
13 the motion.
14          THE COURT:  Response.
15          MR. HANNA:  Well, Judge, speaking to the --
16 to the comments from Counsel about possible surreptitious
17 recordings of Mr. Soliz and his attorney, I don't know
18 anything about that.  I don't -- I don't have any reason
19 to believe that that's the case.  I don't know anything
20 about that, have no reason to believe that anything like
21 that ever occurred.
22          I'm gonna try to outline, as best I can for
23 the Court's knowledge, what I think has happened with a
24 unauthorized recording of the polygraph between the
25 co-defendant of Mr. Soliz, Mr. Ramos, and the

**10**

1  polygrapher, Richard Woods.
2          As I understand the facts that happened
3  about the last part of November of 2011, a polygraph was
4  scheduled by defense attorney Bill Mason who represents
5  Mr. Ramos in this county on the capital murder indictment
6  that is the -- as I said, he's co-defendant of Mr.
7  Soliz.
8          Richard Woods, on behalf of Bill Mason,
9  comes down to the Administration Building of the Johnson
10 County Sheriff's Office for the purpose of administering
11 a polygraph to Mr. Ramos.  Mr. Mason schedules it.  My
12 belief is this is what happened, Judge.  Mr. Ramos was
13 put in a room.  He was waiting for the polygrapher,
14 Richard Woods, to arrive.  When he was put in a room,
15 because of the scrutiny on this particular case and
16 because of the questions about Mr. Ramos's conduct in
17 the jail, because it's a capital murder case, in their
18 monitoring system in the Administration Building, in
19 order for someone to view Mr. Ramos on a TV monitor as
20 he is sitting in a jail, they had to activate and put
21 in a DVD recording device where they could watch
22 Mr. Ramos.
23          Well, Mr. Woods arrives, goes into the
24 room.  The polygraph is administered.  And when it's
25 over, this recording, if there -- if it is a recording,

**11**

1  it's taken out.  It is then sealed with nobody ever
2  looking at it.  And it is now in the Johnson County
3  Sheriff's Department under seal and nobody has ever
4  seen it.  Not -- at least that's what was represented
5  to me, not the Sheriff's Department, not the defense
6  attorney, not the polygrapher, not the State's
7  attorneys.  And it is sitting there right now,
8  unsealed -- unlooked at.
9          The Sheriff's Department employee that did
10 this is Mike Gaudet.  It is my understanding that there
11 was no attempt to really record it, but he had to
12 activate this device in order to view Ramos sitting in
13 the chair before the polygrapher got there, for security
14 purposes.
15          The State's position at this point in time,
16 Judge -- and we've had conversations with Bill Mason
17 yesterday, who is Mr. Ramos's attorney, and also had
18 conversations with Richard Woods.  Richard Woods informed
19 me when I talked to him that sometimes he does himself
20 record video, these polygraph examinations, but he did
21 not do that on that particular day.
22          It's the State's positions here regarding
23 that particular videotape, we haven't looked at it and
24 it is not something we are entitled to have.  We would
25 advocate that that tape probably needs to be given to

**12**

1  Bill Mason and/or his agent, Mr. Woods, because we don't
2  have anything to do with it. We're not entitled to have
3  it. And whatever investigation needs to be conducted on
4  that issue, that's fine. We can conduct one. I question
5  whether there was any intent on behalf of Gaudet with the
6  Sheriff's Department to record this as opposed to monitor
7  Mr. Ramos's conduct, but that may be a decision for
8  another day.
9          Now, regarding the continuance here, the
10  State does oppose a one-month continuance. We've got a
11  Jury selected. We are ready to go Monday morning at
12  9:00. I do understand, you know, what they're asking
13  for. As far as a short delay, that's a matter for the
14  Court, but we are definitely opposed to the one month.
15          And these other matters in the motion,
16  Judge, these DVDs that were delivered to them, and the
17  witness list, the DVDs contain conduct on videotape of
18  Mr. Ramos that occurred -- excuse me, thank you --
19  Mr. Soliz that occurred in the last few days during the
20  jury selection process. So that's something we're just
21  getting to them that we couldn't get to them before that
22  happened in the last several days. And the amended
23  witness list that they make mention of in the motion adds
24  some ancillary witnesses, chain of custody things, that
25  kind of thing, that are way down the list as far as

**13**

1  significance.
2          So that's where we are on this whole matter.
3          MR. HEISKELL: Well, Your Honor --
4          Were you finished?
5          MR. HANNA: Yes.
6          MR. HEISKELL: Your Honor, with regard to --
7  and I'm not exactly clear, Mr. Hanna has indicated that
8  no one has seen this videotape that's in Johnson County
9  possession. Jose Ramos, we've been tendered a proffer
10  agreement that the State has executed with him. They've
11  indicated at least at this point that he -- and he's on
12  the witness list as to being a State witness and, of
13  course, would be a principle witness if called by the
14  State regarding the conduct of the Defendant and the
15  alleged crimes committed. And we certainly would need
16  to obtain that copy of the tape recording, however long,
17  I'm not exactly sure how long that exists, of that
18  polygrapher examination, in order to determine whether
19  any Brady material exists concerning inconsistent
20  statements he would have given during the course of
21  that.
22          In addition, we've been tendered a
23  approximately four-hour interview that the District
24  Attorney's office conducted with Mr. Ramos sometime last
25  fall as well. On top of that, we have his recorded

**14**

1  statements that the Court heard reference at least during
2  the course of the Motion to Suppress held earlier this
3  year. So we have an abundance of recordings that exist
4  already with Mr. Ramos. And we certainly would need to
5  have our hands on that recording as well to insure that
6  our Brady obligations have been met by the State and
7  provide that information to us since the State has
8  constructive possession and custody of that information,
9  and that we explore that purpose as well.
10          So we certainly need time now that we have
11  gone through this tape recordings to now look at this
12  other recordings to compare it against the two long
13  versions, if you will, of recordings that already we have
14  in our possession. And certainly that would give rise to
15  us needing that additional time to, first of all,
16  retrieve it, and then go back to compare as to what was
17  being stated to the other recordings that I just
18  referenced.
19          MR. WESTFALL: Your Honor, may I add one
20  other thing for the record. And these are my only copies
21  of these, so I'm gonna have to, once I explain them, come
22  up and just kind of let you see them. What I do is when
23  I download from the ECFS system in Tarrant County, the
24  first thing I do is I run off a copy of the -- of all of
25  the entries as they exist on the day that I download

**15**

1  them. And then I download them and compare to the prior
2  list to see what's new and what's not, so I don't
3  download them twice.
4          In this case, I downloaded on the 29th of
5  April, the 31st of August, the 18th of November, the 29th
6  of December, and yesterday, the 24th of February. The
7  things that are highlighted are the things that are new
8  since the 29th of December. And the way that the ECF
9  system works is the date that's over here to the right
10  side -- and I'll bring all those up in one second -- that
11  is the date that they were uploaded, not the date that it
12  was turned on so the Defense could see it. So there's
13  actually some things in here that predate, in fact,
14  there's some things that are here from 30 August of 2011,
15  you know, and April of 2011 that were just turned on so
16  that we could see them sometime after December 29th.
17          It took a good two hours yesterday to
18  download all of the new stuff. And, of course, that is
19  kind of what we were talking about in the motion in terms
20  of things just kind of trickling in. Some of this stuff
21  they will have given to us already. They were, as we
22  went through voir dire, they were giving us hard copies
23  of stuff every once in a while, but we're not gonna know,
24  obviously, till we look at it. So this is the -- this is
25  the new things. And if I -- if you want, Your Honor, I

**16**

1 can just approach and hand these to you and then make
2 copies and put them in the record if the Court wants that.
3 THE COURT: Do you want to mark them?
4 MR. WESTFALL: I'm sorry, Your Honor?
5 THE COURT: Do you want to mark them?
6 MR. WESTFALL: Sure.
7 THE COURT: To put them in the record.
8 MR. WESTFALL: Your Honor, for purposes of
9 this hearing, I'll offer Defendant's Exhibits A. through
10 E. They're just printouts from the ECF system.
11 (Pause in proceeding.)
12 (Sotto voce discussion.)
13 THE COURT: Do you want to just put that on
14 hold for a minute?
15 MR. HANNA: Well, that's what I was asking
16 co-counsel here, Judge, if he needs some time to look at
17 those documents before we address those.
18 THE COURT: I mean, I can come back to the
19 documents. I had some other questions --
20 MR. HANNA: Yeah.
21 THE COURT: -- I want to ask, if that's
22 okay.
23 MR. HANNA: Yes, sir. And I was gonna say
24 one thing. Regarding Mr. Heiskell's comment about this
25 tape or recording, if that's what it is, of the

**17**

1 polygrapher and the co-defendant Ramos, the State really
2 doesn't have a position as far as whether they get it or
3 not. It doesn't make me any difference. The problem is
4 that that is work product between Mr. Mason and his
5 client, Mr. Ramos. I mean, that's the issue. That's the
6 crux of the issue. I don't care whether they get it or
7 not, one way or the other. The State has no position in
8 that.
9 THE COURT: Seems like we've split it into
10 three different areas. You have the basic things that
11 are brought up in the written motion. You've got the
12 question of what happened at Richard Wood's office with
13 regard to Ramos and some tape that may belong to Bill
14 Mason and his client. And then you have an allegation of
15 either a mistake and a bad intention or a criminal act by
16 the Sheriff's Department or somebody in the Sheriff's
17 Department with regard to recording things, which it was
18 phrased by Defense counsel as a potential criminal act.
19 In all likelihood, it's a inadvertent mechanical thing,
20 but for the record, that's not been established one way
21 or the other.
22 MR. HANNA: I understand that.
23 THE COURT: And somebody is gonna review
24 this case --
25 MR. HANNA: Sure.

**18**

1 THE COURT: -- potentially --
2 MR. HANNA: Sure.
3 THE COURT: -- later on. And there's --
4 that whole particular scenario has not been -- the
5 allegations raised and it has not been answered
6 evidentiary.
7 So here's the thing. I mean, I don't know
8 how to go ahead and -- the first thing would be to
9 satisfy Defense counsel as to what happened to -- what
10 happened at the Sheriff's Department in Johnson County,
11 Texas, with regard to recording things, whether or not
12 Defense counsel was recorded with Soliz, whether or not
13 there were other recordings and what exactly happened
14 with regard to what was recorded at Johnson County
15 Sheriff's Office, audio and visual, during their
16 meetings.
17 That could be accomplished by reconvening
18 in an hour with certain deputies and the Sheriff to
19 answer those questions right here, and Defense counsel
20 could question them under oath. We can have affidavits
21 entered in by the Prosecutor and the prosecution team
22 as to whether or not they've reviewed anything of that
23 matter.
24 And at the end of that deal, sometime this
25 afternoon if there are still questions that need to be

**19**

1 investigated or further investigations done, the Defense
2 counsel can tell me so. I don't know how else to fix
3 that right now. The only other thing to do would be to
4 call in a Texas Ranger to investigate that, and that
5 would take a couple months, you know, or at least a
6 month. I don't see that happening any faster than that.
7 The -- that seems to be the biggest handicap with moving
8 forward Monday is unless those questions are answered on
9 the record, I don't know what to do about that.
10 MR. HANNA: Judge, that's fine with us.
11 THE COURT: Do you have --
12 MR. HANNA: That's fine.
13 MR. HEISKELL: I'm sorry, Judge?
14 THE COURT: Well, with regard to the
15 allegations against the Johnson County Sheriff's Office.
16 MR. HEISKELL: I do, I agree, Judge, it
17 needs to be addressed somehow and put on the record as to
18 what has occurred or not occurred, for that matter as
19 well, and whether, as he referenced, it was inadvertent
20 or not. I guess that --
21 THE COURT: Do I have to have your client
22 here for a hearing like that or not?
23 MR. HEISKELL: Sir?
24 THE COURT: Do I have to have your client
25 here for that type of hearing?

**20**

1  MR. HEISKELL: Probably so, Judge, yes,
2  with a evidentiary hearing. This is kind of a -- not an
3  evidentiary hearing aspect. To have testimony, yes, sir,
4  we would have to have him here.
5  MR. HANNA: That's fine. I think that
6  sounds like a good idea, Judge. Let's get this sorted
7  out today and that way we know what we're doing.
8  THE COURT: Let me ask Defense counsel
9  about -- there is a good chance that the things that
10  you've raised, although they look suspicious from your
11  eyes and that you have to go through and investigate
12  and double check and make sure and rule out --
13  MR. HEISKELL: Yes, sir.
14  THE COURT: -- that there is no bad
15  behavior. It seems like the initial inquiry ought to
16  be, was there anything really devious that has happened
17  in this particular case. And that needs to be ironed
18  out. And you won't know until you cross-examine some of
19  these witnesses that you have in mind here and different
20  officers and the Sheriff and whatnot as to what happened
21  and when it happened. I can make that happen in short
22  order. We can reconvene here at 1:00 and we'll go till
23  we get to the bottom of it this afternoon.
24  And then there's the other question of
25  what to do about this other stuff. The problem with a

**21**

1  continuance for a couple of weeks is that you're gonna
2  end up potentially having the Jury deliberate over Good
3  Friday and Easter weekend, and I have reservations about
4  whether that's a good idea to request a Jury to do
5  something like that. It adds another dimension into a
6  case, that essentially with regard to Christians, that
7  adds just another wrinkle in there. I have reservations
8  about requiring a Jury to consider whether or not to
9  impose the death penalty over Easter weekend.
10  If you put it off until after Easter, the
11  9th or the 10th or somewhere in that range, you've got
12  14 unsworn Jury members at this particular point, and you
13  have another hundred-and-fifty or so questionnaires that
14  haven't been reviewed by the State. So if it comes to
15  that, that situation at the end of today, then it seems
16  to me that on Monday I would have to ask the original
17  14 whether or not they have any problems being here in
18  April, and to the extent that they do or don't, deal with
19  that, and then go back into jury qualification and pick
20  another 8 or 10 or 15 or 16 people.
21  MR. HEISKELL: Judge, if I may real
22  quickly interject something here. With regard to a
23  recess, if you will, or a continuance, that just
24  happened recently, it's not unprecedented, and I can
25  represent to the Court in a case in Tarrant County

**22**

1  tried last fall and continued here early winter, in
2  which the Jury was picked in November, as I recall, then
3  for whatever reason, asked to come back in January --
4  well, I do know the reason now because of some
5  evidentiary issues too -- come back in January to
6  continue, which they did. And they rendered a death
7  verdict about a month ago in the Kwame Rockwell case,
8  in which counsel Mark Daniel and Tim Moore requested
9  that continuance because the State had given them
10  recordings late in the day, in the game, so to speak.
11  And the Judge in that case did continue it.
12  Now, obviously it's different facts and
13  circumstances, different jury pool and different jurors.
14  But I certainly think that a continuance is warranted at
15  this point for this additional reason. If we come back
16  this afternoon, which I certainly would -- we would be
17  willing to do so to get this settled, so to speak, then
18  that takes us away, again, for a day, if you will, of
19  getting ready for that when we could be trying to
20  review some additional discovery and we have -- this is
21  an unprecedented case, Judge, I put in my motion and I
22  think --
23  THE COURT: I read the motion.
24  MR. HEISKELL: Sir?
25  THE COURT: I read the motion.

**23**

1  MR. HEISKELL: Yes, sir. So that kind
2  of sets us back from that standpoint, so we -- we do
3  need some additional time, Judge. But if -- we'll
4  certainly be prepared to come back this afternoon to
5  conduct this hearing with the deputies and whomever
6  else is involved.
7  THE COURT: Who would you need? Who would
8  you request to have here?
9  MR. HEISKELL: Well, Your Honor, first, of
10  course, is Mr. Mike Gaudet, the deputy.
11  THE COURT: Okay.
12  MR. HEISKELL: And I don't know at this
13  point. And perhaps Mr. Hanna's office or they can
14  determine who else may have been present during this
15  setup for the security for Mr. Ramos's polygraph, and
16  anyone else that may have been involved, but certainly
17  he is first and foremost.
18  THE COURT: I guess with regard to your
19  allegations, I would like to -- I would like some inquiry
20  today to rule in or rule out any bad behavior on the
21  department, Sheriff's Department. I just -- I'm really
22  highly suspect that they would do anything that's
23  improper or illegal. That doesn't -- it's not the
24  character that we have down here in our Sheriff's
25  Department that I know of. But that type of serious

24

1 allegation, we probably ought to inquire into that this
2 afternoon at 1:00.
3 So I want Sheriff Alford, I want Mr.
4 Soliz, and I want Mike Gaudet, and I want the Texas
5 Ranger in the courtroom if I can get him here, just to
6 listen. And we'll see what we can figure out. And if
7 there are other witnesses that are developed during
8 this time period --
9 MR. HANNA: Sure.
10 THE COURT: -- they are to be here.
11 MR. HANNA: I agree with the Court in that
12 regard. I do want to say a couple of things.
13 THE COURT: Yes, sir.
14 MR. HANNA: And I want to get this,
15 these allegations sorted out on this matter today so
16 that we know where we are. We're going to need, at
17 some point, Judge, to get Bill Mason here on behalf of
18 Mr. Ramos.
19 THE COURT: 1:00 is fine with me.
20 MR. HANNA: And I just bring that to the
21 Court's attention.
22 THE COURT: I appreciate that. And I would
23 like to iron out --
24 MR. HANNA: Yes, sir.
25 THE COURT: -- the issues with regard to

25

1 the irregularity, which is either an irregularity or an
2 unusual occurrence on one end of the spectrum, or an
3 illegal act on the other end. I think we're probably
4 over here in the unusual occurrence, irregular activity
5 or what have you, but I want to at least give the Defense
6 attorneys a chance to -- to make those inquiries this
7 afternoon. Those are serious allegations and I don't want
8 them festering out there.
9 MR. HANNA: I agree with the Court.
10 THE COURT: This type of thing, if we can
11 figure out what happened this afternoon, that limits the
12 amount of attention that this may get outside the
13 courthouse, then let's get that done --
14 MR. HANNA: Yes, sir.
15 THE COURT: -- at 1:00.
16 MR. HANNA: Yes, sir.
17 THE COURT: If you'll go make some phone
18 calls.
19 MR. HANNA: We can definitely make that
20 happen as far as our end, Judge. Can I address the Court
21 on --
22 THE COURT: Yes, sir.
23 MR. HANNA: -- the Texas Ranger situation,
24 getting a Texas Ranger assigned --
25 THE COURT: Takes months.

26

1 MR. HANNA: Well, this is what I'm saying,
2 Judge. Getting one assigned to listen to this or
3 investigate this or even be associated with this, it may
4 take some kind of a letter and a request. And I don't
5 know if -- normally, my experience has shown me that no
6 Ranger can be involved in, nor be directed to investigate
7 a public official or a law enforcement type official
8 unless the District Attorney writes a letter to the
9 Captain in Waco or Austin and say, yeah, we're gonna --
10 we'll prosecute this if a violation occurs. Then they're
11 gonna assign somebody, and it's probably not gonna be the
12 local Ranger.
13 So I bring that to the Court's attention
14 because I think we're fixing to have some problems in
15 that area. Now, you can obviously tell us to do what
16 we're gonna do. The Sheriff's Department, Judge, we
17 can have them here, no problem. We can hash this out.
18 I just don't know if we're gonna be able to get the
19 Ranger.
20 THE COURT: That may have been premature
21 for me to suggest that he be here in the courtroom this
22 afternoon.
23 MR. WESTFALL: I guess there may be a
24 possibility we have a conflict with the District
25 Attorney's office here. I guess we just have to see

27

1 if there's anything --
2 THE COURT: Well, you don't know at this
3 point; is that correct?
4 MR. HEISKELL: Yes, sir.
5 THE COURT: You have a suspicion or at least
6 you have an area that you feel that you need to
7 investigate, correct?
8 MR. WESTFALL: That is true, Your Honor.
9 MR. HEISKELL: And my suggestion, Judge, is
10 that once this hearing takes place, then I see no reason
11 why a transcript, statement of facts, can't be sent to a
12 Ranger or whatever process --
13 THE COURT: Let's -- let's deal with that
14 request at the conclusion of today's short, little,
15 impromptu inquiry.
16 MR. HEISKELL: Okay.
17 THE COURT: So we'll have Gaudet and the
18 Sheriff here and whoever else has been associated with
19 Soliz and the recordings and monitoring that situation.
20 And we'll let you question them, State question them,
21 and then if the -- at the end of that, we'll just see
22 where that goes.
23 Now, if you want affidavits from Prosecutors
24 after we identify what recordings there are or not, we get
25 them identified as to what happened, then I don't want to

28

1  put Prosecutors on the witness stand, but I may entertain
2  affidavits from Prosecutors as to what contact or
3  noncontact they have with whatever has developed.
4          At the end of that thing this afternoon or
5  this evening, then you can argue whether or not you need
6  further investigation into those areas or not. And that's
7  what I'm gonna do today. I'm not gonna make any other
8  rulings at this point. I want to hear --
9          MR. HEISKELL: Okay.
10         THE COURT: -- that. So I'm gonna recess
11 this hearing, reconvene at 1:00.
12         MR. HANNA: You know, I needed -- I need to
13 say one other word.
14         THE COURT: All right.
15         MR. HANNA: Earlier there was something
16 said about suspected recordings between Defense attorneys
17 and Mr. Soliz. I don't know anything about that. I've
18 never heard anything about -- I've not even heard an
19 insinuation nor a -- I've not heard anything about that.
20 And I would point out for the record, Judge, that's a far
21 cry from what we're dealing with on this videotape of
22 Mr. Ramos taking a polygraph. I mean, that's a far cry.
23 And I ain't heard anything about any recordings between
24 Soliz and his attorneys. I don't know anything about
25 that. I don't have any reason to think they exist or

29

1  have ever existed or -- that's enough said.
2          THE COURT: And I -- and there's been no
3  evidence that there is any or there are any such things.
4  But there's been a question raised, so let's -- let's
5  nail that down.
6          MR. HANNA: Yes, sir.
7          THE COURT: And figure out what happened.
8          MR. HANNA: Yes, sir.
9          THE COURT: We'll do that at 1:00.
10         MR. HANNA: Yes, sir.
11         THE COURT: At then at the end of the
12 afternoon, I think everybody will have a better
13 understanding of what's going on.
14         MR. HANNA: Right. Okay.
15         MR. WESTFALL: Your Honor, how would you
16 like to deal with these things you asked me to mark? Do
17 you want me to just withdraw these or do you want to just
18 have them for the record or?
19         THE COURT: Well, they're offered but not
20 admitted, so you'll hold on to them and bring them this
21 afternoon.
22         MR. WESTFALL: I'll do that, Your Honor.
23         (Recess taken.)
24         (Defendant present.)
25         THE COURT: We'll go on the record. The

30

1  State versus Mark Soliz. The record will show the
2  attorneys for the State, attorneys for the Defendant
3  and Defendant are present. There are no Jury members or
4  potential Jury members present. This is a continuation
5  of a hearing on Defendant's Motion for Continuance that
6  was started this morning.
7          What I want to do is basically, in my mind,
8  have this in three parts. One is to find some testimony
9  on whether or not the Sheriff's Department audiotaped or
10 videotaped anyone, I guess that would be the two Defense
11 attorneys for Mr. Soliz, whether they audiotaped or
12 videotaped the two Defense attorneys in some manner that
13 is not known to the Defense attorneys.
14         And then the second issue would be the Ramos
15 video at Richard Wood's office. And then the third issue,
16 the last would be final discussion and the end of argument
17 on the -- which is really the basis for the written
18 motion, which is the supplemental evidence by the District
19 Attorney's office.
20         Does that outline work?
21         MR. WESTFALL: It does, Your Honor, except
22 the videotaping of Ramos did not occur at Richard Wood's
23 office. It occurred at the Sheriff's Department.
24         THE COURT: Okay. All right. Well, that
25 would be with that correction then.

31

1          So the first thing I would like to do is
2  I'm gonna give the Defense attorneys an opportunity to
3  call witnesses, to discover whether or not there's
4  anything that occurred at the jail that they find
5  causes them any concern.
6          Now, who did you want to call?
7          MR. HEISKELL: Judge, I don't know who is
8  available.
9          THE COURT: Sheriff Alford is here. Who else
10 would you like?
11         THE BAILIFF: Lieutenant Gaudet, Sheriff
12 Alford and --
13         MR. STRAHAN: Troy Fuller is outside as well.
14         MR. HEISKELL: We call Lieutenant Gaudet,
15 Judge.
16         THE COURT: Okay. Will you please get him
17 for me.
18         MR. STRAHAN: I'll get him. He's right
19 outside.
20         (Pause in proceeding.)
21         THE COURT: Raise your right hand.
22         (Witness sworn.)
23         THE COURT: Please have a seat.
24         MR. HEISKELL: May I proceed, Judge?
25         THE COURT: Yes, sir.

**32**

MICHAEL GAUDET,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HEISKELL:

1 Q. State your name for the Court, please.

2 A. Michael Gaudet.

3 Q. Mr. Gaudet, how are you employed, sir?

4 A. I'm a lieutenant with the Johnson County

9 Sheriff's Office.

10 Q. And for how long have you been a lieutenant

11 with the Johnson County Sheriff's Office?

12 A. I've been a lieutenant for approximately 10

13 years.

14 Q. And what are your duties and responsibilities

15 with that office?

16 A. Excuse me. I supervise 14 detectives, the

17 property room. I assist in supervising transport and

18 courthouse personnel. I'm the Crime Scene officer, the

19 videographer, the photographer, and the latent print

20 examiner. And I am in charge of I.T. for the Sheriff's

21 Office.

22 Q. When you say in charge of I.T., you're talking

23 about Technology?

24 A. Information Technology, yes, sir.

25 Q. Excuse me, Information Technology. You know,

**33**

1 I did not realize -- I've seen you before outside the

2 courtroom here during the course of jury selection; is

3 that correct?

4 A. Yes, sir.

5 Q. I didn't realize you were Lieutenant Gaudet.

6 And you've also acted as, I guess, a bailiff of some sort

7 during the course of these proceedings?

8 A. I acted as the front door security, yes.

9 Q. I'm sorry?

10 A. The security officer at the front door, yes.

11 Q. Okay. And that's security officer at the front

12 door, just to escort jurors in and out; is that right?

13 A. No, sir; just insure that there's no

14 disturbances out front before entering the courtroom.

15 Q. Lieutenant, how long have you been over the I.T.

16 Department at the Sheriff's Office?

17 A. I've been assisting with I.T. for probably the

18 last 10 years.

19 Q. And for how long have you been in charge of the

20 videography and taping procedures?

21 A. Pretty much since I became a detective.

22 Q. And that's been how many years, sir?

23 A. I've served about 18, so like 16.

24 Q. Okay. Let me start out with what audio and

25 video equipment you-all have at the jail itself here

**34**

1 in Cleburne for Johnson County in order to videotape as

2 well as audiotape any proceedings or happenings --

3 occurrences, excuse me, in the Johnson County jail?

4 A. At the jail, there's seven DVRs and

5 approximately 23 cameras.

6 Q. I'm sorry? You said what?

7 A. At the jail, excuse me, there's two separate

8 sections. There's the Admin Building and the jail.

9 Q. Okay. Let me start with the jail, and then

10 we'll move to the Admin Building.

11 A. At the jail, there's -- they just put in a new

12 system. I believe there's seven DVRs and approximately

13 23 cameras, all record to the seven DVRs and are

14 accessible through three separate computers.

15 Q. And the DVRs, where are they located?

16 A. The DVRs at the jail are located back in the

17 lieutenant's office, between the lieutenant's office and

18 the control room in a secure room.

19 Q. And what type of equipment is that, the DVR

20 equipment?

21 A. I have no idea, sir. I didn't --

22 Q. Don't know what brand.

23 A. I wasn't involved in the installation.

24 Q. And so you don't know the brand or anything in

25 particular about the type of DVRs there; is that correct?

**35**

1 A. No, sir, I do not.

2 Q. And the DVRs, I take it they run continuously as

3 part of the security there at the jail?

4 A. Yes.

5 Q. And who monitors the DVRs?

6 A. The staff from Lasalle.

7 Q. Now, you all have visitation areas for the

8 different inmates there at the Johnson County jail; is

9 that correct?

10 A. Yes, sir.

11 Q. And where exactly is the visitation area located

12 whereby visitors, such as counsel, any other persons under

13 the direction of counsel, would meet with an inmate?

14 A. Normally there's a room at the end of the

15 visitation row that's secured on both sides. There's a

16 door through the outside for counsel and a door to the

17 inside for the inmate.

18 Q. And does that area have any recording equipment?

19 A. Not that I know of.

20 Q. And what about any type of contact visit with the

21 inmate, where is that located?

22 A. I'm not involved in any of that, sir.

23 Q. Do you know whether in the interior of the jail

24 and where you have contact visits, are DVR or recording

25 equipments are -- are placed?

36

1    A.  I do not know where they have contact visits,
2  sir.
3    Q.  You are not involved in the installation, as I
4  understand it?
5    A.  That's correct.
6    Q.  Do you know who was?
7    A.  They hired an outside company to install the new
8  video system for the jail.
9    Q.  And do you maintain those or is there a separate
10  person who does maintenance on that equipment?
11    A.  The new equipment is maintained by the company
12  that installed it, yes.
13    Q.  And they come in periodically, I guess, for
14  maintenance purposes; is that correct?
15    A.  I would assume so, under their contract.
16    Q.  And as far as the actual operation part of that,
17  and I'm saying, of course, the recording devices, who is
18  in charge of the actual recording processes being
19  undertaken with the DVRs?
20    A.  The overall direction is in charge of Chief
21  Deputy Jimmy Johnson.
22    Q.  And he's in charge of that part of the jail as
23  far as the recording as well as other duties he has; is
24  that correct?
25    A.  Chief Johnson is in the overall charge of the

37

1  jail and the prisoners.
2    Q.  And so he would be the person, I guess, that
3  would know about the brand, the type of recording devices
4  that are present, and whether it also captures audio as
5  well as video?
6    A.  That would be correct, sir.
7    Q.  Okay.  Let me move now to the Admin Building.
8  Okay.  And that building is located southeast of the jail;
9  is that correct?
10    A.  Yes, sir.
11    Q.  And it is a one-story building; is that correct?
12    A.  Yes, sir.
13    Q.  And that's where the main Sheriff's Office is?
14    A.  It's main administrative offices, yes, sir.
15    Q.  Main administrative office.  And tell us about
16  the recording devices, the DVRs, excuse me, that are
17  located there.
18    A.  There's multiple DVRs in the building, however,
19  only two of them are for recording purposes.  One is for
20  what we call the large interview room and one is for
21  what's called the small interview room.
22    Q.  Okay.  So the recording devices are for two
23  interview rooms; is that right?
24    A.  Correct.
25    Q.  And these recording devices, these are the DVRs;

38

1  am I right?
2    A.  Yes, sir.
3    Q.  Do you know the brand names of those DVRs?
4    A.  I believe they're Toshiba.
5    Q.  Toshiba.  And am I to understand you correctly,
6  sir, that you are in charge of the recording devices at
7  the Admin Office?
8    A.  Yes, I'm responsible for their maintenance and
9  so forth.
10    Q.  I'm sorry?
11    A.  I'm responsible for their maintenance and so
12  forth, yes.
13    Q.  Okay.  And how long have those recording
14  devices been present at the Admin Building, if you
15  know?
16    A.  About five to six years.
17    Q.  And you have two, you said a small interview
18  room and a large interview room; is that correct, sir?
19    A.  Yes, sir.
20    Q.  And are the recording devices for those rooms,
21  are they visible to people who come in to conduct
22  interviews?
23    A.  No.  The cameras themselves are.  The actual
24  devices with the monitor, no.
25    Q.  So the cameras are visible?

39

1    A.  Yes.
2    Q.  Where are the cameras located, if you can give
3  us a brief description?
4    A.  If you walk in, facing the door to the small
5  interview room, it's located on the left-hand side at
6  ceiling level.  If you walk into the large interview
7  room, at the door, it's directly above your head.
8    Q.  And let me start with the small room first.  How
9  tall of a ceiling are we talking about, sir?
10    A.  7-and-a-half, 8 foot.
11    Q.  And that camera is, I think you said, behind, on
12  the front door, near the front door?
13    A.  No, sir.  The camera in the small interview room
14  is on the same wall as the door --
15    Q.  As the door.
16    A.  -- to the far left side of the room.
17    Q.  So it's --
18    A.  In the corner.
19    Q.  So when you walk into the room, it's to the
20  left once you open the door, correct?
21    A.  Correct.
22    Q.  And where is the interview -- if -- are there
23  tables, I assume, and chairs for the interview room to
24  be placed?
25    A.  They're in the middle.  They're in the middle of

40

1  that room.
2      Q. And does that recording device, the camera
3  itself, does it have activated voice recorder on it or
4  is that located elsewhere?
5      A. No, it has -- it has a hot mic.
6      Q. A hot mic?
7      A. Once the device is activated, it continuously
8  records audio and video.
9      Q. Okay. Now, let's move now to the large
10 interview room. You said that particular camera device
11 is located in a different location from the small one;
12 is that correct?
13     A. That's correct, sir.
14     Q. And tell us again where that is.
15     A. The large interview room is located at the end
16 of the hallway for Criminal Investigations. As you enter
17 the room, the camera is directly above your head, above
18 the door. As you're -- as you walk through the door, you
19 can visibly see the camera.
20     Q. And is that room the same height dimension with
21 regard to the ceiling?
22     A. No, sir, it's approximately 10 foot.
23     Q. I'm sorry?
24     A. It's approximately 10-foot ceiling.
25     Q. And it's the same type of camera that exists in

41

1  the large one that exists in the small one?
2      A. Yes, sir, they're identical.
3      Q. And it has a hot mic on it as well?
4      A. That's correct, sir.
5      Q. Now, tell me about with regard to the images on
6  the recorder. How are they stored?
7      A. On those particular two devices, they are
8  stored directly to DVD. There's not a -- there is not a
9  DVR function.
10     Q. So it goes directly to DVD?
11     A. Correct.
12     Q. And once it goes directly to the DVD, if you
13 wanted a copy of it, I take it you would take that
14 copy and burn the disk, another copy for it; is that
15 correct?
16     A. After you complete several other processes,
17 yes.
18     Q. Now, let me direct your attention to the time
19 in which Jose Clemente Ramos was brought to the Admin
20 Building to have a polygraph exam conducted. Do you
21 recall that date, sir?
22     A. Yes, sir.
23     Q. And you -- when was that exactly, if you know?
24     A. After looking up, it was November 22nd.
25     Q. Do you know what time, approximately, it was

42

1  that he was brought over for that purpose?
2      A. It was late afternoon.
3      Q. And did you set up the video recording device
4  that you just referenced for one of those interview rooms
5  in preparation for that polygraph?
6      A. Yes, sir, I did.
7      Q. Which interview room was it?
8      A. The large interview room.
9      Q. And who met in that room initially, in the large
10 interview room?
11     A. Excuse me?
12     Q. Who met in the room initially, in the large
13 interview room?
14     A. Initially he was -- when he was brought in,
15 there was just security personnel with him. I believe
16 after that, he spoke with his attorney, and then after
17 that, Richard Woods, the polygrapher came.
18     Q. Now, is there a sign there at the Admin Building
19 either upon entrance or outside the interview rooms
20 that -- warning of videotaping or acknowledging that
21 videotaping may occur?
22     A. There are signs on our property, but on that
23 particular room, I believe there's a sign on the door
24 that says "interview in progress", and that's it.
25     Q. But nothing about recording devices being in

43

1  use or anything of that nature?
2      A. No, sir.
3      Q. And so what did you do personally to set up
4  the recording device for the large interview room in
5  preparation for the polygraph?
6      A. Knowing that he is a security threat, we
7  automatically start a DVD to record their actions prior
8  to, to insure the safety of the inmate and the officers.
9  And I opened the machine, turned it on, placed a DVD in
10 it and shut it, and waited for the inmate to arrive.
11     Q. And was anyone monitoring the images projected?
12     A. No, sir.
13     Q. Was a hot mic working?
14     A. The hot mic was active. At this point, I
15 cannot remember whether I disconnected the actual mic at
16 the camera, which I've done in the past for interviews
17 with attorney/client or other interviews, or I turned the
18 actual sound off the TV. I know I did turn off the sound
19 at the TV.
20     Q. Okay. But the hot mic itself, you don't recall
21 whether it was turned off or left on or?
22     A. No, sir. I have not reviewed the tape.
23     Q. But the sound, as far as the monitor, I think
24 you said, is turned off?
25     A. Correct.

**Page 44**

1 Q. But if the hot mic was on, then that recording
2 would obviously appear on the DVD; is that correct?
3 A. Yes, sir, it would.
4 Q. Now, before the participants came into the room,
5 did you or anyone at your direction let them know that
6 they were gonna be recorded?
7 A. No, sir, I did not.
8 THE COURT: May I ask you a question? I
9 thought we were gonna first inquire about whether or not
10 Mr. Soliz and his attorneys were taped without their
11 information. So if you're headed off on whether or not
12 Ramos and his attorney Bill Mason were taped without
13 consent or permission, then that's kind of a -- an issue
14 of standing on that that I would like to address before
15 we spend a lot of time on --
16 MR. HEISKELL: And I agree, Judge. And it's
17 my understanding, if I'm hearing Mr. Gaudet correctly,
18 and let me reference then to the Court, the only time we
19 visited with Mr. Soliz is at the jail, not at the Admin
20 Building. And if I'm hearing him correctly, he has no
21 knowledge as to that process or procedure over there.
22 That would be Mr. Johnson, Deputy Johnson;
23 is that correct?
24 THE WITNESS: Chief Deputy Johnson.
25 MR. HEISKELL: Chief Deputy Johnson.

**Page 45**

1 Sorry.
2 THE WITNESS: Yes, sir.
3 MR. HEISKELL: So that's why I get to this
4 point. But also at this point, Judge, you know, I think
5 in light of this, that as a potential violation of the
6 Penal Code Section 16.02, which also references 18.20 of
7 the Code of Criminal Procedure, that there is a violation
8 of the law in which I think is my understanding of the
9 code of professional responsibility on the part of
10 counsel as well as perhaps the Court, that he needs to
11 be advised of his right to counsel.
12 THE COURT: Well, if you assume for a
13 minute that Mr. Ramos and Mr. Mason were audiotaped or
14 videotaped without their knowledge or consent, just
15 assuming that for a minute, that would be their
16 complaint, not yours. You don't have any right to
17 assert that complaint, that I'm aware of, on behalf of
18 Bill Mason or Mr. Ramos, if that occurred, if that was
19 against the law.
20 MR. HEISKELL: Right. And --
21 THE COURT: And so I don't know why I
22 would let you spend a whole lot more time talking to
23 this witness about whether Ramos and his attorney were
24 videotaped or audiotaped without their knowledge or
25 consent, and I don't see anything that would be against

**Page 46**

1 the law yet or even close to that.
2 MR. HEISKELL: Okay. Well.
3 THE COURT: I need you to explain why that
4 would be. But with regard to Ramos, that's not really
5 your ground to assert, I don't believe.
6 MR. HEISKELL: Well, and I'm sorry, Judge.
7 I may have misunderstood. I know you said the first
8 three parts was, you know, the audio of potentially
9 counsel and any counsel's agents, representatives. But
10 it's my understanding he's not aware of the process at
11 the jail for that to have taken place, which we -- which
12 means we would need to talk to Chief Deputy Johnson.
13 And secondly, with this issue of the Ramos
14 video, I certainly -- I don't want to go any further with
15 this because of my concerns with what I just referenced.
16 And I think that that is an issue, and I'm gonna stray
17 away from that in light of what I just stated, Judge.
18 And we -- unless he knows anything at all
19 about the process of taping people at the jail or
20 anything, I don't think, at this point, I don't see
21 anymore questions of Mr. Gaudet.
22 THE COURT: Okay. Pass the witness.
23 Any questions?
24 MR. HANNA: Give me just a half second here,
25 Judge.

**Page 47**

1 CROSS-EXAMINATION
2 BY MR. HANNA:
3 Q. Now, you haven't listened to that DVD, have you?
4 A. No, sir, I have not.
5 Q. And where is it right now?
6 A. It's in my office.
7 Q. And it has been -- it's sealed up?
8 A. Yes, sir, it is.
9 Q. And to your knowledge, has anyone heard it?
10 A. No one has heard it.
11 Q. Has anyone heard it or viewed it or reviewed it
12 since the time you pulled it out of the DVD player --
13 A. No, sir.
14 Q. -- so to speak? And in doing this, what was
15 your purpose in activating this system, so to speak?
16 A. Due to the charges of the inmate and the
17 security issues involved in their transport and
18 detention, we commonly videotape all prisoners that we
19 bring across the state for interviews, just for security
20 purposes. Whether we maintain a tape or not is dependent
21 on whether they behaved or not.
22 Q. So it was a security issue?
23 A. That's correct.
24 Q. All right, sir. And you don't know, really you
25 don't know if there's any sound on it or not, do you?

**48**

1   A. No, sir, I do not.
2   Q. And you don't remember whether you activated the
3 hot mic or not, correct?
4   A. That's --
5     MR. WESTFALL: Object to leading.
6     THE COURT: Overrule.
7   Q. (BY MR. HANNA) Is that what you said on Direct?
8   A. Yes, sir.
9   Q. Okay. I thought that's what you said. So you
10 don't know if there's any sound on it or not?
11   A. That's correct.
12   Q. But did you mute the TV so there would be no
13 sound?
14   A. That's correct.
15   Q. So regarding the -- what was going on in the
16 room with Woods and Ramos, did you hear any of that
17 conversation?
18   A. No, I did not.
19   Q. Did anyone, to your knowledge?
20   A. Not to my knowledge, sir.
21   Q. Do you remember whether there was anybody
22 outside the door to that room or not, Mike?
23   A. Yes, sir, there's a guard stationed outside the
24 door.
25   Q. Okay. Do you know who that was?

**49**

1   A. I believe it was Morris Brown.
2   Q. Okay. And I guess you stand ready to give the
3 tape to whoever the Court says, the DVD, excuse me, to
4 whoever the Court says it belongs to?
5   A. That's correct.
6     MR. HANNA: That's all we've got, Judge.
7     MR. HEISKELL: Your Honor, I have no further
8 questions, but I do want to cite for the record what I
9 think would supplement my concern, concerning his right to
10 Fifth Amendment and right to counsel.
11     A person, under 16.02(b), a person commits an
12 offense if the person intentionally intercepts, endeavors
13 to intercept or --
14     (Clarification by Court Reporter.)
15     MR. HEISKELL: I'm sorry. -- endeavor to
16 intercept a wire, oral or electronic communication. And
17 Article 18.20 of the Code of Criminal Procedure defines
18 oral communication means --
19     THE COURT: Can I stop you a second since
20 you're just reading law to me. If you don't have any
21 further questions of this witness and State has passed
22 him, he's gonna be excused.
23     MR. HEISKELL: Yes, sir.
24     THE COURT: Why are we reading him his
25 rights?

**50**

1     MR. HEISKELL: No, I'm not reading the
2 rights. I'm just saying the -- the code provisions,
3 Judge.
4     THE COURT: But that would be Mr. Ramos
5 or Mr. Mason that would have a complaint, not you. Have
6 you been injured in any way? Has your client's rights
7 been jeopardized in any way by whether or not there was
8 a recording of somebody else?
9     MR. HEISKELL: Not directly, but indirectly,
10 potentially, Judge, from the standpoint of having access
11 or lack of access, I guess be more appropriate, to that
12 recording that exists that could be potentially helpful
13 or Brady material, exculpatory evidence for my client
14 during this death trial. So not currently, but I think
15 potentially it does exist because obviously that the
16 Court will have to rule upon who obtains it. And I
17 believe it really and truly is property of his counsel,
18 Mr. Ramos's counsel, Mr. Ramos. And that's another hill
19 to climb, so to speak. And at some point we obviously
20 will be requesting that from them or asking the Court to
21 assist in that regard.
22     But no further questions of Mr. Gaudet.
23     THE COURT: You may step down.
24     THE WITNESS: Thank you, Your Honor.
25     THE COURT: Who will your next witness be?

**51**

1     (Sotto voce discussion.)
2     MR. HEISKELL: We'll call Troy Fuller, Judge.
3     THE COURT: Do you anticipate desiring to
4 call Jimmy Johnson?
5     MR. HEISKELL: Yes, sir.
6     THE COURT: Could you see if Jimmy Johnson
7 could be made available.
8     MR. HANNA: I'll talk to the Sheriff, Judge,
9 and ask him to get Chief Johnson out here.
10     THE COURT: Thank you.
11     Please raise your right hand.
12     (Witness sworn.)
13     THE COURT: Have a seat.
14     Okay.
15     MR. HEISKELL: Thank you.
16     TROY FULLER,
17 Having been first duly sworn, testified as follows:
18     DIRECT EXAMINATION
19 BY MR. HEISKELL:
20   Q. State your name for the Court, please.
21   A. Troy Fuller.
22   Q. Mr. Fuller, how are you employed, sir?
23   A. I'm with Johnson County Sheriff's Office, a
24 captain over the Criminal Investigations Division.
25   Q. And what are your duties and responsibilities

52

1  as a captain with that division?
2      A.  Basically administrative role.  I do work on
3  major crimes, Criminal Investigation stuff, handle
4  internal investigations.  I'm out of both our office
5  and the jail.  Just other general assignment duties.
6      Q.  Okay.  And are you familiar with the DVR
7  recording devices located at the jail, sir?
8      A.  Yes, sir, I am.
9      Q.  And tell us about your familiarity with those
10 devices.
11     A.  Just essentially the rooms.  We have a small
12 interview room, and we have a larger interview room which
13 we also use as a conference room.  We have a video room
14 that has a television, recording devices, and cameras
15 installed in each room.
16     Q.  Let me stop you there for a minute.  Now, are
17 we talking the Admin Building or we talking the jail?
18     A.  Administration building.
19     Q.  I'm -- I'm sorry.  I'm referencing the jail,
20 sir.  I'm sorry?
21     A.  To my knowledge, other than normal security
22 cameras, we don't have an interview room at the jail.
23     Q.  Okay.  Are you familiar with the operation of
24 the security cameras and recording devices at the jail
25 itself?

53

1      A.  Only basically, sir.  Just that they're set up
2  in certain areas and that you can monitor hallways,
3  outside, things like that.
4      Q.  What about the visitation rooms for counsel and
5  others who would come to visit an inmate?
6      A.  I believe they're video recorded, but I'm not
7  sure how they operate and things like that.
8      Q.  And how many video recordings do you have of
9  those particular visitation rooms?
10     A.  Sir, I'm not sure.
11     Q.  And --
12     A.  Are you talking about the visitation at the
13 jail?
14     Q.  Yes, sir.
15     A.  I'm not sure how many cameras there are, sir.
16     Q.  Okay.  But you would agree, I guess, that there
17 are a number of visitation rooms at the jail?
18     A.  Yes, sir.
19     Q.  Is that right?
20     A.  Yes, sir.
21     Q.  And would each of those rooms have the recording
22 devices?
23     A.  I believe so, yes, sir.
24     Q.  And do you know whether those recording devices
25 also have microphones where there's a hot mic or some

54

1  other regular microphone on them?
2      A.  I'm not absolutely certain, but I don't
3  believe -- I don't believe there's audio.  I think it's
4  just video.  I'm not certain.
5      Q.  Is it fair to state that Captain or Chief
6  Deputy Johnson would know the answer to those, that
7  question?
8      A.  Yes, sir, I believe so.
9      Q.  But other than just knowing that they are there,
10 you, I guess, have no role in the operation of those
11 devices and when they're turned on or monitored or
12 anything of that nature?
13     A.  No, sir.
14         MR. HEISKELL:  Okay.  That's all I have,
15 Your Honor, of him.
16         MR. HANNA:  Give me just a half second,
17 Judge.
18         We don't have any questions, Judge.
19         THE COURT:  You may step down.
20         MR. HEISKELL:  We call Sheriff Alford,
21 Your Honor.
22         (Witness sworn.)
23         THE COURT:  Please have a seat.
24         MR. HEISKELL:  May I proceed?
25         THE COURT:  Yes, sir.

55

1             BOB ALFORD,
2  Having been first duly sworn, testified as follows:
3             DIRECT EXAMINATION
4  BY MR. HEISKELL:
5      Q.  Would you state your name for the Court, please.
6      A.  Bob Alford.
7      Q.  Mr. Alford, you are the Sheriff of Johnson
8  County; is that correct?
9      A.  Yes, sir.
10     Q.  And for how long have you been the Sheriff, sir?
11     A.  Over 15 years.
12     Q.  And can you give us just a general description
13 of your duties and job responsibilities as the Sheriff of
14 Johnson County?
15     A.  It's -- anything to do with law enforcement that
16 comes under the jurisdiction of the Sheriff's Office is
17 under my command, under my supervision.  Primarily it's
18 an administrative position.  I do go afield.  I do work
19 some major cases, but primarily it's administrative
20 position.
21     Q.  Now, does that position also include being in
22 charge of the jail?
23     A.  Yes, sir.
24     Q.  And during the entire tenure, I take it, that's
25 been one of your major job responsibilities and duties;

56

1  is that correct, sir?

2    A. Yes, sir.

3    Q. Now, when we talk about the jail, I understand

4  there's the Administration Building southwest of the jail,

5  and then the jail facility itself with the wires, mesh

6  wire around it; is that correct, sir?

7    A. Yes, sir.

8    Q. Razor wire. Now, Sheriff, tell us, please,

9  about the recording devices there, audio and video

10  recording devices at the jail which are obviously there

11  for security, excuse me, security purposes. Can you

12  give us a brief outline of what you have there?

13    A. Okay. There are a number of cameras located

14  throughout the facility. They're primarily in the

15  living -- the common areas of the jail. They're not

16  focused on the cells. They can't be focused on the --

17  directly on the restroom areas. There are walls that

18  cover the vital proportions of a person when using the

19  facilities and showers and things like that. The

20  hallways, the exterior, the entire exterior of the

21  building is under camera.

22    Q. Okay. And does that include, Sheriff, video

23  cameras or perhaps as well as audio equipment that would

24  cover the visitation area for the inmates?

25    A. No, there's no audio there, but there is video.

57

1  Now, what it will show, it won't be as good as even what

2  we're seeing here. You'll see the main hallway. And

3  then the visitation areas, there's about six to eight

4  benches, and they're kind of back-to-back. The inmate

5  will be on one side of the glass wall, the visitor will

6  be on the other side, and you can kind of see that

7  hallway down that area.

8    Q. Okay. So when you say there are six to eight

9  benches --

10    A. In the most -- in the most -- there's as few as

11  four in one area, then there's up to eight benches on

12  kind of --

13    Q. Oh.

14    A. -- where visitors come in and sit to talk and

15  they pick up the telephone and talk.

16    Q. Okay. What about the visitation area for

17  counsel, defense counsel?

18    A. There's no -- there's no camera in that area.

19    Q. No camera.

20    A. No, sir.

21    Q. There are no cameras in there?

22    A. No, sir.

23    Q. Nor any audio equipment?

24    A. No, sir.

25    Q. And those areas, of course, I've been there

58

1  in visiting my client. There's a separate, one stool, I

2  guess if you want to call it that, for the attorney, and

3  across the -- the window, excuse me, is another stool for

4  the inmate; is that correct?

5    A. Yes, sir.

6    Q. And I recall that when you go into the door for

7  the attorney, it's obviously the steel door, and then the

8  inmate is brought in by the deputy from the opposite side

9  of that, from my experience, into the room. Is that your

10  understanding?

11    A. Yes, sir. The inmate comes from the housing

12  area into the visitation area.

13    Q. So the only cameras you're telling this Court

14  that exist for that area have to do with the hallways? Or

15  am I wrong there?

16    A. No, sir, in that particular area, that's

17  strictly the hallway area would be all that would be on

18  camera in there. The attorney and inmate room, there's

19  no audio, there's no video. There's really no audio

20  throughout the building. It's just video cameras.

21    Q. Okay. Now, there are some hand-held cameras

22  obviously used by the correctional officers there too;

23  is that right?

24    A. When an incident occurs where we have to

25  take action to -- to put an inmate under restraint or

59

1  take back a cell if the inmates have taken a cell,

2  yes, sir.

3    Q. And what about -- and I'm gonna move to the

4  courtroom here shortly, in the court holdover, but let

5  me go back to the visitation for counsel. The cameras

6  that are in the hallway, they show people walking up and

7  down the hallway, entering and exiting those particular

8  visitation areas; is that correct?

9    A. Yes, sir.

10    Q. Now, there's another area that we were taken

11  to at some point, and I want to ask you about where we

12  had contact visits. Okay. That existed, as I recall,

13  kind of more in the bowels of the jail as opposed to

14  the hallway area. Are you familiar with that area,

15  sir?

16    A. I believe you're referring to what used to be

17  the law library, where that a lot of time attorneys, or

18  on special occasion, family will be allowed to come in

19  and have a contact visit, for whatever purposes; someone

20  is fixing to go away for life or there's -- or we need

21  to notify an inmate there's been a death in the family,

22  we'll facilitate those. Now, that room is not under --

23  there's not a video camera in that room.

24    Q. All right. That's what I was gonna ask you.

25    A. Right.

**60**

1  Q. So no video or audio in that room either?
2  A. No, sir.
3  Q. And you have to go through, like, two or three
4  doors to get to that particular room; is that correct?
5  A. Yes, sir. Yes, sir.
6  Q. And when inmates are examined, for instance, by
7  experts and others, then that's the room they're taken
8  to as well, as I understand?
9  A. Yes, sir.
10  Q. The guards who are stationed in that area right
11  outside the door when the examinations or interviews are
12  being conducted in that former library we were just
13  talking about --
14  A. Yes, sir.
15  Q. -- do they have any type of recording devices
16  on them?
17  A. No, sir, they're not allowed to have any. And
18  usually, those are in high profile cases such as this.
19  A routine visit would not necessitate a guard necessarily
20  outside that door. It'd just be a high profile case.
21  And then such as in this case, there's a court order from
22  the Judge advising us that we're not to listen, not to
23  repeat.
24  Q. Are there any in the back here of the courtroom
25  where the holdover cells are, any type of recording

**61**

1  devices there, for instance, when you bring inmates
2  over?
3  A. Yes, sir, there's video recording.
4  Q. And inside the cells themselves, is that
5  video record -- is that also audio recorded or not?
6  A. No audio. It's video recorded.
7  (Sotto voce discussion.)
8  Q. Okay. Sheriff Alford, are you aware of any
9  type of video recordings of Mark Soliz visiting with us
10  as attorneys or with any experts or agents who we call
11  upon to evaluate and interview him?
12  A. No, sir.
13  (Sotto voce discussion.)
14  Q. The -- let me go back to the holdover back in
15  the back here, Sheriff, for a second. When those --
16  Mr. Soliz is back there during the course of this jury
17  selection, as you recall, and we have a video camera in
18  that holdover cell, you recall that, sir?
19  A. Yes, sir.
20  Q. And there was some incident at some point in
21  which, I take it from that, that was recorded, is that
22  correct, on the video camera?
23  A. Of what now?
24  Q. Of an incident in the -- in the holdover. Is
25  that recorded?

**62**

1  A. Oh, yes, sir. If there's any incident, it's
2  recorded, yes, sir.
3  Q. And that was strictly -- sorry -- strictly video
4  only, not audio?
5  A. Yes, sir.
6  Q. And do you know how many recordings were made
7  of the time in which he was in the holdover that's been
8  saved to DVD or somehow preserved?
9  A. I don't. Assuming like for sure one has been
10  kept. I don't have a number.
11  MR. HEISKELL: Okay. That's all. Thank
12  you.
13  THE WITNESS: Yes, sir.
14  MR. HEISKELL: Pass the witness.
15  MR. HANNA: Judge, we don't have any
16  questions.
17  THE COURT: Thank you. You may be excused.
18  THE WITNESS: Thank you, sir.
19  THE COURT: Do you still request
20  Mr. Johnson?
21  MR. HEISKELL: Let me confer, Judge.
22  (Sotto voce discussion.)
23  THE COURT: Oh, he's in Peaster, Texas.
24  MR. HEISKELL: Your Honor, in light of
25  Sheriff Alford's responses, since he's in charge of the

**63**

1  jail, I don't think there's a need at this point for
2  Chief Deputy Johnson. He's given us a full response.
3  THE COURT: Okay. If you would like to ask
4  Deputy Johnson follow-up questions on the record later,
5  I'll give you that opportunity --
6  MR. HEISKELL: Okay.
7  THE COURT: -- during a break or something
8  when he's available.
9  You may cancel Johnson.
10  THE SHERIFF: Yes, sir. Thank you.
11  MR. HEISKELL: I think that's -- those are
12  all the individuals I saw outside, Judge, that were
13  called over.
14  THE COURT: Well, what else would you like?
15  Who else do you want to talk to?
16  MR. HEISKELL: I think that's it, Judge,
17  because obviously, you know, we're at the beckon call of
18  these gentlemen who know the operation. And the only
19  person I've heard mention was Chief Deputy Johnson who
20  was aware, and Sheriff Alford obviously took care of
21  that. So I'm not aware of anyone else, you know,
22  that's...
23  THE COURT: Well, we had --
24  MR. HEISKELL: Prosecution --
25  THE COURT: -- we have these very serious

STATE OF TEXAS V. MARK ANTHONY SOLIZ FEBRUARY 24, 2016

**64**

1  allegations that the Sheriff's Department has taped you
2  and your client --
3          MR. HEISKELL: Well, it was a concern, Your
4  Honor, when we first heard about yesterday what happened
5  with Mr. Ramos and his counsel. We are now learning and
6  have learned that that took place at the Admin Building.
7  I was under the initial impression it was at, like the
8  Court was, I believe, it was at Mr. Wood's office, then
9  we've heard now, found out later that it was at the Admin
10 Building.
11         And we also found out that that's separate
12 from the jail because we went by there so I can know what
13 place we're talking about. So I now know that the Admin
14 Building is down the road further than the jail. So it
15 was a matter of hearing this, these matters take place,
16 being obviously very concerned about what's taking place
17 in light of what we're dealing with here, and we have
18 now had the opportunity to at least flush it out to this
19 degree.
20         And I think at this point, we're satisfied
21 that none of our communication with our client has been
22 violated by confidential communications nor
23 attorney/client privilege matters in light of the
24 further explanation provided by the witnesses and
25 folks we've talked to.

**65**

1          THE COURT: There's also a standing order or
2  an order whenever you had requested an opportunity to have
3  an expert meet with your client --
4          MR. HEISKELL: Yes, sir.
5          THE COURT: -- in the jail, there is an
6  order that is generated by my office and sent to the
7  Sheriff.
8          MR. HEISKELL: Right.
9          THE COURT: I don't have a copy of that
10 with me, but I believe that language in there prohibits
11 any --
12         MR. HEISKELL: That language, Judge, you're
13 right --
14         THE COURT: -- recording or observation.
15         MR. HEISKELL: -- any communication, any --
16 if they over -- even overhear any type of privileged
17 communications, not to disclose it to anyone. That was
18 part of the standing order that the Court granted. And
19 we don't have any reason to believe that's been violated.
20 I've not heard anything of that nature that's been
21 violated as well, but --
22         THE COURT: Okay.
23         MR. HEISKELL: -- I hope the Court can
24 appreciate and understand how we were alarmed when we
25 first heard about this.

**66**

1          THE COURT: That's why I had a hearing --
2          MR. HEISKELL: Yes, sir.
3          THE COURT: -- to get to the bottom of it
4  quickly.
5          MR. HEISKELL: Right.
6          THE COURT: So is there anything from the
7  State on the first two issues?
8          MR. HANNA: Well, no, I don't think so,
9  Judge.
10         THE COURT: Then let me just state that
11 there's no evidence of any recording of any conversations
12 between Defendant Soliz and his attorneys, of an audio
13 nature. And the only potential video recording would be
14 of him in his cell in the Guinn building, which is video
15 only, no audio. So it doesn't -- there just is not one
16 as far as the Court can tell.
17         With regard to the Ramos matter, the sworn
18 pleadings by the Defense team state that neither the
19 Prosecutor nor the Defense counsel had received any video
20 of Ramos. And taking the Defense pleadings as true and
21 the evidence of Officer Gaudet, the Court will find that
22 to the extent the Sheriff's Office may have recorded any
23 audio/video of Ramos or his attorney, that content would
24 be subject to a protection of Mr. Ramos's attorney/client
25 privileges, obviously, and that would be his standing or

**67**

1  his attorney's standing to assert and to maintain.
2          It appears that Gaudet may have turned on a
3  monitor for safety or security reasons, and his testimony
4  is that the audio may or may not exist. If it does exist,
5  he didn't listen to it. He turned off the monitor as far
6  as volume goes. And there's no evidence that it was
7  copied or shared with anybody in any way. So Officer
8  Gaudet would then continue to maintain and preserve that
9  particular document or DVD or whatever it is until such
10 time as there is a motion by Ramos or his attorney asking
11 the Court to do something with it. Otherwise, he should
12 just proceed to maintain it in its integrity.
13         So I think that resolves the first two
14 issues, and I'm down to the supplemental evidence that
15 was given to the -- by the District Attorney to the
16 Defense team as of this last week. So would the State
17 elaborate as to what information is in the 10 CDRs and
18 DVDs and the two incident reports.
19         MR. STRAHAN: Well, I can tell you this,
20 Judge, speaking for the State. We were in five weeks of
21 voir dire, along with the Defense, and what we're
22 generally doing now is if there's an extra witness or
23 somebody -- for example, we are going to update today,
24 I've already told Defense counsel this, a person by the
25 name of Matt Hardy moved some evidence from Benbrook to

68

1 Johnson County yesterday. And he was nowhere on any
2 witness list. He just physically moved it. We have to
3 use him for the chain of custody.
4        That's the type of addition that we've been
5 making to the witness list that's been complained of.
6 And it's an ongoing. We sat for five weeks, just like
7 the Defense counsel did, in that, and getting back onto
8 our case as far as talking to witnesses, those things
9 will come up.
10       I know that I sent over personally three
11 DVDs which are from bad acts under the Code of 404(b),
12 37.07 notice that we believe Mr. Soliz did while we were
13 in jury selection. So when they were made available to
14 us, we gave it back to them. Some of the 37.07 notice is
15 for things that are ongoing; weapons in the jail, other
16 things like that, as we are in this process. So we have
17 no choice but to update them as they happen because
18 there's new acts, frankly, at least in the recent past
19 there's been new acts that we've had to update.
20       And so we've also had -- and I can't speak
21 specifically to what Ms. Jack gave over, whether that's --
22 we gave them a media notebook with 50-some-odd disks in
23 there, and that's some of the stuff we're still going
24 over, we have given that to them. We've had an open file
25 policy. And then this ECFS is the online, computerized, I

69

1 guess, discovery tool of Tarrant County. And so what we
2 have done is try to put every single thing on there, but
3 at the same time, we have maintained physical files right
4 in this office in this courthouse as well as Tarrant
5 County maintaining a physical file with everything in it
6 which have been open to Defense counsel really the entire
7 time.
8        So as far as the updates go, again, we're --
9 I have to add a name today, which I hate to do, but I
10 do because that's a new person who touched a piece of
11 evidence yesterday. It's what we kind of meant earlier
12 by ancillary type people. They're not a brand new
13 expert that we're bringing in, you know, four days
14 before trial. It's someone who touched evidence that
15 we think would be necessary for chain of custody and
16 those types of things. So none of it is meant for,
17 you know, to overwhelm the Defense. I mean, we're
18 working just like they are. And as soon as we get
19 something in, we try to give it over. And that's kind
20 of where we stand on that.
21       MR. WESTFALL: Well, Your Honor, I mean,
22 that's -- we're all working as hard as we can, but
23 they've got over 400 people on the witness list and they
24 refuse to tell us who they're gonna call. I mean, this
25 hasn't been exactly, you know, just all games coming from

70

1 this side. And the fact is that there is an awful lot of
2 evidence, there's a lot of new evidence they've hand
3 delivered, I would say probably an awful lot of what has
4 now been uploaded, but sorting it out takes time.
5        And, I mean, it was -- it was the State, at
6 least Christy Jack, that suggested the possibility of
7 taking an extra week and just in light of the stuff that
8 was coming in, we just -- in light of this other new
9 incident, we thought more than a week might be
10 appropriate and we wouldn't have to come back and ask
11 for anymore.
12       Maybe, you know, yeah, I mean, there has
13 been a lot more than just a few new incidents over in
14 jail. I mean, all the sudden, this whole new huge
15 population of Ramos's letters becomes available, Ramos's
16 probation files all the sudden show up on ECFS and his
17 juvenile files all the sudden show up on ECFS. This is
18 stuff that's hundreds of pages that just needs to have
19 some looking through.
20       MR. HEISKELL: Your Honor, I can also
21 represent what Ms. Jack gave me, I guess, yesterday,
22 yesterday morning, seven, six CDs, I believe, and one
23 DVD. Or maybe I have them mixed wrong, six DVDs and one
24 CD, but two of those have to do with some medical records
25 of Mr. Ruben Martinez, the alleged victim in Tarrant

71

1 County, image and records and other medical records. Two
2 were interviews of -- audiotape interviews of a Brian
3 Brown, a witness that the State intends to call. And
4 there was another -- I have not had a chance to look at
5 all -- look at any of that, for that matter, and there
6 were three other CDs that, um, a general nature, and I've
7 not had a chance to review. But and then Mr. Strahan sent
8 me, that I received yesterday, the three CDs of the
9 incident at the jail and two incident reports. I got
10 that. That comprises the 10 that were referenced in the
11 motion.
12       But, I mean, it is a lot, Judge, and I have
13 the -- my two assistants, my legal assistant, another
14 attorney in my office who are working to help organize
15 information. We have been in jury selection, as you
16 know. Then we have also spent weekends interviewing
17 other witnesses and people of that nature, and that's
18 taken up quite a bit of time. And we think a reasonable
19 amount of time that we are requesting, whether it's a
20 week or whatever, would certainly help us to look at this
21 evidence, compile it, compare it and contrast it with
22 other evidence so that we can be fully ready at the time
23 these witnesses are called.
24       Of a major concern that I have, I think I
25 expressed this morning, was Mr. Ramos himself, who a lot

1    of the information we have just recently because they've
2    apparently struck a deal or pressing for striking a deal
3    with him, and they've given us notice of that, given us a
4    proffer agreement, and now we're getting all of his
5    information together so that we can prepare to at least
6    cross-examine him.
7         THE COURT: Okay. Any final word or
8    argument?
9         MR. HANNA: I'm sorry, Judge?
10        THE COURT: Closing argument of some sort?
11        MR. HANNA: Judge, we're at the Court's
12    direction.
13        THE COURT: Okay.
14        MR. HANNA: We will be ready Monday, we'll
15    be ready in a week, whatever the Court wants to do. We
16    are here. We are ready to go. You tell us.
17        THE COURT: Motion is denied. Be ready at
18    8:30, Monday, a.m. You may be excused.
19        MR. WESTFALL: Thank you, Your Honor.
20        (Court adjourned.)
21
22
23
24
25

```
 1  THE STATE OF TEXAS  )

 2  COUNTY OF JOHNSON   )

 3                I, Pamela K. Waits, Official Court Reporter

 4  in and for the 413th District Court of Johnson County,

 5  State of Texas, do hereby certify that the above and

 6  foregoing contains a true and correct transcription of all

 7  portions of evidence and other proceedings requested in

 8  writing by counsel for the parties to be included in the

 9  volume of the Reporter's Record, in the above-styled and

10  numbered cause, all of which occurred in open court or in

11  chambers and were reported by me.

12                I further certify that this Reporter's Record

13  of the proceedings truly and correctly reflects the

14  exhibits, if any, admitted by the respective parties.

15                WITNESS MY OFFICIAL HAND this the 31 day

16  of December, 2012.

17

18  _____
                      Pamela K. Waits, Texas CSR #4991
19                    Expiration Date:  12/31/13
                      Official Court Reporter
20                    413th Judicial District
                      Johnson County, Texas
21                    204 S. Buffalo Avenue
                      Cleburne, Texas 76033
22                    (817) 556-6041

23

24

25
```