1              REPORTER'S RECORD

2           VOLUME 38 OF 75 VOLUMES

3          TRIAL COURT CAUSE NO. F45059

4     COURT OF CRIMINAL APPEALS NO. AP-76,768

5 STATE OF TEXAS          )      IN THE DISTRICT COURT
                          )
6 VS.                     )      JOHNSON COUNTY, TEXAS
                          )
7 MARK ANTHONY SOLIZ      )      413TH JUDICIAL DISTRICT

8

9 ------------------------------------------------

10                  JURY TRIAL

11            GUILT/INNOCENCE PHASE

12 ------------------------------------------------

13

14

15

16

17         On the 27th day of February, 2012, the

18 following proceedings came on to be heard in the

19 above-entitled and numbered cause before the Honorable

20 William C. Bosworth, Jr., Judge presiding, held in

21 Cleburne, Johnson County, Texas:

22         Proceedings reported by Machine Shorthand and

23 Computer-Aided Transcription.

**FILED IN
COURT OF CRIMINAL APPEALS**

24

**ORIGINAL**

**JAN 22 2013**

25

**Abel Acosta, Clerk**

1               A P P E A R A N C E S

2  DALE HANNA
   SBOT NO. 08919500
3  LARRY CHAMBLESS
   SBOT NO. 04086320
4  MARTIN STRAHAN
   SBOT NO. 00797765
5  District Attorney's Office
   Johnson County
6  204 S. Buffalo
   Cleburne, Texas 76033
7  (817) 556-6801

8  ELIZABETH CHRISTINA JACK
   SBOT NO. 10445200
9  Tarrant County District Attorney's Office
   401 W. Belknap Street
10 Fort Worth, Texas 76102-1913
   817-884-1366
11
   ATTORNEYS FOR THE STATE OF TEXAS
12

13 MICHAEL P. HEISKELL
   SBOT NO. 09383700
14 Johnson, Vaughn & Heiskell
   5601 Bridge Street
15 Suite 220
   Fort Worth, Texas 76112-2305
16 817-457-2999

17 GREGORY B. WESTFALL
   SBOT NO. 00788646
18 Hill Gilstrap, P.C.
   1400 W. Abram Street
19 Arlington, Texas 76013
   817-276-4931
20
   ATTORNEYS FOR DEFENDANT
21

22

23

24

25

1                    I N D E X

2                  VOLUME 38

3            GUILT/INNOCENCE PHASE

4  FEBRUARY 27, 2012                        PAGE   VOL.

5  Proceeding.....................................   6      38

6  State's Motion in Limine.......................   6      38
   Response by Mr. Heiskell.......................   7      38
7  Court's Ruling.................................   7      38

8  Rule invoked...................................   7      38
   Witnesses sworn and placed under rule..........   9      38
9
   Discussion regarding contextual evidence.......  12      38
10
   Jury sworn, instructions.......................  15      38
11
   Presentment of Indictment;
12 Defendant's pleas of not guilty................  19      38

13 State's Opening Statement by Mr. Chambless.....  21      38

14 Defendant's Opening Statement by Mr. Heiskell..  38      38

15 STATE'S WITNESS        DIRECT        CROSS      VOIR   VOL.
                                                   DIRE
16 CHELSEA CIRCELLI       47,86         76                38
   VINCENT CIRCELLI       87            101               38
17 RAMON MORALES          112,142,157   127,155,158       38
   STEPHANIE PHILLIPS     160,178       171               38
18 ADRIAN ALLCON          181                             38
   LORNE TRACY            189,197       195               38
19 SAMMY ABU-LUGHOD       201,239       224               38
   MANDY RIDDLE           241                             38
20 JERRY CEDILLO          253                             38

21 Adjournment................................... 277     38

22 Court Reporter's Certificate.................. 278     38

23

24

25

```
1                          ALPHABETICAL INDEX

2   WITNESS                  DIRECT          CROSS          VOIR    VOL.
                                                            DIRE
3   SAMMY ABU-LUGHOD         201,239         224                    38
    ADRIAN ALLCON            181                                    38
4   JERRY CEDILLO            253                                    38
    CHELSEA CIRCELLI         47,86           76                     38
5   VINCENT CIRCELLI         87              101                    38
    RAMON MORALES            112,142,157     127,155,158            38
6   STEPHANIE PHILLIPS       160,178         171                    38
    MANDY RIDDLE             241                                    38
7   LORNE TRACY              189,197         195                    38

8
                             EXHIBIT INDEX
9   STATE'S
    NO.  DESCRIPTION                         OFFER  ADMIT  VOL.
10
    9    Photo board (18x12)                 63     63     38
11  10   Photo board (18x24)                 63     63     38
    11   Photo board (18x24)                 63     63     38
12  12   Photo board (18x24)                 63     63     38
    13   Photo board (18x24)                 63     63     38
13  14   Photo board (18x24)                 63     63     38
    15   Photo board (18x24)                 63     63     38
14  16   Photo board (18x24)                 63     63     38
    17   Photo board (18x24)                 63     63     38
15  18   Photo board (18x24)                 63     63     38
    19   Photo board (18x24)                 63     63     38
16  20   Photo board (18x24)                 63     63     38
    21   Photo board (18x24)                 63     63     38
17  22   Photo board (18x24)                 63     63     38
    23   Photo board (18x24)                 63     63     38
18  24   Photo board (18x24)                 63     63     38
    25   Photo board (18x24)                 63     63     38
19  26   Photo board (18x24)                 63     63     38
    27   Photo board (18x24)                 63     63     38
20  28   Photo board (18x24)                 93     93     38
    29   9 mm Hi-Point                       97     98     38
21  29A  Box              (Record Only)      98     98     38
    30   Black powder rifle                  97     98     38
22  30A  Box              (Record Only)      98     98     38
    31   Remington Shotgun                   97     98     38
23  31A  Box              (Record Only)      98     98     38
    32   Property Transmittal Form           111    112    38
24  33   Latent Print Lab Report             111    112    38
    34   Latent Print Lab Report             111    112    38
25  35   Statement of Ramon Morales          143    143    38
```

Case 3:14-cv-04556-K   Document 24-29   Filed 08/02/16   Page 5 of 74   PageID 5205
STATE V. MARK ANTHONY SOLIZ     FEBRUARY 27, 2012

5

| | | | | | |
|---|---|---|---|---|---|
| 1 | 36 | Reporter's Record; Morales | 144 | 145 | 38 |
| | 37 | FWPD Print Lineup pg 1 | 199 | 199 | 38 |
| 2 | 38 | FWPD Print Lineup pg 2 | 199 | 199 | 38 |
| | 39 | FWPD Print Lineup pg 3 | 199 | 199 | 38 |
| 3 | 40 | FWPD Print Lineup pg 4 | 199 | 199 | 38 |
| | 41 | FWPD Print Lineup pg 5 | 199 | 199 | 38 |
| 4 | 42 | FWPD Print Lineup pg 6 | 199 | 199 | 38 |
| | 43 | Drivers license, Lughod | 200 | 201 | 38 |
| 5 | 44 | Visa card, Lughod | 200 | 201 | 38 |
| | 45 | MasterCard, Lughod | 200 | 201 | 38 |
| 6 | 46 | Social Security card, Lughod | 200 | 201 | 38 |
| | 47 | Photo board (18x12) | 208 | 208 | 38 |
| 7 | 48 | Photo board (24x36) | 220 | 220 | 38 |
| | 49 | Photo board (24x36) | 221 | 221 | 38 |
| 8 | 50 | Aerial Map (56x38) | 257 | 257 | 38 |
| | 51 | Photo board (18x24) | 270 | 270 | 38 |
| 9 | 52 | Photo board (18x24) | 270 | 270 | 38 |
| | 53 | Photo board (18x24) | 274 | 274 | 38 |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

6

```
1                  P R O C E E D I N G
2          (Open court, Defendant present;
3          Jury not present.)
4          THE COURT:  In F45059, State of Texas versus
5   Mark Anthony Soliz.  Is the State present and ready?
6          MR. STRAHAN:  State is ready.
7          THE COURT:  Defense present and ready?
8          MR. HEISKELL:  Yes, Your Honor.
9          THE COURT:  Defendant is present.
10         MR. HEISKELL:  Yes.
11         THE COURT:  Have you each had a chance to see
12  the instructions to the Jury?
13         MR. HEISKELL:  Yes, Your Honor.
14         MR. STRAHAN:  Yes, sir.
15         THE COURT:  Any comments or objections?
16         MR. HEISKELL:  No, I think this is adequate,
17  Your Honor.
18         MR. STRAHAN:  State agrees.
19         THE COURT:  Anything else before I bring in
20  the Jury and swear them?
21         MR. STRAHAN:  Yes, one thing, Judge.  We
22  filed this morning a very short Motion in Limine we would
23  just ask to be heard.  A copy has been provided.  I didn't
24  know if it had made it to your file yet or not.  Copies
25  have been provided to the Defense this morning.
```

7

```
1          THE COURT:  Any objections?
2          MR. HEISKELL:  No, Your Honor.  I think it's
3   quite clear that only during the time the witness is
4   called or if the door is open somehow that we can get into
5   this, but we agree to the Motion in Limine at this point.
6          MR. STRAHAN:  And for the record, that's the
7   State's Motion in Limine regarding plea agreements which
8   has asked the Defense not to get into any agreements that
9   were made in exchange for testimony until such time as
10  they actually testify or is otherwise relevant to approach
11  first.  Thank you.
12         THE COURT:  Okay.  Granted.
13         MR. HEISKELL:  Your Honor, we also ask at
14  this time that the rule be invoked.
15         THE COURT:  All right.  Do you have any
16  witnesses here today on behalf of the State?
17         MS. JACK:  We do, Your Honor.  We have the
18  Davis family and several police officers and other
19  civilian witnesses outside the courtroom.  Would the Court
20  like us all to bring them in?
21         THE COURT:  Yes.  Do you have any witnesses?
22         MR. HEISKELL:  We have one witness, Your
23  Honor, who is present.
24         MR. CHAMBLESS:  Judge, while we're -- while
25  they're gathering, if we could address -- address one
```

8

```
1   issue related to this.  We have the Davis family.  We have
2   Ben, Kila, Rhett and Riley here.  We would ask if the
3   Court would consider their exemption from the rule in this
4   case.  They wish to be in the courtroom to witness the
5   proceedings.  That's our request.
6          MR. WESTFALL:  Your Honor, that's not a legal
7   basis for exemption from the rule.  And it would be
8   just -- I mean, on top of everything else, they're wearing
9   unique badges that the Jury is going to see.  I mean, it
10  would be highly prejudicial.  And I've spoken with -- with
11  counsel about this, about what the solution could be.  But
12  if they're going to testify, Your Honor, we have to object
13  to them sitting here during the trial.
14         THE COURT:  Are they going to testify during
15  the first phase of the trial?
16         MR. CHAMBLESS:  We anticipate one, at least
17  one of the family would testify during the first phase of
18  the trial, yes, sir.
19         We also need to address, Judge, we have an
20  investigator, Danny McCormick, who will be helping us with
21  witnesses in and out and is potentially also a witness,
22  and I guess I'm inquiring about that.
23         THE COURT:  All right.  First let me swear in
24  these witnesses.  Just line up across here shoulder to
25  shoulder, please.  Okay.  Each of you raise your right
```

9

```
1   hand.
2          Do each of you swear or affirm to --
3          MR. HEISKELL:  Your Honor, I'm sorry.  We
4   have -- our witness failed to come up.  My apologies.
5          THE COURT:  Okay.  Everybody raise your right
6   hand.
7          (Witnesses sworn.)
8          THE COURT:  Will you tell me your name,
9   please, sir.
10         THE WITNESS:  Lorne, L-O-R-N-E.
11         (Interruption in proceeding.)
12         THE WITNESS:  Lorne Tracy, T-R-A-C-Y.
13         THE WITNESS:  Stephanie Phillips.
14         THE WITNESS:  Adrian Allcon.
15         THE WITNESS:  Jerry Cedillo.
16         THE WITNESS:  Chelsea Circelli.
17         THE WITNESS:  Vincent Circelli.
18         THE WITNESS:  Jamie Vessell.
19         THE WITNESS:  Ramon Morales.
20         THE WITNESS:  Mary Smith.
21         THE WITNESS:  Mary Burdette.
22         THE WITNESS:  Sammy Abu-Lughod.
23         THE COURT:  And --
24         THE WITNESS:  Danny McCormick.
25         THE COURT:  All right.  And these two right
```

10

1 here, raise your right hand.
2         (Witnesses sworn.)
3         THE COURT: All of you have been sworn as
4 witnesses. The rule has been invoked, which means you'll
5 have to wait outside the courtroom until you're called to
6 speak as a witness in this case. You're not to talk to
7 each other about anything that goes on in this trial.
8 You're not to converse with anyone else regarding this
9 trial other than one of the attorneys associated with this
10 trial. You're not to read any reports in the newspaper or
11 watch any reports on the TV or listen to anything on the
12 radio regarding this particular trial until the trial is
13 over and you've been excused as witnesses.
14         Do you understand? Thank you. You may be
15 excused.
16         MS. JACK: Judge, both the Defense and State
17 agree to excuse the investigators from the rule.
18         THE COURT: Okay.
19         MR. WESTFALL: Yeah, investigators, Your
20 Honor, kind of falls under a different rule, but these are
21 fact witnesses.
22         MS. JACK: Sheriff, Deputy.
23         These are two additional witnesses, Your
24 Honor.
25         THE COURT: Come forward, please. Please

11

1 raise your right hand.
2         (Witnesses sworn.)
3         THE COURT: With regard to the Sheriff's
4 officers and Officer Gaudet, they would be under the rule
5 with regard to any testimony or any events in the trial
6 with regard to the proceeding; but with regard to
7 security, he's not forbidden to talk about this or to
8 understand or to be in charge. Is that your
9 understanding?
10         MR. WESTFALL: Yes, Your Honor.
11         THE COURT: Correct. The rule is invoked, so
12 with regard to your testimony or exhibits or the official
13 proceeding and what is presented to the Jury, not
14 presented to the Jury, you're not to comment on that.
15 You're not to witness any of that. You're supposed to
16 wait outside the courtroom until you're called as a
17 witness. You're not to read any reports in the media or
18 listen to any reports on TV on the radio regarding this
19 particular trial. You can talk to attorneys related to
20 this case and you can talk to other Sheriff's Department
21 officials about your duties regarding security for this
22 event.
23         Any questions, please talk to the District
24 Attorney first and then Defense Counsel at the same time.
25 You may be excused.

12

1         MR. CHAMBLESS: If I can address the Court.
2 Judge, we understand that the law is in light of an
3 objection then we would not have permission -- the law is
4 that we cannot have that family member in here if they're
5 going to testify, in light of an objection, in which there
6 is one. So we understand that being the situation. So we
7 just made the request so we -- that's where we are.
8         I have one other thing to bring up before,
9 Your Honor, before we get into opening statement. And I
10 think we have an agreement on that. There are -- there is
11 a case which I have given to Mr. Heiskell and
12 Mr. Westfall, also Your Honor. Court of Criminal Appeals
13 case, December 14th, 2011, has to do with same transaction
14 contextual evidence.
15         And I spoke yesterday with Mr. Heiskell and
16 indicated that we intended to begin with a showing of the
17 evidence on a burglary that took place on June 22nd at the
18 home of Chelsea and Vincent Circelli. Out of that home, a
19 handgun, a pistol, was taken, among other things.
20         We also intend to show as part of the
21 evidence at the beginning of Guilt/Innocence an incident
22 on June 24th, 2010, two days later in which a young man
23 named Sammy Abu-Lughod, his 2005 Dodge Stratus was taken
24 at gunpoint, and the person who did that, we intend to
25 show, is Mr. Soliz.

13

1         On June 29th, there is a third extraneous
2 involving a chase, evading arrest, in which Mr. Soliz was
3 driving the stolen Stratus and possessing the stolen gun.
4 Our position is that those events would not make sense
5 unless we were able to explain the background, contextual
6 evidence, the same transaction, contextual evidence, which
7 we believe Devoe versus State addresses. I believe we
8 have -- we're of one accord on that, but I just bring that
9 to the Court's attention before we get it in opening
10 statement.
11         MR. HEISKELL: That is correct, Your Honor.
12 We agree that those matters are admissible, and I did
13 confirm that with Mr. Chambless yesterday when we spoke
14 briefly about this issue. So there will not be any
15 objection to getting into those extraneous issues at this
16 point.
17         MR. WESTFALL: In particular, the case that
18 the State provided and we already knew about it is Devoe
19 versus State, 354 S.W.3d 457, out of the Court of Criminal
20 Appeals in December of 2011. And at page 470, they say,
21 in part, we conclude the trial court did not err. It was
22 within the zone of reasonable disagreement to find the
23 various offenses to be contextual evidence. This was an
24 unending crime spree that lasted several days. We just
25 believe in light of that precedent that it all comes in,

14

1 Your Honor.

2       THE COURT: Thank you.

3       MR. WESTFALL: So, yes, we are in agreement.

4       MS. JACK: And just for clarification

5 purposes, is it my understanding then that there is no

6 motion in limine in effect? You're not asking for any

7 motion in limine with regard to the other offenses for

8 which Mr. Soliz is charged in Tarrant County?

9       MR. WESTFALL: We are not, Your Honor.

10       MS. JACK: The other thing, Your Honor, we

11 would ask for a motion in limine with regard to the fact

12 that Tarrant County has filed notice to seek the death

13 penalty. We think it's not relevant to the trial before

14 this Jury.

15       MR. WESTFALL: Your Honor, I mean, it could

16 become relevant. We certainly can agree to a motion in

17 limine until such time as we can make an argument to the

18 Court why it's relevant.

19       THE COURT: Okay. Thank you. All right.

20 Anything further?

21       You may bring in the Jury.

22       MR. STRAHAN: One second. We're going to

23 remove our witnesses.

24       THE COURT: Can't they stay for opening

25 arguments and then -- the rule is invoked as of first

15

1 witness, not opening arguments, so they may stay for

2 opening argument.

3       (Discussion off the record.)

4       MS. JACK: Did you say that they could stay

5 for opening?

6       MR. WESTFALL: But here's the deal though.

7 Then -- then while the Jury is sitting here, everybody is

8 going to get up and file out of the courtroom. Could --

9 could we sit in the back maybe just for opening

10 statement?

11       THE COURT: I -- I don't think so.

12       MR. WESTFALL: Well, we -- I mean, just for

13 the record, the -- an entire row is going to stand up and

14 walk out of the courtroom after opening statement.

15       (Jury present.)

16       THE COURT: All right. Thank you. You may

17 be seated.

18       Let the record show in Cause No. F4059 (sic),

19 the State of Texas versus Mark Anthony Soliz, the State's

20 attorneys are present and ready, Defense attorneys are

21 present and ready, the Defendant is present, and the Jury

22 is now in the courtroom.

23       At this time, I'll give you the oath. If

24 you'll each raise your right hand.

25       Do you solemnly swear or affirm that you will

16

1 a true verdict render according to the law and the

2 evidence given to you in this case, so help you, God?

3       JURY PANEL: I do.

4       THE COURT: Thank you. Put your hands down.

5 At this time, ladies and gentlemen, I'll read you the

6 instructions of the Court. You've gotten a copy of them

7 there with you.

8       Members of the Jury, Texas law requires that

9 you be given the following instructions before entering

10 upon your duties. Number one. No one may discuss this

11 case with you during your service as a Juror. Do not

12 mingle with nor talk to the lawyers, the witnesses, the

13 parties or any other person who might be connected with or

14 interested in this case except for casual greetings. Do

15 not feel offended if the lawyers in this case do not

16 communicate with you. To maintain the integrity of the

17 jury system, the law prohibits them from speaking with you

18 until you are released from duty on this case.

19       Number two. Do not accept from nor give to

20 any of those persons any favors, however slight, such as

21 rides, food or refreshments.

22       Three. Do not discuss anything about this

23 case or any evidence in this case or even mention it to

24 anyone whomsoever, including your wife or husband, nor

25 permit anyone to mention it in your hearing until you are

17

1 discharged as Jurors or excused from this case. If anyone

2 attempts to discuss this case, report it to me at once.

3       Four. Do not even discuss this case or any

4 evidence in this case with your fellow Jurors until after

5 you've heard all the evidence, the Court's charge, the

6 attorney arguments, and until I've sent you to the jury

7 room to consider your verdict.

8       Five. Do not make any investigation about

9 the facts of this case. Occasionally we have a Juror who

10 privately seeks out information about a case on trial.

11 This is improper. All evidence must be presented in open

12 court so that each side may question the witnesses and

13 make proper objections. This avoids a trial based upon

14 secret evidence. These rules apply to the Jurors the same

15 as they apply to the parties and to me. If you know of or

16 learn anything about this case, except from the evidence

17 admitted during the course of this trial, you should tell

18 me about it at once. You have just taken an oath that you

19 will render a verdict on the evidence submitted to you

20 under my rulings.

21       Six. Do not make any personal inspections,

22 observations, investigations or experiments, nor

23 personally view the premises, things or articles referred

24 to by the witnesses in this case but not produced in the

25 court. Do not let anyone do any of these things for you.

18

1  Seven. Do not tell other Jurors your own
2  personal experiences nor those of other persons, nor
3  relate any special information. A Juror may have special
4  knowledge of matters such as business technical or
5  professional matters or may have expert knowledge or
6  opinions or may know what happened in this or some other
7  lawsuit. To tell the other Jurors any of this information
8  is a violation of these instructions.
9  Eight. Do not seek information contained in
10  law books, dictionaries, public or private records or
11  elsewhere which is not admitted in evidence. You're not
12  permitted to read any newspaper articles about this trial
13  or watch any television or listen to any radio reports
14  that discuss this trial.
15  Nine. Do not use your cell phone, your smart
16  phone or the Internet to transmit or receive any
17  information about this case. You're instructed not to
18  blog, tweet, twitter, facebook, text, instant message or
19  email about this case until after you're released from
20  jury service.
21  At the conclusion of all the evidence, I may
22  submit to you a written charge. Since you will need to
23  consider all the evidence admitted by me, it's important
24  that you pay close attention to the evidence as it is
25  presented. Texas law permits proof of any violation of

19

1  the rules of proper jury conduct. By this I mean that
2  Jurors and others may be called upon to testify in open
3  court about acts of jury misconduct. I instruct you
4  therefore to follow carefully all the instructions I have
5  given you as well as the others which you will receive
6  later while this case is on trial. You may keep these
7  instructions and review them as the case proceeds. A
8  violation of these instructions should be reported to me.
9  Is State prepared to present the indictment?
10  MR. STRAHAN: We are, Your Honor.
11  Cause No. F45059, styled the State of Texas
12  versus Mark Anthony Soliz. In the name and by the
13  authority of the State of Texas, the Grand Jury for the
14  County of Johnson, State of Texas, duly selected,
15  impaneled, sworn, charged and organized as such at the
16  July term A.D. 2010, of the 413th Judicial District Court
17  for said county, upon their oaths present in and to said
18  court at said term that Mark Anthony Soliz, hereinafter
19  styled Defendant, on or about June 29th, 2010, and before
20  the presentment of this indictment in the county and state
21  aforesaid, did then and there intentionally cause the
22  death of an individual, Nancy Weatherly, by shooting her
23  with a firearm, and the said Defendant was then and there
24  in the course of committing or attempting to commit the
25  offense of robbery of Nancy Weatherly.

20

1  THE COURT: With regard to Count One of the
2  indictment, Mr. Soliz, how do you wish to plead?
3  THE DEFENDANT: Not guilty.
4  THE COURT: Thank you.
5  MR. STRAHAN: Paragraph two. And it is
6  further presented in and to said court that the Defendant,
7  in the County of Johnson and state aforesaid, on or about
8  the 29th day of June, 2010, did then and there
9  intentionally cause the death of an individual, Nancy
10  Weatherly, by shooting her with a firearm, and the said
11  Defendant was then and there in the course of committing
12  or attempting to commit the offense of burglary of a
13  habitation of Nancy Weather (sic), who was the owner of
14  said habitation; against the peace and dignity of the
15  State, signed, foreman of the Grand Jury.
16  THE COURT: Mr. Soliz, with regard to Count
17  Two, how do you wish to plead?
18  THE DEFENDANT: Not guilty.
19  THE COURT: Court will receive your verdict
20  of not guilty.
21  State ready for opening argument?
22  MR. CHAMBLESS: Yes. May it please the
23  Court.
24  THE COURT: Yes. Before we do that, on
25  behalf of the State of Texas, Mr. Hanna, would you

21

1  introduce everybody on your side of the room. And then
2  we'll let Defense introduce themselves to the Jury.
3  MR. HANNA: Sure, Judge. Larry Chambless
4  here to my right, Martin Strahan, Christy Jack, all
5  Assistant District Attorneys.
6  THE COURT: Thank you.
7  MR. HEISKELL: Your Honor, thank you. Mike
8  Heiskell, along with my co-counsel Greg Westfall, and, of
9  course, Mark Soliz.
10  THE COURT: Thank you. You may proceed.
11  STATE'S OPENING STATEMENT
12  MR. CHAMBLESS: Good morning. You know, I
13  think we -- we spent a long time together, each of you
14  spent a couple hours with us. And, you know, I'm so
15  privileged to be associated with these attorneys, the ones
16  that Mr. Hanna called out, Christy Jack, Martin Strahan,
17  and these other fine attorneys, Mr. Heiskell and
18  Mr. Westfall. But I think you would recognize, as you
19  think about your service, that this is not about, not at
20  all about the attorneys. It's about something bigger than
21  all of us. It's about the evidence and the truth,
22  whatever truth the evidence tells you about. And we're
23  going to present the evidence to you over the course of
24  several days. And we know that you will give it your full
25  attention. We're very grateful for that.

22

1        The opportunity I have right now in opening
2  statement is to outline, to tell you a little bit of what
3  we anticipate, kind of the summary of what the evidence
4  will be.
5        I'm going to use this white board over here
6  to write down some names. You're going to hear some
7  recurring names and some nicknames of some individuals.
8  There are certain pieces of evidence that are crucial and
9  critical in this case. And there's some names and
10  addresses and dates that I'm going to write out here as we
11  go through this process.
12        You heard in the indictment that on June
13  29th, that Mark Soliz is alleged to have caused the death
14  of Nancy Weatherly, on June 29th, 2010, by shooting her
15  with a firearm. The evidence will show that occurred at
16  her house on FM 2331 in the morning hours between
17  approximately 8 and 10 a.m.
18        But in order to understand that point in
19  time, it's necessary to go back in time approximately a
20  week. We begin on June 22nd of 2010 at the home of
21  Vincent Circelli. He and his wife, Chelsea Circelli,
22  lived at 5317 El Campo in Fort Worth. You'll hear from
23  them. They had lived there; hadn't been married all that
24  long. They went to work. Both left the house at
25  approximately 8 a.m. that morning, June 22nd, 2010.

23

1  You'll hear from Mr. Circelli that he is a lawyer. He
2  works in a civil practice, and I think he does bankruptcy
3  work. So he goes to work at about 8, and Chelsea, his
4  wife, also leaves at about 8.
5        In the early afternoon, Chelsea comes back
6  between 2, 3, I think 3:00, and she picks up an item that
7  I think had been left for her there, and I think leaves at
8  3:30. They meet later at -- after work at 7, 7:30
9  approximately. And then they come home at 8:30 that
10  night. They come up to the door of the house, and the
11  door is kicked in. Parts of the edge side of the door
12  splintered off. Shotgun shells on the outside stoop just
13  outside the door. That's what they came home to at about
14  8:00, 8:30.
15        Inside the house -- you'll see pictures.
16  Inside the house, mattress moved, drawers moved, items
17  moved, things taken. Among the things taken were five
18  long guns, I believe, and one pistol, one handgun. And
19  it's this handgun that I would like for you to think about
20  and remember as we go through this process. I anticipate
21  that the -- Mr. Circelli, Circelli, will tell you that he
22  had a Hi-Point 9 millimeter, and it had a serial number of
23  P1400875. June 22, 2010.
24        You're going to hear from several witnesses,
25  and I want to write some on the left side, some witnesses

24

1  that you're going to hear from and heard here about in the
2  course of this trial. First of all, you'll hear about the
3  Defendant Mark Soliz. You'll hear a nickname used, Kilo.
4  You'll hear about Jose or Joe Ramos. You're going to, some,
5  had been known by that nickname, Kilo. Arturo Gonzales,
6  you're going to hear about, known by the nickname Shadow.
7  On June 29th, he enters the picture that you're going to
8  hear about. He lives in the 3200 block of Oscar Street in
9  Fort Worth, Texas. You're going to hear about a -- from a
10  lady by the name of Jamie Vessell. You're going to hear
11  about a lady named Cathy Richardson. And I appreciate
12  your patience. And you're going to hear about a lady
13  named Elizabeth Estrada.
14        So the first thing we have is the stolen
15  handgun on June 22nd. Then we go to June 24th, 2010.
16  This lady's name over here, nickname I think you'll hear,
17  also the phrase, "Pipa", "Pipa". Two days later. There's
18  a store in Fort Worth on 604 North Riverside. It's called
19  a Discount Food Store. And a young man by the name of
20  Sammy Abu-Lughod had stopped there and bought something,
21  drink. He's in his late 20s, early 30s approximately. He
22  was driving a 2005 -- let me write his name first. He was
23  driving a 2005 Dodge Stratus, green in color, the plate
24  number HGB-006.
25        I anticipate the evidence to be that he was

25

1  getting in his car outside the Discount Food Store after
2  buying a drink. He got in his car, and he noticed a young
3  Hispanic male approached him on the driver side. And he
4  stopped, lowered the window, and he thought who would
5  listen to what he had to say. And the man who approached
6  his window was Mark Soliz. Mark Soliz. He said he wanted
7  50 or 60 dollars, I anticipate the evidence will show. He
8  asked Mr. Lughod if he had 50 or 60 dollars. And Sammy
9  said "No, I don't have that kind of money." I anticipate
10  Sammy will tell you at that point he drew a gun out, a gun
11  that looked very much like a black 9 millimeter handgun,
12  and pointed it at him and told him to get out. And he
13  took his wallet. He had $250 in it. He took inside his
14  wallet, of course, his credit cards, driver's license. He
15  took his cell phone, Sammy's cell phone. And he took his
16  car. He took his car.
17        Now, I anticipate the evidence to be that
18  going back just a minute to this stolen gun, you're going
19  to hear from several witnesses about this. You're going
20  to hear directly from Sammy what happened to him and a
21  couple of officers about that process. But going back to
22  this, there was further investigation. You're going to
23  hear, first of all, from Jamie Vessell. Remember that
24  name on the left here, Jamie Vessell. She's going to
25  testify that sometime in the course of the events here,

26

1  that Joe Ramos, Jose Ramos, and Mark Soliz came over to a
2  house where she was with a Cathy Richardson. And they had
3  a lot of guns. They brought in a lot of guns.
4           There's going to be a person testify by the
5  name of Ramon Morales. Ramon Morales. He will testify
6  and he will tell you that he got with Ramos and Soliz and
7  they sold him -- they sold Morales three of the long guns
8  for a hundred dollars. He will testify, we anticipate the
9  evidence to show, Ramon Morales will tell you that Kilo,
10 that Mark Soliz did not sell the handgun, the 9
11 millimeter, and he made the statement while holding the
12 gun, "I have other plans for this." You'll hear from
13 those witnesses.
14          Two of the long guns were recovered. Ramon
15 Morales will tell you he pawned the long guns, and two of
16 those long guns were recovered by the police after this
17 series of events. So you'll see the flow of that as far
18 as the stolen guns, long guns and then the handgun.
19          So as of June 24th, we have a stolen gun, and
20 we have a stolen car being this Dodge Stratus. So if you
21 can kind of visualize it in a sequence like this as we go
22 through this process.
23          The next event that you'll hear about, I
24 guess sequentially, we move to June 29th, June 29th. And
25 by this time, officers are beginning to work on this

27

1  matter. They are, through a series of interconnected
2  events, they're beginning to really focus on finding Mark
3  Soliz, Jose Ramos, and in particular, this Dodge Stratus.
4  And they're out looking, various officers are out
5  looking.
6           You'll hear from Detective Jerry Cedillo,
7  among others, that he was in a neighborhood in Fort Worth
8  around Arturo Gonzales's house which is in -- around
9  Oscar, and just in that neighborhood on June 29th, and
10 Detective Cedillo sees, at a distance, he sees that Dodge
11 Stratus, the one everybody is looking for, the Dodge
12 Stratus. He sees it in the evening hours of June 29th.
13 He sees it and loses it in that neighborhood, so he
14 communicates with his other police officers who are in the
15 area. About 10 minutes later, he sees it again, and then
16 again loses vision, eyesight of it. So they're focusing
17 on this stolen car, the Dodge Stratus. On June 29th,
18 Detective Cedillo sees it twice, loses it twice, but
19 everybody is looking for it.
20          There's another detective named Alaniz who is
21 set up near the address on Oscar, near Shadow's house.
22 And he'll testify that at about 10:30 or 11, he sees a
23 Jeep, black Jeep Liberty come out from behind Arturo
24 Gonzales's house, and he makes that known. And then all
25 of a sudden, he sees the green Dodge Stratus pulling out

28

1  right behind the Jeep Liberty.
2           So at about 10:30 on June 29th, they catch
3  sight of, and they begin the chase. They stop the Jeep
4  Liberty initially, and but the other car, the Dodge
5  Stratus, takes off, and you'll hear about that. And there
6  is a chase that takes place. The chase takes a period of
7  time, not a real long chase, but it ends up on a street
8  called Braswell. The driver of the Dodge Stratus is Mark
9  Soliz. He crashes into a fence on Braswell, gets out of
10 the Dodge Stratus, and runs. And you'll hear from the
11 officers about that chase. There's a sergeant who will
12 tell you how he pursued Mark Soliz from the time he got
13 out of the Dodge Stratus until the time that he was
14 captured.
15          So if you can kind of get the sequence of
16 events, so about 10:30 on June 29th, 11:00, Mark Soliz is
17 driving the 2005 Dodge Stratus. When they come back to
18 the Stratus after having captured Mark Soliz, on the
19 floor, in his possession, on the floor of the Dodge
20 Stratus, is the stolen gun, the Hi-Point 9 millimeter.
21 Also in the car with him at the time that the chase
22 began was Pipa, Elizabeth Estrada; that last name on
23 the left there. She's with him, but he's captured
24 driving the Stratus. He's captured with possession of
25 the 9 millimeter gun.

29

1           There were four people in the Jeep Liberty,
2  four people in the other car. Jose Ramos was one of those
3  people. Shadow was one of those people. And you'll hear
4  also that a Whitney Lewis and Cathy Richardson were in
5  that Jeep Liberty.
6           All of these people, all of these six
7  individuals were taken down to the police station and they
8  are talked with at the police station, all six people,
9  Cathy Richardson, Whitney Lewis, Jose Ramos, Arturo
10 Gonzalez, Elizabeth Estrada, and Mark Soliz.
11          As a result of their investigation that
12 continues -- now we're past 11, we're into the next day,
13 the 30th, early morning hours, if you can picture this, 2,
14 3 a.m. in the morning of the next day -- officers learn
15 that there is a truck in the same neighborhood, in fact,
16 it's a -- it's on a street called Hutchinson. They locate
17 on 6:30 in the early morning hours, a 2003 Tundra. And
18 it's on a street called Hutchinson, which you'll see from
19 the map where that is located, but it's within a couple
20 blocks. It's nearby the house where the vehicles had
21 pulled out from on Oscar. It's back behind there.
22          So officers go and find this truck on -- at
23 this location on Hutchinson. When they do, they look at
24 it, they are able to check the registration of the truck,
25 and they discover that it belongs and is owned by Nancy

1 Weatherly, Nancy Weatherly from Godley, Texas. And her
2 address is 14386 FM 2331, Godley, Texas.
3     So officers have found a truck up in Fort
4 Worth in the early, oh, 3, 4 a.m. on June 30th. So on
5 June 30th, with this information, two officers from Fort
6 Worth decide to go to Godley. They contact the Johnson
7 County Sheriff's Office, and they say we need to do a
8 welfare check; we need to go out to Ms. Weatherly's house
9 and do a welfare check, see if she's okay.
10     You'll hear from the evidence, and I
11 anticipate it will show that Nancy, on this date, was 61
12 years old. She had lived at that location, 14386 FM 2331,
13 for a couple of years. Anticipate you'll see pictures, a
14 lot of pictures. It's a single-family residence, very
15 nice home. Sits up on a hill about a hundred yards back
16 from FM 2331, fencing all around, and fencing also close
17 to the house. And as it is in the country, there's
18 some -- it -- I guess you don't have next-door neighbors,
19 but the next neighbor is a -- is an acre or so away. And
20 her next neighbor, I anticipate the evidence to show, was
21 her son, Ben Davis. Ben's married to Kila. They have two
22 sons, Rhett and Riley.
23     So they proceed down to Godley, Texas to look
24 for and to do a welfare check at Nancy's house. And when
25 they get there, they go in with a Johnson County deputy,

1 Deputy Truitt, and they walk in the house and they go
2 through the back door, and they see on the floor, face
3 down with her hands underneath her, Nancy Weatherly, in a
4 pool of blood. She's been shot in the back of the head.
5 The bullet came out the front of the head. And there was
6 a bullet and a shell casing found near her body.
7     As you can imagine, officers respond and they
8 begin an investigation of this murder. A lot of officers
9 arrive. Two officers from Mansfield Police Department
10 come after being requested to come. You'll hear from
11 Detective Blansit or Max Courtney, possibly both. You'll
12 hear from one of the Johnson County detectives who
13 responded initially, and he took a videotape of the scene
14 that I just talked about. You'll see how the -- what the
15 house looked like. You'll see drawers pulled out, thrown,
16 items thrown all throughout the house. Appears to be
17 the -- a setting for a TV. The TV is gone. House is
18 ransacked. And he took a videotape of that and you'll see
19 what it shows.
20     Officers began to collect evidence from the
21 location, these two officers especially, Max Courtney,
22 Detective Blansit. They take a lot of things. They take
23 50 or 60 items. They process a lot of things. But the
24 things that are significant is the shell casing found near
25 her body, the bullet found near her body, and a print, a

1 latent print, fingerprint on the latch of a cassette case
2 in the west bedroom of her house. So a print, a bullet,
3 and a shell casing.
4     A lot of other things, and you'll hear as
5 these experts and others testify about what was obtained
6 from the house. You'll hear about all of that. They also
7 process the Tundra, the Tundra, her vehicle. It is
8 towed or taken, driven back or taken from Fort Worth back
9 to Cleburne where it is processed by Courtney and
10 Blansit. And they obtain a number of things from the
11 Tundra. And among those are latent prints and objects
12 within the Tundra, and you'll hear about that. You'll
13 hear about that.
14     You'll hear that Mark Soliz spoke with two
15 detectives in Fort Worth, and he was speaking with them
16 in this time frame, early a.m. hours of June 30th, 5, 6,
17 7 a.m. He's speaking with Detective Paine and Detective
18 Boetcher of Fort Worth Police Department. I anticipate
19 you will -- you'll hear and see a verbal and oral video
20 recorded statement and also a written statement made and
21 given by Mark Soliz. But more on that later.
22     Mark Soliz, his hands, his clothing, the
23 Dodge Stratus, all of this evidence is processed. Among
24 the things that they processed is something called gunshot
25 residue, G.S.R., gunshot residue. You'll hear from Kelly

1 Belcher who is an expert in this area. I anticipate
2 she'll tell you that there are significant things that
3 she -- particular things that she's looking for: barium,
4 antimony and lead, three things in this gunshot residue.
5 When a gun is discharged, in the majority of primer
6 discharges, these three things are found: barium, antimony
7 and lead.
8     Now, you will hear two types of findings from
9 Kelly Belcher. The one that's significant, the ones that
10 -- that is important and carries more evidentiary weight
11 is if -- is when she tells you that it is "characteristic
12 of", as opposed to "commonly associated with". Don't know
13 all there is to know about this, but if you hear the
14 phrase "characteristic of", that's more significant
15 evidentiary-wise. If she says this, that means all three
16 of those elements are present in the sample, barium,
17 antimony and lead, all three. If it's commonly
18 associated, then only one of those elements is found in
19 the sample.
20     They test for G.S.R., gunshot residue, and
21 the only places where this type of G.S.R. is found is on
22 Mr. Soliz's hand, a bandanna in the Stratus -- the
23 bandanna, also I anticipate the evidence to show, there is
24 what appears to be blood on the bandanna in the Stratus.
25 You'll see pictures of it. DNA test was done on that, and

**34**

1 it matches to Mr. Soliz.

2 But G.S.R. is what we're talking about at
3 this particular moment, also on his hand, his bandanna,
4 the front of his pants, and in multiple locations on the
5 Stratus that he was driving. Remember he was the one
6 evading arrest on June 29th, 2010. So his hand, the
7 bandanna that had his blood on it, the front of his pants,
8 the Stratus, and multiple locations, you'll hear about
9 that, and a white towel. The only other location that had
10 G.S.R. characteristic of was on the body of Nancy
11 Weatherly.

12 I anticipate you'll hear evidence that the
13 print, the latent print, there is -- they'll testify as to
14 how this is done, how a latent print is taken, but there
15 is a print taken from a cassette case in Nancy's house, a
16 bedroom, and it matches to Mr. Soliz.

17 They do some examination of the bullet, and
18 they do some examination of the casing. I anticipate the
19 evidence to be that the expert, the experts, actually
20 there are going to be two in this area who will testify
21 that the casing has sufficient individual characteristics
22 to say, to conclude that the casing found within two feet
23 of her body was fired from this gun stolen by Mr. Soliz,
24 possessed by Mr. Soliz. The gun, the casing, and the
25 expert evidence will also show that the bullet has

**35**

1 sufficient individual characteristics to conclude that it
2 was fired from the Hi-Point 9 millimeter.

3 You'll hear also from other witnesses, and I
4 guess these are other, sort of on the side, different
5 things. You'll hear that, and you'll see the pictures,
6 that from Nancy's house a TV was taken. It appears that
7 way. It looks like there's a spot for a TV, and it's
8 gone.

9 You'll hear from a man named J.T. Hinojosa
10 who will testify that Mark Soliz and Jose Ramos sold him
11 Nancy's TV. But also in his possession was found not only
12 the TV but two cell phones that belonged to Nancy
13 Weatherly. Mr. Hinojosa delivered to another guy named
14 Brian Brown credit cards and driver's license belonging to
15 Nancy Weatherly. They came -- all of this came from Mark
16 Soliz and Jose Ramos.

17 You'll hear from the Medical Examiner,
18 Dr. Marc Krouse, from Fort Worth. He will testify as to
19 his autopsy of Nancy Weatherly. He'll tell you that the
20 cause of her death was a gunshot wound to the head. I
21 anticipate the evidence to be that the entry wound was in
22 the back, upper back of her head. I anticipate he'll tell
23 you that it was not a contact wound but something he calls
24 an intermediate range shooting, such that there was powder
25 stippling around the entrance wound. The bullet tore

**36**

1 through her brain, bone, brain matter, and the bullet
2 exited approximately this part of her head. And outside
3 of her body, you're going to hear that there was what
4 appeared to be bone with molten metal. You'll hear his
5 testimony that the manner -- that the manner of death was
6 homicide.

7 He gave a statement, a written statement,
8 Mark Soliz did. And he said they were just driving
9 around. They got the idea to get some more money, get
10 some money. He said, I was driving the green Dodge
11 Stratus. I was familiar with the area around Godley. We
12 found this house in the middle of nowhere. They went up,
13 he and Joe, Jose Ramos, knocked on the door. It was a
14 white female, elderly, Nancy. Granny. When she died --
15 when she opened the door, she was wearing a white T-shirt,
16 said "granny" on it. And she was wearing pajamas
17 bottoms. She opened the door to these two guys, to Mark
18 Soliz and Jose Ramos. Mark Soliz said, I had the gun and
19 I raised it up and kind of walked in the house. She
20 backed up. I told her to sit.

21 Anticipate the evidence to be that she sat
22 in the chair by her table that she ate at. Anticipate
23 the evidence to be as she was there, they told her to
24 be quiet, sit still and for however long tearing through
25 her house, taking things from her house, throwing things

**37**

1 around. They take her car -- her truck. They take her
2 TV. They take whatever they want to take.

3 Mark Soliz then says, he says -- he says, I
4 left the gun on the table in front of Nancy. And he gives
5 this story in this written statement. He says, I left the
6 gun on the table in front of Nancy and I go outside and
7 Joe is still in the house, Jose Ramos, and I hear a
8 gunshot.

9 The officers confront him about this story.
10 And what he ends up saying in a handwritten statement at
11 the very bottom, "It was me" Mark Soliz "that shot the
12 woman".

13 There's a lot of evidence and you'll hear a
14 lot of evidence, some of it tedious, all of it important.
15 She was shot in the back of the head for a pittance of
16 property by Mark Soliz on June 29th.

17 Thank you for your attention.

18 MR. HEISKELL: Counsel, I'm going to --

19 MR. CHAMBLESS: Yes, sir.

20 (Pause in proceeding.)

21 MR. HEISKELL: May it please the Court.

22 THE COURT: Yes, sir.

23 MR. HEISKELL: Counsel for the State,

24 government, Mr. Westfall, Mark.

25 THE DEFENDANT: Yes, sir.

38

1   DEFENDANT'S OPENING STATEMENT
2   MR. HEISKELL: We are what we learn. We are
3 what we live. You know, many of us have been fortunate
4 enough to be blessed with parents who have raised us, and
5 if parents weren't around, grandparents, perhaps cousins,
6 aunts, uncles, whoever, maybe a good Samaritan once in a
7 while, to show us the way, to guide us, to lead us, to
8 discipline us when necessary. But there are others who
9 have never had that. Mark is one of them.
10   Ladies and gentlemen, the journey to the
11 truth is taken one step at a time. And let me tell you
12 about Mark Soliz, what we anticipate the evidence to show
13 you during the course of this trial. He was born January
14 27th, 1982, 30 years ago last month. He was born brain
15 damaged. He was born because he had a 22-year-old single
16 mother who --
17   MS. JACK: Judge, I'm going to object. This
18 is irrelevant at this time.
19   MR. HEISKELL: Judge, I'm just giving
20 background information.
21   MS. JACK: That would be appropriate at a
22 different phase of this trial.
23   MR. HEISKELL: Judge, we anticipate this to
24 come into evidence.
25   THE COURT: Overruled.

39

1   MR. HEISKELL: Thank you.
2   A 22-year-old single mother who, as many of
3 you know who drink alcoholic beverages, there's a warning
4 not to drink if you're pregnant. But she did so as she
5 carried Mark Soliz. But not only that; she sniffed paint,
6 she huffed paint, she used drugs. She was a woman of the
7 streets in Fort Worth. Mark Soliz, at a very young and
8 tender age, lived basically without any guidance, no
9 father, no structure, no nothing, no boundaries. Mark
10 Soliz roamed the streets at 4 and 5 years of age; police
11 officers bringing him home. Mark Soliz, who suppose he
12 had a mother to guide him, to discipline him, to give him
13 boundaries, had none, because she was still, after
14 conception, after giving birth, drugging, sniffing paint,
15 huffing paint, doing drugs, doing alcohol, and in the
16 streets, including prostituting herself. Mark Soliz did
17 have some cousins and aunts, but some of those same aunts
18 and cousins also were in that lifestyle of huffing paint,
19 sniffing paint, alcohol, drugs.
20   You will hear, ladies and gentlemen, of some
21 of the most horrendous facts not only related to what
22 Mr. Chambless told you about that happened in June of
23 2010, a childhood that no one should endure, because
24 you will hear that Mark Soliz, despite the fact that he
25 had this, was taken to school when he had a chance to go

40

1 to school but was in special education, moved from school
2 to school to school. And, in fact, from grade eight to
3 ten was in several different schools, two of them here in
4 Johnson County, one in Keene and one in Grandview.
5   You will hear that Mark Soliz, during the
6 course of that young life, began to sniff paint because
7 his mother taught him how to, used drugs, used alcohol,
8 and at age 10 was hospitalized in the John Peter Smith
9 Hospital Psychiatric Unit at age 10. We anticipate the
10 evidence to show you the records will reflect he was
11 hospitalized for carrying guns, sniffing paint, robbing,
12 stealing, fighting, and hearing voices telling him to kill
13 people.
14   You will hear that a doctor attended to him,
15 a psychiatrist, who indicated that we should look into
16 fetal alcohol syndrome disorder, and he's not to go back
17 to that chaotic home life. But no one followed up. He
18 went back to that same home. Went back to it. You will
19 hear that Mark Soliz, after going back to that home,
20 continued in the lifestyle reflective in the records of
21 John Peter Smith Psychiatric Unit, stealing, burglarizing,
22 many times with his own cousins who took him to the east
23 side of downtown Fort Worth where they broke into cars,
24 broke into parking meters, used Mark because he was small
25 and had these small arms that could break into a car and

41

1 put his hand through a window and unlock the door.
2   He was picked up and picked up and picked up
3 by authorities. Child Protective Services came in and
4 eventually terminated Donna Soliz's parental rights as a
5 mother. He was put in home after home after home after
6 residential center after residential center, and at age 12
7 was given a psychotropic drug, very strong. And for a
8 while he was on that drug. They had to take him off of
9 it. He was also evaluated as ADHD, but the Ritalin given
10 for ADHD the -- you will hear that the people at the
11 school and the CPS and authorities were hesitant to give
12 it because his mother would take the Ritalin because it
13 would give her a high. Yet Mark Soliz in the homes that
14 he went, he ran away, he continued to violate the law, he
15 continued to steal, he continued to be aggressive, he
16 continued to fight, because that's what he lived. That's
17 what he learned.
18   Mark Soliz, ladies and gentlemen, eventually
19 aged out of CPS custody. He eventually aged out and
20 returned essentially homeless to Fort Worth. He began to
21 commit offense after offense after offense, primarily
22 stealing and burglarizing. He was a thief. He went to
23 prison once, came out, goes to prison again. Mark Soliz
24 lived what he learned.
25   He went to prison and eventually came out in

42

1 May of 2010. He meets up with Jose Ramos. You heard the
2 Prosecutor talk about Jose Ramos. You heard the
3 Prosecutor make reference to him. And what happens at
4 that point is you have a person who we believe the
5 evidence will show you through medical testimony from
6 experts who will come down that he was diagnosed with
7 fetal alcohol syndrome disorder, also suffered from
8 extreme neglect.
9        And during the course of May and June of
10 2010, Mark, having what you will hear is fetal alcohol
11 syndrome disorder, a brain damaging medical diagnosis,
12 mixed in with neglect from his mama, his daddy, his aunts,
13 his uncles, his cousins, mixed in with his drug of choice
14 at this time, methamphetamine or ice -- you will hear that
15 that methamphetamine, even during the chase the Prosecutor
16 described for you, was found, some was found in his
17 pocket, you will hear other witnesses testify about him
18 always wanting methamphetamine and ice to use and abuse --
19 mixed in with alcohol, and as these substances course
20 through that damaged brain of him, he went on a crime
21 spree.
22        Not just Nancy Weatherly; he went on a crime
23 spree, folks. Ruben Martinez, Fort Worth, shot and
24 killed, June 29th, 2010. Others robbed, homes
25 burglarized. Others shot at. Others shot. He and Jose

43

1 Ramos, his cohort, his partner in crime, rummaging through
2 the streets of Tarrant County, and unfortunately came down
3 to Johnson County.
4        Fetal alcohol syndrome, you will hear, folks,
5 is a condition -- this looks a lot better than this --
6 that has some behaviors associated with it that you will
7 hear about; law breaking, aggressive behaviors,
8 oppositional behavior, impulsivity, impulsive behaviors,
9 sexual behaviors, and other behaviors including the lack
10 of empathy or remorse.
11        When the Prosecutor told you that the
12 manners -- and you will hear, because we're asking you to
13 listen closely to the cross-examination, about this
14 person, Jose Ramos, his name I'll put up here, I want you
15 to adhere closely to his role played during the course of
16 this offense, because you will also hear that Mark Soliz
17 has demonstrated during the course of having this
18 condition, this disorder, this medical disorder, as being
19 a follower.
20        The journey to the truth, as I stated, needs
21 to be taken one step at a time. And each of you that we
22 talked to over the last five or six weeks, you told us
23 that all of you can be fair and open and follow the law.
24 You will see some unspeakable, heartbreaking, brutal
25 offenses. As we said to some of you, if not all of you,

44

1 this is not for the faint of heart. But you will also see
2 an unspeakable, heartbreaking childhood. Mark is what he
3 learned. Mark is what he lived. Some of the behaviors,
4 I've just listed some of them that you will hear, also
5 involves choking, attempted suicides. You'll hear that he
6 shot himself on one occasion. You will hear about the
7 crime-infested, drug-infested neighborhoods of Fort Worth
8 45 minutes north of here that you probably never thought
9 existed but still, yes, exist to this day.
10        This is not stated as any type of rationale
11 or excuse, but this is just stating to you the truth that
12 you all have sworn that you will hear with an open mind,
13 because as we journey down that road, ladies and
14 gentlemen, we have to hopefully obtain some day justice,
15 justice not only for the Weatherly family, but for the
16 Martinez family, for the rest of the people you may hear
17 about, but also justice for Mark.
18        This torturous journey we're about to embark
19 upon is not going to be easy. It's not going to be
20 simple. It's not going to be short. All we ask you to do
21 is to hold true to your oaths, your statements to us about
22 being in a position to keep an open mind until the end of
23 all of the evidence in this case so that a true verdict
24 can be rendered according to the law and the evidence.
25 Thank you.

45

1        THE COURT: Okay. At this time we'll take a
2 short recess. We'll reconvene at 20 till 11. If you'll
3 take the Jury out.
4        (Recess from 10:18 to 10:41 a.m.)
5        (Jury not present.)
6        MS. JACK: Judge, we have an additional
7 Investigator to be sworn in under the Court's instructions
8 earlier.
9        THE COURT: Okay. Please raise your right
10 hand.
11        (Witness sworn.)
12        THE COURT: Tell me your name, please.
13        THE WITNESS: Maria Elena Hinojosa.
14        THE COURT: Put your hand down. The rule has
15 been invoked which means you can't come in the courtroom
16 until you're called as a witness. And you'll have to
17 remain outside -- or is she subject to the Investigator --
18        MS. JACK: That's right, Judge.
19        THE COURT: You can't read any reports in the
20 newspaper or watch anything on the TV or listen to any
21 radio reports or talk to anybody other than a lawyer
22 associated with this case. You may have a seat.
23        MS. JACK: Judge, I think part of the
24 agreement is that the Investigators may speak to our
25 witnesses as well.

46

```
 1              MR. HEISKELL:  Well, that's fine, but we have
 2   an Investigator as well, Judge, who is not here and we'll
 3   probably do the same exercise, but, yes, that's fine.
 4              THE COURT:  Okay.
 5              MR. WESTFALL:  I think they know not to
 6   communicate what other people testify to.
 7              MS. JACK:  Sure.
 8              MR. WESTFALL:  Yeah, just normal, ordinary --
 9              MS. JACK:  Following the Judge's instruction,
10   we want to make sure we don't run afoul of that.
11              MR. HEISKELL:  Okay.  That's fine.
12              THE COURT:  State ready to proceed?
13              MS. JACK:  Thank you, Your Honor.
14              THE COURT:  Defense ready?
15              MR. HEISKELL:  Yes.
16              MR. WESTFALL:  Yes, Your Honor.
17              THE COURT:  Defendant is present.  You may
18   bring in the Jury.
19              (Off the record.)
20              THE COURT:  Okay.  Please bring in the Jury.
21   All rise for the Jury.
22              (Jury present.)
23              THE COURT:  Thank you.  You may be seated.
24              Call your first witness, please.
25              MS. JACK:  We call Chelsea Circelli.
```

47

```
 1              THE COURT:  This witness was previously sworn
 2   in.  Please have a seat.
 3              THE WITNESS:  Okay.
 4              MS. JACK:  May I proceed, Your Honor?
 5              THE COURT:  Yes.
 6                     CHELSEA CIRCELLI,
 7   Having been previously duly sworn, testified as follows:
 8                     DIRECT EXAMINATION
 9   BY MS. JACK:
10        Q.  All right.  Ms. Circelli, would you please state
11   your full name and spell it for the Court Reporter.
12        A.  Chelsea Ann Circelli, C-I-R-C-E-L-L-I.
13        Q.  And I'm going to ask you to keep your voice up a
14   little bit louder if that's okay.  All right.  Will you
15   please tell the Jury if you're married.
16        A.  Yes, I am.
17        Q.  And who are you married to?
18        A.  Vincent Circelli.
19        Q.  Do you have any children?
20        A.  Yes, one daughter.
21        Q.  How many?
22        A.  One daughter.
23        Q.  And how old is she?
24        A.  She is 12 and a half months, almost 13 months
25   old.
```

48

```
 1        Q.  All right.  Do you live in Johnson County?
 2        A.  No, ma'am.
 3        Q.  All right.  Was there a time that you used to
 4   live in Tarrant County?
 5        A.  Yes, ma'am.
 6        Q.  All right.  What city did you live?
 7        A.  Fort Worth.
 8        Q.  When did you move from Fort Worth?
 9        A.  Just before -- about -- it will be two years in
10   October.
11        Q.  Two years in October, so you moved in October of
12   2010?
13        A.  Yes.
14        Q.  Roughly?
15        A.  Yes.
16        Q.  Not an exact date, but roughly.
17        A.  Correct.
18        Q.  Okay.  When you lived in Fort Worth, and
19   specifically back in June of 2010, were y'all expecting
20   then?
21        A.  Yes.
22        Q.  And where were you living?
23        A.  On El Campo in Fort Worth.
24        Q.  All right.  For those people who may not be
25   familiar with Fort Worth, what part of Fort Worth is that
```

49

```
 1   in?
 2        A.  East Fort Worth.
 3        Q.  Okay.  And is that in Tarrant County, Texas?
 4        A.  Oh, yes, ma'am.
 5        Q.  Okay.  And do you know how Fort Worth is divided
 6   up, like the north part of Fort Worth, the south part of
 7   Fort Worth, east or west necessarily?
 8        A.  No, not -- I'm not really familiar too much.
 9        Q.  All right.  When you lived on El Campo, can you
10   tell the members of the Jury a little bit about your
11   house.
12        A.  Um, it was a small, two-bedroom house that we
13   were renting at the time.  It had an entryway that led
14   into the living room, and there was a guest bedroom on the
15   left side, and then a hallway leading down to the master
16   bedroom, and we had one bathroom and a back yard.
17        Q.  Okay.  And was it an area that's within the city?
18        A.  Yes.
19        Q.  All right.  In other words, not out on the
20   country?
21        A.  No.
22        Q.  Not desolate?
23        A.  Right in the, yeah, heart of the city.
24        Q.  The heart of Fort Worth, so to speak?
25        A.  Yes.
```

50

1 Q. Was that the first home that you and your husband
2 shared together?
3 A. As -- yes.
4 Q. After you were married?
5 A. That's correct.
6 Q. When did you marry?
7 A. We married in April of 2010.
8 Q. All right. So this was just a couple months
9 later?
10 A. That's correct.
11 Q. All right. Were you working at the time?
12 A. Yes, I was.
13 Q. And back in June of 2010, where were you working?
14 A. I was working as an Executive Vice President at
15 Guardian First Federal Credit Union in Fort Worth.
16 Q. And what generally were your responsibilities?
17 A. Um, mostly compliance issues, staff management,
18 any type of credit union management.
19 Q. All right. And did you have particular hours
20 that you worked?
21 A. Typically from about 7:30 to 6-ish was about what
22 I worked.
23 Q. I take it that's 7:30 in the morning?
24 A. Yes, ma'am.
25 Q. All right. And at that time y'all did not have

51

1 any children?
2 A. No.
3 Q. So it's easy to get out of the house early?
4 A. Right.
5 Q. On June 22nd of 2010, does that day stand out in
6 your memory?
7 A. Yes.
8 Q. All right. Can you tell the members of the Jury
9 if you worked that day?
10 A. Yes, I did.
11 Q. Can you tell the ladies and gentlemen of the Jury
12 what time you left your house to go to work?
13 A. To go to work, I probably left around 7, 7:15
14 maybe.
15 Q. All right. Now, when you would leave in the
16 morning, who would leave first between you and your
17 husband?
18 A. Right. If it was a typical morning, I usually
19 left just a bit earlier than my husband.
20 Q. Okay. And you left around 7:15 that morning?
21 A. Yes, ma'am.
22 Q. Are you typically gone all day?
23 A. Yes.
24 Q. All right. Was something different that day?
25 A. Yes.

52

1 Q. Can you tell the ladies and gentlemen of the Jury
2 what was different that day?
3 A. Sure. That particular day was a Tuesday and I
4 was on the board of a credit union committee and that day
5 we were having a bake sale for Children's Miracle
6 Network. So rather than returning immediately home after
7 work, I would have gone to the meeting. And before that
8 time, I had baked brownies that I didn't have ready before
9 I had to go to work, so I needed to go back home to pack
10 them up to take them to the bake sale.
11 Q. So you made some food in preparation for a bake
12 sale?
13 A. That's correct.
14 Q. Charity bake sale?
15 A. Right.
16 Q. Okay. And what time did you come home?
17 A. I had to stop by the house to pick up the
18 brownies that I baked for the bake sale, and I came home
19 probably around 4:00 because the meeting would have
20 started about 5:30.
21 Q. All right. And that's your best estimate?
22 A. Right, probably 3:30, 4, something around that
23 time.
24 Q. When you came home that day -- let me ask you
25 this. When you and your husband generally leave for work,

53

1 do you leave your house secure?
2 A. Yes.
3 Q. All right. What does that entail at your house
4 at that time?
5 A. At that time there was a dead bolt and doorknob
6 lock on the front door, and, of course, the windows were
7 always locked and they were actually caulked shut. Then
8 the back door was locked with a dead bolt and a doorknob
9 lock as well.
10 Q. So all the windows were either caulked or painted
11 shut?
12 A. That's correct.
13 Q. Older house?
14 A. Yes.
15 Q. Front door, back door had a dead bolt?
16 A. Yes, ma'am.
17 Q. Also had locks as well?
18 A. Yes.
19 Q. All right. So the windows were not accessible?
20 A. Correct.
21 Q. Unless the glass was broken?
22 A. Yes.
23 Q. All right. I take it y'all locked your house
24 every morning when you left?
25 A. Yes, ma'am.

54

1    Q.  When you would come home in the evening, would
2  you lock your house overnight?
3    A.  Yes.
4    Q.  Okay.  Did you ever have an alarm?
5    A.  We did following the break-in, yes, ma'am.
6    Q.  Okay.  Before the break-in, did you think an
7  alarm was necessary?
8    A.  No, huh-uh.  No.
9    Q.  All right.  I'm not going to ask you where you've
10  moved, but do you still live in a city?
11    A.  No.
12    Q.  Do you live in the country?
13    A.  Yes.
14    Q.  Okay.  Now, when you came home to get the
15  brownies, did you see anything out of the ordinary in the
16  house?
17    A.  Not since I had left it, no.
18    Q.  Was the front door locked?
19    A.  Yes, it was.
20    Q.  Was the front door dead bolted?
21    A.  Yes.
22    Q.  Was anything in disarray inside of the house?
23    A.  No.
24    Q.  Were there any drawers open?
25    A.  No, ma'am.

55

1    Q.  Were there any mattresses pushed aside?
2    A.  No.
3    Q.  Was the gun cabinet closed?
4    A.  It was closed and locked.
5    Q.  All right.  And is your husband a hunter?
6    A.  Yes, he is.
7    Q.  All right.  What kind of guns does he have?  And
8  I'm not asking for specifics.  Just generally what kind of
9  guns did he have at that time?
10    A.  He had a couple of rifles and maybe a shotgun,
11  bigger guns that were in our gun cabinet, our gun safe.
12    Q.  Okay.  And now you say a "gun safe"; was it
13  actually a safe?
14    A.  It wasn't a safe.  It's just a cabinet that had a
15  lock and key.
16    Q.  Okay.  And the cabinet, was it a see-through
17  cabinet?
18    A.  Yes, it had like a glass display case on the
19  front of it.
20    Q.  So when it was closed, were the long guns visible
21  to anyone who was in the room with the gun cabinet?
22    A.  Yes, ma'am.
23    Q.  Okay.  All right.  So everything was in its place
24  when you left with the brownies?
25    A.  That's correct.

56

1    Q.  And at some point did someone else drop something
2  off at your house?
3    A.  Yes, my dad stopped by, just -- probably just a
4  little bit before I got there.
5    Q.  Okay.  And what did he leave there?
6    A.  He had left a bag on the front porch for me.
7    Q.  All right.
8    A.  Like a duffel bag.
9    Q.  Okay.  Did you and your husband meet up at some
10  point that evening?
11    A.  Yes.
12    Q.  All right.  Where was that?
13    A.  Um, if I remember correctly, we were down at the
14  Sundance, that north conference center.
15    Q.  So --
16    A.  In downtown Fort Worth.
17    Q.  In downtown Fort Worth.  And kind of orient the
18  Jury, about how far from your house on El Campo is
19  downtown?
20    A.  It's about five or six miles maybe.
21    Q.  About 10 minutes to drive?
22    A.  Yeah, 10- or 15-minute, depending on traffic,
23  drive, yes, ma'am.
24    Q.  All right.  At some point did the two of y'all
25  leave downtown?

57

1    A.  Yes.
2    Q.  All right.  Did you leave in separate cars or
3  were you in the same car?
4    A.  We left in separate cars.
5    Q.  All right.  And did you receive a phone call on
6  your way home?
7    A.  Yes, I did.
8    Q.  And who was that phone call from?
9    A.  My husband.
10    Q.  And what did he tell you?
11    A.  He told me -- I'd stopped off by the grocery
12  store, so he got home a little bit before I did.  And he
13  called to tell me that our house had just been broken in
14  to.  And I said, "Do I need to leave now or?"  He said,
15  "Just check out and come home."
16    Q.  Okay.  Meaning leave the grocery store?
17    A.  The grocery store, uh-huh.
18    Q.  When you got home, can you tell the members of
19  the Jury what you saw?
20    A.  When I got home, I saw my husband's red shotgun
21  shells on the front porch, kind of scattered on the front
22  porch down the steps.  The front door had been kicked in
23  and our door frame was broken off and also, you know, kind
24  of kicked in.  And the house was -- our TV was missing,
25  and the house, after that, was just kind of in disarray.

58

1    Q.  Okay.  Now, when you say your front door was
2    kicked in, was there something that looked like it had
3    been kicked in?
4    A.  Right.  There were dents on the door and there
5    was a shoe print like from the sole of a shoe on the door,
6    and there were a couple of dents.  And just the way that
7    the door had kind of been opened, the door frame was
8    broken off on the inside, so it looked like it was opened
9    with some kind of force.
10   Q.  Okay.  Now, we talked about your husband's gun
11   cabinet?
12   A.  Right.
13   Q.  Was there also another gun kept in the house?
14   A.  Yes.
15   Q.  Was it -- why did y'all have the other gun?
16   A.  Um, just for general safety.  Shortly after we
17   got married, my husband kept a handgun in the house.
18   Q.  Do you know what kind of gun it was?
19   A.  Um, I'm not specifically sure.  It was a small
20   handgun, smallish.
21   Q.  Do you know what the difference between a
22   revolver and semi-automatic is?
23   A.  Yes, he had a semi-automatic handgun.
24   Q.  All right.  And I take it between the two of
25   y'all, your husband is more familiar with guns?

59

1    A.  Yes, that's correct.
2    Q.  Where was that gun kept?
3    A.  Um, the gun itself was kept in his nightstand.
4    Q.  Okay.  His nightstand would be a table next to
5    his side of the bed?
6    A.  That's correct.
7    Q.  All right.  And was the gun kept loaded, to the
8    best of your knowledge?
9    A.  No.  I mean, sometimes it was, but in this case
10   it wasn't.
11   Q.  All right.  And where was the ammunition for the
12   gun?
13   A.  It was in a desk that was across from the
14   nightstand on the other wall in the bedroom.
15   Q.  Okay.  When you got home that evening and you saw
16   that the front door had been kicked in, what was missing?
17   A.  Well, the guns from the gun cabinet were missing,
18   and in that same room the comforter on the bed was
19   missing, and our change and the small amount of cash we
20   left at the house was also missing.  The mattress had been
21   turned up.  And in the next bedroom we were missing a
22   checkbook.  We were missing a television, a handgun and
23   the clip, and I think that -- I think that's about it.
24   Q.  Okay.  Were the police called?
25   A.  Yes.

60

1    Q.  Did you and your husband photograph your house
2    for insurance purposes?
3    A.  Yes, we did.
4    Q.  Okay.  And did you provide those pictures to the
5    District Attorney's office?
6    A.  Yes, ma'am.
7    MS. JACK:  Your Honor, may I approach the
8    witness, please?
9    THE COURT:  Yes, ma'am.
10   Q.  Ms. Circelli, I'm going to show you a series of
11   pictures.
12   A.  Okay.
13   Q.  And I'm going to ask you the main question, which
14   is, do each of these pictures fairly and accurately show
15   your house, the exterior and the interior of your house,
16   after it had been broken into?
17   A.  Okay.  Yes.  Sure.
18   Q.  All right.  First of all, State's Exhibit No. 9,
19   is that a fair and accurate portrayal of the exterior of
20   your house?
21   A.  Yes, ma'am.
22   Q.  Okay.  State's Exhibit No. 10 and State's Exhibit
23   No. 11?
24   A.  Yes.
25   Q.  State's Exhibit No. 12?

61

1    A.  Yes.
2    Q.  State's Exhibit No. 13?
3    A.  Yes.
4    Q.  We're a little out of order.  17?
5    A.  Yes.
6    Q.  State's Exhibit 14?
7    A.  Yes.
8    Q.  State's Exhibit 15?
9    A.  Yes.
10   Q.  State's Exhibit 16?
11   A.  Yes.
12   Q.  State's Exhibit 18?
13   A.  Yes.
14   Q.  State's Exhibit 19?
15   A.  Yes.
16   Q.  State's Exhibit 20?  I have it upside down.
17   A.  Yes.
18   Q.  State's Exhibit 21?
19   A.  Yes.
20   Q.  State's Exhibit 22?
21   A.  Yes.
22   Q.  State's Exhibit 23?
23   A.  Yes.
24   Q.  State's Exhibit 24?
25   A.  Yes.

62

1    Q. State's Exhibit 25?
2    A. Yes.
3    Q. State's Exhibit 26?
4    A. Yes.
5    Q. And, finally, State's Exhibit 27?
6    A. Yes.
7    Q. Do each of these pictures, State's Exhibits 9
8  through 27, fairly and accurately depict the exterior of
9  your house and the interior after your house was broken
10 into --
11   A. Yes.
12   Q. -- on June 22nd?
13   A. Yes.
14       MS. JACK: Okay. Are you okay? All right.
15       Your Honor, may I have this witness step down
16 at this time --
17       THE COURT: Yes, you may.
18       MS. JACK: -- to publish the pictures to the
19 Jury.
20       THE COURT: Okay.
21       MS. JACK: Okay. Ms. Circelli, if you'll
22 come around here, I'm going to ask you --
23       MR. HEISKELL: Can I come around, Judge?
24       THE COURT: Yes, you may.
25       MR. HEISKELL: Thank you.

63

1        MS. JACK: And we'll offer State's Exhibits 9
2  through 27 into evidence.
3        MR. WESTFALL: Can we just have a look at
4  them real fast, Judge?
5        THE COURT: Yes, you may.
6        MR. HEISKELL: No objection, Your Honor, to
7  State's 9 through 27.
8        THE COURT: 9 through 27 are admitted.
9        (State's Exhibit Nos. 9 - 27 admitted.)
10   Q. (BY MS. JACK) Ms. Circelli, what we're going to
11 do is I'm going to ask you to stand right here and talk to
12 this half of the Jury, and then we're going to show the
13 picture to the other half of the Jury. All right.
14       State's Exhibit No. 9 is the smallest. Can
15 you tell the members of the Jury what they're looking at?
16   A. This is the front of the outside of our house.
17   Q. When y'all lived on El Campo?
18   A. That's correct.
19   Q. Residential area?
20   A. Yes.
21   Q. Lots of houses in this area?
22   A. Lots of houses.
23   Q. An older part of Fort Worth; is that correct?
24   A. Yes, ma'am, '40s, I think.
25   Q. Your house was built in the '40s?

64

1    A. Yes, ma'am.
2    Q. And just to kind of orient the Jury, if they're
3  familiar with Arlington Heights, is it near Arlington
4  Heights?
5    A. It's in the Arlington Heights neighborhood.
6    Q. Near Camp Bowie?
7    A. Yes.
8    Q. Now, looking at State's Exhibit No. 10, can you
9  tell the members of the Jury what State's Exhibit No. 10
10 shows?
11   A. It is the front door of our house, and this, it's
12 just the outside of the front door.
13   Q. All right. So the green area of State's Exhibit
14 No. 10, what is the green area?
15   A. That's the outside of the house on -- inside the
16 walkway, the front porch, but it's outside.
17   Q. Okay. So this would be like the green shingle
18 area of your house?
19   A. Right.
20   Q. Then looking at the white trim, is this the
21 exterior trim of your front door?
22   A. This part of it is, and then this is sort of like
23 the --
24   Q. The doorjamb?
25   A. Yes.

65

1    Q. Okay. And was this damage as shown on State's
2  Exhibit No. 10, was your doorjamb damaged when you left
3  with the brownies at around 4:00 in the afternoon?
4    A. No.
5    Q. Okay.
6        THE COURT: Did you answer that question?
7        MS. JACK: She did.
8        THE COURT: I didn't hear her.
9        THE WITNESS: No.
10       THE COURT: Thank you.
11   Q. (BY MS. JACK) Looking at State's Exhibit No. 11,
12 can you tell the members of the Jury what State's Exhibit
13 No. 11 is?
14   A. Yes. This is the outside of -- this is the
15 outside of the door that's been kicked in. This is the
16 duffel bag that my dad had dropped off earlier.
17   Q. When you said "this," is this the item that
18 appears over the bottom doorknob; is that right?
19   A. That's correct.
20   Q. Okay. And can you show the members of the Jury
21 where -- the area that was kicked in and the damage to
22 your door?
23   A. Yes. Right here, and there were some scuff marks
24 here and on various places of the door that weren't there
25 when we left. But --

66

1    Q. All right. Is my finger where part of the damage
2  was and it appeared as though your door was kicked in?
3    A. Yes, ma'am.
4    Q. All right. And the duffel bag would be the
5  material that's hanging over the bottom doorknob; is that
6  correct?
7    A. That's correct.
8    Q. State's Exhibit No. 12, can you tell the members
9  of the Jury what they see in State's Exhibit No. 12?
10    A. Yes. This is the outside of the door where the
11  scuff mark from the sole of the shoe is on here, as well
12  as just below this, the sole of the shoe, the scuff mark
13  there is where the door was kicked in. There's a scuff
14  and a dent on the door.
15    Q. Okay. So in between the two framed panels on the
16  exterior of the door, is the shoe impression visible? Is
17  my hand circling that?
18    A. Yes.
19    Q. And, once again, the bottom is the damage -- the
20  bottom part of the frame door is where the damage was, the
21  greater amount of the damage?
22    A. Correct.
23    Q. Was the door open when you got home?
24    A. Well, it was when I got home, yes.
25    Q. Well, was it locked when you got home?

67

1    A. No, it wasn't.
2    Q. Was it locked when your husband got home?
3    A. No -- well, it was still locked but it was kicked
4  open.
5    Q. All right. So the dead bolt was still in place?
6    A. That's correct.
7    Q. Not in the doorjamb?
8    A. No.
9    Q. State's Exhibit 13, is this a closer view of the
10  shoe impression on your front door?
11    A. Yes, ma'am.
12    Q. Looking now at State's Exhibit No. 14, can you
13  tell the members of the Jury, if you were looking at this
14  picture, where you'd be standing?
15    A. In the living room.
16    Q. Okay. And are you looking from inside of your
17  house towards your front door?
18    A. Yes, ma'am.
19    Q. All right. So this is the exterior where I'm
20  pointing?
21    A. Right.
22    Q. Okay. And can we also see on State's Exhibit
23  No. 14 the damage to the trim that was caused in the
24  interior?
25    A. Yes.

68

1    Q. Okay.
2    A. Just on the molding.
3    Q. You can go ahead and point to it.
4    A. Okay. Yes, right here, and all the way up here
5  was just the inside damage.
6    Q. Okay. And is State's Exhibit No. 15 a closer
7  view?
8    A. Of the wall, yes.
9    Q. And of the damage next to --
10    A. The door.
11    Q. -- the door leading out?
12    A. Correct.
13    Q. Looking now at State's Exhibit No. 16, do I have
14  this oriented correctly?
15    A. Yes.
16    Q. All right. Can you tell the members of the Jury
17  what they're looking at?
18    A. We took a photo where kind of the camera is sort
19  of looking down. This is the entryway rug, so the
20  entrance to the door would have been here, and we're
21  looking inside the living room. On the floor here is the
22  doorjamb that was torn off, I guess from the blow of the
23  kicking of the door, and a piece of the dead bolt or door
24  hinge there that was sort of blown off also.
25    Q. So we can see a part of the door trim?

69

1    A. Right.
2    Q. And a part of the doorjamb?
3    A. Yes.
4    Q. Looking at State's Exhibit No. 18, can you tell
5  the members of the Jury why this picture was taken?
6    A. Yes. This is our TV stand, and on top of it was
7  our TV, and it's missing.
8    Q. Okay. So it's really what's not shown in this
9  picture that's important?
10    A. That's correct.
11    Q. Looking at State's Exhibit 19, this appears to be
12  a bedroom; is that correct?
13    A. Yes, ma'am.
14    Q. All right. Can you tell the members of the Jury,
15  was this the guest bedroom or the master bedroom?
16    A. This was the master bedroom.
17    Q. So this is where you and your husband slept?
18    A. Correct.
19    Q. All right. When you left that morning, was the
20  bed made?
21    A. Yes, it was.
22    Q. Not to be too personal.
23    A. It was.
24    Q. Okay.
25    A. That's fine.

70

1    Q. Now, were the mattresses on top of each other?
2    A. Yes.
3    Q. Was the bed in order?
4    A. Yes.
5    Q. Where is the other mattress?
6    A. It's not pictured in this photo because it's been
7  flipped off of the box spring.
8    Q. All right. Did your husband flip it off the box
9  spring?
10   A. No.
11   Q. Did you take it off the box spring?
12   A. No.
13   Q. Was this done in the course of the break-in?
14   A. Yes.
15   Q. So far as you know?
16   A. As far as I know.
17   Q. And does State's Exhibit No. 20, we're going to
18 show these together, 20 and 21 show the mattress after it
19 was tossed? Show you first.
20   A. Yes, uh-huh.
21   Q. This is your bedroom?
22   A. That's correct.
23   Q. All right. Can we see your husband's nightstand
24 in either of these pictures?
25   A. No.

71

1    Q. Okay. I want to go back to State's Exhibit
2  No. 19 for just a moment. Can we see your husband's
3  nightstand in this exhibit?
4    A. Yes.
5    Q. All right. Can you show the members of the Jury
6  where that would be?
7    A. It's right here on his side of the bed.
8    Q. All right. And is this nightstand where the
9  9 millimeter would have been?
10   A. Yes.
11   Q. Where you knew it to be?
12   A. Yes.
13   Q. Can you tell the members of the Jury what is
14 significant about State's Exhibit No. 22, what room it is
15 and what it shows?
16   A. Okay. This is the master bedroom as well. And
17 we took this photo because this desk that was across from
18 my husband's nightstand, one of these drawers would have
19 had the clip to the gun.
20   Q. And the clip for a semi-automatic is what
21 normally contains the live rounds?
22   A. Right.
23   Q. Holds the live rounds?
24   A. Uh-huh.
25   Q. Okay. When y'all got home or when you got home,

72

1  were these drawers open?
2    A. Yes.
3    Q. When you left for work that evening -- that
4  morning, were they open?
5    A. No.
6    Q. When you were home in the middle of the
7  afternoon, were they open?
8    A. No.
9    Q. Look now at State's Exhibit No. 23. Can you tell
10 the members of the Jury what they see in this exhibit,
11 which room it is and why it's important?
12   A. Yes. The -- this is in the dining room. It's a
13 hutch, and in either of these drawers we kept personal
14 information, and this particular drawer contained a
15 checkbook to my husband's checking account.
16   Q. Okay.
17   A. And it's not there anymore.
18   Q. All right. Did you ever recover that checkbook?
19   A. No.
20   Q. Looking at State's Exhibit No. 23, it's the top
21 drawer. I've got it upside down. The top drawer of the
22 hutch; is that correct?
23   A. That's correct.
24   Q. And that would have had personal information and
25 your checkbook?

73

1    A. Right.
2    Q. Okay. What time did you get home that evening?
3    A. It was probably around 8:30.
4    Q. How much earlier did your husband arrive home, if
5  you know?
6    A. It would have been about 15 minutes before, so he
7  would have been there about 8:15.
8    Q. So sometime after you left around 4 and the time
9  that your husband got home around 8, your house was broken
10 into?
11   A. That's correct.
12   Q. All right. Looking at State's Exhibit No. 24,
13 what is important about this picture and what does it
14 show?
15   A. This is my husband's change sorter and it's where
16 he puts his change after each day. And there were four
17 tubes here that contains change. And then this drawer
18 here was a drawer on the change sorter that usually
19 carried a little bit of cash, you know, that we just kept
20 in the house in case we needed it.
21   Q. Was there money taken?
22   A. Yes.
23   Q. Approximately how much?
24   A. About 150 in cash and maybe, you know, $20 in
25 change.

74

1    Q. Looking at State's Exhibit No. 27, is this a
2 closet door?
3    A. Yes, ma'am.
4    Q. Was it open when you left that morning for work?
5    A. No.
6    Q. Okay. Was it open when you returned in the
7 afternoon?
8    A. Yes.
9    Q. When you returned in the afternoon to pick up the
10 brownies?
11    A. When I returned to pick up the brownies, no. In
12 the evening it was.
13    Q. Looking now at State's Exhibit No. 25, can you
14 tell the members of the Jury which room this is?
15    A. This is the guest bedroom.
16    Q. Okay. And what is missing from this room?
17    A. Just from the photo, it's the comforter on the
18 bed.
19    Q. Okay. And finally, looking at State's Exhibit
20 No. 26, is this a picture of your husband's gun cabinet?
21    A. Yes.
22    Q. And can the Jury -- can you point out to the Jury
23 where the glass is that normally belongs in the gun
24 cabinet?
25    A. It's right here.

75

1    Q. Is my finger where the glass is?
2    A. Yes.
3    Q. Right there. All right. And this is State's
4 Exhibit No. 26?
5    A. Yes.
6    Q. Ms. Circelli, do you know how many long guns were
7 taken from the gun cabinet?
8    A. Maybe three or four.
9    Q. You can go ahead and have your seat.
10    A. Okay.
11    Q. Thank you. Were the police called out to your
12 house?
13    A. Yes, ma'am.
14    Q. Did the police respond that evening?
15    A. Yes, they did.
16    Q. Okay. And was Crime Scene able to come at a
17 later point?
18    A. At a later point, yes.
19    Q. A matter of days or --
20    A. Yes.
21    Q. Days later?
22    A. Yes.
23    MS. JACK: Okay. May I have a moment, Your
24 Honor?
25    (Pause in proceeding.)

76

1    Q. And is your husband here with you today as well?
2    A. Yes, he is.
3    MS. JACK: I'll pass this witness for
4 cross-examination, Your Honor.
5    MR. HEISKELL: Thank you.
6    CROSS-EXAMINATION
7 BY MR. HEISKELL:
8    Q. Miss -- is it Circelli?
9    A. Circelli.
10    Q. My name is Mike Heiskell. I have a few questions
11 for you, ma'am. If I ask you something you don't
12 understand, don't hesitate to stop me. Okay?
13    A. Okay.
14    Q. At the time this burglary took place, y'all had
15 been there approximately two months or three months. Did
16 I understand that correctly?
17    A. Yes, yes.
18    Q. And you moved in, I take it, sometime in April of
19 2010; is that correct?
20    A. My husband was renting the house and living in it
21 before, and then when we got married, I moved in with him.
22    Q. All right. Okay. Now, do you know when he had
23 purchased the handgun?
24    A. No, I really don't.
25    Q. To your knowledge, did he already have the

77

1 handgun at the time y'all were dating and got married?
2    A. Yes, yes, he did. I -- it might have been
3 shortly after 2008 or 9 that he purchased it.
4    Q. Okay. And do you know from whom he purchased the
5 weapon from, ma'am, if you know?
6    A. Academy maybe.
7    Q. And as far as the long guns, the shotguns and
8 rifles, were they purchased at the same time or different
9 times?
10    A. Different times.
11    Q. So when you moved in with him, the -- I take it
12 the gun cabinet was already there and the furnishings
13 that we saw in those photographs were already present
14 as well?
15    A. Some of them were. Some of them I brought over.
16    Q. Now, the photographs that we saw, State's No. 9
17 through 27, these are photographs that you and your
18 husband took; am I understanding that correctly?
19    A. That's correct.
20    Q. And when were those photos taken?
21    A. Right after the break-in.
22    Q. So the same day?
23    A. Yes.
24    Q. And we see obviously from the door, the front
25 door, there's some treads and what appears to be shoe

78

1  print treads; is that correct?
2      A. Correct.
3      Q. Now, when was it that the Crime Scene officers
4  that you referred to, when did they come over?
5      A. The Crime Scene officers?
6      Q. Yes, ma'am.
7      A. Maybe -- I think it was one day short of a week
8  later.
9      Q. A week later?
10     A. Yes, I believe so.
11     Q. Okay. To your knowledge, did they take photos as
12  well of the same or similar portions of your home?
13     A. The Crime Scene officers?
14     Q. Yes, ma'am.
15     A. Not to my knowledge, no.
16     Q. Did you provide them these photos that you've
17  displayed today?
18     A. I assume -- I'm -- I'm not sure. They came --
19  they were there when my husband was there and I was
20  not. I was still at work at the time that they were
21  there.
22     Q. So you weren't present when they showed up?
23     A. I was present after they had gotten there. They
24  were dusting for prints when I came in.
25     Q. And do you know where they were dusting for

79

1  prints, Ms. Circelli?
2      A. They took the piece of glass from the gun cabinet
3  and they were in the kitchen dusting it for prints.
4      Q. Now, you and your husband continued to stay there
5  for a week after the break-in took place?
6      A. Immediately after the break-in, we did not stay
7  there. And when we got a new door, then we continued
8  staying there.
9      Q. Okay. When was it that you -- I take it
10  immediately after break-in, y'all left to go some other
11  secure place; is that right?
12     A. Correct.
13     Q. And for how long were you gone before you came
14  back to your residence?
15     A. To then stay?
16     Q. Yes.
17     A. Probably two days.
18     Q. Two days. And at that point, the door had been
19  replaced and I guess security had been accounted for on
20  you and your husband's part?
21     A. Yes. The morning after the break-in, we stayed
22  at the house and made some phone calls to get a
23  replacement door, and nobody could -- it was a custom-made
24  door. So we stayed there during the day and, um, I guess
25  we got like a -- they kind of fitted a door as best they

80

1  could about the second day.
2      Q. I take it after you moved back after two days
3  being away that you and your husband kind of tidied up a
4  bit; is that right?
5      A. Yes.
6      Q. And you replaced things that were disheveled and
7  out of order so that you could continue to live there; is
8  that right?
9      A. Um, I mean, we put, like, our mattress back
10  together so we could sleep on the bed, but as far as
11  everything else, we just left it. Nobody -- we didn't go
12  in the guest bedroom, and so everything there was fine.
13  And I mean, I think I, like, swept up the door, the mess
14  from the door.
15     Q. Okay. That's around the front door?
16     A. That's correct.
17     Q. And what happened with the front door that was
18  damaged? Was it replaced?
19     A. Yes.
20     Q. And what happened to the original door?
21     A. Um, I'm not certain. I would assume that the
22  company that replaced the door took it or maybe the
23  landlord took it. We were renting the house.
24     Q. Right. Do you know, to your own knowledge,
25  whether the police officers ever retrieved the original

81

1  door with the shoe print, footprint on it for purposes of
2  forensics or Crime Scene at all?
3      A. Not to my knowledge. I'm not sure.
4      Q. And when you say you left everything for the most
5  part -- well, outside your bed, as I'm understanding, you
6  tidied up a bit, cleaned up the floor around the front
7  door area; is that correct?
8      A. The floor around -- yes.
9      Q. And what about the nightstand that we saw in the
10  exhibit and the guns -- gun cabinet, what did you do with
11  that?
12     A. The nightstand was in the master bedroom, so we
13  closed the doors and the drawer on it. And the gun
14  cabinet we left because it was in the guest bedroom and we
15  left that. And I don't -- I didn't have another blanket
16  to put over the bed, so it just stayed there without a
17  blanket.
18     Q. What about the nightstand next to your husband's
19  side of the bed?
20     A. Yes, we put that back together.
21     Q. Put that back together?
22     A. Yes.
23     Q. But to your knowledge when -- I take it, again,
24  that you stated when the Crime Scene arrived eventually
25  about a week later, that you were not present during that

82

1 time frame; is that right?
2   A. Not during their arrival, no.
3   Q. When you got back or -- and did arrive, did you
4 notice any type of fingerprint powders on any of the
5 surfaces of inside the interior of your home?
6   A. With the exception of the gun case, no, not that
7 I can remember.
8   Q. So you did notice some on the gun case?
9   A. There was some on the glass. I mean, that's what
10 he was doing when I came in.
11   Q. Okay. And do you recall, by the way,
12 Ms. Circelli, who that Crime Scene officer would have
13 been, the name or anything of that nature?
14   A. I don't, no.
15   Q. I guess your husband would?
16   A. Probably, yes.
17   Q. Now, the time that this happened -- as I recall,
18 you stated you had arrived home at 4:00 --
19   A. Uh-huh.
20   Q. -- to pick up matters, and then you left to go
21 downtown, correct?
22   A. That's correct.
23   Q. Now, in the meantime, the duffel bag that your
24 father had left for you was still in the front door area?
25   A. Yes.

83

1   Q. And the duffel bag, did it contain some items of
2 value or anything?
3   A. No.
4   Q. It was just an empty duffel bag?
5   A. Right.
6   Q. So he had told you beforehand, I guess, he was
7 bringing an empty duffel bag for your use?
8   A. We were going to be traveling soon, and I had
9 called him and asked him to bring it from his house.
10   Q. And when you arrived and saw the duffel bag, was
11 it hanging on the doorknob as we saw in one of those
12 exhibits?
13   A. Yes. Yes, when I arrived, yes.
14   Q. And so when you came back after the burglary was
15 discovered, that duffel bag was still there hanging on the
16 doorknob?
17   A. Yes.
18   Q. Between -- we're talking June of 2010, of
19 course. And if I'm correct, around 8:00 it's still light
20 outside to a certain degree, isn't it?
21   A. Yes, it probably is.
22   Q. And did you, to your knowledge, or your husband,
23 to your knowledge, go around to inquire of neighbors in
24 the area to see if they saw anything, saw a vehicle or
25 in -- any suspicious persons around your home during those

84

1 hours?
2   A. Yes, my husband did.
3   Q. And do you know if he was successful in finding
4 any answers to his questions?
5   A. No, he wasn't. I mean, he was able to
6 communicate with our neighbors and ask them questions, but
7 they said that they didn't see anything.
8   Q. Okay. When -- what time was it -- what time was
9 it after y'all had discovered the break-in did the police
10 arrive?
11   A. It was pretty quickly after my husband called
12 them, which might have been around 8:30 or 8:45. And they
13 were there, they might have been there -- I think they
14 were just getting there when I was getting home.
15   Q. Okay. And in addition to your husband perhaps
16 checking with the neighbors, to your knowledge, do you
17 know whether or not any of the officers canvassed the
18 neighborhood to ask neighbors questions about what they
19 may have seen or heard?
20   A. Not that I know of.
21   Q. I want to -- this is State's Exhibit No. 17,
22 Ms. Circelli.
23   A. Okay.
24   Q. And you can see that from here?
25   A. Yes.

85

1   Q. And this is the one I was referencing about shoe
2 print treads. We see some faint shoe print treads on this
3 door; is that correct?
4   A. That's correct.
5   Q. And this is the door that was eventually replaced
6 by the company or someone, and you're not sure what
7 happened to it after that?
8   A. That's correct.
9   Q. And the purpose of y'all taking the photo of that
10 is because of its value in at least showing a footprint
11 that could perhaps be matched down the road to someone in
12 order to show -- as well as to show how your door was
13 broken into. Am I correct?
14   A. Yes.
15   Q. And was this photograph provided to the police
16 department or anyone right after this took place?
17   A. I'm not certain. I know that we told the police
18 officers who arrived at the house that we took photos. My
19 husband might have spoken with them and provided photos,
20 but I'm not sure --
21   Q. Okay.
22   A. -- if he did or not.
23      MR. HEISKELL: Just one moment, Judge.
24 That's all. Thank you. Pass the witness.
25      MS. JACK: A few brief questions, Your Honor.

86

REDIRECT EXAMINATION

BY MS. JACK:

Q. Ms. Circelli, did you ever give a man by the name of Mark Soliz permission to enter your home?

A. No.

Q. On June 22nd of 2010?

A. No.

Q. Did you ever give Jose Clemente Ramos permission to enter your house on June 22nd of 2010?

A. No.

Q. Did you ever give a man by the name of Santos Rangel permission to enter your house on June the 22nd of 2010?

A. No.

Q. I'm going to ask you to look all the way down to the far end of the other table in the courtroom. Did you ever give that man permission to enter your house?

A. No.

Q. Counsel for the Defense asked you about tidying up your house. Were you able to tidy up and clean up what was visible?

A. Yes.

Q. Did you ever feel safe in your house again?

A. No.

Q. Do you want any of these guns back?

87

A. No.

MS. JACK: I'll pass the witness.

MR. HEISKELL: Nothing further, Your Honor.

THE COURT: May the witness be excused?

MS. JACK: Yes, Your Honor.

MR. HEISKELL: Yes.

THE COURT: Thank you. You may step down. You may be excused.

(Witness excused.)

MR. CHAMBLESS: Your Honor, the State calls Vincent Circelli.

THE COURT: Thank you.

THE WITNESS: Do you want me to step up here?

THE COURT: Please have a seat and speak into the microphone.

This witness has been previously sworn. You may proceed.

MR. CHAMBLESS: Thank you, Your Honor.

VINCENT CIRCELLI,

Having been previously duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CHAMBLESS:

Q. Please state your name.

A. It's Vincent Circelli.

Q. And Mr. Circelli, we just heard from your wife.

88

And she was in here testifying and she told us that you were married in April of what year?

A. 2010.

Q. All right.

A. I got that memorized now.

Q. You've got a pass. All right. And is it correct that at that time you lived in El -- on a street called El Campo in Fort Worth, Texas?

A. I did, yes, sir.

Q. Okay. Generally, what section of town is that in?

A. It's on the west side of town, just north of Camp Bowie kind of near -- near Uncle Julio's restaurant just west of downtown Fort Worth.

Q. And she gave us a description. Just sort of summarize how many bedrooms, baths, that sort of thing.

A. I think it was -- it was a two bedroom, one bath. It was pretty small house. It was a rental house I had moved into in December of 2009, then my wife, once we got married in April, she moved in in April.

Q. Okay. What is your occupation?

A. I'm an attorney in Fort Worth.

Q. Okay. What kind of legal work do you do?

A. All civil, civil litigation, businesses suing each other, things like that.

89

Q. Okay. How long have you been a lawyer?

A. I've been a lawyer about three and a half years.

Q. Okay. We understand you have a child?

A. I do, yes.

Q. And your child's name?

A. Amilliano Marie Circelli.

Q. And how old is she?

A. She is just over a year old. She's -- I think she's 13 months almost.

Q. Okay. Going back to June 22nd, we heard from your wife about that she had left. She was working at a credit union at that time; is that correct?

A. Yes, sir, she was.

Q. Okay. Just going back in your memory to that morning, what time did you leave to go to work?

A. I left probably 8, a little bit before 8.

Q. Okay.

A. 8:00 in the morning. I think she left -- she probably left a little earlier than me, I think.

Q. Okay. And the location where you go to work, is it -- where is it at?

A. I work -- I still work in downtown Fort Worth. It's about ten minutes away from where we were living on El Campo.

Q. Okay. Did you come back to your house at any

90

1 time during the day?

2    A. No, not that day.

3    Q. Okay. You came back later that evening?

4    A. In the evening I did, yes.

5    Q. Now, in your house, did you possess any long

6 guns?

7    A. Yes, I did.

8    Q. And tell the Jury just generally what kind of

9 guns you had.

10    A. I had a gun case that I had gotten as a birthday

11 present. Just it's a basic case and had a glass front on

12 it. It had like a scene of a deer, you know, on the

13 front. And I had a -- I had a few shotguns in there. I

14 had a black powder rifle which is a break-open rifle, it's

15 one shot. I had an old pellet gun in there, a .22, all

16 hunting, hunting guns.

17    Q. When you left for work that morning, were the

18 long guns in the gun cabinet in your house?

19    A. They were, yes.

20    Q. And how is it secured?

21    A. Well, there's a lock on the front of it with a

22 key, a key and a lock, and then the glass front, so it's

23 got a lock where the guns are and then it's got another

24 lock below where the bullets and things like that go on

25 the bottom half.

91

1    Q. Did you have in your house when you left that

2 morning also a handgun?

3    A. I did, yes. I kept a handgun in our bedroom in a

4 dresser.

5    Q. Okay. And do you recall the type of handgun that

6 you had?

7    A. I do, yeah. It was a 9 millimeter. It's called

8 a Hi-Point. I had never heard of that brand before,

9 before I bought the gun, but it was a Hi-Point 9

10 millimeter.

11    Q. Okay. Do you recall when you acquired that gun?

12    A. I believe I got it in probably 2009. When I was

13 in law school, I lived in a bad area so I got one and kept

14 it in the house so...

15    Q. Okay. Now, we've heard that you and Chelsea met

16 sometime after work. About what time was that?

17    A. Well, she -- you know, we work in different

18 places and she had a dinner with her work that was some

19 kind of a -- I don't remember what it was. It was a

20 charity deal. She was going to sell cookies or

21 something. There was a bake sale of some kind, like a

22 raffle with prizes for the different things.

23        So she'd gone home, I guess, earlier in the

24 day while I was still at work to get whatever she was

25 going to bring to the dinner. She then met me downtown

92

1 because our dinner that we were going to was near my work,

2 so I just walked from where I was. Then we went to dinner

3 together. It was -- I imagine it started about 7 and we

4 left about 8:30 or so, downtown. We drove back separately

5 because she had driven downtown to meet me.

6        She needed to stop by the grocery store to

7 pick something up, I think. So I went home first and then

8 she ended up meeting me there after.

9    Q. All right. And as you think back on that

10 evening, when you got home, what did you see?

11    A. The first thing I saw when I pulled up in the

12 driveway was I noticed there was a box of shotgun shells

13 out in front of the house on the curb. And I went and

14 looked at it because I thought it was strange because it

15 was steel shot like what you'd use for duck hunting and it

16 wasn't duck season, so I thought it was strange there

17 would be duck shot sitting out on my front curb.

18    Q. Okay. Hold on right there. I want to show you

19 what's marked as State's Exhibit 28. Do you recognize

20 this photograph?

21    A. Yes, I do.

22    Q. And what is this a photograph of?

23    A. This is, when you walk up my driveway to actually

24 get to the front door, it's my front porch. And there's

25 shotgun shells kind of scattered about, and it's that

93

1 steel shot that was probably in the box that was out on

2 the curb.

3    Q. Does this fairly and accurately show what you

4 first saw as you approached your house at 8:30

5 approximately on June 22nd, 2010?

6    A. Yes, it does.

7        MR. CHAMBLESS: Offer State's 28.

8        MR. HEISKELL: No objection, Your Honor.

9        THE COURT: 28 is admitted.

10        (State's Exhibit No. 28 admitted.)

11    Q. (BY MR. CHAMBLESS) Describe the door, the front

12 door.

13    A. As I walked up right past those shotgun shells, I

14 saw the door had been bashed in or kicked in. It was wide

15 open, and the door frame where the dead bolt would bolt

16 into was broken. It looked like a serious force to get

17 that -- to get it open, but it was wide open.

18    Q. Okay. Were the -- was the door frame intact or

19 was it damaged?

20    A. It was damaged. It was definitely damaged.

21    Q. What did you see in that regard?

22    A. Well, the bolt was still -- because when I'd left

23 that morning, I had locked the door. I don't

24 know, it's not a dead bolt but a lock above -- above the

25 handle, and it was still sticking out on the door.

94

1       So to get the door open, they -- someone had
2   bashed the door in and broken the frame. The whole frame
3   was damaged all the way around the door, including where
4   that lock was sitting, and it was pushed in. And there
5   was some hardware I noticed that was -- hardware from the
6   door that was inside the house, kicked in pretty far.
7       Q. Did you call Chelsea at that time or sometime
8   later?
9       A. First I went through the house real -- you know,
10  I didn't know if somebody was still in there. I went
11  through the house, then I called Chelsea and told her. I
12  asked her where she was. She said she was at the grocery
13  store, she was in line. And I just told her, you know,
14  looks like somebody broke into our house, you can just
15  hang out for a while. She asked if she needed to come
16  right home. I said, no, I was going to call the police.
17  So then she headed -- headed home.
18      Q. Okay. What ultimately, as you went through your
19  house -- and we've heard from Chelsea, seen -- the Jury's
20  seen pictures. Ultimately would you describe just what
21  was missing from your house?
22      A. Sure. There was a -- the first thing I noticed,
23  the living room we had, it was a small room. There was a
24  TV that was missing. I had gotten it for Chelsea for
25  Christmas, and it was -- it was gone.

95

1       And then I went back into our bedroom and
2   noticed the -- our mattress was flipped over, all the
3   drawers were open. Someone had clearly gone through it.
4   I noticed the gun was missing, the handgun.
5       Then I went into the spare bedroom and saw
6   that the gun cabinet had been broken into. They'd broken
7   the glass on it, popped it open. I think Chelsea later
8   went through some of the drawers and saw that there was --
9   I think there was a checkbook missing. And there was a --
10  I had a gun cleaning kit which is in a little box that had
11  been opened and torn apart.
12      There was a -- a blanket that's right next to
13  the gun cabinet. The gun cabinet was in a spare bedroom.
14  There was a spare bed in there. The -- or the blanket was
15  taken also. Looked like they put something in -- in the
16  blanket and carried it out.
17      Q. When you left that morning, and you were the last
18  one to leave, as I understand, did -- was the house
19  secured and locked?
20      A. It was, yeah.
21      Q. Okay. Did you give anyone permission to come
22  into your house and remove those items?
23      A. No.
24      Q. Okay. Did you own a Remington 1187
25  semi-automatic shotgun?

96

1       A. Yes, I did.
2       Q. And also did -- I ask you, did you own a BPI
3   Connecticut Valley Arms black powder rifle?
4       A. Yes, I did.
5       Q. Did you give Mark Soliz or Jose Ramos or Santos
6   Rangel permission to take those items from your house?
7       A. No, I did not.
8       Q. I'm going to show you what's marked as State's
9   Exhibits 30 and 31, State's 30 first. I'd ask you to look
10  at what's inside the box that's marked 30 and look at the
11  item inside and see if you recognize that.
12      A. Yeah, that's my black powder rifle that was taken
13  from my home. It looks like it's been taken apart. It
14  was all together.
15      Q. Was this black powder rifle contained within --
16  in the gun cabinet at your house when you left for work
17  that morning?
18      A. It was, yes.
19      Q. Okay. Now I'm showing you what's marked State's
20  Exhibit 31, and ask you if you can -- if you recognize
21  this.
22      A. Yes, this is my 1187 shotgun that my dad got me
23  several years before. They don't make them this way
24  anymore, so I definitely remember this gun.
25      Q. Okay. Was this Remington shotgun in your gun

97

1   cabinet that morning of June 22nd, 2010 when you left for
2   work?
3       A. It was.
4       Q. Did you give anyone permission to take the
5   shotgun or the black powder rifle from your house that
6   day?
7       A. No, I did not.
8       Q. I'll show you what's marked -- a box marked
9   State's Exhibit No. 29 containing an item which I'll refer
10  to as State's Exhibit 29 to see if you recognize that.
11      A. Yeah, that's the Hi-Point 9 millimeter that I had
12  in my house that was taken.
13      Q. Where in your house was the 9 millimeter handgun
14  located?
15      A. It was in a drawer in a desk that I kept in my
16  bedroom.
17      Q. Okay. Did you give anyone permission to take it
18  from your house that day?
19      A. No, I did not.
20      Q. Did you give Mark Soliz permission to possess it
21  on June 29th, 2010 when he was driving -- while driving a
22  2005 Dodge Stratus in Fort Worth?
23      A. No, I did not.
24      MR. CHAMBLESS: Okay. Your Honor, I'm going
25  to offer 28 -- no, 29, 30 and 31 at this time.

98

1  MR. HEISKELL: No objection, Your Honor.

2  THE COURT: 29, 30, and 31 are admitted.

3  (State's Exhibit Nos. 29 - 31 admitted.)

4  MR. CHAMBLESS: And with the Court's

5  permission, I'm going to mark the -- the handgun 29-A,

6  rifle 30-A, and the other rifle 31-A.

7  MR. HEISKELL: Well, you're marking the --

8  MR. CHAMBLESS: The actual, the gun, the

9  handgun or the shotgun.

10  MR. HEISKELL: Yes, Your Honor, let me

11  withdraw the previous "no objection" because we have no

12  objection to the actual weapons, but we do have to the --

13  and would agree to have them for the record only, the

14  containers that they come in. The containers have certain

15  markings and so forth.

16  MR. CHAMBLESS: Judge, let me suggest this.

17  I'll take the items, the actual items and mark them with

18  those numbers that we've talked about.

19  THE COURT: That's fine.

20  MR. CHAMBLESS: And offer them that way.

21  MR. HEISKELL: Okay. Yes, that's fine.

22  (State's Exhibit Nos. 29-A, 30-A, and 31-A

23  admitted for record purposes only.)

24  MR. CHAMBLESS: If it's all right, I would

25  like to show these exhibits -- just show them to the Jury

99

1  and I'll mark them at the next break.

2  MR. HEISKELL: That's fine.

3  MR. CHAMBLESS: All right.

4  Q. (BY MR. CHAMBLESS) Did the police come out to

5  your house that night?

6  A. They did, yes.

7  Q. Okay. Do you recall what actions they took that

8  night or what actions you took further?

9  A. Yeah, the police, they arrived. It was two

10  patrolmen who had come by. They went through the house,

11  double-checked it, made sure no one was there. They went

12  through my back yard. I had a dog back there and a shed

13  that had tools in it. They looked through there. Nothing

14  was taken from there.

15  They went and interviewed some of the

16  neighbors to see if anyone had seen anything. And they

17  talked to Chelsea and me about what happened and what was

18  missing, told us to make an inventory, things like that,

19  gave us a police report number. And then, you know, from

20  there we ended up going back -- we didn't stay the night

21  at that house. We went back to Chelsea's parents' house.

22  Q. Did the police indicate whether or not any of the

23  neighbors had any information about your situation?

24  A. They did not. I don't believe -- I don't believe

25  any of the neighbors saw anything, because I had also gone

100

1  through and talked to the neighbors before the police got

2  there and no one had seen anything. I think someone said

3  they heard a dog barking, but that was about it.

4  Q. The door that was broken, do you know what

5  happened to it?

6  A. My landlord -- I was renting the house -- he had

7  a door repairman come out and redid the whole door frame

8  and replaced the door because it was damaged. It had

9  been -- you know, there was some force applied to it. So

10  the guy who replaced the door, he took it out and, I

11  guess, threw it away, because I tried to find out later

12  whether he still had it, and the landlord said, no, they

13  don't have it anymore so...

14  Q. Were you present when the police, if the police

15  came at a later time to do any processing of your house?

16  A. Yes, I was present. A detective came out -- I

17  don't remember his name -- and did a fingerprint dusting

18  and said, you know, the only areas that they could really

19  dust were glass and things like that. So he dusted the

20  glass of the gun cabinet that had been broken in, and

21  throughout the house he dusted, but...

22  Q. Okay. Did you eventually yourself submit some of

23  your own prints for comparison?

24  A. I did, yes. I came into the -- in Fort Worth,

25  the D.A.'s office there and gave my fingerprints so they

101

1  could check to see whether they were my prints or someone

2  else's.

3  Q. Do you know what the results of that were?

4  A. No, I do not know.

5  Q. All right. You and your wife have moved to a

6  different house at this time; is that correct?

7  A. We did, yes.

8  MR. CHAMBLESS: Okay. Pass the witness.

9  CROSS-EXAMINATION

10  BY MR. HEISKELL:

11  Q. Mr. Circelli, how are you?

12  A. Good. How are you?

13  Q. I'm fine. My name is Mike Heiskell. I, along

14  with Greg Westfall, represent Mark Soliz. I have a few

15  questions for you, sir. And if I ask you something you

16  don't understand, please don't hesitate to stop me. Okay?

17  A. Will do. Thank you.

18  Q. You are still working with the same firm, I take

19  it?

20  A. I am, yes.

21  Q. You understand that when attorneys ask questions,

22  because you're an attorney yourself, that sometimes it can

23  be two or three prongs to a question, so try to keep me in

24  line and make sure I ask just one question at a time. All

25  right?

102

1    A. Will do.
2    Q. Now, you indicated, sir, that you sought to find
3  out from your landlord what happened to the door?
4    A. I did, yes.
5    Q. And when did you do that, if you recall,
6  Mr. Circelli?
7    A. It probably would have been -- I'm thinking
8  probably about a year ago. We -- I ended up kind of
9  getting crossways with my landlord because we moved out of
10 the house early. I had paid several months, forfeited the
11 deposit. So unfortunately, we don't -- we don't talk too
12 often. We both work in the same building, but I do see
13 him from time to time. But it was probably about a year
14 ago I tried to find out what -- what happened to the door,
15 if he had it or if the guy who replaced the door had it.
16   Q. Was that for purposes of giving it to law
17 enforcement so they could do some forensics on it?
18   A. I don't know -- I think it was probably about the
19 same time I went in and gave my fingerprints or else
20 talked to the guy who came out and dusted. And he may
21 have asked me, "Do you still have the door?" And I said I
22 don't.
23   Q. So it was a year later that the Fort Worth P.D.
24 asked you about the door; is that -- am I saying that
25 right?

103

1    A. No, I don't believe so. I think -- and I
2  apologize, my memory is not crystal clear on when I asked
3  about the door. I think what happened was the break-in
4  happened and the patrolmen came over. Then maybe a week
5  or two weeks later, the detective came over to dust. And
6  this was after the door had been replaced. And I either
7  asked then of my landlord what happened to the door or it
8  was a couple months after that when I went in to give my
9  fingerprints to cross-check it. But it was -- it was
10 pretty close to the break-in. It was within a few months,
11 I believe.
12   Q. Was that Detective Rodriguez?
13   A. The one who dusted?
14   Q. Or you made reference to a detective.
15   A. I think he was a detective. The person who came
16 out and dusted for fingerprints, I don't think his name
17 was Rodriguez.
18   Q. Okay. Was that an Officer Wilson; do you
19 remember that?
20   A. I can't remember.
21   Q. Okay. You were asked to come in to the Fort
22 Worth Police Department to compare your prints to some
23 latent prints they had already retrieved from your home;
24 is that correct?
25   A. I actually went to the Tarrant District

104

1  Attorney's office, I believe.
2    Q. Oh, the D.A.'s office. Okay.
3    A. Yes.
4    Q. And asked to compare your prints to what
5  was already -- had already been lifted?
6    A. Yes, that was my understanding.
7    Q. And they were sought to compare your prints to
8  some latent prints that had already been lifted from your
9  home; is that correct?
10   A. To the extent latent prints are prints that are
11 left somewhere in the home, I think that was the case. It
12 was sort of a -- I don't know if it was an elimination
13 thing or they just said we need to take your prints just
14 so we have them.
15   Q. And when was it, sir, that you did that?
16   A. I'm not positive. I can estimate it was -- it
17 was probably within -- within a few months, three months
18 maybe, two months. I'm not sure exactly.
19   Q. Two to three months after it happened?
20   A. I believe so, yes.
21   Q. And after you did so, did you ever hear any
22 results of the comparison or anything?
23   A. No, I never heard the results. I would be
24 interested to know, but I didn't.
25   Q. Was your wife also asked to come in to compare

105

1  her prints to what was already been lifted?
2    A. No, I don't believe she was, but I'm -- I'm
3  pretty sure she was not asked to come in.
4    Q. And the photo -- first of all, State's No. 28,
5  these are -- this references the shotgun shells; is that
6  right, sir?
7    A. Yes.
8    Q. And when you got there, that's what you saw
9  outside the front of your home?
10   A. That's correct, yeah. If you keep walking up --
11 this is a strange picture -- but if you keep walking up
12 this way, this is like a covered front porch. You would
13 turn to the right, and the door would be on your right.
14 So the door would kind of be like right here.
15   Q. Where had these shells been stored inside your
16 home?
17   A. They were stored in the gun case on the bottom
18 level.
19   Q. Were they in a box?
20   A. They were in a box, yes.
21   Q. And did you discover if the box was outside or
22 still in your home?
23   A. I think the box -- yeah, the box, I believe,
24 was -- was out on the -- out on -- the street is this
25 way. And there's a curb and the driveway is right here.

106

1 I think, if it's the same box, it was out on the curb in
2 front of the house, and I picked it up.
3     Q. You picked it up?
4     A. Yeah, I did.
5     Q. What did you do with it?
6     A. I think I eventually threw it away. I kept it
7 for a while, but I didn't -- I didn't think to keep it. I
8 threw it away.
9     Q. And did you ever let the Fort Worth Police
10 Department Crime Scene know that you had thrown the box
11 away?
12     A. I don't -- I'm not sure. I may have told one of
13 the detectives or police officers, but I'm not sure at the
14 time.
15     Q. And you were -- knew when the first officer came
16 out to the scene, I think you -- let me back up. Before
17 the first officer came to the scene, you had already
18 canvassed the neighborhood, so to speak, and asked the
19 neighbors about what they may have seen or heard?
20     A. I think I may have only talked to my direct
21 next-door neighbor and said, hey, I had a break-in, so,
22 you know, because he had small children. And I just told
23 him, "Did you hear anything, see anything?" It was all
24 pretty fast because the police came really pretty quickly.
25 I may have talked to one before the police got there, but

107

1 I'm not -- not positive. I did end up talking to all the
2 neighbors within the next couple of days and just saying,
3 "Did you see anything?"
4     Q. By the way, what type of dogs did you have in the
5 back?
6     A. I had a Golden Retriever. He -- he's a big dog
7 and he's got a mean bark, but when I came home, he was --
8 he was acting very strange in the back yard. He was
9 cowering back. It seemed strange to me.
10     Q. Okay. Now I want to go back to the door issue
11 that you talked about earlier.
12     A. Yes.
13     Q. And if you recall, why was it that you were
14 trying to retrieve the door here in the last year or so
15 from your landlord?
16     A. I just -- I think when I went in and talked to
17 the detectives about what had happened, and they said, "Do
18 you know what happened to the door?" I said, "I don't. I
19 can ask. I can ask and see if I can find out." And I
20 did.
21     Q. And did you and/or your wife show them the
22 photographs that y'all had taken of the door which showed
23 the footprint and the ridges of the footprint on the door?
24     A. I did turn over all my photos. I think -- I
25 don't know what other photos have been shown. But the one

108

1 I looked at, I think, is one of my -- is a picture that
2 either I took or my wife took that night.
3     The photo, unfortunately, I didn't get a very
4 good shot of the -- of the shoe print or whatever it was
5 in the door. I can see it but...
6     Q. And, Mr. Circelli, this is State's No. 17. Is
7 that one of the photos that shows this?
8     A. That looks -- that does. It looks like a
9 blown-up version of -- unless that was just how it was
10 taken. But, yeah, that's one of the photos I believe
11 I took and then turned over to the -- to the police.
12     Q. Okay. And sometime after that is when they asked
13 you about the door then, trying to retrieve that?
14     A. That's right.
15     Q. But you never were successful in retrieving that;
16 is that right?
17     A. Yeah. And I didn't make a gallant effort on
18 trying to get it back. I did check with my -- I think
19 with my land -- my former landlord, and he said he'd
20 checked with the door company or with the repairman,
21 general repairman, and he had thrown it away or something.
22     Q. And did you also let the Crime Scene or other
23 officers know that you had thrown away the box that those
24 shells had come in?
25     A. The detective who came out to dust, I may have.

109

1 I think I probably did because I think I said I wish I
2 wouldn't have thrown that away.
3     MR. HEISKELL: Okay. Thank you. Pass the
4 witness.
5     MR. CHAMBLESS: No further questions. Thank
6 you.
7     THE COURT: May the witness be excused?
8     MR. CHAMBLESS: Yes.
9     MR. HEISKELL: Yes.
10     THE COURT: You may be excused.
11     THE WITNESS: Thanks, Judge.
12     (Witness excused.)
13     THE COURT: At this time we'll take a recess
14 for lunch. We'll be in recess until about 1:15. You may
15 take the Jury out.
16     (Lunch recess from 12:01 to 1:25 p.m.)
17     (Jury not present.)
18     THE COURT: State present and ready?
19     MR. CHAMBLESS: Yes, Your Honor. May I
20 address the Court, clarify something for the record?
21     THE COURT: Okay. Defense team is present
22 and ready.
23     MR. HEISKELL: Yes.
24     THE COURT: Defendant is here.
25     Okay. Outside the presence of the Jury, did

110

1 you say you want to present something to me?
2         MR. CHAMBLESS: Yes. I just want to
3 clarify for the record how we've marked these exhibits.
4 The 9 millimeter pistol is marked as State's Exhibit 29.
5 The box in which it is contained is 29-A.
6         The black powder rifle is now marked as
7 Exhibit 30. And the box in which it is contained is
8 marked as 30-A. The Remington shotgun is marked as 31,
9 and the box as 31-A, if it please the Court.
10         MR. HEISKELL: That's correct, Your Honor.
11         THE COURT: Previously 30, 31 and 29 were
12 admitted. They were offered and admitted, and you
13 intended that to be the weapons only.
14         MR. CHAMBLESS: Yes. And we've continued to
15 keep the weapons in the boxes, and those now have the "A"
16 designation for each exhibit.
17         MR. HEISKELL: And those are for record
18 purposes only, as I understand.
19         MR. CHAMBLESS: The boxes.
20         MR. HEISKELL: The boxes, yes.
21         THE COURT: At this point, the 29-A, 30-A and
22 31-A have not been offered --
23         MR. CHAMBLESS: Right, that's correct,
24 Judge. We just want to clarify the marking of those
25 pieces of evidence, but the firearms are offered and

111

1 admitted.
2         MR. HEISKELL: Yes, they've been admitted,
3 Judge.
4         THE COURT: Correct.
5 You may bring in the Jury.
6         (Jury present.)
7         THE COURT: Thank you. You may be seated.
8 Who is your next witness?
9         MR. CHAMBLESS: Your Honor, at this time the
10 State offers three exhibits. I think they are, by
11 agreement, by stipulation. Exhibit 32, the document
12 indicating that Officer J. Wilson of the Fort Worth Police
13 Department went to the El Campo residence of Mr. and
14 Ms. Circelli, on July 8th, obtained a fingerprint card
15 containing two latent lifts. That's Exhibit 32.
16         Exhibit 34 is a report of Tom Ekis about
17 those lifts. They were from the exterior glass of the
18 left gun cabinet door, both of them. They were not
19 identified as a result of comparison for Jose Ramos, Mark
20 Soliz or Ramon Morales. And that was true of both latent
21 lifts.
22         In a later report, marked State's Exhibit 33,
23 they were identified as the prints of Vincent Circelli.
24         And so I think we offer those by stipulation
25 and agreement.

112

1         MR. HEISKELL: That's correct, Your Honor.
2 We've seen the reports and we agree to stipulate to their
3 admission.
4         THE COURT: 32, 33 and 34 are admitted.
5         (State's Exhibit Nos. 32 - 34 admitted.)
6         THE COURT: Call your next witness.
7         MS. JACK: Yes, Your Honor. We call Ramon
8 Morales.
9         THE COURT: Come all the way around here by
10 the Deputy and into the witness box. You were previously
11 sworn in, correct?
12         THE WITNESS: Yes, sir.
13         THE COURT: Please have a seat and talk into
14 the microphone. Okay.
15         MS. JACK: May I proceed, Your Honor?
16                 RAMON MORALES,
17 Having been previously duly sworn, testified as follows:
18                 DIRECT EXAMINATION
19 BY MS. JACK:
20     Q. Mr. Morales, will you please state your full
21 name.
22     A. Ramon Augustine Morales.
23         MS. JACK: May I approach the witness, Your
24 Honor?
25         THE COURT: Sir, if you --

113

1         THE WITNESS: Ramon Augustine Morales.
2         THE COURT: Bend that down. It will work if
3 you talk into the end there.
4         THE WITNESS: All right.
5         THE COURT: Thank you.
6     Q. Let's try that one more time.
7     A. Ramon -- oh, y'all can hear me. Ramon Augustine
8 Morales.
9     Q. Can you please spell your name.
10     A. Ma'am?
11     Q. Can you please spell your name.
12     A. R-A-M-O-N, A-U-G-U-S-T-I-N-E, M-O-R-A-L-E-S.
13     Q. All right. Mr. Morales, will you please tell the
14 ladies and gentlemen of the Jury how old you are.
15     A. 32.
16     Q. And where do you live?
17     A. Fort Worth, Texas.
18     Q. With whom do you live?
19     A. My mother.
20     Q. Now, where did you grow up?
21     A. Fort Worth.
22     Q. Fort Worth is home?
23     A. Yes, ma'am.
24     Q. How long have you been home?
25     A. What do you mean as how long have I been home?

114

1    MR. HEISKELL: Judge, can I ask him to speak
2 up? I can barely hear him.
3    THE COURT: I can't really hear you.
4    Try turning that knob up one more notch.
5 Okay.
6    Then try to speak right into the end of that,
7 please.
8    THE WITNESS: All right.
9    Q. (BY MS. JACK) Okay. How long have you been
10 home?
11   A. As in what do you mean how long?
12   Q. When did you get out?
13   A. 2010, March, about March 8th.
14   Q. All right. In June of 2010, who were you seeing?
15   A. As in --
16   Q. June of 2010, who were you dating?
17   A. Miriam.
18   Q. What is Miriam's last name?
19   A. Olivares.
20   Q. All right. And did she have a friend by the name
21 of Cathy Richardson?
22   A. Yes.
23   Q. All right. And from time to time when you and
24 Miriam were dating, would you go by Ms. Richardson's
25 house?

115

1    A. Yes.
2    Q. Or her apartment?
3    A. Yes.
4    Q. Who did she live with?
5    A. Her mother.
6    Q. She lived with her mother. Did she live with
7 anybody else at the apartment that you can recall?
8    A. I mean, there was different people there at
9 times, but, I mean, I wouldn't say they lived there.
10   Q. Okay. So people would stay there from time to
11 time?
12   A. Correct.
13   Q. Okay. Now, when you would go by Ms. Richardson's
14 house, did you come to meet somebody by the name of Kilo?
15   A. I wouldn't say I came to meet him. I met him one
16 time, I mean.
17   Q. All right. And was that on June 22nd, 2010?
18   A. Yes.
19   Q. All right. Who was he with?
20   A. Joe Ramos.
21   Q. Do you see -- did you later learn what Kilo's
22 full name was?
23   A. Yes.
24   Q. What is his full name?
25   A. Mark Anthony Soliz.

116

1    Q. And is "Kilo" his street name?
2    A. I believe so.
3    Q. Do you see Mr. Soliz in the courtroom today?
4    A. Yes.
5    Q. Could you please point to him and identify him by
6 what he's wearing.
7    A. He's right there, white shirt with black tie.
8    Q. A black shirt or what --
9    A. White shirt.
10   Q. White shirt and a black tie. Is he wearing a
11 jacket or not?
12   A. No.
13    MS. JACK: Okay. Your Honor, at this time
14 may the record reflect that the witness has identified the
15 Defendant in open court?
16    THE COURT: Granted.
17    MS. JACK: Thank you, Your Honor.
18   Q. Okay. And, Mr. Morales, you met him for the
19 first time over at Cathy Richardson's house?
20   A. Right.
21   Q. And Mr. Ramos was there as well?
22   A. Correct.
23   Q. And that's Jose Ramos?
24   A. Okay. Well, he said his name was Joe so...
25   Q. Okay.

117

1    A. First time being met, if you tell me what your
2 name is, that's what I go by.
3    Q. Fair enough. Was anybody by the name of Santos
4 Rangel there that day?
5    A. He showed up for a couple minutes maybe, then he
6 left.
7    Q. Okay. Was a girl by the name of Jamie Vessell
8 there at any point?
9    A. Yes.
10   Q. Okay. When you were there and you met Kilo and
11 Joe, were there any firearms in the apartment?
12   A. Yes.
13   Q. Can you tell the members of the Jury about those
14 firearms.
15   A. I believe there was three shotguns, a rifle, and
16 a pistol.
17   Q. All right. Three shotguns, a rifle, and a
18 pistol. All right. And are you familiar with the
19 difference between a revolver and semi-automatic pistol?
20   A. Yes, ma'am.
21   Q. Was the pistol a semi-automatic or a revolver?
22   A. It was an automatic.
23   Q. And are you familiar with a 9 millimeter?
24   A. Somewhat, yes.
25   Q. Did it look like a 9 millimeter?

118

1    A. Yes.
2    Q. And you're not saying it definitively was; you're
3  just saying it looked like a 9 millimeter?
4    A. Yes, ma'am.
5    Q. All right. And where were the guns in her
6  apartment?
7    A. In the closet.
8    Q. In the closet of a bedroom? Of the living room?
9    A. It's a one bedroom, ma'am, so, yes, it was in the
10  closet.
11    Q. Do you know whose bedroom they were in?
12    A. It would be Cathy's -- well, they shared a
13  bedroom so, I mean, it could be.
14    Q. All right. They were in a closet?
15    A. Yes, ma'am.
16    Q. All right. Were they -- do you remember how they
17  looked in the closet?
18    A. They were sitting up, wrapped around a blanket.
19    Q. All right. And who was showing you the guns?
20    A. That would have been -- that would have been
21  Kilo.
22    Q. You just gestured to Mr. Soliz in the courtroom;
23  is that right?
24    A. Uh-huh.
25    Q. The reason why I say that, Mr. Morales, the lady

119

1  seated in front of you is typing out everything that you
2  and I say, so when you do something that is not oral, I
3  have to be able to repeat it so that she can type it out.
4    A. Yes, ma'am.
5    Q. Does that make sense?
6    A. Yes.
7    Q. Okay. So you said that Kilo was the one that was
8  showing you the gun; is that right?
9    A. Right.
10    Q. And you mentioned that the guns were wrapped in a
11  blanket?
12    A. Right.
13    Q. Do you remember what color the blanket was?
14    A. I don't remember the blanket.
15    Q. All right. Did it look like a bed -- a blanket
16  that belonged on a bed at some point?
17    A. Yes, ma'am.
18    Q. All right. And the guns were in the blanket?
19    A. Yes.
20    Q. Where was the pistol?
21    A. He had that on him.
22    Q. When you say "he," you gestured again to --
23    A. I'm sorry. Mark Anthony Soliz.
24    Q. Okay. Where did he have it?
25    A. I guess on him, I mean.

120

1    Q. Do you remember seeing it, where he had it? Like
2  did he have it in his hand? Did he have it --
3    A. Well, I remember I was looking at the shotguns.
4  And then from there, I guess he had pulled it out. I
5  don't -- I didn't see him go anywhere in particular and
6  grab it or anything. It was --
7    Q. But at some point you know he had it?
8    A. Oh, yes, ma'am.
9    Q. All right. What -- what was the conversation
10  about the guns?
11    A. I mean, basically he was trying to sell them to
12  me.
13    Q. And how much was he trying to sell them to you
14  for?
15    A. I bought three shotguns for a hundred dollars. I
16  tried to buy all of them, but the other two guns he said
17  he had plans for.
18    Q. Okay. Let me back up for just a moment. You
19  said that there were four guns in total, four long guns in
20  total?
21    A. Yes, ma'am.
22    Q. One pistol?
23    A. Yes, ma'am.
24    Q. And you tried to buy all of them?
25    A. Correct.

121

1    Q. And he said which ones were not for sale?
2    A. The pistol and one -- I believe it was a rifle.
3    Q. And what did he say he was going to do with
4  those?
5    A. He just said he had plans for them.
6    Q. So those two were not for sale?
7    A. No.
8    Q. Did you buy the other three long guns?
9    A. Yes, ma'am.
10    Q. How much did you pay for them?
11    A. A hundred dollars.
12    Q. All right. Did you pick them up that first time
13  or did you buy them the next time you were at their
14  apartment?
15    A. I believe I came later on that night and that's
16  when I purchased them, which was a little after maybe 2:00
17  in the morning.
18    Q. Okay. All right. You purchased the guns. How
19  did you carry them out?
20    A. In the blanket.
21    Q. All right. So you took the blanket?
22    A. Yes.
23    Q. All right. When he was showing you the pistol
24  and said that he had plans for it, what did he do with the
25  gun?

122

1 A. He just held it in his hand, kind of just was
2 showing me. I grabbed ahold of it, looked at it,
3 whatever. He said it wasn't for sale.
4 Q. All right. So he was holding the 9 millimeter
5 out showing you?
6 A. Yes.
7 Q. And you grabbed it, and he said "not for sale"?
8 A. Right.
9 Q. That he had plans for it?
10 A. Right.
11 Q. All right. Did you see where he put the gun?
12 A. Well, I mean, after he told me it wasn't for
13 sale, he just kind of tucked it in his waist.
14 Q. When he tucked it in his waist, did he tuck it in
15 the front part?
16 A. Yes, ma'am.
17 Q. One side or the other or just the middle?
18 A. I don't really -- I wasn't paying too much
19 attention.
20 Q. You just know it went in his waist?
21 A. Right.
22 Q. Okay. Do you remember which hand he had the gun
23 in?
24 A. Right hand.
25 Q. Was Mr. Ramos there when Mr. Soliz sold you the

123

1 gun?
2 A. He was there, but he wasn't actually right there
3 when me and him were doing the business or whatever.
4 Q. Okay.
5 A. He was in the other room.
6 Q. So the business was between you and Kilo?
7 A. Correct.
8 Q. Who was doing the talking?
9 A. Kilo.
10 Q. Who was the one in charge?
11 A. Kilo.
12 Q. Who was familiar with guns?
13 A. Kilo.
14 Q. Now, did you take those guns the next day to be
15 pawned?
16 A. Yes, ma'am.
17 Q. Where did you pawn them?
18 A. A-1 Pawnshop off of Hemphill.
19 Q. Where is Hemphill Road?
20 A. Hemphill would be in between Seminary and Bolt
21 Street which runs from north to south.
22 Q. And is that in Fort Worth, Texas?
23 A. Yes, ma'am.
24 Q. Is that in Tarrant County, Texas?
25 A. Yes, ma'am.

124

1 Q. Okay. And when you pawned those guns, how much
2 did you get for those guns?
3 A. Maybe a little over 500, I believe.
4 Q. Okay. All right. And, you know, when did you
5 pawn them?
6 A. The very next day.
7 Q. All right. How many did you pawn?
8 A. Three.
9 MS. JACK: May I approach this witness, Your
10 Honor?
11 Q. Mr. Morales, I'm showing you what's been admitted
12 into evidence as State's Exhibit No. 30. Is this one of
13 the guns that you pawned at the A-1 --
14 A. Yes, ma'am.
15 Q. -- Pawnshop on Hemphill Road?
16 A. I believe so.
17 Q. And is this one of the guns that this Defendant
18 sold you?
19 A. Yes.
20 Q. All right. Mr. Morales, I'm now showing you
21 what's been admitted into evidence as State's Exhibit No.
22 30. Is State's Exhibit No. 31 one of the firearms that
23 you pawned at the A-1 Pawnshop?
24 A. Yes. Yes, I remember that one.
25 Q. And is State's Exhibit No. 31 the same long gun

125

1 that Mr. Soliz sold you that evening?
2 A. Yes, ma'am.
3 Q. Mr. Morales, I'm showing you now what's been
4 admitted into evidence as State's Exhibit 29, minus the
5 magazine in the bottom.
6 A. Correct.
7 Q. Does this appear to be the same firearm that Kilo
8 was showing you on June 22nd of 2010?
9 A. Yes, ma'am.
10 Q. Mr. Morales, you've been to prison before; is
11 that correct?
12 A. Yes, ma'am.
13 Q. State jail, prison. And you've been for a number
14 of different cases; is that correct?
15 A. Yes, ma'am.
16 Q. You've been for unauthorized use of a motor
17 vehicle?
18 A. Yes, ma'am.
19 Q. Is that right? Okay. Theft under 1500 with two
20 priors; is that right?
21 A. Yes, ma'am.
22 Q. Okay. Forgery?
23 A. Yes, ma'am.
24 Q. Okay. And burglary of a building?
25 A. Yes, ma'am.

126

1    Q. Okay. You know that because of those prior
2  felony convictions that you're not allowed to have
3  weapons?
4    A. Yes, ma'am.
5    Q. Okay. When you pawned those weapons, you knew
6  that that began a trace or a trail that led back to you?
7    A. Not really.
8    Q. You didn't know that?
9    A. No, ma'am.
10   Q. Okay. Did you learn it led back to you?
11   A. Oh, yeah, I learned real hard.
12   Q. All right. Were you subsequently charged with or
13 later charged with being a felon in possession of a
14 firearm?
15   A. Yes, ma'am.
16   Q. And were you also charged with possession of a
17 controlled substance, that being --
18   A. Yes, ma'am.
19   Q. -- methamphetamine?
20   A. Yes.
21   Q. Okay. And as a result of those charges, did you
22 plead guilty?
23   A. Yes.
24   Q. And did you receive three years in prison? Your
25 sentence was three years in prison back on February the

127

1  22nd of 2010?
2    A. Yes, ma'am.
3    Q. Okay. In fact, I was the Prosecutor that handled
4  your cases; is that correct?
5    A. Yes, ma'am.
6    Q. Okay. And the information that you provided
7  about the sale of the long guns and the information that
8  you provided about Kilo and his possession of the pistol,
9  you provided long before you and I ever met; is that
10 correct?
11   A. Yes.
12   Q. All right. And part of your plea offer when we
13 pled your cases and you pled guilty was that you testify
14 against Kilo; is that correct?
15   A. Correct.
16       MS. JACK: I'll pass this witness for
17 cross-examination.
18       MR. HEISKELL: Thank you, Your Honor.
19              CROSS-EXAMINATION
20 BY MR. HEISKELL:
21   Q. Mr. Morales, my name is Mike Heiskell. I have
22 some questions for you. If I ask you something you don't
23 understand, don't hesitate to stop me and I'll start
24 over. Okay?
25   A. All right.

128

1    Q. That sound fair?
2    A. Yes, sir.
3    Q. Let's start where the Prosecutor left off.
4  You've indicated you've been to prison and State Jail
5  prison before for four different offenses?
6    A. Yes, that's what she said, four.
7    Q. Okay. The first one was back in 2004; is that
8  correct?
9    A. Yes, sir.
10   Q. And what was your sentence at that point?
11   A. I believe it was maybe --
12   Q. I can't hear you.
13   A. I didn't say anything yet. Nine months, sir.
14   Q. Nine months. And did that run concurrent with
15 another sentence?
16   A. No, I believe it was one charge.
17   Q. I'm sorry?
18   A. One charge.
19   Q. One. And the next one was a theft of enhanced
20 State Jail felony; is that correct?
21   A. Yes, sir.
22   Q. And what sentence did you receive at that point?
23   A. A year, one year.
24   Q. One year. And after that, you had a forgery, am
25 I understanding that correctly, another State Jail felony?

129

1    A. Yes, sir.
2    Q. And how much time did you receive for that third
3  one?
4    A. Well, I believe it -- if I recall, maybe two
5  years. I think it was enhanced to T.D.C. felony.
6    Q. I'm sorry?
7    A. Enhanced to a T.D.C. felony, which they gave me
8  two years.
9    Q. That was 2006, was it not?
10   A. I can't remember the actual date.
11   Q. And then you had a burglary case; is that right?
12   A. There's two State Jails and two T.D.C.
13   Q. Okay. The burglary was a T.D.C.?
14   A. Yes. Burglary of building was enhanced to
15 T.D.C. Nine months, one year, two years, and then the
16 three years that I just...
17   Q. Okay. So the burglary was two years as well?
18   A. Yes.
19       MR. HEISKELL: Now may I approach the board,
20 Your Honor?
21       THE COURT: Yes, sir.
22       MR. HEISKELL: Thank you.
23   Q. Are you a Junior; is that correct?
24   A. Yes.
25   Q. And you told us about the unauthorized use of a

130

1 motor vehicle, State Jail for nine months?
2    A. Yes.
3    Q. And that's 2004, correct?
4    A. Yes.
5    Q. And then after that we have the theft, excuse me,
6 State Jail felony again, and this one is for one year?
7    A. Uh-huh, yes, sir.
8    Q. Okay. That was 2006 -- 2004 again, or 2006?
9    A. I believe there were -- the unauthorized use with
10 a motor vehicle, that was nine months. Then I believe
11 theft and the actual forgery were ran C.C.
12    Q. Okay.
13    A. So...
14    Q. That was 2006 then?
15    A. Yes. That way we can get that straight. It
16 wasn't five different times.
17    Q. Okay. All right. And then we finally have this,
18 I think the burglary, that's a T.D.C. case; is that right?
19    A. State Jail felony enhanced.
20    Q. Enhanced, okay. Then you received two years on
21 that one?
22    A. Yes.
23    Q. And that was 2008?
24    A. 8.
25    Q. Now, the Prosecutor said something about

131

1 pleading guilty in February. I believe she may have
2 misspoken 2010. That was actually 2011; is that right?
3    A. Yes.
4    Q. And that's for the weapons here we see in State's
5 No. 31, 32 -- 30, 31, and 29; is that right?
6    A. Yes.
7    Q. Now, that unlawful possession by a felon, that is
8 a third-degree felony; is that right?
9    A. Yes.
10    Q. You could have received anywhere from two to ten
11 years in prison?
12    A. Yes.
13    Q. And you made a deal with the Prosecutors to
14 receive three years; is that right?
15    A. Yes.
16    Q. And that also came with another separate case of
17 possession of a controlled substance; is that right?
18    A. Right. You've got the paperwork, right?
19    Q. Yes, sir. I'm just asking. And what was that
20 controlled substance, by the way, methamphetamine?
21    A. Yes, sir.
22    Q. And those two cases are to run together, that
23 being a third-degree felony as well; is that right?
24    A. Yes, sir.
25    Q. And now, here is what I want to talk to you

132

1 about. Prosecutor said something to the effect that
2 you -- let me put the date up here -- had told the
3 authorities about these guns sometime after you were found
4 in possession of them, at least had pawned them; do you
5 remember that?
6    A. Yes.
7    Q. As a matter of fact, you gave a statement to the
8 police department back on August 11th of 2010; remember
9 that?
10    A. 2010, when I was placed under arrest?
11    Q. Yes.
12    A. Yes.
13    Q. And in that statement you gave to the police back
14 in August of 2010, you told them about meeting with two
15 guys that you did not know, and then you met them a second
16 time, and that second time is when you purchased the guns?
17    A. Right.
18    Q. Isn't that true?
19    A. Right.
20    Q. And the first time you met, I believe, I guess
21 you'll say that's Mark Soliz and Joe Ramos, Jose Ramos?
22    A. Right.
23    Q. And Jose Ramos is also known as Kilo; isn't that
24 true?
25    A. I heard that before but I -- I've only known him

133

1 as that.
2    Q. Okay. And where was the first time you met them?
3    A. At Cathy's house.
4    Q. And where was the second time you met them?
5    A. At Cathy's house.
6    Q. And it's true, is it not, that Cathy's house is a
7 place where people would go to and use methamphetamine,
8 smoke ice; isn't that true?
9    A. I would say so, I mean, if that's what they're
10 doing.
11    Q. Yourself included?
12    A. Me?
13    Q. Yes.
14    A. Yeah.
15    Q. And one of the things that when these guns came
16 up, was that Joe -- Jose Ramos and Kilo wanted to purchase
17 some ice for those guns; isn't that true?
18    A. Yes.
19    Q. You give them ice?
20    A. No, sir.
21    Q. Is that the first time or the second time?
22    A. What do you mean? I gave them a hundred dollars
23 the second time. That was -- that was the deal.
24    Q. Okay. Let's go back to the first time. Was this
25 talking to them about using and dealing in methamphetamine

134

1 and ice?

2    A. No. The first time was for the guns.

3    Q. I'm sorry?

4    A. The first time that I met them, they wanted to

5 sell me the guns.

6    Q. Okay.

7    A. Okay. I didn't get them at that time. Okay. I

8 came back later on after 2:00, that's when I purchased

9 them.

10    Q. And you gave a statement to that effect to the

11 police back in August.

12    A. Okay.

13    Q. Correct? And you didn't mention ice at that

14 point, did you?

15    A. There was no ice involved.

16    Q. You didn't mention the fact that they wanted ice

17 for the weapons, did you?

18    A. I mean, what would I say that for, I mean?

19    Q. I'm sorry, I couldn't hear you.

20    A. What would I say that for, I mean?

21    Q. I'm just asking. You didn't mention that, did

22 you?

23    A. No.

24    Q. Okay. And as a matter of fact, what you told the

25 Prosecutor and this Jury earlier in your testimony about

135

1 Kilo making a statement, "I've got plans for these other

2 guns", you didn't mention that in that statement either,

3 did you?

4    A. What are you getting at? I don't understand.

5    Q. Did you mention that in the statement you gave in

6 August of 2010?

7    A. I did say that in the statement.

8    Q. Pardon?

9    A. I did say that in the statement, I believe.

10        MR. HEISKELL: May I approach, Judge?

11        THE COURT: Yes.

12        THE WITNESS: That he had plans for them.

13    Q. I want to show you, Mr. Morales, to refresh your

14 memory --

15    A. Okay.

16    Q. -- a statement that you can see the second page

17 indicates the date, August of 2010?

18    A. Uh-huh.

19    Q. And read to yourself this first -- this

20 statement, excuse me.

21    A. Okay.

22    Q. You did not say in this statement that he said he

23 had plans for these guns, did you?

24    A. No.

25    Q. Now, what you did tell the Prosecutor when you

136

1 had your deal cut was that, yeah, he made that statement,

2 he got plans for them; is that right?

3    A. Right.

4    Q. That's when you got that deal for three years

5 when you could have faced ten years; isn't that true?

6    A. I don't know. It ranges from two to ten, so I

7 could have got a two as well.

8    Q. Right. But you have a pretty extensive history,

9 wouldn't you agree?

10    A. I've seen worse.

11    Q. You were using methamphetamine back in 2010,

12 weren't you?

13    A. Somewhat.

14    Q. How often?

15    A. Once, twice a week.

16    Q. How would that make you feel? What was the

17 reaction when you get high on meth?

18    A. I mean, I don't know, I mean, just...

19    Q. I'm sorry?

20    A. I'm not sure.

21    Q. Well, you take it for a reason; isn't that true?

22    A. Right.

23    Q. Take it to get high; is that right?

24    A. I wouldn't say get high; maybe stay awake.

25    Q. Make you stay awake and get high. What kind of

137

1 reaction did it have to your body, Mr. Morales, stay awake

2 and what else?

3    A. I mean, that's about it. It wasn't -- not like

4 it's going to have me running around all crazy, I mean. I

5 don't know what you're trying to get at, sir, I mean.

6    Q. You've been using methamphetamine for quite some

7 time, haven't you?

8    A. Matter of fact, I haven't. Most of those are from

9 alcohol.

10    Q. Okay. And including the burglary?

11    A. Burglary, yes, sir. I was drunk and robbed a

12 building and dropped my I.D. in the building. How about

13 that? I don't think methamphetamine would have had me do

14 that.

15    Q. Now, you claim that instead of getting ice or

16 giving ice to Mark Soliz and Jose Ramos, that a hundred

17 dollars was exchanged; is that right?

18    A. I said that already, yes, sir.

19    Q. Were you working at the time?

20    A. No.

21    Q. Where did you get the hundred dollars from?

22    A. Hundred dollars?

23    Q. Yes.

24    A. A hundred dollars is not too easy to come by.

25    Q. Where did you get it from?

138

1    A.  My girlfriend.

2    Q.  Miriam?

3    A.  Uh-huh.

4    Q.  What's her last name again?

5    A.  Olivares.

6    Q.  Olivares.  And when did she give you that $100?

7    A.  It would have been the same -- I guess when we

8  came back the second time.

9    Q.  How much time separated between the first time

10 and the second time?

11    A.  That, I don't remember.

12    Q.  Day, a week, a month or do you remember

13 approximately?

14    A.  It was within that same day.

15    Q.  I'm sorry?

16    A.  The same day.

17    Q.  Oh, the same day.  So some hours separated it or

18 if you --

19    A.  Give or take, yes.

20    Q.  So you were at Cathy's all day that day?

21    A.  How would I come back a second time and be there

22 all day?  No.

23    Q.  You left and came back?

24    A.  I left and came back.

25    Q.  And I think you said the guns were in Cathy's

139

1  bedroom closet?

2    A.  Right.

3    Q.  Who else lived there with Cathy?

4    A.  Her mother.

5    Q.  Who else?

6    A.  Whoever stayed there from time to time, different

7  people.  I mean, that's who actually lived there, Cathy

8  and her daughter -- I mean and her mother Cheryl is what

9  I'm trying to get at.

10    Q.  And who was she seeing or dating at the time, if

11 you know?

12    A.  That, I didn't care, I don't know.  I mean, it's

13 none of my business, sir.

14    Q.  But it was known as a dope house, wasn't it?

15    A.  No, I wouldn't say a dope house, I mean.

16    Q.  Lot of people in and out?

17    A.  I mean, when I'm there, I go see Cheryl and

18 Cathy, and if whoever is there, then they're there.  But I

19 mean, I take my girlfriend over there to see her friends.

20 Who is there doesn't apply to me whatsoever.

21    Q.  Is that where you got your meth from?

22    A.  No.

23    Q.  Where did you get it from?

24    A.  I mean, usually I get it from a friend of mine, I

25 mean.

140

1    Q.  I'm sorry?

2    A.  From a friend of mine.

3    Q.  Who was that?

4    A.  Well, I mean, I'm not going to state his name.

5  No reason to.

6    Q.  Certain things you'll say, certain things you

7  won't?

8    A.  I mean, you got most of the answers written down,

9  but yet you're asking me different questions --

10    Q.  Well, let me ask you this.

11    A.  But you're asking me different questions and...

12    Q.  Did you ever tell the Prosecutors who the name of

13 the person was supplying you dope?

14    A.  No, I don't believe I said, huh-uh.

15    Q.  How much did you pawn these weapons for?

16    A.  I believe I stated that, sir.  I mean, I don't

17 understand what --

18        THE COURT:  Just -- just take it easy.  Just

19 answer whatever question he asks you truthfully.

20        THE WITNESS:  I understand that, Your Honor

21 but --

22        THE COURT:  He may ask you several times and

23 that's just -- that's part of his strategy.  Just answer

24 the question.

25        THE WITNESS:  Yeah, I understand that.

141

1        THE COURT:  If he asks a question three

2  times, answer it three times and we'll just keep on going.

3        THE WITNESS:  All right.

4        THE COURT:  So please ask your question.

5        MR. HEISKELL:  Yes.  Thank you, Your Honor.

6    Q.  (BY MR. HEISKELL)  How much?

7    A.  A little over $500 is what it was.  I believe we

8  have a pawn ticket so we can check how much it was.

9    Q.  And what did you do with that $500, Mr. Morales?

10    A.  I rented a motel for a week, and then I moved

11 to a friend of mine's house and paid him first month's

12 rent.

13    Q.  Oh, by the way, when you received that three-year

14 sentence back in February the -- February of 2011, last

15 year, a year ago, did you immediately go to prison at that

16 point?

17    A.  Well, I sat in the county for whatever waiting

18 to get sentenced.  And then once I signed my time, I

19 believe it was maybe 40 days, I was shipped off, caught

20 chain.

21    Q.  And when did you get out?

22    A.  18 months later, half my sentence.

23    Q.  I'm sorry?

24    A.  18 months later, half my sentence.  Half of three

25 is 18 months.

142

1    Q. So half of three is 18 months. You got -- what
2 date did you get out?
3    A. Um, January 17th, last month.
4         MR. HEISKELL: Pass the witness.
5         MS. JACK: May I approach the witness, Your
6 Honor?
7         THE COURT: Yes.
8              REDIRECT EXAMINATION
9 BY MS. JACK:
10    Q. Mr. Morales, I'm showing you what's been marked
11 as State's Exhibit No. 35 for identification purposes. Do
12 you recognize this?
13    A. Yes.
14    Q. Is this a copy of the statement that you gave the
15 Fort Worth Police Department on August the 11th of 2010?
16    A. I think that was when I was at Mansfield.
17    Q. Right. The one --
18    A. Right.
19    Q. -- you gave Detective Stephanie Phillips?
20    A. Okay.
21    Q. Is that right?
22    A. Yes.
23    Q. Is that a copy of that statement?
24    A. I believe so.
25    Q. I mean, it's not an original. It's not your

143

1 original signature. It's a copy.
2    A. It's a copy of it, yes.
3         MS. JACK: Your Honor, at this time State
4 would offer State's Exhibit No. 35 into evidence.
5         MR. HEISKELL: No objection.
6         THE COURT: 35 is admitted.
7         (State's Exhibit No. 35 admitted.)
8    Q. (BY MS. JACK) Okay. Mr. Morales, what you said
9 was you purchased these guns from two guys you did not
10 know. You'd seen them once before. You didn't speak with
11 them. The second time you saw them was about 3 in the
12 morning. They had four shotguns and one pistol. You
13 bought three shotguns. When I asked how much for the
14 other shotgun and pistol, he said he was keeping them. I
15 went to my girlfriend's friend, Cathy, and two guys were
16 there and they were called Kilo and Joe. And I purchased
17 the weapons for a hundred, the three shotguns only. Is
18 that right?
19    A. Right.
20    Q. And when I met with you, I asked you quite a bit
21 about the conversation with Kilo and Joe; is that right?
22    A. Right.
23    Q. Okay. And I asked you a lot of questions the
24 detective did not ask you; is that fair to say?
25         MR. HEISKELL: Your Honor, we object. That

144

1 calls for speculation and conjecture and leading.
2         THE COURT: Overruled.
3    Q. (BY MS. JACK) You can go ahead and answer.
4    A. Okay. Well, the detective started asking me
5 questions, and when I started writing that down, after she
6 asked a couple questions, she didn't go into detail about
7 anything. I wrote that down, and then from there, she
8 said, well, you can have a lawyer present. And then I
9 said, I want my lawyer. And then that's when she took the
10 paper and put it in her little folder or whatever.
11    Q. When I talked to you, I asked you a lot of
12 detail; is that correct?
13    A. Yes.
14    Q. All right. And, in fact, there was a transcript
15 made of your testimony at the time of your plea; is that
16 correct?
17    A. Yes.
18         MS. JACK: Okay. May I approach the witness,
19 Your Honor?
20         THE COURT: Yes, you may.
21         MS. JACK: At this time we'll offer State's
22 Exhibit No. 35 (sic) into evidence which is a certified
23 copy of the transcript --
24         THE COURT: 36?
25         MR. HEISKELL: Your Honor, we object.

145

1         MS. JACK: -- testimony at the time of his
2 plea.
3         THE COURT: That would be 36, I believe. You
4 said 35.
5         MS. JACK: I'm sorry, I meant 36.
6         THE COURT: You meant 36?
7         MS. JACK: I did.
8         MR. HEISKELL: We object to hearsay, Your
9 Honor. It's not appropriate for a transcript. He's
10 here.
11         THE COURT: Any response?
12         MS. JACK: We are offering as a prior
13 consistent statement, Your Honor.
14         THE COURT: Objection is overruled. 36 is
15 admitted.
16         (State's Exhibit No. 36 admitted.)
17         MS. JACK: May I publish by reading to the
18 Jury, Your Honor?
19         THE COURT: Yes, you may.
20         MS. JACK: "The Court: Mr. Morales, you
21 signed some paperwork here today dealing with two cases;
22 is that correct?"
23         THE WITNESS: Yes, ma'am. Oh. Hey, I'm
24 sorry. Y'all told me to speak into the mic.
25         THE COURT: Hang on while she reads that.

146

1 We'll get back to you.
2          THE WITNESS: Your Honor, I apologize.
3          THE COURT: Thank you.
4          MS. JACK: All right. That's okay. I didn't
5 tell you this was coming. All right.
6          "The Defendant: Yes, sir."
7          In Court -- or "The Court: In each of these
8 cases you've indicated you're aiming to enter a plea of
9 guilty; is that correct?"
10          And you indicated by nodding your head up and
11 down.
12      Q. (BY MS. JACK) All right. Now, without reading
13 all of this, Mr. Morales, this is the instructions from
14 the Court, is that right, going over your plea; is that
15 right?
16      A. Yes.
17      Q. Okay. And you entered your plea; is that right?
18      A. Yes, ma'am.
19      Q. And then under Direct Examination, these were the
20 questions that I asked you; is that correct?
21      A. Yes.
22          MS. JACK: "By Ms. Jack: Okay. Good
23 morning. How are you doing?"
24          And your answer was, "How are you doing,
25 ma'am?"

147

1          And I said, "All right. You and I have met
2 before?"
3          "Yes."
4          "Question: You understand that my name is
5 Christy Jack?"
6          "Answer: Yes, ma'am."
7          "Question: And I'm an Assistant District
8 Attorney for Tarrant County."
9          "Answer: Uh-huh."
10          "Question: And that I'm the Prosecutor
11 assigned to both of your cases."
12          "Answer: Yes, ma'am."
13          "Question: You and I have spoken at length a
14 matter of weeks ago; is that right?"
15          "Answer: Yes, ma'am."
16          "Question: And it concerned your knowledge
17 and your relationship with Mr. Soliz and a Mr. Ramos?"
18          "Answer: Yes, ma'am."
19          "Question: Okay. And among the many things
20 that we discussed was how you came into possession of
21 these three weapons."
22          "Answer: Yes, ma'am."
23          "Question: Okay. And if you would, for
24 purposes of the record, what were the three weapons that
25 you came into possession?"

148

1          "Answer: Three shotguns."
2          "Question: Okay. Can you describe them a
3 little bit for me?"
4          "Answer: I believe one was, I guess, a
5 powdered one, a black powder shotgun. These were -- these
6 were hunting shotguns as well."
7          "Question: Okay."
8          "Answer: One of them, I believe, had a scope
9 on it and the other two were just regular. I don't
10 remember if they were pump or not, but I know that they
11 were hunting, hunting."
12          "Question: Were there three in total?"
13          "Answer: Three total."
14          "Question: And where did you get those
15 weapons?"
16          "Answer: From Mark Soliz and Joe Ramos."
17          "Question: All right. How did you -- how
18 did you acquire them?"
19          "Answer: I acquired them from, I guess,
20 Cathy's house where I met up with these guys, first time I
21 met them."
22          "Question: Would that be Cathy Richardson?"
23          "Answer: Yes, ma'am, Cathy Richardson. And
24 I purchased them for $100, all three shotguns. I stayed
25 with them shotguns throughout the night and took them to

149

1 the pawnshop first thing in the morning when they opened
2 up."
3          "Question: Do you recall the name of the
4 pawnshop?"
5          "Answer: A-1 Pawnshop off Hemphill."
6          "Question: Is that here in Fort Worth,
7 Texas?"
8          "Answer: Yes, ma'am. Yes, ma'am. I think
9 it's the 4200 block, I believe, if I remember, yeah."
10          "Question: Okay. And so the weapons were
11 inside of the residence where Cathy Richardson was
12 staying"?
13          "Answer: Yes, ma'am."
14          "Question: Okay. And do you recall where
15 those weapons were, in other words, what room?"
16          "Answer: They were in the closet in, I
17 guess, well, Cathy and Cheryl's residence. They both
18 shared a room, but it was just a one-bedroom apartment.
19 And three shotguns were in there as well as a pistol and
20 another rifle. There were five total."
21          "Question: Okay. And there was a pistol
22 and --"
23          "Answer: Another rifle, ma'am."
24          "Question: Another rifle?" Another rifle.
25 "And do you recall what kind of pistol it was?"

150

1 "Answer: Small automatic, don't really know
2 the model of it. I just know it was a small handgun,
3 automatic."
4 "Question: Are you familiar with a
5 9 millimeter?"
6 "Answer: Yes. And it looked like a small
7 9 millimeter."
8 "Question: And when -- was it Mr. Soliz or
9 Mr. Ramos who was doing most of the talking concerning the
10 weapons?"
11 "Answer: Mr. Soliz."
12 "Question: And what did you call him?"
13 "Answer: Kilo."
14 "Question: All right."
15 THE COURT: Can you slow down just a little
16 bit for me, please.
17 MS. JACK: Oh, sorry, Judge.
18 "Question: All right. What did he say about
19 the guns?"
20 "Answer: Basically he didn't say where he
21 got them from or anything, just that he was selling them
22 three shotguns; and the other two, he said he had plans
23 for. And as far as that went, I kind of --"
24 "Question: So there were five in total?"
25 "Answer: Yes. My guns that I had bought,

151

1 you know, after he had said that about the other two, it
2 was time for me to go. I didn't know what he was going to
3 do with them."
4 "Question: So there were five in total?"
5 "Answer: Five total, yes, ma'am."
6 "Question: Kilo was the one doing the
7 talking?"
8 "Answer: All the talking."
9 "Question: All right. And he said the three
10 of the five were for sale?"
11 "Answer: Uh-huh."
12 "Question --"
13 THE COURT: Could you pause a little bit
14 between question and answer to allow the Court Reporter to
15 catch up with you.
16 MS. JACK: "Question: Is that yes?"
17 "Answer: Yes. I'm sorry."
18 "Question: That's okay. She can't take your
19 uh-huhs."
20 We had the same problem that day too, didn't
21 we?
22 THE WITNESS: Yes, ma'am.
23 MS. JACK: "Yeah, yes, ma'am."
24 "Question: And that he had plans for the
25 remaining two guns?"

152

1 "Answer: Yes."
2 "Question: And he did not say what those
3 plans were?"
4 "Answer: No, he just kind of flashed it and
5 kind of --"
6 "Question: Okay. Now you're doing something
7 on the record. I want you to describe what you're doing,
8 if you can. Because you just did something with your hand
9 demonstrating how he was holding it, I take it the pistol,
10 given how you were just showing."
11 "Answer: Right. He had the pistol in his
12 right hand and had his finger placed in the -- where the
13 trigger was at and kind of looked at the handgun and kind
14 of pointed it straight forward in front of his body and
15 said that I have plans for this, this one here."
16 "Question: All right."
17 "Answer: He had that one and then the --"
18 "Question: Is that the one you described
19 as looking similar to or consistent with the small
20 9 millimeter?"
21 "Answer: Yes."
22 "Question: And the way you just demonstrated
23 for the record, did you show it -- show him holding it
24 sideways?"
25 "Answer: It was more looking at it in his

153

1 right hand. He was looking at it."
2 "Question: Okay."
3 "Answer: And then from there pointed it
4 outward in front of his body."
5 "Question: With his arm straight?"
6 "Answer: Yes."
7 Q. (BY MS. JACK) And there's further discussion,
8 but that was the gist of our discussion?
9 A. Right.
10 Q. Okay. And then we talked about how you were --
11 that a part of your plea bargain was the fact that you
12 were willing to be a witness against Mr. Soliz and
13 Mr. Ramos; is that correct?
14 A. Right.
15 Q. All right. One of the other things, did you know
16 whether or not the guns were loaded?
17 A. I asked him if the handgun was loaded, and he
18 said yes.
19 Q. Okay. How about the long guns?
20 A. None of those were.
21 Q. All right. So when we look at all of this on the
22 board, your criminal record -- and a State Jail felony
23 carries up to 24 months in State Jail facility; is that
24 right?
25 A. Correct.

**154**

1     Q. All right. So the burglary where you got two

2 years in 2008, that could have carried up to ten years,

3 and you got a minimum sentence, right?

4     A. Right.

5     Q. So really in exchange for your cooperation,

6 you've gotten the longest sentence you've ever gotten,

7 didn't you?

8     A. Yes, three years is the longest sentence.

9     Q. Three years is the longest sentence you've ever

10 gotten?

11     A. Yes, ma'am.

12     Q. Didn't get that much of a deal, did you?

13     A. I wouldn't say so.

14     Q. All right.

15     A. Three years, and I'm paying for it now.

16     Q. And you got out, you got out this January; is

17 that correct?

18     A. Yes, ma'am.

19     Q. And you'll be on parole for the remainder of your

20 three years -- well, not three years, the remainder of

21 your sentence; is that correct?

22     A. Yes, ma'am.

23     MS. JACK: Okay. I'll pass this witness,

24 Judge.

25     MR. HEISKELL: If I may approach, Your Honor.

**155**

1     RECROSS-EXAMINATION

2 BY MR. HEISKELL:

3     Q. State's No. 36, Mr. Morales, that the Prosecutor

4 read portions to you, and I'm looking at page 5, can you

5 see that?

6     A. Yes, sir.

7     Q. Okay. And one of the things the Prosecutor

8 indicated, you have -- you had met with the

9 Prosecutor before this date in February of 2011; is

10 that correct?

11     A. Yes.

12     Q. And how many occasions?

13     A. I believe it was once.

14     Q. Once. And how much earlier was it than February

15 22nd of 2011?

16     A. Um, I can't -- I don't remember.

17     Q. Approximately a week, a month or --

18     A. I said I don't remember.

19     Q. And obviously after that initial conversation

20 with the Prosecutor, I take it a deal was struck for you

21 to get the three years; is that right?

22     A. Yes.

23     Q. And after that deal was struck to get -- well,

24 when you first talked to her, she indicated to you that

25 she was interested in prosecuting Mr. Soliz and Mr. Ramos;

**156**

1 isn't that true?

2     A. Yes.

3     Q. And the exhibit that -- maybe it's still up

4 here. Oh, yes, thank you.

5     Exhibit No. 35 which is when you first talked

6 to the police back in August of 2010, excuse me, that has

7 a paragraph of what you told that particular detective;

8 isn't that true?

9     A. But that's only one paragraph, that's only --

10 it's stops right there.

11     Q. Right, it stops here.

12     A. Because I wanted a lawyer.

13     Q. And then you wanted a lawyer but you still signed

14 it?

15     A. Okay.

16     Q. Is that right?

17     A. Right.

18     Q. And --

19     A. She said we would later on continue and make

20 the statement clear. And that would be the second one,

21 sir.

22     Q. Who told you she would later continue it?

23     A. That detective, she said we can stop right here

24 and you can sign it, and then from there you can talk to

25 another detective or something like that and then get your

**157**

1 story right or whatever.

2     Q. And the only time you got your story right, so to

3 speak, was after you had gotten your deal for three years

4 shown here; is that right?

5     A. No, no, not at all.

6     MR. HEISKELL: Pass the witness.

7     FURTHER REDIRECT EXAMINATION

8 BY MS. JACK:

9     Q. All right. Mr. Morales, at the time I met with

10 you, did you have an attorney?

11     A. Yes.

12     Q. Was your attorney present throughout our

13 conversation?

14     A. Every time.

15     Q. Okay. And when you and I met, we had no deals

16 when we talked; is that right?

17     A. Not at all.

18     Q. Okay. And you told me the information that you

19 had, and I asked you questions about the conversation that

20 night, sale of the weapons and how you came into

21 possession of them and when you pawned them; is that

22 right?

23     A. Yes, ma'am.

24     Q. And then later on after I talked to your

25 attorney, that is when a deal was made; is that correct?

158

1  A. Yes.

2  Q. Okay. Are you proud particularly of that part of

3  your life?

4  A. What do you mean proud of what?

5  Q. Doing drugs, carrying guns.

6  A. No. I have to sit here and answer questions and

7  have somebody else try to confuse me about what's going

8  on. Maybe if I would have bought five, all five guns,

9  somebody would be -- still be alive today.

10  MS. JACK: I'll pass the witness.

11  FURTHER RECROSS-EXAMINATION

12  BY MR. HEISKELL:

13  Q. Well, since you threw that out there,

14  Mr. Morales, maybe if you hadn't been using any meth,

15  you wouldn't have been in that situation; isn't that

16  true?

17  A. Maybe so, but I'm paying for that.

18  Q. Right. And the Prosecutor, as you saw in that

19  transcript, said -- talked to you about many things in

20  addition to the guns; isn't that true?

21  A. Yes.

22  Q. And then -- and by the way, who was your

23  attorney?

24  A. John Johnson.

25  Q. I'm sorry, I didn't hear that.

159

1  A. John Johnson, sir.

2  Q. John Johnson. I'm sorry. And when you -- am I

3  confusing you?

4  A. No. I think I'm confusing you.

5  Q. Okay. And you were trying your best to follow

6  through in this deal you made for the three years; isn't

7  that true?

8  A. I would have -- I would have helped regardless.

9  Q. And back during the time in which these guns

10  were purchased, you were still using meth; is that

11  right?

12  A. A little bit.

13  Q. And yet you never told them who your supplier

14  was, the dealer was giving you this meth and others meth;

15  is that true?

16  A. To give others meth?

17  Q. Yes.

18  A. No.

19  MR. HEISKELL: Pass the witness.

20  MS. JACK: I have no further questions, Your

21  Honor. I would ask he be finally released.

22  THE COURT: May the witness be excused?

23  MR. HEISKELL: Yes.

24  THE COURT: Thank you. You may be excused.

25  THE WITNESS: All right.

160

1  (Witness excused.)

2  MS. JACK: We call Officer Stephanie

3  Phillips, Your Honor.

4  (Pause in proceeding.)

5  THE COURT: Were you sworn earlier?

6  THE WITNESS: Yes, sir.

7  THE COURT: Thank you. Okay.

8  MS. JACK: May I proceed, Your Honor?

9  THE COURT: Yes.

10  STEPHANIE PHILLIPS,

11  Having been previously duly sworn, testified as follows:

12  DIRECT EXAMINATION

13  BY MS. JACK:

14  Q. Detective, would you please introduce yourself to

15  the ladies and gentlemen of the Jury.

16  A. Detective Stephanie Phillips of the Fort Worth

17  Police Department Robbery Unit.

18  Q. Okay. And how long have you been with Fort Worth

19  P.D.?

20  A. 19 years.

21  Q. Can you give the Jury an overview of the

22  assignments that you've had with Fort Worth.

23  A. 17 years in patrol. I've been a background

24  investigator for patrol -- for applicants. And I was also

25  a burglary detective on the West Division for

161

1  approximately six months. I'm now assigned to the Robbery

2  Unit as a detective.

3  Q. When were you assigned to the Robbery Unit?

4  A. January of this year.

5  Q. All right. And when you were in patrol, can you

6  give the Jury an idea of what your daily responsibilities

7  entailed.

8  A. I -- while I was in patrol?

9  Q. Yes.

10  A. I responded to calls for service, and generated

11  reports as necessary.

12  Q. When it means you responded to calls, what does

13  that mean?

14  A. When an individual called 9-1-1 or called the

15  police department, a call would be dispatched out to a

16  patrol officer, and we'd respond to whatever call it was,

17  whatever they needed.

18  Q. Okay. All right. You're a certified police

19  officer in the State of Texas?

20  A. Yes, ma'am. Yes, ma'am.

21  Q. Okay. All right. And now you're currently with

22  the Robbery Unit?

23  A. Yes, ma'am.

24  Q. Okay. Can you tell the Jury kind of how the City

25  of Fort Worth is divided, in terms of the different parts

**162**

1 and the different regions for police purposes?

2 A. It's divided into basically five divisions at

3 this point. North, South, East, West and Central. And...

4 Q. Okay. All right. Back in June of --

5 specifically June 22nd of 2010 --

6 A. Yes, ma'am.

7 Q. -- where were you assigned?

8 A. West Division, Burglary.

9 Q. All right. And the West Division, I take it,

10 would be coordinated with the west part of Fort Worth; is

11 that right?

12 A. Yes, ma'am, yes, ma'am, geographically.

13 Q. What are the boundaries of the west part of Fort

14 Worth or what were they back in June of 2010, just

15 roughly?

16 A. Roughly, basically the Trinity River over to

17 approximately the TCU area, all the way out to -- let me

18 see, that would be Interstate Loop 820, and then over to

19 about White Settlement Road, about White Settlement Road

20 and Downtown.

21 Q. Pretty large area --

22 A. Yes, ma'am, it's very large.

23 Q. -- is that fair to say? How many detectives --

24 well, how large is the Burglary Unit?

25 A. The Burglary Unit for West Division was four with

**163**

1 a relief detective.

2 Q. Okay. So four, sometimes five?

3 A. Yes, ma'am.

4 Q. All right. And that's just for the west part of

5 Fort Worth?

6 A. Yes, ma'am.

7 Q. Does the same hold true for the north, south,

8 east and central part?

9 A. Yes, ma'am.

10 Q. So how many detectives were part of the Burglary

11 Unit for the City of Fort Worth?

12 A. Well, that would have been 20.

13 Q. Okay. How many burglaries come in every day?

14 A. Approximately five per detective.

15 Q. All right. So if we had 20 detectives assigned

16 to the Burglary Unit at Fort Worth, roughly, we have 100

17 burglaries in Fort Worth every day?

18 A. Yes, ma'am.

19 Q. Is that right?

20 A. Yes, ma'am.

21 Q. Is it fair to say we can't always send Crime

22 Scene to every burglary?

23 A. Oh, definitely not.

24 Q. Why is that?

25 A. We don't have the manpower.

**164**

1 Q. All right. How about robberies? How many

2 robberies do we have in Fort Worth generally?

3 A. That averages at least two to three a day.

4 Q. So is it fair to say that the Crime Scene

5 detectives have to be prioritized?

6 A. Yes, ma'am.

7 Q. And they're based upon the priority of the crime,

8 sadly?

9 A. Exactly.

10 Q. Okay. On June the 22nd of 2010, did a burglary

11 occur at an address on El Campo in Fort Worth, Texas?

12 A. Yes, ma'am.

13 Q. All right. And El Campo is located in what part

14 of Fort Worth?

15 A. That's the West Division.

16 Q. All right. Would that have been your division?

17 A. Yes, ma'am.

18 Q. Now, when a burglary comes in, is it immediately

19 assigned to a particular detective?

20 A. At that time, no, it was not. It was not

21 protocol to be assigned unless there were leads.

22 Q. Why is that?

23 A. Once again, manpower, and it's basically just

24 distribution of time.

25 Q. So if we have 100 burglaries a day, fair to say

**165**

1 there are hundreds and hundreds of burglaries in Fort

2 Worth that go unsolved with no leads every month?

3 A. Yes, ma'am.

4 Q. Okay. So as a detective, you can only work on

5 those where there are leads?

6 A. Correct.

7 Q. How does a detective generally go about solving

8 the case?

9 A. We take the leads and we work through the leads

10 until we come to a conclusion, hopefully with a -- an

11 arrested person for prosecution.

12 Q. All right. The Circelli burglary?

13 A. Yes, ma'am.

14 Q. Vincent and Chelsea Circelli, were there any

15 leads when the -- the day the burglary occurred?

16 A. No, ma'am.

17 Q. When was the first time there were any leads on

18 this burglary?

19 A. July 8th of 2010.

20 Q. All right. And when property is stolen, what

21 does the Fort Worth Police Department do?

22 A. That property gets entered into a database based

23 on, first, the property itself, and then whether there's a

24 serial number or some type of identifying mark assigned to

25 that property.

166

Q. It's entered into a database. What kind of database?

A. Yes, ma'am. Yes, ma'am.

Q. What kind of database? Why is the information put into a database?

A. In order to locate it in the future, whether it be pawned or found in some other manner.

Q. Or used in other crimes?

A. Yes, ma'am.

Q. Okay. On July 8th, I believe that's the date you mentioned?

A. Yes, ma'am.

Q. What was the lead that you received?

A. Well, we located a piece of property from the Circelli burglary at a pawnshop.

Q. What was the piece of property?

A. A Remington 1187 shotgun.

Q. All right. And is the database -- the information's placed in the database. Does it then look at or is it a computer-generated or is it done by detectives where they look at what's in the pawnshops?

A. Actually both, actually both.

Q. Okay. So the 1187 shotgun was located?

A. Yes, ma'am.

Q. What did you do then?

167

A. I verified that it -- by the serial number that it was the same as that was listed in the report. I then contacted the pawnshop officer, which was Officer Gilfour at that time, and had a hold put on the piece of property so that it could not be sold or bought back by the person who pawned it.

I then went down to the pawnshop, obtained those items, took photographs of them, and placed them into the property room as evidence.

Q. Okay. Now, you mentioned "items", plural?

A. Yes, ma'am.

Q. What happened?

A. The Remington 1187, once I looked at the pawnshop's ticket, I realized there was another item on there that looked like it matched that from the Circelli burglary, which was a black powder rifle.

I called Mr. Circelli and asked him to describe it to me, and he described what appeared to match that at the pawnshop, so I also had it placed on hold.

Q. Okay. So did you go to the pawnshop?

A. Yes, ma'am.

Q. All right. Did you retrieve both of those guns?

A. Yes, I did.

MS. JACK: May I approach the witness, Your Honor?

168

THE COURT: Yes, you may.

Q. Detective, I'm showing you what's been admitted into evidence as State's Exhibit No. 30. And is State's Exhibit 30 one of the long guns that you retrieved from the pawnshop?

A. Yes, ma'am.

Q. And by the way, what was the name of that pawnshop?

A. A-1 Pawn and Jewelry off Hemphill, off of Hemphill.

Q. All right. And were you one of the detectives who placed the long gun in this box?

A. Yes, ma'am.

Q. All right. And does State's Exhibit No. 30-A bear your initials and your badge number?

A. Yes, ma'am.

Q. Okay. And is that on the orange tag on the box?

A. Yes, it is.

Q. So you were the officer that, in fact, collected it?

A. Yes, ma'am.

Q. And placed it into property?

A. Yes, ma'am.

Q. Looking now, Detective, at State's Exhibit No. 31, is State's Exhibit No. 31 the 1187 shotgun?

169

A. Yes, ma'am.

Q. Okay. And were you the officer that retrieved it and does State's Exhibit No. 31-A bear your badge number and your initials as well?

A. Yes, it does.

Q. What day did you retrieve these weapons?

A. I'll have to look at -- look at my report for that. I can't remember the exact date.

MS. JACK: May I approach this witness, Your Honor?

THE COURT: Yes, ma'am.

Q. Detective, would it refresh your recollection to look at your report, specifically page 1?

A. Yes, ma'am. July 20th, 2010.

Q. Okay. And did you have an opportunity to interview a Mr. Ramon Morales?

A. Yes, ma'am, I did.

Q. Did you take a brief statement from him?

A. Yes, I did.

MS. JACK: Okay. May I have a moment, Your Honor?

Q. And do you know whether or not Crime Scene ever returned to the -- excuse me -- whether or not Crime Scene ever responded to the Circelli address?

A. Yes, ma'am, on -- excuse me, I'm sorry. On July

170

1 8th, 2010.

2 Q. Okay. And so roughly how many days later were

3 they able to respond?

4 A. The burglary came on the 22nd, so July 8th,

5 30 days later. Nearly 30 days. Wait a minute. I'm

6 sorry.

7 Q. Are you a little bit nervous today?

8 A. Yes, ma'am, I am. Yes, ma'am.

9 Q. The burglary occurred on June 22nd?

10 A. Yes, ma'am.

11 Q. Is that right?

12 A. Yes, ma'am.

13 Q. And Crime Scene responded when?

14 A. On July 8th. Approximately 16 days later. I'm

15 sorry.

16 Q. That's okay. That's all right. And while in an

17 ideal world we would love Crime Scene to come the same day

18 of the crime, is it fortunate they were able to come at

19 all?

20 A. Yes, ma'am.

21 Q. Do we have many burglaries where Crime Scene is

22 not even able to come?

23 A. Yes, ma'am.

24 MS. JACK: Okay. I'll pass this witness for

25 cross-examination, Your Honor.

171

1 CROSS-EXAMINATION

2 BY MR. HEISKELL:

3 Q. Detective Phillips?

4 A. Yes, sir.

5 Q. My name is Mike Heiskell. I have a few questions

6 for you, ma'am. If I ask you something you don't

7 understand, I'll start over. Okay?

8 A. Yes, sir.

9 Q. Do you have your report with you, ma'am?

10 A. Yes, sir.

11 Q. And how many pages does your report consist of?

12 A. I would have to look.

13 Q. Yeah, please, if you have it with you.

14 (Pause in proceeding.)

15 A. 18, yes, sir, 18.

16 Q. And what I want you to do, first of all, ma'am,

17 is -- and if you need to refresh your memory, please feel

18 free to do so. When you went to the pawnshop --

19 A. Yes, sir.

20 Q. -- you actually did that yourself; is that

21 correct?

22 A. Yes, sir.

23 Q. And you were able to see the pawn ticket for

24 Ramon Morales; is that correct?

25 A. Yes, sir.

172

1 Q. And you saw not only the guns that were

2 recovered, but you also saw him making purchases of

3 jewelry; is that correct?

4 A. Yes, sir.

5 Q. And how many purchases of jewelry did he make

6 that day?

7 A. One.

8 Q. And for what amount, if you know?

9 A. I would have to look. I'm sorry.

10 Q. Go ahead, please.

11 A. $150.

12 Q. And was that prior to the weapons being pawned?

13 A. Yes, sir.

14 Q. So he purchased some type of jewelry of 150 prior

15 to those -- receiving monies for these weapons; is that

16 right?

17 A. Yes, sir.

18 Q. The time in which you talked to him, do you

19 recall that?

20 A. Yes, sir.

21 Q. And that was -- should have been in August of --

22 according to State's No. 35, August the 11th of 2010; is

23 that right?

24 A. Unfortunately, that's incorrect. It should have

25 been August 12th.

173

1 Q. August 12th. That's fine.

2 A. Yes, sir.

3 Q. And prior to obtaining this written statement

4 from Mr. Morales, you actually read him his Miranda

5 Warnings; is that correct?

6 A. Yes, sir.

7 Q. And, in fact, that's part of your report, is it

8 not?

9 A. Yes, sir.

10 Q. And he went through and he signed the

11 acknowledgment of the reading of those warnings; is that

12 right?

13 A. Yes, sir.

14 Q. And then he proceeded to give you a written

15 statement?

16 A. Yes, sir.

17 Q. And after he gave you the written statement, he

18 signed the written statement?

19 A. Yes, sir.

20 Q. Did at any point he attempt to invoke his right

21 to counsel and the statement was stopped or torn up or

22 somehow disposed of?

23 A. No, sir.

24 Q. He did not?

25 A. No, sir.

174

1 Q. So he did not tell you that he wanted a lawyer
2 and that caused you to stop that statement; isn't that
3 true?
4 A. No, sir.
5 Q. And I'm going to show you State's Exhibit No. 35
6 which purports to be that statement.
7 A. Uh-huh.
8 Q. And you can look at it and compare with your own
9 notes. You see that, ma'am?
10 A. Yes, sir.
11 Q. And this, in fact, is a true and correct copy of
12 the written statement that you obtained from Mr. Morales
13 back in August of 2010?
14 A. Yes, sir.
15 Q. And it contains a full paragraph as to what he
16 told you about the purchase of that weapon; is that right?
17 A. Yes, sir.
18 Q. And you sat there and asked him questions and he
19 gave you answers; is that true?
20 A. Yes, sir.
21 Q. And you spent as much time as you thought
22 necessary in order to obtain that statement, did you not?
23 A. Yes, sir.
24 Q. And, in fact, you were trained as part of your
25 duties as a detective, when you obtain statements, to try

175

1 to get as full of information -- as much information as
2 you can; isn't that true?
3 A. Yes, sir.
4 Q. And you did so on this occasion, did you not?
5 A. Yes, sir.
6 Q. That's part of your duties and responsibilities
7 and you try to do your duties to the best of your ability;
8 isn't that true?
9 A. Yes, sir.
10 Q. And at no time did he say, "Stop, I don't want to
11 talk anymore"; he, in fact, signed that statement as true
12 and correct?
13 A. Yes, sir.
14 Q. Now, in the statement that he signed -- excuse
15 me, ma'am -- back in August, he indicates that the
16 shotguns were purchased from two individuals. And there
17 was something in the middle of this paragraph in which he
18 said that the shotgun, another shotgun and pistol, he was
19 keeping. Do you see that?
20 A. Yes, sir.
21 Q. Okay. There was never anytime that he told
22 you that he had some plans or anything of that nature
23 to the degree -- excuse me -- to the -- let me rephrase
24 that.
25 There was never anything that he told you

176

1 that, "Hey, this guy said I have plans for this gun"; only
2 that he was keeping those guns. Isn't that true? I'm
3 sorry. Did I make myself clear?
4 A. I'm sorry. I don't understand.
5 Q. I'm sorry. I kind of got choked up. You see
6 that statement --
7 A. Uh-huh.
8 Q. -- that he was keeping the guns? You see that?
9 A. Yes, sir.
10 Q. Was there ever any other type of statement that
11 Ramon Morales made that "I have plans for these guns",
12 that the person he purchased them from at any point for
13 him to include in that statement? That may not have been
14 asked correctly. Let me rephrase that again.
15 A. I'm sorry.
16 Q. No, it's my fault. Did he ever say anything to
17 the effect to you, Ramon Morales, that the other guys he
18 purchased the guns from say, quote, unquote, I have plans
19 for these guns?
20 A. I believe so, yes.
21 Q. Well, you see it says "is keeping them"?
22 A. Yes, uh-huh.
23 Q. Okay. And that was indicated in the statement;
24 is that right?
25 A. Yes, sir.

177

1 Q. And that's what he told you back in August?
2 A. Yes, sir, uh-huh.
3 Q. And that he was just keeping those guns; isn't
4 that right?
5 A. Yes, sir.
6 Q. Now, was there ever any statement that was
7 included in this particular -- you follow what I'm
8 saying -- in this statement that in which he used
9 the phrase "he had plans for the guns" is what I'm
10 asking.
11 A. I don't remember.
12 Q. Okay. That's -- I'm sorry it took me so long to
13 get that out. My apologies.
14 How long did that statement take, Miss --
15 Detective Phillips, for him to take back in August?
16 A. I could only say approximately half an hour.
17 Q. Half an hour. So you had plenty of time to talk
18 to him and obtain whatever information you could from him
19 during that half an hour; is that right?
20 A. I believe so.
21 Q. And was that in your office there in Fort Worth
22 P.D.?
23 A. No, sir. That was at the Mansfield --
24 Q. I'm sorry?
25 A. That was at Mansfield Law Enforcement.

178

1    Q. Okay. He was in custody at the Mansfield Law
2  Enforcement Center?
3    A. Yes, sir.
4    Q. And they bring them out to a particular room that
5  you can talk to?
6    A. Yes, sir.
7    Q. And that room is located toward the back end of
8  the jail that has different rooms; is that right,
9  interview rooms?
10   A. I believe so, yes.
11   Q. And your recall is that you spent at least 30
12 minutes with him in which you obtained that statement; is
13 that right?
14   A. Yes, sir.
15       MR. HEISKELL: Pass the witness.
16       MS. JACK: May I approach the witness, Your
17 Honor?
18           REDIRECT EXAMINATION
19 BY MS. JACK:
20   Q. Detective Phillips, who wrote this statement, you
21 or Mr. Morales?
22   A. Mr. Morales.
23   Q. Okay. Is it fair to say, in your experience as a
24 police officer and as a detective, that in times when
25 suspects are completing a statement, if they have to write

179

1  it out themselves, they don't include all the same
2  information?
3    A. Yes, ma'am.
4    Q. It's not as long, is it?
5    A. No.
6    Q. Because sometimes they get lazy and they don't
7  want to write all this down?
8        MR. HEISKELL: We'd object to leading.
9        MS. JACK: I'll rephrase it, Judge.
10   Q. Detective Phillips, why is it that statements are
11 shorter when suspects write the statements out
12 themselves?
13       MR. HEISKELL: Excuse me. I'd also object to
14 irrelevance, Judge, other suspects.
15       THE COURT: Overruled.
16   A. I often find that they don't want to add
17 something that they may have not told me the first time.
18   Q. (BY MS. JACK) Okay. They want to keep it as
19 short as possible; is that right?
20   A. As short as possible, yes.
21   Q. And the guns were pawned on July --
22   A. -- 23rd.
23   Q. June 23rd.
24   A. June 23rd, I'm sorry.
25   Q. Of 2010; is that correct?

180

1    A. Yes, ma'am.
2        MS. JACK: I'll pass the witness, Judge.
3        MR. HEISKELL: Nothing further, Your Honor.
4        THE COURT: May the witness be excused?
5        MR. HEISKELL: Yes, sir.
6        MS. JACK: Yes, Your Honor.
7        THE COURT: Thank you. You may be excused.
8    (Witness excused.)
9        THE COURT: We'll take a recess until 3:00.
10   (Recess from 2:39 to 2:58 p.m.)
11   (Jury not present.)
12       THE COURT: State present and ready?
13       MR. CHAMBLESS: Yes, Your Honor.
14       MR. WESTFALL: We are, Your Honor.
15       THE COURT: Are you ready or do you want to
16 wait for the other guy?
17       MR. WESTFALL: I'll be readier when Mike gets
18 here.
19       THE COURT: We can wait a minute.
20   (Off the record.)
21       THE COURT: All right. Defense counsel is
22 present. Are you ready?
23       MR. HEISKELL: Yes, Your Honor.
24       THE COURT: Defendant is present. You may
25 bring in the Jury.

181

1    (Jury present.)
2        THE COURT: Thank you. You may be seated.
3  Please call your next witness.
4        MR. CHAMBLESS: Your Honor, the State calls
5  Officer Adrian Allcon at this time.
6        THE COURT: You were previously sworn in this
7  morning?
8        THE WITNESS: Yes, sir.
9        THE COURT: Please have a seat.
10       Yes, sir.
11           ADRIAN ALLCON,
12 Having been previously duly sworn, testified as follows:
13           DIRECT EXAMINATION
14 BY MR. CHAMBLESS:
15   Q. Please state your name.
16   A. Adrian Allcon.
17   Q. And, Ms. Allcon, what is your occupation?
18   A. I'm a Fort Worth police officer.
19   Q. Okay. How long have you been a police officer?
20   A. Three years.
21   Q. And are you a certified peace officer in Texas?
22   A. Yes, sir.
23   Q. Tell the Jury a little bit about how you do
24 that. What's your background, your training, your
25 education, in order to become a certified peace officer?

182

1    A. You go through the police academy, and then,
2  excuse me, you take a test that's from TCLEOSE which is
3  our licensing body. And if you pass that, you're a
4  certified peace officer.
5    Q. All right. Is that what you did three years ago?
6    A. Yes, sir.
7    Q. What have you been doing -- what have been your
8  assignments with the Fort Worth Police Department in the
9  last three years?
10    A. First year, field training, and then I went to
11 Central for about a year and a half, and then I went to
12 South side.
13    Q. Is South side where you are now?
14    A. Yes, sir.
15    Q. When you say Central, South side, what does that
16 mean?
17    A. It's just the division of the department that I
18 work in.
19    Q. Okay.
20    A. In patrol.
21    Q. I want to take you back to June 24th, 2010. And
22 do you recall, and particularly about 9:00, the evening
23 hours of June 24th, 2010, were you working as a Fort Worth
24 police officer at that time?
25    A. Yes.

183

1    Q. All right. Do you recall what kind of shift you
2  were working?
3    A. I worked midnights. At that time I worked 8:30
4  to 6:30.
5    Q. Okay. 8:30 p.m. till 6:30 in the morning?
6    A. Yes, sir.
7    Q. And were you working that particular evening by
8  yourself or with someone?
9    A. By myself.
10    Q. Okay. And did you get a call and were you
11 dispatched to a certain place?
12    A. Yes, sir.
13    Q. Okay. About what time did you get this call?
14    A. Just about 9:22.
15    Q. Is that p.m.?
16    A. Yes, sir.
17    Q. Okay. And where were you when you got this call?
18    A. I don't remember where I was.
19    Q. Okay. Where did you go?
20    A. I went to the Discount Food Store at 604 North
21 Riverside.
22    Q. Okay. And what was the -- what was the name of
23 the person you were asked to contact?
24    A. Sammy Abu-Lughod.
25    Q. Okay. And about how old was he, is he?

184

1    A. 29.
2    Q. Okay. And he was at the Discount Food Store?
3    A. Yes, sir.
4    Q. What was your reason for talking to him?
5    A. He called and said that he had been robbed and
6  that his car was stolen.
7    Q. Okay. So did you go and talk with him?
8    A. Yes.
9    Q. All right. And when did he say this offense had
10 occurred?
11    MR. HEISKELL: Excuse me, Your Honor, we
12 would object now to hearsay.
13    THE COURT: Sustained.
14    Q. (BY MR. CHAMBLESS) Okay. Did he indicate what --
15 well, what property was taken, if any? Did you make an
16 inventory of the property that was taken, if any?
17    A. Yes, sir, he said the -- his wallet was stolen,
18 with his driver's license, Social Security card, about
19 $250, along with his car.
20    Q. Okay. Now, can you see the white board just to
21 your left?
22    A. Not really.
23    Q. Okay.
24    A. Kind of.
25    Q. All right. Kind of hard to see. What was the

185

1  name of the person you went to see?
2    A. Sammy Abu-Lughod.
3    Q. Okay. Is that A-B-U-L-U-G-H-O-D?
4    A. Yes, sir.
5    Q. Okay. And what was the address?
6    A. 604 North Riverside.
7    Q. Okay. And he was, do you think, 29 years old
8  when you spoke to him?
9    A. Yes, sir.
10    Q. Okay. And Discount Food Store, correct?
11    A. Yes, sir.
12    Q. How long did you talk to him?
13    A. I'm not sure how long I talked to him.
14    Q. Approximately.
15    A. Probably, I mean, just a guess, 10 or 15 minutes.
16 I know I was on the call for about an hour and a half.
17    Q. Okay.
18    A. But that was taking the report and going and
19 actually writing out the report as well.
20    Q. Okay. And so the nature of the offense that you
21 were looking at was what?
22    A. A robbery.
23    Q. Okay. You said a vehicle was taken?
24    A. Yes, sir.
25    Q. Describe the vehicle, please.

186

1    A. It was a 2005 green Dodge Stratus.

2         THE COURT: Can you scoot forward a little

3   bit or speak up a little bit? Thank you.

4    Q. And, Officer, what was the plate number of the

5   Stratus?

6    A. HGB-006.

7    Q. And you said there was other items of property

8   taken in addition to the Stratus that you listed in your

9   report; is that correct?

10    A. Driver's license, Social Security card, and $250

11   in cash.

12    Q. Okay. Anything else?

13    A. That's what I listed.

14    Q. Now, when you get this information, and

15   did you make a report from this information that he had

16   given you?

17    A. Yes.

18    Q. And what do you do from that point on, I guess

19   procedure-wise? What, do you go back to the police

20   department and enter some data or what happens?

21    A. Yes, I went back to the police department and

22   wrote up my report.

23    Q. Okay. While you were there at the store, in

24   addition to talking to Sammy, did you talk to anybody

25   else?

187

1    A. I talked to the store clerk.

2    Q. Okay. And did you provide Mr. Abu-Lughod, the

3   victim, the report number, the report that you were

4   making?

5    A. Yes.

6    Q. Okay. Did you notify any other individuals?

7    A. I notified my supervisor, Sergeant Luttmer, and

8   the Robbery Detective Tracy.

9    Q. Okay. Did Mr. Abu-Lughod indicate, give you a

10   description of the person who had stolen his car?

11    A. He said --

12         MR. HEISKELL: Your Honor, again, we object

13   to hearsay, Judge.

14         MR. CHAMBLESS: Well, in this context, it's

15   to show why she took the action. I mean, it's not for --

16   it's to show that she received the information about the

17   description of the offender so it can be placed in a

18   report for law enforcement and investigative purposes.

19         THE COURT: Overruled.

20    A. Said it was a thin, 25 -- 20 to 25-year-old,

21   bald, Hispanic male with a goatee wearing a white Dallas

22   Mavericks jersey.

23    Q. (BY MR. CHAMBLESS) Okay. Now, when you compile

24   your report at the police department, is the data about

25   the Dodge Stratus, how does that information get into a

188

1   network where other police officers know about it?

2    A. When I'm finished writing up my report, I call

3   PIC, which is our Police Information Center, and I notify

4   them that we had a stolen vehicle and give them the report

5   number, and they enter it into NCIC.

6    Q. Into what?

7    A. NCIC, National Crime Information Center.

8    Q. All right. So that's a database that allows this

9   information to be made known to other police officers; is

10   that correct?

11    A. Yes, yes.

12    Q. Okay. Is there also TCIC?

13    A. Yes.

14    Q. And what is that?

15    A. It's Texas Criminal Information Center.

16    Q. Okay. Is this same information about the Dodge

17   Stratus, was it entered into that as well?

18    A. Yes.

19         MR. CHAMBLESS: Pass the witness.

20         MR. HEISKELL: No questions, Your Honor.

21         THE COURT: May this witness be excused?

22         MR. HEISKELL: Yes, sir.

23         MR. CHAMBLESS: Yes, sir.

24         THE COURT: Thank you. You may be excused.

25   (Witness excused.)

189

1         THE COURT: Please call your next witness.

2         MR. CHAMBLESS: State calls Detective Lorne

3   Tracy.

4         THE COURT: Please raise your right hand.

5         (Witness sworn.)

6         LORNE TRACY,

7   Having been first duly sworn, testified as follows:

8         DIRECT EXAMINATION

9   BY MR. CHAMBLESS:

10    Q. Please state your name.

11    A. Lorne, L-O-R-N-E. My last name is Tracy,

12   T-R-A-C-Y.

13    Q. What's your occupation?

14    A. I'm a detective assigned to the Fort Worth Police

15   Department Robbery Unit.

16    Q. Tell the Jury something about your law

17   enforcement background, training, experience, duties.

18    A. I've been with the police department for 18

19   years. I went through the Fort Worth Police Academy back

20   in the early '90s. I spent the majority of my career in

21   Patrol. Seven years ago I promoted up to detective, where

22   I served two years in the Auto Theft Unit, and the rest of

23   my years now have been at the Robbery Unit.

24    Q. Okay. June 24th, 25th, 2010, what was your

25   assignment at that time?

190

1    A. At that time I was assigned to the Robbery Unit.

2    Q. Okay. Were you given a case on June 25th of

3 2010, a follow-up to a report generated at the location of

4 604 North Riverside, Discount Food Store in Fort Worth,

5 Texas?

6    A. Yes, sir.

7    Q. Okay. And what was the first thing, I guess,

8 that you did in connection with that case?

9    A. Involving this case, a vehicle had been taken, so

10 one of our procedures is to make sure that the vehicle's

11 been properly entered into our report; to make sure that

12 it is entered properly into the state and national

13 computer system for BOLOs to be placed out for other

14 officers to know that this vehicle was taken.

15    Q. And did you check that to see if that was the

16 case for this report?

17    A. Yes, I did.

18    Q. And what was the result?

19    A. It was entered both into the national system and

20 into the state system.

21    Q. Okay. Did you go to the 604 North Riverside to

22 determine any other matters that day?

23    A. Yes, I did.

24    Q. What did you do?

25    A. Attempted to locate any type of video

191

1 surveillance from either the store or any of the

2 surrounding businesses.

3    Q. Was there any video on the outside of the store?

4    A. No, sir, there was not.

5    Q. Okay. Did you go inside and check for any videos

6 inside the store?

7    A. Yes, I did.

8    Q. And what was the -- what did you find out?

9    A. They had no recording video system inside that

10 store.

11    Q. Okay. And what was the name of the person, the

12 victim in this case?

13    A. His first name is Sammy, and I'll spell his last

14 name. A-B-U-L-U-G-H-O-D.

15    Q. Okay. Do you know what property, if any, was

16 taken from him on June 24th?

17    A. His vehicle was taken, along with some of his --

18 his wallet, which had personal effects in it, driver's

19 license, credit card, Social Security card.

20    Q. Was there anything about a cell phone?

21    A. Yes, cell phone was also taken.

22    Q. On June 26th, did you have any

23 communication with Mr. Abu-Lughod?

24    A. Not on the 26th. I received information through

25 a report on a supplement.

192

1    Q. Okay. In the course of your investigation, did

2 the name "Kilo" surface?

3    A. Yes, sir, it did.

4    Q. Okay. And in connection with the -- I guess I'll

5 call it the nickname or street name "Kilo," did any

6 individual names surface that were linked to the nickname

7 "Kilo"?

8    A. Yes, sir.

9    Q. And what were those names?

10    A. One was Mark Soliz; the other one was Jose Ramos.

11    Q. Okay. When was this taking place in terms of

12 your investigation, what date?

13    A. This took place on Monday, June 28th.

14    Q. So about four days later there is a --

15 you're doing some research or investigation about the name

16 "Kilo", and you have -- you have come up with two names

17 that are linked to that; is that correct?

18    A. That is correct.

19    Q. Did you prepare any, I guess, photo spreads or

20 photo -- photos of individuals in connection with this

21 case?

22    A. Yes, I did.

23    Q. All right. Tell the Jury how that's done, how

24 you do it, and how you conduct such a procedure.

25    A. Okay. It's called a photo spread. A lot of

193

1 people refer to them as a lineup. The Fort Worth Police

2 Department has two ways we do our photo spreads. The way

3 I did the photo spread in this case was six individuals,

4 similar facial characteristics. One individual is placed

5 on each piece of paper giving us a total of six pieces of

6 papers.

7    Q. Okay. And did you do that in connection with the

8 individuals Jose Ramos and Mark Soliz?

9    A. Yes, I did.

10    Q. Okay. And so how many pictures of similar

11 persons with similar facial characteristics did you do in

12 connection with Mark Soliz?

13    A. There would be a total of six pictures.

14    Q. And was that the same with respect to Jose Ramos?

15    A. Yes, sir.

16    Q. Okay. And what was your purpose in doing that?

17    A. To exclude or identify any suspects involved in

18 this offense.

19    Q. Okay. Did you then have a meeting with the

20 victim, Sammy Abu-Lughod?

21    A. Yes, sir, I did.

22    Q. When did that take place?

23    A. That took place also on Monday, June 28th.

24    Q. Okay. Did you record that interview with Sammy?

25    A. Yes, sir, I did.

194

1  Q. Okay. Did you also continue the recording of the
2  time where you showed him a -- these photo pieces?
3  A. Yes, sir.
4  Q. Okay. Did you bring the photos with you today
5  that you showed Mr. Abu-Lughod on that day?
6  A. Yes, sir.
7  Q. Okay. Did you compose a set of six photographs
8  including the photograph of Jose Ramos?
9  A. Yes.
10  Q. And also a -- did you compile a second set of six
11  photographs including the photograph of Mark Soliz?
12  A. Yes, sir.
13  Q. Now, were they persons with similar head, facial
14  characteristics?
15  A. Yes, sir.
16  Q. Okay. Did you show the photo spread containing
17  the picture of Jose Ramos to Sammy Abu-Lughod?
18  A. Yes, sir, I did.
19  Q. Okay. Did he make a response to that in your
20  presence?
21  A. He did not identify anyone in that spread.
22  Q. Okay. Did you show him the -- and describe how
23  the -- do they look at the pictures all six together or
24  one by one or what is the situation?
25  A. On the loose-leaf photo spreads, with my

195

1  instructions, I hand them the packet with all pictures
2  upside down, and I tell them at their convenience they can
3  turn the pictures over and look at them however they
4  wish. So it's up to the individual on how they wish to
5  view the photo spread.
6  Q. Okay. And -- all right. So then when the second
7  set of photographs containing -- one of which contained a
8  picture of Mark Anthony Soliz, did Mr. Abu-Lughod make a
9  response to those?
10  A. Yes, sir, he did.
11  Q. Okay. Did he identify one of those individuals?
12  A. Yes, sir, he did.
13  Q. What was the name of that person?
14  A. Mark Soliz.
15  MR. CHAMBLESS: Okay. All right. Pass the
16  witness.
17  MR. HEISKELL: Oh, I'm sorry. I didn't hear
18  you.
19  CROSS-EXAMINATION
20  BY MR. HEISKELL:
21  Q. Detective Tracy, how are you?
22  A. I'm doing good, sir.
23  Q. I'm fine. I'm Mike Heiskell. I have questions
24  for you. It's not going to be long at all. You
25  indicated, sir, that when Mister -- is it Abu-Lughod or

196

1  Lughod?
2  A. I pronounce it Lughod.
3  Q. Okay. Lughod. You showed him some photographs
4  of Mark Soliz. You said he responded in the affirmative
5  in some way; is that correct?
6  A. Yes, sir.
7  Q. As a matter of fact, there was not a 100 percent
8  ID of him, was there?
9  A. There was not 100 percent ID, no, sir.
10  Q. In fact, you noted that in your report and
11  indicated that Mr. Lughod indicated this person looks more
12  familiar to the person who actually robbed him; is that
13  right?
14  A. That's correct.
15  Q. And you noted as well it was not a 100 percent
16  identification of that; is that a fair statement?
17  A. That's a fair statement; it was 90 percent.
18  Q. Now, you were engaged, I guess, in some follow-up
19  investigation after this ID; is that correct, sir?
20  A. Yes, sir.
21  Q. And were you working hand-in-hand with some other
22  detectives at that time?
23  A. Yes, sir.
24  Q. And who were they?
25  A. Detective Pate, Detective Paine, Detective

197

1  Cedillo, and those are the primary detectives.
2  Q. What about Detective Boetcher?
3  A. Yes, and Detective Boetcher. He's in a different
4  unit than me.
5  Q. And were you involved as well in the eventual
6  apprehension of Mark Soliz and others the following day,
7  the following evening?
8  A. No, sir, I was not.
9  Q. You were made aware of that at some point; is
10  that correct?
11  A. Yes, sir.
12  Q. Did you ever, yourself, interview Mark Soliz?
13  A. No, sir, I did not.
14  Q. The only interviews, I take it, you undertook in
15  this case was with Mr. Abu-Lughod or were there others?
16  A. In reference to this actual report that we're
17  talking about?
18  Q. Yes, sir.
19  A. Yeah, just him.
20  MR. HEISKELL: Just him. Thank you, sir.
21  That's all I have, Judge.
22  REDIRECT EXAMINATION
23  BY MR. CHAMBLESS:
24  Q. You indicated that there was some percentage that
25  he indicated, Mr. Abu-Lughod indicated to you?

198

1    A. Yes, sir.

2    Q. And what did he tell you?

3    A. 90 percent.

4    Q. All right. And did he -- did you ask him about

5  what -- what was it that he was focusing on as far as his

6  identification?

7    A. Focusing on the facial features, the eyes and the

8  mouth and the nose.

9    Q. And did he indicate his identification by placing

10  his signature on that photograph?

11    A. Yes, sir, he did.

12    Q. Now, would you pull out the six photographs that

13  you showed the victim on that occasion?

14    A. Yes, sir.

15    Q. Do you have them with you there?

16    A. Yes, sir.

17    Q. All right. May I see them, please?

18        (State's Exhibit Nos. 37-42 marked.)

19    Q. I'll show you what's marked as State's Exhibit

20  No. 37 through 42. Are these the photographs that I guess

21  you said were placed face down and then shown to Sammy

22  Abu-Lughod?

23    A. Yes, sir, that's correct.

24    Q. All right. Take a minute and look and make sure.

25    A. Yes, sir, that is correct.

199

1        MR. CHAMBLESS: All right. Thank you.

2    Offer 37 through 42 at this time.

3        MR. HEISKELL: No objection, Your Honor.

4        THE COURT: 37 through 42 are admitted.

5        (State's Exhibit Nos. 37 - 42 admitted.)

6        MR. CHAMBLESS: Your Honor, may I show them

7  to the Jury?

8        THE COURT: Yes, you may.

9        (Sotto voce discussion.)

10        (Exhibits published.)

11    Q. (BY MR. CHAMBLESS) I want to show you what's

12  marked as State's Exhibit No. 43 through 46. And if you

13  would, take just a minute and look at these. And are

14  those four items, items that came into your possession as

15  a result of your investigation in this case?

16    A. That is correct.

17    Q. Okay. From whom did you receive these items?

18    A. They came from a Mr. Brian Matthew Brown.

19    Q. Okay. On what date did you receive them?

20    A. They came into the police department's possession

21  on 9/6/2010, September 6th, 2010.

22    Q. Okay. And if you would, describe what each of

23  these exhibits are.

24    A. The first one is a --

25    Q. If you would say the number of the exhibit.

200

1    A. Sorry. This is State's Exhibit No. 46. This is

2  a Social Security card belonging to Sammy Abu-Lughod.

3  State's Exhibit No. 44 is a blue Chase debit Visa card

4  also belonging to Sammy.

5    Q. And when you say "Sammy", that's the victim in

6  this case that we've been talking about, that stolen Dodge

7  Stratus; is that correct?

8    A. Correct, yeah. I just hate messing up his last

9  name.

10    Q. Okay.

11    A. State's Exhibit 43 is a Texas driver's license

12  also belonging to Sammy, the victim in my offense report.

13    State's Exhibit 45 is another blue -- this is

14  a First Convenience bank debit card, this is a MasterCard,

15  and this also belongs to Sammy, the victim in my offense

16  report.

17    Q. All right. These came into your possession

18  through an individual named Brian Brown; is that what you

19  said?

20    A. That is correct.

21        MR. CHAMBLESS: All right. Offer these, 43

22  through 46.

23        MR. HEISKELL: No objection.

24        THE COURT: Was 42 included in that or?

25        THE WITNESS: 46, 44.

201

1        MR. HEISKELL: 42 is a photo spread, Judge, I

2  believe.

3        THE COURT: Okay. No objection. They're

4  admitted.

5        (State's Exhibit Nos. 43 - 46 admitted.)

6        MR. CHAMBLESS: Pass the witness.

7        MR. HEISKELL: I believe that's all I have,

8  Judge. Thank you.

9        THE COURT: May the witness be excused?

10        MR. HEISKELL: Yes, sir.

11        THE COURT: You may be excused.

12        (Witness excused.)

13        MR. CHAMBLESS: State calls Sammy Abu-

14  Lughod at this time.

15        THE COURT: Please raise your right hand.

16        (Witness sworn.)

17        THE COURT: Please have a seat. Okay.

18        SAMMY ABU-LUGHOD,

19    Having been first duly sworn, testified as follows:

20        DIRECT EXAMINATION

21  BY MR. CHAMBLESS:

22    Q. Please state your name.

23    A. Sammy Hisham Abu-Lughod.

24    Q. Okay. We've had a -- we've been wondering how to

25  correctly pronounce your last name.

**202**

1    A. Yes, sir.

2    Q. And is it -- say the last part of your name,

3  please.

4    A. The -- my whole last name?

5    Q. Yes.

6    A. Abu-Lughod.

7    Q. Lughod?

8    A. Yes, sir.

9    Q. Okay. How old are you?

10    A. 29.

11    Q. Okay. Did you, at one time, own a 2005 Dodge

12  Stratus?

13    A. Yes, sir.

14    Q. Okay. How did you come about owning that car?

15    A. I got it from Allen Samuels Dodge in North

16  Richland Hills, Texas.

17    Q. Okay. Did you trade in a car for it?

18    A. Yes, sir. I used to have a 1984 Cadillac

19  Fleetwood, and I had a -- got in the program with a, like,

20  Cash for Clunkers where they gave me a $3,000 trade-in

21  rebate, so I applied that towards the down payment of the

22  car, then I was able to get it.

23    Q. Okay. And do you recall what the date,

24  approximately the date was that you bought your Dodge

25  Stratus?

**203**

1    A. I believe it was sometime in May of -- May of

2  2007, I believe. Maybe 2008, I'm sorry.

3    Q. Do you have any -- do you have a idea of how much

4  you paid for it, how much you owed on it or paid for it?

5    A. Um, I believe I paid around -- well, the initial

6  payment, the price of it was 10,000 and the down payment

7  was 3, so after that I just owed 7,000, and I just paid

8  that monthly. I got it down to around close to 4,000.

9    Q. When this event happened to you?

10    A. Yes, sir.

11    Q. Okay. So you had gotten it down to about 4,000

12  when some event that we're about to talk about on June

13  24th happened to you; is that correct?

14    A. Yes, sir.

15    Q. Okay. Do you live in Fort Worth?

16    A. Right now I live in Haltom City.

17    Q. Haltom City?

18    A. Yes, sir. At the time I did live in Fort Worth

19  though.

20    Q. Back in June 24th of 2010, where did you work?

21    A. I was assistant manager at Little Caesars Pizza

22  in Fort Worth. Well, it was on the border of Fort Worth

23  and Haltom City.

24    Q. Okay.

25    A. Off Western Center and Beach Street.

**204**

1    Q. Okay. That's where you worked?

2    A. Yes, sir.

3    Q. Do you still work there?

4    A. No, sir.

5    Q. Where do you work now?

6    A. Right now I work at Green Stream International in

7  Dallas, Texas.

8    Q. Okay.

9    A. It's an electronic recycling company.

10    Q. You and I talked this morning. Are you nervous?

11    A. Yes, sir, I'm nervous.

12    Q. Okay. All right. What is Green Stream

13  International?

14    A. It's an electronic recycling company. They,

15  like, refurbish cell phones and old cable boxes and just

16  disassemble and sort the pieces into the proper, like,

17  metal and plastic and boards, motherboards and things like

18  that, and they send it to companies to, you know, I guess

19  break them down.

20    Q. Okay. What do you do for that business?

21    A. Right now I just -- it could be -- sometimes, you

22  know, we'll be on disassembly -- disassembly line, you

23  know, taking apart maybe cable boxes. One person might

24  take out a certain amount of screws, pass it down, next

25  person will take out, you know, a certain amount of screws

**205**

1  and, you know, stuff like that. It just varies.

2  Sometimes we sort through returned items from Radio

3  Shack. We open up boxes and then sort the items that are

4  returned into the necessary, like, whatever item. Could

5  be like a lot of times we receive headphones, ear buds

6  that you just -- we just put them in a certain box and,

7  you know, we try to resell and remarket the things that

8  we're able to salvage and that has value.

9    Q. Okay. So it's really truly a recycling business?

10    A. Yes, sir.

11    Q. Okay. Now, how far did you get in school or what

12  is your educational background, Sammy?

13    A. I graduated high school 2003 at Success Night

14  School. I do -- I have a few credits at TCC Community

15  College.

16    Q. Okay. How many hours do you think you have

17  college-wise?

18    A. I only have like -- I only have six credits.

19    Q. Okay. Got a ways to go on that, huh?

20    A. Yes, sir.

21    Q. All right. Now, did you -- when you had the

22  Dodge Stratus on June 24th, was it working?

23    A. Yes, sir.

24    Q. Did you have insurance?

25    A. Yes, sir.

206

1    Q. All right. And that particular day, and I guess
2 we're talking evening hours, were you working that day at
3 Little Caesars or not?
4    A. No. Actually it was a Thursday so I was off that
5 day. I was off on Mondays and Thursdays.
6    Q. Okay.
7    A. And I was off that day.
8    Q. Okay. And in the evening hours, were you going
9 to a certain location?
10    A. Yes, sir, I was going -- I had came from a
11 friend's house. I had stopped by a friend's house because
12 he had a old TV that he had been meaning for me to come by
13 and pick up because he didn't have any need for it, so I
14 stopped by and picked that up. It was just like a --
15 maybe like a 21-inch tube TV.
16    Q. Okay.
17    A. And I was going to give it to my brother so he
18 could put it in his kids' room or give it, you know,
19 something of that nature. So I was heading over to my
20 brother's house --
21    Q. All right.
22    A. -- at that particular time. And I owed him
23 like -- I think I owed him like $20, you know, too so I
24 was going to, you know, take care of both of those things.
25    Q. So you were going to pay him what you owed him?

207

1    A. Yes, sir.
2    Q. And also you had picked up this TV that you were
3 just going to give him?
4    A. Yes, sir.
5    Q. Okay. Well, when you went by your brother's
6 house, was he there?
7    A. Actually, I called him when I was down the
8 street, and he told me he was putting his kids to bed. I
9 guess, you know, it was kind of -- well, I mean, they're
10 kids, at the time, I think it was around close to 8:00
11 or so, so he said he was just putting the kids to bed or
12 something and then just to come by at another time. So I
13 said that was fine. I mean, I understand.
14    Q. So what did you do at that point?
15    A. At that time I was just contemplating where I was
16 going to go because I didn't have any, you know,
17 particular place I was going to go after that. So I just
18 was kind of just driving around, you know, because, I
19 don't know, I guess I was just a little restless or, you
20 know, I was just thinking about what I was going to do
21 because I was off that day so I was just driving.
22    Q. Did you stop somewhere?
23    A. Yes, sir, I stopped at a convenience store off
24 Riverside.
25    Q. Okay. Show you a photograph here. Do you

208

1 recognize what's shown in this photograph?
2    A. Yes, sir.
3    Q. And is that the store that you stopped at on this
4 evening of June 24th, 2010?
5    A. Yes, sir.
6    Q. Does this photograph fairly and accurately show
7 the store in the parking lot where you were?
8    A. Yes, sir.
9    Q. Okay.
10        MR. HEISKELL: No objection, Your Honor, to
11 47.
12        MR. CHAMBLESS: We do offer 47.
13        THE COURT: 47 is admitted.
14        (State's Exhibit No. 47 admitted.)
15    Q. (BY MR. CHAMBLESS) So this Discount Food Store
16 is a location where you stopped after your brother said
17 "maybe another time"?
18    A. Yes, sir.
19    Q. Okay. And there's a little bit of a parking lot,
20 not a real great big one, right?
21    A. Yeah. No, sir, it's not a big parking lot.
22    Q. Okay. Were there many cars there?
23    A. Yes, sir. It was more cars than -- I'll say at
24 least, probably at least about four cars.
25    Q. Okay.

209

1    A. Including -- I mean, my car would probably have
2 been about the fifth car. So it was a good number of
3 amount of cars.
4    Q. Okay. Now, if you would maybe demonstrate by
5 pointing, where was your car and were these other cars
6 that you've described?
7    A. Okay. My car -- trying to see how many parking
8 spaces. I believe my car was on the -- on this side of
9 the truck in between this car and that car but closer.
10 The one right next to the truck, but on this side facing.
11    Q. Okay. And there were how many, approximately how
12 many cars there; do you recall?
13    A. About -- I'd say about four cars.
14    Q. Okay. When you walked in the store, what did you
15 get?
16    A. I was getting a Black and Mild cigar and, like,
17 some Gatorade. I believe it was Gatorade.
18    Q. Okay.
19    A. That's what I got.
20    Q. Just, I guess, would you say a routine purchase
21 in a convenience store?
22    A. Yeah, pretty routine. I mean, just for the -- to
23 go in and buy something, yeah.
24    Q. Okay. Were you by yourself?
25    A. Yes, sir, I was by myself.

210

1    Q. Okay. You come out of the store, and what did
2  you do then?
3    A. I got into my vehicle, you know, turned my car
4  on. I backed out of the -- started backing out of the
5  parking spot and I faced the car towards going back on to
6  Riverside.
7    Q. Okay.
8    A. That's when I seen a individual. I seen the
9  individual already crossing the street but it didn't --
10  you know, I didn't really think anything of it.
11    Q. Okay.
12    A. Um.
13    Q. So you had pulled back, and was your car facing
14  towards Riverside or were you just pulled straight back?
15    A. No, it was facing towards Riverside.
16    Q. Okay. So you had made, I guess, a turn and you
17  were now facing Riverside?
18    A. Yes, sir, proceeding to exit the parking lot.
19    Q. Okay. And what happened then?
20    A. That's when I seen a individual with a Dallas
21  Mavericks jersey on.
22    Q. Okay.
23    A. Um, Hispanic male, walking towards the parking
24  lot. You know, at the time I didn't think anything of it,
25  um, then he, you know, started approaching my vehicle.

211

1    Q. Okay. Which side did he approach?
2    A. The driver side window.
3    Q. Okay. Was your window up or down?
4    A. It was rolled up.
5    Q. Rolled up?
6    A. Yes, sir.
7    Q. I guess June, it's warm?
8    A. Yes, sir. I had my A.C.
9    Q. Got air-conditioning?
10    A. Yes, sir.
11    Q. Okay. All right. Did he -- what happened then?
12    A. When he approached my vehicle, I assumed he
13  wanted to, you know, ask me something. And I really
14  didn't think anything of it just because of the fact that
15  it was still daylight outside. It was still, um,
16  people -- there was people standing around.
17    Q. Okay.
18    A. Like a few people, at least one or two people
19  standing in front of the store. And there was other cars
20  in the parking lot, so I didn't think any --
21    Q. Did he make some sort of motion or gesture or
22  anything?
23    A. I just -- you know, it was just one of those when
24  someone, you know, that wanted to act like, say something.
25    Q. You thought he wanted to say something to you?

212

1    A. Yeah. So I was just -- I thought he was going to
2  ask me for a couple bucks or ask for a ride up the street
3  or something --
4    Q. Okay.
5    A. -- both of which I was going to say no to, but...
6    Q. Did you lower your window?
7    A. Yes, sir, I did.
8    Q. Okay. So how close did he get to your car?
9    A. Oh, he was right -- right up to my -- right up to
10  the door, the driver side door.
11    Q. Were you able to see his face?
12    A. Yes, sir.
13    Q. And he got, I guess, pretty close to you?
14    A. Yes, sir.
15    Q. Was it light enough to where you could make out
16  what he looked like?
17    A. Yes, sir.
18    Q. Okay. Is that person in the courtroom this
19  afternoon?
20    A. Yes, sir.
21    Q. All right. If you see him, would you describe
22  what he's wearing this afternoon?
23    A. Um.
24    Q. Just an article --
25    A. Dress shirt, like a light blue dress shirt. I'm

213

1  not sure what exact color that is.
2    Q. Does he have a coat on?
3    A. No, sir.
4    Q. And what color tie, if he does?
5    A. Dark tie.
6    MR. CHAMBLESS: Okay. Your Honor, I'd ask
7  that the record reflect that the witness has identified
8  the Defendant in this case.
9    THE COURT: Granted.
10    Q. So, Mr. Soliz comes up to you, and what happens
11  then?
12    A. He's -- because he kind of like squatted down in
13  my driver side door. And he was like, I need -- he was
14  like, man, I need some money, or something. And I was
15  like, I was like, what you talking about? He's like, I
16  need like 50, 60 bucks.
17    Q. Okay.
18    A. And he said something like, in Spanish, like
19  "federa" (phonetic spelling), something. I assume it
20  means money in Spanish. I've heard it before but I can't
21  really pronounce it correctly.
22    Q. All right.
23    A. But, um, I was like, I said I don't have it. And
24  that's when he just put his head down and he kind of shook
25  his head like this, and next thing I know, he just pulled

---

**214**

1  a gun out and had it pointed at me in my face.

2      Q.  All right.  You say he pulled a gun out?

3      A.  Yes, sir.

4      Q.  From what part -- you made a gesture there.  From

5  what part did this gun appear to you?

6      A.  Just from probably -- I'm guessing from his

7  back.  I'm not a hundred percent sure about that, I mean,

8  because he was still -- he was still covered up by the,

9  you know, the door on the outside because he was squatting

10  down so...

11      Q.  Okay.

12      A.  You know, I'm not --

13      Q.  He's squatting down, so what you see is -- how

14  much of him could you see?

15      A.  Well, his whole -- his whole face.

16      Q.  Okay.

17      A.  His part -- probably like the equivalent to what

18  I'm sitting at this table right here, this.

19      Q.  That much, your chest and --

20      A.  Yeah.  And he's like -- he had that much exposed

21  of his self after he squatted.

22      Q.  What do you remember about the weapon, if any --

23  what color?

24      A.  It was a black handgun.  I don't know really make

25  and model.

---

**215**

1      Q.  Okay.  Do you know, is it -- was -- do you know

2  the difference between a revolver or a semi-automatic?

3      A.  Yeah, it was a semi-automatic pistol.

4      Q.  Black in color?

5      A.  Yes, sir.

6      Q.  And what hand did he have it in?

7      A.  His right hand.

8      Q.  Okay.  And was it aimed or pointed in any

9  direction?

10      A.  Yeah, pointed at me.

11      Q.  At your face?

12      A.  Yes, sir.

13      Q.  At your body?

14      A.  Mainly my face.

15      Q.  What were you thinking?

16      A.  Um, at the time, I guess I was in shock at the

17  moment because, um, I don't remember.  I just knew he was

18  serious, and I just -- I just knew that -- just proceeded

19  to do what he asked me to do after, you know, he pointed

20  it at me.

21      Q.  What did he say or ask me to do?

22      A.  He said give me -- give me your wallet.  And then

23  he -- then he was like, know what, just give me the car

24  too.

25      Q.  Okay.

---

**216**

1      A.  You can just -- so I got out the car.

2      Q.  Okay.

3      A.  I reached in my back pocket, dropped my wallet on

4  the ground and...

5      Q.  Did you have a cell phone that day?

6      A.  Yes, sir.  It was in the vehicle.  It was in the

7  passenger -- passenger seat.

8      Q.  Okay.

9      A.  And, um, he told me just to, you know, walk in

10  this direction away from the store.  So I did it.  And

11  then I looked back just, you know, I don't know, I was

12  going to see what was happening.  So I looked back, looked

13  back at him, and he picked my wallet up, got in the car,

14  exited out the parking lot to the left, um, what would

15  that be, going south on Riverside.  And then I was

16  walking.  He was like -- the window was rolled down.  He

17  was like, I'm going to come back and get the rest of it,

18  which I don't know what he was referring to, but, you

19  know, he said that as he drove off.

20      Q.  Okay.

21      A.  I just started walking.  I really don't know

22  where I was walking to initially.  I was just -- just

23  walking.  And I, um, after I seen him drive off, I walked

24  back to the store and went inside to ask to use the phone

25  to call the police.

---

**217**

1      Q.  And did you call the police?

2      A.  Yes, sir.

3      Q.  And did they come?

4      A.  Yes, sir.

5      Q.  And you made a report to them?

6      A.  Yes, sir.

7      Q.  All right.  Did you later go and talk with a

8  detective?

9      A.  Yes, sir, Detective Tracy.

10      Q.  Detective Tracy?

11      A.  Yes, sir.

12      Q.  All right.  And, now, a day or two after this

13  event, did you get another phone?

14      A.  Phone call?

15      Q.  Did you get another cell phone?

16      A.  Oh, yes, cell phone, yes, sir, I did.

17      Q.  Okay.  And did you -- were you able to retain the

18  same cell phone number that -- the one you had lost in the

19  robbery?

20      A.  Yes, sir.  Initially, I had -- I was with, on my

21  sister's family plan, AT&T.  And at the time, I went to go

22  get a Metro PCS phone, but since I was -- since I had the

23  number for a certain amount of time, I was able to keep

24  the same number, so, which I did.

25      Q.  Okay.

218

1    A. So yes, sir.
2    Q. All right. Now, in that regard, a day or two
3  later, did you receive a phone call from a female?
4    A. Yes, sir, I did.
5    Q. And was the caller asking for the name of a
6  certain person?
7    A. Yes, sir.
8    Q. What was that name?
9    A. Kilo.
10    Q. And how did you respond?
11    A. I just told them -- well, I asked her again who
12  she asked for, just to make sure. And she said Kilo, "Is
13  Kilo there?" I said, "He's not here right now. Do you
14  want me to have him call you back?" And she was like,
15  yeah, but -- and she told me her name before she hung up,
16  but I just -- I can't remember what her name, what she
17  said.
18    Q. Okay. Now, Mr. Soliz over here that you've
19  identified, had you ever seen him before?
20    A. No, sir.
21    Q. Okay. Is your statement today that this is the
22  person based on your memory of seeing him in front of the
23  Discount Food Store?
24    A. Yes, sir.
25    Q. Okay. You were shown some photographs by

219

1  Detective Tracy; is that correct?
2    A. Yes, sir.
3    Q. And you picked one out; is that true?
4    A. Yes, sir.
5    Q. Okay. Is your testimony today based upon your
6  recollection and memory of the events on June 24 at the
7  Discount Food Store?
8    A. Can you ask the question again?
9    Q. Is your identifying Mr. Soliz this afternoon, is
10  it based on what you saw outside the Discount Food Store
11  outside your car that afternoon, June 24th?
12    A. Yes, sir.
13    Q. Okay. When you -- when he took the car, did it
14  have any kind of firearm in it?
15    A. No, sir.
16    Q. Okay. First of all, do you recall the license
17  plate number of your Dodge Stratus?
18    A. Yes, sir.
19    Q. Okay. What was it?
20    A. HGB-006.
21    Q. Okay. Show you a photograph. Do you recognize
22  the vehicle in this photograph?
23    A. Yes, sir.
24    Q. All right. And whose vehicle is that?
25    A. That was my vehicle.

220

1    Q. If I represented to you that this was at the
2  location of Braswell Street near a fence in Fort Worth, do
3  you have any idea how it got there?
4    A. No, sir.
5    Q. I want to show you --
6            MR. CHAMBLESS: Offer State's 48 at this
7  time.
8            MR. HEISKELL: No objection.
9            THE COURT: 48 is admitted.
10            (State's Exhibit No. 48 admitted.)
11    Q. (BY MR. CHAMBLESS) So, Sammy, is this the
12  license plate on your car?
13    A. Yes, sir.
14    Q. And this was your car?
15    A. Yes, sir.
16    Q. All right. Don't have any idea how it got to
17  this location?
18    A. No, sir.
19    Q. Show you this photograph. Is this -- do you
20  recognize the -- this vehicle?
21    A. Yes, sir.
22    Q. And does this show the -- your vehicle?
23    A. Yes, sir, that's my vehicle.
24    Q. Okay. Is this the condition your vehicle was in
25  when it left your hands?

221

1    A. No, sir.
2            MR. CHAMBLESS: Okay. It's marked State's
3  49, I believe.
4            MR. HEISKELL: No objection.
5            MR. CHAMBLESS: Offer State's 49.
6            MR. HEISKELL: No objection.
7            THE COURT: 49 is admitted.
8            (State's Exhibit No. 49 admitted.)
9    Q. (BY MR. CHAMBLESS) Now, Mister -- Sammy, this
10  has a -- what's different about your car in this
11  photograph?
12    A. Looks like it's been in an accident. Um, it has
13  a gun on the floorboard of the passenger side.
14    Q. Okay.
15    A. That's not mine.
16    Q. The airbag has deployed?
17    A. Airbag has deployed.
18    Q. But this is your car?
19    A. Yes, sir.
20    Q. Okay. Did you later learn that your car had been
21  recovered?
22    A. Yes, sir.
23    Q. And as it turned out, did you end up still owing
24  money for that car?
25    A. Yes, sir, because I -- I, at the time, only had

222

1 liability coverage.
2 Q. Okay.
3 A. Should have had full coverage.
4 Q. Do you see there's, I think, four items on the
5 bench in front of you, credit cards. Do you see those?
6 A. Yes, sir.
7 Q. Would you take a minute to look at those,
8 please. I think they're marked 43 through 46.
9 A. Yes, sir.
10 Q. Do you recognize each of those?
11 A. Yes, sir, I do.
12 Q. What are they?
13 A. Two of them are debit cards. One is my driver's
14 license, my old driver's license, and one is my Social
15 Security card.
16 Q. When was the last time until now that you saw
17 those items?
18 A. June 24th, 2010.
19 Q. Okay. You and I talked, and you were quite
20 nervous about testifying today; is that true?
21 A. Yes, sir.
22 Q. And we talked also about a lot of things when we
23 did talk back in November of 2011; is that correct?
24 A. Yes, sir.
25 Q. All right. And you shared some things with us,

223

1 one of which is that -- is this true, that you have been
2 on probation for about six and a half years?
3 A. Yes, sir.
4 Q. Is it for a felony?
5 A. Yes, sir.
6 Q. And, in fact, I believe it was for aggravated
7 assault; is that correct?
8 A. Yes, sir, that's correct.
9 Q. And have you been able to comply with the terms
10 of your probation?
11 A. Yes, sir, I've completed everything they've asked
12 me on my probation. Just I still had the, you know --
13 I completed everything. I just had to -- my paperwork
14 has to be reviewed by the Judge to see about early
15 dismissal.
16 Q. Do you think you've learned anything during the
17 time that you've been on probation?
18 A. Oh, yes, sir, absolutely.
19 Q. What have you learned?
20 A. Just -- just I learned the impact that you have
21 on other individuals by the actions, you know, that you
22 display. And just, I mean, I don't know -- like, I
23 learned that. I mean, it's a lot that I've learned.
24 I just -- I mean, specifically what would you like, I
25 mean?

224

1 Q. Well, I just -- do you feel like you've maybe
2 matured a little?
3 A. Oh, absolutely, sir, yes, sir. It occurred when
4 I was 21 years old, that what I'm on probation for. I'm
5 29. I've grown a lot as an adult and as a human being.
6 You know, I recognize what I did at the time.
7      MR. CHAMBLESS: Okay. All right. Thank you,
8 Sammy. Now I'm going to pass you as a witness. They may
9 have some questions for you. Okay?
10      THE WITNESS: Yes, sir.
11          CROSS-EXAMINATION
12 BY MR. HEISKELL:
13 Q. Mister -- is it -- help me, Sammy, pronounce the
14 last name again.
15 A. Abu-Lughod.
16 Q. Mr. Abu-Lughod, my name is Mike Heiskell.
17 A. Yes, sir.
18 Q. I have some questions for you. If at any point I
19 ask you something you do not understand, don't hesitate to
20 stop me. Okay?
21 A. Yes, sir.
22 Q. And what I want to do, Mr. Abu-Lughod, is go
23 through the sequence of events of this situation on North
24 Riverside, Discount Food Store.
25 A. Yes, sir.

225

1      MR. HEISKELL: If I can find that --
2      THE WITNESS: It's right here, sir.
3      MR. HEISKELL: Yeah. I'm trying to erase it
4 first. Thank you though. Appreciate it.
5 Q. This Discount Food Store --
6 A. Yes, sir.
7 Q. -- is -- what do they sell in there? Is it just
8 general food? Do they sell any alcohol or --
9 A. Yes, sir, they do sell alcohol, beer, chips.
10 Q. Beer, chips, wine, things like that too?
11 A. Yes, sir.
12 Q. And you told us earlier, sir, that this happened
13 in the middle of the day?
14 A. No, not the middle of the day, sir; in the
15 evening.
16 Q. In the evening. I'm sorry.
17 A. Yes, sir.
18 Q. I misunderstood you. What time was it?
19 A. The time, I believe around 8, 8:00, maybe 8:15.
20 Q. 8:15?
21 A. Something like that.
22 Q. So this is 8:15 p.m., sir; is that right?
23 A. That's correct, sir.
24 Q. This is in the summertime?
25 A. Yes, sir.

226

1    Q. Still daylight?
2    A. Yes, sir.
3    Q. And 8:15 obviously is after work?
4    A. Well, I was off that day.
5    Q. Okay. But for a lot of people who may be after
6    work on the way home or even going by to pick up some
7    beers or stuff like that; is that right?
8    A. Yeah, if that's what they're, you know, going
9    for.
10   Q. And you had gone there by yourself; is that
11   correct?
12   A. Yes, sir, that's correct.
13   Q. How long were you there before this incident
14   happened?
15   A. At the store?
16   Q. Yes, sir.
17   A. Maybe two minutes max.
18   Q. And you were in -- did you go inside the store
19   first?
20   A. Yes, sir. I pulled up, got out of the vehicle,
21   went in the store, made my purchase, exited the store, got
22   in my vehicle, proceeded to leave, and then was approached
23   by the individual.
24   Q. All right. And this person was coming across,
25   you said Mark was coming across the street --

227

1    A. Yeah.
2    Q. -- toward your vehicle?
3    A. I'm sorry?
4    Q. Toward the store, toward your vehicle?
5    A. Yeah, toward -- toward the store.
6    Q. And you indicated that he was wearing a Dallas
7    Mavericks shirt?
8    A. Jersey, yes, sir.
9    Q. I'm sorry, jersey. What kind of pants, if any,
10   do you recall?
11   A. It could have been -- I don't recall. Maybe
12   blue jeans.
13   Q. Some blue jeans?
14   A. I'm not a hundred percent sure about the, you
15   know, pants, whatever, but I definitely remember the
16   Dallas Mavericks jersey.
17   Q. And if you don't mind just telling me, we see
18   here State's No. 47, Mr. Abu-Lughod, you said you were
19   parked somewhere in here, correct?
20   A. Yeah. Where this truck is parked at, I was on
21   the next spot beside the truck.
22   Q. And from what direction did he come from?
23   A. He came from across -- there's like a little
24   pizzeria across the street. I think it's called Mamma
25   Mia's Pizza, or something -- something of that nature.

228

1    And that's where he was coming from, from that parking lot
2    over to this. He was walking. He walked across the
3    street and approached through the driveway.
4    Q. And so Mamma Mia's is on this side of the street?
5    A. Yeah, it's just basically right across the street
6    from this store.
7    Q. Okay.
8    A. But you just can't see it.
9    Q. And was that establishment open as well? In
10   other words, did it have cars --
11   A. Yes, sir.
12   Q. -- in the parking lot?
13   A. Yes, sir.
14   Q. And walked across to where you were in this
15   parking lot; is that right?
16   A. Yeah, he walked over, yes, sir. My vehicle was
17   already about to exit back on to Riverside when he
18   approached me.
19   Q. Okay. So you had pulled out?
20   A. Yes, sir.
21   Q. Okay. And I didn't hear that earlier. So you
22   actually, instead of being here parked, you had backed up
23   and pulled out; is that right?
24   A. Well, I mean, I came up and parked. When I was
25   leaving, I, you know, reversed and then...

229

1    Q. Okay. And you said there were people around
2    here?
3    A. Yes, sir.
4    Q. Front door?
5    A. Like one or two people.
6    Q. One or two people?
7    A. Yes, sir.
8    Q. And there were other cars parked in that area?
9    A. Actually, the car that was parked next to me, it
10   was individuals in that vehicle as well.
11   Q. Okay.
12   A. When I first pulled up, yes, sir.
13   Q. So there were people in the car next to you --
14   A. Yes, sir.
15   Q. -- as well?
16   A. Yes, sir.
17   Q. How many people did you say were out front?
18   A. One or two people.
19   Q. How many people would have been in the other car?
20   A. I think it was two people.
21   Q. Two people?
22   A. Yes, sir. Definitely one in the driver.
23   Q. I'll say one to two people. Is that --
24   A. Yeah, yes, sir, that's accurate.
25   Q. Okay. And then you have the traffic here

STATE V. MARK ANTHONY ABU-LUGHOD

230

1  on Riverside, which is a pretty busy street, isn't
2  it?
3      A.  Yes, sir, at that time it was, yes, sir.
4      Q.  And then you have people across the street at
5  Mamma Mia's; is that right?
6      A.  There's cars in the parking lot.  They
7  probably -- they're inside the establishment.
8      Q.  And the windows to that establishment at Mamma
9  Mia's face toward -- or some of those windows face toward
10 Riverside?
11     A.  Yes, sir, that's correct.
12     Q.  So people inside the restaurant can see across
13 the street toward where you are?
14     A.  Yeah, that and Auto Zone because Auto Zone was
15 next to that.
16     Q.  There's an Auto Zone too?
17     A.  Yeah, Auto Zone is right next to that store on
18 the -- behind it.
19     Q.  And Auto Zone was busy as well, I take it?
20     A.  Yes, sir, Auto Zone is pretty busy always over
21 there.
22     Q.  So both busy.  Is it fair to state that both of
23 these establishments across the street was busy, Discount
24 Food Store was busy?
25     A.  Pretty busy, yes, sir.

231

1      Q.  And this person, in daylight, comes up to you to
2  do this, right?
3      A.  Yeah, yes, sir.
4      Q.  Sounds silly, doesn't it?
5      A.  That sounds -- that's why I didn't think anything
6  of it when he approached me.  I was thinking he was going
7  to ask me a simple question, maybe borrow a couple bucks,
8  you know, ask me maybe for a ride up the street or
9  something like that, you know.
10         And part of the reason I did, you know,
11 acknowledge him and speak to him was because when I'm
12 trying to exit the parking lot, there's cars blocking the
13 intersection to where I can't exit at that moment anyway,
14 and I didn't want to, you know, so...
15     Q.  So other cars were even coming into the parking
16 lot?
17     A.  No.  It's a stoplight right there at the end
18 of -- I don't know the intersection exactly, but right
19 there on Riverside a stoplight maybe --
20     Q.  Where would that be?
21     A.  Yeah, this.
22     Q.  State's No. 47, where would that be, sir?
23     A.  Towards this way, up the street.
24     Q.  Towards this way?
25     A.  Yeah, not too far, maybe -- maybe 50 yards,

232

1  something like that.
2      Q.  So we've got cars, stoplight, cars down the
3  street, Mamma Mia's, Auto Zone, people busy, car
4  next to you, people in it, and people in front of the
5  store?
6      A.  Yes, sir.
7      Q.  That day, you said it was a warm day?
8      A.  Yes, sir, summertime, yes, sir.
9      Q.  Could you tell, do you remember, Mr. Abu-Lughod,
10 if it was a windy day?
11     A.  I don't remember if it was windy, sir.
12     Q.  And you've seen people high before, have you
13 not?
14     A.  High?
15     Q.  Yes.
16     A.  Yes, sir.
17     Q.  And he came up to you, with all these witnesses,
18 and then said he wanted 40 or 50 -- I'm sorry -- 50 to 60
19 dollars?
20     A.  Yes, sir.
21     Q.  And he was also speaking some of that in Spanish
22 in addition to saying it in English?
23     A.  Yeah, he said, "federa" or something like that.
24 I assume means money.  I know it means money.  I just
25 can't pronounce it correctly.

233

1      Q.  Okay.  And when he was doing that, he was kind of
2  squatting down in front by your -- excuse me -- driver's
3  door when he was saying this; is that right?
4      A.  Yes, sir, he had squatted down, yes, sir.
5      Q.  Were you able -- and I know it's -- we're talking
6  almost two years ago now?
7      A.  Yes, sir.
8      Q.  If you recall, able to smell any type of
9  alcoholic beverage on him or anything of that nature on
10 him?
11     A.  No, sir.
12     Q.  Okay.  But he made the statement, you told him
13 no, because I think you told this Jury earlier you were
14 already determined to say no anyway?
15     A.  Yes, sir.
16     Q.  And then that's when the gun is pulled; is that
17 right?
18     A.  Yes, sir.  After he -- after I told him I don't
19 have it.  Like after he said, "I need 50 or 60 bucks", and
20 I said, "I don't have it", he put his head down and shook
21 his head a few times.  And the next thing I know, he
22 pulled a gun out.
23     Q.  He put his head a few times like this?  I mean,
24 I'm kind of demonstrating.
25     A.  Yeah, like I'm disappointing him, like --

234

Q. Okay. He didn't turn his head to look at these other witnesses or look across the street and look to see who was watching; he just put his head down?

A. No, sir. Yeah, he just put his head down and shook his head a few times. And then next thing I know, the gun is pointed at my face.

Q. And then I believe you said, Mr. Abu-Lughod, that when you got out of the car, you dropped your wallet on the pavement?

A. Yes, sir.

Q. And he got in your car?

A. Well, he picked my wallet up first and then got in the vehicle.

Q. Okay. And then -- well, let's back up even before then.

A. Okay.

Q. He asked you for the money first, and I think you said, "Then all of a sudden he said, well, give me your car too".

A. Yeah, he was like -- after he asked me for the 50 or 60 bucks and I said I didn't have it, he put his head down, shook his head a few times. Next thing I know, the gun is pointed at me, at my face. He's like, "Give me your wallet", you know, and he was like, "You know what, give me the car too".

235

So I exited the car, then I drop -- reached in my back pocket, dropped my wallet on the ground. I don't know why, I just dropped it instead of handing it to him. Then I -- he told me to walk off. So I walked off in the direction that he insinuated. And so I did that, and I looked back just to see, I don't know, maybe he was going to shoot me or, I don't know. I looked back.

And he gets in my car, exits the parking lot, goes south on Riverside and yells out the window, "I'm going to come back and get the rest of it".

Q. He said he was going to come back and get the rest of it?

A. Yes, sir, which I don't know what he was referring to.

Q. That didn't sound -- that sounded silly too, didn't it?

A. Yes, sir. Sound crazy to me, not silly.

Q. Crazy?

A. Yeah.

Q. Now, not only that -- and let me put up here real quick. You said sounded silly and crazy, right?

A. More so crazy, sir.

Q. He -- your phone that was in the vehicle --

A. Yes, sir, passenger seat.

Q. -- in the passenger seat, I believe you told us

236

that at some point someone named -- some female called that number?

A. Yes, sir.

Q. But you had already changed that same number to a different phone?

A. I got a different phone with the same number.

Q. I'm sorry. Yeah, different phone with the same number.

A. Yes, sir.

Q. Sorry, I didn't say that right. And then this person calls you asking for Kilo?

A. Yes, sir.

Q. So it's apparent to you that this person had taken your phone and then just started using your phone, I guess?

A. Yeah.

Q. Another silly, crazy thing to do?

A. Was crazy.

Q. And, now, this person that called you, you say you don't recall her name; is that right?

A. Yes, sir. She said her name, but I didn't understand what she said.

Q. Maria or --

A. It could be.

Q. Maria Olivares?

237

A. I don't know her last name. I didn't ask her last name. She didn't mention her last name the first time, so I wouldn't be able to determine that.

Q. But you do recall Maria?

A. Something with an M. But I can't -- I can't tell you Maria for certain.

Q. What did you respond? What did you say to this person?

A. I asked her again what her name was, but I couldn't understand her, so I just hung up or just told her -- the conversation ended after that.

Q. I'm sorry?

A. The conversation ended after that.

Q. Were there any other calls, Mr. Abu-Lughod, other than that one?

A. That I received?

Q. Yes, sir.

A. From -- not asking for that individual.

Q. I want to go now, Mr. Abu-Lughod, that the Prosecutor asked you about before he passed you as a witness to me, that is your probation he made reference to for aggravated assault with a deadly weapon; is that right?

A. Yes, sir, that's correct.

Q. And you went to trial on that case; is that --

238

1   A. Yes, sir.

2   Q. So you pled not guilty but you were found guilty

3   by a jury; is that right?

4   A. Um, yes, sir.

5   Q. And you were convicted in relation to you and

6   others shooting at police and civilians?

7   A. I don't know if --

8       MR. CHAMBLESS: Judge, I object to an inquiry

9   into the details of the event. I think that's not proper

10  Cross.

11      MR. HEISKELL: Well, Judge, I believe he

12  opened the door when he asked about what he learned and

13  some other details, as I recall. I don't recall

14  specifically about all of it.

15      THE COURT: You can ask him the question.

16      MR. HEISKELL: Sir?

17      THE COURT: You can ask him the question.

18      MR. HEISKELL: Okay. Yes, sir.

19  Q. (BY MR. HEISKELL) Was it, Mr. Abu-Lughod?

20  A. Is that what your report says, sir?

21  Q. Well, I'm just asking you. Yes, sir.

22  A. I believe that's what it's referring to, if

23  that's what you're referring to. But when you put it like

24  that, sir, it's kind of like, you know -- when you say

25  it -- when you say it like that, I understand what you're

239

1   doing is -- I understand you're doing your job.

2   Q. Yes, sir.

3   A. And so when you say it like that, it makes it

4   look, you know, pretty ugly, which I understand.

5   Q. Well, but you -- you are serving your debt to

6   society, I think is what you're telling us?

7   A. Yes, sir.

8   Q. Best you can?

9   A. Yes, sir. I went to jury trial. I got

10  probation. I mean, why did I get probation? Must have

11  been some circumstances of the case. So I guess they

12  felt, you know, that was suitable punishment for what I

13  was accused of.

14  Q. And you were convicted of doing some silly,

15  stupid things; is that fair, sir?

16  A. If that's determined in individual -- certain

17  individuals' eyes, yes, sir.

18      MR. HEISKELL: Thank you, Sammy. Appreciate

19  it.

20      THE WITNESS: You're welcome. No problem.

21      MR. HEISKELL: Pass the witness.

22      REDIRECT EXAMINATION

23  BY MR. CHAMBLESS:

24  Q. Thank you. Just a couple things. Now, did -- to

25  your knowledge, did someone that -- any one of your

240

1   acquaintance see your car after it was stolen from you?

2   A. Not from my knowledge.

3   Q. Okay. You said it was a -- the gun you saw was a

4   black in color, correct?

5   A. Yes, sir.

6   Q. Okay. And it was a -- not a revolver, it was a

7   semi-automatic; is that correct?

8   A. Yes, sir.

9   Q. Looking at this item here, was it similar to

10  this?

11  A. Yes, sir.

12  Q. However, the barrel is pointed down at this time;

13  is that correct?

14  A. Yes, sir.

15  Q. Where was it pointed when you saw it?

16  A. In my face.

17  Q. Okay. And was it Mr. Soliz here in this

18  courtroom who pointed that at you?

19  A. Yes, sir.

20      MR. CHAMBLESS: Okay. Thank you.

21  No further questions.

22      MR. HEISKELL: No further questions.

23      THE COURT: May the witness be excused?

24      MR. HEISKELL: Yes, sir.

25      THE COURT: Thank you. You may be excused.

241

1       THE WITNESS: Do I leave these here?

2       THE COURT: Yes, sir. Thank you.

3       (Witness excused.)

4       MR. CHAMBLESS: Your Honor, the State calls

5   Mandy Riddle at this time.

6       THE COURT: Please raise your right hand.

7       (Witness sworn.)

8       THE COURT: Thank you.

9       MS. JACK: May I proceed, Your Honor?

10      THE COURT: Yes, ma'am.

11          MANDY RIDDLE,

12      Having been first duly sworn, testified as follows:

13          DIRECT EXAMINATION

14  BY MS. JACK:

15  Q. Ms. Riddle, would you please introduce yourself

16  to the ladies and gentlemen of the Jury.

17  A. My name is Mandy Riddle. I work for the Fort

18  Worth Police Department. I'm a Senior Public Safety

19  Communicator.

20  Q. What is a Senior Public Safety Communicator?

21  A. I supervise over dispatchers and call takers.

22  I supervise over the 9-1-1 calls that come into the

23  City of Fort Worth. And I just basically -- I handle

24  everything on the first half of it from all the calls

25  that come in.

242

1     Q. Okay. How many 9-1-1 dispatchers do we have?

2     A. Total? We have nine on each shift, and we have

3 three shifts per day, so roughly 27 a day is what we need

4 to run the City of Fort Worth.

5     Q. So you're in charge of a shift; is that correct?

6     A. Yes, ma'am.

7     Q. So you're in charge of nine 9-1-1 dispatchers at

8 any given time when you're on duty?

9     A. Dispatchers, yes. And then there's -- call

10 takers are separate, and then there's roughly about 15 to 20 of

11 those.

12     Q. All right. So what's the difference between a

13 9-1-1 dispatcher and a call taker?

14     A. Call takers, they're just trained to take 9-1-1

15 calls. They're just trained on the situations that come

16 in, how to input the information, how to deal with

17 whatever situation that comes up.

18     The dispatchers are actually further trained

19 on how to dispatch the calls, where the calls are supposed

20 to go, how to determine what officer is closer to what

21 call, how to determine how to deal with situational

22 emergencies that come up to control the channel when you

23 have -- because we roughly have 30 to 50 officers on a

24 channel at a time for one dispatcher.

25     Q. Okay. You may have mentioned and I missed it,

243

1 but how many call takers do you have for each shift?

2     A. Roughly 15 to 20 per shift.

3     Q. So you have 15 to 20 individuals who take in the

4 information, and then roughly nine individuals who are

5 dispatching officers or medical personnel or whatever the

6 emergency call is for?

7     A. Correct.

8     Q. Okay. And you're in charge of -- let me do my

9 math real quick -- roughly 29 people for a given shift

10 then?

11     A. Correct.

12     Q. I know we both had to think for a second. All

13 right. Obviously, you work for the Fort Worth Police

14 Department?

15     A. Yes, ma'am.

16     Q. Okay. Let's go back to -- and how long have you

17 worked for the Fort Worth Police Department?

18     A. About eight years.

19     Q. Let's go back to the week of June of 2010.

20     A. Okay.

21     Q. All right. Specifically, June 24th --

22     MS. JACK: May I approach the witness, Your

23 Honor?

24     Q. June 24th, did you receive a call of an armed

25 robbery with a victim by the name of Sammy Abu-Lughod?

244

1     A. Yes, ma'am.

2     Q. Abu-Lughod. Let me say it that way. And what

3 was the address?

4     A. Address came in at 604 North Riverside.

5     Q. All right. And what was the description of the

6 car that was stolen?

7     A. The description of the vehicle that was stolen

8 was a green Dodge Stratus.

9     Q. Okay. And did you have a license plate?

10     A. Yes, ma'am.

11     Q. What was the license plate?

12     A. H as in Henry, G as in George, B as in boy, 006.

13     Q. Okay. That was on June 24th; is that correct?

14     A. Correct.

15     Q. Okay. On the -- June the 28th, did you receive

16 another call?

17     A. Yes.

18     Q. And was it a sighting of this car?

19     A. Yes.

20     Q. And was it by a man by the name of Chris Malone?

21     A. Yes.

22     Q. And was it a sighting of a green Dodge Stratus

23 with this license plate?

24     A. Yes.

25     Q. Meaning HGB-006?

245

1     A. Yes.

2     Q. Were two officers dispatched?

3     A. Two officers, yes.

4     Q. From the Fort Worth Police Department?

5     A. Correct.

6     Q. All right. And was a description given of the

7 man driving the Dodge Stratus on June 28th?

8     A. Yes.

9     Q. What was that description?

10     A. Hispanic male, bald hair. That was the only

11 description at that time, and the rest of it was

12 directionals of the vehicle.

13     Q. Okay. Directionals of the vehicle, what does

14 that mean?

15     A. The direction the vehicle was last seen headed at

16 the time of the sighting.

17     Q. Where it was going?

18     A. Correct.

19     Q. So you have a civilian following what you know to

20 be a stolen car?

21     A. Correct.

22     Q. All right. You dispatch two Fort Worth police

23 officers, right?

24     A. And Air One.

25     Q. Officer Cantu, is that one of the officers?

**246**

1    A. Yes.

2    Q. Officer Curtis, is that the second officer?

3    A. Correct.

4    Q. Are they -- do they go in separate marked police

5 cars?

6    A. Yes.

7    Q. Does Fort Worth also have a helicopter that they

8 employ at night to give them an aerial vision of the city

9 of Fort Worth when they're looking for someone who may be

10 in a stolen car, perhaps someone dangerous?

11   A. Correct.

12   Q. And is that called Air One?

13   A. Yes.

14   Q. All right. Was Air One dispatched as well?

15   A. Yes.

16   Q. What time?

17   A. Air One was dispatched at 0203 hours, 2 in the

18 morning.

19   Q. Okay. So what time did Air One go up?

20   A. 2:03 in the morning.

21   Q. 2:03. Air One. What time were the officers

22 dispatched?

23   A. The first -- the primary officer was dispatched

24 at 2:04 in the morning.

25   Q. What time is the second officer?

**247**

1    A. 2:09.

2    Q. At 2:09?

3    A. Correct.

4    Q. In what part of Fort Worth was a green Dodge

5 Stratus occupied by a Hispanic male driving?

6    A. This particular time, it was seen at Morningside,

7 southbound South Freeway.

8    Q. Over by La Gran Plaza?

9    A. Yes.

10   Q. Over by what used to be Seminary South Mall?

11   A. 4200 block.

12   Q. What part of Fort Worth is that generally?

13   A. South Division.

14   Q. South Fort Worth. Okay. Close to the highway?

15   A. Yes, ma'am.

16   Q. Which highway?

17   A. 35.

18   Q. Okay. Close to 35. All right. So we have a

19 civilian following this car, two police officers, and Air

20 One going up as well?

21   A. Correct.

22   Q. Did the civilian lose the car?

23   A. Yes.

24   Q. Did the police continue to search for this car?

25      MR. HEISKELL: Your Honor, excuse me. We

**248**

1 object to leading. And I'm not sure if she's testifying

2 from memory or records at this juncture. And if so, we

3 certainly would object unless that is in evidence somehow.

4      THE COURT: I don't really understand the

5 objection.

6      MR. HEISKELL: The objection right now is

7 leading, Judge, but I'll find --

8      THE COURT: Please rephrase your questions.

9      MS. JACK: I'm happy to, Your Honor.

10   Q. (BY MS. JACK) Who was looking for the Dodge

11 Stratus?

12   A. Two Fort Worth police officers and Air One.

13   Q. Okay. And was there a civilian looking for the

14 car as well?

15   A. Correct.

16   Q. All right. Was that vehicle connected to the

17 armed robbery that occurred on June 24th of 2010?

18   A. Yes.

19   Q. The description given by Mr. Abu-Lughod, was it a

20 Hispanic male?

21   A. Yes.

22   Q. Who was armed with a small semi-automatic

23 handgun?

24   A. Correct.

25      MR. HEISKELL: Your Honor, again object to

**249**

1 leading, Your Honor.

2    Q. (BY MS. JACK) What was the description given by

3 Mr. Abu-Lughod?

4    A. The initial description states Hispanic male,

5 white Mavericks jersey, blue jeans, pulled a gun on the

6 complainant, took the complainant's money and vehicle.

7    Q. Okay. Let me ask you this. As the Senior Public

8 Safety Communicator for the City of Fort Worth, when you

9 get information like that and a car is seen four days

10 later, does that take a high priority?

11   A. Absolutely.

12   Q. Why?

13   A. Obviously it's a violent crime when you're

14 carjacking someone. So, I mean, if it's still out there

15 four days later, I mean, it's a priority that we need to

16 find that vehicle and the person in it.

17   Q. Does it take on another level of a priority when

18 a civilian is involved pursuing that car?

19   A. Absolutely.

20   Q. Okay. Did the Fort Worth Police Department look

21 for the car?

22   A. Yes.

23   Q. Were they able to find it?

24   A. No.

25   Q. Was Air One able to find it?

250

1    A. No.
2    Q. Was the car lost --
3    A. Yes.
4    Q. -- in the pursuit?
5    A. Yes, ma'am.
6    Q. All right. On June 28th, was a license plate
7    given of that Dodge Stratus?
8    A. Yes.
9    Q. And did the license plate match the license plate
10   and the make and model of June 24th?
11   A. Yes.
12   Q. All right. The next day, the next day on June
13   the 29th, was there another shooting?
14   A. Yes.
15   Q. Over on Quebec Street?
16   A. Yes.
17   Q. Was a description of the car given?
18   A. Yes.
19   Q. What was the description?
20   A. This one stated a teal four-door sedan.
21       MS. JACK: Okay. May I approach the bench,
22   Your Honor, to get a picture?
23       THE COURT: Yes, you may.
24   Q. Ms. Riddle, I'm showing you what's been marked as
25   State's Exhibit No. 48 and it's already been admitted into

251

1    evidence. Is it fair to say as a dispatcher -- as a
2    senior community -- Senior Public Safety Communicator,
3    that cars sometimes can be described as green or teal or
4    blue, and they're all meaning the same car?
5    A. Yes.
6    Q. All right. When you got the description on June
7    28th -- I'm sorry, June 29th, of a teal Dodge Stratus, did
8    you make note of that as well?
9    A. Yes.
10   Q. And that description was given in connection to a
11   shooting at Quebec -- on the Quebec address?
12   A. Correct.
13   Q. What time was the description of the teal Dodge
14   Stratus given to the Fort Worth Police Department?
15   A. At 0630 hours, 6:30 in the morning.
16   Q. 6:30 in the morning on June 29th; is that right?
17   A. Uh-huh, yes, ma'am.
18   Q. Did Detective Tom Boetcher contact you within
19   minutes?
20   A. Yes.
21   Q. Was he asking you to look at all of the reports?
22       MR. HEISKELL: Excuse me, Your Honor. Object
23   to hearsay what Tom Boetcher is asking her to do and look
24   at.
25       MS. JACK: I'll rephrase my question, Your

252

1    Honor.
2        THE COURT: Thank you.
3    Q. (BY MS. JACK) Ms. Riddle, did you take all the
4    information that you had and look at all of these reports
5    and issue a license plate and make and model to be on the
6    lookout for?
7    A. Yes.
8    Q. Was that sent to the entire Fort Worth Police
9    Department?
10   A. Yes.
11   Q. And did that begin the pursuit of the green Dodge
12   Stratus bearing the license plate HGB-006 on June the
13   29th?
14   A. Yes.
15   Q. So you were the one that put the license plate
16   with it on June the 29th?
17   A. Yes.
18       MS. JACK: I'll pass this witness, Your
19   Honor.
20       MR. HEISKELL: No questions, Judge.
21       THE COURT: Thank you. You may be excused.
22   (Witness excused.)
23       MR. CHAMBLESS: State calls Detective Jerry
24   Cedillo, please.
25       THE COURT: Please raise your right hand.

253

1    (Witness sworn.)
2        THE COURT: Thank you.
3        JERRY CEDILLO,
4    Having been first duly sworn, testified as follows:
5        DIRECT EXAMINATION
6    BY MR. CHAMBLESS:
7    Q. Please state your full name.
8    A. Jerry Cedillo.
9    Q. And, Mr. Cedillo, what is your occupation?
10   A. I'm a Fort Worth police officer.
11   Q. How long have you been a police officer with Fort
12   Worth and what are your duties at this time?
13   A. I have been with the City of Fort Worth Police
14   Department for 14 years. I'm currently assigned to the --
15   I'm currently a detective with the Homicide Unit.
16   Q. How long have you been in the Homicide Unit?
17   A. About eight months.
18   Q. Okay. Before that, what were your -- what was
19   your assignment?
20   A. I was assigned to the Robbery Unit.
21   Q. You're a certified peace officer in the State of
22   Texas?
23   A. Yes, sir.
24   Q. Okay. On June -- back on June 29th of 2010, I
25   want to go back in time. And are there -- in your -- when

254

1 you were in -- were you in Robbery at that time?

2    A. Yes, sir.

3    Q. Okay. What does it mean to say you're an on-call

4 detective for the day?

5    A. An on-call detective is a detective that is

6 responsible for answering calls that come in by

7 communications or by patrol officers related to, and at

8 that time, any robbery calls.

9    Q. Okay. And was that your status as far as work

10 assignment on that day, June 29th, 2010?

11    A. Yes, sir.

12    Q. Okay. And when did -- when did your work day

13 start, what time?

14    A. When you're on call, your shift is basically

15 from 11 a.m. to 7 p.m. And then you're responsible --

16 after 7 p.m., you're on call until the following morning

17 until at about 8:00 in the morning.

18    Q. And early in the morning of June 29th, did you

19 receive an assignment to go to a certain location

20 regarding a shooting victim?

21    A. Yes, I did.

22    Q. What was the name of the victim?

23    A. Ruben Martinez.

24    Q. Okay. What was the -- what was the location of

25 that assignment?

255

1    A. That location was 2700 Azle Avenue.

2    Q. Okay. What time did you get there?

3    A. I arrived there approximately 6:00 in the

4 morning.

5    Q. Okay. And how long did you remain at that

6 location?

7    A. I was there for several hours, approximately two

8 and a half to three hours.

9    Q. Okay. Did you also go to a hospital?

10    A. Later that morning I did.

11    Q. Okay. What hospital did you go to?

12    A. Harris Hospital.

13    Q. And what was your reason for going to Harris

14 Hospital?

15    A. I went to Harris Hospital to respond to a

16 separate robbery victim that was at that location.

17    Q. All right. And what was the name of the victim

18 at that location?

19    A. That was Enrique Samaniego.

20    Q. Okay. And were you able to see Enrique Samaniego

21 at that time?

22    A. Just briefly. He had just got out of surgery, so

23 I was unable to question him at that time.

24    Q. Did he have a medical device attached such that

25 he could not speak to you at that time?

256

1    A. That's correct.

2    Q. What was that?

3    A. It was a trach in his throat.

4    Q. Okay. And did you later follow up, not on this

5 date, but on other dates with Mr. Samaniego?

6    A. Yes, I did.

7    Q. Now, going to the evening hours of June 29th, did

8 you and other officers focus on looking for a particular

9 vehicle?

10    A. Yes, we did.

11    Q. What was the vehicle that you were looking for?

12    A. We were looking for a green Dodge Stratus, four

13 door.

14    Q. We've heard that the license plate was HGB-006.

15 Is that correct?

16    A. That's correct.

17    Q. What area were you focusing on?

18    A. It was predominantly the north side of Fort Worth

19 or the Riverside area which is also somewhat North Fort

20 Worth.

21    Q. Okay. Approximately what time were you involved

22 in that search?

23    A. We began at about 5 p.m. that evening, and

24 continued into the late hours.

25    Q. Okay. And at some point in the evening, did you

257

1 see or locate yourself that vehicle, the Dodge Stratus?

2    A. Yes, I did.

3    Q. Okay. I'm going to show you a rather large board

4 here, ask you if you can take a look at what's shown

5 here. Do you recognize the area shown on this poster

6 board marked State's Exhibit 50?

7    A. Yes, sir, I do.

8    Q. Are you familiar with this area of Fort Worth?

9    A. Yes, I am.

10    Q. Okay. Is this -- what is this? What is shown on

11 State's Exhibit 50?

12    A. This is a aerial map of the location where I

13 encountered a vehicle.

14    Q. Now, the streets that are shown on this map, do

15 they, from your knowledge of the area, do they fairly and

16 accurately show the street, the street names, the

17 geographic locations of different things here?

18    A. Yes, they do.

19         MR. CHAMBLESS: Okay. Offer State's 50 at

20 this time.

21         MR. HEISKELL: No objection.

22         THE COURT: 50 is admitted.

23         (State's Exhibit No. 50 admitted.)

24    Q. (BY MR. CHAMBLESS) All right. If you would step

25 down, and let's, if you would, let's stand up here in

258

1  front of the Jury where Mr. Heiskell can also see.
2      All right.  Detective, if you would, just
3  give us some landmarks here of areas that you were
4  focusing on and so that the Jury can also see it.  What
5  are we looking at, what area?
6      A.  Well, this is what we consider the north side of
7  Fort Worth, the Diamond Hill, actually, more specifically
8  the Diamond Hill area of Fort Worth, which is North Fort
9  Worth.
10     Q.  Okay.  And some of the key roads here, what are
11 we looking at?
12     A.  We have I-35 here which is -- this is
13 southbound.  This is northbound.  We have Long Avenue
14 which travels east and west -- I'm sorry, which is here.
15 These are some railroad tracks.  Long Avenue continues to
16 the west.  We have Deen Road and then we have down here
17 Schwartz Avenue.
18     Q.  Okay.  In particular, what area were you focusing
19 on, if any?
20     A.  At this time we were actually focusing on the
21 East Long area.  We were heading over towards the
22 Riverside area, which there's a back route to get to the
23 Riverside area off of Long.
24     Q.  At some point did you personally observe the 2005
25 Dodge Stratus?

259

1      A.  Yes, I did.
2      Q.  At approximately what time did you first see it?
3      A.  It was approximately 10:14 p.m.
4      Q.  Okay.  If you would, using this map, tell the
5  Jury where you saw it and where you were when you saw it.
6      A.  We were traveling -- my partner and I were
7  traveling eastbound on Long here.  We were coming up to
8  the street called Braswell.  There's a Motel 6 right here.
9          As we were approaching Braswell, I saw the
10 vehicle cross over Long and began to travel westbound, so
11 basically crossed over my road and we encountered each
12 other going the opposite way.
13     Q.  Okay.  So the vehicle was coming opposite
14 direction you were going?
15     A.  That's correct.
16     Q.  Now, who are you with?  What --
17     A.  Detective Paine.
18     Q.  Paine.  Okay.  So what happened then?
19     A.  At that point, I turned to him and I asked him,
20 "Hey, did that look like a Dodge Stratus?"  And he said,
21 "I'm not sure".  So I told him, "I believe that is a Dodge
22 Stratus".  So what I did is, as it passed us, I looked
23 over, got a look at the vehicle, and I was pretty certain
24 that it was a Dodge Stratus, so I came down to the next
25 turnaround, which is actually past Braswell, and made a

260

1  U-turn and began to follow the vehicle.
2      Q.  Okay.  Were you able to get close enough to
3  determine if that was the vehicle you were looking for?
4      A.  Yes, I was.
5      Q.  All right.  And, indeed, were you able to
6  identify it by the license plate and make and color of the
7  vehicle?
8      A.  Yes, I was.
9      Q.  How close to it did you arrive -- did you come to
10 it?
11     A.  I got fairly close.  I would say about five yards
12 of the vehicle.
13     Q.  Okay.  Describe what happened then.
14     A.  Well, as I turned around, I started approaching,
15 I started speeding up to the vehicle as we're getting up
16 here to Deen.  He actually -- as he's getting closer, we
17 had already confirmed that it was the vehicle.  At that
18 time, we're searching for our radios, turning on the
19 radios to get -- to alert dispatch that we have the
20 suspect vehicle in view.
21         We make a stop here at the light, so we're
22 behind him in the right lane.  We get the green light.  We
23 continue on down Long.  He's still in the far right lane
24 as we're coming over -- this is a bridge here that goes
25 over the railroad tracks.  So we're coming over the

261

1  bridge, we're approaching the next light which is going to
2  be here at Schwartz.  The vehicle initially is in the far
3  right lane.  We're behind the vehicle in the right lane.
4          As he's coming up to the green light on
5  Schwartz, he makes a wide left turn.  He crosses from the
6  entire right lane, crosses over to the left lane, crosses
7  over the turn lane, so he makes an illegal turn all the
8  way over.
9          From my experience in doing surveillance, I
10 know that this is typically done by individuals to see if
11 they're being followed.
12     Q.  Now, were you trying to make a stop at that time?
13     A.  No, sir, I was not.
14     Q.  Why was that?
15     A.  Because we're not equipped to make stops.  We
16 were in an unmarked vehicle.  We don't have lights or
17 sirens or anything of that effect.  So we were basically
18 trying to maintain surveillance until one of the patrol
19 cars could get close enough to make a stop.
20     Q.  So when the Stratus made the turn from the far
21 right-hand lane, turning left; is that correct?
22     A.  Yes, sir.
23     Q.  What happened then?
24     A.  At that point I decided to -- because we didn't
25 have a vehicle that was close enough to prevent him from

262

1 noticing that we were following him, I decided to continue
2 past Schwartz, come down to the next turnaround, which is
3 right about here, make a U-turn, and then come back and
4 start following him on Schwartz.
5 Q. Okay. Were you able to catch up with the Dodge
6 Stratus then?
7 A. Not at that point. We lost him for a short
8 period.
9 Q. Okay. For how long -- and you had a second view
10 of this car?
11 A. I'm sorry?
12 Q. Did you see it again?
13 A. Yes, sir, we did.
14 Q. And how long after the first sighting did you see
15 it?
16 A. It was within two or three minutes.
17 Q. Okay. Now tell the Jury where you saw the Dodge
18 Stratus the second time.
19 A. After not seeing him on Schwartz, we began to
20 basically comb the area here. The closest street that we
21 could turn down was this street, which is 32nd, down
22 here. So we make a left-hand turn down 32nd. It kind of
23 dead ends and makes an L-shape. So we turned down this
24 street. We actually see the headlights and the tail --
25 the car lights are on, the tail lamps, and we see that

263

1 it's parked inside of a driveway.
2 Q. Okay. And what street was that on?
3 A. At this point, that's technically Oscar.
4 Q. Okay. What happened then?
5 A. At that point, we still didn't have vehicles in
6 the area. We didn't believe that that was a tactical
7 place to make the stop or the contact. So I decided to
8 have all the squad units back out of the area until the
9 vehicle got back on the road and we were able to make a
10 traffic stop.
11 So we went ahead and passed it up. We
12 just -- basically, we were doing rolling surveillance. We
13 started circling the area. We came back a second time
14 down the street. At that point we didn't see the
15 vehicle any longer.
16 Q. Okay. The vehicle, the Stratus, had been in the
17 driveway on Oscar, that house on Oscar, and then it's
18 gone?
19 A. Yes, sir.
20 Q. All right. Did you obtain any information about
21 the occupant of the house on Oscar or not?
22 A. At that point, I don't believe we did.
23 Q. Okay. But what action did y'all take,
24 collectively, I guess you and other officers, at that
25 point?

264

1 A. Well, once we made the second pass and didn't see
2 the vehicle, my partner, Detective Paine, actually got out
3 on foot, and he watched from kind of a wooded area down
4 here, down Oscar, to see if the vehicle would reappear.
5 We did that for several minutes. We didn't see the
6 vehicle, so I contacted another officer who was working in
7 the area in an unmarked vehicle and asked for his
8 assistance.
9 Q. What was his name?
10 A. That would be, at the time, Officer Alaniz, now
11 Detective Alaniz.
12 Q. And where was he situated, do you recall?
13 A. I don't remember exactly where he positioned
14 himself. I know that we -- I later picked up my partner,
15 Detective Paine. And initially we weren't sure if the
16 vehicle was still in the area, so Detective Paine and I
17 decided to start kind of making bigger surveillances. So
18 we left this area and started searching these areas, just
19 in case the vehicle had left the area and we just missed
20 it.
21 Q. Okay. While you were doing that, making these
22 larger circles for surveillance in an attempt to locate
23 the Dodge Stratus again, did you hear through the
24 communications system anything about the Dodge Stratus?
25 A. Yes, sir, I did.

265

1 Q. What did you hear?
2 A. I heard Officer Alaniz state over the radio that
3 he had the vehicle back on view and that it was beginning
4 to move.
5 Q. Okay. And what direction did he report it to be
6 moving in, do you recall?
7 A. I don't recall exactly.
8 Q. Okay. And did you respond as this information
9 was coming in to you?
10 A. Yes, sir. We had got out of the area somewhat.
11 We immediately turned back around, started heading towards
12 the general area when we heard the pursuit begin.
13 Q. Okay. And did the pursuit end at a certain
14 location shown on this map?
15 A. Yes, sir, it did.
16 Q. Where did it end?
17 A. It ended actually back in the area where we first
18 spotted the car. It ended right here. There's a little
19 block here. The vehicle was actually disabled due to an
20 accident here at the fence.
21 Q. All right. The vehicle, that being the Dodge
22 Stratus?
23 A. Yes, sir.
24 Q. Did you personally come upon that location?
25 A. Later, yes, I did.

266

1    Q. Okay. All right. Thank you. Thank you.
2       When you arrived at the location on Braswell
3 where the Dodge Stratus ended up, did you look inside the
4 Dodge Stratus?
5    A. Yes, sir, I did.
6    Q. All right. I want to show you what's marked as
7 State's Exhibit 49. Do you recognize this photograph?
8    A. Yes, sir.
9    Q. Okay. Is this what you saw in the Dodge, on the
10 floor of the Dodge Stratus when you came to the location
11 on Braswell where it had stopped?
12    A. That's correct.
13    Q. Okay. What is shown in this photograph 49?
14    A. There's a black semi-automatic handgun on the
15 floorboard, passenger side of that vehicle. There's also
16 a blue bandanna that's partially seen over the center
17 console.
18    Q. Okay.
19       (Pause in proceeding.)
20    Q. Approximately what time -- do you recall what
21 time it was that you arrived at the location where the
22 Dodge Stratus was?
23    A. That was approximately 10:45 p.m.
24    Q. Okay. Do you recall how many people were in the
25 Dodge Stratus?

267

1    A. When I arrived, it was empty.
2    Q. Okay. Did you later learn how many occupants
3 there had been?
4    A. Yes, sir.
5    Q. How many?
6    A. Two.
7    Q. Okay. Was there another vehicle involved in the
8 pursuit?
9    A. Not in the pursuit, but there was another vehicle
10 that had left that residence.
11    Q. Okay. And were -- was that vehicle stopped as
12 well?
13    A. Yes, sir.
14    Q. And what kind of vehicle was it?
15    A. That was a Jeep Liberty. I believe it was black.
16    Q. And were there some occupants of that vehicle?
17    A. Yes, sir.
18    Q. Jose Ramos, was he an occupant of that vehicle?
19    A. He was a passenger, yes.
20    Q. Passenger, all right. Whitney Lewis?
21    A. I believe she was the driver.
22    Q. Okay. Arturo Gonzalez?
23    A. I believe he was also a passenger.
24    Q. And Cathy Richardson?
25    A. Yes, sir, passenger.

268

1    Q. All right. Mark Soliz was one of the occupants
2 of the Dodge; is that correct?
3    A. Yes, sir.
4    Q. And also Elizabeth Estrada; is that correct?
5    A. That's correct.
6    Q. What took place after, at this point, with all of
7 those people, those six people?
8    A. I was made aware by Officer Alaniz that one of
9 the occupants wanted to speak to law enforcement, so they
10 voluntarily, along with that individual, agreed to come
11 down to our police station.
12    Q. Okay. Eventually, were all six persons that
13 we've just said their names, were they taken to the police
14 station?
15    A. Yes, sir.
16    Q. And given an opportunity to speak with officers
17 about the situation?
18    A. Yes, sir.
19    Q. And is that where you went?
20    A. Yes, sir.
21    Q. Okay. Approximately 3 to 4 a.m. the next
22 morning, which would have been June 30th, did you receive
23 some information about the location of a certain vehicle?
24    A. It was, I believe, a little after that, but, yes,
25 sir.

269

1    Q. Okay. About what time was it?
2    A. Closer to 5 a.m.
3    Q. Okay. What was the location that you were
4 advised of?
5    A. We received a description of a street, a general
6 area. My partner and I, Detective Pate actually, we were
7 familiar with that area, so we had an idea of the area
8 that was being described.
9    Q. Was that Hutchinson Street?
10    A. That's correct.
11    Q. Okay. And what was the type vehicle that you
12 were going to look for?
13    A. We were looking for a Toyota pickup.
14    Q. Okay. And did you go to Hutchinson and find a
15 Toyota Tundra pickup?
16    A. Yes, we did.
17    Q. All right. I'll show you what's marked as
18 State's Exhibits 51 and 52. Do you recognize what's shown
19 in these photographs?
20    A. Yes, sir.
21    Q. Okay. 51, what is shown there?
22    A. That's the front of the pickup that we located in
23 the 3200 block of Hutchinson.
24    Q. And 52?
25    A. That is the rear view of the same vehicle that we

270

1  located in the 3200 block of Hutchinson.
2      Q. And what is the license plate number on this
3  vehicle?
4      A. It's Adam Nora zero zero 352.
5          MR. CHAMBLESS: Okay. Offer, Your Honor, we
6  offer State's 51 and 52.
7          MR. HEISKELL: No objection.
8          THE COURT: Thank you. 51 and 52 are
9  admitted.
10         (State's Exhibit Nos. 51 and 52 admitted.)
11     Q. (BY MR. CHAMBLESS) Okay. Now, first, if you can
12 come back around just briefly and help us locate
13 Hutchinson. I believe it's parallel to Oscar, if I'm
14 not --
15     A. Yes, sir. It's going to be, actually going to be
16 one street to the east of where we initially saw or where
17 we saw the Stratus, so it's going to be -- this is
18 Hutchinson here. This is Oscar here.
19     Q. Okay. So you had initially, earlier in the
20 evening, seen the Stratus in this area, and the Toyota
21 Tundra was on Hutchinson, this street?
22     A. Yes, sir.
23     Q. And 51 and 52 that we have here, this is what you
24 saw when you got over there?
25     A. Yes, sir, that's correct.

271

1      Q. Did you connect or link up with a patrol officer
2  so that he could take possession of the Toyota Tundra?
3      A. Yes, we did.
4      Q. And do you recall who that was?
5      A. That was Officer Joe Johnson.
6      Q. Okay. And did Officer Johnson then take
7  possession of the Tundra so that you and Officer Pate --
8  you were with a different person at this time; is that
9  correct?
10     A. Yes, sir.
11     Q. Earlier you had been with Detective Paine, and
12 now you're with Detective Pate; is that correct?
13     A. Yes, sir.
14     Q. Okay. Did you and Detective Pate then obtain
15 some information about the Tundra that caused you to do
16 something at that point?
17     A. Yes, sir.
18     Q. Okay. What information about the Tundra on
19 Hutchinson did you obtain?
20     A. I obtained the registration to the vehicle or the
21 registered owner information.
22     Q. All right. And what was that information?
23     A. It was registered to Nancy Weatherly. The
24 address was on a Farm Road, actual address was 14356
25 Farm Road 2331 in Godley, Texas.

272

1      Q. Okay. 143--
2      A. 56.
3      Q. -- 56 FM 2331; is that correct?
4      A. Yes, sir.
5      Q. In Godley. And the name of the registered owner
6  was who?
7      A. Nancy Weatherly.
8      Q. Okay. And was this information about the Tundra
9  something you had obtained during your investigation about
10 the occupants of the Jeep Liberty and the Dodge Stratus?
11     A. I'm sorry. Can you repeat your question?
12     Q. You went to see the Toyota Tundra on Hutchinson
13 as a result of your investigation in connection with the
14 occupants of the two cars; is that correct?
15     A. Yes, sir.
16     Q. Okay. What action did you take at this point?
17     A. At that point, I obtained a phone number for
18 Godley Police Department and advised them that we would
19 be traveling to their city in reference to this address
20 and this information that we had. I was then advised
21 that that particular name was related to a more recent
22 address in Godley, so I was given a additional address
23 that we decided to go to first.
24     Q. Okay. Did you eventually arrive at the location
25 14356 FM 2331, Godley, Texas?

273

1      A. Yes, sir.
2      Q. And did you wait for a period of time and for
3  someone from Johnson County to respond?
4      A. That's correct.
5      Q. Okay. And did someone, a deputy from Johnson
6  County Sheriff's Office, eventually respond?
7      A. Yes, sir.
8      Q. Do you recall her name?
9      A. Yes, sir.
10     Q. What was her name?
11     A. Deputy Truitt.
12     Q. Describe the house, the location, what you saw
13 there just from the outside first.
14     A. It was a -- it was a large property, a house that
15 sat on, appeared to be, several acres. It sat way off,
16 off the road. It had a gate that was open, looked like it
17 had a cattle-guard type where the -- down on the ground.
18 The garage door was open. I remember seeing animals
19 going in and out of the garage. And I believe there was
20 a flag pole.
21     Q. Show you what's marked as State's 53. Do you
22 recognize what's shown in this photograph?
23     A. Yes, sir.
24     Q. Does this fairly and accurately show the location
25 on FM 2331, the home of Nancy Weatherly?

274

1    A.  That's correct.

2    Q.  Is this in Johnson County, Texas?

3    A.  Yes, sir, it is.

4           MR. CHAMBLESS:  Offer State's 53, Your

5    Honor.

6           MR. HEISKELL:  No objection, Your Honor.

7           THE COURT:  53 is admitted.

8           (State's Exhibit No. 53 admitted.)

9    Q.  (BY MR. CHAMBLESS)  And so you're outside, and

10   you and Detective Pate; is that correct?

11   A.  Yes, sir.

12   Q.  And you're waiting for someone from Johnson

13   County to arrive, and a deputy arrives, Deputy Truitt?

14   A.  That's correct.

15   Q.  All right.  What happened then?

16   A.  Well, we advised her of the information that we

17   have.  At that point, we begin to walk towards the

18   residence, looking down, making sure that we're not

19   stepping on any type of evidence.  We approach the front

20   door.  I recall myself and Detective Pate just looking

21   through the windows near the front door.

22   Q.  What did you see when you did that?

23   A.  We saw what appeared to be a ransacked house.

24   There was furniture items that were out of place.  You

25   could tell that there was a disturbance at that residence.

275

1    Q.  Okay.  What happened then?

2    A.  At that point, we went around to the back yard.

3    Detective Truitt had gloves on.  She opened the gate that

4    was latched.  We went in the back door, which was

5    partially open.  They stepped in -- Detective Pate and

6    Deputy Truitt stepped in first.  I was last.

7    Q.  Okay.

8    A.  As they stepped in, I barely stepped into the

9    front -- through the back door.

10   Q.  Now, when you first went in, and I guess behind

11   Deputy Truitt and Detective Pate, describe what you saw.

12   A.  We walk in the back door.  There's a wall to our

13   right.  I believe there's a couch to the left.  We looked

14   towards the front of the house, which is going to be the

15   kitchen area, and there's a table.  And next to the table,

16   we find Ms. Weatherly.

17   Q.  Okay.  And what was the condition of

18   Ms. Weatherly at that time?

19   A.  She had been -- she was deceased.

20   Q.  And what was the -- how was she situated?  Was

21   she up, down, just where was she?

22   A.  She was down on the ground next to the table.  I

23   believe her head was out towards the wall.  Her feet were

24   out towards the back door where we came in.  She was

25   laying on the ground.

276

1    Q.  Was she on her back or stomach, do you recall?

2    A.  I don't recall exactly.

3    Q.  Was it apparent that she was deceased?

4    A.  Yes, sir.

5    Q.  Okay.  What did you do, you and Detective Pate

6    and Deputy Truitt do at that time?

7    A.  Deputy Truitt confirmed that she was deceased and

8    there was no need for us to render aid.  At that point we

9    exited the residence.

10   Q.  Okay.  And did you and the deputy wait for others

11   from Johnson County to arrive?

12   A.  Yes, we did.

13          MR. CHAMBLESS:  Pass the witness.

14          THE COURT:  Let's recess at this point until

15   tomorrow morning.  You may step down.  You need to be here

16   ready to go by 9:00.

17          Ladies and gentlemen, I'm going to let you go

18   home each evening for a while and make the decision

19   whether to sequester you in a hotel on a daily basis.  And

20   at this point, I'm going to again remind you that you're

21   not to read any reports in the newspaper, whether it's in

22   the newspaper or on the computer.  You're not to seek out

23   any information about this case on the Internet in any

24   way.  You're not to -- if you see anything on the news

25   about this story, you should immediately turn off the TV

277

1    or go in the other room and tell your spouse to turn the

2    TV off.  You're not to listen on the radio about any

3    reports or anything like that about this, this particular

4    information or trial.  Anything that you've heard today,

5    you're not to discuss with anyone.  You're just to keep

6    that to yourself and not discuss it with your spouse or

7    anybody else.

8           And you should begin -- follow the same

9    instructions for arriving this morning tomorrow morning,

10   and we'll see you in the morning.  Thank you very much.

11          (Jury not present.)

12          THE COURT:  Anything else from the Defense?

13          MR. HEISKELL:  No, Your Honor.

14          THE COURT:  Anything from the State?

15          MR. CHAMBLESS:  No, sir.  Thank you.

16          (Court adjourned.)

STATE V. MARK ANTHONY SOLIZ   FEBRUARY 27, 2012

278

```
 1  THE STATE OF TEXAS )

 2  COUNTY OF JOHNSON  )

 3          I, Pamela K. Waits, Official Court Reporter

 4  in and for the 413th District Court of Johnson County,

 5  State of Texas, do hereby certify that the above and

 6  foregoing contains a true and correct transcription of all

 7  portions of evidence and other proceedings requested in

 8  writing by counsel for the parties to be included in the

 9  volume of the Reporter's Record, in the above-styled and

10  numbered cause, all of which occurred in open court or in

11  chambers and were reported by me.

12          I further certify that this Reporter's Record

13  of the proceedings truly and correctly reflects the

14  exhibits, if any, admitted by the respective parties.

15          WITNESS MY OFFICIAL HAND this the 31 day

16  of December, 2012.

17

18          _____
            Pamela K. Waits, Texas CSR #4991
19          Expiration Date:  12/31/13
            Official Court Reporter
20          413th Judicial District
            Johnson County, Texas
21          204 S. Buffalo Avenue
            Cleburne, Texas 76033
22          (817) 556-6041

23

24

25
```