1              REPORTER'S RECORD

2          VOLUME 39 OF 75 VOLUMES

3        TRIAL COURT CAUSE NO. F45059

4    COURT OF CRIMINAL APPEALS NO. AP-76,768

5  STATE OF TEXAS          )     IN THE DISTRICT COURT
                           )
6  VS.                     )     JOHNSON COUNTY, TEXAS
                           )
7  MARK ANTHONY SOLIZ      )     413TH JUDICIAL DISTRICT

8

9  ------------------------------------------------

10                    JURY TRIAL

11              GUILT/INNOCENCE PHASE

12 ------------------------------------------------

13

14

15

16

17          On the 28th day of February, 2012, the

18 following proceedings came on to be heard in the

19 above-entitled and numbered cause before the Honorable

20 William C. Bosworth, Jr., Judge presiding, held in

21 Cleburne, Johnson County, Texas:

22          Proceedings reported by Machine Shorthand and

23 Computer-Aided Transcription.

24                                    ORIGINAL

25

```
 1                    A P P E A R A N C E S

 2   DALE HANNA
     SBOT NO. 08919500
 3   LARRY CHAMBLESS
     SBOT NO. 04086320
 4   MARTIN STRAHAN
     SBOT NO. 00797765
 5   District Attorney's Office
     Johnson County
 6   204 S. Buffalo
     Cleburne, Texas 76033
 7   (817) 556-6801

 8   ELIZABETH CHRISTINA JACK
     SBOT NO. 10445200
 9   Tarrant County District Attorney's Office
     401 W. Belknap Street
10   Fort Worth, Texas 76102-1913
     817-884-1366
11

     ATTORNEYS FOR THE STATE OF TEXAS
12

13   MICHAEL P. HEISKELL
     SBOT NO. 09383700
14   Johnson, Vaughn & Heiskell
     5601 Bridge Street
15   Suite 220
     Fort Worth, Texas 76112-2305
16   817-457-2999

17   GREGORY B. WESTFALL
     SBOT NO. 00788646
18   Hill Gilstrap, P.C.
     1400 W. Abram Street
19   Arlington, Texas 76013
     817-276-4931
20

     ATTORNEYS FOR DEFENDANT
21

22

23

24

25
```

```
 1                    I N D E X

 2                  VOLUME 39

 3                GUILT/INNOCENCE

 4  FEBRUARY 28, 2012                    PAGE   VOL.

 5  Proceeding.................................   5    39

 6  STATE'S WITNESS      DIRECT      CROSS      VOIR   VOL.
                                                DIRE
 7  JERRY CEDILLO        24,38       10,37             39
    JESUS ALANIZ         40,113,122  84,119,123
 8                       124                            39
    ROBERT DENA          126,174     160                39
 9  DAVID UKLE           177         195                39
    TIM LEE              204,238     225                39
10  ROBERT PRESNEY       240                            39

11  Adjournment...............................  263    39

12  Court Reporter's Certificate..............  264    39

13                ALPHABETICAL INDEX

14  WITNESS              DIRECT      CROSS      VOIR   VOL.
                                                DIRE
15  JESUS ALANIZ         40,113,122  84,119,123
                         124                            39
16  JERRY CEDILLO        24,38       10,37             39
    ROBERT DENA          126,174     160                39
17  TIM LEE              204,238     225                39
    ROBERT PRESNEY       240                            39
18  DAVID UKLE           177         195                39

19                  EXHIBIT INDEX
    STATE'S
20  NO.   DESCRIPTION                 OFFER ADMIT VOL.
    54    Photo board (24x36)          26    26    39
21  55    Photo board (24x36)          26    26    39
    56    Photo board (24x36)          184   184   39
22  57    Photo board (24x36)          184   184   39
    58    Photo board (24x36)          184   184   39
23  59    Photo board (24x36)          184   184   39
    60    Photo board (24x36)          184   184   39
24  61    Photo board (24x36)          184   184   39
    62    Photo board (24x36)          184   184   39
25  63    Photo board (24x36)          184   184   39
```

STATE V. MARK ANTHONY SOLIZ      FEBRUARY 28, 2012

```
 1  64    CD Timeline         (Demonstrative)  35   36   39
    65    Photo board (24x36)                  207  207  39
 2  66    Photo board (18x24)                  78   78   39
    67    Photo board (18x24)                  78   78   39
 3  68    Photo board (18x24)                  78   78   39
    69    Photo board (18x24)                  78   78   39
 4  70    Photo board (18x24)                  78   78   39
    71    Photo board (18x24)                  78   78   39
 5  72    Photo board (18x24)                  78   78   39
    73    Envelope            (Record only)    194  194  39
 6  73-A  Bullet                               194  194  39
    74    Envelope            (Record only)    194  194  39
 7  74-A  Bullet                               194  194  39
    75    Envelope            (Record only)    194  194  39
 8  75-A  9 mm Magazine                        194  194  39
    76    Photo board (24x36)                  210  210  39
 9  77    Photo board (24x36)                  210  210  39
    78    Photo board (24x36)                  210  210  39
10  79    Photo board (24x36)                  210  210  39
    80    Photo board (24x36)                  210  210  39
11  81    Photo board (24x36)                  210  210  39
    82    Blue Bandana                         217  217  39
12  82-A  Sack                (Record only)    217  217  39
    83    White Towel                          217  217  39
13  84    Label Maker                          219  219  39
    84-A  Box                 (Record only)    219  219  39
14  85    Latent Lift Card                     220  220  39
    85-A  Envelope            (Record only)    220  220  39
15  86    Small envelope with swab 1           225  225  39
    86-A  Large & medium envelope (Record only) 225 225  39
16  87    Small envelope with swab 2           225  225  39
    87-A  Large & medium envelope (Record only) 225 225  39
17  88    Small Envelope with swab 3           225  225  39
    88-A  Large & medium envelope (Record only) 225 225  39
18  89    Photo board (24x36)                  254  254  39
    90    Photo board (24x36)                  254  254  39
19  91    Photo board (24x36)                  254  254  39
    92    Photo board (24x36)                  254  254  39
20  93    Photo board (24x36)                  254  254  39
    94    Envelope            (Record only)    256  256  39
21  94-A  5 swabs                              256  256  39
    95    Envelope            (Record only)    261  262  39
22  95-A  6 bags/6 bullet fragments E,F,G,H,I,J 261 262  39

23  DEFENSE
    NO.   DESCRIPTION               OFFER ADMIT VOL.
24  1     Photo (8x10)               97    98    39

25
```

5

1 PROCEEDING
2 (Open court, Defendant present;
3 Jury not present.)
4 THE COURT: The State's attorneys are present
5 and ready, correct?
6 MR. CHAMBLESS: Yes, sir.
7 THE COURT: Defense attorneys?
8 MR. HEISKELL: Yes, Your Honor.
9 THE COURT: Defendant is present.
10 I have a note the Bailiff gave me from a
11 dentist in Joshua regarding the Juror that had dental
12 surgery on the 23rd. And she must have her sutures out
13 tomorrow, February 29th. And I called him to visit with
14 him about whether that was a 15-minute thing or whether it
15 was more involved. And he said that this particular Juror
16 had been to -- to his office last night at 8:30 for some
17 follow-up care related to her dental surgery, and that she
18 is in a lot of pain and discomfort and she does need to
19 have her sutures out absolutely on Wednesday.
20 So it's possible that I can have Dr. Kelly
21 here in Cleburne take the sutures out over the lunch
22 period tomorrow, if it's just a routine removal of
23 sutures. That's usually not very uncomfortable, but --
24 and he's on standby to do something like that for me if I
25 need him to. That's one option. The other option is to,

6

1 at some point I need to figure out how to talk to her
2 about her -- her dental problem.
3 So I'm looking for -- I mean, I can call her
4 out here and we can visit with her about that, or we can
5 leave it with I take her to Dr. Kelly at -- over the lunch
6 period tomorrow. And if that works, great. If not, then
7 they can put her in a car and take her to Crowley to her
8 dentist and get that reviewed.
9 MS. JACK: Judge, we would ask that the Court
10 talk to her, whether it's in private, about the pain that
11 she's in and whether or not that's affecting her ability
12 to listen to the evidence and listen to the witnesses, in
13 light of the fact that we have two alternates as well.
14 THE COURT: There's not any particular
15 procedure or rules that I know of how to handle this
16 particularly, so if you have a suggestion, I'm listening.
17 MR. HEISKELL: Judge, I would agree, but I
18 think that probably a bench conference with her with
19 Counsel would suffice to do that.
20 MS. JACK: I can only tell you, Judge, that I
21 have had one other case where a juror indicated, and
22 through no fault of anyone, that he knew a witness when
23 that witness appeared, and it affected his ability --
24 well, he brought it to the Court's attention. And what
25 the Court did in that case was brought the juror out, and

7

1 actually the attorneys were not present. The Judge
2 inquired of the witness how that would affect him, if it
3 would affect him, in light of the fact that he knew the
4 witness. And as it turned out, it would affect him. He
5 was excused. An alternate was seated. It was a capital
6 case. I can tell you the name of the case was Quintin
7 Phillippe Jones, and I don't have the cite with me since I
8 wasn't prepared to give that -- give the Court that cite.
9 But I will tell you it was a capital murder case and it
10 has been affirmed by the Court of Criminal Appeals, and
11 it's been reviewed by the Supreme Court as well.
12 MR. WESTFALL: Your Honor, I don't think
13 this -- this thing should be turned into anything bigger
14 than it really is. Sounds like you've got a decent plan
15 having her be able to get her sutures out in the way most
16 expedient. I would say if anything, Your Honor, maybe if
17 she feels like she needs to talk to somebody about it,
18 then perhaps the Court just asks her how she's doing. But
19 it sounds like the dental issue, you've got a plan for
20 that. And just making it a bigger deal than it really is
21 is the danger, I think.
22 MS. JACK: Well, I guess it's not just the
23 surgery or sutures, Judge. I'm concerned if she's in pain
24 how that's affecting her ability to listen and focus on
25 the witnesses and the evidence, Your Honor.

8

1 MR. WESTFALL: Well, anyway.
2 THE COURT: Do you want me to visit with her
3 off the record or on the record?
4 MR. WESTFALL: Perhaps just the Court visit
5 with her.
6 MS. JACK: That's agreeable with the State,
7 Judge.
8 THE COURT: All right. I'll go back out and
9 I'm going to talk to her for about 10 minutes, and I'll be
10 back and we'll get started.
11 (Recess taken from 9:07 to 9:10 a.m.)
12 THE COURT: You may be seated.
13 All right. We'll go back on the record. The
14 attorneys for the State are present and ready. The
15 Defense attorneys and the Defendant are present.
16 I did talk to the Juror that has the dental
17 problem. She says that she would like to have her
18 stitches out on Friday, that the gums are sensitive but
19 that it's not a problem for her, and that it was sore last
20 night. She went to see her dentist. She was on basically
21 a liquid diet type, and other than that is her main
22 complaint is that she's not able to eat, but that she's
23 able to hear and listen. She wants to be here. She'll
24 let me know if there's a problem. Her sutures need to
25 come out. She says she wants to do it on Friday because

9

1 the gums are sensitive right now. And that it would be
2 fine if the local dentist would take care of that for
3 her.
4     So I'll have my standby dentist contact her
5 dentist, and we'll make arrangements to do that over the
6 lunch hour on Friday, and I'll give you an update as that
7 progresses.
8     Is that acceptable to the Defense?
9     MR. WESTFALL: It is, Your Honor.
10     MR. HEISKELL: Yes.
11     THE COURT: State?
12     MR. HANNA: It is.
13     MS. JACK: Yes.
14     THE COURT: Anything else before I call in
15 the Jury?
16     MR. HEISKELL: No, Judge.
17     MR. STRAHAN: The witness on the stand is
18 Larry's, so I might want to --
19     (Pause in proceeding.)
20     THE COURT: You may bring in the Jury.
21     (Jury present.)
22     THE COURT: Thank you. You may be seated.
23     The record will show that all attorneys for
24 the State and the Defense and the Defendant are all
25 present in the courtroom.

10

1     You may begin.
2     MR. HEISKELL: Thank you, Your Honor.
3     JERRY CEDILLO,
4 Having been previously duly sworn, testified as follows:
5     CROSS-EXAMINATION
6 BY MR. HEISKELL:
7     Q. Good morning, Detective Cedillo. How are you?
8     A. Morning, sir. Thank you.
9     Q. My name is Mike Heiskell. You and I know each
10 other, and I'm going to have a few questions for you
11 regarding your investigation. Okay?
12     A. Yes, sir.
13     Q. And you're a very experienced detective and you
14 have a very good reputation. And I know that if I ask a
15 question you don't understand, please don't hesitate to
16 stop me and I'll start over. Okay?
17     A. Yes, sir.
18     Q. You have been with Homicide for a number of
19 years, but for the most part, your career was with
20 Robbery, the Robbery Division before that?
21     A. No, sir. I spent about a year in Robbery. I've
22 been in Homicide for eight months. Prior to that, I spent
23 about ten years in Narcotics.
24     Q. Narcotics, okay. And prior to Narcotics, were
25 you a patrol officer or what did you do?

11

1     A. Yes, sir. I spent almost two years as a patrol
2 officer.
3     Q. And in Narcotics, did you work for those ten
4 years in an undercover capacity or street patrol? Or tell
5 us your role in that respect.
6     A. The majority of my Narcotic career was as an
7 undercover officer.
8     Q. And did you work also in task force capacity as
9 well?
10     A. Yes, sir, I did.
11     Q. And was that with the federal government in
12 addition to the state authorities as well?
13     A. Yes, that's correct.
14     Q. For the most part, when you investigate robberies
15 as well as homicides, Detective, it's true, is it not,
16 that a lot of the times or majority of the times, for that
17 matter, the persons involved, the suspects, whatever, are
18 involved in drug use, alcohol use and abuse; isn't that
19 true?
20     A. Yes, sir.
21     Q. And you know from your own experience in
22 Narcotics for a number of years that there are a variety
23 of drugs on the streets that people use and abuse from
24 time to time that cause them to get in trouble with the
25 law, not just from a standpoint of being arrested for

12

1 those drugs, but also being arrested for different
2 offenses; isn't that true?
3     A. Yes, sir.
4     Q. You are familiar with methamphetamine, are you
5 not?
6     A. Yes, sir.
7     Q. And are you familiar with the acronym "ice",
8 which also equates to methamphetamine; is that correct?
9     A. That's correct.
10     Q. And tell the Jury about methamphetamine as far as
11 the prevalence of it in the Fort Worth area and how it has
12 impacted crime rates in that area in a general sense.
13     A. From my experience in Narcotics, just the last
14 three or four years that I was in Narcotics, I would say
15 probably late 2000s we did see an increase in
16 methamphetamine use and possession in the Metroplex, not
17 just in Fort Worth, but really throughout the Metroplex,
18 and not only that, throughout the country.
19     Q. And I take it during your time as a Narcotics
20 officer, you investigated people involved in the
21 manufacture and delivery and possession of
22 methamphetamine?
23     A. Yes, sir.
24     Q. In a general sense, well, you've seen people, I
25 take it, under the influence of these -- that type of

**13**

1  drug, have you not?

2  A. Yes, sir, I have.

3  Q. And has that been on few or many occasions,

4  Detective?

5  A. I would say on many.

6  Q. And what is the general --

7  MR. CHAMBLESS: With respect to Mr. Heiskell,

8  I -- I respectfully object to this inquiry in that it is

9  not relevant to the focus of his testimony, his direct

10  testimony, and to this case at this time.

11  MR. HEISKELL: Your Honor, I believe I can

12  connect it up, if you will allow me a little bit more

13  leeway with regard to this Defendant in this case.

14  THE COURT: All right. But quickly.

15  MR. HEISKELL: Yes, sir.

16  Q. (BY MR. HEISKELL) I think my question was,

17  Detective, in a general sense, what's the effect of

18  methamphetamine or ice on a person who uses and takes --

19  take that type of drug?

20  A. Well, for the most part, they become illusional

21  (sic). A lot of times they -- they're up for hours at a

22  time. It -- it affects normal behavior.

23  Q. As a matter of fact, you know from your

24  investigation in this case that when Mark Soliz was

25  arrested the night in that green Stratus you told us about

**14**

1  yesterday --

2  A. Yes, sir.

3  Q. -- that methamphetamine was found on him; isn't

4  that true?

5  A. I don't know that for certain, sir.

6  Q. Did you ever see that in any of the reports that

7  you observed during the course of your preparation for

8  this case?

9  A. No, sir.

10  Q. Well, let's talk about that chase you described

11  that ended up -- that we saw in the aerial photograph

12  here. And I'm not going to go through that again, but

13  basically this chase took place over this area in the

14  north side of Fort Worth for quite some time, did it not?

15  And when I say "chase," I'm talking about the surveillance

16  as well as the eventual capture of Mark Anthony Soliz.

17  A. It was less than an hour.

18  Q. And what time of day or night was that,

19  Detective?

20  A. It was -- it was night, so it was approximately

21  about 10:15 when it all began.

22  Q. Okay. And that would have been the night of the

23  twenty -- 29th of June of 2010; is that correct, sir?

24  A. That's correct.

25  Q. Now, you have with you your reports of -- that

**15**

1  you compiled, as well as, I guess, what you may have

2  reviewed in connection with your testimony?

3  A. Yes, sir.

4  Q. And you, in fact, prepared a report, this

5  one-page report I'm looking at here and with a couple of

6  pages supplement; is that correct?

7  A. That's correct.

8  Q. And you also have some additional reports

9  concerning whatever you may have taken for purposes of

10  forensic use in this case; is that right?

11  A. Yes, sir.

12  Q. All right. Detective, if I may, you are familiar

13  with the offenses involving this case, dating from

14  January -- I'm sorry, June 24th of 2010 up to June 29th of

15  2010?

16  A. I'm familiar with most of them, yes, sir.

17  Q. Okay. And let me take you -- are you familiar

18  with an offense involving the robbery at Ridgmar Mall of a

19  Justin Morris?

20  A. Yes, sir.

21  Q. And that would have been on June 24th of 2010, is

22  it not? Is that correct?

23  A. Do you mind if I review my notes?

24  Q. Yeah, go ahead. Please, please do so.

25  A. That's correct, sir.

**16**

1  Q. And the suspects in that case were Mark Soliz and

2  Ramos, isn't that true, Jose Clemente Ramos?

3  A. I don't know if Ramos was a suspect, but I know

4  Mr. Soliz was.

5  Q. Okay. I'll put a question mark there. That was

6  an offense -- or excuse me, a follow-up with another

7  detective's investigation, from your knowledge; is that

8  correct?

9  A. Yes, sir.

10  Q. Are you familiar with a Luis Luna?

11  A. Just not by name.

12  Q. Okay. Person shot in the ear?

13  A. Oh, yes, sir.

14  Q. That was also on the 24th of June, was it not,

15  2010? You can refer to your report, if necessary.

16  A. That sounds correct. I don't know exact date.

17  Q. Okay. And what I'll do since you -- I'll put a

18  question mark there since you have a question as to the

19  date. But you are familiar with that individual, correct?

20  A. Yes, sir.

21  Q. And you're familiar with Jorge Contreras?

22  A. What was that?

23  Q. That one involved also an offense on June the

24  24th in which Mark Soliz and Ramos were involved. Does

25  that ring a bell at all?

17

1    A.  No.  Those weren't my cases, so.

2    Q.  Okay.  Let me go to what one you do recall, and I

3 believe you gave testimony on, and that was Ruben

4 Martinez?

5    A.  That's correct.

6    Q.  That was on June 29th; is that correct?

7    A.  Yes, sir.

8    Q.  I'll go to that one.  That was a murder case,

9 correct?

10   A.  Yes, sir.

11   Q.  And you know that was involving Soliz and Ramos,

12 correct?

13   A.  Yes, sir.

14   Q.  And you made the scene there, am I understanding

15 that correct?

16   A.  That's correct.

17   Q.  And did you help preserve the crime scene in that

18 respect, Detective Cedillo?

19   A.  Yes, sir.

20   Q.  And there were, I take it, there were a lot of

21 crime scene evidence there from footprints to projectiles

22 to a number of things that were available for forensic

23 testing later on; am I correct?

24   A.  I don't know that there was projectiles.  There

25 was a footprint that I believe we recovered.

18

1    Q.  Okay.  And are you familiar with -- I believe you

2 said you were -- Abu-Lughod, Sammy Abu-Lughod?

3    A.  I believe I know, yes, sir.

4    Q.  That's the Discount store on Riverside?

5    A.  That's correct, yes, sir.

6    Q.  And that was also on the 29th and that we've

7 heard about.  We also -- there's a name that I may torture

8 a minute.  Samaniego, Enrique, are you familiar with that

9 one, Detective?

10   A.  Yes, sir.

11   Q.  That was on the 29th as well?

12   A.  Yes, sir.

13   Q.  And that involved a shooting; am I correct?

14   A.  That's correct.

15   Q.  Can you -- do you have that spelling?

16   A.  Enrique, it's E-N --

17   Q.  R-I-Q-U-E?

18   A.  Yes, sir.

19   Q.  And that last one is Sam --

20   A.  I-E.  S-A-M-I-E-N-I-G-O, I believe.

21   Q.  I-G-O.  Okay.  And --

22   A.  Is this the one regarding the vehicle?

23   Q.  Yes, it's the one --

24   A.  That was actually on the 24th, I believe.

25   Q.  Okay.  You're right.  I'm sorry.  And what about

19

1 Mr. Dodgin, Kenny Dodgin?

2    A.  Yes, sir.

3    Q.  That was on the 29th?

4    A.  That's correct.

5    Q.  And that was a robbery at a Lowe's?

6    A.  It was an attempted robbery.

7    Q.  Attempted robbery.  Okay.  Is it D-O-D-G-I-N?

8 Did I get that right?

9    A.  That -- that looks correct.

10   Q.  Okay.  And then, of course, we have this case

11 involving Nancy Weatherly?

12   A.  Yes, sir.

13   Q.  And you, of course, are aware of that.  That's

14 one of the reasons you're here; is that right?

15   A.  Yes, sir.

16   Q.  For the most part, in each of these cases we have

17 the participation of suspect of Mark Anthony Soliz and

18 Jose Clemente Ramos; is that correct?  And it may not be

19 in each and every one, but for the most part is what I'm

20 saying.  He was -- I know this is the exception.  Soliz

21 and the others.  Am I correct, Detective?

22   A.  For the most part, yes, sir.

23   Q.  We also had one other I forgot about, and that

24 is, was there investigation of a shooting at a home?

25   A.  There was a drive-by shooting, yes, sir.

20

1    Q.  And that was on the 29th as well?

2    A.  Yes, sir.

3    Q.  And whose home was that, Detective?

4    A.  I don't remember the gentleman's name.  I believe

5 they suspected him to be part of a rival gang.

6    Q.  So, in essence, we have one, two, three, four, at

7 least, on the 29th, and then three, at least, on the 24th,

8 what I've gathered thus far.  Would you agree with that,

9 Detective?

10   A.  That's about -- yeah, maybe there's one more.

11 I'm trying to remember which other one.

12   Q.  Okay.  Do you have anymore in your notes?  I see

13 you're reviewing those right now.

14   A.  That's about right, yes, sir.

15   Q.  Okay.  And as far as -- well, let me ask you

16 this.  Did you ever conduct any interviews of Mark Soliz

17 or Jose Ramos?  Were you involved at all in that,

18 Detective?

19   A.  No, I did not.

20   Q.  And did you review any of the interviews that the

21 other detectives took part in?

22   A.  No, sir.  But can we add one more to your list?

23   Q.  Okay.

24   A.  There was an incident on the 28th where a group

25 of individuals were robbing a parking lot of a bar.

**21**

1  Q. And what date was that?

2  A. The 28th.

3  Q. Okay. The 28th. Let me see if I can -- robbery

4  at a bar?

5  A. Yes, sir.

6  Q. And what bar was that, Detective?

7  A. It was in the 2800 block of Azle. I don't

8  remember the name.

9  Q. Okay. And so we have, in essence, from the 24th

10  to the -- all the way to the 29th, seven or eight --

11  counting right, eight separate alleged offenses; is that

12  correct, sir?

13  A. Yes, sir.

14  Q. And, of course, what we talked about previously

15  too was the Nancy Weatherly matter here in Johnson County

16  on the 29th as well?

17  A. Yes, sir.

18  Q. Have you ever -- just a minute. When you were at

19  the crime scene at the Ruben Martinez --

20  A. Yes, sir.

21  Q. -- shooting and murder of him on the 29th, you

22  said that you, in fact, recall a footprint at the crime

23  scene; is that correct, sir?

24  A. I was told there was a footprint, yes, sir.

25  Q. And did you go and observe that footprint?

**22**

1  A. No, sir.

2  Q. So you were just told that by some other officers

3  at the scene?

4  A. Other detectives that arrived to take the case

5  over.

6  Q. All right. Are you trained in taking statements

7  from different suspects, sir, as well?

8  A. Yes, sir.

9  Q. And have you done that before in the past?

10  A. Yes, sir.

11  Q. And on few or many occasions?

12  A. On many.

13  Q. And when you have a suspect who is deemed to be

14  under the influence of any type of drugs or alcohol, do

15  you take note of that?

16  A. Yes, sir.

17  Q. Do you also seek to institute any type of drug

18  testing or some testing to determine whether that person

19  is under the influence of drugs or alcohol or anything

20  once you discover that during the course of taking a

21  statement?

22  A. We normally don't test victims, witnesses,

23  suspects. We usually establish through conversation

24  whether or not they're capable of providing a truthful and

25  accurate statement.

**23**

1  Q. But somehow you do take note of that, and that's

2  part of your consideration when you take those statement;

3  is that true?

4  A. Yes, sir.

5  Q. And you factor that in to what that person says

6  and how they may say it and so that you can note it in

7  your report to indicate that that person may be under the

8  influence of a drug or some type of alcoholic beverage?

9  A. Yes, sir.

10  (Sotto voce discussion.)

11  Q. Oh, there's one other, Detective, that my

12  co-counsel is asking me about. And I want to go back

13  up here for a second. Do you recall a --

14  MR. HEISKELL: Did I take that red --

15  Q. -- pickup truck belonging to a Jorge

16  Contreras about a couple hours before the Sammy

17  Abu-Lughod robbery?

18  A. I'm not familiar with the case. I am -- I am

19  aware that a truck was taken at some point during this --

20  Q. Okay.

21  A. -- these incidents.

22  Q. And I believe, would it refresh your memory that

23  it was on the 24th as well, a couple hours before that

24  incident?

25  A. I don't remember.

**24**

1  Q. I'll just go ahead and put it up here. But you

2  are generally aware of that, correct?

3  A. I knew a vehicle was taken, a truck, yes, sir.

4  Q. All right. And as far as your personal

5  involvement, when I say that, you personally being the

6  detective in charge of that investigation, which one of

7  these would that fall into that classification?

8  A. That I personally investigated, would have been

9  Enrique Samaniego on the morning of the 29th.

10  Q. Okay. And is that it?

11  A. Yes, sir.

12  MR. HEISKELL: Okay. Thank you, Detective.

13  Appreciate it.

14  THE WITNESS: Thank you.

15  MR. HEISKELL: Pass the witness, Your Honor.

16  REDIRECT EXAMINATION

17  BY MR. CHAMBLESS:

18  Q. I believe yesterday you were shown some pictures

19  of the Dodge Stratus when it came to stop on Braswell; is

20  that correct?

21  A. Yes, sir.

22  Q. All right. Were you shown these pictures?

23  A. Not that one.

24  Q. Okay. Do you recognize this photograph here?

25  A. Yes, sir.

25

Q. Okay. And what does this show?

A. That's the back end of the Dodge Stratus that we spotted during this entire investigation of -- on this particular night on June 29th --

Q. Okay.

A. -- 2010.

Q. And is this at the location where it came to stop at Braswell in Fort Worth, Texas?

A. That's correct.

Q. Okay. I believe the other one, were you shown this photograph?

A. Yes, I was.

Q. Okay. This one showed the license plate of the Stratus and also -- all right. And this one shows the inside of the floorboard, the passenger floorboard and the weapon that was found there; is that correct?

A. That's correct.

Q. Show you two additional pictures and ask you if you recognize these. They're marked 54 and 55. Do you recognize this one here?

A. Yes, sir, I do.

Q. And the next one marked 55?

A. Yes, sir.

Q. What do these show, these two?

A. Those are the passenger and driver side of the

26

vehicle, same vehicle that we mentioned earlier, and the location where it came to rest after the car -- police chase.

Q. Do these fairly and accurately show the Dodge Stratus in the position it was in on June 29th, 2010?

A. Yes, they do.

MR. CHAMBLESS: Okay. Offer these two at this time, Your Honor.

MR. HEISKELL: No objection.

THE COURT: What are the numbers?

MR. CHAMBLESS: 54 and 55, Your Honor.

THE COURT: 54 and 55 are admitted.

(State's Exhibit Nos. 54 - 55 admitted.)

Q. (BY MR. CHAMBLESS) I notice in State's Exhibit No. 54 there appears to be a Motel 6 sign?

A. Yes, sir.

Q. Is it located near that area?

A. Yes, sir.

Q. Okay. If you could, on this larger map, step down for just a minute and show us where, again, where the location of Braswell is and where the Motel 6 was, is.

A. This is Braswell here. The motel is going to be this whole area here.

Q. All right. Thank you very much. Okay. You were asked on Cross-Examination about basically the

27

other offenses that were involved that week that were investigated that week. And let's go over that a little bit. We've written some on the board, but I think if we went in sequence, I think it would be fair to say we could start with the Vincent Circelli burglary. Do you agree with that from your reading of the reports? As far as the first one in sequence, that would be on June 22nd?

A. Yes, sir.

Q. Okay. See on the slide here that that's the residence at 15 -- on 1517 El Campo, the home of Vincent and Chelsea Circelli. The next one, tell us about this one. What is your knowledge of the Justin Morris robbery at Ridgmar Mall, do you recall?

A. I just recall that Mr. Morris was in the parking lot; a vehicle parked; I believe it was Mr. Soliz and another individual. I don't know if it was a female or another male.

Q. Okay.

A. At some point they approached Mr. Morris and attempted to take his property; I believe it was a wallet or money.

Q. Okay. Do you believe it to be correct -- and please look at your notes if you wish to. Do you think on this particular occasion with Justin Morris, was it

28

Mr. Soliz with a female accomplice? If you would look at your notes and check that.

A. I recall that there was a female involved in the car, was in the car, yes, sir.

Q. Okay. Do the investigative notes indicate that Mr. Soliz and the female later went into a grocery and were observed on a videotape in that grocery.

A. Yes, they were. I believe it was a convenience store.

Q. Okay. Let's go to the next one, I think in sequence, Luis Luna. The location, I believe, would it be correct to say that it was on Woodland Avenue in Fort Worth?

A. Yes, sir.

Q. And basically what was the nature of this allegation?

A. There was an argument between Mr. Luna and another individual. Mr. Soliz got involved in that argument.

Q. Okay. And was Mr. Ramos involved in this?

A. Not to my knowledge, no, sir.

Q. Okay. What happened after during the course of this?

A. Mr. Soliz asked the other individual that was with him if he wanted to get Mr. Luna wet, which from

29

1  street terms that means wet with blood.  At that time,
2  Mr. Luna was shot.
3      Q.  And who is alleged to have shot Mr. Luna?
4      A.  Mr. Soliz.
5      Q.  Okay.  Now, is there -- going back to Justin
6  Morris, is there an allegation that a weapon was used at
7  that time?
8      A.  I believe so, yes, sir.
9      Q.  Okay.  And where was Mr. Luna shot, do you know
10 from your notes?
11     A.  He was shot, I believe it was the ear.
12     Q.  Okay.  Okay.  So we've covered Justin Morris and
13 Luis Luna, both on the 24th now, and the Circelli
14 burglary.  Let's go to the next one in sequence, Jorge
15 Contreras, also on the 24th at later in the day.  Do you
16 know what the, in general, the allegation was on that
17 case?
18     A.  That's what we would call a carjacking or when a
19 vehicle is taken during a robbery.
20     Q.  Okay.  Okay.  And is it alleged that one or two
21 individuals were involved in this one?
22     A.  From my understanding or from what I recall,
23 there was only one individual.
24     Q.  Okay.  And was the vehicle, the vehicle of
25 Mr. Contreras, was it taken by that person?

30

1      A.  Yes, it was.
2      Q.  Okay.  Let's go to the next one in sequence.
3  We heard yesterday from Mr. Abu-Lughod, and what, in
4  general, this was the robbery and the theft of the 2005
5  Dodge Stratus; is that correct?
6      A.  Yes, sir.
7      Q.  Okay.  Who was involved in this one, the
8  allegation as far as the actor?
9      A.  Mr. Soliz.
10     Q.  Okay.  And was Mr. Ramos involved in that one?
11     A.  Not to my knowledge.
12     Q.  Okay.  Was a weapon alleged to have been
13 involved?
14     A.  Yes, sir.
15     Q.  Okay.  Let's go to the next one then, sequence.
16 Tamayo, Jorge Tamayo, and Maximo Chavez Soto, on the 28th,
17 early morning hours.  Do you have a summary of this, and
18 what's your knowledge of this one?
19     A.  My knowledge of this is that there was two
20 couples, two males/females were outside of a bar.  It was
21 closing time.  Two Hispanic males approached them,
22 demanded money.  One point, one of the suspects
23 pistol-whipped one of the males and took their wallet
24 which contained U.S. currency.
25     Q.  Were both, both Ramos and Soliz involved or

31

1  allegedly involved in this one?
2      A.  I believe so, yes, sir.
3      Q.  Okay.  Let's go to the next one in line then, the
4  Ramirez and Garcia, Juan Ramirez and Garcia family, on the
5  29th.  Can you tell us, in general, what the allegation on
6  this date and time was?
7      A.  Allegation is that there was a drive-by done at
8  this residence where multiple bullets were fired into and
9  at the residence.
10     Q.  Okay.  Is it alleged that one or both were
11 involved in this one?
12     A.  Both.
13     Q.  Okay.  And then the next one in line, Enrique
14 Samaniego.  I believe you mentioned that you went to the
15 hospital to see him?
16     A.  Yes, sir.
17     Q.  And what, in general, was the allegation here?
18     A.  That he had been robbed as -- on his way to work
19 as he was walking to his vehicle to get in, he was robbed
20 and shot multiple times.
21     Q.  Okay.  Where was he shot?
22     A.  He was shot in the chest, stomach, torso area.
23     Q.  Okay.  And to your knowledge, who was involved or
24 alleged to have been involved in that shooting?
25     A.  That point, I believe, well, we weren't able

32

1  to determine exactly who the shooter was.
2      Q.  Okay.  At a later point were you able to make a
3  case on that?
4      A.  Yes, sir.
5      Q.  Okay.  And who were the allegations against?  Was
6  it both of them in that case?
7      A.  Yes, sir.
8      Q.  All right.  Okay.  The next one in line, Ruben
9  Martinez.  You were asked about that case.  Actually is
10 that a capital murder case?
11     A.  That's correct.
12     Q.  Okay.  What was the location of that event or
13 that murder?
14     A.  That was a Texaco gas station, 2700 block of Azle
15 Avenue, which is at Azle and East Long -- West Long, I'm
16 sorry.
17     Q.  What is the allegation in that case as far as
18 what happened?
19     A.  That a Budweiser delivery, a beer delivery
20 employee was in the process of leaving that location.
21 Prior to entering his truck to leave, he was approached by
22 an individual, his wallet was demanded, a struggle took
23 place, and he was shot.
24     Q.  Okay.  And from the investigation, to your
25 knowledge, who is alleged to be the shooter of Ruben

33

1  Martinez?

2     A.  Mark Anthony Soliz.

3     Q.  Was Ramos present also?

4     A.  He was in the area.

5     Q.  Okay.  Let's go to the next one in sequence then,

6  Kenny Dodgin.  You were asked about Kenny Dodgin at

7  Lowe's.  What is your -- what would be the summary of this

8  allegation?

9     A.  Mr. Dodgin was arriving at Lowe's store.  He's

10  an employee there.  As he was exiting his vehicle, he was

11  approached by a Hispanic male wearing a bandanna, armed

12  with a handgun.  His wallet and money was also demanded.

13  He immediately began to run from the suspect, at which

14  time he was fired upon.

15     Q.  Okay.  Was -- is it alleged that he was fired

16  upon one time or multiple times?

17     A.  Multiple times.

18     Q.  Okay.  And that event is alleged at 6:20 a.m. on

19  June 29th; is that correct?

20     A.  May have been just a tad after that, but that's

21  about right.

22     Q.  Do you know who was alleged to have been involved

23  in that shooting?

24     A.  The shooter was believed to have been Mark

25  Anthony Soliz, but Jose Ramos was in the vehicle.

34

1     Q.  Okay.  The next sequence, next event in sequence,

2  let's go to that one.  Here we have an event just

3  following the Kenny Dodgin situation.  This would

4  have been -- would have been in Benbrook, Texas.  Are

5  you familiar with this?  Do you have a knowledge of

6  this case?

7     A.  Which case is that, sir?

8     Q.  This is Watson.

9     A.  Watson.

10     Q.  Yes.

11     A.  I don't have all the details.  I do believe

12  there was a home burglary shortly after the incident at

13  Lowe's.

14     Q.  Okay.  All right.  And then also there was a

15  second incident in Benbrook, the Girton family, just

16  following that.  Do you see that?  Is that a similar home

17  invasion burglary?

18     A.  Burglary, yes, sir.

19     Q.  Okay.  Then the next event, the morning hours,

20  Nancy Weatherly; is that correct?

21     A.  Yes, sir.

22     Q.  Okay.  If I'm counting right, is that a total of

23  13 separate events?

24     A.  Yes, sir.

25          (Pause in proceeding.)

35

1          MR. CHAMBLESS:  Your Honor, at this time

2  the State would offer the timeline, the chart that

3  we've just shown to the Jury that is simply a PowerPoint

4  showing --

5          MR. HEISKELL:  Well --

6          MR. CHAMBLESS:  -- as a chart.

7          MR. HEISKELL:  I'm not exactly sure.  You

8  said this is exact duplicate of what's --

9          MR. CHAMBLESS:  Yes, these are what's

10  shown on the screen.  It is a PowerPoint which shows --

11  the CD is a PowerPoint that is shown on the screen

12  which we've just -- is a chart, a demonstrative aid

13  to the Jury.

14          MR. HEISKELL:  Well, since we have the

15  demonstrative aid, Judge, I don't see any reason to have

16  the actual exhibit in as a PowerPoint, so we would object

17  for that purpose since we have the demonstrative aid

18  already displayed for the Jury.

19          THE COURT:  If I admit it as a demonstrative

20  aid, then it would not go into the jury room, but it would

21  be available for review.

22          MR. HEISKELL:  All right.

23          THE COURT:  Does that satisfy your

24  objection?

25          MR. HEISKELL:  Yes, sir.

36

1          THE COURT:  That is marked as 56?

2          MR. CHAMBLESS:  I'm sorry, 64, Your Honor.

3          THE COURT:  64 is admitted as a demonstrative

4  aid and not as any other reason.

5          (State's Exhibit No. 64 admitted for

6          demonstrative purposes only.)

7          MR. CHAMBLESS:  Yes, sir.  Thank you.

8     Q.  (BY MR. CHAMBLESS)  Detective, you indicated you

9  were familiar with the North Fort Worth area; is that

10  correct?

11     A.  Yes, sir.

12     Q.  And tell the Jury why.  What is the basis of your

13  knowledge of the area?

14     A.  I was raised in that neighborhood.  And shortly

15  after graduating from the academy, I spent two months

16  there before transferring to the east side of Fort

17  Worth.

18     Q.  So that's -- that's home to you?

19     A.  Yes, sir.

20     Q.  Okay.  And how long have you been with the Fort

21  Worth Police Department?

22     A.  14 years.

23     Q.  And at what age did you begin work for them?

24     A.  I was 23.

25          MR. CHAMBLESS:  Okay.  Pass the witness.

37

1    RECROSS-EXAMINATION

2  BY MR. HEISKELL:

3      Q.  Detective, can you see this from where you are?

4      A.  I have a smaller screen, yes, sir.

5      Q.  Oh, that's right, you do.  And what I want to

6  point out, you indicated, sir, in your previous testimony

7  in response to my questions about methamphetamine causing

8  a person to be delusional and up all night, kind of keep

9  you awake; is that right?

10     A.  Yes, sir.

11     Q.  And we see here from your -- starting with

12 the Jorge Tamayo, Chavez Soto, on the 28th, is that

13 2 a.m.?

14     A.  Yes, sir.

15     Q.  Then we have -- move to the next one on the 29th,

16 3:30 a.m.?

17     A.  Yes, sir.

18     Q.  5:10 a.m.?  5:47 a.m., et cetera?  Do you see

19 that?

20     A.  Yes, sir.

21     Q.  On those morning hours.  So, apparently, these

22 folks were kind of up all night; is that correct?

23     A.  It appears so, yes, sir.

24     Q.  Now, with regard to the Benbrook matters, when it

25 says the Watson family, Girton family, those were empty

38

1  homes, were they not?

2      A.  As far as I know, yes, sir.

3      Q.  So they were -- they were not occupied?

4      A.  No, sir.

5      Q.  And the only one that was occupied was what

6  we go back here to the 22nd, the Circelli family, that,

7  of course, we've heard from; is that correct?

8      A.  I don't know if it was occupied or not.  I don't

9  remember that.

10         MR. HEISKELL:  Thank you, sir.

11         That's all we have, Your Honor.

12     FURTHER REDIRECT EXAMINATION

13 BY MR. CHAMBLESS:

14     Q.  Well, just to go back to that.  The residence

15 of the Watson family was occupied; is that not true?

16     A.  I don't know a hundred percent if it was or was

17 not.

18     Q.  All right.  Now, you were asked about whether

19 people under the influence of methamphetamine commit

20 burglaries; basically is that what you were asked, at

21 these hours?

22     A.  Yes, sir.

23     Q.  Okay.  Is it also true that people not under

24 the influence of methamphetamine sometimes commit

25 burglaries?

39

1      A.  Yes, sir.

2      Q.  Okay.  At these hours?

3      A.  Yes, sir.

4      Q.  Okay.  Now, in the case of Contreras, I want to

5  go back to that one.  That's the fourth one on the chart,

6  the one on June 24th.  I want to clarify this.  Who was

7  the actor, alleged to have been the actor in that case, to

8  your knowledge?

9      A.  Is that the one with the truck, the truck that

10 was taken?

11     Q.  Yes.

12     A.  I believe it was Mr. Soliz.

13         MR. CHAMBLESS:  Okay.  Thank you very much.

14         MR. HEISKELL:  No further questions.

15         THE COURT:  May the witness be excused?

16         MR. HEISKELL:  Yes.

17         THE COURT:  Thank you.  You may be excused.

18         THE WITNESS:  Thank you.

19         (Witness excused.)

20         (Pause in proceeding.)

21         MR. STRAHAN:  State would call Detective

22 Alaniz.

23         THE COURT:  Please raise your right hand.

24         (Witness sworn.)

25         THE COURT:  Yes, sir.

40

1         JESUS ALANIZ,

2    Having been first duly sworn, testified as follows:

3         DIRECT EXAMINATION

4  BY MR. STRAHAN:

5      Q.  Would you state your name and spell it for the

6  record, please.

7      A.  My name is Jesus Alaniz.  That's J-E-S-U-S.  Last

8  name is A-L-A-N-I-Z.

9      Q.  And how are you currently employed?

10     A.  I'm employed as a police officer with the City of

11 Fort Worth Police Department.

12     Q.  And how long have you been with the City of Fort

13 Worth?

14     A.  Nine years, sir.

15     Q.  Are you a certified peace officer?

16     A.  Yes, I am, sir.

17     Q.  Okay.  And whenever you start off as a peace

18 officer in Fort Worth -- did you -- did you ever work any

19 other police agencies besides Fort Worth P.D.?

20     A.  I did not.

21     Q.  And where are you originally from?

22     A.  I'm from Fort Worth, Texas.

23     Q.  What part of the city of Fort Worth do you come

24 from?

25     A.  I grew up from the north side of Fort Worth.

41

1    Q. And what are the -- I guess in the north side
2 what -- that's a quadrant of the city that, I guess,
3 is also separated out within Fort Worth P.D. as -- as
4 per officers and detectives' assignments; is that fair
5 to say?
6    A. Yes, sir.
7    Q. Okay. And generally speaking, what -- what
8 streets are the main streets? What's the boundaries of
9 the north side of Fort Worth?
10    A. North Fort Worth, I would say Interstate 35 over
11 to -- that's to the east, Jacksboro Highway to the west,
12 and everything north of downtown. I would say I would
13 consider the north loop, Loop 820, the northern boundary
14 of north side.
15    Q. All right. Now, when you work with Fort Worth
16 P.D., what was your first basic assignment?
17    A. My first assignment was patrol. I worked Patrol
18 Division, South Fort Worth for about five years.
19    Q. And after Patrol Division, then what did you do?
20    A. I was assigned to a Special Operations, Gang
21 Enforcement Unit for about three years.
22    Q. Tell us about the Gang Enforcements Unit. What
23 is that?
24    A. The Gang Enforcement Unit deals with all levels
25 of criminal gangs within the city of Fort Worth. My

42

1 specific duty there was enforcement, so we would address
2 any kind of high -- any high entry, high-risk warrants for
3 narcotics, any gang investigations that would culminate
4 with arrest warrant of known gang members. We would
5 execute and we would do street level enforcement in known
6 gang areas. Where we would have high gang trends, we
7 would saturate the area and pretty much do enforcement on
8 gang members.
9    Q. And did you have specialized training in the --
10 specifically the gang part of your job?
11    A. I did. I attended -- I attended national
12 conferences, regional conferences and local conferences
13 pertaining to international all the way down to street
14 level gangs.
15    Q. Okay. And so you would have familiarity with the
16 prison gangs of T.D.C. as well as all the way down to the
17 street gangs of Fort Worth?
18    A. I am familiar with some, yes, sir.
19    Q. Okay. And about the gang situation in Fort
20 Worth, where are the -- the street gangs mostly
21 concentrated for, what parts?
22    A. I'd say there -- there -- there's a fair
23 concentration over most of the city. You just have
24 different, different concentrations all over. I mean,
25 you have -- I mean, gangs traditionally claim territory,

43

1 so it just depends on who you're dealing with. A lot
2 of -- a lot of gangs do migrate over the city. I can
3 tell you through my experience, I would say north,
4 north east and south were a lot of areas that I would
5 do enforcement on.
6    Q. And what are the gangs that concentrate, some
7 of the gangs that concentrate the north side of Fort
8 Worth?
9    A. North side, traditionally it's V.N.S. That's
10 Varrio North Side. That's -- they're located or their
11 area is usually shorter, closer to downtown. You have
12 Varrio Diamond Hill that's pretty active. And those
13 were the two biggest that we were dealing with at the
14 time.
15        There's also smaller gangs. You have Varrio
16 15th Street that's located in the area. True Bud Smokers,
17 that's another smaller faction that operates in the area.
18 There's 21st Street Bloods. We have Four Trey Crips that
19 are in the area.
20        And you've got your prison gangs that -- that
21 migrate in usually, usually hang out in the areas. You
22 know, they come back from prison. They usually -- it's
23 not common to see them with some of the younger gang
24 members there at the street level.
25    Q. Okay. Well, in the area, North Fort Worth where

44

1 you grew up, what were the, I guess, the biggest gangs in
2 that area?
3    A. The biggest gangs when I grew up was -- Varrio
4 North Side was probably the biggest that I can recall.
5 And that's just growing up through my childhood and
6 growing up on that side of town.
7    Q. Okay. Now, and those are the street level
8 gangs. When some of these guys who get arrested who are
9 gang affiliated on the street level and then they go to
10 T.D.C., has it been your experience that when they come
11 back, they are a member of another gang as well?
12    A. It's common. I think a lot of them end up
13 joining -- joining those gangs whenever they reach prison,
14 be it for -- I don't know what reasons; it could be to
15 protect themselves or what. But I do find a lot of the
16 guys that we -- or to my experience I have arrested that
17 do come back and that I do encounter at the street level,
18 some of them have joined prison gangs throughout their
19 stints.
20    Q. Generally speaking, the north side, the area that
21 you grew up in, what is the general, roughly, racial
22 makeup of that part of Fort Worth?
23    A. I would say it's predominantly Hispanic.
24    Q. Okay. And so the gangs that you're talking about
25 that you've mentioned, would those generally be

**45**

1  Hispanic-based gangs?

2      A.  Predominantly Hispanic, yes, sir.

3      Q.  And you may have other members of other ethnic

4  groups, I guess, that are involved, but generally that is

5  a Hispanic-based unit?

6      A.  But the vast majority are Hispanic.

7      Q.  And from your own experience and training, are

8  you aware of the Hispanic-based gangs in the Texas prison

9  system?

10     A.  I'm aware of some of them, yes, sir.

11     Q.  And what would just some of those be?

12     A.  You have Texas Syndicate, Mexican Mafia, Puro

13  Tango Blast.  There's P.R.M., that's Partido

14  Revolucionario Mexicano.  It's a primarily Mexican

15  national gang that's in the penitentiary.

16          You have H.P.L. that's down there -- based

17  out of the Laredo area.  And you have the Tri-City Bombers

18  that are down from the Laredo area, and Barrio Azteca,

19  which their main hub is over in the El Paso area.

20     Q.  Okay.  So during your Gang Enforcement time --

21  and you're a detective now; is that correct?

22     A.  That's correct.

23     Q.  Just recently been promoted to detective?

24     A.  That's correct, sir.

25     Q.  Okay.  In your Gang Enforcement time, the people

**46**

1  who come back from T.D.C. that you've dealt with, you

2  know, because you're talking about different gangs from,

3  you know, as far down as Laredo and other places?

4      A.  Yes, sir.

5      Q.  What was the concentration of new prison gang

6  members or their affiliation when they came back to Fort

7  Worth?

8      A.  Well, a lot of Fort Worth and I'd say the vast

9  majority that I dealt with were a -- were a part of Puro

10  Tango Blast, P.T.B.  Tattoos are usually stars.  They

11  have -- most of them have tattoos that are related to

12  geographical locations in the city of Fort Worth, a city

13  skyline to show their affiliations.

14     Q.  And would you also have people from the Texas

15  Syndicate also be in that area of Fort Worth?

16     A.  Yes.  As a matter of fact, when I was -- when I

17  was in Gang, we ran a federal operation with the FBI

18  targeting Texas Syndicate in North Fort Worth.

19     Q.  And in these tattoos, you say the geographic

20  location, what kind of examples are --

21     A.  Well, Tango Blast, where they're broken up,

22  they're broken up by regional factions.  You have a

23  faction within the prison gang that belongs to --

24  that pertains to the city of Fort Worth or their

25  geographical area.  You also have a faction that

**47**

1  pertains to Dallas.  You have a faction that pertains

2  to San Antonio and Houston.

3          Say, for the Dallas faction, a lot of those

4  guys will have stars tattooed on their head, and that

5  brings their connection back to the Dallas Cowboys.  The

6  city of Fort Worth, they'll have the Fort Worth skyline.

7  A lot of them will have the Foros, F-O-R-O-S, and Foritos,

8  which is short for Fort Worth.  That's prison slang for

9  Fort Worth, Texas.

10     Q.  And -- okay.  And so it would be common to see

11  these tattoos on what parts of people's bodies?

12     A.  I've seen them on their head, on their neck,

13  sleeves.  I've even seen one on their cheek.

14     Q.  Okay.  Let me take you to the evening of June

15  29th, 2010.  Do you remember where you were working that

16  evening?

17     A.  Yes.  I was working Gang Enforcement in North

18  Fort Worth that evening.

19     Q.  Okay.  And generally speaking, your Gang

20  Enforcement hours, this is about what time in the evening

21  did you start?

22     A.  I believe that day we were working 6 p.m. to 4 in

23  the morning.

24     Q.  What is the point of working 6 to 4 a.m., 6 p.m.

25  to 4 a.m.?

**48**

1      A.  Well, per our commander, our command staff over

2  there at Gang, they believe that that was the time when

3  most of our violent crimes or most of our gang-related

4  crimes were more likely to occur, so they wanted us on

5  the street in case we have to respond to any shooting

6  or any kind of gang-related offenses.

7      Q.  Okay.  Have you ever been involved in the Drug

8  Task Force, personally?

9      A.  Not -- no, not in the Drug Task Force, no.

10  We've executed warrants them, but not directly making

11  purchases or anything like that.

12     Q.  So do you know the hours?  And if you know; if

13  you don't, that's fine.  Do you know the hours of people

14  who are specifically engaged in Drug Enforcement, what

15  hours they generally work, if you know?

16     A.  I don't.

17     Q.  Okay.  You're working 6 p.m. to 4 a.m. because

18  that's when gang activity is taking place; is that

19  correct?

20     A.  That's correct.

21     Q.  Okay.  So 6 a.m. to 4 -- or 6 p.m. to 4 p.m. --

22  4 a.m., excuse me, is the time that gangs are most active?

23     A.  Yes.

24     Q.  That's why you're out there?

25     A.  Yes, sir.

49

1    Q. Okay. Does that necessarily always involve
2  drugs?
3    A. No. It could be gang-on-gang robberies, it can
4  be drive-by shootings, retaliations that we're getting
5  intelligence from on certain -- certain areas of town or
6  assisting other units.
7    Q. Generally speaking, with your training and
8  experience, do Fort Worth gang members generally have
9  8 to 5 jobs?
10   A. Generally, I'd say no.
11   Q. Okay. Do they generally do whatever crimes and
12 whatever actions they're going to do in the early morning
13 hours?
14   A. No.
15   Q. When, I mean, as far as --
16   A. I -- and I'm saying no because we've -- our
17 commanders usually tailor our hours whenever they feel
18 that gang activity is prevalent throughout the city, so
19 I've never worked a day shift working gangs so I would
20 say no.
21   Q. Okay. So that's why you're 6 p.m. to 4 a.m.?
22   A. Yes, sir.
23   Q. Because you were in the Gang Unit?
24   A. That's correct.
25   Q. Okay. And by the way, you are a detective now.

50

1  What is your current assignment?
2    A. Assigned to Criminal Investigations, and I
3  investigate domestic violence cases.
4    Q. Okay. So that's a totally different area than
5  you were in?
6    A. Yes, sir.
7    Q. Okay. Can you step down for just a second and --
8    A. Sure.
9    Q. -- let me show you this.
10        Okay. Now, during the evening of June 29th,
11 you're out there working Gang Enforcement?
12   A. Yes, sir.
13   Q. And on a typical night, what does that mean to
14 work Gang Enforcement?
15   A. Unless we have any kind of specific targets or
16 any units that are asking for assistance, we'll saturate
17 an area. In this case, this is Diamond Hill, so we have
18 a lot of Varrio Diamond Hill activity. We'll usual do --
19 we'll set up on known gang houses that we have --
20        THE REPORTER: I'm sorry?
21        THE WITNESS: I'm sorry. Yes, ma'am.
22   A. So nights like this, we'll usually set up on
23 houses that are documented gang houses within the
24 neighborhoods to see if we have any kind of gang activity
25 going on, if there's any vehicles we can try to identify

51

1  new gang members, or make probable cause stop on traffic
2  stop to see if any of them are in possession of weapons or
3  firearms or narcotics.
4    Q. Okay. And, okay, so you are going into
5  specifically, like, hanging out at known gang hangouts and
6  trying to specifically target people who are members of a
7  gang?
8    A. Yes, sir.
9    Q. In your job?
10   A. Yes, sir.
11   Q. And you've got traffic police doing their thing
12 and other sections of the Fort Worth P.D. doing their
13 thing at the same time?
14   A. That's correct.
15   Q. That's what you're concentrating on?
16   A. Gangs, yes, sir.
17   Q. And do -- do these gangs get along with each
18 other generally or do some and not? I mean, how does
19 that work?
20   A. Generally, no, but it's -- there's been times
21 where we've -- where we've encountered gang members from
22 different gangs in the same vehicle or going about their
23 daily activities --
24   Q. Okay.
25   A. -- you know, with themselves.

52

1    Q. Okay. So sometimes other motives will get those
2  people together outside of their own gang differences?
3    A. Yes, sir.
4    Q. Okay. All right. Can you tell me if -- what,
5  if anything, happened while you're out there that got you
6  involved in this case?
7    A. Well, 6:00, and one of my former gang officers
8  had just left my Gang Unit, was assigned to Patrol
9  Division in North, so I think he was getting off shift,
10 and he had contacted me and said that there was a rash of
11 robberies in North Fort Worth.
12   Q. Was this Jerry Cedillo who called you?
13   A. No, this was Officer Camacho --
14   Q. Okay.
15   A. -- former gang member, but he had told me
16 that Jerry was the detective taking over the
17 investigation. So as soon as I came in, I called
18 Jerry and just told him, hey, if you need anything,
19 we're here to help you out.
20   Q. You said Camacho is a former gang member. You
21 mean a --
22   A. A former gang officer. I'm sorry. He's a former
23 gang officer.
24   Q. So he's an officer with Fort Worth P.D., no gang
25 affiliation?

53

1  A. No gang affiliation, no. He had just left to
2  Patrol Division. He was working the Patrol Division the
3  day the robberies went out, and he contacted me.
4  Q. You're not part of a gang either, are you?
5  A. No, I'm not.
6  Q. But you grew up in the north side of Fort Worth?
7  A. I did grow up in the north side.
8  Q. You -- you became a peace officer?
9  A. Yes, sir.
10  Q. And now you've become a detective?
11  A. That's correct, sir.
12  Q. Okay. All right. Go ahead. Sorry. Camacho
13  called you and talked to you about, hey, there's a big
14  bunch of robberies that have gone on.
15  A. And he told me Jerry was the detective
16  investigating the case. So I contacted Jerry and said,
17  hey, I understand this guy may have some gang ties, we're
18  here at your disposal.
19  Q. And what guy is that? Did he discuss with you
20  what guy that you were going to be looking for?
21  A. He -- there was a broadcast going out, and I
22  don't know if I got the information from Jerry or the
23  broadcast on the MDCs that had the stolen vehicle and
24  the street name "Kilo".
25  Q. What is a -- what is a BOLO?

54

1  A. A BOLO is a -- it's an acronym for "Be On the
2  Look Out". Those are bulletins that patrol officers or
3  detectives send out to -- citywide, depending on where
4  they're trying to target the information. It's to make
5  officers informed of critical information relating to
6  investigations or just anything potentially.
7  Q. Okay. Now, in these robberies, whenever
8  Detective Cedillo -- I guess the Fort Worth police
9  officers in different sections, whether it's Gang or
10  Robbery or Homicide, can call upon each other for help
11  and depend upon each other to help out with whatever
12  they're doing?
13  A. That's correct, sir.
14  Q. Okay. And do -- I guess in this particular case,
15  you were looking -- you were told to be on the lookout for
16  this Kilo person?
17  A. That's correct.
18  Q. And did you ever get a name associated with that
19  particular person you were looking for?
20  A. I ended up running the name -- I did not. I
21  ended up getting the name -- running the name through our
22  Gang Intelligence files and got a couple of names on that,
23  on those gang hits.
24  Q. Okay. So ultimately were you able to determine
25  the person that they were specifically looking for being a

55

1  Mark Anthony Soliz?
2  A. I did -- I did not. I ran across his name. I
3  did find out that it was Mark Soliz. I wasn't familiar
4  with him. I was familiar with the second one, and that's
5  Mr. Ramos.
6  Q. Jose Ramos?
7  A. Yes. I was more familiar with him, but those
8  are the two that came up in the Gang Intelligence files,
9  so.
10  Q. Is it common for people in different gangs to
11  have the same nickname, nickname?
12  A. In different gangs, yes.
13  Q. Okay.
14  A. It is.
15  Q. All right. And so that's nothing that you
16  would have --
17  A. No.
18  Q. -- been a big shock to you. Okay. And so
19  ultimately you're looking for what, what type of person,
20  description that you're looking for?
21  A. At this point, I didn't take it any further
22  simply because Jerry said he had it handled. So other
23  than researching our Gang Intelligence database and
24  finding out a name, we -- we cut -- we communication off
25  with Jerry at that point. Said, hey, if you need some

56

1  help, go ahead and call us. So we lost contact with
2  Jerry for about, I don't know, maybe three hours.
3  Q. Now, when this BOLO goes out and when they start
4  looking for someone, who all gets that within the police
5  officers in Fort Worth?
6  A. That goes citywide.
7  Q. Okay.
8  A. That goes city -- well, depending on who the
9  detective or whoever sent the BOLO wants to target. So
10  if he was simply sending his BOLO out to North Division
11  officers, then he would have simply sent this out to North
12  Division. If he wanted citywide, every officer and every
13  command could have had this BOLO.
14  Q. Okay. And, now, are there a lot or a few BOLOs
15  that go out every day?
16  A. Oh, daily, there's a lot.
17  Q. Okay. There's a lot. Now, do you generally get
18  calls from detectives regarding a specific BOLO or is that
19  rare?
20  A. No, a lot of times our officers will log on their
21  computers and as we're loading up our gear, we'll go
22  through the BOLOs and see which ones will probably pertain
23  to us in our area of enforcement.
24  Q. Okay. And the BOLO on Mark Soliz, was that one
25  that you thought might pertain to your area?

57

1   A.  Well, the gang affiliation, I thought we could
2  have -- we could help Detective Cedillo out, just due to
3  our knowledge of the geographical area in North Fort
4  Worth.  And the alleged robberies that were taking place,
5  we felt that -- that was more important to us than doing
6  other gang functions that day.
7   Q.  Okay.  So this particular person, because of the
8  nature of the offenses that he was being wanted for, I
9  guess --
10   A.  Yes, sir.
11   Q.  -- made him more important to you that night than
12  your other gang activities?
13   A.  Yes, sir.
14   Q.  Okay.  Was it very important to you, I guess, and
15  to everyone in that area, to find this particular car and
16  this particular person?
17   A.  Yes, sir.
18   Q.  And why is that?
19   A.  Just the nature of the offenses.  My
20  understanding is a beer delivery truck driver was shot
21  that morning, there may have been other people that were
22  shot, the use of a handgun, and the fact that he was
23  still in the area, our feeling, he was still in the area,
24  and didn't want anyone else to get hurt by him.
25   Q.  Okay.  So it was important, I guess, to stop

58

1  him at this point before someone else may have gotten
2  hurt?
3   A.  Yes, sir.
4   Q.  Robbed?
5   A.  Yes, sir.
6   Q.  Or killed?
7   A.  Yes, sir.
8   Q.  Okay.  All right.  And did you hear from
9  Detective Cedillo later on in the evening?  Because the
10  first time you hear from, I guess, is the beginning of
11  your shift?
12   A.  Yes, it is.
13   Q.  When is the next time you hear from him?
14   A.  The next time I hear from him, I think we
15  were -- we focused our investigation outside the city
16  of Fort Worth.  I think we were in Haltom City looking
17  at a house of known associates.  That way we wouldn't be
18  in Detective Cedillo's way, but if we did find something
19  out, we could contact him.  I think I had a Gang officer
20  that was monitoring North Patrol.  He contacted me and
21  said, "Hey, they're on a different radio channel and I
22  think they just spotted the stolen vehicle."
23   Q.  Okay.
24   A.  So at that point, all my Enforcement Team went
25  over to the radio channel that Detective Cedillo was

59

1  working on.  I could hear Detective Cedillo.  He was
2  talking about the vehicle.  And through the conversation,
3  it sounded like he had lost the vehicle.  So at that
4  point, I called Detective Cedillo and I said, "Hey,
5  where are you at?  Do you need our help?"
6   He said, "Yeah, we're in this area."  And I
7  was pretty familiar with the area down at Oscar.  He said,
8  "We've lost it in this area."
9   Half of my unit is comprised of undercover
10  vehicles.  So I said, "Hey, why don't we go down and help
11  you out.  That way we're not as noticeable as a patrol
12  unit is."
13   Q.  Okay.  Let me stop you right there.  How many
14  people are in your unit?
15   A.  At that time, well, I don't know how many were on
16  shift that day, but my unit has 10 Gang officers that are
17  assigned to it.
18   Q.  And were y'all making this a priority for you
19  that night?
20   A.  Yes, we were.
21   Q.  All 10 of your people, if that's how many were
22  working, were all on this?
23   A.  Yes, sir.
24   Q.  Do you know how many detectives or other
25  officers in that area were also working on this

60

1  specific person?
2   A.  Outside of my unit, I have no idea, but I think a
3  lot of patrol officers in that area were engaged in
4  helping Detective Cedillo.
5   Q.  Okay.  So for sure at least as many as 10 people
6  who were ordinarily just dedicated to Gang are --
7   A.  Yes.
8   Q.  -- specifically looking for this vehicle?
9   A.  Yes, sir.
10   Q.  This is a big deal?
11   A.  Yes, sir.
12   Q.  Okay.  Where are you at whenever you start
13  listening to the channel that Cedillo is on and decide
14  that you can be of help?
15   A.  Actually, this is Long Avenue.  I was outside of
16  this picture, probably on the edge of Haltom City coming
17  back into Fort Worth.
18   Q.  Does that border Fort Worth?
19   A.  Yeah, borders Fort Worth to the east.
20   Q.  So you're coming in, and whenever this car is
21  spotted, you hear Cedillo say where they had seen it and
22  lost it?
23   A.  Yes, sir.
24   Q.  And what -- what part of this area would that
25  have been?

61

1    A. Well --
2    Q. That they were at.
3    A. The area would have been right here.
4    Q. Okay. And that's the Diamond Hill area?
5    A. Yes, sir.
6    Q. Okay. And so you're coming from outside, from
7    Haltom City kind of area and going through this way?
8    A. Yes, sir.
9    Q. What is this road that runs right through there?
10   A. This is Long Avenue.
11   Q. Okay. And this is railroad tracks here?
12   A. These are railroad tracks.
13   Q. And so you coming through here, and at some
14   point you were on -- what exactly were you on the lookout
15   for, what kind of vehicle?
16   A. I believe it was a Dodge Stratus. I don't know
17   the plate, but the plate was ingrained in our -- in our
18   minds for most of the day, I just -- through the broadcast
19   and everybody being on the lookout for it.
20   Q. Okay. And so you're looking for a specific type
21   of car with a specific plate which you had in your
22   possession?
23   A. Yes, sir.
24   Q. Okay. And at some point did you actually come
25   into contact with that car?

62

1    A. I did.
2    Q. Okay. And where did you set up? Where were
3    you at whenever you got back into this part of the city,
4    I guess?
5    A. Well, when I got back to this part of the city,
6    Detective Cedillo said he lost it here around -- I'm
7    guessing 33rd and Schwartz, around this area. I think
8    he said more specifically Oscar. Now, Oscar, I dealt
9    with a gang member in my past that lived at 3264 Oscar, I
10   believe.
11   Q. And who is that person?
12   A. That's Arturo Gonzales.
13   Q. And what is his street name?
14   A. I believe he goes by Shadow.
15   Q. Okay. And you had dealt with him right here?
16   A. I hadn't dealt with him. I had -- I was
17   looking for him. He had an active warrant about a year
18   ago. I never caught him, but I did do a consensual
19   search of the residence about a year ago, so I knew
20   the geographical layout of his house and the block and
21   surrounding areas.
22   Q. Okay. Okay. So you're -- you're over there
23   sitting out -- and is that, I mean, why would you pick
24   that point?
25   A. Well, because this is an uncommon street here.

63

1    Detective Cedillo said he lost him down here. I also
2    knew there was a bunch of poor lighting. I don't think
3    there was any active street lights on this block.
4         So Detective Cedillo said he lost him
5    somewhere off of Oscar. So I said, "Hey, this is where
6    it just loops around, comes in one way and you can only
7    exit the same." And I knew we had -- I had -- I'm sorry,
8    Mr. Arturo Gonzales that I had dealt with in the past, so
9    I said, "Let me go check that house out."
10   Q. What gang was he associated with?
11   A. I believe Mr. Arturo Gonzales is -- he's
12   affiliated with Puro Tango Blast.
13   Q. Okay. And you also had figured out a gang
14   affiliation for Mark Soliz as well, or no?
15   A. I had ran Mark Soliz that day, and I believe he
16   was linked to V.N.S. and Texas Syndicate. That's what our
17   Gang Intelligence file said.
18   Q. So what -- V.N.S., you told us it means what?
19   A. It's Varrio North Side. That's a street level
20   gang.
21   Q. Okay.
22   A. On the north side of Fort Worth.
23   Q. All right. Okay. And would you expect somebody
24   in that gang to have tattoos that maybe said "north side"
25   on them?

64

1    A. Most -- well, some would.
2    Q. Okay. All right. Have you ever seen Mr. Soliz
3    up close and personal?
4    A. I never have.
5    Q. Okay. And does -- do you know if he has any
6    tattoos?
7    A. I believe he has, and that's per our intelligence
8    files.
9    Q. Okay. Does he have the tattoo "north side" on
10   his neck?
11   A. I'm not sure.
12   Q. Okay. So you have a gang house here which is
13   Tango Blast, and so you're waiting out there. What
14   happens next for you?
15   A. Well, I had -- I had an officer that was training
16   with me from Patrol. We were in an unmarked car. We
17   drove down -- this is Diamond, and we passed by the house
18   here on Oscar. The vehicle that we saw in the driveway
19   was a black Jeep Liberty. And as we passed by, we could
20   see several males that were congregating near the front of
21   the Jeep, had his lights on, and we noticed that one of
22   the tail lamps was out on the vehicle.
23        I didn't see the Dodge Stratus, but due to
24   the fact that Detective Cedillo had lost the car in this
25   vicinity, more specifically, I believe he said Oscar, and

**65**

1  the fact that I think Detective Cedillo would have noticed
2  this vehicle come out since there's no other exit other
3  than coming back to Schwartz, I had a hunch that the
4  vehicle may have been there.
5       Now, when I saw that vehicle at the gang
6  house with the -- with the equipment violation, I figured
7  I would set up on it since it's a known gang house and
8  maybe do a stop and question them as to the location of
9  the stolen vehicle.
10      Q.  Okay.  All right.  And so you see them.  What do
11 you do once you see them and decide that that's --
12      A.  Well, when I passed by, I came down here to
13 Schwartz.  And this is a decline here and it comes back up
14 to an incline.  So I set up here with my lights out and I
15 was watching these two exits.  These are the only exits
16 that come out of Oscar Street.
17      So I waited about 10 to 15 minutes, and I saw
18 the Jeep Liberty pull up to this intersection right here.
19 And right as the Jeep Liberty is pulling onto Schwartz, I
20 see the Dodge Stratus pull up right behind it, didn't
21 stop, didn't pause.  It looked like it was trying to
22 follow the Jeep Liberty, in my opinion.  And I knew the
23 Jeep Liberty had the back tail lamp out.
24      Q.  Okay.
25      A.  So I knew that was it.

**66**

1       Q.  And so at that particular point in your own mind,
2  you connected the two vehicles together somehow?
3       A.  Yes, sir.
4       Q.  Okay.  And so what did you do whenever you
5  visualize this Dodge Stratus right there?
6       A.  Well, when I saw the vehicle pull out, I
7  initially went after the Jeep when I initially -- when I
8  first saw it.  And I'm probably about mid block when the
9  Dodge Stratus pulls up right behind it.
10      Q.  You're in an unmarked vehicle?
11      A.  I'm in an unmarked vehicle.  As I pull up to the
12 Dodge Stratus, I identify the plate as the vehicle that's
13 stolen, so I get on the radio and call for marked units,
14 marked police units to intercept the vehicle and make a
15 stop on it.
16      And right when we approach 33rd -- I'm sorry,
17 Schwartz and Long Avenue, I made the radio call.  And
18 right when both vehicles take a -- take a right to go
19 back east on Long, two patrol units intercepted the
20 stolen vehicle.
21      Q.  Okay.  And so after the -- after you knew that
22 marked units were on the stolen vehicle, the Dodge
23 Stratus -- by the way, did you see how many occupants
24 were in the Dodge Stratus?
25      A.  I didn't see how many were in there.

**67**

1       Q.  Were you able to visualize the color of the
2  vehicle and the vehicle and its license plate to make
3  sure it was the right one?
4       A.  Yes, I identified it by the plate, and the
5  vehicle, I believe it was like a real light teal, maybe
6  like a green color.
7       Q.  Okay.  And so whenever you saw marked units had
8  heard you and they were onto the Dodge Stratus, what did
9  you do?
10      A.  Well, whenever the vehicles -- I let the -- I
11 let the patrol units go ahead of me.  And as soon as
12 patrol units got behind the Stratus, the Stratus
13 accelerated and went around the Jeep Liberty and took
14 off at a high rate of speed.
15      At that point, two patrol units engaged
16 the stolen vehicle in a vehicle pursuit.  It's against
17 my -- or our Department's operating procedure to engage
18 in a pursuit with an unmarked unit, but I do have LED
19 lights that are used to initiate traffic stops.  So I
20 stayed with the Jeep Liberty and initiated a traffic
21 stop right here at Deen Road and Long.
22      Q.  Okay.  And so you can see the Stratus; whenever
23 it sees the police cars, it takes off?
24      A.  Yeah, didn't hesitate when it saw the lights.
25      Q.  Okay.  Was that moving at a slow or high rate of

**68**

1  speed?
2       A.  A very high rate of speed.
3       Q.  Did the Jeep Liberty act a little bit differently
4  as far as the driver is concerned when it -- when the -- I
5  guess because if they were right together, they would have
6  seen the police cars too?
7       A.  Yes, sir.  No, the Jeep Liberty, I just recall it
8  kind of pulling over to the side whenever the Stratus went
9  around it, and the police officers engaged the Stratus in
10 a -- in a pursuit.  And I stayed behind the Jeep Liberty
11 the whole time.  My intent was to pull it over on traffic,
12 on the equipment violation.
13      Q.  Okay.  And -- and so did the -- the Jeep, the
14 Jeep Liberty ever speed or try to evade or do anything
15 like that?
16      A.  No.  I lit it up with my LED lights that are
17 located on my dash, also have corner LED lights on my
18 vehicle.  I don't have a siren.  I lit it up here right
19 before it hit the bridge, and it came to a stop right as
20 we crossed Deen Road, sir.
21      Q.  Okay.  Did you encounter any traffic lights
22 whenever you were in -- you have the view of both vehicles
23 together?
24      A.  There's a traffic light here at Deen Road and
25 Long.

69

1    Q. Okay. And whenever you got to it, was that a red
2 light or a green light?
3    A. I can't recall.
4    Q. Okay. Did you and the Jeep Liberty both go
5 through that light?
6    A. Yes, we did.
7    Q. Okay. Do you remember if that was a red light
8 when the Stratus went through it?
9    A. I can't remember. I can't recall.
10    Q. Okay. All right. And so eventually the Jeep
11 Liberty pulls over?
12    A. Uh-huh.
13    Q. Okay. And what do you do?
14    A. Well, I stayed with the Jeep Liberty. Me and
15 Officer Lara got out of the vehicle. We didn't want to
16 approach the vehicle. We had -- we didn't know what was
17 going on with it. We had an active pursuit going on with
18 the Stratus, so the radio channel was going crazy. We
19 also had officers that were trying to assist the pursuit
20 that were getting confused with our traffic stop thinking
21 that we had the pursuing vehicle. So we were at a
22 standstill waiting more patrol units to get back in the
23 chase. So it wasn't until they started getting this under
24 control that we initiated the traffic stop and got
25 everybody out of the Jeep.

70

1    Q. Okay. And you get the traffic stop going. Who
2 all was in this Jeep Liberty?
3    A. My recollection, it was Ms. Whitney.
4    Q. Whitney Lewis?
5    A. Whitney Lewis was driving the vehicle.
6    Q. Okay.
7    A. And the passengers was Ms. Villegas, Ms. Cathy
8 Richardson.
9    Q. Richardson?
10    A. Yes. Mr. Jose Ramos, and Arturo Gonzales.
11    Q. Okay. And Arturo is the person whose house you
12 had been sitting on over here?
13    A. Yes, sir, that's the owner of the house where I
14 spotted the -- the Jeep.
15    Q. Okay. And he's with Jose Ramos or Joe Ramos; is
16 that correct?
17    A. Correct.
18    Q. And then these girls. What -- what did you do
19 with the Jeep Liberty? What happened to the people
20 involved?
21    A. I got --
22    Q. Did you get them out?
23    A. I got everybody out of the vehicle. As soon
24 as I made contact with it, I recognized Arturo Gonzales
25 as a gang member, and I recognized Jose Ramos as being

71

1 a prison gang member too. So there was only two of
2 us who were conducting the stop, so we -- I believe
3 we got everybody out one at a time and sat them away
4 from the vehicle and pretty much kept them detained
5 at a standstill until this situation was quelled with
6 Mr. Soliz and until we could get more assistance because
7 we were dealing with five people on our traffic stop and
8 there was just two of us.
9    Q. Okay. Now, whenever you do a traffic stop,
10 especially something that is what you now, I guess, know
11 as known gang members --
12    MR. STRAHAN: You can take your seat.
13    THE WITNESS: Yes, sir.
14    Q. Do you do anything about protecting yourself as
15 far as patting these people down?
16    A. Yes, I do, sir.
17    Q. Okay. And what did you do in this particular
18 regard? Did you see if Mr. Ramos or Mr. Gonzales had any
19 weapons on them?
20    A. Yes, we did. I had them exit the vehicle. We
21 put them off to the side on some grass; and as we got more
22 officers there, we ended up handcuffing them for safety, I
23 believe. And we did do a pat-down, just due to the fact
24 that they're gang members and wanted to insure they had no
25 weapons on them.

72

1    Q. Okay. Did they have any weapons on them?
2    A. I don't believe they did.
3    Q. Okay. And the females, did you have a female
4 police officer pat them down or?
5    A. I don't think we had any females out there, so I
6 don't recall.
7    Q. Okay. And did you do a search of the car to
8 clear that car for weapons or any other contraband?
9    A. Yes, we did.
10    Q. And did you find anything in the car?
11    A. I believe there was only a knife that was found
12 in that vehicle. We didn't remove anything. Whenever I
13 saw Jose Ramos in there, I made the connection with Kilo,
14 and I wasn't sure if Jerry was totally sure -- I'm sorry,
15 Detective Cedillo, if he was totally sure that it was
16 Soliz by the street name Kilo or if it was Clemente by
17 the street name Kilo who was a suspect in the robberies.
18 So at that point, we searched the vehicle, but we left
19 everything in the vehicle and contacted Jerry. He said
20 he wanted the vehicle impounded.
21    Q. Okay. And so was the vehicle ultimately
22 impounded?
23    A. Yes, it was.
24    Q. Okay. And do you remember what kind of knife or
25 where this knife was found?

73

1   A. I believe the knife was found in the back seat.
2   I don't recall exactly what it looked like. I couldn't
3   describe it to you.
4       Q. Okay. It was found in the back seat?
5       A. I believe so.
6       Q. Okay. And do you remember where this vehicle,
7   how it was occupied, where everybody was sitting?
8       A. I know both of the -- both Jose and Arturo were
9   in the back seat. I couldn't tell you if they were --
10  if they were -- who was behind the driver, who was behind
11  the passenger.
12      Q. Okay. And the -- the vehicle itself belonged to
13  who, the driver?
14      A. I believe it belonged to Ms. Whitney Lewis.
15      Q. Whitney Lewis?
16      A. Yes, sir.
17      Q. Okay. And so you couldn't, based on, I guess,
18  where everybody is sitting, you couldn't really attribute
19  the knife to any particular person?
20      A. Yes, sir.
21      Q. Okay. You didn't find any guns?
22      A. No, no firearms, sir.
23      Q. No firearms in this vehicle. And what
24  happened with those people that -- the vehicle is
25  going to be impounded. What was done with them?

74

1       A. I believe two of the -- two of the people there
2   had a couple of traffic warrants. Actually it was just,
3   yeah, Cathy Richardson and Arturo had active warrants.
4   When they were detained, I contacted Detective Cedillo
5   and told him what I had. He said go ahead and confirm on
6   the warrants and transport everybody up to our criminal
7   investigations to be interviewed.
8       Q. Okay. And at some point they all go basically to
9   the police station to C.I.D., I guess?
10      A. Yes, sir.
11      Q. And to be interviewed by whom?
12      A. I believe it was Detective Cedillo. That I could
13  recall, it was Detective Cedillo and I recall seeing
14  Detective Tom Boetcher.
15      Q. Okay. And -- all right. And was Danny Paine,
16  Detective Danny Paine also involved in that?
17      A. Yes, yes, he was.
18      Q. Okay. And whenever somebody goes to -- to be,
19  I guess, questioned or talked to, who are the people who
20  generally take charge of speaking with them?
21      A. Those are usually our detectives.
22      Q. Okay. And so if somebody was in trouble for a
23  robbery or wanted for robbery or a suspect in a robbery,
24  would you expect one of the Robbery detectives to talk to
25  them?

75

1       A. Yes.
2       Q. Okay. And if somebody were wanted in connection
3   with a murder or a possible homicide, would you expect a
4   Homicide detective to talk to them?
5       A. Yes, sir.
6       Q. Okay. And do you recall what section of the Fort
7   Worth Police Department Detective Danny Paine was involved
8   in at that time?
9       A. I believe Danny Paine was assigned to Robbery at
10  the time.
11      Q. And do you recall where Detective Tom Boetcher
12  was assigned at that time?
13      A. Tom Boetcher was assigned to our Homicide Unit.
14      Q. And those are the people that talked to the
15  people who were in, I guess, the Jeep Liberty?
16      A. That's correct.
17      Q. Okay. And did you come to an understanding
18  that they also eventually talked to Mark Soliz that
19  same night?
20      A. I wasn't sure. Once our guys transported them,
21  I don't know who talked to who, but they were transported.
22      Q. Okay. And you had said that there was a -- an
23  initial hit that, I guess, on your information that Mark
24  Soliz was involved with the Texas Syndicate; is that
25  correct?

76

1       A. Per our Gang Intelligence files.
2       Q. So the Gang Intelligence file will say that he
3   was?
4       A. Yes.
5       Q. Okay. And, again, that's a T.D.C. prison gang;
6   is that correct?
7       A. Yes, sir.
8       Q. At the time that you were looking for Mr. Soliz
9   that evening, you had been, I guess, told that there
10  were a bunch of robberies or a series of robberies and
11  carjackings and things; is that correct?
12      A. That's correct, sir.
13      Q. Were you aware of any other offenses out of the
14  city of Fort Worth?
15      A. Outside of the city, no, just the robberies that
16  happened within the city.
17          MR. STRAHAN: Okay. Judge, at this time I
18  would ask the witness to get down from the stand and
19  visually inspect just the chest, face and head area of
20  Mr. Soliz for visible tattoos above his clothing.
21          THE COURT: Okay. Let's take a 15-minute
22  recess first. You may take the Jury out.
23          (Jury not present.)
24          THE COURT: Okay. Mr. Strahan, did you want
25  that inspection to take place in front of the Jury?

77

1    MR. STRAHAN: No, no. Well, I mean, we don't
2 have to do that in front of the Jury. I just want him to
3 be able to see if there's any visible tattoos on his hands
4 or his neck or head, because he's already testified to
5 that as something he might look for.
6    MR. HEISKELL: Well --
7    (Sotto voce discussion.)
8    THE COURT: I'll tell you what, I'm going
9 to take a recess. Work this out. In about 15 minutes
10 I'll come back and we'll resolve this.
11    MR. HEISKELL: All right.
12    (Recess taken from 10:39 to 10:59 a.m.)
13    THE COURT: The attorneys for the State
14 are present, the Defense attorneys and Defendant are
15 present. Has this matter about the inspection of
16 Defendant's body been --
17    MS. JACK: I think we've reached an
18 agreement, Judge.
19    THE COURT: What is the agreement?
20    MR. STRAHAN: We have -- I think what
21 we're going to do is stipulate to some prior photos,
22 some a few years back and some now, that show, depict
23 the tattoos that we were wanting to show without having
24 to actually have him inspect it today.
25    THE COURT: Okay. Thank you.

78

1    MR. STRAHAN: Is that right?
2    MR. HEISKELL: Yes.
3    (Sotto voce discussion.)
4    THE COURT: Are you ready to proceed?
5    MR. STRAHAN: Yes, sir.
6    THE COURT: Please bring in the Jury.
7    (Jury present.)
8    THE COURT: Thank you. You may be seated.
9    MR. STRAHAN: May I proceed?
10    THE COURT: Yes, sir.
11    MR. STRAHAN: Judge, I believe we have a
12 stipulation as to the admissibility of State's Exhibits
13 66 through 72. And I believe the stipulation is they
14 are all photographs of tattoos on the body of this
15 Defendant, Mark Soliz, taken at various times in his
16 life. So we would offer State's 66 through 72.
17    MR. HEISKELL: No objection, Your Honor.
18    THE COURT: 66 through 72 are admitted.
19    (State's Exhibit Nos. 66 - 72 admitted.)
20    Q. (BY MR. STRAHAN) Could you step down, please.
21 Okay. I'm showing you what has been admitted now as
22 State's Exhibit No. 66, and I'll represent to you that
23 that is a tattoo of the Defendant, Mr. Soliz.
24    Now, he is charged and shows up in some
25 of the records as S-O-L-I-Z. This tattoo is S-O-L-I-S.

79

1 Now, is there something within the Spanish language and
2 the names where the "S" can be traded back and forth
3 with the "Z"?
4    A. There's -- I've seen it throughout my career
5 and more specifically my name. My last name is spelled
6 with a "Z", but there's variations of it. It's quite
7 common to end with an "S" too.
8    Q. And is it also common for people who are in
9 trouble with the law to be booked in at various times
10 in their life with that difference in the spellings
11 both ways, depending on what they say their name is?
12    A. Well, if they're intending to be deceitful and
13 not get caught, then yes, they will change their names
14 and make variations of it.
15    Q. I'm going to show you what's State's 67. Now,
16 here you can see three different tattoos on -- and again,
17 I'll represent this is Mark Soliz, the Defendant, in this
18 case. Can you tell us what this one says right there on
19 his -- I guess would be his right arm, right shoulder?
20    A. Looks like it says "Kilo".
21    Q. And what was the name that you were actually
22 searching for him under his street nickname whenever y'all
23 got involved with that chase?
24    A. It was the name "Kilo".
25    Q. Okay. And there's another picture of this too.

80

1 Can you tell what this tattoo says on the side of his
2 neck?
3    A. Looks like it reads "North Sider".
4    Q. Okay. And is -- have you seen, in your
5 experience, gang members from the north side of Fort
6 Worth having "north side" or something to that effect
7 tattooed across their neck?
8    A. And that's not just confined to north side.
9 That's all over town --
10    THE REPORTER: I'm sorry?
11    A. That's not confined just to north side. If the
12 member, the gang member has an affiliation to the east
13 side, south side, they'll also be used and tattoo that
14 name.
15    THE COURT: Martin, could you just --
16    MR. STRAHAN: Sir.
17    THE COURT: -- move back a little bit so
18 the Court Reporter has a line of sight with the
19 detective's mouth so she can kind of watch him talk.
20 That will help quite a bit.
21    MR. STRAHAN: Okay.
22    THE COURT: Thank you.
23    Q. (BY MR. STRAHAN) And so this top tattoo says
24 North Sider, and again, it could be anything, but this
25 is what you have previously testified to, people will

81

1 put their geographic location where they're from on
2 their body?
3     A. Yes. And that coincides with the street gang
4 that was documented as being affiliated with Varrio North
5 Side.
6     Q. Okay. All right. And I'll show you what's been
7 admitted now as State's Exhibit No. 68. And again, that's
8 just another photograph of those same tattoos; is that
9 correct?
10     A. Yes, sir.
11     Q. And what appears to be -- can you tell what
12 that is on the chest?
13     A. I can't tell.
14     Q. Okay. You can't tell from your --
15     A. From that angle.
16     Q. Okay. Are you familiar with what he does have
17 tattooed on his chest?
18     A. Is it a -- no, I don't.
19     Q. Okay. Picture of Jesus?
20     A. Picture of Jesus. I've never seen it.
21     Q. Okay. Let me show you what has been admitted
22 as State's Exhibit No. 70. Can you see what is depicted
23 on this hand tattoo that appears to be the second finger
24 on the left hand and middle finger on the left hand?
25     A. It appears to be a "S" overlapped over a "T".

82

1     Q. And in your experience and training as a Gang
2 Task Force member, what does that particular tattoo
3 signify when you see it?
4     A. Affiliate, affiliation with the prison gang Texas
5 Syndicate.
6     Q. Okay. Another picture at a later date of the
7 exact same hand, and does that appear to be that same
8 tattoo with something scribbled on it or smudged out or
9 something?
10     A. Yeah, it appears that the actual symbol is maybe
11 filled in.
12     Q. Okay. And is there a variety of reasons why
13 somebody might do that?
14     A. They want to cease affiliation with it.
15     Q. Okay.
16     A. That would be a reason why.
17     Q. And does that help change someone's
18 classification when they go to prison if they say
19 they're not in a gang?
20     A. It will affect them, I'm sure, once they get
21 there. It all depends whether they're confirmed or not.
22 It all pertains to the gang. If they're really not a
23 part of the gang, that would be wise for them to scratch
24 it out.
25     Q. Okay. And if they really are part of a gang, if

83

1 they are part of a gang, wouldn't it be wise to disavow
2 that so that you're not --
3     A. If they're no longer part of the gang, then yes,
4 most of them will try to scratch it out to show that
5 they're not affiliated with them anymore or they're an
6 ex-gang member.
7     Q. Does that make someone's life easier in prison as
8 far as prison officials go?
9     A. I couldn't tell you.
10     Q. Somebody else can answer that question. Okay.
11 And 71 is another close-up of that North Sider tattoo; is
12 that correct?
13     A. Yes, sir.
14     Q. Okay. Now, 72, the last one here, can you tell
15 us what that tattoo depicts? And, again, these are all of
16 this Defendant.
17     A. Looks like a smiling face and a frowning face
18 with tears.
19     Q. Do you ordinarily see this cartoon caricature
20 pictured on the bodies of known gang members in your area?
21     A. Yes, I have seen it before.
22     Q. Okay.
23     A. On gang members.
24     Q. And, generally, what is the saying that goes with
25 these two faces?

84

1     A. The one that I usually see says "smile now, cry
2 later". This one has a variation of "live now, die
3 later". When I talk with them, it's usually you're
4 laughing about what's going on right now and enjoying what
5 you're doing now but you're gonna end up paying the
6 penalty and crying later.
7     Q. And this one particularly says "live now, die
8 later"?
9     A. Yes, sir.
10     MR. STRAHAN: Okay. I'll pass the witness.
11     MR. HEISKELL: May I proceed, Your Honor?
12     THE COURT: Yes, sir.
13     MR. HEISKELL: Thank you.
14     CROSS-EXAMINATION
15 BY MR. HEISKELL:
16     Q. Detective Alaniz, my name is Mike Heiskell. You
17 and I just met today; is that correct?
18     A. That's correct, sir.
19     Q. And, sir, if I ask you a question you do not
20 understand, please don't hesitate to stop me, and I'll
21 start over. Okay?
22     A. Yes, sir.
23     Q. And your first name is Jesus?
24     A. That's correct.
25     Q. And you grew up in the north side?

85

1    A. That's correct, sir.
2    Q. And how long have you been with the Gang Unit
3 now, sir?
4    A. I was with the Gang Unit for close to three
5 years.
6    Q. And what time did that encompass? What time span
7 are we talking about?
8    A. It's two-seven -- 2007 through 2010.
9    Q. And at the time that you were there from 2007 to
10 2010, how many Gang Units were there in Fort Worth?
11    A. How many gang units?
12    Q. Yes, sir.
13    A. Well, there's one Gang Unit. There's two
14 Enforcement Teams.
15    Q. Okay. One Gang Unit, and I believe you said at
16 some point during your testimony that one unit consisted
17 of at least 10 members of that unit?
18    A. Actually both. There's two Gang Enforcement
19 Teams, both of them comprise of 10 officers and a
20 supervisor.
21    Q. And these, this Gang Unit, does that cover the
22 whole city of Fort Worth?
23    A. Yes, our area of responsibility is the whole
24 city, the entire city of Fort Worth.
25    Q. And from what you just told this Jury about the

86

1 North Sider versus South Sider, et cetera, I take it gangs
2 exist all over the city from north, south, east to the
3 west; is that correct?
4    A. Yes, sir. Yes, sir.
5    Q. And do you know the gang population of Fort
6 Worth?
7    A. I couldn't give you an exact number.
8    Q. What is your approximate number?
9    A. It's in the thousands.
10    Q. Are we talking tens of thousands, are we talking
11 two or three thousand, if you can?
12    A. I'm guessing maybe 3,000.
13    Q. About 3,000?
14    A. Yes, sir.
15    Q. And predominantly male?
16    A. Predominantly, male, yes, sir.
17    Q. And are there any females as well, Detective?
18    A. Yes.
19    Q. And about what percentage comprise of females, if
20 you know?
21    A. Very small percentage, that are actually
22 documented.
23    Q. Yes, sir. And you grew up in the north side?
24    A. That's correct.
25    Q. And what area, was it the Diamond Hills area that

87

1 you said you grew up in?
2    A. No, I grew up in the north side.
3    Q. The north side?
4    A. Yes, sir.
5    Q. And generally speaking, what does that --
6 boundaries of that encompass where you grew up?
7    A. The way I see north side, it's usually the
8 Main Street, North Main Street, everything to the west
9 of North Main is considered the north side, and
10 everything -- everything northeast of North Main, and
11 I would say 28th Street. North Side Drive is considered
12 Diamond Hill.
13    Q. Okay. So if we go past the stockyard area, North
14 Main, Northeast 28th, if you can divide that quadrant,
15 then you have the area, I guess, to the west of there that
16 you said you grew up in?
17    A. Yes.
18    Q. Okay. You know, I -- listening to your
19 testimony and hearing what you have to say, it appears
20 as though this job that you are doing and have done in
21 the past with gangs is a passion that you have; is that
22 correct?
23    A. Yes, it is, sir.
24    Q. And that this is more of a -- than a job to you,
25 that you are dedicated to, I guess, try to help people out

88

1 in that area, people who may have fallen into gangs and
2 trying, perhaps, to even get people out of gangs; is that
3 right?
4    A. That's correct.
5    Q. You grew up with a father?
6    A. Yes, I did.
7    Q. What did your dad do?
8    A. He worked construction for 39 years.
9    Q. Your mother?
10    A. Mother was a homemaker, still a homemaker.
11    Q. Really. And how many brothers and sisters,
12 Detective?
13    A. I have four sisters and no brothers.
14    Q. And are you the youngest or middle or oldest?
15    A. Second youngest.
16    Q. Second youngest. So your mother was a homemaker,
17 worked there at home and did not work outside the home?
18    A. Did not work outside the home, no, sir.
19    Q. And your parents were both good providers for
20 you and your sisters; is that right?
21    A. Yes, sir.
22    Q. So you were pretty fortunate, were you not?
23    A. Yes, I was.
24    Q. You have studied gangs, correct?
25    A. That's correct.

89

1    Q. And I take it in your training and experience,
2  Detective, you've attended different courses and seminars,
3  et cetera, dealing with gangs and their make-up?
4    A. Yes, sir.
5    Q. And was this prior to you becoming a part of the
6  Gang Unit, if you will?
7    A. I didn't take any formal courses prior to -- to
8  joining the Gang Unit.
9    Q. But after joining the Gang Unit?
10   A. Yes, I did take course and attended conferences.
11   Q. These conferences, I take it, dealt with the
12  whole spectrum of gang, gang memberships, people at risk
13  for gangs, et cetera; is that right?
14   A. Yes, sir. Yes, sir.
15   Q. And there are, in fact, risk factors for people
16  who become members of gangs, are there not?
17   A. I'm sure there are.
18   Q. And it's quite known that gangs in certain areas
19  prey upon younger people?
20   A. Yes, sir.
21   Q. And they prey upon young, vulnerable people, do
22  they not?
23   A. Yes, sir.
24   Q. And people can present different vulnerabilities
25  depending on what stage they are in their life; isn't that

90

1  true?
2    A. I'm sure, yes, sir.
3    Q. And part of the risk factors as far as membership
4  or a person becoming a member of a gang is, in fact, the
5  lack of a father, isn't it, in the home?
6    A. I'm not sure, but I'll -- I'll agree with you.
7    Q. Lack of a mother can be a risk factor, can it
8  not?
9    A. Yes, sir.
10   Q. Part of the risk factor could be a older brother,
11  for instance, who may be in trouble or be in a gang?
12   A. Yes, sir.
13   Q. Part of the risk factors can be neglect of that
14  person as a child, can it?
15   A. Yes, sir.
16   Q. In which that child is looking to form an
17  attachment with someone or somebody because of a lack
18  of an attachment at home?
19   A. That's correct.
20   Q. And they're seeking some form of confirmation
21  as to who they are and what they are by seeking others
22  to --
23   A. Yes, sir.
24   Q. -- hold onto; isn't that true?
25   A. Yes, sir.

91

1    Q. Now, when you have thousands, as you say, in Fort
2  Worth -- and let me ask you this question, Detective
3  Alaniz. Is it fair to say that the north side of Fort
4  Worth has more gang members than the east, south or west
5  side? Or is that spread out equally?
6    A. I'd -- I'd have to look at the numbers, sir. I
7  couldn't tell you yes or no.
8    Q. But from your own experience of three years --
9    A. Uh-huh.
10   Q. Is it fair to say that more gang activity took
11  place on the north side, when you talk about gang houses
12  that you've mentioned earlier and so forth?
13   A. Out of -- if you're splitting Fort Worth into
14  four quadrants, north, south, east and west, I'd say it
15  would be one of the top two, if not the top.
16   Q. One of the top two?
17   A. Yes, sir.
18   Q. And you knew -- okay. Let me put that, north
19  side one of the top two. What would be the other one, if
20  you know, Detective?
21   A. It would either be east or the south.
22   Q. Okay. And where is your Gang Unit located? Does
23  it have a specific office or location?
24   A. Yeah, we're centralized in the -- near the center
25  of Fort Worth.

92

1    Q. Downtown area?
2    A. Yes, sir.
3    Q. Part of what you try to do when we talk about
4  kids who are at risk and primarily young men --
5    A. Yes, sir.
6    Q. -- when they have these risk factors is that you
7  try to at least implement some type of program, if you
8  will, to try to get folks out of gangs?
9    A. Well, we actually have a -- a section within our
10  Gang Unit that's called Intervention Prevention. Those
11  officers are specifically trained within our Gang Unit to,
12  I guess, act as an intervention between youths that are at
13  risk and those that are, you know, on the cusp of joining
14  the street gang.
15   Q. Okay. And what do y'all do as a -- an
16  intervention group?
17   A. I'm not an Intervention officer. Like I said, we
18  had four officers that were assigned to our Intervention
19  section.
20   Q. So do you know what type of programs they have
21  for intervention or not?
22   A. I believe one of them, I know they work with the
23  Coming Up Program, which is with the Boys Club. And I
24  think those Coming Up Programs are spread out throughout
25  Fort Worth. Each one of them is specifically located to

93

1 try to -- try to tend to the needs of those that will
2 follow gangs in those geographical areas. For instance,
3 I believe the one -- there's a Boys Club down there off of
4 Vaughn and Rosedale, and I believe they cater -- it would
5 be either the East Side Latin Kings or their rival down
6 that area.
7 Q. What about on the north side?
8 A. When I was working, there was a Coming Up
9 Program, I believe at the Diamond Hill Recreation Center.
10 They catered to the Varrio Diamond Hill members. And I'm
11 not too sure, I couldn't tell you if there was one for the
12 North Siders, but I think there was one set out for each
13 Boys Club hub within the city of Fort Worth.
14 Q. Okay. Let me go back up here and talk about
15 some of the things we were starting to get into in
16 addition to those risk factors. And I now want to
17 get into this arena, if you will, Detective, of gang
18 members preying on the younger males in the community.
19 Okay?
20 A. Yes, sir.
21 Q. Is it true, for the most part, gangs have
22 hierarchies?
23 A. Yes.
24 Q. And when we say "hierarchies", can you explain to
25 the Jury what you mean by that, sir?

94

1 A. Having a gang leader, kind of an echelon of
2 leadership all the way up to the top.
3 Q. And does that exist generally in all of the
4 gangs? You've mentioned Tango Blast. You mentioned Texas
5 Syndicate. You mentioned V.N.S., and there may be others
6 I missed.
7 A. Well, I think the only documented or the ones
8 that I have actually seen pertain more to prison gangs
9 where there's actual generals and lieutenants. To my
10 experience looking at the street gangs in Fort Worth
11 and even Tango Blast, the classes that I've attended
12 in relation to the gang Tango Blast, there is no
13 leadership. For the most part, these gangs just get
14 together by association or to follow their pursuits,
15 be it criminal or whatever the reasons.
16 Q. That preying on the -- the young, those folks at
17 risk, that even goes down to childhood, adolescents, does
18 it not?
19 A. I would say, yes, sir.
20 Q. What age?
21 A. What age would they prey upon them?
22 Q. Yes.
23 A. My guess would be at the middle school level is
24 where it starts.
25 Q. Okay. 10, 11, 12?

95

1 A. Yes, sir.
2 Q. I'll say 10, 13 or?
3 A. Yeah, up to -- I would say up to 12.
4 Q. Up to 12. And this is a vulnerable age for young
5 men, is it not?
6 A. I would say, yes, sir.
7 Q. It's preadolescent?
8 A. Yes, sir.
9 Q. And especially if those young men don't have any
10 guidance or parents around to show them the right things
11 to do; isn't that true?
12 A. Yes, sir.
13 Q. And you were fortunate enough you had a mother
14 and dad to help show you the right thing to do; isn't that
15 right?
16 A. That's correct.
17 Q. Now, some of these, in addition to preying on
18 the young, it's true as well, is it not, Detective Alaniz,
19 that they also prey on folks by enticing them with drugs
20 and alcohol?
21 A. That could be a means, yes, sir.
22 Q. And that, of course, is enticement, is it not,
23 for the young, that they can get high and kind of use it
24 as an escape from whatever they're going through?
25 A. They could use it, yes, sir.

96

1 Q. Is that right?
2 A. Yes, sir.
3 Q. In addition, they also can use weapons or guns
4 to display to young boys to help entice them in the gangs;
5 isn't that true?
6 A. Yes, sir.
7 Q. And generally speaking, boys at this age, they
8 may have some toy guns or B.B. guns or whatever, but the
9 gang members can come along and show them and give them
10 real guns to handle and carry and display; isn't that
11 true?
12 A. Yes, sir.
13 Q. Now, I guess first, or perhaps first and
14 foremost, when we talk about that affiliation, if you
15 will, to get them in, is the fact that they also use
16 the fact that what I'm using as a general term,
17 Detective, association, or friends, in other words, a
18 connection with people, other people?
19 A. Yes, sir.
20 Q. Isn't that true?
21 A. That's correct.
22 Q. And that being the common denominator for
23 people to join in with a group, that young men like
24 that would certainly want to join in; isn't that true?
25 A. That's true.

97

1     Q. Especially when they don't have anyone at home
2 to have a group forum in a home family environment; isn't
3 that true?
4     A. Yes, sir.
5     Q. There are certain gangs you make reference to,
6 the Tango Blast; is that right?
7     A. Yes, sir.
8     Q. You knew of Jose Clemente Ramos?
9     A. I knew of him.
10     Q. And you knew from your own intelligence that he
11 was a part of a prison gang?
12     A. That's correct.
13     Q. I'm going to show you now what's been marked for
14 identification purposes, Detective Alaniz, as Defense
15 Exhibit No. 1, which purports to show, excuse me, an
16 individual with tattoos and et cetera, and also to see
17 if you can identify this person from the stop made with
18 the Liberty Jeep back on June 29th of 2010.
19     A. Yes, sir, the person is Jose Ramos.
20     Q. And does that fairly and accurately depict
21 Jose Ramos as he appeared on June the 29th of 2010?
22     A. Yes, sir.
23     MR. HEISKELL: Your Honor, at this time, we
24 tender it to Prosecution counsel and would offer Defense
25 Exhibit No. 1.

98

1     MR. STRAHAN: I have no objections.
2     MR. HEISKELL: No objection?
3     MR. STRAHAN: No objection. No objection.
4     THE COURT: 1 is admitted.
5     (Defendant's Exhibit No. 1 admitted.)
6     MR. HEISKELL: Thank you.
7     Q. (BY MR. HEISKELL) Detective, could you step down
8 for a minute, please. This is -- and we're going to do
9 this in two phases, sir. Let's start down here.
10     Defense Exhibit No. 1 is what I'm displaying
11 for you as Jose Ramos. Is that right?
12     A. Yes, sir.
13     Q. And we see him seated in a chair leaning over,
14 apparently asleep or nodding out or something; is that
15 right?
16     A. Yes, sir.
17     Q. And we see as well tats on his arm, both his left
18 and right arm?
19     A. Yes, sir.
20     Q. As well as toward his neck and chest area; is
21 that correct?
22     A. Yes, sir.
23     Q. And is there tats on his face, under his eyes as
24 well?
25     A. Looks like he has two teardrops at the edge of

99

1 his right eye.
2     Q. And we see on one of the tats on his right arm a
3 star?
4     A. Yes, sir.
5     THE COURT: I need to stop you.
6     MR. HEISKELL: Oh, I'm sorry.
7     THE COURT: I cannot hear him and the Court
8 Reporter cannot hear him because he's got his back to us.
9 So we need to either have him in the witness chair and use
10 the overhead or come up with a different program.
11     MR. HEISKELL: Let me use the overhead,
12 Judge. That will work better. Thank you.
13     (Sotto voce discussion.)
14     Q. Okay. We're focusing in, Detective Alaniz, on
15 the hand, forearm area. And we see the star on the left
16 hand -- right, excuse me. Yeah, right hand, excuse me;
17 is that right?
18     A. Yes, sir.
19     Q. And we also see tattoos on the left hand covering
20 the right forearm; is that right?
21     A. Yes, sir.
22     Q. Can you describe or tell the Jury what those
23 tattoos are of and what the significance they are or what
24 significance they have?
25     A. Well, it appears the tattoo on the top of his

100

1 wrist on his right wrist appears to be a star. And if
2 you're looking at his other hand, at his left hand, it is
3 overlapping looks like his index finger. And this
4 photograph really isn't too clear. It appears to be a
5 star also. The stars are identifiers, tattoos that are
6 common with Tango Blast gang members.
7     Q. Okay. And let's go back. We're going to show a
8 little further view of that. We see all this jewelry on
9 him; is that right?
10     A. Yes, sir.
11     Q. Oh, and by the way, did y'all check that jewelry
12 to see if it had been stolen from any location?
13     A. I didn't.
14     Q. Okay. The forearm, the left forearm, what is
15 that a tat of?
16     A. It looks like a -- like a clown with his -- with
17 his tongue out.
18     Q. Was that similar to the clown figures we saw on
19 the photographs involving Mark Soliz?
20     A. Yes. Tattoos like that are -- are pretty common
21 with gang members, prison gang members.
22     Q. Yes. Indicating, I think you said, laughter and
23 then crying kind of identifiers; is that right?
24     A. Yes, sir.
25     Q. We see on the right eye at least the -- those are

101

1  two tattoos; is that correct?
2      A. Yes, sir.
3      Q. Teardrops?
4      A. Yes, sir.
5      Q. What does that signify or mean?
6      A. There's different variations for it. I couldn't
7  tell you exactly what it means.
8      Q. All right. And we also see an area of the neck
9  on the -- and also the top chest area; is that correct,
10  sir?
11      A. Yes, sir.
12      Q. And are you able to tell what they signify or
13  what those, in fact, are, Mister -- Detective Alaniz?
14      A. It's not legible enough for me to read, sir.
15      Q. Okay. Did you -- thank you. Did you actually
16  observe him that night after he was placed in custody?
17      A. Yes, I did observe him.
18      Q. Did you also check out the rest of his body with
19  his shirt off to see the other tattoos that existed?
20      A. No, I didn't. Like I said, upon his detention,
21  he was placed in a police car and transported to robbery
22  at that point.
23      Q. If a person has tattoos, let's say a member of
24  the Tango Blast with five stars on their back, what does
25  that signify?

102

1      A. It signifies he has five stars on his back, sir.
2  I mean, I don't see what it would signify. Yeah.
3      Q. You indicated, Detective, that the night of this
4  chase you went to the home of Arturo Gonzales?
5      A. That's correct, sir.
6      Q. He's also known as Shadow?
7      A. That's correct.
8      Q. He has another name, nickname, does he not?
9      A. I only know him by Shadow.
10      Q. You ever heard the name "Hydro"?
11      A. I think I saw it on his intelligence report.
12      Q. And first of all, do you know what "Shadow" means
13  when a person use -- using that nickname?
14      A. Just common knowledge of what a shadow is, which
15  is, you know, a silhouette when the light hits you.
16      Q. Sorry?
17      A. It's a silhouette that's made whenever the light
18  hits you. That's the only thing I know shadow of.
19      Q. Are you familiar with the term "hiding in the
20  shadows"?
21      A. Yes.
22      Q. Hydro, what does that mean?
23      A. Hydro is street -- it's kind of a street term for
24  hydroponic.
25      Q. Right.

103

1      A. Marijuana.
2      Q. Marijuana?
3      A. Yes, sir.
4      Q. And this is a person who is heavily involved in
5  the marijuana trade?
6      A. He may be.
7      Q. And people may use that term to reference that
8  person as Hydro because of that reference to hydroponic
9  marijuana; is that correct?
10      A. They could term him for that reason, yes, sir.
11      Q. And this -- you termed it a drug house of Arturo
12  Gonzales's on the night on the north side -- I'm sorry,
13  gang house, excuse me, not drug house, gang house?
14      A. That's correct.
15      Q. And when you say "gang house", can you tell the
16  members of the Jury what you mean by that?
17      A. Gang house as referenced in my report is simply a
18  known residence of a gang member.
19      Q. And when you set up on that residence for
20  surveillance purposes or what have you, you're looking to
21  see, number one, the traffic that goes in and out of that
22  home, correct?
23      A. Not specifically on his that day because I didn't
24  have a line of sight on it.
25      Q. Okay. Well, let's take the equation out of that

104

1  day because you're looking for that vehicle. Okay?
2      A. Yes, sir.
3      Q. But normally when you identify gang houses,
4  you're looking at the traffic that goes in and out of
5  that house, correct?
6      A. That's correct.
7      Q. To see if there are other gang members that may
8  go in and out of that home?
9      A. That's correct.
10      Q. And also to identify as to whether any type of
11  illicit activity such as drug trafficking and the like
12  would go in -- in there?
13      A. That's correct, sir.
14      Q. As well as, perhaps, trafficking any weapons or
15  anything else?
16      A. That's correct, sir.
17      Q. On this particular day, the gang house of Arturo
18  Gonzales, and by the way, who did he live with at the gang
19  house?
20      A. I don't know that day. Like I said, about a
21  year, about -- I would say a little over a year ago, I had
22  gone to that residence and identified his mother as living
23  there. And she had granted us consent to search the
24  residence as he was wanted for an outstanding warrant. So
25  I'm guessing his mother lived there with him.

105

1    Q.  But generally speaking, when you enter a gang
2  house, certainly you have to be on your toes, so to
3  speak, because of the implicit danger of going into a
4  gang house?
5    A.  That's correct, sir.
6    Q.  Because you know that that gang house could
7  contain a number of things that could cause harm perhaps
8  to you and others?
9    A.  That's correct, sir.
10    Q.  There was never any gang house identified with
11  Mark Soliz, was there?
12    A.  No, sir.
13    Q.  In fact, you knew that he was homeless?
14    A.  I didn't know that he was homeless.  My research
15  to Mark Soliz was simply confined to a street name.  When
16  I talked to Detective Cedillo, prior to the day of the
17  robberies and prior to Mark Soliz's name popping up, I
18  never even came across his name or bothered researching
19  him for any kind of intelligence.
20       (Sotto voce discussion.)
21    Q.  Detective, I'm going toward the end of my
22  questioning of you, sir.  Your information identifies Mark
23  Soliz as a member of the -- what was it, V. -- V.N. --
24    A.  V.N.S.
25    Q.  V.N.S.  Is it "V" as in Victor?

106

1    A.  Victor North Sam, yes, sir.
2    Q.  And the "V" stands for what?
3    A.  Varrio.
4    Q.  Varrio?
5    A.  Yes.
6    Q.  Is that V-A-R-R-I-O?
7    A.  Yes, sir.
8    Q.  It's like, I guess, I'm used to that term
9  "barrio" with a "B", but this is "varrio"?
10    A.  It's -- it's more of a -- of a English twist to
11  the Spanish word.
12    Q.  Okay.  And the "N"?
13    A.  North.
14    Q.  "S", Side?
15    A.  Yes, sir.
16    Q.  And then you also identified him as a -- one of
17  the prison gang of the Texas Syndicate; is that right?
18    A.  Yes, sir.
19    Q.  And that's what we saw in that tattoo, T.S.,
20  something along those lines?
21    A.  That's correct.
22    Q.  All right.  And you -- let's look at Jose Ramos.
23  Now, what gang was he a member of?
24    A.  Puro Tango Blast.
25    Q.  Say that first one.

107

1    A.  Puro, P, P-U-.
2    Q.  Okay.  P, P-U -- T-A?
3    A.  R-O.  "R" as in Robert.
4    Q.  P-U-R-O?
5    A.  Uh-huh.
6    Q.  Okay.
7    A.  Next word is going to be Tango, T-A-N-G-O.
8    Q.  Blast?
9    A.  Blast, yes, sir.
10    Q.  Puro, okay.  And is that it?
11    A.  Yes, sir.
12    Q.  And then we have the person with the gang house
13  who is Arturo Gonzales?
14    A.  Yes, sir.
15    Q.  And by the way, Kilo, Kilo, as far as the aliases
16  for these individuals?
17    A.  That's correct.
18    Q.  Shadow and Hydro for Arturo Gonzales; is that
19  right?
20    A.  Yes, sir.
21    Q.  And what gang membership was Arturo Gonzales?
22    A.  Same gang membership as Mr. Jose Ramos.
23    Q.  Puro Tango Blast.  Was there any other
24  affiliation that Gonzales had?
25    A.  I believe he was, and I'm not a hundred

108

1  percent sure, but I believe he was listed as Varrio
2  Malone Street.
3    Q.  "Varrio" again?
4    A.  Uh-huh.
5    Q.  And what was the --
6    A.  I believe it was Malone Street.
7    Q.  M --
8    A.  Yeah.
9    Q.  -- A-L-O-N-E?
10    A.  Yes, sir.
11    Q.  Now, is that a gang that's on the north side as
12  well?
13    A.  Yes, it's actually -- the actual street itself is
14  probably within a mile of his gang house, of his
15  residence.  I'm sorry.
16    Q.  Okay.  And with regard to the Puro Tango Blast
17  and Varrio Malone Street gangs, are they rival gangs in
18  the sense of that term?
19    A.  No, not really.  And the gang where they had
20  them listed is pretty outdated.  I don't recall working
21  anything active on the gang side during my time there.
22  They were pretty active years back.  As far as them being
23  affiliated, I'm finding a lot once these guys reach
24  prison, once they go into the Puro Tango Blast level, it's
25  pretty common to see guys from different street factions

109

1 hanging out with each other as long as they're -- as long
2 as they're affiliated with Tango Blast.
3     Q. All right. Now -- and I'm about to finish. You
4 are familiar with the term "wanna be" gang members, aren't
5 you?
6     A. Yes, sir.
7     Q. Tell the Jury what a "wanna be" is
8     A. A "wanna be" is not a confirmed gang member.
9 And there's certain stipulations that the State has
10 in order to confirm a gang member. Those vary from
11 self-admission to identifying their tattoos, to being
12 identified with other gang members. "Wanna be's" are
13 usually those that are aspiring to be gang members and
14 haven't been documented as a confirmed gang member.
15     Q. And do you find that a lot in a lot of the
16 younger gang members before they are confirmed or reach
17 more maturity, they act out that they want to be a gang
18 member?
19     A. Yes, sir.
20     Q. And part of gang membership, and I think you
21 alluded to it during your direct examination, Mister --
22 Detective Aloniz, is the fact that people join gangs for
23 different reasons?
24     A. Yes, sir.
25     Q. And one of the reasons is for protection, isn't

110

1 it?
2     A. Yes, sir.
3     Q. Tell us about that.
4     A. Well, at the street level, and it's kind of
5 what you alluded to, it can be someone who -- who feels
6 ousted within their group, seeking protection, seeking
7 acceptance. It's more prevalent in, I think, the Tango
8 Blast group, they're a pretty -- the last class I went
9 to involving Tango Blast, it's -- it's the biggest gang
10 within the Texas Department of Corrections.
11     Q. That's the biggest gang?
12     A. That's my understanding.
13     Q. The Puro Tango Blast?
14     A. Yes, sir. Simply because there's so many
15 numbers that are within that gang, unlike -- unlike
16 your more traditional gangs like Texas Syndicate or
17 Mexican Mafia where it's kind of a blood oath that you
18 take. Tango Blast, in most cases, simply involves
19 something as similar as being jumped in a street
20 gang, just taking four guys on, and all of the sudden,
21 you're part of the group.
22         But through my past experience in
23 interviewing these guys, a lot of they guys say they do
24 it for protection within the prison system. So I think
25 it comes back to the street level side. A kid who is

111

1 maybe picked on and looked down upon is easy prey for a
2 gang to take in and say, hey, we'll protect you. And all
3 of the sudden, he has an identity.
4     Q. Okay. So identity is a major part too, I guess,
5 of the draw, if you will, of young men into gangs?
6     A. I'd say it's a factor.
7     Q. It's a factor?
8     A. Yes, sir.
9     Q. And that's one of the factors I didn't list, but
10 certainly is something that you recognize; is that right?
11     A. Yes, sir.
12     Q. And this gang prevalence in Fort Worth that we've
13 been talking about with the thousands of members, and I
14 think you said there were three -- at least 3,000
15 approximately in Fort Worth, correct?
16     A. That's my estimate.
17     Q. I don't know why I'm putting a dollar sign.
18         And what you've identified as intervention or
19 prevention, if you will, primarily dealt with the Boys or
20 Girls Club?
21     A. Going to schools, talking to -- talking to
22 students at schools, setting up presentations.
23     Q. What if a child is not in school; do you try to
24 reach out to those kids going to school -- not going to
25 school?

112

1     A. That would be up to the Intervention officer to
2 answer. I couldn't -- I couldn't tell you specifics what
3 they would do.
4     Q. And then there's a Diamond Hill Boys Club, or
5 Girl?
6     A. I believe so, yes. When I was working, there
7 was.
8     Q. Do you know if that still is there?
9     A. It was a Diamond Hill center, and I believe it
10 was a recreation center in Diamond Hill which -- which
11 had it.
12     Q. And what -- your knowledge, those are the two
13 primary intervention or prevention?
14     A. I wouldn't say primary. I know they're --
15 they're areas that are Intervention officers target
16 to -- to try to intervene with these at-risk youths.
17         MR. HEISKELL: Okay. Just a moment, Judge.
18         (Pause in proceeding.)
19     Q. Finally, Detective, you've used that term
20 "at-risk kids" a number of times. What -- tell the Jury
21 what is an at-risk kid.
22     A. It falls in line with the factors that you listed
23 up here, sir. And the areas that are -- that are pretty
24 prevalent with gangs; high schools, I mean, if -- if a
25 kid isn't -- isn't looked after, if you have a kid that's

113

1  bullied, someone seeking protection, I mean, they're --
2  they're more inclined to -- to join a gang with open arms
3  as opposed to someone whose -- whose, I guess, parents are
4  on their butt about, you know, going to school and keeping
5  them straight. So in that view, gangs, you know, prey on
6  kids, you know, that are -- that are at risk.
7          MR. HEISKELL: Thank you, Detective.
8          Your Honor, I pass the witness.
9              REDIRECT EXAMINATION
10 BY MR. STRAHAN:
11     Q. How many people are there in the city of Fort
12 Worth, just roughly?
13     A. Population-wise?
14     Q. Just, are they at a million yet?
15     A. No. I think they're over 700,000.
16     Q. 700,000. Okay. So, if there's 700,000 people
17 in the Fort Worth area, and there's 3,000 gang members,
18 that means 667,000 people in Fort Worth chose not to be
19 in a gang; is that fair to say?
20     A. Yes, sir.
21     Q. Okay. So this number here may be, and, again,
22 it's all approximations, but 697,000, if those are the
23 correct numbers, chose not to. Now, you're from the north
24 side of Fort Worth. You chose not to be in a gang, and
25 you had two parents; is that right?

114

1      A. That's correct.
2      Q. Did you have friends that you grew up with that
3  were from one-parent households?
4      A. Yes, I did.
5      Q. Okay. Did they all join gangs?
6      A. No.
7      Q. Okay. You were how old when you lived in the
8  north side? I mean from what years of your life. Were
9  you born to that area?
10     A. Yes, sir.
11     Q. Okay. And did you go all the way through high
12 school in that area?
13     A. Yes, sir.
14     Q. You were 7 years old on the north side of Fort
15 Worth, weren't you?
16     A. Yes, sir.
17     Q. You were 8 years old on the north side of Fort
18 Worth, weren't you?
19     A. Yes, sir.
20     Q. Were you 9 and 10 and 11?
21     A. Yes, sir.
22     Q. You were a young man, correct?
23     A. Yes, sir.
24     Q. You had friends that were young men as well?
25     A. That's correct.

115

1      Q. Were there gang members around you in your
2  school?
3      A. Yes, sir.
4      Q. Were there gang members in your neighborhood?
5      A. Yes, sir.
6      Q. Okay. And so in that area, it would be hard, I
7  guess, not to run in to or be around people that were in
8  gangs; is that right?
9      A. That's correct.
10     Q. You chose not to?
11     A. Yes, sir.
12     Q. You had friends that grew up in single-parent
13 households, they chose not to?
14     A. Yes, sir.
15     Q. Now, whenever you are working on the Gang Unit,
16 have you had some instruction into the laws as far as how
17 you charge people with certain crimes?
18     A. Yes, I do.
19     Q. Does it make a difference in how you charge
20 people if somebody is in a gang or not?
21     A. Yes, there are certain stipulations with specific
22 regard to gang members.
23     Q. And what does that mean?
24     A. Take, for instance, unlawful carrying of a
25 weapon; it's not illegal for a person to carry a weapon in

116

1  their vehicle, but if they're documented as a street gang
2  member, then it's an arrestable offense.
3      Q. Okay. And are there certain offenses that are
4  actually enhanced or taken to a higher grade because of
5  someone's gang membership?
6      A. That's correct. That's an enhancement of
7  engaging in organized crime.
8      Q. So the law in the State of Texas doesn't see
9  gang membership as an excuse; it sees it as something to
10 make punishment worse. Is that correct?
11     A. That's correct.
12     Q. Okay. Would the residence of Mr. Soliz be
13 listed in the various police reports regarding his case,
14 if he had a residence?
15     A. Would it be listed?
16     Q. Yes.
17     A. It should.
18     Q. Okay. And the different street gangs, especially
19 like the -- the street level gangs, what are the general
20 age ranges that those people go from?
21     A. I would say between 14 years of age when they're
22 in middle school, up to their 20s. That's if they haven't
23 gone to prison.
24     Q. Okay. And you say generally into their 20s?
25     A. Yeah, yes, sir.

117

1    Q.  Okay.  And so the vast majority though, do people
2  hang on that long to the gang into their 20s or how does
3  that generally work?
4    A.  At the street level, I wouldn't say -- I would
5  say no.  I think at the street level, they usually -- it
6  usually tapers off.  A lot of them fall into the prison
7  gang side.  Once they hit 18, they end up committing an
8  offense.  And then once they hit the prison, or once they
9  hit that age, around 18 or 20, a lot of them end up
10  joining the prison gangs.  And at that point, it just
11  becomes a repetitive cycle.
12    Q.  Okay.  And by the time you're 18 or 20,
13  especially if you have been, I guess, in a gang as a
14  youth, you are a -- a gang member who's been involved in
15  that lifestyle for some time if you're someone who joined
16  at 12, 13, 14, correct?
17    A.  Yes, sir.
18    Q.  You're not a little boy anymore when you join a
19  prison gang, are you?
20    A.  No, sir.
21    Q.  You are a full-grown adult at that point?
22    A.  Yes, sir.
23    Q.  And, ultimately, whenever you were on the north
24  side, you could have joined a gang, I suppose, if you
25  wanted to; is that fair to say?

118

1    A.  Yes, sir.
2    Q.  And there were gang members around you, correct?
3    A.  Yes, sir.
4    Q.  And what was the choice that you made?
5    A.  I didn't join.
6    Q.  Okay.  You did not.  So while there may be
7  influences that affect different people, ultimately that
8  person makes a choice to join or not join?
9    A.  Yes, sir.
10    Q.  In fact, you mentioned something about people
11  being jumped in to gangs?
12    A.  Yes, sir.
13    Q.  You choose to join that gang and you might get
14  the you-know-what beat out of you as part of your
15  initiation?
16    A.  This's correct.
17    Q.  And so that's a choice that a person would make?
18    A.  Yes, sir.
19    Q.  And whether a person is in a gang or not, if they
20  commit a crime, would that be their own choice?
21    A.  Yes, sir.
22    Q.  Okay.  And so people have choices to make in this
23  life; is that fair to say?
24    A.  Yes, sir.
25    Q.  And some people have better backgrounds than

119

1  others and everything varies, correct?
2    A.  Yes, sir.
3    Q.  Did you ever see people from good homes that
4  ultimately got involved in gangs, I mean two-parent
5  households right there on the north side?
6    A.  Yes.
7    Q.  Okay.  And so some people with two good parents
8  decide to join a gang?
9    A.  Yes, sir.
10    Q.  Some people without two good parents decide to
11  join a gang?
12    A.  Yes, sir.
13    Q.  Ultimately would be their choice; is that right?
14    A.  That's correct.
15    Q.  Committing crimes is a person's choice?
16    A.  Yes, sir.
17    MR. STRAHAN:  Okay.  I'll pass the witness.
18    RECROSS-EXAMINATION
19  BY MR. HEISKELL:
20    Q.  Detective Alaniz, sorry to keep you here for so
21  long.  Just a few more questions, sir.  One of the risk
22  factors I neglected to put up there I want to ask you
23  about is whether that young person who may be preyed upon
24  has some mental health issue.  That could be a factor,
25  couldn't it?

120

1    A.  I suppose it could, sir.
2    Q.  Yes.  And let me ask you this.  Did you ever run
3  across any young person, young man that you felt that you
4  influenced not to get into a gang?
5    A.  Yes, sir.
6    Q.  Tell us about that.
7    A.  Well, a lot of the kids that I would come across
8  were usually at that middle school level or they would end
9  up being attached to that gang member via family.  It
10  would be something as simple as a traffic stop.  Those
11  kids that aren't documented, and by documented meaning
12  they meet the criteria set forth by the State to document
13  them as a confirmed gang member, I felt still had a
14  chance.
15    Q.  And I want to ask you, if you would pick one of
16  those persons that you recall, tell us about that person
17  you helped direct them away from a gang.
18    A.  The one I -- the one I can recall is a confirmed
19  prison gang member.  And I remember this person because I
20  put him away -- I'm sorry, he was convicted on a charge.
21    Q.  Yes, sir.
22    A.  And this was back when I was in patrol, and he
23  said he did it.  I saw him when I was in Gang Enforcement,
24  probably two years into it.  And he came up and gave me
25  a flyer and said he started his own roofing company.

---

**121**

1 Said nobody would hire him as a felon. I told him,
2 well, I said, "That's going to happen," I said, "but
3 you've got to go about your own and, you know, make
4 something out of yourself." So he gave me a flyer and
5 said, "Got a roofing company now. If you need any work
6 done, here you go."
7　　　I figured he'd be mad at me, you know. I
8 did my investigation and did it thoroughly enough for
9 him to go back to prison; but he came back, and the day
10 I stopped him, I believe he was with his wife and his
11 kids.
12 　Q. And have you had the same experience with any
13 younger kid or?
14 　A. To come back around and confirm it, no, but I
15 wasn't -- I wasn't very reserved in sharing anything
16 that I could to help them out of it. I know for me,
17 at 19, I joined the military to get out of the
18 neighborhood for a while. And that's one thing that
19 I -- that I would usually counsel a lot of the young
20 and at-risk youth is, there is a world bigger than Fort
21 Worth. And I'm hoping some of them did take advantage
22 of it.
23 　　　MR. HEISKELL: Thank you.
24 　　　THE WITNESS: Yes, sir.
25 　　　MR. HEISKELL: That's all.

---

**122**

1 　　　FURTHER REDIRECT EXAMINATION
2 BY MR. STRAHAN:
3 　Q. So this person that you are talking about had at
4 some point been a confirmed member of a prison gang?
5 　A. At the time that I arrested him, I wasn't in a
6 Gang Unit, so I never confirmed that. But when I did
7 make the traffic stop on him, he had gone to prison and
8 I had researched him via our Gang database, and he was
9 confirmed.
10 　Q. So this is a confirmed prison gang member. About
11 how old was he whenever you were stopping him this last
12 time talking to him?
13 　A. He was about my age, about 30.
14 　Q. About 30. I'm going to represent to you that
15 Mr. Soliz is 30 also. This person at 30 years of age had
16 quit the gang?
17 　A. I don't know if he did or if he didn't, but he
18 was -- he seemed responsible. And like I said, he said
19 he had taken it upon himself to start his own business.
20 　Q. And had a wife and kids?
21 　A. Yes, sir.
22 　Q. And the reason that you brought this up is you
23 were asked if somebody had, I guess, changed their life or
24 you had affected somebody?
25 　A. Yes, sir.

---

**123**

1 　Q. So this is a person who, in that whole gang
2 lifestyle, even in a prison gang, who at 30 years old
3 is trying to start a roofing company and has a wife
4 and kids?
5 　A. Yes, sir.
6 　Q. Okay. So this person made a choice to get out
7 of that lifestyle as an adult?
8 　A. Yes, sir.
9 　　　MR. STRAHAN: Okay. All right. I'll pass
10 the witness.
11 　　　FURTHER RECROSS-EXAMINATION
12 BY MR. HEISKELL:
13 　Q. Just one other. I mean, this person obviously
14 had the smarts, the wherewithal, and the mental acuity to
15 start a business on his own; is that right?
16 　A. I take it, yes, sir.
17 　Q. Stopped using drugs, stopped hanging around,
18 associating with people; change of his life. Is that
19 right?
20 　A. My only encounter was during the traffic stop.
21 For all I know, he could have been lying to me. But he
22 did -- he did give me a flyer and he was with his kids
23 and he wasn't engaged in any kind of illicit act at the
24 time. So my perception of him was that he did get
25 everything straight.

---

**124**

1 　　　MR. HEISKELL: Good. Thank you. That's all.
2 　　　THE WITNESS: Yes, sir.
3 　　　FURTHER REDIRECT EXAMINATION
4 BY MR. STRAHAN:
5 　Q. One last thing. You had said that there's not
6 very many females in the gang population; is that
7 correct?
8 　A. Yes, sir.
9 　Q. And there's, I mean, I guess a astronomically
10 different percentage, higher percentage of people that
11 are male versus female?
12 　A. That's correct.
13 　Q. So on the north side of Fort Worth, are you more
14 likely to be in a gang if you're male or female?
15 　A. I'd say if you're male.
16 　Q. So then just being born a male, a boy, is a
17 higher risk factor for gang affiliation?
18 　A. Yes.
19 　　　MR. STRAHAN: I pass the witness.
20 　　　MR. HEISKELL: Nothing else.
21 　　　THE COURT: May the witness be excused?
22 　　　MR. HEISKELL: Yes, sir.
23 　　　MR. STRAHAN: Yes, sir.
24 　　　THE COURT: Thank you, sir. You may be
25 excused.

STATE VS. MARK ANTHONY SOLIZ

125

1    THE WITNESS: Thank you.

2    (Witness excused.)

3    THE COURT: At this time we'll recess for

4  lunch, and we'll resume at 1:15.

5    (Jury not present.)

6    (Off the record.)

7    (At the bench.)

8    THE COURT: Let's go back on the record.

9    MR. WESTFALL: Your Honor, certainly the

10  thing that we always want to try to prevent is the Jury

11  looking at the newspaper. Now they've already seen the

12  pictures, so it's up to -- and the whole issue of access

13  of the press versus --

14    THE COURT: Well, I know that Matt had

15  mentioned that -- if you don't have any objection to the

16  press looking at the exhibits that have been admitted and

17  shown to the Jury, then I would like to know that. If

18  you have an objection, I would like to know that.

19    MR. STRAHAN: I don't have any objection.

20    MR. HEISKELL: No, I don't.

21    THE COURT: All right. If the press wants

22  to look at an exhibit that has been admitted and shown to

23  the Jury, then that would be available for them to look at

24  either right before the trial resumes at 1:15.

25    (Off the record.)

126

1    (Recess taken from 11:56 a.m. to 1:32 p.m.)

2    (Jury not present.)

3    THE COURT: State ready to proceed?

4    MR. STRAHAN: Yes, sir.

5    THE COURT: Defense ready?

6    MR. HEISKELL: We're ready, Your Honor.

7    THE COURT: Defendant here?

8    MR. HEISKELL: Yes.

9    THE COURT: Jury ready? Bring them in.

10    (Jury present.)

11    THE COURT: Thank you. You may be seated.

12    MR. STRAHAN: We're walking the next witness

13  in, Judge. Sergeant Dena.

14    (Pause in proceeding.)

15    THE COURT: Please raise your right hand.

16    (Witness sworn.)

17    THE COURT: Thank you.

18        ROBERT DENA,

19  Having been first duly sworn, testified as follows:

20        DIRECT EXAMINATION

21  BY MR. STRAHAN:

22    Q. Would you state your name and spell it, please.

23    A. Robert Dena, D-E-N-A.

24    Q. And how are you employed?

25    A. I'm a Sergeant with the Fort Worth Police

127

1  Department.

2    Q. How long have you been with Fort Worth P.D.?

3    A. Be 25 years in March.

4    Q. Are you a certified peace officer in the State of

5  Texas?

6    A. I am.

7    Q. And you've been with Fort Worth, you said 25

8  years?

9    A. Soon to be, yes.

10    Q. Soon to be 25 years. Have you worked in any

11  agencies besides Fort Worth P.D.?

12    A. I have not.

13    Q. So your entire police career has been there?

14    A. Yes, it has.

15    Q. When you started off with Fort Worth P.D., what

16  were your general job duties at that time?

17    A. Patrolman, neighborhood patrol officer, community

18  officer, DARE Program. I did a little bit of intervention

19  at that time, youth intervention work within the

20  department. And then promoted with the DWI Unit, and

21  promoted to Detective. Then I went to Traffic

22  Investigation Unit, and promoted to Sergeant, went back to

23  patrol and have been there since.

24    Q. Okay. So you say promoted to Detective and then

25  promoted again to Sergeant; is that what you said?

128

1    A. Correct.

2    Q. Okay. And as Sergeant, what -- and currently how

3  long have you been a sergeant?

4    A. Five years.

5    Q. And what are your current job duties?

6    A. I am an administrative supervisor for the midnight

7  shift. My primary duties at this point is to handle all

8  type of administrative investigations, paperwork, issue

9  tapes, things like that.

10    Q. Okay. So are you generally an officer who spends

11  time on the street at this point in your career?

12    A. Most of my time at this point is mainly in the

13  office in the patrol function. Once administrative duties

14  are performed and completed, then I'm available to patrol

15  and can go in patrol, and I do, and help out with calls

16  and what have you.

17    Q. Okay. Are there situations sometimes where

18  the -- I don't want to say regular, but the patrol

19  officers, where they'll have situations that arise that

20  they will specifically call out a sergeant for help?

21    A. Yes.

22    Q. And situations that maybe they're not -- have

23  enough experience to handle, things of that nature?

24    A. Yes.

25    Q. Okay. Let me take you to June 29th, 2010. Were

129

1  you working that day?

2  A. Yes, I was.

3  Q. Okay. Did you somehow get involved on looking

4  for a vehicle that had been taken in an armed robbery?

5  A. Yes, I did.

6  Q. Okay. Tell us, tell the Jury how you got

7  involved that evening.

8  A. A sergeant friend of mine, we were riding

9  together, a two-man unit, and we had just finished our

10  lunch break. And we heard that, I believe, it was

11  fugitive units, gang units, had located a vehicle, suspect

12  vehicle that was connected to a homicide suspect and that

13  it was in the area where we were at, so.

14  Q. Okay. And what area were you patrolling whenever

15  you got this call out?

16  A. This would be in the area of Long and Decatur.

17  Q. And what --

18  A. Fort Worth.

19  Q. Okay. What part of Fort Worth is that in?

20  A. That is the north side of Fort Worth.

21  Q. And is that generally the part of Fort Worth that

22  you are in charge of the patrolmen in that area?

23  A. Yes, it is.

24  Q. Okay. And so when you say you got off your lunch

25  break, I'm guessing this wasn't noon?

130

1  A. No, it was not. This is in the evening.

2  Q. Okay. And so about what time would you say that

3  you got this call and jumped into action?

4  A. It was after 10:00.

5  Q. Okay. And so you hear something on the radio

6  that an unmarked unit has maybe spotted this green

7  Stratus?

8  A. That is correct.

9  Q. Okay. And what did you do?

10  A. We assisted patrol in setting up a perimeter so

11  that we could make sure that the vehicle did not go

12  outside the perimeter, that we would either discover it so

13  we could then assist in the takedown of the vehicle.

14  Q. And how big of a perimeter are we talking about?

15  A. Probably 10 square blocks.

16  Q. Okay. And this is in the area of -- the direct

17  area where this vehicle had been spotted?

18  A. Correct.

19  Q. And the people who had spotted the vehicle, if

20  you know, were they in a marked or unmarked unit?

21  A. Unmarked unit.

22  Q. Okay. And generally what is the policy of Fort

23  Worth P.D. with effecting traffic stops in unmarked units?

24  A. Unmarked units are required to get a marked unit

25  to assist in a traffic stop.

131

1  Q. Okay. And the unit that you were riding in, was

2  that marked or unmarked?

3  A. It's fully marked.

4  Q. Okay. And please tell the Jury what it means to

5  be in a marked police car.

6  A. A fully marked police car is a police car which

7  has the City of Fort Worth logos on the side, has the

8  lights on the top, and has bumpers on the front, and has

9  the full insignia of the City of Fort Worth or the city

10  that it represents.

11  Q. And is the purpose of that to be unmistakable as

12  a police car so that you can effect traffic stops?

13  A. That is correct.

14  Q. Do you have the lights on top and sirens and all

15  that stuff that goes with the police car?

16  A. Yes.

17  Q. So this is what we think of when we see a police

18  car driving down the road?

19  A. Yes.

20  Q. Okay. So you're in a marked unit and you are

21  helping set up the perimeter. What is the next thing that

22  happened in reference to this particular Stratus?

23  A. Myself and the other officer that I was riding

24  with, the sergeant that I was riding with, we were

25  headed -- be westbound on Long at the street called

132

1  Schwartz. And when we came to that intersection, we heard

2  on the radio that the vehicle, the suspect vehicle which

3  had in it -- I believe we were told that it may be

4  occupied by two occupants at that time, one of them being

5  the suspect -- was approaching Long from Schwartz. And so

6  we looked to our left, approached the intersection. We

7  then immediately noticed that that was the green Stratus

8  as described.

9  MR. STRAHAN: Okay. Can you step down?

10  Judge, may he step down from the stand?

11  THE COURT: Yes, sir.

12  MR. STRAHAN: Okay. I'm going to set this up

13  a little bit higher so we can see. Do you want to hold

14  it?

15  THE COURT: If you would, if you would

16  just --

17  MR. STRAHAN: I can move back.

18  THE COURT: Move back a little bit and let

19  the officer stand so that he can face the Court Reporter

20  and the Jury. That way we can kind of hear. Speak up for

21  me.

22  THE WITNESS: I can assist in holding it.

23  MR. STRAHAN: I can hold it for you.

24  Q. Tell us the spot you were in whenever you first

25  made visual contact with the Stratus.

133

1      A. Okay.
2      Q. This is State's Exhibit No. 50. Is this
3  Schwartz?
4      A. Okay. Thank you. I had to get my bearings. I
5  was looking for Schwartz. There it is. Okay. This is
6  Schwartz. Okay. So this is going north, I'm sorry, yes,
7  and this is going south, west, this is your east. We are
8  coming right here going east right about here. I'm
9  sorry. Is that right? Sorry. Up here, this is where
10 we're at. This is Long Avenue right here. This is
11 Schwartz.
12     Q. Okay.
13     A. Right there about where you see this vehicle in
14 this picture, we're sitting right about here, and their
15 vehicle is coming up this direction right here being
16 followed by undercover vehicles. We're being notified at
17 that time the direction of travel on Schwartz going north,
18 report at Long, and we sit here and we see the vehicle
19 come and turn this direction.
20     Q. Okay. Now, you had set up a perimeter with other
21 marked vehicles; is that correct?
22     A. That's correct.
23     Q. How many marked vehicles were involved in setting
24 up this perimeter?
25     A. I don't know the accurate -- the exact count

134

1  of how many. I would say probably anywhere from five
2  to anywhere up to maybe ten vehicles. I never got the
3  exact count. Most of it at that time there were -- the
4  location of the vehicle was somewhere in this area over
5  here, and there was vehicles dotted all throughout this
6  area here to -- just in case, you know, he went one
7  direction or the other. We had no idea where this may
8  go and we had -- they'd originally gotten sight of the
9  vehicle, then they repositioned because I think the
10 vehicle moved and then came back out again. So
11 everybody's kind of moving different positions trying
12 to get in the most likely position where we think the
13 vehicle may present itself.
14     Q. Okay. We've heard some testimony already that
15 there were maybe as many as ten of the specific to Gang
16 Enforcement Section officers were in this area as well.
17 So if there were five patrol cars, were they occupied two
18 times by police officers or some have one? How did that
19 work?
20     A. There is no specific criteria that we follow as
21 far as occupying our vehicles. Sometimes it may be that
22 there just aren't enough vehicles to go around so an
23 officer may double up with another officer; in that
24 capacity they'll ride together for the rest of the shift.
25 So some may have been doubled up, some may be just going

135

1  by themselves as one-man units or two-person units
2  depending on, you know, what the preference is or need is
3  and vehicles and so forth.
4      Q. Okay. So you said there was probably at least
5  five, maybe as many as ten cars, and so depending on if
6  they're doubled up, you had a minimum of five officers,
7  maybe as many as 12, 15; is that possible?
8      A. Yes, very possible, very possible.
9      Q. Okay. And so that in conjunction with the gang
10 people could have been as many as 20 people, 15 to --
11     A. Yes.
12     Q. -- 25 maybe; is that fair to say?
13     A. That's very fair.
14     Q. All looking for this one car?
15     A. That is correct.
16     Q. And that's a lot of Fort Worth P.D. resources
17 looking for one person and one car?
18     A. It is. It is. And we had had BOLOs that had
19 gone out in reference to this actor and the actions that
20 he was suspected of at that time, so we had a -- we had
21 pictures that we all had, were aware of to look at.
22 And so when we knew that this was a call out for
23 assistance, then we were quick to respond, as far
24 as uniform services.
25     Q. If you recall, what is the name of the person

136

1  that you were looking for in the green Stratus?
2      A. At that -- trying to remember his name.
3  Sorry. I am so sorry. You would think I would know
4  that. I'm just totally drawing a blank.
5      Q. Okay.
6      A. As an explanation, I work midnights, so I am
7  not -- I'm try to get my bearings here.
8      Q. This case is State of Texas versus Mark Soliz.
9      A. Soliz, yes.
10     Q. Anyway, do you recall that being the name now?
11     A. Yes, I do, and I recognize the gentleman.
12     Q. Okay. Well, okay, since you've done that, the
13 person that you were looking for, eventually at some point
14 you caught up with him in the night; is that correct?
15     A. That is correct.
16     Q. Okay. And do you see him in the room with us
17 today?
18     A. I do, sir.
19     Q. Would you point out who it was you were looking
20 for and who you eventually came in contact, and describe
21 what he's wearing.
22     A. Gentleman sitting over here wearing a black tie.
23     Q. Okay. Without the --
24     A. Light color shirt.
25         MR. STRAHAN: Okay. I would ask the record

137

1  reflect he's identified the Defendant.

2       THE COURT: Granted.

3       Q. Okay. So you were looking for him and he crosses

4  by you, is that correct, in this green Stratus?

5       A. That is correct.

6       Q. Okay. And so whenever that happens, do you

7  immediately notify everyone else, all the other patrolmen

8  and everybody for Fort Worth P.D. who is listening and let

9  them know that you've seen it?

10      A. That is correct.

11      Q. Okay. And so your purpose at this point to go

12 ahead and try to stop him or are you just watching him?

13 What are you doing?

14      A. At this point we're going to try and attempt the

15 stop. We know -- the stop. We know that we have several

16 officers in the area to assist in the stop. We know that

17 we have undercover officers following the vehicle also,

18 but we know that the way this is going to have to work is

19 that a marked unit is going to have to initiate the

20 traffic stop by hitting our lights on and then getting the

21 vehicle pulled over. So we then --

22      Q. You specifically mentioned that a possible

23 murder and then was there other robberies that he was

24 wanted for?

25      A. Yeah, we knew that he was a suspect in some

138

1  robberies and a shooting that we had, several, a couple of

2  shootings that we've had in Fort Worth. And, of course,

3  we knew of the homicide that had taken place in Johnson

4  County.

5       Q. And did the officers share this information back

6  and forth so that everybody had heard that he was

7  connected with these robberies and maybe these --

8       A. Right.

9       Q. -- this murder, and that was the reason you

10 wanted to pull him over?

11      A. That is correct. And part of my duties as a

12 patrol supervisor, prior to this, officers going out into

13 the field, is to brief them on BOLOs. BOLOs are "Be On

14 the Look Out for", B-O-L, BOLOs, be on the lookouts for

15 certain suspects that we may have, that we need to be

16 aware of. And, of course, I, myself, briefed them on

17 the -- that we were looking for Mr. Soliz in reference

18 to the -- being a homicide suspect.

19      Q. Were you also aware the particular vehicle, that

20 Stratus, was also a stolen vehicle? Is there some report

21 that goes out that tells you that?

22      A. There are reports that go out on that also.

23      Q. Okay. And so at that time would you have been

24 given a description of the car, the license plate, so that

25 you know that it's the right car you're attempting to pull

139

1  over?

2       A. Right. Well, at this time I did not know that

3  that vehicle was stolen. Okay. Others may have had that

4  information in the field. I did not know that

5  information. It -- but what we did know is that this was

6  the vehicle that they were setting up on which was

7  occupied by the suspect. And so they described the

8  vehicle as it was approaching us from Schwartz onto Long,

9  and so we knew exactly that that was the vehicle.

10      Q. And, in fact, I guess Detective Cedillo,

11 Detective Paine, who had more information about the other

12 offenses, had asked you to stop this particular car?

13      A. Yes, they did.

14      Q. Okay. And so you're basing it on what they

15 already knew about their cases as well in your rationale

16 for wanting to stop this car?

17      A. Yes, sir.

18      Q. Okay. So you see the car, and you're going to

19 effect a stop. What do you do with the car itself? How

20 do you get into place and what do you do to let the driver

21 know that you're wanting to stop them?

22      A. Okay. As the vehicle -- I'm facing this

23 direction as if this were going westbound. We see the

24 vehicle right about where the chalkboard would be coming

25 from, from that direction. So as it turns to go back

140

1  east, I'm going west. We obviously just get on the radio,

2  say we have the suspect vehicle, we are getting behind the

3  vehicle now. Yeah, he's telling us that is the vehicle,

4  that's the vehicle. Said we got. We get in behind the

5  vehicle. We turn on our reds and blues which is the

6  lights on top. And at that time we go ahead and get

7  behind the vehicle, attempt to pull it over.

8       When we realized it was speeding up to go

9  eastbound on Long, we then hit our actual audible, which

10 is the siren. And now the pursuit, what we call pursuit

11 is in full gear at that point.

12      Q. Okay. Whenever you hit your lights and turn

13 the siren on attempting to pull someone over and they

14 speed up, is that a felony offense not to stop at that

15 point?

16      A. It is.

17      Q. In a vehicle. Okay. And so this vehicle speeds

18 up. Where are you whenever you hit your lights on this

19 map, roughly?

20      A. As we turned the corner here, we automatically

21 can hear the vehicle picking up speed and moving quick.

22 So the minute that we turn around, we're already hitting

23 our lights and our sirens, and we advise that we're in

24 pursuit. The vehicle is going eastbound on Long.

25      Q. Now, would it be a fair assumption that whenever

141

1 you see the vehicle, you're in a fully marked unit, they
2 saw you too?
3    A. Yes.
4    Q. Okay. And they sped up before you hit your
5 lights?
6    A. I believe so, yes.
7    Q. Okay. And so you hit your lights and you start
8 going. Can you show us the direction of travel and what
9 happened?
10    A. The direction of travel is going to be this
11 direction here going on Long.
12    Q. Okay. And this -- from this area where you see
13 them, how -- how much in distance are we talking about to
14 right in this area?
15    A. You're looking at maybe a mile from about here to
16 Braswell.
17    Q. Okay. And so at what kind of distance away
18 from the vehicle were you traveling when you were chasing
19 it?
20    A. I would say about -- that would be equivalent
21 about half a block. This would be a full block here.
22 Well, yeah, this would be a full block here. We're
23 saying our distance is about a half a block away, about
24 this far as the pursuit continues and moves forward in
25 this way.

142

1    Q. Okay. And whenever you were in this pursuit, is
2 somebody radioing to other patrol marked units to let them
3 know, or even the unmarked units, are you letting
4 everybody know that you've got the car and this is where
5 you are?
6    A. Yes. And that's what I did.
7    Q. Okay. And so --
8    A. I was the passenger and my co-sergeant was the
9 driver, so I had control of the radio.
10    Q. And who was the co-sergeant that was with you?
11    A. Reynolds.
12    Q. Okay. And so you're on the radio. You're
13 telling everybody what's going on, where you are. Do
14 other units, marked or unmarked, get involved on the same
15 road and in the same chase that you're in?
16    A. Yeah, I believe that definitely was the case. As
17 you could imagine, when I got engaged in the pursuit, my
18 focus was in relaying information about we were -- where
19 we were headed. And, of course, I had my understanding in
20 my mind as to where this might end and how this might end
21 in regards to who we are chasing. So my focus isn't on
22 who all is behind me, who all is -- who my backups are at
23 that time. My focus is on that vehicle ahead of me and
24 what their next actions may be and then what I'm going to
25 be prepared to do should it come to whatever end.

143

1    Q. Okay. You've gotten us, I guess, all the way
2 down to this point on Long where you're still chasing this
3 vehicle. You are, if there are other cars behind you, you
4 would be the lead car?
5    A. We are the -- we are the lead vehicle. At this
6 point, I don't know that there is anybody else behind us
7 other than the unmarked vehicle at that time, the Gang
8 Units.
9    Q. Do you recall the kind of speeds you're hitting
10 going down Long as you're chasing this vehicle?
11    A. I -- again, that wasn't something I was paying
12 attention to, but I probably want to say anywhere from 50
13 to 60 miles per hour.
14    Q. And what's the speed limit on that road?
15    A. I believe it is 40.
16    Q. Okay. And so you're going at a higher rate of
17 speed than the speed limit, whatever that was, trying to
18 get there?
19    A. Right.
20    Q. Okay. Can you please keep directing us the line
21 of travel where the chase went from there.
22    A. This is a good indication here, this vehicle
23 here, which is not our vehicle, of course, but just any
24 vehicle. We're approaching this direction here, and you
25 can see there is actually looks like an 18-wheeler parked

144

1 right here. It's hard to tell. But this is Braswell and
2 this is a Motel 6 right here. His vehicle came this
3 direction, turned this corner here. They could not
4 negotiate the turn properly and wrecked their vehicle out
5 right there, which would be right in front of this vehicle
6 that is parked right there. They wrecked in -- jumped the
7 curb and wrecked out right here. We then positioned our
8 vehicle just kind of right to their -- the left back
9 quarter of their vehicle, kind of at this angle like
10 this. So they're like this and we're like this.
11    Q. Okay. Did anyone exit the vehicle after it
12 wrecked out?
13    A. Yes, two people did.
14    Q. Who was the first person to exit the vehicle?
15    A. I believe it was Mr. Soliz.
16    Q. Okay. And which side of the vehicle did he exit
17 on?
18    A. I believe it was the passenger side.
19    Q. Now, did the door come open and he get out? How
20 did that happen?
21    A. I believe -- I'm trying to remember. I believe
22 it was I tried to push the door open but it wouldn't.
23 What I remember specifically though is him exiting out
24 through the window.
25    Q. Okay. And so he would have had to have crawled

145

1   out the window, and he exited first?

2       A.  Correct.

3       Q.  Okay.  Do you know whether or not he crossed the

4   other person and climbed out the window or could you see

5   what was going on inside the car?

6       A.  No, everything happened too quickly.  I don't

7   remember that at all.

8       Q.  Okay.  But he did exit first and he exited

9   through the window, not through the door?

10      A.  Correct.

11      Q.  Okay.  And so when he gets out of the vehicle,

12  was there an exchange -- how close was he to you?

13      A.  I would say probably from about here to that

14  corner.

15      Q.  Okay.  And that's where he is.  Do you have a

16  clean line of sight to him getting out of the vehicle?

17      A.  Yes, I do.

18      Q.  And what are you doing at this point?

19      A.  I got out of the vehicle and had my weapon out,

20  had my weapon pointed in his direction like this, and I'm

21  waiting to see what his next move is going to be.

22      Q.  Okay.  And you're waiting there.  He crawls out.

23  Does he land on his feet?  Does he hit the ground?  What

24  happens with him?

25      A.  As you can imagine going out through the window

146

1   in this direction, he touches the ground with his hands

2   first, and I think he stumbles a little bit and gets back

3   up and takes off running.

4       Q.  Okay.  And what did you do?  Did you say anything

5   to him?

6       A.  I believe I may have told him to "stop, police".

7   I don't remember.

8       Q.  And this is with your weapon drawn; is that

9   correct?

10      A.  Yes.

11      Q.  Okay.  And did he have a reaction or a response

12  to you telling him to stop?

13      A.  Um, I remember -- I think I remember him looking

14  in my direction and then taking off and going.

15      Q.  And did he say anything?  Did you notice anything

16  about his body or his waistband as he was falling out of

17  the car that was important to you?

18      A.  Right.  When he came out this direction, as you

19  can imagine, his shirt went forward this way.  And so, you

20  know, part of my whole presence of mind is officer safety

21  and being prepared to fire.  I believe that we were going

22  to have an exchange of gunfire.  That was my true belief

23  that was going to happen, so I was prepared for that.

24          So I had my weapon drawn, and I believe I

25  yelled at him "get down on the ground" or "stop".  And his

147

1   shirt, as he's coming out of the vehicle, his shirt goes

2   forward.  I'm looking at his waistband area.  I can see

3   that there isn't a weapon on this side.  I didn't know if

4   he had a gun still in his pocket, was it in his ankle

5   holster, or -- sorry -- on the other side, on the left

6   side.  I had no idea.  But I knew that this area here on

7   this side appeared to be secure.  But, you know, again, we

8   don't know if someone could take it out of a pocket,

9   switch a hand.  After that point, he got on the ground and

10  took off running.

11      Q.  Okay.  And can you show us on this map where

12  he -- did you give chase, first of all?

13      A.  I did.

14      Q.  Okay.  And where did he go?  Point us to where he

15  was wrecked out again, and then orient us as to where he

16  ran from there.

17      A.  Okay.  This is a really good picture because this

18  18-wheeler here, looks like a long-bed trailer, was parked

19  there.  And I believe you may have seen other photographs

20  that show that.  He wrecked out here.  And so there's a

21  little grassy area here behind the 18-wheeler.  Our

22  vehicle is here.  So he takes off running down this way

23  and going into the parking lot of the Motel 6.  I'm coming

24  on the other side of the Motel 6, and I lose momentary

25  sight, as you can imagine, because of the 18-wheeler.

148

1           When I see him at this point, I'm coming

2   around this direction here.  The female at this time has

3   already come back around this direction also.  And so the

4   first person I see, as he -- I had to momentarily freeze

5   as he takes off and goes.  Then I see in my peripheral

6   another person coming by the vehicle.  So now, officer

7   safety, I have to pan back this other direction.  I see

8   that now she's run behind the 18-wheeler.  So then I start

9   giving chase again.  So at this point, he's already

10  cleared the 18-wheeler this direction.  I -- now she's

11  coming.  I'm coming.  She comes out in front of me.  I

12  believe at this point I -- trying to remember right.

13  Happened so quick.  I think I either pushed her to the

14  ground or yelled at her, "get down on the ground".  So I

15  shoved her to the ground.  I knew that my assist officer,

16  which was my co-sergeant, had her.

17          And I see him in my peripheral going behind

18  vehicles.  The vehicles are going to be all parked here in

19  this shadowed area here.  As you can imagine, on this

20  night you can -- these are all cars.  This area is full.

21  All that shadowed area now is vehicles.  You see one car

22  here.  All these were occupied.  Okay.

23      Q.  This is in the parking lot of the Motel 6?

24      A.  In the parking lot of the Motel 6.  It's a

25  well-lit area.  We have light posts here and here, I

**149**

1 believe, so the whole area is pretty well lit. I guess
2 they try to maintain a good security presence there at
3 that motel. But it's well lit, and I see him duck behind
4 the vehicles up here by the building. So I'm cleared,
5 pushed her down right about here. She hits the ground.
6 And then I leave her there, and now I'm having to pan
7 every vehicle in search of him and I don't know where he
8 is at.
9     Q. Okay. So you make a felony stop, and that
10 actually ends in a wreck; is that correct?
11     A. Yes.
12     Q. And the person -- the information you have is
13 that person is possibly wanted for either murder and for
14 sure robberies; is that correct?
15     A. That is correct.
16     Q. Okay. And you don't know, from your testimony,
17 whether he's got -- you didn't see one here, but you don't
18 know whether he's got guns in his pocket or --
19     A. Correct.
20     Q. -- on his ankle or anything. You don't know?
21     A. That is correct.
22     Q. Okay. And the place where he wrecked out, is
23 that well lit or is that not well lit?
24     A. It is well lit. In my opinion, it is well lit.
25 I could see where my targets were, what I was looking for.

**150**

1     Q. Okay. And so once he runs around the corner and
2 gets into the Motel 6, do you see him duck behind cars?
3     A. I see him. That's the last thing I see. I'm
4 pushing her down to the ground. I see him cut between a
5 vehicle, and then I don't see anymore of him.
6     Q. And so he's behind the vehicle and that
7 area was darker, correct, the -- where the shadowy parts
8 of the vehicles, I guess?
9     A. Well, as you can imagine, there's vehicles as the
10 ones we have parked in front of the building here. You
11 can't see what's in front of the vehicles. Someone could
12 be down like this, crouched. As if this right here were
13 all vehicles, once he gets on the other side of that, I
14 can't see. No matter how much light there is, I cannot
15 see him between the vehicle and the building.
16     Q. Okay. And so --
17     A. But it's well lit enough if he had popped his
18 head up, I would have -- I would have seen him.
19     Q. Okay. Did you have anyone -- for instance, the
20 female that you pushed down, the other occupant of the
21 vehicle, did somebody go ahead and take her into custody
22 or detain her?
23     A. I did not hesitate to find out, so I did not
24 stop.
25     Q. Did you later find out that someone else --

**151**

1     A. Right. I believed I heard footsteps behind me
2 and I knew that to be -- I believed to be my assist
3 officers, but I don't know.
4     Q. Okay.
5     A. My focus was getting her down, and I knew that
6 there was still the suspect out there and he may have a
7 gun. So my focus is get her to the ground really quick,
8 and I started panning trying to find him.
9     Q. Okay. And you're panning. Were you walking
10 alongside the cars and looking between them?
11     A. I am, I guess it would be what we call a stagger
12 step.
13     Q. Okay. What does that mean?
14     A. It's I'm going with my vehicle -- I'm sorry, with
15 my hand on my weapon. I'm going like this as I'm clearing
16 each vehicle, because I think that at any minute he's
17 going to pop out with a handgun and try to shoot me. So
18 as I clear each vehicle, I'm watching, just going down
19 each vehicle trying to see where he's at.
20     Q. Okay. And so at this point you think you're by
21 yourself?
22     A. Yes.
23     Q. But you keep doing it anyway, don't you?
24     A. Yes.
25     Q. Okay. So you keep going vehicle to vehicle. Did

**152**

1 you at any point spot Mr. Soliz hiding behind the vehicles
2 where you had seen him run?
3     A. Not until he pops out.
4     Q. And where does he pop out later or around that
5 same time?
6     A. Okay. Let's go back. Okay. I -- again, I'm
7 having to go very slow. I don't know where he's at. So
8 she goes down. And I start panning each vehicle, panning,
9 panning, panning, panning. I get probably right about to
10 here, and he comes running out right here. From right in
11 this corner, he runs out.
12     Q. Okay. Does he cross --
13     A. So now there's probably about -- our distance is
14 about from me to that door.
15     Q. Okay.
16     A. To Mr. Soliz.
17     Q. All right. And do you say anything to him at
18 this point whenever you make visual contact with him
19 again?
20     A. I believe I may have said two things. I believe
21 I may say -- told him, "Stop. Get down on the ground.
22 Police." Or just "stop, police". I'm not sure which one
23 I said, but I know I yelled commands at him to "stop,
24 police".
25     Q. And did he have a reaction or a response to that?

153

1   A. He did. His response was either "I can't do
2   that" or "I can't go back". And again, this is happening
3   so fast. The last thing I was concerned about was what he
4   was saying because of the position of his body at that
5   time, which was a great deal of concern to me, the way his
6   body was positioned.
7   Q. How was his body positioned that made it a
8   concern to you?
9   A. It would be best for me to be from this side over
10  here. When he came out, I'm as if the last juror over
11  there, perhaps more even this distance over here. He
12  comes out, and he's got his hand on his hip like this and
13  he's coming out like this.
14  Q. Okay. From your training and experience, what do
15  you think is --
16  A. I believe he has a weapon.
17  Q. Okay.
18  A. I believe he's trying to find out is this
19  something I want to do or not, do I want to turn and face
20  the officer with a weapon.
21  Q. So you're thinking he's making a decision on
22  that?
23  A. Oh, yeah. And so I'm -- got my -- I'm just
24  trained on him because I know any second now if he turns,
25  I'm going to drop him.

154

1   Q. And, in fact, did he ever turn that way or pull
2   anything?
3   A. No, he did not.
4   Q. What did he do after that?
5   A. When he got right about to the corner right over
6   here where he could see that he had this way, this
7   direction to run, he took off and ran. He made the
8   comment of, again, "I can't do that" or "I can't go
9   back". It was one of those two. I don't remember which,
10  which one it was that he said. He took one last look at
11  me, and then he took off running.
12  Q. Okay. And did you give chase when he took off
13  running?
14  A. When he took off running, he was from here to
15  here like this. He never would pull this arm out so that
16  I didn't know if he, again, had a weapon or not.
17  Q. Could you turn your body and show us on this
18  side. I don't know that they could see because you're on
19  my side. Show me how he had his weapon again -- not
20  weapon, but how he had his hand.
21  A. Right. He had his hand positioned like this, and
22  he wouldn't turn. As if I'm over there, he would never
23  face his body unless he wanted me to believe that he was
24  armed so as to keep me at bay and because he knew that I
25  couldn't do anything till I saw what I knew for sure was a

155

1   threat at that time.
2   And then once he made to what would be --
3   this would be the break of the building right here. Once
4   he made it to this point here, then he turned and ran this
5   way, but he, again, kept his hand up. So that lead me to
6   believe that he still had a gun here. So I don't know at
7   this point while he's down behind those vehicles from
8   earlier whether he had taken a weapon from his pants or
9   his pocket, stuck it up here, because as I stated earlier,
10  when he got out of the vehicle, I didn't see anything
11  here, but I wasn't going to take that chance, so.
12  Q. So that was enough of an action on his part to
13  stop you, yet avoid him getting shot?
14  A. Correct.
15  Q. Okay. And did you give chase to him after that?
16  A. We did. We then continued chasing him. I
17  started yelling at him again to "Stop. Police. Stop.
18  Police." He made it all the way here to the freeway.
19  There's a lot of traffic coming by. He darted right
20  across the freeway. I wasn't as, what do you want to call
21  it, uncautious as he was, so I had to play the little
22  frogger game and stop and go and get across the freeway
23  and finally make it across. While at the same time, I'm
24  on my radio. So I had my gun out, my radio in this hand.
25  I'm telling the people where -- my assist officers where

156

1   he's going. I'm watching him. I'm watching the car.
2   Trying to do all these things at the same time.
3   And I see his shadow, secure, go behind this
4   building over here. The last I saw of him. I made it
5   across the street and I -- right about in the center
6   median, I look ahead and I see him going down. I'm
7   crossing the street. Then I see a shadow over this
8   direction over here. And I'm already advising everybody
9   else in the area that I believe he went behind the
10  building, this building here, which I believe is a
11  discount store of some type.
12  Q. Okay. And did he get any further than the area
13  of that store right there?
14  A. I don't believe so. But my recollection is he
15  was apprehended in a little, small, fenced-in area over on
16  this side over here, I believe it is.
17  Q. Okay. So you're calling on your radio trying to
18  give his location, and other officers got there at that
19  point to get him?
20  A. That is correct.
21  Q. Okay. Do you recall which officers that was that
22  actually effected his arrest?
23  A. I know there were Gang officers there at the
24  scene. I also know there was marked patrol officers, full
25  uniformed officers also.

157

Q. Okay. And did they go ahead and take him into custody at that point?

A. Yes, they did.

MR. STRAHAN: Okay. You can take your seat. Thank you.

Q. Officer -- or Sergeant Dena, I'm going to show you what has already been offered into evidence as State's Exhibit No. 48. Can you tell us what that is?

A. That's the Dodge Stratus.

Q. Okay. And looking at the license plate and its positioning with the fence and all that, is that the same Dodge Stratus that you chased until it wrecked out June 29th, 2010?

A. It is.

Q. Okay. Now, looking at this photo, this would be State's No. 55; do you recognize what's in this picture?

A. That is the Dodge Stratus that we chased.

Q. Okay. Now, looks here like this big rig is kind of right on the bumper of the Stratus. Is that a fair look at how far or was that rig a distance back from the bumper?

A. That is an accurate depiction from that direction, but, no, it is not up against the 18-wheeler.

Q. Okay. And so your line of vision if you saw him

158

get out of the passenger -- or crawl out of the passenger side, would have been between the rig and --

A. Correct.

Q. -- this?

A. As you saw the previous picture just before that.

Q. Okay. And now I'm going to show you State's Exhibit No. 54. That's the other side of that vehicle; is that correct?

A. It is.

Q. Okay. And I think you can see maybe a Crime Scene vehicle; is that what that is right up here?

A. Yes, it is.

Q. Okay. And also the marked police car?

A. Yes.

Q. Do you know if that's the police car that you were in? Because there's several cars around at this point.

A. I do not believe that that is our vehicle, no. I believe ours was closer up. You cannot see it.

Q. Okay. And this is -- there appears to be on State's 54 some damage to the front end of the Stratus; is that correct?

A. Yes.

Q. Okay. And the air bags were deployed, according to that picture; is that right?

159

A. Yes.

Q. Okay. And if you will look carefully at State's No. 55, does it appear to be damage on the bumper of the big rig that would have been on the same side as the damage to the Stratus?

A. There appears to be, yes.

Q. Do you know if it hit the truck or not?

A. I do not remember it, whether or not it hit the truck or not.

Q. Okay. Appears to be damage on the same side of the Stratus that would have come around to that same bumper on the big rig?

A. That is correct.

Q. Okay. Now, do most sergeants get out and get into foot chases these days?

A. Not that often.

Q. Okay. And why did you do it?

A. Duty called for it.

Q. I'm sorry?

A. Duty called for that.

Q. Did you think it was important to get this particular individual arrested, based on everything that you had heard?

A. Yes.

MR. STRAHAN: I'll pass the witness.

160

CROSS-EXAMINATION

BY MR. HEISKELL:

Q. Sergeant Dena, hi.

A. Yes.

Q. My name is Mike Heiskell. I don't think I've met you before, but I do have some questions for you. And if at any point I ask you something you don't understand, please let me know and I'll start over. Okay? You have been with the Fort Worth P.D. for 25 years. Am I understanding that correctly?

A. Soon to be, yes.

Q. And if you don't mind me asking, how old a man are you, sir?

A. I'm 49.

Q. And is that your whole entire law enforcement career, has it been with Fort Worth P.D.?

A. Yes, it has.

Q. Going back to this incident on January (sic) 29th, you and Sergeant Reynolds had been at lunch, I think you said around 10:00 at night; is that correct?

A. Yes, we had finished probably just a little bit before that.

Q. And what time were you to get off that evening, if you recall?

A. I work midnight hours, so I -- at that time I

161

1  worked from 8 p.m. to 6 in the morning.
2      Q.  And at the time that you and Sergeant Reynolds
3  gave chase to this vehicle, I believe you said that he was
4  driving and you were in the front seat passenger seat with
5  him relaying information and also focusing in on the
6  vehicle, correct?
7      A.  That is correct.
8      Q.  And eventually when you stopped and the vehicle
9  had wrecked out at that location that you described for
10 us, you saw Mark Soliz bail out of the passenger window;
11 is that correct?
12     A.  Yes.
13     Q.  Now, I'm showing you now, Sergeant, State's
14 Exhibit No. 48.  Is that a fair depiction of where this
15 vehicle was eventually stopped at that location described
16 earlier?
17     A.  Yes, it is.
18     Q.  And where were you and Sergeant Reynolds parked?
19     A.  Exactly where you're holding that, this would be
20 perhaps a good depiction of where our vehicle would be,
21 but perhaps a little further back, not much more.
22     Q.  And that's to the right side of that vehicle?
23     A.  Yes, we would be on the right side of his
24 vehicle, just catty-corner.  I can --
25     Q.  Well, I'm trying to visualize this.

162

1      A.  Correct.
2      Q.  If this is the vehicle parked in this direction,
3  you're telling us you would be in the position where
4  you're seated right now; is that correct?
5      A.  That's when we ended up in the vehicle, but then
6  I had to get out, so that placed me to where I could see
7  him coming out of the window.
8      Q.  All right.  And this is on the passenger side
9  window?
10     A.  It is.
11     Q.  And the female, I take it, you saw was in the
12 driver's window -- driver side, driver side seat?  Excuse
13 me.
14     A.  I believe she was the driver, but the -- yeah.
15     Q.  Go ahead.  Okay.  You believe she was the driver?
16     A.  Uh-huh.
17     Q.  And here again in State's No. 55 -- oh, this is a
18 better one.  State's No. 54.  Can you see that, Sergeant?
19     A.  I can, yes.
20     Q.  And this, of course, is showing the passenger
21 side, correct?
22     A.  It is.
23     Q.  And this is showing the passenger side with the
24 wrecked area here, and the airbag deployed here, and I
25 believe there's another airbag deployed on the driver

163

1  side; is that correct?
2      A.  Correct.
3      Q.  And here we have the door at least partially
4  open; am I correct?
5      A.  Correct.
6      Q.  And we also have -- apparently there's some type
7  of damage to the panel of that door or the side of that
8  door?
9      A.  Correct.
10     Q.  And is this the window that you said that you saw
11 him come out of?
12     A.  Yes.
13     Q.  And can you tell from this photograph if that
14 window is open or closed?
15     A.  It is open.
16     Q.  And he -- you were, I take it, in a position
17 perhaps where this photograph was taken from?
18     A.  No.  I would be --
19     Q.  Where would you have been?
20     A.  I would be to the right back -- to the right back
21 corner of his bumper.
22     Q.  Okay.  You would have been back towards this
23 direction?
24     A.  That is correct, but with more distance between,
25 you know, between us, between me and the bumper.

164

1      Q.  Okay.  And --
2      A.  I'm not right up on the bumper is what I'm
3  saying.
4      Q.  Sure.
5      A.  Yes.
6      Q.  And I believe you described earlier that from
7  this vantage point, you were pointing toward the corner of
8  the courtroom, is how far you were; is that right?
9      A.  Right.  It may have been closer, but just a
10 guess.  I'm trying to figure the distance of the vehicle
11 length and the police car with a space there, so that may
12 be about right.
13     Q.  Where were the -- your unit, Sergeant Reynolds
14 driving, in what direction was that unit facing?
15     A.  Our car?
16     Q.  Yes.
17     A.  It's -- here's their vehicle, and I believe we
18 were something just like that.
19         MR. HEISKELL:  Okay.  You know what, I think
20 it's better, could you --
21         Your Honor, could I have him step down on the
22 chart board for a second.
23     Q.  Why don't you step down here, Sergeant.  Why
24 don't you take this marker, sir, and give me a brief
25 drawing description of the vehicle.

165

1   A.  Okay.  You bet.
2       This is the 18-wheeler.  This is the driveway
3   going into the Motel 6.  This is the street that he turned
4   down.  This is another entranceway down here at the Motel
5   6.
6   Q.  Speak up a little louder, sir, so she can hear
7   you.
8   A.  Okay.  I'm just drawing it in my head.  And then
9   vehicle, vehicle, vehicle.  And, of course, this is not to
10  scale.
11  Q.  Sure.  All right.
12  A.  So and then there's the building here, the other
13  exit.
14  Q.  And if you'd mind standing here just for a
15  second, Sergeant Dena.  So your vehicle is pointing this
16  direction.  I'm doing this to show the directional.  This
17  vehicle is in this direction, correct?
18  A.  Correct.
19  Q.  And the line here, is there any significance to
20  this line here?
21  A.  That is the roadway that he left.  That is the
22  curb line.
23  Q.  And this is where we see the damage, for the most
24  part, on the vehicle?
25  A.  Yes.

166

1   Q.  Now, are there any street lights here?
2   A.  I want to say that there is one here, and I
3   believe there may be some here.  I thought there was one
4   on the other side of the fence.  I honestly cannot
5   remember where they are at.
6   Q.  Well, I noticed we don't have any street lights
7   showing on the photographs here.  I was asking you your
8   recall.  And by the way, did you make a report in this
9   case?
10  A.  I did not make a report, no.
11  Q.  So what you're telling us is you're kind of going
12  from memory from a year and a half ago from what
13  happened.  Is that a fair statement?
14  A.  It is very fair.
15  Q.  Okay.  And so with Sergeant Reynolds being here
16  as the driver, you were here as a passenger?
17  A.  Right.
18  Q.  And the female is driving here and Mark Soliz is
19  here, correct, sir?
20  A.  Yes, that's what I believe.
21  Q.  And the only lighting you recall would be in this
22  area here and I believe you pointed somewhere up here
23  somewhere; is that right?
24  A.  It may have been up there but -- go ahead.
25  Q.  Okay.  And you said you thought there may have

167

1   been a light, you don't recall, somewhere in this area.
2   Am I saying that correctly?
3   A.  I believe so, somewhere over there.
4   Q.  So the only lighting in this vicinity at this
5   point would be your own headlights perhaps, and I guess
6   your grid lights going, and then the lights of this
7   vehicle.  Is that a fair statement?
8   A.  It is fair.
9   Q.  And then we have this 18-wheeler.  Now, is this
10  18-wheeler operational?  Were the lights on?
11  A.  No.
12  Q.  Okay.  So it was unoccupied?
13  A.  That is correct.
14  Q.  And then we have the -- these cars, as you said,
15  a distance away.  Of course, that's not to scale,
16  correct?  Is that correct, sir?
17  A.  Oh, yes.
18  Q.  All right.  Okay.  I think you can take your seat
19  back now.
20  A.  I had one more thing I was going to add.
21  Q.  Oh, okay.  Go ahead.
22  A.  We have a spotlight on this car right over here.
23  Again, this may not be exact to exactly where we're at.
24  We may have been more close.  I believe we could have been
25  closer, but I know that this was fully illuminated over

168

1   here because I hit my light, turned it that direction.
2   And then I believe, too, I may have had my flashlight out
3   in this hand like this.  So I could see clearly what he
4   was doing because I got out of my vehicle.
5   Q.  And came this direction?
6   A.  Came over this direction over here, so I could
7   see --
8   Q.  Okay.
9   A.  -- over here.  The --
10  Q.  All right.  And that's when you're able to see
11  when he came out that the shirttail was up or something
12  along those?
13  A.  That it was coming up over his head as he's going
14  down; gravity is pushing his shirt toward the surface.
15  Q.  And you didn't see anything fall out of the shirt
16  or anything of that nature?
17  A.  I did not.
18  Q.  And didn't see anything in the waistband, as you
19  said earlier, correct?  And it appeared secure there; is
20  that right?
21  A.  Not on that side, yeah.
22  Q.  And then his hands, I think you said, kind of
23  buffered his fall when he came out and he tumbled to the
24  ground?
25  A.  Yes.

169

1    Q. And then he took off running in this general
2  vicinity?
3    A. That is correct.
4    Q. And at some point I believe you said you pushed
5  the female down, I take it somewhere in this area?
6    A. Uh-huh.
7    Q. Here you go.
8    A. Okay. He came this direction here; somewhere in
9  here, he went between the vehicles.
10   Q. Okay.
11   A. As I see him running right about -- probably
12 right about here, I see another figure coming over here.
13 So I hesitate because I don't know if that person is
14 armed.
15   Q. Uh-huh.
16   A. Okay. How she got around the vehicle, I don't
17 know. If she slid over the top of the hood or what, I
18 don't know. But I remember seeing over here a figure
19 right about here. And so now I'm watching this figure
20 here, and that's -- that's her. She comes this direction,
21 stops right -- stops right about here. At which point now
22 I'm already paralleling her, and then I take her down
23 right here.
24   Q. Okay.
25   A. And she's on the ground.

170

1    Q. I guess it's conceivable, Sergeant, that she
2  could have also come through that window?
3    A. It's possible. I don't know.
4    Q. Okay.
5    A. It happened very fast. Again, I have multiple
6  things going on. My main concern was him. So as I see
7  him clearing out, I was going like this, watching. I see
8  little feet going that direction. I'm trying to follow.
9  Then I have to stop because I see another figure in my
10 peripheral. So I turn and face, and then when I see her
11 go behind the 18-wheeler, I take off again.
12   Q. The reason I say that, because we have this
13 fenced area here?
14   A. That is correct.
15   Q. Correct? That the car was up against?
16   A. Correct.
17   Q. Right. And she came over the top or through the
18 passenger window or door here; is that correct?
19   A. It's all possible.
20   Q. Possible. All right. And you know that at the
21 conclusion of this that there was a weapon found inside
22 the vehicle as opposed to on Mark Soliz; is that right?
23   A. I've seen photos of that, yes.
24   Q. And at the time that he was stopped eventually by
25 Officer Hyder or whomever that was, there was no weapon

171

1  found on him; is that correct?
2    A. I don't know that it was Hyder. I believe it was
3  other officers that made the arrest.
4    Q. Do you know that name, by chance? Do you know
5  their names, by chance?
6    A. I do not know, no. I don't know who made the
7  actual arrest of the suspect.
8    Q. Now, you indicated, sir, at some point beyond
9  here --
10       And you can go back and take a seat now.
11       There is a freeway in which that he crossed;
12 is that right?
13   A. Yes.
14   Q. And I believe you said that he darted across the
15 freeway and you followed him, but you did so in a cautious
16 manner, more cautious manner?
17   A. Right. There was several vehicles, and he just
18 took right across. I don't think any vehicles had to come
19 to a stop or anything like that. Maybe he had a better
20 break than I did. But when I got to the freeway and
21 looked, I saw vehicles, so I naturally stopped, allowed
22 the vehicles to pass, then I worked my way across the
23 freeway.
24   Q. And was that Interstate -- what interstate was
25 that?

172

1    A. That is 35.
2    Q. 35?
3    A. Uh-huh.
4    Q. And that's a pretty busy intersection, is it
5  not? I'm sorry, interstate. Excuse me.
6    A. It is.
7    Q. And we're talking here around, what, 10:30 at
8  night by this time approximately?
9    A. Yes.
10   Q. And still at nighttime, that's a pretty busy
11 interstate, is it not?
12   A. It is.
13   Q. And this person, Mark Soliz, in a reckless manner
14 ran across that freeway. You followed him. And then he
15 was eventually caught by some other officers who were
16 assisting you; is that correct?
17   A. That is correct.
18   Q. But at no time did he turn and gesture toward
19 you or do anything of that nature where you felt yourself
20 to be in harm that you would have discharged your weapon?
21   A. I felt myself to always be at the risk of harm.
22 Did he face me with a weapon? No, he did not.
23   Q. All right. At the beginning of the chase, you
24 said it lasted a mile or mile and a half or so?
25   A. Maybe close to that, maybe a little more, little

173

1  less. I don't remember what the measurements are. I
2  guess we could Google that and find out for sure.
3      Q. And while you were chasing that vehicle for that
4  length of time, could you see the driver, the female,
5  clearly from your vantage point?
6      A. I believe when they rounded the corner coming
7  from Schwartz onto Long, I believe our quick look, I saw
8  two occupants in the vehicle. I thought it was the female
9  that was driving the vehicle. In the sense that the
10 vehicle, too, although was obviously failing to yield, it
11 was not going as fast in a pursuit as some have in the
12 past, which I believe -- I can't remember if I dialogued
13 with my co-sergeant saying I think the female is driving.
14 I can't remember exactly.
15     So either way, it seemed like the manners, it
16 was more of a guarded pursuit as if either they're trying
17 to find out what they want to do next, but they did not
18 immediately shoot to like 80 miles or a hundred miles an
19 hour going down Long. It was more slower speeds than what
20 I thought was normal for a pursuit that I've been in the
21 past. Nevertheless, I knew it was quicker than the speed
22 limit, and so I wasn't sure, were they trying to find
23 another way to go or what, or was she driving, not as
24 experienced a driver. I don't know. It's just pure
25 supposition at that point.

174

1          However, at the point of the stop, when you
2  have the impact, the immediate exit of myself from the
3  vehicle, the just sheer amount of time, you know, it
4  seemed as if he would have been the one in the passenger
5  seat and able to get out of the window that quick; unless
6  he dove over her and put himself out the window, so, but I
7  know that I saw him coming out that window.
8      Q. And by the way, if you recall, Sergeant, what was
9  Mark Soliz wearing?
10     A. I do not recall what he was wearing.
11     Q. And --
12     A. I know it was a shirt and jeans, I believe.
13     Q. Shirt and jeans?
14     A. Yeah, shirt and pants.
15     Q. And did you also know that at the time he was
16 captured he had methamphetamine or ice in his pockets?
17     A. I was not aware of that.
18         MR. HEISKELL: Thank you, Sergeant.
19         Pass the witness, Your Honor.
20         MR. STRAHAN: Just briefly.
21             REDIRECT EXAMINATION
22 BY MR. STRAHAN:
23     Q. Did you specifically see the female driving or do
24 you base your opinion on the fact that he came out the
25 window?

175

1      A. I think it's more the fact that he came out of
2  that window, and the driving habits either were very, very
3  guarded or not -- well, I don't know. I don't guess the
4  driving had any play in it. It could be the male or
5  female could drive in that regard. But I base most of it
6  on the fact that she -- that he came out of that window so
7  quickly led me to believe that he was the passenger of
8  that vehicle.
9      Q. In any event, he's the first one that comes out
10 of this window; is that right?
11     A. Yes.
12     Q. Okay. Now I'm going to show you State's Exhibit
13 No. 49. And I'll represent to you that's already been
14 testified that this is a view inside that passenger window
15 onto the floorboard. Okay. Do you see what this item is
16 right there?
17     A. That is a pistol.
18     Q. Okay. And that pistol being in the passenger
19 side floorboard, if Mr. Soliz was, indeed, the passenger,
20 then that pistol is at his feet, correct, if he's in the
21 car?
22     A. Yes.
23     Q. If Mark Soliz was the driver and crawled through
24 this passenger side window, his body crosses the part of
25 this car space where that pistol is later found; is that

176

1  correct?
2      A. It is.
3      Q. Either way, is Mark Soliz in close proximity to
4  that pistol?
5      A. He is.
6          MR. STRAHAN: I'll pass the witness.
7          MR. HEISKELL: No further questions.
8          THE COURT: May this officer be excused?
9          MR. STRAHAN: Yes, sir.
10         MR. HEISKELL: Yes.
11         THE COURT: Thank you, sir.
12         (Witness excused.)
13         THE COURT: Call your next witness.
14         MS. JACK: Yes, Your Honor. We call Officer
15 David Ukle.
16         THE COURT: Does anybody need a break?
17         (Pause in proceeding.)
18         THE COURT: Please raise your right hand.
19         (Witness sworn.)
20         THE COURT: Thank you.
21         MS. JACK: May we approach the bench, Your
22 Honor?
23         (Sotto voce discussion off the record
24         at the bench.)
25         THE COURT: This witness has been sworn. You

177

1  may proceed.
2          DAVID UKLE,
3  Having been first duly sworn, testified as follows:
4          DIRECT EXAMINATION
5  BY MS. JACK:
6      Q. Officer, would you please introduce yourself to
7  the ladies and gentlemen of the Jury.
8      A. My name is David Wayne Ukle.
9      Q. And can you please tell them how you're
10  employed.
11     A. I work as a police officer with Fort Worth Police
12  Department, specifically with the Crime Scene Unit.
13     Q. All right. How long have you been a police
14  officer with the City of Fort Worth?
15     A. 26 years.
16     Q. All right. And have you always served in the
17  capacity of a Crime Scene officer?
18     A. No.
19     Q. Can you tell the members of the Jury, can you
20  give them a little bit of an overview of your time with
21  your career with the Fort Worth Police Department?
22     A. During the time that I've been with the Fort
23  Worth Police Department, it's been about split in half. I
24  spent the first part of my career in patrol, answering
25  calls as patrol officers do. Second half has been with

178

1  the Crime Scene Unit.
2      Q. All right. Now, before you joined the Fort Worth
3  Police Department, what did you do?
4      A. I actually worked for the City of Fort Worth.
5      Q. In what capacity?
6      A. In the Forestry Department.
7      Q. All right. How did you go from the Forestry
8  Department to the Police Department?
9      A. The Fort Worth Police Department was in a hiring
10  freeze for a year. When it came open, I joined.
11     Q. So you wanted to be a police officer from the
12  beginning?
13     A. Yes.
14     Q. All right. Now, you mentioned that you were part
15  of the Crime Scene Unit. Can you tell the members of the
16  Jury what the Crime Scene Unit entails.
17     A. The Crime Scene Unit is there to -- basically we
18  collect evidence, any form of evidence. That can be
19  through photographs, physical evidence, DNA evidence,
20  whatever that may take. As far as depending on the crime,
21  can be bullets, guns, anything really.
22     Q. All right. Now, how many officers are there
23  assigned to the Crime Scene Unit?
24     A. I believe there's 15 right now.
25     Q. And in a given day, is the Crime Scene Unit

179

1  broken up into different shifts?
2      A. It is.
3      Q. How many Crime Scene officers do we have or do
4  you have at the City of Fort Worth in a given shift?
5      A. There's about five per shift.
6      Q. All right. Is there five per each shift or is
7  there one shift in particular that has more officers
8  dedicated to it?
9      A. Right now I believe they're pretty even. I'm not
10  really sure.
11     Q. Okay. On June 29th of 2010, were you on duty?
12     A. Yes.
13     Q. And were you assigned to the Crime Scene Unit at
14  that time?
15     A. Yes, I was.
16     Q. All right. Were you dispatched to an address on
17  Braswell Drive?
18     A. Yes, I was.
19     Q. What was the specific address?
20     A. 3300 Braswell.
21     Q. All right. In Fort Worth?
22     A. Yes.
23     Q. In Tarrant County, Texas?
24     A. Correct.
25     Q. What was the purpose of your dispatch to that

180

1  address?
2      A. I was originally dispatched on a stolen recovered
3  vehicle.
4      Q. And was that to Long Avenue?
5      A. Correct.
6      Q. All right. And then you changed directions and
7  went to the Braswell address?
8      A. Yes. They redirected me when I reached that
9  address to Braswell.
10     Q. Okay. And can you tell the members of the Jury
11  about what time you got there?
12     A. 35 minutes after 11 p.m.
13     Q. So you were working the nighttime shift on that
14  date?
15     A. Yes.
16     Q. And can you tell the members of the Jury what
17  part of Fort Worth the Braswell address is in?
18     A. North, North Fort Worth.
19     Q. All right. Now as a Crime Scene officer, could
20  you be dispatched to any part of Fort Worth?
21     A. Absolutely.
22     Q. All right. So on this evening, it was the north
23  side of Fort Worth?
24     A. Correct.
25     Q. When you got there, can you tell the Jury who you

181

1 spoke with?

2    A. I met with a Detective Cedillo who informed me

3 what he needed.

4    Q. All right. Would that be Detective Jerry

5 Cedillo?

6    A. I'm not sure of his first name.

7    Q. Okay. Detective assigned to the Robbery Unit?

8    A. Correct.

9    Q. All right. And what were the instructions that

10 you received?

11    A. Detective Cedillo wanted me to collect some

12 evidence, particularly a handgun that was in a vehicle

13 there and a jacket that was on the ground.

14    Q. Okay. And did you do so?

15    A. I did.

16    Q. All right. Can you tell the members of the Jury

17 about how many pictures you took in photographing the car

18 and the location of the handgun within the car?

19    A. It was about 68 photographs.

20    Q. Okay. And did you provide those pictures to the

21 District Attorney's Office?

22    A. I'm not sure if I did or not.

23    Q. Someone at the Fort Worth Police Department did,

24 in any event; is that correct?

25    A. Correct.

182

1    Q. You've had an opportunity to review your

2 pictures; is that correct?

3    A. Yes.

4    Q. All right. Officer, I'm showing you -- I'll show

5 you several pictures that have already been admitted into

6 evidence, specifically beginning with State's Exhibit 55.

7 Is this one of the pictures that you -- is this the Dodge

8 Stratus that you photographed that evening?

9    A. It is.

10    Q. All right. And is this one of the series of

11 pictures that you took at the 3300 Braswell address?

12    A. Yes.

13    Q. All right. Now, specifically looking at State's

14 Exhibit 49, which has also been admitted into evidence, is

15 this a picture that you took as well?

16    A. Yes, it is.

17    Q. And down here in somewhat the left-hand corner,

18 is this the firearm that you photographed as well?

19    A. Yes.

20    Q. And did you collect that firearm?

21    A. I did.

22    Q. All right. Now, what is the purpose in

23 collecting a firearm?

24    A. Well, we collect -- whatever we collect, it's

25 collected as evidence in relation to a possible offense.

183

1 In this particular case, I would believe that it had been

2 involved in a shooting, so I don't know.

3    MS. JACK: May I have a moment, Your Honor?

4    May I approach the witness?

5    Q. Officer, these are a little bit difficult for me

6 to handle. Can you stand up and look at them? All

7 right. Beginning with State's Exhibit 56, is this a

8 fair and accurate depiction and a closer view of the

9 9 millimeter that you seized out there on Braswell?

10    A. It is.

11    Q. Looking at State's Exhibit 57, looking at

12 State's Exhibit 57, is this a closer view of the firearm

13 that you collected on Braswell Drive in a picture that

14 you took back at the Crime Scene office of the Fort Worth

15 Police Department?

16    A. It is.

17    Q. It is a fair and accurate picture?

18    A. It is.

19    Q. And is State's Exhibit 58 a fair and accurate

20 picture of the round that you removed from the

21 9 millimeter that you collected?

22    A. It is.

23    Q. Does State's Exhibit 59 fairly and accurately

24 depict the 9 millimeter along with the magazine that you

25 removed back at the Crime Lab -- I'm sorry, back at the

184

1 Crime Scene office of the Fort Worth Police Department?

2    A. It is.

3    Q. Does State's Exhibit 60 fairly and accurately

4 depict the caliber, the model, and what type of gun it

5 was?

6    A. It does.

7    Q. Does State's Exhibit 61 also fairly and

8 accurately depict the handgun that you seized?

9    A. Yes.

10    Q. Does State's Exhibit 62 fairly and accurately

11 show the length of the gun?

12    A. Yes.

13    Q. Does State's Exhibit 63 fairly and accurately

14 depict the underside and the location of the serial number

15 of the 9 millimeter you collected?

16    A. Yes.

17    MS. JACK: Your Honor, at this time the State

18 would offer State's Exhibits 56 through 63 into evidence

19 for all purposes.

20    MR. HEISKELL: No objection, Your Honor.

21    THE COURT: 56 through 63 are admitted.

22    (State's Exhibit Nos. 56 - 63 admitted.)

23    MS. JACK: May I have this officer step down

24 as I publish to the Jury?

25    THE COURT: Yes.

185

1    Q. (BY MS. JACK) Officer, if you would, please step
2 down.
3         Officer, looking now at State's Exhibit 56,
4 is this a closer view of the 9 millimeter found in the
5 passenger floorboard of the Dodge Stratus on June 29th?
6    A. Yes, it is.
7    Q. And is this the exact location where the gun was?
8    A. Yes.
9    Q. And, Officer, after you collected the gun, did
10 you take it back to the Crime Lab -- excuse me, the Crime
11 Scene office at Fort Worth Police Department?
12    A. Yes.
13    Q. All right. And do you take measurements of a
14 firearm when you seize a weapon as evidence?
15    A. Yes.
16    Q. What is the purpose of that?
17    A. To help the lab and ourselves to know the
18 measurement, because it's -- a picture alone, kind of
19 difficult to tell a measurement.
20    Q. Okay. And is State's Exhibit 62 a picture of
21 the measurements of the 9 millimeter that you seized that
22 evening?
23    A. It is.
24    Q. And can you tell the Jury what the measurements
25 were?

186

1    A. This is indicating about 6 and a half inches in
2 length.
3    Q. All right.
4         THE COURT: I can't hear him. So you're
5 going to have to switch places or put him back on the
6 witness stand. If you'll switch places, then he'll be
7 speaking toward the Court Reporter and me.
8         MS. JACK: I'm happy to do that, Judge.
9         THE COURT: Then I'll be able to hear him
10 maybe. Thank you.
11         MS. JACK: Happy to, Judge.
12    Q. All right. Looking now at State's Exhibit 61,
13 can you please tell the members of the Jury what they're
14 looking at.
15    A. This is the same handgun that was collected from
16 that Dodge Stratus, and just a front view mainly of the
17 barrel area.
18    Q. Okay. So if the weapon were pointed in your
19 direction, what you would see?
20    A. Yes.
21    Q. Okay. And granted, this is a larger version than
22 the actual gun?
23    A. Correct.
24    Q. Now, does State's Exhibit 63 indicate the serial
25 number of the 9 millimeter?

187

1    A. It does.
2    Q. And can you tell the members of the Jury what
3 part of the gun is depicted?
4         THE COURT: I'm sorry. Would you please step
5 back so the Court Reporter has a clear shot at his face.
6 Then she can see what he says at the same time and hear
7 it. So you're blocking him with the sign, and I can't see
8 and she can't see. That will work right there.
9         MS. JACK: How about this.
10         THE COURT: Thank you.
11    Q. State's Exhibit 63, can you tell the members of
12 the Jury what they're looking at?
13    A. This is a photograph of the serial number of the
14 handgun that was collected, and it is just under the
15 underside of the end of the barrel.
16    Q. All right. Can you read the serial number,
17 please, Officer?
18    A. It's upside down but it's P --
19    Q. Let's try it this way.
20    A. P, as in Paul, fourteen hundred eight seven five.
21    Q. And are there some zeros in there as well?
22    A. Yes.
23    Q. All right. So what is the entire number?
24    A. P, as in Paul, 1400875.
25    Q. All right. All right. Officer, I want to make

188

1 sure I stand back further, far enough where everybody can
2 hear and everybody can see. All right. Make sure
3 everybody can see.
4         All right. Now, State's Exhibit 60, can you
5 tell the Jury what they can see in this picture?
6    A. This is a photograph indicating the make and
7 model of the handgun itself indicating it's a Hi-Point
8 Firearms, Model C9, 9 millimeter Luger semi-automatic
9 handgun.
10    Q. Okay. Now, Officer, what does it mean to render
11 a gun safe?
12    A. To remove the bullets so it cannot be fired.
13    Q. All right. And was the firearm that you seized,
14 the 9 millimeter with that serial number, was it loaded at
15 the time that you recovered it?
16    A. It was.
17    Q. And how is a 9 millimeter, a semi-automatic
18 loaded?
19    A. From the magazine.
20    Q. All right. And does State's Exhibit No. 59
21 depict the firearm and the magazine?
22    A. Yes, it does.
23    Q. All right. Can you show the members of the Jury
24 where the magazine is?
25    A. The magazine is right here, which contains the

189

1  rounds, and it is injected into the handle portion of the
2  handgun.
3      Q. So was the gun loaded when you found it?
4      A. Yes.
5      Q. Did you remove the magazine?
6      A. I did.
7      Q. And how many rounds were contained within the
8  magazine?
9      A. Three.
10     Q. All right. And, Officer, can you please tell the
11  Jury what it means for a round to be chambered in a
12  semi-automatic?
13     A. Chambered means that it is -- there's a bullet
14  actually in the barrel ready to fire. So there was a
15  round actually inside right here and ready to be fired.
16     Q. All right. So the round that was chambered is in
17  addition to whatever rounds were contained within the
18  magazine; is that correct?
19     A. Correct.
20     Q. So how many rounds were in the magazine?
21     A. Three in the magazine, one in the chamber.
22     Q. All right. So there were four live rounds found
23  in that 9 millimeter that day; is that correct?
24     A. Correct.
25     Q. Officer, when a round is chambered, do you

190

1  photograph the round after you remove it from the firearm?
2      A. I do, yes.
3      Q. State's Exhibit 57, does that depict the
4  9 millimeter after you removed the live round that was
5  chambered?
6      A. It does.
7      Q. And can you tell the members of the Jury what
8  State's Exhibit No. 58 shows?
9      A. This was a photograph of the actual stamp and
10  identifier of the particular round, in this case, it's an
11  FC 9 millimeter Luger round.
12     Q. Okay. So this is a closer view of the underside
13  of the live round that had been chambered in the 9
14  millimeter?
15     A. Correct.
16         MS. JACK: All right. Thank you very much.
17  Officer, you can go ahead and take your seat, please.
18         May I approach the witness?
19         THE COURT: Yes, you may.
20     Q. Officer, I'm showing you what's been admitted
21  for the record as 29-A. I'm showing you what's been
22  admitted for all purposes as State's Exhibit No. 29.
23  State's Exhibit No. 29, is this one in the same
24  9 millimeter that you seized from the green Dodge
25  Stratus at 3300 Braswell Drive?

191

1      A. Yes, it is.
2      Q. And how do you know that, Officer?
3      A. From the serial number on it.
4      Q. All right. And where is the serial number on the
5  gun?
6      A. It's on the bottom side of the barrel.
7      Q. Is my finger where it is?
8      A. It is.
9      Q. Officer, when you collect a firearm, magazine and
10  live rounds, do you package them together?
11     A. I do.
12     Q. All right. And State's Exhibit No. 29-A that's
13  been admitted for the record, is that a gun box that
14  officers at the Fort Worth Police Department use when they
15  collect firearms and magazines and cartridges?
16     A. Correct.
17     Q. In fact, is this the same box that you used to
18  collect the firearm, the magazine and the live rounds?
19     A. It is.
20     Q. All right. Officer, I'm showing you what's been
21  marked as State's Exhibit No. 75. Do you recognize this
22  exhibit?
23     A. It's going to be the magazine that was in -- in
24  that weapon.
25     Q. Okay. So State's Exhibit No. 75 contains the

192

1  magazine that you personally removed from State's Exhibit
2  No. 29; is that correct?
3      A. Yes.
4      Q. Well, the contents of State's Exhibit 75; is that
5  correct?
6      A. Correct.
7      Q. All right. State's Exhibit No. 73, do you
8  recognize what this is?
9      A. These were the -- supposed to been the three
10  rounds that were collected from the magazine itself.
11     Q. Okay. Now, State's Exhibit No. 74, do you
12  recognize what's contained within State's Exhibit 74?
13     A. This is going to be the live round that was
14  actually in the chamber.
15     Q. All right. So the chambered round. Now --
16         MS. JACK: Your Honor, at this time the State
17  would offer State's Exhibit 73, 74 and 75 into evidence,
18  and their contents.
19         (Sotto voce discussion.)
20     Q. All right. Officer, if you would, beginning with
21  State's Exhibit No. 75, can you please open that?
22     A. (Witness complied.)
23     Q. For the record, Officer, did you just put the
24  contents of State's Exhibit 75 into a baggy marked 75-A?
25     A. Yes.

193

1    Q. Officer, would you do the same for State's
2  Exhibit 74, please.
3    A. (Witness complied.)
4    Q. Officer, for the record, did you just put the
5  contents of State's Exhibit 74 into a clear baggy that is
6  labeled State's Exhibit 74-A?
7    A. Yes.
8    Q. Officer, would you do the same for State's
9  Exhibit 73, please.
10    A. (Witness complied.)
11    Q. And, Officer, for the record, are you removing
12  the contents of State's Exhibit 73 and placing them into a
13  baggy that is marked 73-A?
14    A. Yes.
15    Q. Okay. Now, let's begin first with --
16    MS. JACK: Well, at this time, Your Honor,
17  State would offer State's Exhibit 73, State's Exhibit 74,
18  and State's Exhibit 75 for the record. We would offer
19  State's Exhibit 73-A,74-A and 75-A for all purposes.
20    MR. WESTFALL: No objection as offered, Your
21  Honor.
22    THE COURT: Admitted.
23    (State's Exhibit Nos. 73-A, 74-A, and 75-A
24    admitted.)
25    (State's Exhibit Nos. 73, 74, and 75 admitted

194

1    for record purposes only.)
2    Q. (BY MS. JACK) Okay. Now, Officer, State's
3  Exhibit 75-A would be the magazine that you removed from
4  the 9 millimeter; is that correct?
5    A. Yes.
6    Q. All right. And State's Exhibit 74 would be
7  the live round that was removed from the chamber of the
8  9 millimeter; is that correct?
9    A. Let me check this. Yes.
10    Q. State's Exhibit 73-A originally contained all
11  three live rounds; is that correct?
12    A. Correct.
13    Q. And there's one live round remaining; is that
14  right?
15    A. Yes.
16    Q. All right. And do you know, in fact, whether or
17  not there had been any ballistics tests done on this
18  firearm and the rounds that were seized?
19    A. I do not.
20    Q. Okay. Not an uncommon thing to happen, is
21  there -- is it?
22    A. No.
23    MS. JACK: All right. May I publish this,
24  Your Honor, simply by showing to the Jury?
25    THE COURT: Yes, you may.

195

1    (Exhibits published.)
2    MS. JACK: I'll pass this witness for
3  Cross-Examination, Your Honor.
4    THE COURT: We'll take a 15-minute recess and
5  come back. You may take the Jury out.
6    (Recess taken from 2:57 to 3:17 p.m.)
7    (Jury not present.)
8    THE COURT: Thank you. You may be seated.
9  State ready to proceed?
10    MS. JACK: State's ready, Your Honor.
11    THE COURT: Defense ready?
12    MR. WESTFALL: Defendant is ready.
13    THE COURT: Defendant here?
14    MR. WESTFALL: He is.
15    THE COURT: That's fine. You may bring them
16  in.
17    (Jury present.)
18    THE COURT: Thank you. You may be seated.
19    Yes, sir.
20    MR. WESTFALL: Thank you, Your Honor.
21    CROSS-EXAMINATION
22  BY MR. WESTFALL:
23    Q. Officer Ukle, I'm Greg Westfall.
24    A. Yes.
25    Q. We have met?

196

1    A. Yes.
2    Q. Sometime ago. How have you been?
3    A. Well. Thank you.
4    Q. Good. How long have you been in Crime Scene now?
5    A. 12 years.
6    Q. 12 years?
7    A. Yes.
8    Q. How do you like it?
9    A. I like it a lot.
10    Q. What do you like about it?
11    A. Looking for evidence.
12    Q. Tell me about that. How -- what do you do when
13  you come to a crime scene? What is your sort of protocol?
14    A. Well, when I initially come to a scene, I
15  immediately find out whether or not I have the right to be
16  there. Beyond that, I make contact with a sheet officer
17  or those that have information for me as far as the
18  evidence is concerned. And after gathering that
19  information, generally I start with photographs and then
20  marking evidence, collecting it, keeping in contact with
21  the detectives on the scene.
22    Q. Okay. What do you mean first thing you do is
23  find out if you have a right to be there?
24    A. Well, in certain instances, evidence that has to
25  be obtained might be in a, say, private location such as a

STATE VS. MARK ANTHONY SOTO

197

1 residence, and consent or a warrant would need to be
2 obtained in a lot of those situations before processing
3 can begin.
4     Q. Okay. I get that. And you said sheet officer.
5 What's a sheet officer?
6     A. Sheet officer is generally the officer that's
7 dispatched to handle the call originally.
8     Q. I would imagine that a crime scene needs to be
9 protected.
10     A. Correct.
11     Q. And that in order for you to be able to get all
12 the evidence that you can get, we don't want people
13 trampling through a crime scene and stuff like that?
14     A. Correct.
15     Q. Can that be a problem?
16     A. If it's not properly protected, yes.
17     Q. How do you properly protect a crime scene?
18     A. Well, that, in most instances, that's completed
19 by the officers on scene posting sufficient officers
20 around the scene to keep anybody from disturbing the
21 evidence.
22     Q. How would they go about doing that?
23     A. Well, they could -- there is crime scene tape,
24 traffic cones, patrol units, even the officer themselves
25 to direct traffic around the evidence.

198

1     Q. And it's real important to protect the crime
2 scene?
3     A. Yes.
4     Q. When you get to the crime scene, what's kind
5 of -- you said the first thing you do generally is take
6 photographs?
7     A. No, I determine whether or not I should -- I have
8 the right to be there.
9     Q. Right. Okay. Well, let's assume you have the
10 right to be there. Then what?
11     A. Then I would contact generally the sheet officer,
12 the officer that was dispatched originally because they
13 would probably have the most information for me.
14     Q. Okay. And tell me, tell us about that. You
15 would contact the sheet officer, and then what? The sheet
16 officer gives you a report?
17     A. Just gives me the basic information that I need
18 to accomplish my job.
19     Q. Tell -- tell us what that is.
20     A. Well, the information would be directly in line
21 with the evidence that I would need to collect, where it
22 is, if there are any other scenes to process. That way I
23 would know if I needed additional help.
24     Q. Okay. What are some of the tools that you have?
25 I know we all have seen CSI and all that, but tell us what

199

1 are the tools that a real Crime Scene officer has?
2     A. Well, one of our primary tools is the camera. We
3 use it quite frequently. Beyond that, we -- measuring
4 tools, metal detectors, our trucks, bags, swabs, sterile
5 fluids to use the swabs with, gloves, a number of
6 packaging items such as boxes, plastic bags, envelopes,
7 and tools to mark, mark evidence with as well.
8     Q. I notice that you took, like, 20 pictures of this
9 gun. Why do you do that?
10     A. I wanted to make sure that the evidence was
11 properly recorded and to depict certain areas of the guns,
12 like the serial number, the length, the make, and any
13 other evidence that might be on the gun, just want to make
14 sure I have it properly recorded.
15     Q. And do you oftentimes take pictures of the ground
16 in a crime scene?
17     A. Sometimes.
18     Q. Why would you do that?
19     A. Well, it would be in direct relation to some
20 evidence item, to give perspective of it perhaps, or
21 perhaps there is some evidence on the ground that needs to
22 be photographed.
23     Q. Like, for instance, footprints?
24     A. Correct.
25     Q. And would you, in footprints, would you actually

200

1 yourself walk around looking for footprints?
2     A. Depending on the case, yes.
3     Q. All right. If it's a day when it's been kind of
4 rainy out, and you feel like there's a chance there might
5 be footprints, is that something that you would look for?
6     A. Yes, if that was indicated to me that that's what
7 we're looking for.
8     Q. Are you -- are you at the -- at the will of the
9 sheet officer in which you look for or is there any
10 discretion that you can exercise on your own part to try
11 to find evidence?
12     A. Yes, of course, there's discretion on my part
13 from my experience.
14     Q. So in your experience, if there is a possibility
15 of footprints, you're going to look for footprints whether
16 a sheet officer tells you to or not, aren't you?
17     A. Correct.
18     Q. And what sorts of things could -- could destroy
19 the usefulness of, for instance, footprint evidence?
20     A. Other traffic on the area where those footprints
21 were made.
22     Q. People, if people are running in and out of the
23 crime scene, they can mess up those footprints?
24     A. Correct.
25     Q. And so that's why we want to limit the number of

201

1  people that go in and out of a crime scene; isn't that
2  true?
3      A.  Yes.
4      Q.  In this case there was a -- I guess a jacket that
5  you picked up?
6      A.  Correct.
7      Q.  Pink and black.  And why did you pick that up?
8      A.  Detective Cedillo wanted it collected.
9      Q.  Did you do anything else with that?
10     A.  Other than packaging it and taking it to the
11  property room, no.
12     Q.  And you were -- do you know how to take
13  fingerprints?  You know how to lift latent fingerprints,
14  right?
15     A.  Correct.
16     Q.  What's the process of doing that?
17     A.  Well, depending on the surface, generally we use
18  powder and a -- I use a feather brush and just regular
19  black fingerprint powder and apply it to the surface, and
20  hoping that if fingerprints is what I'm looking for, that
21  those prints will be raised to where it can be visible.
22     Q.  And were you told to take any fingerprints in
23  this case?
24     A.  No.
25     Q.  When you -- when you take pictures of evidence,

202

1  what do you do with those pictures once you take them?
2      A.  They're downloaded onto our server, and they're
3  basically accessed through the lab.
4      Q.  Okay.  And who accesses those?
5      A.  Lab personnel, and we in the Crime Scene Unit
6  have access to them.
7      Q.  Right.  And they -- they get submitted to a
8  detective as well, right?
9      A.  My understanding is detectives have to ask for
10  them.
11     Q.  Okay.  Well, the -- in the hierarchy of people
12  who investigate cases, the detectives, what's their place?
13     A.  Well, in any case they're the primary leader in
14  the case itself.
15     Q.  So the detective would be the one that would want
16  to look at the evidence and try to solve the case?
17     A.  Correct.
18     Q.  And the detective is also the one that makes the
19  decisions on what evidence gets tested and what evidence
20  doesn't?
21     A.  Correct.
22     Q.  When there's a -- for instance, the Crime Lab,
23  the Fort Worth P.D. Crime Lab does some things on cases?
24     A.  Yes.
25     Q.  And but it's the detective that makes a request

203

1  for them to do that?
2      A.  That is my understanding.
3      Q.  And so the detective would naturally be
4  interested in the photographs that you took in trying to
5  get the overall picture of the case, wouldn't you think?
6      A.  Yes.
7      Q.  And if you found things like footprints or other
8  things that you might think are evidence, you would
9  certainly want the detective to know about that?
10     A.  Yes.
11     Q.  And that's part of your job?
12     A.  Correct.
13     Q.  That's the reason why you -- why Crime Scene
14  exists to try to solve crimes?
15     A.  Yes.
16         (Sotto voce discussion.)
17     Q.  Do you generally work alone or with a team or
18  what?
19     A.  In most cases alone, but if assistance is needed,
20  we can call.
21         MR. WESTFALL:  Okay.  All right.  Officer
22  Ukle, thank you.  Pass the witness.
23         THE WITNESS:  Thank you.
24         MS. JACK:  We have no further questions, Your
25  Honor.

204

1          THE COURT:  May this officer be excused?
2          MS. JACK:  Yes, please.
3          MR. WESTFALL:  He may.
4          THE COURT:  Thank you.  You may be excused.
5          THE WITNESS:  Thank you, Your Honor.
6          (Witness excused.)
7          MR. CHAMBLESS:  Your Honor, the State calls
8  Officer Timothy Lee, Tim Lee.
9          THE COURT:  Please raise your right hand.
10         (Witness sworn.)
11         THE COURT:  Thank you.  Please have a seat.
12                 TIM LEE,
13  Having been first duly sworn, testified as follows:
14             DIRECT EXAMINATION
15  BY MR. CHAMBLESS:
16     Q.  Please state your name.
17     A.  Officer Timothy Lee.
18     Q.  What's your occupation?
19     A.  Police Officer for the City of Fort Worth.
20     Q.  What are your duties at this time?
21     A.  I'm a Crime Scene Investigator.
22     Q.  How long have you worked as a Crime Scene
23  Investigator?
24     A.  Almost four years.
25     Q.  Tell the Jury, tell these folks basically what

205

1 you do and what your function is as a Crime Scene
2 Investigator.
3     A. I work with the detectives at the scene to
4 identify, collect, preserve and submit evidence that's
5 located that deals with the crime scene.
6     Q. What are some of the processes that you use to
7 evaluate and collect evidence, what are the -- how you go
8 into a situation, and what do you do, just in general?
9     A. We take notes of the scene, of the general
10 description of the scene, items that we see, we
11 photograph, and then we will document each thing that we
12 find in the scene and for preparation of presentation in
13 court.
14     Q. Okay. And, for example, if you're going to a
15 vehicle to process it, to evaluate it for potential crime
16 scene evidence, what -- what's on your mind? What are
17 your thoughts as you do that?
18     A. Any biological evidence, fingerprints, anything
19 in the interior of the vehicle that may yield either DNA
20 evidence, fingerprint evidence, or physical evidence of
21 the crime.
22     Q. Okay. On July 1st of 2010, were you requested to
23 go to the Fort Worth Auto Pound?
24     A. Yes, I was.
25     Q. And what is the Fort Worth Auto Pound?

206

1     A. The auto pound is where any vehicle that's seized
2 by the City of Fort Worth Police Department goes for
3 storage, either disposition back to the owner or seizure
4 or held as evidence in a crime.
5     Q. Okay. Is there a -- an area where there is
6 security provided for vehicles that is to be evaluated for
7 crime scene evidence?
8     A. Yes, we have a specific area where those vehicles
9 are held, and they're held separately from every other
10 vehicle in the pound.
11     Q. Okay. On July 1st, 2010, approximately what time
12 were you contacted?
13     A. I was contacted at 1030 hours, 10:30 in the
14 morning.
15     Q. All right. And who contacted you?
16     A. Detective Boetcher with the Homicide Unit.
17     Q. Okay. And what was his request of you?
18     A. Said he had a search warrant for a vehicle and he
19 needed my assistance in processing and documenting the
20 vehicle.
21     Q. And how did he -- what was the vehicle and would
22 you describe it for the record?
23     A. The vehicle was stored in our secure bay. It was
24 damaged. There was damage to the front of the vehicle and
25 specifically the right side. Both air bags had been

207

1 deployed. There were quite a few items inside the
2 vehicle.
3     Q. What make and year model was it, do you recall?
4     A. It's a green Dodge Status (sic) and I have the
5 license plate listed as HGB-006, Texas plate.
6     Q. Okay. Show you a board which has a photograph on
7 it. Do you recognize this photograph?
8     A. Yes, I do.
9     Q. And what does it depict? What does it show?
10     A. That's the vehicle as I saw it that day at the
11 auto pound.
12     Q. All right. So it's actually in the auto pound as
13 you saw it that day, July 1st, 2010?
14     A. Yes, it is.
15     MR. CHAMBLESS: Okay. Offer; this is marked
16 State's Exhibit 65.
17     MR. WESTFALL: No objection, Your Honor.
18     THE COURT: Do you offer 65?
19     MR. CHAMBLESS: Yes, Your Honor.
20     THE COURT: 65 is admitted.
21     (State's Exhibit No. 65 admitted.)
22     Q. (BY MR. CHAMBLESS) Did you take a series of
23 photographs of the vehicle as you were involved in
24 processing it?
25     A. Yes, I did.

208

1     Q. Okay. Bear with me just a minute.
2     Show you another set of photographs that are
3 on these boards, and they're marked first State's Exhibit
4 80. Do you recognize this?
5     A. Yes, I do.
6     Q. Is this a photograph that you took that day?
7     A. Yes, it is.
8     Q. And does it fairly and accurately show what it
9 depicts within the Stratus that day, July 1st?
10     A. Yes, it does.
11     Q. Okay. State's 79, did you take this photograph?
12     A. Yes, I did.
13     Q. And does it fairly and accurately show what you
14 saw and observed that day in the Stratus in the auto
15 pound?
16     A. Yes, it does.
17     Q. This one is marked 78. Do you recognize this?
18     A. I do.
19     Q. And is this a photograph that you took that day?
20     A. It is.
21     Q. All right. Does it fairly and accurately show
22 what you saw in the Stratus that day?
23     A. Yes, it does.
24     Q. And it's marked 78. This one marked 77, do you
25 recognize this one?

209

1    A. Yes, I do.
2    Q. And is this a photograph that you took of the
3  Stratus, the interior of the Stratus that day?
4    A. Yes, it is.
5    Q. This one is marked 76. Do you recognize this?
6    A. I do.
7    Q. And is this a photograph you took of the interior
8  of the Stratus that day?
9    A. Yes, it is.
10    Q. Okay. And finally, this one marked 81, do you
11  recognize this?
12    A. I do.
13    Q. Is this a photograph of the interior of the
14  Stratus you took that day?
15    A. It is.
16       (Sotto voce discussion.)
17       MR. HEISKELL: No objection, Your Honor.
18    Q. (BY MR. CHAMBLESS) Officer Lee, if you would be
19  kind enough to step down for just a minute. We'll look --
20  if you would help us with what we're looking at here in
21  front of the Jury. First we'll start with 76. What are
22  we looking at and what was the location within the
23  Stratus?
24    A. It's upside down.
25    Q. There we go.

210

1    A. This is the back passenger seat.
2       THE COURT: Switch the officer on the other
3  side so he's facing the Court Reporter, please.
4       Did you intend to offer these?
5       MR. CHAMBLESS: Yes, I do, Your Honor, 76
6  through 81.
7       MR. HEISKELL: Your Honor, we have no
8  objections.
9       THE COURT: Admitted. Go ahead.
10       (State's Exhibit Nos. 76 - 81 admitted.)
11    Q. (BY MR. CHAMBLESS) Okay. Tell us what we're
12  looking at.
13    A. This is the back passenger seat of the Stratus.
14  This is a label maker that was in the back seat, back --
15  originally I believe it was in the floorboard, and we
16  moved it up here to get a better picture of it, but it
17  was in the back of the Dodge Stratus.
18    Q. Okay. This one is marked 77. What are we
19  looking at here?
20    A. This is the rear seat of the Stratus. This is
21  the floorboard driver side here. There's a jewelry box
22  here, pair of pants here, and a bandanna here.
23    Q. Okay. Thank you. This one marked 78 I believe
24  is a similar photo. What are we seeing here?
25    A. That's the same area as you saw earlier but a

211

1  closer view showing the jewelry box here a little better.
2  It also shows the bandanna up here as well. You can see
3  this is the original position of where the label maker
4  was.
5    Q. Okay. Now marked 79, what are we looking at
6  here?
7    A. This is a closer view of a white towel that was
8  in the vehicle along with a blue bandanna, and that's in
9  the center console area of the Dodge Stratus.
10    Q. Thank you. This one is marked 80. Give us the
11  perspective we're looking at here, please.
12    A. This is actually where the bandanna was. This is
13  the front part here. This is the armrest between the two
14  seats, and the white towel right here, that's inside the
15  Dodge Stratus.
16    Q. Then, finally, marked State's 81.
17    A. That's a detailed view of the bandanna showing a
18  red-colored stain in this area from where -- from --
19  that's actually showing a better view of it, but this
20  in the one you saw earlier on the armrest.
21    Q. Okay. All right. Thank you. Go ahead and take
22  a seat.
23       Who was present at the auto pound when you
24  were there?
25    A. Just Detective Boetcher with our Homicide Unit,

212

1  and Lieutenant Gaudet with Johnson County Sheriff's
2  Department.
3    Q. Okay. What happened when you got there? What
4  was the first thing, or just tell us your mental process
5  as you begin to go through your duties there that
6  morning.
7    A. I always make a observation of my scene. In this
8  case, it would be Dodge Stratus. I note any damage that I
9  see, any items I see in the vehicle. I -- then I go to
10  general pictures of the vehicle, the outside, showing the
11  condition of the vehicle, and then I go to interior
12  photographs, showing what's inside the vehicle and any
13  things that we find during our search.
14    Q. Did you remove any items that day from the
15  vehicle?
16    A. Yes, I did.
17    Q. Tell the Jury what items you took.
18    A. I removed a blue bandanna and a white towel.
19    Q. Where was that located?
20    A. It was between the front left seat and the center
21  console.
22    Q. Okay.
23    A. There was a pair of blue Dickey's pants that were
24  in the rear floor, a brown jewelry box that was in the
25  rear left floor. There was a white and multicolored shirt

213

1 that was in the right rear floor, a New World Recycling
2 receipt and with a shoe print on it in the right rear
3 floor. Then I also removed the brake pedal cover, the
4 accelerator pedal, the right front floor mat, a small bat
5 from the trunk, and then the Brother label maker from the
6 right rear floor.
7     Q. Okay. And if I've counted it up right, that's
8 ten items; is that correct?
9     A. Yes, sir.
10     Q. Okay. What did you do with the brown jewelry
11 box?
12     A. I released that to Lieutenant Gaudet.
13     Q. Okay. Did you retain possession of the other
14 nine items?
15     A. Yes, I did.
16     Q. Did you do any processing of the evidence or
17 other -- did you do anything else with the car that day?
18     A. Not that day, no. I took everything and secured
19 it in our evidence room that day.
20     Q. Now, did you come back later, a couple days
21 later, July 3rd, and what was your purpose in doing so, if
22 you did?
23     A. I was requested by Detective Boetcher to obtain
24 some possible DNA swabs from the vehicle.
25     Q. Okay. Tell the Jury what you did.

214

1     A. I took DNA swabs of the interior front left door
2 release handle, the steering wheel, and the interior right
3 front door release handle.
4     Q. Okay. That was on what day?
5     A. That was Saturday, July 3rd.
6     Q. Okay. And what did you do with those items?
7     A. They were packaged and submitted to the Property
8 Room.
9     Q. Okay. Following that, did you have further
10 activity with these items on July 14th?
11     A. Yes, sir, I processed the label maker package and
12 the bat.
13     Q. Okay. First tell the Jury what you did with the
14 label maker package.
15     A. Using black powder fingerprint powder, I
16 processed the label maker package and obtained two
17 fingerprint lifts from that package.
18     Q. Okay. So you obtained two latent lifts from the
19 label maker package; is that correct?
20     A. Yes, sir.
21     Q. What did you do with respect to the small bat?
22     A. I processed it with cyanoacrylate, super glue
23 fuming in our chamber, and examined it for latent prints,
24 but I found none of value on that.
25     Q. Tell -- tell us a little bit about that process,

215

1 the super glue process.
2     A. Super gluing is a process used to develop latent
3 prints on an item. It's placed in a chamber. The super
4 glue is heated. It causes fumes. The fumes will attach
5 itself to the prints on the item. And then we use either
6 black powder, magnetic powder or other dye stains to
7 develop them, to lift them and submit them.
8     Q. Okay. And is that what you did with the bat?
9     A. Yes, sir.
10     Q. All right. But there were -- the result was
11 what?
12     A. There were no prints of value that I noted on the
13 bat.
14     Q. Okay. Did you do anything with respect to the
15 front floor mat, the brake pedal cover and accelerator
16 pedal that day?
17     A. Yes, I did. I processed those with Blue Star
18 Forensic for latent blood.
19     Q. And what is your purpose in doing that?
20     A. The Blue Star will adhere itself to any blood on
21 an item, and it fluoresces to show the presence of blood.
22     Q. And what was the result when you used that with
23 those items that day?
24     A. It was a negative result which means I got no
25 fluorescent.

216

1     Q. I'm going to hand you certain items here, show
2 you this and ask if you recognize this particular item?
3     A. Yes, I do.
4     Q. Okay. And how do you recognize that?
5     A. It's my packaging. It's got my initials, my
6 markings on the -- on the packaging.
7     Q. Is the packaging, was it -- when was it prepared
8 by you, done by you, do you recall?
9     A. It would have been on the 14th of July.
10     Q. What does it contain?
11     A. This contains a blue bandanna and a white towel.
12     Q. Okay. And were those items removed -- we've seen
13 the pictures, but were they removed from the Dodge Stratus
14 on July 1st, by you?
15     A. Yes, they were.
16     Q. Were they kept in a secure location by you?
17     A. Yes.
18     Q. And they're packaged in their present form; is
19 that correct?
20     A. That's correct.
21     Q. All right. If you would, just take a minute, put
22 on the gloves, and open up that package, please.
23     A. (Witness complied.)
24     Q. Okay. Would you open up the blue bandanna there
25 for us, please. Okay. And -- okay.

217

1     A. (Witness complied.)

2     Q. So these are marked, let's see, the white towel,

3 is it marked State's Exhibit 83?

4     A. Yes, it is.

5     Q. And the blue bandanna is now marked State's

6 Exhibit 82; is that correct?

7     A. Correct.

8     Q. And then the packaging, the package that you had

9 placed this in is marked 82-A; is that correct?

10     A. Correct.

11     Q. Okay. These were removed by you on that day,

12 July 1st?

13     A. Correct.

14     MR. CHAMBLESS: Offer for all purposes 82 and

15 83, and for record purposes, the packaging marked as 82-A.

16     MR. WESTFALL: No objection as offered, Your

17 Honor.

18     THE COURT: Admitted.

19     (State's Exhibit Nos. 82 - 83 admitted.)

20     (State's Exhibit No. 82-A admitted for

21     record purposes only.)

22     Q. (BY MR. CHAMBLESS) I'm going to show you this

23 item here. It's in a bag like you see. If you would be

24 kind to open up in the presence of the Jury and examine

25 the contents, see if you recognize that item.

218

1     A. Yes, I do.

2     Q. All right. What is -- I believe it's marked

3 GB-30 on the outside. What is -- do you recognize the

4 item that's within that package marked GB-30?

5     A. Yes, I do.

6     Q. What is it?

7     A. That's the jewelry box that I removed from the

8 Status (sic) and released to Lieutenant Gaudet.

9     Q. Of the Johnson County Sheriff's Department?

10     A. Yes, sir.

11     Q. And you released that to him on July 1st of 2010;

12 is that correct?

13     A. Yes, sir.

14     Q. Okay. Now I'm going to hand you two items here.

15 If you would, open up first the box and then this package,

16 if you would.

17     A. (Witness complied.) Okay.

18     Q. First the large box, do you recognize that box?

19     A. Yes, I do. That's my box with my markings and my

20 packaging information.

21     Q. Okay. And what does it indicate to you?

22     A. That, as far as I can tell, it hasn't been opened

23 since I packaged it and placed it in the Property Room.

24     Q. And is it marked in a certain way, package

25 number, a certain number?

219

1     A. Yes, it has a tag number on it that's issued when

2 it goes to the Property Room. It also has the report

3 number for this, this offense, and my initials and I.D.

4     Q. Okay. What's contained within the box?

5     A. It has the Brother label maker package.

6     Q. If you could remove the label maker package.

7     A. (Witness complied.)

8     Q. I marked the plastic bag with the label maker as

9 State's Exhibit No. 84, and the packaging as 84-A; is that

10 correct?

11     A. Yes, sir.

12     MR. CHAMBLESS: All right. I offer these at

13 this time.

14     MR. WESTFALL: No objection as offered, Your

15 Honor.

16     MR. CHAMBLESS: Offer 84 for all purposes,

17 84-A for the record.

18     THE COURT: Admitted.

19     (State's Exhibit No. 84 admitted.)

20     (State's Exhibit No. 84-A admitted for

21     record purposes only.)

22     Q. (BY MR. CHAMBLESS) Now, this package that you

23 have in front of you, do you recognize that?

24     A. Yes, I do.

25     Q. And how do you recognize it?

220

1     A. It's got my initials and I.D., my markings on it

2 when I sealed it, and the specific tag number for that

3 item of evidence.

4     Q. All right. And have you removed what was inside

5 that package?

6     A. Yes, I have.

7     Q. And what was inside and what is contained inside?

8     A. Two latent lift cards containing a latent lift on

9 each card, and the evidence transmittal.

10     Q. Okay. If you would place the evidence. Okay.

11 All right. Now, were those latent lifts made by you on

12 the date, July -- in July of 2010?

13     A. Yes, on July 14th.

14     Q. The -- are the two latent lifts now in a

15 plastic bag marked State's Exhibit No. 85?

16     A. Yes.

17     Q. Okay. And is the envelope that the latent lifts

18 in State's 85 now marked State's 85-A?

19     A. That's correct.

20     MR. CHAMBLESS: Offer the two latent lifts

21 and the packaging marked 85-A for record purposes, 85 for

22 all purposes.

23     MR. WESTFALL: No objection as offered, Your

24 Honor.

25     THE COURT: Admitted.

STATE VS. MARK ANTHONY SOLIZ FEBRUARY 28, 2002

221

1    (State's Exhibit No. 85 admitted.)

2    (State's Exhibit No. 85-A admitted for

3    record purposes only.)

4    Q. (BY MR. CHAMBLESS)  I want to hand you some other

5  items. This is -- do you recognize this I'm handing to

6  you?

7    A. Yes, I do.  That's my packaging with the report

8  number, the tag number, and my initials and I.D. markings.

9    Q. What is contained within that package?

10   A. This is the small bat removed from the trunk of

11 the Stratus.

12   Q. All right.  And what processing did you do with

13 respect to the bat?

14   A. This was the cyanoacrylate or super glue fuming

15 that I did to develop latent prints.

16   Q. Did it yield any usable evidence?

17   A. No, it did not.

18   Q. Okay.  Thank you.  Show you this.  Do you

19 recognize this item?

20   A. Yes, I do.

21   Q. And what is it?  How is it marked?

22   A. It's marked with the specific report number, tag

23 number, my name and I.D., and then my markings to seal it.

24   Q. And what is contained within that package?

25   A. It's the floor mat from the Dodge Stratus.

222

1    Q. You've indicated you did some processing of that

2  on July 14th; is that correct?

3    A. Yes, I did.

4    Q. Did it yield any usable evidence?

5    A. No, it did not.

6    Q. Okay.  Show you this package and ask you if you

7  recognize it?

8    A. Yes, I do.  It's got the specific report number,

9  the tag number, my name and I.D., and then my initials

10 marking the seals.

11   Q. What is contained within this particular package?

12   A. It's a pair of blue pants.

13   Q. Okay.  Where was it located within the vehicle?

14   A. I believe that was on the armrest or in the

15 rear. Let me check my report.  They were -- it was -- the

16 pants were on the rear floor of the vehicle.

17   Q. Did you do any processing with respect to this

18 item?

19   A. No, I did not.

20   Q. Okay.  Show you this particular -- this next

21 package, and ask you to take a look at it.  Do you

22 recognize it?

23   A. Yes, I do.  It's the specific report number, tag

24 number with my name and I.D., and my initials marking the

25 seal.

223

1    Q. What is contained within that package?

2    A. It's a white and multi-colored shirt.

3    Q. And it was collected by you from the Stratus; is

4  that correct?

5    A. That's correct.

6    Q. Did you do any processing with respect to this

7  item?

8    A. I did not.

9    Q. Okay.  If you would, take each of these, and one

10 at a time, tell the Jury if you recognize those and what

11 they contain, please.

12   A. This is my packaging of the New World Recycling

13 receipt taken from the Stratus with my specific markings,

14 the report number, tag number, and my I.D.

15   Q. Did you do any processing with respect to that

16 item?

17   A. No, I did not.

18   Q. Okay.  What is the next item?

19   A. It's the brake pedal; again, the packaging has

20 the specific report number, tag number, and my initials

21 and I.D. marking the seals.

22   Q. Did you process this on July 14th?

23   A. That was processed by me with the Blue Star

24 Forensic.

25   Q. Did it yield any usable evidence?

224

1    A. No, it did not.

2    Q. Okay.  What is the next item?

3    A. It's the accelerator pedal from the Dodge Stratus

4  with my specific I.D. and name, the report number and tag

5  number and my markings on the seal.

6    Q. Okay.  Did you do any processing with respect to

7  this item?

8    A. It was processed with the Blue Star Forensic.

9    Q. Did it yield any usable evidence?

10   A. No, it did not.

11   Q. Okay.  What are the next three items?

12   A. They are the swabs taken from the Dodge Stratus

13 on July 3rd from the interior door release handles and the

14 steering wheel.

15   (Sotto voce discussion.)

16   (Pause in proceeding.)

17   Q. Okay.  Beginning with item number swab 1, the

18 swab itself has been marked 86; is that correct?

19   A. Yes, it is.

20   Q. And the packaging 86-A; is that correct?

21   A. Yes.

22   Q. Okay.  With respect to swab 2, is it now marked

23 87 and the packaging 87-A?

24   A. Yes.

25   Q. Okay.  And now with respect to swab 3, is it

225

1 marked 88 and the packaging 88-A?
2 A. Correct.
3 MR. CHAMBLESS: We offer this at this time
4 marked in the fashion described.
5 MR. HEISKELL: What were those numbers again,
6 Mr. Chambless?
7 MR. CHAMBLESS: 86, 87 and 88.
8 MR. WESTFALL: And then A. No objection as
9 offered, Your Honor.
10 THE COURT: Admitted.
11 (State's Exhibit Nos. 86 - 88 admitted.)
12 (State's Exhibit Nos. 86-A, 87-A, and 88-A
13 admitted for record purposes only.)
14 Q. (BY MR. CHAMBLESS) Did you have any further
15 responsibilities with respect to these items of evidence?
16 A. No, sir.
17 Q. Did you do any further processing of the Stratus?
18 A. No, sir.
19 Q. Or of the items within the Stratus?
20 A. No, sir.
21 MR. CHAMBLESS: Pass the witness.
22 MR. WESTFALL: Thank you, Your Honor.
23 CROSS-EXAMINATION
24 BY MR. WESTFALL:
25 Q. Officer Lee, how you doing?

226

1 A. I'm good.
2 Q. I'm Greg Westfall. Good to see you again. Can
3 you see this board okay from where you are?
4 A. Yes, sir.
5 Q. What is the Property Control Unit?
6 A. Property Control Unit is where all property that
7 we seize or collect is taken to for storage.
8 Q. Is that what you've been calling the Property
9 Room?
10 A. Yes, sir.
11 Q. Okay. And where is that exactly?
12 A. It's -- I believe it's 2616 East Lancaster. I'm
13 not exactly sure the exact address, but it's on East
14 Lancaster at Ayers Street.
15 Q. It used to be at the main police station?
16 A. It was at 350, yes, but they're now combined with
17 the Crime Lab on East Lancaster.
18 Q. Okay. And then the Crime Lab is right there at
19 the same place?
20 A. Yes, sir.
21 Q. So you -- some things you submitted to the
22 Property Control Unit and some things you submitted to the
23 Crime Lab?
24 A. The two latent lifts and the photographs were
25 submitted to the Crime Lab; everything else was submitted

227

1 to the Property Control Unit.
2 Q. How do you submit those to the Crime Lab?
3 A. The latent prints are put in the envelope, and
4 then they're taken and put in a safe at the Property
5 Control Unit. But the Latent Print Unit are the only ones
6 that have access to it. Once it goes in the safe, no one
7 else has access to that safe.
8 Q. I got you. So it's like a drop safe sort of
9 thing?
10 A. Yes, sir.
11 Q. Okay. I want to talk to you a little bit about
12 how your evidence gets marked.
13 A. Okay.
14 Q. And I was hearing a couple of phrases, a specific
15 report number and a tag number?
16 A. Yes, sir.
17 Q. Is there anything else?
18 A. As far as marking the evidence?
19 Q. Right.
20 A. Well, the evidence itself is marked with my
21 initials and I.D. Once it goes into the packaging, the
22 exterior of the packaging has the report number for that
23 offense. And then to be submitted to the Property Control
24 Unit, it has to have a tag number which is specific to
25 that set of evidence.

228

1 Q. Right. Right. And -- and the reason why I'm
2 asking is this. I know that when it goes to the Crime
3 Lab, they, like, will assign it a different number.
4 A. Correct.
5 Q. So what I want to do is try to figure out how we
6 trace something through the system.
7 A. The tag number stays with it, the report number
8 stays with it wherever it goes. So you can locate any
9 given piece of evidence by the report number or tag
10 number. The lab assigns their number to it for their
11 accounting purposes specific to their office.
12 Q. Okay.
13 A. And someone at the lab could explain exactly how
14 that works, but when I submit it, you can have ten
15 different tag numbers on one report number. So if I
16 submit evidence to the Property Control Unit for this
17 report, another officer will submit evidence as well, that
18 gets a specific tag number to that officer. So you could
19 basically say the tag number is specific to me. The
20 report number is specific to the entire offense.
21 Q. Okay. I get it. And so if there's like two
22 Crime Scene officers that have separate reports, then
23 they're -- that's the way to keep that all straightened
24 out as well?
25 A. Yes, sir.

229

1     Q. Can you -- are you sure you can see this if I
2  write? Would you be better off writing it yourself?
3     A. No, I can see it. I can see it.
4     Q. Okay. Then --
5     A. Or I can write it if you prefer.
6     Q. You know what, you just stop me if I'm not doing
7  it right. Report number?
8     A. Yes.
9     Q. And tag number?
10    A. Correct.
11    Q. Okay. And then like the next number that it
12 might get might be the Medical Examiner?
13    A. They will have a number that's specific to the
14 Medical Examiner's office.
15    Q. Okay. Well, where does it go, once you're done
16 with it, where does it go?
17    A. It goes to the Property Control Unit.
18    Q. Once at the Property Control Unit, then what?
19    A. It stays there, that -- they are the custodians
20 of the property.
21    Q. Okay.
22    A. If I go to check something out, then I sign for
23 it, but it goes back to the Property Control Unit unless
24 it's retained by the court. Same thing with the Medical
25 Examiner's Office, if they check something out, it goes

230

1  back to the Property Control Unit until it's either
2  disposed of or submitted in court. But the Property
3  Control Unit is where everything stays and it's kept
4  secure until it's either disposed of or presented in court
5  or further testing is done.
6     Q. I got you. So on, you know, whatever date this
7  was, you put it in the Property Control Unit, and then
8  when Detective Boetcher asked for the additional testing,
9  you went and pulled it out of the Property Control Unit,
10 did your testing, and then put it back?
11    A. No, my testing was done before it went to
12 Property Control Unit.
13    Q. Where was it before that?
14    A. It was in a secure evidence room in our office,
15 and it is secured by an alarm and specific keys that only
16 current Crime Scene officers have access to.
17    Q. Okay. And so then when you're done with whatever
18 you're going to do, then you take it to the Property
19 Control room?
20    A. Correct.
21    Q. Unit?
22    A. Yes.
23    Q. So the report number is what?
24    A. The report number is a specific number that
25 always begins with the year that we are in. So for this,

231

1  this offense, it would have started with 10-066785 would
2  be the number.
3     Q. Okay.
4     A. The "10" indicates the year that you're in. For
5  anything that happens this year, it will be 12. Then the
6  following six numbers are the actual number of that
7  offense, and it begins on January 1 with 10, five zeros
8  and a one.
9     Q. Got you. And the tag number and then item. So
10 let's start with the blue bandanna.
11    A. Okay.
12    Q. What was the tag number on that?
13    A. The tag number on that one will be 10-0009102.
14    Q. Does each one of these have a unique tag number?
15    A. No. Everything that I submit, that I submitted
16 to the Property Control Unit has that tag number.
17    Q. Okay. So this report number and this tag number,
18 but then I guess there's got to be like an item number
19 too?
20    A. I assign an item number to it. The way I work
21 is the very first thing I collect on a scene, that's item
22 No. 1.
23    Q. Right.
24    A. And I go in succession until I finish
25 collecting. So I may have 45 items of evidence, that's my

232

1  item number, that's each individual piece of evidence.
2     Q. Okay. But that number would also kind of follow
3  through too, right?
4     A. I'm not sure of your question.
5     Q. Well, I mean, if we have like, for instance, the
6  swabs, there's three different sets of swabs you did.
7     A. Correct.
8     Q. How would we ever be able to tell the difference
9  between swab No. 1 and swab No. 3 if we didn't use your
10 item number?
11    A. Because it's written on the envelope swab 1, swab
12 2 and swab 3. And then I list in my report what swab
13 number and where it came from.
14    Q. Okay.
15    A. So on the envelope you will see swab 1, and
16 that's on the actual piece of evidence itself. And then
17 in my report, swab 1 came from the interior front left
18 door release handle.
19    Q. Okay. So this blue bandanna, how is it
20 identified?
21    A. It's item No. 1 in my report.
22    Q. Okay. So I'm going to put -- and then item
23 number, and then we'll do open parenthesis, "one", is that
24 fair?
25    A. Sure.

233

1    Q.   Okay.  Because I'm just trying to figure out, you
2  know, how -- so I guess the white towel is going to be the
3  same report number and the same tag number?
4    A.   Yes, sir.
5    Q.   But just a different item number?
6    A.   Yes, sir.
7    Q.   What is the item number for the white towel?
8    A.   White towel is item number -- it's -- it was --
9  they were collected together so they're both item No. 1.
10    Q.   Okay.  And then there was the blue Dickies pants?
11    A.   Correct.  They're item No. 2.
12         MR. WESTFALL:  I'm sorry this thing is so
13  squeaky.  At least you can't smell them.
14    Q.   And then there was a white with multicolors
15  stained shirt?
16    A.   Yes, sir.  That's item No. 3.
17    Q.   Your World Recycling receipt was 4?
18    A.   Correct.
19    Q.   Then there was your brake pedal cover, your
20  accelerator, right floor mat.  Then we get down to swabs
21  though.  Let's just skip to there.  That's item 10, 11 and
22  12?
23    A.   Yes, sir.
24    Q.   And item 10 was what?
25    A.   Item 10 is swab No. 1.

234

1    Q.   Where was that taken?
2    A.   From the interior front left door release handle.
3    Q.   And that's of the Stratus, right?
4    A.   Yes, sir.
5    Q.   So interior driver's door handle?
6    A.   Correct.  That's the handle that you use to open
7  the door.
8    Q.   Right.  That was item No. 10?
9    A.   Yes, sir.
10    Q.   And then 11 is swab No. 2?
11    A.   Correct.
12    Q.   And that is from the steering wheel of the
13  Stratus?
14    A.   Correct.
15    Q.   Item No. 11?
16    A.   Item No. 11 is --
17    Q.   Well, that's that.  Item No. 12 is the --
18    A.   That's swab 3.
19    Q.   The passenger door?
20    A.   Yes, the passenger door handle.
21    Q.   Again, that's of the Stratus?
22    A.   Correct.
23    Q.   That's what all this is is the Stratus?
24    A.   Yes, sir.
25    Q.   And then you have items 13 and 14 which was

235

1  latent lift cards that we saw?
2    A.   Yes, sir.
3    Q.   And then your pictures?
4    A.   Correct.
5    Q.   13, latent lifts.  And, I'm sorry, what were
6  those from again?
7    A.   Those were from the Brother label maker package.
8    Q.   And that was on that plastic stuff?
9    A.   Yes, sir.
10    Q.   When do you use super glue instead of, like,
11  regular dust?
12    A.   It depends on the situation and the surface.  The
13  main thing that you use the super glue for is it
14  permanently affixes that print to the object, which the
15  advantage to that is if I needed to lift a print off of
16  that several days, several weeks, several months later,
17  the print is still going to be there.  As a general, when
18  you lift a -- do a tape lift of a latent print off of an
19  object, that's it.  You don't get another chance with it.
20  Super glue permanently affixes that print to the object.
21    Q.   Okay.  And there's also you can get DNA out of
22  prints, right?
23    A.   You can, yes.
24    Q.   And what is the method for that?  Is that the
25  swab deal you're swabbing, this is to try to get DNA?

236

1    A.   Correct.
2    Q.   All right.  And is it -- I guess it's not
3  uncommon at all for you to get DNA like off of a steering
4  wheel?
5    A.   It's not uncommon at all, no.
6    Q.   Because that's where people are holding and the
7  DNA comes out in the oil and sweat in your hand?
8    A.   It comes -- actually comes off of the epithelial
9  cells.  It can come off of perspiration and the oils in
10  your hand.
11    Q.   Okay.  And so that's just -- just a good idea to
12  do stuff like this, take swabs of places where people are
13  likely to be touching?
14    A.   Yes, it is.
15    Q.   Now, you don't make, yourself, the decision on
16  what ultimately gets tested, like, for instance, if 10, 11
17  and 12 actually go for DNA testing; that's not your call,
18  right?
19    A.   No, sir.
20    Q.   The Detective makes that?
21    A.   Correct.
22    Q.   So Detective Boetcher, I guess, in this case
23  would have made that call?
24    A.   Correct.
25    Q.   And I guess you don't make the call either as to

237

1 whether latent prints actually get examined to see if they
2 match up to anything?
3    A. No, I don't make that decision.
4    Q. You just make the prints. You lift the prints?
5    A. Correct. I don't make them. I lift them.
6    Q. Do you have any idea what of this evidence did
7 actually get followed up on?
8    A. No, I do not.
9    Q. The bandanna and the white towel, I guess
10 those stains, you suspect that might be blood?
11    A. Correct.
12    Q. Now, who would -- who would look to see if that
13 was blood or so, you know, DNA and whatnot?
14    A. That would go to the lab and it would be
15 requested by -- which I believe it may have been
16 requested, but it would go to the lab for what type of
17 substance it is and what's contained in it.
18    Q. Okay. And the swabs for the DNA testing, where
19 would that go?
20    A. That would originally originate at the lab, and
21 then sometimes they send it out to different places to be
22 actually tested.
23    Q. Okay. And the detective is the one that makes
24 the idea on what gets tested?
25    A. Correct.

238

1    Q. And then the lab handles it from there. And were
2 you asked -- I know somebody, somebody did G.S.R., gunshot
3 residue testing on this car.
4    A. I believe --
5    Q. Do you have any idea who did that?
6    A. I don't know who did.
7    Q. Okay. Maybe I'm remembering that wrong. But
8 this is what -- this is everything you were asked to do?
9    A. Correct.
10    MR. WESTFALL: All right. Very good. Well,
11 thank you so much.
12    THE WITNESS: Thank you.
13    MR. WESTFALL: Your Honor, we'll pass the
14 witness.
15       REDIRECT EXAMINATION
16 BY MR. CHAMBLESS:
17    Q. Just a couple things to follow up. You were
18 asked about the swabs. Let's just assume for a minute we
19 have a stolen vehicle, okay. And picture in your mind
20 this, that the person who stole the vehicle is in the
21 vehicle and is seen by officers leaving, getting out of
22 the vehicle, and is later captured. We know the identity
23 of that person who was in the stolen vehicle, if you can
24 just picture that in your thoughts.
25    A. Okay.

239

1    Q. And maybe one other occupant also, and that
2 person's identified. And so if we -- if we were fortunate
3 enough to have DNA on the -- any of these swabs that were
4 identified to those people, that would be, in part,
5 redundant, would you agree?
6    A. Yes.
7    Q. Because we already have independent verification
8 of those two people anyway within the car; is that
9 correct?
10    A. Correct.
11    Q. Okay. With respect to steering wheels, what has
12 been your experience with respect to swabs and
13 fingerprints?
14    A. Swabs are better than fingerprints on steering
15 wheels because of the surface.
16    Q. Okay.
17    A. It's a rough, porous surface. It's not conducive
18 to fingerprinting but is very conducive to DNA.
19    MR. CHAMBLESS: Okay. Thank you very much.
20 We appreciate your time.
21    THE WITNESS: Thank you.
22    MR. CHAMBLESS: Pass the witness.
23    MR. WESTFALL: Nothing further, Your Honor.
24 Thank you.
25    THE COURT: May the witness be excused?

240

1    MR. WESTFALL: He may.
2    THE COURT: Thank you. You may be excused.
3    THE WITNESS: Thank you.
4    (Witness excused.)
5    MR. STRAHAN: State is going to call Robert
6 Presney.
7    THE COURT: Come on up here, around here by
8 that Deputy. Raise your right hand.
9    (Witness sworn.)
10    THE COURT: Thank you.
11       ROBERT PRESNEY,
12 Having been first duly sworn, testified as follows:
13       DIRECT EXAMINATION
14 BY MR. STRAHAN:
15    Q. Would you state your name, please.
16    A. Robert Presney.
17    Q. Would you spell it for the record, please.
18    A. Robert, then Presney is P-R-E-S-N-E-Y.
19    Q. And how are you employed?
20    A. I'm a police officer with the City of Fort Worth.
21    Q. And how long have you been a police officer with
22 Fort Worth?
23    A. Coming up on about 27 and a half years.
24    Q. Now, are you a certified peace officer?
25    A. Yes, I am.

241

1    Q. Okay. And have you worked at other agencies
2 besides Fort Worth?
3    A. No, I have not.
4    Q. Okay. So you spent your entire career, you said
5 27 years with the City of Fort Worth?
6    A. That is correct.
7    Q. P.D. Okay. And when you first started as a
8 police officer, what were your basic job responsibilities?
9    A. When I first started out of the academy, my first
10 responsibilities were in the Patrol Division, answering
11 calls, working accidents.
12    Q. And how long did you do that for?
13    A. I did that for -- I think it was about three,
14 four years.
15    Q. What was your next assignment after that?
16    A. After I worked in patrol, I moved over to the
17 Traffic Division where I did speed enforcement, did
18 accidents, DWIs.
19    Q. Okay. And about how long did you do that?
20    A. That was about two years.
21    Q. And where did you move from there?
22    A. After Traffic, I moved over to Crime Scene Unit.
23    Q. Okay. And how long have you been with the Crime
24 Scene Unit then?
25    A. Roughly since about 1990-ish.

242

1    Q. You say you were over the Crime Scene Unit or in
2 to the Crime Scene?
3    A. I was in to the Crime Scene Unit.
4    Q. Okay. And for all these years, has that been
5 your position as a member of the Crime Scene unit?
6    A. Yes.
7    Q. Okay. And can you tell us basically what kind of
8 training and experience you have in doing what you do as a
9 Crime Scene officer.
10    A. With the city, what we do is we start with
11 on-the-job training. You come over, you work with an
12 experienced officer, you work the different calls for
13 several months. Then you get released under watchful
14 eye. Then you're cut loose completely. And then as
15 schools and other things come available, then you are
16 allowed to go to the schools.
17    Q. Okay. And do you go to different kinds of
18 schools on collection of evidence?
19    A. You can, yes.
20    Q. Okay. And, for instance, is there a school on
21 the detection of gunshot or gunpowder residue? And for
22 actually taking that out of, say, a vehicle or someone's
23 hands, is there a certain technique for doing that?
24    A. I don't know of any schools. We were just taught
25 how to do it. And we've changed our procedure to the more

243

1 current one that we use now.
2    Q. Okay. And if you were going to take a gunpowder
3 residue, gunshot residue sample from a person's hands, how
4 would you do that?
5    A. We have little dobbers now, and what we do is we
6 just dob what would be the web area in the top part of the
7 hand. Then we also go and we dob the palm of the hand for
8 any signs of gunshot residue.
9    Q. And when you say dob, you take that dobber that
10 comes in a gun residue kit; is that correct?
11    A. That is correct.
12    Q. And then you actually put it on that part of the
13 hand, and then you change dobbers, put it on the other
14 part of the hand?
15    A. That is correct.
16    Q. And then you do both hands generally?
17    A. Yes.
18    Q. Okay. Now, is it also important for a Crime
19 Scene officer to have and be able to use a digital camera
20 these days?
21    A. Yes, it is.
22    Q. And are you called out sometimes to process crime
23 scenes, one, with G.S.R. kit, potentially; is that -- does
24 that happen sometimes?
25    A. Yes.

244

1    Q. Does it also happen that you're called upon to
2 take pictures?
3    A. Yes.
4    Q. Okay. And what other types of evidence can you
5 be called upon to collect? For instance, if in a
6 shooting, if there's casings or bullets, what would be
7 your responsibilities?
8    A. If there's casings or bullets, we would, you
9 know, photograph them and then we would collect the
10 casings and the bullets at that time.
11    Q. Is there a certain method that you go by to
12 collect the bullets and the casings so that you don't
13 personally alter them or contaminate them?
14    A. When we collect the bullet, the way our lab
15 currently wants us to do it is we'll collect it, we use
16 gloves, I put it in a separate envelope from each other,
17 and then it is submitted to the Property Room.
18    Q. Okay. Now, whenever you do that, is it also part
19 of your training and experience to package everything in
20 such a way that it doesn't get mixed up or lost within the
21 police department?
22    A. Yes.
23    Q. I would imagine that there's thousands and
24 thousands and thousands of individual piece of evidence
25 that come through Fort Worth P.D. every year?

245

1    A. Yes, there are.
2    Q. Okay. And I would imagine that you handle a
3  great deal of those?
4    A. Yes.
5    Q. Who are some of the other Crime Scene officers
6  that you work with on a daily basis?
7    A. Some that I've seen here today were Officer Lee,
8  Officer Ukle. There's several retired ones that I've
9  worked with through the years, Varnon, Robertson. We have
10  some on evening shift which would be a Glen Wilson, a J.J.
11  Jeans. There's 15 of us.
12    Q. 15. Okay. And some have retired, but they will
13  occasionally, if they retire after a case, you know, after
14  a case is done, or excuse me, if they retire before a case
15  goes to trial, they'll come back and testify?
16    A. That is correct.
17    Q. For their part in that. And so let me ask you
18  this. If a call is made on a crime, and somebody calls
19  9-1-1, the first person generally to respond, unless it's
20  a medical emergency, the first police officer to respond
21  is generally who?
22    A. A patrol officer.
23    Q. Patrol officer. If it turns out to be an actual
24  crime where evidence is needed, say a robbery or a murder,
25  something like that, would a detective at some point be

246

1  called out also?
2    A. Yes.
3    Q. And at some point not only the officer but the
4  detective is there who is going to handle the case, but
5  then at some point the Crime Scene officer is called out?
6    A. That is correct.
7    Q. To collect; is that correct?
8    A. Yes.
9    Q. Is it a general practice for police officers, the
10  guy or the girl who shows up, 9-1-1 responder, first
11  responder, do they generally mess with evidence or touch
12  evidence or they try to wait until the Crime Scene person
13  gets there?
14    A. Normally they try and wait till the Crime Scene
15  officer gets there.
16    Q. Are there emergency situations where that's not
17  possible?
18    A. Yes, there are.
19    Q. For instance, to check to see if somebody is
20  alive or dead or give aid to someone?
21    A. Correct.
22    Q. Or potentially going into a crime scene where the
23  criminal or the perpetrator is still there and having to
24  deal with them?
25    A. That is correct.

247

1    Q. So it's kind of a lot of different situations
2  that you could encounter?
3    A. Yes.
4    Q. Okay. And as a crime scene person, do you get
5  called out to multiple criminal offenses on a daily basis,
6  or how busy are you, I guess is the question, as far as
7  going out to scenes and collecting evidence?
8    A. We're busy; varies on a day-to-day basis. Some
9  days we may not do very much. Other days, from the time
10  we get there to the time we leave, we're constantly doing
11  something.
12    Q. All right. So you would be called out in a
13  variety of cases, multiple cases, and have to do different
14  crime scenes as part of your job; is that correct?
15    A. That is correct.
16    Q. And let me ask you --
17        MR. STRAHAN: May I approach the board, Your
18  Honor?
19        THE COURT: Yes, sir.
20    Q. Generally speaking, when a 9-1-1 call is made or
21  a criminal case is reported, do the police officers make a
22  case number for Fort Worth P.D.'s use?
23    A. They request one, yes.
24    Q. Okay. And so they'll get one assigned to that
25  particular case?

248

1    A. Yes.
2    Q. Is that right? Okay. And whenever you collect
3  evidence from a particular case, and this is just
4  hypothetically, say there's a case number here, and you
5  collect evidence, if the evidence is later matched up to
6  another offense, say one person is committing multiple
7  offenses, would there be other case numbers that are
8  related to that, that can be related to the same person is
9  what I'm getting at?
10    A. Yes, there are.
11    Q. In other words, if one person commits five
12  crimes, the case number is not specific to that person; it
13  would be specific to each and every crime?
14    A. Correct.
15    Q. But they could all eventually be related to one
16  person or more than one person?
17    A. Yes.
18    Q. Okay. All right. So Fort Worth P.D. assigns a
19  number to, I guess, incidents or cases. And then evidence
20  would be collected from each one based on whatever that
21  number is?
22    A. Correct.
23    Q. Okay. Do you remember having been called out to
24  the scene of an offense where a green Dodge pickup was
25  taken from someone at gunpoint?

249

1  A. Yes, I do.

2  Q. Do you remember the name Contreras?

3  A. I was not given the name on that particular call.

4  Q. Okay. Did you process a scene or deal with a

5  vehicle?

6  A. I dealt with a vehicle in this case.

7  Q. Okay. And what would be the Fort Worth number

8  for that offense?

9  A. That would be 10-066736.

10  Q. Okay. And that was involving what type of

11  vehicle? What was the issue in that case?

12  A. This would have been a green Dodge pickup truck.

13  Q. Okay. And did you understand that to have been a

14  robbery of the vehicle, a carjacking where again the

15  vehicle is recovered later?

16  A. Yes.

17  Q. And you were asked to process that vehicle; is

18  that correct?

19  A. That is correct.

20  Q. Okay. And do you remember or do you have in your

21  report just the date that that offense was committed?

22  A. That was July 1st of 2010.

23  Q. July 1st or June 1st?

24  A. I have it as the day I dealt with the vehicle was

25  July 1st.

250

1  Q. You dealt with it. So where did you deal with

2  this vehicle?

3  A. At the auto pound.

4  Q. Okay. And so you go out and process this vehicle

5  at the auto pound. Do you know what date the actual

6  offense itself occurred?

7  A. No, I don't.

8  Q. Okay. So this would have its own case number.

9  Do you have in your documents where the offense took place

10  allegedly?

11  A. Not in mine I have here. I have another stack I

12  could look through and see if there is something listed

13  there.

14  Q. And what I'm trying to do is, you were called out

15  on multiple scenes that --

16  A. Right.

17  Q. -- ended up being related in one way or another

18  to this case; is that right?

19  A. That is correct.

20  Q. So can you just tell me, if you can refresh your

21  memory, can you tell me what the address was of this

22  offense?

23  A. Let me look through here because I'll need to

24  check.

25        I actually have nothing here other than mine

251

1  with that service number on it, so I don't know the actual

2  location.

3  Q. Okay. In relation to this particular cause

4  number -- or, I'm sorry, this particular police department

5  number, case number, were you asked to process that

6  vehicle?

7  A. Yes, I was.

8  Q. Can you tell the Jury what you actually did to

9  process that vehicle?

10  A. In this vehicle, I was asked by Detective Tracy

11  to go out and process it, and I was asked to swab part of

12  the vehicle, process it for prints, and take some

13  photographs.

14  Q. Okay. And did you do all of that?

15  A. Yes, I did.

16  Q. Now, did you -- were you able to find any prints

17  that were unable to compare to other people?

18  A. No. The condition of the vehicle was very poor

19  when I went out there.

20  Q. Okay. And do you know, whenever you take swabs,

21  is the purpose of doing that to see if there's DNA in

22  there?

23  A. That is correct.

24  Q. Okay. And do you know if the DNA swabs or the

25  swabs that you took for that purpose, whether they

252

1  actually were ever tested or ever amounted to anything?

2  A. No, I do not.

3  Q. Okay. And did you -- did you also -- you did

4  take pictures of that vehicle; is that correct?

5  A. That is correct.

6  Q. Okay. Okay. I'm going to show you these

7  photographs that have been marked State's 89, 90, 91 -- I

8  know you can't see real well from there -- 92 and 93. I'm

9  going to ask you to look at all of these. Can you look at

10  State's 89 and tell me if you've seen this before?

11  A. That would be the picture of the license plate on

12  the vehicle.

13  Q. And that is a photograph that you personally

14  took?

15  A. Yes.

16  Q. And where was this vehicle whenever you took the

17  photo?

18  A. This vehicle was at the Fort Worth Auto Pound.

19  Q. Okay. And does this vehicle fairly and

20  accurately -- or this picture fairly and accurately

21  represent the way that vehicle looked, that part of the

22  vehicle when you took the photograph in the impound?

23  A. Yes.

24  Q. Okay. Hand you what's been marked as State's

25  No. 90. Can you tell me what this is?

253

A. This State's 90 would be a photograph of the interior of the vehicle, specifically the front seat area.

Q. Okay. And these are all having to do with Fort Worth case number 10-66736; is that correct?

A. That is correct.

Q. Does that fairly and accurately reflect the way the interior of that vehicle looked when you took the photo at the impound?

A. Yes.

Q. Okay. Show you State's No. 91. Tell me if you've seen this before.

A. Yes, I have.

Q. Can you tell me what that is?

A. That would be the inside of the vehicle again; this side from the passenger -- excuse me, the driver side of the vehicle.

Q. Okay. Does that fairly and accurately depict the way the vehicle looked in the impound?

A. Yes.

Q. Okay. Show you State's Exhibit No. 92. Can you tell us what that depicts?

A. 92 would be an exterior photograph of the vehicle from the front end.

Q. Okay. And does that fairly and accurately depict the way that vehicle looked in the impound, that angle?

254

A. Yes.

Q. Okay. Finally State's 93. Can you tell us what that is?

A. That would be a picture of the exterior of the vehicle from the backside.

Q. Okay. And does that fairly and accurately depict the way that vehicle looked?

A. Yes, it does.

Q. Okay. And that vehicle had a lot of damage to the outside and inside; is that fair to say?

A. Correct.

MR. STRAHAN: Okay. At this time, Your Honor, I'll offer State's 89 through 93.

MR. WESTFALL: No objection, Your Honor.

THE COURT: 89 through 93 are admitted.

(State's Exhibit Nos. 89 - 93 admitted.)

Q. (BY MR. STRAHAN) Okay. And I'm also going to show you a package here, has your name on it. Can you tell us what is in this package?

A. This is a package containing five swabs that I took from inside the vehicle.

Q. Okay. And this -- those particular swabs are taken from this vehicle that you had pictures of?

A. Yes.

Q. Okay. I'm going to mark this package as State's

255

Exhibit No. 94. Can you tell me, is that a package that you had originally created?

A. Yes, it is.

Q. Can you go ahead and open that package, please, and tell us what's inside.

A. Inside are five packages with swabs from that vehicle.

Q. Okay. And so what you have inside this package is exactly what you expected to find; is that correct?

A. That is correct.

Q. Okay. If you would, can you place those swabs in this bag. And the packaging the swabs came in today, the package you just looked at with your name on it and this Fort Worth P.D. number on it is State's 94; is that correct?

A. That is correct.

MR. STRAHAN: Okay. And I'm going to mark the bag with the actual swabs in it now as State's 94-A. Okay.

And at this time, Your Honor, I would offer State's 94 for record purposes, and 94-A for all purposes.

MR. WESTFALL: No objection, Your Honor, as offered.

THE COURT: Up to now, the "A" has been the

256

one for record. It would be more helpful later if 94-A would be the one offered for record.

MR. STRAHAN: I can just tell you that some of these packages I've never opened and there's going to be multiple items and I can't -- some of them we can pre do that, but it's kind of hard. We can certainly try that.

THE COURT: All right. 94-A and 94 are admitted. And 94 is what you called for record only, correct?

MR. STRAHAN: Yes, sir.

(State's Exhibit No. 94-A admitted.)

(State's Exhibit No. 94 admitted for record purposes only.)

Q. (BY MR. STRAHAN) Were you called at some point to process a scene at 2608 Pearl Avenue?

A. Yes, I was.

Q. Okay. And what was the date you were called out on that?

A. That would have been June 29th, 2010.

Q. And is that in Fort Worth, Texas?

A. Yes, it is.

Q. Okay. And about what time were you called out?

A. I received the call at 7:09 in the morning.

Q. Okay. And what type of scene were you walking in

257

1  to?  What was your understanding of what was going on
2  there?
3      A.  I was dispatched to this reference a "shots
4  fired" call in a house that had been struck by gunfire.
5      Q.  Okay.  And the address is 2608 Pearl.  What part
6  of Fort Worth is that in?
7      A.  That's on the north side of Fort Worth.
8      Q.  Okay.  And was a Fort Worth case number
9  ultimately assigned to that case?
10     A.  Yes, it was.
11     Q.  And what is that case?
12     A.  That would be 10-068302.
13     Q.  Okay.  And did you have the opportunity to learn
14  the complainants and the victims in this case, what their
15  names were?
16     A.  No, I did not.
17     Q.  Okay.  And you characterize this as what type of
18  an offense?
19     A.  I -- I was dispatched on a "shots fired" call.
20     Q.  Okay.  And whenever you went to the scene, were
21  you able to see whether or not any of these shots that had
22  been fired had hit this house?
23     A.  Yes, I was.  And the officer on the scene said
24  they were making a deadly conduct report reference this.
25     Q.  This is what would commonly be referred to as a

258

1  drive-by shooting?
2      A.  Correct.
3      Q.  And so you were asked to come to this scene and
4  process it; is that correct?
5      A.  That is correct.
6      Q.  Okay.  To your knowledge, was anybody actually
7  hit in that shooting?
8      A.  No.
9      Q.  Okay.  And in order to process this particular
10  scene, what all did you do?
11     A.  At this scene, after speaking to the officer who
12  was there, I photographed the scene, placards were put by
13  pieces of evidence I had located, and those were
14  photographed, and then I collected them.
15     Q.  Okay.  I'm going to hand you a sealed package.
16  Can you take a look at this and tell us what this is?
17     A.  This would be a package containing six
18  projectiles that I collected from the scene.
19     Q.  And what is the -- is there an associated
20  case number with the package that you're holding right
21  now?
22     A.  The case number would be 10-068302.
23     Q.  Okay.  And is that the same number that we're
24  talking about here from 2608 Pearl Avenue?
25     A.  That is correct.

259

1      Q.  Okay.  Can you open the contents of the package
2  you're holding and tell us what is in there?
3      A.  There are six packages in here with projectiles
4  with number -- excuse me, letters written on each package
5  to designate a placard.
6      Q.  And so you expected to find what in that package
7  when you looked at that?
8      A.  Six projectiles.
9      Q.  Okay.  And what did you find in that package?
10     A.  Six projectiles.
11     Q.  Okay.  I am going to mark the envelope that it
12  came in as State's No. 95.  Now, are the objects within
13  the package actually marked?
14     A.  On these we don't.  We are told not to mark the
15  projectiles anymore because it can damage evidence, so we
16  just put them in envelopes.
17     Q.  Okay.  And so these particular envelopes here
18  were not marked by you individually?
19     A.  No.
20     Q.  Okay.  So these would be all of the bullets you
21  actually took from the scene at 2608 Pearl?
22     A.  That is correct.
23     Q.  Okay.  All right.  Would you take all six -- you
24  said it was six, correct?
25     A.  Yes.

260

1      Q.  Six of those bullets, and would you put them in
2  this clear bag.  Okay.  The bag you just put them in I am
3  sealing or closing and marking as State's No. 95-A.  And
4  are these the exact same bullets that you were able to get
5  from the location at 2608 Pearl Avenue?
6      A.  Yes.
7      Q.  Now, can you tell the Jury where all -- I mean,
8  they're all packaged together, I understand that, but
9  where all did you find bullets when you went into the
10  house?
11     A.  When I walked into the house, there were three in
12  the living room just inside the front door.  When you
13  continued going through the house, you came to a wall, and
14  there was a picture in a wall.  Directly underneath one of
15  the pictures, there was another projectile that was still
16  in the Sheetrock in the wall.  Farther down into the house
17  there was a glass door.  There was a bullet hole in the
18  door.  The glass was shattered.  And behind that door was
19  another projectile.  On the outside of the house, there
20  was a screen to one of the windows that had a bullet hole
21  in it.  The projectile went through the glass, went
22  through a drape, into a closet, through the wall behind
23  the closet, entered another bedroom behind that, went
24  through a wall by a headboard, into the back bedroom, and
25  ended up on the floor.

261

1    Q. Okay. So did you also photograph where these
2 bullets were recovered and the holes that they had made
3 within the house?
4    A. Yes.
5    Q. Okay. And about how many photographs did you
6 take, if you recall?
7    A. I think there was like 65 total photographs.
8    Q. Okay. Now, do these bullets seem to be in the
9 same or substantially similar condition as to when you
10 actually picked them up?
11    A. Yes.
12    Q. And these have actually gone through testing, or
13 do you know if they've gone through testing at labs that
14 are specific to bullets and casings and gun testing,
15 ballistics?
16    A. There is tape and initials which are consistent
17 with that.
18    MR. STRAHAN: Okay. All right. At this time
19 I would offer State's 95 for purposes of the record, and
20 95-A, which is the packaging containing the projectiles.
21    MR. WESTFALL: No objection as offered, Your
22 Honor.
23    THE COURT: 95 as record and 95-A with
24 projectiles?
25    MR. STRAHAN: Yes, sir.

262

1    THE COURT: They're admitted.
2    (State's Exhibit No. 95-A admitted.)
3    (State's Exhibit No. 95 admitted for
4    record purposes only.)
5    MR. STRAHAN: Thank you.
6    THE COURT: Let's go ahead and recess for the
7 day. It's 5:00. It's been a long day. We've got quite a
8 bit accomplished today.
9    Ladies and gentlemen, I'll excuse you.
10 Please remember my instructions. I'll allow you to go
11 home again today. Please do not discuss this case with
12 anyone and do not read any reports or listen to any media
13 reports of this case. I am going to make the decision --
14 I know the sequestration thing has caused some of you some
15 concern. I'll make that decision on a daily basis.
16 There's no need for it today. Maybe later in the trial at
17 some point that it might make sense, so you should be
18 prepared for that, but not overly concerned or worried
19 about it.
20    If there is an event where I have to put you
21 in a hotel room overnight, then, of course, we would allow
22 an opportunity for family members or deputies to take you
23 to get your belongings if you didn't have them ready. And
24 any medications that you need, you would be able to access
25 them. And we would definitely take care of you if we have

263

1 to get to that point.
2    So I appreciate your understanding and your
3 work today, and you may accompany the bailiff out of the
4 courtroom.
5    (Court adjourned.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1  THE STATE OF TEXAS )

 2  COUNTY OF JOHNSON  )

 3            I, Pamela K. Waits, Official Court Reporter

 4  in and for the 413th District Court of Johnson County,

 5  State of Texas, do hereby certify that the above and

 6  foregoing contains a true and correct transcription of all

 7  portions of evidence and other proceedings requested in

 8  writing by counsel for the parties to be included in the

 9  volume of the Reporter's Record, in the above-styled and

10  numbered cause, all of which occurred in open court or in

11  chambers and were reported by me.

12            I further certify that this Reporter's Record

13  of the proceedings truly and correctly reflects the

14  exhibits, if any, admitted by the respective parties.

15            WITNESS MY OFFICIAL HAND this the 3/ day

16  of December 2012.


17

18            _____
              Pamela K. Waits, Texas CSR #4991
19            Expiration Date:  12/31/13
              Official Court Reporter
20            413th Judicial District
              Johnson County, Texas
21            204 S. Buffalo Avenue
              Cleburne, Texas 76033
22            (817) 556-6041

23

24

25
```