1              REPORTER'S RECORD

2          VOLUME 42 OF 75 VOLUMES

3        TRIAL COURT CAUSE NO. F45059

4     COURT OF CRIMINAL APPEALS NO. AP-76,768

5   STATE OF TEXAS          )      IN THE DISTRICT COURT
                            )
6   VS.                     )      JOHNSON COUNTY, TEXAS
                            )
7   MARK ANTHONY SOLIZ      )      413TH JUDICIAL DISTRICT

8

9   -----------------------------------------------------------

10                     JURY TRIAL

11               GUILT/INNOCENCE PHASE

12  -----------------------------------------------------------

13

14

15

16

17          On the 2nd day of March, 2012, the following

18  proceedings came on to be heard in the above-entitled and

19  numbered cause before the Honorable William C. Bosworth,

20  Jr., Judge presiding, held in Cleburne, Johnson County,

21  Texas:

22          Proceedings reported by Machine Shorthand and

23  Computer-Aided Transcription.

24                                    ORIGINAL

25

1                A P P E A R A N C E S

2   DALE HANNA
    SBOT NO. 08919500
3   LARRY CHAMBLESS
    SBOT NO. 04086320
4   MARTIN STRAHAN
    SBOT NO. 00797765
5   District Attorney's Office
    Johnson County
6   204 S. Buffalo
    Cleburne, Texas 76033
7   (817) 556-6801

8   ELIZABETH CHRISTINA JACK
    SBOT NO. 10445200
9   Tarrant County District Attorney's Office
    401 W. Belknap Street
10  Fort Worth, Texas 76102-1913
    817-884-1366
11
    ATTORNEYS FOR THE STATE OF TEXAS
12

13  MICHAEL P. HEISKELL
    SBOT NO. 09383700
14  Johnson, Vaughn & Heiskell
    5601 Bridge Street
15  Suite 220
    Fort Worth, Texas 76112-2305
16  817-457-2999

17  GREGORY B. WESTFALL
    SBOT NO. 00788646
18  Hill Gilstrap, P.C.
    1400 W. Abram Street
19  Arlington, Texas 76013
    817-276-4931
20
    ATTORNEYS FOR DEFENDANT
21

22

23

24

25

```
 1                        I N D E X

 2                      VOLUME 42

 3                GUILT/INNOCENCE PHASE

 4   MARCH 2, 2012                      PAGE      VOL.

 5   Proceeding................................    5        42

 6   STATE'S WITNESS        DIRECT      CROSS      VOIR   VOL.
                                                  DIRE
 7   DANNY PAINE            12,38,40    31,39             42
     MICHAEL GAUDET         54          91          75    42
 8   JENNIFER NOLLKAMPER    99,148,158, 135,154,161
                            161                           42
 9
     Adjournment.................................. 163    42
10
     Court Reporter's Certificate................ 164    42
11
                    ALPHABETICAL INDEX
12
     WITNESS                DIRECT      CROSS      VOIR   VOL.
13                                                DIRE
     MICHAEL GAUDET         54          91          75    42
14   JENNIFER NOLLKAMPER    99,148,158, 135,154,161
                            161                           42
15   DANNY PAINE            12,38,40    31,39             42

16                        EXHIBITS
     STATE'S
17   NO.   DESCRIPTION                   OFFER ADMIT VOL.

18   188   DVD, crime scene                81    82    42
     189   Chain of Custody form           50    51    42
19   190   Chain of Custody form           51    51    42
     191   Major Case Prints; Soliz        51    52    42
20   192   Major Case Prints; Soliz        51    52    42
     193   Major Case Prints; Ramos        52    52    42
21   194   Major Case Prints; Ramos        52    52    42
     195   Evidence Release                52    53    42
22   196   Evidence Release                53    54    42
     197   Photo Board (18x24)             59    59    42
23   198   Photo Board (18x24)             59    59    42
     199   Photo Board (18x24)             59    59    42
24   200   Photo Board (18x24)             59    59    42
     201   Photo Board (18x24)             59    59    42
25   202   Photo Board (18x24)             59    59    42
```

STATE V. MARK ANTHONY SOLIZ   MARCH 2, 2012

4

| | | | | OFFER | ADMIT | VOL. |
|---|---|---|---|---|---|---|
| 1 | 203 | Photo Board (18x24) | | 59 | 59 | 42 |
| | 204 | Photo Board (18x24) | | 59 | 59 | 42 |
| 2 | 205 | Photo Board (18x24) | | 59 | 59 | 42 |
| | 206 | Photo Board (18x24) | | 59 | 59 | 42 |
| 3 | 207 | Photo Board (18x24) | | 59 | 59 | 42 |
| | 208 | Photo Board (18x24) | | 59 | 59 | 42 |
| 4 | 209 | Jewelry Box | | 63 | 63 | 42 |
| | 209-A | Bag | (Record only) | 63 | 63 | 42 |
| 5 | 210 | Motorola cell phone | | 69 | 69 | 42 |
| | 210-A | Envelope | (Record only) | 69 | 69 | 42 |
| 6 | 211 | Black Nike shoes | | 71 | 71 | 42 |
| | 211-A | Sack | (Record only) | 71 | 71 | 42 |
| 7 | 212 | Buccal swab | | 73 | 73 | 42 |
| | 212-A | Envelope | (Record only) | 73 | 73 | 42 |
| 8 | 213 | Buccal swab | | 73 | 73 | 42 |
| | 213-A | Envelope | (Record only) | 73 | 73 | 42 |
| 9 | 214-A | Sack | (Record only) | 75 | 76 | 42 |
| | 214-15 | Beer can | | 76 | 76 | 42 |
| 10 | 214-16 | Beer bottle | | 76 | 76 | 42 |
| | 215 | Latent Prints | | 78 | 79 | 42 |
| 11 | 215-A | Envelope | (Record only) | 78 | 79 | 42 |
| | 216 | Two checkbooks | | 84 | 84 | 42 |
| 12 | 216-A | Envelope | (Record only) | 84 | 84 | 42 |
| | 217 | Kyocera cell phone | | 84 | 84 | 42 |
| 13 | 217-A | Envelope | (Record only) | 84 | 84 | 42 |
| | 218 | Samsung cell phone | | 85 | 85 | 42 |
| 14 | 218-A | Envelope | (Record only) | 85 | 85 | 42 |
| | 219 | Nokia cell phone | | 86 | 86 | 42 |
| 15 | 219-A | Envelope | (Record only) | 86 | 86 | 42 |
| | 220 | hp battery | | 86 | 86 | 42 |
| 16 | 220-A | Envelope | (Record only) | 86 | 86 | 42 |
| | 221 | hp notebook O.S. CD | | 87 | 87 | 42 |
| 17 | 221-A | Envelope | (Record only) | 87 | 87 | 42 |
| | 222 | hp quickrestore CDs | | 87 | 87 | 42 |
| 18 | 222-A | Envelope | (Record only) | 87 | 87 | 42 |
| | 223 | Sylvania flat-screen TV | | 88 | 88 | 42 |
| 19 | 224 | Shell casing | | 91 | 91 | 42 |
| | 225 | Spent Bullet | | 91 | 91 | 42 |
| 20 | 226 | Nollkamper report | | 107 | 107 | 42 |

21 DEFENDANT'S
   NO.   DESCRIPTION                           OFFER ADMIT VOL.
22

| 23 | 9 | Photo (8X10 black & white) | 138 | 138 | 42 |
|---|---|---|---|---|---|
| | 10 | Photo (8X10 black & white) | 138 | 138 | 42 |
| | 11 | Photo (8X10 black & white) | 143 | 143 | 42 |
| 24 | 12 | Photo (8X10 black & white) | 143 | 143 | 42 |

25

**5**

```
 1              P R O C E E D I N G
 2        (Open court, Defendant present;
 3        Jury not present.)
 4        THE COURT:  State ready to proceed?
 5        MR. STRAHAN:  Yes, sir.
 6        THE COURT:  Defense ready to proceed?
 7        MR. WESTFALL:  Yes, Your Honor.
 8        THE COURT:  Defendant is present.
 9        THE DEFENDANT:  Yes, sir.
10        MR. WESTFALL:  We have a little issue just to
11   take up real fast.
12        THE COURT:  Okay.
13        MR. WESTFALL:  Yesterday, of course,
14   Detective Paine testified pretty extensively on Direct
15   Examination, the hearsay statements of Jose Ramos.
16   Therefore, under Rule 806, that gives us the ability to
17   cross-examine the declarant.
18        THE COURT:  The what?
19        MR. WESTFALL:  Cross-examine the declarant as
20   though Jose Ramos were sitting on the stand.  And if Jose
21   Ramos were sitting on the stand, we would surely
22   cross-examine him on the plea agreement that he has worked
23   out with the State whereby he will plead guilty and get a
24   life sentence for all the acts that we've been hearing
25   about.  This agreement, as the State knows and the Court
```

**6**

```
 1   probably knows, was worked out prior to this trial
 2   beginning.
 3        THE COURT:  I don't know of anything about
 4   Ramos.
 5        MR. WESTFALL:  Oh, okay.
 6        THE COURT:  Other than I know that the
 7   District Attorney has not filed a certification with the
 8   Court saying he's seeking the death penalty.  But I've
 9   appointed Bill Mason to represent Ramos until such time as
10   that declaration is filed, and I've not seen that.  And
11   that's all I know about Ramos.
12        MR. WESTFALL:  Okay.  Well, then, then I'll
13   correct myself, for the Court's information.  Jose Ramos
14   and the State struck a -- an agreement before this trial
15   began for Jose Ramos to receive a life sentence on these
16   cases.  They will waive the death penalty in return for a
17   plea of guilty and -- and his testimony.  The State's
18   Motion in Limine, which we agreed to initially, is
19   directed at that, I presume, the Motion in Limine
20   regarding plea agreements.
21        I would argue, Your Honor, that in light
22   of Rule 806 and in light of the testimony from yesterday,
23   that the plea -- that the plea agreement is now
24   admissible, it is relevant, and I am pretty certain
25   the Detective knows about it.  But we should be able
```

**7**

```
 1   to cross-examine him on that as though, like I said,
 2   under 806, as though Jose Ramos were sitting in that
 3   chair.
 4        MR. STRAHAN:  The response we would have,
 5   Judge, is the door to anything specifically Jose Ramos
 6   may have said, that door was opened not only in the
 7   Defense's opening statement, also in their own
 8   cross-examination of this witness.  And I think what
 9   they're attempting to do is profit by a door that they
10   already opened.  And I don't think they're allowed to do
11   that, open the door themselves and then try to get in this
12   particular plea agreement.
13        Everything that's been testified to at this
14   point has nothing to do with whether or not Jose Ramos
15   ever agrees to testify or not.  Statements by him that
16   were made at the time as a basis of this investigation,
17   two completely separate entities.  And so on that
18   rationale, we would object.
19        THE COURT:  Well, as it stands, the Court has
20   not approved any plea bargain agreement with regard to
21   Ramos.  Isn't Ramos in the 413th Court?
22        MR. STRAHAN:  Yes, sir, he is.
23        THE COURT:  And I don't recall approving any
24   plea bargain agreement or any visiting Judge approving any
25   plea bargain agreements.  It may -- seems like this may
```

**8**

```
 1   come up at some point, but I don't see why it's come up
 2   yet.  Can you elaborate or explain why it would be
 3   necessary at this point?
 4        MR. WESTFALL:  Absolutely, Your Honor.  First
 5   of all, he testified on Direct Examination before we
 6   cross-examined him as to statements made by Jose Ramos.
 7   And then secondly, I mean, we received a notice from the
 8   State that Jose Ramos and the State have reached an
 9   agreement, and this agreement is for a life sentence.
10   They waive the death penalty.  That certainly goes to his
11   credibility.  I mean, under the rules of evidence, I think
12   it's pretty clear that would go to his bias and
13   credibility.  And so, you know, if he were to have been in
14   here testifying himself, then we would be able to use this
15   to impeach his credibility, because he has a bias for the
16   State.  He's trying to get his life sentence.
17        THE COURT:  I understand that part.  What I
18   was trying to get at, isn't this officer a stranger to any
19   plea bargain agreement between the State of Texas and
20   Mr. Ramos?
21        MR. WESTFALL:  Except that he is the State of
22   Texas, Your Honor.  He's an agent.
23        THE COURT:  I don't understand why this
24   officer would be the one that would have knowledge and
25   understanding and authority with regard to a plea bargain
```

**9**

1 agreement that may or may not exist with Ramos.
2 MR. WESTFALL: Well, I don't think 806
3 hinges on -- on the character of the person who delivers
4 the testimony of the declarant. You know, if he doesn't
5 have personal knowledge, I mean, I'm not sure that even
6 matters either. We -- as soon as the hearsay statements
7 are out there, we're allowed to impeach the declarant as
8 though he were here, under Rule 806.
9 THE COURT: Response.
10 MR. STRAHAN: I would say to that, Judge,
11 first of all, the statements that he made at that time,
12 there was no offer of anything in exchange for his
13 testimony. What he's talking about doing is impeaching a
14 witness that is not here, has not testified, on statements
15 that he would have made before he was ever offered
16 anything in exchange to testify. So at the time he made
17 the statements that are being spoken of, it's impossible
18 for him to have had that type of bias for this particular
19 agreement that was made.
20 And so at this point, I think that it would
21 be not relevant until such time as he did testify. Then
22 they could get in to impeaching him on that because he's
23 testifying and his motives for doing so at that time.
24 That's our position.
25 THE COURT: When was the plea bargain

**10**

1 agreement offer extended?
2 MR. STRAHAN: In December of 2011.
3 THE COURT: Was there any offer of that prior
4 to that?
5 MR. STRAHAN: No, sir.
6 THE COURT: So at the time that this
7 Detective was involved, wasn't that prior to
8 indictment?
9 MR. STRAHAN: Yes, sir. It was June 30th of
10 2010.
11 THE COURT: The relevant time period, the way
12 I'm approaching this would be at the time of the offer was
13 extended or at least post-indictment but not
14 pre-indictment when it was back in a point where nobody
15 had been charged with a crime yet.
16 MR. WESTFALL: Your Honor, 806 says when
17 hearsay statements have been admitted, the credibility of
18 the declarant may be attacked, and if attacked, may be
19 supported by any evidence which may be admissible for
20 those purposes if the declarant had testified as a
21 witness. And it's not -- it's not tied to time period
22 except for when the hearsay statements come out, what
23 could effect his credibility at that time. And I say as
24 of yesterday, this plea deal was highly relevant and is
25 highly relevant.

**11**

1 THE COURT: Was there any objection to any
2 hearsay statements? Were they identified to the Court and
3 what the hearsay statements were?
4 MR. WESTFALL: No. I mean, but he certainly
5 testified to what Jose Ramos said. And that is, I mean,
6 it's -- opening the door is something that you have to do
7 at your own peril. You can't depend on the other side to
8 object, and 806 doesn't require that.
9 THE COURT: Okay. I'm going to overrule the
10 request at this time.
11 State ready to proceed?
12 MR. STRAHAN: Yes, sir.
13 MR. WESTFALL: You're going to deny our
14 request? I'm sorry, because --
15 THE COURT: At this particular time with this
16 particular witness, I'm going to deny your request without
17 prejudice to reurging it when you think it's appropriate
18 to reurge it.
19 MR. WESTFALL: Thank you, Your Honor.
20 MR. HEISKELL: Thank you, Judge.
21 THE COURT: Please bring in the Jury.
22 (Jury present.)
23 THE COURT: Thank you. You may be seated.
24 You may continue.
25 MR. STRAHAN: Thank you.

**12**

1 DANNY PAINE,
2 Having been previously duly sworn, testified as follows:
3 FURTHER REDIRECT EXAMINATION (Continued)
4 BY MR. STRAHAN:
5 Q. Detective Paine, you understand you're still
6 under oath, correct?
7 A. Yes, I do.
8 Q. Okay. Yesterday there were some similarities and
9 some differences noted between Jose Ramos and Mark Soliz,
10 the Defendant in this case. Can you tell me, if you know
11 from your investigation, Mr. Ramos's date of birth?
12 A. Yes. 7/22 of 1983.
13 Q. That's Mr. Ramos?
14 A. Yes.
15 Q. Okay. What is Mr. Soliz's date of birth?
16 A. 1/27 of '82.
17 Q. Okay. So just looking at that, what's on the
18 board, which one of these individuals is actually the
19 eldest?
20 A. Mr. Soliz.
21 Q. Okay. When we left off yesterday, the two
22 written statements by Mr. Ramos had been admitted into
23 evidence; is that correct?
24 A. Yes.
25 Q. I'm sorry -- Mr. Soliz. I would like to go

13

1 through them with you at this point. Do you have that on
2 your screen?
3    A. Yes, I do.
4    Q. Okay. At the start, at the very top of State's
5 Exhibit No. 2, there is a "State of Texas, County of
6 Tarrant", and there's a starting time when this was
7 beginning; is that correct?
8    A. Yes.
9    Q. And this is the one that was done during the
10 first time y'all stepped out of the room; is that right?
11    A. I believe so, yes.
12    Q. Okay. And can you tell us what that first
13 paragraph says, if you can see it?
14    A. Would you like me to read it entire or just
15 describe what it is?
16    Q. You can read it.
17    A. Okay. "I, Mark Soliz, prior to making any
18 statement, having been duly warned by Detective T.
19 Boetcher, No. 1795, the person to whom this statement is
20 made, understand that, one, I have the right to remain
21 silent and not make any statement at all and that any
22 statement I make -- that I make may be used against me at
23 my trial; two, any statement I make may be used as
24 evidence against me in court; three, I have the right to
25 have a lawyer present to advise me prior to and during any

14

1 questioning; four, if I am unable to employ a lawyer, I
2 have the right to have a lawyer appointed to advise me
3 prior to and during any questioning; and five, I have the
4 right to terminate the interview at any time. Having been
5 informed of these rights --" I'm sorry. "Having been
6 informed of these, my rights, and understanding same, I
7 hereby freely, intelligently, voluntarily, and knowingly
8 waive these rights, not desiring a lawyer, voluntarily
9 choose to make the following statement."
10    Q. Okay. And those, whenever you-all at Fort Worth
11 P.D. take a written statement from someone who is a
12 suspect like we talked, do you always add those rights to
13 the top of that statement or somewhere on the statement?
14    A. Yes.
15    Q. I think we heard yesterday off camera, but you
16 could still hear that Detective Boetcher is telling him to
17 read it and make any corrections he wants before he signs
18 it; is that correct?
19    A. Yes.
20    Q. Okay. And so he would have had the opportunity
21 to read that, those rights one more time before he read,
22 before he signed the document; is that correct?
23    A. Yes.
24    Q. Okay. Now would you read that second paragraph
25 that's in bold, please.

15

1    A. "My full name is Mark Anthony Soliz. I am 28
2 years of age. My date of birth is 1/27/82. I live at,
3 not available. My contact telephone number is
4 817-806-8069. I have completed nine years of school. I
5 can read, write and understand the English language."
6    Q. Again, all of that he would have had the
7 opportunity to read and correct if he wanted to prior to
8 signing this document; is that correct?
9    A. Yes.
10    Q. Can you see the very first statement after that,
11 the very first couple sentences? Could you read that to
12 us.
13    A. Actually on mine, if you could squeeze it a
14 little bit, it's cutting off the left edge on mine. Right
15 there. I'm sorry. Which part would you like me to read?
16    Q. Could you start with the body of the statement.
17    A. "I got out of prison in May of this year. I
18 stayed with my cousin Yolanda off Berry by Riverside in
19 those apartments. My cousin knew this guy named Joe and
20 he had the same nickname as me, Kilo, and we became
21 friends and started hanging out."
22    Q. Let me stop you right there. The first thing he
23 says is he got out of prison in May, which is just a
24 couple months before this; is that correct?
25    A. Yes.

16

1    Q. Okay. And while he does not list a home address,
2 it says not available, he had a place to stay clearly?
3    A. Yes, his cousin Yolanda.
4    Q. In fact, if you know, if you don't, that's fine
5 too, when someone paroles out of T.D.C., do they have to
6 have a place specifically they parole out to?
7    A. Yes, sir.
8    Q. Somebody has to have a plan for a place to live
9 whenever they get out, if that's the way parole works?
10    A. Yes, and for monitoring reasons.
11    Q. Okay. If you could, keep going a little bit,
12 please.
13    A. "The first robbery that I tried to do was getting
14 this car from this man. He was at a little grocery
15 store. He was getting something to drink and he had a
16 car, Dodge, slash --" I think it's supposed to be "Saturn,
17 turquoise green." I had a gun, 9 millimeter pistol, and I
18 walked up to him and told him to get out of the car and
19 give me the keys. And he said all right, and he got out
20 of the car and gave me the keys. And I asked for his
21 wallet. Got no more than a couple bucks. And we left,
22 and I have had that car ever since."
23    Q. Okay. Let's stop right there. And based on
24 your -- what you've already testified to in our time line,
25 which offense is he speaking of?

17

1  A. The 604 North Riverside, Sammy Abu-Lughod,
2  Abu-Lughod.
3  Q. Does he say in that statement that he used a gun
4  in that robbery?
5  A. Yes.
6  Q. Does he say he's with anyone or alone?
7  A. He does not indicate that he was with anyone.
8  Q. Okay.
9  A. In fact, he refers to "I".
10  Q. Okay. Okay. Could you start with the next one
11  then, please.
12  A. "The next time was on East Belknap. Man with a
13  Dodge pickup. Also me by myself. It was green in color.
14  He was at a store. He was Hispanic guy. He was walking
15  to his truck, and I walked up to him and I told the guy to
16  give me his keys and wallet. And I have the same gun with
17  me as before. And he gave me his keys and wallet. And I
18  took off in his truck, parked it about a block away from
19  Fuzzy's house on Nichols. Got a couple bucks only from
20  him also."
21  Q. Okay. Let's stop right there. Which offense is
22  he talking about, based on your investigation?
23  A. The offense at 3416 East Belknap.
24  Q. And who is the victim?
25  A. That is Jorge Contreras.

18

1  Q. He starts that part of the statement off with the
2  words "I was also by myself"?
3  A. Yes.
4  Q. Is he referring back up to the first one?
5  A. Yes.
6  Q. So he's saying he was by himself on both of
7  these, both of these robberies, and he had a gun both
8  times?
9  A. Yes.
10  Q. What is the next one? Where does it start?
11  A. Here.
12  Q. Okay. Go ahead.
13  A. "The next thing I was involved in was a shooting
14  on Woodland, a friend's house, a female. He was making
15  too much noise and banging on the windows and asking for
16  money. I was over there visiting when the guy started.
17  And I tried to leave and they started fighting, and I ran
18  up to them with a gun on them and raised it up in the air
19  and it went off and I did not know where it hit him. I
20  was not aiming to hit him."
21  Q. Okay. And he says in that one -- first of all,
22  which offense is he talking about?
23  A. Referring to the -- I believe it's 1220 Woodland.
24  Q. And who is the victim?
25  A. Luis Luna.

19

1  Q. And again he says "I did it. I did it. I did
2  it". Is there any mention of Jose Ramos?
3  A. None.
4  Q. Was there a gun involved?
5  A. Yes.
6  Q. And someone actually got shot?
7  A. Yes.
8  Q. Would you go to the next one, please.
9  A. "The next one at Ridgmar Mall. You say you have
10  me on video, and I was not even there, but now I
11  remember. I was alone. A man by Penney's, he was in his
12  car, and I do not remember what kind of car, and I walked
13  up to him and I pointed the gun and I demanded his wallet
14  and I told him that I wanted his debit card number. And I
15  tried to use it at a store down the street and found out
16  it was fake."
17  Q. Okay. Who was the victim in that offense?
18  A. Justin Morris.
19  Q. We've seen the video of that in court today; is
20  that correct?
21  A. Yesterday, yes.
22  Q. Or yesterday, I'm sorry. And you said Miriam
23  Oliveras was in the car. According to that video, did he
24  act alone?
25  A. During the robbery, yes. Afterwards, they were

20

1  together. Okay. Was a gun involved in that one?
2  A. Yes.
3  Q. Okay. What is the next one? Or keep going,
4  please. I'm sorry.
5  A. No, that's fine. The next one was on the 28th,
6  June, at 2800 Azle Avenue. "It was before the Bud --
7  Bus-wiser shooting. They were coming out of a bar. We
8  were driving down Azle Avenue. I was driving the green
9  Dodge Stratus and Joe was in the passenger side, and we
10  saw about four people in the parking lot of the bar. Joe
11  had the gun as he was on the passenger side and he went up
12  to the people and demanded their wallets. I got out of
13  the car to help him collect the wallets. Altogether we
14  got about $1700. We split it up in half. We trashed the
15  wallets. We did not keep them."
16  Q. Okay. And on this one he says he's with Joe
17  Ramos, but now he's saying in this one he says that Joe
18  had the gun on that one; is that correct?
19  A. Yes.
20  Q. Okay. Can you go to the next one, please. I'm
21  sorry. Where did this occur? Which one is he referring
22  to?
23  A. That is the 2800 Azle Avenue in the parking lot
24  near the bar.

21

1    Q. What are the names of the victims associated with
2  that one?
3    A. Jorge Tamayo and Maximino Chavez.
4    Q. Okay. And what is the next one?
5    A. "The morning of the Budweiser shooting we were
6  driving around and I was driving the Dodge Stratus, and we
7  were passing by the Texaco station to get some cigarettes,
8  and Joe came up with the idea to rob the beer man. Joe
9  said he thought they would have a bunch of money from the
10 delivery. I had the gun and I parked the car in the next
11 block, and I got out of the car with the gun and I
12 followed Joe as he went up to the store. The beer guy was
13 inside and I stayed by the dumpsters. And Joe was
14 supposed to go by the pay phones. The beer man came back
15 outside. I went around to the driver's side of his
16 truck. I came out from behind the dumpster to where he
17 was. I pointed the gun at 'home' and told him to come
18 here, don't go nowhere. He said all right, all right.
19 And then I grabbed him by the shirt sleeve and the gun
20 went off. He did not give me his wallet. He tried to
21 give me his phone. While I was pulling him on the shirt,
22 the gun went off. When I had the gun pointed at him, it
23 was pointed high. Before all this happened, the
24 Budweiser -- Budweiser driver gave his wallet to Joe who
25 was standing by the pay phone."

22

1    "On the report date of 6/29/10 at 6:29 a.m.,
2  I was with Joe and we were in the Dodge Stratus and I was
3  driving, and we wanted to go try and make some money. I
4  had the gun and I seen the white -- I seen --"
5    Q. Let's stop before that one. On the one before
6  that, Ruben Martinez, is that who that refers to?
7    A. Yes.
8    Q. And what was the address of that one?
9    A. 2700 Azle Avenue.
10   Q. And the Defendant admits that he had the gun and
11 he actually shot Mr. Martinez; is that right?
12   A. Yes.
13   Q. Okay. And in -- ultimately Mr. Martinez died; is
14 that right?
15   A. Yes.
16   Q. Now, sorry, go to the next one, please.
17   A. I will start back at the -- where I think I was
18 supposed to leave off. "On the report date of 6/29/10 at
19 6:29 a.m., I was with Joe and we were in the Dodge Stratus
20 and I was driving, and we wanted to go try and make some
21 money. I had the gun and I seen this white guy pull up
22 into the parking lot of Lowe's. We both saw him and we
23 parked next to him, and the dude did not want to give me
24 his wallet. I got out of the car and went to the dude and
25 said give me your wallet, and I showed him my gun and

23

1  pointed it to the ground. And the guy turned around and
2  started running. And I shot at the ground a couple times
3  as he ran away."
4    Q. And which offense is he referring to?
5    A. The 6000 Quebec, Lowe's parking lot.
6    Q. Who is the victim in that?
7    A. Kenny Dodgin.
8    Q. And there the Defendant admits that he had the
9  gun and he's the one that did the robbery even though
10 Ramos was with him; is that right?
11   A. That is correct.
12   Q. And is that the end of the narrative part of
13 that?
14   A. Yes.
15   Q. Okay. And then there's a statement after that
16 about making statements to police or falsely doing that;
17 is that correct?
18   A. Yes, sir.
19   Q. And there's an ending time, and is there a
20 signature that appears at the bottom?
21   A. Yes.
22   Q. And whose signature does that appear to be?
23   A. Mark Soliz.
24   Q. Okay. Is there anything else on that report?
25   A. No, I don't believe so.

24

1    Q. Okay. Now, there was a lot of conversation
2  before and during when these statements were put together;
3  is that correct?
4    A. Yes.
5    Q. Okay. And you could hear on the video, which is
6  before the Jury already, how Detective Boetcher is
7  telling, "Hey, this is your statement, your statement",
8  correct?
9    A. Yes.
10   Q. And do you recall if Mr. Soliz said anything
11 about knowing, "Yes, this is my statement"?
12   A. Yes.
13   Q. Okay. So he said that, he acknowledged, "Yeah, I
14 know this is my statement". And they go on at that
15 point. And earlier in the video, could you hear Detective
16 Boetcher talking about something about seeing Mark Soliz
17 at the Texaco station? He confronts him with that during
18 the statement in the video part; is that correct?
19   A. Yes, he does.
20   Q. Okay. And did he tell him, "I see you crouching
21 down by a dumpster"?
22   A. Yes.
23   Q. "Wearing white tennis shoes. Why do you think I
24 took the shoes", correct?
25   A. Yes.

25

1    Q. So there was some knowledge, I guess, with you
2  and/or Boetcher at that time about something that had gone
3  on specifically with Mr. Soliz at the Texaco station in
4  relation to Ruben Martinez?
5    A. Yes.
6    Q. Can you tell me if there was a video, any video
7  from the convenience store at the Texaco station at the
8  time of the murder of Ruben Martinez?
9    A. Yes, there was.
10    Q. And was that video reviewed by Detective Boetcher
11  or you, Detective Boetcher, prior to having the
12  conversation with Mr. Soliz?
13    A. Yes.
14    Q. Okay. And did Mr. Soliz in his statement that we
15  saw admit that he was the one crouching by the dumpster?
16    A. Yes, he actually detailed what we saw on the
17  video, he detailed verbally to us.
18    Q. Okay. Let's take a look at State's Exhibit
19  No. 3 which is the second statement. And, again, I won't
20  ask you to read it, but does it have the same admonition
21  of his rights at the very top just like the other one did?
22    A. Yes, it does.
23    Q. Okay. And then it also has the same in bolded or
24  capitalized, all capped statement, says his name and he
25  can read, write and understand the English language?

26

1    A. Yes.
2    Q. And is this -- this is the second statement that
3  was taken another time where more information was learned,
4  and y'all exited the room or Boetcher and Mr. Soliz exited
5  the room; is that right?
6    A. Yes.
7    Q. Okay. Can you read what that statement says.
8    A. "We were just driving around until we got the
9  idea to get some money. I was driving the green Dodge
10  Stratus and we ended up in Godley. I was familiar with
11  that area, and we found this house out in the middle of
12  nowhere. Joe said we could just go up to the door and ask
13  for directions, and we parked the Dodge in the driveway
14  and went up to the house. We both went up to the front
15  door and knocked on the door. It was a white female,
16  elderly, opened the door. Joe asked for -- asked her for
17  directions. And I had the gun, and I raised it up and
18  kind of walked in the house as she backed up."
19    Q. Let me stop you right there. If somebody, just
20  based on your training, if somebody puts a gun to
21  somebody, shows a gun and is attempting to take their
22  stuff, what kind of an offense is that?
23    A. Aggravated robbery.
24    Q. Okay. If somebody, using a gun or not, forces
25  their way into someone's home in order to take their

27

1  stuff, what offense is that?
2    A. You said if they do not have?
3    Q. If they have a gun but they're forcing their way
4  into someone's home without permission.
5    A. Oh, aggravated robbery.
6    Q. Well, forcing into the home?
7    A. I guess I'm not clear on the question.
8    Q. Would that be a burglary if somebody is going
9  into someone's home without consent?
10    A. Okay. That's why I was asking about the gun. No
11  gun, just going in.
12    Q. Either way.
13    A. Okay. Yes.
14    Q. I'm asking you.
15    A. Yes, burglary.
16    Q. Okay. So at this particular point in the
17  statement, has Mr. Soliz admitted to himself committing
18  the act of aggravated robbery and burglary against Nancy
19  Weatherly?
20    A. Yes.
21    Q. Okay. Go on.
22    A. "And she backed up and she -- and just told her
23  to sit down on the couch, and me and Joe started looking
24  for things to take. We found two flat-screen TVs, a
25  computer, and some quarters. I was looking for stuff too,

28

1  and I sat the gun down on the dining room table and I
2  started looking for stuff. And I asked Joe what's she
3  doing, since I left the gun on the table. And Joe went in
4  there and got the gun. I was still looking for things,
5  and that was it, and time to go. I was out by the car,
6  and then the gun went off. Joe was the one in the house
7  when the gun went off. And Joe closed the garage door.
8  And we left and came back to Fort Worth."
9    Q. Okay. And so at this point he is blaming, saying
10  that he's there and a participant, and but blaming the
11  actual shooting of Ms. Weatherly on Jose Ramos; is that
12  right?
13    A. Yes.
14    Q. And you obviously have seen the video, and
15  there's more conversation with him, and eventually he does
16  admit that he's the one that shot Nancy Weatherly,
17  correct?
18    A. Yes.
19    Q. Can you read the last thing that he wrote in his
20  own handwriting with his own initials.
21    A. "It was me that shot the woman, M. period A.
22  period S."
23    Q. 'So the last thing he says in that statement, it
24  was him that shot that woman, correct?
25    A. Yes.

29

1  Q. So according to his statement, ultimately he shot
2 and killed two different people in the presence of Jose
3 Ramos, correct?
4  A. Yes.
5  Q. And ultimately he says he's the one that did
6 both?
7  A. Yes.
8  Q. Yet you can also see what we just wrote or what I
9 just wrote on the board, and from these, he also did
10 robberies and shot people completely without Jose Ramos?
11  A. Yes, he did.
12  Q. Okay. So he could act alone or he could act with
13 Ramos?
14  A. Yes.
15  Q. Okay. Part of your investigation, you were able
16 to find that a couple of the guns stolen from the
17 Circelli's house was pawned on the 23rd of June, 2010,
18 correct?
19  A. Yes.
20  Q. Okay. By a person by the name of Ramon Morales?
21  A. That's correct.
22  Q. Who I think said -- testified he got them the day
23 before.
24  A. (Witness nods.)
25  Q. From Mark Soliz, tried to buy that handgun, that

30

1 9 millimeter that Soliz had other plans for?
2  A. Correct.
3  Q. You've heard that before. You weren't in here
4 while he was testifying, but you've heard that before,
5 correct?
6  A. Yes.
7  Q. And there was some talk yesterday when -- or not
8 yesterday, but earlier about the possibility that Mark
9 Soliz actually got that gun, the 9 millimeter, from
10 Ramos. Have you heard that also?
11  A. Yes.
12  Q. Okay. And so if Ramon Morales says that, and you
13 know from records when the guns were pawned, if he says it
14 happened on June 22nd, the fact that Mark Soliz had the
15 guns to give him or whatever and had a use for that gun
16 puts the 9 millimeter in Mark Soliz's hand, even if it's
17 from Jose Ramos, on June 22nd?
18  A. On or before then.
19  Q. On or before then, right. Okay. So if he got it
20 from Jose Ramos, he would have got it on or before this
21 date, correct?
22  A. Correct.
23  Q. June 22nd, 2010. When did the shootings in this
24 case start?
25  A. In -- on the 24th of June, 2010.

31

1  Q. And robberies?
2  A. Yes.
3  Q. So if that is correct, if he actually received
4 the gun, and by "he" I mean the Defendant Mr. Soliz, from
5 Jose Ramos, he would have gotten it before any of these
6 shootings or robberies started; is that correct?
7  A. Yes.
8  Q. So the gun would have been in whose possession
9 the moment the violence started?
10  A. Mark Anthony Soliz.
11      MR. STRAHAN: I'll pass the witness.
12      FURTHER RECROSS-EXAMINATION
13 BY MR. HEISKELL:
14  Q. Detective Paine, I have a few more questions for
15 you, sir. And want to talk about some of the things that
16 was referenced yesterday concerning Ramos's statements to
17 you and Detective Boetcher. Okay?
18  A. Yes, sir.
19  Q. And I believe y'all -- you told us as well that
20 Ramos had indicated that he didn't like guns, didn't touch
21 a gun, didn't want to be around guns, some words to that
22 effect; isn't that true?
23  A. Yes.
24  Q. And that he also indicated in that same context
25 and conversation about Soliz not having it all up here.

32

1 Remember that part we were talking about?
2  A. Yes.
3  Q. Now, with regard to Ramos's statements, you've
4 heard that axiom, if you will, that actions speak louder
5 than words?
6  A. Yes.
7  Q. And as a matter of fact, Ramos's actions you look
8 at, we discover that back on June 22nd when we talk about
9 the Circelli burglary?
10  A. Yes, sir.
11  Q. That is likely that he's the one that kicked that
12 door in to begin the burglary of that home; isn't that
13 true?
14  A. Yes, sir.
15  Q. And you know from your own investigation that
16 once entering that home, that he took the guns, wrapped
17 them up in the quilt, and the long rifles as well as
18 taking the handgun; is that correct?
19  A. Yes.
20  Q. And that he as well gave or sold that 9
21 millimeter to Mark Anthony Soliz; isn't that true?
22  A. Yes.
23  Q. And we also know that when he talks about not
24 being -- wanting to be around guns and not wanting to be
25 associated with guns and words to that effect, we also

33

1 know that on June 29th at around 3:30 a.m., the Ramirez
2 drive-by, you referenced that, remember?
3    A. Yes.
4    Q. And Ramirez is a 26-year-old; is that correct?
5    A. I believe so.
6    Q. And you also know that there was a relationship
7 between Jose Ramos and members of that particular family
8 on Pearl Street. You knew that, didn't you?
9    A. Based on the investigation and the interviews, it
10 was my understanding that there was some sort of knowledge
11 of one another.
12    Q. Right. And it was that particular address, Pearl
13 Avenue, where Ramos had a relationship with someone in the
14 Ramirez family where this drive-by shooting took place
15 with Ramos present; isn't that true?
16    A. Yes.
17    Q. And that Ramos could have, if he said he was
18 mortified and didn't want to be around, he could have
19 easily left or turned around or walked away or drove away
20 or whatever from that residence. He could have done that,
21 couldn't he?
22    A. I don't believe he was driving.
23    Q. Well, walking away then?
24    A. He could have exited the vehicle, yes.
25    Q. Right. And then he continued on with, if you

34

1 look at what his actions are compared to his words, with
2 respect to the Enrique Samaniego -- and I always torture
3 that last name -- shooting; is that right?
4    A. As far as?
5    Q. Him being present, him being with Mark Soliz.
6    A. Yes.
7    Q. Okay. And he didn't run away from that incident,
8 did he?
9    A. No.
10    Q. He likely was egging Soliz on, wouldn't you agree
11 with that?
12    A. I don't know what he was participating in as far
13 as words, whether he was agging him on or not.
14    Q. But he also shared in the proceeds of this and
15 other robberies and so forth with regard to Soliz; isn't
16 that true?
17    A. Yes, he was a criminal.
18    Q. All right. And continuing on that same evening,
19 June 29th, around 5 or 6:00 that evening the -- I'm sorry,
20 that morning, excuse me, the Ruben Martinez shooting?
21    A. Yes.
22    Q. He's seen on that video?
23    A. Yes.
24    Q. And he's seen there participating. We also saw
25 the footprint that was referenced earlier; is that

35

1 correct?
2    A. Yes.
3    Q. And he could have easily walked away from that or
4 run away from that, but he was there along with Mark
5 Anthony Soliz when that took place; isn't that true?
6    A. Yes, he was.
7    Q. And this thing about being mortified about what
8 happened and, "Oh, I was horrified"; yet he continued to
9 stay with Mark Soliz during this entire episode; isn't
10 that true?
11    A. Yes, he did.
12    Q. And yet he continued on when they went to
13 Benbrook. Well, let's stop at the Lowe's first. Go
14 ahead.
15    A. No, you're fine.
16    Q. With the Lowe's first. And he participated in
17 that incident, did he not?
18    A. Yes, he did.
19    Q. In fact, he was the getaway driver for that,
20 wasn't he?
21    A. Yes.
22    Q. And he could have easily, if he were so horrified
23 by all this, turned that vehicle around and run Mark Soliz
24 over, couldn't he have?
25    A. Yes, he could have.

36

1    Q. But he continued with him. He stayed with him
2 shoulder to shoulder, didn't he?
3    A. Yes, they remained together throughout the day.
4    Q. And then he went to Benbrook and kicked the doors
5 in in Benbrook at the homes there, Jose Ramos, didn't he?
6    A. The doors were forced entry. I'm not sure that
7 he did it, but yes.
8    Q. And, well, you knew that was his role, to use his
9 foot to kick the doors in in burglaries, didn't you?
10    A. He has done it before or appears to have done it
11 before.
12    Q. He shared in the proceeds there as well, didn't
13 he?
14    A. Yes.
15    Q. And then we get to Johnson County, and he was
16 there shoulder to shoulder with Mark Anthony Soliz,
17 correct?
18    A. Yes, he was.
19    Q. And after the poor lady, Ms. Weatherly, was
20 killed, he was the one that chose to get into her truck,
21 take it closer to the home, and load it up with the TVs,
22 with other items and head to Fort Worth; isn't that true?
23    A. I don't believe he chose that on his own solely.
24 I think that was a mutual agreement.
25    Q. Well, he could have easily chose not to do that?

**37**

1    A. Yes, he could have.
2    Q. He could have easily stated, "Hey, man, I'm out
3 right now." But he continued on shoulder to shoulder with
4 Mark Soliz, didn't he?
5    A. Yes, he did.
6    Q. And as a matter of fact, back when that
7 Budweiser, Mr. Martinez's situation, he was the one that
8 suggested to Mark Soliz, "Hey, he'll probably have some
9 money as a result of these deliveries", to egg him on to
10 do this, didn't he?
11    A. According to Mr. Soliz's statement, yes, that's
12 what happened.
13    Q. And also according to Ramos. Didn't he tell you
14 that?
15    A. I don't recall that he stated that he said that
16 was the case. I believe, if I remember correctly, Ramos
17 just indicated that they believed he would have money, not
18 that he's -- personally believed that; that they
19 collectively believed that that would happen or that that
20 delivery man would have money.
21    Q. But once again, his actions, the like, his words,
22 he was shoulder to shoulder with Mark Soliz?
23    A. Yes.
24    Q. And you see in the statement that Mark Soliz
25 gave, on the video, the written statements here, that

**38**

1 Soliz eventually became cooperative with you-all and told
2 you what you-all wanted to get from him essentially; isn't
3 that true?
4    A. For the majority, yes.
5    Q. Yet Ramos is the one who refused to sign that
6 last statement and invoke his right to counsel and end the
7 interview?
8    A. Yes.
9       MR. HEISKELL: Pass the witness.
10      FURTHER REDIRECT EXAMINATION
11 BY MR. STRAHAN:
12    Q. Is it clear from everything you know about this
13 case that Mark Soliz is perfectly capable of robbing and
14 shooting people whether Ramos is there or not?
15    A. Yes, it is.
16    Q. In fact, he did, didn't he?
17    A. Yes.
18    Q. Do you have information from any source other
19 than Soliz himself that Ramos had the gun in any of these
20 offenses?
21    A. No.
22    Q. So outside of that Defendant right there, you've
23 never heard from anybody that Ramos was the one wielding
24 the gun in any of those offenses?
25    A. No.

**39**

1       MR. STRAHAN: I'll pass the witness.
2       FURTHER RECROSS-EXAMINATION
3 BY MR. HEISKELL:
4    Q. One other, Detective, and I think you'll
5 hopefully get a chance to go home.
6    A. That's fine.
7    Q. You're familiar with gunshot residue testing
8 procedures, are you not?
9    A. I'm sorry?
10    Q. Gunshot residue testing procedures, forensic
11 testing for gunshot residue, are you familiar that was
12 done in this case?
13    A. The most I'm familiar with is that a swab can be
14 taken off of an item, a hand, and submitted for --
15    Q. Sure.
16    A. -- analysis. And how they do that, I have no
17 idea.
18    Q. Well, I'm not asking how they do it, but you're
19 familiar with it, correct?
20    A. Yes.
21    Q. Okay. And you know from this case, gunshot
22 residue appeared not only on Mark Soliz but also Jose
23 Ramos?
24    A. I believe so.
25    Q. Not only his hands but on his clothing as well;

**40**

1 is that correct?
2    A. Yes, I believe so.
3       MR. HEISKELL: Thank you. That's all.
4       FURTHER REDIRECT EXAMINATION
5 BY MR. STRAHAN:
6    Q. Were you aware that in gunshot residue, there's
7 two different kinds of residue? There's characteristic,
8 which is from the primer, and then there's other types of
9 residue that are commonly associated with it.
10    A. Yes, my understanding is that even if you don't
11 fire a weapon, if you're in close proximity to someone who
12 does fire a weapon, you can have clothing or particles of
13 that residue on, about you or inside the vehicle or
14 anywhere else.
15    Q. Okay. And particles can be different based on
16 your proximity to a firearm that has gone off; is that
17 right?
18    A. Yes.
19    Q. Where the characteristic closer to the actual
20 firing of the gun?
21    A. Correct.
22    Q. And you just testified that you are aware that
23 Jose Ramos had some particles of one of those types on
24 him; is that correct?
25    A. Yes.

41

1    Q. And Mark Soliz also had some of those particles
2  on him, one of those two kinds or both of those kinds; is
3  that correct?
4    A. Yes.
5    Q. Were you aware that Nancy Weatherly also had
6  particles on her?
7    A. I was not.
8        MR. STRAHAN: I'll pass the witness.
9        MR. HEISKELL: Nothing further, Your Honor.
10       THE COURT: May the witness be excused?
11       MR. HEISKELL: Yes, sir.
12       MR. STRAHAN: Yes, sir.
13       THE COURT: Thank you. You may be excused.
14       MR. STRAHAN: Our next witness is five
15 minutes from here. Can we take a short break, Judge?
16       THE COURT: Ladies and gentlemen, while we're
17 getting ready for the next witness, we'll take a 15-minute
18 recess. We'll come back at five minutes after 11 (sic).
19       (Recess taken from 9:48 to 10:06 a.m.)
20       (Jury not present.)
21       THE COURT: You may be seated. Let's go on
22 the record. The attorneys for both sides are present,
23 Mr. Soliz is present, and the Jury is not present. We're
24 going on the record.
25       We had a short off-the-record discussion with

42

1  regard to trial schedule, and it seems that the current
2  pace of the trial and the current pace is appropriate for
3  both the State and Defense, and neither side has asked me
4  to increase the amount of hours or to change the pace of
5  the trial at this particular point.
6        And Mr. Chambless has a matter to bring to my
7  attention before we get the Jury in; is that correct?
8        MR. CHAMBLESS: Yes, sir, in order to save
9  time. There is a witness anticipated shortly, Mike
10 Gaudet. He was the first Johnson County Detective to
11 arrive and take control of the crime scene. And the very
12 first thing he did, I expect his testimony to be, he took
13 a videotape of the exterior and then in the inside of the
14 house of Nancy Weatherly. It's approximately 12 to 15
15 minutes. And we're going to ask permission to -- that he
16 play that, this CD which has been provided. And that's
17 our -- that's the issue, I think.
18       MR. WESTFALL: And, Your Honor, as the Court
19 is aware by now certainly, we can represent it will
20 continue this way, we are not contesting anything like
21 cause of death, crime scene preservation of the scene,
22 anything like that. This is a videotape of a murder scene
23 where the deceased is still on the floor. It is going to
24 be shown to the Jury on what looks like a 10-foot-
25 by-6-foot screen. We had this conversation about the

43

1  Medical Examiner pictures, and one of the things that the
2  Prosecutor argued and under the law is appropriate is that
3  they are just little 8-by-10s, but then he showed them on
4  the screen. This is much worse than those pictures.
5        And under Rule 403, Your Honor, we believe
6  they should be excluded for being, number one,
7  substantially more prejudicial than probative. And we'd
8  ask the Court to look at the video in camera. And then
9  number two, continuing, there is -- that certainly promises to be an
10 awful lot of crime scene photographs that may contain the
11 exact same thing.
12       We would also object to, you know, a
13 multitude of crime scene photographs which depict that
14 picture. If they are going to be these huge, large,
15 blown-up things, we just think that, Your Honor, is
16 substantially more prejudicial than probative, but I
17 haven't seen those exhibits.
18       MR. HEISKELL: Your Honor, and furthermore
19 under 403 that I think it's unduly necessary in light of
20 what we already have on the record and also what we
21 anticipate from the crime scene officers at the Weatherly
22 home. And the videotape, I believe Mr. Chambless has
23 represented is about 12 to 15 --
24       MR. CHAMBLESS: Roughly, yes.
25       MR. HEISKELL: -- minutes in length. And I

44

1  agree with Co-Counsel, seeing that is very graphic and
2  very prejudicial, I guess for lack of a better term, Your
3  Honor. And we think the -- that certainly outweighs the
4  probative value of what we already know and what's already
5  in the record.
6        MR. WESTFALL: We have two photographs, Your
7  Honor, that State is going to seek to admit, both of which
8  are in the sort of 16 by 20 or 24 range that show the
9  crime scene as the detectives found it. And we believe
10 that the video would certainly be cumulative of that and
11 therefore not probative at all and only prejudicial. So
12 we would ask the Court to exclude the video, and certainly
13 review it in camera if the Court needs to do so to make a
14 ruling.
15       MR. CHAMBLESS: I'll represent to the Court,
16 and Mr. Westfall can correct me if I'm wrong, but of the
17 12 minutes, perhaps a minute, maybe a minute and a half of
18 the 12 minutes shows -- depicts the -- Nancy Weatherly's
19 body and position of the body in relation to evidence that
20 was later collected. The balance of the videotape just
21 shows the condition of the living room and different
22 bedrooms in the house.
23       MR. WESTFALL: Well, if that part of the
24 video would be relevant, then we would ask it be -- that
25 the minute and a half, which is an extremely long time, be

redacted. It's just piling on as cumulative and it's substantially more prejudicial than probative.

THE COURT: I'll review the video in chambers. Do you want me to do that at this point now? Do you plan on playing it if I allow it?

MR. CHAMBLESS: Yes, sir.

THE COURT: Can I have the video and I'll look at it. And I'll also note that the video screen that Mr. Westfall talks about being large is on the clear opposite side of the courtroom from the Jury Panel. It is not presented in front of the Jury. It's on the opposite side of the courtroom.

MR. WESTFALL: I agree, Your Honor, it is.

THE COURT: I think the measurements of the courtroom are part of the packet that the Sheriff's Department has with regard to security plans.

MR. CHAMBLESS: Judge, if I could, I would mark that tentatively as Exhibit 188, I believe.

MR. WESTFALL: That's the videotape is 188?

MR. CHAMBLESS: Yes, sir.

MR. WESTFALL: We also discussed those two pictures, if you want to do that for the record.

MR. CHAMBLESS: Judge, we would be glad to, as far as the photographs, the still photographs of Nancy Weatherly, we would -- I would be -- I'll restrict that to

one of the two if the Court allows that. I'll offer this one and not this one.

MR. WESTFALL: And at this point, Your Honor, I mean, our objection is to the video as being cumulative of these photographs. I mean, I think that there is a legal reason to have these photographs, so we're not going to -- certainly I think picking one is a good idea. But I understand that those are relevant and there's not a 403 issue. My objection is directed towards the minute and a half of the video.

THE COURT: Is there any benefit of me taking this in chambers since the Jury is not here or just playing it here in the courtroom?

MR. CHAMBLESS: That's fine.

MR. HEISKELL: That's fine.

THE COURT: Play it here, then you can identify the exact spot that you think is a problem.

MR. CHAMBLESS: Yes, sir.

(Pause in proceeding.)

MR. WESTFALL: Your Honor, would you mind doing it in chambers?

THE COURT: That's fine.

MR. WESTFALL: Yeah.

THE COURT: Thank you. I'll be back in a few minutes.

(Recess taken from 10:17 to 10:32 a.m.)

THE COURT: You may be seated. The State's attorneys are present, Defense attorneys present, Defendant is present. Jury is not present. I reviewed State's Exhibit No. 188 upstairs in chambers, find that the objection to its admissibility as stated would be overruled. The exhibit would be admissible if offered, subject to any other foundation requirements that might be needed.

The question is if that exhibit is offered and played, for the most part, there's just a few sounds on there that can't be transcribed by the Court Reporter. There may or may not be something that's more or less unintelligible said by something that I think would be Officer Fuller, just if I recognized his voice, but I don't know that I could really ascertain what he said. So basically the point the Court would make is that if that video is played in court, the Court Reporter would not transcribe any of the audio in that particular video unless there's a request otherwise.

MR. CHAMBLESS: Thank you, Judge.

THE COURT: All right. Everybody ready for the Jury to come in?

MR. HEISKELL: Yes.

(Pause in proceeding.)

MR. CHAMBLESS: One other thing.

(At the bench.)

MR. CHAMBLESS: There was one other thing. They had a Motion in Limine about anything that identified Nancy Weatherly as a cancer patient. I anticipate testimony to be Gaudet says there was a letter addressed to Nancy Weatherly in the mailbox. It opens with that. The purpose of videotaping that is to show who had ownership, right to possession of the premises. It does have a return address of Texas Oncology. I'm just bringing it up because there was a Motion in Limine.

MR. WESTFALL: And, Your Honor, we object to it. We believe it's victim impact. And it is certainly -- her address is not a contested issue in this case. There's no reason to prove it. It's going to be assumed. It's going to be accepted. There's no probative value whatsoever. And like I said, victim impact, and also therefore not relevant in the Guilt/Innocence case, and also Rule 403.

MR. CHAMBLESS: Our position is that it's admissible for reasons stated.

MR. HEISKELL: But there are other mailings.

MR. CHAMBLESS: That was the only one.

MR. HEISKELL: I recall there was another.

MR. WESTFALL: I mean --

49

1 THE COURT: The fact that that letter -- I
2 saw the letter on the video. That letter alone does not
3 describe her as a cancer patient or indicate that she's
4 receiving anything other than a lab report or whatever the
5 envelope says. I would allow the video as it was
6 presented in 188 and overrule your objection with regard
7 to the letter at the beginning of the video, but I'm
8 not -- I'm not expanding that to allow any discussion of
9 her medical condition with regard to cancer at this
10 particular point.
11 MR. WESTFALL: And we also -- we also object
12 to the video, Your Honor, on the grounds that it contains
13 hearsay and also testimonial statements that would be in
14 violation of the confrontation clause, so.
15 THE COURT: What statements are contained on
16 the video that fit in that category?
17 MS. JACK: Judge, I think we can turn the
18 volume down if there's an objection.
19 MR. WESTFALL: Turning the volume down would
20 take care of that as long as the Jury doesn't get access
21 to the volume later on.
22 THE COURT: Well, the only time that that
23 video would be replayed for the Jury would be in the
24 courtroom.
25 MR. HEISKELL: Okay. Good.

50

1 THE COURT: So at that point we would have to
2 have a reminder that there's no audio.
3 MR. WESTFALL: All my other objections still
4 stand for the record, Your Honor.
5 THE COURT: Okay.
6 (In open court.)
7 THE COURT: Yes, sir, bring in the Jury.
8 (Jury present.)
9 THE COURT: You may be seated.
10 Please call your next witness.
11 MR. CHAMBLESS: Yes, Your Honor. As we get
12 started now with the next witness and before the next
13 witness, there's been a stipulation agreed to between the
14 State and the Defense with regard to certain documents.
15 And if I may, I'll just speak --
16 MR. HEISKELL: Right.
17 MR. CHAMBLESS: -- speak to those. First
18 there's a document marked State's Exhibit No. 189, and it
19 is a chain of custody form and it shows -- it represents
20 that on March 10th, 2011, Tina Hodnett of the Johnson
21 County Sheriff's Department took the evidence items listed
22 on the form, State's Exhibit 189, from the Johnson County
23 Sheriff's Department to the Tarrant County Medical
24 Examiner's Office in Fort Worth. And her testimony would
25 be that she collected those items. Those items are

51

1 spelled out on the form, State's Exhibit No. 189, and she
2 transported those without any tampering or anything to the
3 Medical Examiner's Office. So I would offer 189 by
4 stipulation.
5 MR. WESTFALL: And we have no objection.
6 THE COURT: 189 is admitted.
7 (State's Exhibit No. 189 admitted.)
8 MR. CHAMBLESS: State's Exhibit 190 is also a
9 chain of custody form. And I anticipate the testimony
10 that we're covering on this would be that Mike Gaudet on
11 September 13th, 2010, transported two items that were
12 collected from Nancy Weatherly's house, Exhibit BRB-01, a
13 fired shell casing, and BRB-16, a spent bullet lead, and
14 that he transported those items from the Johnson County
15 Sheriff's Department to Jennifer Nollkamper in Fort Worth,
16 Texas, on September 13th, 2010. So we would offer 190 for
17 that purpose.
18 MR. WESTFALL: Did you say spent bullet lid?
19 MR. CHAMBLESS: Lead.
20 MR. WESTFALL: Lead. We have no objection,
21 Your Honor.
22 THE COURT: Admitted.
23 (State's Exhibit No. 190 admitted.)
24 MR. CHAMBLESS: Also offering 190 (sic) and
25 191 which are major case prints for Mark A. Soliz that

52

1 were utilized in this case by Bill Walker and Tom Ekis.
2 MR. WESTFALL: No objection.
3 MR. CHAMBLESS: 191 and 192. And that the
4 person, the Defendant in this case, Mark Soliz, is one in
5 the same person whose photographs are shown on State's
6 Exhibit 191 and 192.
7 MR. WESTFALL: 191 and 192 are both Mark
8 Soliz?
9 MR. CHAMBLESS: Yes, sir.
10 MR. WESTFALL: No objection, Your Honor.
11 THE COURT: 191, 192 are admitted.
12 (State's Exhibit Nos. 191 - 192 admitted.)
13 MR. CHAMBLESS: Also finally, 193 and 194
14 represent -- these are major case prints of Jose Clemente
15 Ramos that were utilized in the examination by Bill Walker
16 and Tom Ekis in this case, Co-Defendant to Mark Soliz.
17 MR. WESTFALL: And we stipulate those are
18 indeed Jose Ramos's prints.
19 MR. CHAMBLESS: We would offer 193 and 194.
20 MR. WESTFALL: No objection.
21 THE COURT: Admitted.
22 (State's Exhibit Nos. 193 - 194 admitted.)
23 MR. CHAMBLESS: State's Exhibit No. 195 which
24 we offer is a evidence release that shows that on July
25 20th of 2010, Max Courtney, of the Mansfield Police

53

1  Department, released the items listed on this document,
2  State's Exhibit 195, to Garit, G-A-R-I-T, Bennett of the
3  Johnson County Sheriff's Department, and that Garit
4  Bennett transported those items in a secure way and placed
5  those into evidence at the Johnson County Sheriff's
6  Department on that date. Offer 195 for that purpose.
7        MR. WESTFALL: No objection, Your Honor.
8        THE COURT: Admitted.
9        (State's Exhibit No. 195 admitted.)
10       MR. CHAMBLESS: State's Exhibit 196 consists
11 of two pages. And we offer this for the purpose of
12 showing that on October 18th, 2011, Max Courtney released
13 major case prints of Jose Ramos, major case prints for
14 Mark Soliz, four latent prints from a television set, and
15 known impressions of shoe out soles to Garit Bennett, that
16 being on October 18th, 2011. Testimony would be he
17 received those items and transported those items, the
18 major case prints of Soliz and Ramos and four latent
19 prints from the television, to the Tarrant County Medical
20 Examiner's Office on October 18th, 2011. I believe that
21 is the stipulation with regard to those items.
22       MR. WESTFALL: You're offering this as 196?
23       MR. CHAMBLESS: Yes.
24       MR. WESTFALL: Your Honor, we have no
25 objection to State's 196.

54

1        THE COURT: Admitted.
2        (State's Exhibit No. 196 admitted.)
3        MR. WESTFALL: Is that all?
4        MR. CHAMBLESS: That's all for now.
5        Judge, we call Mike Gaudet at this time.
6        THE COURT: Please raise your right hand.
7        (Witness sworn.)
8        THE COURT: Thank you. Have a seat.
9              MICHAEL GAUDET,
10   Having been first duly sworn, testified as follows:
11            DIRECT EXAMINATION
12 BY MR. CHAMBLESS:
13    Q. Please state your full name.
14    A. Michael Joe Gaudet.
15    Q. And, Mr. Gaudet, what's your occupation?
16    A. I'm a Lieutenant with the Johnson County
17 Sheriff's Office.
18    Q. What are your responsibilities as a Lieutenant
19 with Johnson County?
20    A. I'm in charge of the Criminal Investigations
21 Division where I supervise 16 detectives. I'm the Crime
22 Scene officer, the videographer, the photographer, latent
23 print examiner. I also assist in supervision of the
24 school resource officers, courthouse personnel and
25 warrants and transport.

55

1    Q. Okay. How long have you been in law enforcement?
2    A. Been in law enforcement since '77. I've been
3 employed by the Sheriff's Office since '94.
4    Q. Okay. And just briefly describe your -- I guess
5 the entirety of your law enforcement career, where you
6 worked and what you've done.
7    A. Originally I started out with the Military Police
8 in the Army for seven years, then went out to Lockheed for
9 ten years. And then became a reserve with Johnson County
10 Sheriff's Office, and eventually became full-time employee
11 with Johnson County Sheriff's Office.
12    Q. On June 30th, 2010, did you receive a call about
13 a situation at 14356 FM 2331 in Godley, Texas?
14    A. Yes, we did.
15    Q. What was the source of your information?
16    A. Fort Worth P.D. had contacted my office and spoke
17 to another one of my detectives and advised that a
18 possible homicide out at that address, and we were in the
19 process of obtaining the information.
20    Q. Okay. So did you and other officers go to that
21 location, go to Godley, Texas?
22    A. Yes, sir, we did.
23    Q. Did you yourself go to that location?
24    A. Yes, sir, I did.
25    Q. And describe generally the outside, the exterior,

56

1 where you went, what it looks like.
2    A. Residence is located in the rural section of
3 Godley, Texas. It's more of a ranch style where the house
4 is set off the highway about 300, 200 feet. It's got a
5 cattle guard, a white pipe fence, surrounded by a
6 three-strand bob-wire fence. The -- it's a ranch style
7 house, red brick, I believe it's white trim. Had a pool
8 to the back on the right-hand side with a pool house, that
9 was surrounded by a chain-link fence. And then there was
10 livestock roaming freely about the property.
11    Q. Okay. What time did you get there?
12    A. I believe it was 9 something.
13    Q. Okay. Were the other officers who had arrived
14 there, had they received instructions as far as what they
15 were to do, where they were to be, prior to your -- before
16 your getting there?
17    A. Yes, sir, they were.
18    Q. What was the protocol or procedure?
19    A. Detective -- Deputy Truitt had already gone out
20 to the scene. They had verified that there was a deceased
21 person. They then secured the front gate, started a crime
22 scene log, and waited arrival of the other detectives.
23    Q. Okay. And was it -- were they instructed no one
24 was to enter the house until you got there?
25    A. Correct.

57

1    Q. All right. And why is that?
2    A. To protect the scene.
3    Q. And is -- what is your responsibility with regard
4  to crime scene or your responsibility that day with regard
5  to crime scene?
6    A. Initially my responsibility is to determine
7  whether there's an actual death. Make sure that the scene
8  is protected by crime scene tape, either enlarge or narrow
9  it down. Assign -- make sure somebody is assigned to
10  conduct a crime scene log at the front gate or wherever we
11  determine the entrance to be. Then hand out assignments
12  as far as who is going to do photography, who is going to
13  do videography, who is going to be the assigned case agent
14  and so forth.
15    Q. Now, approximately an hour and a half after you
16  were there, did something change as far as the
17  responsibility for crime scene processing?
18    A. Yes, sir.
19    Q. And what changed?
20    A. I was advised that Max Courtney from Mansfield
21  P.D., who is a crime scene specialist, was in route to the
22  scene at the direction of the District Attorney's office.
23    Q. And so at some point did Max Courtney arrive?
24    A. Yes, he did.
25    Q. Did he bring others with him?

58

1    A. Yes, he did.
2    Q. Was Brandon Blansit one of the other individuals?
3    A. Yes, he was.
4    Q. Was the crime scene, Nancy Weatherly's house,
5  released to them for their work?
6    A. Correct.
7    Q. Okay. And at that point did you and Johnson
8  County, I guess, back off and allow them to take control
9  of the crime scene?
10    A. Yes, sir, we did.
11    Q. Okay. I want to show you a group of pictures,
12  and starting with 197, take a minute, see if you recognize
13  these photographs, please.
14    A. (Witness complied.)
15    Q. Do you recognize the photographs shown on these
16  exhibits?
17    A. Yes, sir, I do.
18    Q. And were these photographs taken at or near the
19  time that you were there?
20    A. Yes, they were.
21    Q. And do they fairly and accurately show the -- I
22  guess the condition of the house, the bedrooms and
23  different portions of the house at the time you arrived
24  that morning about approximately 9 a.m. on June 30th,
25  2010?

59

1    A. Yes, they do.
2    MR. CHAMBLESS: Okay.
3    MR. WESTFALL: No objection, Your Honor.
4    THE COURT: Admitted.
5    MR. CHAMBLESS: It's 197, I believe the last
6  number is 208, we offer those at this time.
7    THE COURT: 197 through 208 are admitted.
8    (State's Exhibit Nos. 197 - 208 admitted.)
9    Q. (BY MR. CHAMBLESS) Mike, if you wouldn't mind,
10  come on down and let's -- okay. If you would stand over
11  here, please. All right. First of all, this marked 197,
12  tell us what we're looking at here.
13    A. That is a picture of the Weatherly residence
14  standing in the driveway proceeding up to the residence.
15    Q. Okay. This one is -- I guess to go in order, we
16  would go here. This one is marked 198. What are we
17  seeing here?
18    A. Standing at the -- standing at the end of the
19  concrete driveway that leads into the garage of the
20  residence.
21    Q. Okay. 199, please.
22    A. That's interior of the garage.
23    Q. I believe the next one would be 200. Where are
24  we at this location?
25    A. Standing outside the chain-link fence at the edge

60

1  of the garage looking into the back yard.
2    Q. 201, what is shown here?
3    A. Standing on the back covered patio looking at a
4  pair of French doors with one door open.
5    Q. Okay. This is on the backside of the house?
6    A. Yes, it is.
7    Q. Okay. Now 202?
8    A. It's the interior of the residence, to the left
9  side of the doorway looking back towards the door.
10    Q. All right. Is this perspective, if you were to
11  enter the house from the patio in the back, is this kind
12  of the first perspective inside the house?
13    A. Well, if you went from right to left, yes.
14    Q. Okay. 203, what's shown here?
15    A. The garage door from the interior of the house to
16  the garage, and the left wall of the interior of the
17  living room.
18    Q. 204, what do we see here?
19    A. This would be the entertainment center on the
20  left wall and the front door of the residence on the
21  opposite wall.
22    Q. What is the location of this one, the 205?
23    A. That would be the master bedroom. One of the
24  drawers on the floor have been pulled out from the
25  armoire, cabinet, whichever you prefer to call it.

61

Q. What are we looking at here on 206?

A. That's the night stand next to the bed in the master bedroom.

Q. 207, Mike, what are we seeing here?

A. I believe that was back in one of the other bedrooms where she had her work materials and her computer and so forth.

Q. Okay. 208, what's shown on this?

A. That's the wall with the back door and from the corner nearest the garage door towards the back door.

Q. Okay. Thank you. So these photographs, is it correct this gives us a little bit of a sense of the interior of the house when you -- when you first walked in; is that correct?

A. Yes, it is.

Q. So you were active in this for an hour, hour and a half, two hours until Max Courtney and Brandon Blansit arrived from Mansfield; is that correct?

A. Correct.

Q. Okay. Now I want to jump ahead just for the moment. On July 1st, following the date that the crime scene, Nancy Weatherly's house was processed, did you meet with Detective Boetcher in Fort Worth?

A. Yes, I did.

Q. Where did you go and meet him at?

62

A. I met him at the Target at Las Vegas Trail and I-30.

Q. Okay. Did you also meet with Officer -- Detective Officer Tim Lee at that time?

A. The first time I met Boetcher was at the Fort Worth P.D. impound yard.

Q. Okay. And did you meet Tim Lee and Boetcher at that place?

A. Yes, I did.

Q. Did you receive an item from Tim Lee at that time?

A. Yes, I did.

Q. Okay. Show you this item. I'll represent to you it was opened here in court in front of the Jury by Officer Lee. Would you look at this, see if you can identify this please, sir.

A. (Witness complied.)

Q. Do you recognize that item?

A. Yes, I do.

Q. And did you take possession of that on July 1st, 2010?

A. Yes, I did.

Q. And did you -- have you retained it within your possession or position of Johnson County Sheriff's Office since that time?

63

A. Yes, I have.

Q. On July 8th, was it taken to Max Courtney's location where Max Courtney was for fingerprint processing?

A. Yes, it was.

Q. Okay. And was it returned to the Johnson County Sheriff's Office the very same day, I believe July 8th, 2010?

A. Yes, sir.

Q. Okay. If you would, place it in here.

A. (Witness complied.)

MR. CHAMBLESS: I've marked the bag as 209-A and the item within the plastic as 209. Offer that at this time.

MR. WESTFALL: No objection to 209 for all purposes, and 209-A, I guess for the record, Your Honor.

THE COURT: 209 and 209-A are admitted.

(State's Exhibit No. 209 admitted.)

(State's Exhibit No. 209-A admitted for record purposes only.)

Q. (BY MR. CHAMBLESS) Did you also receive certain items from Detective Boetcher on that day?

A. Yes, sir, I did.

Q. What were those items?

A. Two telephones that had been recovered from Jose

64

Ramos.

Q. Okay. What were the -- what kind of cell phones, what brand were they?

A. One was a Kyocera. And I believe the other one was a Nokia.

Q. Okay. Show you what has markings on it, two envelopes. Would you examine those, see if you recognize those items, please. Do you recognize these items?

A. Yes, I do.

Q. What are they?

A. The one is a Kyocera phone, one Samsung phone. Both those I received from Detective Boetcher that morning.

Q. Did he represent to you that these cell phones had been taken from the person of whom?

A. Jose Ramos.

Q. Okay. Did you later at a point within the past year, did you process these cell phones for fingerprint evidence?

A. Yes, sir, I did.

Q. What was the result of that?

A. There were no usable latent prints recovered off either.

Q. However, did you, pursuant to search warrant and legal authority, did you obtain some information regarding

65

1  the cell phone, the cell phone usage?
2      A.  Yes, sir, we did.
3      Q.  Tell the Jury about that.
4      A.  Utilizing a cell phone Cellebrite device, we were
5  able to extract the information off the phones, the
6  address book, contacts, instant messages, so forth.
7  Contained in there was the name of Tat Man, a person of
8  interest where stolen property had been released to.  And
9  I then copied that number and released that phone number
10 to Detective Boetcher to see if he can locate that
11 individual in Fort Worth.
12     Q.  Okay.  You say Tat Man.  What was the full name
13 or the legal name of that person?
14     A.  Robert Lee Hinojosa.
15     Q.  Okay.  Did you meet with that individual?
16     A.  Yes, I did.
17     Q.  On July 3rd, 2010, did you meet with
18 Mr. Hinojosa, also known as Tat Man?
19     A.  Yes, I did.
20     Q.  And did you obtain from him certain items of
21 evidence?
22     A.  Yes, I did.
23     Q.  On the -- if you would step around and help me
24 pull this out.
25     A.  (Witness complied.)

66

1      Q.  All right.  This item, what is this?
2      A.  This is a LCD TV.
3      Q.  Okay.  And it was -- came into your possession
4  through Mr. Hinojosa, also known as Tat Man, July 3rd,
5  2010; is that correct?
6      A.  Yes, it did.
7      Q.  Now, was this TV taken by Garit Bennett from
8  Johnson County to Max Courtney's place of business at
9  Mansfield for fingerprint processing, I believe July 8th,
10 2010?
11     A.  Yes, it was.
12     Q.  Okay.  Was it returned back to you, back to the
13 Johnson County Sheriff's Department on that same day?
14     A.  Yes, it was.
15     Q.  From your memory of the living room of Nancy
16 Weatherly's house, was there indications to you that one
17 or more TVs had been taken?
18     A.  Yes, there was.
19     Q.  And did it -- was the space for the TV in the
20 living room, was it similar in size to this particular TV?
21     A.  Yes, it was.
22     Q.  Did you also receive other items from
23 Mr. Hinojosa that particular day?
24     A.  Yes, I did.
25     Q.  Show you what's marked as various markings on

67

1  it.  Just take a look at these.
2      A.  (Witness complied.)
3      Q.  All right.  Do you recognize the items that you
4  have looked at in each of these packages?
5      A.  Yes, sir, I do.
6      Q.  And where did you first see them?
7      A.  Those were provided to me by Mr. Hinojosa.
8      Q.  Okay.  I believe that was on July 3rd, 2010; is
9  that correct?
10     A.  Yes, sir.
11     Q.  On this one, I believe it's a Hewlett-Packard CD;
12 is that correct?
13     A.  That's correct.
14     Q.  And this one is marked -- is this your marking
15 where it says 11?
16     A.  Yes, sir, it is.
17     Q.  On your marking says 10 is also a CD, operating
18 system CD; is that correct?
19     A.  Correct.
20     Q.  And your marking 9 is a Hewlett-Packard battery;
21 is that correct?
22     A.  Correct.
23     Q.  Now, at a later time in August of 2011, did you
24 process those three items for possible fingerprints?
25     A.  I did.

68

1      Q.  And what was the result of that?
2      A.  No usable latent prints were recovered from the
3  items.
4      Q.  Okay.  Now with respect to your marking on 7 and
5  8, what is in these two packages here?
6      A.  It's a pair of cell phones, a Nokia cell phone
7  and a Motorola cell phone.
8      Q.  And did you do -- did you find out any
9  information about the ownership of these two phones?
10     A.  Yes, I did.  With a search warrant we obtained
11 information off of the phones utilizing the Cellebrite
12 extraction device.  One phone we were able not to obtain
13 any information, there was none stored in the memory and
14 there was not a SIM chip.  And on the other phone, we were
15 able to obtain the contact list, conversations, basically
16 all the information off the phone.
17     Q.  And what did that information link to, if
18 anything?
19     A.  That information linked back to a phone number
20 that says "my desk" on the phone.  I contacted the
21 number.  It was a phone number based at Lockheed.  I
22 called, spoke to her supervisor.  He advised that it was
23 Ms. Weatherly's phone.  And then I contacted Industrial
24 Security and notified them that I had the phone.
25     Q.  Okay.  Now which phone was that?  Do you recall

69

1   which one this was?
2       A. I believe it was the Motorola.
3       Q. Okay. And so this cell phone, which through this
4   process was linked to Nancy Weatherly, is marked as your
5   Exhibit 8; is that correct?
6       A. Yes.
7           MR. CHAMBLESS: Okay. I've marked the
8   envelope as 210-A, the cell phone as 210.
9           MR. WESTFALL: No objection as offered, Your
10  Honor.
11          THE COURT: Admitted.
12          MR. CHAMBLESS: Offer 210 for all purposes,
13  210-A for record.
14          THE COURT: Admitted.
15          (State's Exhibit No. 210 admitted.)
16          (State's Exhibit No. 210-A admitted for
17          record purposes only.)
18      Q. (BY MR. CHAMBLESS) Also, did you process
19  both cell phones for possible fingerprints at a later
20  time?
21      A. I did.
22      Q. What was the result of that?
23      A. There was no usable latents recovered off either
24  phone.
25      Q. Okay. On July 9th of 2010, did you obtain a

70

1   search warrant for shoes of a certain person?
2       A. I did.
3       Q. And tell us about that and what you did in that
4   regard.
5       A. I was requested to obtain the shoes of Jose
6   Ramos, at which time I sent Detective Bennett to Tarrant
7   County to verify that they were available. We then
8   generated search warrant, and I personally went to Tarrant
9   County jail and met with Lieutenant Skidmore and presented
10  him with a copy of the search warrant and obtained the
11  shoes.
12      Q. Okay. And whose shoes were you seeking?
13      A. Jose Ramos.
14      Q. Okay. Show you this package, and ask you if
15  you can take a look at that and see if you can identify
16  that.
17      A. (Witness complied.)
18      Q. And what's contained within this package?
19      A. A pair of sneakers.
20      Q. Is that what you obtained from Lieutenant or
21  Officer Skidmore at Tarrant County on the July, I believe,
22  9th of 2010?
23      A. It is.
24      Q. Okay. Would you remove those, please.
25      A. (Witness complied.)

71

1           MR. CHAMBLESS: Marked the packaging as
2   211-A and the shoes of Jose Ramos as 211.
3           MR. WESTFALL: And A is for the record?
4           MR. CHAMBLESS: Yes.
5           MR. WESTFALL: No objection as offered.
6           THE COURT: Admitted.
7           (State's Exhibit No. 211 admitted.)
8           (State's Exhibit No. 211-A admitted for
9           record purposes only.)
10      Q. (BY MR. CHAMBLESS) All right. On September 13th
11  of 2010, did you transport two evidentiary items to
12  Jennifer Nollkamper?
13      A. I did.
14      Q. I believe we've already offered the document
15  showing that you did that, but would you just look for
16  this moment at these two. They're marked BRB-01 and 16.
17  And do not open them at this time, but are those the items
18  that you took?
19      A. Yes, sir, they are.
20      Q. All right. Where did you take them from?
21      A. I recovered them from my evidence room, and they
22  were transported to the Fort Worth P.D. Crime Lab.
23      Q. And did you personally release them to Jennifer
24  Nollkamper at that location?
25      A. Yes, I did.

72

1       Q. At a later point on March 2nd, 2011, did you,
2   pursuant to legal authority, obtain saliva samples of Mark
3   Soliz and Jose Ramos?
4       A. I did.
5       Q. Okay. How did you -- tell us how you -- how
6   that's done.
7       A. Basically they're known as a buccal swab. I
8   obtained two sterile swabs still in their container,
9   sealed, then proceeded to Blue West where the two inmates
10  were being detained at that time, advised them of my
11  purpose for being there, removed the sterile swabs from
12  their container, then swabbed the interior of their cheek
13  and gums and placed the swabs inside a sterile, white,
14  plain white box container and sealed it.
15      Q. Okay. I want to show you what's marked, I guess
16  by your number 17 and 18, and ask you if you recognize
17  those items?
18      A. Yes, sir. Those will be the -- those will be the
19  buccal swabs that I obtained from both of them.
20      Q. Would you open those, please.
21      A. (Witness complied.)
22      Q. All right. First one, your package marked 17, is
23  the buccal swab contained within that?
24      A. Yes, it is.
25      Q. Would you remove that, please.

73

1    A. (Witness complied.)
2    Q. And the swab itself has the name "Mark Soliz" and
3  the date, I guess, that you took it?
4    A. Yes, the time and my initials also.
5        MR. CHAMBLESS: Okay. At this time I would
6  offer State's 212 being the buccal swab, 212-A being the
7  packaging.
8        MR. HEISKELL: No objection, Your Honor,
9  212-A for record only, and 212 for all purposes.
10       THE COURT: Admitted.
11       (State's Exhibit No. 212 admitted.)
12       (State's Exhibit No. 212-A admitted for
13  record purposes only.)
14    Q. (BY MR. CHAMBLESS) Would you look in the
15  package marked 18. You have already done that. Is
16  that the buccal swab of Jose Clemente Ramos?
17    A. Yes, it is.
18       MR. CHAMBLESS: If you would, go ahead and
19  place it in there.
20       Offer at this time 213-A, record purposes,
21  213 being buccal swab of Jose Ramos.
22       MR. HEISKELL: No objection, Your Honor.
23       THE COURT: Admitted.
24       (State's Exhibit No. 213 admitted.)
25       (State's Exhibit No. 213-A admitted for

74

1        record purposes only.)
2    Q. (BY MR. CHAMBLESS) Was there a vehicle
3  recovered from Fort Worth, Texas by the Johnson County
4  Sheriff's Department?
5    A. Yes, there was.
6    Q. Was that a 2003 Tundra pickup owned by Nancy
7  Weatherly?
8    A. Yes, it was.
9    Q. Who was dispatched to escort the Tundra from Fort
10  Worth to Cleburne?
11    A. Detective Terry Dalton and Detective J. Kniffen.
12    Q. Okay. And in the course of that, did Detective
13  Kniffen submit a beer can and beer bottle into evidence at
14  the Johnson County Sheriff's Department?
15    A. Yes, he did.
16    Q. All right. I want to show you this item and ask
17  you if you would examine that and see what's contained in
18  that package.
19    A. (Witness complied.)
20    Q. And from what location in the Tundra were these
21  items taken?
22    A. They were located in the bed of the Tundra.
23    Q. Okay. They were located in the bed of the Tundra
24  pickup and removed by Officer Kniffen before the Tundra
25  was driven to Cleburne; is that correct?

75

1    A. Yes.
2    Q. If you could --
3        MR. CHAMBLESS: At this time, offer the beer
4  can and beer bottle as 214, the packaging as 214-A.
5        MR. WESTFALL: Your Honor, may I take the
6  witness on voir dire just for one second?
7        THE COURT: Yes, sir.
8            VOIR DIRE EXAMINATION
9  BY MR. WESTFALL:
10    Q. Lieutenant, when these were collected, they were
11  given separate, separate item numbers evidence-wise,
12  weren't they?
13    A. Yes, they were.
14    Q. Were the items 15 and 16?
15    A. They were.
16    Q. And it does not appear that they're marked in any
17  way on the -- for the number of the evidence item on the
18  bottle and can.
19    A. First time I've seen them outside of the bag,
20  sir.
21        MR. WESTFALL: Okay. Thank you.
22        Your Honor, we would ask that these be at
23  least made two separate exhibits just for the record
24  because it is confusing. They're not marked in any way as
25  evidentiary items and there's no way to separate them out

76

1  for future witnesses.
2        DIRECT EXAMINATION (Continued)
3  BY MR. CHAMBLESS:
4    Q. Do you have records that indicate which exhibit
5  is which, number-wise?
6    A. Yes, sir.
7    Q. All right. And what is that?
8    A. The Bud Light beer can is 15, and the beer bottle
9  is 16.
10    Q. Okay. If you would remove one of the items,
11  please.
12    A. (Witness complied.)
13        MR. CHAMBLESS: We've marked the beer can as
14  214-15, the beer bottle as 214-16, and then the original
15  packaging as 214-A.
16        MR. WESTFALL: Your Honor, may I just have
17  one moment.
18        No objection as offered.
19        THE COURT: Thank you. Admitted.
20        (State's Exhibit No. 214-15 admitted.)
21        (State's Exhibit No. 214-16 admitted.)
22        (State's Exhibit No. 214-A admitted for
23  record purposes only.)
24    Q. (BY MR. CHAMBLESS) Did you also -- after
25  Detective Blansit and Max Courtney finished their crime

77

1  scene processing, under your direction was a Wells Fargo
2  checkbook removed from the Nancy Weatherly house?
3      A.  Yes, it was.
4      Q.  And would you please examine what's marked on
5  your records as No. 2 item.
6      A.  (Witness complied.)
7      Q.  What is No. 2?
8      A.  It is two checkbooks.
9      Q.  Okay.  Did you process those checkbooks at a
10  later time for possible fingerprint evidence?
11      A.  Yes, I did.
12      Q.  What was the result of your processing?
13      A.  There was no usable latent prints recovered.
14      Q.  On August 22nd of 2011, did you take certain
15  items to the -- of latent print evidence to the Tarrant
16  County Medical Examiner's office?
17      A.  I did.
18      Q.  Okay.  If you would, take a look at the -- this
19  package, which I believe you've opened this morning with
20  me; is that correct?
21      A.  Yes, sir.
22      Q.  All right.  Take a look and tell us what's in
23  there.
24      A.  These are latent prints that were recovered off
25  the vehicle and at the crime scene.  And there is also --

78

1      Q.  We've taken the major case prints out.
2      A.  All right.  This contains strictly latent print
3  cards taken from the vehicle and from the crime scene.
4      Q.  All right.  And on the date that you took them,
5  did you place them within that envelope that you're
6  holding?
7      A.  Yes.
8      Q.  Okay.  And how many latent prints were taken by
9  you to Tarrant County Medical Examiner's office on August
10  22nd, 2011?
11      A.  10.
12      Q.  And for the record, would you read those, just
13  which ones were taken.
14      A.  BRB-11, BRB-21, BRB-22, BRB-23, BMC-01, BMC-02,
15  BMC-18, BMC-36, BMC-37-A, BMC-37-B.
16      Q.  Okay.  And are all those prints that you've just
17  spoken of, are they here contained within that envelope?
18      A.  Yes, sir, they are.
19      Q.  All right.  If you would place them here within
20  this plastic bag, please.
21      A.  (Witness complied.)
22          (Sotto voce discussion.)
23          MR. CHAMBLESS:  Offer the packaging as 215-A,
24  and the prints themselves collectively as 215.  Each print
25  is marked, I'll represent, in the manner that Officer

79

1  Gaudet read into the record.
2          MR. WESTFALL:  Your Honor, agreed, and no
3  objection as offered.
4          THE COURT:  Admitted.
5          (State's Exhibit No. 215 admitted.)
6          (State's Exhibit No. 215-A admitted for
7          record purposes only.)
8      Q.  (BY MR. CHAMBLESS)  One of the first things
9  the -- what was, I guess, the very first thing that you
10  did when you arrived at Nancy Weatherly's house?
11      A.  After signing in to the crime scene, I initiated
12  a crime scene video.
13      Q.  Okay.  Did you operate that equipment yourself?
14      A.  I did.
15      Q.  What do you do that -- what's the purpose of
16  doing that?
17      A.  To document the scene as is, make sure that we
18  have the proper colors, make sure that if there's any
19  sound in the house, that it's on audio on the video.
20      Q.  Okay.  Did you begin the videotape outside the
21  house?
22      A.  Started at the front gate.
23      Q.  Okay.  And was there any -- any envelopes, any
24  mail in the -- at the front gate?
25      A.  Yes, there was.

80

1      Q.  All right.  And did you photograph that as well?
2      A.  Yes, sir, I did.
3      Q.  What's your reason for doing that?
4      A.  Normally we open the mailbox and we photograph
5  what's in the mailbox to ensure that we're -- same people
6  belong to that residence.
7      Q.  Trying to identify the owner or the resident of
8  the house; is that correct?
9      A.  Or possible suspects that live at the residence.
10      Q.  Okay.  And did you continue the videotape
11  throughout the house?
12      A.  Yes, I did.
13      Q.  Did you go into each room and look at it from
14  different perspectives?
15      A.  Yes, I did.
16      Q.  This was the, I guess, earliest documentation
17  visually of Nancy Weatherly's house by law enforcement; is
18  that correct?
19      A.  It is.
20      Q.  The videotape is approximately how long?
21      A.  I have no idea.  It's probably 15, 20 minutes.
22      Q.  Okay.  That location, 14356 FM 2331, it's in
23  Godley, Texas; is that correct?
24      A.  Yes, it is.
25      Q.  And, Officer Gaudet, is that in Johnson County,

81

1 Texas?

2    A. Yes, it is.

3    Q. Okay. I'm going to show you what's marked as

4 State's Exhibit No. 188. Ask you if you recognize this

5 item?

6    A. Yes, sir, I do.

7    Q. What is State's Exhibit No. 188?

8    A. This is a DVD with my crime scene video on it.

9    Q. Okay. And -- okay. Does this fairly and

10 accurately show the condition of the Nancy Weatherly house

11 and of Nancy Weatherly when you first got there?

12    A. It does.

13        MR. CHAMBLESS: Offer 188 at this time.

14        MR. WESTFALL: Your Honor, no further

15 objections to 188.

16        THE COURT: Can I see both up here for a

17 question about that.

18        (At the bench.)

19        THE COURT: We have an agreement to play it

20 without the audio, and the officer testified that he

21 videoed it with the sound on to capture the sounds in the

22 house, so I don't want to leave anybody with the wrong

23 impression on that.

24        MR. CHAMBLESS: I did hear that, except I

25 could see -- but there was nothing effectively captured

82

1 sound-wise.

2        MR. WESTFALL: Right, nothing, just

3 background voices.

4        THE COURT: Just ask him that question.

5        (In open court.)

6        THE COURT: 188 is admitted.

7        (State's Exhibit No. 188 admitted.)

8        MR. CHAMBLESS: All right. Thank you, Judge.

9    Q. (BY MR. CHAMBLESS) Detective, is there -- was

10 there anything -- you said the sound was on for what

11 reason?

12    A. Just to document the sounds that are within the

13 house, like if they had their radio going or TV turned on,

14 things of that nature.

15    Q. Was there anything evidentiary-wise that was

16 effectively captured by sound-wise on your video?

17    A. No, there was not.

18        MR. CHAMBLESS: Okay. Judge, I would like

19 permission to play State's Exhibit No. 188, if I might.

20        THE COURT: Granted.

21        (Off-the-record discussion.)

22        (State's Exhibit No. 188, DVD with no audio,

23        played in open court.)

24        THE COURT: Is that the end of the video?

25        MR. CHAMBLESS: It is, Your Honor.

83

1        THE COURT: We'll recess for lunch. Be back

2 at 1:15.

3        (Recess taken from 11:53 a.m. to 1:22 p.m.)

4        (Jury not present.)

5        THE COURT: State present and ready?

6        MR. CHAMBLESS: Yes, Your Honor.

7        THE COURT: Defense present and ready?

8        MR. WESTFALL: Yes, Your Honor.

9        THE COURT: Defendant present?

10        MR. WESTFALL: He is.

11        THE COURT: Jury ready? If they are ready,

12 please bring them in.

13        (Jury present.)

14        THE COURT: Thank you. You may be seated.

15    Q. (BY MR. CHAMBLESS) Detective Gaudet, to go back,

16 you arrived at the Nancy Weatherly house at approximately

17 9 a.m. on June 30th; is that correct?

18    A. Correct.

19    Q. And approximately 10:30 or thereabouts, Max

20 Courtney and Detective Blansit arrived and, I guess, took

21 over the crime scene; is that where we were?

22    A. Yes, sir.

23    Q. Okay. This morning we looked at several pieces

24 of evidence. For example, 2 and 3, yours marked 2 and

25 yours marked 3, what are those, according to your list?

84

1    A. 2 are two checkbooks from Wells Fargo, and No. 3

2 is a Kyocera Domino red phone.

3    Q. Okay. What is 4?

4    A. 4 is a Samsung phone, red in color.

5    Q. Okay. Now, is this correct, you processed all of

6 these items, the checkbook and two cell phones for

7 possible fingerprint evidence; is that correct?

8    A. Yes, it is.

9    Q. And the result was a negative result?

10    A. Correct.

11        MR. CHAMBLESS: All right. Offer the

12 checkbook as item 216, and packaging as 216-A for record

13 purposes.

14        MR. WESTFALL: No objection, Your Honor.

15        THE COURT: Admitted.

16        (State's Exhibit No. 216 admitted.)

17        (State's Exhibit No. 216-A admitted for

18        record purposes only.)

19        MR. CHAMBLESS: Offer the Kyocera cell phone

20 as 217, packaging as 217-A.

21        MR. WESTFALL: No objection.

22        THE COURT: Admitted.

23        (State's Exhibit No. 217 admitted.)

24        (State's Exhibit No. 217-A admitted for

25        record purposes only.)

85

1    MR. CHAMBLESS: And offer the Metro PCS cell
2  phone as 218, and the packaging as 218-A -- Samsung.
3  Sorry.
4    MR. WESTFALL: Okay. No objection, Your
5  Honor, to Exhibit 218 for all purposes, and 218-A for the
6  record.
7    THE COURT: Admitted.
8    (State's Exhibit No. 218 admitted.)
9    (State's Exhibit No. 218-A admitted for
10    record purposes only.)
11    Q. (BY MR. CHAMBLESS) Your exhibit marked No. 7,
12  what is that?
13    A. It's a Nokia cell phone.
14    Q. Okay. And we looked at that this morning. You
15  processed as well for fingerprints; is that correct?
16    A. Yes, sir, it is.
17    Q. Tell the Jury, basically how do you do that?
18    A. Depending on the shape and texture of the item to
19  be fingerprinted, you can either do a physical process or
20  a chemical process.
21    Chemical process is where you treat the
22  exterior of the item with different chemicals that will
23  adhere to it, to the fats, amino acids, and salts and
24  solids that are in a fingerprint. Use DFO, anhydride,
25  several other chemicals.

86

1    Or you can do a physical process where you
2  literally do what's called cyanoacrylate ester fuming,
3  commonly known as super glue, place it into a chamber,
4  super glue it, determine whether there's any prints on it
5  or not. Then using a physical process, you use a black
6  graphite dust and fingerprint brush, dust the print
7  itself, and then lift it with fingerprint tape.
8    Q. Okay. In the case of items, your item 7 and your
9  item 9, what was the result of your processing?
10    A. It was negative for usable latent prints.
11    MR. CHAMBLESS: Okay. Offer item 219, being
12  the Nokia cell phone marked as 219, packaging as 219-A.
13    MR. WESTFALL: No objection as offered.
14    THE COURT: Admitted.
15    (State's Exhibit No. 219 admitted.)
16    (State's Exhibit No. 219-A admitted for
17    record purposes only.)
18    MR. CHAMBLESS: Offer State's Exhibit No.
19  220 being the Hewlett-Packard battery, packaging is 220-A.
20    MR. WESTFALL: No objection as offered.
21    THE COURT: Admitted.
22    (State's Exhibit No. 220 admitted.)
23    (State's Exhibit No. 220-A admitted for
24    record purposes only.)
25    Q. (BY MR. CHAMBLESS) These items marked by your

87

1  packaging as item 10 and 11, which items are they?
2    A. 10 is a "Operating System CD" disk, and 11 is a
3  "hp quickrestore" operating systems disk.
4    Q. Did you also process these items for possible
5  fingerprints?
6    A. I did.
7    Q. What was the result?
8    A. Negative usable latent prints.
9    MR. CHAMBLESS: Okay. Offer the operating
10  system CD as 221, the packaging as 221-A.
11    MR. WESTFALL: No objection as offered, Your
12  Honor.
13    THE COURT: Admitted.
14    (State's Exhibit No. 221 admitted.)
15    (State's Exhibit No. 221-A admitted for
16    record purposes only.)
17    MR. CHAMBLESS: Offer the Hewlett-Packard
18  quickrestore system recovery CD as 222, and packaging as
19  222-A.
20    MR. WESTFALL: No objection as offered.
21    THE COURT: Admitted.
22    (State's Exhibit No. 222 admitted.)
23    (State's Exhibit No. 222-A admitted for
24    record purposes only.)
25    Q. (BY MR. CHAMBLESS) Earlier this morning you

88

1  indicated this television that you recovered from
2  Mr. Hinojosa. Do you recall the date that you did that?
3    A. Not really.
4    Q. Would that have been on July 3rd of 2010?
5    A. Yes, sir.
6    MR. CHAMBLESS: Okay. It's been marked now
7  as item No. 223, and would offer the television recovered
8  from Hinojosa as item 223.
9    MR. WESTFALL: No objection, Your Honor.
10    THE COURT: Admitted.
11    (State's Exhibit No. 223 admitted.)
12    Q. (BY MR. CHAMBLESS) Now, following -- the point
13  at which Garit Bennett recovered all of the items
14  processed from the Nancy Weatherly house were retrieved
15  and taken by Garit Bennett to Johnson County Sheriff's
16  Department; is that correct?
17    A. Yes, they were.
18    Q. Okay. And during the time that those items were
19  at the Sheriff's Department, did you evaluate certain of
20  those items at our request for possible fingerprint
21  evidence?
22    A. Yes, I did.
23    Q. Okay. Now, just for the record, some of these,
24  the ones from the Nancy Weatherly house, have the
25  beginning letters BRB; is that correct?

89

1    A.  Yes.

2    Q.  And the ones -- items of evidence taken from the

3  Tundra begin with BMC; is that correct?

4    A.  Correct.

5    Q.  Okay.  Did you process on July 28th, 2011, BMC

6  item 15, a keyless entry device?

7    A.  I did.

8    Q.  What was the result of that?

9    A.  Negative usable latent prints.

10   Q.  Okay.  Did you process on the same date BMC-17, a

11  Dairy Queen sack on that date?

12   A.  I did.

13   Q.  What was the result?

14   A.  Negative usable latent prints.

15   Q.  Okay.  On July 28th, 2011, did you process

16  BMC-22, a cellular phone plastic holder?

17   A.  I did.

18   Q.  And what was the result of that?

19   A.  Negative usable latent prints.

20   Q.  Okay.  Also from the Tundra, BMC-9, a earring,

21  did you process that on August 24th, 2011?

22   A.  I did.

23   Q.  What was the result?

24   A.  No usable latent prints.

25   Q.  On August 24th, 2011, did you process BRB-20,

90

1  pills and pill bottles?

2    A.  I did.

3    Q.  And what was the result on that date?

4    A.  No usable latent prints.

5    Q.  All right.  You testified that you transported

6  BRB-01 and BRB-16 on September 13th of 2010 to Jennifer

7  Nollkamper; is that correct?

8    A.  Yes, sir.

9    Q.  All right.  Ask if you would, if you would be

10  kind enough to open those packages, please.

11   A.  (Witness complied.)

12   Q.  Okay.  If you would, place the contents of BRB-01

13  in -- in this.

14   A.  (Witness complied.)

15   Q.  Okay.  We've marked the contents of BRB-01 in to

16  an envelope now marked 224; is that correct?

17   A.  Yes, sir.

18   Q.  And the packaging being 224-A?

19   A.  Correct.

20   Q.  And that corresponds to BRB-01?

21   A.  Yes, sir.

22   Q.  Okay.  Have we now placed the contents of BRB-16

23  into a package marked State's Exhibit No. 225?

24   A.  Yes, sir.

25   Q.  And the packaging now marked 225-A?

91

1    A.  Yes, sir.

2        MR. CHAMBLESS:  We would offer the contents

3  of BRB-16 being a bullet, portion of a bullet, and the

4  contents of BRB-01, a shell casing, both of which I'll

5  represent were recovered from the home of Nancy Weatherly.

6        MR. WESTFALL:  Your Honor, no objection.

7        THE COURT:  How are those marked?  What are

8  the markings on the -- the evidence and markers?

9        MR. CHAMBLESS:  The 225 would be the bullet

10  fragment.  224 will be the shell casing, casing cartridge.

11       THE COURT:  225 and 224 are admitted.

12       (State's Exhibit Nos. 224 - 225 admitted.)

13       MR. CHAMBLESS:  Yes, sir.  Thank you.  Pass

14  the witness.

15                CROSS-EXAMINATION

16  BY MR. WESTFALL:

17   Q.  Hello, Lieutenant Gaudet.

18   A.  Morning.

19       MR. WESTFALL:  Your Honor, may I move this

20  just out of view?

21       THE COURT:  Yes, sir.

22       MR. WESTFALL:  What I want is that list of

23  the evidence.

24   Q.  Okay.  So this State's Exhibit No. 189, that's in

25  evidence already.  This is the chain of custody.  I'm just

92

1  going to put this on the overhead.  Now BRB is -- is that

2  Brandon Blansit?

3    A.  Yes, sir.

4    Q.  And he was one of the Crime Scene officers that

5  came from Mansfield?

6    A.  Mansfield, yes, sir.

7    Q.  And BMC is, I think Byron?  We all know him as

8  Max Courtney?

9    A.  Yes, sir.

10   Q.  And he's from?

11   A.  Mansfield P.D.

12   Q.  Mansfield also.  They came together and worked

13  the scene after y'all had been there for a little bit.  I

14  guess they showed up around 10?

15   A.  Around then.

16   Q.  And then these 15, 16, 17, 18, when you sent

17  Detective Kniffen and --

18   A.  Dalton.

19   Q.  -- Dalton up to Fort Worth to, you know, one of

20  the things they did was retrieve the truck or secured the

21  truck.  These items were in the truck, the Tundra that was

22  taken from Nancy Weatherly's house?

23   A.  Those were in the bed of the truck.

24   Q.  And two of these items are on the list, they're

25  15 and 16, right?

93

1    A.  Yes, sir.
2    Q.  And it's beer can, and what's the letters next to
3  it?
4    A.  DNA.
5    Q.  Does that mean that some DNA testing was going to
6  take place or did take place?
7    A.  That was the request.
8    Q.  That was the request.  Okay.  And 16 is beer
9  bottle and requested for DNA?
10   A.  Yes.
11   Q.  The beer can is 214-15 and the beer bottle is
12 214-16?
13   A.  Yes, sir.
14          (Pause in proceeding.)
15          (Sotto voce discussion.)
16          MR. WESTFALL:  I'm going to have to open up
17 State's Exhibit No. 215.
18          (Sotto voce discussion.)
19   Q.  This is kind of what your fingerprints look like
20 when they get sent to the lab, right?
21   A.  Yes, sir, that's one form.
22   Q.  And this is a piece of tape?
23   A.  Yes, sir, it is.
24   Q.  And it was used to lift the powder that you had
25 applied to get the print; is that right?

94

1    A.  I didn't specifically do it, but that's how it's
2  done, yes.
3    Q.  Oh, okay.  Well, I mean, just generally so the
4  Jury can understand how a fingerprint is lifted.
5    A.  A fingerprint is generally lifted utilizing the
6  adhesive side of a clear, clear acetate or clear tape.
7    Q.  And then this -- if I can get it in focus.  Does
8  that appear to be in focus?
9    A.  Pretty close.
10   Q.  Okay.  And this thing here, this sort of circle,
11 that's going to be the print that ultimately gets looked
12 at?
13   A.  That is correct.
14   Q.  And as it stands right here, would you call this
15 a latent print?
16   A.  Yes.
17   Q.  And this particular print was taken from the
18 driver's side door of something; that's what it purports
19 to be?
20   A.  Correct.
21   Q.  Do you know that this was Nancy Weatherly's
22 truck?
23   A.  The BMCs were taken from the Tundra, yes.
24   Q.  Okay.  And that's BMC-18?
25   A.  Yes, sir.

95

1    Q.  Driver side door.  Okay.  Also in here, I guess
2  in one of these envelopes is a BRB-23, right?
3    A.  Correct.
4    Q.  It's not on here, but BRB-23, do you remember
5  that as being a fingerprint from a cassette box that was
6  taken inside of Nancy Weatherly's house?
7    A.  Yeah, I believe so.
8    Q.  Thank you.  Another thing that you did some work
9  on was this Samsung phone, right?
10   A.  Yes, sir.
11   Q.  It's a little red -- here.  This is the phone
12 that Detective Boetcher took from Jose Ramos --
13   A.  Yes, sir.
14   Q.  -- when he was arrested?  And you actually did
15 some forensics on this.  You can go in with some software
16 and pull all the information out of it?
17   A.  I personally did not.  I have a individual at my
18 office certified to use Cellebrite, and he performed the
19 examination.
20   Q.  He did that under your supervision.  I guess
21 you're the one that had it done?
22   A.  Yes, sir.
23   Q.  And there were phone numbers extracted?
24   A.  Yes, sir.
25   Q.  What was this exhibit called?  Not the State's

96

1  Exhibit.  What was it called when it came to --
2    A.  My Exhibit No. 4.
3    Q.  4.  It's recognizable; I guess it was analyzed
4  under the name Samsung phone, right?
5    A.  I would have to look at the actual document.
6    Q.  Okay.  We'll say 4, Samsung phone from Joe
7  Ramos.  And inside that phone was a phone number for a guy
8  name Tat Man that you called?
9    A.  I did not call Tat Man.
10   Q.  You did not call Tat Man.  Somebody called Tat
11 Man though, right?
12   A.  Detective Boetcher.
13   Q.  Okay.  And this number though came out of that
14 phone, right?
15   A.  I believe so.
16   Q.  That phone.  And, I mean, I don't want you to go
17 on memory here.  I have the report.  That's the report
18 that came from the forensic analysis of the phone, right?
19   A.  Yes, sir, it is.
20   Q.  What are you looking for?
21   A.  Tat Man.
22   Q.  Oh, I've got it marked.  The phone numbers are in
23 front.  Does this refresh your memory as to whether Tat
24 Man's number is in the phone?
25   A.  Yes, sir.

97

1    Q. Okay. And there's also a number for a Whitney in
2 the phone, right?
3    A. Yes, sir.
4    Q. Tat Man told them to check this. His phone
5 number is 817. And Whitney, 817-995-0959. Am I correct
6 on that?
7    A. Yes, sir.
8    Q. And Tat Man, through your own personal
9 investigation you know is -- what's his name?
10    A. Robert Lee Hinojosa.
11    Q. Robert Lee.
12    A. I believe it's H-I-N-J-O-S-A.
13    Q. Okay. Do you recognize this guy?
14    A. Yes, sir.
15    Q. Jose Clemente Ramos?
16    A. Yes.
17    Q. And those are the shoes he was wearing?
18    A. Appears so.
19    Q. Appear to be the same shoes that you collected,
20 right?
21    A. Yes, sir.
22    Q. You see the tread pattern?
23    A. Yes, sir.
24    Q. Let me ask you this. Are you aware that Max
25 Courtney developed a electrostatic print of a -- of a

98

1 footprint impression on newspaper on the scene?
2    A. Yes, sir, I am.
3    Q. Are you also aware that Max Courtney discovered a
4 footwear impression on the driver side step on Nancy
5 Weatherly's pickup truck?
6    A. Yes, sir.
7    Q. And there was a footwear impression on the other
8 side of Nancy Weatherly's truck that was examined and
9 evaluated as well on the passenger side. Did you know
10 that?
11    A. No, sir.
12         MR. WESTFALL: Okay. Okay. Give me just one
13 second. Okay.
14         Your Honor, I'll pass the witness.
15         Thank you, Lieutenant.
16         MR. CHAMBLESS: Nothing further. Thank you,
17 Detective.
18         THE COURT: May the witness be excused?
19         MR. WESTFALL: He may.
20         (Witness excused.)
21         MR. STRAHAN: State would call Jennifer
22 Nollkamper.
23         (Pause in proceeding.)
24         MR. STRAHAN: She hasn't been sworn, Your
25 Honor.

99

1         THE COURT: Please raise your right hand.
2         (Witness sworn.)
3         THE COURT: Thank you.
4              JENNIFER NOLLKAMPER,
5    Having been first duly sworn, testified as follows:
6                DIRECT EXAMINATION
7 BY MR. STRAHAN:
8    Q. Would you state your name, please.
9    A. Jennifer Marie Nollkamper.
10    Q. And how are you employed?
11    A. I'm a Senior Forensic Scientist with the Fort
12 Worth Police Department Crime Laboratory.
13    Q. Okay. I'm sorry, I can barely hear you. Can you
14 pull that microphone a little bit, please.
15    A. I'm a Senior Forensic Scientist with the Fort
16 Worth Police Department Crime Laboratory.
17    Q. And how long have you held that position?
18    A. I've been with the Crime Lab for almost five
19 years.
20    Q. And specifically what kind of work do you do
21 there in the Crime Lab?
22    A. I'm a firearms examiner.
23    Q. Okay. And is there a field of scientific
24 analysis or study that has to do with firearm and tool
25 mark analysis?

100

1    A. Yes, there is.
2    Q. Could you please tell us basically what's
3 involved in that field of study.
4    A. Firearm analysis is basically the study of
5 identifying cartridge cases and/or bullets or other
6 ammunition components to firearms which they were fired
7 from.
8    Q. Okay. And you -- have you ever testified as an
9 expert regarding firearm analysis?
10    A. Yes, I have.
11    Q. Okay. And how many times have you testified as
12 an expert?
13    A. Approximately seven.
14    Q. What is your educational background and your work
15 experience that qualifies you as an expert in firearms
16 analysis?
17    A. I have a Bachelors of Science degree in
18 Microbiology from Montana State University. I have a
19 Masters of Science degree in Forensic Science with a
20 concentration in criminalistics and advanced investigation
21 from the University of New Haven in New Haven,
22 Connecticut. I have completed a two-year training program
23 which is modeled after the Association of Firearms and
24 Tool Mark Examiners training manual. This training
25 program included both practical and written exercises and

101

1 testing in the area of firearms and tool marks. I have
2 also attended a number of conferences, workshops and
3 manufacturers' armors courses dealing with specific
4 firearms.
5     Q. Okay. And you have testified in courtrooms in
6 the State of Texas as an expert in this field; is that
7 correct?
8     A. Yes, I have.
9     Q. Okay. Now, what exactly does a firearm examiner
10 do?
11     A. I will examine the firearms evidence using
12 various equipment, a compound microscope, and I will look
13 at that and determine if that ammunition, items of
14 ammunition were fired from that particular weapon.
15     Q. Okay. Well, let's talk about weapons, first of
16 all. How is it possible; something has got to get you all
17 the way to the microscope. In other words, what happens,
18 how exactly does a firearm work?
19     A. A firearm, the definition of a firearm is a
20 mechanical device which propels a projectile using the
21 forces of combustion. When a firearm is manufactured,
22 there are a number of marks that are placed on the metal
23 during the manufacturing process. Those marks will impart
24 a unique and random set of individual marks onto those --
25 onto the bullet or the cartridge case. I can then compare

102

1 test fires from the weapon to the evidence items and
2 determine if they were or were not fired from that weapon
3 using those unique marks.
4     Q. Okay. And if -- so that I understand, if we're
5 talking about a handgun with a -- with a hammer, and the
6 hammer would hit a firing pin which hits the shell casing,
7 and that explosion occurs forcing a bullet through the
8 barrel; is that fair to say?
9     A. That's correct.
10     Q. And when that pin is -- is made of metal; is that
11 right?
12     A. Usually, yes.
13     Q. A metal pin hits the back of the shell.
14 That's -- I mean, it's metal coming in contact with metal
15 pretty hard; is that right?
16     A. Correct.
17     Q. Crushing the primer causing combustion and the
18 explosion propelling the bullet through the barrel; is
19 that right?
20     A. That's correct.
21     Q. Okay. And so when the firing pin actually hits
22 the back of the shell casing, it leaves a dent or a mark;
23 is that right?
24     A. That's correct.
25     Q. Okay. And if you were to look at that dent and

103

1 that mark microscopically, could you tell specific --
2 could you have enough characteristics in some cases to
3 match up any shell if it's in good shape and the -- it's a
4 good enough mark? Can you -- do you have enough
5 characteristics of, I guess, marks made into the metal of
6 the shell where you can compare that to the weapon that
7 fired it and say conclusively that that shell casing was
8 fired through that weapon?
9     A. That's possible, yes.
10     Q. Okay. And can you also look at the
11 characteristics of a projectile or bullet that's gone
12 through the barrel of a firearm, and kind of the same way
13 look at the markings that are made and determine whether a
14 bullet was fired through a particular weapon?
15     A. Yes.
16     Q. Okay. Now, whenever you are going to decide to
17 do that, what is the very first thing, if I were to ask
18 you to compare this particular weapon, say a firearm
19 that's a handgun, 9 millimeter, if I were to ask you to
20 compare that to a shell casing found at the scene of an
21 offense and they were not found together, two different
22 things, how would you specifically start your
23 investigation to determine whether that shell casing was
24 fired through that particular firearm?
25     A. After I receive the request, I would go to the

104

1 property room or transfer the evidence, maintain the chain
2 of custody. I would check it for safety. I would perform
3 a function test to make sure that it is functioning
4 properly. Excuse me. During that time I would write down
5 any identifying marks. I would examine the class
6 characteristics such as the rifling, number of grooves and
7 direction of twists, where the safeties are located, if
8 any, any other unique items that may be associated with
9 that weapon. Then I would go to our firing range where we
10 have a water tank, and I would use laboratory ammunition
11 to fire into the water tank and retain the barrel --
12 sorry, excuse me, retain the projectiles and the cartridge
13 cases for examination.
14     Q. Okay. Now, you said something about lands and/or
15 grooves and twists. What is all that?
16     A. When a barrel is manufactured, there is a set of
17 spiral grooves that are manufactured inside that barrel to
18 make the projectile more stable during flight. That
19 manufacturing process causes those -- those lands and
20 grooves to be imparted on the projectile as they come
21 out. There will be actual dips and high areas on the
22 projectile that we can view. That is where a lot of the
23 unique individual marks that I will use to do my
24 comparison are found.
25     Q. And so those lands and grooves, when a bullet is

105

1 forced through the barrel, the lands and grooves are what
2 makes it start to spin as it's going through the barrel,
3 correct?
4      A. That's correct, much like throwing a football, a
5 spiral football.
6      Q. And because -- and I guess the point would be
7 that a bullet flies faster, straighter, harder, more
8 accurately if it's spinning through the air?
9      A. That's correct.
10     Q. Okay. And sometimes, or that will, I guess, make
11 marks onto the bullet from the firearm; is that right?
12     A. Yes, it will.
13     Q. Okay. And you said class characteristics. Do
14 certain makes of firearms have a certain number of twists
15 and a certain, I guess, way of right-to-left lands and
16 grooves that a certain manufacturer will have in most or
17 all of its firearms?
18     A. Yes, they are usually within one class; a
19 manufacturer will have one particular style.
20     Q. Okay. And were you asked in this particular case
21 to compare different bullets and shell casings found at
22 various scenes that are related to this case?
23     A. Yes, I was.
24     Q. Okay. And as part of your practice, whenever you
25 do these comparisons, do you generate a written report?

106

1      A. Yes, I do.
2      Q. And did you generate a written report in this
3 case?
4      A. Yes.
5          MR. STRAHAN: May I approach, Your Honor?
6          THE COURT: Yes, sir.
7      Q. I have handed you what's been marked as State's
8 Exhibit No. 226. Can you tell us what that is?
9      A. This is a copy of my report and notes from my
10 case number FW10-06104, and I believe the Johnson County
11 number S10-15645.
12     Q. Okay. If there were different crime scenes that
13 shell casings and bullets came from, and we wanted to
14 compare them all, would your report contain several case
15 numbers?
16     A. Yes.
17     Q. Okay. And, in fact, did you generate multiple
18 reports in this specific case?
19     A. Yes, I did.
20     Q. Okay. And did you also, in each one of those
21 reports entitled -- I guess the top of it, the case report
22 having to do with the Fort Worth P.D. cases that it was
23 associated with or in this case the Johnson County case?
24     A. Yes, I did.
25     Q. Okay. And did you also list all the associated

107

1 cases in each report and kind of have a master list in
2 every report that contains all of your findings on all the
3 casings?
4      A. Yes, I did.
5      Q. And bullets. Okay. Is this State's 226 a -- the
6 actual report that you came up with in this case?
7      A. It's a copy of it, yes.
8      Q. But does it appear to be the report, the exact
9 report without any alterations or changes?
10     A. Yes, it does.
11         MR. STRAHAN: I would offer State's 226.
12         MR. HEISKELL: No objection, Your Honor.
13         THE COURT: Admitted.
14         (State's Exhibit No. 226 admitted.)
15     Q. (BY MR. STRAHAN) I have also laid in front of
16 you some State's Exhibits that have already been admitted
17 into this case. Each one of them has a State's Exhibit
18 number along with a projectile or a shell casing inside
19 them. Okay. And there also is a bag that these things
20 had come to court in sealed with a lot of markings
21 considered with chain of custody and things like that.
22 For example, in State's 225, can you look on the bag that
23 it came in. Do you see your markings on this bag?
24     A. Yes, I do.
25     Q. Okay. And I will represent to you that your

108

1 markings, well, they're on all of these. Chain of custody
2 is complete. These items are already in evidence. Okay.
3 And I'm going to ask you which items you compared, and
4 make a list, if I could, of all the items you compared in
5 your report.
6      A. Okay.
7      Q. Do you have your report, your own copy in front
8 of you?
9      A. Yeah, let me take a look here.
10     Q. First of all, I'm going to have you take a look
11 at State's 29, which is contained within State's Exhibit
12 29-A. Can you take a look at State's 29. You can see how
13 that's marked. And tell us what that is.
14     A. It's a Hi-Point Model C9 pistol, 9 millimeter.
15     Q. Okay. And can you tell us specifically something
16 about the Hi-Point as a manufacturer of those types of
17 pistols.
18     A. Hi-Point is unique because the manufacturer
19 rifles the barrels in a nine left, which is very
20 uncommon. In fact, it's the only known manufacturer to
21 use the nine left, left-handed twist on the land/groove
22 impressions.
23     Q. Okay. And so if a bullet were to be fired
24 through that or if you found any bullet that had those
25 specific nine left lands and grooves, can you conclude,

109

1    just based on that, that it was at least fired through a

2    Hi-Point pistol?

3        A. Yes, I can.

4        Q. Can you also determine by looking at the

5    projectile, if you have enough of it, the size of the

6    round, whether it be a 38 or 9 millimeter, whatever it is?

7        A. I can put it in a caliber class, yes.

8        Q. And so you can take a look at a bullet with your

9    microscope and look at these lands and grooves and

10   determine that this is a 9 millimeter fired through a

11   Hi-Point 9 millimeter handgun; is that correct?

12       A. Yes.

13       Q. And you -- is there some specific history with

14   the manufacturer of Hi-Point why it's the only one that

15   has that particular land and groove setup?

16       A. The manufacturer attends a number of our

17   conferences, and over time he has learned that his weapons

18   are used by criminals to do bad things, so he, in order to

19   help us out, has manufactured them uniquely so that we can

20   easily identify that particular class of weapon. We

21   can't -- the nine left doesn't allow us to identify back

22   to a specific Hi-Point, but we can say it's from a

23   Hi-Point firearm.

24       Q. Okay. And so the manufacturer knowing -- is that

25   an expensive, like really good handgun?

110

1        A. In my personal opinion, it's not an expensive

2    handgun, no.

3        Q. Okay. And I guess there's -- everybody has their

4    own opinion about that, would you agree?

5        A. I -- yes.

6        Q. And so have you personally seen and had the

7    occasion to do some scientific testing based specifically

8    on State's No. 29, State's Exhibit No. 29, the

9    9 millimeter pistol?

10       A. Yes, I did.

11       Q. Okay. Did you assign a specific number in your

12   lab so that you can keep track of this item number was

13   tested against all these other item numbers?

14       A. Yes, I did.

15       Q. What is the lab number you used for this item?

16       A. 8443-03.

17       Q. Now I'm also going to hand you State's Exhibit

18   No. 75. Will you take a look at this, and 75-A. Take a

19   look at what is 75-A, and if you would, tell me, please,

20   what that item is.

21       A. It's a Hi-Point pistol magazine.

22       Q. Okay. And was that something that came with this

23   particular Hi-Point 9 millimeter pistol whenever you

24   received this in evidence from Mike Gaudet?

25       A. Yes.

111

1        Q. And did you assign a specific number in your

2    report to the magazine?

3        A. I assigned the same number, the 8443-03.

4        Q. Okay.

5        A. Sorry. Excuse me. It's 8443-04. I'm sorry, I

6    misspoke.

7        Q. All right. There's a lot of writing on there; is

8    there not?

9        A. Yes, there is.

10       Q. Can you tell us something about that magazine?

11   How many bullets or how many shells does that particular

12   magazine hold?

13       A. I'll have to refer to my notes quickly. That

14   magazine has a capacity of eight rounds.

15       Q. Okay. And is it possible for this particular

16   Hi-Point weapon to have one in the chamber and all eight

17   of those rounds within the magazine altogether?

18       A. Yes, it is.

19       Q. And so does the pistol itself have the capability

20   of having nine live rounds in it?

21       A. Yes.

22       Q. Okay. Can you tell us one thing, what is the

23   difference between centerfire cartridges and rimfire

24   cartridges?

25       A. In a rimfire cartridge, the primer which is --

112

1    the primer material is basically a -- an explosive which

2    will explode when it is hit with something. So in the

3    rimfire, that material is placed around the edge of the

4    cartridge case, around the bottom. So it is hit there on

5    the rim.

6        In a centerfire, there is a primer containing

7    that same material in the middle. And so that primer,

8    when it is hit, the primer will explode and cause the

9    reaction with the gunpowder inside the cartridge.

10       Q. Again, are those types of weapons specific, of a

11   particular pistol, is it specific to only being able to

12   fire rimfire versus centerfire or can the same weapon fire

13   both?

14       A. It will only fire one or the other.

15       Q. Okay.

16       A. Generally.

17       Q. All right. And so I guess you would have to know

18   something about that weapon if you were going to go buy

19   some new ammunition?

20       A. Correct.

21       Q. Because if you didn't know something about that

22   weapon and you were to buy rimfire versus centerfire, it

23   wouldn't actually work, would it?

24       A. Correct.

25       Q. You would have to put some thought into that

113

1 before you reloaded it or bought some new ammunition,
2 would you not?
3    A. Yes, you would.
4    Q. You would have to be accurate for it to work?
5    A. Correct.
6    Q. Okay. Now I'm also going to show you State's
7 Exhibits 73-A and 74-A. Can you take a look at that and
8 tell me if you have seen those before?
9    A. Yes, I have.
10    Q. What are they?
11    A. They are unfired cartridges, 9 millimeter,
12 Federal.
13    Q. Okay. And are there many, many brands of
14 9 millimeter cartridges out there that are easy to come
15 by on the market from Walmart or, you know, Target,
16 wherever --
17    A. Yes, there are.
18    Q. -- Academy? Yes, there are?
19    A. Uh-huh.
20    Q. And just if you could estimate, you may not know
21 this, about how many different brands can the general
22 public get of ammunition for a 9 millimeter?
23    A. I would have to completely guess, ten -- maybe a
24 hundred. There's a very large number of different
25 manufacturers for 9 millimeter.

114

1    Q. Okay. And also in those, say, okay, let's talk
2 about Federal particular ammunition. Federal makes
3 9 millimeter obviously ammo or ammunition for 9 millimeter
4 handguns; is that right?
5    A. Correct.
6    Q. And do you, as part of your job, have to go out
7 and, I guess, obtain test fire ammunition in some cases if
8 you get a weapon where you need more ammunition to test it
9 or a weapon that you don't see very often? Do you have to
10 get or -- you know, get some new ammo sometimes?
11    A. Yes, we do. We try to maintain a comprehensive
12 ammunition library, but it's difficult.
13    Q. Okay. And just generally speaking, if you were
14 to go to Walmart or Academy, some place, the Federal
15 ammunition, if you know, how many, generally, comes in a
16 box if it's centerfire 9 millimeter?
17    A. Anywhere from 20 to 50.
18    Q. Okay. And so you don't have boxes of 10, do
19 you? Have you ever seen that?
20    A. I haven't personally seen one, but I wouldn't be
21 surprised if they existed.
22    Q. Okay. But generally speaking, 20 to 50; is that
23 correct?
24    A. About, yes.
25    Q. Okay. And are these particular ones, do they

115

1 come with the State's Exhibit No. 29, were they together
2 with that?
3    A. Yes.
4    Q. Okay. And were there a couple of extra live
5 rounds that also came with that?
6    A. Yes, there were.
7    Q. So you had a total of four; is that right?
8    A. Total of four, correct.
9    Q. Did you actually fire any of those rounds in your
10 testing?
11    A. Yes, I consumed two in testing.
12    Q. And so if originally you were brought with four,
13 when it left your lab, it's going to have two, and that
14 would be why?
15    A. Because I consumed two in testing. The fired
16 rounds are maintained at the Crime Laboratory.
17    Q. Okay. I'm going to hand you what has been
18 admitted into evidence as State's 224 and 225. Would you
19 tell me if you have seen those before.
20    A. Yes, I have.
21    Q. Okay. And can you tell us what 224 is?
22    A. 224 is a cartridge case, Federal, 9 millimeter.
23    Q. Okay. And can you look on this bag and see what
24 the original, whenever that was collected, what that
25 original item was?

116

1    A. The original item number is BRB-01.
2    Q. Okay. And I will represent to you that this
3 shell casing came near the body of Nancy Weatherly who was
4 murdered in Godley, Texas. There's been testimony to that
5 already. And what is the other one, 225, what is that?
6    A. It's a fired projectile.
7    Q. Okay. And can you tell us if you've seen that
8 before?
9    A. Yes, I have.
10    Q. Okay. And that fired projectile, we're talking
11 about a bullet that's already been fired through a weapon,
12 correct?
13    A. Correct.
14    Q. Okay. Can you tell what the original number was
15 when that was originally collected?
16    A. BRB-16.
17    Q. And I will represent to you again that this
18 particular bullet was found on the kitchen table in Nancy
19 Weatherly's home in Godley, Texas. Now, did you assign
20 specifically in your own report a corresponding number so
21 that you could keep track of your own number for these two
22 items?
23    A. I did not. I maintained the Johnson County
24 numbers.
25    Q. Oh, you did. Okay. So your number for State's

117

1  224 would still be BRB-01; is that correct?
2      A. That's correct.
3      Q. And your number for -- yeah, your number for the
4  fired bullet would also be then BRB-16?
5      A. That's correct.
6      Q. All right. Okay. I'm going to hand you two
7  exhibits that have been admitted as State's Exhibit 96-A
8  and 95-A. Can you tell us what those are? Can you tell
9  us what State's Exhibit 96 is?
10     A. 96 are four Federal 9 millimeter cartridge cases.
11     Q. And did you assign a specific lab number of your
12 own to those?
13     A. The number I assigned to these are 8410-01 A.
14 through D.
15     Q. Was there a Fort Worth P.D. case number
16 associated with those particular cases?
17     A. Yes. The Fort Worth P.D. number is 10-068302.
18     Q. Okay. And I will represent to you that these
19 cases were collected at the scene of a drive-by shooting
20 at the home of Juan Ramirez, based on that Fort Worth case
21 number. Can you also take a look, if you would, at
22 State's No. 95-A, and just tell us what that is?
23     A. These are six fired projectiles.
24     Q. Okay. And did you assign your own specific -- by
25 the way, does this come from the exact same Fort Worth

118

1  P.D. case number as what I just represented to you were
2  the cases found at the scene of the Juan Ramirez drive-by
3  shooting?
4      A. Yes, it does.
5      Q. Okay. And what number did you assign your lab
6  for these six fired projectiles?
7      A. 8410-02 E. through J.
8      Q. And have you seen these before?
9      A. Yes, I have.
10     Q. In fact, all the items that I'm showing you to
11 this point, you received those in evidence and you also
12 tested them in relation to State's Exhibit No. 29, this
13 specific 9 millimeter Hi-Point firearm; is that correct?
14     A. That's correct.
15     Q. Okay. All right. I'm going to hand you what has
16 been admitted as State's Exhibit No. 130. Can you tell us
17 if you have seen that before?
18     A. Yes, I have.
19     Q. And what is that?
20     A. They are two cartridge cases.
21     Q. Okay. And do they have an associated Fort Worth
22 P.D. number on them as well?
23     A. Yes, they do.
24     Q. Can you tell me what that is, please?
25     A. 10-068316.

119

1      Q. Okay. And I'll represent to you that we have had
2  testimony that those cases were found at the scene of a
3  Lowe's parking lot of a scene of an attempted robbery and
4  shooting, a firearm having been fired. Did you also look
5  at those and test those against this particular State's
6  Exhibit No. 29, Hi-Point 9 millimeter handgun?
7      A. Yes, I did.
8      Q. Okay. And finally, going to hand you what has
9  been marked State's 164-A-1-A through A-4-A and State's
10 Exhibit 164-A-5-A. Would you look through those, please.
11     A. These are four cartridge cases and one
12 projectile.
13     Q. Okay. And do they have a Fort Worth P.D. number
14 that's assigned to them as well?
15     A. Yes, it is 10-068307.
16     Q. And this is four cases and one projectile; is
17 that correct?
18     A. That's correct.
19     Q. I will represent to you we've had testimony based
20 on that particular case number that that has to do with a
21 attempted robbery and shooting of an individual on 26th
22 Street in Fort Worth, Texas by the name of Samaniego. I
23 neglected to ask you this before, but on these, can you
24 tell us if you have assigned your own particular lab
25 number that's related to these, the four cases and the one

120

1  fired bullet?
2      A. Yes. My lab number for the cases are 8452-01 A.
3  through D. and the projectile is 8452-02.
4      Q. What is the purpose of assigning all these
5  numbers here? There's already numbers assigned from
6  different agencies, I suppose, but you have to assign your
7  own; is that correct?
8      A. We assign our own through generation of our
9  laboratory information management system. It's actually
10 the last four digits of the Fort Worth Police Department
11 tag number.
12     Q. Okay. And the tag number is what they actually
13 put on these particular items, and then it's associated
14 with a case number, but the tag number is a little bit
15 different; is that right?
16     A. Correct.
17     Q. I didn't ask you on 130, you've already
18 represented that you've looked at those. We talked about
19 that, but I didn't ask what your lab number was on State's
20 Exhibit No. 130.
21     A. 8510-01 A. and B.
22     Q. Okay. Now looking at your report, State's
23 Exhibit No. 226, did you go through and do the testing
24 like you've talked about to try to determine whether any
25 of these shell casings were specifically fired -- whether

121

1  you can tell scientifically whether they were specifically
2  fired through State's No. 21 -- 29, that 9 millimeter
3  pistol?
4      A.  Yes, I did.
5      Q.  And can you tell us, based on your report, what
6  was your conclusion as to BRB-01, the case found at the
7  home of Nancy Weatherly?  Was that fired through State's
8  No. 29?
9      A.  Yes, it was.
10     Q.  Was -- turning now to State's Exhibit No. 96,
11 which would be your lab numbers 8410-01 A. through D.,
12 those four cases found outside the home of Juan Ramirez,
13 were those four cases fired from State's No. 29, the
14 9 millimeter handgun?
15     A.  Yes, they were.
16     Q.  Looking at State's 130, which would be the two
17 cases, your lab number 8510 or item number 8510-01 A.
18 through B., A. and B., are those two cases, were they
19 fired through State's No. 29, that particular 9 millimeter
20 handgun?
21     A.  Yes, they were.
22     Q.  And the four cases from the Samaniego shooting,
23 your lab item No. 8452-01 A., B., C. and D., were all four
24 of those cases fired through State's No. 29, that
25 particular Hi-Point 9 millimeter semi-automatic handgun?

122

1      A.  Yes, they were.
2      Q.  Okay.  And tell us a little bit again about how
3  you went about specifically testing this handgun.  Tell us
4  about the fired casing and how you compared those.
5      A.  After I obtained the test fires, I place them on
6  our comparison microscopes, which is basically two
7  microscopes that you have like in your high school biology
8  class, but they're connected with a special optical bridge
9  which allows an examiner or anyone really to see both
10 sides of the microscope through one set of occulars.  It's
11 much like looking through a pair of binoculars, and so the
12 screen is cut in half and I can see whatever I'm
13 comparing.
14         In this case, the evidence was on one side
15 and the test fires were on the other.  And I was able to
16 line up the individual characteristics and determine that
17 they were indeed fired from that particular pistol.
18     Q.  Okay.  And so that would be a total that you
19 tested that I have got written here.  What is the total
20 number of cases that were tested that I have written up
21 here?  How many total are we just now talking about?
22     A.  11.
23     Q.  So 11 cases tested and all 11 were fired from
24 this particular weapon; is that correct?
25     A.  That's correct.

123

1      Q.  And the capacity of that weapon is how many
2  total?
3      A.  Nine.
4      Q.  And whenever you received it, it had four live
5  rounds, correct?
6      A.  That's correct.
7      Q.  Okay.  And so if it had four live rounds in
8  there, and you know that 11 had been fired, correct, so
9  that would be a total of 15 rounds at some point through
10 that weapon; is that right?
11     A.  That's correct.
12     Q.  Which means is there any possibility of firing 11
13 bullets through this weapon without having to reload it at
14 some point?
15     A.  It's not possible.
16     Q.  Okay.  Now, did you also do a comparison as to
17 the particular bullets that we have talked about, the
18 fired bullets in these cases?
19     A.  Yes, I did.
20     Q.  Okay.  And tell us again how did you go about
21 doing that?
22     A.  Basically the same fashion.  After I obtained the
23 test fires, I placed them on the comparison microscope and
24 looked for individualizing characteristics to make an
25 identification.

124

1      Q.  Let me ask you this.  Just in a general sense, a
2  shell casing in a semi-automatic, well, this particular
3  semi-automatic Hi-Point 9 millimeter, if I'm standing here
4  and I shoot, does the shell casing automatically eject?
5      A.  If it's -- yes, it does.
6      Q.  Okay.  Semi-automatic.  And so it would eject and
7  another one pops up and it's ready to shoot again; is that
8  correct?
9      A.  That's correct.
10     Q.  And what's the difference between an automatic
11 and semi-automatic?
12     A.  An automatic, if you pull the trigger, it will
13 continue to fire until the weapon is empty.
14     Q.  Okay.  And so for a semi-automatic, it reloads as
15 long as there are shell casings in the magazine, but you
16 still have to pull the trigger each time?
17     A.  That is correct.
18     Q.  And the shell casings on this particular weapon,
19 how do they eject?
20     A.  I'm sorry, I don't understand.
21     Q.  Whenever you fire a shell casing, it doesn't stay
22 in the weapon, does it?
23     A.  No, it does not.
24     Q.  Okay.  Does it eject out?
25     A.  Yes, that's correct.

**125**

1    Q. How does it do it on this one?
2    A. As the slide moves rearward, the extractor will
3  pull the projectile -- or sorry, the cartridge case out
4  and the ejector will hit the cartridge case and it will
5  fly out the ejection port.
6    Q. And do the manufacturers of not just this one but
7  all weapons, do they specifically make it come out at an
8  angle in a direction so, number one, it doesn't pop up and
9  hit you in the face?
10    A. I believe they attempt to do so, yes.
11    Q. Okay. All right. And do a lot of them have like
12  a right ejection, up to the right or something like that,
13  something like that?
14    A. Under ideal circumstances. There are a lot of
15  factors that can play into that though.
16    Q. It could jam, it could hit something on the way
17  out, it could flip a different direction?
18    A. That's correct.
19    Q. But the point is for that to automatically eject
20  away from the weapon so it's ready to fire again?
21    A. That's correct.
22    Q. Okay. All right. And so a shell casing, when it
23  comes out of a gun, just generally speaking, it would fly
24  off and land somewhere; is that fair to say?
25    A. That's correct.

**126**

1    Q. Okay. And if conditions were perfect, no -- if
2  it's outside, no rain or wind or something running over
3  it, if it -- it would fall and sit there; is that right?
4    A. That's correct.
5    Q. Okay. What happens, generally speaking, to a
6  bullet whenever it comes out of a gun?
7    A. It will fly through the air in a parabolic shape
8  with a curve on it. It will start off nice and flat. And
9  then as it go -- as it continues in its path, it will go
10  down.
11    Q. Okay. And so how many -- I -- this is probably
12  an unfair question, but how many bullets and shell casings
13  do you think you've reviewed in your career? Big number?
14    A. I've completed approximately a hundred, over --
15  I've completed over a hundred cases dealing with firearms
16  in my career.
17    Q. And I guess what I'm getting at is when a bullet,
18  if you're asked to compare a bullet with a shell casing,
19  it's because that bullet was or the shell casing were
20  believed to have been involved in a crime, correct?
21    A. That's correct.
22    Q. Okay. And in that particular case, they are
23  retrieved as evidence?
24    A. That's correct.
25    Q. And so somebody would have to either dig them out

**127**

1  of a person's body or find them at a crime scene, dig them
2  out of a wall, there's lots of things, correct?
3    A. Correct.
4    Q. Okay. And so does a bullet itself, generally
5  speaking, is a bullet in better shape or worse shape as a
6  piece of evidence in your experience than a shell casing
7  that simply ejects and falls to the ground?
8    A. A projectile will often hit something in flight.
9  It has to stop in some fashion, so it's often damaged.
10    Q. Okay. And -- and if it whether -- yeah, whether
11  it goes through a person's bones or through a wall or
12  whatever, generally speaking, unless it falls and then
13  just falls from the sky and gently lays on the ground,
14  there's probably some damage to that, correct?
15    A. That's correct.
16    Q. And are the components of a general projectile of
17  a bullet, is that made of the same thing as the jacket
18  that -- and the shell casing?
19    A. I'm sorry, could you repeat.
20    Q. The bullet is made -- the projectile itself, is
21  it different from the jacket that it's fired through and
22  the shell casing?
23    A. Oh, the casing and the projectile are usually
24  made of different material.
25    Q. Okay. And is the bullet generally made of lead

**128**

1  or some kind of component like that?
2    A. In this case, they were all jacketed with copper
3  with a lead core.
4    Q. Okay. So the jacketing copper, which means the
5  shell casing had copper?
6    A. The projectile was a copper jacket. The casing
7  itself was brass.
8    Q. Okay. And so the projectile itself would be
9  copper jacketed but it's lead on the inside?
10    A. Correct.
11    Q. Okay. Is lead a hard or soft substance compared
12  to these other materials?
13    A. It is a soft substance.
14    Q. And so does that tend to get damaged more than a
15  harder substance would?
16    A. Yes, it will be damaged more.
17    Q. For those reasons, is it easier for you, based on
18  how you get these types of things into your lab, is it
19  harder or easier to do your comparison and get conclusions
20  on a bullet or the shell casing?
21    A. In general, shell casings are easier to make an
22  identification from.
23    Q. Okay. But it's still possible to get an
24  identification from both?
25    A. Yes, of course.

129

1    Q. If a bullet is in poor shape or a particular
2 weapon doesn't make good enough individual markings on it,
3 can you still see in cases, based on other types of
4 markings like the lands and grooves, that it came from a
5 particular type of weapon?
6    A. Yes, I can.
7    Q. And did you do a comparison on all of the bullets
8 in -- that I've written on the board that you've included
9 in your report?
10    A. Yes, I did.
11    Q. Okay. Let's talk about BRB-16 in your report.
12 Bullet found next to the body of Nancy Weatherly. What
13 can you tell us? Do you know, can you say scientifically
14 that that bullet was specifically fired through this
15 9 millimeter handgun?
16    A. I cannot.
17    Q. Okay. And why can you not?
18    A. There were -- was damage done to the
19 projectiles, and I was unable to, without a doubt, in my
20 experience, say that it was fired from that particular
21 weapon.
22    Q. Okay. And so if you don't have enough on that
23 basic bullet, does that mean it was most definitely not
24 fired through that weapon or does it mean you just don't
25 have enough to say scientifically that it was?

130

1    A. I can't say whether it was or was not fired from
2 that weapon.
3    Q. So specifically your results, on your results on
4 this projectile found in the home of Nancy Weatherly, you
5 didn't believe you had enough to say, yes, out of this
6 specific weapon, or no, correct?
7    A. Correct.
8    Q. So you didn't say it was and you also didn't rule
9 it out?
10        MR. WESTFALL: Object to leading, Your Honor.
11    A. Correct.
12        THE COURT: Sustained.
13    Q. (BY MR. STRAHAN) Could you tell anything else?
14 If you can't tell specific to this handgun, were you able
15 to determine anything else? Did you have enough
16 characteristics to do that?
17    A. I had enough characteristics to determine that it
18 was nine left and that it was fired from a Hi-Point
19 firearm.
20    Q. So while you didn't have enough markings and
21 characteristics in your own mind to determine that it was
22 with this specific handgun, you can tell us that it was
23 fired through a Hi-Point 9 millimeter semi-automatic
24 handgun?
25    A. That is correct.

131

1    Q. Okay. Let me ask you this. We -- in regard to
2 other things, like fingerprints, are you familiar with
3 generally, not that you're an expert in that area, but are
4 you familiar with how fingerprints work, where they look
5 at, you know, these different markings specifically and
6 curls and whatever? Are you --
7    A. Right.
8    Q. Do you understand how that kind of works?
9    A. In general terms, yes.
10    Q. And do you know whether or not in the past there
11 has been specific, like FBI or other rules as to how many
12 specific markings you have to have before you can call it
13 the same print?
14    A. I believe there's some debate whether or not
15 there should be a certain threshold of identifying marks
16 within the latent print field.
17    Q. What I'm getting at is, do you have that in
18 yours? Can you find marks that match up, but is there
19 a certain threshold number that you say, hey, I need
20 two more to call it conclusively fired through a weapon,
21 or I need this many differences to say it absolutely was
22 not?
23    A. I don't particularly use a certain number, but in
24 this case I did find some similarities. They just weren't
25 enough for me personally to determine that that was -- the

132

1 projectile was fired through that weapon.
2    Q. Let me ask you this. The casing themselves,
3 we've had a conversation about how they're generally in
4 better shape. Were they in better shape than the
5 projectiles overall in all these cases?
6    A. Yes, they were in better shape overall and
7 they're also marked better.
8    Q. Marked better. And again, you looked at all
9 those, found they were fired through that particular
10 weapon, correct?
11    A. Correct.
12    Q. Do you think that any reasonable firearm examiner
13 would differ with your opinion on the cases?
14    A. I don't believe so, no.
15    Q. That's real obvious right there, correct?
16    A. Correct.
17    Q. Okay. Let's talk about the six fired bullets,
18 your lab numbers 8410-02 E. through J. Were you able,
19 based on your analysis of those through the microscope, to
20 find enough characteristics to say conclusively that it
21 was or was not fired from these -- this particular
22 handgun?
23    A. I did not find enough individual characteristics
24 to determine if it was or was not fired from that
25 particular weapon.

133

1    Q. Okay. And were you -- and this is kind of the
2  same discussion we just had on the other one. Did it have
3  similarities?
4    A. There were some similarities, yes.
5    Q. Just not enough for you to say conclusively it
6  was fired out of this particular weapon?
7    A. That is correct.
8    Q. Did you find enough characteristics to determine
9  whether what type of handgun that all six of these fired
10  bullets came from?
11    A. Yes, they were all nine left, which would
12  indicate they were from a Hi-Point firearm.
13    Q. Okay. All of them?
14    A. Yes.
15    Q. Okay. And finally, the one fired bullet in
16  Samaniego case, your item No. 8452-02, were you able to
17  find enough characteristics to determine conclusively
18  whether it was or was not fired out of this particular
19  weapon?
20    A. I was not able to determine.
21    Q. Okay. Were you able to find enough
22  characteristics to determine what type of weapon, what
23  class of weapon actually fired that?
24    A. Yes, it was fired from a Hi-Point firearm.
25    Q. Okay. So to, I guess, summarize, and in your

134

1  written report, in looking at all of these items, you --
2  all these items establish conclusively to a scientific
3  certainty that all the cases we've listed there were fired
4  through this particular weapon?
5    A. That is correct.
6    Q. Okay. And while you didn't have enough to say
7  whether each and every projectile was fired through that
8  particular weapon, you did say that based on what you
9  could see on those items, they were all fired through a
10  Hi-Point 9 millimeter semi-automatic handgun?
11    A. That is correct.
12    Q. Okay. And you said you personally, I guess,
13  could not make the call on all of the bullets. They
14  didn't have enough characteristics for you; is that
15  correct?
16    A. That is correct.
17    Q. On any of those bullets, did any of them have
18  enough characteristics for you to rule them out as having
19  been fired through that particular weapon?
20    A. No, they did not have enough characteristics to
21  rule out.
22    Q. All of them were fired through a Hi-Point
23  9 millimeter?
24    A. That is correct.
25        MR. STRAHAN: I'll pass the witness.

135

1            CROSS-EXAMINATION
2  BY MR. WESTFALL:
3    Q. Ms. Nollkamper, I'm Greg Westfall.
4    A. Hello.
5    Q. Tell us again -- I represent Mark Soliz, by the
6  way. Tell us again about the school that you went through
7  after you got your masters degree.
8    A. It was a in-house Fort Worth Police Department
9  Crime Laboratory, and it was a two-year program. It was
10  modeled after the Association of Firearms and Tool Mark
11  Examiners training manual. And it included modules on
12  cartridge case comparison, firearm functionality testing,
13  bullet comparison, serial number restoration, a number of
14  other modules. There were practical and written
15  examinations as well as practice, homework-type materials.
16    Q. And it sounds like what y'all learned in there
17  was the state-of-the-art of the art and science of tool
18  mark examination in what you do?
19    A. Yes, it was.
20    Q. And you're with the Fort Worth P.D., right, Fort
21  Worth P.D. Crime Lab?
22    A. Yes, I am.
23    Q. And do y'all have -- use state-of-the-art
24  equipment there, up to date?
25    A. It is the -- we have the normal microscopes that

136

1  most labs have.
2    Q. Okay. And the microscope that you're using is a
3  comparative microscope?
4    A. That's correct.
5    Q. And how long has that technology been around?
6    A. Since the '30s.
7    Q. And so the comparative microscope that you're
8  using is -- I mean, they didn't come out with some new
9  invention in the world of comparative microscopes and
10  y'all are behind the times, right?
11    A. No, it's basically the same microscope that was
12  developed by Dr. Goddard in the 1930s. Mine, of course,
13  is -- has newer optics, has a camera attached. And I
14  believe we got it three years ago, so it's a new scope.
15    Q. Okay. I'm picking up on the upshot of all of
16  this is that there are class characteristics of bullets
17  and then there's -- or of the tool marks that the rifle
18  makes or the pistol makes, there's class characteristics
19  and then there's individual characteristics?
20    A. That's correct.
21    Q. And that the class characteristics would make it
22  consistent that a round was fired out of a particular
23  weapon, right? If you looked at the class characteristics
24  and you knew the class characteristic, you could say those
25  are consistent?

137

1    A.  Those fired out of a class of weapons, not a
2  particular weapon.
3    Q.  Okay.  So for the particular weapon, then I guess
4  we need the individual characteristics?
5    A.  That's correct.
6    Q.  Did you bring any of your pictures?
7    A.  I do have some of my pictures, yes.
8    Q.  I have copies of them.
9    A.  Of -- I have a number of --
10    Q.  Are they Xeroxed copies?
11    A.  No, they're not.  I have a number of -- these are
12  the ones related to this particular case.
13    Q.  Okay.  Then hold on to these.  Am I remembering
14  right that you did competitive shooting when you were
15  young?  That's how you got interested in guns?
16    A.  Yes, I did do competitive shooting when I was
17  younger, yes.
18    Q.  And tell me, how long you been working with guns
19  now?
20    A.  Oh, I've been around guns my entire life, but as
21  far as a firearms examiner, been five years.
22    Q.  Okay.  You still liking it?
23    A.  Yeah.
24    Q.  See, what I don't want to do, I don't want to
25  take yours away from you.  So I want to put these into

138

1  evidence, but I want to use these if the Court will allow
2  me just to put them on the screen.  That's why I'm doing
3  this.  Do you have these two in your deal there?  Tell you
4  what, those are good enough, aren't they?
5    A.  Yeah.
6    MR. WESTFALL:  Can I have these two marked.
7    (Defendant's Exhibit Nos. 9 - 10 marked.)
8    MR. WESTFALL:  Thank you.
9    Q.  I'm showing you what have been marked now as
10  Defendant's 9 and 10.  Do you recognize those?
11    A.  Yes, I do.
12    Q.  And are those pictures through your -- your
13  comparative microscope on tool marks having to do with
14  this case?
15    A.  Yes, they are.
16    MR. WESTFALL:  Your Honor, we move for
17  admission of Defense 9 and 10.
18    MR. STRAHAN:  Oh, I have no objection.
19    THE COURT:  Defendant's 9 and 10 are
20  admitted.
21    (Defendant's Exhibit Nos. 9 - 10 admitted.)
22    MR. WESTFALL:  Thank you, Your Honor.
23    Q.  (BY MR. WESTFALL)  Ms. Nollkamper, this here,
24  please tell us what this is.
25    A.  That is a photomicrograph of the breech face area

139

1  of a primer of the items 8510-01A, and I was comparing it
2  to test fire from the Hi-Point pistol, 8443-03.
3    Q.  I've just given you a laser pointer.  Could you
4  please just kind of show us the different things that we
5  see on this?
6    THE COURT:  You can stand up.
7    A.  This right here is what's called the primer
8  pocket -- or sorry, the firing pin impression.  That's
9  where the firing pin actually hits the primer and
10  causes the pressure-sensitive explosion to occur.  These
11  marks here are all breech face marks.  They occur when
12  the cartridge case or cartridge case primer, in this
13  particular instance, hits against the breech face of
14  the pistol.
15    So where the -- there's a flat area.  In
16  that flat area, there's a hole where the firing pin
17  will come through.  That area will have some
18  manufacturing marks that are -- microscopically show up
19  like this.
20    This line right here down the middle --
21  sorry, my hand is shaking.  This line you can see down the
22  middle, that's where my scope splits.  So on the left-hand
23  side is the evidence, and on the right-hand side is the
24  test fire.
25    Q.  Okay.  And the test fire was one of the bullets

140

1  that was actually recovered, right?
2    A.  Test fire No. 2 would not be.  I believe 5 and 6
3  were the ones that were recovered.  I fired three from our
4  lab and then --
5    Q.  Oh, okay.  So this would be some from your stock?
6    A.  True, yes.
7    Q.  Fired out of the same pistol into the water?
8    A.  Right.
9    Q.  And so on this side over here, this is the --
10  this split right here is where the microscope has two
11  different lenses?
12    A.  Correct.
13    Q.  And this round thing here, are we looking at the
14  primer here?  Is that what this is?
15    A.  That's correct.  The primer is what looks in
16  this, because it's magnified, the half moon area would be
17  the -- where the primer is.
18    Q.  And then this right here would be the dividing
19  line between two different bullets.  This is the one
20  you're trying to match up?
21    A.  That's correct.
22    Q.  What conclusion were you able to reach based upon
23  this?
24    A.  That this particular cartridge case was fired in
25  a -- in the Hi-Point firearm.

141

1    Q. Okay. And how were you able to tell?
2    A. Well, as you can see, this particular one has
3  lots and lots of marks. It starts all the way up at the
4  top, and you can see how they come across all the way, all
5  the way down really.
6    Q. Now, does it matter -- what is this thing right
7  here? Does that thing matter?
8    A. When I line them up -- it does not matter. When
9  I line them up, because I'm -- I have a small area I'm
10  taking a picture of, I can't always get everything in, in
11  the frame. We don't actually do the identifications off
12  of the photographs. The photographs are basically just
13  notes that we keep to remind us for the future what we saw
14  that day instead of having to pull all the evidence out
15  again, because it's usually here in court.
16    Q. I get it. I get it. Now, this here is
17  Defendant's No. 10, and kind of looks like we're looking
18  at a primer, right?
19    A. Yes, that's the same general area. It's lower
20  down on the primer. Because these are my notes and
21  they're to remind me, I try to take a -- I don't -- I try
22  to take pictures of different places on the primer so I
23  have a good representation. Back before they had
24  photomicrographs ability, they would actually draw these
25  out. So this is just a easier way and more accurate way

142

1  of taking notes basically.
2    Q. And more thorough way, for sure?
3    A. For sure.
4    Q. And these are called breech face marks?
5    A. That's correct.
6    Q. What is a breech face?
7    A. As I said previously, in the chamber on the back
8  of the slide in this particular case, there is a flat area
9  where the firing pin comes through. The cartridge case,
10  the head of the cartridge case rests upon that when it is
11  in battery and ready to fire. When the firing pin comes
12  through and strikes that primer, that -- the power from
13  that explosion of the primer and then subsequently the
14  gunpowder within the cartridge, causes that cartridge case
15  and, in this case, the primer, to hit against that flat
16  area. And during manufacturing, marks were left behind by
17  the different finishing processes that are imparted on the
18  primer.
19    Q. Okay. So it just -- these lines and stuff
20  from forming the breech face actually just get pounded
21  into the -- because of the force from the bullet going
22  backwards?
23    A. Essentially, yes.
24    Q. Is this another picture from the --
25    A. It's a picture from one of the related cases,

143

1  yes.
2    Q. Yeah, something have to do with this case or this
3  whole situation? This one too?
4    A. Yes, it is.
5      MR. WESTFALL: Could I have these marked.
6      (Defendant's Exhibit Nos. 11 - 12 marked.)
7    Q. Now I did that backwards. I'm showing you what's
8  marked 11 and 12. These are the ones you just said that
9  you identified, right?
10    A. Yes, they are.
11      MR. WESTFALL: Your Honor, I'll move for
12  admission of Defendant's 11 and 12.
13      MR. STRAHAN: I don't have any objection.
14      THE COURT: Admitted.
15      (Defendant's Exhibit Nos. 11 - 12 admitted.)
16    Q. (BY MR. WESTFALL) Please tell us what we're
17  looking at here. I -- first of all, is it in focus? Is
18  this in focus?
19    A. It looks relatively in focus.
20    Q. Okay. Please tell us what this is.
21    A. This upper region here is a micrograph of a
22  land impression. This area right here is what we
23  call slippage. And basically slippage is when the
24  projectile is going down the barrel, as it first
25  engages that barrel, it will slip a little bit on the

144

1  land impressions, like as it get -- grabs purchase
2  basically, and it will cause those marks. The lower area
3  with the fewer markers on it is the groove impression, a
4  photo of a groove impression. So it's all one little
5  square of the -- the projectile.
6    Q. Okay. Tell us, please, about the lands and
7  grooves. We've heard that term several times. Could you
8  just tell us what that is? You can draw it if you need
9  to.
10    A. Actually I have a --
11    Q. Oh, okay.
12    A. So basically this is a little plastic
13  representation of what would be a really big barrel if it
14  was complete. The land and grooves are manufactured into
15  the barrel, and they spiral down. You can see how they
16  have a little bit of a diagonal in them. You can imagine
17  that they would continue spiraling that direction. The
18  land impressions are the ones that are raised, hence
19  "land", and the grooves are the lower ones. This adds
20  stability to the projectile in flight.
21    Q. Makes it spin?
22    A. Correct.
23    Q. And hopefully not tumble out, right?
24    A. Correct.
25    Q. So then please show us what makes the land

145

1  impression, what makes the groove, or what are the land
2  impressions and groove impressions on this?
3      A. The upper area with all the marks would be made
4  by this raised portion here, and the lower, the lower part
5  of the picture with the fewer marks would be made by
6  the -- by this, the groove, the lower part.
7      Q. So this here is in a groove and this is a land?
8      A. Basically, yes.
9      Q. And is this one of the -- one of the bullets you
10 were asked to look at?
11     A. Yes, it is.
12     Q. And this is the actual projectile obviously?
13     A. Yes.
14     Q. That's got the lands and grooves?
15     A. Correct.
16     Q. What conclusion, if any, were you able to reach
17 as a result of this examination?
18     A. I did see some similarities here, but I was
19 inconclusive because they weren't -- they weren't of
20 quality and quantity that would allow me personally to
21 make a identification.
22     Q. And this has a -- a line down the middle, is that
23 -- that's your stereoscope?
24     A. That's -- that's with a comparison scope,
25 correct.

146

1      Q. Now, different manufacturers, I guess, have
2  different amounts of lands and grooves?
3      A. That is correct.
4      Q. Why?
5      A. It's their choice. It's their -- from my
6  personal reading of literature, there's always been some
7  debate as to whether more or less lands and grooves and
8  which twist is better, but really it's just a choice of
9  the manufacturer.
10     Q. I don't know, just common sense, it would seem
11 like if you had more of those things it would, like, slow
12 your bullet down?
13     A. I can't comment on that. I'm not versed in that
14 particular subject.
15     Q. And when you say a twist, what do you mean?
16     A. That would be the spiral. It's going to -- the
17 spiral is going to twist one direction or the other.
18     Q. And some of them are right-hand and some of them
19 are left-hand?
20     A. That's correct.
21     Q. And Hi-Point is the only one that uses nine?
22     A. It is. Nine left.
23     Q. And they do that because they know that their
24 guns get used in crimes?
25     A. That is correct.

147

1      Q. That's amazing. So, I mean, what does Taurus do
2  or Bersa? There's other cheap brands, right?
3      A. I'm -- off the top of my head, I don't know what
4  their particular class characteristics are, but I know
5  Hi-Point is a nine left.
6      Q. And you've actually met the manufacturer?
7      A. I have met him, yes.
8      Q. Where are they made?
9      A. I believe in Ohio.
10     Q. What did you -- did you study shoe comparisons
11 and stuff when you were in your masters program?
12     A. I had a half a class on it, but not much.
13     Q. Just, I mean, I'm not going to ask you to make
14 any comparisons, but this deal with the class
15 characteristics and individual characteristics, they use
16 the same -- same sort of thing in the shoe comparison, I
17 guess tire comparisons?
18     A. Correct. It's the same general standard
19 operating procedure, yes.
20         MR. WESTFALL: You can sit down.
21         THE WITNESS: Okay. Wasn't sure what was
22 next.
23         MR. WESTFALL: Thank you so much for doing
24 that.
25         I'm finished. Your Honor. Thank you. Thank

148

1  you. Pass the witness.
2         REDIRECT EXAMINATION
3  BY MR. STRAHAN:
4      Q. This is Defendant's Exhibit No. 9, and that's a
5  great picture. You said that this -- these photographs
6  you make to refresh your memory later?
7      A. That is correct.
8      Q. Okay. And I guess as a lay person, we want to
9  just sit and say, wow, if it goes like that, it must be
10 the same. That's a great picture, right?
11     A. Yes, that's a -- that's a very nice looking
12 picture.
13     Q. Who took that picture?
14     A. I was quite happy with that picture.
15     Q. It's a nice picture. It shows a lot. And I
16 can't help it, I guess it's human nature, I just want to
17 look at that picture and go, standing right here with your
18 black and white picture, I can tell that those two cases
19 were from the same exact weapon. That's not fair for me
20 to do, is it?
21     A. No. These are just notes that I keep in my --
22 my -- during my examination.
23     Q. Okay. But is there a lot more to your scientific
24 opinion than looking at these comparison on these two
25 pictures and saying, yep, that's it?

149

1   A. Yes, there is.

2   Q. So there's a lot more to it than that. Now, tell

3 me about, again, what is a slippage mark?

4   A. Slippage occurs when the, like I said before,

5 when the bullet starts traveling through the barrel, it

6 needs to get purchase on those lands and grooves. And it

7 will -- they'll slip just a little bit and cause --

8 they're not up there anymore -- but cause those marks.

9   Q. Now, does it always slip exactly the same?

10   A. It's often you can find some individual marks in

11 slippage. It doesn't -- there isn't always slippage

12 though either.

13   Q. Okay. And so whether there is slippage or not

14 slippage would make a difference even in bullets fired

15 through the same barrel, correct?

16   A. Yes.

17   Q. Okay. And the difference in the slippage

18 because, I guess, the bullet through the explosion has to

19 catch and then start spinning, correct?

20   A. Correct.

21   Q. Okay. And so that is not going to be necessarily

22 as accurate because there's more variables with the

23 slippage and whether there's slippage at -- there at all;

24 is that fair to say?

25   A. That's correct. There's more variables in

150

1 projectiles in general.

2   Q. Okay. And so you said before, it's a lot easier,

3 I guess, to do cases than it is to do bullets, correct?

4   A. That's correct.

5   Q. Okay. I guess if I were to step on a wet floor

6 and slip twice in two days, I might not slip the same way

7 twice; is that fair to say?

8   A. Fair.

9   Q. So in Defendant's Exhibit No. 11, it looks really

10 clear there kind of in the mid-section that there's -- and

11 I hate to even say this, but there's seven or eight or

12 nine lines that match up perfectly, just as what we're

13 looking at. I know that's not the scientific term and you

14 probably hate that, but there's several of these marks

15 that line up perfectly at the bottom in the middle?

16   A. Yes, there are some similarities there, but

17 that's only one of the nine lands and grooves. There are

18 nine of them we have to examine and determine, you know,

19 if there's enough for them to be called.

20   Q. Okay. And so if the only thing you were looking

21 at was that particular land and groove, you might say this

22 particular bullet was fired through that particular gun,

23 if that's a good one that is similar; or is that not fair

24 either?

25   A. I don't believe that's fair because we look at

151

1 the entirety of the projectile. We aren't going to -- we

2 aren't going to make -- it's rare that we would make an

3 identification off of a single land and/or groove.

4   Q. All right. And what part -- I guess what I'm

5 getting at is how big in real life is this picture that

6 we're looking at? What percentage of that bullet or

7 what's left of a bullet are we really looking at, if you

8 can put it in those terms?

9   A. Well, it's been magnified 55 times, so that would

10 be -- it's hard to really quantify, but it's like the top

11 of a pin, like a stick pin.

12   Q. That area is this top of a stick pin like a

13 needle?

14   A. Yeah, like a little flat stick pin. It's a very,

15 very small area.

16   Q. Okay. And you're talking --

17   A. In my best guestimation.

18   Q. The tip of a pin, needle?

19   A. The part you push.

20   Q. Oh, okay, like --

21   A. Not the tip of the pin but the head of the stick

22 pin.

23   Q. I got you. Okay. And so something that tiny,

24 looking at that portion, and it's magnified 55 times to

25 where we can see it like this, correct?

152

1   A. Correct.

2   Q. And, again, on this particular bullet, this one

3 being BRB-16 that I have represented to you was the bullet

4 found at the home of Nancy Weatherly, and so this is one

5 where you said there were not enough to make -- to confirm

6 that it came out of that particular weapon, yet also not

7 enough differences, I guess, to say that it did not?

8   A. That's correct. I didn't have enough quality or

9 quantity.

10   Q. Okay. So it's just inconclusive then?

11   A. Yes.

12   Q. However, you did have an opinion as to whether or

13 not this particular bullet was fired through a Hi-Point

14 9 millimeter specifically, yes?

15   A. Yes, I did.

16   Q. Okay. And in your test firing, you test fired

17 more than one shell or one bullet yourself; is that

18 correct?

19   A. That's correct.

20   Q. Okay. And when you test fire, you fired into a

21 tank of water? How does that work?

22   A. It's really important for us to get a nice,

23 pristine projectile to compare to, if we can. One of the

24 methods is to fire into a large tank of water. Our tank

25 is about 4 by 15 by 4. And what that does is it just

153

1 absorb -- the water will absorb all of the energy of the
2 projectile, and the projectile will fall nicely to the
3 ground or to the bottom of the tank without any damage to
4 the projectile itself. And then we use a retrieval device
5 to get out and take a look at it.
6     Q. Okay. So in a controlled environment like that,
7 if you test fired two bullets, both of them are going to
8 be in as good and pristine, after having been fired, of
9 shape as they can possibly be in?
10    A. Yes, hopefully.
11    Q. And that's not going through a wall or going
12 through someone's body or bone or anything like that?
13    A. That's correct.
14    Q. Okay. Did you compare the two test fired
15 projectiles that you personally test fired?
16    A. Yes, I did.
17    Q. Okay. And did you -- these are ones under your
18 control into that water; is that right?
19    A. Yes.
20    Q. Did you have an opinion, based on your scientific
21 evidence, about those two projectiles that you personally
22 fired holding the same gun, do you have an opinion as to,
23 scientifically, based on that analysis, whether those were
24 fired out of the same particular Hi-Point handgun?
25    A. The test fires did not mark well either, so I

154

1 actually, even knowing that they were fired, you know, me
2 personally firing them and knowing that they came from
3 that particular weapon, it was still difficult to make an
4 identification. So in my notes I put inconclusive,
5 meaning the individual marks didn't really show up very
6 well and it was difficult to see where they had any
7 agreement.
8     Q. So having fired them yourself, you had to write
9 in your own report that it was inconclusive even though
10 you had fired them from the same weapon?
11    A. That's correct. And I use the word
12 "inconclusive" more in my notes to term -- I know their
13 identification. I did it myself, so.
14    Q. Okay. So your memory is, on having fired those
15 two, is very conclusive?
16    A. Yes.
17    Q. Your scientific results on the two that you fired
18 are inconclusive?
19    A. Correct.
20        MR. STRAHAN: I'll pass the witness.
21            RECROSS-EXAMINATION
22 BY MR. WESTFALL:
23    Q. Starting to get the idea we shouldn't go out and
24 buy Hi-Point firearms. Is that -- I mean, is that because
25 the gun is so cheap that you couldn't even do two out of

155

1 the same gun that you watched being fired and then they're
2 really not any good for comparison?
3     A. That's not necessarily the truth. It could be
4 from wear. Even what you would consider, you know,
5 high-end guns can have wear and the barrel can not mark
6 well. It might be the actual ammunition. Every
7 manufacturer manufactures their projectile just a little
8 bit different with a different amount of -- you know, it's
9 a copper jacket but it's not pure copper, so there's
10 different -- it's an alloy, so it might be harder or
11 softer than others. There's a number of reasons why they
12 might not mark well.
13    Q. What's the most popular semi-automatic pistol?
14    A. I do not know that answer.
15    Q. I don't mean brand, I mean caliber.
16    A. I do not know that answer for sure.
17    Q. Certainly a 9 millimeter would be one you see?
18    A. A 9 millimeter is very common, yes.
19    Q. And the ammunition tends to be quite a bit
20 cheaper than, say, a 10 millimeter, some other handgun,
21 because even a 40 caliber --
22    A. In my experience, yes, buying 9 millimeter
23 ammunition is cheaper than 40.
24    Q. Tell us the process -- first of all, did you --
25 did anything I say sound like I was arguing with you about

156

1 your conclusions?
2     A. No.
3     Q. Okay. Good. The process that you did, just let
4 us know the process that you did, because I understand the
5 pictures are your notes, but what I was trying to discover
6 is what was the procedure that you used to make the
7 comparisons? And will the pictures help you to explain
8 it?
9     A. Actually if I might grab a --
10    Q. Yeah, please do.
11    A. These are big plastic projectiles. Basically it
12 would be the same thing as if we were on, you know -- if
13 we're looking through the microscope and we could match up
14 the different lands and grooves here. As you can see,
15 these ones have been manufactured with really large, gross
16 lands so you can see how you -- we would twist it. We
17 would put it on the microscope.
18        What I usually do is I find an area I like
19 that has some nice marks on it, and then I will use that
20 area and then rotate the other one. And then I will
21 rotate it to the next one and rotate it and trying to
22 match it up.
23        Projectiles are a little bit more difficult
24 because they do have so many other surfaces. Breech
25 traces -- or, sorry, the head of the cartridge case,

157

1 there's just one nice, flat surface, but with a
2 projectile, it's a 3-D surface to begin with, so it makes
3 it difficult to see everything all at once because the way
4 a microscope works, it's looking at a slice.  So we're
5 trying to look at something that's looking at slices, but
6 in -- but it's actually 3-D.  So we'll look at -- so --
7 it's the focus, you have to be very careful of the focus
8 and the lighting.
9        And I basically rotate one and then look down
10 the length and the breadth of it to see if I can find any
11 areas that look like they match.  Then I'll rotate it
12 again and do the same thing over and over again until
13 hopefully I find some results.
14    Q.  About how long will you spend looking at a
15 bullet?
16    A.  It really depends on the particular bullet.  A
17 lot of times I find that identifications are shorter
18 because if it's there, it's there.  You -- it's really --
19 you know, it pops out at you.
20    Q.  Yeah.  Science speaks for itself?
21    A.  Exactly.
22    Q.  I would imagine -- well, let me just ask you.  Do
23 you see yourself as, in your scientific evaluations and
24 your scientific conclusions, do you see yourself as being
25 conservative, middle of the road, liberal?  Or is that --

158

1 is there even such a thing in the world of science?  Are
2 the shots just called as you see them?
3    A.  I wouldn't characterize myself as anything in
4 particular, just...
5    Q.  If it's there, it's there?
6    A.  I want to make sure it's there.  Especially, you
7 know, someone's -- when these matters are so important, I
8 don't want to make a mistake.  I want to make sure that if
9 it's there, it's there.
10        MR. WESTFALL:  Excellent.  Thank you.
11        FURTHER REDIRECT EXAMINATION
12 BY MR. STRAHAN:
13    Q.  I asked you before about the casings and whether
14 reasonable scientific minds you thought other firearm tool
15 mark experts could differ on that.  And you were very
16 solid on that.  There's a great, a lot, plenty of marks
17 with characteristics; is that correct?
18    A.  That's correct.
19    Q.  And with less markings whenever something is
20 inconclusive, if another expert were to look at it, could
21 reasonable minds differ on the bullets because of the lack
22 of characteristics that you found?
23    A.  The fewer characteristics, the more likely -- the
24 harder it is to make an identification, and it is possible
25 that someone else may have identified those.

159

1    Q.  With maybe finding something different or a
2 different experience or just that's a closer call, I
3 guess, than how obvious the casings were?
4    A.  Right.  There's a number of factors, you know, if
5 you're using the same microscope, lighting, experience.
6 There's -- it's -- there's a number of factors that could
7 play into that, yes.
8    Q.  Okay.  And as far as these particular Hi-Points,
9 not necessarily being a cheap weapon, but you said
10 something about the amount of usage of the weapon would
11 make a difference on how good of a mark it would make on
12 the bullets; is that correct?
13    A.  That's one of the possible reasons a projectile
14 may not mark well.
15    Q.  If a gun had been used a lot, would it mark
16 better or less, you think?
17    A.  I haven't read any studies or done any work
18 myself, but I would surmise that it would probably mark a
19 little worse.
20    Q.  Okay.  Which means not as --
21    A.  Not as well.
22    Q.  Not as well.  Okay.  And so any kind of damage,
23 I guess, to the interior of the gun, whether it's a
24 worn firing pin, might make a difference on the shell
25 casings?

160

1    A.  That's true.
2    Q.  Okay.  And so if a weapon -- like whenever you
3 were competitively shooting, did you take a lot of good
4 care of your weapons?
5    A.  Yes, I did.
6    Q.  I mean, did you clean them after every use and
7 that sort of thing and maintain them?
8    A.  Yes.
9    Q.  Were you careful with them?
10    A.  Yes.
11    Q.  Did you generally keep them in cases so that they
12 would not get damaged?
13    A.  Yes, I did.
14    Q.  Do you think those weapons would have marked
15 really well?
16    A.  I can't say how well they would mark.  It would
17 depend on a lot of factors, but I did take good care of
18 them, yes.
19    Q.  Okay.  And so if a weapon was used a lot,
20 banged around or dropped, or was just old, do you think
21 it would mark as well as a brand new, pristine, nice
22 weapon?
23    A.  It would depend on manufacturer and a lot of
24 other things.
25        MR. STRAHAN:  I'll pass the witness.

161

1    FURTHER RECROSS-EXAMINATION
2  BY MR. WESTFALL:
3    Q. So that's what I guess I -- my assumption was
4  that maybe you make conservative, more conservative
5  opinions than some other labs might, but I guess what --
6  there could be a reasonable disagreement. You could look
7  at a bullet and someone else could look at a bullet. They
8  could see a match and you would say, for me personally,
9  I'm not going to call it a match?
10   A. That's correct.
11        MR. WESTFALL: Okay. I get it. All right.
12 Thank you so much.
13        FURTHER REDIRECT EXAMINATION
14 BY MR. STRAHAN:
15   Q. And by the same token, you could see one and say,
16 "I see enough here to say that it's definitely not a match
17 as well", correct?
18   A. That's correct.
19   Q. I mean, you could do both. And where you were on
20 all the bullets in this case, including the two that you
21 test fired, was not enough markings for you to
22 conclusively say one way or the other?
23   A. That's correct.
24   Q. However, every single casing --
25        MR. WESTFALL: Object to leading.

162

1    Q. What was the result of every single casing that I
2  have on that board with relation to that particular
3  handgun?
4    A. All the casings on the board were fired from the
5  Fort Worth -- sorry, from the Hi-Point firearm.
6        MR. STRAHAN: Okay. Thank you. I'll pass
7  the witness.
8        MR. WESTFALL: I'm not going to ask anymore
9  questions, Judge.
10        THE COURT: May the witness be excused?
11        MR. STRAHAN: Yes. Thank you.
12        MR. WESTFALL: She may.
13        THE COURT: Thank you.
14        We'll take a 15-minute recess.
15        (Recess taken from 3:20 to 3:31 p.m.)
16        (Jury present.)
17        THE COURT: You may be seated. Ladies and
18 gentlemen, I've reviewed the trial schedule and the
19 progress with the attorneys, and I'm pleased with the
20 progress that we're making and we're on track to being --
21 we've completed a good portion of the work this week. And
22 we do have probably another two weeks, plus or minus a few
23 days, for everybody to have time to present everything
24 that you need to hear. So with that, it's appropriate to
25 recess for the weekend at this time at 3:30 on Friday

163

1  rather than trying to cram something else in in the
2  afternoon.
3        The Court will again remind you that it's
4  very important that you pay close attention to all the
5  rules that I've read you at the beginning of this trial
6  and that I've reminded you of every evening, and that is
7  that you absolutely must not review or read any report of
8  this case in any media, whether it's on the Internet,
9  whether it's in the newspaper, whether it's on the radio
10 or the TV, and that you should not discuss this case with
11 anyone, not even your spouse. And that's a very
12 particularly difficult thing to do, but you're just going
13 to have to say, "I'm taking the weekend off and I'm not
14 going to talk about it right now. Maybe someday when this
15 is over I can talk about it." And go on and enjoy your
16 family and loved ones for the weekend, and come back here
17 and be ready to go Monday morning at the same time.
18        So with that, I can excuse you at this time.
19 And thank you for your attention this week.
20        (Court adjourned.)
21
22
23
24
25

1 THE STATE OF TEXAS )

2 COUNTY OF JOHNSON  )

3              I, Pamela K. Waits, Official Court Reporter

4 in and for the 413th District Court of Johnson County,

5 State of Texas, do hereby certify that the above and

6 foregoing contains a true and correct transcription of all

7 portions of evidence and other proceedings requested in

8 writing by counsel for the parties to be included in the

9 volume of the Reporter's Record, in the above-styled and

10 numbered cause, all of which occurred in open court or in

11 chambers and were reported by me.

12              I further certify that this Reporter's Record

13 of the proceedings truly and correctly reflects the

14 exhibits, if any, admitted by the respective parties.

15              WITNESS MY OFFICIAL HAND this the _3/_ day

16 of _December_ 2012.

17

18 _____
   Pamela K. Waits, Texas CSR #4991

19 Expiration Date:  12/31/13
   Official Court Reporter

20 413th Judicial District
   Johnson County, Texas

21 204 S. Buffalo Avenue
   Cleburne, Texas 76033

22 (817) 556-6041

23

24

25

1              REPORTER'S RECORD

2            VOLUME 43 OF 75 VOLUMES

3          TRIAL COURT CAUSE NO. F45059

4      COURT OF CRIMINAL APPEALS NO. AP-76,768

5  STATE OF TEXAS            )      IN THE DISTRICT COURT
                             )
6  VS.                       )      JOHNSON COUNTY, TEXAS
                             )
7  MARK ANTHONY SOLIZ        )      413TH JUDICIAL DISTRICT

8

9  -----------------------------------------------------

10                    JURY TRIAL

11               GUILT/INNOCENCE PHASE

12 -----------------------------------------------------

13

14

15

16

17         On the 5th day of March, 2012, the following

18 proceedings came on to be heard in the above-entitled and

19 numbered cause before the Honorable William C. Bosworth,

20 Jr., Judge presiding, held in Cleburne, Johnson County,

21 Texas:

22         Proceedings reported by Machine Shorthand and

23 Computer-Aided Transcription. FILED IN

                          COURT OF CRIMINAL APPEALS  ORIGINAL
24
                          JAN 2 2 2013
25

                          Abel Acosta, Clerk

```
 1                    A P P E A R A N C E S

 2  DALE HANNA
    SBOT NO. 08919500
 3  LARRY CHAMBLESS
    SBOT NO. 04086320
 4  MARTIN STRAHAN
    SBOT NO. 00797765
 5  District Attorney's Office
    Johnson County
 6  204 S. Buffalo
    Cleburne, Texas 76033
 7  (817) 556-6801

 8  ELIZABETH CHRISTINA JACK
    SBOT NO. 10445200
 9  Tarrant County District Attorney's Office
    401 W. Belknap Street
10  Fort Worth, Texas 76102-1913
    817-884-1366
11
    ATTORNEYS FOR THE STATE OF TEXAS
12

13  MICHAEL P. HEISKELL
    SBOT NO. 09383700
14  Johnson, Vaughn & Heiskell
    5601 Bridge Street
15  Suite 220
    Fort Worth, Texas 76112-2305
16  817-457-2999

17  GREGORY B. WESTFALL
    SBOT NO. 00788646
18  Hill Gilstrap, P.C.
    1400 W. Abram Street
19  Arlington, Texas 76013
    817-276-4931
20
    ATTORNEYS FOR DEFENDANT
21

22

23

24

25
```

STATE V. MARK ANTHONY SOLIZ   MARCH 5, 2012

3

```
                         I N D E X

                        VOLUME 43

                  GUILT/INNOCENCE PHASE

MARCH 5, 2012                              PAGE   VOL.

Proceeding.....................................   8     43

STATE'S WITNESS         DIRECT        CROSS     VOIR   VOL.
                                                DIRE
CYNTHIA TRUITT          9                              43
BRANDON BLANSIT         18,119,126    104,123          43
MAX COURTNEY            130,162       151,163          43
SUNDAYE LOPEZ           168,213       206,214          43
JAY KNIFFEN             215                            43

Adjournment................................... 228     43

Court Reporter's Certificate.................. 229     43


                  ALPHABETICAL INDEX

WITNESS                 DIRECT        CROSS     VOIR   VOL.
                                                DIRE
BRANDON BLANSIT         18,119,126    104,123          43
MAX COURTNEY            130,162       151,163          43
JAY KNIFFEN             215                            43
SUNDAYE LOPEZ           168,213       206,214          43
CYNTHIA TRUITT          9                              43


                   EXHIBIT INDEX
STATE'S
NO.   DESCRIPTION                   OFFER  ADMIT  VOL.
227   Photo board (18x24)            17     17     43
228   Sketch                         --     23     43
229   Sketch                         28     28     43
230   Photo (8x10)                   50     51     43
231   Photo (8x10)                   50     51     43
232   Photo (8x10)                   50     51     43
233   Photo (8x10)                   50     51     43
234   Photo (8x10)                   50     51     43
235   Photo (8x10)                   50     51     43
236   Photo (8x10)                   50     51     43
237   Photo (8x10)                   50     51     43
238   Photo (8x10)                   50     51     43
239   Photo (8x10)                   50     51     43
```

| | | | | | |
|---|---|---|---|---|---|
| 1 | 240 | Photo (8x10) | | 50 | 51 | 43 |
| | 241 | Photo (8x10) | | 50 | 51 | 43 |
| 2 | 242 | Photo (8x10) | | 50 | 51 | 43 |
| | 243 | Photo (8x10) | | 50 | 51 | 43 |
| 3 | 244 | Photo (8x10) | | 50 | 51 | 43 |
| | 245 | Photo (8x10) | | 50 | 51 | 43 |
| 4 | 246 | Photo (8x10) | | 50 | 51 | 43 |
| | 247 | Photo (8x10) | | 50 | 51 | 43 |
| 5 | 248 | Photo (8x10) | | 50 | 51 | 43 |
| | 249 | Photo (8x10) | | 50 | 51 | 43 |
| 6 | 250 | Photo (8x10) | | 50 | 51 | 43 |
| | 251 | Photo (8x10) | | 50 | 51 | 43 |
| 7 | 252 | Photo (8x10) | | 50 | 51 | 43 |
| | 253 | Photo (8x10) | | 50 | 51 | 43 |
| 8 | 254 | Photo (8x10) | | 50 | 51 | 43 |
| | 255 | Photo (8x10) | | 50 | 51 | 43 |
| 9 | 256 | Photo (8x10) | | 50 | 51 | 43 |
| | 257 | Photo (8x10) | | 50 | 51 | 43 |
| 10 | 258 | Photo (8x10) | | 50 | 51 | 43 |
| | 259 | Photo (8x10) | | 50 | 51 | 43 |
| 11 | 260 | Photo (8x10) | | 50 | 51 | 43 |
| | 261 | Photo (8x10) | | 50 | 51 | 43 |
| 12 | 262 | Photo (8x10) | | 50 | 51 | 43 |
| | 263 | Photo board (18x24) | | 50 | 51 | 43 |
| 13 | 264 | Photo board (18x24) | | 50 | 51 | 43 |
| | 265 | Photo board (18x24) | | 50 | 51 | 43 |
| 14 | 266 | Photo board (18x24) | | 50 | 51 | 43 |
| | 267 | Photo board (18x24) | | 50 | 51 | 43 |
| 15 | 268 | Photo board (18x24) | | 50 | 51 | 43 |
| | 269 | Photo board (18x24) | | 50 | 51 | 43 |
| 16 | 270 | Photo board (18x24) | | 50 | 51 | 43 |
| | 271 | Loose hair fibers | | 72 | 72 | 43 |
| 17 | 271-A Sack | (Record only) | 72 | 72 | 43 |
| | 272 | Loose hair fibers | | 72 | 72 | 43 |
| 18 | 272-A Sack | (Record only) | 72 | 72 | 43 |
| | 273 | Newspaper | | 73 | 73 | 43 |
| 19 | 273-A Sack | (Record only) | 73 | 73 | 43 |
| | 274 | Hammer | | 73 | 73 | 43 |
| 20 | 274-A Sack | (Record only) | 73 | 73 | 43 |
| | 275 | Bag of white pills | | 74 | 74 | 43 |
| 21 | 275-A Sack | (Record only) | 74 | 74 | 43 |
| | 276 | CVS bottle and pills | | 75 | 75 | 43 |
| 22 | 276-A Sack | (Record only) | 75 | 75 | 43 |
| | 277 | Bag of red/gray/blue pills | | 75 | 75 | 43 |
| 23 | 277-A Sack | (Record only) | 75 | 75 | 43 |
| | 278 | 4 swabs | | 77 | 77 | 43 |
| 24 | 279 | Bone fragment | | 78 | 79 | 43 |
| | 279-A Envelope | (Record only) | 78 | 79 | 43 |
| 25 | 280 | Bone fragments | | 78 | 79 | 43 |

STATE V. MARK ANTHONY SOLIZ   MARCH 5, 2012                 5

| | | | | | |
|---|---|---|---|---|---|
| 1 | 280-A   Envelope | (Record only) | 78 | 79 | 43 |
| | 281   Bone fragments | | 78 | 79 | 43 |
| 2 | 281-A   Envelope | (Record only) | 78 | 79 | 43 |
| | 282   2 pill bottles, various pills | | 79 | 80 | 43 |
| 3 | 282-A   Sack | (Record only) | 79 | 80 | 43 |
| | 283   Cut piece of white cloth | | 80 | 80 | 43 |
| 4 | 283-A   Sack | (Record only) | 80 | 80 | 43 |
| | 284   Photo (8x10) | | 82 | 82 | 43 |
| 5 | 285   Photo (8x10) | | 82 | 82 | 43 |
| | 286   Photo (8x10) | | 82 | 82 | 43 |
| 6 | 287   Photo (8x10) | | 82 | 82 | 43 |
| | 288   Photo (8x10) | | 82 | 82 | 43 |
| 7 | 289   Photo (8x10) | | 82 | 82 | 43 |
| | 290   Photo (8x10) | | 82 | 82 | 43 |
| 8 | 291   Photo (8x10) | | 82 | 82 | 43 |
| | 292   Photo (8x10) | | 82 | 82 | 43 |
| 9 | 293   Photo (8x10) | | 82 | 82 | 43 |
| | 294   Photo (8x10) | | 82 | 82 | 43 |
| 10 | 295   Photo (8x10) | | 82 | 82 | 43 |
| | 296   Photo (8x10) | | 82 | 82 | 43 |
| 11 | 297   Photo (8x10) | | 82 | 82 | 43 |
| | 298   Photo (8x10) | | 82 | 82 | 43 |
| 12 | 299   Photo (8x10) | | 82 | 82 | 43 |
| | 300   Photo (8x10) | | 82 | 82 | 43 |
| 13 | 301   Photo (8x10) | | 82 | 82 | 43 |
| | 302   Photo (8x10) | | 82 | 82 | 43 |
| 14 | 303   Photo (8x10) | | 82 | 82 | 43 |
| | 304   Photo (8x10) | | 82 | 82 | 43 |
| 15 | 305   Photo (8x10) | | 82 | 82 | 43 |
| | 306   Photo (8x10) | | 82 | 82 | 43 |
| 16 | 307   Photo (8x10) | | 82 | 82 | 43 |
| | 308   Photo (8x10) | | 82 | 82 | 43 |
| 17 | 309   Photo (8x10) | | 82 | 82 | 43 |
| | 310   Photo (8x10) | | 82 | 82 | 43 |
| 18 | 311   Photo (8x10) | | 82 | 82 | 43 |
| | 312   Photo (8x10) | | 82 | 82 | 43 |
| 19 | 313   Photo (8x10) | | 82 | 82 | 43 |
| | 314   Photo (8x10) | | 82 | 82 | 43 |
| 20 | 315   4 swabs; 2 straws | | 92 | 92 | 43 |
| | 315-A   Sack | (Record only) | 92 | 92 | 43 |
| 21 | 316   4 CDs | | 92 | 93 | 43 |
| | 316-A   Sack | (Record only) | 92 | 93 | 43 |
| 22 | 317   Marlboro pack | | 92 | 93 | 43 |
| | 317-A   Sack | (Record only) | 92 | 93 | 43 |
| 23 | 318   Small wood jewelry box drawer | | 93 | 93 | 43 |
| | 318-A   Sack | (Record only) | 93 | 93 | 43 |
| 24 | 319   1 Gold-colored earring | | 94 | 94 | 43 |
| | 319-A   Envelope | (Record only) | 94 | 94 | 43 |
| 25 | 320   Vial of dark liquid | | 94 | 94 | 43 |

STATE V. MARK ANTHONY SOLIZ   MARCH 5, 2012

6

| | | | | | |
|---|---|---|---|---|---|
| 1 | 320-A   Envelope | (Record only) | 94 | 94 | 43 |
| | 321   Vial of clear liquid | | 95 | 95 | 43 |
| 2 | 321-A   Envelope | (Record only) | 95 | 95 | 43 |
| | 322   Keyless remote button | | 95 | 95 | 43 |
| 3 | 322-A   Envelope | (Record only) | 95 | 95 | 43 |
| | 323   Orange shirt with stripes | | 96 | 96 | 43 |
| 4 | 323-A   Sack | (Record only) | 96 | 96 | 43 |
| | 324   Dairy Queen sack, ketchup packets | | 96 | 96 | 43 |
| 5 | 324-A   Sack | (Record only) | 96 | 96 | 43 |
| | 325   1 CD | | 97 | 97 | 43 |
| 6 | 325-A   Envelope | (Record only) | 97 | 97 | 43 |
| | 326   Shoeprint impression | | 99 | 129 | 43 |
| 7 | 326-A   Envelope | (Record only) | 99 | 129 | 43 |
| | 327   Shoeprint impression | | 99 | 99 | 43 |
| 8 | 327-A   Envelope | (Record only) | 99 | 99 | 43 |
| | 328   Cell Phone Accessories Charger package | | 100 | 100 | 43 |
| 9 | 328-A   Sack | (Record only) | 100 | 100 | 43 |
| | 329   Green cigarette lighter | | 100 | 100 | 43 |
| 10 | 329-A   Sack | (Record only) | 100 | 100 | 43 |
| | 330   Texas Lottery $1 Scratch Off | | 101 | 101 | 43 |
| 11 | 330-A   Envelope | (Record only) | 101 | 101 | 43 |
| | 331   LiftMaster Security opener | | 101 | 102 | 43 |
| 12 | 331-A   Envelope | (Record only) | 101 | 102 | 43 |
| | 332   Swab | | 102 | 102 | 43 |
| 13 | 332-A   Envelope | (Record only) | 102 | 102 | 43 |
| | 333   1 CD | | 103 | 103 | 43 |
| 14 | 333-A   Sack | (Record only) | 103 | 103 | 43 |
| | 334   Box with Mylar impression | | 139 | 139 | 43 |
| 15 | 334-A   Paper wrapper | (Record only) | 139 | 139 | 43 |
| | 335   2 print lift cards | | 142 | 143 | 43 |
| 16 | 335-A   Envelope with envelope | (Record only) | 142 | 143 | 43 |
| | 336   Shoeprints | | 145 | 146 | 43 |
| 17 | 336-A   Sack | (Record only) | 145 | 146 | 43 |
| | 337   Envelope | (Record only) | 188 | 189 | 43 |
| 18 | 337-A   Small Envelope with swab | | 188 | 189 | 43 |
| | 337-B   Small Envelope with swab | | 188 | 189 | 43 |
| 19 | 337-C   Small Envelope with swab | | 188 | 189 | 43 |
| | 337-D   Small Envelope with swab | | 188 | 189 | 43 |
| 20 | 337-E   Small Envelope with swab | | 188 | 189 | 43 |
| | 337-F   Small Envelope with swab | | 188 | 189 | 43 |
| 21 | 337-G   Small Envelope with swab | | 188 | 189 | 43 |
| | 338   Large Envelope | (Record only) | 191 | 191 | 43 |
| 22 | 338-A   Medium Envelope | (Record only) | 191 | 191 | 43 |
| | 338-A-1   2 Dobbers | | 191 | 191 | 43 |
| 23 | 339   Medium Envelope (sealed)(Record only) | | 203 | 204 | 43 |
| | 340   Medium Envelope (sealed)(Record only) | | 203 | 204 | 43 |
| 24 | 341   Official Laboratory Report; Lopez | | 205 | 205 | 43 |
| | 342   Official Laboratory Report; Lopez | | 205 | 205 | 43 |
| 25 | 343   Official Laboratory Report; Lopez | | 205 | 205 | 43 |

```
 1  DEFENDANT'S
    NO.   DESCRIPTION                        OFFER  ADMIT  VOL.
 2
    13    Photo  (8x10)                        110    110    43
 3  14    Photo  (8x10)                        110    110    43
    15    Photo  (8x10)                        110    110    43
 4  16    Photo  (8x10)                        110    110    43
    17    Photo  (8x10)                        110    110    43
 5  18    Photo  (8x10)                        110    110    43
    19    Photo  (8x10)                        110    110    43
 6  20    Photo  (8x10)                        110    110    43

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

8

1    P R O C E E D I N G
2    (Open court, Defendant present;
3    Jury not present.)
4    THE COURT: Is the State ready to proceed?
5    MR. STRAHAN: Yes, sir.
6    THE COURT: Defense present and ready?
7    MR. WESTFALL: Yes, Your Honor.
8    THE COURT: Defendant present?
9    MR. WESTFALL: He's here.
10   THE COURT: Jury ready?
11   THE BAILIFF: Yes, sir.
12   THE COURT: You may bring them in.
13   (Jury present.)
14   THE COURT: Thank you. You may be seated.
15   Please call your next witness.
16   MR. CHAMBLESS: State calls Deputy Truitt,
17   Johnson County Sheriff's Office.
18   THE COURT: Come all the way around here.
19   Please raise your right hand.
20   (Witness sworn.)
21   THE COURT: Thank you. Have a seat.
22   MR. CHAMBLESS: You might pull the microphone
23   to where you can speak into it in front of you there.
24   Thank you.
25

9

1    CYNTHIA TRUITT,
2    Having been first duly sworn, testified as follows:
3    DIRECT EXAMINATION
4    BY MR. CHAMBLESS:
5    Q. Please state your name.
6    A. Cynthia Truitt.
7    Q. And, Ms. Truitt, what is your occupation?
8    A. I'm a patrol officer for the Johnson County
9    Patrol Division.
10   Q. How long have you worked as a patrol officer?
11   A. Four years now.
12   Q. Okay. And are you a certified peace officer?
13   A. Yes, sir.
14   Q. And has that been your duties throughout your
15   time with Johnson County Sheriff's Department?
16   A. No. I've held other positions.
17   Q. What are they?
18   A. Started out Transport Division for three years,
19   worked as an S.R.O. Since then, I've been in Patrol.
20   Q. S.R.O., what's that?
21   A. School Resource Officer.
22   Q. Okay. Transport is, well, maybe obvious, but
23   just tell us what that involves.
24   A. Well, I worked Transport Division. It was
25   basically working with the jail. We brought those

10

1    individuals incarcerated in the jail up here to the
2    courthouse to speak with their attorneys and to do
3    whatever they needed to do. We also transported to the
4    T.D.C. units. We bench-warranted back from the T.D.C.
5    units. We did mental health commitments.
6    Q. Variety of duties?
7    A. A variety of duties.
8    Q. So you first worked there, then the school
9    resource officer, and then the last few years you've been
10   on patrol?
11   A. Yes.
12   Q. Okay. And how does patrol work? Are there a lot
13   of deputies out on patrol at a given time in Johnson
14   County?
15   A. We have more officers on duty basically during
16   the first two shifts than we do deep nights, but we have
17   an overlapping shift now which really helps out a lot too.
18   Q. You say "deep nights". What hours does that
19   cover?
20   A. Presently it covers from 10:45 until 8 in the
21   morning.
22   Q. Okay. So are you saying that's the shift that
23   has the least staffing for the Sheriff's Department?
24   A. A lot of times.
25   Q. Okay. Now, back on June 30th of 2010, were you

11

1    working as a patrol officer for the Johnson County
2    Sheriff's Department?
3    A. Yes, sir.
4    Q. And did you receive an assignment from, I guess,
5    dispatch or from some other source to go to a residence in
6    Godley, Texas?
7    A. There initially had been a call dispatched to
8    back up a Godley officer.
9    Q. Okay.
10   A. For agency assist.
11   Q. What time are we talking about in the morning,
12   approximately?
13   A. This was right at that over -- hour overlapping
14   shift change. And so I was just coming off shift, but it
15   came in and I was close and I went ahead and took it.
16   Q. Okay.
17   A. The Godley unit came back on and advised, I
18   guess, myself or dispatch that that was not going to be
19   the address that we needed to go to, we needed to go out
20   on FM 2331 at -- I don't remember the exact address.
21   Q. All right. Was it 14356 FM 2331?
22   A. That sounds right.
23   Q. All right. We've heard from Detective Cedillo of
24   the Fort Worth Police Department that he and another
25   officer, Detective Pate, were already there?

12

1    A. Yes.
2    Q. And when you got to the residence in Godley, were
3 they there?
4    A. Yes, they were. They were outside the gate at
5 the roadway.
6    Q. What happened when you first arrived?
7    A. When I first arrived, they told me what was --
8 what they felt was going on, that the elderly female that
9 lived at that residence had been shot and killed by two
10 people or shot and robbed by two people that they had
11 apprehended the day before.
12    Q. Okay. And so what did you and Detectives Cedillo
13 and Pate do at that time?
14    A. I got my latex gloves. We went onto the property
15 by foot. I asked them to go ahead and check the front of
16 the house, and I checked the garage because the garage
17 door was up.
18    Q. Okay.
19    A. We met again at the end of the garage, and they
20 advised me that they saw an open door on the back of the
21 house.
22    Q. Okay. So they had gone to the front of the
23 house; you went to the garage?
24    A. Right.
25    Q. And then the three of you met somewhere around

13

1 the garage?
2    A. Right. At the end of the garage.
3    Q. Then what happened?
4    A. They told me that they had seen an open door on
5 the back of the house, so we went through the cyclone --
6 the gate for the cyclone fence there and saw the open
7 door.
8    Q. Now, the Jury has seen a lot of photographs of
9 the layout of the house. Is there a pool as you go
10 through the gate on the --
11    A. Yes.
12    Q. -- right side?
13    A. As you go through the gate, there's a pool kind
14 of in front of to the right, and then on the left-hand
15 side is the covered patio where the back door is.
16    Q. All right. Did you and the other two officers go
17 to the covered patio area?
18    A. Yes.
19    Q. All right. Now, as you were there at that time,
20 just tell us, and very slowly, tell us what your -- you
21 did, what your impressions were, and so on.
22    A. I advised them that with an open door, we're
23 going to go in the house.
24    Q. Okay.
25    A. I was the first one in. I announced myself,

14

1 "Sheriff's Office", two to three times before I made
2 entry.
3    Q. Okay.
4    A. I looked around.
5    Q. What was the first thing you saw when you walked
6 in?
7    A. I'd never been in the house before, so when I --
8 first thing that I noticed was everything was all
9 cluttered.
10    Q. Okay.
11    A. Or messy. We all have our own definition of it,
12 but things weren't right.
13    Q. All right.
14    A. I walked pretty much straight through and was
15 glancing around, listening, just in case there was someone
16 there. And when I walked toward the front of the house, I
17 saw a white female lying face down between a chair, a
18 table, with her head close to the wall.
19    Q. Okay. And what was her condition?
20    A. When I approached her and bent over her to try to
21 check for signs of breathing, something to tell me that
22 she might still be alive, I didn't see any. I bent over
23 her and I saw a huge pool of blood under her -- under her
24 face or under her head.
25    Q. Did you see any signs that she was breathing or

15

1 still alive?
2    A. No, sir, I didn't.
3    Q. Okay. What happened then?
4    A. As soon as I was sure that there weren't any
5 signs of life, I backed away from her, almost stepping on
6 the shell casing that had been on a rug there kind of
7 close to her, and I backed away from that, turned around
8 and walked out the back door and contacted my sergeant.
9    Q. Is that -- you're talking you, but is that
10 collectively all three of you?
11    A. It would have been -- I'm not real sure how close
12 to me they were, although they did see the shell casing
13 too because I had almost stepped on it, and I'm not sure
14 which one did, but they warned me, "Look out, there's a
15 shell casing".
16    Q. Okay. And so did the three of you leave the
17 house?
18    A. Yes.
19    Q. And where did you go?
20    A. I called my sergeant there on the back patio, and
21 then the three of us walked back off the property and
22 closing the gates as we went, and waited.
23    Q. Okay. And why did you wait? What's the reason
24 for that?
25    A. We had to close the -- I had to close the crime

16

```
1   scene so that my shift sergeant could contact all the
2   admin that he needed to contact.
3       Q.  Okay.  Is it the procedure or the process,
4   protocol that's followed that no one enter the crime scene
5   until other detectives or officers assigned with that
6   responsibility --
7       A.  Yes.
8       Q.  -- get there?  Is that --
9       A.  That is, that is the policy.
10      Q.  Is that what you had in your mind?
11      A.  Yes.
12      Q.  And is that what you did until others arrived
13  from the --
14      A.  That's what we did.
15      Q.  Okay.  I'll show you a photograph that's marked
16  State's Exhibit 227.  Do you recognize what's shown here?
17      A.  Yes.
18      Q.  What is -- what is shown here?
19      A.  This is where I walked up into the other room and
20  found the white female lying.
21      Q.  Is this the position that she was in and is this
22  basically exactly what you saw when you walked in?
23      A.  Yes.  There's more detail than what I actually
24  saw because I had left my flashlight in my car and the
25  house was kind of dim.
```

17

```
1       Q.  Is that the position of Ms. Weatherly's body when
2   you got there?
3       A.  Yes, it is.
4       Q.  Okay.  If you would look just at the very edge of
5   the photograph, do you see an item there?
6       A.  That's that shell casing.
7       Q.  All right.  And is that just on the rug a few
8   feet or apparently a few feet from her body?
9       A.  It's just a few feet from her body.
10          MR. CHAMBLESS:  Okay.  Offer 227 at this
11  time.
12          MR. WESTFALL:  Your Honor, 403, substantially
13  more prejudicial than probative and cumulative.
14          THE COURT:  Objection is overruled.  227 is
15  admitted.
16          (State's Exhibit No. 227 admitted.)
17          MR. CHAMBLESS:  Pass the witness.
18          MR. WESTFALL:  No questions.
19          THE COURT:  May the witness be excused?
20          MR. WESTFALL:  She may.
21          MR. CHAMBLESS:  Yes, sir.
22          THE COURT:  Thank you.  You may be excused.
23          (Witness excused.)
24          THE COURT:  Please raise your right hand.
25          (Witness sworn.)
```

18

```
1           THE COURT:  Please have a seat.
2                   BRANDON BLANSIT,
3   Having been first duly sworn, testified as follows:
4                   DIRECT EXAMINATION
5   BY MR. CHAMBLESS:
6       Q.  Please state your name.
7       A.  Brandon Blansit.
8       Q.  And, Mr. Blansit, what is your occupation?
9       A.  I'm a police officer for the City of Mansfield.
10      Q.  Okay.  How long have you been a police officer?
11      A.  Going on seven and a half years.  This will be my
12  -- going on my eighth year.
13      Q.  Okay.  What are your current duties?
14      A.  Patrol, also included crime scene work and
15  negotiations.  And I've recently taken on the task of
16  becoming a coordinator for a crime-free multi-housing
17  program.
18      Q.  In June, specifically June 30th of 2010, did you
19  have crime scene responsibilities as part of your duties
20  with Mansfield Police Department?
21      A.  I did, sir.
22      Q.  And what kind of training have you received in
23  that area?
24      A.  Related to crime scene training alone, quite a
25  bit actually.  I've gone through a -- an accredited
```

19

```
1   program through Sirche Laboratory, fingerprint
2   laboratories in North Carolina.
3           THE REPORTER:  I'm sorry?
4       A.  Sirche Laboratories, fingerprint laboratories.
5   It's a company that specializes in equipment that is
6   brought to the crime scene, forensics world, if I would
7   use that word.  During that class, you learn the theories
8   behind fingerprint development, the different tools that
9   are used to develop fingerprints and collect evidence.
10      Q.  Okay.  And is there another, I guess, crime scene
11  or maybe more than one other crime scene person that you
12  work with in Mansfield Police Department?
13      A.  Yes, there is two.  At the time of this case on
14  June 30th, I worked with Max Courtney.  Here recently over
15  the last year we've hired a secondary or a third one now,
16  and her name is Courtney as well.
17      Q.  Okay.  Now, on June 30th, 2010, approximately
18  9:00, did you and Max Courtney receive a call or a request
19  to go and work on a crime scene?
20      A.  We did.
21      Q.  All right.  And where -- were you asked to go to
22  14356 FM 2331, a location of a house in Johnson County?
23      A.  Yes, sir.
24      Q.  Okay.  Did you leave together with Max or
25  separately?
```

20

1    A.  No, Max left prior to me.  He called me, and I
2  responded to the police department, gathered necessary
3  equipment that I think that we would need, and I responded
4  separately.
5    Q.  Now, what kind of equipment did you bring with
6  you?
7    A.  Well, we have equipment that is pretty well
8  gathered altogether, all within -- contained in a box
9  or -- it includes fingerprint brushes, tapes.  It includes
10  different collection vials, boxes.  Could be number of
11  things.  Different types of powders.  There's a number of
12  things.  Tweezers to collect, you know, small trace
13  evidence collections, bags, paper bags.
14    Q.  Okay.  So you had a number of items with you and
15  you were going there with the intention of assisting
16  Johnson County in evaluating, processing this potential
17  crime scene; is that correct?
18    A.  Yes, sir.
19    Q.  All right.  Approximately what time did you get
20  there at that location?
21    A.  10 -- about 10:30.  10:48, I believe, is what
22  time I checked in on the crime scene log.
23    Q.  What was the first thing that you did or as you
24  go through your thought process and, I guess, later
25  documented what you did, what was -- kind of walk us

21

1  through your mental journey as you begin this.
2    A.  Okay.  When we respond to crime scenes, obviously
3  the most important part is to preserve and protect any
4  physical evidence that is at the scene.  It also includes
5  the physical evidence that is outside of your scene, as
6  far as outside of a residence.
7         When I first arrive on scene, one of the
8  first things I do is that I establish a location of where
9  I'm going to park my vehicle, to where I'm going to set up
10  my -- as we kind of would refer to it as a command post.
11  While I'm looking for these areas, I'm ensuring that I'm
12  not going to disturb or, you know, inadvertently damage or
13  destroy any type of evidence that might be there.
14         On this case in particular, Max showed up
15  prior to me.  He had already found a designated area as to
16  where the vehicles were going to be parked at.  He
17  conducted a search of that area, so I didn't necessarily
18  have to worry about that on this case.  Max had already
19  taken care of it.
20         As we're walking up to a scene, we obviously
21  are observing everything and, you know, the case in whole.
22    Q.  All right.  Describe just generally from the
23  outside what you were looking at.
24    A.  There's a residence.  It's somewhat atop a hill
25  on a large acre of land, I would say maybe 10 or 15

22

1  acres.  The residence is mostly constructed of brick.
2  It's got wood siding on it.  It's somewhat of a larger
3  house.  It's secured by a fence.  It has an internal
4  fence, and also has a couple of flag poles that were out
5  in front of the house as well.
6    Q.  Okay.  Now, as part of your work, did you and/or
7  Max Courtney develop a sketch or a diagram of the inside
8  of the residence?
9    A.  There was a sketch, yes.
10    Q.  Okay.
11    A.  There is a sketch.
12    Q.  I want to show you what's marked as State's
13  Exhibit 228 and ask you to look at that and if you
14  recognize that or not.
15    A.  Yes, I do.
16    Q.  What is State's Exhibit 228?
17    A.  This is a final sketch of the residence.
18    Q.  All right.  Is this a sketch of the inside of the
19  Nancy Weatherly home there at 14356 FM 2321?
20    A.  Yes.
21    Q.  And does it show the layout of the garage, the
22  living room, kitchen and the bedrooms?
23    A.  Yes.
24    Q.  And do you think this is -- was it helpful to you
25  in your work to make a sketch like this?

23

1    A.  Yes, it is.
2        MR. CHAMBLESS:  All right.  Thank you.
3        MR. WESTFALL:  No objection to 228, Your
4  Honor.
5        THE COURT:  228 is admitted.
6        (State's Exhibit No. 228 admitted.)
7    Q.  (BY MR. CHAMBLESS)  I want to jump ahead just a
8  little bit and come back to where we are.  I'll show this
9  on the overhead here.  Can you see it?
10    A.  It's much larger on my screen than -- okay.  We
11  are looking at the same thing actually.  Yes, we're good.
12    Q.  All right.  I will start at this end where the
13  garage is.  Just is this -- does this demonstrate or show
14  the layout, let's see, east, west, north, south?  Do you
15  have -- well, I think it would be more helpful to maybe
16  start here.
17    A.  Yes.
18    Q.  Okay.  This shows three bedrooms, so I guess that
19  gives us an orientation.  The east side is on the right,
20  west side on the left, north up to the top of the house;
21  is that correct?
22    A.  Yes, that accurately depicts that, yes.
23    Q.  And then with the northeast bedroom, there is a
24  bathroom accessible from that bedroom; is that correct?
25    A.  That is.

24

1   Q. And it shows the different closets for each
2   bedroom?
3   A. Yes.
4   Q. Then there is a main hallway. And coming, going
5   south, I guess, we come into the dining room and living
6   room area. Now, how many doors, outside doors are there
7   of this house?
8   A. On the exterior walls of the house?
9   Q. Yes.
10   A. There -- well, including the two double doors at
11   the back door, a total of three.
12   Q. Okay. The -- this is the back door or the two
13   double doors you just referred to?
14   A. Yes, sir.
15   Q. And this would be the front door?
16   A. Yes, sir.
17   Q. Okay. And then there's also, I guess if the --
18   if the garage is open, an entryway from the garage?
19   A. Yes.
20   Q. Okay. And so the dining area, living room, and
21   then there's access --
22   A. -- to the garage.
23   Q. -- to the garage, this door, and if it's open,
24   storage area, utility room. Okay.
25   Did you make any observations as you

25

1   approached the house, again, walking us through your
2   mental process as you began to go from the -- I think the
3   parking area towards the house?
4   A. The driveway is a dirt, gravel driveway. There
5   were some wet areas as I walked up to the driveway from
6   recent rainfall that we had had. Outside, I didn't really
7   notice anything that was irrelevant -- or relevant to the
8   case, with the exception of some, I believe, some tire
9   tracks that Max had already excluded from -- from the
10   case. Nothing, nothing that was real relevant to the case
11   on the outside of the house.
12   Q. Okay. And tell us then about the house itself
13   and just your personal observations in the house before
14   you began to do any processing.
15   A. Are we talking about the outside of the house or
16   the inside?
17   Q. Well, first the outside.
18   A. The outside of the house. On the outside of the
19   house, it was a well-kept residence. It seemed that
20   someone did care for the residence. There was a pool that
21   was on the -- I guess that would probably be the southeast
22   side of the house with a pool house that was fenced in. I
23   remember noting that the pool was -- was taken care of as
24   well. There were some items on the back porch that
25   included a cat bowl; looked like it had some cat food in

26

1   it. I do remember there being a cat at one time around
2   the house. The exterior of the house was, like I said,
3   pretty well kept up and clean.
4   Q. Okay. Were there any animals present on the
5   outside of the house?
6   A. There were some animals, yes. Going back to the
7   size of the residence or the lot, there was enough there
8   to contain a donkey, a couple horses, I believe. I don't
9   recall if she had any cows, but a couple horses and
10   a donkey, I do recall them being there.
11   Q. Okay. Begin, as you think back on it, with your
12   observations and when you entered the Nancy Weatherly
13   home. Kind of walk us from that beginning part.
14   A. The designated entry point for this residence, we
15   established it at the back door where you see the two
16   double doors. In any crime scene, we try to designate a
17   entrance and exit to where anyone that comes in has to
18   come in through that one door; anyone that exit has to go
19   out through that same -- same entrance.
20   Q. Okay.
21   A. We established that our entrance and exit was
22   going to be at the back door. When we walk in, obviously
23   you can see the -- this diagram that we have here, you
24   walk into the larger area of the living room, the dining
25   room and the kitchen. As I noted, these rooms were pretty

27

1   well contained altogether. There wasn't much separation
2   between these rooms. If one walked into the living room,
3   he could easily have access to the dining room and to the
4   kitchen. Everything was in view, including the furniture,
5   the dining room table, and even some parts of the kitchen.
6   Q. What was the condition of the living room area?
7   A. The condition of the living room area was pretty
8   well in complete disarray. It was what would be referred
9   to as ransacked or tossed. The cushions were knocked off
10   of the couches. There were several things that it just
11   appeared that had been disturbed.
12   Q. Okay. Did you see, as you walked in, were you
13   able to see Nancy Weatherly?
14   A. Yes.
15   Q. And where was she and what was her -- how was she
16   situated in the -- in the home?
17   A. Ms. Weatherly was positioned on the -- it would
18   be on the south side of the table, I believe. Do we have
19   the...
20   Q. Yes.
21   A. May I show you this? If you want to look at
22   that.
23   Q. Okay. Show you what's marked State's Exhibit
24   229. Do you recognize this?
25   A. I do, sir.

28

1    Q. And what is added or different about 229 and what
2  is 229?
3    A. This is, again, a final sketch of the residence.
4  This includes furniture, bedroom furniture, sinks and
5  kitchens and bathtubs. It includes positions of the
6  furniture and then shows -- we do have that one up there
7  as well. This is including the furniture.
8         MR. CHAMBLESS: Okay. Thank you.
9         Offer 229.
10        MR. WESTFALL: No objection, Your Honor.
11        THE COURT: Admitted.
12        (State's Exhibit No. 229 admitted.)
13   Q. (BY MR. CHAMBLESS) Okay. I'm trying to focus
14 from the -- or focus on the living room and the dining
15 room area. Let's see here. Is that where the focus is on
16 this now? Can you see?
17   A. Yes, sir. Yes, I can see it.
18   Q. All right. Is this the back door that you
19 referred to?
20   A. Yes, sir.
21   Q. And this would be the -- what area would this be?
22   A. The dining room area.
23   Q. All right. And the area down here, what is this?
24   A. I believe you're pointing, the living room area.
25   Q. Okay. Where was Ms. Weatherly?

29

1    A. At the dining room table, see where the chair is
2  kicked out, the chair on the south side? That would be
3  the south side of the table.
4    Q. Okay.
5    A. She was laying in between the chair and the table
6  on the floor.
7    Q. All right. Was she -- what was the position of
8  her body?
9    A. Her face, her head was pointing -- that would be
10 toward the -- toward the north -- toward the west. Her
11 legs were pointed toward the east. She was laying on her
12 stomach with her face toward the north side of the house.
13   Q. What was she wearing?
14   A. She had on a multicolored pajama bottom pants
15 with a white T-shirt.
16   Q. Okay. Was there any -- anything on her feet that
17 you recall?
18   A. No.
19   Q. Did you see any apparent or visible injuries
20 about her body as she lay there?
21   A. Yes.
22   Q. And what was -- what did you see?
23   A. There was an apparent bullet defect at the crown
24 of the head.
25   Q. Okay. Now, you told us about the living room,

30

1  that it was, I guess, ransacked or tossed. You see the
2  body of Nancy Weatherly there by the dining table. Walk
3  us through other things that you saw in the different
4  rooms that you were in.
5    A. The kitchen, there wasn't much disturbance
6  there. I found a pill organizer that was atop one of
7  counter tops, and I believe it was -- I can't recall
8  without looking at notes as to what day was missing, but
9  there were some pills in the pill organizer. I believe
10 there was some food in a sink. But, generally speaking,
11 the kitchen was -- didn't appear disturbed as the living
12 room or other rooms within the house.
13        As we move on -- would you like for me to
14 continue?
15   Q. Yes. And this would be the hallway --
16   A. Yes.
17   Q. -- going past the kitchen area?
18   A. Yes. Going into the hallway, the only thing that
19 I did note in the hallway was the thermostat for the air
20 conditioner. It was -- I believe it was set on 72
21 degrees, and it was 70 degrees in the household, if I
22 remember right.
23   Q. All right.
24   A. If you continue, you can go into a guest
25 bathroom.

31

1    Q. All right. This would be a bathroom just to the
2  right and behind the kitchen; is that correct?
3    A. That is correct, yes.
4    Q. What did you notice, if anything, about the
5  bathroom?
6    A. This bathroom didn't appear disturbed. When we
7  work crime scenes, we do process bathrooms, including
8  toilets. This toilet was processed. The sink was
9  processed. I observed the bathroom -- or the bathtub.
10 The bathtub had some dead crickets in it as if it's
11 probably not a used bathroom.
12   Q. Okay. Now, there are three bedrooms. And on the
13 other diagram you've referred to northeast, northwest and
14 west bedroom; is that correct? This would be the
15 northeast?
16   A. Yes, yes.
17   Q. The northwest --
18   A. Northwest.
19   Q. -- and west?
20   A. Yes, sir.
21   Q. Walk us through. I guess this would be the
22 master bedroom here?
23   A. That is the master bedroom.
24   Q. All right. What did you see when you walked in
25 there?

32

1    A.  The room was, again, ransacked.  The mattress to
2  the bed, as you can see the bed here, was tossed over to
3  the -- that would be toward the north side of the house or
4  toward the outside wall.  In the bathroom, I checked that
5  bathroom as well, it seemed to be irrelevant to the case.
6  I didn't find anything significant in the bathroom.
7         In the closet, if you'll slide it up just a
8  little bit, there's an entrance to the closet here where
9  the door swings outward.  In the closet, this one piece of
10  furniture inside the closet at -- against the north wall
11  right there, some drawers were pulled out on that.  There
12  was quite a few pair of shoes in there.  It didn't appear
13  that anything else had really been disturbed in that
14  closet.
15         On the north wall as well, that piece of
16  furniture there, the drawers were pulled out on it and
17  several miscellaneous items thrown into the floor.  Same
18  thing with the nightstand on the north side of the bed,
19  things were pulled out of it and thrown into the floor.
20         The pillows, it shows there to be some
21  pillows on the sketch there in the bed.  There were
22  pillows stacked against the south wall just prior to
23  entering into the bathroom.  They appeared neatly, neatly
24  stacked against the wall.  Also with the bed, the sheets
25  on the -- this would be the south side of the bed, the

33

1  sheets were pulled back on the bed but no sheets were
2  pulled back on the right side.
3    Q.  Okay.  Was there any apparently obviously missing
4  items in this bedroom?
5    A.  Yes.
6    Q.  And what was that?
7    A.  Right in front of the bed, the piece of furniture
8  seen there was a small entertainment center.  On top of
9  that you could see -- if you could imagine where you have
10  your TV at your home and when you go to clean around your
11  area, if you lifted your TV up, you would see that there's
12  no dust imprints or no dust settled around where your TV
13  was actually laying at.
14         Here, this is what I observed.  I observed
15  that there was a base to what I believe was a TV that had
16  been removed off of the stand.  I found a R.C.A. manual
17  that was laying there.  32-inch, I believe is what it was.
18    Q.  Was there also -- was there any indication of a
19  cable connection in that area; do you recall?
20    A.  I do not recall about cable connection.  I'd have
21  to probably look at my notes, but I don't recall.
22    Q.  All right.  Anything else about the master
23  bedroom, the northeast bedroom, that you recall?
24    A.  With the exception of a blood stain that was
25  found on the bed that -- that we looked at, nothing else.

34

1    Q.  All right.  Now, Officer Blansit, if you would,
2  let's go to this, the bedroom opposite, I guess one of the
3  available bedrooms here, the northwest side, the west
4  side, north side of the house.
5    A.  Uh-huh.
6    Q.  What observations, what did you see?
7    A.  These observations were pretty well consistent
8  with the same observations that I saw in the master
9  bedroom.  The mattress was tossed.  It appears that
10  somebody was attempting to locate something underneath a
11  mattress.  The drawers in the nightstand beside the bed
12  were pulled out.  Again, the drawers on the dresser across
13  the hall were pulled out.  I'm sorry?
14    Q.  Okay.
15    A.  Yes.  That is a double opening door for a
16  closet.  It didn't appear disturbed, didn't appear that
17  anything was pulled out.  There were some picture frames
18  in there.  There was a smaller TV that I don't necessarily
19  believe was -- was involved.
20    Q.  Now, the final bedroom is what you -- on the
21  other sketch has been labeled the "west bedroom", and tell
22  us what you saw here, if anything is significant.
23    A.  This room kind of appeared to me as more of a --
24  of a storage room for her.  I saw a treadmill, some boxes
25  that were filled with -- filled with clutter is what it

35

1  appeared as.  In addition to that, the closet was open.
2  Inside the closet it had plastic totes that were filled
3  with miscellaneous items.
4         Laying right out in front of the closet on
5  the floor, I saw what I believe is a older cassette tape
6  or cassette tape holder.  The cassette tape holder has
7  metal latches on it, is what secures it.  The latches were
8  open.  And the cassette tape was laying more or less right
9  in the entry of the door.
10    Q.  Okay.  Let's go down now to the next sequence,
11  and would that be the actual processing of the crime scene
12  and where you begin and go to different locations and you
13  do that work?
14    A.  That's correct.
15    Q.  Okay.  Talk about the back door, the entrance at
16  the back door, and what you did, if anything, about
17  processing and collecting of evidence from that point
18  specifically.
19    A.  At the back door, numerous law enforcement
20  personnel and people had entered and exited this door.  I
21  ruled that door out as far as being processed due to --
22  due to the possibilities of contamination in that door.
23  So the door itself was not processed, just based on the
24  entrance and exits that had been made in that area.
25    Q.  Okay.

36

1    A. And, again, right there in that area of the
2 walkway for any kind of shoe wear impressions.
3    Q. As you go into the back door, past the back door,
4 what activities did you -- what did you look at and what
5 did you do at that point?
6    A. Coming into the back door, you're obviously
7 looking for the things that we had mentioned earlier,
8 signs of disturbances, signs of forced entry, anything
9 that would lead one to believe that either one has been
10 handled or suspected to have been handled.
11        If you look right here at the two double
12 doors, there's two pieces of furniture. Those are showing
13 a table, and then right beside the table here on the --
14 that would be on the west side, is a small chest. I saw
15 that the chest had been opened. Things were thrown about
16 in the area of the chest. That was processed with black
17 powder. It's a fingerprint powder to try to develop any
18 kind of fingerprints.
19    Q. What was the result of that?
20    A. There was no fingerprints developed.
21    Q. Okay. Was there an item inside the chest that
22 you looked at specifically?
23    A. Yes, there was -- there was a tray and a photo
24 case, a photo case is what I believe it was or an album
25 case that did have a smooth process or smooth surface on

37

1 it that was processed with powder as well.
2    Q. Okay. And did that yield anything that was
3 usable?
4    A. No, it did not.
5    Q. Okay. You know, we live in a world of CSI and
6 all of that. Tell us about that. I mean, you get the
7 impression from TV that you can just walk in and find
8 everybody's prints on every kind of surface. Tell us
9 about that.
10    A. Yes, unfortunately, that's not exactly how it is
11 in the crime scene world. In order to develop some of the
12 things, you do have to have a general understanding of how
13 a fingerprint is transferred to a surface. Basically,
14 your fingerprints secrete inorganic and organic substances
15 through your glands, including eccrine glands, sebaceous
16 glands, and different glands that you have that secrete
17 these substances. And also, in general, just when you
18 wipe your face or your hands, you're transferring these
19 oils to your fingers. And then when you touch a surface,
20 it is transferring the substances to that surface.
21        So, generally speaking, you have to have some
22 kind of substances or something has to be secreting from
23 your fingertips or from your fingerprints in order to
24 transfer a latent print or transfer that substance to that
25 item. You have to handle it, you know, in certain ways to

38

1 transfer these, these impressions over. And, you know,
2 it's not always just that easy just to transfer a
3 fingerprint. There's some times you just do not transfer
4 that substance from your skin to the surface.
5    Q. I guess what I'm thinking, and I'm asking you if
6 you would think the homeowner had handled this a lot of
7 times, and here you're saying there had been apparent
8 movement. Why is it that you're not seeing latent prints
9 everywhere?
10    A. Well, and latent prints are primarily made up of
11 about 95 percent of water. When you transfer these oils
12 and these substances, about 95 percent of them are water,
13 and you're only really dealing with about, you know, 5
14 percent of the oils. Different environments could dry
15 these oils up to where they just do not develop.
16 Different substance -- or surfaces do just not take the
17 transfers of the oils to where either, one, they absorb
18 into the actual surface itself to where you have to
19 possibly use a different type of method that -- a chemical
20 method that could be used to bring those prints out of the
21 surfaces. I mean, a number of things could occur as far
22 as the environmental -- environment that these
23 fingerprints are in to where the oils could simply dry up
24 or be disturbed or, as I said, a number of things can
25 happen as to why you don't have those prints.

39

1    Q. So was it surprising or not surprising to you
2 that when you processed initially this wooden chest and
3 items including the photo -- the smooth surface photo
4 album, was it surprising or not surprising that you did
5 not find any immediate latent prints?
6    A. Not surprising.
7    Q. Okay. Take us into the living room and tell us
8 what you did as far as collection of evidence and
9 processing in the living room area.
10    A. The living room, one of the focal points that I
11 focused on here in the living room was the entertainment
12 center. I had seen an open area for a TV; the TV was
13 missing. I observed a hammer laying on top of the
14 entertainment center, saw some markings on a wall mount
15 that was actually fixed to the entertainment center. Also
16 right below the entertainment center was another CD case
17 or photo case, I forget exactly what kind of case that it
18 was, but another album case that was laying directly below
19 the entertainment center. These items were processed for
20 fingerprints as well. The hammer was collected as a
21 actual piece of physical evidence and was processed with a
22 different method at a later date.
23    Q. Okay. And what was the -- do you know what took
24 place with the hammer, what method was used with that
25 later?

40

1     A.   The method that was used with the hammer is
2  called a cyanoacrylate method or also better known as
3  super glue.  The active ingredients in super glue is
4  cyanoacrylate.  What that does is it affix -- or it will
5  attach to your acids, your amino acids and proteins and
6  fatty acids that secrete from your -- from you fingertips,
7  and it will create this white kind of ash color look on
8  the fingerprint and it will show your actual ridges.  It's
9  a fuming method is what it is.
10    Q.   Was the hammer, did it have a wooden handle?
11    A.   It did have a wooden handle, yes.
12    Q.   What was the result of that super glue processing
13 of the hammer later; do you recall?
14    A.   No -- no fingerprints were developed.
15    Q.   Okay.  Was that surprising to you?
16    A.   No.
17    Q.   Okay.  Was there anything that came up from your
18 processing of the entertainment center or this CD case
19 that you refer to?
20    A.   No.
21    Q.   Okay.  Did you find any identification, possible
22 identification of the homeowner there in the living room
23 area?
24    A.   Yes.
25    Q.   Okay.  What did you find and what did you do with

41

1  those items?
2     A.   We found a work badge, an I.D. badge.  I believe
3  it was to Lockheed Martin.  I believe that's who it was.
4  Yes, Lockheed Martin is who she was employed with.
5          I processed them with fingerprint powder and
6  did develop, I believe, a latent print on them.  I do not
7  know the extent or what happened with that print as far as
8  it being identified or not.
9     Q.   So you did -- you were able to establish a latent
10 print from one of the identification cards?
11    A.   Yes.
12    Q.   Okay.  Tell us what else you found in the living
13 room area, what you collected, what you did.
14    A.   There were some miscellaneous pills, I think some
15 including some hydrocodone, some Tylenol ER that were
16 bagged, some pill bottles.  There was also a coffee cup on
17 top of the coffee table.  I recall there being some Justin
18 Roper boots in the room.  There was a black glove
19 that is -- was there, but I don't believe that it was
20 relevant to the case, where I found it, underneath a
21 cushion.  See.
22    Q.   Did you process a brown folder about -- that
23 containing a file on horses?
24    A.   Yes.
25    Q.   And what was the result of that?

42

1     A.   The brown folder did not have any latent prints
2  on it that were developed.
3     Q.   Okay.  Front door.  Tell us what you saw, what
4  you did at the front door location.
5     A.   On the inside of the front door, really what
6  brought my attention to the front door is that there were
7  some boxes that were scattered near the front door.  They
8  would be on the -- that would be on the north side of the
9  front door.  There were some boxes that were scattered
10 that appeared to me that they were once stacked.  That's
11 really what brought my attention to the front door.  I
12 processed the front door with black powder on the interior
13 and exterior side of the door.
14    Q.   Did that result in any ridge detail that you
15 could develop?
16    A.   No.
17    Q.   Was there any indication of damage to either the
18 front door or the door from the back off the patio?
19    A.   I did not find any signs of forced entry, no.
20    Q.   The dining room area, the area around Nancy
21 Weatherly's body, tell us about that.
22    A.   The dining room area, the table was -- was filled
23 with miscellaneous items such as papers and bags and
24 purses and tabletop crafts and arts.  The chairs, as you
25 see here set up, was exactly where -- appears as --

43

1  depicts the way that it was when I found it.
2          I found a checkbook, a pen, and a pair of
3  reading glasses or eyeglasses.  Right on top of the table
4  as if the chair that is kicked out, if you put that chair,
5  slide it up to where it would normally go, I found a
6  checkbook, like I said, a pair of reading glasses and a
7  pen sitting right there at the table.  There was pooling
8  of blood on top of the table right here as well.  The
9  pooling of blood -- yes.
10    Q.   Okay.
11    A.   Yes.  The pooling of blood goes off of the table
12 into this chair here that he is pointing at.  And then
13 from into the chair, it pools off the blood and goes into
14 the floor.
15    Q.   Okay.
16    A.   I found a large amount of blood surrounding the
17 victim, and the pooling of the blood went underneath the
18 table and on underneath the -- the chest that's against
19 the wall.
20    Q.   Was there any blood spatter in the area?
21    A.   There was, there was some blood spatter, yes.
22    Q.   And is this -- is there any indication that it
23 was from the bullet or other source, other origin?
24    A.   I believe the blood spatter that we have, the
25 blood initially was pooling onto the table top.  The blood

44

1 then will flow. If you can follow me with this for just a
2 minute, the blood will flow down the side of the table and
3 it will go into the chair.
4     Once blood starts pooling into the chair, the
5 blood that continues to flow into the chair will cause
6 a -- it will splash into the blood and cause a
7 spattering. I found very little bit of spattered blood in
8 the chair, okay. That blood flows into the floor and
9 creates a pool of blood into the floor.
10     I believe that the victim at one time was
11 sitting in the chair while the blood, excuse me, while the
12 blood had been pooling into the table, pooling into the
13 chair, and then once the blood pooled into the floor, she
14 fell into the floor and splashed into the pool of blood
15 which caused a blood spatter pattern that went onto the
16 north wall.
17     Q. Okay. And that would be on this wall here; is
18 that correct?
19     A. Yes.
20     Q. All right. Was that -- was there a way to
21 determine if that was, in fact, blood?
22     A. Yes, a presumptive test --
23     Q. Okay.
24     A. -- to determine whether that is blood, yes.
25     Q. All right. Around the dining room table and

45

1 around the body of Nancy Weatherly, was there any
2 fragments that appeared to be fragments of the body of
3 Nancy Weatherly?
4     A. Atop the table, and then if you look over toward
5 the kitchen on that split wall right -- come down just a
6 little bit. Right there in that general area, we did find
7 several different little pieces of off-white material that
8 we believe were bone fragments.
9     Q. Okay. And was one of those fragments, the one on
10 top of the table, tested, a presumptive test done on that
11 fragment by you or Max Courtney?
12     A. The one on top of the table was a presumptive
13 test that was done by Max Courtney.
14     Q. And what was the result?
15     A. It tested positive.
16     Q. All right.
17     A. Tested positive for blood.
18     Q. For blood?
19     A. Yes.
20     Q. Okay. And so there was -- on this fragment that
21 was on top of the table, it tested positive for blood on
22 the -- what appeared to be a bone fragment; is that
23 correct?
24     A. Yes.
25     Q. Okay. Did you continue collecting items? And

46

1 just tell us what some of the items that you collected
2 were.
3     A. In the dining room area, in each one of the pools
4 of blood, as I explained earlier, on the table, on the
5 chair, and in the floor, we collected a swab of the
6 blood. In addition to that, atop the table there were
7 miscellaneous pills. I did not know what these pills
8 included, but they were packaged together and they are
9 just miscellaneous pills that were collected atop the
10 table. While searching through this table, I came across
11 a bullet.
12     Q. Okay. Where was the bullet in relation --
13     A. What was the bullet or where? I'm sorry.
14     Q. -- in relation to the body of Nancy Weatherly?
15 Where was the bullet fragment?
16     A. The bullet was on top of the table, somewhat
17 underneath a green table mat. It had come out and gone
18 underneath a table mat.
19     Q. Okay. Did you find a cartridge casing?
20     A. Yes.
21     Q. And where was it found?
22     A. We found it on the -- it would be on the -- that
23 would be the east side of Ms. Weatherly in a -- just
24 between the table, and come out just a little bit. In
25 that general area there is where we found the cartridge

47

1 case.
2     Q. Did you do any processing in the hall bathroom?
3     A. The hall bathroom, yes. The hall bathroom was
4 processed with black powder. The toilet seats were
5 processed. The toilet flush handle was processed. The
6 countertops were processed.
7     Q. Did you obtain any latent prints from there?
8     A. We did obtain a latent print on the flush handle
9 of the toilet.
10     Q. In the master bedroom and bath, what did you do
11 in that area?
12     A. The master bedroom, processed all the handles and
13 all the drawers that had been pulled out of the
14 furnitures. Processed the blood stain that was found on
15 the mattress cover. It was the box springs cover is
16 what -- the sheet that lays over the box spring. There
17 was a really small blood stain there. We tested it as
18 well. In the bathroom, we processed the bathroom the same
19 as we did the other bathroom, with black powder.
20     Q. Okay. The northwest and west bedrooms, what did
21 you do in those rooms?
22     A. Can you slide that up for me, please?
23     Q. Yes.
24     A. The northwest bedroom, the one on top, again, we
25 processed them or the pieces of furniture that the drawers

**48**

1 had been pulled out, the bed, searched around the bed,
2 looked for anything irrelevant to the investigation
3 there. We spoke briefly about a small TV that I found in
4 the -- in the closet. I did look at that and processed
5 it, visually processed it by excluding it, that I don't
6 believe that it had been handled in quite some time,
7 simply because you could see that there was a palm
8 impression on top of the TV, but there was a layer of dust
9 that had settled on top of this palm impression.
10    Q. In the west bedroom, did you process anything
11 that was worth mentioning at this time?
12    A. In the west bedroom. Southwest bedroom right
13 here?
14    Q. There's a northwest, and then below that, the
15 west bedroom.
16    A. Yes. Yes, this bedroom was -- I collected the
17 cassette tape holder, processed it with black powder, the
18 latches, and was able to develop a latent print on one of
19 the latches.
20    Q. As a result of your work, did you and Max
21 Courtney collect, I believe, 24 items of evidence on that
22 date from the house?
23    A. Yes.
24        (Pause in proceeding.)
25    Q. Now, in the house, were these items that you

**49**

1 collected, is it your custom to give them a number or
2 designation, each of the items of evidence?
3    A. Yes, sir.
4    Q. Okay. And with respect to the house, were they
5 numbered by the initials "BRB slash 1", "BRB slash 2", and
6 so on?
7    A. Yes, sir.
8    Q. Okay. If you would, Officer Blansit, if you
9 would look at these. They're marked State's Exhibits 238
10 (sic) through 262, and ask you if you recognize each of
11 those.
12    A. (Witness complied.)
13        (Sotto voce discussion.)
14    Q. They're marked 230, I'm sorry, 230 through 262.
15    A. Yes, sir.
16    Q. And are these photographs of the evidence,
17 evidentiary items, potential evidentiary items that you
18 collected that day, June 30th, 2010, at Nancy Weatherly's
19 house in Godley, Texas?
20    A. Yes, sir.
21    Q. And do these -- and they show by placement and
22 exhibit number the items that you either processed or
23 collected?
24    A. They do.
25    Q. Okay. If you would look at these marked 263

**50**

1 through 270 as well.
2    A. (Witness complied.)
3    Q. Do you recognize these photographs?
4    A. I do.
5    Q. 263 through 270, what are they?
6    A. 263 through 270, these are photographs of
7 evidence that was collected at the scene, including the
8 bullet, the casing, the tape cassette. I may have to
9 refresh my memory on some of them, but yes.
10    Q. Do they fairly and accurately show the evidence
11 that you collected on that date, June 30th, 2010?
12    A. They do.
13        MR. CHAMBLESS: All right. Offer 238 through
14 270 -- 230, I'm sorry, 230 through 270.
15        (Pause in proceeding.)
16        THE COURT: The Court will take a 15-minute
17 recess at this time.
18        (Recess taken from 10:06 to 10:26 a.m.)
19        (Jury not present.)
20        THE COURT: Thank you. You may be seated.
21        MR. WESTFALL: I can state the objection I
22 have basically for the record onto the record, and then he
23 could offer these in front of the Jury.
24        THE COURT: All right. State is present and
25 ready?

**51**

1        MR. CHAMBLESS: My witness is making -- is in
2 the process of talking on the phone in the hallway. Other
3 than that, we're ready, but we can do this part.
4        THE COURT: All right. Defense is present
5 and Defendant is present.
6        Go ahead. Any objections to the 263 to 270?
7        MR. WESTFALL: Yes, Your Honor. For the
8 record -- no, I'm sorry, from 230 to --
9        MR. CHAMBLESS: 270.
10        THE COURT: 230 to 270. I'm sorry.
11        MR. WESTFALL: 235, Your Honor, we object
12 under 403, cumulative, substantially more prejudicial than
13 probative.
14        244, 245, 246, 247, we object, 403,
15 substantially more prejudicial than probative and
16 cumulative.
17        250 through 256, 403, substantially more
18 prejudicial than probative and cumulative.
19        And no objection to the other ones that I did
20 not specifically name.
21        THE COURT: May I see the pictures, please?
22        (Pause in proceeding.)
23        THE COURT: The objections are overruled.
24 230 through 270 are admitted.
25        (State's Exhibit Nos. 230 - 270 admitted.)

52

1    MR. CHAMBLESS: Thank you.
2    THE COURT: You may bring in the Jury.
3    (Jury present.)
4    THE COURT: You may be seated. Yes, sir.
5    Q. (BY MR. CHAMBLESS) Officer Blansit, I want to
6 show you two items that have already been admitted; first,
7 224 in the plastic baggy, and 224-A, the packaging. Do
8 you recognize that?
9    A. Yes, I do.
10   Q. What is that?
11   A. That is the 9 millimeter cartridge case that was
12 found in the house.
13   Q. Okay. And did you collect that?
14   A. I did.
15   Q. And that being on June 30th, 2010; is that
16 correct?
17   A. Yes, sir.
18   Q. Now I show you what's marked State's Exhibit
19 twenty -- 225 in the plastic, and then the packaging
20 marked 225-A. Do you recognize that?
21   A. Yes, I do.
22   Q. And what is that?
23   A. It's the fired bullet that was located atop a
24 table, dining room table inside the house.
25   Q. All right. If you would, step down for just a

53

1 minute. These photographs here, first this one has a
2 number by it, and what's the reason for the yellow number?
3    A. It indicates the item number. As I briefly
4 explained earlier, each piece of property or evidence has
5 a item that is -- or a number that is relevant to that
6 piece of property, and that was -- indicate No. 1, that
7 would be the first piece of evidence that was marked
8 inside the house.
9    MR. HEISKELL: Your Honor, could he explain
10 what exhibit, explain to the Jury at this point what
11 exhibit number.
12   Q. (BY MR. CHAMBLESS) Would this be -- it's BRB-01
13 marked as State's Exhibit 224. And what is the location
14 of this item here?
15   A. That's in the dining room area just beside the
16 dining room table on the floor mat or the rug that is
17 there.
18   Q. Okay.
19   A. That -- if you want me to further explain, I
20 will, where it is.
21   Q. Yes.
22   A. You see the mark here on the leg, that would be
23 your -- that would be your southeast leg to the table.
24   Q. Okay. And then this closer-up is same item; is
25 that correct?

54

1    A. Yes, same item, close-up photograph.
2    Q. What is it that -- what information do you gather
3 from the end of the cartridge casing like this? Is there
4 anything significant? Does it tell you what caliber or
5 type of --
6    A. Couple different things. Number one, it is a
7 fired cartridge case. Well, indicating it's fired because
8 of the primer cap has the -- where the hammer would hit
9 the primer cap. It is a 9 millimeter Luger FC, Federal
10 Cartridge. It has its brand, its caliber, and the type of
11 cartridge that it is.
12   THE COURT: Can you -- can you switch
13 positions so the Court Reporter can at least see the
14 witness. If you'll stand on the other side of
15 Mr. Chambless.
16   THE WITNESS: Oh, I'm sorry. Okay.
17   THE COURT: And look at the Court Reporter
18 and the Jury when you're talking. That will help a lot.
19   A. Again, the -- the primer cap here in the center
20 has an indication that it had been fired from the hammer
21 striking the primer cap. On the outside, the lettering
22 indicates the caliber of the bullet or the cartridge. The
23 Luger is the type of cartridge that it is, and the FC
24 indicates the make, Federal Cartridge.
25   Q. Show you a couple of other photographs here.

55

1 These, I believe, are marked 16, and they refer to State's
2 Exhibit 225. All right. What are we looking at here?
3    A. This is the fired bullet that was found on top of
4 the table.
5    Q. All right. Where was it found on the table?
6    A. It was found underneath a tabletop mat. You can
7 see this green mat here, there's -- kind of folded back.
8 It was found underneath.
9    Q. Do you have -- do you have an explanation? Was
10 the -- was the bullet under the mat when it was fired and
11 ricocheted, or was it, the mat, placed over it by things
12 being moved around? Do you have any -- any thoughts about
13 that?
14   A. Um.
15   Q. Any idea why it was found where it was?
16   A. There could be one reason is the table could have
17 been ransacked or tossed. Like I said, there were
18 miscellaneous papers and stuff atop the table. The purse
19 had been dug through. It's very possible that the -- that
20 the mat was folded over the bullet after it had been
21 fired.
22   Q. Okay. And is this a closer-up view? And why is
23 the ruler used in these photographs?
24   A. Well, we put scales in the photograph to show
25 relevant size, to depict the exact size of what this

56

1 bullet is.
2 Q. And --
3 A. Yes.
4 Q. And then, finally, the -- I guess the most near
5 dimension of this bullet here?
6 A. Yes, close-up photograph indicating an
7 approximate size. With the scale, as a close-up, you can
8 actually see your numbers.
9 Q. Now, you indicated you found a cartridge -- I
10 mean, a cassette case in the west bedroom; is that
11 correct?
12 A. Yes.
13 Q. This is marked 266. What is -- what is this?
14 A. It's a case, cassette tape case that was found in
15 the back northwest bedroom, just more or less right after
16 the entry of the room. It was laying there outside of the
17 closet. As I said earlier, the latches were open on it.
18 Q. Is this the position it was in before it was
19 processed by you?
20 A. Yes, sir.
21 Q. And the two latches appear to be up and open; is
22 that correct?
23 A. Yes.
24 Q. What's different about these, this photograph
25 here?

57

1 A. The photograph, what makes this different is I
2 had brought the case into the kitchen and set it up on top
3 of the dining room table to where I could better process
4 it. The latches were closed down to where I could process
5 them. It has a scale in the photograph showing where the
6 fingerprint was developed.
7 Q. Okay. And then finally, this one marked State's
8 268.
9 A. Again, what's been implemented into this picture
10 is the Tent No. 23 indicating the item number, showing a
11 little bit more of a close-up without a scale of the
12 fingerprint that was developed.
13 Q. Okay. Thank you. Go ahead and have a seat.
14 Did you collect the cassette case itself?
15 A. No.
16 Q. Show you one of the latent fingerprints within
17 State's Exhibit 215, within an envelope. Would you take
18 the item out and see if you recognize it, please, sir?
19 A. Yes.
20 Q. Do you recognize that item?
21 A. I do.
22 Q. What is this item that's part of the collection
23 of latent prints within State's 215?
24 A. That is the lifted fingerprint that was on the
25 cassette tape holder.

58

1 Q. And I believe it's marked BRB-23; is that
2 correct?
3 A. That is correct.
4 Q. Now, on the backside here, is that the actual
5 latent print?
6 A. Yes, that's the actual latent print with the tape
7 lift on it, yes.
8 Q. All right. So this is the latent print developed
9 from the latch of the cassette case from the photographs,
10 and the latent print is BRB-23; is that correct?
11 A. That is correct.
12 Q. And did you actually develop that latent print
13 that day, June 30th, 2010, yourself?
14 A. I did.
15 Q. All of the items of evidence we're talking about
16 from the house, from Nancy Weatherly's house, did you take
17 possession of all of those items that day?
18 A. Yes.
19 Q. And did you secure those items in the Mansfield
20 Police Department safely?
21 A. Yes.
22 Q. And how do you do that? What's y'all's procedure
23 in doing that?
24 A. In this case, numerous pieces of evidence, they
25 were taken to our Crime Scene office, it's a secured

59

1 office, and put into the secure office where, if some of
2 the property had to be processed later, it would be
3 readily available to us.
4 Q. Okay. Now we've got some photographs here that
5 show each of the items, I think that are marked BRB-1
6 through 24, that were collected within the house; is that
7 correct?
8 A. I'm sorry. Repeat that.
9 Q. BRB-1 through 24, are those the numbered items
10 that were collected within Nancy Weatherly's house?
11 A. Yes.
12 Q. All right. All right. This one here, and what
13 are we looking at here?
14 A. The cartridge case.
15 Q. Okay. And this would be Item No. 1; is that
16 correct?
17 A. Yes.
18 Q. That shows its position in relationship to the --
19 at the top the -- is that the dining room table?
20 A. Yes, it is.
21 Q. Leg of the dining room table. All right.
22 Now you've got BRB-2 marked down here at the
23 bottom. What is -- what are we seeing? What's the
24 purpose of this item?
25 A. These are hair fibers that were found on the

60

1 floor in close proximity to the victim.
2    Q. Okay. And were these collected as well?
3    A. They were.
4    Q. The next item, BRB-3, where was this within the
5 house and what are we looking at?
6    A. If you -- if you're looking at -- this is a
7 newspaper article. And if you look to the left of this
8 newspaper looking at this paper, you will see the dining
9 room table. That's where this paper is in -- relevant to
10 the dining room table. And your kitchen is over to
11 your -- to your right.
12    Q. Okay.
13    A. Yeah, here you go.
14    Q. And back here, it would be, is it to the north
15 side of the dining room table?
16    A. Yes.
17    Q. Okay. All right. So between the dining room
18 table and the wall; is that the approximate area we're
19 looking at?
20    A. Yes.
21    Q. A piece of newspaper?
22    A. Yes.
23    Q. Why was it collected?
24    A. It had a shoe impression, a shoe impression on
25 it --

61

1    Q. Okay.
2    A. -- that was developed.
3    Q. All right. Item No. 4, what are we looking at
4 here?
5    A. You're looking at a Band-Aid. I don't know if
6 the jury is able to actually see the hair fibers that are
7 around the Band-Aid, but this is -- this is hair fibers on
8 top of the table.
9    Q. All right. Additional hair fibers --
10    A. Okay.
11    Q. -- that were collected; is that --
12    A. Yes.
13    Q. -- the purpose of this? Okay.
14    A. Yes.
15    Q. This might be a better view of that.
16    A. Yes.
17    Q. Your No. 5, what -- where -- what is the location
18 of this within the house?
19    A. That's on the entertainment center in the living
20 room. It's the hammer.
21    Q. Okay. Would this be on the, I guess, the
22 southern end of the house next to the garage?
23    A. Yes.
24    Q. All right. And this is the entertainment
25 center. It appeared to be -- what was it being used for

62

1 apparently, as you look at it?
2    A. To hold a TV.
3    Q. And there was no TV there?
4    A. No, there was not.
5    Q. The hammer was collected; is that correct?
6    A. Yes, it was.
7    Q. Item No. 6, where was this found?
8    A. In the floor on the couch -- near the couch in
9 the living room.
10    Q. It appears to be a number of pills in a plastic
11 bag?
12    A. Yes.
13    Q. Okay. Item No. 7, where was this found?
14    A. It's a prescription bottle that was found on
15 the -- on the couch.
16    Q. All of these items, we say 1 through 7, they
17 would -- they're referred to as BRB-1, 2, 3, 4, 5, 6, 7?
18    A. That is correct, yes.
19    Q. This was collected as well; is that true?
20    A. Yes.
21    Q. Now, 8, what is 8 here?
22    A. 8, that's at the base of the entertainment
23 center. It's another CD album, photo album that was
24 collect -- or it was not collected; it was processed.
25    Q. All right. Why was it not collected?

63

1    A. Did not develop any fingerprints or evidential
2 value on it.
3    Q. So it was processed but not collected, but given
4 a number, No. 8?
5    A. Yes.
6    Q. No. 9?
7    A. Pill capsules. These were found on top of the
8 coffee -- coffee table in the living room as well.
9    Q. All right. Those were collected?
10    A. Yes.
11    Q. Okay. Now, what's marked as your exhibit BRB-10,
12 where was this found and what was done?
13    A. That was also found on top of the coffee table in
14 the living room. It's a coffee cup that had a liquid
15 sample in it.
16    Q. And the result of the processing was what?
17    A. No -- no fingerprints developed.
18    Q. All right. So this was processed, but, also like
19 No. 8, not collected?
20    A. Not collected, right. Photograph only.
21    Q. BRB-11, what are we seeing here? Where was this
22 found?
23    A. The Lockheed Martin name badge, it was found in
24 the chair in the living room. This photograph was where I
25 had developed or processed the name badge, and then I

64

1 photographed it on top of the countertop or the -- I'm
2 sorry -- coffee table where the photograph was taken at.
3     Q. All right. Was this a -- was a latent print
4 developed from this item?
5     A. There was.
6     Q. And did you develop that latent print and collect
7 the latent print yourself?
8     A. Yes, sir.
9     Q. Okay. I believe I'll just represent to you it's
10 already been admitted into evidence as BRB-11.
11     A. Okay.
12     Q. But that is a latent print you, yourself,
13 developed from the -- appears to be an I.D. card, Lockheed
14 Martin, says N.A. Weatherly or Nancy; is that correct?
15     A. Yes, sir, that is correct.
16     Q. The card itself was not collected once you
17 obtained the latent print?
18     A. No, sir.
19     Q. BRB-12, where is the position of this?
20     A. It's in the dining room on the dining room table,
21 atop the table where the blood pool is.
22     Q. All right.
23     A. It's going to be on the -- that would be on the
24 west wall.
25     Q. So it would be at the west side of the table,

65

1 west wall on the edge of the dining room table?
2     A. Correct.
3     Q. And what did you do with this?
4     A. Photographed it, and then we swabbed it to
5 collect a sample.
6     Q. Okay. BRB-13, what are we looking at?
7     A. This is the pooling of the blood in the chair on
8 the west side of the table.
9     Q. What is the relationship of this to the blood we
10 saw in the previous photograph?
11     A. The blood on the previous photograph was atop the
12 table where the blood was pooling or flowing off of the
13 table into the chair.
14     Q. Okay. Did you also collect a sample of this?
15     A. Yes.
16     Q. By a swab?
17     A. Yes.
18     Q. Finally, State's -- I mean, BRB-14, what is the
19 location of this?
20     A. This is right below the table on the west side
21 near the west wall of the table. This is where
22 Ms. Weatherly had been located at, where her face was
23 that's on the floor.
24     Q. Her head was in this area; is that correct?
25     A. That is correct.

66

1     Q. Did you take a sample of this as well?
2     A. Yes, sir.
3     Q. State's -- BRB-15, what are we looking at?
4     A. A blood spatter pattern on the west wall.
5     Q. Okay. 16 is -- what are we looking at here?
6     A. That's the fired bullet.
7     Q. Okay.
8     A. It was found on top of the table in the dining
9 room.
10     Q. 17, what is -- what is 17?
11     A. It's the off-white material that was -- a
12 presumptive test was done on that and concluded that it
13 was positive for blood. That's what we believe to be bone
14 fragments.
15     Q. This was on top of the dining room table; is that
16 correct?
17     A. Yes, on top of the dining room table as well.
18     Q. Was it collected?
19     A. It was collected, yes.
20     Q. Another photograph of the same exhibit; is that
21 correct?
22     A. Yes.
23     Q. BRB-18, where was this? What was the location of
24 18?
25     A. These are in the -- between the dining room and

67

1 the kitchen, on the floor, just near the refrigerator is
2 where these were found at. It's the same material as to
3 what was found on top of the table.
4     Q. Also apparently appear to be bone in nature?
5     A. Yes, it does.
6     Q. Okay. Were these collected?
7     A. Yes, they were.
8     Q. BRB-19, what is the location of this and what is
9 the exhibit BRB-19?
10     A. It's, again, near the dining room, kitchen area.
11 That's on the rug that is in the dining room area. 19 is
12 also representing another white fragment believed to be
13 bone fragments.
14     Q. All right. Now, 20 and 21, where is the location
15 of 21?
16     A. This would be in the guest bathroom in the main
17 hallway as you're going toward the north side of the
18 house.
19     Q. Okay.
20     A. And that's obviously on the toilet in the guest
21 bathroom.
22     Q. Did you obtain and collect a latent print from
23 this toilet lid?
24     A. From the toilet lid? I would have to refer to my
25 notes. I do not recall.

68

1     Q. All right. 22, BRB-22?

2     A. This is -- I'm sorry. Go ahead.

3     Q. Go ahead. Is this also in the guest bathroom?

4     A. It is, yes.

5     Q. What has -- what has happened here? What are we

6 looking at?

7     A. That is the flush handle of the same toilet in

8 the guest bathroom, and a latent print was developed on

9 the flush toilet -- on the flush handle.

10     Q. And I'll represent to you it's been admitted as

11 BRB-22. And did you, yourself, collect that latent print

12 that day?

13     A. Yes.

14        THE COURT: It was exhibit -- it was admitted

15 as State's Exhibit something else. The Medical Examiner

16 No. is 22. You said -- 258 is the State's Exhibit,

17 correct?

18        MR. CHAMBLESS: Yes, sir.

19     Q. (BY MR. CHAMBLESS) State's Exhibit 258 is BRB-22

20 and so the -- would the latent print be BRB-22?

21     A. Yes.

22     Q. Okay. Thank you. 23, we've looked at already.

23 This would be the print developed from the latch of the

24 cassette case; is that correct?

25     A. Yes, sir.

69

1     Q. Go back just briefly to our diagram. It was

2 found in the west bedroom, which is just past the dining

3 room on the left; is that correct?

4     A. That is correct.

5     Q. This photograph, 260, what are we looking at

6 here?

7     A. It's in the master bedroom.

8     Q. Okay. And there appears to be a focus here.

9 You've used a ruler. And what is the purpose of this

10 photograph?

11     A. The -- an apparent blood stain that was located

12 on, like I said, the -- the box spring cover.

13     Q. Okay. And is this a closer picture of that

14 apparent blood stain?

15     A. Yes, sir.

16     Q. And was that -- was a cutting of that stain

17 obtained and recovered by you and Max Courtney that day?

18     A. Yes, sir.

19     Q. If you would -- you've already identified

20 BRB-23. Would you take the latent prints out of this

21 package, and let's talk about these for just a minute.

22     A. Oh, I see, it's stapled to it. Just go through

23 these?

24     Q. Yes, let's just go through these.

25     A. This is going to be a print that was lifted off a

70

1 CD, an audio CD that I believe was found in a pickup.

2     Q. In a Tundra pickup?

3     A. In a Tundra pickup, yes.

4     Q. Okay. We're going to talk about that in just a

5 minute.

6     A. Okay. These, again, are latent prints that have

7 been developed off of a Tundra pickup. They were

8 processed.

9        THE COURT: What was the State's Exhibit

10 number on those packets?

11        MR. CHAMBLESS: It's 215, 1 through 10,

12 Judge.

13        THE COURT: Thank you.

14     Q. (BY MR. CHAMBLESS) Now let's focus just for the

15 moment on these three. I believe they were taken from the

16 house; is that correct?

17     A. Okay. Yes.

18     Q. Okay. What numbers are they? What are your

19 exhibit numbers?

20     A. My exhibit numbers will be BRB-22, BRB-21, and

21 BRB-11.

22     Q. Okay.

23     A. Do you want me to --

24     Q. Yes. Tell us where they came from.

25     A. Okay. BRB-11 is from the I.D. card, the Lockheed

71

1 Martin badge, I.D. badge. BRB-21 is on the lid to the

2 toilet. And BRB-22 is on the flush handle of the toilet.

3     Q. Okay. And then you've previously spoken that

4 BRB-23 was the latent print developed by you from the

5 handle of the cassette case; is that correct?

6     A. That is correct.

7     Q. All right. Those are the four latent prints

8 recovered by you from the house of Nancy Weatherly; is

9 that true?

10     A. I do recall that, yes.

11     Q. Okay. All right. If you would be kind enough to

12 open this too.

13     A. What's in it?

14     Q. These are the hairs. First, it's marked BRB-02.

15 Do you see the -- what is contained within BRB-02?

16     A. Loose hair fibers.

17     Q. Okay.

18     A. Do you want them open?

19     Q. Would you open it and see if that's what it

20 contains within that, please.

21     A. (Witness complied.)

22     Q. Okay.

23     A. Yes, you can see the hairs.

24     Q. Okay. Contained within BRB-02, we've seen a

25 picture of it, but these are loose hairs collected by you

72

1  and Max Courtney that day; is that correct?
2      A.  Correct.
3      Q.  Okay.  If you would be kind enough to open this
4  also, I believe also contains hairs, marked BRB-04.
5      A.  (Witness complied.)
6          MR. CHAMBLESS:  Offer State's Exhibits 271
7  and 272, which are hairs marked BRB-02 and -04, the
8  packaging, 271-A and 272-A.
9          MR. WESTFALL:  No objection as offered, Your
10  Honor.
11          THE COURT:  Admitted.
12          (State's Exhibit Nos. 271 - 272 admitted.)
13          (State's Exhibit Nos. 271-A, 272-A
14          admitted for record purposes only.)
15      Q.  (BY MR. CHAMBLESS) I've shown you what's marked
16  BRB-03.  Would you be kind enough to open that, please,
17  sir.
18      A.  (Witness complied.)
19          (Sotto voce discussion.)
20      Q.  We've seen a picture of it, I believe, on
21  photographs.  This is the newspaper that was collected by
22  you and Max Courtney; is that correct?
23      A.  Yes.
24      Q.  And you've told us the location of that, which
25  was where?

73

1      A.  In the dining room area beside the dining room
2  table.
3          MR. CHAMBLESS:  Okay.  I offer the BRB-03,
4  which is the newspaper, as 273, and the packaging as
5  273-A.
6          MR. WESTFALL:  No objection as offered, Your
7  Honor.
8          THE COURT:  Admitted.
9          (State's Exhibit No. 273 admitted.)
10          (State's Exhibit No. 273-A admitted for
11          record purposes only.)
12      Q.  (BY MR. CHAMBLESS) BRB-05, I believe you
13  testified, is a hammer.  Would you be kind enough to open
14  that package and see if that's the hammer that was
15  collected by you that day.
16      A.  Yes.
17          MR. CHAMBLESS:  Okay.  We offer the hammer
18  as 274, packaging as 274-A, his marking BRB-05.
19          MR. WESTFALL:  No objection as offered, Your
20  Honor.
21          THE COURT:  Admitted.
22          (State's Exhibit No. 274 admitted.)
23          (State's Exhibit No. 274-A admitted for
24          record purposes only.)
25      Q.  (BY MR. CHAMBLESS) BRB-06, I believe you

74

1  testified this is some Tylenol capsules; is that correct?
2      A.  Yes.
3      Q.  Would you be kind enough to open that, please.
4      A.  (Witness complied.)
5      Q.  These were collected as well by you and Max
6  Courtney on that date; is that correct?
7      A.  Correct.
8          MR. CHAMBLESS:  Offer the exhibit, BRB-06,
9  the capsules as State's Exhibit No. 275, the packaging as
10  275-A.
11          MR. WESTFALL:  No objection as offered, Your
12  Honor.
13          THE COURT:  Admitted.
14          (State's Exhibit No. 275 admitted.)
15          (State's Exhibit No. 275-A admitted for
16          record purposes only.)
17      Q.  (BY MR. CHAMBLESS) BRB-07, I believe you
18  testified, is a pill bottle that was found in or on the
19  couch area.  Will you be kind enough to open that and see
20  what's contained therein.
21      A.  Can I cut through that?
22      Q.  Yeah.
23      A.  (Witness complied.)
24      Q.  And this was collected by you and Max Courtney on
25  that date, June 30th; is that correct?

75

1      A.  Yes.
2          MR. CHAMBLESS:  Offer BRB-07 as State's
3  Exhibit 276, the packaging as 276-A.
4          MR. WESTFALL:  For the record only?
5          MR. CHAMBLESS:  For the record only.
6          MR. WESTFALL:  No objection as offered, Your
7  Honor.
8          THE COURT:  Admitted.
9          (State's Exhibit No. 276 admitted.)
10          (State's Exhibit No. 276-A admitted for
11          record purposes only.)
12      Q.  (BY MR. CHAMBLESS)  BRB-09, you've testified, is
13  some Tylenol capsules.  Would you be kind enough to open
14  that, please, sir.
15      A.  (Witness complied.)
16          MR. CHAMBLESS:  Offer BRB-09, Tylenol
17  capsules, as State's Exhibit 277, packaging as 277-A for
18  the record.
19          MR. WESTFALL:  No objection as offered, Your
20  Honor.
21          THE COURT:  Admitted.
22          (State's Exhibit No. 277 admitted.)
23          (State's Exhibit No. 277-A admitted for
24          record purposes only.)
25      Q.  (BY MR. CHAMBLESS)  Okay.  BRB-12, 13, 14, and

**Page 76**

1  15, I'll show these to you.  And could you tell us what
2  these are, these four exhibits?
3     A.  This one here, BRB-13, is the top one.  It's the
4  blood swab that was collected off of the chair in the
5  dining room table.
6        About to sneeze.
7        The next one, BRB-14, is a blood swab
8  collected off of the floor next to the table.  And the
9  next one is BRB-15, and it is collected off of the wall.
10    Q.  Okay.  Now I'll show you what's marked as 12.
11 Would you tell us what that is, please, sir.
12    A.  This is the blood stain swab that is collected
13 off -- off the table, the top of the table.
14    Q.  All right.  Does it indicate it's packaging only
15 at this time?
16    A.  I'm sorry?
17    Q.  Does it indicate that what it contains here is
18 packaging only at this time?
19    A.  Okay, packaging only, yes.
20    Q.  But BRB-12 was a swab from the blood as you
21 described; is that correct?
22    A.  Yes, that is correct.
23       MR. CHAMBLESS:  Okay.  Offer these, these
24 being the --
25       (Sotto voce discussion.)

**Page 77**

1        MR. CHAMBLESS:  Offer 278, State's Exhibit
2  278, which I represent to be the four swabs taken by
3  Officer Blansit from the Nancy Weatherly house on June
4  30th, 2010.  They're marked as BRB-12, 13, 14, and 15
5  within State's Exhibit 278.  The packaging we're offering
6  for the record only; the swabs themselves were offered for
7  all purposes.
8        MR. WESTFALL:  Your Honor, we have -- we have
9  no objection as offered, with the -- I mean with the
10 understanding that if it ever comes to pass that it's
11 necessary, they'll be separated.
12       THE COURT:  Admitted.
13       (State's Exhibit No. 278 admitted.)
14    Q.  (BY MR. CHAMBLESS)  All right.  Show you what's
15 marked as State's -- BRB exhibits 17, 18, and 19, which
16 you've testified these are fragments of material that were
17 found in the house at different locations.
18       First, BRB-17, if you would open that,
19 please.
20    A.  (Witness complied.)
21    Q.  You're holding in your hand the contents of
22 BRB-17; is that correct?
23    A.  Correct, yes.
24       (Pause in proceeding.)
25    Q.  Show you what's marked as State's BRB-18, if you

**Page 78**

1  would open that and tell us if that contains that
2  particular item.
3     A.  Yes, it does.
4     Q.  This would be BRB-18; is that correct?
5     A.  That is correct.
6     Q.  Can you place those in there.
7     A.  (Witness complied.)
8     Q.  Finally, BRB-19, if you would be kind enough to
9  open that and see if it contains the items that were
10 collected by you on that date.
11    A.  Going to put this one in there first.  I can't
12 get the other one out.  There's more.  Yes.
13    Q.  Does it contain the item that was collected by
14 you on that date?
15    A.  Yes, it does.
16       MR. CHAMBLESS:  At this time we offer BRB-17,
17 the packaging as 279-A for record purposes, the bone
18 fragment as 279.
19       Offer BRB-18, the packaging as 280-A for
20 record purposes, the bone fragments as 280 within a clear
21 plastic bag.
22       BRB-19 as State's Exhibit 281, packaging as
23 281-A for record purposes.
24       MR. WESTFALL:  To each, Your Honor, object
25 under 403; substantially more prejudicial than probative,

**Page 79**

1  and cumulative.
2        THE COURT:  Objection is overruled.  The
3  exhibits are admitted.
4        (State's Exhibit Nos. 279 - 281 admitted.)
5        (State's Exhibit Nos. 279-A, 280-A, 281-A
6        admitted for record purposes only.)
7     Q.  (BY MR. CHAMBLESS) If you would, take a look
8  at BRB-20.  And you've testified these were collected
9  by you on that date.
10       If you would, open that and see if it
11 contains the item that was collected.
12    A.  These were collected by both of us.  These are
13 the pills that were on top of the -- these are the pills
14 that were on top of the dining room table that were
15 miscellaneous pills that were collected together.  One
16 pill was in this one.
17    Q.  Show you what's marked State's Exhibit No.
18 BRB-24, if you would open that and see if it contains the
19 item you spoke about.
20       (Sotto voce discussion.)
21       MR. CHAMBLESS:  At this time we offer BRB-20
22 as State's Exhibit 282, packaging as 282-A for record
23 purposes.
24       MR. WESTFALL:  No objection as offered, Your
25 Honor.

80

1    THE COURT: Admitted.

2    (State's Exhibit No. 282 admitted.)

3    (State's Exhibit No. 282-A admitted for

4    record purposes only.)

5    MR. CHAMBLESS: We also offer BRB-24 as

6    State's Exhibit 283, and the packaging as 283-A for

7    record.

8    MR. WESTFALL: No objection as offered, Your

9    Honor.

10    THE COURT: Admitted.

11    (State's Exhibit No. 283 admitted.)

12    (State's Exhibit No. 283-A admitted for

13    record purposes only.)

14    Q. (BY MR. CHAMBLESS) And just, again, we -- I think

15    they were already admitted, but the latent prints that you

16    recovered from the house, I believe they're marked BRB-11,

17    21, 22 and 23; is that correct?

18    A. That sounds right, yes.

19    MR. CHAMBLESS: And we offer those as well.

20    I think they've already been offered and admitted as part

21    of State's Exhibit 215, but I make those specific requests

22    at this time.

23    MR. WESTFALL: May I have just a moment?

24    THE COURT: Yes, sir.

25    (Sotto voce discussion.)

81

1    MR. CHAMBLESS: I offer all of the prints,

2    those are BRB-11, 21, 22, 23, as well as BMC-01, 02, 11,

3    36, and 37 which contains two latent prints, a total of

4    ten latent prints. I think they've already been admitted.

5    THE COURT: Okay.

6    MR. HEISKELL: I have them as admitted,

7    Judge, under 215.

8    Q. (BY MR. CHAMBLESS) Following the evaluation of

9    the house of Nancy Weatherly, did you go, you and Max

10    Courtney go to a location and look at her vehicle, a

11    truck?

12    A. Yes, we did.

13    Q. How long were you at the house roughly; do you

14    recall?

15    A. 10 hours, I believe. I can find out for you if

16    you need me to.

17    Q. Roughly. I'm not asking exactly, but just

18    roughly it was about 10 hours?

19    A. About 10 hours, yes.

20    Q. Okay. What kind of vehicle was it?

21    A. It was a Toyota Tundra, green, forest green

22    pickup.

23    Q. And did you process the Toyota Tundra for

24    evidence as well?

25    A. Yes.

82

1    Q. Tell the Jury something of what you did, what you

2    did as far as processing for evidence.

3    A. Um, in relation to fingerprints, I processed the

4    outside vehicle, including door handles, door frames,

5    windows, gas caps, with black powder; then tried to

6    attempt latent fingerprints.

7    Q. Okay. Show you some photographs marked 271

8    through 290 -- I'm going to have to change that now. Have

9    you seen these photographs before this moment in time?

10    A. Yes.

11    Q. And do these photographs fairly and accurately

12    show the Toyota Tundra and parts of the Tundra that you

13    processed for evidence on that day?

14    A. Yes.

15    (Sotto voce discussion.)

16    (Pause in proceeding.)

17    MR. CHAMBLESS: Offer 284 through 314 at this

18    time.

19    MR. WESTFALL: Your Honor, I looked at these

20    pictures over the break, and I have no objection to them.

21    THE COURT: Thank you. Admitted.

22    (State's Exhibit Nos. 284 - 314 admitted.)

23    Q. (BY MR. CHAMBLESS) All right. Now, the items

24    that were collected from Nancy Weatherly's vehicle,

25    instead of being designated BRB, were they used -- did

83

1    they use the initials "BMC"?

2    A. Yes, we did "BMC".

3    Q. And then 1 through, and I believe there's 27 of

4    these exhibits; is that correct?

5    A. Correct.

6    Q. Starting with No. 1, what is shown here on

7    State's Exhibit 284?

8    A. It's a photograph of a latent print, latent print

9    from the front door, the exterior door of the driver side.

10    Q. Were you able to --

11    A. I'm sorry. Passenger side.

12    Q. Were you able to obtain a latent print from this

13    area?

14    A. I do believe so, yes. Yes.

15    Q. And so it would be marked "BMC dash 01"; is that

16    correct?

17    A. That is correct.

18    Q. What is shown on this photograph?

19    A. It's gonna be also on the passenger front door

20    handle. It's a latent -- latent print development.

21    Q. All right. And did you personally collect the

22    latent print on that day?

23    A. Yes.

24    Q. It would be marked BMC-02; is that correct?

25    A. 02, correct.

84

1    Q. BMC-03 would have been a swab; is that true?
2    A. Yes, a swab of the exterior door handle.
3    Q. BMC-04, what are we looking at?
4    A. Looking at some CDs that were found in the visor,
5  interior, the interior of the vehicle.
6    Q. All right. Is this a, I guess, a better picture
7  of that?
8    A. Yes.
9    Q. There are actually, I believe, one, two, three,
10 four DVDs, correct?
11   A. Yes.
12   Q. And they're marked BMC-04; is that true?
13   A. Correct.
14   Q. BMC-05, what was BMC-05?
15   A. It's a swab of the exterior door handle on the
16 driver side.
17   Q. Okay. BMC-06, what is this and where was it
18 located?
19   A. It's the front console of the -- center console
20 of the vehicle. BM-6 (sic) is showing the cigarette
21 lighter.
22   Q. Okay.
23   A. And the -- well, the cigarette box, and the
24 cigarette lighter is what it's representing.
25   Q. There is a Marlboro Light cigarette package just

85

1  below -- just above the placard marked 6; is that correct?
2    A. Correct, yes.
3    Q. BMC-07, what was that?
4    A. This is a tray or a shelf, a drawer to a jewelry
5  box that was found in the -- shoved in between the
6  console, the center console of the vehicle and the
7  passenger side seat.
8    Q. Okay. And this shows a different further-back
9  view of the same item; is that correct?
10   A. That is correct.
11   Q. BMC-08 is -- what is that?
12   A. 08 is also going to be a swab of the interior
13 front door, front driver, driver -- let's see, passenger
14 side door.
15   Q. All right. Is BMC-09 a gold earring recovered
16 within the vehicle?
17   A. It is.
18   Q. And where was it found?
19   A. It was found in the front passenger seat.
20   Q. Okay.
21   A. Under the front passenger seat is where the --
22 where it was found.
23   Q. BMC-10, was it also a swab?
24   A. Yes, a swab of the -- BMC-10 would be a swab of
25 the interior driver door handle.

86

1    Q. Okay. 293, BMC-11, what is that, please, sir?
2    A. It's the -- indicating the liquid sample from a
3  Dairy Queen cup that was found in the car.
4    Q. Now, how many Dairy Queen cups were found in the
5  truck?
6    A. Two.
7    Q. And where were they found?
8    A. In the back, on the backside of the center
9  console where the cup holders are for your consoles.
10   Q. Okay. So they were in the cup holders for, I
11 guess, passengers in the back seat?
12   A. Correct.
13   Q. BMC-12, what does this represent?
14   A. A straw from the cup, the actual straw that was
15 removed from the cup.
16   Q. So it correct to say that you collected liquid
17 from the Dairy -- from the cup and also the straw, and
18 you've marked each either as 11 and now 12 for the straw;
19 is that correct?
20   A. That is correct.
21   Q. 13, what is shown here?
22   A. It's going to represent the liquid that was
23 collected from the Dairy Queen cup.
24   Q. The second one?
25   A. The second one, correct.

87

1    Q. You can see the other one just on top of it; is
2  that correct?
3    A. That is.
4    Q. 14, what is shown here?
5    A. Is representing the straw that was collected from
6  the cup, on the cup, No. 13 cup.
7    Q. The BMC-15, what is shown here?
8    A. The keyless remote entry.
9    Q. Okay.
10   A. For the vehicle.
11   Q. It was collected as well?
12   A. Correct.
13   Q. BMC-16, what are we seeing here?
14   A. 16 is representing a polo shirt, collared shirt
15 that was found on top of the headrest of the driver seat,
16 I believe, yeah, driver seat.
17   Q. Okay. BMC-17, what was collected under this
18 number?
19   A. That's going to be a Dairy Queen sack that I
20 found in the bed of the truck.
21   Q. Is that a better view of that same sack?
22   A. Yes.
23   Q. BMC-18, what is this?
24   A. That's a latent print on the driver side door,
25 exterior door handle or exterior door.

STATE VS. MARK ANTHONY SOZA                MARCH 5, 2012

88

1    Q. Okay. I think I misspoke earlier. I said
2  BMC-11, but BMC-18 is actually the third latent print that
3  was -- that we've spoken about from the truck; is that
4  correct? We have BMC-01, 02, and now 18?
5    A. Yes, that is correct.
6    Q. And was this latent print recovered by you on
7  that date, June 30th, 2010?
8    A. Yes, sir, it was.
9    Q. 19, what are we seeing here?
10   A. A CD, audio CD that was found in the pocket of
11 the lower center console.
12   Q. Okay. Is that -- that appears to be to the right
13 of the driver?
14   A. That's correct, driver side, yes.
15   Q. BMC-20, what is shown here?
16   A. It's a shoe impression on the Nerf bar step rail
17 that's going into the truck. The exterior side of the
18 truck on the driver side, the step rail, that's a shoe
19 impression.
20   Q. Okay. And 21, what is BMC-21?
21   A. 21 is on the passenger side of the vehicle. It's
22 an impression that -- a block pattern, believed to be a
23 shoe impression of some kind.
24   Q. Okay. So on the driver side you had a -- the
25 impression that was more visible on this is a different

89

1  pattern than on the driver side?
2    A. That's correct.
3    Q. You say it was a block pattern?
4    A. Yes.
5    Q. BMC-22, what is shown here? What was collected?
6    A. That is a CD case charger -- I'm sorry. A
7  cellular phone charger that was found in the -- in the
8  back seat of the truck. We did not locate the actual
9  charger though, just the case.
10   Q. So it's the plastic packaging that was collected;
11 is that true?
12   A. Correct, yeah.
13   Q. Is that because you did some -- what, as far as
14 your attempt to obtain prints from the inside of the
15 truck, how do you go about that?
16   A. In this, in this case, we used what I briefly
17 mentioned earlier, the super glue method, the fuming
18 method, where we actually fumed the interior of the
19 truck. And you can see a little bit there on the C -- I
20 keep calling it CD case, I'm sorry -- on the cellular
21 packaging, the phone charger packaging where it's kind of
22 a white ash look color on the plastic, and that's the
23 results that you get when you fume an item. There you go.
24   Q. Okay. So the whitish, I guess, tint to the
25 red -- what appears to be like the plastic over the red is

90

1  what you're speaking to?
2    A. Yes.
3    Q. Okay. It was collected as well, the packaging;
4  is that true?
5    A. Yes.
6    Q. Now, BMC-23, what is this item?
7    A. It's a green lighter that was found in the center
8  console.
9    Q. And it was collected as well?
10   A. Yes.
11   Q. Okay. BMC-24, and apparently 25 as well, what
12 is -- what was collected here?
13   A. 24 is representing the lottery ticket that was
14 found in the front passenger floorboard, and then 25 is
15 the garage door opener. You can --
16   Q. Might be better seeing it here?
17   A. There you go. Yeah, you can see it there.
18   Q. All right. BMC-26, what's shown here?
19   A. It's representing an oily spot, some form of
20 transfer that was on the passenger side window.
21   Q. All right. Was a swab obtained from this area?
22   A. Yes.
23   Q. Finally, BMC-27, what's shown here?
24   A. A CD that was pulled out of the actual CD player
25 of the vehicle.

91

1    Q. All right. So it was, when -- before it was
2  pulled out, it was -- apparently had been inserted as if
3  to play; is that correct?
4    A. Yes, it was.
5    Q. So you had to push the, I guess, the button to --
6  to eject it; is that correct?
7    A. Correct.
8    Q. All right. And this is the CD that was in the
9  player at the time that you did this processing; is that
10 correct?
11   A. That is correct.
12   Q. All right. If you would be kind enough to open
13 this. I believe it contains multiple exhibits marked 3,
14 5, 8, 10, 12 and 14.
15   A. (Witness complied.)
16   Q. What is contained within the packaging that you
17 just opened?
18   A. Swabs.
19   Q. And is items BMC-12 and 14, what are they?
20   A. 14 is going to be a straw from the Dairy Queen
21 cup.
22   Q. Okay. And 12?
23   A. 12 is going to be straw from a Dairy Queen cup.
24   Q. Okay. Place all of those in here.
25   A. (Witness complied.)

92

1    MR. CHAMBLESS: Judge, at this time, Your
2 Honor, we would like to offer four swabs which are marked
3 BMC-3, 5, 8 and 10, and then the two straws marked
4 BMC-12 and 14. They're marked appropriately within the
5 smaller boxes here.
6    And so I've marked those items State's
7 Exhibit 315 dash 3, 5, 8, 10, 12 and 14. The boxes for
8 record only, the envelope for record only, and the items
9 themselves for all purposes.
10    MR. WESTFALL: No objection as offered, Your
11 Honor.
12    THE COURT: Admitted.
13    (State's Exhibit No. 315 admitted.)
14    (State's Exhibit No. 315-A admitted for
15      record purposes only.)
16    Q. (BY MR. CHAMBLESS) Be kind enough to open this
17 one, please, sir.
18    A. Yeah, audio CDs.
19    Q. We've seen a picture of this. Are these the four
20 DVDs or CDs that were on the visor of the Tundra and
21 collected by you and Max Courtney that date?
22    A. Correct. That would be the cigarette case.
23    (Pause in proceeding.)
24    MR. CHAMBLESS: Offer what's marked as
25 BMC-04 as State's Exhibit 316, being the four DVDs, the

93

1 packaging as 316-A for record purposes; BMC-06 as 317,
2 and the packaging as 317-A for record.
3    MR. WESTFALL: No objection as offered, Your
4 Honor.
5    THE COURT: Admitted.
6    (State's Exhibit No. 316 - 317 admitted.)
7    (State's Exhibit No. 316-A, 317-A admitted
8      for record purposes only.)
9    Q. (BY MR. CHAMBLESS) If you would be kind enough
10 to open this, please, sir.
11    A. (Witness complied.)
12    Q. What is BMC-07?
13    A. A shelf from a jewelry box, jewelry drawer.
14    Q. Okay. This was collected by you. You indicated
15 it was found on the passenger side between the seat and
16 the console; is that correct?
17    A. Yes.
18    MR. CHAMBLESS: Offer BMC-07, the drawer as
19 318, the packaging as 318-A.
20    MR. WESTFALL: No objection as offered, Your
21 Honor.
22    THE COURT: Admitted.
23    (State's Exhibit No. 318 admitted.)
24    (State's Exhibit No. 318-A admitted for
25      record purposes only.)

94

1    THE WITNESS: Earring.
2    MR. CHAMBLESS: Offer BMC-09, a gold earring
3 as State's Exhibit No. 319, the packaging as 319-A.
4    THE WITNESS: Correct.
5    MR. CHAMBLESS: For record purposes.
6    MR. WESTFALL: No objection.
7    THE COURT: Admitted.
8    (State's Exhibit No. 319 admitted.)
9    (State's Exhibit No. 319-A admitted for
10      record purposes only.)
11    THE WITNESS: Liquid sample.
12    Q. (BY MR. CHAMBLESS) Is this the liquid sample
13 that was collected by you from the Dairy Queen -- one of
14 the Dairy Queen cups found in the rear cup holder area of
15 the Tundra?
16    A. Yes, it was.
17    MR. CHAMBLESS: Offer State's -- offer
18 BMC-11, the liquid sample, as 320, and the packaging as
19 320-A for record purposes.
20    MR. WESTFALL: No objection, Your Honor.
21    THE COURT: Admitted.
22    (State's Exhibit No. 320 admitted.)
23    (State's Exhibit No. 320-A admitted for
24      record purposes only.)
25    Q. (BY MR. CHAMBLESS) What is this item?

95

1    A. Liquid sample from the Dairy Queen cup, the
2 second Dairy Queen cup.
3    MR. CHAMBLESS: Offer BMC-13 as State's
4 Exhibit No. 321, and the packaging as 321-A.
5    MR. WESTFALL: No objection, Your Honor, as
6 offered.
7    THE COURT: Admitted. Admitted.
8    (State's Exhibit No. 321 admitted.)
9    (State's Exhibit No. 321-A admitted for
10      record purposes only.)
11    THE WITNESS: This is going to be the keyless
12 remote.
13    MR. CHAMBLESS: Offer the remote that was
14 collected by Mr. Blansit as State's Exhibit No. 322, his
15 marking BMC-15, the packaging as 322-A for record.
16    MR. WESTFALL: No objection as offered, Your
17 Honor.
18    THE COURT: Admitted.
19    (State's Exhibit No. 322 admitted.)
20    (State's Exhibit No. 322-A admitted for
21      record purposes only.)
22    Q. (BY MR. CHAMBLESS) What is contained within that
23 exhibit?
24    A. It's going to be the polo-styled collared shirt
25 that was found on the headrest of the driver side seat, I

96

1  believe.
2      Q. And this was collected by you on that date from
3  within the Tundra of Nancy -- that being Nancy Weatherly's
4  vehicle; is that correct?
5      A. Correct.
6          MR. CHAMBLESS: Offer the polo shirt, BMC-16,
7  as State's Exhibit No. 323, the packaging as 323-A.
8          MR. WESTFALL: No objection as offered, Your
9  Honor.
10         THE COURT: Admitted.
11         (State's Exhibit No. 323 admitted.)
12         (State's Exhibit No. 323-A admitted for
13         record purposes only.)
14     Q. (BY MR. CHAMBLESS) What is this?
15     A. This is the Dairy Queen sack that was found in
16  the bed of the truck.
17     Q. Okay.
18     A. Ketchup packaging.
19         MR. CHAMBLESS: Offer BMC-17, being the Dairy
20  Queen sack as State's Exhibit No. 324, the packaging as
21  324-A for record purposes.
22         MR. WESTFALL: No objection as offered, Your
23  Honor.
24         THE COURT: Admitted.
25         (State's Exhibit No. 324 admitted.)

97

1          (State's Exhibit No. 324-A admitted for
2          record purposes only.)
3      Q. (BY MR. CHAMBLESS) Show you what's marked
4  BMC-19, if you could open that, please, sir. What is
5  BMC-19?
6      A. Be the audio CD that was found in the center
7  console.
8          MR. CHAMBLESS: Offer BMC-19, a CD, as
9  State's Exhibit No. 325, packaging as 325-A for record.
10         MR. HEISKELL: No objection as offered, Your
11  Honor.
12         THE COURT: Admitted.
13         (State's Exhibit No. 325 admitted.)
14         (State's Exhibit No. 325-A admitted for
15         record purposes only.)
16         THE COURT: At this time the Court will
17  recess for lunch. Be back and ready to go at 1:15.
18         (Recess taken from 11:57 a.m. to 1:18 p.m.)
19         (Jury not present.)
20         THE COURT: State present and ready?
21         MR. CHAMBLESS: Ready.
22         THE COURT: Defense present and ready?
23  Defendant present?
24         MR. WESTFALL: Yes. He is, Your Honor.
25         THE COURT: Jury ready?

98

1          THE BAILIFF: Yes, sir.
2          THE COURT: You may bring the Jury in.
3          (Jury present.)
4          THE COURT: Thank you. You may be seated.
5      Q. (BY MR. CHAMBLESS) Okay. We were -- we had
6  talked about the items that you had collected from the
7  house of Nancy Weatherly and we were at the end of the
8  items or marking the items that you had collected from her
9  truck, the 2003 Tundra.
10         Would you look at what's marked as BMC-20,
11  open that and see if you recognize that, please, sir.
12     A. (Witness complied.)
13     Q. What is BMC-20?
14     A. It's going to be a dust impression with class
15  characteristics with chevron characteristics on a dust
16  impression.
17     Q. Where was this impression taken from, what part
18  of the truck?
19     A. It was on the exterior step rail of the driver
20  side of the vehicle.
21     Q. All right. Was this impression made by you?
22     A. I'm sorry?
23     Q. Was this impression made by you?
24     A. It was developed by me, yes.
25         MR. CHAMBLESS: Okay. Right. That was a

99

1  critical distinction there. Thank you.
2          THE WITNESS: Sorry.
3          MR. CHAMBLESS: We'd have to stop and ask if
4  you had been warned here or something.
5          Offer the impression as State's Exhibit 326,
6  his marked BMC-20, and the packaging as 326-A.
7          MR. WESTFALL: No objection as offered, Your
8  Honor.
9      Q. (BY MR. CHAMBLESS) BMC-21, if you would open
10  that and see if you recognize that item.
11     A. This here is a dust impression. It was taken on
12  the side exterior step rail on the passenger side of the
13  vehicle.
14     Q. Okay.
15     A. That I did develop.
16         MR. CHAMBLESS: Thank you. Offer this as his
17  marked BMC-21, State's Exhibit offered as 327, packaging
18  as 327-A for record purposes.
19         MR. WESTFALL: No objection as offered, Your
20  Honor.
21         THE COURT: Admitted.
22         MR. CHAMBLESS: Show you what's marked -- I'm
23  sorry.
24         THE COURT: Admitted.
25         (State's Exhibit No. 327 admitted.)

100

1       (State's Exhibit No. 327-A admitted for
2       record purposes only.)
3       Q. (BY MR. CHAMBLESS) Show you BMC-22, if you
4   could open that, please, sir.
5       A. Cell phone chargers that were found in the back
6   seat of the vehicle.
7       MR. CHAMBLESS: Offer these, his mark is
8   BMC-22, State's Exhibit 328 offered for all purposes, the
9   packaging, 328-A for record only.
10      MR. WESTFALL: No objection, Your Honor.
11      THE COURT: Admitted.
12      (State's Exhibit No. 328 admitted.)
13      (State's Exhibit No. 328-A admitted for
14      record purposes only.)
15      Q. (BY MR. CHAMBLESS) Show you what's marked
16  BMC-23. If you would open that and see if you recognize
17  that item.
18      A. Be the green lighter that was found in the center
19  console.
20      MR. CHAMBLESS: I offer the green lighter,
21  which is his mark BMC-23, marked now as State's Exhibit
22  329 for all purposes, the packaging for record as 329-A.
23      MR. WESTFALL: No objection, Your Honor.
24      THE COURT: Admitted.
25      (State's Exhibit No. 329 admitted.)

101

1       (State's Exhibit No. 329-A admitted for
2       record purposes only.)
3       Q. (BY MR. CHAMBLESS) Show you now BMC-24.
4   Would you open that and tell us if you recognize that
5   item.
6       A. Be a lottery ticket found in the floorboard of
7   the pickup.
8       (Sotto voce discussion.)
9       MR. CHAMBLESS: Okay. Lottery ticket, his
10  mark is BMC-24, marked as State's Exhibit and offered as
11  State's Exhibit 330 for all purposes, the packaging marked
12  as 330-A for the record.
13      MR. WESTFALL: No objection, Your Honor.
14      THE COURT: Admitted.
15      (State's Exhibit No. 330 admitted.)
16      (State's Exhibit No. 330-A admitted for
17      record purposes only.)
18      Q. (BY MR. CHAMBLESS) Show you what's marked
19  BMC-25. If you would open that, please, sir.
20      A. Be the garage door opener.
21      Q. Okay. It was found, I believe, next to the
22  lottery ticket in the floor of the -- behind the passenger
23  seat; is that correct?
24      A. That is correct.
25      MR. CHAMBLESS: Okay. Your mark BMC-25, the

102

1   garage opener is marked and offered as State's Exhibit 331
2   for all purposes, the packaging for record as 331-A.
3       MR. WESTFALL: No objection, Your Honor.
4       THE COURT: Admitted.
5       (State's Exhibit No. 331 admitted.)
6       (State's Exhibit No. 331-A admitted for
7       record purposes only.)
8       Q. (BY MR. CHAMBLESS) Show you now BMC-236. If
9   you would open that, and ask if you recognize that item.
10      A. It's going to be the swab of the oily substance
11  that was found on the right front passenger window.
12      Q. Okay. So this is a swab contained within a box,
13  a small box, which is the appropriate container for the
14  swab, of the oily spot on the front windshield; is that
15  correct?
16      A. Uh-huh, yes, front -- right-front window, yeah.
17      MR. CHAMBLESS: Offer as his exhibit 26, the
18  packaging marked as 332-A for record, the exhibit as 332
19  being the swab of the oily spot contained within the box,
20  which is offered for record purposes.
21      MR. WESTFALL: No objection.
22      THE COURT: Admitted.
23      (State's Exhibit No. 332 admitted.)
24      (State's Exhibit No. 332-A admitted for
25      record purposes only.)

103

1       Q. (BY MR. CHAMBLESS) Hand you now BMC-27.
2   What is BMC-27?
3       A. It appears as the CD that came out of the case,
4   the CD, audio CD player in the Toyota Tundra.
5       MR. CHAMBLESS: His mark BMC-27, offered as
6   State's Exhibit 333 for all purposes, the packaging marked
7   as 333-A for record purposes.
8       MR. WESTFALL: No objection, Your Honor.
9       THE COURT: Admitted.
10      (State's Exhibit No. 333 admitted.)
11      (State's Exhibit No. 333-A admitted for
12      record purposes only.)
13      Q. (BY MR. CHAMBLESS) Finally, if you would locate
14  BMC-01, 02 and 18.
15      A. 01, 02 and 18?
16      Q. 18, yes, sir.
17      A. Okay.
18      Q. Have you located those?
19      A. Yes.
20      Q. What are BMC-01, 02 and 18?
21      A. They're latent prints, fingerprints that were
22  developed off of the driver side door, passenger side door
23  handle, and the passenger side door handle of the pickup.
24      Q. Okay. And were those developed by you on that
25  date, June 30th of 2010?

104

1    A. Yes, they were.

2    Q. Okay. Now, collectively all of the items that
3  were taken or processed from the Tundra and from the house
4  of Nancy Weatherly, was it retained and possessed by you
5  and transferred to a secure location at the Mansfield
6  Police Department at the end of your work?

7    A. Yes.

8         MR. CHAMBLESS: Okay. Pass the witness.

9              CROSS-EXAMINATION

10 BY MR. WESTFALL:

11   Q. Officer Blansit, I'm Greg Westfall.

12   A. Hello.

13   Q. How long have you been doing crime scene work?

14   A. Started in 2007, 2008, I believe it was.

15   Q. So coming up on five years?

16   A. Yes. I'm trying to think. I've been working
17 with Max for the last two and a half years. I was
18 assigned to the unit a couple years prior to that but
19 wasn't near as involved or active as I was till Max came
20 along.

21   Q. Right. How long you been with Mansfield?

22   A. This is going on my eighth year in the Patrol
23 Division.

24   Q. And so you've been in Crime Scene for five years?

25   A. Been involved in it, yes.

105

1    Q. Did you do -- do you do patrol also?

2    A. Yes.

3    Q. And then Crime Scene on like an as-needed basis?

4    A. Correct, yeah.

5    Q. And then Max, this is all he does?

6    A. Yes.

7    Q. Have you gone to other schools?

8    A. Yes, I have.

9    Q. Like what?

10   A. Well, in-house training. We are fortunate to
11 have Max Courtney as our Director of Crime Scene, and he
12 is able to put on numerous different classes. And just
13 training side-by-side with him does count for training in
14 itself.

15       In addition to that, I've gone through
16 conferences and different schools through -- that is put
17 on through the University of West Virginia. They're
18 week-long classes that you can go through that are just,
19 you know, the theory of crime scene protection and
20 collection of evidence and processing the evidence.

21       In addition to that, I have gone through
22 latent print training to develop prints and somewhat
23 analyze the prints to a certain level. Other trainings
24 include through the -- can't think who it was through
25 right now. It was a -- it's photography classes through a

106

1  company in Florida. I can't think of their name right
2  now, but I've gone through a -- more or less, it's an
3  advanced photography school.

4    Q. What do you do in the advanced photography
5  school?

6    A. In the advanced photography school, you do more
7  toward taking photographs of the close-up photographs,
8  what is known as examination-quality photographs to where
9  they can be basically viewed from a one-to-one ratio to
10 where if you have -- say you're taking a photograph of a
11 fingerprint; you would be able to take that photograph in
12 a way to where the person who was analyzing the
13 fingerprint would be able to take the known fingerprint
14 and have them at the exact same size. And in order to do
15 that, you would have to put your scales in there and
16 properly take the photograph with the right lighting, and
17 it involves some of those things.

18   Q. And not shake it around?

19   A. I'm sorry?

20   Q. And not shake it around?

21   A. Oh, yeah. A lot of those photographs require a
22 tripod actually. The human just cannot hold the camera
23 still enough in order to get those kind of photographs.

24   Q. Y'all did -- y'all did several photographs with
25 fingerprints in this case?

107

1    A. Yes.

2    Q. And so you have the technology, and I guess the
3  technology has been around for a while to be able to do
4  fingerprint examinations off pictures, hasn't it?

5    A. Yes, sure, yes.

6    Q. You know, it is true that we might apply super
7  glue fumes to a hundred different surfaces, but then out
8  of all of that, we might only get one fingerprint?

9    A. Very true, yes. I would agree to that.

10   Q. But that's what makes finding a print all that
11 more important, doesn't it?

12   A. I'm sorry?

13   Q. I mean, so it's the finding the print that's
14 important, not the fact that we didn't find the prints on
15 the other things, right?

16   A. Yes.

17   Q. Because it's really not much we can read into,
18 the fact that we didn't find prints; isn't that true?

19   A. Yes.

20   Q. Because, you know, if I -- if I handle this
21 remote and set it down, and you super glue it and you find
22 no fingerprints on there, I mean, you just saw me handle
23 it?

24   A. Correct.

25   Q. Obviously the prints didn't take?

**108**

1    A.  That's correct, yes.
2    Q.  And so but when we find a print on something,
3  then that is significant?
4    A.  Correct.
5    Q.  And the same thing about contact DNA, I mean, you
6  tested several places inside that Tundra for contact DNA,
7  didn't you?
8    A.  I did.
9    Q.  And, in fact, Max, I guess, was the one who did
10  it, but you knew that the oily spot in the back was being
11  swabbed for contact DNA as well?
12    A.  Yes.
13    Q.  And that's the reason why you did those swabs
14  inside the truck, right?
15    A.  Absolutely, yes.
16    Q.  Because that's for the DNA?
17    A.  Yes, sir.
18    Q.  And the straw as well, you packaged the straw so
19  it could be tested for DNA, both the straws?
20    A.  Yes, sir.
21    Q.  In the D.Q. cups?
22    A.  Yes.
23    Q.  Do you remember those?
24    A.  Oh, yes.
25    Q.  And, you know, DNA that comes out of something

**109**

1  that's been in somebody's mouth is actually a bit of a --
2  a little bit of a higher percentage chance of finding DNA
3  because we have the cells inside our mouth, right?
4    A.  Yes.
5    Q.  And like if you find cigarette butts at a crime
6  scene, you're always going to collect those?
7    A.  Correct.
8    Q.  Because a lot of times there's going to be DNA
9  inside those filters?
10    A.  Right.
11    Q.  But, once again, you know, we can look at those
12  straws, we can test those straws and they can come back
13  inconclusive or no DNA, and there's not much we can read
14  into that?
15    A.  That's -- that's correct.
16    Q.  But when we find DNA on the straws, that's
17  something?
18    A.  It is.
19    Q.  And then the footprint impressions as well, and
20  that was the last stuff y'all put in was the footprint
21  impressions?
22    A.  Yes, yes.
23    Q.  And let me just do this.  I'm showing you what's
24  been marked for identification as Defendant's 13 through
25  20.  And just take a look and tell me, do those fairly and

**110**

1  accurately depict what they show?
2    A.  Yes, sir.
3      MR. WESTFALL:  Thank you.  Let me get them
4  in.
5      Your Honor, we move for the admission of
6  Defendant's 13 through 20.
7      MR. CHAMBLESS:  No objection.
8      THE COURT:  Admitted.
9      (Defendant's Exhibit Nos. 13 - 20 admitted.)
10      MR. WESTFALL:  Thank you, Your Honor.
11    Q.  (BY MR. WESTFALL) I'm going to come back to the
12  pictures.  I want to write down some of the stuff you
13  collected.  Okay.  Thanks.
14      Okay.  Some of this you collected; some of it
15  I think you probably know about.  Already in evidence is
16  Kniffen's No. 15 and 16, the Bud Light beer can and Bud
17  Light beer bottle.  Do you remember those?  Came out of
18  the bed of Nancy Weatherly's truck.
19    A.  I don't recall those.
20    Q.  Okay.  Fair enough.  Hold on just one second.
21      I don't guess you've seen them, just a Bud
22  Light bottle and Bud Light can.  Do you see them in your
23  records anywhere?
24    A.  Can you give me just a minute?  I just don't
25  recall that at all.

**111**

1    Q.  And in all fairness, I've never seen anything
2  that said you even touched them.
3    A.  Okay.
4    Q.  Yeah, so --
5    A.  At this time I do not recall those being
6  collected by me.
7    Q.  Yeah, the testimony was that Kniffen collected
8  them, gave them to Gaudet who then did some fingerprint
9  work on them --
10    A.  Not even sure who Kniffen is.
11    Q.  -- for DNA.  Okay.
12    A.  Yeah.
13    Q.  So BRB-03 though, newspaper page, right?
14    A.  BRB-03, yes.
15    Q.  Now, this is Defendant's 13.  And the newspaper
16  page that you collected is this right here, right?
17    A.  Yes, that is the newspaper that was collected,
18  yes.
19    Q.  And what is this thing?
20    A.  That's called an electromagnetic dust lifter.
21  Would you like for me to explain?
22    Q.  Please.
23    A.  Okay.  This is a machine that is used to -- you
24  put a film, it's more of an aluminum-type film that will
25  go over the top of the newspaper.  Through electrostatic,

112

1  this machine, the wires that you see, you connect one of
2  them to the film itself; the antenna lays beside it.
3         Now, I obviously cannot explain the in-depths
4  of how the machine actually works, but what it does is it
5  causes a -- a friction between the aluminum foil or the
6  film that goes over the top of the paper and it sucks down
7  to the top of this paper. And what it does is any dust
8  that is on the paper or on the surface that you are
9  processing, it will lift that dust and it will stick to
10 your aluminum foil or to your -- to your film that you use
11 through a -- yeah.
12     Q. Did you do the electrostatic dust print or did
13 Max?
14     A. Max did.
15     Q. Okay. And the print itself, I think, was
16 numbered BRB-03-A. Have you seen that come into evidence
17 yet?
18     A. I don't believe.
19     Q. The electrostatic print that was collected from
20 this?
21     A. No, no, I haven't.
22     Q. I'll show you Defendant's 17. This is a print
23 that came off of the driver side of the Tundra.
24     A. Yes, sir.
25     Q. I don't know if it's even possible to see. I

113

1  guess this is it a little bit closer up. Is that the
2  print?
3      A. Yes, sir.
4      Q. Now, do you do any footprint comparison work?
5      A. No, I do not, sir.
6      Q. Don't have any knowledge of it?
7      A. No.
8      Q. And then Defendant's 19 may be duplicative of
9  something already in, but there's just this avalanche of
10 pictures. So this is BRB-27, and this is the CD that was
11 actually in the CD player?
12     A. Yes, sir.
13     Q. And you ejected it?
14     A. Yes, sir. It was ejected, yes, sir.
15     Q. Okay. And were you the one that took the latent
16 prints off of this?
17     A. It was -- it was fumed.
18     Q. Okay.
19     A. Was I -- restate your question. I'm sorry.
20     Q. Were you the one that developed the latent prints
21 on this CD?
22     A. It was fumed, and then later, I believe, it was
23 followed up with a dust lift, if I'm not mistaken, but
24 that was not done by me.
25     Q. Okay. Then these here are actually the placement

114

1  of the two Dairy Queen cups?
2      A. Yes, sir.
3      Q. This one would be on the driver side, I guess,
4  and that would be on the passenger side?
5      A. Yeah, yes, sir.
6      Q. So BRB-03-A is the dust print from the newspaper
7  page, right?
8      A. Yes, sir.
9      Q. BMC-12, as I recall, is the straw from the
10 passenger side D.Q. cup?
11     A. That is correct.
12     Q. Passenger back?
13     A. Yes.
14     Q. And the passenger back, that's also where that
15 oily spot was too, right?
16     A. I would have to refer to my notes. I thought it
17 was on the front window. Was it on the back?
18     Q. I've got the picture right here.
19     A. Okay.
20     Q. I guess you can't really tell from this. Does
21 that refresh your memory at all?
22     A. That's going to be on the front. It's interior
23 front passenger side door.
24     Q. Okay. So passenger side but on the front?
25     A. Yes, sir.

115

1      Q. All right. And that was what again, BMC-26?
2      A. That's correct.
3      Q. And then BMC-27, that's the audio CD that came
4  out of the CD player.
5         Now, I've looked again at my notes and it
6  appears as though the two latent lifts are identified as
7  BMC-37. Does that mean Max took those?
8      A. Yes, uh-huh, that is correct.
9      Q. And then BMC-18, forgot that one. That's latent
10 print from the driver side door?
11     A. Exterior, yes.
12     Q. Yeah, okay. Okay. Now, tell me about those.
13 Where were those?
14     A. The latent prints?
15     Q. On the driver side door, where were they on the
16 door; do you remember?
17     A. I believe there was two, two of them. Let's see.
18 (Sotto voce.) It was above the handle, if I recall
19 correctly on that one. It was on the -- the door frame
20 going down to the door handle.
21     Q. Okay. So where you might have grabbed the door
22 just to close it like this?
23     A. Yeah.
24     Q. All right.
25     A. If I could see the photo, that would refresh my

116

1  memory a little bit better, but.
2      Q. Let me see if I can find it for you because I
3  looked at them. There's this. That's 2, right?
4      A. Yes, sir, that would be 2.
5      Q. Seems like I'm finding every one except 18. I
6  found 1. I found 24. Do you have it notated anywhere?
7      A. The exterior doors and the windows were
8  processed. Yeah, two latent prints were developed off the
9  exterior surface to the front passenger door. There's two
10 of them that's been lifted. One was developed off the
11 exterior surface of the front driver side door.
12     Q. That's just exterior surface of the front driver
13 side door?
14     A. Yes, sir.
15     Q. Okay. Then we've got that. We'll go with that.
16 And then BMC-20 is the footwear impression on the driver
17 side door of the Tundra, right?
18     A. Yes, sir.
19     Q. Now, you also developed a -- some sort of an
20 impression over on the passenger side?
21     A. Yes.
22     Q. Okay. You -- you preserved that and submitted
23 that as well?
24     A. I did, sir.
25     Q. Part of the -- I guess the point of doing this is

117

1  to try to figure out what happened, the progression of
2  events, isn't it?
3      A. Yes, sir.
4      Q. And I can't remember what exhibit it is, but in
5  the house there is -- on the back bedroom, one of the back
6  bedrooms there is what appeared to be a fresh blood stain
7  on the box spring; is that true?
8      A. On the sheet that covers the box spring. I don't
9  know how fresh it was, but, yes, there was a blood stain
10 there.
11     Q. You can tell something is real old or if it's
12 pretty new, can't you, or was it beyond that?
13     A. It was dry.
14     Q. Okay.
15     A. I can't put --
16     Q. Okay. Yeah. Once it's dry, it's dry, I guess?
17     A. Yes.
18     Q. We have heard evidence in this case from the
19 Medical Examiner that the only thing that would have
20 happened to Nancy Weatherly that would have caused her to
21 bleed was the gunshot, and we know where that happened.
22 So just the natural progression of things, the -- if that
23 blood, which let's assume that that's Nancy Weatherly's
24 blood on that box spring. Okay?
25     A. Uh-huh.

118

1      Q. That would have had to have happened after she
2  was shot, if we assume that the blood was put there that
3  day, right?
4      A. Yes and no.
5      Q. Okay.
6      A. Reason no, it could have been there before the
7  mattress was flipped.
8      Q. I understand. But I said if we assume it was put
9  there that day.
10     A. Yes, okay, I'll go with that. Sorry.
11     Q. And then the bullet underneath the deal, you said
12 that the thing probably got moved on top of the bullet?
13     A. Yes.
14     Q. Which would have meant that the thing was moved
15 after she was shot?
16     A. That would indicate that, yes.
17     Q. And things can get kicked around in crime scenes
18 too?
19     A. Yes, they can.
20     Q. Do you have any idea which way the footprint was
21 heading on -- that was on the newspaper, or is Max the
22 person to ask about that?
23     A. I don't recall there being enough detail to
24 determine that, but, yes, that would probably be a better
25 question for Max.

119

1      Q. Okay. Give me one second. Did you do any of the
2  processing on the stuff that was recovered later from Tat
3  Man, or was that all Max also?
4      A. From who?
5      Q. From Hinojosa, Tat Man, the one who had the TV?
6      A. No.
7      Q. Did your work with this stop after the truck?
8      A. With the exception of helping them carry the TV
9  back to the guy who came and picked it up from our office,
10 I assisted them in carrying a TV to their -- to their car
11 and that's it, yes.
12     Q. Okay. You did no further forensic testing or
13 forensic work?
14     A. No, no.
15         MR. WESTFALL: All right. Very well. Thank
16 you, Officer Blansit.
17         THE WITNESS: Yes.
18         REDIRECT EXAMINATION
19 BY MR. CHAMBLESS:
20     Q. Just a couple things I want to add to, I guess,
21 this list here.
22         (Sotto voce discussion.)
23         BRB-23, what was that, do you recall?
24     A. BRB-23?
25     Q. Yes, sir.

STAPP VS. CLARK ANTHONY SOLIZ MARCH 3, 2015

120

1    A. That's the latent lift on the cassette tape case,
2 the latch.
3    Q. Okay. And where was the cassette case that the
4 latent lift was found?
5    A. In the west bedroom on the floor.
6    Q. It was found in one of the bedrooms in Nancy
7 Weatherly's house; is that correct?
8    A. That is correct.
9    Q. And BMC-21, which one was that?
10    A. BMC-21?
11    Q. Yes.
12    A. That's the shoe print on the passenger side
13 exterior step rail.
14    Q. Okay. He asked you about the stain or the
15 apparent blood stain on the mattress in the -- I guess the
16 master bedroom; is that correct?
17    A. Correct.
18    Q. How big was that?
19    A. Very small. Extremely small. We've got it in
20 scale. Very small blood stain.
21    Q. All right. A spot?
22    A. A spot.
23    Q. A very tiny spot; is that correct?
24    A. That is correct, yes.
25    Q. Okay. Now, could that spot of blood been on

121

1 that -- was it on the mattress or the sheets or what was
2 it on?
3    A. It was on the box spring cover.
4    Q. The box spring cover. As you think about that,
5 is there a way to determine that it happened that day, a
6 week before, a year before?
7    A. Is there a way to determine that?
8    Q. Yes, the time that that spot of blood was put
9 there.
10    A. I do not know of a way.
11    Q. Okay. So it could have been put there -- it
12 could have caused -- she could have had a -- if it were,
13 for example, Nancy Weatherly's blood, just assuming, it
14 could have been there a year before, correct?
15    A. It could have been, yes.
16    Q. Two years before?
17    A. Yes.
18    Q. A week before?
19    A. Yes.
20    Q. Or that day?
21    A. Or that day, yes.
22    Q. All right. Now, when we talk about DNA, for
23 example, on a -- if DNA is able to be developed from
24 examination by a DNA expert, they find it on a -- on a
25 sample. Same question. Can you -- is it possible to

122

1 determine when that DNA was put on there?
2    A. I'm not able to answer that question. I do not
3 know if a DNA analysis would be able to determine the age
4 of blood.
5    Q. Okay. Now, for example, suppose there was DNA on
6 a straw in the Tundra, for example, just hypothetically.
7 Okay?
8    A. Uh-huh.
9    Q. And I'll represent to you that the Tundra was
10 found in Fort Worth.
11    A. Okay.
12    Q. Okay. And so it would -- you would have to know,
13 if you could determine when that straw or when that Dairy
14 Queen cup or -- you would have to know something more
15 about that to determine when that -- how that got there,
16 wouldn't you?
17    A. Yes, sir.
18    Q. Could it have been put in there in Fort Worth, I
19 mean, just hypothetically?
20    A. Oh, yes, absolutely.
21    Q. And it could have been put in there somewhere
22 between, for example, Godley and Fort Worth?
23    A. Could have.
24    Q. All right. There's just a lot of possibilities
25 there, correct?

123

1    A. Yes, there is.
2    Q. All right. But if you found a print on a
3 cassette case in the bedroom of Nancy Weatherly, do you
4 think that would have significance and relevance for this
5 case?
6    A. Yes.
7    MR. CHAMBLESS: Okay. Pass the witness.
8    RECROSS-EXAMINATION
9 BY MR. WESTFALL:
10    Q. Why? Let's assume the print is Mark Soliz, okay?
11    A. Okay.
12    Q. And let's assume that the DNA is a guy named --
13    MR. WESTFALL: What's his name, Mike?
14    MR. HEISKELL: Shadow.
15    MR. WESTFALL: I know Shadow, but what's his
16 real name?
17    MR. HEISKELL: Arturo Gonzales.
18    Q. (BY MR. WESTFALL) Arturo Gonzales. Have you
19 ever heard that name? He wouldn't have anything to do
20 with anything you did, but his name has come into
21 evidence.
22    A. Okay.
23    Q. Now, if Arturo Gonzales's DNA got on that straw
24 and that straw got into the back seat of Nancy Weatherly's
25 truck, I guess there's a point at which common sense needs

124

1  to kind of -- because there's a lot of common sense that
2  goes into crime scene work, isn't there?
3      A.  There's a lot of it, yes, sir.
4      Q.  And common sense would say that unless Nancy
5  Weatherly and Mr. Gonzales knew each other, then it would
6  be a little bit strange that his DNA would be inside that
7  truck?
8      A.  It would be questionable, yes.
9      Q.  And it would be a little bit strange if his DNA
10 was on a beer bottle that was in the bed of that truck?
11     A.  Yes, sir.
12     Q.  Perhaps not as strange as being inside the truck,
13 but still?
14     A.  Right.
15     Q.  There's a lot of people in the world and --
16     A.  Absolutely.
17     Q.  -- the coincidences start to get layered on.
18         So from an evidentiary standpoint, is that
19 any less significant than the fact that Mark Soliz's
20 fingerprint was there?
21     A.  Is it any less significant?
22     Q.  It's all significant, right?
23     A.  Yes, it is.
24     Q.  Because it's all evidence?
25     A.  That's correct.

125

1      Q.  What do you make of the blood stain on the box
2  spring?
3      A.  With it being so small, just one drop, and where
4  it was, I really don't have a professional opinion as to
5  how it was transferred or whether it is a transfer off of
6  a finger or if it was her nose that may have been bleeding
7  or how it became there.  Like I said, it's such a small
8  spot that it's really hard to give an opinion as to how it
9  was -- how it came about.
10     Q.  Well, it sounds like the tendency is to believe
11 that it actually predated this whole incident, just from
12 what I'm hearing you say?
13     A.  Um, yes and no at the same time.  If you would
14 allow me to explain it, I would.  Okay.
15         The blood stain is collected for a number of
16 reasons, whether we feel at the time that it is exactly
17 relevant to our case or whether it's not irrelevant.  The
18 reason we collect it is not only for evidential value but
19 it's also to exclude everyone else from the scene.
20         So if we would have left that there behind,
21 it would have raised questions as to whose it is and why
22 it's there and how it got there.  And that's the reason
23 why we collect things that may not come across as
24 immediately relevant to our case.
25     Q.  And I understand that as to relevance, but my

126

1  question was, it sounds like what I'm hearing you say is
2  that to your mind, you believe this stain, there's a very
3  good chance that it predated this incident?
4      A.  I cannot put a whole lot of weight on it, if that
5  answers your question.  I can't put a whole lot of weight
6  on it.
7          MR. WESTFALL:  It does, yes.
8          THE WITNESS:  Okay.
9          MR. WESTFALL:  Thank you.
10         THE WITNESS:  Okay.
11         REDIRECT EXAMINATION
12 BY MR. CHAMBLESS:
13     Q.  The fact is, there's no way to date a blood
14 stain; is that true?
15     A.  Not to my knowledge, no.
16     Q.  The same thing is true about DNA.  If I said
17 there's no way to date when DNA is placed on an item; is
18 that correct?
19     A.  That's correct.
20     Q.  All right.  Now, he asked you what's the relative
21 significance.  Let's think through this.  Let's think or
22 imagine that there is, say, Arturo Gonzales's DNA on that
23 straw in the Dairy Queen cup in the back of the Tundra.
24 Just hypothetically, okay?
25     A.  Okay.

127

1      Q.  I guess the relevance or the significance of it
2  is that at some point that you would tend to believe that
3  Arturo Gonzales had sipped from that straw that was found
4  in the back seat of the Tundra in Fort Worth; is that
5  correct?
6      A.  Yes, it would be easy to believe that, yes.
7      Q.  There is no way to determine when that event
8  occurred, correct, because you can't date DNA?
9      A.  That's correct.
10     Q.  The truck is -- in other words, it was Nancy
11 Weatherly's truck, she owned it, and it should have been
12 in Godley, Texas.  Can you see that?
13     A.  Oh, yes.
14     Q.  But it was found in Fort Worth, however.  So a
15 truck can be moved?
16     A.  Uh-huh.
17     Q.  It's mobile.  And so there's no way to determine
18 when that straw or that Dairy Queen cup was placed in the
19 Tundra, correct?
20         MR. WESTFALL:  Object to the leading, Your
21 Honor.
22         THE COURT:  Overruled.
23     Q.  (BY MR. CHAMBLESS)  Would that be true or not?
24     A.  True.
25     Q.  All right.  The relevance and the significance of

128

1  the print on the cassette case is that it puts, if it's
2  Mark Soliz's, it puts Mark Soliz in her bedroom at her
3  house; is that true?
4      A.  That is true.
5          MR. CHAMBLESS:  Pass the witness.
6          MR. WESTFALL:  You know, I have no further
7  questions.  Thank you, Officer Blansit.
8          THE WITNESS:  You're welcome, sir.
9          THE COURT:  May the witness be excused?
10         MR. CHAMBLESS:  Yes, Your Honor.
11         MR. WESTFALL:  He may.
12         THE WITNESS:  Is that a yes?
13         THE COURT:  Yes, sir.  Thank you.
14         THE WITNESS:  Thank you.
15         (Witness excused.)
16         THE COURT:  Take a short 15-minute recess.
17  Be back with the next witness.
18         (Recess taken from 2:11 to 2:30 p.m.)
19         (Jury not present.)
20         THE COURT:  State ready to proceed?
21         MR. CHAMBLESS:  Yes, Your Honor.  I think by
22  agreement, Brandon Blansit has been excused from the rule,
23  is in the courtroom, if that's okay with Your Honor.
24         THE COURT:  That's fine with me.  Is that
25  okay?

129

1          MR. WESTFALL:  Yes, Your Honor.
2          THE COURT:  Defense attorneys are present and
3  ready?
4          MR. HEISKELL:  Yes.
5          THE COURT:  Defendant is present?
6          MR. WESTFALL:  He is, Your Honor.
7          THE COURT:  The Court Reporter tells me that
8  I -- that she did not hear me say 326 and 326-A were
9  admitted.  It's my recollection that that was the
10  footprint on the newspaper.
11         MR. HEISKELL:  No -- 326, Your Honor?
12         THE COURT:  326.
13         MR. STRAHAN:  -- impression on the driver
14  side, BMC-20, and the No. 326 was admitted for all
15  purposes, 326-A was admitted for record purposes only.
16         THE COURT:  That's what I have on my -- on my
17  notes, but the Court Reporter did not have -- did not
18  agree.  So it's admitted.  326 and 326-A is admitted.
19         (State's Exhibit No. 326 admitted.)
20         (State's Exhibit No. 326-A admitted for
21           record purposes only.)
22         THE COURT:  You may bring in the Jury.
23         (Jury present.)
24         THE COURT:  Thank you.  You may be seated.
25         MR. CHAMBLESS:  State calls Max Courtney.

130

1          THE COURT:  Got to go around all the way past
2  the deputy.
3          THE WITNESS:  All right, sir.
4          THE COURT:  Please raise your right hand.
5          (Witness sworn.)
6          THE COURT:  Thank you.  Have a seat.
7                  MAX COURTNEY,
8  Having been first duly sworn, testified as follows:
9                DIRECT EXAMINATION
10  BY MR. CHAMBLESS:
11      Q.  Please state your name.
12      A.  My name is Max Courtney.
13      Q.  Mr. Courtney, what's your occupation?
14      A.  I'm the Director of the Crime Lab and Crime Scene
15  Search for Mansfield Police Department.
16      Q.  Okay.  The lawyers here are well acquainted with
17  you, Mr. Courtney.  Will you tell the Jury something about
18  your background and Crime Scene and Forensics and that.
19      A.  All right, sir.  Academically, I have a B.S. and
20  an M.S. in Chemistry, both of them from what's now West
21  Texas A & M University.
22          I went to work in 1970 at the Fort Worth
23  Police Crime Lab as a Criminalist/Forensic Scientist.  I
24  stayed there till 1980.  Took a full-time teaching job at
25  U.T. Arlington in Criminal Justice.

131

1          In the meantime, I started my business, which
2  was Forensic Consultant Services in 1976.  I left U.T.A.
3  in '86 and ran Forensic Consultant Services as a private
4  company doing forensic lab work and also crime scene work,
5  mostly for police departments but also for attorneys and
6  investigators and others.
7          I left there in 2005, went and took a
8  teaching appointment at Baylor University in the Forensic
9  Science program, stayed there three years, went to
10  Mansfield where I've been for the last three years.
11      Q.  Thank you.  Now, back in June of 2010,
12  specifically June 30th of 2010, were you working with the
13  Mansfield Police Department at that time?
14      A.  Yes, sir.
15      Q.  And did you receive a request and was it approved
16  that you and others come and assist or process a potential
17  crime scene in Godley, Johnson County, Texas?
18      A.  Yes, sir.
19      Q.  Okay.  Tell us approximately what time you got to
20  the home of Nancy Weatherly in Godley, Texas.
21      A.  I was logged in there at 10:24 a.m.
22      Q.  Okay.  Tell the Jury a little bit about your
23  mental decision-making, the processing that you go
24  through, the steps that you take and the steps that you
25  took that morning.

132

1    A. The first, I think, important thing is to try to
2 assess what you have to work with, without messing
3 something up. So you have to very carefully walk through
4 the scene, and see what's here, what's there, and then
5 make some decisions about how you're going to actually go
6 about processing it.
7       We like to photograph everything in place
8 before we start moving anything or changing anything. And
9 then we process the evidence, collect the evidence, and
10 secure it.
11    Q. Okay. It appears that you were at the Weatherly
12 home for approximately maybe nine, ten hours; is that
13 approximately correct?
14    A. That sounds about right, yes, sir.
15    Q. And we went through with Officer Blansit, I
16 believe there were 24 items, 22 of which were collected
17 from the house. And the Jury has seen pictures of that.
18 But as you entered the house, I want to ask you about some
19 of your observations.
20       First, of Nancy Weatherly, the body, as you
21 first went in, what were your impressions and
22 observations?
23    A. First thing I did was to try to assess how long
24 she had been there. I raised her left leg as she was
25 lying there a little bit, and it was where the knee was

133

1 down. The knee did not bend, so when I lifted the leg,
2 the leg kind of came up without, well, like that, without
3 the knee bending, which told me that rigor mortis was
4 present, and that gave me an idea about the time she had
5 been there.
6    Q. Now, tell us about rigor mortis and when does
7 rigor begin to occur in a body, and how long does it last,
8 approximately?
9    A. It's gonna depend on the circumstances, and on
10 the individual, the environment, several factors. So what
11 we can do is estimate. And rigor is going to start within
12 a few hours after death. And this is just a stiffening of
13 the muscles in response to decomposition of the body. And
14 it's going to happen to all of us.
15       And it is complete anywhere from 8 to 12
16 hours after death, and then it's going to start resolving
17 after some hours, so that after 24 to 36 hours, it should
18 be fully resolved.
19    Q. Okay. So it's a period of gradual, I guess,
20 onset, becoming full rigor at between 8 to 12 hours; is
21 that correct?
22    A. Correct.
23    Q. And then at some point, from that point between 8
24 and 12 hours, some point between 24 and 36 hours then
25 it -- the body no longer has that condition; is that fair

134

1 to say?
2    A. Yes, sir.
3    Q. Okay. So when you were looking at and observing
4 her body and you raised her leg, that was the condition
5 you observed at that time, that being about 10:30 that
6 morning?
7    A. Yes, sir.
8    Q. What else did you notice about Nancy Weatherly?
9 Any apparent injuries to her body?
10    A. Yes, sir.
11    Q. What did you notice?
12    A. I noticed a defect in the back of her head.
13    Q. Okay. The blood around her body, what -- do you
14 have any observations about that?
15    A. I do.
16    Q. Tell the Jury about that.
17    A. There was blood on the edge of the table. And if
18 I were facing north in the living room and looking at the
19 table, this would be on the left side of the table, so
20 that's going to be basically the southwest corner of the
21 table as the table sat in the dining area. There's blood
22 up on the corner there; the blood has run off the edge of
23 the table, dripped onto the seat of a chair sitting
24 beneath it, and then ran off of the chair and onto the
25 floor beneath it.

135

1       And also, in my opinion, when the body fell,
2 there was blood spattered from the floor up to the wall by
3 it and also the floor around it.
4    Q. So did you feel like the spatter of the blood was
5 from her head falling onto the floor?
6    A. That, and also the blood just dripping.
7 Dripping -- blood-drops falling into a pool of blood makes
8 a very fantastic amount of spatter coming off of it.
9    Q. Okay. What was the -- how was she dressed; do
10 you recall?
11    A. She was wearing -- I don't -- I can look at the
12 colors and everything, but she was basically wearing what
13 you might term as pajamas or the equivalent thereof.
14    Q. Okay. Now, we've heard from Officer Blansit
15 about each of the items or almost all of the items that
16 were collected, but there's two or three, I think, that
17 you were involved with that we want to address.
18       First of all, there was a newspaper sheet
19 that was found on the floor in the house; is that correct?
20    A. Yes, sir.
21    Q. Do you recall where that was found?
22    A. It was found kind of on the northeast edge of the
23 table, and then going more or less between. And if you're
24 standing about to walk down the hallway, you've got the
25 kitchen on your right and the dining area on your left,

136

1 and kind of a, I guess, a no-man's-land in between there,
2 where it's not kitchen and it's not dining area and it's
3 not hallway. So basically that's where the piece of paper
4 was found.
5    Q. Okay. Show you what has been admitted as State's
6 Exhibit 273. It's -- and attached to it is some
7 packaging, and ask you to take a look at that, see if you
8 recognize that.
9    A. Yes, sir.
10    Q. All right. What is that?
11    A. This is the sheet from that newspaper.
12    Q. Okay. Now, did you -- why did the sheet of
13 newspaper catch your attention? What was it about the
14 newspaper that was significant to you?
15    A. It was in a traffic pattern that one would use to
16 go through the house, and I thought it likely that there
17 might be footwear impressions on it.
18    Q. Okay. Did you utilize a certain process with
19 respect to that sheet of newspaper to attempt to draw a
20 footwear impression from it?
21    A. Yes, sir.
22    Q. What equipment did you use?
23    A. It's called an electrostatic dust print lifter.
24    Q. How does that work?
25    A. Basically you take a sheet of mylar film like you

137

1 would put on your car, but you don't put this on your car
2 because it's totally opaque. It's got a silvered side on
3 one side and then a black side on the other, so you can't
4 see through it except just a little bit of light. This
5 makes a nice reflective surface, so that when you shine a
6 low angle light across it, you're going to readily see
7 impressions that are on there.
8         So what you do is you put this dark side down
9 onto the area you suspect might have a footwear
10 impression, and then you charge electric -- static
11 electricity, several thousand volts of static electricity,
12 and you basically zap it by putting down an antenna on one
13 side and a probe from the static electricity on the other
14 side. Dust will preferentially lift from the surface that
15 you're on onto that mylar film, so you get a reverse
16 impression of whatever is there in the dust.
17    Q. So is that what you did on June 30th, 2010?
18    A. Yes, sir.
19    Q. Did you obtain a full or a partial footwear
20 impression?
21    A. Partial.
22    Q. Okay. Right there in front of you, I think, is a
23 box. If you would examine that and tell us what's
24 contained inside.
25    A. That is the mylar film on which I captured a

138

1 partial footwear impression.
2    Q. Okay. If we open that, would it be possible to
3 look and see the impression inside?
4    A. Maybe.
5    Q. Or would that destroy the --
6    A. No, it would not destroy it. It could be
7 preserved. I don't know; I haven't looked at it since I
8 sealed it up a long time ago, so I don't know what's in
9 there now.
10    Q. All right. If you would, would it be -- what
11 would be the best way to open this and view this? Is it
12 something we should take out or leave within the box and
13 just open the flap or what would you recommend?
14    A. I would open the flap.
15    Q. Okay. If you wouldn't mind, use these scissors
16 or whatever you think appropriate, and let's just open the
17 flap here.
18    A. (Witness complied.)
19    Q. Okay. The box is marked BMC-03-A; is that
20 correct?
21    A. Yes, sir.
22    Q. All right. And as we open the flap, the mylar
23 sheet is inside and it's taped to the inside of the box;
24 is that what we see?
25    A. Yes, sir.

139

1    Q. Okay. Now, is this something that you did that
2 day, June 30th, or sometime -- or sometime other time?
3    A. I did it there while we were processing the
4 scene.
5         MR. CHAMBLESS: Okay. I'm going to offer
6 the, I guess, the actual exhibit, the mylar impression as
7 334, and the box as 334-A.
8         MR. WESTFALL: No objection, Your Honor.
9         THE COURT: Admitted.
10         (State's Exhibit No. 334 admitted.)
11         (State's Exhibit No. 334-A admitted for
12         record purposes only.)
13         (Sotto voce discussion.)
14    Q. (BY MR. CHAMBLESS) All of the -- is it correct
15 that all of the exhibits that were retrieved either from
16 the Weatherly house or the Tundra were taken by yourself
17 and Officer Blansit back to the Mansfield Police
18 Department; is that correct?
19    A. Yes, sir.
20    Q. At a later time did you process certain of the
21 exhibits, specifically BMC-19 and 27, to find out if there
22 were any latent prints on those exhibits?
23    A. Yes, sir.
24    Q. What was the result of your work in that -- on
25 those two items? I guess beginning with BMC-19.

A. Okay.

Q. I believe this would have been on July 19th of 2010.

A. Yes, sir. I'll catch up with you here soon.

Q. Okay.

A. All right, sir.

Q. Tell us what happened when you processed BMC-19, I believe is a CD that was found within the Tundra, and also BMC-27, another CD that was found within the Tundra.

A. I took one latent print lift from BMC-19 and two from BMC-27.

Q. Okay. Showing you BMC-19. Is this the item which you processed on July 19th, 2010?

A. Yes, sir.

Q. Okay. And now I show you BMC-27, State's 333, is this the item that you processed on July 19th, 2010 and obtained two latent prints?

A. Yes, sir.

Q. Okay. Showing you now certain items. They're marked as BMC-36, BMC-37-A and 37-B.

Beginning with BMC-36, would you examine this and tell us if you recognize that item?

A. I do.

Q. What is BMC-36?

A. The latent print I lifted from the CD, BMC-19.

Q. Okay. Thank you. And now if you would look at these marked BMC-37-A and B.

A. All right, sir.

Q. What are they, 37-A and 37-B?

A. These are two latent print lifts I took from the CD in Item 27, BMC-27.

Q. All right. Thank you. Now to go back in time to -- specifically to July 6th, 2010, did someone from the Johnson County Sheriff's Department bring you a Sylvania flat screen television set?

A. Yes, sir.

Q. Okay. And specifically was that Garit Bennett of the Johnson County Sheriff's Department?

A. Yes, sir.

Q. Okay. What did you do with regard to that item?

A. We -- fumed the surfaces with a cyanoacrylate fuming wand. And cyanoacrylate is super glue. So I fumed it. It's a wand that heats up the super glue, causes it to come out as a fume, and it deposits across the surface. If there are latent prints that are present on the surface, then the super glue will stick to the latent prints so that you've got a visual image of them.

Q. What was the result when you did that process to the television?

A. I got four partial prints.

Q. Okay. Looking on the bench in front of you, do you see an envelope marked BMC-40?

A. Yes, sir.

Q. Would you be kind enough to open that, and I'll ask if you recognize those items.

A. Okay. I'm going to note that this envelope is sealed. All right, sir.

Q. Do you recognize the items contained within your marking BMC-40?

A. I do.

Q. And what are they?

A. These are the four lifts I took from the Sylvania television set.

Q. If you would be kind enough to place those in here, appreciate it, the lifts.

A. Do you want the jacket also?

Q. No. I want to ask you to look over here. If you can kind of stand up and look at this item, this television here. It's been admitted into evidence in this case, I'll represent that. Is this the television on which you did the super glue processing and obtained these four latents marked BMC-40?

A. It appears to be.

MR. CHAMBLESS: Okay. Offer the four prints as 335, and the packaging as 335-A for record purposes.

MR. WESTFALL: No objection, Your Honor.

THE COURT: Admitted.

(State's Exhibit No. 335 admitted.)

(State's Exhibit No. 335-A admitted for

record purposes only.)

Q. (BY MR. CHAMBLESS) Were you also brought by Garit Bennett from the Sheriff's Department a certain item which I'm going to show you marked as State's Exhibit 209? If you would take a look at this object. Do you recognize it?

A. All right, sir.

Q. Do you recognize that particular piece?

A. It appears to be the jewelry box that was brought to me by Garit Bennett on July 8th.

Q. July 8th?

A. 2010, yes, sir.

Q. Now, collected from the Tundra, we've identified that you and Officer Blansit collected this item, your marking of BMC-07, State's Exhibit 318. Let me show you that.

A. Yes, sir, I collected this.

Q. All right. Now, on that date, July 8th, did you examine these two items and whether -- and what were your observations about them, if anything?

A. First off, I tried to develop latent prints and

144

1  was unsuccessful.  I used the same fuming wand as I had
2  used before.  And I then just did a physical comparison of
3  the drawer, State's Exhibit 318, with the cabinet, which
4  is what?
5       Q.  Maybe it would be helpful to open this up here.
6  Tell you what, let's just take that out.
7       A.  The cabinet is State's 209.
8       Q.  Okay.  If you would, tell us what your
9  observations were, first about this item, and then the
10 drawer that you had obtained from the Tundra.
11      A.  I noticed there were four empty slots, four
12 drawers in State's 209.  And the drawer in State's 318
13 just fit into those slots.  And also the construction of
14 318 and the drawer still found in 209 were the same, same
15 lining, same finish, same handles, everything.
16      Q.  Okay.
17      A.  So indistinguishable from the drawer that's in
18 the cabinet.
19      Q.  Now, I'll represent that the jewelry box was
20 found in a Dodge Stratus and the drawer was found in a
21 Tundra.  Of course, that's the item you recovered from the
22 Tundra; is that correct?
23      A.  Yes, sir, that's correct.
24      Q.  On a certain date were you provided what you have
25 marked, I believe, as BMC-31?  I'll show you what's been

145

1  admitted as State's Exhibit 211.  Would you take a look at
2  these.
3       A.  All right, sir.
4       Q.  Do you recognize what had been in the packaging
5  GB-31?
6       A.  I do.
7       Q.  And what is that?
8       A.  State's 211 is a pair of Nike athletic shoes that
9  were submitted to me on Tuesday, July 13th, 2010, by
10 Garit Bennett.
11      Q.  Okay.  Now, on the bench to your left there is an
12 item marked BMC-39.  Would you be kind enough to open
13 that, and tell us if you recognize that item.
14      A.  Yes, sir.
15      Q.  What is BMC-39?
16      A.  This is known test impressions I made with
17 a device called an Identicator, which are known shoe
18 print impressions from that pair of shoes I just looked
19 at.  I think it may be 207, but I wouldn't swear to it.
20      Q.  All right.  Could you remove that from the
21 packaging.
22      A.  (Witness complied.)
23      Q.  On what date did you develop this impression?
24      A.  On July 13th.
25          MR. CHAMBLESS:  Okay.  Offer the impression

146

1  as State's Exhibit No. 336, the packaging as 336-A.
2          MR. WESTFALL:  No objection, Your Honor.
3          THE COURT:  Admitted.
4          (State's Exhibit No. 336 admitted.)
5          (State's Exhibit No. 336-A admitted for
6          record purposes only.)
7       Q.  (BY MR. CHAMBLESS)  I want to ask you, on July
8  19th of 2010, did you evaluate certain of the items that
9  were collected for possible fingerprint impressions?
10      A.  Yes, sir.
11      Q.  Did you examine BRB-05, the hammer?
12      A.  I did.
13      Q.  And what was the result?
14      A.  No prints.
15      Q.  Okay.  BRB-06, a plastic bag, I think with pills
16 inside, did you examine that?
17      A.  I did.
18      Q.  And what was the result?
19      A.  No prints.
20      Q.  BRB-07, did you do the same for that?
21      A.  I did.
22      Q.  The result?
23      A.  No prints.
24      Q.  BRB-09, a plastic bag with pills, did you examine
25 that?

147

1       A.  I did.
2       Q.  And the result?
3       A.  No prints.
4       Q.  BMC-23, a lighter, what -- did you examine that?
5       A.  I did.
6       Q.  And what were the results?
7       A.  No prints.
8       Q.  BMC-24, a lottery ticket, did you examine that?
9       A.  Yes, sir.
10      Q.  And what was the result on that date?
11      A.  No prints.
12      Q.  BMC-25, a door opener, did you examine that item?
13      A.  I did.
14      Q.  And what was the results?
15      A.  No prints.
16      Q.  BMC-04, four DVDs, did you examine that item?
17      A.  Yes, sir.
18      Q.  And what was the result?
19      A.  4, there were no prints.
20      Q.  And BMC-06, a Marlboro Light cigarette package,
21 did you examine that?
22      A.  Yes, sir.
23      Q.  And what was the result?
24      A.  No prints.
25      Q.  Mr. Courtney, we live in a CSI world here, and

**148**

1  this seems puzzling.  Is it surprising to you?
2      A.  No, sir.  That we didn't get prints on any of
3  those?
4      Q.  That's right.
5      A.  Not at all.
6      Q.  I mean, I thought you could just look at
7  something and see a print.  I mean, it seems like that.
8      A.  One might think that from watching television.
9  It's not -- not my world.
10     Q.  Okay.  Did you release all of the items collected
11 from the house and from the Tundra to Garit Bennett on
12 July 20th, 2010?
13     A.  Yes, sir.
14     Q.  Okay.  With the exception of the four latent
15 prints from the television, and you released that to
16 Garit Bennett, I believe, on October 18th of 2011; is that
17 correct?
18     A.  Yes, sir.
19     Q.  Now, some questions that we have talked about
20 earlier, is there -- when you think about DNA, is it
21 possible to date when the DNA was placed on an item?
22     A.  No, sir.
23     Q.  Not possible?
24     A.  No, sir.
25     Q.  It could be put here just five seconds ago, five

**149**

1  years ago; no way to tell?
2      A.  Right.
3      Q.  Okay.  Fingerprints, same question?
4      A.  Same answer.
5      Q.  Same answer?
6      A.  Same answer.
7      Q.  In other words, you cannot date, there's no time
8  stamp with fingerprint impressions?
9      A.  Time is a factor to some extent, but for the most
10 part, it's going to be all these other things, the
11 environment, how many people are touching it, how hot it
12 is, how dry it is, the medium that it's placed on, the
13 medium that it's placed in.  All those things go in to
14 that, so that five years from now you could have a perfect
15 latent print.  In fact, if it's on paper, you might get a
16 print after 50 years, and then you might not get one 5
17 minutes after the person touched it.
18     Q.  It seems like it's almost rare or unusual to
19 actually develop a latent print from a crime scene?
20     A.  Well, it's not nearly as usual as I would like
21 for it to be.  We have a lot of cases where we do not get
22 prints.
23     Q.  What are some of the factors that contribute to
24 that?
25     A.  Well, one of the factors now is that people wear

**150**

1  gloves when they're in a crime scene because it has been
2  on television a lot.  But also just we don't get clean
3  touches on good surfaces.  We have smudges.  They don't
4  make good contact with it.  Sometimes they wipe their
5  prints down.  It's not ever really possible to know why we
6  didn't get prints.
7      Q.  Okay.  One final thing, the class -- what is the
8  difference between class and individual characteristics on
9  a shoe impression?
10     A.  Class characteristics are those traits that are
11 built into the shoe by the manufacturer.  The shoes we
12 looked at there that I last identified by number have a
13 bunch of squiggly lines on them.  Those squiggly lines are
14 X millimeters apart and the angles bend at a certain
15 angle.  That's because the manufacturer chose to make it
16 that way.  Okay.
17         And then individual characteristics are going
18 to be imperfections in the manufacture process and, more
19 generally, going to be the defects that happen, like you
20 step on a piece of glass and put a cut in the out sole.
21 These are actually going to show up.  Those are individual
22 characteristics, which are random and can be used to
23 identify a particular shoe.
24     Q.  Do you have an opinion as to the class
25 characteristics of the shoes from GB-31?  Show you which

**151**

1  ones.  These shoes, the class characteristic of this item,
2  State's Exhibit 211, and the class characteristics on the
3  mylar impression you obtained from the newspaper at the
4  Weatherly house, do you have an opinion about that?
5      A.  I have to say, first off, to qualify this
6  opinion, that this was a very cursory examination I did.
7  I did not do it with the thought that I was going to
8  actually do a full comparison.  Based on a limited
9  observation, I did not see anything that would cause me to
10 conclude that those shoes did not make that print.
11     Q.  But is that something that would have to, I
12 guess, undergo further evaluation if someone were to
13 testify as to that?
14     A.  Correct.
15         MR. CHAMBLESS:  All right.  Thank you,
16 Mr. Courtney.
17         Pass the witness.
18         THE WITNESS:  Yes, sir.
19         CROSS-EXAMINATION
20 BY MR. WESTFALL:
21     Q.  Hi, Max.
22     A.  Hi.
23     Q.  Tell me more about the shoe impression.  You've
24 been doing it for quite a while, haven't you?
25     A.  I have.

152

1    Q. Sir, just tell us generally what the -- what
2 the -- I guess the theory is.
3    A. Well, a person, let's say in this case, steps
4 onto a piece of newspaper with dust on their shoe. They
5 leave an impression here, which is going to be the
6 impression -- if my right hand were a shoe, my left hand
7 would be the impression that it leaves. They'll be mirror
8 images of each other in dust on the surface. Okay.
9    The class characteristics, the chevrons --
10 they're really not squiggly lines, they're really
11 chevrons. The chevrons on there have their own shape and
12 size, so that's going to get transferred onto there. So
13 we look at the shoe or test impressions from the shoe
14 ideally, as I made in the other one where I put the
15 impressions on the paper. So I look at the test
16 impressions here versus the impression I see on the -- oh,
17 okay, yeah.
18   Q. Do you need a laser pointer? Do you have one?
19   A. I don't have one with me, no, sir.
20   Q. Would it help you to have one?
21   A. Sure.
22   Q. All right. So tell us about the class
23 characteristic.
24   A. Okay. Here we have these chevrons or zigzag
25 lines, and the distance between those is a class

153

1 characteristic. The angle at which they turn is a class
2 characteristic. The width of the shoe at this point is a
3 class characteristic, and here, and here. The length is a
4 class characteristic. The placement of the logo there,
5 the size of it is also a class characteristic. So all of
6 these are there by manufacturer's design. And you're
7 going to see those in the surface, if the surface -- if
8 the impression is distinct enough, you're going to see
9 some or all of these class characteristics there.
10   Q. I guess, as you say, it would be a mirror image
11 once you lifted it up?
12   A. Right. Yes, sir.
13   Q. Now, look back here on the heel. That sort of
14 would indicate the way a person walks, I guess, right?
15   A. Yes, sir.
16   Q. Would that be what you would call an individual
17 characteristic?
18   A. Actually, no. It would be what I would call a
19 wear characteristic. It's not good enough for
20 identification of a shoe.
21   Q. Okay. Can you see anything in here that you
22 might consider a individual characteristic?
23   A. Yes, sir, right here.
24   Q. Oh, okay. Let me go put that on the overhead.
25   A. All right, sir.

154

1    Q. Okay. Tell the Jury what you have found there.
2    A. Is that as sharp as the focus will go at this
3 point?
4    Q. Yeah, I know, I'm trying to. Right there.
5    A. All right. Right here is a -- that chevron has
6 been broken off, probably in wear. Exact placement of
7 where that broke is random. Okay. So if you did it 50
8 times and you damaged one of those chevrons, it wouldn't
9 be the same place on that shoe. So we start getting now
10 individual characteristics which will tend to, if you've
11 got a sufficient number of them, will tend to identify
12 that as the shoe that made the impression.
13   Q. I would suspect that both of them could be
14 evidence, class characteristics and individual
15 characteristics?
16   A. Both of them could be evidence. One of them
17 could be proof.
18   Q. Okay. And it would be like the funnel?
19   A. The funnel?
20   Q. The -- I guess so many, so much of different
21 forensic evidence is kind of like that. You've got the
22 gunshot residue that one of them is one way, one of them,
23 I guess, evidence and proof or --
24   A. Right.
25   Q. I mean, you would see class characteristics being

155

1 testified about in court?
2    A. Sure --
3    Q. -- if somebody found a footprint --
4    A. As long as they -- I'm sorry.
5    Q. Well, if someone found a footprint at a scene
6 that had the class characteristics as the same shoes the
7 defendant was wearing, you would expect to see that
8 testified to in court?
9    A. As long as they limited their testimony to not
10 saying that this is the shoe, yes.
11   Q. Okay. This is -- it was a footprint made by the
12 same type of shoe or shoe with the same class
13 characteristics?
14   A. Right.
15   Q. Now, this is from State's Exhibit 336. This is
16 one of the footwear impressions, I guess, prints that you
17 made, right?
18   A. Right.
19   Q. You used that for the comparison?
20   A. Yes, sir.
21   Q. So how long does it take for you to look at it
22 and decide that it matches the class characteristics?
23   A. Um, I've identified -- oh, class
24 characteristics?
25   Q. Right.

156

A.  Well, at the level I did it, it didn't take very
long.  If I were going to do a written report or testify
in court, expect to testify in court as to the
significance of it, I would probably spend several hours
at least looking.  Because sometimes you look at it and
you say, oh, yeah, this looks the same.  And then you see,
oh, no, it zigged when it should have zagged.  So you've
got to be really careful about that.

Q.  Would you be qualified to testify about the
individual characteristics and shoe print impressions?

A.  I've testified to it before, yes, sir.

Q.  Were you asked to do any analysis like that in
this case?

A.  I was not.

Q.  Now I'm going to go ahead and show these to you
because it's almost impossible to see.  That mylar is hard
to see.

Is this, Defendant's 16, is that a picture of
the mylar where you can kind of see the footprint?

A.  You can kind of see it.  Yeah, you can see it
very well there.

Q.  But this is the same thing?  I guess, it's got
that little white dot?

A.  Yes, sir.

Q.  Let me put this one on the overhead.  This is

157

Defendant's 15 that I...  And this is off of that mylar
sheet that was the electrostatic print off the newspaper?

A.  Yes, sir.

Q.  Do you -- do you remember which way this print
was facing?  Could you tell from this print whether they
were walking down the hall, walking back from the hall?

A.  They were walking back from the hall.

Q.  Okay.

A.  This is the -- basically the toe box of the
shoe.  And it's -- they stepped onto the paper, so it's on
the edge of the paper is the way I remember it.

Q.  This would have been somebody coming -- coming
back from those back bedrooms?

A.  I believe so, yes, sir.

Q.  And this --

A.  Can I have just a second to review this, make
sure I'm not misspeaking?  Okay.  Well, I guess I didn't
state it.  I believe that it's correct that the person was
leaving the bedroom area.

Q.  Okay.  And just from the Max Courtney eyeballing
it, you know, I'm not going to ask you to spend several
hours, but this footprint on the newspaper coming back
from the bedroom area has the same class characteristics
as GB-31, those black Nike shoes?

A.  By my cursory examination, yes, sir, it does.

158

Q.  Which would be -- if we assume that this is --
Jose Ramos is the person those shoes came from, these
would be those black Nike shoes, the same ones that are in
the bag over there?

A.  Yes, sir.

Q.  Now, it's got a BMC number, but it might have
been Officer Blansit that got the footwear impression off
the step side of the Tundra, the driver side?

A.  It was Officer Blansit that -- it was
photographed only.  He was the one that found it and the
one that took the photographs of it, I believe.

Q.  And that, I think, is this one, BMC-20, which is
pictured in Defendant's 17?

A.  Yes, sir.

Q.  I don't know if we can -- ah, there was a
footwear impression there as well, right?

A.  Yes, sir.

Q.  And y'all preserved it?

A.  Photographically.

Q.  And did you do something else?  Didn't you lay
down a film on it or something and --

A.  I don't think we got anything if we did.  Hold
on.

Q.  I'm finding a passenger side impression lift.
There may not have been one on the driver side, but that's

159

what I was thinking of.

A.  The passenger side.

Q.  Yeah, do you have one that -- you did one on the
passenger side but not the driver?

A.  What's the number on that one?

Q.  B -- well, BMC-21.

A.  21.  Okay.  Yes, sir, footwear impression lift
from driver side exterior step rail, BMC-20.

Q.  20.  Okay.  It's in here somewhere.  Here it is.

A.  Okay.

Q.  It's really not any easier to see than the
picture.  So, once again, looking at it, would you say
that this has the same class characteristics as those
black Nike shoes?

A.  At first look, yes, it does.

Q.  This is a little bit closer of it.  Does that
appear to have the same class characteristics as the Nike
shoes?

A.  Yes, sir.

Q.  Now I want to show you photograph -- several
photographs from a different scene, but these are in
evidence.

A.  Okay.

Q.  These are from an incident that occurred before
Nancy Weatherly.

160

1    A. Okay.
2    Q. You probably recognize these. Do you recognize
3 all those people? Well, maybe not the patrol officers,
4 but you recognize Boetcher, right?
5    A. Um, I -- yeah. I don't know him well. I've seen
6 him and dealt with him before.
7    Q. Well, over here, you see the white thing on that
8 fence?
9    A. I do.
10    Q. And here's the white thing on the fence again.
11    A. Okay.
12    Q. And what we're circling around to --
13    A. Hum.
14    Q. -- there's another footprint.
15    A. Okay.
16    Q. And would you say, just looking at it the way you
17 do and the way you can, does that appear also to be the
18 same class characteristics as those black Nikes?
19    A. Certainly a possibility.
20    Q. There's a bit closer in.
21    A. Yes, sir.
22    Q. And that's from the scene of Ruben Martinez, a
23 man who was shot at the Texaco station before.
24    A. All right, sir.
25          MR. WESTFALL: May I have Mr. Courtney step

161

1 down, Your Honor?
2          THE COURT: Yes.
3          MR. WESTFALL: Thank you, Max.
4          THE WITNESS: Yes, sir.
5    Q. (BY MR. WESTFALL) You stand here. Now I'm
6 going to show you what's already in evidence as State's
7 Exhibit 17, State's Exhibit 12, and State's Exhibit
8 13. And these -- I'll represent to you, this is in
9 evidence.
10    A. Okay.
11    Q. -- are on a door that got kicked in at the home
12 of Vince Circelli.
13    A. All right, sir.
14    Q. It was a burglary.
15    A. Okay.
16    Q. And would you say that these footprints on this
17 door, are they also consistent with the class
18 characteristics of those black Nike shoes?
19    A. As far as I can tell, first examination, yes,
20 sir.
21          MR. WESTFALL: Thank you.
22          THE WITNESS: All right, sir.
23          MR. WESTFALL: Your Honor, I'll pass the
24 witness.
25          Thank you, Max.

162

1          REDIRECT EXAMINATION
2 BY MR. CHAMBLESS:
3    Q. Mr. Courtney, let's suppose on the one hand, just
4 hypothetically, we had a written and verbal statement that
5 said, "On the morning that I shot Ruben Martinez", I being
6 Mark Soliz, "Jose Ramos was with me". We had this written
7 or verbal statement.
8    A. Okay, sir.
9    Q. On the other hand, you were shown these
10 photographs here, and let's just assume those class
11 characteristics are similar to Jose Ramos' shoes, right?
12    A. Okay.
13    Q. Let's assume even further that those are, in
14 fact, the shoe impressions of Jose Ramos.
15    A. All right.
16    Q. If Jose Ramos' shoe prints were there in the mud
17 on the way out from the Ruben Martinez capital murder,
18 would that lend support to the statement of Mark Soliz
19 saying they were there together?
20    A. Um, sure.
21    Q. Okay. And let's suppose also that you had the
22 same statement from Mark Soliz, a written and verbal
23 statement said, "I was with Jose Ramos. He was with me.
24 I had the gun, but we went in together, and we were in the
25 house and we stole from the house of Nancy Weatherly."

163

1          If the shoe impression on BRB-03, if indeed
2 that were the shoe impression of Jose Ramos, would that
3 corroborate and support what Mark Soliz said was the case,
4 that he and Jose Ramos were in the house committing that
5 offense?
6    A. Yes, sir.
7    Q. Okay. Which is more significant evidence-wise,
8 is it the class characteristic of a shoe or a fingerprint
9 of an individual?
10    A. Class characteristic of a shoe? Well, a
11 fingerprint would be. Fingerprint identification would be
12 more absolute than just using class characteristics of a
13 shoe.
14          MR. CHAMBLESS: Thank you, Mr. Courtney.
15          RECROSS-EXAMINATION
16 BY MR. WESTFALL:
17    Q. Were you ever asked to compare the fingerprints
18 from -- or these shoe impressions from the several
19 different scenes?
20    A. I'm just now aware of their existence.
21    Q. And do you have any -- oh, okay, you're just
22 aware of the existence. And you have no idea if anyone
23 was ever asked to actually do these?
24    A. I don't know.
25    Q. And I guess if the comparisons never get done,

164

1  then we never know if they have evidentiary value or not,
2  do we?
3      A.  Right.
4      Q.  There's certainly -- and we've heard many times
5  while we've been here that there could be a hundred
6  surfaces that we test for fingerprints, but on the hundred
7  and first, we may find a fingerprint?
8      A.  True.
9      Q.  And it's not the -- the fact that it is
10 relatively rare makes the time that we find one
11 significant?
12     A.  Sure.
13     Q.  And you found several fingerprints?
14     A.  We did.
15     Q.  You developed fingerprints on the -- on the CD
16 that was in the CD player of the truck?
17     A.  Yes, sir.
18     Q.  And you sent those to be examined?
19     A.  Yes, sir.
20     Q.  And you swabbed the straw that was in the
21 Dixie -- or in the D.Q. cup in the back seat?
22     A.  Swabbed the what?
23     Q.  The straw.
24     A.  Oh, I submitted the straw actually.
25     Q.  Submitted.  Who did you submit it to?

165

1      A.  Well, I sent it back to the Johnson County
2  Sheriff's Office through Deputy Bennett to take to a lab
3  to do DNA.
4      Q.  To do DNA, contact DNA on the --
5      A.  Yes, sir.
6      Q.  And then, okay, so BMC-37 is where you developed
7  the prints that was on the CD that was in the CD player?
8      A.  Yes, sir.
9      Q.  And then BMC-39, tell us what that was.
10     A.  That's the prints from the television.
11     Q.  Okay.
12     A.  Well, hold on.  39 are the known out sole
13 impressions from the shoes.
14     Q.  That's why I made a mental note of it.
15     A.  That's why I looked.
16     Q.  And then the -- the oil stain on the passenger
17 side of the truck, why did you do a swab of that?
18     A.  Thought it could have DNA in it.
19     Q.  Why did you think that?
20     A.  Well, it was as if someone had leaned their head
21 against it like with oily hair.  It's what it reminded me
22 of when I saw it.
23     Q.  Okay.  And, yeah, if you get a full-on DNA match,
24 that is pretty powerful proof that somebody was there?
25     A.  Yes, sir.

166

1      Q.  And there were several things that you did send
2  to the crime lab.  Like, for instance, the BMC-37, you
3  sent that to be examined?
4      A.  Yes, sir.
5      Q.  Those are the fingerprints that were on that CD?
6      A.  Right.
7      Q.  The dust print, the footprint, you sent that
8  stuff to be examined as well, and somebody else kind of
9  did that analysis.  Do you have any idea if they analyzed
10 those other -- these other prints as well?
11     A.  I don't know if they did or not.
12     Q.  That wouldn't have been a bad thing to do, would
13 it?
14     A.  No, it wouldn't have.
15     Q.  There's not -- you don't have any control over
16 what gets tested and what doesn't, right?
17     A.  Well, I think I have recommendation authority.  I
18 think everything that I asked to be done on this case was
19 done.
20     Q.  Did you ask them to test that oily spot?
21     A.  That what?
22     Q.  BMC-26, the oily spot on the window.
23     A.  Yes.
24     Q.  You asked them to test that?
25     A.  I mentioned it, yes.

167

1      Q.  Okay.  You wanted them to test it?
2      A.  Yes, sir.
3      Q.  So, um, there's individual characteristics,
4  there's class characteristics, but somebody has to do the
5  analysis to see if we have any of that?
6      A.  Yes, sir.
7      Q.  And short of that, what we've got is you in court
8  looking at it, eyeballing it and saying, you know what, it
9  looks similar?
10     A.  Yes, sir.
11         MR. WESTFALL:  Okay.  Thank you.
12         THE WITNESS:  Yes, sir.
13         MR. CHAMBLESS:  No further questions.  Thank
14 you, Mr. Courtney.
15         THE COURT:  May this witness be excused?
16         MR. CHAMBLESS:  Yes, sir.
17         MR. WESTFALL:  Yes, Your Honor.
18         THE WITNESS:  Thank you, sir.
19         (Witness excused.)
20         MS. JACK:  We call Sundaye Lopez.
21         (Pause in proceeding.)
22         THE COURT:  Please raise your right hand.
23         (Witness sworn.)
24         THE COURT:  Go ahead and have a seat.
25         MS. JACK:  May I proceed, Your Honor?

168

1    THE COURT: Yes, ma'am.
2              SUNDAYE LOPEZ,
3    Having been first duly sworn, testified as follows:
4              DIRECT EXAMINATION
5    BY MS. JACK:
6    Q. Would you please introduce yourself to the ladies
7    and gentlemen of the Jury.
8    A. Yes. My name is Sundaye Lopez, and I work for
9    the Fort Worth Police Crime Laboratory.
10   Q. Would you tell the members of the Jury about the
11   Fort Worth Police Department Crime Laboratory.
12   A. Our lab is part of the Fort Worth Police
13   Department. We consist of four different units. We have
14   a Latent Print Unit, a Firearms Unit, a Drug Chemistry
15   Unit, and the Evidence Screening DNA Unit, which is what
16   I'm a part of.
17   Q. Now, are all these units centralized in one large
18   building?
19   A. Yes, they are.
20   Q. And is there also a Property Control Area of that
21   building as well?
22   A. Yes. There's another unit within our -- within
23   our building called the Property Control Area, and we
24   receive our evidence from that area and take it to our
25   Crime Lab.

169

1    Q. Okay. Let me -- to give the Jury an idea, how
2    large a building are we talking about?
3    A. Oh, I don't know. It's a big -- we consider it a
4    campus, so it's a large area.
5    Q. And in many ways is it often referred to as
6    somewhat of a complex?
7    A. Yes, it is.
8    Q. But it's all centrally located under one large
9    building, under one large roof?
10   A. That's correct.
11   Q. If we're going to follow a piece of evidence,
12   when a police officer collects a piece of evidence, a
13   Crime Scene officer, for instance, is it initially taken
14   at times to the Crime Scene office?
15   A. Yes.
16   Q. And is that Crime Scene office in the same
17   building or is it in the Fort Worth Police Department in a
18   different location?
19   A. The Crime Scene office is located in Fort Worth
20   Police Headquarters, and the Property is on a different
21   location.
22   Q. All right. So once the Crime Scene officer
23   processes whatever piece of evidence, allows it to dry,
24   does whatever they need to do, what do they do with the
25   evidence from there?

170

1    A. Once it's packaged up, they'll drive it over to
2    the Lancaster office and place it in the Fort Worth Police
3    Property Room.
4    Q. You said once it's packaged up. Is every piece
5    of evidence packaged?
6    A. Yes, it is.
7    Q. Why is that?
8    A. It helps to maintain the integrity of the
9    evidence. If a package is sealed, it has tape on it, an
10   initial, a date, and that way you can track a chain of
11   custody. You know that the evidence has been protected
12   from any type of tampering or contamination.
13   Q. Okay. Now, when the evidence is brought to
14   this large complex and is checked into the Property
15   Control Area, is that an area that's open to the general
16   public?
17   A. No, it's not. It's -- we have security tags that
18   allow us in there, so it's a -- it's a secure, limited
19   access area.
20   Q. All right. And are there employees that are
21   specifically assigned just to that Property Control Area?
22   A. Yes, there are.
23   Q. All right. Now, you're an employee of the Fort
24   Worth Crime Lab, are you not?
25   A. Right.

171

1    Q. Do you have access to that area?
2    A. No, I don't.
3    Q. Okay. Do police officers have access to that
4    area?
5    A. No, they do not.
6    Q. Do Prosecutors have access to that area?
7    A. No.
8    Q. Okay. So certainly the general public has no
9    access to this area?
10   A. Right.
11   Q. Is the Property Control Area a secure area?
12   A. Yes, it is.
13   Q. When there are pieces of evidence that come in
14   that are connected to a particular case, are they in one
15   particular container?
16   A. They're usually grouped together by a service
17   number.
18   Q. Okay. And is there some overlap when we have a
19   particular suspect commit several crimes?
20   A. Yes.
21   Q. Okay. For instance, in this case, when we have a
22   stream of crimes over seven days, sometimes evidence is
23   stored in multiple -- well, sometimes evidence is in
24   different sections; is that correct?
25   A. That is correct.

172

1     Q. Okay. So when you want to take a piece of
2 evidence out to look at it, how do you go about checking
3 it out?
4     A. Each submission of evidence by a Crime Scene
5 officer or an officer is given a tag number, a unique tag
6 number. So if I want a piece of evidence off of a certain
7 tag number that was submitted by an officer, I let one of
8 the Property Control people know that that's the piece of
9 evidence I want. And I go to a window, and they go pick
10 it up for me and bring it to the window.
11     Q. So you don't even get to go retrieve it?
12     A. No, I don't.
13     Q. Now, you mentioned and you told the Jury that
14 you're a forensic scientist. Can you tell the Jury what
15 that means?
16     A. I work in the biology area, so I screen items of
17 evidence for the presence of body fluids. I try to
18 identify and characterize those fluids, and then I collect
19 them and send them for DNA testing if it's needed.
20     Q. Can you tell the Jury your educational background
21 that qualifies you to do this.
22     A. Yes. I received my degree in biology from Texas
23 A & M University. After graduation, I completed an
24 on-the-job training program at the Crime Lab. And since
25 then, I have many hours of continuing education in DNA

173

1 testing, evidence screening, biological collection,
2 packaging, so on, from University of North Texas Health
3 Science Center and Cedar Crest College, West Virginia
4 University and --
5        THE REPORTER: I'm sorry?
6     A. Orchid Cellmark in Dallas.
7     Q. What is Orchid Cellmark?
8     A. It's a private DNA testing company.
9     Q. All right. And have you attended several
10 seminars in this particular area?
11     A. Yes.
12     Q. All right. Can you give the Jury an idea of the
13 types of seminars you've attended?
14     A. I've gone to seminars put on by the Association
15 of Forensic DNA Analysts and Administrators, and that's a
16 group of DNA analysts from around Texas and we'll get
17 together and discuss the latest technologies, the trends
18 in forensic science, special cases. I go to DNA training
19 across the country put on by the Promega Corporation, and
20 basically we get together and learn the best possible ways
21 to collect evidence, discuss our experiences and how
22 testing changes over a period of time.
23     Q. Okay. Can you tell the members of the Jury about
24 what memberships you hold?
25     A. Yes. I'm a member of the Association of Forensic

174

1 DNA Analysts and Administrators.
2     Q. Can you tell the Jury what your professional
3 background entails?
4     A. I've been doing this job for about 11 years now.
5 I have testified in Tarrant County multiple times. This
6 is my first time in Johnson County.
7        I assist the detectives if they have
8 questions on DNA testing. I assist Prosecutors if they
9 have any questions.
10     Q. Okay. And you said that you testified several
11 times in Tarrant County. Have you testified as an expert
12 specifically in the area of biology or evidence screening?
13     A. Yes, I have, many times.
14     Q. And can you tell the members of the Jury what
15 serology means?
16     A. Serology is basically looking at an item of
17 evidence and trying to find a biological fluid on it.
18 We'll test a fluid or a stain to see if we can identify
19 what that stain may be and if it may be of a biological
20 use in DNA testing.
21     Q. Okay. And is that a part of evidence screening
22 or how would you explain what it means to "screen" a
23 particular piece of evidence?
24     A. To screen a piece of evidence, we look at
25 something with our -- with a naked eye, see if we see any

175

1 blatant stains. Sometimes we'll use alternate light --
2 excuse me -- an alternate light source to better view a
3 stain.
4        Once we find something that is worthy of
5 testing, we'll take a small sample of it using a cotton
6 swab, swab our sample. And then we'll perform our testing
7 on this swab, not actually on our piece of evidence, and
8 see if we can identify what that may be.
9     Q. Okay. Now, when you're in the process of
10 under -- of conducting your test, are there certain
11 quality measures or quality precautions that you take?
12     A. Yes. We're very mindful of our evidence and
13 the integrity of our evidence. Anytime we're in a
14 laboratory, we have to wear a lab coat, gloves, a mask
15 to cover our mouth, just so that we -- to protect
16 ourselves from the evidence and also the evidence from
17 ourselves.
18     Q. All right. When you check a piece of evidence
19 out, and you're working on it in the lab, how many
20 different cases are you working on in any given
21 time?
22     A. We have one piece of evidence open at any time,
23 at a time. We will not have two pieces of evidence open
24 at the same time.
25     Q. Okay. So you're not going to have multiple

**176**

1 pieces of evidence from multiple cases open and out on
2 your workspace; is that --
3    A. No --
4    Q. -- correct?
5    A. -- absolutely not.
6    Q. Okay. All right. Now, were you asked to review
7 a series of pieces of evidence in connection with Mark
8 Anthony Soliz and Jose Clemente Ramos?
9    A. Yes, I was.
10    Q. Okay. And let's begin first with --
11       MS. JACK: May I approach this witness, Your
12 Honor?
13       THE COURT: Yes, you may.
14    Q. Okay. Ms. Lopez, let's begin first with what has
15 already been admitted into evidence as State's Exhibit
16 29. And it came to the court sealed in State's Exhibit
17 29-A. Do you recognize State's Exhibit 29-A?
18    A. Yes, I do.
19    Q. How do you recognize that?
20    A. I see my lab number and my initials --
21    Q. Okay.
22    A. -- on the box.
23    Q. And what was your lab number in connection with
24 these items?
25    A. Our lab number was FW10-04242.

**177**

1    Q. And does it also bear your initials after that
2 lab number?
3    A. Yes, it does.
4    Q. All right. And State's Exhibit 29, was what item
5 of evidence to you?
6    A. This was a Hi-Point pistol.
7    Q. Okay. And was it Item 8443-03?
8    A. Let me refer to my notes real fast.
9    Q. Would that jog your memory?
10    A. Yes.
11    Q. Okay.
12    A. Could you repeat that number, please?
13    Q. Sure. Lab No. 10-04242, Offense No. 66785, Tag
14 8443, Item 03?
15    A. That's correct.
16    Q. All right. And is that the 9 millimeter Hi-Point
17 pistol which is now admitted into evidence as State's
18 Exhibit 29?
19    A. Yes, it is.
20    Q. All right. And can you tell the members of the
21 Jury what evidence you collected from State's Exhibit 29?
22    A. From this item I attempted to collect contact
23 DNA, so I would look at the item and attempt to collect
24 contact DNA from areas where there's going to be a lot of
25 friction. So you would go for the grip, trigger areas

**178**

1 like that.
2       And on this one, I collected swabs from --
3 for contact DNA from the trigger area, excuse me, and also
4 from the grips.
5    Q. All right. How many swabs did you collect from
6 the trigger area?
7    A. I collected two swabs from the trigger area.
8    Q. And can you show the members of the Jury where
9 those swabs were collected on State's Exhibit 29.
10    A. That would be this area right in here.
11    Q. Okay. And how many swabs did you collect from
12 the grip area?
13    A. I also collected two swabs from the grip area.
14    Q. Can you show the members of the Jury where you
15 attempted to collect contact DNA.
16    A. On the sides where you have the textured, rough
17 area.
18    Q. All right. Can you show the Jury? I'm going to
19 hold it.
20    A. It's these sides right here and the back.
21    Q. The sides and the back?
22    A. Yes.
23    Q. All right. And did you also collect a swab from
24 the magazine which has been admitted into evidence as
25 State's Exhibit 75-A?

**179**

1    A. Yes, I did.
2    Q. And how many swabs did you take from the
3 magazine?
4    A. I collected one swab from the magazine.
5    Q. Can you tell the members of the Jury the location
6 of the swab?
7    A. Yes. I took it from the --
8       MS. JACK: If you can stand up and show the
9 Jury, if that's all right with Your Honor.
10       THE COURT: Yes, ma'am.
11    A. I collected it from the back edge and the
12 crevices.
13    Q. So when you say the "back edge," where my finger
14 is right there?
15    A. Yes.
16    Q. And the crevice?
17    A. Yes. And those would be areas of contact.
18    Q. All right. And did you also collect a swab from
19 one of the live rounds that was -- that was contained
20 within State's Exhibit 29-A?
21    A. Yes, I did.
22    Q. All right. Can you tell the members of the Jury
23 from which bag, if you can, the swab's collected? In
24 other words, which round?
25    A. This one.

Case 3:14-cv-04556-K Document 24-32 Filed 08/02/16 Page 96 of 109 PageID 5549

STATE vs. MARK ANTHONY SOLIZ                                    MARCH 5, 2015

180

1    Q. When you say "this one", you're indicating
2  State's Exhibit 74-A; is that correct?
3    A. That's correct.
4    Q. This is the swab -- this is the round that you
5  swabbed in an attempt to get contact DNA?
6    A. That's correct.
7    Q. All right. Now, Ms. Lopez, I'm showing you
8  what's been marked as State's Exhibit 337. Do you
9  recognize State's Exhibit 337?
10   A. Yes, I do.
11   Q. How do you recognize this exhibit?
12   A. I also see our lab number and my initials and
13 signature on here.
14   Q. And what was your lab number?
15   A. Our lab number was FW10-04242.
16   Q. And where are your initials?
17   A. They're written on this "Submitted By" and also
18 on the seal.
19   Q. All right. And can you tell the members of the
20 Jury what State's Exhibit thirty -- I'm sorry -- 337
21 contains or contained at the time you collected it?
22   A. Yes. This is the envelope that I placed my
23 samples that I collected from a blue bandanna, a white
24 towel, the handgun, the magazine, and the live round. I
25 placed them in this envelope for storage.

181

1    Q. Okay. So it contained each of the swabs, the two
2  swabs from the trigger, the two swabs from the grip, the
3  swab from the live round, and the swab from the magazine;
4  each of those were placed inside of State's Exhibit 337;
5  is that correct?
6    A. That's correct.
7    Q. And, in addition, did you review a -- or did you
8  look at what was collected from the Dodge Stratus, a blue
9  bandanna and a white towel as well?
10   A. Yes, I did.
11   Q. And what was the purpose in looking at these?
12   A. I was trying to identify some body fluids, maybe
13 contact DNA.
14   Q. All right.
15   A. And blood.
16   Q. Now, beginning first with State's Exhibit 82,
17 which I'll represent was removed from State's Exhibit
18 82-A, and do you recognize State's Exhibit 82-A?
19   A. Yes, I do.
20   Q. How do you recognize State's Exhibit 82-A?
21   A. It also has that unique lab number and my
22 initials on it.
23   Q. All right. So is State's Exhibit 82 the blue
24 bandanna that you screened for evidence?
25   A. Yes.

182

1    Q. All right. Can you tell the members of the Jury
2  how you go about screening a piece of fabric or material?
3  I think you mentioned earlier that you begin with a visual
4  inspection. What happens next?
5    A. Once I made the visual inspection, I can identify
6  on here just looking at it there are some stains. So I
7  wanted to know what those stains may be, so I'll take a
8  small sample of it and perform a presumptive test for
9  blood to see if I can identify blood. If I do find that
10 there's blood on here, I will collect it with either a
11 cutting or a swabbing.
12      Also, it was requested on this that I collect
13 contact DNA. So to do that, I want to take a swabbing of
14 this item, this fabric item, and try to avoid any of the
15 stained areas. Because contact DNA is usually skin cells
16 which you cannot see with your visual eye, so you're going
17 to want to take a swabbing of an area around the stains,
18 so I wanted to try to avoid the blood stains.
19   Q. So, first of all, you do a visual inspection?
20   A. Yes.
21   Q. All right. And then next, is that when you test
22 for blood?
23   A. Yes.
24   Q. Okay. And I believe you mentioned that there was
25 a test that you do that's a presumptive test for blood.

183

1  What does that mean?
2    A. A presumptive test is a chemical color change
3  test, and what it does is it's going to give us an idea if
4  we're on the right track. If I see a brown or a red stain
5  on something, I think it may be blood, I'm going to
6  perform a presumptive test.
7      And depending on that test, if I get a
8  positive result, then I know I'm going to need to do some
9  further testing to identify it as blood. If I get a
10 negative result, I can stop right there.
11   Q. All right. Now, so something may look like blood
12 but it may not, in fact, be blood?
13   A. That's correct.
14   Q. So this is a test, it's kind of a first step to
15 see whether or not it may be blood?
16   A. Yes.
17   Q. Okay. And what -- does it have a particular
18 name?
19   A. The one we use is called the leucomalachite green
20 test.
21   Q. All right. And did you conduct this test, the
22 leucomalachite green test on some of the spots on the blue
23 bandanna that appeared to be blood?
24   A. Yes, I did.
25   Q. Were they positive for blood?

Case 3:14-cv-04556-K-S Document 24-32 Filed 08/02/16 Page 97 of 109 PageID 5550
MARCH 5, 2015
184
185
186
187

1    A. Yes, they were.

2    Q. All right. When you have a presumptive that is

3 positive for blood, what's the next step?

4    A. If we have enough of a sample there, we'll try to

5 characterize that as human blood. So we'll perform the

6 next test that's called a human trace test. And that's

7 what I did on this bandanna.

8    Q. What were the results?

9    A. It was positive for human blood.

10    Q. And so did you take a swab of some of the blood

11 stains on State's Exhibit 82?

12    A. Yes, I did.

13    Q. Okay. And did you collect those swabs?

14    A. Yes, I did. I collected two swabs from the

15 stain.

16    Q. And those were also contained within State's

17 Exhibit 337; is that correct?

18    A. That's correct.

19    Q. All right. And did you also take some further

20 swabs for contact DNA purposes?

21    A. Yes, I did.

22    Q. And do you swab over the blood when you take

23 those samples?

24    A. No. I try to avoid the stained areas.

25    Q. Did you do that in this case?

---

1    A. Yes, I did.

2    Q. And when those swabs were collected, were they

3 placed into State's Exhibit 337?

4    A. Yes, they were.

5    Q. Okay. Now, with regard to the white towel

6 that was found in connection with the blue bandanna

7 in the Dodge Stratus, do you recognize State's Exhibit 83?

8    A. Yes, I do.

9    Q. How do you recognize State's Exhibit 83?

10    A. By the initials that are placed on the towel.

11    Q. Okay. And you're looking inside the plastic bag

12 that contains State's Exhibit 83 and you see your black

13 markings?

14    A. Yes, I do.

15    Q. And can you show the members of the Jury where

16 those would be?

17    A. They're located right here on the tag of the

18 towel.

19    MS. JACK: I would ask you to stand up, if

20 that's okay with Your Honor.

21    THE COURT: Yes, ma'am.

22    A. I can recognize my initials right here underneath

23 the tag of the towel.

24    Q. Okay. So you know that that's one and the same

25 towel from which you took a cutting?

---

1    A. That's correct.

2    Q. Why did you take a cutting?

3    A. I was able to identify human blood on this item.

4    Q. When you said you were able to identify human

5 blood, did you go about testing it the same way that you

6 tested the bandanna?

7    A. Yes, I did.

8    Q. What determines when you take a swab versus when

9 you take a cutting?

10    A. The material of the item will determine. If it's

11 a thick item, such as a towel, I will make a cutting. If

12 it's a thin item or something that can't be cut, then I

13 will take swabbings, and that's what I did with the

14 bandanna.

15    Q. All right. Thank you very much. And, Ms. Lopez,

16 I'm going to ask you to go ahead and open State's Exhibit

17 337, please.

18    A. (Witness complied.)

19    Q. Okay. Now, Ms. Lopez, I'm showing you what's

20 been marked for identification purposes as 337-A. Is

21 337-A the envelope containing the two swabs from the

22 trigger area of the Hi-Point handgun?

23    A. Yes, it is.

24    Q. I'm showing you what's been marked as State's

25 Exhibit 337-B. Is that the envelope containing the two

---

1 swabs from the front and back textured grip area of the

2 Hi-Point handgun?

3    A. Yes, it is.

4    Q. I'm showing you what's been marked as State's

5 Exhibit 337-C. Is this the envelope containing the one

6 swab from the magazine?

7    A. Yes, it is.

8    Q. I'm now showing you what's been marked as State's

9 Exhibit 337-D. Is this the envelope containing the swab

10 from the crevice of the live round?

11    A. Yes, it is.

12    Q. I'm showing you what's been marked as State's

13 Exhibit 337-E for identification purposes. And is this

14 the envelope that contains the two swabs from the

15 bandanna?

16    A. Yes, it is.

17    Q. And what are the -- what does the word "H.T.O."

18 stand for?

19    A. H.T. is a abbreviation we use for the Human Trace

20 test, which is the one we use to identify human blood.

21 The symbol next to it is a positive. That means we've got

22 human blood positive on this sample.

23    Q. Okay. So State's Exhibit 337-E contains the

24 swabs of the blood from the bandanna?

25    A. That's correct.

188

1    Q. Okay. I'm showing you what's been marked as
2 State's Exhibit 337-F for identification purposes. Does
3 this envelope contain the swabs from the blue bandanna for
4 contact DNA purposes?
5    A. Yes, it does.
6    Q. And, lastly, I'm showing you what's been marked
7 as State's Exhibit 337-G for identification purposes. Is
8 this the envelope containing the cutting from the white
9 towel that you collected?
10    A. Yes, it does.
11    Q. Now, in each of these smaller envelopes, A
12 through G, if we were to feel inside, what would you
13 feel?
14    A. Feels like there's a swab inside of it.
15    Q. So when we say a "swab," what does a swab look
16 like?
17    A. Like a Q-tip.
18    Q. Just a scientific Q-tip?
19    A. Yes. That's what it is, a sterile Q-tip when we
20 start.
21    MS. JACK: All right. Your Honor, at this
22 time the State would offer State's Exhibit No. 337, the
23 larger envelope for record purposes, and State's
24 Exhibits 337-A through G and their contents for all
25 purposes.

189

1    MR. WESTFALL: No objection, Your Honor.
2    THE COURT: Admitted.
3    (State's Exhibit No. 337 admitted for
4    record purposes only.)
5    (State's Exhibit Nos. 337-A through 337-G
6    admitted.)
7    Q. (BY MS. JACK) Now, were some G.S.R. stubs
8 collected from the bandanna as well when you had it out
9 and were processing it in the Crime Lab?
10    A. Yes, there were.
11    Q. All right. And who did the G.S.R. testing on the
12 blue bandanna?
13    A. The stubs were collected by Crime Scene Officer
14 Ken Robertson.
15    Q. And were the same quality assurance measures in
16 place when you-all collected the G.S.R. stubs as when you
17 were collecting all of the other contact DNA swabs, the
18 samples of the blood, the cuttings, that type of thing?
19    A. Yes. I made Officer Robertson wear his gloves,
20 his mask, and his lab coat.
21    Q. Was he happy about that?
22    A. Probably not.
23    Q. All right. But you're kind of the one in charge
24 of the lab at that point?
25    A. I was, yes.

190

1    Q. So you were present when he collected all of
2 this?
3    A. Yes, I was.
4    Q. You made him follow all the rules?
5    A. Yes.
6    Q. Not that he wouldn't have anyway, but he did?
7    A. Yes, he did.
8    Q. He collected those stubs and that was done in
9 your presence and they were turned in to the Fort Worth
10 Property Control Area; is that correct?
11    A. Yes, they were.
12    Q. All right. And I'm showing you what's been
13 marked as State's Exhibit 338 for identification
14 purposes. Do you recognize this exhibit?
15    A. Yes, this is the envelope that Ken Robertson
16 placed the stubs in.
17    Q. Okay. In your presence?
18    A. Yes.
19    Q. Can you please open up State's Exhibit 338.
20    A. (Witness complied.)
21    Q. Within State's Exhibit 338, is there another
22 envelope?
23    A. Yes, there is.
24    Q. All right. Do you recognize the initials on the
25 back here?

191

1    A. Yes, I do. That's Ken Robertson's initials.
2    Q. Okay. And this is the same G.S.R. kit that was
3 collected or the stubs that were collected in your
4 presence?
5    A. Yes.
6    Q. Okay. Can you please go ahead and open State's
7 Exhibit 338-A.
8    A. (Witness complied.)
9    Q. And did I just remove the contents from State's
10 Exhibit No. 338-A and place them in a clear plastic baggy
11 marked State's Exhibit 338-A-1?
12    A. Yes.
13    MS. JACK: Your Honor, at this time the State
14 will offer State's Exhibits 338, 338-A for record
15 purposes, and State's Exhibit 338-A-1 for all purposes.
16    MR. WESTFALL: No objection, Your Honor.
17    THE COURT: Admitted.
18    (State's Exhibit No. 338-A-1 admitted.)
19    (State's Exhibit No. 338 and 338-A admitted
20    for record purposes.)
21    Q. (BY MS. JACK) And, Ms. Lopez, did you also screen
22 some clothing in connection with these two Defendants?
23    A. Yes, I did.
24    MS. JACK: May I have just a moment, Your
25 Honor, to move all the clothing up there?

STATE VS. MARK ANTHONY SOLIZ                                    MARCH 5, 2012

192

1        THE COURT:  That's fine.
2        Q.  Now, did you screen some K-Swiss shoes, K-Swiss
3    shoes in connection with Offense No. 68309, Item No.
4    8449-04?
5        A.  I did.
6        Q.  All right.  And how did you go about screening
7    State's Exhibit 171?
8        A.  I looked for -- I did a visual examination for
9    stains on this and then proceeded with an L.M.G. test, the
10   presumptive for blood.
11       Q.  All right.  So what kind of stains were you
12   looking for?
13       A.  I was looking for blood stains, so I was looking
14   for red-brown stains.
15       Q.  Now, there are some purple markings on these
16   shoes.  Do you know what these are for?
17       A.  Yes.  Those are my markings.
18       Q.  Why did you make purple markings on these shoes?
19       A.  Because I like purple.  No.  I circled the stains
20   that were on the shoes.
21       Q.  Okay.  All right.  You circled what appeared to
22   be stains or what are stains?
23       A.  Yes.
24       Q.  Did you do the presumptive test for the presence
25   of blood on these stains?

193

1        A.  Yes, I did.
2        Q.  And were they positive?
3        A.  No, they were not.
4        Q.  All right.  So there was no need to do any
5    further testing?
6        A.  No.
7        Q.  All right.  And I didn't ask you this, but
8    looking at State's Exhibit 171-A, which is connected to
9    State's Exhibit 171, do you recognize the packaging?
10       A.  Yes, I do.
11       Q.  How do you recognize the packaging?
12       A.  I recognize the unique lab number and my initials
13   again.
14       Q.  All right.  So, once again, these precautions are
15   in order to maintain the chain of custody and make -- and
16   to make sure that we're testing the exact pieces of
17   evidence that go with the exact case?
18       A.  That's correct.
19       Q.  All right.  Now, beginning with the black shorts,
20   your tag number one zero -- or 0330-01, the black shorts
21   purportedly belonging to whom?
22       A.  Mark Soliz.
23       Q.  And I'm looking at State's Exhibit 132 and the
24   packaging in connection with this exhibit marked 132-A.
25   Do you recognize this packaging?

194

1        A.  Yes, I do.
2        Q.  How do you recognize this packaging?
3        A.  I recognize my initial and the unique lab number.
4        Q.  All right.  And does it also bear the Crime Scene
5    officer that seized these shorts from the Defendant?
6        A.  Yes, it does.
7        Q.  And would that be Officer Presney?
8        A.  Yes.
9        Q.  Okay.  Now, when you screened these shorts, what
10   did you look for?
11       A.  I was looking at these shorts for blood.
12       Q.  All right.  And did you find the presence of
13   blood?
14       A.  I did not.
15       Q.  And did you find any signature or any writing on
16   these shorts?
17       A.  Yes, I found a -- the writing in the white
18   section, the grayish-white section, some handwriting in
19   marker.
20       Q.  Okay.  And I'm showing you some marking on these
21   shorts.  Where I'm showing you, which is towards the
22   bottom of the shorts in the grayish-white area, is that
23   the writing that you indicated?
24       A.  Yes, it is.
25       Q.  What does it say?

195

1        A.  I wrote that it appeared to say "Kilo G".
2        Q.  And do you know what the "G" would stand for?
3        A.  No.
4        Q.  Now, did you write that on there?
5        A.  No, I did not.
6        Q.  So that was already on there when you screened
7    this piece of evidence?
8        A.  Yes.
9        Q.  Is that right?
10       A.  Yes.
11       Q.  Okay.  Now, the next item would be the black
12   T-shirt; is that correct, 0330-02?
13       A.  That's correct.
14       Q.  All right.  All right.  Now, looking at State's
15   Exhibit 134, which is connected to the packaging that's
16   marked 134-A, do you recognize the packaging?
17       A.  Yes, I do.
18       Q.  How do you recognize it?
19       A.  Again, I recognize the lab number and my
20   initials.
21       Q.  All right.  And so is that the way that you can
22   tell that this is the same shirt that you screened for
23   evidence?
24       A.  Yes.
25       Q.  All right.  And can you tell the members of the

196

1 Jury what you found when you screened Mr. Soliz's black
2 T-shirt?
3     A. I was able to identify human blood on this item.
4     Q. All right. And was that with the presumptive
5 test?
6     A. Yes, I did the presumptive test, and then I
7 followed it with the Human Trace test.
8     Q. All right. And when you found the presence of
9 blood and that it was human blood, what did you do next?
10    A. I collected a cutting from the item. I collected
11 the -- I collected the entire stain as a sample.
12    Q. Do you know about how big the stain was?
13    A. Yes. The stain was very small. I have it in my
14 notes that it was .25 centimeters by .25 centimeters.
15    Q. Okay. So not a large amount at all?
16    A. No.
17    Q. But you collected the stain as a cutting?
18    A. Yes, I did.
19    Q. Okay. Now, you mentioned that the Fort Worth
20 Crime Lab has an Evidence Screening, Serology DNA
21 section. At that time, was the Fort Worth Crime Lab
22 conducting DNA analysis?
23    A. No.
24    Q. Now, with regard to Item 0330-03, what would that
25 be?

197

1     A. That item is a white sleeveless shirt collected
2 from Mark Soliz.
3     Q. I'm showing you what's already been admitted into
4 evidence as State's Exhibit 133, and the packaging
5 associated with it marked as State's Exhibit 133-A. Do
6 you recognize the packaging?
7     A. Yes, I do.
8     Q. How do you recognize that?
9     A. The lab number and my initials.
10    Q. Okay. So this is the same T-shirt that you
11 screened?
12    A. Yes.
13    Q. All right. Can you tell the members of the Jury
14 what your results were?
15    A. I did not find any blood or stains that could be
16 blood on this sample -- sorry, on this item.
17    Q. Okay. And so was there any necessity to take a
18 cutting?
19    A. No, there was not.
20    Q. Or to swab anything?
21    A. No.
22    Q. Okay. Now, looking at Item No. 0330-04, all
23 right, can you tell the members of the Jury what item that
24 would be?
25    A. These are black denim shorts collected from Jose

198

1 Ramos.
2     Q. Okay. And I'm showing you what's been admitted
3 into evidence as State's Exhibit 136, and the packaging
4 associated with it as 136-A. Do you recognize the
5 packaging?
6     A. Yes. I recognize the lab number and my initials.
7     Q. Okay. And each of these bags are open now, but
8 at the time that you receive them, are they all sealed?
9     A. Yes, they are.
10    Q. And when you return them to the Property Control
11 Area, are they likewise sealed as well?
12    A. Yes, they are.
13    Q. Okay. Can you tell the members of the Jury what
14 your examination of Mr. Ramos's black denim shorts showed?
15    A. Upon examination of this item, I found a cotton
16 ball inside the -- the closet, sorry -- the pocket of this
17 item, and the cotton ball tested positive for human blood.
18    Q. Okay. And what did you do as a result?
19    A. I collected that entire cotton ball.
20    Q. And that -- did that become Item No. 0330-04-A?
21    A. Yes, it -- yes, it did.
22    Q. Now, with regard to Item 0330-05, can you tell
23 the members of the Jury what that item or those items
24 were?
25    A. Those were black T-shirts collected from Jose

199

1 Ramos.
2     Q. Okay. Now, you say "black T-shirts". Why do you
3 say black T-shirts, plural?
4     A. Whenever I opened the package, I found that there
5 were two T-shirts, one inside of another, as if it were
6 taken off as one item.
7     Q. Now I'm showing you what's been marked as State's
8 Exhibit 135, and the packaging associated with it as
9 State's Exhibit 135-A. Do you recognize this packaging?
10    A. Yes. I recognize the lab number and my initials.
11    Q. And once again, was this sealed when you received
12 it?
13    A. Yes, it was.
14    Q. Okay. And it was sealed once again when you
15 returned it to the Property Control Area; is that correct?
16    A. That is correct.
17    Q. Okay. Did you screen these items for evidence?
18    A. Yes, I did.
19    Q. Can you tell the members of the Jury what you
20 found?
21    A. I found -- I performed a presumptive test on a
22 stain that was located on this item, and it was a very
23 weak positive presumptive. And based on my experience, I
24 know that I can get better results from DNA testing than I
25 can trying to identify something as human. So on this

200

1  particular item, I made the choice just to collect the
2  presumptive positive and skip the human blood
3  confirmation.
4      Q. Okay. So the rest of the sample would not be
5  consumed in further testing?
6      A. That's right.
7      Q. Okay. And did you collect that sample?
8      A. Yes, I did.
9      Q. And did that become Item No. 0330-05-A?
10     A. Yes, it did.
11     Q. Was that a cutting that you took?
12     A. Yes.
13     Q. And did you also collect some hairs off of these
14 two T-shirts as well?
15     A. Yes, I did.
16         MS. JACK: Okay. May I have a moment, Your
17 Honor? I'm missing one piece of evidence.
18         (Pause in proceeding.)
19     Q. Okay. Ms. Lopez, I'm showing you what's been
20 admitted into evidence as State's Exhibit 172, and the
21 packaging associated with it as State's Exhibit 172-A.
22     A. Okay.
23     Q. Okay. Do you recognize the packaging, State's
24 Exhibit 172-A? You can open it up if you need to.
25     A. I recognize my initials on this item and the

201

1  unique lab number.
2      Q. Okay. So these are one and the same pants as
3  were collected from Mark Soliz?
4      A. That's correct.
5      Q. Okay. And did you perform or conduct some
6  evidence screening on Mr. Soliz's blue jeans?
7      A. Yes, I did.
8      Q. Can you tell the members of the Jury what your
9  results were?
10     A. I was able to identify human blood on this item.
11     Q. Okay. And when you were able to identify Human
12 blood, was it a little bit, was it a lot? Can you give
13 the Jury an idea?
14     A. I tested many stains on this item, and I got
15 presumptive positive on quite a few. I chose two to
16 collect.
17     Q. All right. The sizes of the stains, were the
18 sizes small or can you give the Jury an idea of what size
19 they were?
20     A. They -- well, there was quite a bit of staining
21 on this item. The -- do you want to know the size of the
22 ones I collected?
23     Q. Yes, please.
24     A. Okay. The first item I collected, 8449-03-A, the
25 sample that I collected was 2 -- I'm sorry. The stain

202

1  size was 2 centimeters by 1 centimeter, and I collected
2  that entire stain.
3      Q. Okay. And was that taken from the front of his
4  blue jeans, the back of his blue jeans? What was the
5  location of that cutting?
6      A. Let me check and see. That item was collected
7  from the front side, the front of the blue jeans near the
8  pocket.
9      Q. Okay. Was there a second cutting that was taken
10 from the blue jeans?
11     A. Yes, there was.
12     Q. And where was that cutting taken from?
13     A. That was collected from the back side of the
14 jeans.
15     Q. And would that have been Item 8449-03-AA?
16     A. Yes, it was.
17     Q. Did you bring the packaging with you that was
18 used when you collected each of those cuttings?
19     A. Yes, I did.
20     Q. Okay. Now, when you send an item off for DNA
21 testing, are those samples many times retained by the lab
22 that did the DNA testing?
23     A. Yes, they are.
24     Q. Was that the case in each of these cuttings from
25 the Defendant's clothing?

203

1      A. Yes.
2      Q. So when the Medical Examiner's office did their
3  DNA testing, were the items or your samples returned to
4  the Fort Worth Property -- to the Fort Worth Crime Lab?
5      A. For these samples, all we received back from the
6  Medical Examiner's office was packaging. They retain the
7  actual samples in their laboratory.
8      Q. And I'm showing you what's been marked as State's
9  Exhibit 339 and State's Exhibit 340. Do you recognize
10 both of these exhibits?
11     A. Yes, I do.
12     Q. And how do you recognize them?
13     A. The unique lab number and my signature.
14     Q. Okay. And there appears to be quite a few stamps
15 on each of these envelopes, or stickers?
16     A. Yes.
17     Q. Would those be typical or characteristic of
18 evidence labeling by the Tarrant County Medical Examiner's
19 Office?
20     A. Yes, they are.
21         MS. JACK: Your Honor, the State would offer
22 State's Exhibit 339 and State's Exhibit 340 for record
23 purposes only.
24         MR. WESTFALL: May I see it?
25         MS. JACK: Sure.

STATE VS. MARK ANTHONY SOLIZ                                    MARCH 5, 2012

204

1    MR. WESTFALL: No objection, Your Honor.
2    THE COURT: Admitted.
3    (State's Exhibit Nos. 339 - 340 admitted for
4    record purposes only.)
5    Q. (BY MS. JACK) Ms. Lopez, for clarification
6    purposes, there's nothing in these envelopes, right?
7    A. No. It's just packaging.
8    Q. The actual samples are retained at the Tarrant
9    County Medical Examiner's office?
10   A. Yes, that's correct.
11   Q. Is that often the case with biological samples?
12   A. Yes.
13   Q. Why is that?
14   A. They -- the lab that tests the sample wants to
15   store it so that they can test it again if it's necessary.
16   Q. And let me ask you this. When samples are
17   tested, many times do the individuals that conduct the DNA
18   analysis make every effort to leave enough samples that in
19   event the Defense wants to retest, they can?
20   A. Yes, they do.
21   Q. Okay. So it's not just there's evidence just for
22   the State to test; there's evidence that the Defense can
23   test?
24   A. Yes, that's correct.
25   Q. If they choose to.

205

1    A. That's correct.
2    MS. JACK: May I have a moment, Your Honor?
3    May I approach the witness again, Your Honor?
4    THE COURT: Yes, ma'am.
5    Q. Ms. Lopez, I'm showing you what's been marked for
6    identification purposes as State's Exhibit 341, State's
7    Exhibit 342 and State's Exhibit 343. Do you recognize
8    each of these exhibits?
9    A. Yes, I do.
10   Q. How do you recognize them?
11   A. These are my official laboratory reports.
12   Q. And were these the summary of the evidence
13   screening and your results that you just testified to this
14   Jury?
15   A. Yes. Can I make sure my signature is on those?
16   Q. Please.
17   A. Okay. Yes, they are.
18   MS. JACK: Your Honor, at this time State
19   would offer State's Exhibits 341, 342 and 343 into
20   evidence for all purposes.
21   MR. WESTFALL: No objection, Your Honor.
22   THE COURT: Admitted.
23   (State's Exhibit Nos. 341 - 343 admitted.)
24   Q. (BY MS. JACK) And when samples are sent off to
25   other labs, I believe I asked you this, whether it's the

206

1    Medical Examiner's Office, whether it's UNT, regardless of
2    what laboratory it is, do each of those laboratories
3    employ the same kind of security precautions that the Fort
4    Worth Crime Lab strives to employ in every case?
5    A. Yes, they do.
6    Q. Every effort is made to preserve that chain of
7    custody from the beginning to the end?
8    A. Yes, that's correct.
9    Q. There and back?
10   A. Yes.
11   MS. JACK: Okay. With that, Your Honor, I
12   believe I'll pass the witness.
13   MR. WESTFALL: Thank you, Your Honor.
14   CROSS-EXAMINATION
15   BY MR. WESTFALL:
16   Q. Hello, Ms. Lopez.
17   A. Hi.
18   Q. Would you please tell the Jury what "contact DNA"
19   is?
20   A. Contact DNA is what we refer to, you often hear
21   it as "touch DNA". And it's if somebody touches an item
22   of evidence and a friction is created, and the skin cells,
23   sweat cells transfer onto that item, that's what we refer
24   to as contact DNA.
25   Q. And so from a fingerprint, if you just touch

207

1    something, then somebody could come along and swab that
2    and get like a full DNA match out of that?
3    A. You're not likely to get a full DNA profile out
4    of a fingerprint, but you leave DNA behind when you do
5    touch an item.
6    Q. I guess it's possible though, huh?
7    A. I would say probably a partial profile would be
8    possible.
9    Q. Okay. Well, did you -- were you the person that
10   all the gunshot residue got sent to or did that --
11   A. No.
12   Q. -- some of that go straight to Kelly Belcher?
13   A. That went straight to the T.C.M.E.
14   Q. The what?
15   A. Tarrant County Medical Examiner.
16   Q. Oh, okay.
17   A. Trace Area.
18   Q. And, in fact, there -- I'm trying to round -- I'm
19   sorry.
20   A. That's okay.
21   Q. Give me a second to round this up. There's
22   several different labs that do DNA, right?
23   A. Yes, there are.
24   Q. And due to some circumstances back in Tarrant
25   County, the Crime Lab stopped doing it for a while, and

208

1   then Orchid Cellmark was one of the places that did the
2   DNA for the county, right?
3       A. No, I don't know if Orchid Cellmark has done any
4   testing for the County.
5       Q. Okay. How long have you been working there?
6       A. I work for the Fort Worth Police Department.
7       Q. Okay. For how long?
8       A. I've been there for 11 years.
9       Q. 11 years, and you don't realize that Orchid
10  Cellmark has done work for Tarrant County?
11      A. I don't work at Tarrant County so I don't -- I
12  don't know who does testing for them.
13      Q. Okay. Did you know that University of North
14  Texas does DNA testing?
15      A. Yes.
16      Q. And you've submitted stuff to University of North
17  Texas?
18      A. Yes, I have.
19      Q. And Tarrant County Medical Examiner does DNA
20  testing?
21      A. That's correct.
22      Q. You've submitted stuff to them?
23      A. Yes.
24      Q. And now, I guess, y'all do DNA testing in-house?
25      A. Not yet. We're in the process of setting it up.

209

1       Q. Okay. Do you find out the results when you send
2   stuff away?
3       A. If we request the testing, we'll receive a DNA
4   report.
5       Q. So you know then that all the DNA that was on
6   those pants that Mark Soliz was wearing was his own?
7       A. I'm not -- did Tarrant County do the DNA testing
8   on that item? If Tarrant County did the testing, we
9   didn't request that one, so I wouldn't have received the
10  DNA report for that item. The report that we received was
11  from UNT.
12      Q. Just because you package the stuff up, that
13  doesn't mean that you're going to get the report back?
14      A. No, unfortunately not.
15      Q. Here is one of your reports that was just put
16  into evidence.
17          MR. WESTFALL: I don't have a clue how to
18  work that.
19          THE COURT: Just input select. It says
20  input. It's right on the front. Little gray button says
21  input select, just push it.
22          MR. WESTFALL: Okay. Very good.
23      Q. (BY MR. WESTFALL) This is one of your reports
24  that was just put in?
25      A. Yes.

210

1       Q. And this is the one actually that has the -- has
2   the black denim shorts and the pants, the clothing of both
3   Ramos and Soliz?
4       A. Yes, it is.
5       Q. And who did you submit that to?
6       A. The cuttings from the shorts?
7       Q. Yes.
8       A. After I collected my samples, I submitted those
9   to our Fort Worth Property Room, and then they were later
10  outsourced. Those items were later outsourced to the
11  Tarrant County Medical Examiner's Office for DNA testing.
12      Q. So you wouldn't have received the report back?
13      A. No.
14      Q. Could I see any UNT reports that you might have?
15      A. Yes. These are the two UNT reports that I have,
16  and these are from the items from the -- I mean the
17  samples collected from the bandanna, and the towel and the
18  weapon.
19      Q. Is there any difference to these?
20      A. Let me check. There should be.
21      Q. I see different dates but I don't see --
22      A. One is titled Forensic DNA Report, and the other
23  is titled Forensic DNA Report No. 2. I don't know at the
24  moment what the difference is in there in the UNT reports.
25      Q. Let me show you a picture here really fast. This

211

1   is already in evidence as State's Exhibit 93. You would
2   have no reason to -- to know what that is?
3       A. No, I don't recognize.
4       Q. But this is the truck of a fellow name Jorge
5   Contreras Carvajal, and it would be your lab No.
6   10-04352-2. Would you please look for that for me.
7       A. What's that number again?
8       Q. Here.
9       A. Okay. That -- this report shows the swabs, five
10  swabs.
11      Q. Yes.
12      A. Okay. Okay.
13      Q. Do you have it there with you?
14      A. Yes, I do.
15      Q. Okay. Now, does it look like you submitted those
16  five swabs to the University of North Texas?
17      A. Yes, I did.
18      Q. Did you get a report back dealing with those five
19  swabs?
20      A. No, I did not.
21      Q. So you submitted the evidence to the University
22  of North Texas to be DNA tested, and they just never sent
23  it back; they just never sent you a report?
24      A. For some reason they did not do the testing on
25  that item.

211

1  is already in evidence as State's Exhibit 93.  You would
2  have no reason to -- to know what that is?
3      A.  No, I don't recognize.
4      Q.  But this is the truck of a fellow name Jorge
5  Contreras Carvajal, and it would be your lab No.
6  10-04352-2.  Would you please look for that for me.
7      A.  What's that number again?
8      Q.  Here.
9      A.  Okay.  That -- this report shows the swabs, five
10  swabs.
11      Q.  Yes.
12      A.  Okay.  Okay.
13      Q.  Do you have it there with you?
14      A.  Yes, I do.
15      Q.  Okay.  Now, does it look like you submitted those
16  five swabs to the University of North Texas?
17      A.  Yes, I did.
18      Q.  Did you get a report back dealing with those five
19  swabs?
20      A.  No, I did not.
21      Q.  So you submitted the evidence to the University
22  of North Texas to be DNA tested, and they just never sent
23  it back; they just never sent you a report?
24      A.  For some reason they did not do the testing on
25  that item.

212

1      Q.  All right.  Please go to your Fort Worth Lab
2  No. 04242.
3      A.  Okay.
4      Q.  Did you find it?
5      A.  Yes, I did.
6      Q.  Is there a form in there showing three swabs of
7  contact DNA going to University of North Texas as well?
8      A.  The swabs that I collected from the bandanna, the
9  handgun, the magazine and live rounds?
10      Q.  No; 9102-10, 9102-11 and 9102-12.
11      A.  Yes.  I see that.  I have it.
12      Q.  And those are not from the bandanna and whatnot.
13      A.  No.
14      Q.  Those are contact swabs from the car, right?
15      A.  I believe they're from a Dodge Stratus.
16      Q.  A Stratus, exactly.  The car that belongs to --
17  we've got it up here -- Sammy Abu-Lughod.
18      A.  Okay.
19      Q.  And is this another situation where UNT just
20  never did the testing, never sent you a report?
21      A.  No, we did not get a report from UNT on this
22  item.
23      Q.  So the DNA, the contact DNA from the case
24  involving Jorge Carvajal -- which is in evidence, I'll
25  just tell you, you don't know this, but it's in

213

1  evidence -- that's from inside the interior of that
2  truck.  And then the contact DNA from Sammy Abu-Lughod's
3  Dodge Stratus, which, once again, it's in evidence, I'll
4  just tell you, contact DNA from inside the car.
5      A.  Okay.
6      Q.  Those two things apparently, even though you
7  submitted them, they were never tested?
8      A.  Okay.
9      Q.  Is that true?
10      A.  We did not receive a report so I have to assume
11  they weren't tested by UNT.
12          MR. WESTFALL:  Pass the witness, Your Honor.
13              REDIRECT EXAMINATION
14  BY MS. JACK:
15      Q.  Did you know that the bandanna and the towel that
16  were also found in the Stratus were tested?
17      A.  Yes, they were.
18      Q.  And they were tested by the Medical Examiner's
19  Office?
20      A.  Yes.  And they were also tested by the University
21  of North Texas Health Science Center.
22      Q.  And so while three swabs were not, other items in
23  the car that contained blood were tested?
24      A.  Yes.
25      Q.  Okay.  And do you know whether or not the

214

1  bandanna came back to the Defendant, that it was his
2  blood?
3      A.  I would have to look at -- I would have to look
4  at UNT's report to know.  Their report doesn't say.
5      Q.  Does it give a profile?
6      A.  Yes, it does.
7          MS. JACK:  All right.  Thank you.
8          I'll pass the witness, Judge.
9              RECROSS-EXAMINATION
10  BY MR. WESTFALL:
11      Q.  But we have no profile for the two automobiles,
12  the contact DNA, because it was never tested or sent back
13  to you, right?
14      A.  No, I don't have a UNT report for those items.
15      Q.  So on Jorge Carvajal Contreras, some Crime Scene
16  officer took the time to collect five swabs, you took the
17  time to send it to North Texas, and nothing happened; is
18  that right?
19      A.  I -- apparently; I didn't receive a report.
20      Q.  And then on Sammy Abu-Lughod, some other Crime
21  Scene officer took the time to collect contact DNA from
22  inside the car, properly submitted it to you, you did
23  everything you were supposed to do, you sent it to UNT,
24  and it just vaporized, nothing happened?
25      A.  I didn't get a report.

215

1    Q.  Okay.  Which means nothing happened, right?
2    A.  Hopefully there's no vaporization.
3          MR. WESTFALL:  Thank you, Your Honor.
4          MS. JACK:  I have nothing further.  I would
5    ask this witness be excused.
6          THE COURT:  May the witness be excused?
7          MR. WESTFALL:  She may.
8          THE COURT:  Thank you.  You may be excused.
9          (Witness excused.)
10         THE COURT:  Do you have another witness?
11         MS. JACK:  Yes, Your Honor.  We call
12   Detective Jay Kniffen.
13         (Witness sworn.)
14         THE COURT:  Thank you.
15         MS. JACK:  Thank you, Your Honor.
16               JAY KNIFFEN,
17   Having been first duly sworn, testified as follows:
18            DIRECT EXAMINATION
19   BY MS. JACK:
20   Q.  Detective, could you please introduce yourself to
21   the ladies and gentlemen of the Jury?
22   A.  My name is Jay Kniffen.
23   Q.  And can you tell them how you're employed?
24   A.  I work with the Johnson County Sheriff's Office
25   as a detective.

216

1    Q.  All right.  What do you do as a detective?
2    A.  Crimes against persons, assaults, manslaughters,
3    aggravated assaults, things like that.
4    Q.  So are you responsible for responding to a crime,
5    investigating the crime, and apprehending the individual
6    responsible?
7    A.  Yes.
8    Q.  Okay.  How long have you been with the Johnson
9    County Sheriff's Department?
10   A.  Eight years.
11   Q.  Are you a certified police office in the State of
12   Texas?
13   A.  Yes.
14   Q.  How many years all told have you been in law
15   enforcement?
16   A.  Almost 12.
17   Q.  Okay.  Were you on duty on June 30th of 2010?
18   A.  I was.
19   Q.  All right.  Were you asked to respond to 14356
20   North FM 2331?
21   A.  Yes.
22   Q.  And can you tell the members of the Jury what
23   that address is?
24   A.  That address is the residence of a homicide
25   victim.

217

1    Q.  All right.  How was it that you came to come
2    out -- how was it that you were called out there?
3    A.  Lieutenant Gaudet called me out to that location.
4    Q.  All right.  And what was the purpose of your
5    coming out there?
6    A.  To work a homicide.
7    Q.  All right.  What time did you get there?
8    A.  8:25.
9    Q.  Did you go alone or were you with someone else?
10   A.  I went with Detective Dalton.
11   Q.  All right.  What did you do once you arrived?
12   A.  We walked down the driveway and went to the back
13   of the residence, then the back yard.  Met with other
14   detectives there.  We went in the house for about a
15   minute.  Lieutenant Gaudet wasn't done videotaping, so we
16   all had to back out of the residence until he got
17   finished.
18   Q.  All right.  Once he finished videotaping the
19   crime scene, what did you do?
20   A.  It was decided that me and Detective Dalton go to
21   Fort Worth P.D. and speak with detectives there.
22   Q.  Who decided that?
23   A.  Captain Fuller.
24   Q.  All right.  So you were asked to drive to Fort
25   Worth?

218

1    A.  Right.
2    Q.  What was the purpose of going to Fort Worth?
3    A.  Pick up initial reports that they had in
4    reference to Mr. Soliz and to look at the victim's
5    vehicle.
6    Q.  All right.  When you got to Fort Worth, who did
7    you talk to?
8    A.  Detective Rhoden.
9    Q.  Where did you speak with him?
10   A.  At the Fort Worth Police Department.
11   Q.  Did you take -- did he take you to
12   Ms. Weatherly's truck?
13   A.  Yes, he did.
14   Q.  Do you know where it was stored at the time?
15   A.  It was at the Fort Worth Police impound, 2500
16   Brennan Street.
17   Q.  All right.  Can you tell the members of the Jury
18   what you did once you saw her truck?
19   A.  Took photos of the vehicle.  While I was taking
20   photos of the vehicle, I noticed that there were a few
21   items in the bed of that vehicle; one was a black pair of
22   pants.  There was a pair of gloves in there, and a
23   24-ounce Bud Light beer can, empty, open, and a Bud Light
24   beer bottle, also empty and open.
25   Q.  Did you collect those items at that time?

219

1    A.  Not at that time.  What we did, we ended up
2  leaving, and then about an hour later, they wanted us to
3  go back and collect -- actually get Ms. Weatherly's
4  vehicle and tow it back to Johnson County Sheriff's
5  Office.
6    Q.  All right.  And who towed it back to the Johnson
7  County Sheriff's Office?
8    A.  Reid's Wrecker.
9    Q.  All right.  Did you escort her truck back into
10  Johnson County and into Cleburne?
11    A.  Yes, we did.
12    Q.  And is the Sheriff's Department in this building,
13  as a matter of fact?
14    A.  Yes, it is.
15    Q.  All right.  Was the truck towed to, I guess, the
16  bottom level, the same level this courtroom is on?
17    A.  Uh-huh.
18    Q.  All right.  Where is the opening to where the
19  truck was towed into?
20    A.  It would be the north side.  We call it the
21  north sally, but it's kind of the north side of the
22  building.
23    Q.  All right.  How far away from this courtroom was
24  her truck then?
25    A.  A hundred yards, 75, something like that.

220

1    Q.  All right.  So that's where you process evidence
2  like a truck?
3    A.  That's where we processed that vehicle; or
4  actually I didn't process it, but that's where it was
5  processed.
6    Q.  All right.  And is that when you collected
7  the beer can, the beer bottle, the gloves and the black
8  pants?
9    A.  No, that's not where we collected it.  We --
10  we -- once we went back, once it was decided that we tow
11  the vehicle back to Johnson County, I collected those
12  items then.  If we would have left them in there, they
13  would have blown out the back of the bed of the vehicle
14  and took a chance on losing them, so that's why we
15  collected them then.
16    MS. JACK:  Okay.  May I approach this
17  witness, Your Honor?
18    THE COURT:  Yes, you may.
19    Q.  Was it a pretty windy day?
20    A.  I can't remember.
21    Q.  You were just worried if these items were in the
22  back of the truck, driving down the road, they might get
23  lost?
24    A.  Well, you know, going 70 miles an hour down the
25  highway, they could get lost.

221

1    Q.  All right.
2    A.  Blow out the bed.
3    Q.  Detective, I'm showing you what's been marked as
4  State's Exhibit 214-A.  Do you recognize State's Exhibit
5  214-A?
6    A.  Yes.
7    Q.  And what is that?
8    A.  It's Item No. 15, Bud Light beer can, and Item
9  No. 16, Bud Light beer bottle.
10    Q.  Okay.  So is 214-A the packaging that contained
11  both the beer bottle and the beer can?
12    A.  Yes.
13    Q.  And were both of these empty when you collected
14  them?
15    A.  Yes.
16    Q.  All right.  So they were pretty light?
17    A.  Right.
18    Q.  All right.  And so you were the detective
19  that collected both of these items and placed them
20  in 214-A?
21    A.  Right.
22    Q.  Okay.  Did you collect any other items of
23  evidence from the truck?
24    A.  We collected the black pair of pants.  They're
25  more like a -- a wind pant, I think.  And then we

222

1  collected -- there was a pair of black gloves that we
2  also collected.
3    Q.  Did you collect anything else?
4    A.  No.
5    Q.  Okay.  How long were you there at the truck?
6    A.  The first time for maybe 30, 35 minutes.  The
7  second time, physically at the truck, probably another 20
8  minutes.
9    Q.  All right.  Do you remember about what time
10  you arrived back in Cleburne with Ms. Weatherly's truck?
11    A.  I believe it was around 5:30.
12    Q.  All right.  Once you had those items of evidence
13  in your possession, what did you do with them?
14    A.  We took them back to the Johnson County Sheriff's
15  Office.
16    Q.  All right.  Where is that?
17    A.  That is located at 1102 East Kilpatrick Street in
18  Cleburne.
19    Q.  And when you place evidence in storage there, is
20  it a secure facility?
21    A.  Yes.
22    Q.  And are the -- all of the evidence -- are all
23  pieces of evidence sealed and security precautions taken
24  to make sure that they're protected?
25    A.  Yes.

223

1    Q. All right. And did that conclude your
2 involvement in this investigation?
3    A. Yes, it did.
4    Q. All right. Now, on September 24th of 2010, did
5 you meet Mr. Soliz?
6    A. I did.
7    Q. Okay. Did you also meet Mr. Ramos?
8    A. I did.
9    Q. Were you asked to transport both prisoners to
10 Johnson County?
11    A. Yes, I was.
12    Q. All right. And can you tell the members of the
13 Jury how you went about doing that.
14    A. Well, we just transported, me and another
15 detective, Detective Ketchum or Deputy Ketchum, we went to
16 Fort Worth, Tarrant County Jail, picked up the two,
17 Mr. Soliz and Mr. Ramos, for our charges and we're going
18 to bring them back to Johnson County. I don't really have
19 a time on that, but we arrived at Tarrant County Jail,
20 placed them in custody, got their belongings, put them in
21 the vehicle, and then escorted them back to Johnson
22 County.
23    Q. Okay. Now, at the time that they were in Tarrant
24 County, they were being held on capital murder charges; is
25 that correct?

224

1    A. Correct.
2    Q. And were they being brought to Johnson County to
3 stand trial on capital murder charges here?
4    A. Yes.
5    Q. Were you in a marked patrol unit?
6    A. Yes, we were.
7    Q. All right. And was there videotape capabilities
8 within that patrol unit?
9    A. Yes.
10    Q. All right. And were both Defendants transported
11 together?
12    A. Yes.
13    Q. All right. Were you driving or were you the
14 passenger?
15    A. I was the passenger.
16    Q. Can you tell the members of the Jury where
17 Mr. Soliz was seated in connection with where you were
18 seated.
19    A. Okay. I was in the front passenger seat of the
20 vehicle. Mr. Soliz was directly behind me in the
21 passenger seat.
22    Q. Okay. And was the other deputy driving?
23    A. Yes.
24    Q. And was Mr. Ramos seated behind him?
25    A. Correct.

225

1    Q. Okay. And was this a secure car?
2    A. Yes, it is.
3    Q. All right. Now, when you're transporting
4 somebody that is under arrest or in custody, is it part of
5 the protocol of the Johnson County Sheriff's Department to
6 turn on the videotape?
7    A. Yes.
8    Q. All right. So there was nothing different about
9 this particular transport?
10    A. No.
11    Q. Okay. And they were transported together?
12    A. Right.
13    Q. They were in custody?
14    A. Yes.
15    Q. Were you asking them any questions?
16    A. No.
17    Q. Were they being interrogated in any way?
18    A. No.
19    Q. Were you asking them any questions designed to
20 illicit any kind of incriminating response?
21    A. No.
22    Q. Is there any expectation of privacy in the back
23 seat of a patrol car?
24    A. No.
25    Q. All right. Have you reviewed the videotape from

226

1 this transport?
2    A. I have.
3    Q. And have you reviewed a transcript of the
4 videotape of this transport?
5    A. Yes, I have.
6    Q. And I want to talk to you specifically about some
7 comments that Mr. Soliz makes. Is that okay?
8    A. Yes.
9    Q. All right. Do you recall Mr. Soliz making some
10 comments about a man pawning some straps?
11    A. Yes.
12    Q. What is "straps" slang for?
13    A. Guns.
14    Q. So he's talking about a boy pawning some guns; is
15 that right?
16    A. Yes.
17    Q. All right. And that they were going to get him
18 on capital murder too; is that right?
19    A. That's right.
20    Q. And did he tell Mr. Ramos, "All we've got to do
21 is play dumb, play dumb till the end"?
22    A. Yes.
23    Q. At the end of the videotape -- and about how long
24 is the drive from Tarrant County to Johnson County?
25    A. 20 miles.

227

```
1       Q.  Okay.  How fast do you drive?  How long does it
2   take to drive that drive?
3       A.  I think it was probably 40 minutes, something
4   like that.
5       Q.  All right.  So it's a pretty lengthy video?
6       A.  Right.
7       Q.  At the end of the video, do you recall Mr. Soliz
8   indicating that Godley was a city?
9       A.  Yes.
10      Q.  And that he was familiar with Godley?
11      A.  Correct.
12      Q.  And that he was familiar with Keene?
13      A.  Yes.
14      Q.  And that he knew Johnson County?
15      A.  Right.
16          MS. JACK:  I'll pass this witness, Your
17  Honor.
18          MR. HEISKELL:  No questions, Judge.
19          THE COURT:  May the witness be excused?
20          MS. JACK:  Yes, Your Honor.
21          THE COURT:  Thank you.  You may be excused.
22          (Witness excused.)
23          THE COURT:  This would be appropriate place
24  to break until -- recess until tomorrow morning.  So if
25  you'll remember all the instructions I've given you and
```

228

```
1   I keep repeating to you at the end of each day, not to
2   watch TV, not to read newspapers, not to get on the
3   Internet, I'll allow you to go home again this evening.
4   And we'll see you bright and early in the morning.  Thank
5   you.  Be in recess until 8:45.
6           (Court adjourned.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 THE STATE OF TEXAS )

2 COUNTY OF JOHNSON  )

3          I, Pamela K. Waits, Official Court Reporter

4 in and for the 413th District Court of Johnson County,

5 State of Texas, do hereby certify that the above and

6 foregoing contains a true and correct transcription of all

7 portions of evidence and other proceedings requested in

8 writing by counsel for the parties to be included in the

9 volume of the Reporter's Record, in the above-styled and

10 numbered cause, all of which occurred in open court or in

11 chambers and were reported by me.

12          I further certify that this Reporter's Record

13 of the proceedings truly and correctly reflects the

14 exhibits, if any, admitted by the respective parties.

15          WITNESS MY OFFICIAL HAND this the 31 day

16 of December 2012.

17

18          _____
            Pamela K. Waits, Texas CSR #4991
19          Expiration Date:  12/31/13
            Official Court Reporter
20          413th Judicial District
            Johnson County, Texas
21          204 S. Buffalo Avenue
            Cleburne, Texas 76033
22          (817) 556-6041

23

24

25