REPORTER'S RECORD

VOLUME 49 OF 75 VOLUMES

TRIAL COURT CAUSE NO. F45059

COURT OF CRIMINAL APPEALS NO. AP-76,768

| | | |
|---|---|---|
| STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| VS. | ) | JOHNSON COUNTY, TEXAS |
| | ) | |
| MARK ANTHONY SOLIZ | ) | 413TH JUDICIAL DISTRICT |

------------------------------------------------------------

JURY TRIAL

PUNISHMENT PHASE

------------------------------------------------------------

On the 13th day of March, 2012, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable William C. Bosworth, Jr., Judge presiding, held in Cleburne, Johnson County, Texas:

Proceedings reported by Machine Shorthand and Computer-Aided Transcription.

ORIGINAL

STATE V. MARK ANTHONY SOLIZ.   MARCH 13, 2012

2

```
 1                    A P P E A R A N C E S

 2   DALE HANNA
     SBOT NO. 08919500
 3   LARRY CHAMBLESS
     SBOT NO. 04086320
 4   MARTIN STRAHAN
     SBOT NO. 00797765
 5   District Attorney's Office
     Johnson County
 6   204 S. Buffalo
     Cleburne, Texas 76033
 7   (817) 556-6801

 8   ELIZABETH CHRISTINA JACK
     SBOT NO. 10445200
 9   Tarrant County District Attorney's Office
     401 W. Belknap Street
10   Fort Worth, Texas 76102-1913
     817-884-1366
11
     ATTORNEYS FOR THE STATE OF TEXAS
12

13   MICHAEL P. HEISKELL
     SBOT NO. 09383700
14   Johnson, Vaughn & Heiskell
     5601 Bridge Street
15   Suite 220
     Fort Worth, Texas 76112-2305
16   817-457-2999

17   GREGORY B. WESTFALL
     SBOT NO. 00788646
18   Hill Gilstrap, P.C.
     1400 W. Abram Street
19   Arlington, Texas 76013
     817-276-4931
20
     ATTORNEYS FOR DEFENDANT
21

22

23

24

25
```

STATE V. MARK ANTHONY SOLIZ   MARCH 13, 2012                    3

```
                         I N D E X

                        VOLUME 49

                   PUNISHMENT PHASE

MARCH 13, 2012                              PAGE   VOL.

Proceeding.....................................  5      49

STATE'S WITNESS          DIRECT       CROSS        VOIR   VOL.
                                                  DIRE

KENNY DODGIN             5                                49
KENNETH ROBERTSON        16                               49
ARNOLD DOMINGUEZ         72                               49
MARK PORTER              94                               49
JOSE ARRIOLA             127,142      136                 49
LAURIE GUNTER            144,156      152,157             49
RONNIE MCCOWAN           158,171,184  167,178,185
                         185                              49
DELBERT PIERCE           186,202      198                 49

Adjournment...................................  205       49

Court Reporter's Certificate..................  206       49


                   ALPHABETICAL INDEX

WITNESS                  DIRECT       CROSS        VOIR   VOL.
                                                  DIRE

JOSE ARRIOLA             127,142      136                 49
KENNY DODGIN             5                                49
ARNOLD DOMINGUEZ         72                               49
LAURIE GUNTER            144,156      152,157             49
RONNIE MCCOWAN           158,171,184  167,178,185
                         185                              49
DELBERT PIERCE           186,202      198                 49
MARK PORTER              94                               49
KENNETH ROBERTSON        16                               49


                     EXHIBIT INDEX
STATE'S
NO.   DESCRIPTION                        OFFER ADMIT VOL.
442   Photo board (24x36)                  85    85   49
443   DVD; Tarrant Co. D.A. Texaco         87    87   49
444   Photo board (18x24)                  66    66   49
445   Photo board (18x24)                  66    66   49
446   Photo board (24x36)                  21    21   49
```

STATE V. MARK ANTHONY SOLIZ   MARCH 13, 2012                    4

| | | | | | |
|---|---|---|---|---|---|
| 1 | 447 | Photo board (24x36) | | 26 | 26 | 49 |
| | 448 | Photo board (24x36) | | 26 | 26 | 49 |
| 2 | 449 | Photo board (24x36) | | 26 | 26 | 49 |
| | 450 | Photo board (24x36) | | 26 | 26 | 49 |
| 3 | 451 | Photo board (24x36) | | 26 | 26 | 49 |
| | 452 | Photo board (24x36) | | 26 | 26 | 49 |
| 4 | 453 | Photo board (24x36) | | 26 | 26 | 49 |
| | 454 | Photo board (24x36) | | 35 | 35 | 49 |
| 5 | 457 | Photo board (24x36) | | 26 | 26 | 49 |
| | 458 | Photo board (24x36) | | 64 | 64 | 49 |
| 6 | 459 | Photo board (24x36) | | 64 | 64 | 49 |
| | 460 | Photo board (24x36) | | 64 | 64 | 49 |
| 7 | 470 | Large sack | (Record only) | 45 | 46 | 49 |
| | 470-A | Budweiser cardboard box | | 45 | 46 | 49 |
| 8 | 471 | Large sack | (Record only) | 48 | 48 | 49 |
| | 471-A | Bud Light cardboard box | | 48 | 48 | 49 |
| 9 | 472 | Sack | (Record only) | 50 | 50 | 49 |
| | 472-A | Ruben Martinez I.D. | | 50 | 50 | 49 |
| 10 | 473 | Sack | (Record only) | 51 | 51 | 49 |
| | 473-A | Nokia cell phone | | 51 | 51 | 49 |
| 11 | 474 | Sack | (Record only) | 52 | 52 | 49 |
| | 474-A | Stride gum package | | 52 | 52 | 49 |
| 12 | 475 | Sack | (Record only) | 56 | 56 | 49 |
| | 475-A | Motorola Cell Phone | | 56 | 56 | 49 |
| 13 | 476 | Large sack (sealed) | | 53 | 54 | 49 |
| | 477 | Sack | (Record only) | 54 | 54 | 49 |
| 14 | 477-A | Pocket knife | | 54 | 54 | 49 |
| | 478 | Sack | (Record only) | 55 | 55 | 49 |
| 15 | 478-A | Plastic jar with gold jewelry | | 55 | 55 | 49 |
| | 480 | Envelope | (Record only) | 53 | 53 | 49 |
| 16 | 480-A | 2 quarters | | 53 | 53 | 49 |
| | 481 | Cardboard Box | (Record only) | 59 | 59 | 49 |
| 17 | 481-A | White wrapper | | 59 | 59 | 49 |
| | 481-A1 | Navy blue shorts | | 59 | 59 | 49 |
| 18 | 481-B | White wrapper | | 61 | 61 | 49 |
| | 481-B1 | White stained undershirt | | 61 | 61 | 49 |
| 19 | 481-C | White wrapper | | 62 | 62 | 49 |
| | 481-C1 | Shirt | | 62 | 62 | 49 |
| 20 | 482 | DVD; Arrival No Time Code P in P | | 110 | 111 | 49 |
| | 483 | Photo board (56x38) | | 120 | 120 | 49 |
| 21 | 484 | Photo board (56x38) | | 120 | 120 | 49 |
| | 485 | DVD; Soliz flooding cell 7-10-11 | | 135 | 136 | 49 |
| 22 | 486 | DVD; Soliz UoF 4-24-11 | | 164 | 164 | 49 |
| | 487 | Black & White Photo (8x10) | | 174 | 174 | 49 |
| 23 | 488 | Black & White Photo (8x10) | | 174 | 174 | 49 |
| | 489 | Bag; elastic/plastic/battery/string | | 192 | 192 | 49 |
| 24 | 490 | Bag with ink pen refill and paper | | 196 | 196 | 49 |
| 25 | | | | | | |

5

```
1              P R O C E E D I N G
2         (Open court, Defendant present;
3    Jury not present.)
4         THE COURT:  State ready to proceed?
5         MS. JACK:  State's ready, Your Honor.
6         THE COURT:  Defense ready?
7         MR. HEISKELL:  Yes, Your Honor.
8         THE COURT:  Defendant is present.
9         MR. HEISKELL:  Yes.
10        (Pause in proceeding.)
11        THE COURT:  Okay.  You can bring in the
12   Jury.
13        (Jury present.)
14        THE COURT:  Thank you.  You may be seated.
15        MS. JACK:  We call Kenny Dodgin, Your Honor.
16        THE COURT:  Please raise your right hand.
17        (Witness sworn.)
18        MS. JACK:  May I proceed?
19        THE COURT:  Yes, ma'am.
20        MS. JACK:  Thank you, Your Honor.
21              KENNY DODGIN,
22   Having been first duly sworn, testified as follows:
23              DIRECT EXAMINATION
24   BY MS. JACK:
25        Q.  Mr. Dodgin, can you please tell the Jury your
```

6

```
1    full name.
2         A.  Kenneth Ray Dodgin.
3         Q.  And, Mr. Dodgin, are you here by yourself today
4    or are you here with someone else?
5         A.  I'm here with my wife.
6         Q.  Where do you call home?
7         A.  Watauga, Texas.
8         Q.  So you live in Tarrant County?
9         A.  Uh-huh.
10        Q.  Do you have any children?
11        A.  Got five daughters.
12        Q.  All right.  What are their ages?
13        A.  20, 26, 28; the other two, late 30s.  I don't
14   know.  There's too many to keep up with.
15        Q.  Okay.  All right.  And when you're not keeping
16   up with your five daughters, do you work?
17        A.  Yes, I do.
18        Q.  Where do you work?
19        A.  I work for Lowe's.
20        Q.  All right.  What do you do for Lowe's?
21        A.  I'm in deliveries.
22        Q.  All right.  How long have you worked for Lowe's?
23        A.  Going on five years.
24        Q.  And when you say that you're in deliveries, what
25   do you do in terms of deliveries?
```

7

```
1         A.  We deliver appliances, install them.
2         Q.  Okay.  Which Lowe's do you work at?
3         A.  The one in Lake Worth.
4         Q.  All right.  What street, what's the address of
5    that Lowe's?
6         A.  I think it's 2300 Center Drive.
7         Q.  All right.  And is it close to Quebec?
8         A.  It's -- Quebec runs right behind it.
9         Q.  Okay.  And does your wife work there as well?
10        A.  She works for the Lowe's in Hurst.
11        Q.  All right.  So you both are Lowe's employees?
12        A.  Uh-huh.
13        Q.  All right.  Now, were you working on June 29th --
14        A.  Yes, ma'am.
15        Q.  -- of 2010?
16        A.  Yes, I was.
17        Q.  All right.  Were you also working in the
18   delivery section then?
19        A.  Yes, I was.
20        Q.  And can you tell the members of the Jury what
21   shift you normally worked?
22        A.  Usually I'd get there about 7:00, but my boss
23   had called me; his truck was broke down, so he had me
24   come on in early.
25        Q.  All right.  So when you were going in early,
```

8

```
1    what time did that take you there?
2         A.  I got there in the parking lot probably about
3    6:20, 6:25.
4         Q.  All right.  And what time was your shift
5    normally?
6         A.  7.
7         Q.  Till when?
8         A.  Till 4.
9         Q.  All right.  So you got there about 6:25.  Do you
10   remember seeing any other cars in the parking lot?
11        A.  Not out where I park, no.
12        Q.  And do you park in a different place or the same
13   place every day?
14        A.  Same place.
15        Q.  Where generally do you park?
16        A.  At the Lumber end out at the very end of the
17   parking lot.  We got to park out at the end.
18        MS. JACK:  May I approach this witness,
19   Your Honor?
20        THE COURT:  Yes, ma'am.
21        Q.  And can you tell the members of the Jury kind
22   of what some of the other businesses are around that
23   Lowe's?
24        A.  Well, right across the parking lot is a
25   T-Mobile phone, and there's a Care Now.  And then next
```

STATE VS. MARK ANTHONY SOLIZ   MARCH 13, 2013

9

1    door to us is a 24 Hour Fitness and a -- like a Best
2    Buy or something next to it.
3       Q.  All right.  So is it a rather large kind of
4    parking area for all of those businesses?
5       A.  It's one real big parking area.
6       Q.  All right.  Looking now at State's Exhibit 125,
7    and I'll tell you this has already been admitted into
8    evidence.  Can you see this okay?
9       A.  Yeah.
10      Q.  All right.  Now, can you show the Jury where the
11    24 Hour Fitness is?
12      A.  It's right here.
13      Q.  All right.  And we see -- is this the Lumber
14    section back here?
15      A.  Yes.
16      Q.  All right.  And does the Lowe's continue on in
17    this direction?
18      A.  Uh-huh.
19      Q.  All right.  Can we see where you typically park
20    in State's Exhibit 125?
21      A.  Well, it would be like three or four more of
22    these parking places back this way towards the Care Now
23    and all that.
24      Q.  Okay.  Does State's Exhibit 126 show the area
25    a little bit closer to where you generally park?

10

1      A.  Usually right out in here.
2      Q.  So right about here?
3      A.  Uh-huh.
4      Q.  All right.  So you're about two car -- two
5    spaces away?
6      A.  Well, probably more on this side of the rack,
7    out in here.
8      Q.  When you say "the rack", are you talking about
9    the area where --
10      A.  Yeah, the cart rack.
11      Q.  -- the carts go in.  Okay.  And so you
12    generally park on this side, opposite side of the rack,
13    across from where we can see the pylons?
14      A.  Uh-huh.
15      Q.  All right.  Is that yes?
16      A.  Yes.
17      Q.  Okay.  She has to type down --
18      A.  I'm sorry.
19      Q.  That's okay.  She just has to type down what we
20    both say.  All right.  Did you park there on June the
21    29th?
22      A.  Yes, I did.
23      Q.  Did you see any other cars in the parking lot?
24      A.  There was no cars down at this end where I
25    parked at all.

11

1      Q.  All right.  So were you going to go there and
2    open up the Lowe's or the delivery section of the Lowe's?
3      A.  No, they were already open.
4      Q.  They were already open?
5      A.  I was just getting there to get everything ready
6    to go.
7      Q.  Okay.  And getting ready to work an eight-hour
8    shift?
9      A.  Uh-huh.
10      Q.  Okay.  Can you tell the members of the Jury what
11    happened?
12      A.  Well, I pull in and I park.  And I got my lunch
13    bag and I'm getting everything together.  And all of a
14    sudden, I notice a car come up beside me about two spaces
15    over, and they're going real slow.  And I looked, and the
16    passenger never looked at me, didn't do nothing.  They
17    just rolled up about two spaces.
18      Q.  I'm going to stop you right there.  When you say
19    they rolled up about two spaces, can we see on State's
20    Exhibit 126 where they rolled up?
21      A.  Rolled up probably right about out here.
22      Q.  Okay.  So kind of in front of or --
23      A.  They were to the left of me.  I was here and
24    they were to the left.
25      Q.  So were they in between what we see as the two

12

1    pylons and the parking space you've already identified
2    for the Jury?
3      A.  Uh-huh, yes.
4      Q.  Okay.  All right.  So they pulled up about two
5    spaces away and on the opposite side, the same side as
6    the rack?
7      A.  Uh-huh.
8      Q.  And tell the Jury what happened.
9      A.  Well, I grabbed my stuff and got out, shut the
10    door.  And when I shut the door and turned around, I
11    noticed the driver exiting out his door.  And so I was
12    watching him as I walked.  And when I got around past his
13    car, I looked down.  And he had his hand down, and I
14    could see a black bandanna or a dark bandanna hanging
15    down by his side.  And I kept walking and...
16      Q.  Did you hear him say anything?
17      A.  I heard him say "sir" or "excuse me, sir", and I
18    was still staring at him.  And about the time he said
19    that, he raised his hand, and I seen a gun.  And
20    I...(crying)
21      Q.  All right.
22      A.  I just took off, and then he shot three times.
23      Q.  What kind of car did you see pull up?
24      A.  It was a teal Dodge Stratus.
25         MS. JACK:  May I have a moment, Your Honor?

13

1    THE COURT: Yes, you may.

2    Q. Mr. Dodgin, does State's Exhibit 55 appear to be

3  the same car that you saw the gunman get out of on June

4  29th in the morning hours at Lowe's?

5    A. Yes.

6    Q. When you said that you saw the gun, where was

7  the gun?

8    A. It was -- when he pulled his hand up, it was

9  coming out from underneath the bandanna.

10    Q. So the bandanna was wrapped around it or over it

11  and the gun was -- the barrel was coming out?

12    A. Yeah.

13    Q. You could see the barrel. What you could see of

14  the gun, does it appear to be the same gun in State's

15  Exhibit 56?

16    A. It looks like it. I mean, all I seen was the

17  end of it.

18    Q. You didn't wait around to check it?

19    A. No.

20    Q. Okay. How close was he to you when you saw the

21  bandanna?

22    A. He was probably about -- I'd say 10 feet.

23    Q. Okay. And you were looking directly at him?

24    A. Uh-huh.

25    Q. How close was he to you when he raised the gun?

14

1    A. Probably, I don't know, 6, 7 feet, because he

2  was just, I mean, he was walking towards me as I was

3  walking off.

4    Q. I want you to tell me when to stop, and you tell

5  me how close he was to you.

6    A. There.

7    Q. So about this distance with his arm out in your

8  direction; gun level at you. What made you start

9  running?

10    A. It just didn't feel right. I mean, when I seen

11  him raise his arm, I knew. I mean, when he raised it up,

12  I hollered "no" as loud as I could, and I turned. And

13  that's when he shot three times.

14    Q. What were you thinking when you were running?

15    A. Not ever seeing...(crying)

16        Never seeing my kids or my family again, or

17  my little grandson that was born.

18    MS. JACK: Thank you. I believe I'll pass

19  the witness, Your Honor.

20    MR. HEISKELL: No questions, Your Honor.

21    THE COURT: May the witness be excused?

22    MS. JACK: Yes, Your Honor. We'd ask that

23  he be finally released.

24    MR. HEISKELL: Yes.

25    THE COURT: You may be excused.

15

1    (Witness excused.)

2    MS. JACK: May we have a moment, Your

3  Honor? Or may I approach for just a moment?

4    (Pause in proceeding.)

5    MS. JACK: May I approach, Your Honor?

6    THE COURT: Yes, you may.

7    (At the bench.)

8    MS. JACK: We should have two witnesses here

9  at 9:30. I apologize to the Court, Judge.

10    THE COURT: Okay.

11    (In open court.)

12    THE COURT: Ladies and gentlemen, it will

13  be 15 or 20 minutes before the next witness is available,

14  so I will recess you into the jury room and call you back

15  at about 9:30.

16    (Recess taken from 9:15 to 9:28 a.m.)

17    (Jury not present.)

18    MS. JACK: Judge, we have a witness here.

19    THE COURT: State's ready to proceed. Is

20  Defense ready to proceed?

21    MR. HEISKELL: Yes, Your Honor.

22    THE COURT: Defendant is present. Is the

23  Jury ready?

24    THE BAILIFF: Yes, sir.

25    THE COURT: Please bring them in.

16

1    (Jury present.)

2    THE COURT: Thank you. You may be seated.

3    (Witness sworn.)

4    THE COURT: Thank you.

5    MS. JACK: May I proceed, Your Honor?

6    THE COURT: Okay.

7        KENNETH RICHARD ROBERTSON,

8    Having been first duly sworn, testified as follows:

9        DIRECT EXAMINATION

10  BY MS. JACK:

11    Q. Officer, would you please introduce yourself to

12  the ladies and gentlemen of the Jury.

13    A. My name is Kenneth Richard Robertson.

14    Q. All right. And can you tell them how you were

15  formerly employed.

16    A. I was a police officer with the City of Fort

17  Worth, Texas.

18    Q. For how many years?

19    A. 27 years, 8 days, and about 8 hours, but I

20  wasn't counting.

21    Q. Are you recently retired?

22    A. Yes, ma'am.

23    Q. Okay. Did you come back to testify in this

24  case?

25    A. Yes, ma'am.

**17**

1    Q.  All right.  Can you give the Jury an idea or an
2    overview of your career with the Fort Worth Police
3    Department.
4    A.  I spent my first two years in Patrol working on
5    the north side.  The next year and a half I spent in a
6    specialized undercover unit called Street Crimes.  I
7    spent 19-and-a-half years working K-9 Search and Rescue,
8    which involved building searches, searching on the
9    ground, tracking human beings, as well as narcotic
10   interdiction.  I worked with the DEA Task Force out at
11   D/FW.  And then in 2006, I transferred to the Crime Scene
12   Search Unit where I spent the rest of my career.
13   Q.  Can you tell the members of the Jury as a member
14   of the Crime Scene Unit what your responsibilities were,
15   what you did on a daily basis.
16   A.  Our responsibilities were to go to any scene
17   where a crime had been committed, secure the scene to
18   prevent the evidence from being tampered with or in any
19   way obliterated, destroyed; locate evidence, properly
20   document its location and relevance to the crime through
21   diagramming and photography, and then collect it
22   properly, package it properly, submit it to the Property
23   Control Unit so that it could be later used in courtroom
24   testimony.
25   Q.  Okay.  And as a member of the Crime Scene Unit,

**18**

1    did you-all have your own area within the Fort Worth
2    Police Department?
3    A.  Actually, we covered the entire city.
4    Q.  Okay.  And I didn't ask my question very well.
5    Did you have your own area where the detectives and the
6    other officers worked in the Crime Scene office?
7    A.  Oh, yes, ma'am, we do.
8    Q.  Okay.  And did you also have an adjacent area
9    where items of evidence could dry or -- could dry before
10   you package them and submit them to the Property Control
11   area?
12   A.  Yes, ma'am.
13   Q.  All right.  And is the Fort Worth Police
14   Department a separate building from where evidence is
15   stored?
16   A.  Yes, ma'am.
17   Q.  Okay.  The area where you would allow items to
18   dry, for instance, is that a locked and secure area?
19   A.  Yes, ma'am, it uses what's called a three-key
20   system and it also has an alarm.  The three-key system --
21   Q.  Go ahead.
22   A.  -- was designed so that if one of us loses a
23   key, our supervisor can come in and turn -- put in his
24   key and re-key the door.  And then we all have to be
25   issued a second key.  And that can be done three times

**19**

1    in one day.  So that if at any time we feel like that
2    system has been violated, we can just change the whole
3    system.
4    Q.  All right.  So it's a secure area?
5    A.  Yes, ma'am.
6    Q.  Okay.  Can you tell the members of the Jury
7    where you responded on June 29th of 2010, initially.
8    A.  I was originally sent to John Peter Smith
9    Hospital to the ER area to take photographs and try to
10   collect any clothing from a victim.
11   Q.  Okay.  And was the victim's name Ruben Martinez?
12   A.  Yes, ma'am, it was.
13   Q.  What was the nature of your dispatch?
14   A.  That there had been a shooting over on the north
15   side of town and that the detectives were en route to
16   that location, and that they wanted me to go to the
17   hospital and try to get photographs first before making
18   the scene.
19   Q.  All right.  Had the victim already been
20   transferred or transported from the crime scene location
21   to John Peter Smith Hospital?
22   A.  Yes, ma'am.  He was on his way, actually, and I
23   was on my way to work, so I had to go get my van and then
24   get to there, so we kind of passed.  I got my van and
25   then met him there.

**20**

1    Q.  Was the victim in critical condition?
2    A.  He was unresponsive and unconscious when I
3    arrived.
4    Q.  When you got to the hospital, can you tell the
5    members of the Jury what you did.
6    A.  When I arrived, they were actually moving him
7    from the trauma area, which is T-1, over to take him into
8    a CAT scan.  So literally I got a couple of pictures of
9    an empty room as they were wheeling him down the hallway
10   where he had originally been placed.  And then I followed
11   him into the CAT scan area and took additional
12   photographs as I could.  He was wearing a C-collar at
13   the time, so I couldn't really get good pictures of his
14   neck, which appeared to be where the injury was from, but
15   I did get pictures off of the screen from the CAT scan.
16   Q.  Okay.  So the physicians and the medical team
17   that were trying to save his life were not going to wait
18   for you to take pictures?
19   A.  Right.  And I'm not going to interfere with
20   that.
21   MS. JACK:  May I approach this witness,
22   Your Honor?
23   THE COURT:  Yes, ma'am.
24   Q.  Officer, I'm showing you what's been marked as
25   State's Exhibit 446.  Do you recognize this picture?

21

1      A. Yes, ma'am. That's a photograph I took.
2      Q. Okay. And can you tell, for the purposes of the
3  record and the Jury, how many pictures you took of the
4  victim at John Peter Smith Hospital, if you have an idea.
5      A. I think it was only about 10 or 12.
6      Q. So 10 or 12 pictures of the victim Ruben
7  Martinez at John Peter Smith Hospital?
8      A. Right.
9      Q. And this is only one of those pictures; is that
10  correct?
11      A. Correct.
12      Q. All right. Does this fairly and accurately
13  depict Ruben Martinez on June 29th of 2010 at the time
14  that you saw him?
15      A. Yes, ma'am, it does.
16      MS. JACK: All right. Your Honor, at this
17  time, the State would offer State's Exhibit 446 into
18  evidence.
19      MR. HEISKELL: Your Honor, we do object
20  under Rule 403, cumulative, the prejudicial value
21  outweighing the probative value.
22      THE COURT: May I see the picture?
23      MS. JACK: Yes, Your Honor.
24      THE COURT: The objection is overruled.
25  446 is admitted.

22

1      (State's Exhibit No. 446 admitted.)
2      MS. JACK: May I publish to the Jury, Your
3  Honor?
4      THE COURT: Yes, ma'am.
5      Q. (BY MS. JACK) Do you know where in the hospital
6  Ruben was specifically when you took this picture?
7      A. He was in the CAT scan bedding area and they
8  were moving him over to the bed itself.
9      Q. And for the record, this picture does not show
10  his injury, does it?
11      A. Correct.
12      Q. After you photographed Ruben Martinez and the
13  CAT scan images and the equipment there that the medical
14  professionals were using to try to save his life, when
15  did you leave John Peter Smith Hospital?
16      A. Looks like I left there about 7, pretty close to
17  7, and arrived on that scene at about 7:10.
18      Q. Okay. Now, when a victim arrives at the
19  hospital, do they typically come in their clothing or do
20  they come with personal effects?
21      A. They typically come in clothing unless it's been
22  cut off by the staff that's trying to assist in keeping
23  them alive at the scene.
24      Q. Okay. Did Mr. Martinez come to the hospital
25  with many of his personal effects?

23

1      A. Yes.
2      Q. His clothing?
3      A. Yes.
4      Q. Did you ask the hospital to bag his clothing and
5  his personal effects?
6      A. Yes, ma'am.
7      Q. Did you have time to stay and wait for his
8  clothing and his personal effects?
9      A. No, ma'am.
10      Q. Why is that?
11      A. The -- at the scene they were advising me that
12  it had just started raining and they were worried about
13  the evidence there being compromised by the weather.
14      Q. Can you tell the members of the Jury what that
15  means when you're worried about evidence being
16  compromised? How can the weather compromise evidence?
17      A. Well, we've got several pieces of evidence that
18  are lying on the ground out in the open that potentially
19  have both DNA and fingerprint evidence on them. The rain
20  can wash away either one of those.
21      Also, any possible tracks or trails leading
22  away from there, since I was a K-9 tracker for years, I
23  know how to track people, so I want to know how they came
24  or how they left from the scene. And the water will
25  eventually, you know, wash that away so I may lose that

24

1  evidence.
2      Q. What about ballistics, Officer?
3      A. Ballistics can also be washed away by really
4  fast water, fast-moving water down the roadway. And
5  that particular roadway leans downhill towards the
6  intersection. Probably runs through there pretty quick.
7      Q. And so how about the projectile or the casing,
8  how would the weather affect your ability to find those?
9      A. For one thing, it makes the ground really soft
10  so people walking through an area can crush it down into
11  the ground to where we can't even see it. But, secondly,
12  again, it can be washed away into a drainage ditch or
13  someplace like that.
14      Q. And is there a difference between a contained
15  crime scene, in other words, one that is in an enclosed
16  room, and an -- a crime scene like this?
17      A. Yes, ma'am, a great deal of difference.
18      Q. What is the difference?
19      A. Exposure, for one thing, to just about anybody.
20  It's easier to contain an area where you have doors,
21  windows, walls, than it is an exterior area like that.
22  This is an open area to the public, so before we even got
23  there and could set up a perimeter, people have already
24  walked through it. They can pick up stuff and walk off
25  with it, so...

STATE VS. MARK ANTHONY SOLIZ   MARCH 15, 2012

25

1    Q. This particular business, do you know what the
2 name of the business is?
3    A. Shop and Save, I think.
4    Q. Okay. And is it informally known as the Texaco?
5    A. Yes.
6    Q. All right. What's the address?
7    A. I think it's 2700.
8    Q. Azle Avenue?
9    A. Azle Avenue.
10    Q. In Fort Worth?
11    A. Yes, ma'am.
12    Q. What are the major thoroughfares right there
13 next to the Texaco?
14    A. 2700 Azle runs kind of northeast and
15 southwest -- no, northwest and southeast. And then
16 cutting across that would be Long, the 30 -- I think the
17 2600 block of Long.
18    MS. JACK: May I approach this witness,
19 Your Honor?
20    THE COURT: Yes, ma'am.
21    Q. Officer, if you can stand up for just a moment
22 and take a look at these pictures. I'm showing you
23 what's been marked for identification purposes as State's
24 Exhibit 447, 448, 449, 450, 451, 452, 453, and 457. Do
25 each of these pictures fairly and accurately depict both

26

1 the aerial views and the crime scene as you saw it on
2 June 29th of 2010?
3    A. Yes, ma'am, they do.
4    MS. JACK: Your Honor, at this time the
5 State would offer into evidence State's Exhibits 447
6 through 453 and 457 for all purposes.
7    MR. HEISKELL: No objection, Your Honor.
8    THE COURT: Admitted.
9    (State's Exhibit Nos. 447 - 453, 457
10 admitted.)
11    MS. JACK: May I have this witness step
12 down?
13    THE COURT: Yes.
14    Q. (BY MS. JACK) Officer, if you would, I'm going
15 to hold the picture. We've been having a little bit of
16 trouble with this, so I'm going to have you stand over
17 here at the far corner of my table and speak up real
18 loudly and clearly so everybody on the Jury can hear.
19    A. Yes, ma'am.
20    Q. All right. I'm going to hold the picture.
21    A. Okay.
22    Q. All right. Beginning with State's Exhibit 447,
23 we talked about the major thoroughfares -- and I'm going
24 to ask you to turn somewhat where everybody on the Jury
25 can see. Okay.

27

1    Looking at State's Exhibit 447, can you
2 tell the members of the Jury where Azle and Long is?
3    A. This is going to be Azle. This is going to be
4 Long.
5    Q. All right. So this street right here that kind
6 of runs on a diagonal on this picture is Azle. All
7 right. And then the street running directly in front of
8 the Texaco would be Long; is that right?
9    A. Yes, ma'am.
10    Q. Now, this Jury has heard testimony about a
11 robbery that took place at 2800 Azle Avenue at a bar.
12    A. Yes, ma'am.
13    Q. Can you show the members of the Jury how close
14 the proximity is -- first of all, where is 2800 Azle
15 Avenue?
16    A. Should be right in here.
17    Q. Okay. So this blue building right here, is that
18 2800 Azle Avenue?
19    A. Yes, ma'am. That would be the start of 2800.
20    Q. All right. So if this Jury has already heard
21 testimony about a robbery that occurred there, this would
22 be the general proximity to the Texaco, a matter of two
23 or three blocks?
24    A. One block.
25    Q. One block.

28

1    A. You can see one location from the other
2 actually.
3    Q. Okay. Now, if the Jury has already heard
4 testimony about another robbery that occurred at 3005
5 Northwest 26th, where is Northwest 26th on this map?
6    A. This is Northwest 26th and it runs northwest
7 to southeast.
8    Q. Okay. And if the Jury has already heard that
9 address, can you show the members of the Jury generally
10 where that area would be?
11    A. These blocks are actually pretty short blocks
12 relative to how they look in the actual photograph. If
13 you take three of these, that would put that hundred
14 block, "3000" hundred block of 26 right over here. So
15 about this far.
16    Q. Okay. So we're talking a matter of how many
17 blocks from Texaco?
18    A. Three blocks.
19    Q. Three blocks from the Texaco. So we have one
20 robbery one block away, another robbery roughly three
21 blocks away; is that right?
22    A. And this would pretty much be in the middle.
23    Q. Okay. Now, at the time that you were called out
24 to go to the Texaco, were you aware of other Crime Scene
25 officers working the Enrique Samaniego robbery?

29

1    A. I was not.
2    Q. Okay. You had just come on duty?
3    A. I -- they actually called me at my house and
4  asked me to come in early.
5    Q. So you were not aware at that time that
6  other Crime Scene officers were working other crimes
7  connected to this Defendant?
8    A. No.
9    Q. Okay. Looking now at State's Exhibit 448, is
10  this a closer aerial view of the Texaco?
11    A. Yes, ma'am.
12    Q. And can you orient the Jury in terms of what you
13  saw when you arrived?
14    A. I believe that I arrived on Long. I came up 35
15  and arrived on Long and came up from this area. And when
16  I arrived on the scene, officers had this all blocked off
17  with yellow tape, so I actually had to jump the median,
18  come around and park over on this side over here. There
19  were officers on the perimeter guarding the alley,
20  guarding this area over here, pretty much from here all
21  the way around to over here.
22    Q. All right. So in terms of the crime scene, how
23  large a crime scene are we talking about?
24    A. About five times the size of a good size house,
25  probably a half-acre.

30

1    Q. Okay. So we're talking about the parking lot,
2  the business, and the lot which would be to the north?
3    A. If -- well, you've got this alley, and then
4  eventually I determined that I had track marks leading
5  up this alley to over here, so it expanded and ended up
6  taking this whole end of this block.
7    Q. Okay. And when we say "the alley," is that, in
8  fact, a vacant lot?
9    A. It's a vacant lot that they've been using for
10  traffic back and forth to that store, so it looks like
11  an alley now and there's actually a driveway at the end
12  of it.
13    Q. Looking now at State's Exhibit 449, can you
14  orient the Jury.
15    A. Like I said, I parked on the side of the
16  building, so as I approach, I start taking photographs.
17  So this is my first photograph as I approach the building
18  from the -- this would be the west side of the building,
19  and I'm up against Azle Avenue.
20    Q. Okay.
21    A. This is the Ben E. Keith truck, and the crime
22  scene actually -- the shooting actually occurred on the
23  other side of it.
24    Q. Okay. And you said the Ben E. Keith truck?
25    A. Yeah, Ben E. Keith.

31

1    Q. So right over here where my finger is would be
2  where Ruben Martinez -- the truck that Ruben Martinez
3  was supposed to drive that morning?
4    A. On the other side, right.
5    Q. Okay. Now, was there when you arrived?
6    A. No, he was not.
7    Q. Because he was already at the hospital?
8    A. Yes, ma'am.
9    Q. All right. And what is this where my finger
10  is?
11    A. It's a drive-up window for the Shop and Save.
12    Q. Okay. And over here to the other side of the
13  picture of State's Exhibit 449, we see the gas pumps?
14    A. Yes, ma'am.
15    Q. Looking at State's Exhibit 450, what is State's
16  Exhibit 450?
17    A. State's Exhibit 450 was taken from the center
18  median, basically almost directly towards the north.
19  It's going to show -- my van is actually behind this
20  one. It's going to show the entire front area of the
21  store all the way over to the edge of the truck where
22  the crime scene is taken from.
23    Q. Now, were there one or two Ben E. Keith trucks
24  there when you got there?
25    A. There was only one when I got there.

32

1    Q. Okay. Can you tell the members of the Jury what
2  State's Exhibit -- sorry -- 451 shows?
3    A. This is going to show the -- basically the east
4  side of my crime scene. This is the truck. This area
5  here is where I've actually covered property with a tarp
6  because it was raining. This also -- the crime scene
7  also leads all the way back to this area over here and
8  continues on around.
9    Q. All right. Now, looking at this picture, can
10  you show the members of the Jury where the dumpster is?
11    A. Be right there.
12    Q. Can you show the members of the Jury where the
13  pay phones are?
14    A. Right here.
15    Q. All right. And where -- if someone were to park
16  on the other side of the vacant field on what would be, I
17  guess, 27th street?
18    A. Uh-huh.
19    Q. Where they would be running from?
20    A. Running from?
21    Q. If they parked on the other side --
22    A. Right.
23    Q. -- of the vacant field --
24    A. Right.
25    Q. -- on 27th Street, can you show the members of

33

1  the Jury where they would come out in relation to this
2  business.
3      A. They're going to actually come out at the end
4  of this fence. That fence goes across the alley side
5  and then goes all the way across the north side of that
6  property.
7      Q. I'm going to ask you to step back just a
8  little bit. All right. So if we're showing the
9  Jury where they would come out, would they come out
10 in this general area?
11     A. Yes, ma'am.
12     Q. Okay. So the vacant field is this direction?
13     A. Correct.
14     Q. Okay. Looking now at State's Exhibit 453,
15 can you tell the members of the Jury what this is
16 depicting?
17     A. This was shot from the end of the alley at the
18 curb line, and it basically depicts down the side of the
19 truck back towards the dumpster, the alley, and the
20 businesses behind it which is a washateria.
21     Q. Okay. And is the washateria adjoining the
22 building with the Texaco?
23     A. No.
24     Q. Okay. So we can see the dumpster over here. We
25 can see the pay phones. And that same field, if someone

34

1  were to park on the other side of the vacant field and
2  they would come out, would they come out in this general
3  area right here?
4      A. Yes, ma'am.
5      Q. Okay.
6      A. They'd basically come out straight across from
7  the dumpster.
8      Q. Okay. Can you tell the members of the Jury what
9  they see in State's Exhibit 452?
10     A. This was prior to laying down the plastic. Of
11 course, we've got blood in this area here. Two boxes
12 that were collected. This is paraphernalia that was left
13 there by MedStar. After they treat them, they'll bag
14 that and drop it on the scene. Cell phone and then an
15 I.D. from our victim.
16     Q. Ruben Martinez?
17     A. Yes.
18     Q. Okay.
19     A. Way over there is some gum and some coins that
20 were pulled out of his pocket, we believe, and dropped
21 there.
22     Q. Okay. And the coins, how many coins were there?
23     A. Two quarters.
24     Q. All right. Now, were there change -- was there
25 change removed from his personal effects at the hospital?

35

1      A. Yes.
2      Q. Okay. So these two coins were at the scene?
3      A. Yes, ma'am.
4      Q. All right. Different locations?
5      A. Yes, ma'am.
6      Q. All right. You can go ahead and take your seat,
7  Officer.
8         Officer, I'm showing you what's been marked
9  as State's Exhibit 454 for identification purposes.
10     A. Yes, ma'am.
11     Q. Did you create this exhibit?
12     A. Yes, ma'am, I did.
13     Q. Does it illustrate where you found the various
14 pieces of evidence out at the crime scene?
15     A. Yes, ma'am.
16        MS. JACK: Okay. Your Honor, at this time
17 the State would offer State's Exhibit 454 into evidence.
18        MR. HEISKELL: No objection, Your Honor.
19        THE COURT: Admitted.
20        (State's Exhibit No. 454 admitted.)
21        MS. JACK: May I publish it, Your Honor?
22        THE COURT: Yes, ma'am.
23     Q. (BY MS. JACK) All right. Officer?
24     A. Yes, ma'am.
25     Q. Can you tell the members of the Jury what items

36

1  1 through 4 were and where they were found?
2      A. Item 1 was a Ben E. Keith name badge with the
3  name "Ruben Martinez". It was collected from the
4  sidewalk southeast of the truck. Item No. 2 was a Nokia
5  2610 cell phone. It was collected from the sidewalk
6  southeast of the truck. 3 was an open package of Stride
7  spearmint gum that was collected in the driveway east of
8  the truck. And 4 were two quarters collected in the
9  driveway east of the truck.
10     Q. Okay. How close to the truck were the two
11 quarters?
12     A. About a foot, maybe a foot and a half out from
13 the truck.
14     Q. Okay.
15     A. Right straight up from the driver's door.
16     Q. All right. Where did you find the beer boxes?
17     A. They were at the curb line.
18     Q. And the two buttons, where were the two buttons
19 found?
20     A. The two buttons were found about 20 feet in from
21 the south curb line, pretty much just in a straight line,
22 pretty close together.
23     Q. Okay. And you've indicated on this exhibit
24 where the shoe tracks were found. Where were the shoe
25 tracks?

37

1    A.  The shoe tracks were right at the -- as you
2  leave the alley and start into the vacant lot.
3    Q.  Okay.  Were the shoe tracks consistent with
4  where someone would arrive at the business if they were
5  to come through the vacant field?
6    A.  The particular shoe track, no.
7    Q.  Okay.
8    A.  They are consistent with a person leaving at a
9  high rate of speed and turning the corner.
10    Q.  All right.  Fair enough.  Fair enough.  So those
11  shoe tracks were more consistent with individuals leaving
12  the crime scene?
13    A.  Yes, ma'am.
14    Q.  Okay.  Did you collect -- did you collect all
15  the evidence?
16    A.  Yes, ma'am, I did.
17    Q.  All right.  And what did you do with it once
18  you collected it?
19    A.  It was all taken back to our secure facility
20  where I allowed it to dry because most of it was blood
21  soaked and we're not allowed to place blood-soaked items
22  in the property room.
23    Q.  Okay.
24    A.  So I had to let it dry, I believe, two days in
25  the secured facility, and then it was marked and packaged

38

1  and placed in the Property Control Unit by me.
2    Q.  Did you look for a bullet in this case?
3    A.  Yes, ma'am, I did.
4    Q.  Did you look for a shell casing in this case?
5    A.  Yes, ma'am, I did.
6    Q.  Can you tell the members of the Jury all the
7  efforts that you went through personally to try to find
8  a projectile.
9    A.  We actually, once we found out that the
10  projectile most likely passed through Mr. Martinez, we
11  actually expanded our crime scene to go all the way over
12  to all the buildings that were actually across the
13  intersection, thinking they might have become a backdrop
14  so if the bullet struck it, it would drop within a foot
15  or so.  We searched that entire area as well.
16        I had about ten detectives, officers and
17  sergeants assist me in the search initially.  And then
18  another Crime Scene Unit came out and we searched all of
19  the grassy area here and all of the grassy area in the
20  center median with metal detectors.  We found lots of
21  stuff but no shell casings or projectiles.
22    Q.  So on June 29th, how many officers looked for
23  the projectile?
24    A.  At least ten.
25    Q.  And you mentioned it being a through-and-through

39

1  injury?
2    A.  Yes.
3    Q.  Can you tell the Jury what that means?
4    A.  The bullet actually enters on one side having an
5  entry wound, and then at some point makes its way back
6  out of the body leaving an exit wound.  And pieces may be
7  left of the bullet inside, but the major parts of it have
8  exited.
9    Q.  Okay.  And when a semi-automatic, specifically
10  a 9 millimeter, Hi-Point 9 millimeter is fired, what
11  happens to the casing, generally speaking?
12    A.  Generally, it should be ejected from the weapon.
13    Q.  Okay.  And, generally speaking, does it go up
14  and to the right?
15    A.  On most weapons, it does.
16    Q.  On most semi-automatics?
17    A.  Yes, ma'am.
18    Q.  All right.  And when a casing hits the ground or
19  a projectile hits the ground, especially when it's
20  asphalt or concrete, what can happen?
21    A.  It will normally bounce and roll to the lowest
22  point gravity will carry it, or, in some cases, wind.
23    Q.  Okay.  So you have wind affecting your ability
24  to find these things, you have rain potentially affecting
25  your ability to find these things.  How many people were

40

1  at this crime scene?
2    A.  All in all, probably 14.
3    Q.  And that's just officers?
4    A.  Officers and detectives, yes.
5    Q.  And when officers arrive at a crime scene, while
6  they try to protect the crime scene, they're walking; is
7  that correct?
8    A.  Yes, ma'am.
9    Q.  And when people get there to try to save lives,
10  who normally arrives at a crime scene?
11    A.  MedStar ambulance service and the fire
12  department, which both had driven through the crime scene
13  area actually.
14    Q.  When a car drives through a crime scene, what
15  can happen?
16    A.  Unfortunately, they can pick up the shell
17  casings and/or projectiles in their tires and carry them
18  from the crime scene.
19    Q.  In their tread of a tire --
20    A.  Yes, ma'am.
21    Q.  -- they can pick up a projectile; they can pick
22  up a casing?
23    A.  Yes, ma'am.
24    Q.  And when MedStar arrives, is MedStar concerned,
25  more concerned with saving a life than protecting the

41

1  crime scene?
2      A. Yes, ma'am.
3      Q. How about the fire department?
4      A. Same thing.
5      Q. And when we have firemen, are firemen also
6  trained EMTs?
7      A. Yes, ma'am, they are.
8      Q. Every fireman?
9      A. Yes, ma'am.
10     Q. So when they get to a crime scene, they're going
11 to be more concerned with saving a life than saving a
12 crime scene?
13     A. Yes, ma'am. And normally they want to get their
14 equipment as close to the victim as possible.
15     Q. Okay. And do the fire department respond every
16 time with MedStar?
17     A. As a rule, yes.
18     Q. So we have individuals walking, we have trucks,
19 we have cars, we have the weather. Everything kind of
20 worked against you in this case?
21     A. Yes, ma'am.
22     Q. All right. Did you look all over the truck to
23 see if the projectile struck the truck?
24     A. Yes, ma'am. I did find one defect in the
25 upper -- there's a cowling that goes across the top to

42

1  deflect the wind up over the top of the truck trailer
2  itself, it's kind of efficiency-type thing. It had a
3  defect in it, but I determined that that was actually
4  from striking something and not from a bullet hole
5  itself.
6          I crawled underneath the vehicle and
7  searched in the tires before it was moved. And then
8  after it was moved, I searched it all again.
9      Q. And you're doing all this in the rain?
10     A. Yes, ma'am.
11     Q. As are 14 other officers?
12     A. Yes, ma'am.
13     Q. How long were you-all at the crime scene,
14 processing the crime scene, looking for projectile -- a
15 projectile or a casing?
16     A. Give me just a moment to look at that. Looks
17 like I was there about three-and-a-half hours.
18     Q. Okay. And were the other officers there as
19 well?
20     A. Yes, ma'am.
21     Q. Okay. I want to jump ahead for just a moment.
22 Did you return to that crime scene approximately October
23 15th of that same year?
24     A. Yes, ma'am, I did.
25     Q. And what was the purpose?

43

1      A. To research. Along an area between concrete
2  and grass, there is a little trough there. So we
3  basically went out to research and see if we could find
4  the shell casing in that trough area, in that grass area
5  or in that center median area. And also in the street
6  between the concrete curbs and the asphalt roadway,
7  you'll have a trough there. We searched those areas as
8  well.
9      Q. How many officers went out to the crime scene
10 that time?
11     A. I believe I've got one detective, two Crime
12 Scene officers, Crime Scene sergeant, yourself and --
13     Q. I was trying to leave myself out of this.
14     A. And one other. There were five.
15     Q. Was every effort made to find that projectile
16 or the shell casing?
17     A. I believe so. We did find items that were close
18 as far as how they looked. There's a sheet metal or sheet
19 manufacturing company, metal manufacturing company that
20 recovers, recycles, not too far away, so there's a lot of
21 metal in those curb lines.
22         We found something that was consistent with
23 a wad cutter, but I picked it up with a magnet, and
24 bullets are not magnetizable. I went ahead and collected
25 them and put them in the Property Room, but they were not

44

1  bullets.
2      Q. So they were not bullets?
3      A. Right.
4      Q. So we had two different groups of individuals go
5  out and search the area in hopes of finding the projectile
6  or the shell casing?
7      A. Yes, ma'am.
8      Q. Okay. Are you satisfied that every effort was
9  made?
10     A. I believe we did.
11     Q. Okay. Officer, I'm showing you what's been
12 marked as State's Exhibit 470. Do you recognize this
13 exhibit?
14     A. Yes, ma'am. It's a package that I packaged and
15 submitted to the Property Control Unit.
16     Q. And what does the package contain?
17     A. It should be an empty beer box, a Budweiser
18 brand. It's also blood stained with blood spatter and
19 transfer.
20     Q. Okay. Officer, do you have a pair of scissors
21 up there?
22     A. I got a pocket knife.
23     Q. You have a pocket knife. Can you go ahead and
24 open State's Exhibit 470.
25     A. (Witness complied.)

45

1    Q.  Officer, would you please remove the contents
2  of State's Exhibit 470.
3    A.  Here's my initials.
4    Q.  All right.  I'm going to ask you to say that --
5  Do you recognize the contents of State's Exhibit
6  No. 470?
7    A.  Yes, ma'am.  It has my initials and I.D. on it.
8    Q.  All right.  And does State's Exhibit 470 --
9         (Pause in proceeding.)
10    Q.  Did you place the contents of State's Exhibit
11  470 in a baggy marked State's Exhibit 470-A?
12    A.  Yes, ma'am, I did.
13         MS. JACK:  All right.  Your Honor, at this
14  time, the State would offer State's Exhibit 470 for the
15  record, and State's Exhibit 470-A for all purposes.
16         MR. HEISKELL:  No objection as offered,
17  Judge.
18         THE COURT:  470-A is the bag or is 470 the
19  exhibit inside the bag?
20         MS. JACK:  470 --
21    Q.  (BY MS. JACK)  Well, Officer, let me ask you
22  this.  Is the contents of State's Exhibit 470-A what was
23  previously the contents of State's Exhibit 470?
24    A.  Correct.
25    Q.  In other words, you took the beer box out of

46

1  470 and put it in the baggy marked 470-A?
2    A.  Yes, ma'am.
3         MS. JACK:  So I'm offering State's Exhibit
4  470 for the record, and the contents of 470-A for all
5  purposes, Your Honor.
6         MR. HEISKELL:  Yes, that's fine.
7         THE COURT:  Admitted.
8         (State's Exhibit No. 470 admitted for
9         record purposes only.)
10         (State's Exhibit No. 470-A admitted.)
11    Q.  (BY MS. JACK)  And, Officer, I see some dots
12  down on the bottom of State's Exhibit 470-A.  Can you
13  tell the members of the Jury what this is?
14    A.  That would appear to be blood spatter.
15    Q.  Okay.
16    A.  And it's medium velocity.
17    Q.  What is medium velocity?
18    A.  High velocity is when you're very close to
19  something that moves at an extremely high rate of speed;
20  the drops are much smaller.
21         Medium velocity is over 1 millimeter in size
22  up to about 5 millimeters in size, and that's the stuff
23  that goes past.  The smaller it is, the less distance it
24  can go.  So medium velocity can go farther.  So those are
25  medium velocity.

47

1    Q.  Okay.  And in terms of being a Crime Scene
2  officer, what does that tell you or what is that
3  consistent with having happened or how close the victim
4  was to this beer box?
5    A.  He was probably within about four feet, and
6  that's about as far as medium velocity will go.
7    Q.  Okay.  And is this -- is this consistent with
8  his breathing after he's been shot or is this consistent
9  with him having been shot in close proximity to this
10  beer box?
11    A.  It could be either one.
12    Q.  Okay.  All right.  So this could be while he's
13  struggling to breathe or it could be he was shot in
14  close proximity to the beer box?
15    A.  Right.
16    Q.  Did you collect the second beer box?
17    A.  Yes, ma'am.
18    Q.  And is that marked State's Exhibit 471 on the
19  backside?
20    A.  Yes.
21    Q.  And is that the packaging for the second beer
22  box?
23    A.  Yes, ma'am.
24    Q.  And do you recognize State's Exhibit 471?
25    A.  It's my packaging.

48

1    Q.  Your packaging, your initials, you collected on
2  June 29th?
3    A.  Yes.
4    Q.  If you would, go ahead and open it, Officer.
5    A.  (Witness complied.)
6    Q.  Again, if you can, can you go ahead and put it
7  in the bag.
8    A.  (Witness complied.)
9         MS. JACK:  Your Honor, at this time, the
10  State would offer State's Exhibit 471 for the record, and
11  the contents of State's Exhibit 471-A for all purposes.
12         MR. HEISKELL:  No objection as offered,
13  Your Honor.
14         THE COURT:  Admitted.
15         (State's Exhibit No. 471 admitted for
16         record purposes only.)
17         (State's Exhibit No. 471-A admitted.)
18    Q.  (BY MS. JACK)  Officer, is there something
19  significant about State's Exhibit 471-A?
20    A.  First, let me tell you that this is --
21    Q.  That's your bag.
22    A.  -- my initials and I.D. here marking this as my
23  evidence.  These two boxes were actually overlaying each
24  other, so this has got a continuation of blood spatter
25  coming from about 4 feet away by the indication of the

49

1  length of how long it hit and then ran afterwards.  The
2  other box was laid over the top of this, so it got some
3  of the smaller spatter.
4      Q.  Okay.
5      (Pause in proceeding.)
6      Q.  Okay.  Officer, we've marked a series of bags;
7  is that correct?
8      A.  Yes, ma'am.
9      Q.  Now, and we've marked them collectively State's
10  Exhibits 472 through 480; is that correct?
11      A.  Yes, ma'am.
12      Q.  All right.  I'm going to ask you, do you
13  recognize each one of these bags?
14      A.  Yes, ma'am, they're all packages that I
15  packaged.
16      Q.  And how do you know they're all packages that
17  you packaged?
18      A.  They have my initials and I.D. at the bottom
19  of each one.  As we went through them, I looked for
20  those.  Plus the inventory markings that were done
21  by me.
22      Q.  Okay.  So each of those bags collectively holds
23  either items that were collected from the crime scene or
24  items that were collected from the hospital; is that
25  correct?

50

1      A.  Yes, ma'am.
2      Q.  Okay.  Now, can you tell me which bags contain
3  the items that were found at the crime scene, the smaller
4  items?
5      A.  Can I pull these apart?
6      Q.  Yes.
7      A.  These four items, Items 1 through 4.
8      Q.  And you've indicated State's Exhibit 472,
9  State's Exhibit 473, 474 and 480; is that correct?
10      A.  Yes, ma'am.
11      Q.  Okay.  Now, can you go ahead and open the
12  packaging for State's Exhibit 472, please.
13      A.  (Witness complied.)
14      Q.  All right.  Does the baggy marked
15  State's Exhibit 472-A contain the contents of what
16  was previously marked or contained within the bag
17  State's Exhibit 472?
18      A.  Yes, ma'am, it does.
19      MS. JACK:  All right.  Your Honor, at this
20  time, State would offer State's Exhibit 472 for record
21  purposes, and State's Exhibit -- the contents of State's
22  Exhibit 472-A for all purposes.
23      MR. HEISKELL:  No objection.
24      THE COURT:  Admitted.
25      (State's Exhibit No. 472 admitted for

51

1      record purposes only.)
2      (State's Exhibit No. 472-A admitted.)
3      Q.  (BY MS. JACK) Officer, if you would, go ahead
4  and please open State's Exhibit 473.
5      A.  (Witness complied.)
6      Q.  Was this the victim's phone that was found at
7  the crime scene?
8      A.  Yes, ma'am, it was the phone that was found at
9  the crime scene.
10      Q.  And you removed that from the baggy marked
11  State's Exhibit 473?
12      A.  Yes, ma'am, I did.
13      Q.  You placed it into the plastic baggy marked
14  State's Exhibit 473-A?
15      A.  Yes, ma'am, I did.
16      MS. JACK:  Your Honor, at this time, the
17  State would offer 473 for record purposes, the contents
18  of State's Exhibit 473-A for all purposes.
19      MR. HEISKELL:  No objection, Your Honor.
20      THE COURT:  Admitted.
21      (State's Exhibit No. 473 admitted for
22      record purposes only.)
23      (State's Exhibit No. 473-A admitted.)
24      Q.  (BY MS. JACK)  Officer, if you would, please
25  open State's Exhibit 474.

52

1      A.  (Witness complied.)
2      Q.  Officer, did you place the contents of State's
3  Exhibit 474 into the baggy marked State's Exhibit 474-A?
4      A.  Yes, ma'am, I did.
5      MS. JACK:  Your Honor, at this time, the
6  State would offer State's Exhibit 474-A (sic) for record
7  purposes, and the contents of State's Exhibit 474-A for
8  all purposes.
9      MR. HEISKELL:  No objection.
10      THE COURT:  Okay.  You named -- you numbered
11  those 474-A and 474-A?
12      MS. JACK:  474 would be the baggy -- I'm
13  sorry.  474-A (sic) would be the paper sack.  State's
14  Exhibit 474-A would be the baggy that contains the
15  contents of what was previously State's Exhibit 474.
16      MR. HEISKELL:  Yes, that's fine.
17      THE COURT:  Admitted.
18      (State's Exhibit No. 474 admitted for
19      record purposes only.)
20      (State's Exhibit No. 474-A admitted.)
21      Q.  (BY MS. JACK)  Now, Officer, can you go ahead
22  and open State's Exhibit 480, please.
23      A.  (Witness complied.)
24      Q.  And the contents of State's Exhibit 480, have
25  you now placed into a baggy about to be marked State's

53

1 Exhibit 480-A?

2    A. Yes, ma'am.

3      MS. JACK: Thank you. I'll offer State's

4 Exhibit 480 for the record, State's Exhibit 480-A for all

5 purposes.

6      MR. HEISKELL: No objection.

7      THE COURT: Admitted.

8      (State's Exhibit No. 480 admitted for

9      record purposes only.)

10      (State's Exhibit No. 480-A admitted.)

11    Q. (BY MS. JACK) And these two quarters were found

12 at the crime scene?

13    A. Yes, ma'am.

14    Q. The rest of Ruben's change was at the hospital?

15    A. Yes, ma'am.

16    Q. Now, Officer, if you would, go ahead and open

17 the next exhibit -- well, let me ask you this, Officer.

18 State's Exhibit 476 contains the day planner that was

19 found among the property of Ruben Martinez at the

20 hospital; is that correct?

21    A. Yes, ma'am.

22      MS. JACK: We'll offer State's Exhibit 476.

23      MR. HEISKELL: You said it was the what?

24      MS. JACK: Day planner, year calendar.

25      MR. HEISKELL: No objection.

54

1      THE COURT: 476 is admitted.

2      (State's Exhibit No. 476 admitted.)

3    Q. (BY MS. JACK) Officer, if you can, would you

4 please open State's Exhibit 477.

5    A. (Witness complied.)

6    Q. Pocket knife?

7    A. Yes, ma'am.

8    Q. Okay. Something somebody would use to cut boxes

9 and break them down when they deliver something?

10    A. Looks that way.

11    Q. All right. Would you please place that in the

12 baggy marked State's Exhibit 477-A.

13    A. Okay.

14      MS. JACK: I'll offer State's Exhibit 477

15 for the record, State's Exhibit -- or the contents of

16 State's Exhibit 477-A for all purposes.

17      MR. HEISKELL: No objection.

18      THE COURT: Admitted.

19      (State's Exhibit No. 477 admitted for

20      record purposes only.)

21      (State's Exhibit No. 477-A admitted.)

22    Q. (BY MS. JACK) Officer, if you can go ahead and

23 open State's Exhibit 478, please.

24    A. (Witness complied.)

25    Q. All right. Is State's Exhibit 478-A the

55

1 contents of State's Exhibit 478?

2    A. Yes, ma'am, it is.

3      MR. HEISKELL: No objection.

4      THE COURT: Admitted.

5      MS. JACK: 478-A for all purposes, contents

6 of it, and 478 for the record.

7      (State's Exhibit No. 478 admitted for

8      record purposes only.)

9      (State's Exhibit No. 478-A admitted.)

10    Q. (BY MS. JACK) Officer, I want to point out, the

11 container that holds the jewelry in State's Exhibit

12 478-A, is that a Crime Scene container?

13    A. No, actually that's a hospital container.

14    Q. And was this the hospital container that John

15 Peter Smith Hospital placed Mr. Martinez's jewelry in?

16    A. Yes, ma'am.

17    Q. And what is the name indicated on there?

18    A. John Doe 3.

19    Q. Okay. When somebody goes to John Peter Smith

20 Hospital and the medical technicians are moving so

21 quickly, do they have time necessarily to get someone's

22 name?

23    A. No.

24    Q. Does this tell you they were moving as quickly

25 as possible to save his life?

56

1    A. Yes.

2    Q. Officer, can you please open the next bag.

3    A. (Witness complied.)

4    Q. Is State's Exhibit 475 the baggy -- I'm sorry --

5 the paper bag that contained what is now the contents of

6 State's Exhibit 475-A?

7    A. Yes, ma'am.

8    Q. All right. And is the contents of State's

9 Exhibit 475-A the phone that was collected from the

10 victim's property at the hospital?

11    A. Yes, ma'am.

12      MS. JACK: Okay. Your Honor, at this time,

13 the State would offer State's Exhibit 475 for the record,

14 State's Exhibit -- the contents of State's Exhibit 475-A

15 for all purposes.

16      MR. HEISKELL: No objection.

17      THE COURT: Admitted.

18      (State's Exhibit No. 475 admitted for

19      record purposes only.)

20      (State's Exhibit No. 475-A admitted.)

21    Q. (BY MS. JACK) All right. Officer, I'm showing

22 you what's been marked as State's Exhibit 481.

23    A. Yes, ma'am.

24    Q. Do you recognize State's Exhibit 481?

25    A. Yes, ma'am.

STATE VS. MARK ANTHONY SOLIZ MARCH 15, 2012

57

1     Q. How do you recognize it?
2     A. That's my initials and I.D. on it and my invoice
3 tag that I filled out.
4     Q. What does it contain?
5     A. It contains the victim's clothing.
6     Q. All right. The victim Ruben Martinez?
7     A. Victim Ruben Martinez. It says boxers,
8 underwear, T-shirt, socks, shoes, shorts, belt and shirt.
9     Q. Okay.
10     A. And stamped "biohazard", so they will be blood
11 soaked.
12     Q. When it's stamped "biohazard" as some of these
13 packages are stamped, what does that mean?
14     A. That there was the potential for there being
15 blood on it at the scene or there definitely was blood
16 on it.
17     Q. And you know there was blood on it?
18     A. Yes, ma'am.
19     Q. Officer, if you would, go ahead and open that,
20 please.
21     A. (Witness complied.)
22     Q. Now, these items are wrapped a little
23 differently?
24     A. Yes, ma'am.
25     Q. Why is that?

58

1     A. Anytime something has blood on it, I want to
2 protect anybody that might open this, so I wrap it again
3 in -- in this craft paper to protect any DNA that might
4 be on it from accidentally being contaminated by another
5 piece of evidence in the box or from contaminating a
6 person who might have to handle it.
7     Q. All right. I want to talk about the shirt and
8 the shorts. Can you put your hand on the shirt and the
9 shorts?
10     A. Shirt, undershirt, short pants and belt.
11     Q. All right. And I'm going to ask you to keep
12 your voice up, if that's okay.
13     A. Okay. Sorry.
14     Q. That's okay. Are those items in a baggy inside
15 of the white, I guess, butcher paper, for lack of a
16 better word?
17     A. No, they won't be. They'll be wrapped directly
18 in it.
19     Q. Okay.
20     A. Potential DNA evidence can't be wrapped in
21 plastic because it will cause it to degrade. It starts
22 to mold and actually kill itself. So everything that has
23 potential DNA on it has to be wrapped in something
24 breathable; so anything that's cardboard, paper is
25 breathable.

59

1     Q. Okay. And so that's why these are marked a
2 little bit differently?
3     A. Yes, ma'am.
4     Q. All right. Officer, I'm going to ask you to go
5 ahead and open the first sack, please. I'm going to ask
6 you -- we're going to put it all in one sack.
7     A. (Witness complied.)
8        MS. JACK: All right. Your Honor, at this
9 time, State would offer State's Exhibit 481 for the
10 record, State's Exhibit 481-A and State's Exhibit
11 481-A-1 for all purposes.
12        MR. HEISKELL: Which one is A-1?
13        MS. JACK: A-1 is the shorts.
14        (Sotto voce discussion.)
15        MR. HEISKELL: No objection, Your Honor.
16        THE COURT: Admitted.
17        (State's Exhibit No. 481 admitted for
18        record purposes only.)
19        (State's Exhibit No. 481-A and
20        481-A-1 admitted.)
21     Q. (BY MS. JACK) Okay. Officer, I'm going to ask
22 you just to hold those up where the Jury can see them for
23 just a moment.
24     A. (Witness complied.)
25     Q. Now, they're cut obviously. Who cut them?

60

1     A. MedStar personnel or F.D. personnel would have
2 done that.
3     Q. And they read "Budweiser" on the bottom?
4     A. Yes, ma'am.
5     Q. Is that part of the uniform?
6     A. Yes, ma'am.
7     Q. And on the inside of the shorts on the waistband
8 we see what appears to be blood? I'm sorry, on his leg.
9     A. Actually, the zipper.
10     Q. On the zipper, okay. So it would be the
11 waistband if it was completely zipped up and had not been
12 cut?
13     A. Right.
14     Q. Okay. Officer, if you would, let's go ahead and
15 put both of these exhibits in a bag.
16     A. (Witness complied.)
17     Q. If you would, please, Officer, if you would go
18 ahead and open -- hold on just a moment; wait -- what has
19 been marked for identification purposes as State's
20 Exhibit 481-B, and that contains what?
21     A. It says undershirt.
22        MS. JACK: And it's packaged, for the
23 record, in the same fashion as the shorts.
24     Q. Have I now marked the white undershirt State's
25 Exhibit 481-B-1 for identification purposes?

61

1    A.  Yes, ma'am, you have.

2         MS. JACK:  Your Honor, at this time, the

3    State would offer State's Exhibit 481-B and State's

4    Exhibit 481-B-1 for all purposes.

5         MR. HEISKELL:  No objection.

6         THE COURT:  Admitted.

7         (State's Exhibit No. 481-B and 481-B-1

8         admitted.)

9    Q.  (BY MS. JACK)  Officer, can you please show the

10   members of the Jury.

11   A.  (Witness complied.)

12   Q.  And the brown spots we see on the undershirt,

13   are those consistent with blood?

14   A.  Yes, ma'am.

15   Q.  Are these among the items that you allowed to

16   dry in the Fort Worth crime lab -- Crime Scene Unit

17   office?

18   A.  Yes, ma'am.  Took about two days.

19   Q.  Took about how long?

20   A.  Two days.

21   Q.  Okay.  I'm going to ask you to go ahead and

22   place those in this bag.

23   A.  (Witness complied.)

24   Q.  Officer, I'm going to ask you to open State's

25   Exhibit 481-C or what's been marked as State's Exhibit

62

1    481-C.  And is that packaged the same way as the other

2    two pieces of clothing, for the record?

3    A.  Yes, ma'am.

4         MS. JACK:  Okay.  Your Honor, at this time,

5    the State would offer State's Exhibit 481-C and State's

6    Exhibit 481-C-1 for all purposes.

7         MR. HEISKELL:  No objection, Your Honor.

8         THE COURT:  Admitted.

9         (State's Exhibit No. 481-C and 481-C-1

10        admitted.)

11   Q.  (BY MS. JACK)  And for the record, the brown

12   spot that we see on a large part of the shirt, is that

13   consistent with blood?

14   A.  Yes, ma'am, it is.

15   Q.  And is -- are that -- is that one of the items

16   of clothing that you had to allow to dry in the Fort

17   Worth Crime Scene office?

18   A.  Yes, ma'am.

19   Q.  How long did it take for it to dry?

20   A.  Two days.

21        MS. JACK:  Hold on just a moment.

22        Your Honor, at this time, the State would

23   offer 481-C and State's Exhibit 481-C-1 for all purposes.

24        MR. HEISKELL:  I thought that was --

25        MS. JACK:  The Court previously admitted

63

1    it?

2         MR. HEISKELL:  481-C.

3         MS. JACK:  All right.  You can put those in

4    there.

5         May I have a moment, Your Honor?

6         THE COURT:  Yes.

7    Q.  (BY MS. JACK)  Officer, did you photograph the

8    victim's clothing in this case?

9    A.  Yes, ma'am, I did.

10   Q.  What is the purpose of photographing the

11   victim's clothing as it's drying?

12   A.  Well, the main thing is to potentially try to

13   see something with the camera that we might not be seeing

14   with the naked eye that we may see later when we look at

15   the photographs blown up.  Also to have a photographic

16   record of what we saw.

17   Q.  Does State's Exhibit 485 and 486 -- I'm sorry,

18   485 and 458 and 459 fairly and accurately show the

19   victim's clothing as it was drying on June the 29th?

20   A.  Yes, ma'am.  One of the other things we do is

21   we look for entry/exit wounds and try to put them back

22   together as close as possible, and look for other

23   potential --

24   Q.  At the time you're responding to a crime scene,

25   do you know, for instance, how many times a victim has

64

1    sustained an injury?

2    A.  No, ma'am.

3    Q.  How many different wounds you're looking for?

4    A.  No, ma'am.

5    Q.  How many different projectiles or casings?

6    A.  No, ma'am.

7    Q.  And does State's Exhibit 460, is that a fair and

8    accurate depiction of the victim's personal property,

9    both found at the crime scene and at -- from taken at the

10   hospital?

11   A.  Yes, ma'am.

12        MS. JACK:  Your Honor, State would offer

13   State's Exhibit 458 through 460 into evidence for all

14   purposes.

15        MR. HEISKELL:  No objection.

16        THE COURT:  Admitted.

17        (State's Exhibit Nos. 458 - 460 admitted.)

18        MS. JACK:  May I publish them, Your Honor?

19        THE COURT:  Yes, you may.

20   Q.  (BY MS. JACK)  State's Exhibit 458, is this

21   Ruben Martinez' shorts as they're drying in the Crime

22   Scene office of the Fort Worth Police Department?

23   A.  Yes, ma'am.

24   Q.  Same shorts the Jury has already seen?

25   A.  Yes.

65

1    Q. State's Exhibit 459 shows the victim's top shirt
2  that he was wearing on June the 29th?
3    A. Yes, ma'am.
4    Q. Indicating part of his uniform?
5    A. Right.
6    Q. We see the name "Budweiser" and we see the name
7  "Ruben" on it?
8    A. Yes, ma'am.
9    Q. And, in fairness, there are cuts on the shirt;
10 and were those cuts, using your best judgment and common
11 sense, made by MedStar?
12   A. They're consistent with what EMTs will do.
13   Q. Okay. And did you allow this shirt to dry in
14 the Crime Scene office as well?
15   A. For two days, yes, ma'am.
16   Q. Okay. Looking now at State's Exhibit 460, is
17 this the personal property collected from the crime
18 scene, these items, and the personal property collected
19 from the hospital?
20   A. Correct.
21   Q. Okay. Officer, did you ever come across a
22 wallet?
23   A. No, ma'am.
24   Q. Not at the hospital?
25   A. No, ma'am.

66

1    Q. Not at the scene?
2    A. No, ma'am.
3    Q. All right. Thank you. Officer, I'm showing you
4  what's been marked as State's Exhibit 444 and State's
5  Exhibit 445. Do you recognize what's portrayed in these
6  exhibits?
7    A. Yes, ma'am, I do.
8    Q. Okay. Do they fairly and accurately depict
9  another victim in this case, Mr. Enrique Samaniego?
10   A. Yes, ma'am, they do.
11   Q. And do they fairly and accurately depict him at
12 John Peter Smith Hospital?
13   A. Yes, ma'am.
14   Q. On July the 2nd of 2010?
15   A. Yes, ma'am.
16       MS. JACK: Your Honor, at this time, the
17 State would offer into evidence State's Exhibit 444 and
18 445 for all purposes.
19       MR. HEISKELL: No objection to 444, Your
20 Honor. We do object to 445, Rule 403, probative value
21 is outweighed by the prejudicial.
22       THE COURT: What's the other one?
23       The objection is overruled.  444 and 445
24 are admitted.
25       (State's Exhibit Nos. 444 and 445 admitted.)

67

1    Q. (BY MS. JACK)  For the record, Officer, how many
2  pictures of Mr. Samaniego were taken?
3    A. I believe I took ten.
4    Q. You took ten. And this was when he was -- after
5  his surgery had been completed?
6    A. Yes, ma'am.
7    Q. Okay. And this was at John Peter Smith
8  Hospital; is that correct?
9    A. Yes, ma'am.
10   Q. Can you tell the members of the Jury where the
11 injuries to Mr. Samaniego were central -- centralized or
12 focused?
13   A. The injuries that I could see basically started
14 here at the top of the sternum and went all the way down
15 to basically the naval area.
16   Q. Okay. And State's Exhibit 445, this is after
17 Mr. Samaniego had undergone lifesaving surgery; is that
18 correct?
19   A. That's my understanding.
20   Q. So some of the bandaging is as a result of the
21 surgery?
22   A. Yes, ma'am.
23   Q. Okay. But it was your understanding he was shot
24 in the stomach multiple times?
25   A. Yes, ma'am.

68

1        MS. JACK: May I publish this to the Jury,
2  Your Honor?
3        THE COURT: Yes, you may.
4    Q. Well, before I do that, Officer, how was it that
5  you came to be photographing a separate victim in this
6  case?
7    A. The detective that's working that particular
8  case contacted the Crime Scene sergeant and needed
9  somebody to go and take photographs of this victim on
10 this particular case because it was the first time we had
11 the opportunity. He had either been in surgery or been
12 in critical care around the clock, so this was the first
13 time we had a chance to actually take photos.
14   Q. So you know he was injured on June the 29th; is
15 that right?
16   A. Yes, ma'am.
17   Q. And it wasn't until July the 2nd that you could
18 actually photograph him?
19   A. Yes, ma'am. That's the first time he was stable
20 enough for us to enter.
21   Q. What does that mean when you say that "he was
22 stable enough for us to enter"?
23   A. Basically if they have them in an area where you
24 -- we call it "bunny suiting up" where you have to be
25 completely covered head to toe so that you don't infect

69

1  him as a result of your presence there.
2      Since our cameras and our gear and stuff
3  go out in the field, they have the potential for
4  infecting him.  The value of the pictures over infecting
5  him or, you know, causing him more harm is not worth
6  the pictures, so we wait until they tell us that they
7  have him secure from potential infection from us being
8  there.
9      Q.  Okay.  So, once again, we chose -- we choose to
10  save a life versus preserving evidence?
11      A.  Yes, ma'am.
12          MS. JACK:  Okay.  May I publish at this
13  time, Your Honor?
14          THE COURT:  Yes, you may.
15      Q.  And State's Exhibit 444, is this with
16  Mr. Samaniego in his hospital gown?
17      A.  Yes, ma'am.
18      Q.  And can you see certain medical devices around
19  Mr. Samaniego?
20      A.  Yes, ma'am.
21      Q.  Was Mr. Samaniego conscious when you took these
22  pictures?
23      A.  At no time while I was there.
24      Q.  At no time.  So he was unconscious the entire
25  time?

70

1      A.  Yes, ma'am.
2      Q.  Now, in fairness, do you know whether or not
3  this was medically induced or whether he had just not
4  regained consciousness?
5      A.  I do not know that.
6      Q.  Okay.  Now, next picture, is it a little bit
7  graphic?
8      A.  Yes, ma'am, it is.
9      Q.  Okay.  And can you tell the members of the Jury
10  what they'll be seeing in State's Exhibit 445?
11      A.  It's going to be that area, like I said, just
12  below the sternum all the way down to the naval area.
13  That area had been opened for exploratory surgery to try
14  to get bullets, bullet fragments out and patch anything
15  that had been done.
16          They have several things that they use now
17  to cover those areas instead of closing them so that if
18  they have additional problems, they can go back in.  This
19  one is actually a pretty -- a pretty good one.  It's
20  covered in a blue mesh and then it's got cellophane over
21  it that seals that from infection.
22          So that's what you're actually going to
23  be seeing is that packing, the mesh, and then the
24  cellophane over the top of it.  If they need to go
25  back in, they just pull that back off instead of

71

1  unsuturing him.
2      Q.  So actually if the bandages were off of him,
3  the covering was off, we would actually see the true
4  extent of his injuries?
5      A.  Yes, ma'am.
6      Q.  Did you return at any point to photograph
7  Mr. Martinez later?
8      A.  I don't believe I did.
9          MS. JACK:  Okay.  May I have a moment, Your
10  Honor?
11          THE COURT:  Yes, you may.
12          MS. JACK:  I'll pass this witness for
13  cross-examination, Your Honor.
14          MR. HEISKELL:  No questions, Your Honor.
15          THE COURT:  May the witness be excused?
16          MS. JACK:  Yes, Your Honor.  We'd ask that
17  he be finally released.
18          THE COURT:  Thank you.  You may be released.
19          THE WITNESS:  Thank you.
20          (Witness excused.)
21          MS. JACK:  We call Arnold Dominguez.
22  May I approach the witness, Your Honor?
23          THE COURT:  Please raise your right hand.
24          (Witness sworn.)
25          MS. JACK:  May I proceed, Your Honor?

72

1          ARNOLD DOMINGUEZ,
2  Having been first duly sworn, testified as follows:
3          DIRECT EXAMINATION
4  BY MS. JACK:
5      Q.  Mr. Dominguez, would you please tell the Jury
6  your full name.
7      A.  Arnold Dominguez, Jr.
8      Q.  All right.  Can you tell them where you work?
9      A.  Ben E. Keith Beverages.
10      Q.  Ben E. Keith Beverages?
11      A.  Yes.
12      Q.  How does Ben E. Keith work?
13      A.  We deliver beer to the market.  Pretty much
14  there's a salesman that goes out and presells a store,
15  and then we go out the following day and we deliver to
16  the stores.
17      Q.  Okay.  How long have you worked for Ben E.
18  Keith?
19      A.  Three years.
20      Q.  Before you worked for Ben E. Keith, what did you
21  do?
22      A.  I was a banker for Washington Mutual, managed a
23  branch out in North Richland Hills.
24      Q.  Before you were a banker, what did you do?
25      A.  I was in the Marine Corps.

STATE VS. MARK ANTHONY SOLIZ   MARCH 13, 2012

73

1  Q.  How long were you a Marine?

2  A.  I was a Marine for three-and-a-half years.

3  Q.  Okay.  Actually, you never stop being a Marine,
4  do you?

5  A.  No, never stop.

6  Q.  All right.  What year did you begin working for
7  Ben E. Keith?

8  A.  Was it 2009, I believe.

9  Q.  Okay.  And when you began to work for Ben E.
10  Keith, what did you do for them?

11  A.  I started off as a helper.  I would go out on
12  different routes and help put up stores, down stack beer,
13  things of that nature.

14  Q.  And do you know Ruben Martinez?

15  A.  Yes, I do.

16  Q.  How long have you known Ruben Martinez?

17  A.  Pretty much all my life, ever since we were
18  kids.  We grew up together.

19  Q.  Where did you grow up?

20  A.  In north side of Fort Worth, Diamond Hill.

21  Q.  How old are you, sir?

22  A.  33.

23  Q.  And was Ruben Martinez 29 at the time of his
24  death?

25  A.  Yes, he was.

74

1  Q.  So you were a little bit older than him growing
2  up?

3  A.  Correct.

4  Q.  Okay.  When you began to work for Ben E. Keith,
5  did you begin to work with him?

6  A.  No.  I started out on a different route, but six
7  months later I was with him.

8  Q.  All right.  When you worked with him, what would
9  y'all do?

10  A.  We -- started off as a helper with him, and I
11  was always side-by-side with him.  We would go out and
12  put up stores together and he would drop me off at
13  different locations.  And we'd pretty much just do the
14  route like, you know, throughout the day.

15  Q.  So y'all would drive together?

16  A.  Drive together.

17  Q.  Both of you in the front seat?

18  A.  Correct.

19  Q.  All right.  And when you say "put up a store",
20  what does that mean?

21  A.  We'd get to a store and we'd down stack the
22  beer, pretty much pull it off with a forklift, down
23  stack it off, you know, on the side of the store, make
24  it into stacks so we can roll it in with dollies.  And
25  we'd roll in the beer together at the store.  We'd check

75

1  it in with the branch manager -- I mean with the store
2  manager, and then we'd put the store up in the cooler,
3  fill the windows.  And it'd usually take about an hour
4  or so to do.

5  Q.  So you spent a lot of time together?

6  A.  Pretty much all day together we were side by
7  side.

8  Q.  Were you good friends?

9  A.  Very good friends.

10  Q.  Did you know his wife Lisa?

11  A.  Yes, I did.

12  Q.  Had you met his son?

13  A.  Yes.

14  Q.  Did you know they were expecting another one?

15  A.  Yes.

16  Q.  Can you tell the members of the Jury what your
17  normal route was during the week.

18  A.  We worked Monday through -- Monday through
19  Friday.  Our days would usually start about 3:30 in the
20  morning.  4:00 in the morning we'd be at our first stop,
21  4:15, give or take.  And from that point on, it was just
22  putting up about anywhere between 15 to 16 stops a day.
23  Our day would usually end about 1:30 or 2.  We'd have
24  lunch for a couple hours, and then head back into the
25  warehouse about 3:00, do paperwork, and then call it a

76

1  day about 3:30, 4:00 in the afternoon.

2  Q.  All right.  Now, you spent a lot of time with
3  him.  I'm guessing you're familiar with his habits.

4  A.  Yes.

5  Q.  Was he on the phone a lot?

6  A.  Constantly.

7  Q.  Who was he on the phone with?

8  A.  His wife, every single stop.  His wife was at
9  home and he was on the -- on the phone just talking.

10  Q.  Were they close friends?

11  A.  Yes, very close friends.  That's all he spoke
12  of.

13  Q.  Family was important to him?

14  A.  Main priority.

15  Q.  Do you also know what he kept on him normally?

16  A.  Um, pretty much just -- being out in these small
17  stores, we just, you know, carry very little cash on us.
18  Carry, you know, his wallet, usually about $10 or so.
19  Actually, you know, a lot of these stores won't take
20  debits unless you charge more than $5 on a single stop,
21  so he carried little cash, probably about $10, wallet,
22  cell phone.  That's about it.

23  Q.  Why did you not carry very much cash?

24  A.  A, because we knew it was dangerous.  They
25  pretty much told us not to carry too much cash.  B, he

77

1  was -- he liked to use his card a lot. You know,
2  everybody has their own preference, but the main reason
3  was that we didn't carry too much cash for the simple
4  fact that we're out delivering and we didn't want to run
5  into a problem like we did.
6      Q.  Now, the two of y'all worked together for some
7  time. Was there a time then where you got your own
8  truck?
9      A.  Yes.  Usually the north side route was one of
10  the biggest routes in the company, so we were -- we were
11  always going with three -- two or three trucks at a time.
12  He had a truck; I had a truck fully loaded.  And so, yes,
13  every single day we had a different truck.
14      Q.  Okay.  Now, even though you had different
15  trucks, would you go to some of the same routes, run the
16  same route together or some of the same locations
17  together?
18      A.  Yes, the big stops.  We were always at the big
19  stops together.  On the north side we're -- all the
20  stops are big.  We would see each other at every single
21  stop, because I drove the forklift truck, so we'd get to
22  a stop and he would be waiting there for me if I was
23  putting up another stop.  And I would drop the pallets
24  for him, down stack together and roll in.  That's when
25  the light came out.  A lot of times in the morning we'd

78

1  like to stick together just for -- you know, we didn't
2  want to be at one stop alone in that part of town with
3  what could happen.
4      Q.  Okay.  On June the 29th, do you recall what day
5  of the week it was?
6      A.  Yes, Tuesday.
7      Q.  All right.  And on Tuesdays, what was the first
8  stop?
9      A.  Buy & Save, corner of Azle and Long.
10      Q.  And is that 2700 Azle Avenue in Fort Worth,
11  Texas?
12      A.  Yes, it is.
13      Q.  Okay.  And what time would y'all generally meet
14  up at that particular location or would you meet up at
15  Ben E. Keith and then come there?
16      A.  We would meet up at Ben E. Keith.  We'd check
17  the truck in together.  Pretty much when I say "check the
18  truck in," we'd figure out what bay was what store and we
19  would write it down.  For instance, Buy & Save was Bay 2
20  and 3 on the driver's side.  So we'd write that down so
21  when we get there, we knew where to go to, instead of
22  throwing up all the bays and trying to figure it out.
23  So we'd usually get about -- there about 4:15 or so on
24  Tuesday morning.
25      Q.  Okay.  And was June the 29th just like any other

79

1  day?
2      A.  Just like any other day.
3      Q.  Initially?
4      A.  Yes.
5      Q.  You drove one truck.  Did Ruben drive another
6  truck?
7      A.  Yes.
8      Q.  Now, had something happened leading up to June
9  29th to you when you were driving one of the trucks?
10      A.  Yes.  The Friday before that Tuesday, I -- I
11  jackknifed the 18-wheeler into a -- into a bridge,
12  guardrail of a bridge.  So I couldn't drive the remainder
13  of the day on Friday, so I wasn't able to drive until
14  Tuesday again.  And Tuesday, I didn't drive the big
15  forklift truck.  He -- he drove it.
16      Q.  Okay.
17      A.  For me.
18      Q.  What was the weather like when you jackknifed
19  the truck?
20      A.  It was raining.  It was kind of misting.  So
21  driving a big truck like that, empty on the way back with
22  a big heavy load of the forklift on the back, it's kind
23  of hard to control if it kind of gets away from you, so
24  you tend to slip and slide.  And I, unfortunately,
25  jackknifed the truck that Friday.

80

1      Q.  So was your truck a particular kind of truck and
2  his was a different kind of truck?
3      A.  Correct.
4      Q.  And you were supposed to be driving the truck
5  where this happened?
6      A.  That morning, yes, I was.
7      Q.  What happened?  Why were you not driving that
8  truck?
9      A.  Well, we finished up putting up the store, and
10  it was starting to mist again.  I had initially drove
11  that truck that morning and parked it where it was that
12  morning.  And we came out after putting up the stop, and
13  he -- he noticed that it was misting.  And he just told
14  me, he's like, "Hey, I know you're still kind of scared
15  about driving the truck.  I'll go and drive the truck for
16  you, you know, this morning, and you take my truck on the
17  other side."
18          He was in charge of the route, so, you know,
19  there was -- you know, I said, "Are you sure?"  And he
20  said, "Yeah, I'll take one for the team," pretty much is
21  what he said.  He was like, "You go and drive the smaller
22  truck where not -- you know, it's a lot easier to
23  control."  So...
24      Q.  And you were grateful?
25      A.  Yeah.

STATE VS. MARK ANTHONY SOLIZ  MARCH 13, 2012

81

1   Q.   You wanted him to drive that truck?
2   A.   Yeah, definitely.
3   Q.   You were still a little skittish?
4   A.   Yes.
5   Q.   Can you tell the members of the Jury how you
6   unloaded and when you put the -- cut the boxes up, and
7   then you went your separate ways.
8   A.   Yes.  We got done with the route and then we
9   pretty much break down the boxes.  And we went to the
10  back of the 18-wheeler where the forklift is at.  It was
11  backed up against the dumpster.
12        And that point, I just turned around and
13  threw the boxes.  We talked about him taking the truck,
14  and that was it.  He said, "I'll see you at the next
15  stop."  And I walked one direction towards the front of
16  the store to go on the other end of the store, and he
17  walked on the other side out of sight of me to get in the
18  pass -- into the driver side of the truck.
19  Q.   What happened?
20  A.   As I was walking away, not even turning the
21  corner of the store, I heard a gunshot.  And at the time,
22  I just -- I fell down to the ground and kind of turned
23  towards the actual pumps.  And I seen people getting
24  down.  There was a guy at the pump kind of ducking, you
25  know, and I was kind of crawling back towards that

82

1   direction.  And I yelled out at the guy, I said, "What's
2   going on?  You know, what was that?"  And he pretty much
3   just turned to me and said, "I don't know, but there's
4   somebody in the front of the truck."
5        And that's when I ran towards the front of
6   the truck, and I seen Ruben lying there next to the curb.
7   Q.   What did he look like?
8   A.   Not moving, eyes were just a blank stare, just
9   blood coming out of -- side of his head.  I didn't know
10  if it was -- he had gotten shot in the head or where, but
11  it was just pretty much everywhere.
12  Q.   Was he face up or face down?
13  A.   Face down on his stomach.
14  Q.   Could he move?
15  A.   No.
16  Q.   Was he conscious?
17  A.   No.
18  Q.   Were his eyes open?
19  A.   Yes.
20  Q.   Were you trying to talk to him?
21  A.   Yes.  I put my hands underneath him and tried
22  to hold him to see if I can feel something, and there
23  was nothing.
24  Q.   Were you able to move him?
25  A.   No, I mean, pretty much just by me putting my

83

1   hand underneath him, that was it.  I didn't want to move
2   him or jerk him around too much.
3   Q.   Was 9-1-1 called?
4   A.   Yes.
5   Q.   Did you call 9-1-1?
6   A.   No.  As I was running towards him, the store
7   owner was coming out at the same time.  And I yelled at
8   him, "Call 9-1-1."  He had his phone with him already,
9   and he called.  And then -- but no, I didn't.  My first
10  call wasn't to 9-1-1.
11  Q.   Did you stay there with Ruben?
12  A.   Yes, I did.
13  Q.   Were you there when MedStar got there?
14  A.   Yes.
15  Q.   Were you there when they took him to the
16  hospital?
17  A.   Yes.
18  Q.   Did you go and visit him at the hospital?
19  A.   Every day.
20  Q.   Were there days that you went more than once?
21  A.   Almost every day.
22  Q.   From the last time that he told you, "I'll see
23  you at the next stop", was he ever able to speak to you
24  again?
25  A.   No.

84

1   Q.   How was he able to communicate?
2   A.   We would spend hours with him at the -- at the
3   hospital, and myself, his wife, and one other guy from
4   work, and we would sit there and go through the entire
5   alphabet, because we knew he was trying to speak to us.
6   And we'd, you know, name out a letter, like A, "Does it
7   start with A?  And blink once if yes; blink twice if
8   no."  So that's how he would spell out what he -- what
9   he wanted to tell us.
10  Q.   How long would it take him to tell you, for
11  instance, he was hot or needed help?
12  A.   Two hours at least.  He would get frustrated
13  because we couldn't -- he would get tired.  He was dozing
14  in and out, but about two hours or so just to get a
15  simple "I'm hot."
16  Q.   What's the last thing he told you or
17  communicated to you?
18  A.   From the hospital was "I'm hot" pretty much is
19  what he told me.  That was the only thing we made out.
20  Q.   Is that the same way he could communicate with
21  his family?
22  A.   I think so.  That's -- that's the only way he
23  could communicate with his family.  I know when I was
24  there, that was what we would try to get out of him.
25  Q.   Was he ever able to move?

STATE VS. MARK ANTHONY SOLIZ   MARCH 13, 2012

85

1.  A.  No.
2       MS. JACK:  May I approach the witness, Your
3  Honor?
4       THE COURT:  Yes, you may.
5  Q.  Mr. Dominguez, I'm showing you what's been
6  marked as State's Exhibit 442 for identification
7  purposes.  Do you recognize what's portrayed in this
8  picture?
9  A.  Yes.
10  Q.  Does that fairly and accurately show Ruben
11  Martinez in the hospital in the days leading up to his
12  death?
13  A.  Yes.
14       MS. JACK:  Your Honor, at this time, the
15  State would offer State's Exhibit 442 into evidence for
16  all purposes.
17       MR. HEISKELL:  No objection.
18       THE COURT:  Admitted.
19       (State's Exhibit No. 442 admitted.)
20       MS. JACK:  May I publish it, Your Honor?
21       THE COURT:  Yes.
22  Q.  (BY MS. JACK)  Mr. Dominguez, have you had an
23  opportunity to watch the surveillance video from the
24  Texaco?
25  A.  Yes.

86

1  Q.  And you knew that they had cameras at the store?
2  A.  I did.
3  Q.  All right.  And specifically Camera No. 9, the
4  video that's captured on that, does that fairly and
5  accurately show looking across the profile of the store,
6  the Texaco there on June the 29th of 2010?
7  A.  Yes.
8  Q.  Does it fairly and accurately show the events,
9  you and Ruben unloading the beer boxes, you and Ruben
10  unloading, making deliveries inside of the store,
11  returning to the truck, that type of thing?
12  A.  Yes.
13  Q.  All right.  Have you had a chance to watch that?
14  A.  Yes, I have.
15  Q.  Do you see an individual come out of the shadows
16  by the dumpster?
17  A.  Yes, I do.
18  Q.  And does that individual come out near where the
19  dumpster is?
20  A.  Yes.
21  Q.  Does it appear as though he has something in his
22  hand?
23  A.  Yes.
24  Q.  And are you facing him or is your back to the
25  individual as he comes out from the dumpster?

87

1  A.  Back towards the individual.
2  Q.  So it's behind you?
3  A.  Uh-huh.
4  Q.  Did you ever know how close you were to Mark
5  Soliz?
6  A.  Never had any idea until I seen the video.
7  Q.  Okay.  After you saw that individual walk behind
8  you, was he walking towards where your friend was?
9  A.  Right behind.
10  Q.  Was your friend ever the same again?
11  A.  No.
12       MS. JACK:  Your Honor, at this time, the
13  State would offer the video footage from Camera 9 on
14  State's Exhibit 443 into evidence.
15       MR. HEISKELL:  No objection.
16       THE COURT:  Admitted.
17       (State's Exhibit No. 443 admitted.)
18       MS. JACK:  May I play it, Your Honor?
19       THE COURT:  Yes, you may.
20       MS. JACK:  It may take me a few minutes to
21  set it up.
22       THE COURT:  That's fine.
23       (Pause in proceeding.)
24       MS. JACK:  Judge, we may need a few minutes,
25  based upon the player.

88

1       (Pause in proceeding.)
2       MS. JACK:  Judge, may we change laptops for
3  just a moment?
4       THE COURT:  Okay.
5       (Pause in proceeding.)
6       MR. CHAMBLESS:  Your Honor, may we approach
7  the bench?
8       THE COURT:  Yes, you may.
9       (At the bench.)
10       MR. CHAMBLESS:  If you could give us five
11  minutes recess, we'll get this done.
12       THE COURT:  They've got it already running,
13  don't they?
14       (In open court.)
15       THE COURT:  We'll take a short recess.
16       (Recess taken from 11:14 to 11:34 a.m.)
17       (Jury not present.)
18       THE COURT:  State ready to proceed?
19       MS. JACK:  State's ready.
20       THE COURT:  Defense ready?
21       MR. HEISKELL:  Yes, sir.
22       THE COURT:  Jury ready?  Please bring in the
23  Jury.
24       (Jury present.)
25       THE COURT:  Thank you.  You may be seated.

89

1        MS. JACK:  At this time, Your Honor, I will
2   also offer the video footage from Camera 7 and Camera 8
3   as well.
4        MR. HEISKELL:  No objection, Your Honor.
5        THE COURT:  How are those marked?
6        MS. JACK:  Now, Mr. Dominguez --
7   I'm sorry, Your Honor?
8        THE COURT:  How are those marked?
9        MS. JACK:  They're also on the same CD.
10        THE COURT:  Which is marked as State's
11   what?
12        MS. JACK:  It's in the player.
13        MR. HEISKELL:  443, I believe.
14        THE COURT:  Thank you.  Go ahead.
15   Q.  (BY MS. JACK)  Mr. Dominguez, the time indicated
16   on this footage indicates 6:45 down there at the bottom.
17   What time are y'all actually at the Texaco?
18   A.  We got there about 4:30.  That's probably about
19   5 something, 5:15 or so, 5:30.
20   Q.  So it's about an hour fast?
21   A.  Right, right.
22   Q.  So they didn't adjust for Daylight Savings?
23   A.  Right.
24   Q.  Okay.  All right.  But other than that,
25   everything is a fair and accurate portrayal of what

90

1   happened that morning?
2   A.  Correct.
3   Q.  Okay.  The video clip that you've watched is
4   much longer; is that right?
5   A.  Yes.
6   Q.  For purposes of the Jury's sake, we're going to
7   just show a shortened part of that clip.  All right?
8   A.  Okay.
9        (A portion of State's Exhibit No. 443,
10        DVD with no audio, played simultaneously
11        in open court.)
12   Q.  Now, do you see the individual that just -- did
13   you see the man come out of the shadows?
14   A.  Yes, I did.
15   Q.  Okay.  And what would that area have been?
16   A.  That's where the dumpster is at.
17   Q.  Does it appear as though he has white tennis
18   shoes or light-colored shoes?
19   A.  Yes, it does.
20   Q.  And a light-colored shirt?
21   A.  Yes.
22   Q.  And he just went back to that area?
23   A.  Yes.
24   Q.  Who is that?
25   A.  That's Ruben.

91

1   Q.  Who is the second gentleman out of the store?
2   A.  That's me.
3   Q.  All right.  And are y'all wearing your uniforms?
4   A.  Yes, we are.
5   Q.  What are you getting ready to do?
6   A.  We're going to go back to that -- where the
7   dumpster is at, throw away the boxes that we have broken
8   down that are on my dolly.
9   Q.  Do y'all use knives to break down the boxes
10   sometimes and cut up the trash?
11   A.  Yes, yes, we do.
12   Q.  And you look as though, for just a moment, as
13   though you were looking around.  Had you and Ruben heard
14   anything that morning?
15   A.  That morning we did.  When we first showed up to
16   the stop and we were down stacking one of the pallets
17   that we had pulled off the truck, we had heard gunshots
18   in the area.  And pretty much just heard them and went on
19   in our business.
20   Q.  Want to be careful?
21   A.  Yeah.
22   Q.  What are you doing right there?
23   A.  I am going to put the dollies on the back of
24   the truck.
25   Q.  And what's Ruben doing?

92

1   A.  Ruben is throwing away the trash.
2   Q.  In what?
3   A.  The dumpster.
4   Q.  Did you ever know anyone was behind you?
5   A.  No, no idea.
6   Q.  Mr. Dominguez, can you see the two light-colored
7   areas at the very top of the screen?
8   A.  On the right side?  Yes, I do.
9   Q.  From what you know, is that the area consistent
10   with or the same area as the vacant field adjacent to the
11   Texaco?
12   A.  Yes.
13   Q.  And this camera footage does not show you, but
14   what were you doing at this very moment?
15   A.  I was running towards the front of the truck to
16   find Ruben where he was laying down, lying.
17   Q.  And does one of the other views show, in fact,
18   the young man in the red truck or the red car that ducked
19   at the sound of the gunfire?
20   A.  Yes.
21   Q.  You knew Ruben.  Was he a healthy man?
22   A.  He was.
23   Q.  Was he a young man?
24   A.  He was.
25   Q.  Any reason to believe he wouldn't have lived a

STATE VS. MARK ANTHONY SOLIZ   MARCH 13, 2012

93

1  long, happy life but for June 29th and this Defendant?
2        A.  No reason.
3             MS. JACK:  I'll pass this witness.
4             MR. HEISKELL:  No questions.  No questions,
5  Judge.
6             THE COURT:  May the witness be excused?
7             MS. JACK:  Yes, Your Honor.  We'd ask that
8  he be finally released.
9             THE COURT:  Thank you.  You may be excused.
10            (Witness excused.)
11            THE COURT:  Any objection to recessing for
12  lunch?
13            MS. JACK:  No, Your Honor.
14            MR. HEISKELL:  No, Your Honor.
15            THE COURT:  Recess for lunch.  Be back at
16  1:15.
17            (Recess taken from 11:41 a.m. to 1:14 p.m.)
18            (Jury not present.)
19            THE COURT:  State ready to proceed?
20            MS. JACK:  State is ready, Your Honor.
21            THE COURT:  Defense ready?
22            MR. HEISKELL:  Yes.
23            THE COURT:  Defendant here.  Jury ready?
24  Please bring in the Jury.
25            (Jury present.)

94

1             THE COURT:  Thank you.  Be seated.
2             MS. JACK:  We call Mark Porter, Your Honor.
3             THE COURT:  Please raise your right hand.
4             (Witness sworn.)
5             MS. JACK:  May I proceed, Your Honor?
6             THE COURT:  Yes, ma'am.
7                     MARK PORTER,
8        Having been first duly sworn, testified as follows:
9                  DIRECT EXAMINATION
10  BY MS. JACK:
11       Q.  Mr. Porter, would you please introduce yourself
12  to the ladies and gentlemen of the Jury.
13       A.  My name is Mark Porter.
14       Q.  And can you please tell them how you're
15  employed.
16       A.  I'm a forensic video analyst for the Tarrant
17  County District Attorney's Office.
18       Q.  So you work for the Tarrant County D.A.'s
19  Office?
20       A.  Yes, ma'am.
21       Q.  All right.  Can you tell the members of the
22  Jury your educational background that qualifies you to
23  do forensic video analysis.
24       A.  I attended courses put on through LEVA, which is
25  the Law Enforcement and Emergency Services Video

95

1  Association at the University of Indianapolis.  It
2  consisted of four courses, each one of them a week long,
3  and each one of them has a test at the end.  And it --
4  the first one was Basic Forensic Video Analysis and the
5  Law.  Excuse me.  It deals with basically how video
6  works, how your VCR gets images from a tape, and how
7  these things are used in a courtroom setting or in a
8  trial setting.
9             The second course is Intermediate Forensic
10  Video Analysis and the Law, and that entails digital
11  stuff, or excuse me, digital evidence, media like a DVR
12  which is like you see in a security video setting that
13  you see in stores when you go in there.  That's all
14  digital-based.  It's ones and zeros.
15            And in that course, what you have to do is
16  you have to learn about how a DVR functions, how the DVR
17  puts information -- it takes information from the cameras
18  and puts it on a hard drive of the machine, and what
19  software and codecs -- little magic decoder rings -- it
20  takes to play that software back if you export out that
21  video off the machine.
22            The third one is Advanced Forensic Video
23  Analysis and the Law.  And basically it's just a
24  compilation of the first two courses.  What we do is
25  we -- they assign the students a mock case.  You'll get

96

1  case, basically, evidence, video footage, and you have to
2  prepare that as if it's going to trial, and you have to
3  defend it in a moot court, which the -- basically the
4  instructors of the course will grill you like we're in a
5  courtroom setting such as this.   And in addition to
6  that, you have practical exercises, hands-on exercises
7  that you do during the entire week that you have to turn
8  in and show proficiency that you understand the
9  methodologies and things like that to actually present a
10  case in court.
11            The last is Photographic Video Comparison.
12  And that entails taking known images of something like an
13  individual or a vehicle or an object, like a patterned
14  piece of clothing, and in an image, a still image, and
15  comparing it to video footage that you may have of an
16  unknown object.  And then you have to assign or you have
17  to look for class characteristics, which, is it a white
18  truck, yes, is it a Ford truck, yes.  And then you --
19  once you catalog, write all those down, you start looking
20  for specific, which are unique characteristics; does it
21  have a dent, you know, in the back quarter panel or is
22  there damage to the windshield, and items of that nature.
23       Q.  How long have you been doing forensic video
24  analysis for the Tarrant County District Attorney's
25  office?

97

1    A.  I've been doing forensic video analysis since
2    2006.
3    Q.  Okay.  Can you tell the Jury what kind of tools
4    you have that enable you to do your analysis?
5    A.  We use a variety of tools.  We use software
6    tools which are programs that we use.  We use hardware
7    tools which is an Avid, spelled A-V-I-D.  It's a video
8    system.  It's the same system that you use in broadcast
9    television to put TV shows on the air.  They have a
10   specific set of filters or software application that's
11   used in our line of work to clarify images on video, to
12   stabilize video that's jumpy and things of that nature.
13   Q.  Have you testified as an expert before in the
14   area of forensic video analysis?
15   A.  Yes, I have.
16   Q.  On few or several occasions?
17   A.  Several occasions.
18   Q.  Have you testified as an expert in this area in
19   Tarrant County?
20   A.  Yes, ma'am.
21   Q.  Has your expertise been limited to Tarrant
22   County or have you testified -- testified outside of
23   Tarrant County as an expert in forensic video analysis?
24   A.  I have testified outside of Tarrant County as
25   an expert.

98

1    Q.  All right.  Can you tell the members of the Jury
2    the different counties where you have testified.
3    A.  I've testified in Potter County, which is
4    Amarillo which is up in the Panhandle; Lubbock County,
5    which encompasses the city of Lubbock; and Bexar County,
6    which is where San Antonio is located.
7    Q.  And as a part of or as the head of the Forensic
8    Video Analysis Unit in the District Attorney's Office, do
9    you assist or work with police agencies?
10   A.  Yes, ma'am, all -- all the time.
11   Q.  Okay.  And does that include all of the agencies
12   within Tarrant County?
13   A.  Yes.  At one point or another it -- just about
14   all of the municipalities came -- have come to me for
15   assistance.
16   Q.  Okay.  Do you also help agencies outside of
17   Tarrant County?
18   A.  Yes, ma'am.
19   Q.  Can you tell the members of the Jury what
20   agencies you've assisted outside of Tarrant County.
21   A.  I've assisted Denton County District Attorney's
22   Office, the Denton County Sheriff's Department, Flower
23   Mound and Collin County, Plano Police Department, as well
24   as Burleson and Cleburne here in Johnson County.
25   Q.  Okay.  And have you also assisted with agencies

99

1    as far north as Oklahoma?
2    A.  Yes, ma'am, I assisted the Norman Police
3    Department with an investigation in the last three weeks.
4    Q.  Okay.  Have you also been called by defense
5    attorneys to testify as an expert in the area of forensic
6    video analysis?
7    A.  Yes, ma'am, I have.
8    MS. JACK:  May I approach the witness, Your
9    Honor?
10   THE COURT:  Yes, ma'am.
11   Q.  Mr. Porter, I'm showing you what's been admitted
12   into evidence as State's Exhibit 443.  Do you recognize
13   this exhibit?
14   A.  Yes, I do.
15   Q.  How do you recognize it?
16   A.  It's -- it's a DVD disk.  It has our lab label
17   attached to the top as well as has my initials M.P. and a
18   date.
19   Q.  Okay.  Now, when you say "our label", what label
20   is that specifically?
21   A.  It's the Tarrant County Criminal District
22   Attorney's Office.
23   Q.  Okay.  So when you make a working copy or an --
24   a duplicate copy of a video that the Fort Worth Police
25   Department has obtained and you conduct video forensic

100

1    analysis, do you label it with the Tarrant County
2    District Attorney's Office label?
3    A.  Yes, I do.
4    Q.  Okay.  Are you familiar with the footage that is
5    on State's Exhibit 443?
6    A.  Yes, ma'am.
7    Q.  And, specifically, I am referring to the footage
8    from Cameras 7, 8 and 9.
9    A.  Yes, ma'am.
10   Q.  And can you tell the members of the Jury what
11   each of those, what each of the footages from those
12   cameras show?
13   A.  Camera number -- they're a little bit out of
14   order, but Camera No. 8 is a camera that's located what
15   would be on the west side of the business looking south.
16   And it's located up high and it overlooks an area that
17   it's like a drive-up window where people in -- can walk
18   up or people can drive up in cars and get merchandise
19   from the store.
20   Q.  It's a drive-through window?
21   A.  Yes, ma'am.
22   Q.  All right.  Camera 8, what does Camera 8 show?
23   A.  That was Camera 8.
24   Q.  Okay.  What does Camera 7 show?
25   A.  I'm sorry.  Camera 7 is basically an overview of

101

1  the parking lot that shows the front parking lot of the
2  business.
3      Q.  Okay.
4      A.  And -- I'm sorry.
5      Q.  What does Camera 9 show?
6      A.  Camera 9 is a camera that's located on the
7  corner of the building and looks basically parallel
8  or straight down the front of the business.  You catch
9  a little bit of the parking spaces that are at the very
10  front of the store, but it's mainly the front store, the
11  sidewalk area.
12      Q.  Okay.  Now, when you received that disk or that
13  DVD, did you prepare a shorter version of the video
14  footage of those three cameras in connection with this
15  case?
16      A.  Yes, ma'am, I did.
17      Q.  All right.  Now, can you tell the Jury how you
18  went about doing that?
19      A.  What I did is I used a software tool that I
20  have.  It's called "DVR dCoder".  I opened up the player
21  software that came from the DVR that had the camera
22  images in it, and used that software to capture the
23  images as they were playing in the player and exported
24  them out in a QuickTime movie format.
25      Q.  Okay.  Now, are there certain things that you

102

1  look at to know, for instance, the time of an event?
2      A.  Yes, ma'am.
3      Q.  What, in this case, did you look for in terms of
4  the timing of an event?
5      A.  I looked for the arrival of a Dodge Stratus or a
6  vehicle that came onto the property.
7      Q.  Okay.  Now, did you also look at an ending time?
8      A.  Yes, ma'am, I did.
9      Q.  All right.  And what event told -- what time or
10  what event signaled the end of the crime?
11      A.  The end of the event was indicated to me by some
12  reactions of patrons in the store parking lot.
13      Q.  Okay.  And what were they doing?
14      A.  They -- one patron looked towards the Budweiser
15  truck.  Another patron that was away from him at the fuel
16  pumps actually ducks down at a certain point.
17      Q.  Consistent with someone just having heard a
18  gunshot?
19      A.  Yes, ma'am.
20      Q.  Now, as a video analyst, why is the ending time
21  important?
22      A.  I need to ensure that I have the -- the entire
23  scope of the event captured so we can do our analysis on
24  it.  We don't want to leave any events off of our
25  finished product or off of our product to make sure that

103

1  we have covered everything in its totality.
2      Q.  Does it give you a point at which you can work
3  backwards then?
4      A.  Yes, ma'am, it does.
5      Q.  Okay.  Now, you had the ending time, and what
6  was the ending time according to the video where the
7  individual ducked down?
8      A.  It was on -- according to the time stamp on the
9  video, it was 6:47 a.m.
10      Q.  All right.  And you understand that the video
11  footage is actually roughly about an hour fast?
12      A.  Yes, ma'am, I do.
13      Q.  Okay.  So what time in real time would that
14  individual have ducked down?
15      A.  Can I refer to my notes?
16      Q.  Certainly.
17      A.  In real time, that would have occurred at
18  approximately 5:50 a.m.
19      Q.  All right.  So when you're working backwards
20  then, what do you look for?
21      A.  I look for a continuation of actions or items
22  that I see from that ending point.
23      Q.  Okay.  And was it your understanding that a
24  Dodge Stratus was driven throughout this crime spree?
25      A.  Yes, ma'am

104

1      Q.  Were you able to locate what appeared to be a
2  Dodge Stratus on one of the camera footages?
3      A.  Yes, ma'am.
4      Q.  Okay.  And can you tell the members of the Jury
5  where you first saw what appeared to be a Dodge Stratus?
6      A.  I first saw what appeared to be a Dodge Stratus
7  at the point where the vehicle had pulled up to the
8  drive-through window and then proceeded, after sitting at
9  the drive-through window for a short period of time,
10  proceeded through the parking lot into the different
11  camera view that had significantly better lighting
12  conditions.
13      Q.  Okay.  So you see the one camera view in the
14  drive-through; is that correct?
15      A.  Yes, ma'am.
16      Q.  Then you see a different camera footage where
17  the Dodge Stratus is captured in the parking lot of the
18  Texaco; is that right?
19      A.  That's -- that's correct.
20      Q.  What time did you first see the car in the
21  drive-up window?
22      A.  At --
23      Q.  According to the video.
24      A.  According to the video, it would be 6:29 and 7
25  seconds.

105

1    Q.  Okay.  In real time, what time did the car drive
2  up to the video?
3    A.  That would be 5:32 and 7 seconds.
4    Q.  Okay.  And what time did the car drive to or
5  towards the front of the business and in the larger area
6  of the parking lot?
7    A.  The time stamp, according to the video, it would
8  be 6:30 and 38 seconds.
9    Q.  And what time in real time was that?
10   A.  In real time, that would be 5:33 and 38 seconds.
11   Q.  Can you tell the Jury what you saw the car do?
12   A.  The car proceeded from the drive-through area
13 across the parking lot and appeared to stop in close
14 proximity to the Budweiser truck, towards the front of
15 the Budweiser truck.
16   Q.  What did the truck do -- sorry.  What did the
17 car do next?
18   A.  The car then proceeded to turn right out onto
19 the street and proceed over to the stoplight to the left
20 turn lane and sat there.  I couldn't see the traffic
21 signal, but it sat in the left turn lane for a few
22 seconds.  And the it made a U-turn and went back
23 eastbound on the street and disappeared from camera view.
24   Q.  Okay.  And the Jury has already heard the
25 confession by Mr. Soliz.  And if it indicated or if he

106

1  told the police that they made the block after seeing the
2  truck, that would be consistent, wouldn't it?
3    A.  Yes, ma'am.
4    Q.  All right.  What is the next thing that you saw?
5    A.  I observed two areas of light-colored pixels in
6  the dark or the area between the rear of the Budweiser
7  truck and the front of the store appeared to come towards
8  the camera.
9    Q.  And you're familiar with that area, are you not?
10   A.  Yes, ma'am.
11   Q.  Okay.  And the area where you see the two
12 light-colored pixels, would that be consistent with or in
13 the same location as the vacant field?
14   A.  Yes, ma'am, it would.
15   Q.  Okay.  And about what time do you see those two
16 light-colored pixels coming through the vacant field?
17   A.  Approximately 6:33.
18   Q.  Okay.  And what time in real time was that?
19   A.  That would be 5:36 a.m.
20   Q.  All right.  And what do you see the two
21 light-colored pixels do then?
22   A.  What I observed at -- what I saw the two
23 groups of light-colored pixels do, they come towards the
24 camera.  They get closer to the camera.  One group of
25 light-colored pixels will move towards the rear of the

107

1  Budweiser truck.  The other light-colored group of pixels
2  appears to move towards the top of the video, the frame,
3  as if they were moving away from the camera.
4    Q.  Okay.  And we've called them light-colored
5  pixels.  Is there such a thing -- I'm trying to think of
6  the right word, "noise" or "artifacts" --
7    A.  Yes, there --
8    Q.  -- on the video?
9    A.  Yes, there -- there are -- there are artifacts
10 that are compression artifacts in the -- present in this
11 video, yes.
12   Q.  These two light-colored pixels, are they
13 artifacts?
14   A.  No, ma'am, they are not.
15   Q.  How do you tell the difference between what is
16 an artifact and what is actually something moving or
17 something happening?
18   A.  What I do is I -- when I'm observing the video,
19 I look at the compression artifacts that tend to move
20 back and forth, in this instance in a horizontal or a
21 side-to-side motion.
22         These two light groups of pixels move in a
23 different fashion.  They move from top to bottom, and at
24 one point they kind of move in a diagonal direction as
25 well.

108

1    Q.  Okay.  So if something is an artifact or noise,
2  do they move in a different way?
3    A.  They -- you have to watch it from frame to frame
4  over time to see what the motion is of those artifacts.
5    Q.  Okay.  So could you tell whether the pixels were
6  artifacts or were, in fact, something really happening?
7    A.  I -- I could tell that there was -- there was --
8  there were objects moving within the field of view.
9    Q.  Okay.  When you see those artifacts, do they
10 come through the field?
11   A.  They come through the field towards -- or they
12 actually get closer to where the camera is located.
13   Q.  And one of the lighter pixel areas, does it go
14 towards what you know to be the dumpster area?
15   A.  Yes, ma'am, it does.
16   Q.  Does the other pixilated area go towards what
17 you know to be the telephone?
18   A.  Yes, ma'am.
19   Q.  Pay phone, not telephone.  Pay phone?
20   A.  Yes, ma'am, it does.
21   Q.  And the lighter pixel area, at some point do you
22 see an individual come from the shadows?
23   A.  In what area?
24   Q.  The dumpster area.
25   A.  Yes, ma'am, I do.

109

1    Q.  About what time do you see that?

2    A.  Approximately 6:45 a.m.

3    Q.  Okay.

4    A.  And that would be 5:48 a.m. in real time.

5    Q.  Okay.  And did you take the three camera

6    footages from 7, 8 and 9 and edit them to make one

7    shorter film for the Jury to see?

8    A.  Yes, I did.

9    Q.  And what does this edited film show?

10   A.  It basically shows the progression from when

11   the vehicle arrives onto the property, as the vehicle

12   drives through the parking lot, out into the street,

13   makes the U-turn and goes out of camera view.  And then

14   it shows the light area of pixels approaching the camera,

15   moving towards the dumpster area, towards the front of

16   the truck, as well as an individual later in time coming

17   from that dumpster area towards a vehicle located in the

18   parking lot as well as going towards the front of the

19   truck later on.

20   Q.  Okay.  And the video that you've prepared, is it

21   the exact copy of each of those clips but a shorter

22   version?

23   A.  Yes, ma'am, it is.

24   Q.  In other words, there's not 40 minutes of

25   Camera 7 followed by 40 minutes of Camera 8 followed by

110

1    40 minutes of Camera 9?

2    A.  That is correct.

3    Q.  And, Mr. Porter, can you please tell the Jury

4    from the time that the pixilated areas come through the

5    vacant field until the time that you see the individual

6    walk towards the end of the Budweiser truck, how long

7    that took.

8    A.  It took approximately 16 minute -- or excuse

9    me -- 13 minutes.

10   Q.  13 minutes he laid in wait?

11   A.  Yes, ma'am.

12         MS. JACK:  May I approach this witness, Your

13   Honor?

14         THE COURT:  Yes, ma'am.

15   Q.  Mr. Porter, I'm showing you what's been marked

16   for identification purposes as State's Exhibit 482.  Do

17   you recognize this?

18   A.  Yes, I do.

19   Q.  How do you recognize it?

20   A.  It has my handwriting on it as well as my

21   initials.

22   Q.  Okay.  And is that the video you've prepared in

23   connection with your testimony today?

24   A.  Yes, ma'am, it is.

25         MS. JACK:  Okay.  Your Honor, at this time,

111

1    the State would offer State's Exhibit 482 into evidence

2    for all purposes.

3         MR. HEISKELL:  No objection, Your Honor.

4         THE COURT:  Admitted.

5         (State's Exhibit No. 482 admitted.)

6         MS. JACK:  Okay.  May I publish it at this

7    time, Your Honor?

8         THE COURT:  Yes, ma'am.

9         MS. JACK:  May I have this witness publish

10   it, in fact?

11         THE COURT:  Yes.  Does he need to do that

12   over there?

13         MS. JACK:  He's already got the cord set up.

14         THE COURT:  Okay.  Yes.

15         THE WITNESS:  Your Honor, can I have the

16   lights dimmed a little bit, please?

17   Q.  (BY MS. JACK) And, Mr. Porter, as we're going

18   through this video, if you will stop and point out to the

19   Jury different observations that you made.

20   A.  Yes, ma'am.

21         (State's Exhibit No. 482, DVD with no audio,

22          playing simultaneously in open court.)

23   Q.  Which view is this, Mr. Porter?

24   A.  This is Camera No. 8.  This is located at the

25   drive-through window area.

112

1    Q.  Mr. Porter, if you can, go ahead and

2    fast-forward it to the starting point.

3    A.  Okay.  This is the --

4         THE WITNESS:  May I stand?

5         THE COURT:  Yes.

6    A.  Yes.  This is the car, the vehicle located in

7    the area of the drive-through window at the business.

8    Q.  Are those the gas pumps we see in the middle at

9    the top of the screen?

10   A.  Yes, ma'am, this is the fuel -- the fuel pumps,

11   the gas pumps in the front of the business.

12         MS. JACK:  If it would be easier just to

13   let it play, that will be fine.

14         THE WITNESS:  Well, it appears to be frozen.

15         (Pause in proceeding.)

16         THE WITNESS:  Let me back up.

17         The video appears not to be playing for some

18   reason.  I have a copy of this footage on my --

19         MS. JACK:  You can play it from the hard

20   drive.

21         THE WITNESS:  -- on my hard drive.

22         MS. JACK:  Is it the exact same copy?

23         THE WITNESS:  Yes, ma'am, it is.

24         MS. JACK:  Okay.

25         (Pause in proceeding.)

113

1    A.  The car will proceed to the front of the
2 business; that will switch to Camera No. 7.
3    Q.  And what do we see in the far left-hand corner
4 of the screen?
5    A.  That is the -- the cab of the tractor area of
6 the Budweiser vehicle.  The car will proceed to the
7 right-hand portion of the image and you'll see it stop.
8 You'll see the taillights in this area here.
9    Q.  How can you tell it does a U-turn?
10   A.  I observed the vehicle after it proceeds
11 forward.  You'll see the lights reflecting on the area of
12 the ground beside the building across the street.
13   Q.  Would those be the headlights?
14   A.  Yes, ma'am, the headlights.
15        It switches to Camera No. 9.  At 6:33 and
16 12 seconds by the clock indicated, you'll see two light
17 areas approach in this area.
18   Q.  Can you see them now?
19   A.  Yes, right there.  Now they're separated.  There
20 is one right there.
21   Q.  And the other one went in the direction of the
22 pay phones?
23   A.  Yes, ma'am, he proceeded behind the truck out
24 of camera view.
25   Q.  Can we still see the one individual?

114

1    A.  No, ma'am, not at this point.  At 6:33:47 you
2 will see the light area proceed towards the camera view
3 right here.
4    Q.  And did he walk in the direction of the
5 dumpsters?
6    A.  Yes, ma'am, he did.  Do you want me to
7 fast-forward to the next event?
8    Q.  Yes, please.
9        Mr. Porter, will you hold on for just a
10 moment, please.  Did you see the individual ever come out
11 from the dumpster in that entire time?
12   A.  Not up until this point.  I did not see that
13 individual come into camera view from that area.
14   Q.  Okay.
15        MR. WESTFALL:  Your Honor, the video really
16 would be the best evidence of what's seen on the video.
17 Instead of taking a shortcut and just narrating it, we'd
18 ask the video just be played, Your Honor.
19        THE COURT:  You want it played full, full
20 stop?
21        MR. WESTFALL:  Well, I mean, as opposed to
22 fast-forwarding through a part and then telling the Jury
23 what they could have seen if they had been watching the
24 video, or not seen, quite frankly.
25        MS. JACK:  Judge, I'm -- I'm happy to

115

1 publish the whole thing.  I was trying to save the Jury
2 some time.
3        THE COURT:  Publish the whole video --
4        MS. JACK:  I can do so --
5        THE COURT:  -- and then if you want to go
6 back and ask questions about the video, then you may
7 proceed along those lines.
8        MS. JACK:  That's fine.
9        Mr. Porter, will you please start at the
10 beginning.
11        THE WITNESS:  Yes, ma'am.
12        (State's Exhibit No. 482, DVD with no audio,
13        played in open court.)
14        THE WITNESS:  That's the end.
15   Q.  (BY MS. JACK)  Mr. Porter, on which camera
16 footage is it with the gas pump in?
17   A.  That would be Camera No. 7.
18   Q.  Okay.  Earlier in the film or earlier in the
19 video, could you see a police car driving by?
20   A.  Yes, I did.
21   Q.  As the police car is driving by, was that before
22 the shooting at the Texaco?
23   A.  Yes, ma'am, it was.
24   Q.  Would the police car have driven by the same
25 area where Ruben Martinez, Jose Ramos, and Mark Soliz

116

1 were?
2    A.  Yes.
3    Q.  Roughly the same time?
4    A.  Approximately, yes.
5    Q.  Okay.  Mr. Porter, did you prepare a number of
6 stills or take a number of stills from this video
7 footage?
8    A.  Yes, I did.
9    Q.  And do these stills fairly and accurately -- are
10 they actual stills from the video footage?
11   A.  Yes, ma'am, they are.
12   Q.  I'm showing you what's been marked for
13 identification purposes as State's Exhibit 483 and 484.
14 Do you recognize both of these exhibits?
15   A.  Yes, I do.
16   Q.  Okay.  And State's Exhibit 483, does it contain
17 eight stills showing the Dodge Stratus at the Texaco?
18   A.  Yes, ma'am, it does.
19   Q.  And are those exact copies or are those stills
20 from the actual footage that's already in evidence?
21   A.  Yes, ma'am, they are.
22   Q.  All right.  And State's Exhibit 483, did you
23 indicate where the Dodge Stratus was in the Still No. 1,
24 Still No. 4, Still No. 5, 6, 7 and 8?
25   A.  I can't actually see the stills.

117

1    Q.  I'm sorry.
2    A.  I indicated with an orange circle in Still
3 No. 1, Still No. 4, Still No. 5, and Still No. 8.
4    Q.  Okay.
5    A.  Excuse me.  I also -- in Still No. -- actually
6 in 6 and 7 as well.  You were blocking them.  I'm sorry.
7    Q.  I'm sorry.  Now that you can see them?
8    A.  Yes, ma'am.
9    Q.  Did you indicate where the Dodge Stratus was in
10 each of these pictures?
11   A.  Yes, ma'am, I did.
12   Q.  Now, State's Exhibit 484, does it contain 12
13 stills taken from the footage that indicate where the two
14 lighter-colored pixilated areas are coming through the
15 field?
16   A.  Yes, it does.
17   Q.  And that's 1, Still No. 1.  Still No. 2, does it
18 indicate where the pixels separate?
19   A.  Yes.
20   Q.  And Still No. 3, is it a couple of frames after
21 Still No. 2?
22   A.  Yes, ma'am.
23   Q.  Okay.  And Still No. 4, is it a couple of frames
24 after Still No. 3?  In other words, these are in
25 succession; is that correct?

118

1    A.  That is correct.
2    Q.  And have you indicated by an arrow on Still
3 No. 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, and 12, when you see
4 the pixilated area and when you see the individuals, did
5 you mark those with an orange arrow?
6    A.  I did.
7    Q.  And did you indicate the second pixilated area
8 in Still No. 1 and Still No. 12 with a green arrow?
9    A.  Yes, I did.
10   Q.  Okay.  Now, with regard to Stills No. 1 through
11 4 on State's Exhibit 484, did you apply what's called a
12 filter?
13   A.  Yes, ma'am.
14   Q.  All right.  And is this type of filter something
15 that's accepted within the scientific community of
16 forensic video analysis?
17   A.  Yes, ma'am, it is.
18   Q.  Okay.  What does this filter do?
19   A.  This filter is a -- excuse me -- it's called
20 Color-Safe Curves.  It is a filter from Ocean Systems,
21 which is a software provider that produces the plug-ins
22 or the software that I use on my Avid video system.  What
23 I did with this Curve filter, I basically made the darks
24 or the darker areas of the images just a little bit
25 darker, I adjusted those down, and the lighter areas I

119

1 brought those up.  So I made the darks a little darker
2 and the lights a little bit lighter.
3    Q.  Okay.  So, for instance, if we were to turn off
4 the lights in this courtroom, would it be like you moved
5 the furniture around or would it be like you just turned
6 the lights on?
7    A.  No, ma'am.  I just -- didn't -- that's all I
8 did is I clarified the image.  I came in and turned
9 the lights on so you could see the details more
10 easily.
11   Q.  Okay.  And is this type of process something
12 that is accepted within the scientific community, the
13 community of forensic video analysis?
14   A.  Yes, ma'am, it is.
15   Q.  Whether we're talking about the FBI, whether
16 we're talking about the Tarrant County District
17 Attorney's Office?
18   A.  Yes, ma'am.
19   Q.  Okay.  And are there a number of types of
20 filters?
21   A.  Yes, there are quite a few.
22   Q.  Much more complicated, much more sophisticated?
23   A.  Yes, ma'am.
24   Q.  Okay.  So this is a basic filter?
25   A.  Yes, ma'am, it is.

120

1    MS. JACK:  Okay.  With that understanding,
2 Your Honor, the State would offer State's Exhibit 483 and
3 484 into evidence for all purposes.
4    MR. WESTFALL:  May I have just a moment to
5 look at them, Your Honor?
6    (Pause in proceeding.)
7    MR. WESTFALL:  No objection.
8    THE COURT:  Admitted.
9    (State's Exhibit Nos. 483 and 484 admitted.)
10   MS. JACK:  May I have this witness step
11 down, Your Honor, while I publish it?
12   THE COURT:  Yes, you may.
13   MS. JACK:  May I use the easel?
14   THE COURT:  Yes.
15   Q.  (BY MS. JACK)  I'm going to ask you to stand over
16 there at the end of our table.
17   Mr. Porter, if you would, can you please
18 tell the Jury what's depicted and what you noted or
19 notated on each of these stills in State's Exhibit 483.
20 And begin, if you can, begin at the first one.
21   A.  Okay.  In the first image, what I did is I
22 applied a circle, an orange circle around the vehicle as
23 it's driving into or up to the drive-through area of the
24 business.
25   No. 2 is from Camera No. 7.  It shows the

121

1 top and the front portion of the vehicle as it proceeds
2 from the drive-through area and through the parking lot
3 area.
4        Still No. 3 is a continuation of this.  It
5 shows the car basically in its entirety from front to
6 back.
7        Still No. 4 -- if anyone can't see, please
8 tell me.  Still No. 4 shows the vehicle at the --
9 basically at the road at the edge of the parking lot,
10 stopped beside the Budweiser truck.
11        Still No. 5 shows the vehicle as it's turned
12 out onto the street proceeding up towards the left turn
13 signal, the stoplight.
14        Still No. 6, the rear of the vehicle, the
15 rear taillights can be observed just past the post where
16 the gas pump is.  I annotated that with an orange circle
17 and a line and a annotation that says "rear of vehicle".
18        No. 7 is showing where the car has proceeded
19 through and made a U-turn, proceeding back the opposite
20 direction.  I annototed -- or excuse me, I annotated the
21 headlight pattern that you can see reflected on the
22 ground; the headlights of the vehicle, which are just
23 visible by the post, and the taillights of the vehicle
24 that are visible between the edge of the image and the
25 post where the gas pumps are located.

122

1        Still No. 8 is basically a profile shot.  I
2 annotated it with an orange circle that shows the vehicle
3 traveling back the opposite direction.
4        Q.  In each of these eight stills, does it indicate
5 the time as is recorded on the video?
6        A.  Yes, ma'am.  The time stamp can be observed in
7 the lower left corner of each image.
8        Q.  Okay.  Can you please tell me the time of the
9 very first still.
10        A.  06:29 and 6 seconds.
11        Q.  And in real time, that would have been what?
12        A.  Approximately --
13        Q.  A little after --
14        A.  -- 5:33, yes, ma'am.
15        Q.  Okay.  Mr. Porter, if you can do the same with
16 State's Exhibit 484.
17        A.  Okay.  In Image No. 1, it's dated -- excuse
18 me -- time stamp is 06:33 and 16 seconds.  I annotated
19 the two light areas of pixels that I observed at the top
20 area of the image.  One is annotated with an orange arrow;
21 one is annotated with a green arrow.
22        Q.  Go ahead.  Talk about each of the stills,
23 please.
24        A.  No. 2, one area of pixels has gone out of the
25 camera view and proceeded back towards or back behind the

123

1 Budweiser truck.  I annotated one area that's still
2 visible at the top of the image with an orange arrow at
3 6:33 and 18 seconds.
4        Still No. 3 is basically a continuation to
5 show the progression of travel of that light-colored
6 pixel area from the middle ground, approximately halfway
7 between the Budweiser -- end of the Budweiser truck and
8 the side of the business.  It shows the light pixel area
9 traveling approximately halfway in between to closer
10 towards the edge of the business or the dumpster area.
11        No. 4 is a continuation of No. 3 to show
12 the direction of travel of that same area.
13        Still No. 5 is 06:45:23 to show there are
14 no areas -- I don't -- I didn't observe any light areas
15 of pixels in this area at all at this time.
16        Q.  And why is that important?
17        A.  To show that no -- I didn't observe any other
18 pixels going into or traveling out of that area.
19        Q.  Okay.  And is that what also confirms the fact
20 that Still No. 1, 2, 3, and 4 are not artifacts but are,
21 in fact, real things happening in the video?
22        A.  Yes.  It isn't a pixel.  It's an object moving.
23        Q.  An object.  Thank you.  All right.  You can go
24 ahead.
25        A.  No. 6, at 06:45 and 24 seconds shows an

124

1 individual coming from the dumpster area where the
2 light-colored areas were observed traveling into.  They
3 are traveling away or coming out from the dumpster area
4 towards the Budweiser truck.
5        No. 7 is at 06:45:26.  The person is still
6 traveling towards the end of the Budweiser truck in the
7 two-toned pickup.
8        Still No. 8, at 06:45:27 shows this
9 individual turning around and going -- traveling back
10 towards the dumpster area as a patron exits the front of
11 the business with an item in his hand; appears to be a
12 bag of ice.
13        No. 9 is a continuation that shows the
14 patron a little bit further out of the -- of the front of
15 the business in the door, and shows this individual still
16 traveling back towards the dumpster area.
17        Still No. 10, at 06:46:20 depicts an
18 individual coming back out of the dumpster area behind
19 the Budweiser employee traveling towards the back of the
20 Budweiser truck.
21        No. 11 is a continuation of that.  It shows
22 the individual still traveling towards the Budweiser
23 truck behind the employee as he is walking towards the
24 front door of the business.
25        Q.  Okay.  I want to stop you for just a moment.  In

125

1  Still No. 11, the individual that's seen behind what this
2  Jury now knows to be Arnoldo Dominguez, is that
3  individual, the attire that he has on, is that consistent
4  with wearing a white T-shirt?
5      A.  Yes, ma'am, it's light-colored upper clothing.
6      Q.  Okay.  Consistent with wearing blue jeans?
7      A.  Yes, ma'am.
8      Q.  Consistent with wearing white tennis shoes?
9      A.  Yes, ma'am, white shoes.
10     Q.  White shoes.  And that may be more visible in
11  Still No. 7 right here where my finger is; is that
12  correct?
13     A.  Yes, ma'am.  You can see his footwear.
14     Q.  And State's Exhibit No. 6 as well?
15     A.  Yes, ma'am.
16     Q.  Okay.  Can you tell the members of the Jury then
17  what's depicted in Still No. 12 on State's Exhibit 484.
18     A.  Still No. 12 at 06:47 and 2 seconds depicts two
19  light areas of pixels moving from the rear area of the
20  Budweiser truck up towards the top of the image of the
21  frame away from where the camera is situated.
22     Q.  Consistent with running away from the Texaco?
23     A.  Yes, ma'am.
24     Q.  Is that correct?
25     A.  Yes.

126

1      Q.  All right.  So with an ending time of 6:47 and a
2  beginning time of 6:33 -- I'm sorry, 6:29 on the other,
3  all told, how long did this crime take?
4      A.  Approximately 17 minutes.
5          MS. JACK:  You can take your seat.  Thank
6  you.
7          I'll pass this witness for
8  cross-examination.
9          MR. WESTFALL:  No questions, Your Honor.
10         THE COURT:  May the witness be excused?
11         MS. JACK:  Yes, Your Honor.  We'd ask that
12  he be finally released.
13         THE COURT:  Thank you.  You may be excused.
14         THE WITNESS:  Your Honor, can I disconnect
15  my equipment?
16         THE COURT:  Yes.
17         THE WITNESS:  It will take me just a couple
18  of minutes.
19         THE COURT:  We're going to take a short,
20  15-minute recess while you do that.
21         THE WITNESS:  Thank you.
22         (Witness excused.)
23         (Recess taken from 2:12 to 2:33 p.m.)
24         THE COURT:  You may be seated.  State ready
25  to proceed?

127

1          MR. STRAHAN:  Yes, sir.
2          THE COURT:  Defense ready?
3          MR. HEISKELL:  Yes, Your Honor.
4          THE COURT:  Defendant here.  Is the Jury
5  ready?
6          THE BAILIFF:  Yes, sir.
7          THE COURT:  You may bring in the Jury.
8          (Jury present.)
9          THE COURT:  You may be seated.
10         MR. STRAHAN:  State would call Corrections
11  Officer Jose Arriola.
12         THE COURT:  Please raise your right hand.
13         (Witness sworn.)
14         THE COURT:  Please have a seat.
15         THE WITNESS:  Yes, sir.
16                JOSE ARRIOLA,
17     Having been first duly sworn, testified as follows:
18              DIRECT EXAMINATION
19  BY MR. STRAHAN:
20     Q.  Would you state your name, please, and spell it
21  for the Court Reporter.
22     A.  Jose Arriola, J-O-S-E, A-R-R-I-O-L-A.
23     Q.  And how are you employed?
24     A.  I work at the Johnson County correctional
25  facility.

128

1      Q.  What do you do there?
2      A.  I'm the corporal over the -- the back of the
3  jail, sir.
4      Q.  Back of the jail?
5      A.  Yes, sir.  I'm a supervisor over the back of the
6  jail.
7      Q.  Okay.  And as a corporal and a supervisor, how
8  many other corrections officers do you supervise?
9      A.  Mostly 30.
10     Q.  About 30?
11     A.  Yes, sir.
12     Q.  And how long have you worked in that capacity?
13     A.  Over two years, sir.
14     Q.  Okay.  And where did you get your training to be
15  a corrections officer?
16     A.  Through the Johnson County facility.
17     Q.  Can you explain to us what you actually have to
18  do to become a corrections officer?
19     A.  Well, basically you're there to make sure
20  that -- safety of all the inmates, make sure nothing --
21  no problems are started.  It's the very best, you know,
22  communication.
23     Q.  Okay.  What I'm getting at is like a police
24  officer goes through the police academy.
25     A.  Correct.

STATE VS. MARK ANTHONY SOLIZ  MARCH 13, 2012

129

1    Q.  Right.  And I'm just curious, what specific type
2  of training do you have once you get hired on by, say,
3  Johnson County jail?
4    A.  I went through a basic training through T.C.C.,
5  Tarrant County Community, where I got my jailer's
6  license.  It's a school with a three-week program.
7    Q.  Okay.  And so you go -- you went to T.C.C. and
8  it was about a three-week program.
9    A.  Yes, sir.
10    Q.  And they teach you, I guess, what you need to
11  know?
12    A.  Basic training.
13    Q.  Basic, okay.  And the rest of it, do you learn
14  on the job?
15    A.  Yes, sir.
16    Q.  Does Johnson County, the jail, have any rules
17  about how old you have to be before you can be a jailer?
18    A.  No, sir.
19    Q.  No.  Okay.  So if somebody were --
20    A.  Oh, 18, you have to be 18.
21    Q.  18, okay.
22    A.  Yes, sir.
23    Q.  So somebody as young as 18 with a three-week
24  course at T.C.C. would be qualified and could
25  potentially be hired on by a jail; is that --

130

1    A.  Correct.
2    Q.  Okay.  And then you learn, I guess, a lot as you
3  go?
4    A.  Hands-on experience.
5    Q.  Okay.  And so you've been there a couple years
6  now?
7    A.  Yes, sir.
8    Q.  Okay.  What specific part of the -- you said the
9  back of the jail.  What does that mean, where you work?
10    A.  Mainly all the posts, all the pods, all the
11  tanks.
12    Q.  Okay.  And what would be in the front of the
13  jail then?
14    A.  Booking areas, when they come in.
15    Q.  All right.  So booking areas handle new inmates
16  as they're coming in, correct?
17    A.  Correct.
18    Q.  And then what you generally stay is in the back
19  where everybody is already booked in and being housed in
20  different places?
21    A.  Yes, sir.
22    Q.  Okay.  Do you do any work in the Ad-Seg area of
23  your jail?
24    A.  Yes, sir.
25    Q.  Okay.  And in your work in Ad-Seg, have you come

131

1  into contact with an inmate by the name of Mark Anthony
2  Soliz?
3    A.  Yes, sir.
4    Q.  And in your time -- we've talked to other
5  jailers, so I'm not going to waste a lot of your time,
6  but in your time there, have you had difficulties with
7  him as an inmate?
8    A.  Yes, sir.
9    Q.  Specifically, have you had issues with him
10  flooding his cell?
11    A.  Yes, sir.
12    Q.  And would that be on more than one occasion?
13    A.  Yes, sir.
14    Q.  Okay.  Let's talk specifically about an occasion
15  on July 10th of 2011.  Do you recall an issue that arose
16  where Mr. Soliz was flooding his cell and you had to deal
17  with that situation?
18    A.  Yes, sir.
19    Q.  Can you tell us just briefly what was going on
20  that day and how this kind of started.
21      THE COURT:  Can you either scoot forward and
22  speak into the microphone or speak up a little bit.
23      THE WITNESS:  Yes, sir.
24    A.  It was a normal day.  He was very calm that day,
25  no problems going on.  Then we had a problem with the

132

1  phone.  The phone had broke, and he wasn't getting to use
2  the phone very well.  And he had broke the phone earlier
3  before that.
4    Q.  Okay.  Let me stop you right there.  How does
5  the phone work?  I mean, where is it located?
6    A.  We bring it up to their door and we remove the
7  food slot.  We open the food slot.  They're allowed to
8  come down, type in their code which they can communicate
9  whoever they call.
10    Q.  Okay.  And so had he been able to use the phone
11  prior to this?
12    A.  Yes, he had his opportunity to use the phone.
13  It was not working.
14    Q.  Okay.  And how do you -- does this phone, kind
15  of like a hotel, make only local calls or how does that
16  work?
17    A.  Yes.  You have to be set up to get collect
18  calls.  They have to put money on their books.  And if he
19  runs out of money, then he -- he can't make any phone
20  calls.
21    Q.  Okay.  And to this point had he been making
22  phone calls?
23    A.  Yes, sir.
24    Q.  Okay.  Would that be on few or many occasions?
25    A.  Many occasions.

133

1    Q.  Okay.  And the other inmates could also make
2 phone calls, but you had to bring the phone to them?
3    A.  Yes, sir.
4    Q.  And you said, before I cut you off, you said
5 that he had broken the phone earlier in the day?
6    A.  Correct.  Yeah.
7    Q.  How had he done that?
8    A.  He had ripped off the part of the volume at the
9 very top.  It was like a pay phone.  He had ripped off
10 the top where you press to turn up the volume and stuff
11 like that.
12    Q.  Okay.  And so did you take the phone back up
13 there for him to use again?
14    A.  No, sir.
15    Q.  Okay.  And is that kind of the source of where
16 this problem stemmed?
17    A.  Yes, sir.
18    Q.  Okay.  How did you know that something else
19 besides the phone being broken was going on?  How did you
20 become alerted that there was a more serious problem?
21    A.  Whenever water started rushing off the top tier
22 over and down to the bottom tier.
23    Q.  Okay.  And you have had more than one incident
24 with this specific inmate about flooding the cell; is
25 that correct?

134

1    A.  Yes, sir.
2    Q.  What kind of problem does it cause for you and
3 also inmates that are housed near there when someone
4 floods their cell?
5    A.  Water starts rushing to every cell, you know,
6 you're having to get new bedding, new everything.  It
7 stops all inmate movement.  It could impede with count if
8 they're around count time, or having to stop, you know,
9 turn off all the water.  It's a process.  You've got to
10 find the keys, make your way up through several doors to
11 get to the water valve, shut off switches.
12    Q.  Okay.  And so it also, I guess, would mean
13 certain of the corrections officers are going to have to
14 deal right up front with that problem; is that --
15    A.  Yes, sir.
16    Q.  -- fair to say?
17    A.  Yes, sir.
18    Q.  And somebody else is going to have to go and
19 turn the water off.  Does it turn the water off to the
20 entire jail or that portion of the jail?
21    A.  Just that portion.
22    Q.  Okay.  But somebody's got to go somewhere and
23 turn that water off?
24    A.  Yes, sir.
25    Q.  Okay.  So would it affect all of the inmates in

135

1 that area?
2    A.  Yes, sir.
3    Q.  And it would also affect all the guards in that
4 area that are having to do something?
5    A.  Yes, sir.
6    Q.  All right.  Now, in this particular incident,
7 we're talking about July 10th, 2011.  Was there a video
8 made of that incident to show what was going on?.
9    A.  Yes, sir.
10    Q.  And have you watched that video?
11    A.  Yes, sir, I have.
12        MR. STRAHAN:  Okay.  Let me -- may I
13 approach?
14        THE COURT:  Yes, sir.
15    Q.  This is a short video, by the way.  I'm going to
16 show you what's been marked as State's 485.  Would you
17 tell me if you've seen that before?
18    A.  Yes, sir.
19    Q.  Okay.  And is this a true and correct copy of
20 the video of the incident that we're talking about from
21 July 10th, 2011?
22    A.  Yes, sir.
23        MR. STRAHAN:  Okay.  At this time, Your
24 Honor, I would offer State's Exhibit 485.
25        MR. HEISKELL:  No objection, Your Honor.

136

1        THE COURT:  Admitted.
2        (State's Exhibit No. 485 admitted.)
3        MR. STRAHAN:  May I publish this to the
4 Jury?
5        THE COURT:  Yes, sir.
6        (State's Exhibit No. 485, DVD with audio,
7        played in open court.)
8    Q.  (BY MR. STRAHAN)  Now, all that was because he
9 couldn't use a phone that he had broken the same day; is
10 that correct?
11    A.  Correct.
12    Q.  And whenever you confronted him with it -- well,
13 first of all, you can see the water flowing out of his
14 clogged-up toilet, can you not, in that video?
15    A.  Yes, sir.
16    Q.  How deep was the water in his cell?
17    A.  I would say a couple inches.
18    Q.  Okay.  And when confronted with that, he's on
19 video, you asked him what, if he's going to stop, are you
20 done?  And did he reply he didn't do that?
21    A.  Yes, he did.
22        MR. STRAHAN:  Okay.  I'll pass the witness.
23        CROSS-EXAMINATION
24 BY MR. HEISKELL:
25    Q.  Is it Corporal Arriola?

137

1    A.  Yes, sir.

2    Q.  Corporal, my name is Mike Heiskell.  I have some

3  questions for you.

4    A.  Yes, sir.

5    Q.  Let's start out on this day of July the 10th.

6  And you said earlier in your testimony that he had

7  allegedly broken this phone earlier that day; is that

8  correct?

9    A.  Yes, sir.

10    Q.  And what time -- I think we saw on your watch;

11  what time was this with the flooding of the cell?

12    A.  The cell was 22:47.

13    Q.  And what time is that?

14    A.  10:47.

15    Q.  All right.  And what time was the allegation that

16  he allegedly broke the phone?

17    A.  It was about an hour before that.

18    Q.  An hour before that?

19    A.  Yes, sir.

20    Q.  And he, in fact, told you and I guess the rest

21  of the COs that he did not break that phone; isn't that

22  true?

23    A.  Yes, sir.

24    Q.  Y'all have hearings in the jail, do you not?

25    A.  Yes, sir.

138

1    Q.  And these hearings are to afford the inmate some

2  level, if you will, of trying to determine whether an

3  allegation is true or not true, and the finding conducted

4  by a hearing officer; is that true?

5    A.  Yes, sir.

6    Q.  And when things of this magnitude happen, for

7  instance, the alleged breaking of the phone, the inmate

8  is afforded an opportunity to plead guilty or not guilty;

9  is that right?

10    A.  Yes, sir.

11    Q.  And if they plead guilty, obviously they'll be

12  found guilty; is that right?

13    A.  Yes, sir.

14    Q.  Sometimes they plead not guilty, then after the

15  hearing they are found guilty; isn't that true?

16    A.  Yes, sir.

17    Q.  And in this instance, you know that Mark Soliz

18  pled not guilty to damaging the phone, didn't you?

19    A.  Yes, sir.

20    Q.  And he was found not guilty of that by your

21  officers, wasn't he?

22    A.  Okay.  Yes, sir.

23    Q.  And so the allegation you said he broke the

24  phone, you and -- well, the hearing officers within the

25  jail had the hearing on that issue, he said he didn't do

139

1  the -- that because the phone was already broken when it

2  came to him, and he was found not guilty of that; isn't

3  that true?

4    A.  Yes, sir.

5    Q.  So based upon your own findings within the

6  Johnson County jail, he's not guilty of that and you know

7  the allegation of him doing that upset him, didn't it?

8    A.  Yes, sir.

9    Q.  And when he tried to tell you, "Hey, I didn't do

10  it, it was already broken by the time it got to me",

11  isn't that what he told you-all?

12    A.  Yes, sir, but he also presented me with one of

13  the pieces of it.

14    Q.  And, in fact, the piece he said that came off

15  the phone when he was trying to use the phone; isn't that

16  true?

17    A.  Yes, sir.

18    Q.  And when y'all had this hearing that was held

19  about a week later on the 17th, all of that was presented

20  to the hearing officer, was it not?

21    A.  I was not in that hearing, sir.

22    Q.  And by the way, do you ever participate in those

23  hearings, Officer, Corporal?

24    A.  Yes, sir.  Yes, sir.

25    Q.  And so y'all try to be as fair as possible to

140

1  the inmate, I take it; is that right?

2    A.  Yes, sir.

3    Q.  And so the people who are selected to be hearing

4  officers, if you will, try to be as fair as -- as

5  possible as they can, as far as you know; isn't that

6  true?

7    A.  Yes, sir.

8    Q.  And when evidence is presented, testimony is

9  presented, they can fall either way, guilty or not

10  guilty.  And in this instance, Mark was found not guilty

11  of destroying that phone; is that right?

12    A.  Yes, sir.

13    Q.  Now, obviously, when he's accused of that within

14  the jail, phone privileges are pretty important to

15  inmates, are they not?

16    A.  Yes, sir.

17    Q.  And as well as receiving letters, things of that

18  nature, communication with the outside world, so to

19  speak?

20    A.  Yes, sir.

21    Q.  If they need to or want to hear from friends,

22  family, what have you, attorneys even, then that phone is

23  the conduit, that's the mechanism of communication to the

24  outside world; isn't that true?

25    A.  Yes, sir.

141

1     Q.  And when these inmates don't have access to the
2   phone, don't get the phone, it can be an upsetting thing
3   to them; isn't that a fair statement?
4     A.  Yes, sir.
5     Q.  Can make them frustrated and angry; is that
6   right?
7     A.  Yes, sir.
8     Q.  And especially if they've been accused of
9   something they didn't do from the standpoint of even
10  having a hearing in which you found they didn't do it;
11  isn't that true?
12     A.  I didn't find that they didn't do it.
13     Q.  Well, it was found by the hearing.
14     A.  Correct.
15     Q.  You indicated that there was at least one other
16  occasion, I believe you said, and correct me if I'm
17  mistaken, of which Soliz had flooded his cell; is that
18  right, Corporal?
19     A.  Yes, sir.
20     Q.  And I believe you saw one of those yesterday or
21  whenever it was as far as the O.C. spray, the pepper
22  spray being used; is that right?  Well, you weren't
23  here.  Y'all use pepper spray from time to time?
24     A.  Yes, sir.
25     Q.  But pepper spray was not utilized in this

142

1   instance, was it?
2     A.  No, sir.
3     Q.  And it was not necessary to do that because he
4   was compliant -- became compliant with you and your
5   officers once this situation was discovered, taped, and
6   then remedied.  You didn't have to use the pepper spray;
7   is that right?
8     A.  No, we did not.
9         MR. HEISKELL:  Thank you.  That's all.
10        REDIRECT EXAMINATION
11  BY MR. STRAHAN:
12     Q.  You actually had to have trustees come and clean
13  this mess up; is that correct?
14     A.  Correct.
15     Q.  So it's not like he got a mop and did it
16  himself?
17     A.  Correct.
18     Q.  Okay.  And that hearing was had, what, seven
19  days later?
20     A.  Yes, sir.
21     Q.  And at the time that all this went on, he had
22  handed you a broken piece of that very phone?
23     A.  Correct.  And I took pictures of it.
24     Q.  And you took pictures of it?
25     A.  Myself.

143

1     Q.  And so for all you knew at that particular time,
2   he had broken the phone?
3     A.  Correct.
4     Q.  Okay.  And so later on -- by the way, did
5   anybody ever fess up to having broken that particular
6   phone?
7     A.  No, sir.
8     Q.  Is that one of those unsolved mysteries in the
9   jail that we'll just never know about?
10     A.  Yes, sir.
11     Q.  Okay.  But the phone was broken nonetheless, and
12  he handed you a piece?
13     A.  Yes, sir.
14     Q.  Do you think that gives him the right to flood
15  that entire area, including all the way down onto the
16  second floor?
17     A.  No, sir.
18         MR. STRAHAN:  I'll pass the witness.
19        MR. HEISKELL:  Nothing further, Judge.
20        THE COURT:  May the witness be excused?
21        MR. STRAHAN:  Yes, sir.
22        MR. HEISKELL:  Yes.
23        THE COURT:  Thank you.  You may be excused.
24     (Witness excused.)
25        MR. STRAHAN:  Call Laurie Gunter.

144

1        THE COURT:  Please raise your right hand.
2     (Witness sworn.)
3        THE COURT:  Yes, sir.
4         LAURIE GUNTER,
5   Having been first duly sworn, testified as follows:
6        DIRECT EXAMINATION
7   BY MR. STRAHAN:
8     Q.  Would you state your name, please.
9     A.  Laurie Gunter.
10     Q.  And you're going to have to lean in a little and
11  speak into that microphone for us, please.
12     A.  Laurie Gunter.
13     Q.  Thank you.  And how do you spell your last name?
14     A.  G-U-N-T-E-R.
15     Q.  And how are you employed?
16     A.  With LaSalle Southwest Corrections at the jail.
17     Q.  What do you do there?
18     A.  Classifications officer.
19     Q.  Okay.  And, well, tell us specifically, what
20  does a classifications officer do?
21     A.  Based on criminal history and current history, I
22  determine where they're housed based on their
23  classification level.
24     Q.  Okay.  So you're one of the people that decides
25  whether somebody goes to like a minimum-security type pod

145

1 or all the way to Ad-Seg; is that correct?
2    A. Yes, sir.
3    Q. Okay. And how long have you been doing that?
4    A. Four-and-a-half years.
5    Q. Okay. And what kind of -- have you worked in
6 jails before this?
7    A. No.
8    Q. Okay. And so in your four-and-a-half years,
9 it's all been with Johnson County, which is run by
10 LaSalle?
11    A. Yes, sir.
12    Q. Okay. What kind of training did you get in
13 order to be -- to become in this job that you have?
14    A. I went to jailer's school.
15    Q. Tell me about jailer's school. Where did you go
16 to school?
17    A. In Tarrant County at the training academy.
18    Q. Okay. And how long was your academy?
19    A. 90 hours.
20    Q. 90 hours?
21    A. I think.
22    Q. Okay. And is that over several weeks or --
23    A. Yes.
24    Q. Okay. And so you get trained, and did you
25 have your job with Johnson County before you got

146

1 trained or do you go to the school and then try to get
2 a job somewhere?
3    A. I was temporarily at the jail on a temporary
4 jailer's license and then went to school.
5    Q. Okay. So you were working and going to school
6 at the same time?
7    A. Yes.
8    Q. Okay. And so how much training, before you
9 stepped into that jail, how much training had you
10 actually had on the inside of the jail?
11    A. 40 hours OJT.
12    Q. What is OJT?
13    A. On-the-job training with a -- a training
14 supervisor.
15    Q. Okay. And so you just follow this training
16 supervisor, see what that person does for 40 hours?
17    A. Yes. I shadowed them.
18    Q. Okay. And so do you do that over several days
19 or a month or a week?
20    A. It was for several weeks.
21    Q. Okay. And so you're basically following someone
22 and learning on the job and then also going to school?
23    A. Yes.
24    Q. Just curious; do you learn more on the job or do
25 you learn more in the classes?

147

1    A. On the job.
2    Q. Okay. And whenever you work inside the jail, is
3 there a part of the jail that you as a female officer are
4 not allowed to go or not?
5    A. No, sir.
6    Q. Okay. Do you go to where the men are housed?
7    A. Yes, sir.
8    Q. Do you also go where the females are housed?
9    A. Yes, sir.
10    Q. Do you go into Ad-Seg?
11    A. Yes, sir.
12    Q. Okay. And do males go into the female side of
13 the jail, male officers?
14    A. Not typically.
15    Q. Okay.
16    A. They're not stationed there.
17    Q. Okay. But you will find yourself going to all
18 parts of the jail; is that right?
19    A. Yes, sir.
20    Q. Okay. Have you had an occasion to deal with Mark
21 Anthony Soliz?
22    A. Yes, sir.
23    Q. Would that be on few or many occasions?
24    A. Few.
25    Q. Okay. Do you recall specifically one time where

148

1 you had a problem with him?
2    A. Yes, sir.
3    Q. Can you tell us, was this in October of 2011?
4    A. Yes, sir.
5    Q. Can you tell us what happened? What was the
6 situation?
7    A. He was to be dressed out in a paper gown to go
8 to a medical exam with the doctor. And while we were
9 putting the restraints on him for his paper gown, he
10 pinched my hand up against the bean chute door.
11    Q. Okay. Now, tell us how do you actually put --
12 if you're going to take somebody from Ad-Seg out of their
13 cell, how do you go about putting their hand restraints
14 on them or wrist restraints?
15    A. Their hands are placed in front of him through
16 the bean chute door, which is a square hole in the door,
17 and I physically put the handcuffs on him while his hands
18 are outside the door.
19    Q. Okay.
20    A. And tighten them down and lock them.
21    Q. Okay. And do you get specific -- it seems like
22 maybe, you know, to the outside world not a big deal to
23 put some handcuffs on someone, but do you get specific
24 training and experience doing that?
25    A. Yes, sir.

149

1    Q.  And there's a certain way that you have to do
2  that, correct?
3    A.  Yes, sir.
4    Q.  Is it a problem, No. 1, if the handcuffs are not
5  double locked?
6    A.  Yes, sir.
7    Q.  Is it a problem if they're too loose or too
8  tight?
9    A.  Yes, sir.
10    Q.  And is it also a problem if you've got one hand
11  cuffed and you lose control of the other hand?
12    A.  Yes, sir.
13    Q.  Or either hand at that point?
14    A.  Yes, sir.
15    Q.  Okay.  And so you have to be careful?
16    A.  Yes, sir.
17    Q.  Okay.  And so a person who you're going to take
18  out of Ad-Seg would put their hands behind them and
19  through the bean chute; is that correct?
20    A.  Yes, sir.
21    Q.  And are you trained to only lock their hands
22  behind their back coming out of that cell or those cells?
23    A.  Yes, sir.
24    Q.  Okay.  On this particular occasion, you were
25  just taking Mr. Soliz to some medical-type appointment;

150

1  is that correct?
2    A.  Yes, sir.
3    Q.  Okay.  And did you have an issue while cuffing
4  him; you said that he pinched you?
5    A.  Well, I was tightening the handcuffs down for a
6  double lock.  He pulled his hands back through, which
7  pulled my hand up against the door and pinched it up
8  against the door.
9    Q.  Okay.  And was it kind of trapped against the
10  door?
11    A.  Yes, sir.
12    Q.  Okay.  And forgive this, but how -- how big are
13  you?
14    A.  5 feet.
15    Q.  5 feet.  Okay.  And so would he be a lot
16  physically stronger than you?
17    A.  Yes, sir.
18    Q.  And so your hand is trapped against the door.
19  Is it causing you any pain?
20    A.  Yes, sir.
21    Q.  Okay.  And so you're stuck?
22    A.  Yes, sir.
23    Q.  Did you say anything to Mr. Soliz about that?
24    A.  Yes, sir.  I told him he had my hand and he
25  needed to let go.

151

1    Q.  Okay.  Did he immediately let go?
2    A.  No, sir.
3    Q.  Okay.  How long do you think that he held you
4  there like that?
5    A.  For several seconds.  And I asked him again, and
6  he still would not let go.
7    Q.  Okay.  And did you have someone there that could
8  help you if this situation didn't --
9    A.  Corporal Kinnard was not right up against me but
10  he was close.
11    Q.  Okay.  And so did you continue to talk to
12  Mr. Soliz while your hand was being pinned against the
13  bean chute?
14    A.  Yes.
15    Q.  Okay.  And did he say anything to you?
16    A.  He said that I -- that the cuffs were tight,
17  were tight enough and I wasn't going to tighten them down
18  any more.
19    Q.  Okay.  And what did you say to him?
20    A.  And I said we were going to follow procedure and
21  he was going to let go of my hand.
22    Q.  Okay.  And so did it appear to you that this was
23  intentional then?
24    A.  Yes, sir.
25    Q.  Okay.  And he knew he was hurting you after you

152

1  said that?
2    A.  Yes, sir.
3    Q.  And he continued to do that?
4    A.  Yes, sir.
5    Q.  Okay.  And about how long did the whole
6  incident, you think, take before it was resolved?
7    A.  Maybe a minute, minute and a half.
8    Q.  Okay.  And how was it finally resolved?
9    A.  He finally loosened his hold and we
10  double-locked the handcuffs, and then we finished putting
11  the shackles on and took him to his visit.
12         MR. STRAHAN:  I'll pass the witness.
13              CROSS-EXAMINATION
14  BY MR. HEISKELL:
15    Q.  Ms. Gunter?
16    A.  Sir.
17    Q.  My name is Mike Heiskell.  I have some
18  questions.  You are very soft spoken, so we're going to
19  ask if you could speak up a little louder, please.  And
20  if I ask you something you don't understand, I'll try to
21  start over.
22         You said that you were dressing him out --
23  or, I'm sorry, he was being dressed out for medical
24  reasons; is that correct?
25    A.  Yes, sir.

153

1    Q. And this Ad-Seg area is an area where a lot --
2    well, the jail itself, when you get around inmates, it's
3    a lot of noise; isn't that true? People hollering and
4    screaming and so forth; isn't that right?
5    A. Sometimes.
6    Q. And you went to have his -- put his hands
7    through the bean chute. And as the Prosecutor
8    demonstrated from his seat, I believe what we talked
9    about doing is that you call the inmate to back up to the
10    bean chute and put his hands back --
11    A. Yes, sir.
12    Q. -- is that right? I'm sorry?
13    A. Yes, sir.
14    Q. And when he does that, he -- Mark Soliz complied
15    and backed his hands up; isn't that true?
16    A. Yes, sir.
17    Q. And was that the first time you had done that
18    that day or you had done it earlier to him?
19    A. That was the first time I had done it that day.
20    Q. I'm sorry?
21    A. That was the first time I had done it today --
22    or that day.
23    Q. And in doing so, he did comply initially by
24    backing up and putting his hands through the -- through
25    the bean chute?

154

1    A. Yes, sir.
2    Q. And you proceeded to clamp down on the -- on the
3    handcuffs, is that right, to put the handcuffs on him?
4    A. Yes, sir.
5    Q. And at that point, you're saying you were
6    following procedures to double-lock the handcuffs?
7    A. Yes, sir.
8    Q. And as the Prosecutor said, sometimes it can be
9    too loose and sometimes it can be too tight; isn't that
10    true?
11    A. Yes, sir.
12    Q. And if the handcuff is tight on an inmate, then
13    certainly that can cause pain to that inmate, can't it?
14    A. Yes, sir.
15    Q. And you've seen that before, have you not?
16    A. No, sir.
17    Q. You've never seen that before?
18    A. I've never put handcuffs on too tight, sir.
19    Q. Okay. Well, in this instance, when you put them
20    on, he kind of flinched to a point where, as you said, he
21    pulled back and which pulled your hand toward the door or
22    the bean chute; is that right?
23    A. Yes, sir.
24    Q. Okay. And I believe you said at that point you
25    asked him to pull back or something, words to --

155

1    A. To release his hold.
2    Q. To release. To release.
3    A. Uh-huh.
4    Q. And, now, this is a metal door?
5    A. Yes, sir.
6    Q. Is that right? The only slot that's open is
7    down at the bean chute; is that right?
8    A. Yes, sir.
9    Q. The glass at the top that you can look into the
10    cell to actually see; is that right?
11    A. Yes, sir.
12    Q. And with a person with a soft-spoken voice where
13    there may be some noise, screaming going on, you may have
14    to say things more than once to an inmate in order for
15    that inmate to hear you clearly about what you're
16    requesting; isn't that true?
17    A. It's possible.
18    Q. All right. And at some point when -- after he
19    had pulled back and flinched from the tightening of the
20    cuffs, when you asked him, eventually he kind of released
21    or whatever, pulling back so you can finish your job;
22    isn't that true?
23    A. After repeated, yes.
24    Q. I'm sorry? I couldn't hear you.
25    A. After repeated asked, yes.

156

1    Q. Okay. And, now, were any type of administrative
2    action taken against Mark Soliz for this? Was he written
3    up, a disciplinary action hearing and so forth?
4    A. I did write a report, sir. I don't recall
5    anything about disciplinary.
6    Q. In fact, you know from your own records that
7    none was filed. You know that, right?
8    A. I don't know, sir. I don't recall.
9    Q. Were any photographs taken of the pinched area
10    of your hand or wrist or --
11    A. No, sir.
12    Q. -- anything like that? Ma'am?
13    A. No, sir.
14    Q. And but after this happened, Mark Soliz complied
15    with your request. You were able to get him out and take
16    him to his medical to continue -- so you could continue
17    on with your duties; is that right, ma'am?
18    A. Yes, sir.
19    Q. No other problems with him?
20    A. No, sir.
21    MR. HEISKELL: Okay. That's all.
22    REDIRECT EXAMINATION
23    BY MR. STRAHAN:
24    Q. If he answered you and said the cuffs were not
25    going to get any tighter, is that a pretty good idea that

157

1   he heard you?
2       A.  He heard me clearly.
3       Q.  Absolutely.  He hurt you anyway, didn't he?
4       A.  Yes, he did.
5       Q.  And he continued to hurt you, even when you
6   asked him to stop?
7       A.  Yes, he did.
8           MR. STRAHAN:  I'll pass the witness.
9               RECROSS-EXAMINATION
10  BY MR. HEISKELL:
11      Q.  Did you -- you said, well, you said he continued
12  to hurt you.  You went to medical?  Did you go to
13  medical?
14      A.  No, sir.
15          MR. HEISKELL:  That's all, Judge.
16          MR. STRAHAN:  No further questions, Judge.
17          THE COURT:  May the witness be excused?
18          MR. STRAHAN:  Yes, sir.
19          THE COURT:  Thank you.  You may be excused.
20          (Witness excused.)
21          MR. STRAHAN:  State would call Ronnie
22  McCowan.
23          THE COURT:  Raise your right hand.
24          (Witness sworn.)
25          THE COURT:  Thank you.  Have a seat.

158

1               RONNIE MCCOWAN,
2       Having been first duly sworn, testified as follows:
3               DIRECT EXAMINATION
4   BY MR. STRAHAN:
5       Q.  Would you state your name, please.
6       A.  Ronnie McCowan.
7       Q.  And how are you employed?
8       A.  I am a Corporal at the Johnson County jail.  I
9   work for LaSalle Southwest Corrections.
10      Q.  And how long have you done that?
11      A.  At this facility?
12      Q.  Yes, sir.
13      A.  Approximately two years, two-and-a-half.
14      Q.  Okay.  And did you work somewhere prior to that?
15      A.  Texas Department of Criminal Justice.
16      Q.  And where did you work?
17      A.  I worked Ellis One.  I've worked Diagnostic
18  Unit, which is now the Byrd Unit.  I opened up the
19  Hutchins State Jail in Hutchins, Texas; that's near
20  Dallas.  I've worked at various units.
21      Q.  Okay.  So you've worked in the prison and in the
22  State Jails which are all by T.D.C.J.; is that correct?
23      A.  Yes, sir.
24      Q.  And then also have you worked in other jails
25  besides Johnson County?

159

1       A.  No, sir.
2       Q.  Okay.  And you've been here, you said, two
3   years?
4       A.  Two plus years, yes, sir.
5       Q.  Two plus years.  Okay.
6       A.  Not quite three.
7       Q.  Okay.  And what are your job duties on a
8   day-to-day basis out at the jail?
9       A.  Well, as a corporal, I -- my responsibility is
10  the back of the jail.  I make sure everyone is doing
11  their paperwork.  And I go in, and including segregation,
12  I sign the folders, making sure that everyone is getting
13  their yard out, getting rec -- getting fed, you know,
14  just making sure everything is done properly for the
15  Segregation inmates.
16      Q.  Okay.  And so you spend a lot of your time with
17  the Segregation inmates; is that correct?
18      A.  Yes, sir.
19      Q.  Okay.  And in your time in the Segregation Unit,
20  have you come into contact with Mark Anthony Soliz?
21      A.  Yes.
22      Q.  And would that be on few or many occasions?
23      A.  Many occasions.
24      Q.  Okay.  And have you had any issues with him,
25  number one, causing damage or flooding his cell?

160

1       A.  Yes, sir.
2       Q.  Okay.  And has he had issues on few or many
3   occasions that you're aware of?
4       A.  Few occasions that I'm aware of.  I witnessed
5   one such occasion.
6       Q.  Okay.  And was that on April 24th, 2011?
7       A.  Yes, sir.
8       Q.  Okay.  Can you tell the Jury what was going on
9   prior to the problem that you had?
10      A.  Well, I -- this was when I was still a
11  corrections officer.  I was -- I wasn't a corporal then
12  at this incident.  I was just working Blue West, which is
13  our segregation area in the jail.  It's a single cell, one
14  inmate per cell.  They have a shower, toilet, sink in
15  there, so it's pretty -- everything is self-contained.
16  There's a food slot which we pass them the food, the
17  trays, and we give drinks and everything.
18          And on this particular instance, I was
19  passing out juice before a meal was being served, and I
20  had given Mark Soliz his juice and he asked me for more
21  than what I could give everyone.  So I have to give
22  everyone the same.  And he became upset because I
23  wouldn't give him more than what I was able to give to
24  another inmate.
25      Q.  How could you tell that he became upset?

161

1    A. Well, he flooded his cell. He became very
2  upset. He took his clothes and put them underneath the
3  door and stopped up the drain in the cell. Which when he
4  stopped up the toilet, it caused it to overflow, and
5  there was a quite amount of water in his cell. And when
6  he pulled the pants and the shirt away from underneath
7  the door, he forced all the water underneath the door
8  which created a flood that went outside the day room door
9  and down the hall. It was -- it was quite an extensive
10  cleanup.
11    Q. Okay. And so that kind of causes a problem for
12  other inmates as well as the other corrections officers?
13    A. Yes, sir.
14    Q. Okay. And on this particular day, whenever you
15  discovered he was doing this, did you go in there and try
16  to take him out of his cell and clean up his cell?
17    A. Yes, sir, we -- we tried, yes, sir.
18    Q. And what happened when you tried?
19    A. Well, we had -- we had to -- we were -- he sat
20  on his bunk and he grabbed the -- with one hand he
21  grabbed the front of the bunk, which is all metal, flat
22  metal. It's probably maybe an eighth of an inch thick.
23  So, I mean, it's a pretty heavy bunk. But he grabbed
24  hold of the front part and the back part of the bunk and
25  just braced himself in there and would not be allowed to

162

1  be handcuffed.
2        I managed to get one of his hands free and
3  get it handcuffed and put it behind his back, but the
4  other officers couldn't get the other hand free in order
5  for us to handcuff him from behind.
6    Q. Okay. And were you attempting to handcuff him
7  behind his back?
8    A. Behind his back. And just all we were going to
9  do is just take him to another cell.
10    Q. So you were just going to take him to a cell,
11  out of his cell that he had already flooded on his own?
12    A. Yes, sir, because the toilet was stopped up;
13  therefore, until we got it unstopped, he couldn't or
14  another inmate couldn't be in that cell.
15    Q. So did he agree to allow you to handcuff him
16  behind so that you could get him out of the cell he
17  flooded?
18    A. No, sir, he -- he refused.
19    Q. Okay, and you said you got one handcuff on one
20  of his arms; is that correct?
21    A. Yes, yes, sir.
22    Q. How many officers were in there trying to
23  handcuff this one inmate?
24    A. I believe there was myself, Officer Jesse
25  Turner, and Lieutenant Noel Boutwell. So there was --

163

1  and Mr. Turner, Officer Turner, he's a very large man,
2  very tall man; so was Lieutenant Boutwell. He's taller
3  than I am.
4    Q. Okay. So there were three of you working to get
5  Mr. Soliz, just his arms behind his back so that you
6  could cuff him to take him out of his cell that he had
7  flooded?
8    A. Yes, sir.
9    Q. Okay. Did you ever get his hands cuffed behind
10  his back?
11    A. No, sir.
12    Q. Okay. Were they just cuffed ultimately in
13  front?
14    A. Yes, sir.
15    Q. Okay. And whenever you have to do this sort of
16  a incident with inmates, are -- somebody hold a hand-held
17  video so that you can do that?
18    A. Yes, sir.
19        MR. STRAHAN: Okay. Approach, Your Honor?
20    Q. Do you recall if there was a video made of this
21  incident? Okay. Is that a yes?
22    A. Yes, sir.
23    Q. And that was from 4/24/2011, correct?
24    A. Yes, sir.
25    Q. And does the video fairly and accurately depict

164

1  exactly what happened?
2    A. Yes, sir.
3        MR. STRAHAN: Okay. At this time, I'll
4  offer 486.
5        MR. HEISKELL: No objection, Your Honor.
6        THE COURT: Admitted.
7        (State's Exhibit No. 486 admitted.)
8    Q. (BY MR. STRAHAN) Now, let me ask you something.
9  Do they -- is there some law that makes you give inmates
10  in Ad-Seg a mattress?
11    A. Yes, sir.
12    Q. Do you have to give them a pillow and a blanket?
13    A. Yes, sir.
14    Q. So they -- go ahead, I'm sorry.
15    A. Well, not pillows, but they do -- they are given
16  blankets and bedding.
17    Q. Okay. So what happens if an inmate destroys his
18  own mattress? Do you have to give him another one?
19    A. Eventually, yes, sir, within a proper amount of
20  time.
21    Q. Okay. And just what kind of amount of time
22  would that be?
23    A. A few minutes or a few hours, depending on
24  what's going on in the jail. The mattresses are kept in
25  a different location in the jail; just however long a

165

1  time it would take.

2      Q.  So as soon as reasonably practical, you have to

3  get an inmate another mattress after he just destroyed

4  his own?

5      A.  Yes, sir.

6      Q.  And what if he destroyed two?  Would you have to

7  give him two?  Do they have to have a mattress?

8      A.  I would say yes, sir, he would have to have one,

9  but I never had anybody ever destroy two in a row or --

10     Q.  On the same day?

11     A.  On the same day.

12     Q.  Okay.

13         (State's Exhibit No. 486, DVD with audio,

14          played in open court.)

15     Q.  Now, is it against your policy in Ad-Seg to

16  leave an Ad-Seg inmate out with their hands in front of

17  them?

18     A.  Yes, sir.  Under those circumstances, he should

19  have been handcuffed behind his back.

20     Q.  Okay.  Were y'all standing in a puddle when you

21  were dealing with him?

22     A.  Yes, sir, approximately 2 inches of water.

23     Q.  And I'm guessing that Jesse Turner was the one

24  that ended up kind of on the left.  You described him as

25  a big, big man?

166

1      A.  He -- yes, sir.

2      Q.  Okay.  And so there were three of you trying to

3  get the cuffs on Mr. Soliz who was barefoot and in his

4  boxers; is that correct?

5      A.  Yes, sir.

6      Q.  And, in fact, you never got his hands cuffed

7  behind his back?

8      A.  No, sir.

9      Q.  Okay.  And in -- he said he wasn't going to have

10  his hands cuffed behind his back; is that right?

11     A.  Yes, sir.

12     Q.  And is it, generally speaking, a good rule to

13  let the inmate dictate how these things are going to go?

14     A.  No, sir.

15     Q.  Okay.  Can you explain?  Just, I mean, you were

16  not the person in charge, correct --

17     A.  No, sir.

18     Q.  -- in this situation?  Can you explain why he

19  was allowed to come out with his hands cuffed in front of

20  him just like he had wanted?

21     A.  Well, it was Lieutenant Noel Boutwell's decision

22  to allow Mr. Soliz to come out of his cell with the

23  handcuffs in the front, just to get him -- it was more of

24  a -- just to get him moved, just -- and that's pretty

25  much his rationale.

167

1      Q.  Okay.  And you're a corporal now; is that

2  correct?

3      A.  Yes, sir.

4      Q.  Do you just -- and I'm not trying to say

5  anything about Mr. Boutwell, but do you, the way you're

6  trained and the way you operate now, do you think that

7  that was a good idea?

8      A.  That would -- that would not happen, not with --

9  not with me.

10     Q.  Okay.  Does it become a problem if the inmate

11  starts to dictate how the guards operate?

12     A.  Yes, sir.

13     Q.  Okay.

14     A.  We're not in the business of negotiation.

15     Q.  Okay.  And all this was because he didn't get an

16  extra juice?

17     A.  Yes, sir.  He get -- to get more than what

18  he's -- what other inmates are given, the same amount.

19         MR. STRAHAN:  Okay.  I'll pass the witness.

20             CROSS-EXAMINATION

21  BY MR. HEISKELL:

22     Q.  Corporal McCowan, my name is Mike Heiskell.  If

23  I ask you something, don't hesitate to stop me and make

24  it clear.  Okay.  And also you need to speak up audibly

25  so the Court Reporter can take it down.

168

1         You worked at T.D.C.J. for a number of

2  years; is that correct, sir?

3      A.  Yes, sir.

4      Q.  And you've seen situations where -- flooded

5  cells before?

6      A.  Yes, sir.

7      Q.  That's a common occurrence, isn't it?

8      A.  Um, I would say it occurs frequently in

9  predominantly the Segregation areas of most prison units.

10     Q.  And when that happens, I guess you go through

11  some of the same protocol, try to go in to get the inmate

12  out so that cell can be cleaned by either other inmates

13  who are trustees or perhaps some other staff; is that

14  correct?

15     A.  Yes, sir.

16     Q.  And y'all have trustees here at the Johnson

17  County jail as well?

18     A.  Yes, sir, we do.

19     Q.  Okay.  And the fact -- from the standpoint of

20  the mattress, I believe the Prosecutor made some

21  statement about a mattress being flooded or being somehow

22  destroyed or damage done, I guess is a better word, in a

23  flooded cell; do you remember that?

24     A.  Yes, sir, I remember.

25     Q.  And are those mattresses on the floor or are

169

1 they raised mattresses?

2    A. Well, there's -- what you were seeing where

3 Mr. Soliz was sitting down, he was holding the -- he was

4 sitting on his mattress but he was holding the metal

5 mattress where the -- I mean, where the bunk is to brace

6 himself so, um...

7    Q. I'm just asking where the mattress was.

8    A. Well, the blue, the blue part you saw in the

9 video --

10    Q. Yes.

11    A. -- that's the mattress cover.  Inside the

12 mattress cover is the mattress.

13    Q. Is the mattress.  And how far off the ground,

14 the floor, is the mattress?

15    A. I would say approximately 12 to 18 inches, give

16 or take.

17    Q. So there was not a damaged mattress in this case

18 because you said it was a couple inches; is that right?

19    A. 12 to 18 inches off the floor.

20    Q. And those are the same heights of mattresses, I

21 guess, in all Ad-Seg cells, is that correct, the same

22 height from the floor?

23    A. Approximately, yes, sir.

24    Q. Now, Corporal, all this is over him not getting

25 the juice, some extra juice?

170

1    A. Extra juice, yes, sir.

2    Q. Do you have kids?

3    A. No, sir.

4    Q. Are you familiar with child-like behavior, kids

5 who may throw temper tantrums?

6    A. Yes, sir.

7    Q. When they don't get something that mama or daddy

8 didn't give them or whatever, they hold their breath,

9 they do something, they stomp and they throw a tantrum;

10 is that right?

11    A. Yes, sir.

12    Q. And that, you know, from young kids who have a

13 feeble mind and they throw these types of tantrums, it's

14 to not only get attention but also to try to demand in

15 their own particular manner what they want; is that

16 right?

17    A. Yes, sir.

18    Q. And you -- I guess you've seen it or know of

19 that to happen with children before?

20    A. So I've heard, yes, yes, sir.

21    Q. As a matter of fact, we've heard in the video,

22 "All I want is I want some juice.  All I want is some

23 juice."  Remember toward the end of that video?

24    A. Yes, sir.

25    Q. And then there was, again, making reference to

171

1 the juice he didn't get from whenever you were pouring it

2 a little while earlier; is that right?

3    A. He had been given juice before he flooded his

4 cell.  Everyone, everyone in Blue West received juice.

5    Q. And at the end of that, I believe I also heard a

6 statement to the effect of, before he was lifted up and

7 left, is that, "Hey, that's all you have to say to me,"

8 and then he complied.  Do you remember that, sir?

9    A. Yes, sir.

10    Q. And that was something that he said in response

11 to either you or Lieutenant Boutwell or CO Turner saying

12 something to him; is that correct?

13    A. Yes, sir.

14    Q. And once those words were stated, then he said,

15 "Well, that's all you have to say," and he got up and

16 walked out with you-all; is that right?

17    A. Yes, sir.

18    Q. Like a kid would do maybe once he hears

19 something; is that right?

20    A. You could say that.

21        MR. HEISKELL:  Pass the witness.

22            REDIRECT EXAMINATION

23 BY MR. STRAHAN:

24    Q. It's also like a convict, a seasoned convict

25 would do too, isn't it?

172

1    A. Yes, sir.

2    Q. Do whatever they have to do to manipulate guards

3 and get their way?

4    A. Yes, sir.

5    Q. Okay.  Are you aware that this Defendant has

6 been convicted of capital murder now?

7    A. Yes, sir, I have.

8    Q. Okay.  Do you think that security is a concern

9 for this particular inmate?

10    A. Yes, sir, I do.

11    Q. Okay.  Do you recall an incident that occurred

12 on February 28th, 2012 back in the jail regarding the

13 blue box?

14    A. Yes, sir, I do.

15    Q. Can you describe to us what the blue box and the

16 handcuff things are.

17    A. Okay.  Everyone knows what a pair of handcuffs

18 looks like, but in our line of work, there is a special

19 box that secures the handcuffs where they can't be turned

20 or twisted, and it create -- it makes it where it's very

21 difficult for the person who is wearing them to be able

22 to -- I'm sorry -- manipulate the locking mechanism

23 within the handcuffs.

24        And Mr. Soliz came in back from court on

25 February 28th.  We were -- we were in the C-1 infirmary

173

1 area, which is the back door to the jail, and we were in
2 this enclosed caged environment by the back door. And
3 this is where we -- our staff members, the LaSalle
4 corrections officers, we pass on Mr. Soliz to the
5 deputies. And the deputies bring Mr. Soliz back. And
6 then we carry him, once he's inside the jail, back to
7 Blue West where we keep our segregation inmates.
8         When he came back on this day, he -- I
9 noticed -- I looked down and I noticed that the blue box,
10 there is a metal bracket that fits over it to make it
11 secure, and then there is a brass ring that fits through
12 the hole. There's two holes; one in the bracket and one
13 in the box. So when you put them together, you can put
14 the brass ring through and you can feed the chains
15 through it in order to secure his waist to his handcuffs
16 and blue box with his leg irons. So everything is
17 attached.
18         MR. STRAHAN: May I approach, Your Honor?
19         THE COURT: Yes, sir.
20 Q. I'm going to show you what's been marked as
21 State's No. 487 and State's No. 488. Can you tell me
22 what those are?
23 A. These are two pictures; one is a blue box and a
24 pair of handcuffs, and the second one is -- it looks like
25 it's -- it's the same thing.

174

1 Q. With the chain?
2 A. With the chain, um, with a piece missing, if I'm
3 looking at this correctly. Yes.
4 Q. Okay. Do these fairly and accurately represent
5 the blue box and the belly chain that would go around the
6 waist of this Defendant upon his return to the jail?
7 A. Yes, sir.
8         MR. STRAHAN: Okay. I'll offer 487, 488.
9         MR. HEISKELL: No objection to 487 and 488,
10 Your Honor.
11         THE COURT: Admitted.
12         (State's Exhibit Nos. 487 and 488 admitted.)
13 Q. (BY MR. STRAHAN) Okay. I'm putting State's
14 Exhibit 487 up on the screen. Now, can you tell us
15 again -- or you were explaining what parts go into what.
16 Is this the blue box?
17 A. Yes, sir.
18 Q. Okay. Tell us about that. How does that work
19 then?
20 A. Okay. Inside this box, there is a pair of
21 regular handcuffs that -- that probably everyone has seen
22 someone being arrested on TV or wherever, but that's just
23 a plain pair of handcuffs. The blue box fits over the
24 handcuffs which covers the key hole and the -- most of
25 the locking mechanisms where it cannot be manipulated

175

1 when properly applied. And this is the metal bracket
2 that would go over, that you can see how it's been made
3 to fit this metal bracket in order to secure it.
4 Q. Okay. So this whole box, the idea is to
5 basically secure the chain in between the two sets of
6 cuffs; is that correct?
7 A. Yes, sir, and --
8 Q. And the end of the cuffs as well?
9 A. Yes, sir, and to prevent tampering with the
10 locking mechanisms.
11 Q. And on the 28th day of February, which I'll
12 represent to you is the second day of evidence in this
13 trial, 2012, did you have a problem with Mr. Soliz and
14 that box?
15 A. Yes, sir, I did.
16 Q. Can you explain to us what you saw, what
17 happened?
18 A. Well, he came back, and I saw that the -- that
19 the metal bracket wasn't properly inserted over the blue
20 box and -- but the brass ring was fitted through the blue
21 box. And the way that it was applied, I notified
22 Lieutenant David Boggess of this.
23         And he reached over to look at Mr. Soliz's
24 setup, which is what we call it, the blue box and the
25 handcuffs and the belly chain and the leg irons, and

176

1 he pulled the bracket out, and Mr. Soliz was able to
2 free himself from the -- from the blue box and was able
3 to -- he was still connected, but he was free where he
4 could possibly have injured someone if he wanted to be
5 violent.
6 Q. Let me ask you something. This slot here, we've
7 talked about it, but I don't think I was real clear.
8 This fits into this slot; is that correct?
9 A. Yes, sir.
10 Q. And it goes all the way up and there's a
11 matching slot there?
12 A. Yes, sir.
13 Q. That something goes in between to lock this into
14 that?
15 A. Yes, sir.
16 Q. Okay. And so you're saying that the key thing
17 was filled in there, but this thing wasn't all the way
18 pushed in?
19 A. No, sir.
20 Q. So this thing could come out at any time and the
21 whole box could come off?
22 A. Yes, sir.
23 Q. Okay. Okay. And so was any action taken at
24 that time to figure out what had happened there?
25 A. I'm sorry. I couldn't hear you.

177

1    Q.  Was any action taken at that time to figure out
2    why his box was not locked correctly?
3    A.  Well, at that time, I was ordered by the Warden
4    Janicek to re-administer the handcuffs, leg irons, check
5    everything and redo it according to the way Warden
6    Janicek wanted it done.  And then Lieutenant Boggess and
7    I, we escorted Mr. Soliz back to Blue West housing area.
8    Q.  Okay.  Did anyone inquire of Mr. Soliz what he
9    knew about this particular lock box problem?
10   A.  Yes, sir.
11   Q.  Tell us about that.
12   A.  Well, Lieutenant Boggess and I were escorting
13   him; we each had an arm, we both had our -- an open hand
14   escorting Mr. Soliz down the hallway.  And Lieutenant
15   Boggess said that -- asked him about, you know, "You know
16   what you did", you know, asking, you know, trying to get
17   him to admit to it.  And Mr. Soliz says, "Yeah, I know,
18   you know, I did it."
19   Q.  Okay.  And so that would tell you that that was
20   an intentional tampering of this device in order to free
21   himself of the lock box?
22   A.  Yes, sir.
23   Q.  While in this trial?
24   A.  Yes, sir.
25   Q.  Okay.  Do you think that's a child-like act or

178

1    do you think that's a sophisticated act of a convict?
2    A.  I think it's a very sophisticated act of a
3    convict who intended just to show that he could -- what
4    he's capable of.
5           MR. STRAHAN:  Thank you.  I'll pass the
6    witness.
7           RECROSS-EXAMINATION
8    BY MR. HEISKELL:
9    Q.  Corporal McCowan.
10   A.  Yes, sir.
11   Q.  You're saying that with a -- this man with a
12   belly chain on and blue box with -- inserted properly,
13   that he was able to get out of that like Houdini; is that
14   right?
15   A.  I'm not saying that, sir, because I wasn't with
16   Mr. Soliz the whole day.  I wasn't there when he was --
17   when the -- he's not in handcuffs or leg irons right now,
18   so someone has to administer those and take him back to
19   the jail.
20   Q.  Well, who put the blue box on him that day?
21   A.  I do not know, sir.  I was not here.  I was at
22   the jail.
23   Q.  And the blue box is a new contraption?
24   A.  No, sir, it's been around for a few years.
25   Q.  Was it -- is it new to Johnson County?

179

1    A.  I don't know.
2    Q.  You've never seen it before?
3    A.  Yes, sir, I have, in T.D.C.  That was -- I
4    started in 1991.  We've had blue boxes for many years.
5    Q.  Okay.  I'm talking about seeing it before -- I'm
6    sorry, I didn't ask that correctly -- in Johnson County.
7    A.  In Johnson County?
8    Q.  Yes, sir.
9    A.  Um, I'm sure they -- they had them, but I've
10   only seen them in the jail probably in the last two
11   years.
12   Q.  And so it's up to the jailer to make sure that
13   that thing goes in all the way in the blue box so it
14   won't come out by, you know, slipping out or whatever;
15   isn't that true?
16   A.  Well, it's kind of hard to say that it's going
17   to slip out because that bracket, there's pressure on
18   that metal bracket that you have to use a certain amount
19   of force to put it in there.
20   Q.  Right.
21   A.  That you know that it's there.
22   Q.  Well, and if the force, you hear the force and
23   it will click, there will be a clicking sound, right?
24   A.  No, sir, there won't.  It's a visual thing.  You
25   know it's in there.

180

1    Q.  When you know it's in there, it presses up
2    against another piece of metal inside; isn't that true?
3    A.  The blue box is actually made of a plastic, a
4    polymer plastic that's very -- it's very, very tough.
5    But the metal bracket is actually a metal bracket.  I
6    don't know what kind of metal but it's -- it's --
7    Q.  Okay.
8    A.  -- it's been tested.
9    Q.  It's been tested and there is at least some type
10   of acknowledgment that it's in there, a clicking sound or
11   something to indicate that it's locked in?
12   A.  Yes, sir.
13   Q.  Is that true?
14   A.  Well, the way it's designed is that metal
15   bracket will fit plumb against the blue box on all
16   three sides.
17   Q.  And how would a CO know that it's locked in?
18   A.  You just visually look at it.  You can tell that
19   it's in there, locked properly.
20   Q.  Well, are there any type of probes or anything
21   that come up or anything to indicate that it's locked in
22   other than just looking?
23   A.  Well, when you visually see it's locked in,
24   that's when you insert the brass ring and then administer
25   putting the other -- the belly chain on and adding to --

181

1    Q.  Right.
2    A.  -- the setup.
3    Q.  And if that CO does not visually look at it or
4  maybe if he visually looks at it, didn't look at it
5  appropriately or properly, then it may not be locked in;
6  isn't that true?
7    A.  But that's -- it's like -- it's hard to say that
8  because it's kind of like if you're handcuffing someone,
9  it's kind of like how do you not see that you're not
10 doing it right?  It's -- I can't explain how he came back
11 to the jail the way he was.
12   Q.  Well, you've seen instances where people are
13 handcuffed with regular cuffs --
14   A.  Uh-huh.
15   Q.  -- and the cuffs are too loose and the person
16 can slip their hand out; isn't that true?
17   A.  Yes, sir.
18   Q.  So that's a mistake on the part of the CO to do
19 that; isn't that true?
20   A.  Well, not necessarily.  The person could be
21 double-jointed, and we have no way of knowing that.  Or
22 the person may have small wrists.
23   Q.  Well, that's part of what the CO is to do, to
24 check their wrists to make sure they fit appropriately?
25   A.  But if someone is double-jointed, we're not

182

1  going to check to see if they're double-jointed.
2    Q.  So double joint -- is Mark Soliz double-jointed?
3    A.  I don't know.  I have no idea, sir.  He was
4  still in his handcuffs; just the bracket on the blue box
5  was loose and everything fits around that blue box, his
6  belly chain and everything else, that when the lieutenant
7  pulled out that -- that metal ring, it just went apart.
8    Q.  Okay.  And was it a defective blue box?
9    A.  No, sir.
10   Q.  Was it used on Mark Soliz again?
11   A.  To my knowledge, a blue box is a blue box to me,
12 sir.  I don't know how to distinguish between one or the
13 other, it's blue and they -- they bring me -- they bring
14 to me the restraints that I'm supposed to use and that's
15 what I use.
16   Q.  Well, regardless, I guess, as to whether it was
17 a mistake on the part of the CO or what have you, Soliz
18 never did attack anyone or do anything or try to escape
19 that; he even kind of laughed about it, didn't he?
20   A.  Yes, sir, he -- he -- yes, sir.
21   Q.  And, you know, you indicated, Corporal McCowan,
22 in response to the Prosecutor's questions about
23 sophisticated inmates and sophisticated convicts and
24 things of that nature.  You recall that?
25   A.  Yes, sir.

183

1    Q.  And, obviously, you know that Mark Soliz has
2  been convicted of capital murder, and you are here as
3  part of the Prosecution team to put together some
4  evidence at the Punishment Phase to show that he's a
5  danger.  Is that what you're trying to do?
6    A.  Sir, all I know is I was subpoenaed to come to
7  this courtroom to testify in this case.  That's what I
8  know.
9    Q.  Okay.  And all I'm getting at is when we look at
10 the situation with the blue box, the inference is, is
11 that somehow he was able to take this contraption, even
12 he was cuffed with a belly chain on it, to somehow
13 manipulate and take whatever portions you may take out of
14 that to have the blue box inoperable.  Is that what
15 you're telling this Jury?
16   A.  Sir, all I'm saying is, is when Mark Soliz came
17 back from court on February 28th, in C-1 infirmary in
18 that little room that's no bigger than probably this
19 witness area here, he came back, and that little metal
20 bracket was not where it was supposed to be, and that
21 when the lieutenant pulled it out, everything fell
22 apart.  That's what I'm testifying to.
23   Q.  Okay.
24   A.  I cannot speculate how it happened.
25        MR. HEISKELL:  Okay.  Well, okay.  I

184

1  appreciate that.  Thank you.
2        That's all I have, Judge.
3        FURTHER REDIRECT EXAMINATION
4  BY MR. STRAHAN:
5    Q.  And when Lieutenant Boggess asked him,
6  specifically Soliz, if he did it, he said yeah?
7    A.  Yeah.
8    Q.  He admitted he did it?
9    A.  He laughed.
10   Q.  Thought it was funny.  Okay.  And theoretically,
11 somebody, if their handcuffs are tight enough in the
12 jail, they shouldn't be able to get out of the handcuff
13 either, correct?
14   A.  Normally, no, sir.
15   Q.  Okay.  And have you seen inmates who will
16 manipulate the guards, pull -- pull their hands or even
17 maybe pin their hand against a door in order to keep
18 their handcuffs from getting any tighter?  Has that
19 happened?
20   A.  I've seen it happen, yes, sir.
21   Q.  Trying to manipulate the situation, correct?
22   A.  Yes, sir.
23   Q.  Okay.  And since we're on the subject, do you
24 think Mark Soliz is dangerous?
25   A.  Yes, sir.

185

1    Q. Very?
2    A. Uh, yes, sir.
3           MR. STRAHAN: I'll pass the witness.
4           MR. HEISKELL: Just a second, Judge.
5           (Pause in proceeding.)
6           FURTHER RECROSS-EXAMINATION
7    BY MR. HEISKELL:
8    Q. Corporal McCowan, I noticed -- the reason I
9    paused is that you paused when the Prosecutor asked that
10   question. Before, he said "Very?", you paused and gave
11   us "yes, sir." You've been in the prison system for a
12   number of years; is that right?
13   A. Yes, sir.
14   Q. And you've seen dangerous people before?
15   A. Yes, sir, I have.
16   Q. A lot more dangerous than Mark Soliz, haven't
17   you?
18   A. I'm not God, sir.
19          MR. HEISKELL: Okay. Thank you. That's
20   all.
21          FURTHER REDIRECT EXAMINATION
22   BY MR. STRAHAN:
23   Q. Do you think he's very dangerous?
24   A. Yes, sir, I do.
25   Q. Do you think he's manipulative?

186

1    A. Yes, sir, I do.
2    Q. Do you think he's crafty?
3    A. Yes, sir.
4    Q. Do you think he's sophisticated in a criminal
5    sort of way?
6    A. Yes, sir.
7           MR. STRAHAN: I pass the witness.
8           MR. HEISKELL: No further questions, Judge.
9           THE COURT: May the witness be excused?
10          MR. STRAHAN: Yes, sir. Thank you.
11          THE COURT: Thank you. You may be excused.
12          (Witness excused.)
13          MR. STRAHAN: We would call Corrections
14   Officer Pierce.
15          THE COURT: Please raise your right hand.
16          (Witness sworn.)
17          THE COURT: Thank you. Please have a seat.
18               DELBERT PIERCE,
19   Having been first duly sworn, testified as follows:
20               DIRECT EXAMINATION
21   BY MR. STRAHAN:
22   Q. Would you state your name, please.
23   A. Delbert Pierce.
24   Q. And how are you employed?
25   A. I'm a Housing Control Officer for Johnson County

187

1    jail.
2    Q. Okay. And specifically what are your job duties
3    there at the jail?
4    A. To make -- make sure the -- for the safety of
5    the inmates, do routine searches, stuff like that.
6    Q. Okay. And how long have you been employed with
7    the Johnson County --
8    A. Going on five months.
9    Q. Five months?
10   A. Yes, sir.
11   Q. Okay. And where were you employed before that?
12   A. I was a truck driver.
13   Q. Okay. Which job do you like better?
14   A. They both have their perks.
15   Q. I understand. Okay. And what kind of training
16   did you receive to make you qualified to work in the
17   jail?
18   A. They done -- we done -- we went through a
19   one-week class and then we done training with the other
20   officers that have more seniority.
21   Q. Okay. And so you have been with this particular
22   jail for -- I guess this is the only jail you've worked
23   at?
24   A. Yes, sir.
25   Q. So you've been in this line of work for about

188

1    five months?
2    A. Yes, sir.
3    Q. Okay. And are part of your duties to search
4    inmates' cells to look for contraband?
5    A. Yes, sir.
6    Q. And just, generally speaking, let's limit
7    ourselves to the minimum security areas. Do you work in
8    those areas some?
9    A. No. I mostly work C-1.
10   Q. Okay. What is C-1?
11   A. It's -- it's more of a medium/maximum security.
12   Q. And do you also sometimes work in the
13   Ad-Seg cell area?
14   A. Yes, sir.
15   Q. Okay.
16   A. Yes, sir.
17   Q. In the medium to maximum security areas, how
18   often do you actually conduct searches of cells?
19   A. We do them every three days or if the inmates
20   has been removed for any reason of his cell.
21   Q. Okay. So if an inmate were to go to the doctor
22   or to court or something like that or a visitation, you
23   might search their cell then?
24   A. Yes, sir.
25   Q. Because they wouldn't really expect it to be

189

1  searched, necessarily?

2     A.  Right.

3     Q.  Okay.  If -- do you have times where you sweep

4  and do like an entire floor at the same time?

5     A.  No, sir.  We just pretty much focus on whatever

6  cell that's available, that's open.

7     Q.  Okay.  And so I guess the idea would be so the

8  other inmates couldn't let somebody else know that

9  they're searching or something; is that right?

10    A.  Yes, sir.

11    Q.  Okay.  And have you had the -- a cause to search

12 Mark Soliz's cell?

13    A.  We just -- we just done them randomly.

14    Q.  Okay.  But have you done that on more than one

15 occasion?

16    A.  Yes, sir.

17    Q.  Did you do that on January 3rd, 2012?

18    A.  Yes, sir.

19    Q.  Okay.  And tell us, generally speaking, how do

20 you conduct a cell search?

21    A.  Once the inmate is -- is gone from the cell, we

22 basically go in and we just start going through their --

23 their belongings from top to bottom of the cell.  I mean,

24 no part in the cell is untouched.

25    Q.  What about are there crevices or hiding places

190

1  just within the cell just because of the construction?

2     A.  Some of them, there is; some of them, there is

3  not.

4     Q.  I mean, this is not one just solid block of

5  cement, is it?

6     A.  Yes, the walls are but --

7     Q.  Are there sinks?

8     A.  There is some -- there's some places where the

9  walls are placed together.  They have like a silicone gel

10 in between them that has been removed on some.

11    Q.  What about sinks and toilets and things of that

12 nature?

13    A.  There are sinks and toilets in there, yes, sir.

14    Q.  Are they also places that things can be hidden?

15    A.  Yes, sir.

16    Q.  On the January 3rd, 2012 search, did you, in

17 fact, search Mark Soliz's room in Ad-Seg?

18    A.  Yes, sir.

19    Q.  Okay.  And did you find any contraband?

20    A.  Yes, sir, we did.

21         MR. STRAHAN:  May I approach, Your Honor?

22         THE COURT:  Yes, sir.

23    Q.  I'm going to hand you what has been marked as

24 State's Exhibit 489.  And I'm going to ask you, have you

25 seen these items before?

191

1     A.  Yes, sir.

2     Q.  And were these items found by you and another

3  officer in the cell of this Defendant, Mark Anthony

4  Soliz?

5     A.  Yes, sir, they was.

6     Q.  Was this on January 3rd, 2012?

7     A.  Yes, sir, it was.

8     Q.  Okay.  What do the three items appear to be in

9  State's 489?

10    A.  One part of it is -- appears to be a portion of

11 a -- coffee cup.  The other one is a battery that they

12 use as what we call a fishing line.

13    Q.  Okay.  Is that --

14    A.  And then --

15    Q.  Go ahead.

16    A.  And then the other one is, from what I'm looking

17 at, looks like part of a boxer rim.

18    Q.  Do you know how -- with your training and

19 experience so far there in the jail, do you know how

20 these different items could be used by an inmate?  You

21 mentioned the battery.

22    A.  Yeah, the battery they use basically to

23 transport stuff around through the cells.

24    Q.  Okay.  What about the other two items?

25    A.  This item here, I mean, it could be used as any

192

1  kind of a weapon because of the sharp points.

2     Q.  Okay.  And what about the waistband?

3     A.  The waistband, it could be anything from wrapped

4  around, hold the weapon or to strangle somebody with.

5     Q.  Okay.  So would you consider that to be possibly

6  a weapon as well?

7     A.  Yes, sir.

8     Q.  And so -- okay.  And are these the correct items

9  that were found, the contraband items that were found in

10 the cell of Mark Anthony Soliz on January 3rd?

11    A.  Yes, it was.

12         MR. STRAHAN:  Okay.  At this time, Your

13 Honor, I'll offer State's 489.

14         MR. HEISKELL:  No objection, Your Honor.

15         THE COURT:  Admitted.

16         (State's Exhibit No. 489 admitted.)

17    Q.  (BY MR. STRAHAN)  Now, have you, in your

18 training and experience, seen people in the cells take

19 ordinary items like pieces of metal or toothbrushes and

20 sharpen them to make them a more dangerous weapon?

21    A.  We have.

22    Q.  Okay.  Let me show you this piece of plastic

23 that's found within there.  Does that appear to have been

24 sharpened on some cement?

25    A.  It -- it -- it appears to me that it has been

193

1    altered.
2       Q. Is that because of the smoothness right there
3    and the color change?
4       A. Yes, sir.
5       Q. Okay. Okay. Can you see on your screen what
6    I'm pointing to right there?
7       A. Yes, sir, I can.
8       Q. Is that the sharp edge of this hard piece of
9    plastic?
10      A. Yes, sir.
11      Q. Does that appear to be discolored from the rest
12   of the piece of plastic?
13      A. Yes, sir, it does.
14      Q. Does that appear to have been sharpened
15   intentionally?
16      A. It does.
17      Q. Okay. And if you turn it over, there's a sharp
18   point to it; is that correct?
19      A. Yes, sir, there is.
20      Q. Okay. And then, of course, we have the elastic
21   or the band in there and also the battery which
22   appears -- when it focuses -- to have a string wrapped
23   around it; is that correct?
24      A. Yes, sir, it does.
25      Q. And could you explain to us how that is worked

194

1    to move contraband or mail or whatever between inmate to
2    inmate in cells.
3       A. One inmate will take from one end of Seg,
4    somehow or another they'll get it under their door, but
5    they'll shoot it down the mezzanine. And another inmate
6    will throw another one out and they'll catch it, wrap
7    them together, pull it in their tank. They'll tie
8    whatever they want to tie onto it, and then the other
9    one will pull it back.
10      Q. Okay. And does that piece of plastic look like
11   the cups that you serve the inmates' drinks in?
12      A. Yes, sir.
13         MR. STRAHAN: Okay. May I publish this to
14   the Jury?
15      Q. Now, did you also go in and search Mr. Soliz's
16   cell on January 6th of 2012?
17      A. Yes, sir, we did.
18      Q. Okay. And did you also find some contraband on
19   that date?
20      A. Yes, sir. Yes, sir.
21         MR. STRAHAN: Okay. May I approach, Your
22   Honor?
23         THE COURT: Yes, sir.
24      Q. I'm going to hand you what has been marked as
25   State's Exhibit 490. Can you take a look at that and

195

1    tell us what that is?
2       A. This here is magnets that have been either taken
3    off of headphones that they're -- that they have in their
4    possession or, I mean, that's the only thing I can figure
5    it was, it came off of a set of headphones.
6       Q. And what's the other item, just generally?
7       A. The other item is a ink pen sleeve wrapped
8    with a piece of paper around it with a string tied
9    around it.
10      Q. Okay. And are these contraband items found
11   within the cell of Mark Soliz --
12      A. Yes, sir --
13      Q. -- on January 6th?
14      A. -- they are.
15      Q. Is that a yes?
16      A. Yes, sir.
17      Q. Okay. Are these things that are given out by
18   the commissary?
19      A. The headphones are. They're issued. But when
20   they're taken apart and like the magnets are crushed
21   apart, then they're considered contraband because
22   they're taken out of their origin, original state.
23      Q. Can you see if these are the same items you
24   actually found in Mark Soliz's cell?
25      A. Yes, sir.

196

1          MR. STRAHAN: Okay. At this time, Your
2    Honor, I'll offer State's 490 and its contents.
3          MR. HEISKELL: No objection, Judge.
4          THE COURT: Admitted.
5          (State's Exhibit No. 490 admitted.)
6       Q. (BY MR. STRAHAN) Now, let me ask you this.
7    Where specifically did you find these magnets?
8       A. The magnets was up under the bunk.
9       Q. Okay. Is the bunk made of metal or is it --
10      A. Yes, sir.
11      Q. -- metal parts?
12      A. Yes, sir, it's a metal bed.
13      Q. What would be the use for an inmate to put his
14   magnets up under the bunk of a bed, a metal bed?
15      A. They can attach anything, any metal object up to
16   it to where it would hold it up out of sight.
17      Q. Okay. So if there were a piece of metal,
18   magnets are already stuck to the bunk, you could put the
19   metal and it will stick?
20      A. Yes, sir.
21      Q. And where did you find this ink pen wrapped in
22   this paper sleeve with string on it?
23      A. The pen was up under the -- the toilet and the
24   sink is all made in one, and the ink pen was up
25   underneath the toilet.

197

1    Q.  Okay.  Would this item be contraband?

2    A.  Yes, sir, it would.

3    Q.  Do you think that this item, the pen, the way

4  it has been wrapped with paper and also wrapped again

5  with the string, do you think that that could be used as

6  a weapon?

7    A.  Yes, sir, it could.

8    Q.  Now, do the inmates in Ad-Seg especially have

9  any face-to-face contact with other inmates?

10    A.  Yes, sir, they do.

11    Q.  They do?

12    A.  Oh, other inmates, no, sir.  No, sir.

13    Q.  Other inmates, okay.  Do they have face-to-face

14  visits with anyone else besides guards and/or doctors or

15  nurses?

16    A.  No, sir.

17    Q.  Okay.  Does this look like a weapon to you?

18    A.  Yes, sir, it does.

19        MR. STRAHAN:  May I publish this to the

20  Jury?

21        THE COURT:  Yes, sir.

22        MR. STRAHAN:  I'll pass the witness.

23        MR. HEISKELL:  Your Honor, could I wait

24  until they've finished reviewing that before I do my

25  Cross?

198

1        THE COURT:  Okay.

2        MR. HEISKELL:  Thank you.

3        (Pause in proceeding.)

4        MR. HEISKELL:  May I proceed, Your Honor?

5        THE COURT:  Yes, sir.

6            CROSS-EXAMINATION

7  BY MR. HEISKELL:

8    Q.  Officer Pierce?

9    A.  Yes, sir.

10    Q.  My name is Mike Heiskell.  I have some questions

11  for you, sir.  You've been with the jail for five months;

12  is that correct, sir?

13    A.  Yes, sir.

14    Q.  And I want to show you again State's No. 489,

15  which is admitted, and shows this -- I think you call it

16  a fishing line that has the silver battery?

17    A.  Yes, sir.

18    Q.  And you explained to the Jury that fishing line,

19  of course, is used if a person can throw down the

20  hallway, so to speak, and get to some other inmate and

21  may tie something to it and pitch it back?

22    A.  Yes, sir.

23    Q.  Is that right?

24    A.  Yes, sir.

25    Q.  And that's a common thing used in jails all over

199

1  the country; isn't that true?

2    A.  I don't know about all over the country, but

3  I've witnessed it here.

4    Q.  Okay.  Well, okay, you've been here five months.

5  Okay.  I shouldn't maybe ask you that question.  But let

6  me look -- have you look now at this broken cup or

7  partial plastic cup.

8    A.  Okay.

9        MR. HEISKELL:  And, Judge, could I ask him

10  to step in front of the Jury real quick?

11        THE COURT:  Yes, sir.

12        MR. HEISKELL:  Could you step down, sir.

13        (Witness complied.)

14    Q.  Officer Pierce, you stated earlier in response

15  to the Prosecutor's question that this area of the cup,

16  the broken part of the cup --

17    A.  Yes, sir.

18    Q.  -- had the discoloration, which is here, is that

19  right, the brown area; is that right?

20    A.  Yes, sir.  Yes, sir.

21    Q.  Now, this is a coffee cup, is it not?

22    A.  Yes, sir.

23    Q.  And we also see in this brown area a brown stain

24  here, do we not?

25    A.  Yes, sir.

200

1    Q.  And that stain is similar to what we see here on

2  what the Prosecutor said is evidence of it being

3  sharpened; isn't that true?

4    A.  Yes, sir.

5    Q.  Let's go down here and show this Jury.  That is

6  the brown stain that we see here, and again, my finger is

7  right here pointing toward it, on this cup.  You see

8  that?

9    A.  Yes, sir.

10    Q.  The same color as what the discoloration the

11  Prosecutor said is evidence of it being sharpened by

12  someone, correct?

13    A.  Yes, sir.

14    Q.  And coffee cups hold coffee, right?

15        You can take your seat.

16        And coffee is brown or black in color,

17  isn't it?

18    A.  Yes, sir, it is.

19    Q.  And this is consistent with a coffee stain on

20  this particular piece of broken cup, is it not?

21    A.  Yes, sir.

22    Q.  Well, if you sharpen something on whatever piece

23  of metal or hard object using this plastic, then that --

24  certainly, you can see the edges here that are white --

25  it would produce a white color as opposed to a brown

201

1    color. Isn't that true, Officer Pierce?
2        A. I don't know that.
3        Q. So that opinion that you gave this Jury earlier
4    about it being sharpened, by Mark Soliz perhaps, is based
5    upon what the Prosecutor asked you, but you also see
6    that's consistent with a coffee stain?
7        A. Yes, sir.
8        Q. Now, this, which is State's No. 90 -- 490,
9    excuse me, this again is a fish -- part of a fishing
10   line; is that right? The pen, I'm sorry, the pen I'm
11   referencing earlier.
12       A. Okay.
13       Q. Is that correct, sir?
14       A. It's not part of a fishing line, no, sir.
15       Q. Well, you see that -- well, you see the string
16   attached here?
17       A. Yes, sir.
18       Q. So that could be used as a fishing line,
19   correct, this particular object with the string?
20       A. I guess it could. I don't know.
21       Q. Okay. And when you look at something like this
22   broken cup together with the -- back to 489 now -- this
23   waistband, you see that?
24       A. Yes, sir.
25       Q. What can happen is that a person can use this to

202

1    pick out a piece of this waistband to make a string out
2    of it, to pull that so that a string can be pulled from
3    here; isn't that true?
4        A. I guess it could.
5        Q. Okay. And that way, you can use this to pull
6    it out and make a string for a fishing line for
7    communication purposes with other inmates; isn't that
8    true?
9        A. Yeah.
10           MR. HEISKELL: Pass the witness.
11                  REDIRECT EXAMINATION
12   BY MR. STRAHAN:
13       Q. Do you think it's ironic that the only smooth
14   part of the broken cup that seems to be discolored is
15   right on this pointed edge? Does that make sense to
16   you?
17       A. Yes.
18       Q. Right here, the rest of that smooth, broken
19   edge doesn't have a mark on it, does it?
20       A. No, sir.
21       Q. Okay. And do you recall where this specific
22   item was found in the cell?
23       A. It was found inside of a bag of Mark Soliz's,
24   his personal property.
25       Q. Did you find the rest of the cup?

203

1        A. No, sir.
2        Q. And, again, you said this looks a lot like a
3    weapon to you; is that correct?
4        A. Yes, sir.
5        Q. And is it possible that --anything is possible,
6    I guess, with a piece of string on it to be used as a
7    fishing line; is that correct?
8        A. Yes, sir.
9        Q. Is it also possible for somebody to get stabbed
10   with this, which is State's 490?
11       A. Yes, sir.
12       Q. It was hidden, correct?
13       A. Yes, sir, it was.
14       Q. These other items were also hidden; is that
15   correct?
16       A. They was out of sight, yes, sir.
17           MR. STRAHAN: I'll pass the witness.
18           MR. HEISKELL: Nothing further, Judge.
19           THE COURT: May the witness be excused?
20           MR. STRAHAN: Yes, sir.
21           THE COURT: Thank you. You may be excused.
22       (Witness excused.)
23           MR. STRAHAN: May we approach?
24       (At the bench.)
25           MR. STRAHAN: I had one other witness for

204

1    today. He has bronchitis and actually gone to the
2    emergency room, so I think we're probably done for the
3    day, if that's okay. I had one more but...
4        (Sotto voce discussion.)
5            MR. HEISKELL: Just a second, Judge.
6            MR. STRAHAN: He's very sick, has been for
7    two days. I thought he would be here this afternoon but
8    he's not, so that's kind of where we are.
9            MR. HEISKELL: Do you think he'll be here
10   tomorrow?
11           MR. STRAHAN: I don't know. If he's still
12   sick, he won't. But in any event, we have other
13   witnesses to call. I planned on rounding the day with
14   him, but that's where I am.
15           MR. HEISKELL: Okay.
16           THE COURT: Can I tell him he has
17   bronchitis?
18           MR. STRAHAN: Well, if he's still sick,
19   he'll never show up tomorrow and I'll just leave him
20   alone.
21       (In open court.)
22           THE COURT: All right. Ladies and
23   gentlemen, we're at the end of the day for today.
24   Appreciate all the time that you've put in. And
25   scheduling our witnesses is sometimes a complicated

205

1    matter for the Court.  I'm going to excuse you for the

2    rest of the day.  Please remember all the instructions

3    that I've given you, and be back here again, ready to

4    go in the morning.

5           (Court adjourned.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  THE STATE OF TEXAS )

 2  COUNTY OF JOHNSON  )

 3              I, Pamela K. Waits, Official Court Reporter

 4  in and for the 413th District Court of Johnson County,

 5  State of Texas, do hereby certify that the above and

 6  foregoing contains a true and correct transcription of all

 7  portions of evidence and other proceedings requested in

 8  writing by counsel for the parties to be included in the

 9  volume of the Reporter's Record, in the above-styled and

10  numbered cause, all of which occurred in open court or in

11  chambers and were reported by me.

12              I further certify that this Reporter's Record

13  of the proceedings truly and correctly reflects the

14  exhibits, if any, admitted by the respective parties.

15              WITNESS MY OFFICIAL HAND this the 31 day

16  of ___December___ 2012.

17

18              _____
                Pamela K. Waits, Texas CSR #4991
19              Expiration Date:  12/31/13
                Official Court Reporter
20              413th Judicial District
                Johnson County, Texas
21              204 S. Buffalo Avenue
                Cleburne, Texas 76033
22              (817) 556-6041

23

24

25
```

REPORTER'S RECORD

VOLUME 50 OF 75 VOLUMES

TRIAL COURT CAUSE NO. F45059

COURT OF CRIMINAL APPEALS NO. AP-76,768

| | | |
|---|---|---|
| STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| VS. | ) | JOHNSON COUNTY, TEXAS |
| MARK ANTHONY SOLIZ | ) | 413TH JUDICIAL DISTRICT |

--------------------------------------------------------

JURY TRIAL

PUNISHMENT PHASE

--------------------------------------------------------

        On the 14th day of March, 2012, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable William C. Bosworth,

Jr., Judge presiding, held in Cleburne, Johnson County,

Texas:

        Proceedings reported by Machine Shorthand and

Computer-Aided Transcription.

ORIGINAL

```
 1                 A P P E A R A N C E S

 2  DALE HANNA
    SBOT NO. 08919500
 3  LARRY CHAMBLESS
    SBOT NO. 04086320
 4  MARTIN STRAHAN
    SBOT NO. 00797765
 5  District Attorney's Office
    Johnson County
 6  204 S. Buffalo
    Cleburne, Texas 76033
 7  (817) 556-6801

 8  ELIZABETH CHRISTINA JACK
    SBOT NO. 10445200
 9  Tarrant County District Attorney's Office
    401 W. Belknap Street
10  Fort Worth, Texas 76102-1913
    817-884-1366
11
    ATTORNEYS FOR THE STATE OF TEXAS
12

13  MICHAEL P. HEISKELL
    SBOT NO. 09383700
14  Johnson, Vaughn & Heiskell
    5601 Bridge Street
15  Suite 220
    Fort Worth, Texas 76112-2305
16  817-457-2999

17  GREGORY B. WESTFALL
    SBOT NO. 00788646
18  Hill Gilstrap, P.C.
    1400 W. Abram Street
19  Arlington, Texas 76013
    817-276-4931
20
    ATTORNEYS FOR DEFENDANT
21

22

23

24

25
```

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012          3

```
1                          I N D E X

2                        VOLUME 50

3                     PUNISHMENT PHASE

4   MARCH 14, 2012                          PAGE   VOL.

5   Proceeding.....................................  5      50

6   STATE'S WITNESS        DIRECT      CROSS      VOIR  VOL.
                                                   DIRE
7   RAJESH GHANDI          5                             50
    STEPHEN ROGERS         29,102,116  63,114,116        50
8
    705 Hearing...............................  118      50
9
    STATE'S WITNESS        DIRECT      CROSS      VOIR  VOL.
10                                                 DIRE
    DAVID SELF             118         125              50
11
    State Rests.............................  135      50
12
    DEFENDANT'S WITNESS    DIRECT      CROSS      VOIR  VOL.
13                                                 DIRE
    KRISHA FLORES          136,233     197,242           50
14  LETICIA HERRERA        245                           50

15  Adjournment..............................  263      50

16  Court Reporter's Certificate.................  264     50

17
                     ALPHABETICAL INDEX
18
    WITNESS                DIRECT      CROSS      VOIR  VOL.
19                                                 DIRE
    KRISHA FLORES          136,233     197,242           50
20  RAJESH GHANDI          5                             50
    LETICIA HERRERA        245                           50
21  STEPHEN ROGERS         29,102,116  63,114,116        50
    DAVID SELF             118         125              50
22

23

24

25
```

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012          4

```
 1                        EXHIBIT INDEX
     STATE'S
 2   NO.   DESCRIPTION                       OFFER ADMIT VOL.

 3   491   Model torso    (Demonstrative only)  11    11    50
     492   DVD; Dr. Ghandi (Demonstrative only) 10    10    50
 4   493   Photo (8x10)                         60    60    50
     494   Photo (8x10)                         60    60    50
 5   495   Photo (8x10)                        -60    60    50
     496   Photo (8x10)                         60    60    50
 6
     DEFENDANT'S
 7   NO.   DESCRIPTION                       OFFER ADMIT VOL.

 8   28    TDCJ Unit Classification Procedure    69    69    50
     29    TDCJ Administrative Segregation Plan  69    69    50
 9   30    TDCJ Ad-Seg Reference Chart           69    69    50
     31    TDCJ Unit Classification Procedure    69    69    50
10   32    Photo (8x10)                          89    89    50
     33    Photo (8x10)                          89    89    50
11   34    Photo (8x10)                          89    89    50
     35    Photo (8x10)                          89    89    50
12   36    Photo (8x10)                          89    89    50
     37    Photo (8x10)                          89    89    50
13   38    Photo (8x10)                          89    89    50
     39    Photo board (20x16)                  141   141    50
14   40    Photo board (20x16)                  141   141    50
     41    Photo board (36x36)                  152   153    50
15   42    Photo (8x10)                         155   155    50
     43    Photo (8x10)                         155   155    50
16   44    Photo board (36x36)                  165   165    50
     45    Photo board (36x36)                  165   165    50
17   46    Photo board (37x35)                  166   166    50
     47    Photo board (21x48)                  166   166    50
18   48    Photo board (20x16)                  173   173    50
     49    Photo board (20x16)                  173   173    50
19   50    Photo board (20x16)                  173   173    50
     51    Photo board (20x16)                  173   173    50
20   52    Photo (8x10)                         185   185    50
     53    Photo (8x10)                         185   185    50
21   54    Photo (8x10)                         185   185    50
     55    Photo (8x10)                         185   185    50
22   56    Photo (8x10)                         185   185    50
     57    Photo (8x10)                         185   185    50
23   58    Photo (8x10)                         185   185    50
     59    Photo (8x10)                         185   185    50
24   60    Photo (8x10)                         185   185    50

25
```

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

5

1                    P R O C E E D I N G
2          (Open court, Defendant present;
3          Jury not present.)
4          THE COURT:  Is the State ready to proceed?
5          MS. JACK:  State's ready, Your Honor.
6          THE COURT:  Defense ready?
7          MR. HEISKELL:  Yes, Your Honor.
8          THE COURT:  Defendant is present.  Jury
9   ready?  Please bring in the Jury.
10         (Jury present.)
11         THE COURT:  You may be seated.
12         MS. JACK:  We call Dr. Raj Gandhi, Your
13  Honor.
14         THE COURT:  Please raise your right hand.
15         (Witness sworn.)
16         THE COURT:  Thank you.  Please have a seat.
17  Okay.
18         MS. JACK:  Thank you, Your Honor.
19                    RAJESH GANDHI,
20     Having been first duly sworn, testified as follows:
21               DIRECT EXAMINATION
22  BY MS. JACK:
23    Q.  Dr. Gandhi, would you please tell the Jury your
24  name and how you're employed.
25    A.  Rajesh Gandhi.  I'm the Trauma Medical Director

7

1     A.  In this region, besides John Peter Smith,
2   there's Dallas Children's, Parkland, and Baylor.  Both --
3   all three of those are in Dallas County.
4     Q.  So John Peter Smith, as it exists right now, as
5   it existed in 2010, is somewhat the state of the art in
6   terms of Level One Trauma Centers now?
7     A.  Yes, ma'am.
8     Q.  All right.  And you're the head of the trauma
9   center now?
10    A.  Yes, ma'am.
11    Q.  Can you tell the members of the Jury your
12  educational background?
13    A.  Sure.  Went to college in Massachusetts,
14  Cambridge, Massachusetts at Massachusetts Institute of
15  Technology.  I went to medical school in Albany, New
16  York, and then did my residency in general surgery at
17  New York Medical College; after which I did a two-year
18  fellowship in adult and pediatric trauma and critical
19  care at the University of Pennsylvania in Philadelphia.
20    Q.  Can you give the Jury an idea of your
21  professional background as well.
22    A.  What I do every day basically is to take care of
23  sick people, very sick people, both in general surgery as
24  well as trauma.  So those people that most of the other
25  general surgeons wouldn't want to take care of, we take

6

1   at John Peter Smith through Texas Healthcare.
2     Q.  All right.  Can you tell the members of the Jury
3   a little bit about John Peter Smith Hospital.
4     A.  Sure.  John Peter Smith is about a 567-bed
5   hospital, county hospital in Tarrant County.  It's the
6   only Level One Trauma Center in Tarrant County.
7     Q.  What is a Level One Trauma Center?
8     A.  Level One Trauma Center basically means that
9   it's a one-stop shopping.  You go there whether you're
10  hurt, head, neck, chest, belly.  The only thing we don't
11  do is big, big, bad burns; those, we send to Parkland.
12  Parkland is the only burn center we have in this region.
13  Then the other thing we don't do is reimplantation
14  because we won't  see enough to keep us very good at it.
15  So that's the only two things that we don't do, but
16  everything else we pretty much take care of.
17    Q.  Has John Peter Smith always been a trauma one or
18  a Level One Trauma Center?
19    A.  No.  When I got to Peter Smith, which was in
20  August of 2007, it was a Level Two Trauma Center.  And I
21  was recruited to bring John Peter Smith to be a Level One
22  Trauma Center, so we did that.  In November of 2009, we
23  had our verification.
24    Q.  All right.  How many different Level One Trauma
25  Centers are there in this region?

8

1   care of them.  We also take care of, obviously, very sick
2   trauma patients.  So that's kind of what I do every day.
3   And the other part of my job is my administrative duties
4   as a Trauma Director at John Peter Smith.
5     Q.  Okay.  Can you tell the members of the Jury what
6   certifications you hold.
7     A.  I have a board certification in general surgery
8   and surgical critical care.
9     Q.  All right.  Can you tell them about your
10  academic responsibilities.
11    A.  Academically, what we do is we do quite a bit of
12  research, and so I'm involved in different research
13  around John Peter Smith and different collaborations,
14  some with Parkland, some with other institutions around
15  the area as well, as well as around the region or around
16  the state.
17    Q.  Can you give the Jury an idea of the honors that
18  you've received in terms or in connection with your
19  expertise in surgery.
20    A.  There's -- we -- I have different honors in
21  terms of being listed in Who's Who, also in terms of
22  being asked to speak and lecture at different venues
23  around the country and around the world.  So those --
24  those would be some of the honors.
25    Q.  Okay.  And you're being a little bit modest, are

9

1  you not, Dr. Gandhi?
2      A.  Yes, ma'am.
3      Q.  Okay.  You're one of the best surgeons in 2011
4  in the United States?
5      A.  Yes, ma'am.
6      Q.  Okay.  Now, you've been at John Peter Smith
7  since 2007; is that correct?
8      A.  Yes.
9      Q.  All right.  Were you one of the treating
10  physicians, one of the surgeons for Ruben Martinez?
11      A.  Yes.  I was in the Intensive Care Unit when
12  Mr. Martinez had come in.  So after he was there, I was
13  there for his last seven days.
14      Q.  All right.  And approximately how long was he at
15  John Peter Smith hospital?
16      A.  About 13 days.
17      Q.  All right.  From June the 29th until July 12th;
18  is that correct?
19      A.  Yes, ma'am.
20      Q.  All right.  And have you prepared a short
21  PowerPoint presentation that kind of gives an overview of
22  the treatment and the procedures that Mr. Martinez
23  underwent while he was in your care?
24      A.  Yes, ma'am.
25          MS. JACK:  All right.  May I approach the

10

1  witness, Your Honor?
2          THE COURT:  Yes, you may.
3      Q.  Doctor, I'm showing you what's been marked as
4  State's Exhibit 492.  And is State's Exhibit 492 a disk
5  that contains your PowerPoint presentation?
6      A.  Yes, ma'am.
7          MS. JACK:  Okay.  Your Honor, at this time,
8  the State would offer State's Exhibit 492 into evidence
9  for demonstrative purposes.
10          MR. HEISKELL:  For demonstrative purpose
11  only, Judge, we have no objection.
12          THE COURT:  Admitted.
13          (State's Exhibit No. 492 admitted for
14          demonstrative purposes only.)
15          (State's Exhibit No. 492, CD with no audio,
16          playing simultaneously in open court.)
17      Q.  (BY MS. JACK)  Dr. Gandhi, I'm going to give you
18  the remote and laser pointer.  All right.  Now, in
19  preparation for your testimony, did you -- did you review
20  all the medical records in connection with this case?
21      A.  I did.
22      Q.  All right.  And I believe you have the file
23  folder in front of you --
24      A.  Yes, ma'am.
25      Q.  -- with some, I don't know, 3 to 4 inches worth

11

1  of medical records regarding Ruben Martinez?
2      A.  Yes, ma'am.
3      Q.  Did you also review the autopsy in connection
4  with Mr. Martinez?
5      A.  I did.
6      Q.  Okay.  And looking at State's Exhibit 491, would
7  this model of the torso of an individual aid you in your
8  explanation to the Jury in terms of what injury Ruben
9  Martinez sustained and the complications that arose as a
10  result?
11      A.  I think it would.
12          MS. JACK:  Okay.  Your Honor, at this time,
13  the State would offer State's Exhibit 491 into evidence
14  simply for demonstrative purposes.
15          MR. HEISKELL:  No objection, Your Honor.
16          THE COURT:  Admitted.
17          (State's Exhibit No. 491 admitted for
18          demonstrative purposes only.)
19      Q.  (BY MS. JACK)  All right.  Doctor, we'll just
20  leave that up there.  Now, can you tell the members of
21  the Jury what it means when we talk about how a patient
22  presented?
23      A.  Basically what it means is what the patient
24  looks like when they first come in.  So any -- any
25  patient who comes in, how they look, what are they doing,

12

1  what are they not doing.  Basically kind of, you know, if
2  you go to a scene or you see something happen, what's that
3  person look like right there, they're on the ground, you
4  know, are they doing something, are their eyes open, are
5  they not open, are they talking, they're not talking.
6  What's going on, basically.
7      Q.  Okay.  Can you tell the members of the Jury how
8  Ruben Martinez presented.
9      A.  Mr. Martinez presented, as I listed here,
10  unresponsive.  What that means is he's not doing anything
11  really.  He's not talking.  You're not able to really
12  wake him up.  And on the history, it was listed that his
13  G.C.S. or Glasgow Coma Scale was a 5T.  So what a Glasgow
14  Coma Scale is, basically is kind of how awake is the
15  person.  And it's got three parts.
16          The first part is what do they do with the
17  eyes.  And if they're fully awake, you know, they're
18  blinking, all that, they get a level of 4.  His -- his
19  was not.  He wasn't doing anything with his eyes, so he
20  gets -- he gets a 1.
21          The second thing we look at is verbal.  Are
22  they talking?  Are they confused?  Can you really
23  understand what they're saying or not understand?  And it
24  goes down to where they're not doing anything.  So you're
25  trying to pinch him and you're pushing him, you're doing

13

1  something to make him talk or yell at you or do
2  something, and they're not doing anything.  He gets a
3  1 for that.
4          What a T. means, he's got a breathing tube
5  in, so we've put T. for tube.
6          And then the last thing that we look at is
7  what we call motor, meaning what's he able to move,
8  what's he able to do.  And on him, he wasn't moving
9  anything as well.  So really 3 would have been where we
10 would be at.  For some reason, I think he had his eyes
11 open and they were able to get his eyes open and so
12 that's why he got a little bit more than a 3.
13         He was also hypotensive.  What that means
14 is that his blood pressure was low.  Usually it means
15 that it's much lower than normal and usually we need to
16 do something about it, either give him fluid or give
17 blood or do something because his blood pressure isn't
18 normal.  So --
19    Q.  You can go ahead, Doctor.
20    A.  I'm sorry?
21    Q.  You can continue, Doctor.
22    A.  Thank you.  So again, from the records, the
23 gunshot, the trajectory or where the gunshot went started
24 about up here and it ended about here.  So you can see,
25 if I kind of go like this, it kind of went through this

14

1  area, kind of went through this area that you can't see,
2  this whole area.  And we'll show you pictures of kind of
3  that area on a CAT scan.  But basically it went the
4  bottom part of the brain and the first vertebral body,
5  the first neck bone, if you will.
6    Q.  And, Doctor, looking at the autopsy and looking
7  at the medical records, you showed the Jury the path of
8  the bullet.  Can you tell the Jury where the entrance
9  wound would have been and where the exit would have been,
10 which was which.
11   A.  Yeah.  According to the autopsy report, the
12 entrance was up here, and the exit was 8 inches down from
13 the top and 8 inches kind of from the front to the back.
14 So somewhere around here.  So it was, again, this kind of
15 trajectory, going this way.
16   Q.  Now, when the path of the bullet -- when a
17 bullet takes that kind of path, what does it do to the
18 body?
19   A.  Again, a bullet is very high speed, high
20 velocity, and so it does a lot of damage.  And it's kind
21 of -- when it goes through, especially brain and other
22 tissue, anything in the path is kind of almost like
23 it's blenderized, you know what I mean.  It kind of takes
24 it and it just smushes up all the tissue in its way.  And
25 that's what it would have done.  And you'll see that

15

1  again on the CAT scan, that that's what it did to the
2  bottom part of the brain and the top part of the spinal
3  cord.
4    Q.  Okay.  When you looked at the spinal cord, what
5  did you see?
6    A.  You don't really see much.  There's just tissue
7  there.  You don't see what a normal spinal cord looks
8  like.  And I think I have a picture of what a normal
9  spinal cord looks like so you can see the big difference
10 between normal and what Mr. Martinez's looked like.
11   Q.  When you looked at Mr. Martinez's spinal cord or
12 the images of the spinal cord, did you, in fact, see some
13 bone in that?
14   A.  Yes.
15   Q.  Is there normally supposed to be bone in a
16 spinal cord?
17   A.  No.  What happened was, again, as the bullet
18 went through, it went through bone, it's going to push
19 that bone to the front of it.  It's going to go through.
20 And so that's how that bone got into the middle of the
21 spinal cord, which normally doesn't have bone.  Again,
22 that bone also kind of helped, you know, blenderize all
23 that tissue inside and as it kind of went through.
24   Q.  You mentioned the location of the injury.  What
25 part of the spine was that?

16

1    A.  That was the first bone, the first part of the
2  spinal column.  That's where it was.  What the spinal
3  column does is the brain is kind of our neuro network,
4  right.  That's what controls everything in the body.
5  That control goes out; the communication to the rest of
6  the body is through the spinal cord.  So if you cut the
7  spinal cord, which is basically what happened, none of
8  those signals go to anywhere in the body.  So that's why
9  he wasn't able to move anything or do anything.  And
10 since it was so high, he actually couldn't move his
11 facial muscles either, so he couldn't talk or do anything
12 else.
13         He had what we call locked-in syndrome, and
14 all he could do was blink his eyes.  So that's how we
15 were able to communicate with him down the line is with
16 him blinking his eyes.
17   Q.  In fact, Doctor, how many thousands of patients
18 have you seen over the years?
19   A.  Many thousands.
20   Q.  Okay.  Do you remember Mr. Martinez in
21 particular?
22   A.  I do.
23   Q.  Why do you remember him?
24   A.  You know, we -- every now and again there's --
25 there's a patient who, who, you know, is just kind of

17

1   a salt of the earth person, and something, you know,
2   horrible happens and just devastates the family,
3   devastates our staff and the physicians as well because
4   you don't like to see, you know, bad things happen to
5   good people like that. And what we want to do is make
6   them better and get them back to -- you know, he was a,
7   you know, a bread truck driver -- get him back to driving
8   trucks. That's what we would love to do, but in this
9   case, it was impossible because, again, his spinal cord
10  was completely severed. There's nothing we can do to put
11  it back together.
12      Q. From the moment he sustained that gunshot wound,
13  at a minimum, what was he looking at?
14      A. He had a very, very high mortality rate. So at
15  best, his -- his survival, at best, would have been a 50
16  percent two-year survival.
17      Q. Okay. Would have been able to move his hands
18  or his arms or his legs?
19      A. Never.
20      Q. Ever again?
21      A. Never. And also he would never have been able
22  to breathe on his own.
23      Q. Okay. All right. And would he have been
24  rendered a quadriplegic as well?
25      A. He was, yes.

18

1       Q. And you've indicated on your slide over there,
2   he had no drive to breathe. What does that mean?
3       A. Again, one of the controls from our brain is our
4   ability to breathe normally. You know, we do that without
5   even thinking. And again, because his spinal cord was cut
6   so high, that ability was gone as well. So he was not
7   going to be able to breathe. He would need to be on a
8   breathing machine for the rest of his life.
9       Q. Were there certain procedures that John Peter
10  Smith employed to, I guess, help comfort him in his last
11  few days?
12      A. Yes. We do a number of different things to --
13  again, the breathing tube that we had put down is like
14  having a gigantic sore throat constantly. And so one of
15  the things is to put a breathing tube that goes right
16  into the throat. It's called a tracheostomy. And that's
17  much more comfortable for the patients, and, you know,
18  allows the family to be able to see the face again.
19  Because if you look at someone who's got a breathing
20  tube, they've got the tube coming out, they've got
21  another tube in their mouth, they've got tape all over.
22  You can't really see their face. And so, you know, kind
23  of being able to see your loved one's face again makes a
24  big difference in kind of how everybody feels. And so
25  that's one of the things we do for the patient in terms

19

1   of comfort, and family at least has the ability to see
2   their face again.
3       Q. Okay. And, in fact, do you have a slide that
4   includes a number of procedures that Mr. Martinez --
5       A. I do. So the procedures he had, again, the
6   first thing in the trauma bay, he had a breathing tube
7   put in. And multiple times we have to do what's called
8   bronchoscopy. That's where we put a light, a tube that
9   has a light and a camera in the end, down his breathing
10  tube into his lungs and basically suck out the mucus and
11  stuff that's there.
12          The reason we do that is he doesn't have the
13  ability to cough up. You know, you get up in the morning
14  and you've got something in the back of your throat, you
15  cough it up and spit it out. He can't do that, and so we
16  have to do that for him when it fills up too much. And
17  so that's -- we did that multiple times.
18      Q. And for somebody that can't cough up mucus, what
19  is that mucus like in their lungs?
20      A. It's kind of -- what happens with that mucus,
21  especially when it dries up, and I'm sure many of you
22  have experienced it, you get the mucus that's real dry,
23  you cough it up. And it looks like a little piece of,
24  like, concrete or something that's come out. And that's
25  really what happens inside the lung is it makes casts of

20

1   the lung. And so that's really what we call them, casts.
2   And because they're very thick and tenacious, it can't
3   get off on its own. You really have to do the
4   bronchoscopy to get all that mucus out.
5       Q. How many times a day roughly was he having to
6   undergo this?
7       A. Well, the suctioning, he was undergoing
8   frequently. The suctioning doesn't always get everything
9   that's deep. And so we did that, you know, I believe at
10  least a half a dozen times while he was in the ICU.
11      Q. Okay. And as his stay progressed, was it
12  necessary for hospital staff to do this more and more
13  each day?
14      A. Uh-huh.
15      Q. Why is that?
16      A. Again, because there's going to be more --
17  again, we don't do it everyday. We do it when the
18  patient looks like they need to have it done, because
19  it's not something that's fun for the patient. You know,
20  you can imagine you kind of have a breathing machine, and
21  then when we do this, we actually suck everything out,
22  right. So you can't breathe during that time that we're
23  doing it. We don't do it long periods of time, but
24  still, it's not a very comfortable procedure. We make
25  sure the patients are sedated and all that, but still you

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

**21**

1  can imagine that it's not a very comfortable thing, even
2  if you're sedated.
3       Q.  What are some of the other procedures that you
4  and your staff tried to help Ruben feel better?
5       A.  We did the tracheostomy.  Again, that's the tube
6  in the throat, goes right into the trachea or the
7  windpipe.  We put in what's called a filter.  What
8  that -- that is is basically it's a device, it looks like
9  an umbrella without the cloth on it.  And it goes in one
10  of the big veins that goes to the heart.  It's kind of --
11  I don't know if I can take all this apart.
12          MS. JACK:  May I approach the witness, Your
13  Honor?
14          THE COURT:  Yes.
15          MS. JACK:  I think there's a hinge in the
16  front.
17          THE WITNESS:  I was never good at playing
18  with things like this.
19       A.  Okay.  Basically it goes in the vein that's
20  right here, goes all the way down.  And what that does is
21  it prevents clots from going to the heart and lungs and
22  killing the patient.  The reason you form clots is
23  because normally we're walking, we're moving, and so the
24  blood is squeezed through our body.  With him, it kind of
25  stays there.  Whenever blood stays in one place, it forms

**22**

1  clots.  And so we want to prevent those clots from going
2  to his heart and lungs.
3       Q.  What other procedures were there?
4       A.  The other thing we did is put a feeding tube in.
5  And so we always go through the mouth, check out the food
6  pipe, go down in the stomach, check out the stomach,
7  check out the first part of the intestine, make sure
8  there's no ulcers, other problems, and then we put a
9  feeding tube through that.  So that was the last thing.
10       Q.  And where did you insert the feeding tube?
11       A.  In the stomach.  It would have come out right
12  about here in the stomach.
13       Q.  Was that because he couldn't swallow?
14       A.  Right.  He didn't have any ability to swallow.
15  And we had a tube that went down from his mouth to his
16  stomach to feed him during that time.  But, again, you
17  can't leave those tubes in forever.  And those tubes are
18  hard, so they can kind of cut through soft tissue, you
19  know, cut through the lips, things like that.  So you
20  don't want to keep them in for long periods of time, so
21  we take them out and then we put the feeding tube in.
22       Q.  Okay.  What was his prognosis?
23       A.  Prognosis just means how was he going to do.
24  The neurosurgeons on the first day said prognosis is
25  grim, at best, locked in.  So what "grim" means is it's

**23**

1  going to be really, really, really bad.  And "locked in"
2  means he can't talk to us.  You know, he's got function
3  in the brain and he's thinking about stuff, but he can't
4  communicate that to us.  And the way he communicated with
5  us is by blinking.  And so we'd ask him yes/no questions,
6  and he would blink, you know, whichever way the answer
7  was supposed to be.
8       Q.  And do you, in fact, recall talking to him or
9  communicating with him where he communicated in return by
10  blinks?
11       A.  I do.  And, you know, I verified in my note
12  that that's how we did talk to him.  There was a time
13  when he was tired and actually we stopped, and I came
14  back later on in the afternoon to talk with him and his
15  family again.
16       Q.  Do you recall having or speaking to him and
17  talking to him about his decision with regard to his care
18  and whether or not a do-not-resuscitate order would be
19  put in place?
20       A.  Yes, we had that.  That was one of the
21  conversations where we came back several times about
22  that.  Because, again, you can imagine that you're in
23  this situation, you're doing your regular job, and all
24  the sudden one day your entire life is changed, and now
25  you've got this guy, me, standing over you or standing

**24**

1  next to you and asking you, you know, "This is what's
2  going on.  I'm sorry.  And, you know, you have a
3  capability of deciding for yourself what it is that you
4  want done, you know, for yourself.  And unfortunately
5  because of the nature of the injury, you're never going
6  to be able to breathe on your own again.  You're never
7  going to be able to walk.  You're never going to be able
8  to talk.  Never going to be able to feed yourself.
9  You're never going to have the quality of life that you
10  had before the injury.  And so, you know, really, how
11  would you want to live, or do you want, you know, to say,
12  you know, I'll let -- I'll let God or let whatever is
13  going to happen decide what's going to happen with me."
14          And really that's what "do not resuscitate"
15  or "allow natural death" means.  It's, you know, we let
16  the person's body decide.  And many times we'll do
17  everything except if their heart stops, and then we stop.
18          And so that's really how we started.  And
19  then he, you know, progressively said he wanted less and
20  less done.  And at one point, he was very, very sick, and
21  the family decided that, you know, that's not really what
22  he would want.
23       Q.  Early on when you talked to him, did he
24  communicate to you that he wanted to live?
25       A.  Um, no, not -- not in that way is really not how

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

25

1  he wanted to live.  He wanted to always be how he was,
2  productive, and really be the father and the husband that
3  he's always been.
4      Q.  Okay.  Did you personally counsel with the
5  family in terms of his care and what was available at
6  John Peter Smith and his prognosis?
7      A.  Several times.
8      Q.  Were those easy conversations or difficult
9  conversations?
10     A.  They're always very difficult conversations
11 because, you know, you -- the -- our philosophy, my
12 partners and I philosophy is that these are all our
13 families.  So he's like a brother to me, and I'm trying
14 to counsel my brother on what -- what does he want in
15 terms of his life.  And so it's always a very difficult
16 conversation to have.
17     Q.  Doctor, do you think that Ruben understood that
18 he was dying?
19     A.  Yes.
20     Q.  Okay.  With each day that he was at John Peter
21 Smith Hospital, was his condition worsening?
22     A.  Yes.
23     Q.  Okay.  In the end, did he pass away at John
24 Peter Smith Hospital?
25     A.  Yes, he did.

26

1      Q.  And what day was that and what time was he
2  pronounced?
3      A.  That was July 12th at 22:30 hours, 10:30 at
4  night.
5      Q.  Okay.  And what was -- what was the cause of his
6  death?
7      A.  The autopsy report, cause of death was the
8  residual complications from the gunshot wound that he
9  sustained.
10     Q.  Okay.  And, Doctor, you've reviewed his medical
11 records.  Before June 29th, was there any reason to
12 believe that he would not have lived a happy, healthy
13 life but for the events of June the 29th?
14     A.  No.  He should have, if it hadn't been for those
15 events, he should have lived, you know, anywhere between
16 74 and 84 years of age at the least.
17     Q.  Did you also include some slides of some radial
18 images of his brain --
19     A.  I did.
20     Q.  -- and of this injury?
21     A.  I did.  Once again, complications of the
22 perforating gunshot wound to the head was cause of death,
23 according to the autopsy report.  This is a CAT scan of
24 kind of the bottom of his head, top of his spine.  And
25 that's the top of his head or face, the back of his head,

27

1  his right side and his left side.
2          This is the first ring, so that's the first
3  neck bone, if you will.  And that's part of the skull.
4  And you can see all these fragments.  Basically this is
5  showing you some of the trajectory, you know, where the
6  bullet went through.  And these are the fragments of bone
7  that were placed into the spine.
8          Spinal column will be in here.  And you kind
9  of just see some grayish stuff.  And I'll show you what
10 the normal will look like.  And you'll see that you can
11 actually see his spinal cord inside in some of the other
12 images.
13     Q.  And the image the Jury is looking at right now,
14 is that a radial image of Ruben Martinez?
15     A.  Right.  This is Mr. Martinez's actual CAT scan.
16 This is another picture of his CAT scan, and, again,
17 this is the spinal cord.  This white over here is
18 actually blood.  Then again, this solid white is
19 all bone.
20          This is normal.  So there's no bone.  And
21 you can see the spinal cord right here.  Which, again,
22 over there, all of this was all the dark gray stuff.
23 There was no difference between anything.  So you really
24 couldn't tell what was spinal cord and what was anything
25 else.

28

1          Again, this is a better picture.  You can
2  see the spinal cord right easily.  Over on the other
3  picture, you couldn't see anything and you saw the blood
4  over here.  So there's no blood here.  There's a spinal
5  cord going down.  You know, it's a nice, pretty oval kind
6  of shape, so that's kind of a normal.
7      Q.  Okay.  Thank you very much, Doctor.  Is there
8  anything about the fact that Mr. Martinez was injured
9  away from the hospital or the distance away from John
10 Peter Smith or the time that it would have taken to
11 transport him to John Peter Smith that would have
12 affected one way or another his prognosis?
13     A.  No.  The -- you know, again, when a gunshot goes
14 through, at that time, fate has been dealt.  I mean,
15 there's not going to be anything that's going to change
16 what happens.  The only change would have been if the
17 gunshot didn't occur.
18     Q.  If he had been shot in the emergency room of
19 John Peter Smith hospital, would it have changed one
20 single thing?
21     A.  No.  Again, you know, once -- once that bullet
22 went through the spinal cord and disrupted everything, I
23 mean, kind of blew that whole spinal cord apart, nothing
24 was going to put it back together, unfortunately.
25         MS. JACK:  Okay.  Thank you, Doctor.

STATE VS. MARK ANTHONY SOLIZ            MARCH 14, 2012

29

1    Your Honor, at this time I'll pass the
2  witness for cross-examination.
3    MR. HEISKELL:  No questions.
4    THE COURT:  May the witness be excused?
5    MR. HEISKELL:  Yes.
6    THE COURT:  Thank you, sir.
7    THE WITNESS:  Thank you.
8    (Witness excused.)
9    MS. JACK:  We call Stephen Rogers, Your
10  Honor.
11    THE COURT:  Please raise your right hand.
12    (Witness sworn.)
13    MS. JACK:  May I proceed, Your Honor?
14          STEPHEN ROGERS,
15  Having been first duly sworn, testified as follows:
16          DIRECT EXAMINATION
17  BY MS. JACK:
18    Q.  Mr. Rogers, would you please tell the Jury your
19  name and where you work.
20    A.  My name is Stephen Rogers, and I work for the
21  Texas Prison System, more commonly known now as the
22  Texas Department of Criminal Justice.
23    Q.  Okay.  Can you tell the members of the Jury how
24  long you've worked for the Texas Department of Criminal
25  Justice.

30

1    A.  I've worked for them now for approximately
2  29-and-a-half years.
3    Q.  So you've made a career of it?
4    A.  Yes, ma'am, I have.
5    Q.  Okay.  All right.  Can you tell the members of
6  the Jury all the different positions that you've held
7  within -- is the acronym for the Texas Department of
8  Criminal Justice, T.D.C.?
9    A.  T.D.C.J.
10    Q.  T.D.C.J.?
11    A.  Yes, ma'am.
12    Q.  Can you tell the members of the Jury the
13  different positions that you held within T.D.C.J. over
14  those almost 30 years?
15    A.  Sure.  I was a correctional officer at three
16  different maximum security facilities for about three
17  years.  I then went into case management, which is
18  classification.  I was in -- the Chief of Classification
19  and Assistant Chief of Classification for approximately
20  three years.  I became a Classification Coordinator for
21  just a couple months, promoted to Assistant Warden for
22  two years, promoted to Senior Warden for two years, and
23  then became a State Classification Committee Member.
24  I've been doing that for about the past 13 years now.
25    Q.  What does it mean, when you talk about the word

31

1  "classifications", what does that mean?
2    A.  What we're doing, in a nutshell, is grouping
3  offenders according to security and treatment needs.
4  Now, that's just a basic definition.  I could go in depth
5  to it, if you would like.
6    Q.  Please do.
7    A.  Basically an offender arrives.  We do look at
8  his sentence, as far as him being a first offender, the
9  length of his sentence; at which point, we make a
10  decision on what type of facility, prison, to place him
11  at.  We're looking at his security characteristics.
12  We're looking at his medical needs.  We're looking at
13  educational issues, stuff like that.  And then we select
14  a facility that we think he can successfully adjust to
15  the prison life at.
16          Also we're looking at his -- we assign him
17  a custody.  And one of my primary duties is to initially
18  assign offenders and to select a custody, and find a
19  facility in the system that has that custody as well as
20  would meet any other kind of need he might have.
21    Q.  Okay.  Have you testified as an expert in the
22  area of classifications at T.D.C.J.?
23    A.  Yes, ma'am.
24    Q.  On few or several occasions?
25    A.  Many occasions.

32

1    Q.  How many different counties have you testified
2  in as an expert in this area?
3    A.  Off the top of my head, maybe five, six
4  different counties.
5    Q.  Okay.  Have you testified in Tarrant County?
6    A.  Yes, ma'am -- I'm sorry, no, ma'am.  I've been
7  called a couple times, but I never had the privilege of
8  testifying.
9    Q.  You were present during the trial?
10    A.  Yes, ma'am.
11    Q.  And prepared to testify?
12    A.  Correct.
13    Q.  And the evidence came out through another
14  witness?
15    A.  Correct.
16    Q.  Okay.  Testified in a number of other counties
17  as well?
18    A.  Yes, ma'am.
19    Q.  But this is your job and has been your job for
20  13 years?
21    A.  Correct.
22    Q.  Specifically classification?
23    A.  Yes, ma'am.
24    Q.  All right.  Now, how many different prison
25  units, if you have an idea or general idea, are there in

STATE VS. MARK ANTHONY SOLIZ           MARCH 14, 2012

33

1  Texas?
2      A.  We currently have a hundred and eleven.
3      Q.  And does that include State Jail facilities and
4  other prisons?
5      A.  Yes, ma'am.
6      Q.  Okay.  And State Jail felonies would be like
7  unauthorized use of a motor vehicle, theft case, that
8  kind of thing?
9      A.  Yes, ma'am, fourth-degree felonies.
10     Q.  Fourth-degree felonies.  So the third-degree
11 felonies and on up and including capital murder would be
12 the other prison units; is that correct?
13     A.  That is correct.
14     Q.  All right.  Now, how many different inmates do
15 we have in custody?  Give an idea of the number of
16 inmates that we have in custody in T.D.C.J.
17     A.  As of Monday, we have a little under a hundred
18 and fifty-five thousand.
19     Q.  Okay.  And that's spread over all these
20 different units; is that correct?
21     A.  That's correct.
22     Q.  Now, you mentioned that you had previously
23 worked for three maximum security prisons; is that
24 correct?
25     A.  Yes, ma'am.

34

1      Q.  What were those three units?
2      A.  Coffield, Beto and Michael.
3      Q.  All right.  And what determines whether or not
4  a unit is a maximum security unit?
5      A.  A maximum security facility or any kind of
6  facility is defined by the strictest level of custody
7  that unit can house and maintain.  For example, the
8  Michael Unit is considered a maximum security facility
9  because they house maximum security offenders in
10 Administrative Segregation.
11     Q.  Okay.  Now, you mentioned Administrative
12 Segregation.  And I'll tell you the Jury has heard about
13 the word "administrative segregation".  All right.  And
14 is Administrative Segregation a type of maximum security?
15     A.  Yes, it is.
16     Q.  Is Death Row a type of maximum security?
17     A.  Yes, ma'am.
18     Q.  Where is Death Row in Texas?
19     A.  Death Row is in the Polunsky Unit in Livingston,
20 Texas.
21     Q.  So we only have one unit for Death Row
22 offenders?
23     A.  Correct.
24     Q.  How many different units do we have that include
25 Administrative Segregation?

35

1      A.  If you hadn't asked me, I could have told you.
2  We have --
3      Q.  Just give the Jury a rough idea.
4      A.  29, we have about 29 -- um, I'm sorry, that's
5  probably not correct, but any other time I'm batting that
6  number around, I want to say we have probably --
7      Q.  Be conservative.  How about that.
8      A.  12 to 15.  12 to 15.  I'm sorry.
9      Q.  Okay.  All right.  12 to 15 units that house
10 Administrative Segregation sections of the prison?
11     A.  Yes, ma'am.
12     Q.  Now, when we talk about a particular unit that
13 has an Administrative Segregation part, do they also have
14 another part that's called General Population?
15     A.  Yes, they do.
16     Q.  What's the difference between Administrative
17 Segregation and General Population?
18     A.  Administrative Segregation, number one, the
19 offender has pretty much earned his way into that status.
20 He's either a gang member or he's committed a violent
21 offense, he's assaultive.  Of recent, we put cell phones,
22 guys that are caught with a cell phone are put into
23 Administrative Segregation.
24         In that status, an offender's movement is
25 strictly controlled.  He's in the cell 23 hours a day.

36

1  He comes out one hour per day for recreation.  In a
2  nutshell, that's Administrative Segregation.
3         General population, the offenders are free
4  to move around without handcuffs, without escort.  They
5  live with other offenders in like general population
6  custodies.  They can have a job.  They can go to school.
7  They can go to church.  If they have a medical
8  appointment, they -- they're called out, they walk down
9  a hallway, they walk into the medical department for
10 their appointment; no handcuffs.  There might be a
11 correctional officer down the hallway directing traffic.
12         When a Administrative Segregation offender
13 is fed his meals, they're brought to him in his cell,
14 given to him through a food slot.
15         A General Population offender would be
16 allowed to go to the chow hall, dining hall, go through a
17 serving line, be served his meal, sit down and eat it and
18 get up and leave.
19     Q.  Okay.  So we have, at the very highest maximum
20 security, we have Death Row?
21     A.  Yes, ma'am.
22     Q.  And you mentioned that now individuals who are
23 found with -- and is a cell phone contraband, by the way?
24     A.  It is contraband, but it's considered dangerous
25 contraband.

STATE VS. MARK ANTHONY SOLIZ            MARCH 14, 2012

37

1    Q. Why is it considered dangerous contraband?
2    A. At the Stiles facility of recent, an offender
3  actually used his cell phone to help effect an escape
4  from Administrative Segregation.
5    Q. Now, are they allowed cell phones?
6    A. No, ma'am.
7    Q. How do they get the cell phones in?
8    A. Unfortunately, staff bring them in; other
9  offenders bring them in that may be outside trustees;
10  they receive a drop-off from, say, a family member or a
11  friend, and it's brought in through -- into the prison
12  from the outside.
13    Q. Okay. Now, you mentioned staff sometimes bring
14  them in. Is there somewhat of a black market for
15  contraband in prison?
16    A. There is.
17    Q. And that doesn't mean that all staff would
18  violate the rules, but there are some staff that have
19  violated the rules?
20    A. That is correct.
21    Q. Now, you mentioned that now they're placed in
22  Administrative Segregation if they're caught with a
23  phone. Was there a recent incident that kind of
24  initiated that?
25    A. Yes, ma'am.

38

1    Q. What happened?
2    MR. HEISKELL: Excuse me, Your Honor. We
3  object to that as relevance. A phone and some recent
4  incident, that's not relevant to this proceeding.
5    MS. JACK: I'll move on, Your Honor.
6    THE COURT: Okay.
7    Q. (BY MS. JACK) Are a cell phone the only type of
8  contraband that individuals have acquired in prison?
9    A. No, ma'am.
10    Q. What other kind of contraband have they
11  acquired?
12    A. They've received -- I've seen offenders receive
13  makeup. I've seen offenders receive weapons or pieces of
14  material they can fashion into weapons; drugs, of course,
15  the cell phones, the chargers, the SIM cards.
16    Q. You mention --
17    A. Money.
18    Q. Money. Okay. Now, you mentioned this type of
19  contraband. Is this limited to individuals who are in
20  general population or have inmates that are housed in
21  Administrative Segregation also been able to acquire this
22  kind of contraband?
23    A. Offenders in Administrative Segregation have
24  also been able to acquire all of that, those different
25  types of contraband.

39

1    Q. And for that matter, have individuals on Death
2  Row as well?
3    A. Yes.
4    Q. To a lesser extent?
5    A. Yes, ma'am.
6    Q. But they've still been able to acquire it as
7  well?
8    A. Right.
9    Q. Now, you mentioned individuals had received
10  pieces of items or pieces of items that they can fashion
11  into a weapon?
12    A. Yes, ma'am.
13    Q. Okay. Can you tell the Jury what that means and
14  what kind of pieces of objects they've received that they
15  would fashion into weapons?
16    A. Ink pens, paper clips. Sheets of
17  8-and-a-half-by-11 paper can be fashioned in a way to
18  make a spear.
19    Q. How does that happen?
20    A. What they do is they roll the paper up real
21  tight, roll several pieces of paper tightly, insert one
22  into the end of the other, and then they -- at the end
23  of that, that piece of -- that spear, they can place a
24  sharp object. I've seen Plexiglass. I've seen, like I
25  said, paper clips. Also if they wet the paper and let

40

1  it dry, it becomes hardened and it makes it more of a
2  weapon. I've seen the bars of the cell used as a weapon
3  as well.
4    Q. How do they get the bars of the cell and fashion
5  that into a weapon?
6    A. What they do is they cut them off and they cut
7  them off at an angle so that, number one, it's cut off,
8  it's several feet long, and it can be used as a spear,
9  and they cut the angle at one end. And I was actually
10  involved in a situation involving that.
11    Q. Okay. Where are the staff when all this is
12  going on? Where are the guards?
13    A. Well, guards are required to walk the run every
14  15 minutes.
15    Q. What does that mean?
16    A. That means they go onto the cell block, walk up
17  and down the row, looking in cells, checking bars,
18  looking for contraband, any other item that might be
19  dangerous to the facility or the staff or the offenders.
20  They walk, do security checks basically. They would come
21  back to do a count. But it's basically just walking and
22  observing and checking and making sure everything is
23  still safe over there and that someone hasn't left the
24  facility unauthorized.
25    Q. Does that happen?

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

41

1    A. Yes, it does.

2    Q. Is that what's called an escape?

3    A. Yes, ma'am.

4    Q. Is that limited to General Population or have we

5  had attempts or, in fact, escapes from Administrative

6  Segregation?

7    A. There have been escapes from both areas of the

8  prison.

9    Q. Okay. So when we talk about crime or we talk

10  about contraband, it's not limited to General Population?

11    A. No, ma'am, it's not.

12    Q. So Administrative Segregation is not as safe as

13  the general public would like to believe?

14    A. I -- I don't think so.

15        MS. JACK: Okay. May I approach the

16  evidence for just a moment?

17        THE COURT: Yes, you may.

18        (Pause in proceeding.)

19    Q. Mr. Roger (sic), I'm showing you what's been

20  admitted into evidence as State's Exhibit 489. And a

21  part of State's Exhibit 489, do you see that as a hard

22  plastic, piece of a hard plastic?

23    A. Yes, ma'am.

24    Q. Do you see the sharp corners?

25    A. Yes, ma'am, I do.

42

1    Q. All right. In the hands of an inmate at T.D.C.,

2  what can happen with this?

3    A. Well, he could -- I don't know that he could do

4  fatal damage, but he could certainly use it to his

5  advantage to cause some damage to a staff member or

6  another offender.

7    Q. Okay. Could it be used as a weapon?

8    A. I think it could be.

9    Q. Okay. Now, looking at State's Exhibit 490,

10  which appears to be a pen wrapped in a Scantron with

11  string around it?

12    A. Yes, ma'am.

13    Q. What can an inmate do -- what could this cause

14  in the hands of an inmate?

15    A. An offender could use it to stab someone.

16  Again, I don't think you could do it fatally, but put an

17  eye out. Depends on how far he's wanting to go with

18  that, the person he wants to stab. If he wants to kill

19  them or just inflict a little bit of injury to make a

20  statement, that happens as well.

21    Q. Okay. And have you seen serious injury caused

22  with items just like these?

23    A. Not per se. I've seen similar items fashioned

24  into -- into homemade weapons, shanks, that could -- that

25  have done damage, yes.

43

1    Q. Okay. Now, you mentioned Administrative

2  Segregation and how someone gets into Administrative

3  Segregation.

4    A. Yes, ma'am.

5    Q. All right. If they engage in a disciplinary,

6  they violate one of the rules, can they end up in

7  Administrative Segregation?

8    A. Yes, they could.

9    Q. If they are a confirmed gang member, can they

10  end up in Administrative Segregation?

11    A. Yes, ma'am.

12    Q. All right. Now, when we talk about

13  Administrative Segregation, do they have the opportunity

14  to have visits with individuals?

15    A. Yes, they do.

16    Q. Now, is there a difference between a general

17  visit and a contact visit?

18    A. Yes, ma'am.

19    Q. What's a general visit?

20    A. A general visit would be on a phone, through

21  Plexiglass, they could see their loved one. Some older

22  facilities have, not a phone, but they have a screen, a

23  small portion of screen that they could speak to their

24  loved one through.

25        A contact visit would be they -- they can,

44

1  at the beginning and end of the visit, they can

2  physically embrace their loved one, peck on the cheek,

3  sit down, share a Coke and a candy bar for several hours

4  in a visitation area supervised by -- supervised by

5  correctional staff.

6    Q. Okay. Now, in Administrative Segregation, which

7  type of visit do they get to have?

8    A. They would have the regular general visit

9  through the -- on the phone or through the mesh screen to

10  talk to their loved one.

11    Q. They could talk to their loved one. They could

12  visit with their loved one. They just couldn't touch

13  their loved one?

14    A. Correct.

15    Q. And they could do that for a couple hours; is

16  that right?

17    A. Yes, ma'am.

18    Q. They get out once a day; is that right?

19    A. One hour per day.

20    Q. One hour per day. Okay. And on weekends, do

21  they have the opportunity to have any rec. time as well?

22    A. As far as Administrative Segregation, it's one

23  hour per day every day of the week.

24    Q. And are they entitled to the resources of the

25  law library; not go to the law library, but have those

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

45

1  books brought to them in their cell?
2      A.  Yes, they can.
3      Q.  All right.  Are they entitled to use the phone?
4      A.  Ad-Seg is not allowed to use the phone.
5      Q.  All right.  Are there cameras in the Ad-Seg
6  cell, generally speaking?
7      A.  Not in the cell, no, ma'am.
8      Q.  So we couldn't see what an individual is doing?
9      A.  No, ma'am.
10     Q.  All right.  Are they allowed to have personal
11  property, some personal items?
12     A.  Yes, ma'am.
13     Q.  Are they allowed to have commissary?
14     A.  Yes, ma'am.
15     Q.  So if an individual goes to Administrative
16  Segregation, they can get there a couple of different
17  ways; if they're a disciplinary problem or if they're a
18  member of a -- documented member of a gang; is that
19  correct?
20     A.  That's correct.
21     Q.  Now, do all gang members end up in
22  Administrative Segregation?
23     A.  No, ma'am.
24     Q.  Are there particular gangs that T.D.C. views as
25  especially violent?

46

1      A.  Yes, ma'am.
2      Q.  And what are those gangs?
3      A.  The Texas Syndicate, the Mexican Mafia, the Raza
4  Unida, Barrio Azteca, Aryan Brotherhood, HPL.
5      Q.  What is HPL?
6      A.  It's a mouthful.  Hermanos Pistoleros Latinos.
7      Q.  Okay.
8      A.  Those are most of the confirmed gangs.  There's
9  the Bloods, the Crips, Mandingo Warriors; they're not
10  necessarily placed straight into Administrative
11  Segregation solely on their gang affiliation.  They
12  would -- if they were caught recruiting and/or extorting
13  on behalf of their gang, then we would look at strongly
14  putting them in the Administrative Segregation.  But the
15  others, once confirmed as Mexican Mafia, Texas Syndicate,
16  the like, defined by our Security Threat Group folks,
17  then those guys, once confirmed, go straight into
18  Administrative Segregation.
19     Q.  Now, you did not mention individuals who are
20  serving a life sentence without parole.
21     A.  Life without parole.
22     Q.  Do they go into Administrative Segregation
23  automatically?
24     A.  No, not automatically.  If -- a life without
25  parole offender is a General Population offender, barring

47

1  any kind of gang confirmation or violent offense that
2  would put him into Administrative Segregation.
3      Q.  Okay.  Now, you understand that this Defendant
4  has been a confirmed or a documented member of the Texas
5  Syndicate.
6      A.  Yes, ma'am.
7      Q.  Which would put him automatically into
8  Administrative Segregation?
9      A.  That's correct.
10     Q.  Is that right?
11     A.  Yes, ma'am.
12     Q.  Okay.  Do you know which unit he would go to
13  necessarily?
14     A.  He would go to a maximum security facility, a
15  Beto, a Coffield, a unit so designed to house
16  administrative -- one of those 12 to 15 Administrative
17  Segregation facilities.
18     Q.  Sure.  So he could go to one of 12 to 15
19  different units?
20     A.  Correct.
21     Q.  We don't know which one?
22     A.  Right.
23     Q.  Would this Jury have any say in which one, if he
24  were to receive a life sentence without parole?
25     A.  They would not.

48

1      Q.  Does a Jury ever have any say in how an
2  individual is housed?
3      A.  They do not.
4      Q.  Now, understanding that initially he would go to
5  Administrative Segregation, do individuals in
6  Administrative Segregation stay there forever?
7      A.  Not necessarily.  An offender, for example, has
8  contraband deemed a weapon, he's written a disciplinary
9  for that weapon.  We would place him in Administrative
10  Segregation and review him by State classification every
11  six months until we decided that he's no longer a threat.
12  If he puts distance between him and that situation that
13  puts him in Administrative Segregation, I, as a State
14  committee member, can release him to the General
15  Population.
16         If he's a confirmed gang member, he can
17  still eventually be released from Administrative
18  Segregation, but to do so, he has to renounce his gang
19  membership, fill out the paperwork as such, and then go
20  through a gang renunciation process to eventually make
21  it into -- make it into an ex-gang status so we can put
22  --then put him in General Population.
23     Q.  Even if he's serving life without parole?
24     A.  Yes, ma'am.
25     Q.  Individuals in Administrative Segregation, are

STATE VS. MARK ANTHONY SOLIZ                    MARCH 14, 2012

49

1  they put there because of the type of offense they
2  committed?
3      A. No, ma'am.
4      Q. Are they put there because of the length of
5  sentence they're serving?
6      A. No, ma'am.
7      Q. Okay. Does the type of crime for which they
8  were convicted have anything to do with necessarily how
9  they're housed or where they go?
10     A. No, ma'am.
11     Q. So Administrative Segregation does not
12 discriminate based upon the offense they've committed?
13     A. No, it doesn't.
14     Q. Okay. How long does it take to go through the
15 gang renunciation program?
16     A. It's roughly nine months.
17     Q. Okay. How long does it take for an individual,
18 or how quickly could someone serving Administrative
19 Segregation or in Administrative Segregation be in
20 General Population if they convinced the investigators or
21 the authorities that they're no longer a member of the
22 Texas Syndicate?
23     A. The quickest would be less than three years.
24     Q. Okay. So in theory, let's say Mr. Soliz goes
25 down to T.D.C., is placed in Administrative Segregation,

50

1  and immediately renounces his gang membership, how
2  quickly could he be in General Population if he convinces
3  the investigators and authorities at T.D.C.J. that he is
4  no longer an active member of the Texas Syndicate?
5      A. Again, less than three years.
6      Q. Okay. Now, when he goes into general -- if he
7  were to go into General Population, are there multiple
8  levels for General Population?
9      A. Yes, ma'am.
10     Q. And what are those different levels?
11     A. Those different levels are G1, general --
12 G stands for General Population. G1, G2, G3, G4, and G5.
13     Q. Okay. Now, General Population 1 and 2, I take
14 it, are minimum security?
15     A. Correct.
16     Q. And I take it that General Population 4 and 5
17 would be trending towards the more medium security?
18     A. Right.
19     Q. All right. An individual serving a life
20 sentence without parole, I take it, coming out of
21 Administrative Segregation could work his way down
22 how far in terms of General Population and the
23 security necessary to guard?
24     A. That -- a life without parole offender would be
25 allowed custodies of G3, G4 and G5. If he -- his

51

1  behavior is appropriate in the population, he could
2  maintain a G3 status, and that would be for the duration
3  of his stay in the prison system.
4      Q. Okay. Now, and I neglected to ask you this.
5  When someone is in the custody of Administrative
6  Segregation, regardless of the unit that they're in, this
7  Jury has heard a previous number or previous ratio of
8  guards to inmates of roughly one to a hundred and
9  forty-five. Does that generally kind of jive with the
10 numbers that you're familiar with?
11     A. I agree with that number.
12     Q. In Administrative Segregation?
13     A. Yes, ma'am.
14     Q. In General Population, whether it's G3, G4, G5,
15 do those numbers increase in terms of the number of
16 inmates to the guards?
17     A. Yes, they do. For example, when I was a warden
18 at the facilities I was a warden, we had dormitories. We
19 had four living areas, for example, A, B, C and D. Each
20 of those areas held 50 offenders. We had a control
21 officer. You've always got to have a control officer.
22 And then one of -- one officer was considered a roving
23 staff member, counting, taking care of situations at
24 the -- in the housing area. On a good day, we would have
25 a control officer plus two officers monitoring those 200

52

1  offenders.
2      Q. All right. So one, maybe two, possibly three
3  guards for in the neighborhood of 200 offenders in
4  General Population?
5      A. Yes, ma'am.
6      Q. Okay. Now, in General Population, if someone is
7  serving a life sentence without parole, do they wear a
8  particular uniform that says L.W.O.P.?
9      A. They do not.
10     Q. Do the guards know what the individuals are
11 serving?
12     A. Not necessarily.
13     Q. Do the guards know what the facts of the
14 offenses are?
15     A. They probably do not unless they watch TV or
16 they've read the file.
17     Q. Or they get on the Internet?
18     A. Ma'am?
19     Q. Or they get on the Internet?
20     A. Or they get on the -- yes, ma'am.
21     Q. Okay. Now, how about the other inmates, do they
22 know what an -- well, setting aside somebody bragging
23 about what they've committed, do the other inmates know
24 what the other inmates are serving or what they've
25 committed or what they've been convicted of?

**53**

1   A. No, ma'am, they -- they -- they wouldn't.

2   Q. Okay. Is it possible for someone serving a life

3   sentence without parole for capital murder to be in the

4   same cell, in the same dorm with someone who is simply

5   serving a sentence for a high theft?

6   A. Yes.

7   Q. A DWI, habitual DWI?

8   A. That's possible, yes.

9   Q. Someone that is serving a nonviolent sentence?

10  A. Correct.

11  Q. Okay. So the guards don't know, the other

12  inmates don't know what that individual is serving or

13  been convicted of?

14  A. No, they don't.

15  Q. Unless they talk about it?

16  A. Correct.

17  Q. Okay. Now, G5, G4, and G3, are they allowed --

18  are those inmates allowed to work?

19  A. Yes.

20  Q. What are the areas that they can work in?

21  A. G3 offender could work just about any job in the

22  facility except one that would allow him free and

23  frequent access to the facility or one that would allow

24  him close proximity to the outer perimeter. Other than

25  that, he can work just about any type of job.

**54**

1   G4 and G5 are pretty much disciplinary-type

2   custodies. Those offenders primarily work outside the

3   security perimeter in a -- what's called a hoe squad

4   where you may have guys picking peas, hoeing the grass,

5   under the supervision of a -- of an armed correctional

6   officer.

7   Q. Okay. So G3, G4, G5, the highest security, at

8   least for General Population, can work outside of the

9   security perimeter?

10  A. G2 through G5 can work outside the security

11  perimeter under armed guard.

12  Q. Is this outside of the fence of T.D.C.?

13  A. It is outside the fence of T.D.C. of that unit.

14  Q. Okay. Now, there does have to be a guard out

15  there?

16  A. Yes.

17  Q. And that guard has to be armed; is that correct?

18  A. Correct.

19  Q. How many offenders, generally speaking, can go

20  outside the fence of T.D.C.J.and work?

21  A. Per one guard, it could be 15 to 25 offenders

22  being supervised at the time. And, of course, there

23  would be several squads out. And if you've ever been

24  by one of -- a prison facility, you may see offenders,

25  several squads of offenders out with several officers

**55**

1   on horseback, armed guard, working that facility's

2   agricultural areas or chopping grass or picking peas,

3   corn, whatever.

4   Q. So if Mr. Soliz is given a life sentence without

5   parole, renounces his gang membership, and comes out of

6   Administrative Segregation inside of three years or

7   around three years, he could be working outside of the

8   perimeter of T.D.C.J.?

9   A. Yes.

10  Q. Under a guard, under a guard who is armed; is

11  that correct?

12  A. Yes, ma'am.

13  Q. Along with his fellow inmates?

14  A. Correct.

15  Q. Be given tools?

16  A. Yes.

17  Q. Tools that could be used as weapons?

18  A. Yes.

19  Q. And have been in the past?

20  A. Yes.

21  Q. Let me just tell you as a practical -- let me

22  ask you as a practical matter, if those squads decide to

23  rush an officer, what happens?

24  A. Well, the officer, most officers, except the

25  high rider of the field squad, would be carrying a

**56**

1   six-shooter, a pistol. They would be able to shoot that

2   offender or ride off on their horse from that offender.

3   But once those six shells are expended, then catastrophe

4   would probably occur.

5   Q. And has that happened?

6   A. That has happened.

7   Q. Did we have a high rider a few years ago -- was

8   a high rider killed by a group of individuals outside of

9   the security perimeter at T.D.C.J.?

10  A. Yes, they were.

11  Q. I want to talk about the training that guards

12  have whether it's General Population or whether it's

13  Administrative Segregation. You're not saying the guards

14  don't do everything they can, are you?

15  A. No, ma'am, I'm not saying that.

16  Q. Where does T.D.C.J. recruit from?

17  A. They recruit from military bases. They recruit

18  from high schools, they -- colleges, universities,

19  wherever we can find able-bodied staff.

20  Q. Okay. So you may have an 18-year-old guard; is

21  that right?

22  A. That's correct.

23  Q. What kind of training does that 18-year-old

24  guard get?

25  A. Other than the six-week training school that

STATE VS. MARK ANTHONY SOLIZ                    MARCH 14, 2012

57

1  they go through either in Huntsville or Gatesville,
2  that's pretty much it.  And it's considered an
3  orientation more so, and they get two weeks at the
4  facility, two weeks to a month of on-the-job training.
5      Q.  Do females get anymore training than that?
6      A.  No, ma'am.
7      Q.  When you start at T.D.C.J, do you start in
8  General Population as a guard or do you start -- can you
9  start potentially in Administrative Segregation?
10     A.  You could start either place, wherever the need
11 is.
12     Q.  So you could have an 18-year-old female guard
13 guarding a hundred and forty-five Administrative
14 Segregation inmates?
15     A.  Yes, ma'am.
16     Q.  With six weeks of training?
17     A.  Yes, ma'am.
18     Q.  And, by the way, the guards in Administrative
19 Segregation, what do they wear?
20     A.  They wear gray suits, their uniforms.  They
21 also wear -- now they've got knife thrust vests is what
22 they call them that most of them wear those, depending
23 on agency budgets.  They have -- usually have a
24 keep-on-person can of mace and riot batons in their --
25 on their person when they're working the wing.

58

1      Q.  What is a thrust vest?
2      A.  Thrust vest is simply like a bullet-proof vest,
3  only these are -- handle a knife, stopping a knife from
4  penetrating the vital organs of the body.
5      Q.  And are the thrust vests or uniforms worn by
6  guards in Administrative Segregation a relatively new
7  change or policy?
8      A.  I worked Administrative Segregation '85 through
9  '87, and we did not have those.
10     Q.  Okay.
11     A.  Depending on -- it's a relative term.  As far as
12 I'm concerned, it's relatively new, but it's been --
13 they've been around for several years.
14     Q.  So even with all the changes and all the
15 improvements that T.D.C.J. has, it was necessary for the
16 guards in Administrative Segregation to basically wear
17 body armor; is that right?
18     A.  Yes.
19     Q.  What is the most secure area that we have at
20 T.D.C.J.?
21     A.  Maximum security Administrative Segregation.
22     Q.  What is even more secure than that?
23     A.  More secure than that would be -- well, we have
24 protective custody.
25     Q.  Okay.  Is Death Row the most --

59

1      A.  I'm sorry.  Death Row.  Thing about Death Row
2  is it's managed just like Administrative Segregation.
3      Q.  Same kind of guards could be on Death Row?
4      A.  Yes.
5      Q.  Do we still have crime on Death Row?
6      A.  Yes, we do.
7      Q.  And you're not here disparaging the guards or
8  the employees of T.D.C.J., are you?
9      A.  Not at all.
10     Q.  You do everything you can?
11     A.  Yes, we do.
12     Q.  Underpaid and overworked?
13     A.  I think so.
14     Q.  Are there signs around the various units of
15 T.D.C.J. discussing the possibility of hostages being
16 taken?
17     A.  Yes, at the front door.
18     Q.  Why is that?
19     A.  Because if a hostage is taken, and, for example,
20 if the Warden has a knife to his throat with -- by an
21 offender, and that last gate is the -- going to -- the
22 officer in that control area is not going to punch the
23 button to open that gate to let that offender and that
24 Warden out, even if that offender cuts the throat of that
25 Warden, because it's -- we don't want that person in the

60

1  public.  And if public safety is violated, then we've
2  just failed in our mission.
3      Q.  So even with all the security that we have, it's
4  still necessary to warn visitors that hostages may be
5  taken?
6      A.  Absolutely.
7      Q.  And that they enter at their own risk?
8      A.  Correct.
9          MS. JACK:  May I approach this witness, Your
10 Honor?
11         THE COURT:  Yes, ma'am.
12     Q.  Mr. Rogers, I'm showing you what's been marked
13 for identification purposes as State's Exhibits 493
14 through 496.  Are each of these pictures examples of the
15 signs that are found at the various units around
16 T.D.C.J.?
17     A.  Yes, ma'am, they are.
18     Q.  Are they fair and accurate portrayals of those
19 signs found around T.D.C.J.?
20     A.  Absolutely.
21         MS. JACK:  Your Honor, at this time, State
22 would offer into evidence State's Exhibits 493 through
23 496.
24         MR. HEISKELL:  No objection.
25         THE COURT:  Admitted.

STATE VS. MARK ANTHONY SOLIZ                   MARCH 14, 2012

61

1        (State's Exhibit Nos. 493 - 496 admitted.)
2        MS. JACK:  May I publish, Your Honor?
3        THE COURT:  Yes, ma'am.
4    Q.  (BY MS. JACK)  Mr. Rogers, is this an exhibit,
5    State's Exhibit 493, of one of the signs found around the
6    units of T.D.C.J.?
7    A.  Yes, it is.
8    Q.  It says "Will not permit inmates or hostages to
9    escape from custody or otherwise interfere with orderly
10   institutional operations.  Hostages will not be
11   recognized for bargaining purposes.  All inmates,
12   visitors, staff and volunteers will be informed of this
13   regulation."  And it's also in Spanish; is that true?
14   A.  That's true, yes, ma'am.
15   Q.  And the hostages, whether we're talking about a
16   Governor or whether we're talking about a mother and her
17   children, T.D.C. cannot negotiate for those hostages?
18   A.  No, we cannot.
19   Q.  And is this another example of one of the signs
20   found around T.D.C.J.?
21   A.  Yes, it is.
22   Q.  And these are all from different units, are they
23   not, Mr. Rogers?
24   A.  It looks to be.  And I see those signs every
25   time I go visit a facility.

62

1    Q.  And so the Jury understands, where are those
2    signs generally in terms of the facility?
3    A.  Usually as you're driving into the facility,
4    you'll probably pass a marker that says, for example,
5    the Michael Unit.  You proceed further down the road,
6    to the right you'll see one of those signs that say
7    "hostages not taken; concealed weapons not allowed".
8    Then you get to the entryway, and you'll see right
9    outside on the front door and on the inside gate as
10   if you were exiting the facility, you'll see the
11   hostage warnings posted there.
12   Q.  Mr. Rogers, can you see this sign?
13   A.  Yes, ma'am.
14   Q.  And it says, "Do not pick up hitchhikers"; is
15   that correct?
16   A.  That is correct.
17   Q.  Where is this sign?
18   A.  It's usually on a road -- well, every time I go
19   to the Coffield, Beto, Michael facilities for
20   Administrative Segregation hearings, those signs are down
21   the main road.  If you've never been to a prison but have
22   been within a few miles of a prison, for example, Highway
23   287 in Palestine area, you're going to see the signs that
24   say "Do not pick up hitchhikers".  And these signs are
25   several miles from the facility on main thoroughfares of

63

1    the -- of the state.
2    Q.  Why is it necessary to have a sign like that?
3    A.  Because they could be -- those hitchhikers could
4    be escaping offenders, and we don't want somebody to get
5    hurt that way or help aid in someone's escape from a
6    facility.
7        MS. JACK:  Okay.  May I have a moment, Your
8    Honor?
9        I believe that's all I have.  I'll pass this
10   witness for cross-examination, Your Honor.
11              CROSS-EXAMINATION
12   BY MR. HEISKELL:
13   Q.  Mr. Rogers?
14   A.  Yes, sir.
15   Q.  My name is Mike Heiskell.  How are you?
16   A.  I'm fine.  How are you, sir?
17   Q.  I'm fine.  Thank you.  I have some questions for
18   you.  If you don't understand me when I ask you those,
19   don't hesitate to stop me and I'll start over.
20   A.  Yes, sir.
21   Q.  Now, you've testified before in capital murder
22   cases, correct?
23   A.  Yes, sir, I have.
24   Q.  And your -- purpose of your testimony is to
25   essentially let the Jury know that T.D.C. is not a safe

64

1    place so that a death sentence can be imposed; isn't that
2    true?
3    A.  Pretty much, yes, sir.
4    Q.  Okay.  And so there's an agenda on your part to
5    say that.  Okay.  You know, you've worked in
6    classifications for a number of years, and you've worked
7    at T.D.C. for a number of years.  And you know, for
8    instance, that when -- these guards and administrators
9    and folks there try to do the best they can to keep it
10   safe and secure; isn't that true?
11   A.  Yes, sir; however, I -- may I disagree with the
12   fact of what you said about me having an agenda?  I don't
13   necessarily have an agenda.  I'm just trying to tell you
14   what I know.  That's all.
15   Q.  Okay.  Well, let's get to what you know.  And
16   you know that state law requires T.D.C.J. put together a
17   classification plan for inmates when they come in?
18   A.  Yes, sir.
19   Q.  And, in fact, part of that classification plan
20   is instituted by virtue of T.D.C. interviewing inmates
21   who come in through the Diagnostic Unit; is that correct?
22   A.  That is correct, sir.
23   Q.  And they look at the prior criminal history?
24   A.  Yes.
25   Q.  They look at prior classification in T.D.C. if

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

65

1 they've been in T.D.C. before, correct?
2    A. Correct.
3    Q. They look at prior violent offenses, as the
4 Prosecutor stated, such as capital murder, correct?
5    A. Correct.
6    Q. You look at medical needs for that particular
7 inmate?
8    A. Yes, we do.
9    Q. There's a mental health evaluation to see what
10 type of inmate you're dealing with mentally speaking;
11 isn't that true?
12    A. That's true.
13    Q. And all of these factors go into play in trying
14 to classify and place that inmate in a particular unit so
15 that not only will the guards be safe but other inmates
16 be safe, isn't that true?
17    A. That is true.
18    Q. And that's not thrown away and disregarded or
19 trashed or shredded, but that's something that stays with
20 that inmate throughout; isn't that true?
21    A. That is true.
22    Q. Now, with regard -- let me ask you this. Those
23 signs we just saw about "Do not enter" or "Enter at your
24 own risk", you see that at county jails as well, don't
25 you?

66

1    A. I -- I don't -- I haven't been to a county jail
2 in -- I don't think I've ever been to a county jail per
3 se, sir.
4    Q. All right. Well, never being -- well, granted,
5 I've been to a lot of county jails.
6    A. Yes, sir.
7    Q. I've seen similar. You don't disagree with that,
8 do you?
9    A. I wouldn't disagree with you at all, no, sir.
10    Q. Whether it's Johnson County jail or Tarrant
11 County jail.
12    A. Correct.
13    Q. Let me ask you this. How many 18-year-old
14 female guards do y'all have working on that
15 Administrative Segregation?
16    A. I don't know that, sir.
17    Q. Do you have stats you can give this Jury?
18    A. I don't have personnel stats. I could quickly
19 acquire them, but I don't have them off the top of my
20 head.
21    Q. Okay. 12 to 15 units you said have
22 Administrative Segregation?
23    A. Yes, sir.
24    Q. And that Administrative Segregation is managed
25 the same as is managed on Death Row, the Polunsky Unit,

67

1 correct?
2    A. That's correct.
3    Q. And they have -- regarding that, we're talking
4 about the same type of cells, the pods and so forth
5 exists at Death Row also exists for Administrative
6 Segregation?
7    A. Yes, sir.
8       MR. HEISKELL: Let me approach, if I may,
9 Judge. I have a number of exhibits.
10       MS. JACK: May I approach as well so I can
11 see?
12       (Pause in proceeding.)
13    Q. (BY MR. HEISKELL) Mr. Rogers, I'm, first of
14 all, going to hand you what's been marked for
15 identification purposes as Defense Exhibit No. 28.
16    A. Okay.
17    Q. And ask you to review that, see if you can
18 identify that, please.
19    A. Yes, sir. That's -- this is our policy
20 regarding classification procedures as relates to
21 classification committees.
22    Q. Okay. I'm also now going to hand you what's
23 been marked for identification purposes as Defense
24 Exhibit 29 and ask if you can identify that, please.
25    A. This is the Administrative Segregation plan that

68

1 we use that tells us all the particulars of how to -- how
2 we're going to manage Administrative Segregation on a
3 unit.
4    Q. And Defense Exhibit No. 30, please.
5    A. This is an Administrative Segregation reference
6 chart. It tells the classification boundaries and the
7 conditions of those boundaries as to how we're going to
8 treat a individual in Administrative Segregation.
9    Q. And, finally, Defense Exhibit No. 31.
10    A. Again, this is similar to a Administrative
11 Segregation plan. It's the actual classification
12 procedure as to how often we review offenders, their
13 different levels. The units have to review an offender
14 ever so often for leveling, level 1, 2 and 3, which is
15 keyed to how they're acting. And that's what this one
16 involves, sir.
17    Q. And all of these exhibits, if you will look at
18 the effective dates, these are the most recent, updated
19 Administrative Segregation plan and reference charts and
20 classification procedures, are they not?
21    A. Yes, sir, they are.
22    Q. And these are some of the procedures and
23 classification issues that you deal with on a day-to-day
24 basis?
25    A. Yes, sir.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

69

1    MR. HEISKELL: Your Honor, at this time we
2 would offer 28 through 31.
3    MS. JACK: No objection, Judge.
4    THE COURT: Admitted.
5    (Defendant's Exhibit Nos. 28 - 31 admitted.)
6    Q. (BY MR. HEISKELL) Mr. Rogers, I'm going to use
7 this overhead, if I can, to go through some of these
8 documents.
9    A. Yes, sir.
10    THE COURT: Let's take a 15-minute recess
11 and then we'll come back.
12    (Recess taken from 10:30 to 10:48 a.m.)
13    (Jury not present.)
14    THE COURT: You may be seated. Is the State
15 ready to proceed? State ready?
16    MS. JACK: We're ready, Judge.
17    THE COURT: Defense ready?
18    MR. HEISKELL: Yes, Your Honor.
19    THE COURT: Defendant is present. Jury
20 ready?
21    THE BAILIFF: Yes, sir.
22    THE COURT: Bring them in, please.
23    (Jury present.)
24    THE COURT: You may be seated.
25    Yes, sir.

70

1    MR. HEISKELL: Thank you, Your Honor.
2    Q. (BY MR. HEISKELL) Mr. Rogers, I'm showing you
3 now Defense Exhibit No. 28, which is the classification
4 of procedure -- classification procedure -- if I can zoom
5 this out -- that you previously identified; is that
6 correct, sir?
7    A. Yes, sir, that's correct.
8    Q. Can you see that on your monitor in front of
9 you?
10    A. Yes, sir, I can.
11    Q. Okay. And this is the first page. We see this
12 is dated February of 2010; is that correct, sir?
13    A. That's correct.
14    Q. All right. I now want to take you to a section
15 entitled The Administrative Segregation Committee. And
16 is that a committee that you were a part of?
17    A. No, sir, it's not, not the Ad-Seg committee.
18 That's a unit-based committee.
19    Q. And tell us about this unit-based committee of
20 Administrative Segregation.
21    A. They -- when an offender is initially placed in
22 Ad-Seg, he's required to be reviewed by the Ad-Seg
23 committee for -- to make sure his placement is accurate.
24 He could be reviewed by this committee for promotion in
25 time-earning status, promotion in level, transfer

71

1 requests to state classification because he's got an
2 issue, a housing change. Lots of different reasons the
3 Ad-Seg committee would talk to a fellow.
4    Q. Okay. And we see on that second paragraph here
5 regarding classification office may refer offenders from
6 the U.C.C. to the A.S.C., and that's that unit
7 classification issue, due to assaultive behavior or
8 Security Threat Group confirmation. Do you see that,
9 sir?
10    A. Yes, sir. I'm losing something on the right
11 side of the page there.
12    Q. Okay. I'm sorry. Let me --
13    A. Yes, sir.
14    Q. Okay. Now, I want to now take you to what is
15 referenced in the attachment to this document, State's --
16 Defense Exhibit 28, what is called the General Population
17 Level. And I've highlighted a certain area, sir, on this
18 particular exhibit. And if you could see that, it
19 references G3 custody, does it not?
20    A. Yes, sir, it does.
21    Q. And, in fact, it says G3 custody shall be
22 assigned to primarily SAT 3, SAT 4 or Line Class 1,
23 time-earning status offenders?
24    A. Yes, sir.
25    Q. And custody should only be assigned to offenders

72

1 who have one or more of the following characteristics.
2 You see that?
3    A. Yes, sir, I do.
4    Q. And that first one highlighted is "no
5 requirement for a more restrictive custody". You see
6 that, sir?
7    A. Yes, sir, I do.
8    Q. And a requirement for a more restrictive custody
9 could be, in fact, be that Security Threat Group
10 designation; is that true?
11    A. The custody based on the Security Threat Group
12 that would put him into Ad-Seg, yes, sir.
13    Q. And you see here at the bottom, and this
14 references offenders convicted of capital murder and
15 sentenced to life without parole, highlighted in that
16 bullet point 8. You see that, sir?
17    A. Yes, sir, I do.
18    Q. Okay. Now, when we look at that, and then we
19 move to the next document, sir, which is Defense Exhibit
20 No. 29 which is entitled Administrative Segregation Plan,
21 do you see that, sir?
22    A. Yes, sir, I do.
23    Q. And it may not be --
24    A. It's a little blurry.
25    Q. Yeah, I'm trying to get that, if I can. Okay.

73

1  And this document, sir, for purposes of showing us here
2  is dated March -- it's brand-spanking new, March of 2012;
3  is that right?
4      A.  Yes, sir, it is.
5      Q.  We go to the actual page 1 of this document,
6  sir, we have the definition of Administrative
7  Segregation?
8      A.  Yes, sir.
9      Q.  Can you see that clearly and can you read it
10  briefly, that first paragraph, sir?
11      A.  I can't -- the left and right margins are a
12  little out, so.
13      Q.  Let me try to correct that.  Is that helpful?
14      A.  It's blurred, but I'll give it a try.
15  Administrative Segregation is a nonpunitive, maximum
16  custody status involving the separation of an offender
17  from General Population for the purpose of maintaining
18  safety, security and order among General Population
19  offenders and correctional officers within the prison and
20  the public.  For the purpose of this plan, ad --
21  Administration Segregation shall consist of the following
22  four categories.
23      Q.  And it lists the four categories below that; is
24  that correct, sir?
25      A.  That's correct.

74

1      Q.  And including the number one category, security
2  detention?
3      A.  Yes, sir, that's correct.
4      Q.  And then we have under that, prehearing
5  detention, and under that, protective custody, and
6  finally, temporary detention; is that correct, sir?
7      A.  That is correct.
8      Q.  And let me move to the definition at the bottom
9  of this document referencing security detention.  You see
10  that, sir?
11      A.  Yes, I do.
12      Q.  And what I've highlighted here, security
13  detention is used for an offender who is a, and at the
14  very bottom, you see that, confirmed member of a Security
15  Threat Group?
16      A.  Yes, sir.
17      Q.  And you've told this Jury that you are aware
18  that Mark Anthony Soliz is a confirmed member of a
19  Security Threat Group, and that is Texas Syndicate?
20      A.  Yes, sir, that's what was on my computer when I
21  checked him out the other day.
22      Q.  And when you checked him out the other day, you
23  also saw that he'd been in the Texas Prison System
24  before, had he not?
25      A.  Yes, sir.

75

1      Q.  Was there from approximately January of 2007
2  until approximately 2010; isn't that true?
3      A.  I believe so.
4      Q.  And during that entire time, he was in
5  Administrative Segregation, was he not?
6      A.  I think a small time he was in the population,
7  but the majority of the time was in Ad-Seg.
8      Q.  And that was after he was confirmed as a member
9  of that gang that he referenced; is that true?
10      A.  That is true.
11      Q.  And he stayed in that Administrative Segregation
12  for at least three or so years; isn't that true?
13      A.  I didn't check the time frame, but I know he
14  paroled out in that status.  He was in Ad-Seg.
15      Q.  And he -- he paroled out in that status, and
16  previous to that, he had been locked up in
17  Administrative-Seg for about three years; isn't that
18  true?
19      A.  Yes, sir.
20      Q.  And that's part of the classification procedure
21  when you look at some things like that, when you find a
22  person has been in the prison system before, has been in
23  Administrative-Seg, has been in a Security Threat Group,
24  that plays into how you would place him when he comes
25  back to prison; isn't that true?

76

1      A.  That is true.
2      Q.  And during that entire time he was in
3  Administrative-Seg, he stayed there and there was no
4  movement from -- of him from Administrative-Seg back to
5  General Population?
6      A.  No, sir, I didn't see a move back.
7      Q.  I'm now going to reference, Mr. Rogers, Defense
8  Exhibit No. 30.  Can you see that, sir?
9      A.  Yes, sir.
10      Q.  And this particular talks that -- references
11  the reference chart that you talked about when I showed
12  you this document earlier.  Do you recall that, sir?
13      A.  Yes, sir, I do.
14      Q.  Are you -- can you read that chart from where
15  you're seated?
16      A.  Offenders in security detention shall be subject
17  to the following classification boundaries.
18      Q.  Okay.  And let me -- let me take them one at
19  a time, if I may, so we can discuss them.  When we look
20  at A., it says ineligible for promotion.  Trying to
21  tighten it up a little bit.  Okay.  Can you see that,
22  Mr. Rogers?
23      A.  Yes, sir.
24      Q.  Ineligible, excuse me, for promotion of time and
25  class SAT 4.  Explain to the Jury what that means.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

77

1   A.  SAT 4 is -- that means State Approved Trustee
2   4.  That's his time-earning status, his time-earning
3   paycheck, how much good time he would get.  The life
4   without parole, it really wouldn't factor in.
5      Q.  So he gets no time.  He's in there for the rest
6   of his life?
7      A.  Yes, sir.
8      Q.  The B. part says ineligible for contact visits,
9   however, may have one noncontact visit each week?
10     A.  Yes, sir.
11     Q.  Now, a contact visit is where an inmate can
12  actually touch or hold or feel a visitor; is that
13  correct?
14     A.  Yes.
15     Q.  And that visitor, and I think you referenced
16  when the Prosecutor was asking you questions about those
17  situations where visitors can perhaps sneak contraband in
18  somehow, I guess, to inmates in the prison; is that
19  right?
20     A.  They can do it several ways, and one of them is
21  contact visitation.
22     Q.  However, here, the person is not eligible to have
23  any type of contact visit?
24     A.  Correct.
25     Q.  For the rest of his or her life?

78

1      A.  Correct.
2      Q.  However, they may have a one noncontact visit
3   each week, I guess depends upon whatever boundaries that
4   are for that particular inmate; is that correct?
5      A.  I'm sorry, say that again, please.  I'm sorry.
6      Q.  However, may have one noncontact visit each
7   week?
8      A.  Yes, sir.
9      Q.  All right.  That person, of course, would be
10  through that Plexiglass, I think you told us about; you
11  can get on the phone and see the person on the other side
12  of the glass?
13     A.  Yes, sir, that's it.
14     Q.  Okay.  I'm sorry, I moved that.  Ineligible for
15  an emergency absence.  Now, the emergency absences can
16  be when an inmate's mother or father perhaps has died or
17  some relative, you can go for a emergency visit or
18  absence to that funeral service?
19     A.  To the funeral service or to the bedside at,
20  say, a hospice.
21     Q.  To watch their loved one die or?
22     A.  To at least visit for that, for a few hours.
23     Q.  But a person in this status cannot do that, can
24  they?
25     A.  No, they cannot.

79

1      Q.  Ineligible for a job assignment or participation
2   in educational programs.  Those job assignments we talked
3   about, perhaps within the prison facility, whether it's
4   outside or inside, nevertheless, that person cannot have
5   a job under this particular boundary; is that correct?
6      A.  Correct, not being in Administrative
7   Segregation.
8      Q.  Nor have any type of educational program to
9   attend to?
10     A.  No, sir.
11     Q.  Is that right?
12     A.  Correct.
13     Q.  Requires constant armed supervision outside the
14  security perimeter, escort to and from activities outside
15  the offender's assigned cell.  In other words, when they
16  go for that one hour for perhaps recreation or be in a
17  rec area, it's got to have that type of security around
18  them; is that right?
19     A.  That is correct.
20     Q.  That last part, must be housed in a single cell
21  specifically designed for housing security detention
22  offenders.  In other words, they're not grouped with
23  others; they're in that single cell?
24     A.  That's correct.
25     Q.  Okay.  But the other conditions here for the

80

1   Level 1 Ad-Seg talks about out-of-cell recreation
2   scheduled at warden's discretion, one hour seven days a
3   week or, at discretion, two hours five days a week; is
4   that right?
5      A.  That's correct.
6      Q.  Okay.  And then we have meals, which is a
7   regular food tray that those are provided through the
8   food slot or a bean chute?
9      A.  Yes, sir, he gets the same food that's served
10  to the regular -- the General Population.
11     Q.  Commissary.  If someone can provide monies, then
12  that's $70 every two weeks and allowed special purchase
13  items; is that right?
14     A.  That is correct.
15     Q.  Property.  Basic list items plus additional
16  items general available -- generally, excuse me,
17  available to G.P., which is General Population?
18     A.  Yes, sir.
19     Q.  And what are the basic list items, if you recall
20  or do you know?
21     A.  He could have a radio, a fan, a Bible, books.
22  I'm sure there's other items.  Well, they have to have a
23  razor.  Lots of different miscellaneous items, pen,
24  pencil, paper, their letters, their legal mail, items
25  like that.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

81

1   Q. Okay. We have to provide a opportunity to
2   shower seven days a week. Is there a shower in that
3   cell?
4   A. Most facilities have a shower area, not
5   necessarily in the cell, but they're escorted to a
6   shower.
7   Q. And they have to be escorted by armed escorts?
8   A. No, the escorts, the correctional staff in
9   Ad-Seg; they have a riot baton and keep-on-person mace.
10   Q. Okay. All right. F. says: May have access to
11   in-cell programs that are consistent with security
12   requirements. Excuse me. Allow materials available
13   through the commissary and in-cell correspondence course
14   materials, if approved. Those are some of the things we
15   mentioned earlier; is that correct, sir?
16   A. Yes, sir.
17   Q. Okay. And access to counselors, chaplains and
18   medical care?
19   A. Yes, sir.
20   Q. And the last one, eligible -- eligible for
21   in-cell arts and crafts, piddling.
22   A. I don't think that's happening.
23   Q. Okay. Why do you say that?
24   A. Well, because arts and -- well, they can draw
25   and have colored pencils, but as far as when I think

82

1   piddling shop, that's the place -- you know, a lot of
2   law enforcement agencies in Texas have offenders that
3   do their belt buckles and their gun holsters, and that
4   would require some sharp objects and, you know, stuff
5   that's -- wouldn't be allowed in a cell. But when
6   they're speaking of in-cell arts and craft, it would be
7   something of the nature of pastels to draw pictures and
8   stuff like that.
9   Q. Oh, okay.
10   A. Something that wouldn't be a threat to security.
11   Q. Okay. So that's always a consideration; you
12   look at what could be considered a potential threat by
13   looking at what objects they may have access to? Is that
14   correct?
15   A. Yes, sir. And everything we're talking about is
16   subject to the discretion of the unit warden.
17   Q. Okay. Thank you. I'm now going to show you,
18   Mr. Rogers, Defense Exhibit No. 31, which is the Unit
19   Classification Procedure. You see that, sir?
20   A. Yes, sir.
21   Q. And that's dated October of 2009; is that right?
22   A. Yes, sir, it is.
23   Q. And when we look at -- I think you referenced
24   this earlier in your testimony, and that is the annual
25   Security Threat Group review by S.C.C.

83

1   A. Yes, sir.
2   Q. And tell us again what is S.C.C.
3   A. That stands for State Classification Committee.
4   There's 11 of us in the state that have certain authority
5   to release these guys from Administrative Segregation as
6   well as being required to review them yearly, to see if
7   he's doing okay, if there's anything we can help him
8   with. He may need a referral to the medical department
9   or the psychological department or refer him to Security
10   Threat Group because he wants to renounce his gang
11   affiliation.
12   Q. And that would have taken place -- that takes
13   place for every Ad-Seg inmate who is a member of that
14   group, that annual review?
15   A. Yes, sir.
16   Q. And then a determination is made at some point
17   by the inmate if he or she wants to renounce that
18   particular gang, and then a process is started for that;
19   is that right?
20   A. Yes, sir.
21   Q. And that process can take, I think as you
22   stated, several weeks or months; is that correct, sir?
23   A. Yes, sir, nine months.
24   Q. And that process is in which a person would
25   renounce, that is known within the administration of

84

1   T.D.C. as well as obviously to perhaps even other inmates
2   who are gang members?
3   A. Yes, it is. Let me clarify something just a
4   little bit. An offender that says "I want to renounce
5   my gang affiliation", first of all, at a minimum of two
6   years, the -- once he makes that request, the Security
7   Threat Group officer at that facility is going to watch
8   his mail. They're going to watch him on the rec yard,
9   see if he's affiliating or associating with any known
10   gang members, if he's got any property or tattoos or
11   anything new that they think he's not sincere about
12   his disassociation. So it's a minimum of two years
13   they're going to watch him.
14       And let's say after that two years the
15   Security Threat Group officer says this guy, he's --
16   we're going to ex him, he's not affiliated anymore,
17   he's sincere, then he would be sent to what's called
18   the GRAD program, Gang Renunciation And Disassociation.
19   Excuse me. It's a process, and that's about nine months
20   long.
21   Q. Okay. So the two-year period, you add another
22   nine months to that for that GRAD program?
23   A. Yes, sir.
24   Q. Okay. So for two years he's watched and
25   observed. Now, is he --

85

1    A. That's at a minimum, sir.
2    Q. That's at a minimum. So it could be longer?
3    A. It could be longer, and it could come back that
4  they say, no, we think he is still affiliated.
5    Q. And one thing, I guess, persons in that capacity
6  would look out for is whether they are being somehow
7  fooled by this inmate or the inmate is being deceptive or
8  manipulative, and they can detect that and say, hey, you
9  know, this guy is really not sincere?
10   A. Yes, sir.
11   Q. Okay. And those officers who do that are
12 trained in looking out for those type of things, are they
13 not?
14   A. Yes, they are.
15   Q. They have been experienced in looking out for
16 those persons who may, in fact, try to be deceptive,
17 manipulative or what have you, in order to show a
18 sincerity or lack thereof in making that decision?
19   A. Yes, sir.
20   Q. And we know that Mark Soliz, as you stated, was
21 in Ad-Seg under that Security Threat Group for at least
22 three years from '07 till '10?
23   A. Yes, sir.
24        MR. HEISKELL: If I may approach again, Your
25 Honor?

86

1        THE COURT: Yes, sir.
2    Q. I'm going to show you now, Mr. Rogers, a series
3  of photographs, Defense Exhibits 32 through 38. I'll
4  start with 32.
5    A. Yes, sir.
6    Q. And ask if you can identify Defense Exhibit
7  No. 32.
8    A. Okay. That one is an ad -- Administrative
9  Segregation housing area at an extended cell block.
10   Q. Okay. And that's part of the Texas Prison
11 System; is that correct?
12   A. Yes, it is.
13   Q. And that's representative of what an Ad-Seg unit
14 or unit looks like; is that correct?
15   A. Yes, sir, a more newer model.
16   Q. Defense Exhibit No. 33, if you can identify
17 that, please.
18   A. Yes, sir. This is the actual cell that the
19 offender would be in. Yes, sir, that's with the seat and
20 the writing area and the bunk.
21   Q. And Defense Exhibit No. 34, please.
22   A. Yes, sir. This is the actual outer door, the
23 door to the cell with the two-slot windows and the food
24 slot for feeding him.
25   Q. Okay. Defense Exhibit No. 35, please.

87

1    A. It's the same thing except the door is painted
2  blue instead of white.
3    Q. Okay. And that's showing it from --
4    A. From the door being open.
5    Q. Door being open.
6    A. Yes, sir.
7    Q. Okay. In fact, it has a cell number on that; is
8  that right?
9    A. Yes, sir.
10   Q. Defense Exhibit No. 36.
11   A. That is his commode, his wash -- his sink, and
12 he gets a drink from there.
13   Q. Okay. And let's go to Defense Exhibit 37. Tell
14 us what that is.
15   A. This would be a riot helmet. It's the helmet
16 the officers wear should they have to force-move an
17 offender or if there is a riot on the facility anyplace
18 else, they would wear this riot helmet along with any
19 other protective equipment.
20   Q. And Defense Exhibit No. 38.
21   A. And these are -- I see leg irons. I see riot
22 batons. I see plastic cuffs. And I see gas masks.
23   Q. Okay. And the gas masks are for purposes of
24 what, sir?
25   A. In case offenders become violent, tearing up

88

1  property, harming, any threat to the security
2  institution, and the warden directs or highest supervisor
3  on duty directs tear gas be administered or applied, then
4  officers would wear those tear gas masks so they could go
5  do their jobs and quell the situation.
6    Q. Now, we've heard use at least in Johnson County
7  jail of the pepper spray, and we talk about tear gas. Is
8  there a difference?
9    A. Not really. They're all -- they all have the
10 same purpose. They're all similar in their composition.
11 One may be stronger than the other given the situation,
12 but they're pretty much the same.
13   Q. And they're pretty effective, are they not?
14   A. Yes, sir. There are some fellows that can -- it
15 doesn't phase them.
16   Q. But there are some it does phase?
17   A. It phases most of them, yes, sir.
18   Q. Phase most of them. Okay. All of these photos,
19 Defense Exhibit twenty -- 32, excuse me, through 38, do
20 they fairly and accurately depict the scenes as described
21 here, the Ad-Seg unit, the cells, the interior of the
22 cells, the security devices and the gas masks?
23   A. Yes, they do. That's on a more modern facility.
24 The older facilities, Administrative Segregation are a
25 bit different.

STATE VS. MARK ANTHONY SOLIZ                    MARCH 14, 2012

89

1    Q. How many modern facilities are there?
2    A. There are five that I -- five on top of my head.
3    Q. Okay. Five out of the 12 to 15?
4    A. Yes, sir.
5        MR. HEISKELL: Your Honor, at this time we
6  offer Defense 32 through 38.
7        MS. JACK: No objection.
8        THE COURT: Admitted.
9        (Defendant's Exhibit Nos. 32 - 38 admitted.)
10       MR. HEISKELL: Thank you. May I publish,
11  Your Honor?
12       THE COURT: Yes, sir.
13   Q. (BY MR. HEISKELL) Mr. Rogers, this is Defense
14  Exhibit No. 32, and this is what we term an
15  Administrative Segregation unit; is that correct?
16   A. Yes, sir, that's one of the housing areas.
17   Q. And we see the different cells that are lined up
18  and down the rows here, the bottom floor, and I take it
19  there are also cells on the top floor as well?
20   A. That's correct, sir.
21   Q. And these doors, can you explain how they lock
22  and unlock?
23   A. There's an officer in a control area pushes a
24  button or turns a knob and that door will slide shut
25  electrically.

90

1    Q. Okay. And is that the only way that door will
2  lock or unlock?
3    A. No, sir, it can be hard keyed.
4    Q. So it can be done electronically plus hard key?
5    A. Or manually, it can be manually done.
6    Q. And when we look at this area here, the hallway,
7  is that used by the guards to patrol or walk, if you
8  will, the unit?
9    A. Yes, it is.
10   Q. And that's both upstairs and downstairs; is that
11  right?
12   A. That's correct.
13   Q. And what is the purpose for the guards to walk
14  the unit, if you will?
15   A. Well, they're walking to, number one, they could
16  be doing count; number two, they could be doing security
17  checks, which they're required to do every 15 minutes.
18  They walk up and down the cell -- cell block looking into
19  cells to see if an offender may have a medical problem, a
20  seizure or something of that effect. But they count.
21  They're just walking to make sure everything is safe and
22  secure on that -- in that housing area.
23   Q. Now, is there a plan for T.D.C. to eventually --
24  you said this was a newer unit, if you will -- to upgrade
25  all the units to appear in the same as Defense Exhibit

91

1  No. 32?
2    A. No, sir. That costs money and I don't think
3  that would ever come to be.
4    Q. Well, you've had money to be -- have these
5  updated for the last few years?
6    A. Yes, sir. When we say modern, these have been
7  in place for several years, but.
8    Q. Okay. I'm going to show you now Defense No. 33,
9  sir. And tell us what that is.
10   A. That's the actual cell. You see a bunk. Under
11  the bunk you have storage space. And then you see a
12  shelf to your upper left. Below that you'll see a
13  desktop for writing, and then a chair he can sit on to
14  write.
15   Q. Okay. And what are the dimensions of this unit,
16  sir, if you know?
17   A. Not off the top of my head. I don't want to
18  venture a guess on that. I used to know, but that's a
19  figure I just don't know right now.
20   Q. And if I -- let's pretend like this is a cell
21  area with you here, and the front of your witness stand
22  being part of the cell, could you tell me what dimensions
23  would look like from here?
24   A. Probably the front of this podium to you, to the
25  jury box, the front of the jury box, and maybe a little

92

1  bit further. If you went that way maybe a foot.
2  Roughly, roughly, very rough.
3    Q. All right. And here, does it go back this far
4  or I'm trying to look at --
5    A. It goes to about where you would be. Maybe a
6  little bit less. Yes, sir.
7    Q. And then to the Jury box back over toward you?
8    A. Yes, sir.
9    Q. Defense Exhibit No. 34, Mr. Rogers, you see
10  that?
11   A. Well, you see two slotted windows, kind of look
12  like eyes, where officers would look through to look at
13  the offender, make sure he's all right. The horizontal
14  slot is the food slot which is -- has a little door on it
15  that's kept locked.
16   Q. Okay. And this area here, the bottom door to
17  the floor, is that flush to the floor? Is there any space
18  there or can you explain that?
19   A. I can't help you on that, sir. I don't know.
20   Q. Let me -- maybe this one will help us out here.
21  This is Defense No. 35, a door as well.
22   A. Yes, sir -- it is flush to the floor. Looks
23  like an outer plate has been tack-welded on there.
24   Q. Okay. This is that outer plate?
25   A. Yes, sir.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

93

1  Q. And what that does is if persons who are within
2  Ad-Seg try to use what are called fishing lines, this
3  would help prevent that from taking place?
4  A. Yes, it would.
5  Q. And the fishing lines are those lines in which
6  inmates may wrap a line together on some type of piece of
7  metal or pin or whatever and push it out and pull it --
8  push it down the row, so to speak?
9  A. Yes, sir.
10  Q. So another inmate can kind of grab it and put
11  correspondence on there and the like.
12  A. Yes, sir.
13  Q. But this particular plate prohibits that; is
14  that correct, sir?
15  A. Yes, sir.
16  Q. No. 36, Mr. Rogers, that's obviously the commode
17  area, and is that a drink right above the commode?
18  A. Yes, sir. He's got a sink to wash up in, brush
19  his teeth, comb his hair. And there's a polished metal
20  mirror in there. But, yes, he would actually put his --
21  in the middle knob there, he would put his finger over
22  one of those running -- when the water is running down
23  into the sink, you put your finger over the hole and it
24  pushes it up so you can get a drink.
25  Q. Okay. This right here?

94

1  A. Yes, sir.
2  Q. Okay. Now, Defense Exhibit No. 37, we're
3  talking about the security procedures as well as what's
4  available for the guards to utilize in case there's a
5  problem; is that right?
6  A. Yes, sir.
7  Q. And these are the -- explain to the Jury what
8  these are.
9  A. These are riot helmets. They are part of an
10  ensemble, if you will, of riot material, which includes
11  this helmet, with other -- there's a suit that officers
12  would wear should they have to quell a riot or if you
13  have an offender, for example, throwing items from a
14  cell, they need to go in and move him, take him out,
15  subdue him, then they would don this, this outfit. So
16  it's to protect themselves, protective clothing, to go in
17  and deal with the security issue.
18  Q. And Defense Exhibit No. 38, explain what that
19  reflects.
20  A. The top shelf are -- those are the gas masks,
21  which would be part of that ensemble. On the bottom
22  shelf you see leg irons, you see plastic cuffs. There's
23  actually a -- looks like a plastic razor back there too.
24  And on the right side bottom you see three riot batons.
25  Q. And these are the gas masks at the top. When

95

1  tear gas is utilized, the guards can wear that without
2  any fear of them being contaminated with the spray
3  itself; is that right?
4  A. Yes, sir, that's correct.
5  Q. In order for -- we talked about some of those
6  boundaries and conditions before for people in
7  Administrative Segregation. Remember that reference to
8  commissary?
9  A. Yes, sir.
10  Q. In order for a person to receive commissary,
11  they must have, I guess, some outside family or friend or
12  whatever that would put money on their books so that they
13  can purchase those items; is that correct?
14  A. Yes, sir, that is correct.
15  Q. And if they don't have family, of course, then
16  they don't have any access to commissary for those people
17  at least to give them?
18  A. Other than friends or church members, folks like
19  that.
20  Q. Okay. You -- a noncontact visit, when we talk
21  about through the Plexiglass, remember we talked about
22  that?
23  A. Yes, sir, I do.
24  Q. And with persons on the phone on one side of the
25  glass and the visitors on the other side of the glass, do

96

1  they have to -- the inmate has to put down, I guess, a
2  visitation list of people?
3  A. Yes, sir, he can have ten, ten approved folks on
4  his visitation list.
5  Q. And then, of course, it's up to those persons to
6  come down to whatever unit that person is in to visit for
7  that contact or noncontact visit to actually take place;
8  is that right?
9  A. That's right.
10  Q. When we look at, Mr. Rogers, issues of
11  whether -- and I think this was kind of alluded to by
12  the Prosecutor -- whether you guys do a good job or not,
13  okay, I want to go back to that.
14  A. Yes, sir.
15  Q. And you've told us that these folks who were
16  employed by your facilities try to do the best they can
17  under the circumstances, many of them do?
18  A. I believe they do.
19  Q. And we're talking about virtually with 155,000
20  inmates, kind of a small city, are we not?
21  A. Yes, sir.
22  Q. A city of about the size of, what, Waco or maybe
23  a little larger than Waco?
24  A. Waco, Tyler, San -- no, San Antonio has got more
25  than that, but close enough, I guess.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

**97**

1    Q. And when you look at what happens in those
2  facilities, obviously when people -- by the way, how many
3  correctional officers are employed by T.D.C.?
4    A. You guys are always asking me statistical stuff.
5  I could give you off the top of my head 26,000 at least.
6  There are a lot of correctional staff. I don't have the
7  exact number for you. Of course, I can find that if you
8  need it.
9    Q. So but approximately 26,000?
10   A. I'm -- about 26,000 as far as correctional
11 officers.
12   Q. And you mentioned earlier about the training,
13 excuse me, that the officers would go through once
14 they're recruited; is that right?
15   A. Yes, sir.
16   Q. Are you involved in any aspect of training
17 yourself?
18   A. No, sir, not with the correctional staff,
19 correctional officers.
20   Q. Have you ever gone through any of the training
21 or seen any of the training? Obviously you were a
22 correctional officer.
23   A. Right. I had to go through the training.
24   Q. And how long ago was it that you went through
25 your training?

**98**

1    A. I went through in 1982.
2    Q. And things obviously have changed since 1982;
3  would you agree?
4    A. Yes, yes, I would agree.
5    Q. And training methodologies and concepts have
6  changed over the years, have they not?
7    A. Yes, they have.
8    Q. Because you're dealing with, from 1982 time
9  frame, a different type of inmate, a different class of
10 inmate than you were back then, were you not?
11   A. I don't know that they're necessarily a
12 different class of offender. I think they're -- I'm
13 going to say yes to that. I think so, yes.
14   Q. And your training methodologies try to adapt to
15 that because you recognize dealing with these different
16 type of offenders as -- that may have existed back in
17 1980s or even before then?
18   A. Yes.
19   Q. And those training programs are, if you will,
20 they last for how many weeks again, Mr. Rogers?
21   A. Six weeks, yes, sir.
22   Q. The Prosecutor referenced hostage situations and
23 so forth. Do you remember we talked about those signs --
24   A. Yes, sir.
25   Q. -- up there? And I think she threw out the

**99**

1  example of mother and children or even the Governor or
2  something like that. Do you remember that?
3    A. Yes, sir, I do.
4    Q. When was the last time y'all had a mother and
5  children held hostage?
6    A. I can't recall any of those.
7    Q. Can't recall any of them?
8    A. No, sir.
9    Q. The issues of -- I want to go back briefly now
10 to the Security Threat Group issue, Mr. Rogers.
11   A. Yes, sir.
12   Q. And those inmates who may make an attempt to
13 renounce, say someone decides after how many years of
14 being a confirmed member and go through that two year or
15 more process of renunciation, do you know what percentage
16 of those are successful or not, from your knowledge of
17 the renunciation program?
18   A. In -- with my involvement with sending offenders
19 to the GRAD process and moving those offenders around the
20 system who are exed, I would say a majority of them are
21 successful at being in that status.
22   Q. And those persons who have to be watched for
23 those two years or more, they're also asked to provide
24 information or snitch on fellow gang members; isn't that
25 true?

**100**

1    A. As a -- as a requirement of their being exed, I
2  don't think that they necessarily snitch. I'm not saying
3  that information doesn't get hands changed to, you know,
4  to get the ex status per se, but I'm just going to say not
5  that I know of to that -- to any extent that comes to my
6  knowledge.
7        MR. HEISKELL: Just a moment, Judge.
8    Q. Finally, Mr. Rogers, I just want to bring this
9  up now. During the break, I asked you some questions.
10   A. Yes, sir, you did.
11   Q. About some of these things. Do you remember
12 that?
13   A. Yes, I do.
14   Q. And you were up there -- I was up there by the
15 witness stand just asking you some general questions
16 about this whole matter; is that right?
17   A. Yes, sir, you did.
18   Q. And do you remember turning to me and saying,
19 hey, I don't know if I should be talking to you because
20 it may make the Prosecutors mad?
21   A. That's right.
22   Q. Now, you work for the State of Texas; is that
23 right?
24   A. Yes, sir.
25   Q. And I guess you know my tax dollars and their

101

1  tax dollars go to same pot?
2      A.  Yes, sir.
3      Q.  And that hopefully you also know that you don't
4  belong to the Prosecutors as a witness; you belong to the
5  courtroom and to this Jury.  Is that right?
6      A.  That's right.
7      Q.  But you're fearful of talking to me --
8      A.  No, sir, I'm not fearful of talking to you.
9  My -- in my mind, what I don't want to do is speak to
10  anyone out of turn in the court that may be detrimental
11  either way.  Earlier we mentioned the agenda, and I don't
12  have an agenda.  All I want to do is honestly tell you
13  what I know as best I can.  And, you know, who it
14  benefits is who it benefits.  But I don't fear them.  I
15  don't think they're going to be angry with me.  But I,
16  you know, I don't want to talk out of turn to anyone
17  really.
18      Q.  And how many times have you talked to the
19  Prosecutors in preparation for your testimony?
20      A.  I -- I arrived yesterday and we had a meeting
21  yesterday afternoon about the testimony and what type of
22  questions would be asked of me.  And I have spoken with
23  the investigators.  They came to Huntsville and we
24  chatted about the situation and classification, how it
25  relates to the Defendant here.

102

1      Q.  And, of course, me nor my co-counsel were there,
2  right?
3      A.  No, sir.
4          MR. HEISKELL:  Pass the witness.
5          REDIRECT EXAMINATION
6  BY MS. JACK:
7      Q.  Well, Mr. Rogers, you and I just met last night;
8  is that correct?
9      A.  Yes, that is correct.
10      Q.  And you're here as a result of a subpoena; is
11  that right?
12      A.  That is correct.
13      Q.  That my investigator served on you, I don't
14  know, eight weeks ago; is that right?
15      A.  Roughly eight weeks, correct.
16      Q.  And that's because when it comes to
17  classifications, you know exactly what's going on at
18  T.D.C.; is that correct?
19      A.  Yes, ma'am.
20      Q.  Okay.  I never met you before last night,
21  neither had my partner or either one of them; is that
22  right?
23          MR. HEISKELL:  Your Honor, we object to
24  Counsel leading the witness.
25      A.  Not that I know of.  I don't recall meeting any

103

1  of you.  I saw that guy in the middle, I saw his picture
2  on the bar association wall out there, but other than
3  that, I haven't -- I don't know you folks.
4      Q.  He's kind of famous that way.  All right.
5  Sorry.  You're here as a result of a subpoena.  You
6  didn't volunteer to come down; is that correct?
7      A.  No, I didn't ask for this.
8      Q.  Okay.
9      A.  I'm sorry.  I'm not trying to be disrespectful.
10  I'm just -- I'm just stating that.
11      Q.  And the fact of the matter is you gave me a
12  whole lot of bedtime reading last night, didn't you?
13      A.  Yes, I did.
14      Q.  You gave me the Offender Orientation Handbook,
15  and I got a whole bunch of unit classification
16  procedures?
17          MR. HEISKELL:  Excuse me, Your Honor, we
18  object to leading.
19          THE COURT:  Overruled.
20      Q.  (BY MS. JACK)  You can go ahead and answer that.
21  You gave me a lot of reading and a lot of homework to do
22  last night; is that fair to say?
23      A.  Yes, I did, I did.
24      Q.  And I did the best I could to understand it all?
25      A.  Yes.

104

1      Q.  Okay.  To try to understand 29 years worth of
2  reality and 29 years worth of experience with T.D.C.J.;
3  is that correct?
4      A.  That is correct.
5      Q.  Ad-Seg, the only way an inmate gets into Ad-Seg
6  is the result of the choices he makes; is that correct?
7      A.  That is correct.
8      Q.  All right.  Now, in Ad-Seg -- you know, the fact
9  of the matter is Counsel for the Defense put a document
10  up there and he made a point --
11          MR. WESTFALL:  Your Honor, may we have a
12  running objection to leading questions?
13          THE COURT:  I haven't heard the question
14  yet.
15          Ask the question.
16          And pause before you answer it so I can see
17  if there's an objection to the question.
18          THE WITNESS:  Yes, sir.
19      Q.  (BY MS. JACK)  Do you recall Counsel for the
20  Defense putting a document up there on the computer and
21  pointing out the date, March 2012?
22      A.  (Pausing)  Yes, I do.
23          MS. JACK:  That was the end of my question.
24          THE WITNESS:  I don't want to piss the Judge
25  off.  I'm sorry.  I won't be invited back, I guess.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

105

1   Q. All right. And did the document include the
2  word "supercedes" and gives a date?
3   A. Yes, it does.
4   Q. And is that because the policies that control
5  Administrative Segregation change?
6   A. Yes.
7   Q. Frequently?
8   A. I wouldn't say frequently, but from time to
9  time, yes.
10   Q. What causes a change?
11   A. Internally we may have issues that we may need
12  to address to make the Ad-Seg areas safer and secure for
13  all. We may need to change a policy, tweak it. Outside,
14  the state legislature has a lot to do with how we
15  administer our policies, procedures. We have to be in
16  line with state and federal law.
17   Q. And in the Offender Orientation Handbook that
18  you provided me, which is over a hundred pages, are there
19  several references to the legislature and when certain
20  policies were put into effect?
21   A. Yes.
22   Q. And that is because the legislature can change
23  the policy regarding Ad-Seg anytime they want?
24   A. Yes, they could.
25   Q. If they pass a legislation that says release

106

1  everyone in Administrative Segregation in the next
2  session, what happens?
3   A. We would have to do it, with strong objection to
4  the legislature.
5   Q. But does everybody in Administrative
6  Segregation, would they be released into General
7  Population?
8   A. If so ordered, we would have to follow -- obey
9  that law, yes.
10   Q. And you've been a member of the staff of
11  T.D.C.J. for almost 30 years. In terms of the trends
12  that you have seen over the years, where is the
13  legislature trending on Administrative Segregation and
14  security within the prison?
15   A. After this session, legislation came out that
16  would require officials to take another look at the
17  Administrative Segregation policies and how long we keep
18  these offenders in Ad-Seg. That's -- that's the trend.
19  Apparently, some folks in society think we are keeping
20  offenders locked up in Administrative Segregation just
21  too long.
22   Q. So the trend is to release more from
23  Administrative Segregation into General Population; is
24  that correct?
25   A. Yes, it is.

107

1   Q. All right. And one of the documents, I forget
2  which one, that Counsel for the Defense gave you or
3  showed this Jury, said there were two ways to keep
4  somebody in Ad-Seg, security threat -- or security
5  threat; is that correct?
6   A. If he's a threat to safety and security, yes.
7   Q. If somebody disavows their gang membership and
8  succeeds in convincing those investigators, and serving
9  a life sentence without parole, where do they go?
10   A. I'm sorry. Repeat that question.
11   Q. I didn't ask it very well.
12   A. Something -- something took my mind away there.
13   Q. The GRAD program.
14   A. Yes.
15   Q. All right. And that's in the Offender
16  Orientation Handbook, isn't it?
17   A. Yes, it is.
18   Q. If somebody, regardless of the offense that
19  they've been convicted of, regardless of their sentence,
20  satisfactorily graduates from disavowing their gang or
21  that program, where do they go?
22   A. They go into General Population.
23   Q. And with regard to being exed out, isn't one of
24  the very first steps striking a line through a tattoo
25  that would be their gang membership sign?

108

1   A. Yes, that would be a good indicator.
2   Q. So if an individual has a strike through the
3  "TS", Texas Syndicate, for instance, that would be the
4  first step in convincing those guards, the staff, that
5  they are no longer a member of the gang and want to be in
6  General Population?
7   A. That would certainly help, but what's going to
8  happen is when he contacts the Security Threat Group
9  office, they're going to call him down to fill out
10  paperwork where he signs a piece of paper saying I hereby
11  renounce my affiliation.
12   Q. And we take his word for it?
13   A. Yes, we do.
14   Q. Because if they're in Administrative
15  Segregation, they're only out for an hour a day; is that
16  right?
17   A. Right.
18   Q. They're not around other offenders, are they?
19   A. No, no, ma'am.
20   Q. So we really can't monitor whether or not
21  they're still actively involved in their gang, can we?
22   A. No.
23   Q. When they're out on the rec yard, they're by
24  themselves, aren't they?
25   A. Yes. There could be other offenders in a -- in

109

1 a chain-link fenced cage next to them that they could
2 talk to, but not physical contact per se.
3   Q. So it's a lot more difficult to truly gauge
4 whether or not somebody has disavowed their gang; is that
5 right?
6       MR. WESTFALL: That was a leading question,
7 Your Honor. We object to it.
8       THE COURT: Sustain.
9   Q. (BY MS. JACK) Okay. The majority of
10 individuals who sign up for this GRAD program succeed in
11 leaving Administrative Segregation and going to General
12 Population; is that correct?
13   A. That's correct.
14   Q. The majority of them?
15   A. Right. I would say the majority.
16   Q. Individuals who are serving life sentences
17 without parole have graduated from this GRAD program,
18 have they not?
19   A. Yes.
20   Q. They are in General Population, are they not?
21   A. Yes.
22   Q. In somewhat a little bit above minimum security
23 facilities; is that right?
24   A. Security -- facilities that are designated G --
25 that can house G3 custody, yes.

110

1   Q. Okay. How many of our units can house G3?
2   A. 29 units can house G3 custody that we actually
3 assign to. Some units have G3 custody, for example, a
4 medical facility, but that's just to accommodate -- you
5 can't turn a guy down for medical treatment because of
6 his custody, so they have like a G3, but it's just
7 temporary. But 29 effectively that we assign inmates to.
8   Q. Individuals in G3 population can have
9 unit-to-unit visitation, can't they?
10   A. Intra-unit visits, yes, they can.
11   Q. In other words, an inmate from one unit can
12 actually be transported to another unit because they want
13 to visit if they're in General Population; is that
14 correct?
15   A. Yes, they can.
16   Q. Inmates with a G3, G4 visit -- excuse me,
17 classification can have contact visits with their loved
18 ones?
19   A. G1, 2 and 3.
20   Q. G1, 2 and 3?
21   A. Yes.
22   Q. And Mr. Soliz, in fairness, would never be below
23 a G3, at least as the legislature sees fit right now?
24   A. Correct.
25   Q. He would be allowed contact visits; is that

111

1 right?
2   A. Yes.
3   Q. He would be allowed to hold his loved one
4 that -- hold their hand?
5   A. Yes.
6   Q. He would be allowed to kiss his loved one?
7   A. Yes, he would.
8   Q. He would be allowed to tell --
9       MR. HEISKELL: Excuse me. We still object
10 to leading, Judge. It's her witness.
11       THE COURT: Sustain.
12       MR. HEISKELL: Thank you.
13   Q. (BY MS. JACK) All right. Would he be allowed
14 to tell his loved one he loved them?
15   A. Yes, he would.
16       MR. HEISKELL: Same objection, Your Honor.
17       THE COURT: Overruled.
18   Q. (BY MS. JACK) Counsel for the Defense asked you
19 about Administrative Segregation. How much room is there
20 in Administrative Segregation right now?
21   A. Again, I don't have an exact number how much,
22 but in a recent meeting with our Deputy Director of
23 Operations -- excuse me, Support Services, the indication
24 is that we are filling up rather significantly in
25 Administrative Segregation.

112

1   Q. We're almost full, aren't we?
2   A. I think so.
3   Q. And when Counsel for the Defense is showing you
4 the gear for riots, that's because riots occur, don't
5 they?
6   A. Yes.
7   Q. What happens when a riot occurs?
8   A. When a riot occurs, people get hurt.
9   Q. Who gets hurt?
10   A. Staff and offenders get hurt.
11   Q. And that gear the Counsel for the Defense showed
12 the Jury, that's great for self-defense, if you can get
13 to it in time?
14   A. Yes.
15   Q. Have you seen instances where guards have been
16 seriously hurt?
17   A. Yes.
18   Q. Have you seen instances where guards have been
19 taken hostage?
20   A. Yes.
21   Q. Have you seen instances where a warden was
22 seriously hurt?
23   A. Yes, I do, I did.
24   Q. Have you seen instances where a guard is killed?
25   A. Yes.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

113

1   Q. Just the sheer number of it, the sheer number
2   of inmates prevents staff from being safe; is that
3   correct?
4   A. That's a -- I believe so, yes.
5   Q. Okay. And when Counsel for the Defense asked
6   you about when the last time was that a mother and child
7   were held hostage, in 2000, the Texas Seven occurred,
8   didn't it?
9   A. Yes.
10   Q. Seven inmates escaped from T.D.C., did they not?
11   A. Yes, they did.
12   Q. And an Irving police officer was killed while
13   they were out?
14   A. Yes.
15   Q. In 2003, was there an escape and a murder by an
16   inmate from T.D.C.?
17   A. That's one I'm not -- I'm not familiar with that
18   one.
19   Q. Okay. In 2007, was that when the high rider was
20   killed outside of T.D.C.J.?
21   A. Yes, ma'am.
22   Q. Since this Jury has been convened, has an
23   individual serving a life sentence without parole at
24   T.D.C.J. committed a murder?
25   A. Yes.

114

1   Q. Within three weeks ago; is that correct?
2   A. Yes, ma'am.
3   Q. We've had three homicides at T.D.C.J. in the
4   last month, have we not?
5   A. Yes.
6   Q. And all those things, whether it's Ad-Seg or
7   whether it's General Population that this Defendant if he
8   receives a life sentence without parole, are all things
9   that the victim in this case will never get to do again;
10   is that correct?
11   A. Right. That's correct.
12        MS. JACK: I'll pass this witness.
13        RECROSS-EXAMINATION
14   BY MR. HEISKELL:
15   Q. Mr. Rogers, you -- how many times have you
16   testified before for the State in capital murder cases?
17   A. 15 to 20 or so.
18   Q. And that's part of your job duties and
19   responsibilities with the State, to come and testify; is
20   that right?
21   A. Yes, sir, it is correct.
22   Q. And to come testify for the State to try to get
23   the Jury to do a death sentence; is that right?
24   A. Yeah, it's my understanding.
25   Q. And in doing so, you want to be as effective as

115

1   you can on the witness stand in trying to convey certain
2   matters and certain factors; isn't that true?
3   A. I want to be truthful is what I want to do.
4   Q. And when we talked about being truthful,
5   obviously you want to be able to sway a Jury in trying to
6   be effective in your testimony, isn't that true?
7   A. I'm not sure how to answer that because I'm not
8   really -- again, I just say what I say, and then how it
9   sways them or affects them is -- I'm -- I don't really
10   come in here trying to really sway anybody. I just want
11   to enlighten people as to what goes on in prison.
12   Q. And I guess what I -- what I'm getting at is,
13   what I'm hearing is, your -- part of your duties and
14   responsibilities is to do the classification, come
15   into court and testify so people can get death
16   sentences as opposed to life without parole to ease the
17   workload.
18   A. I don't -- I don't know that it's -- I don't
19   know about the "ease the workload" thing, but I know the
20   Prosecution's purpose is to try to get him the death
21   sentence. And your purpose is probably to get him life
22   without parole. Whether it's to ease the load or not, I
23   don't think I can agree with that per se. It's not
24   really my position to agree or disagree with that.
25        (Pause in proceeding.)

116

1        MR. HEISKELL: Pass the witness. That's all.
2        FURTHER REDIRECT EXAMINATION
3   BY MS. JACK:
4   Q. And part of the reason why we believe the death
5   sentence is appropriate is because the most secure place
6   for Mr. Soliz is Death Row; is that right?
7   A. Yes.
8   Q. And because the crime merits it, more
9   importantly; is that right?
10   A. In my opinion, yes.
11        MS. JACK: I'll pass the witness.
12        FURTHER RECROSS-EXAMINATION
13   BY MR. HEISKELL:
14   Q. So I guess your opinion is persons convicted of
15   capital, capital murder should always get the death
16   penalty. That's a true statement, isn't it, Mr. Rogers?
17   A. I'm going to say that if an offender is found
18   guilty, and some of the heinous things that I have seen
19   individuals do, I'm a proponent of the death penalty,
20   yes.
21        MR. HEISKELL: That's all. Thank you.
22        MS. JACK: I have nothing further of this
23   witness, Your Honor.
24        THE COURT: May the witness be excused?
25        MR. HEISKELL: Yes.

117

1    MS. JACK: Yes, Your Honor.
2    THE COURT: You may be excused.
3    THE WITNESS: Thank you, sir.
4    (Witness excused.)
5    THE COURT: At this time, we'll recess for
6    lunch till 1:15.
7    (Recess taken from 11:44 a.m. to 1:17 p.m.)
8    (Defendant present.)
9    (Jury not present.)
10   THE COURT: State ready to proceed?
11   MR. CHAMBLESS: Well, Your Honor, we have --
12   the next witness I anticipate will be Dr. David Self.
13   I've told Greg Westfall that he is our next witness and
14   what I anticipate he'll testify about. I think he wants
15   a 705 hearing.
16   MR. WESTFALL: Brief 705 hearing, Your
17   Honor.
18   THE COURT: Okay.
19   MR. CHAMBLESS: We would call Dr. David
20   Self at this time for the purpose of this hearing.
21   THE COURT: The record will show the
22   attorneys for the State and Defense are present, the
23   Defendant is present, the Jury is not present at this
24   time.
25   (Witness sworn.)

118

1                    DAVID SELF,
2    Having been first duly sworn, testified as follows:
3                  DIRECT EXAMINATION
4    BY MR. CHAMBLESS:
5    Q. Please state your name.
6    A. David Self.
7    Q. And are you a licensed psychiatrist in the State
8    of Texas?
9    A. Yes, sir, I'm a Medical Doctor specialized in
10   psychiatry and licensed in the State of Texas.
11   Q. And describe your employment at Rusk State
12   Hospital.
13   A. Well, I'm currently employed there on a part-
14   time basis. I work there two days a week. I've been
15   associated with that hospital since 1991. I retired from
16   there in May of '09 and went back in March '10 on a
17   half-time basis. I work on the forensic service there.
18   Q. All right. And as part of your work in the past
19   and your work in the present, does it involve doing a --
20   something called a risk assessment?
21   A. Yes, sir. The assessment of risk is part and
22   parcel of every day of my work, clinically as well as my
23   practice apart from that.
24   Q. What is a risk assessment, generally?
25   A. A risk assessment is a method of arriving at

119

1    some notion of an individual's characteristics that would
2    contribute to or would mitigate against their likelihood
3    to commit a violent act.
4    Q. Is there a difference and a distinction between
5    risk assessment, assigning someone to a risk assessment
6    category and a -- making a statement about prediction of
7    future violence?
8    A. Yes, sir. Mental health science, psychiatry and
9    psychology, have reckoned with the fact that our accuracy
10   in these matters is not sufficient to ethically permit
11   categorical prediction that an individual will or won't
12   commit a violent act. We are comfortable though on using
13   research-based factors, these empirical correlates of
14   violence, in looking for the presence or the absence of
15   those in an individual, looking at details of their case
16   and the specifics we know about them clinically, and
17   combining that into an estimate of the level of risk they
18   pose relative to some population in some environment.
19   Q. Okay. How many -- what are the risk levels?
20   A. Well, there's no -- I think the honest way to do
21   it is not to imply that there's some precision and, you
22   know, give these finite 92 or 31 percents. We use low,
23   medium and high, a fairly broad estimation.
24   Q. Okay. What is the methodology that you use and
25   others use in this risk assessment?

120

1    A. Well, we collect all the facts about the history
2    of the individual that we can. And we're looking again
3    for these factors that have been demonstrated through
4    empiric research and they're reliable in study after
5    study as far as their contribution to the individual's
6    likelihood of committing a violent act. Once we have
7    those factors defined and that history and we have done a
8    thorough psychiatric evaluation, in my particular case,
9    we combine all that and we utilize clinical judgment at
10   that point to weight those factors and to arrive at an
11   estimate of their risk.
12   Q. Okay.
13   A. This method is called in the literature the
14   structured professional judgment or structured clinical
15   judgment.
16   Q. Is this -- do you keep current in the literature
17   in this area?
18   A. Yes, sir, I do.
19   Q. And with respect to individuals that you do this
20   for, for example, is there a population of individuals at
21   Rusk who are there because they've been found not guilty
22   by reason of insanity?
23   A. Yes, sir. Rusk State Hospital is a state-
24   operated psychiatric facility that houses basically three
25   populations. About half of the place is dedicated to

121

1  civil commitments; people that don't have any criminal
2  charges at all but that meet the Texas Health and Safety
3  Code in that they've been found to be at risk of harm to
4  self or others as a result of mental illness. They're
5  committed to certain units at the hospital. Then we have
6  a forensic population that is comprised of the
7  individuals you mentioned, the not guilty by reason of
8  insanity, acquittee's, a larger population that have been
9  adjudicated as not competent to stand trial that are
10 there for restoration of trial competency.
11    Q. Are yearly assessments required of those who
12 have been acquitted of criminal offenses but who are
13 there because they have been considered to be a risk of
14 danger to themselves or others?
15    A. Yes, sir. The statute requires at least on a
16 12-month basis that we report back to the district court
17 that has jurisdiction over that case and offer an opinion
18 about whether or not the individual can safely be managed
19 in a less restrictive environment, which entails a risk
20 assessment.
21    Q. Is the methodology that you've spoken about
22 applied in that context?
23    A. Yes, sir, it's pretty much the same across
24 different populations in legal questions that we rely on
25 research-based factors that we have confidence, have been

122

1  demonstrated to contribute to risk, and then combining
2  those in a fashion and weighting them and arriving at a
3  judgment. It's pretty much the same process regardless.
4     Q. Is this methodology and risk assessment tool
5  that -- or procedure that you've spoken about, is it
6  generally accepted in the psychiatric community to which
7  you belong?
8     A. Yes, sir, it is.
9     Q. All right. And have you testified about this
10 risk assessment process in the courts of this state?
11    A. Yes, sir, many times.
12    Q. Okay. Have you testified specifically in
13 capital murder cases about risk assessment including the
14 methodology that you spoke of this afternoon?
15    A. Yes, sir, I have.
16    Q. Okay. And approximately how many cases have --
17 of capital murder cases, for example, have you been
18 involved with?
19    A. It would be a really rough approximation. And
20 I would hate to be held to -- up to the fire over the
21 accuracy of it, but I would guess somewhere between 20
22 and 30.
23    Q. Okay. Do you testify or are you consulted and
24 possibly testify sometimes for the defense?
25    A. You know, over time, I've looked back at my

123

1  practice, and it works out about 50/50 as far as being
2  sided in a case. I'm called for the state about half the
3  time and the defense about half the time. Then, of
4  course, there's another body of cases that are court
5  appointments that are neither here nor there.
6     Q. Okay. You also -- do you also do risk
7  assessments in connection with civil issues pertaining to
8  sexual predators?
9     A. I do. I'm frequently retained by the Special
10 Prosecution Unit, Civil Division, and would take
11 appointment from the counsel for offenders as well, the
12 defense side, to evaluate folks that are fixing to be
13 released from prison about their risk of future sexual
14 violence.
15    Q. Are you part of a statewide committee involved
16 in looking at maximum security issues?
17    A. I'm not any longer. I was for a number of years
18 on the statewide -- it was MHMR then, and then the
19 Department of Health Services have a cadre of experts
20 that they use to go to the maximum security hospital at
21 Vernon and where they have statutorily a obligation to
22 review their dangerousness, called the Manifest
23 Dangerousness Review Board, and I served on that for
24 many years.
25    Q. Now, specifically, to go back to the methodology

124

1  here, are you here this afternoon to testify simply about
2  the risk assessment tool and the empirical factors that
3  play in to the risk assessment evaluation?
4     A. Yes, sir.
5     Q. For example, is one of those factors
6  demographic?
7     A. Yes, sir.
8     Q. And is another a history of violence?
9     A. Yes, sir.
10    Q. Is another the age of a person when they first
11 become involved in criminal activity?
12    A. Yes, sir.
13    Q. Is another relationship factors?
14    A. Yes, sir.
15    Q. And is another employment issue?
16    A. Yes, sir.
17    Q. Is another substance abuse problems?
18    A. Yes, sir.
19    Q. And are additional factors major mental illness,
20 personality disorders and contextual factors?
21    A. Yes, sir.
22    Q. All right. And are you speaking in general
23 terms of those factors and the weight you give those
24 factors as an aid to the Jury?
25    A. Yes, sir.

125

1    MR. CHAMBLESS:  Pass the witness.

2    MR. WESTFALL:  Your Honor, may I approach?

3    THE COURT:  Yes, you may.

4    MR. WESTFALL:  Dr. Self, may I see whatever

5  you have up here with you?

6    THE WITNESS:  Yes, sir.

7    MR. WESTFALL:  Thank you.

8    (Pause in proceeding.)

9          CROSS-EXAMINATION

10  BY MR. WESTFALL:

11    Q.  Dr. Self, are you -- are you here to make any

12  conclusions about whether Mark Soliz is a low risk, a

13  high risk or a medium risk?

14    A.  No, sir, I'm not.

15    Q.  Do you -- have you ever had anything to do with

16  the T.D.C. classification process?

17    A.  No, sir, I have not.  Well, I say nothing to do

18  with.  I spent a lot of time in penitentiary charts and

19  such, but as far as me having an active role in the

20  process, no.

21    Q.  Right.  Making decisions about where people --

22    A.  No, I'm not involved in that at all.

23    Q.  Tell us about the empirical research, if you

24  don't mind.

25    A.  Okay.  Could you narrow that down a little bit

126

1  for me?

2    Q.  You have those factors there.

3    A.  Yeah.

4    Q.  And you said that study after study has

5  confirmed the factors?

6    A.  Yes, sir.

7    Q.  Could you please just, once again, tell us the

8  factors.

9    A.  Okay.  In general, the demographic factors are

10  of import, the sex, the age, socioeconomic status of the

11  individual in question.  And those have all been looked

12  at over time.  The way all these are arrived at is

13  empirically.  It's a straight ahead research.  You look

14  for -- it's similar to what insurance companies do with

15  their actuarials.  You look for the presence of a factor

16  in a population.  Then you look for the incidents of

17  whatever is of interest, you know, be it automobile

18  wrecks in teenagers or whatever, so.

19    Q.  Right.

20    A.  And then these have all been borne out over

21  multiple research projects of that sort, empirical

22  research projects, and have been demonstrated time and

23  again, now are accepted into the profession as basically

24  factual.  Do you want me to go through the list?

25    Q.  Please.

127

1    A.  Okay.  You have historical factors, and under

2  that, the violence history is of particular import, of

3  course, in a matter where you're trying to assess risk

4  for future acts of criminal violence.  Okay.  There's

5  also a quantitative assessment of that.  You look at the

6  number of acts, the type and number of acts.  Then

7  there's a qualitative assessment of that.  We have

8  various typologies of violence that have been

9  demonstrated to have import in this notion of predicting

10  someone's likelihood of future acts.

11        An isolated factor that has been shown to be

12  valid as far as contributing to risk is the age at which

13  the individual first commits criminal or violent acts;

14  how early in life they started that.

15        There is several that pertain to social

16  stability that are -- I have broken out here, rather than

17  use the broad header.  Relationship instability, the

18  individual's ability to form adult -- and usually means

19  intimate, romantic type relationships, to basically enter

20  into marital type relationships.  Employment history has

21  been shown over and over to be of import.  And so those

22  kind of wrap up that social stability idea.

23        Substance abuse issues have been shown over

24  and over now; certain substance abuse issues have been

25  shown to contribute to the risk of violence.  Okay.  In

128

1  particular, psychostimulants and ethanol, alcohol, have

2  been shown to greatly increase the risk of violence;

3  people that have a propensity for use.  And there's

4  quantitative issues in that, not just do they use them.

5  If they use them every blue moon, obviously you don't

6  weight it very heavily; but if they use them frequently,

7  it's a regular part of life, if they recur to it over the

8  years after years, then it becomes of more import.

9        We also look at major mental illnesses.  And

10  the relationship here gets a little bit trickier because

11  it's not just the presence or absence of major mental

12  illnesses.  You have to get into the specific illness and

13  the specific symptoms.  Certain symptoms of certain

14  illnesses have been shown to be associated with an

15  increased risk of violence.  An example of this would be

16  paranoid delusions.  If someone believes that they're

17  being attacked by someone else, they're very likely to

18  become violent in either a preemptive way or retributive

19  way.  Manic excitement would be another one of those.

20        Personality disorders.  Certain personality

21  disorders in particular, antisocial, borderline

22  personality disorders are associated with an increased

23  risk of violence.

24        Kind of a sub group of antisocial

25  personality disorder, psychopathy or psychopaths have

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

129

1  been shown to be at especially high risk. So we're
2  always looking for that.
3        As I said earlier in response to Defense's
4  questions, we're not just looking at these in terms of
5  global risk. We're looking at them in a context of an
6  environment they're headed for, in a population we're
7  going to compare them to. So in whatever the question at
8  hand is, the style is that. And we're real interested
9  there in factors in that environment that may influence
10 that propensity for violence, that likelihood of violence
11 one way or the other. Okay.
12     Q. So is that all the factors?
13     A. That's pretty much all, yes.
14     Q. And how are you going to apply these factors to
15 Mark Soliz?
16     A. Today?
17     Q. Yes.
18     A. I'm not.
19     Q. You're not going to apply those at all to him?
20     A. What I have been asked to do is to provide the
21 Jury with an understanding of how a mental health
22 professional who does this as a matter of course, day in,
23 day out, arrive at this decision about someone's risk
24 level, how we go about looking at information to make
25 that decision.

130

1      Q. Okay. Then I guess that's all the questioning I
2  had. Now, I asked you -- you said empirical research,
3  study after study, and I guess I might have gotten you
4  off on the risk factors. Can you name some of the
5  studies that support this?
6      A. No, not right off the top of my head I can't
7  give you a bibliography. Again, these don't hinge on one
8  isolated study that happened, you know, very recently.
9  These have been established to the point that they're
10 well accepted in the field.
11     Q. Is there a -- is there a sampling error that we
12 can apply to this or a standard deviation?
13     A. There is not a statistically arrived at error
14 rate, no. There have been evaluations of this type of
15 method that have been done, that have arrived at a notion
16 that is an acceptable rate, that it's better than chance,
17 significantly better than chance, which is an improvement
18 over the older studies and such.
19     Q. And when you do one of these risk assessments,
20 why are you doing it?
21     A. To make -- it depends on what context I'm doing
22 it in.
23     Q. Why was it invented?
24     A. Well, because we are asked to make decisions or
25 to help make decisions about violence, persons that might

131

1  commit violence, all the time, about commitments to
2  hospitals, discharges from hospitals, in forensic matters
3  of all sorts, and dispositions are made, so, you know,
4  rather than the old way of doing this was that clinicians
5  would simply kind of, you know, eyeball it and have a
6  hunch and go on about their business, the Jim Grigson
7  method, the purely clinical method. People have tried
8  to make this more methodologic and it will advance the
9  actuarial method where you have some precooked
10 algorithmic approach to these same factors, but they
11 weigh them in and you have a fixed scoring and there's
12 not any leeway for including what you can see and know
13 about the specifics.
14       And so somewhere in between those two
15 standards is the structured professional judgment or
16 structured clinical judgment method, which most of the
17 learned treatises and texts hold to be the way we ought
18 to be doing business.
19     Q. But an actuarial model is a model that's been
20 worked out mathematically, it has a -- has percentages
21 attached to different factors, something that's been
22 derived through a procedure where we can see, where there
23 would be -- where you could bring something to court
24 where we could see the empirical data that underlies it.
25 But I guess you're telling me that there isn't any?

132

1      A. I'm not telling you that.
2      Q. Okay. Then where is it?
3      A. Where is what?
4      Q. Where's the empirical data that underlies these
5  factors?
6      A. Well, it's published in every major text or
7  treatise there is about this. I didn't bring one to
8  court with me but I can -- I can if you would like. I
9  mean, this is -- this is not a rarity. This is the way
10 business is done in the profession and the way it's
11 accepted that we can ethically arrive at these estimates,
12 as long as we stay within the bounds of what we're really
13 capable of doing.
14     Q. What would be the most important text that would
15 contain --
16     A. I couldn't tell you a most important text.
17 There -- I mean, there's just -- there's hundreds of
18 them.
19     Q. Tell me your favorite one.
20     A. It's the Psychologic Evaluations for the Court
21 by Melton.
22     Q. And is there -- is there any -- are these
23 factors differently weighted? Are some more important
24 than others?
25     A. Well, that's where a structured professional

133

1  judgment approach varies from the actuarial. You have to
2  exercise some judgment in weighting them. And if you use
3  an algorithmic approach, that weighting, that algorithmic
4  thing is locked in, and that's where most -- most of the
5  difficulty comes. All the actuarials I'm aware of offer
6  the caveat they are not to be taken in isolation, that
7  there must be clinical judgment exercised about how to
8  interpret those findings.
9      Q. Race used to be a factor in this, right?
10     A. Sir, I have never seen it published, no. And
11 I'll tell you my understanding is that the studies on
12 race have found that socioeconomic status wipes out any
13 differences. If you hold socioeconomic status constant,
14 race is not a predictor.
15     Q. And the point of this, this analysis is to
16 figure out the probability that somebody is going to
17 commit violent acts?
18     A. No.
19     Q. What is the point of it?
20     A. It's to say that if you -- once you've described
21 these factors that are present, that if you will -- if
22 you'll imagine a group of people, it's not to say that
23 individual "X", a defendant in this matter or a patient
24 in another, individual X will or won't commit an act, or
25 even a probabilistic statement about will or won't. It's

134

1  to say people that have -- that look like this are at a
2  low, a medium or a high risk relative to some comparative
3  population of committing acts of violence.
4      Q. What would be the comparative population?
5      A. In this case it would be prison inmates, I mean
6  if we're talking specifically about this case.
7      Q. Okay. But you -- you can't apply this to this
8  case at this point?
9      A. No.
10     MR. WESTFALL: That's all the questioning I
11 have, Your Honor.
12     Number one, I don't think they've proven by
13 clear and convincing evidence that -- that this is
14 relevant or that his data underlies his conclusions; but
15 number two, it's not going to be applied to the case,
16 it's just going to be abstract testimony. Therefore, it's
17 not relevant, and we'd object to the testimony, period.
18     THE COURT: Do you have a rebuttal argument
19 or rebuttal questioning?
20     MR. CHAMBLESS: I do not at this time. If
21 the Court would like to -- would the Court like to hear
22 some further?
23     THE COURT: I -- I don't understand the
24 relevance of the testimony if it's not going to be
25 applied to this particular Defendant.

135

1      MR. CHAMBLESS: Okay, Your Honor.
2      THE COURT: And I don't understand the
3  science behind the analysis.
4      MR. CHAMBLESS: Okay.
5      THE COURT: That's where I am at the
6  moment. So if you have any information or more testimony
7  that you wish to elicit to help me understand why it's
8  necessary and why it's reasonably accurate and how it
9  applies to this particular case, that would be helpful.
10     MR. CHAMBLESS: Very well. At this time,
11 Your Honor, we'll withdraw our offer through this witness
12 at this time and revisit it at a later time.
13     THE COURT: Okay. You may step down.
14     Is the State ready to proceed?
15     MR. CHAMBLESS: Yes, sir.
16     THE COURT: Defense ready to proceed?
17     MR. HEISKELL: Yes.
18     MR. WESTFALL: We are, Your Honor.
19     THE COURT: You may bring in the Jury.
20     (Pause in proceeding.)
21     (Jury present.)
22     THE COURT: You may be seated.
23     MR. STRAHAN: At this time, Your Honor, the
24 State of Texas would respectfully rest its case on
25 Punishment.

136

1      MR. WESTFALL: Your Honor, we call Krisha
2  Flores. Krisha.
3      THE COURT: You were sworn in the other
4  day. You may be seated. Can you scoot forward a little
5  bit. Pull the microphone down so it's pointed at your
6  mouth. Thank you.
7              KRISHA FLORES,
8      Having been first duly sworn, testified as follows:
9              DIRECT EXAMINATION
10 BY MR. WESTFALL:
11     Q. Ms. Flores, how you doing?
12     A. Fine.
13     Q. Would you please state your -- your name just
14 for the record, for the Jury.
15     A. It's Krisha Flores.
16     Q. And speak up a little bit.
17     A. It's Krisha Flores.
18     Q. Okay. And where do you live? Where do you
19 live?
20     A. At 81 -- in Fort Worth.
21     Q. Fort Worth?
22     A. The whole address?
23     Q. I don't need your address. Just wanted --
24     A. In Fort Worth.
25     Q. And do you know Mark over here?

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

**137**

1  A. Yes, sir.
2  Q. How do you know him?
3  A. That's my cousin.
4  Q. How old are you?
5  A. 36.
6  Q. And do you have any kids?
7  A. Yes, sir.
8  Q. How many?
9  A. I have four.
10  Q. How old are they?
11  A. One is 17, a 16-year-old, 14, and a 10-year-old.
12  Q. I would like to go through the Soliz family just
13  with you and kind of line out who all the people are in
14  the family.  Can we do that?
15  A. Okay.
16  Q. Can you see this?
17  A. Barely.
18  Q. With your grandmother, what were their names,
19  your grandmother and grandfather?
20  A. Vic -- Vicky Soliz and Santos Soliz.
21  Q. And where did Vicky and Santos live?
22  A. On the north side of Fort Worth, Houston.
23  Q. Houston Street?
24  A. Yes.
25  Q. At 3113 Houston?

**138**

1  A. Yes, sir.
2  Q. And they had a lot of children, didn't they?
3  A. Yes.
4  Q. How many?
5  A. It was ten girls and two boys.
6  Q. And do you know all their names?
7  A. Yes, sir.
8  Q. Can you just sort of take them in turn?
9  A. Lizzie Soliz.
10  Q. Lizzie?
11  A. Liz.
12  Q. Who is that?
13  A. My aunt.
14  Q. And is that one of Donna Soliz's sisters?
15  A. Yes, sir.
16  Q. And Donna Soliz is your aunt also?
17  A. Yes, sir.
18  Q. Who else?
19  A. It's Donna, and Victoria Soliz.
20  Q. Donna and Victoria?
21  A. Yes, sir.
22  Q. Does she go by Vicky?
23  A. Yes.
24  Q. Who else?
25  A. Francis, Cynthia Soliz, Carolyn, Rita, Sharon,

**139**

1  Ruby, and Kathryn.
2  Q. And then there was?
3  A. Two boys.
4  Q. Two boys?
5  A. Yes.
6  Q. Okay.  Who are they?
7  A. Gary Soliz and Mike Soliz.
8  Q. Okay.  Now, can you tell me who Lizzie's kids
9  are?
10  A. Patrick, and he passed away.
11  Q. Okay.
12  A. And it's Eric, Joey.
13  Q. Joey?
14  A. Uh-huh.  And Crystal.
15  Q. And Donna?
16  A. Is Mark, Mike.
17  Q. And Vicky?
18  A. Yolanda, JoAnna, Sonia, Freddy, and Veronica.
19  Q. And Francis?
20  A. Monica and Leticia.
21  Q. How about Cynthia?
22  A. It was Michelle, Romero.
23  Q. Romero is first name?
24  A. Yes.  Sophia, Sandra and Angelina.
25  Q. Angelina?

**140**

1  A. Yes.
2  Q. And then Carolyn?
3  A. It was Stephanie.
4  Q. All right.
5  A. Stevie.
6  Q. Stevie?
7  A. Uh-huh.  Raul, Jennifer, Artrevino.
8  Q. Artrevino?
9  A. Artrevino.
10  Q. Like A-R-T-R-E-V-I-N-O with the tilde on the
11  end?
12  A. I think so.
13  Q. All right.
14  A. Christina and Anna.
15  Q. And how about Rita?
16  A. She don't have no kids.
17  Q. Okay.  And Sharon?
18  A. She had Emiliano, Vince, Santos, and Thomas.
19  Q. Ruby?
20  A. She had Tommy and John Paul, and that was it.
21  Q. Kathryn?
22  A. She had me, Krisha.
23  Q. That's your mom?
24  A. Yes, that's my mother.  Christopher Flores.  And
25  then she had two stepkids that she was raising.

141

```
1    Q.  Uh-huh.
2    A.  Ramona -- Ramona.
3    Q.  Say that, Ramon?
4    A.  Ramona.
5    Q.  Okay.
6    A.  And Kenneth.
7    Q.  And Kenneth.  Okay.  Gary?
8    A.  Gary had Vicky, and I think his son's name was
9  Anthony.
10   Q.  And then Mike?
11   A.  He had Michael Frank.  That's the only one he
12 had.
13   Q.  Okay.  I'm showing you what's marked as Defense
14 39 and 40.  Do you recognize these?
15   A.  Yes.
16   Q.  They fairly and accurately depict that house as
17 it exists today?
18   A.  Yes.
19   Q.  Is this the 3113 North Houston?
20   A.  Yes, sir.
21       MR. WESTFALL:  Your Honor, we offer
22 Defendant's 39 and 40.
23       MR. STRAHAN:  No objection.
24       THE COURT:  Admitted.
25       (Defendant's Exhibit Nos. 39 - 40 admitted.)
```

142

```
1    Q.  (BY MR. WESTFALL)  Now I want to talk about when
2  you were a little girl for a little bit.  Okay?
3    A.  Okay.
4    Q.  Do you remember this house on Houston Street?
5    A.  Yes, sir.
6    Q.  Tell us about it.  What did it look like?
7    A.  It was -- the way it looked in front, when you
8  walked in the door, it was like the stairs, the living
9  room.  On the right side was my grandma's and grandpa's
10 room.  When you passed the living room, it was the
11 kitchen.  Then when you walked in the door, the upstairs,
12 you walked upstairs.  And it was two rooms on the side,
13 and then in the back it was some rooms and the restroom.
14   Q.  And first of all, how many people are living in
15 the house when you're there as a little girl?
16       Which of the adults?  There's Lizzie, Donna,
17 Vicky, Francis, Cynthia.  Which of these adults lived
18 there at the time you were a little girl?
19   A.  It was Carolyn, Vicky, Gary, Cynthia.  My mom
20 had her house next door.  So Francis was and Donna, just
21 that I can remember.
22   Q.  So five or six adults.  And how many of them had
23 kids at the time?  Donna had both of hers, right?
24   A.  Yes.  Kathryn, my mom.  Mona -- I mean Francis,
25 Cynthia, and Vicky, and I think Gary too.
```

143

```
1    Q.  And Gary also.  And did Gary have his kids at
2  the time?
3    A.  Just his oldest daughter, Vicky.
4    Q.  Vicky?
5    A.  Vicky.
6    Q.  So I guess that makes five or six adults and at
7  least five or six more kids?
8    A.  Yes, sir.  It was quite a bit of kids in the
9  house.
10   Q.  And this is the house that you stayed in?
11   A.  Yes, sir.
12   Q.  All right.  This -- how were the sleeping
13 arrangements in that house at the time?
14   A.  It --
15   Q.  Where did y'all sleep?
16   A.  On the bed in the -- well, they slept like in
17 the beds in the same room with their moms or on the couch
18 or, I mean, like wherever there was room.
19   Q.  Okay.
20   A.  Like the youngest ones, they slept in the room
21 with their mom.  And like the other ones will sleep, like
22 if we spend the night, will sleep like in the living room
23 or they had a extra room where the kids go hang -- you
24 know, play and lay at in the back of the house.
25   Q.  And at the time there was also some adults there
```

144

```
1  that would sniff paint?
2    A.  Yes, sir.
3    Q.  And who were they?
4    A.  Donna, Vicky, Francis and Carolyn, that I
5  remember of.
6    Q.  And where would they -- where would they sniff
7  the paint?
8    A.  They would sit on the front porch or like in the
9  back yard.  They would, I mean, they would just be right
10 there while we would be running in and out of the house
11 playing or going next door to where my mother lived back
12 and forth.  And they would just be on the front porch just
13 in their own little world.
14   Q.  Right.  Well, there came a time when you started
15 sniffing paint?
16   A.  Yes, sir.
17   Q.  Can you tell us how you got started on that?
18   A.  I started when I was 13.  I was right -- I was a
19 runaway.  I was hanging around with my cousins on my
20 dad's side of the family, and they would -- they were a
21 little bit older than me.  And they were sniffing, and I
22 just tried it and then I got -- I liked it and I started
23 doing it.
24   Q.  And how long did you do it?
25   A.  I did it for a long period of time until like --
```

145

1  until I lost my vision in 2003. I did it for a long
2  period of time. I was in and out of it. Then I lost my
3  vision in 2003, and I stayed clean for so long. And then
4  I got back in it for like another six months. And I just
5  quit, say, last year in July when I got like paralyzed.
6  My potassium dropped real low to like 1.8, 1.8, and it
7  paralyzed me. So I knew it was the inhalant, so I
8  stopped. And my kids was like on the lifeline where they
9  was fixing to get removed, so it was like either keep
10  doing what I was doing or keep my kids, so I choose my
11  kids over that and my life.
12      Q. All right.
13      A. So I haven't touched it since.
14      Q. Have you started getting your vision back?
15      A. Now that I haven't been -- since I been clean in
16  drug -- it's getting a little bit better, but then it's
17  times it don't get all the way. I mean, I'm still blurry
18  for me.
19      Q. Right. How -- what did this look like out there
20  on the porch? How many adults are out there sniffing
21  paint?
22      A. It would be like quite a bit, about five or six.
23  Some of them didn't. Some of them didn't do the
24  sniffing. They were just standing around drinking. Some
25  of them didn't do sniffing and some of them did, but it

146

1  would just be the adults in the front porch and us kids
2  were just running on the side of the house or in the back
3  yard.
4      Q. How do you sniff paint?
5      A. There's -- you could -- there's certain kinds of
6  ways. You could inhale it out of a can. You could put
7  it on a rag or put it in a plastic bag and inhale it like
8  that.
9      Q. How were they doing it out on the porch?
10      A. In a can.
11      Q. Tell us how you do that.
12      A. Huh?
13      Q. Tell us how you do that.
14      A. Just you spray it in a can. Once you spray it
15  in a can, you just put it against your mouth and inhale
16  it.
17      Q. And is there a particular type of paint that you
18  use over others?
19      A. Back then when our aunts were using it, it used
20  to be that crystal clear, if I'm not mistaken, it was the
21  crystal clear they were doing.
22      Q. I guess some of the paints, inhalers don't like
23  to inhale?
24      A. I guess like the inhalants that we did, from my
25  experience, is the ones that had like, like that sweet

147

1  taste in it. That's like what we inhaled. But if they
2  had like a nasty taste, we wouldn't do it unless it had
3  like a sweet taste to it.
4      Q. What does the -- what does the paint do that
5  makes it so addictive?
6      A. It just -- it's like a quick high. It's just
7  like it -- really it makes you dumb, like slow. It's
8  just like a real quick high.
9      Q. Uh-huh.
10      A. And it's like once the high goes away, it just
11  makes you wanna keep, keep on doing it, because once you
12  like remove it from inhaling it, not even a couple
13  minutes, that high goes away. So that make you wanna
14  keep doing it to keep the high there.
15      Q. And how often would they, would Donna, for
16  instance, be out there on the porch inhaling the paint?
17      A. They -- they used to do it a lot.
18      Q. Of course, you were how old back then?
19      A. About 6, 7.
20      Q. Okay. So you weren't inhaling paint at that
21  time?
22      A. No. Because we would find the inhalants on the
23  side of the house by the tree, and we'll pick them up and
24  we'll go throw them down the sewer or throw them away.
25  And we would get in trouble for it. We'll get a whipping

148

1  for it, because, for one, we touched it and we wasn't
2  supposed to touch it; and then we threw their high away,
3  so we would get a whipping for it, with my aunts and them
4  or -- my mom, she didn't do no inhalants. She would whip
5  us for touching it, but we were just throwing it away
6  because it was just on the side of the house.
7      Q. I want to talk to you a little bit about the
8  Soliz family. And I know that not all of these people
9  lived here in town. So there was a -- there was kind of
10  a block of the Soliz family that sort of hung together
11  during these days, wasn't there?
12      A. Yes.
13      Q. And who were -- who were the adults in this
14  block?
15      A. The one that stayed here after my grandpa passed
16  away, the ones that stayed here was my Uncle Gary.
17      Q. Okay.
18      A. Carolyn, Vicky, my Aunt Ruby, Cynthia, Donna,
19  and Kathy.
20      Q. Kathryn?
21      A. Yeah, Kathryn.
22      Q. Okay.
23      A. I think that's just about it.
24      Q. Sharon lived here too?
25      A. Oh, yes, Sharon.

149

1  Q.  But of those now -- and Francis also lived here?
2  A.  Oh, yeah, Francis.
3  Q.  But of those now -- here is what I want to talk
4  about.  The part of the Soliz family that you were in,
5  what was the weekly routine sort of like?
6  A.  It would start on Wednesday.  They sat around
7  the house, just drank, planning what was gonna happen for
8  that weekend.  Then when Thursday came around, they were
9  in and out of the clubs, you know, what -- they would
10  take us -- take us to the park or come -- when we came
11  home from school, make sure our work was done, they fed
12  us.  They would go out from Thursday, Friday, Saturday
13  and Sunday.  Like Monday and Tuesday they stayed home
14  and they rest.  But they wasn't like -- they didn't pay
15  attention really to us that much because that was their
16  rest-up day, ready for that weekend to come.  So, I mean,
17  they got up, they cooked and made sure we did our
18  homework, but once Thursday hit, they were in and out of
19  the clubs and drinking and partying.
20  Q.  And did y'all spend time at Marine Park during
21  those days?
22  A.  Yes.
23  Q.  Please describe for the Jury what Marine Park
24  is.
25  A.  Marine Park, it's a park that we used to go to

150

1  in the north side of Fort Worth.  I mean, a lot of family
2  members went, like our families, friends and all of us,
3  we'd all meet up there.  We cook out.  The kids, all of
4  us kids would go to the park and play.  And then once
5  the -- when it starts getting dark, say about 7 or 8,
6  when it starts getting dark, we'd all pack up and leave
7  and go home.  And then they would get us, clean us up,
8  get us dressed.  And whoever was babysitting, that's
9  where we went, to the babysitter's house, and while they
10  were -- went to whoever's house and got stuff together so
11  they could get ready to go do their -- go do their
12  partying.
13  Q.  Marine Park, Marine Park is kind of large?
14  A.  Yes, it's a big park.
15  Q.  And as we look out over Marine Park, if we stand
16  at the top of it and look down, are there streets all the
17  way around it?
18  A.  Yes, sir.  It's like it's a circle.  You could
19  go around a circle and it's like right there.  Because it
20  has a pool there, too, and then it has the playground.
21  Then when you walk through the park towards the back way,
22  there's, like, a basketball court.  And then on the other
23  side it gots, like, a picnic, a bench, table, stuff like
24  that.  You could go in there and sit down.  I think it
25  gots two play areas.  One was up in front by that church

151

1  where we all went, and then there's another one in the
2  backside, on the other side.
3  Q.  Was it a pretty large Catholic church on the
4  front part of the park?
5  A.  Yes.  And then like on -- remember where we were
6  standing, when you look like towards the back way, there
7  was another part on the other end.
8  Q.  Okay.
9  A.  So it's like two sets of park -- two sides of
10  the park.
11  Q.  And this road that goes all the way around the
12  park, was it at the time common for people to cruise
13  that?
14  A.  Yes, they used to like on Saturdays.  Like when
15  we go on Saturdays, like mostly when everybody really
16  piled up was on Saturdays.
17  Q.  Right.
18  A.  And that's when we, the kids, was us playing and
19  stuff, and the families were out there, you know, cooking
20  or drinking or whatever.  And the cars would cruise
21  around seeing who's there and just driving around.  It's
22  like a hang-out spot.
23  Q.  And during this time, you're what, 6 or 7 years
24  old?
25  A.  8 -- about 8 or 9, little bit older then.

152

1  Q.  Then of that -- before we get any further into
2  that, that's what I was talking about.  That group of
3  people that hung together and did all of that, who were
4  they?
5  A.  It was Vicky.
6  Q.  Okay.
7  A.  Kathryn, Carolyn, Sharon, Cynthia, Donna and
8  Ruby and Gary.
9  Q.  And Gary?
10  A.  Yes, sir.
11  Q.  So everyone I checked.  Kathryn also?
12  A.  Yes.
13  Q.  Okay.  And the kids?
14  A.  Yes, sir.
15  Q.  Showing you -- showing you Defendant's 41.  Do
16  you recognize this?
17  A.  Yes.
18  Q.  Recognize all the people in this?
19  A.  Yes.
20  Q.  And are these all folks you're related to?
21  A.  Yes, sir.
22  Q.  Fairly and accurately depict them?
23  A.  Yes.
24        MR. WESTFALL:  Your Honor, we move for
25  admission of Defendant's 41.

153

1  MR. STRAHAN: I have no objection.

2  THE COURT: Admitted.

3  (Defendant's Exhibit No. 41 admitted.)

4  MR. WESTFALL: Thank you, Your Honor.

5  Q. (BY MR. WESTFALL) Can you see from there?

6  A. Yes, sir.

7  MR. WESTFALL: Can she step down, Your

8  Honor?

9  THE COURT: Yes.

10  Q. Stand here. Okay. And please tell us who these

11  people are. Let's just go straight across.

12  A. Okay. This is my Aunt Victoria, the one that

13  passed away. My Grandmother Vicky. Francis. And my

14  mother, Kathryn. And Veronica and Mark. And I can't

15  remember.

16  Q. No one else in there. So this is your mom?

17  A. Yes, sir.

18  Q. And where was this taken, best you can guess?

19  A. I think in the Butler Housing at Vicky's house,

20  if I'm not mistaken.

21  Q. Okay. And they're all holding bottles of booze?

22  A. Uh-huh.

23  Q. Okay. Go ahead and take your seat. Now, tell

24  us about picture-taking in your family. Were there many

25  pictures taken?

154

1  A. Yes.

2  Q. And how was that?

3  A. My mom, she loved to take pictures. My mom

4  would take pictures of anything and everything she could

5  from the beginning to the end. She, I mean, she was just

6  a flasher.

7  Q. And what kind of camera would she use, one of

8  those insta-matic?

9  A. She used to have one of them Polaroids, the one

10  that comes right on out. She had one of those. Or

11  she'll get the ones that you got to go get developed, the

12  disposable ones.

13  Q. But the little film would come out and over a

14  couple of minutes kind of develop so you could see the

15  picture?

16  A. Yes, she had -- she took a lot of those like

17  that.

18  Q. Seems like though she was pretty much the only

19  one that took pictures?

20  A. Yeah. She always been that way keeping up with

21  pictures.

22  Q. Uh-huh. Okay. I would like to show you some.

23  How is your mom doing?

24  A. She's doing okay.

25  Q. Show you what's been marked as Defendant's 42

155

1  and 43. Do you recognize those people?

2  A. Yeah. That's Monica and Leticia. Then that's

3  my Uncle Gene and Donna and Mark.

4  Q. All right. Fairly and accurately depict them?

5  A. Yes.

6  MR. WESTFALL: Your Honor, offer Defendant's

7  42 and 43.

8  (Sotto voce discussion.)

9  MR. STRAHAN: I have no objection.

10  THE COURT: 42 and 43 are admitted.

11  (Defendant's Exhibit Nos. 42 - 43 admitted.)

12  MR. WESTFALL: Thank you, Your Honor.

13  Q. (BY MR. WESTFALL) I want to continue to kind of

14  identify some people in the family. Okay. You see this

15  all right?

16  A. Yes, sir.

17  Q. You've got a screen in front of you that may

18  help. Who is this over here?

19  A. That's my Uncle Gene.

20  Q. Uncle Gene?

21  A. Uh-huh.

22  Q. Tell us about Gene.

23  A. That's like Mark's and Mike's stepdad.

24  Q. Uh-huh.

25  A. He took care of them when he got with my aunt.

156

1  So he was like a role model for them, the father figure

2  for them.

3  Q. Uh-huh.

4  A. I mean, well, actually for all of us, like all

5  his -- like us, we're not his biological nieces or

6  whatever, but he claims us. He helped all of us out a

7  lot, and up to this day he still do.

8  Q. And how does he do that?

9  A. He's self-employed. He works on cars and he

10  sells them. And if we need help or we need money for

11  something and we don't have the money, he would take the

12  time out to take us to go pay what we got to pay or pick

13  up something if we need. Or if we need something like a

14  pack of meat or something, he would take us, and we don't

15  have to pay him back. Unless we borrow like a large

16  amount of money, we have to pay back, but if it's a

17  little bitty, we don't have to. He takes care of us like

18  if we're his own family.

19  MR. WESTFALL: Can y'all -- can you hear?

20  Okay. Do me a favor. I'm a little bit hard

21  of hearing, but speak just a little bit louder.

22  THE WITNESS: Okay.

23  Q. So on that subject here, we've got Lizzie,

24  Donna, Vicky, Francis, Cynthia, Carolyn, Rita, Mike, Gary,

25  Kathryn, Ruby and Sharon. And let's talk about the ones

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

157

1  that are in with -- the ones that sort of hung out
2  together. Because Mike lives in Oklahoma City, right?
3       A.  Yes, sir.
4       Q.  And so not everyone lives in town; but of the
5  ones that are here, which ones had jobs?
6       A.  Um, Francis, Ruby, Sharon, sometimes Cynthia and
7  Donna, and my mom before she got hurt.
8       Q.  Okay.  And Gene, you said though, provided for
9  everybody?
10      A.  Yes.  He was self-employed.  He -- I mean, he
11  practically -- he's been around the family for some
12  years, so he helped everybody out.  If somebody needed
13  help, he was always there.  Some -- you know, you could
14  call him and ask him for help and he was there to help
15  you because, I mean, he had his own money by buying cars,
16  fixing them and selling them.  So everybody would rely,
17  like turn to him and ask him for help.  And he would help
18  you until you did something wrong to him, and then he'll
19  cut you off.
20      Q.  And what would you do wrong to Gene to make him
21  cut you off?
22      A.  Like if you borrow a large amount of money and
23  not pay him, then he won't help you no more.  I mean, it
24  would be kind of hard to get something out of him.  But
25  he was -- then again, he would still turn around and try

158

1  to help you.
2       Q.  Uh-huh.  And you mentioned that you were a
3  runaway.  How -- sort of what periods of time were you
4  away from all the family?
5       A.  From the -- actually from the age of 13 I really
6  was never -- I would come and go, but I never would stay
7  home because I didn't -- I didn't like it.  I mean, I
8  rather be with my dad and his family, because I felt like
9  I got treated better over there with them than what I did
10  with my own family.  And I would stay gone, and there
11  would be times my mom -- I think it went like almost two
12  years and she didn't know nothing about me.  She didn't
13  even know where I was for two years.  I was gone.
14           And it was because the help of my dad.  He's
15  the one who had me -- had me in a safe place here and
16  there.  And every time my mom would find out where I was,
17  I would leave and go somewhere else because I didn't want
18  to go home and go through that environment with them, so
19  I would leave.  And then if I get caught, I'll go --
20  she'll leave me in juvenile for a couple days, then
21  she'll go get me.  And I'll stay home for a couple days,
22  and then the argument with me and her or the family, and
23  I just wait till everybody go to sleep and I'll sneak out
24  the door or I'll jump out the window, and I'll stay gone
25  again until they find me.  But I would never stay home.

159

1  But up to this day, I still don't come around my mom like
2  that no more, I mean, I still keep my distance from her.
3       Q.  And were you and your dad pretty close from the
4  time you were born?
5       A.  My real dad, yes.  But we -- my mom also stopped
6  us from going with him because he was a alcoholic.  And
7  that's too why I would run away, so I could go see my dad
8  and be with my dad because we couldn't be around him
9  because he was a alcoholic.
10      Q.  So in these weekends that would start out at
11  Marine Park, kind of take us through the routine.  You
12  would be there and it would be hanging out and the adults
13  drank and the kids hang out?
14      A.  We would be cooking out.  Like we'll cook out,
15  we'll eat, go play, and then we'll clean up our mess.
16  And everybody, you know, we'll all load up and meet up
17  at Cynthia's house on --
18          THE REPORTER:  I'm sorry?
19      A.  We'll meet up at Cynthia's house on Refugio
20  Street.  And then the grownups would discuss who the --
21  who, what kids were going to what house and who is going
22  to stay where.  And they will split us all, you know,
23  split us up to where we'll go to different kinds of
24  places and stay and while they, you know, go out.  Or
25  some people would stay right there on Refugio.  Some

160

1  people would go to the Marine Creek Apartments or to the
2  Butler Housing.  We'll get split up like that, and then
3  they'll go out.
4       Q.  So the kids would all -- they would stay at a
5  place and the parents would go out and drink?
6       A.  Yes.  Well, some of the kids -- sometimes there
7  will be like some adults around.  Or like with in me, I
8  was probably -- about that time I was already like 10 or
9  11, so they would leave us, leave some of the kids with
10  us because they would consider us old enough to babysit
11  the youngest kids.
12      Q.  Uh-huh.
13      A.  And we would have to stay home and watch them
14  while they were out partying until 2 or 3:00 in the
15  morning.
16      Q.  Okay.  So the 10 and 11-year-olds watched all
17  the younger ones?
18      A.  Yes.
19      Q.  And how often did this happen, this -- this
20  drinking every weekend thing?  Was it every weekend?
21      A.  It was every weekend, all, it was every weekend
22  when it -- every weekend.
23      Q.  Okay.  And at 3113 North Houston, is that where
24  Mark was born?
25      A.  Yes, yes, sir.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

161

1    Q.  And how did a baby get taken care of in that
2  house?  Do you remember at all?
3    A.  Not really.  I mean, what parts little I know is
4  like everybody pitched in to take care of a kid.  You
5  know, once a newborn comes, everybody would try to baby,
6  spoil, hold them, pay attention for a little while.  But
7  once they hit that age when they got to moving around, it
8  was too much.  You could just -- as long as you could
9  walk, you got around.  I mean, the attention was there
10 but not like it should have been.
11    Q.  And when you're -- in your experience, when
12 you're sniffing paint, what's it like taking care of kids
13 in that condition?  Can you do it?
14    A.  Yeah.  Well, I guess on my part, I know I did
15 what I did but always like took the time out to stop and
16 check the kids, to make sure they had their diaper
17 changed, they, you know, it was time to eat.  And then I
18 also had like my neighbors and friends around that was
19 helping me because they spoiled my kids.  They spoiled
20 my kids, so they would help me.
21    Or when nobody was there, you know, I knew
22 this is a time I can't do this because I got to, you
23 know, pay attention to them.  I would stop doing what
24 I'm doing so I could feed them, take them a bath and get
25 them dressed.  Then after I did all that, once they were

162

1  playing or whatever, then that's when I would go get
2  high.  And then I'm not gonna lie about it, yeah, I did
3  get high in front of them, but I also did what a mother
4  was supposed to do for the kids too.  And it didn't
5  matter how high I was, I made sure I had their food done,
6  their Pampers was changed, they -- and I kept up with all
7  their doctor's appointments.  Anything, everything I had
8  to do, I did.
9    Q.  You said there was some threat they were going
10 to take your kids away?
11    A.  Yes, they got tooken away from me twice.  The
12 first time they got tooken away, I was living with my --
13 well, I was living in White Settlement, and I was getting
14 high, and they removed them because I had lost my vision
15 and I couldn't walk my daughter to -- well, I walked to
16 the bus stop, but I couldn't see.  I seen pitch white, but
17 I was going by the feelings with my feet.  And a neighbor
18 tried to get me, so called the ambulance, and I took off
19 running and like -- well, not run, but like felt myself
20 back to my house.  Then the police came, knocked and told
21 me I had to go get myself checked.  If not, they were
22 gonna arrest me.  And I didn't have no choice but to.
23    So I went and got checked.  Well, CPS
24 stepped in and they got removed.  And my mom had them,
25 and I had to go to rehab.  Then when I got out, I got

163

1  them back.  And I stayed clean for a long period of time,
2  for over four years.  Then I started hanging out with the
3  wrong crowd again and started up again.
4    And then I had moved to Forrest Hill and
5  then I had some family members living with me.  I put
6  them out.  They reported me to CPS.  They did a drug
7  test.  I failed.  They got removed again.  And I did
8  everything I was supposed to do, and then I got them back
9  and I've been having them since.
10    Q.  Well, back when you were little, now, it sounds
11 like in 3113 North Houston everyone was kind of doing the
12 same thing, sniffing paint and all that?
13    A.  Yes.
14    Q.  Did they do it in front of the kids?
15    A.  Yes, sir.  They'd sit on the front porch and
16 just get high in front of us, I mean, like they didn't
17 care.  The only time they will hide it was when my Uncle
18 Gary would come and they would try to hide it or throw
19 it to the side or something because he would come home
20 because he felt like he was the man of the house since
21 my grandpa passed away.  And he'll come and he'll see
22 them and he'll start yelling and going at it with the
23 girls and get in their stuff and throwing it away.  So
24 everybody knew when he got off work and came home, it
25 was time to put everything up because it was gonna be

164

1  a big ol' scene.
2    Q.  When, I guess, he was working.  This is already
3  in.  Can you tell us who -- who are these people here?
4    A.  The two little girls, that's Leticia Herrera and
5  Monica Herrera.
6    Q.  Is this Gene here working on a car?
7    A.  Yes.
8    Q.  Now Leticia and Monica, are they Francis's?
9    A.  Francis, Francis' kids.
10    Q.  Daughters, yeah.  There came a time when several
11 of y'all moved over to Butler, right?
12    A.  Yes.
13    Q.  And what is Butler?
14    A.  It's the -- they call them -- it's the Butler
15 Housing.  They call them The Projects, the East Side
16 Projects.
17    Q.  Uh-huh.
18    A.  Off of 287.  And I mean that's how -- well, I
19 mean, that's how we call it by, The Projects.
20    Q.  Okay.  Showing you what's been marked as
21 Defendant's 44 and 45.  Do you recognize this?
22    A.  Yes.
23    Q.  A picture of you there?
24    A.  That's me holding Mark when he was a baby.
25    Q.  Okay.  And then Defendant's 45?

165

1   A. Mark at my grandma's house on Houston Street.
2       MR. WESTFALL: Okay. Your Honor, we offer
3   Defendant's 44 and 45.
4       MR. STRAHAN: No objection.
5       THE COURT: Admitted.
6       (Defendant's Exhibit No. 44 - 45 admitted.)
7   Q. (BY MR. WESTFALL) Okay. This is you?
8   A. Yes, and Mark.
9   Q. And how old do you think you are there?
10  A. Probably about 7, if I'm not mistaken.
11  Q. Okay. And do you recognize any of those others?
12  A. The one back there with the hair down, that's
13  Mike.
14  Q. Okay.
15  A. And the girl in the back is Michelle.
16  Q. Michelle?
17  A. And the lady up on top, I think it's my Aunt
18  Ruby.
19  Q. Okay. And this would have been over on Houston
20  Street?
21  A. Yes.
22  Q. And this one here is on Houston Street, I guess,
23  as well?
24  A. Yes.
25  Q. And that's Mark?

166

1   A. Yes.
2   Q. Okay. Showing you 46 and 47. Do you recognize
3   that?
4   A. Yes.
5   Q. What is it?
6   A. The Butler Housing, The Projects.
7   Q. Okay. Fairly and accurately represented? Is
8   that --
9   A. Yes.
10  Q. And then this is 47?
11  A. The freeway and where the railroad track and the
12  Water Garden.
13      MR. WESTFALL: Okay. Your Honor, we offer
14  46 and 47.
15      MR. STRAHAN: I have no objection.
16      THE COURT: Admitted.
17      (Defendant's Exhibit Nos. 46 - 47 admitted.)
18      MR. WESTFALL: Could I have her step down,
19  Your Honor?
20      THE COURT: Yes, you may.
21  Q. (BY MR. WESTFALL) Stand here. Okay. Can you
22  see this all right?
23  A. Yes.
24  Q. Now, where -- who all lived in Butler right
25  after the move away from Houston Street?

167

1   A. It was Sharon, Donna. Sharon, Donna and Vicky,
2   and my -- well, my mom and Victoria lived in the same
3   apartment.
4   Q. Okay. And Victoria is Vicky?
5   A. Yes, Vicky.
6   Q. And so where did -- can you tell from looking at
7   this aerial where you lived and where --
8   A. Huh-uh.
9   Q. You can't. All right. And let me then show you
10  some other pictures. Well, while I got you standing,
11  let's do this. Let's just show the Jury. Is this Butler
12  here also?
13  A. Uh-huh.
14  Q. Okay. Was there a -- where would you all --
15  you're 7 years old. Mark is, I guess --
16      MR. STRAHAN: I'm going to object to
17  leading. Can he ask a question, please.
18  Q. (BY MR. WESTFALL) How old were you when you
19  were in Butler?
20  A. We moved in Butler when we were like 8 or 9
21  years old.
22  Q. Okay. And how long did you stay before you ran
23  off?
24  A. We stayed there until I was 15.
25  Q. Okay. And how old was Mark during this time?

168

1   A. He was about 8, 9.
2   Q. Okay. Tell me what you all did for fun.
3   A. Well, we used to walk through the bridge-way.
4   Q. Show us what you're talking about.
5       (Sotto voce discussion.)
6   A. We used to walk across the bridge-way and jump
7   the railroad tracks to go downtown and get in the Water
8   Garden. Well, we didn't have a pool in The Projects,
9   so we would jump the railroad tracks to go to the Water
10  Garden to swim in the Water Gardens. And then after
11  that, we would go home until after we -- they said we
12  couldn't do the Water Gardens no more, so we found
13  something else to get our self into.
14      Since it was boring in The Projects, it
15  was nothing to do, we would go downtown and get money
16  from the meters, take the money from the meters and
17  things like that. Then one day we got caught by the
18  cops and we got picked up and we went to juvenile.
19  Then we got out, and we wasn't supposed to be in
20  downtown where the parking lot -- we couldn't be on
21  that area no more because if we got put back on, we
22  were gonna get in trouble. So we would have to find
23  another way to get downtown to go to the Water Gardens.
24  Because in the Water Gardens, like it had a wall and
25  the water came falling down, and we could stand against

STATE VS. MARK ANTHONY SOLIZ     MARCH 14, 2012

169

1 there, just put our body so we could get wet; we just
2 couldn't get in the little water area. And that's what
3 we would do for fun, and then go home, and then get in
4 trouble because we were at the Water Gardens and we
5 wasn't supposed to be there.
6       Then they would find out we were jumping the
7 railroad tracks as they were -- the railroad tracks were
8 going, the trains were going, we were jumping them. And
9 we would get in trouble for that.
10    Q. So at this time are you living with your mom?
11    A. On 13th Street.
12    Q. On 13th Street. And then you said Sharon is
13 also in --
14    A. She was living on Waters. Donna and Sharon was
15 living next doors on Waters Street.
16    Q. Waters Street?
17    A. Uh-huh, before they moved to that Northwest
18 Freeway up that way, they were living there.
19    Q. Right. And so Sharon and her family is there?
20    A. Yes, and --
21    Q. Kathy and her family is there?
22    A. Uh-huh.
23    Q. And Vicky and her family is there?
24    A. Yes.
25    Q. And then Donna is there?

170

1    A. Yes.
2    Q. Does Mike live with Donna at this time?
3    A. I think he was in Mexico, if I'm not mistaken.
4    Q. Now, Mike's father is different than Mark's
5 father?
6    A. Yes, sir, they got two different dads.
7    Q. Okay. And did Mike's father live in the area?
8    A. No, he lived in the north side of Fort Worth
9 down the street on Houston Street. It was like about
10 four houses down from us on -- when we used to live on
11 Houston Street.
12    Q. Okay. And so Mike's father, if you were living
13 on Houston Street, that is kind of the area, right?
14    A. Houston Street. So did Mike's father actually
15    Q. Houston Street. So did Mike's father actually
16 have anything to do with him?
17    A. Not really, until the end when he seen like it
18 was a bunch of commotion going on with our family, then
19 he took him to Mexico to keep him from getting in trouble
20 and messing up. And he went and stayed out there for
21 about a year or two, if I'm not mistaken, then he came
22 back, and then I don't -- from there I can't remember if
23 he had anything to do with his dad or what.
24    Q. Right.
25    A. Because I was never -- I was never around. I

171

1 was always out in the street running the streets.
2    Q. And you said -- you said not really until the
3 end. I mean, he took him to Mexico when he was like 5,
4 right, or 4?
5    A. Yes. Then when he brung him back, he -- Mike
6 was in his own little world. Either he was living with
7 my mom or my Aunt Sharon.
8    Q. He didn't go back to live with Donna?
9    A. No. I mean, well, he did, but Donna was there
10 with them, you know, bouncing here and there.
11    Q. Right.
12    A. So it was like --
13    Q. Well, tell us what you mean by that. Go ahead
14 and have a seat. What do you mean, "Donna was here and
15 there bouncing around"?
16    A. Like she would -- like she would live on 13th
17 Street with -- where it used to be Vicky's house, or
18 she'll go with Sharon. Or her and Gene, they would have
19 their own place, like they would have a trailer home and
20 they would live in a trailer home. Or Gene always made
21 sure they had a place to stay, until they got split up.
22 So then that's when she would come and live with the
23 family, like on 13th Street and with Sharon and stuff
24 after she lost her apartment on Waters Street.
25    Q. Right. And she lost her apartment on Waters

172

1 Street, that was after Gene left her?
2    A. Yes.
3    Q. And was there a time on Waters Street where she
4 actually sold all the furniture?
5    A. Yes.
6    Q. And bought crack-cocaine?
7    A. Yes.
8    Q. And was Donna also prostituting herself?
9    A. She was.
10    Q. Was she also turning tricks to get drugs?
11    A. Yes.
12    Q. And was Cynthia doing that also?
13    A. Um, Cynthia wasn't -- she was in the north side
14 of Fort Worth with her -- one of her daughter's father's.
15    Q. Uh-huh. And we'll talk about Cynthia's house in
16 just a second. We'll go back to that. But while we're
17 on Waters Street, let me show you a couple pictures.
18       Showing you what's been marked as
19 Defendant's 48, 49, 50 and 51. Okay. Do you recognize
20 that?
21    A. That's the one we lived in on east -- the -- the
22 corner one. We lived on East 13th Street. That's where
23 Vicky and my mom was living.
24    Q. And --
25    A. That's on 13th Street.

173

1    Q.   Okay.
2    A.   That's Waters.
3    Q.   Uh-huh.  And do you see Donna's apartment in
4    there?
5    A.   We didn't live in this first -- they didn't live
6    in the first section.  They lived in the second -- no,
7    no.  Yeah, that was this first section.
8    Q.   Okay.  And then --
9    A.   It was like Donna's house and Sharon's
10   apartment.
11   Q.   All right.  So this -- this all fairly and
12   accurately depict the way it looks now at least?
13   A.   Uh-huh.
14        MR. WESTFALL:  We offer Defendant's 48
15   through 51, Your Honor.
16        MR. STRAHAN:  No objection.
17        THE COURT:  Admitted.
18        (Defendant's Exhibit Nos. 48 - 51 admitted.)
19        MR. WESTFALL:  Could I have her step down
20   one more time, Your Honor?
21        THE COURT:  I just really have trouble
22   hearing her.  You can have her step down if you'll have
23   her speak up.
24        MR. WESTFALL:  I've got a way to show this
25   up here that might be better.

174

1         THE COURT:  I can read along, but I have
2    trouble hearing what she's saying.
3    Q.   (BY MR. WESTFALL:)  Can you see this?
4    A.   That's on 13th Street.
5    Q.   Okay.  And who lived on -- at 13 and Chambers?
6    A.   It was Vicky and all five of her kids.  It was
7    Kathryn and all four -- all four of us.  And my Uncle
8    Gary, sometimes he would be there and sometimes he
9    wouldn't.
10   Q.   And so -- all right.  And this is another view
11   of their apartment?
12   A.   Of 13th Street.
13   Q.   And which one did they live in?
14   A.   The end one, at the last apartment at the end.
15   Q.   So 1306?
16   A.   Yes.
17   Q.   And then who lived at Water and Luella?
18   A.   It was the one -- there was two apartments, and
19   one was Donna, Gene, Mark, and Mike.  And then in the
20   next one was Sharon and all her kids, and my Uncle Gary
21   and his little girl Vicky and his wife Maria, or his girl
22   Maria.
23   Q.   Okay.  And then are these, 1704 and 1702, are
24   these more close --
25   A.   On Waters Street.

175

1    Q.   Those are more close-ups of the apartments where
2    everyone you just named lives.  Now, these were taken
3    pretty well.  What was -- what was the Butler Housing
4    Project like in the late Eighties?
5    A.   When we were growing up there, it was bad.  I
6    mean, you see people out there selling drugs.  We used to
7    get in trouble because we used to sneak off to the park.
8    One day we were at the park, a shoot-out, a gang-related
9    shoot-out happened from a gang from another side of town
10   came to the -- came and was shot at the people at the
11   park, and we happened to be there.  We were hiding under
12   the merry-go-rounds and the slides and stuff.  I mean, it
13   was bad.  People was getting killed, beat up, jumped, and
14   it was just bad, drugs, you know.
15   Q.   Was there a vacant school at both ends of the
16   Butler Housing Project?
17   A.   Yes.
18   Q.   Is that these two things?
19   A.   Yes.  One was up there on the 13th Street.
20   Q.   Okay.  So this is on the same street that you
21   lived on?
22   A.   Yes, we lived right across the street from that
23   school.
24   Q.   And is there some special meaning to that school
25   up there?  Did things happen in that school, that vacant

176

1    school?
2    A.   Well, we wasn't allowed to hang out or go up
3    there and play or just fool around up there because it
4    was well known as guys getting girls and taking them back
5    there and raping them or little girls were getting pulled
6    back there being molested.  Things were -- or people were
7    out there like stripping cars, taking stolen cars and
8    stuff.  So we wasn't allowed to go to that school because
9    it was always something going on or they were finding a
10   dead body up there, so.
11   Q.   How many times did stuff happen like that when
12   you were living there when you were a girl?
13   A.   I think, like, we heard about it like three
14   times about a lady getting raped.  But we were, you know,
15   we were kind of young so they really wouldn't let us know
16   too much.  When something like that happened, they would
17   keep us in the house so we wouldn't really know what was
18   going on.
19   Q.   Now, did you -- what was -- were you spending
20   time with Mark during this time?
21   A.   When he was about 9 or 10 years old, me and him
22   used to run around with each other, like go downtown,
23   which, I mean, I should have been a better role model
24   for him, but I was young and dumb.  And we used to go
25   downtown together and we used to rob the meters, and

177

1  just do dumb things. Try to get -- like if we seen money
2  in a car, we would try to get in the car and get it, till
3  we got caught. Then we would go home and we would get
4  our butt whipped. And my mom, she would go to the
5  juvenile and tell them everything that I did and stuff,
6  you know, try to lock me up. I mean, I mean, we did
7  crazy things when we were growing up.
8      Q. Well, during this time, did Donna have a
9  relationship with a woman named Becky?
10     A. Yes.
11     Q. And did Becky ever accompany you-all on these
12 runs to go steal this money?
13     A. Yes, she used to go with us. And she had these
14 wire cutters and they were -- she would cut the -- like
15 it had a lock on there, and them wire cutters, it will
16 cut the lock off. And we would get all the change that
17 was in there or whatever money people would put in there
18 to pay for their parking. We used to get the money and
19 then split it all up.
20     Q. Okay. Split it up between whom?
21     A. Me, her and Donna and Mark.
22     Q. Okay. So Donna would actually take part in the
23 proceeds of this theft?
24     A. Well, Becky would do it to -- I guess so she
25 could be on good terms with Donna.

178

1      Q. Okay. And Donna knew -- did she know where the
2  money was coming from?
3      A. Half of the time she didn't, and then at the end
4  she started finding out what we were doing. And then she
5  told me if she found out that I had did it again, I had
6  to leave.
7      Q. Uh-huh.
8      A. Because, well, for one, too, I was a runaway
9  and I would go hide up there at her house until my mom
10 started sending the cops over there. So she told me
11 either I had to stop doing what I was doing or I had to
12 leave. And then it was because I was bringing Mark along
13 with me doing it, so it's either I had to stop or I had
14 to leave. So I just left.
15     Q. There came a point, I mean, when Mike came back
16 from Mexico, he actually chose not to live with Donna, is
17 that --
18     A. Yes, he lived with my aunt. He was back and
19 forth with my Aunt Sharon and my mom, with Kathryn.
20     Q. Uh-huh. And why didn't he want to live with
21 Donna?
22     A. Because he didn't like the ways, what she was
23 doing within the drugs and the prostituting and stuff.
24 And -- and like, there was nothing there. It was like
25 no furnitures, no nothing there.

179

1      Q. So who lived in this house with no furniture?
2      A. It was Donna, Becky, Mark, me when I would run
3  away, like just about us because really nobody would like
4  to go over there but whoever was messing up because we
5  knew if we went over there, we could get away with it.
6      Q. Why?
7      A. Well, because Donna would be doing her own
8  thing, she would be high or be at the neighbor's house
9  or something and we'll be there.
10     Q. Were you aware or did you know of Mark to
11 disappear for periods of days?
12     A. I know he would leave and nobody knew where he
13 was, but then when people did know where he was, he was
14 either at Sharon's house or at one of the neighbor's
15 house.
16     Q. And to your knowledge, did Donna sniff paint
17 throughout this entire time?
18     A. She did when we lived on Waters Street because I
19 used to sniff with her. I mean, I used to be the one
20 coming and bringing the paint and we all would get high.
21 I mean, she'll be downstairs in the living room and I'll
22 be upstairs in the room. And then it would be time, I
23 mean, we'll get up and we would leave, like the next
24 morning we'll get up and we'll leave early before she
25 even got up.

180

1      Q. And when you say "we", you're talking about you
2  and Mark?
3      A. No, me and whatever friend she would let me
4  go -- like one of the girls I hang around with or --
5      Q. Right.
6      A. -- we'll get up and leave.
7      Q. So y'all would go sniff paint with Donna?
8      A. Uh-huh.
9      Q. Where would Mark be?
10     A. Sometimes he wouldn't be around. He'll be
11 either at Sharon's or either at his friends or somewhere.
12     Q. And how often did you -- did you-all go and
13 sniff paint with Donna?
14     A. About just whenever I didn't have nowhere to go
15 and I needed somewhere to go, I would go over there with
16 her because I knew if I go, I have somewhere to stay.
17     Q. Did she ever tell you, "No, I don't want to
18 sniff paint with you"?
19     A. Yeah, there was times she wouldn't, but then
20 when we leave and we, like, hide the stuff in the closet
21 and we come back, you know, she would be high.
22     Q. Because she sniffed your paint?
23     A. Yes.
24     Q. And how old were you when this was going on?
25     A. I was about 13, 14.

181

1   Q. During this same time in Butler, was there --
2   you mentioned something about gangs. Can you tell us
3   more about that?
4   A. Well, when we lived there, when we lived there
5   it was like the Crips. It was like where we -- in The
6   Projects at that time, it was the Crips, and then it
7   would be like the Crips would be enemies with the Stop
8   6 Projects in the east side of Fort Worth, and they were
9   called the Bloods. When the shooting and all that went
10  on, that was when the Bloods came over to the Butler to
11  get at the Crips. That was like mainly the main two
12  heavy gangs that was running through that was the Crips
13  and the Bloods.
14  Q. Uh-huh. And was Mark -- did Mark see any of
15  this with you like at the playground?
16  A. No.
17  Q. Mark there?
18  A. No, he wasn't with us when all this was going
19  on.
20  Q. Okay. And how old were you when this is going
21  on?
22  A. About the age of 14.
23  Q. Okay. So same age. Mark just didn't happen to
24  be there?
25  A. No.

182

1   Q. Do you remember the Glass Key?
2   A. Yes.
3   Q. And did you walk by the Glass Key?
4   A. We used to walk by there just because we had to
5   go to the store. Like when we cut through right there,
6   the store was right there and the Glass Key was on the
7   side of the store.
8   Q. And did you -- did you ever go out and ride the
9   trains with Mark?
10  A. Yes.
11  Q. Tell us about that.
12  A. We used to jump on the -- like when the trains
13  would go slow, we would jump. We would grab the bars and
14  jump on there and just ride it till we could cross, like
15  cross in the middle of the train to get to the other
16  side, and we'll jump off when they were going slow. If
17  they was going fast, we never took a chance in trying to
18  jump it. Only when they were going slow, then we'll jump
19  it. Or sometimes the trains were just sitting there and
20  we'll cross over like that.
21  Q. And did you ever ride them up to the north side,
22  up to Rock Island?
23  A. It would take us halfway. It wouldn't take us
24  all the way. It will only take us like half of the way,
25  then we'll jump off because it would end up going another

183

1   direction, so we'll have to jump off.
2   Q. So you're -- when you're 14, Mark is, what,
3   about 9 or 10?
4   A. Yeah.
5   Q. And at what point --
6   A. About 10.
7   Q. -- did he start, well, if he did, start sniffing
8   paint with y'all?
9   A. If I'm not mistaken, I think he was about 10.
10  Q. Tell us about that. How did Mark start sniffing
11  paint?
12  A. Seeing us doing it, and I guess he tried it. At
13  the first he didn't like it, but then at the end once he
14  got older, then he started doing it.
15  Q. So when you say "us", are you talking about you
16  and Donna?
17  A. No, me and my friends and my brothers.
18  Q. Uh-huh. And did you hear of Mark sniffing paint
19  with his mother?
20  A. No.
21  THE COURT: We're going to take a 15-minute
22  recess.
23  (Recess taken from 2:56 - 3:14 p.m.)
24  (Jury not present.)
25  THE COURT: State ready to proceed?

184

1   MR. STRAHAN: Yes, sir.
2   THE COURT: Defense ready?
3   MR. WESTFALL: Yes, Your Honor.
4   THE COURT: Defendant present. Jury ready?
5   THE BAILIFF: Yes, sir.
6   THE COURT: Please bring the Jury in.
7   (Jury present.)
8   THE COURT: You may be seated. Continue.
9   Q. (BY MR. WESTFALL) Okay. I'm showing you what's
10  marked as Defendant's 52 through 60. Just look at those
11  real fast.
12  A. (Witness complied.)
13  Q. Okay. Do you recognize the people and places in
14  these pictures?
15  A. Some of them.
16  Q. Okay. Do you recognize the people in this
17  picture?
18  A. Yes.
19  Q. Do you recognize the people in this picture?
20  A. Yes.
21  Q. Do you recognize the people in Defendant's 58?
22  A. Yes.
23  Q. Do you recognize the people in Defendant's 57?
24  A. Yes.
25  Q. Do you recognize the people in Defendant's 56?

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

185

1    A. Yes.
2    Q. 53 and 54, do you recognize the place that is in
3  53 and 54?
4    A. On Houston.
5    Q. Yeah, that's the house on Houston Street, right?
6    A. Yes.
7    Q. And then this here, 52 and 55, is a house on
8  23rd and Refugio. Do you recognize that house?
9    A. Yes.
10   Q. Are all these accurate?
11   A. Yes.
12       MR. WESTFALL: Your Honor, we'd offer
13  Defendant's 52 through 60.
14       MR. STRAHAN: I have no objection, Judge.
15       THE COURT: Admitted.
16       (Defendant's Exhibit Nos. 52 - 60 admitted.)
17   Q. (BY MR. WESTFALL) Now let's just take these.
18  Can you see that okay?
19   A. Yes.
20   Q. Now, who is this?
21   A. That's Mike and his dad.
22   Q. Okay. And Mike's dad was also named Mike?
23   A. Yes. We used to call him Uncle Mike.
24   Q. And Uncle Mike actually looks like he had a
25  relationship with his son?

186

1    A. Yes.
2    Q. And did he take his son to Mexico for a period
3  of years?
4    A. Yes.
5    Q. And another picture?
6    A. That's Mark. And I don't know who the little
7  one is.
8    Q. Okay. This is Mark?
9    A. Yes, yes.
10   Q. Who is this?
11   A. Donna, Mark and Mike.
12   Q. And Mike is the same one here, right?
13   A. Yes.
14   Q. What he looks like when he got bigger?
15   A. Yes.
16   Q. And this is Mark?
17   A. Yes.
18   Q. And this is Donna back then?
19   A. Yes.
20   Q. Do you have any idea what this is?
21   A. Uh, some -- I mean, our cousins.
22   Q. And just for the Jury's benefit, are you related
23  to this lady?
24   A. Um, I don't recall her. I don't think so.
25   Q. Okay. Were you ever a part of one of -- of a

187

1  deal that they would do annually, come to The Projects
2  like the angel tree and give everybody presents?
3    A. Yes, we used to be signed up with that.
4    Q. And does this look like one of those things?
5    A. No, it look like just the cousins getting
6  together to take a picture.
7    Q. Okay. With a lady that you don't know. This
8  lady, these people here, who are they? Who is this?
9    A. That's my cousin, Yolanda.
10   Q. Okay. And --
11   A. That one, I can't recognize who that one is.
12  I still don't, Greg.
13   Q. No?
14   A. Santos.
15   Q. This is who?
16   A. That's Vince.
17   Q. Vince?
18   A. Yes.
19   Q. And whose child is Vince?
20   A. Sharon.
21   Q. Okay. This is Mike again?
22   A. Mike, uh-huh.
23   Q. Who is this?
24   A. I -- okay. Wait. I can't tell you.
25   Q. Do you know this -- this person?

188

1    A. No.
2    Q. And her? Are you seeing these okay?
3    A. Yeah, but I can't -- I mean, I can't remember
4  who they are.
5    Q. Do you remember --
6    A. That's -- one right here in the white T-shirt,
7  that's Emiliano.
8    Q. Okay.
9    A. And that one, I can't tell you.
10   Q. How about this?
11   A. Those three boys are my brothers. The one in
12  the red shirt is my brother -- my stepbrother, Kenneth.
13  And the one that's holding up the dice is my brother,
14  Christopher. And the other boy in the back is my
15  brother, Vincent. And that's me.
16   Q. Okay. How old do you think you would have been
17  here?
18   A. About 15.
19   Q. All right. Now, this here is in evidence. Is
20  that a picture of the house over on Houston Street? Do
21  you see it okay?
22   A. Yes.
23   Q. Now, did it look like this back then?
24   A. No, it was different.
25   Q. What did it look like back then?

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

189

1    A.  It looked more, like, like a old house.  It
2  wasn't fixed up or painted up like that.
3    Q.  Okay.  The -- in fact, is the whole neighborhood
4  quite a bit nicer than it was back in the Eighties?
5    A.  Yes.
6    Q.  And when you were talking about the porch
7  earlier, is this where we're talking about here?
8    A.  Yes, everybody used to be on each side --
9    Q.  Uh-huh.
10    A.  -- get -- you know, either drinking or getting
11  high.  And as kids, we -- like where the walkway is, we
12  would be running through there or on the side of the
13  house or in the front yard.
14    Q.  And you said there was a side where they used to
15  hide their cans.  Was it on this side or the other side?
16    A.  The other side.
17    Q.  Can you see it here?
18    A.  Where the tree -- where that tree is.
19    Q.  Uh-huh.
20    A.  At the bottom, they will hide it in the back of
21  the tree.  But with us kids running through there, we
22  would find them.
23    Q.  And throw them down the sewer?
24    A.  The sewer.  We'll walk, like, up to, like --
25  like, if we're walking, there's a school down the

190

1  street.  We will walk down, like, towards the school way,
2  and there was a sewer line and we would throw them down
3  in there.
4    Q.  Like in a storm drain?
5    A.  Yes.
6    Q.  Now I'm showing you what's in evidence as
7  Defendant's 52.  What is this?
8    A.  My Aunt Cynthia's house on Refugio and 23rd
9  Street.
10    Q.  So when you've been saying Refugio, it's this
11  R-E-F-U-G-I-O?
12    A.  Yes.
13    Q.  And is it also much nicer now than it was back
14  then?
15    A.  Yes, it's much cleaned up more now.
16    Q.  Is this the front of it?
17    A.  Yes.
18    Q.  Now --
19    A.  It didn't look like that when we lived there.
20    Q.  What's that?
21    A.  It didn't look like that when we lived there.
22    Q.  What did it look like?
23    A.  It was more like -- how can I -- more like --
24  how can I say that in a better way.  Like hooded out.
25  Like it wasn't all fixed up.  All like -- it was, like,

191

1  kind of like ragged out.  It wasn't fixed up pretty like
2  that.
3    Q.  Right.  And how many people lived in this house?
4    A.  It was Cynthia and all her kids, and Carolyn and
5  her boyfriend and her -- what kids she had.  And then
6  just whoever will go over there and hang out, they would
7  stay nights over there.
8    Q.  And this house actually is kind of close to
9  Marine Park, wasn't it?
10    A.  Yes.
11    Q.  So was this a house that everybody kind of
12  congregated at after the Marine Park?
13    A.  Yes, that's the house we -- everybody would get
14  back to and hang out for a while till they decided where
15  they were gonna send the kids to go.
16    Q.  Uh-huh.  And Cynthia, what did she do for money?
17    A.  She, um, she had a boyfriend that worked, but
18  when they got split up, she would bootleg, sell beer
19  after hours when the stores wasn't selling them.  They
20  were selling beer and selling drugs out of the house.
21    Q.  Okay.  Tell me more about that, selling drugs
22  out of the house.  What were they selling?
23    A.  My understanding, they were selling, um, powder
24  cocaine and crack.
25    Q.  And is this the house that everyone would get

192

1  together after Marine Park?  I mean the kids and everyone
2  would be there too?
3    A.  Yes, we all would hang out there.  Sometimes
4  that's where, if we didn't go to the park, that's where
5  we had our family get-togethers.  Everybody got together
6  at that house if we didn't make it to the park.  That's
7  where everybody would gather up at because that's when,
8  like, the bootlegging was going on, the beer was selling
9  and the drugs and stuff.
10    Q.  And was there a -- was there a place in the
11  house where the kids were not allowed to go?
12    A.  In my Aunt Cynthia's room.
13    Q.  Why?  Why?
14    A.  Because that was the room that the drugs were
15  going on, they were doing the drugs, and that's where the
16  drugs were hidden at in that room.
17    Q.  Okay.  And so what would the kids be doing?
18    A.  We'll be either in the back yard or running
19  around in the front yard playing or running in and out
20  getting on their nerves, because they were getting high,
21  so we would do anything and everything to make them mad
22  so they could pay some attention to us.  We'll get into
23  things or just do dumb things so they could come out of
24  the room because they would always be locked up in the
25  room.

193

1  Q.  And all the kids would be outside the room?
2  A.  We'll be all running around either in the living
3  room or in the kitchen or the back yard or the front -- I
4  mean front yard.
5  Q.  What would you be doing?  You said dumb things.
6  Like what?
7  A.  We'll be fighting with each other, or we'll be
8  running in and out of the house slamming the doors, or
9  getting into the icebox and getting into things that we
10  wasn't 'posed to get into, or just fighting or
11  spilling things on the floor, just so they could get out
12  and give us some kind of attention.  Or we'll bang on the
13  doors and tell them we're hungry, we're ready to eat, but
14  we had to wait till whenever they were ready to feed us.
15  Or they would tell us go in there and make us a baloney
16  sandwich or something, you know, a sandwich or something.
17  Q.  And would you ever get a response from them?
18  A.  They would tell us to go in there and if
19  whatever was easy for us to get, then we'll get it.  But
20  like us older ones, us older ones that was like 13, 14,
21  12 and 11, we had to go in there and serve the little
22  kids like sandwiches, pour them something to drink or
23  make them a bowl of cereal.  We had to feed them until
24  they were ready to come out the room and give us
25  something decent to eat.

194

1  Q.  And Mark's right there for all this, right?
2  A.  Yes.
3  Q.  You sound angry.  Tell me what's going on.
4  A.  It's just that house brings back memories.
5  Q.  Of what?
6  A.  I mean, within the drugs and everything and then
7  within my aunt getting killed in there.
8  Q.  Tell us about that.
9  A.  It was one -- we were at the park.  We all
10  gathering at the park.  All of us were there.  My aunt
11  and her boyfriend got into it because his ex-wife or girl
12  was cruising through the park running her mouth to my
13  aunt.  A argument broke out.  We left.  We went back to
14  the house right there on Refugio.  She was telling him
15  she didn't wanna be with him and stuff.  And, of course,
16  little kids are gonna be nosey.  They're gonna wanna know
17  what's going on.  And every time somebody would argue, of
18  course, us little kids gonna be nosey and try to sneak
19  around the corner and look and see what's going on.  The
20  argument, she told him she didn't wanna be with him no
21  more.  Well, he reached -- had her back against the
22  cabinet, against the sink, and he grabbed the knife and
23  he stabbed her in the back and in her chest.
24  And then us little kids went running to the
25  front to call -- because everybody was standing up in the

195

1  front drinking and everything.  Nobody knew what was
2  going on till all of us little kids, you know, all her
3  kids seen it, what happened, Mark seen it, me, my
4  brothers and sisters, we seen when he stabbed her.  He
5  stabbed her in her back, in her chest.  We ran out there
6  to get help.  Then my Uncle Gary and my aunts and all
7  them went in.  My Aunt Cynthia tried to stop him.  He
8  almost stabbed her, told her to get out the way or she
9  was gonna be next.  And he threw her in the corner.
10  By the time everybody tried to catch him,
11  time everybody came, she staggered from the kitchen
12  trying to go to the front door.  And as she was walking,
13  blood started coming down her eyes, and then blood just
14  gushed out of her mouth, and she fell forward and she
15  suffocated in her -- within her blood.  We were trying,
16  my aunts and everybody that was there, was trying to turn
17  her over, but she had already got heavy.  And we were
18  trying to help them and we couldn't because she was
19  already cold and heavy and she suffocated in her blood,
20  and she died.
21  Q.  And Mark was there with you?
22  A.  Do what?
23  Q.  Mark was there with you?
24  A.  Mark was there.  He seen it, because that's when
25  he lost it because he was so close to her.  She's the

196

1  only one that kept that family together.  And it's like
2  once she passed away, our family went downhill.
3  Everybody started doing drugs bad.  Everybody was going
4  out.  Nobody paid attention to us.  We were like we were
5  taking care of our self.  Mark took it hard.  He, I mean,
6  he was close to her.  He seen her get stabbed.  He took
7  it hard.  I mean not just him but with all of us.  We all
8  took it hard because she's the one that kept all of us
9  holding up.
10  Q.  Now, it sounds like -- well, you ended up living
11  with someone who wasn't your mom, right?
12  A.  Yes.
13  Q.  And Mike ended up living away from Donna.  Did
14  any of the other aunts want to take Mark?
15  A.  It's like nobody wanted to deal with him.  It
16  was like if he was a problem child, nobody never took
17  time out to try to take care of him.  It's like, really
18  honest, it's like we raised our self.
19  Like up to this day, my mom tells me, "The
20  streets raised you.  The streets raised you."  Okay.  The
21  streets raised us because you didn't take the time out to
22  take care of us.  Y'all were too busy drinking and at the
23  dope house and leaving us here and there.
24  Because we were older, we had to take care
25  of the younger ones.  So it was like they didn't have no

197

1 role model. We didn't have no role model. We had to
2 raise our self. We had to learn the hard way for us to
3 live a better life now because we didn't have a parent to
4 be there.
5     Q. Just out of curiosity, how many of these kids
6 have been to prison?
7     A. My brother Christopher Flores, my brother
8 Kenneth, my sister Mona, my cousin Freddy, Vicky's son.
9     Q. Uh-huh.
10     A. And --
11     Q. Mark and Mike.
12     A. Yeah, them two. Vince, Santos, and Emiliano.
13     Q. How about Tommy or John Paul?
14     A. John Paul. That's about it, that I think of.
15     Q. None of Cynthia's kids?
16     A. No.
17     Q. And none of Carolyn's?
18     A. No.
19     Q. Carolyn was the youngest, right?
20     A. Yes.
21        MR. WESTFALL: Your Honor, I'll pass the
22 witness.
23        CROSS-EXAMINATION
24 BY MR. STRAHAN:
25     Q. Are you doing okay?

198

1     A. Yeah.
2     Q. Okay. Do you need a minute?
3     A. No, I'm okay.
4     Q. Okay. I'm a Prosecutor in this case. Did they
5 tell you I was going to be mean to you? Because I ain't.
6 I'm just telling you that I'm not. Do you need a tissue?
7 But I do have some questions for you because I get lost
8 easily and it's hard for me to keep up, okay, so I do
9 have some questions.
10        These people have -- that are marked here
11 have gone to the pen; is that correct?
12     A. Yes.
13     Q. Is that for like thefts and drugs and stuff or?
14     A. Two -- two of them is for murder.
15     Q. Okay.
16     A. One of them was for drugs, and two of them was
17 for armed robbery. One of them was he was dating a girl
18 and they got split up, and the mother put -- he was older
19 than the girl. And after him and the girl got split up,
20 he put rape charges on her -- on him. And the other ones
21 are just like for theft.
22     Q. Okay. So kind of a wide variety there. Tell me
23 again, who were the people who were doing all the drug
24 sniffing again -- or the -- I'm sorry, the paint
25 sniffing, who was it that was doing that?

199

1     A. Out of the aunts?
2     Q. Yes, out of all these people that are listed.
3     A. Okay. It was Donna.
4     Q. Okay.
5     A. Carolyn.
6     Q. Carolyn?
7     A. Francis.
8     Q. Okay.
9     A. Um, Vicky.
10     Q. Okay.
11     A. And I think that's about it.
12     Q. What about Sharon or Ruby or Kathryn or Gary or
13 Mike?
14     A. Okay, Sharon too. I'm sorry, yes, Sharon.
15 Sharon was the one too.
16     Q. Okay. What about Ruby?
17     A. Ruby, no.
18     Q. No. And I'm just circling them so I can keep
19 track of them. Okay?
20     A. Okay. Ruby, no, Ruby was more as a drinker.
21     Q. And Kathryn is your mom?
22     A. Yes.
23     Q. And you already said she didn't do that kind of
24 stuff?
25     A. Well, she --

200

1     Q. She didn't sniff paint?
2     A. She didn't sniff paint, but she dranked and did
3 drugs.
4     Q. Okay. All right. And what about Gary?
5     A. He drank and did drugs.
6     Q. Okay. I thought he was the one that would come
7 home and be mad if anybody -- they would hide stuff from
8 him.
9     A. Well, as far as the sniffing part, he didn't
10 approve of the sniffing part, but he did drinking and
11 drugs.
12     Q. So he was okay with drugs and drinking but not
13 the sniffing paint?
14     A. Not the sniffing. He was very against the
15 sniffing.
16     Q. Do you know what his problem with sniffing paint
17 as opposed to the drugs was or do you know?
18     A. I don't know.
19     Q. Okay. And what about Mike?
20     A. Uncle Mike, he didn't do, that I know of.
21     Q. Sure.
22     A. I think he just did drinking, but he wasn't like
23 all the time. It was a once-in-a-while drinker, not a
24 heavy thing.
25     Q. Okay. And I thought your mom didn't want you to

STATE VS. MARK ANTHONY SOLIZ                    MARCH 14, 2012

201

1  go to your real dad's because he was an alcoholic.
2     A.  Yes.
3     Q.  So she would disapprove of his drinking?
4     A.  Yes.
5     Q.  And she didn't think that was good for you?
6     A.  No.
7     Q.  Yet you're telling us that she drank and did
8  drugs herself?
9     A.  Yes.
10    Q.  But she didn't think it was okay for him.  I
11 don't understand, I guess.
12    A.  Well, because my dad would drive around with us.
13    Q.  Uh-huh.
14    A.  And my dad would go to the -- to the bar and
15 we'll -- it's like -- it's weird because in Fort Worth
16 on the main street, it's like it's a club way in the back
17 and on the side is like some buildings, once you get on
18 the main street.  And there was always a man in the --
19 security guard in the door.  And he would park up in
20 there.  While we would be in the car asleep, my dad would
21 be in the bar drinking.
22    Q.  Okay.
23    A.  And when we would wake up, my dad would not be
24 around.  And when we started telling my mom, so she put a
25 stop.  Then he would drink with us and he would go to the

202

1  lake and, you know, he would be doing donuts.  He would
2  be driving with us while he was drunk.
3     Q.  Uh-huh.
4     A.  And the difference with my mom and him, my mom
5  didn't drive with us when she was on drugs or drinking.
6  She left us at home and she was out on her own, you know,
7  they were out in the streets.
8     Q.  Okay.  Okay.
9     A.  So that's when she stopped us going with my dad,
10 because I think, if I'm not mistaken, I think my dad had
11 got into a accident one time when he was drinking, so she
12 put a stop with us being with him.
13    Q.  I see.  So if I understand that, it would be
14 okay to do that stuff at home as long as you're not
15 running the kids around?
16    A.  Yes.
17    Q.  Okay.  And, in fact, in your own life you sniffed
18 paint around your own children; is that correct, or have?
19    A.  Yes, yes.
20    Q.  How long have you been clean from that?
21    A.  I been clean since last year in July.
22    Q.  Okay.
23    A.  Well, I'm sorry.
24    Q.  It's okay.
25    A.  It was June.  It was in June.  It was in June.

203

1     Q.  So June of last year you have been able to keep
2  yourself clean?
3     A.  Yes.
4     Q.  Okay.  And you, I guess, were very concerned
5  that somebody was ultimately going to take your kids
6  away?
7     A.  Yes.
8     Q.  And how many kids did you say you have?
9     A.  I have four, two boys, two girls.
10    Q.  What are their ages?
11    A.  17, 16.
12    Q.  Oh, you told --
13    A.  17, 16, 14 and a 10-year-old.
14    Q.  A 10-year-old.  And what is your living
15 arrangement right now?  Do they -- do they all live with
16 you now?
17    A.  Um, my two daughters live with me.
18    Q.  Okay.
19    A.  My oldest son, he's -- he's 17, fixing to be --
20    Q.  On his own?
21    A.  -- 18 in May.  He done moved out of the house.
22    Q.  Okay.
23    A.  My 16-year-old, he lives with my mother.  He
24 don't live with me, well, because our problems with his
25 attitude towards me.  He's very disrespectful, tries to

204

1  put his hands on me.
2     Q.  Sure.
3     A.  So he don't live with me.  I only have my two
4  daughters with me.
5     Q.  Okay.  And how are they doing?
6     A.  They're doing fine.  I mean, they -- they're
7  proud of me because I did a lot of whole turn around.
8  I'm change -- you know, I changed.  I mean, I do more
9  activity things with them, you know, and I focus more on
10 them.
11    Q.  Do they go to school?
12    A.  Yes.
13    Q.  And what kind of -- are they in, I guess, middle
14 school and high school or elementary school, high school?
15    A.  One, the 10 years old, she's in fourth grade.
16 The 14-year-old is in seventh grade.  And the
17 16-year-old, he's in ninth grade.
18    Q.  Okay.  So you've got them all in school.
19 They're all --
20    A.  They're all in school.
21    Q.  Besides, I guess, his attitude problems, other
22 than that, I guess, he is doing okay, your son?
23    A.  No.
24    Q.  Okay.  He's got problems?
25    A.  He's having -- not going to school and I'm

205

1 getting fined and trouble behind him not -- for him not
2 going to school.
3 Q. Okay. And you -- I think you had stated you --
4 when -- and I was trying to keep track of all this. You
5 saw all this paint sniffing going on at that one house,
6 correct?
7 A. Yes, sir.
8 Q. And then you ran away and also went to live with
9 your dad early on?
10 A. Yes, sir.
11 Q. And I think that you had said you started
12 sniffing paint after you left to go to your dad's, you're
13 hanging out with some bad people?
14 A. I was hanging around with my cousins on my dad's
15 side of family. I was -- that's how I started hanging
16 around with them.
17 Q. So you saw all this, but you decided it was a
18 good idea for you actually when you got out of there; is
19 that right?
20 A. Yes.
21 Q. You left and had a whole different influence and
22 then started doing it?
23 A. Yes.
24 Q. Okay. And you had told us when you were
25 testifying that you wanted to get out of this drug and

206

1 paint sniffing situation, correct? And then you leave
2 and go with your dad and then you start doing it on your
3 own?
4 A. And --
5 Q. Go ahead.
6 A. And it's like -- it's not no excuse or nothing,
7 but it's like I was trying to fit in the crowd, make
8 myself feel comfortable, hey, I can be big and bad and I
9 can do this and I could do this and I could get away with
10 it thinking --
11 Q. Right.
12 A. -- you know, but I mean, that's --
13 Q. You made a dumb choice, right?
14 A. Yes.
15 Q. And but it's a choice. I mean, you decided to
16 do it and you knew better?
17 A. And it's like it's not an excuse and it's not no
18 reason, but I feel like, I mean, I done changed and I'm a
19 better person now. And I feel like in a way I'm kind of
20 glad that I went through them consequences and the
21 situation that I -- the trouble that I got in. That made
22 me a better person now to make me strong now to be a
23 clean person and to be able to raise my kids without me
24 being 30, 40 years old still doing this and this and
25 that, that the aunts are still doing.

207

1 Q. Sure.
2 A. And it just made me be a better and a stronger
3 person and a better person for my kids.
4 Q. Would you agree that seeing some of this stuff
5 can a lot of times tell you this is the way I don't want
6 to be?
7 A. At times it did, but then it was like it ain't
8 gonna hurt me. And then when I lost my vision, I should
9 have learned my first time, you know, because God gave me
10 a second chance to live because I was in ICU for a week.
11 I was at the edge of life and death. I could anytime,
12 you know, if I would have went to sleep I would have
13 died. They had to keep me up 24 hours. And you would
14 think I would learn my lesson the first time, but I
15 didn't.
16 Q. You chose even after that to go back to that
17 lifestyle for a while anyway, right?
18 A. Yes, because I started hanging around with the
19 wrong crowd again and it was temptations. And then I
20 started back again to finally the end when I lost my -- I
21 got paralyzed with my potassium. I stayed in the
22 hospital for almost two weeks. Then finally that's when
23 I was like, I give up. God gave me a second chance. He
24 gave me this life to live, to take care of my kids.
25 Thank God, I lost my vision, but thank God I still got

208

1 good enough vision to help my kids. I'm -- still could
2 be there to provide for my kids like feed them, clothe
3 them, take care of them.
4 Q. Yeah.
5 A. I mean, it's hard to help them with their work,
6 but I have a lot of support with my oldest daughter. She
7 helps me out a lot.
8 Q. Okay. And -- okay. But ultimately even as a
9 kid, you made that choice?
10 A. Yes.
11 Q. And I guess now you figured some things out; is
12 that right? But you also made that choice as an adult on
13 multiple occasions?
14 A. Yes.
15 Q. Even after you hurt yourself pretty bad and got
16 in trouble. But it's always been a choice. You don't
17 sit here and make excuses for it, do you?
18 A. No, I don't. I blame myself for everything.
19 It's not nobody to blame but me.
20 Q. Okay. And that's a very adult attitude about
21 that. You're doing good now, right?
22 A. I'm doing so much because, you know, I thank God
23 my daughters, you know, yeah, I have problems with them,
24 with my 14-year-old, her attitude, but she looks up to
25 me. And I have to be a better role model for them. I

209

1  don't want them like, hey, I should have seen what my
2  family was doing. I shouldn't walk down that path, but I
3  did. I don't want my daughters to grow up and be like me
4  and run the streets or do drugs or do this. I want them
5  to be able to finish school.
6      Q. Right. And, well, if you need to finish, go
7  ahead. I just have another question for you.
8      A. So it was like, I guess now I done open my eyes
9  about a lot of -- my daughters are my daughters and my
10 sons are my sons too. And I thank God, you know, they
11 respect me and they see the changes in me and they
12 starting to respect me more and help me more and do
13 things with me more.
14     Q. That's good. That's all good. Tell me, and so,
15 okay, Carolyn -- I circled these. Carolyn was doing all
16 this stuff. And it looks like Cynthia kind of stayed
17 away from it; is that right?
18     A. Yes.
19     Q. Okay. And you -- Mike, I guess, really kind of
20 didn't live in this area anyway?
21     A. No.
22     Q. Okay. And as far as the aunts go, Sharon was
23 doing it, Donna was doing it, Vicky, Francis, correct?
24     A. Yes.
25     Q. Okay. So Carolyn, was she just as involved in

210

1  all this bad stuff as, say, Donna was?
2      A. Yes.
3      Q. Were they all kind of equally involved?
4      A. Yes.
5      Q. And Donna and Vicky and Francis and Carolyn, all
6  equally involved, correct?
7      A. Francis didn't, if my -- I mean, I'm not lying
8  or nothing, but on my behalf, I don't think Francis did
9  the drugs. I know she did the sniffing.
10     Q. Okay.
11     A. And as far as the drugs, I never known her as
12 doing any hard drugs. I know drinking, but not no hard
13 drugs on Francis.
14     Q. And I think you said Gary was not sniffing but
15 he was into the drugs?
16     A. Yes.
17     Q. Okay. And none of Gary's kids went to the
18 penitentiary, did they?
19     A. No.
20     Q. Okay. And none of Carolyn's kids went to the
21 penitentiary, did they?
22     A. Yes.
23     Q. Okay.
24     A. Her daughters.
25     Q. None of those are marked.

211

1      A. Stephanie.
2      Q. Stephanie did?
3      A. Her daughter Stephanie.
4      Q. Okay.
5      A. She went to prison.
6      Q. Okay. She did. Okay. That's you think or do
7  you know?
8      A. Yes, she -- I know.
9      Q. That's one of one, two, three, four, five, six,
10 seven kids, right?
11     A. Yes. She's the only one I forgot to mention.
12     Q. And then Francis's kids did not go to the pen;
13 is that right?
14     A. No.
15     Q. And one out of, I guess, one, two, three, four,
16 five of Vicky's. I mean, it's all kind of on the board.
17 Let me ask you about the parents of all of these people,
18 I guess would be your grandparents?
19     A. My aunts.
20     Q. Well, I mean Donna's father and mother and
21 Vicky's father and mother.
22     A. Oh, yes.
23     Q. Whose that?
24     A. Those are my grandparents.
25     Q. Who are they?

212

1      A. Santos Soliz.
2      Q. Right. Santos?
3      A. Soliz.
4      Q. Uh-huh.
5      A. And Vicky Soliz.
6      Q. Okay. And are they from the north side of Fort
7  Worth also?
8      A. They -- yes. They lived in Oklahoma, then they
9  moved down -- Oklahoma City. Then they moved here. And
10 when my grandpa passed away, my grandma moved back to
11 Oklahoma.
12     Q. What kind of work did your grandpa do while he
13 was alive?
14     A. If I'm not mistaken, I think he was a welder.
15     Q. Okay. And he had a bunch of kids to raise,
16 didn't he?
17     A. Yes.
18     Q. Was he a hardworking man?
19     A. Yes.
20     Q. Was he a good man?
21     A. Yes.
22     Q. And your grandmother Vicky, was she -- did she
23 work or did she stay at home?
24     A. She was a home -- she was a wife at home that
25 took care of the house things like the cooking, cleaning.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

213

1  Q.  Okay.  Was your grandparents, were they good,
2  law-abiding citizens?
3  A.  Yes.
4  Q.  Hard workers?
5  A.  Yes.
6  Q.  You ever know them to do drugs?
7  A.  No.
8  Q.  Or sniff paint, any of that kind of stuff?
9  A.  My grandpa was a drinker.  He was a drinker.  My
10  grandma, up to this day she'll drink one or two beers,
11  that's it.  But as far as her being a heavy drinker or in
12  drugs, no.
13  Q.  Okay.  Okay.  Let me talk to you about some of
14  these places because there's some things that I don't
15  understand.  What I would like to know is, I got confused
16  on where you were living when, which one of these places,
17  so if you could help me with that.  When you were --
18  let's say -- you are six years older than Mark; is that
19  right?
20  A.  Yes.
21  Q.  Because you're 36 and he's 30, right?
22  A.  Yes.
23  Q.  Okay.  So at the time you are 6 years of age,
24  where are you living?
25  A.  We were living, if I'm not mistaken, we were

214

1  living in the north side of Fort Worth on Houston.
2  Q.  That's the house with the porch and all that or
3  you were next --
4  A.  We were next doors.  My mom and my dad had the
5  house next doors.
6  Q.  Okay.  And from 6 until what age did you live at
7  Houston?  I'm just trying to figure out.
8  A.  We lived on Houston till the age of, say, about
9  11.
10  Q.  Okay.  So you're 6 to 11, about five years
11  there.  Okay.
12  A.  Say from the -- from -- from the age -- well,
13  say at the end of 11, from the end of 11 till the age of
14  15 or 16, we lived at the Butler Housing.
15  Q.  Okay.
16  A.  Because after that, my stepdad had bought my mom
17  a house in the east side of Fort Worth, and we been living
18  there for over 20 years.
19  Q.  Okay.  And so do you live there now with them or
20  you say --
21  A.  My mother still lives there.
22  Q.  They live there for 20 years.
23  A.  Yes.
24  Q.  All right.  And so at some point during this
25  though, this is where Mark and his family and all these

215

1  people we just talked about, where your mother also lived,
2  right, at this time; is that correct?
3  A.  Yes.
4  Q.  But wasn't there a good deal of this time in
5  those years that you were actually away living with your
6  dad or running away or whatever?
7  A.  From the age of 13 was when I started running
8  away.
9  Q.  Okay.
10  A.  And staying with my -- like go with my dad.  And
11  I would stay, I mean, I would stay gone for a long period
12  of time.  I would stay gone for three to six months.  One
13  time I stayed gone for two years, almost two years.
14  Q.  From when to when?
15  A.  To --
16  Q.  Just roughly.
17  A.  From say the age from 15 -- no, no, 14 to 16.
18  Q.  Okay.  So --
19  A.  Just about.
20  Q.  At 13 you at least spent some time moving with
21  your dad, right?
22  A.  Yes.  Well, I was in and out of Fort Worth and
23  Oklahoma and Denton and Lewisville.
24  Q.  Okay.
25  A.  I was just in and out everywhere trying to get

216

1  away.
2  Q.  All over the place.  And from 14 to 16 you said
3  that you weren't around at all?
4  A.  Nobody really didn't know nothing about me
5  because I was either gone, and then when I did get
6  caught, I got locked up and got put in a home in Roanoke,
7  in Lena Pope Home.
8  Q.  And you would leave and go away again?
9  A.  I ran from there.
10  Q.  Okay.  And so it's, I guess, is it fair to say
11  that at about the age of 13 or so you were not, including
12  the time you were completely gone, from 13 on, you're not
13  around these two places very often but some?
14  A.  I will be -- it's like I will come, but nobody
15  knew when I was around.  Because once somebody knew I
16  was around, I already knew somebody was gonna run back
17  and tell my mom, so I would hurry up and leave before
18  she  even found out.  Because time she go look for me,
19  I had already left.
20  Q.  Okay.  And so the -- if this is correct,
21  you're -- you maybe come around sometimes but you're not
22  living there spending a lot of time after 13; is that
23  fair to say?
24  A.  No.
25  Q.  Okay.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

217

1   A. No, I wasn't.
2   Q. And so this is where Mark Soliz was living, so
3 at the time of 13 on, you're kind of hit and miss, not
4 there around him everyday anymore?
5   A. Yes.
6   Q. Okay. All right. So if you are 6 to 11 at
7 Houston Street, Mark being six years younger than you,
8 would be zero to 5. Does that make sense?
9   A. Yes.
10   Q. Okay. And then if you are 11 to 15 at the times
11 you were in Butler, I guess, Mark would have been 6 or 5
12 to 9, correct?
13   A. Yes.
14   Q. Okay. And that's when you're 11 to 15. I want
15 to keep it straight. And so if you're gone two years
16 after, so 11, 12 to 13, if you are gone at 13, then
17 you're really not around Mark after he's 7, very much?
18   A. Not much.
19   Q. Okay.
20   A. Because I know at the age of like at the end of
21 9 and 10, that's when we used to go run the downtown and
22 do the -- getting the money, jumping the tracks, jumping
23 the railroad tracks and stuff.
24   Q. Okay. But really after he's about 7 years old,
25 you're not around very much?

218

1   A. Not --
2   Q. That's when you were 13 and doing other things?
3   A. I would be like in and out. I will come for,
4 like, a day or two and then I will run off.
5   Q. Okay. Okay. Now, this -- let me find this.
6 Which -- this is Defendant's 51. Which place is this
7 exactly?
8   A. That's on Waters Street.
9   Q. And that's in the Butler thing?
10   A. The Butler Housing.
11   Q. Okay. And again, this, I think you've already
12 testified this looks much better now than it did then; is
13 that right?
14   A. It's much cleaned up better now.
15   Q. Okay. And this is all Butler street -- or I'm
16 sorry, Butler Project?
17   A. Waters Street.
18   Q. All these. And it all looks better now than it
19 did 25 years ago?
20   A. Yes.
21   Q. Okay. And this, even the aerial views, this
22 place is cleaned up compared to what it was 25 years ago?
23   A. Yes, it's much better now.
24   Q. And then this house is the one from which
25 street?

219

1   A. 2030 Refugio.
2   Q. Okay. And did Mark live in that house, Mark
3 Soliz, or was that just an aunt's house?
4   A. That was my aunt's house. I can't recall if
5 they were living there too, but that's where we mostly
6 all hung out at, at that house.
7   Q. Just spent some time?
8   A. Yes.
9   Q. And this house has also been cleaned up; this
10 looks a lot better now too?
11   A. Yes, and that area is much cleaned up.
12   Q. Okay. And then this house, which is 53, Defense
13 Exhibit 53, that's the one with the porch and all that?
14   A. Yes.
15   Q. The Houston Street house; is that right?
16   A. Yes, yes.
17   Q. And this is also cleaned up and it's much nicer
18 than it was before?
19   A. Yes, it's much better.
20   Q. Okay. So every single one of these places were
21 not great 25 years ago, but now they're great now; they
22 look great now?
23   A. Yes.
24   Q. So everything has gotten better in 25 years?
25   A. Okay.

220

1   Q. And this is a picture of your brothers and
2 stepbrother and you?
3   A. Yes.
4   Q. And that would be you with 1980's hair, correct?
5   A. Yes.
6   Q. Okay. Not sure what that has to do with
7 anything. These other pictures, this is a Christmas
8 picture with a lot of your relatives, correct?
9   A. Yes.
10   Q. Do you know if Mark Soliz is in that picture,
11 the kid in the blue shirt, or not?
12   A. I can't recall.
13   Q. Okay.
14   A. I mean, I can't see it that good.
15   Q. And one of those kids in the picture is Vince?
16   A. Yes, the one that's sitting -- standing up there
17 by Mike, the one at the end.
18   Q. Okay.
19   A. And the one at -- the yellow hat, that's Vince.
20   Q. That's Vince. So standing behind him is Mike,
21 which is Mark's brother, correct?
22   A. Yes.
23   Q. Okay. And so this picture would have actually
24 been taken at Vince's house. There's a stocking with
25 Vince's name on the back between the kids on the left.

221

1  Do you see that?
2      A. Oh, okay.
3      Q. Is that right or wrong?
4      A. It may be right.
5      Q. Okay.
6      A. I mean.
7      Q. So they would have had a Christmas tree and
8  gifts. And by the way, everyone in this picture, would
9  you agree that everyone is clean, the kids?
10     A. Yeah.
11     Q. Everybody has got clean clothes on?
12     A. Yes.
13     Q. Everybody's smiling? Yes?
14     A. Yes.
15     Q. Okay. And everybody appears to be well fed?
16     A. Yes.
17     Q. Okay. And then this picture, which would be, I
18  guess, according to the bottom of the picture, taken in
19  November of 1982, correct?
20     A. Yes.
21     Q. Okay. And in that photograph, if Mark was born
22  January 27th of 1982, he would have been about 10 months
23  old, correct?
24     A. Yes.
25     Q. Okay. All right. And I think Counsel asked

222

1  you, the family didn't take a whole lot of pictures,
2  correct?
3      A. Yes. It was only like certain people who would
4  take a lot of pictures.
5      Q. Okay. And that's -- at the bottom of this is
6  Mike with the kind of light tan and brown sort of western
7  shirt with a jacket, correct?
8      A. Yes.
9      Q. Okay. And this, again, was Gene?
10     A. Yes.
11     Q. And Gene was like a stepfather and a role model
12  for everyone?
13     A. Yes, at times.
14     Q. Okay. Well, before, you said he was a role
15  model, would do anything for you, correct?
16     A. Well, yes.
17     Q. Okay. And so he was a good person to get help
18  from and to be a role model?
19     A. Yes.
20     Q. Okay. And do you know -- and, okay. So Mike
21  had a different father than Mark did, correct?
22     A. Yes.
23     Q. Okay. And so let me show you this. Defendant's
24  56 is a picture of Mike with his dad, correct?
25     A. Yes.

223

1      Q. Okay. And did all these families get along with
2  each other? I'm talking about specifically Donna's --
3  Gene and her exhusband or whoever that is that was a
4  father to Mike?
5      A. Gene was -- Gene was always out in Springtown,
6  Azle, working. So only time Gene would be around is,
7  like, in the nighttime, like when it's time to get ready
8  to eat, go to bed. And then like, say, about 4 or 5 in
9  the morning, he was up and gone, working on cars, getting
10  them ready to sell. So Gene was always in and out.
11     Q. Okay. Was he around for like what's going on in
12  this picture or do you know? You're just seeing the
13  pictures.
14     A. I can't tell you because I don't know.
15     Q. Do you see, if you look close right there, this
16  picture with Donna and Mark and Gene and everybody, do
17  you see the shirt that Mike is wearing?
18     A. Yes.
19     Q. Mike wearing the exact same shirt in the picture
20  with his real dad?
21     A. Yes.
22     Q. Okay. So, apparently, those pictures were taken
23  pretty close together?
24     A. I guess, I mean, I can't say yes or no because I
25  really don't know.

224

1      Q. Mike was wearing the exact same shirt, wasn't
2  he?
3      A. Yes.
4      Q. Okay. Is that around Thanksgiving where
5  everybody would get together?
6      A. I believe so.
7      Q. Okay. Now, this picture, Defendant's 45, and
8  who is this in this picture?
9      A. That's Mark when we lived in my grandma's house
10  on Houston Street.
11     Q. Okay. All right. And Mark would be -- if this
12  picture is correct, on the bottom it says 11/25 of 1982,
13  correct?
14     A. Yes.
15     Q. If he was born in January 27th of 1982, that
16  puts him at a little less than 10 months old. Would you
17  agree with that?
18     A. Yes.
19     Q. Okay. So does he look clean?
20     A. Yes.
21     Q. Does he look healthy and happy and all that good
22  stuff?
23     A. Yes.
24     Q. Okay. I mean, he looks fine, doesn't he?
25     A. Yes.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

225

1    Q.  Face is clear, there's no bruising, nothing
2  wrong with him in this picture.  Would you agree with
3  that?
4    A.  Yes.
5    Q.  He's also shy -- just shy of 10 months old,
6  correct?
7    A.  Yes.
8    Q.  He's walking, isn't he?
9    A.  I think so.
10    Q.  Nothing holding him up, is there?  He's able to
11  stand and walk on his own at 10 months old.  Would you
12  agree?
13    A.  I guess, yeah.
14    Q.  I mean, it's in the picture.  Not holding on to
15  anything, is he?
16    A.  No.
17    Q.  Okay.  And so again, clean, looks like he's fed,
18  looks healthy?
19    A.  Yes.
20    Q.  10 months old and able to walk.  This picture,
21  which is Defendant's 44, is a picture of you holding
22  Mark; is that right?
23    A.  Yes.
24    Q.  Okay.  And you're smiling, you're happy?
25    A.  Yes.

226

1    Q.  Right?
2    A.  Yes.
3    Q.  Okay.  This picture, which would be Defendant's
4  41, and again, I couldn't see before, but can you just
5  tell me who these people are?  Who is this person?
6    A.  That's my Aunt Vicky.
7    Q.  Okay.  And then this one?
8    A.  My grandma.
9    Q.  Oh, your grandma.  Okay.  And this one?
10    A.  My Aunt Francis.
11    Q.  Okay.
12    A.  And my mom Kathryn.
13    Q.  Okay.  And that's Mark in the bottom of this
14  picture, correct?
15    A.  Yes, and --
16    Q.  Go ahead.
17    A.  And Veronica.
18    Q.  Little Veronica?
19    A.  Yes.
20    Q.  Is that a cousin?
21    A.  That's Vicky's daughter, the youngest.
22    Q.  Okay.  And so Mark in the bottom of this
23  picture, and does he appear to be wearing clean clothes?
24    A.  Yes.
25    Q.  Does he appear to be healthy?

227

1    A.  Yes.
2    Q.  Does he appear to be smiling?
3    A.  Yes.
4    Q.  Okay.  And how old would he have been in this
5  picture?
6    A.  I can't tell you.
7    Q.  Okay.  Looks like a pretty happy group photo,
8  would you agree?
9    A.  Yes.
10    Q.  Okay.  Do these bottles appear to be open, by
11  the way, these liquor bottles, the way they're being
12  held?  Or can you tell?
13    A.  I can't tell.
14    Q.  Okay.  Now, do you remember, I guess, the night
15  that your Aunt Vicky was killed, right, that's at that
16  house on -- how do you say it?
17    A.  Refugio.
18    Q.  Refugio?
19    A.  Yes.
20    Q.  Okay.  And you were in there that night,
21  correct?
22    A.  Yes.
23    Q.  The kids were running around; seems to be a
24  whole lot of people around there?
25    A.  Yes.

228

1    Q.  Okay.  And you said Mark took that hard,
2  correct?
3    A.  Yes, yes.
4    Q.  Okay.  Would you agree with me then -- and he
5  was close to her, correct?
6    A.  Yes.  She's like the one that kept everybody up
7  and helped with the kids and take -- like took care of
8  kids and make sure everything was good and everything.
9    Q.  Okay.  And you had also said before that
10  somebody, some people in the family, I mean, it sounds
11  like kind of a village to raise some kids kind of group
12  where there's different people doing different things for
13  you.  And by you, I mean all the kids running around.  Is
14  that fair to say?
15    A.  At some times.
16    Q.  Well, you said that somebody was making sure
17  y'all did your homework and stuff before and there was
18  always a babysitter before they went out drinking or
19  whatever.
20    A.  Well, I mean, yeah, they did, but it was like
21  minors, you know, like within us 13-year-olds, 12 years
22  old, you know, we were the ones helping each other.  And
23  they wouldn't overlook or nothing until the morning when
24  it was time to go or sometimes they wouldn't even get
25  overlooked at times.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

229

1  Q. And you also said, I think, that if you
2  touched -- when you were at the Houston house, if you
3  touched their cans, you got whipped. Those were your
4  words, correct?
5  A. Yes.
6  Q. What of those adults would whip y'all for
7  touching their cans?
8  A. For throwing their high away.
9  Q. Not why, but which ones. Who would do that?
10  A. Oh, well, like my Aunt Carolyn or Donna, they
11  would get mad because we would throw their high away.
12  Then I would get a whipping from my mother because, for
13  one, I shouldn't have been touching it.
14  Q. Right. And I think you also said that whenever
15  you started doing this running around, I guess, in the
16  Butler Project area with Mark, y'all were kind of having
17  fun, jumping some trains and doing stuff like that; is
18  that correct?
19  A. Yes.
20  Q. And even before that, this, you know, Marine
21  Park and stuff, y'all were having barbecues and having fun
22  out there, were you not?
23  A. Yes.
24  Q. Okay. And this whole gang thing that you saw,
25  Mark didn't even see, did he?

230

1  A. No.
2  Q. Okay. And Donna in the very beginning was also
3  going to tell you that if you get Mark into trouble, you
4  would have to leave, correct?
5  A. Yes, but then --
6  Q. Go ahead.
7  A. There would be times she wouldn't say nothing,
8  you know. She would just tell him she was gonna bust his
9  butt, but we would be right out doing the same thing
10  again.
11  Q. I understand. But she was trying to keep him
12  from getting into trouble and also from you to be a bad
13  influence?
14  A. Yes.
15  Q. And that school where somebody had allegedly
16  been raped or y'all had heard that, y'all were given
17  strict orders to stay away from that school, correct?
18  A. Yes.
19  Q. And you did, didn't you?
20  A. No.
21  Q. I thought you just said you didn't go in there
22  because people got raped.
23  A. I wouldn't, but the other kids would go up
24  there. Like the boys and stuff, they would be back there
25  riding their bikes or whatever, back there playing and

231

1  stuff.
2  Q. Okay. Point is, if you touched the paint stuff
3  at the old house, you might get a butt whipping, correct?
4  A. Yes.
5  Q. Donna was not happy if you were running around
6  and as -- just as a kid yourself and getting Mark in any
7  trouble. She didn't want that.
8  A. At times. Sometimes Donna wasn't even all
9  there. She was all high on crack or sniffing her own
10  self, so half of the time she didn't even know what Mark
11  was doing.
12  Q. I understand, but when she did, she would tell
13  you, you're going to have to leave if you get him in
14  trouble.
15  A. When she had a straight mind, but it was every
16  once in a while when she had a straight mind.
17  Q. Because it's bad for a mother to use any kind of
18  drugs around their kids, right?
19  A. Yes.
20  Q. Okay. And this thing that happened with your
21  aunt, this stabbing, who was the Miguel guy that did
22  that?
23  A. It was her boyfriend.
24  Q. Okay. And how many people do you think were in
25  and around the house when that happened?

232

1  A. It was me, my Aunt Cynthia, my Uncle Gary,
2  Carolyn, my mom, Donna, and say about -- my Aunt Vic --
3  all of my Aunt Vicky's kids, all of my mom's, Katherine's
4  kids, Mark, and Cynthia's kids were there, that I
5  remember of.
6  Q. So there was a ton of people there, correct?
7  A. Yes. And my Aunt Francis's kids were there too.
8  Q. Okay. So a lot of people there. And I guess
9  Vicky was kind of the -- you said the glue that held
10  everyone together and sort of took care of everyone?
11  A. Yes.
12  Q. And was she also one -- she was also one of the
13  paint sniffers in all this too; is that correct?
14  A. Yes, she was.
15  Q. She was helpful with the kids?
16  A. Yes.
17  Q. And it was hard on Mark?
18  A. Yes.
19  Q. Do you think more than anybody else then, Mark
20  Soliz would understand what it's like to have a loved one
21  murdered?
22  A. I mean, I can't answer for him on that, but
23  maybe.
24  Q. He saw his aunt die and it was hard on him?
25  A. Yes.

233

1  Q. So you don't know that he would understand what

2  it would be like to have your close family member killed?

3  A. I mean, yeah, he -- I can't answer for him. He

4  should understand, but.

5  Q. Sure. Okay.

6  A. I mean, I can't answer for him on that.

7  MR. STRAHAN: Okay. Thank you. I'll pass

8  the witness.

9  REDIRECT EXAMINATION

10 BY MR. WESTFALL:

11 Q. Of all the people out there that paint-sniffed,

12 who were -- who were the ones that kind of did it the

13 most often?

14 A. Carolyn, Donna and Mona -- I mean Francis. I'm

15 sorry.

16 Q. Carolyn, Donna and Francis?

17 A. Yes. And Vicky. Vicky will be -- I mean, she

18 will be too right along with them.

19 Q. What was it about Vicky, why was she the glue

20 that held the family together?

21 A. I don't know. I don't -- I mean, everybody

22 looked up to her. I don't know what was the difference

23 with her and all the other aunts, but she was the main

24 one that make sure everything was maintained, everybody

25 got along. No, we didn't fight if we -- whoever aunts or

234

1  the sisters fight, she got in the middle of it and made

2  sure they worked it out or whatever. It just something

3  about her, she's the one who had everybody together. And

4  once she passed away, it's like everybody fell downhill.

5  It's like you had a group of aunts on this side, you had

6  another group of aunts on this side, you had the aunts

7  and uncles on this side, or you had the ones that didn't

8  bother with us. Just everybody started splitting up and

9  not talking with each other, fighting with each other.

10 Just like when she passed away, everything just went

11 downhill.

12 Q. And she was -- she was the only one that was

13 nice to Mark?

14 A. She was in -- I can't guarantee you who else was

15 because, I mean, I was young and I was out running and

16 everything, but I know she's the one who paid a lot of

17 attention to a lot of us kids.

18 Q. Okay. When Vicky was killed, she lived on

19 Luella Street in The Projects along with your family,

20 right?

21 A. 13th Street and Chambers at that corner house.

22 Q. How many of y'all were in that house?

23 A. Say about three of us.

24 Q. Three?

25 A. Three families.

235

1  Q. Oh, three families?

2  A. Lived up in there.

3  Q. And then what happened when she died? Who took

4  care of the kids?

5  A. My mom took over the house. My mom had her kids

6  for a quite -- you know, for a while. Then my Aunt

7  Sharon came and removed them from my mom, and she end

8  up getting custody over the girls. And my mom kept the

9  apartment.

10 Q. So it's been said now that Mark was born in

11 1982. And when were you born, what year?

12 A. 1976.

13 Q. '76. So you're six years older than Mark?

14 A. Yes.

15 Q. Roughly. So when Mark is born, you're 6. So

16 when you're 13, Mark is 7?

17 A. Yes.

18 Q. How old do you think you are there? I guess

19 you would be -- if he was around 10 months, you would

20 be about 7?

21 A. Yes.

22 Q. Or 8. What is the part of this picture we don't

23 see? You've got a smile. He looks like a clueless baby.

24 What is going on in your house at the time?

25 A. I can't tell you because I don't remember.

236

1  Q. Where did you go to school?

2  A. I went to -- I traveled around. I went to a lot

3  of different kinds of schools.

4  Q. You did what?

5  A. I traveled around and went to different kinds

6  of schools. I was -- like, elementary I went to

7  Washington Heights and Kirkpatrick Elementary, then I

8  went to Kirkpatrick Middle School, then I went to

9  Stripling Middle School, then I went to Arlington

10 Heights, and then to North Side High School.

11 Q. And where did Mark go to school? Were you aware

12 of him going to school?

13 A. Yes, but I can't remember what school it was

14 that they were going to with the elementary, with

15 washing -- I mean from The Projects. I can't think of

16 that name of that elementary school that they went to

17 when they were in The Projects.

18 Q. In The Projects. How many times did you go over

19 there and say, "Hey, Mark, let's hang out", and he said,

20 "Ah, got homework to do"?

21 A. None.

22 Q. How many times did you hear his mom from the

23 other room say "You can't go out and sniff paint till

24 you've done your homework"?

25 A. None, because she was all either locked up in

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

237

1  the room getting high her own self or at somebody else's
2  house getting high. And we would just get up and go. Or
3  we find they -- when we leave, the little kids, well,
4  like Mark will follow us. And we'll try to get rid of
5  him, but he would stick with us, so we'd just bring him
6  right along with us because he was smaller and we were
7  thinking, well, he's littler, he'll be easier to use to
8  get in to things.
9      Q. What do you mean?
10     A. Like not get in to things. Like within the
11 cars, he was little, you know, his hands were smaller
12 than us, he would be able to reach over and try to
13 unlock it or however.
14     Q. When you say "we", who are you talking about?
15     A. Well, within me and Becky. And Mark will go.
16 Like Mark was the easy one to -- we could influence to
17 help us. As long as he was getting a little bit of chump
18 change or like 5 or 10 dollars, he would go and help; or
19 something for us to eat on, because when we'd leave
20 without 'em, there was never no food in the house. So
21 whatever little money we gathered up, we were downtown
22 at the -- that Sundance or something like that, little
23 restaurant on the corner. We used to go down there and
24 eat or go to the Tandy Center and find somewhere to go
25 eat and then go home.

238

1      Q. And Becky, this is Donna's significant other at
2  the time?
3      A. Yes.
4      Q. So your -- this is on North Houston Street?
5      A. Yes, if I recall, yes.
6      Q. Okay. So these -- this would have been about
7  the age when you were walking in and out of the adults
8  that were sniffing paint?
9      A. Yes, you know, we would walk through there.
10 Plus, we lived next door from my grandma's house, my mom
11 and my step -- well, my real dad. After they split up,
12 it was my mom and my stepdad. So we'll be like from my
13 grandma's house to our house next doors.
14     Q. You said earlier that your dad, your dad was
15 kind of involved with you when you were little; is that
16 true?
17     A. Yes.
18     Q. Do you know -- you knew your dad?
19     A. Yes. Up to this day he's still in my life.
20     Q. You ever meet Mark's real dad?
21     A. No.
22     Q. Closest thing he had, I guess, was Gene?
23     A. Yes.
24     Q. And then --
25     A. And my stepdad, the one that passed away. My

239

1  stepdad was there, did a lot for me, too. I mean, he
2  took me in as if I was his own.
3      Q. Your stepdad took you in?
4      A. Yeah, me and my brothers. He took care of us
5  like if we was his own kids.
6      Q. And how did he die?
7      A. He died of cirrhoses with liver, and he was
8  hurt. He was in a nursing home. They left him in the
9  whirlpool. Like when he -- he was paralyzed and he was
10 in the whirlpool take -- I guess they were cleaning him.
11 They left him in there too long, and it burned his skin
12 up.
13     Q. Well, there was an incident that caused him to
14 become paralyzed. What was that?
15     A. Um, my aunt and her girlfriend, Donna and Becky,
16 they were getting high, and at that period of time, my
17 mom was right along with them, but she had stopped for a
18 minute because I was always turning her in. When I would
19 run away and when the cops would find me, they pick me
20 up, I would snitch on my mom and my dad -- my stepdad,
21 that they were, you know, smoking crack and stuff.
22         And, well, then they stopped, but my Aunt
23 Donna and Becky and them, they kept on. And they owed
24 the dope man some money. And he knocked on the door
25 looking for them, and they told them that they wasn't

240

1  there. He kicked the door in, and he attacked my mom
2  and my dad. He -- he choked her. He raped her. He
3  sliced her wrist, and he tried to cut her down there in
4  her middle part. My stepdad caught the knife, and it cut
5  my stepdad's hands. He stabbed my stepdad. My stepdad
6  was already in crutches. He kicked him in his legs,
7  messed up his legs. And he beat my mom real bad. Her
8  face was messed up.
9          And they didn't find them until the next --
10 they didn't find my mom and my dad till the next day.
11 My stepdad came out of the -- he woke up. He was
12 unconscious. He woke up. He always carried a gun for
13 protection, and they were looking for the gun but they
14 didn't find it. My stepdad got -- started shooting out
15 the window, shooting through the windows. Finally, the
16 neighbors next door would -- this lady, we used to call
17 her grandma, her sons heard. They went and they found
18 them. My mom was bleeding to death. She bled. She had
19 a rope around her neck. And my stepdad was laying there.
20     Q. And this was over a drug debt that Donna owed?
21     A. Well, it was Donna and Becky.
22     Q. They just -- they came to your house instead of
23 hers?
24     A. Well, they thought my mom and them were lying
25 about the girls being there.

STATE VS. MARK ANTHONY SOLIZ                          MARCH 14, 2012

241

1    Q. Uh-huh.
2    A. So they thought my mom was lying and hiding, you
3  know, trying to cover up for my -- for them. And then
4  they were trying to get money out of my mom and my
5  stepdad to pay for it, you know, pay whatever debt they
6  owed, and they wouldn't. So they took it out on my mom
7  and them, well, my mom and my stepdad.
8    Q. When -- when Vicky was killed, do you remember
9  the year?
10   A. No.
11       MR. WESTFALL: May I approach, Your Honor?
12       THE COURT: Yes, sir.
13   Q. I want to show you something, just to refresh
14  your memory about it. Okay. Does that refresh your
15  memory? Can you read it?
16   A. I can't even see it.
17   Q. It says June 25th, 1989.
18   A. Okay.
19   Q. Okay. So in June of 1989, is that --
20   A. Yes.
21   Q. So in June of 1989, Mark is 7 and you're 13.
22  Kids always seem to smile, don't they?
23   A. When it's time to take pictures, we would be --
24  when we were young, you know, we were happy to take
25  pictures. So every time there was a camera flashing,

242

1  we were ready to smile and try to fit up in the picture
2  so we could get a picture taken.
3    Q. The truth is, y'all kind of lived in a jungle
4  there, didn't you, Butler? That thing you just talked
5  about, didn't that happen in Butler?
6    A. Yes, on 13th Street.
7       MR. WESTFALL: Pass the witness, Your Honor.
8          RECROSS-EXAMINATION
9  BY MR. STRAHAN:
10   Q. Mark wasn't anywhere around for this thing that
11  happened to your mom and your stepdad, and neither were
12  you, for that matter, right, you weren't home?
13   A. No. I was a runaway.
14   Q. Okay. This is one of those bad things that
15  happened, but it really didn't have -- that part didn't
16  have anything to do with Mark; is that right? He wasn't
17  there, was he?
18   A. I mean, I'm not gonna say by "he say, she say",
19  whatever, but my understanding a little bit before that
20  had happened, my aunt had -- well, his mother had walked
21  him to Sharon, to my Aunt Sharon's house. That's my
22  understanding, but like I say, you can't go by "he say,
23  she say".
24   Q. Didn't your mom and your stepdad lay there for a
25  long time until they woke up?

243

1    A. They stayed there till the next morning.
2    Q. Okay. So nobody was there to help them out or
3  call the police or anything?
4    A. Till early that morning. If I'm not mistaken,
5  it was about 7 or 8:00 in the morning when the neighbor
6  heard my dad -- my stepdad. You know, he finally got all
7  woke up. He was yelling, screaming. He started shooting
8  out the window. They heard gunshots. That's when they
9  kicked the door in and they found him in the room hurt.
10   Q. And they both lived through that incident,
11  correct, your mom and your stepdad?
12   A. They lived through it.
13   Q. And as you sit here today, how many years ago
14  was that?
15   A. I can't even recall.
16   Q. Okay. You weren't there but you heard about it
17  obviously?
18   A. I didn't find out about it, say, about a
19  week-and-a-half later is when I found out about --
20  because I had been just -- my aunt seen me in the
21  streets, and they asked me did I hear what happened. And
22  I was like, what are y'all talking about. And when they
23  told me, I went to the hospital and I seen my mom just
24  laying there, face all -- eyes gushed out red, I mean,
25  her face was busted up, and choke -- I mean her arms were

244

1  cut up, her neck. I mean, I didn't find out till almost
2  about a week later when I found out about it.
3    Q. All right. And your mom and stepdad hadn't done
4  anything to these people, correct?
5    A. No.
6    Q. Okay. So violence at the hand -- violence
7  against someone innocent at the hands of somebody else is
8  a terrible thing, isn't it?
9    A. Yes.
10   Q. Yeah. And they lived, correct?
11   A. Yes.
12   Q. And you are traumatized 20 something years
13  later, and you weren't even there. But it's traumatic,
14  isn't it?
15   A. Yes.
16   Q. And do you know, by the way, who Ruben Martinez
17  is or Nancy Weatherly?
18   A. No.
19       MR. STRAHAN: I'll pass the witness.
20       MR. WESTFALL: I have nothing further, Your
21  Honor.
22       THE COURT: May the witness be excused?
23       MR. WESTFALL: She may.
24       MR. STRAHAN: Yes, sir. Thank you.
25       THE COURT: You may be excused.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

245

1    MR. WESTFALL: May she be finally released,
2  Your Honor?
3    THE COURT: Yes.
4    (Witness excused.)
5    MR. WESTFALL: Your Honor, call Leticia
6  Herrera.
7    THE COURT: Were you sworn in the other day?
8    THE WITNESS: Yes.
9    THE COURT: Please have a seat. Okay.
10   MR. WESTFALL: Thank you, Your Honor.
11           LETICIA HERRERA,
12  Having been previously duly sworn, testified as follows:
13          DIRECT EXAMINATION
14 BY MR. WESTFALL:
15   Q. Ms. Herrera, would you please say your name for
16 the record and for the Jury.
17   A. Leticia Herrera.
18   Q. Make sure you speak up.
19   A. Okay.
20   Q. How do you know Mark?
21   A. He's my cousin.
22   Q. Okay. Who is your mom?
23   A. Francis Herrera.
24   Q. So your mom was Francis?
25   A. Yes, sir.

246

1    Q. And who is your sister?
2    A. Monica Herrera.
3    Q. Okay. And that's all, everyone in your little
4  family?
5    A. Uh-huh, from my mother, yes.
6    Q. Who is your dad?
7    A. Pete Herrera.
8    Q. Pete Herrera?
9    A. Yes, sir.
10   Q. Can you give us sort of a thumbnail of your
11 earliest life with your mom and your dad, I mean?
12   A. They were together up until we were 9. And
13 after that, they separated.
14   Q. Okay. And then what? Is he still in the area?
15 Do you --
16   A. Yes. I still have contact with my father.
17   Q. And do you have any kids?
18   A. Yes, sir, I have four kids.
19   Q. Four kids?
20   A. Uh-huh.
21   Q. Please tell us about them.
22   A. Mariah, she's 12, and Jeremiah, he's -- I'm
23 nervous, y'all. Sorry. He's 7. Isaiah is 5, and Malaya
24 is 1.
25   Q. And you take care of all of them?

247

1    A. Yes, sir.
2    Q. Recognize anyone in that picture?
3    A. Yes, sir.
4    Q. Who are they?
5    A. Gene and Mike, Monica and me.
6    Q. Gene and who?
7    A. Gene, Mike, which we call -- yes, sir. And
8  Mike, which we call Bubbles. And, right. And then
9  Monica is in the black or the blue. And I'm in the red.
10   Q. And that's you?
11   A. Yes, sir.
12   Q. And do you know who this is bending in the car
13 here?
14   A. You know, I don't recognize who that is.
15   Q. Okay. Well, I want to talk to you a little bit
16 about what the family was like back then.
17   A. Okay.
18   Q. Francis was one of the Soliz sisters that sort
19 of hung out, right?
20   A. Yes.
21   Q. Please tell us kind of just what life was like
22 during that time.
23   A. Around that time right there?
24   Q. Yes.
25   A. We pretty much all stayed in the house on

248

1  Houston Street.
2    Q. How old do you think you are there?
3    A. I want to say I was about 5.
4    Q. About 5?
5    A. Uh-huh.
6    Q. How old are you?
7    A. Right now? I'm 32.
8    Q. So this would have been -- horrible with math.
9  What year were you born?
10   A. 1980.
11   Q. 1980. So this is about '85?
12   A. Uh-huh.
13   Q. And then so Mark was born and is about 3 at this
14 time?
15   A. Uh-huh.
16   Q. And y'all lived at the Houston house?
17   A. Yes, sir.
18   Q. Okay. Please tell us what is it like to live in
19 the Houston house, North Houston Street house.
20   A. It was a lot of partying going on. My grandma,
21 it was my grandmother's house. She -- she would cook for
22 us and stuff, and but it was a lot of -- on the weekends
23 it was like, you know, parties, drinking. Some parents
24 were sniffing, things like that.
25   Q. Okay.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

249

1  A. Going on. And we pretty much played in the back
2  yard, you know, to keep away from the parents, but we
3  pretty much knew what was going on, you know, so.
4  Q. You played "keep away" from the parents?
5  A. Yeah, like we would play in the back. Either
6  they would tell us to go play and while they were
7  drinking or whatever or while a cookout was going on.
8  And we pretty much would be away from them.
9  Q. All right. So when you say you played "keep
10  away", you stayed away from the parents?
11  A. Right.
12  Q. And did you ever see them sniffing?
13  A. Yes, sir.
14  Q. Where did you see them sniffing?
15  A. On the front porch.
16  Q. Tell us about that, please. What does that look
17  like? How many are there?
18  A. Like there was a lot of us, like, like Bubbles,
19  Daniel, you know, all of us there. And they would be
20  drinking and sniffing. And we would be playing from the
21  front to the back, you know, like kids do. And we would
22  see them sniffing and drinking, and we would just be
23  running around.
24  Q. Okay. Who is "them"?
25  A. Like Freddy Martinez. Like couple of family

250

1  members. I don't exactly know who all was there, but I
2  do know I remember seeing --
3  Q. Was your mom one of them?
4  A. No, sir, but I know that she did sniff, but I --
5  she wasn't one of them. Like I didn't see with my eyes
6  that she sniffed.
7  Q. Was -- was Donna one of them?
8  A. Yes, sir.
9  Q. And how many in this group do you think that'd
10  sit out there and sniff on the porch?
11  A. I want to say Donna. I want to say Freddy, but
12  I'm not for sure if he was because there was like a
13  family friend that had long hair, and I want to say that
14  it was Freddy, but I'm not quite sure if my vision, I
15  mean, you know, like trying to get the picture of seeing
16  that person.
17  Q. So you're like 5 or 6 at this time?
18  A. Right. So I'm trying to remember.
19  Q. Right. I understand. Well, where did you
20  all -- where did you move after the Houston Street?
21  A. My father and my mother had a place on Warwick,
22  a house, and then they also had one on Chestnut. We
23  didn't live on Warwick for -- we might have lived there
24  for a couple years, but then we moved on Chestnut. And
25  then after we were 9, they split up. And then we kind of

251

1  just stayed with Kathryn, my aunt, and then Sharon, and
2  then we just bounced around after that because um, my
3  Aunt Vicky, she pretty much had a lot of our gatherings.
4  She was pretty much the one that holded us together.
5  Sorry. (Crying.)
6  She passed away, that was pretty much it.
7  We didn't have family gatherings anymore.
8  Q. You -- after your parents split and you started
9  living with other family members, was that in Butler?
10  A. Yes, sir, because Kathryn and Vicky had their
11  apartment there.
12  Q. Kathryn and Vicky lived together on the --
13  A. Kathryn had an apartment on top of the -- I mean
14  Vicky had apartment on top of the hill on East 13th
15  Street.
16  Q. Showing you what's in evidence already as
17  Defendant's 46. Do you recognize this here?
18  A. Yes.
19  Q. Now, is this where Vicky lived and Kathy?
20  A. I want to say.
21  Q. You said the top of the hill. Is this whole
22  thing a hill or what?
23  A. You know where the 13th Street is on Chambers,
24  Chambers go up the hill, and then 13th Street is right
25  there in front of the school.

252

1  Q. Okay.
2  A. The old school building. Right on the corner,
3  I want to say it was probably 1306 East Chambers Street,
4  that's where Vicky lived.
5  Q. And then do you think you can pick out on here
6  where --
7  A. I'm kind of turned around on that one.
8  Q. -- where Donna lived?
9  A. Donna stayed on Waters Street.
10  Q. And then did Sharon live in here also?
11  A. Sharon stayed right next to -- her and Donna had
12  an apartment right next door to each other. Right,
13  that's Waters and Luella.
14  Q. That's Donna and Sharon's little wing there?
15  A. Right, right.
16  Q. And --
17  A. Which that's the apartment right there.
18  Q. Right. 1702 and 1704?
19  A. Right.
20  Q. And this here?
21  A. Was of Vicky's apartment.
22  Q. Right.
23  A. Is that the front of it right there?
24  Q. Yeah.
25  A. Okay.

253

1    Q. And so -- so that's where you moved into after
2  your folks split?
3    A. Uh-huh.
4    Q. What was -- and do you remember Mark during
5  those days?
6    A. Yes.
7    Q. Where was Mark at that time?
8    A. With Donna and Gene at the apartment on Luella
9  and Waters Street.
10   Q. And Mike was where?
11   A. I want to say he was -- he was there also, I
12 want to say.
13   Q. Yeah.
14   A. If not in Mexico, but I think he was because I
15 think he was younger when he was in Mexico, yeah.
16   Q. What was it like to be in Butler? I guess
17 that's -- we're talking about like 1985-ish, '86. So
18 what was it like to be in Butler then?
19   A. Um, we pretty much ran around a lot. We didn't
20 stay inside a lot. We ran around. We stayed outside a
21 lot.
22   Q. Could you do me a favor and go a little bit
23 closer to the microphone.
24   A. Okay.
25   Q. Now, you took a long pause there. What went

254

1  through your mind?
2    A. Seeing my cousin running around The Projects and
3  in the woods in the back, seeing him and when he would
4  jump on the train and leave and pretty much be gone a
5  lot. We always looked for him.
6    Q. You're talking about Mark?
7    A. Yes, sir.
8    Q. How old is he when he's doing this?
9    A. I want to say he was probably 8, 7, 8. I want
10 to say 8 or 9 probably because we were a little bit older
11 when we lived up on the Waters. And I say "we" because
12 we all pretty much moved around a lot. Like we didn't
13 have a certain specific house we lived in, you know, like
14 my Aunt Vicky's kids did. Like they stayed on 13th
15 Street. You know, Mark and them stayed on Waters. But
16 we pretty much -- my mom didn't have a permanent place at
17 the time. She had just left my father.
18   Q. Uh-huh.
19   A. So when I think about Waters Street, I think
20 about Mark pretty much just running, running the streets
21 and running through the woods. And we couldn't go back
22 there, but he would always be back there. I don't know
23 if it was like a -- now that I'm older -- if it was like
24 a comfort zone for him or what, but he -- he would be
25 there. He would be in the woods.

255

1    Q. Did you say "we couldn't go back there"?
2    A. We couldn't. We weren't supposed to. We
3  weren't allowed to go back there.
4    Q. Why?
5    A. Because it was just like the woods. It was
6  dark. And it was just dangerous, had a lot of glass,
7  boards, trees. And I don't even know if it's still
8  there, but, yeah, we couldn't go back there, but that's
9  where he would be.
10   Q. So where is Donna when this is going on?
11   A. In the house.
12   Q. Did the kids go hang out at Donna's house?
13   A. We would be outside most of the time. We
14 wouldn't be in the house. Like our thing wasn't in the
15 house. We would be out playing. There was a field there
16 that we played or a rock park, sand park. We pretty much
17 stayed outside a lot.
18   Q. Did you -- tell us about Mark during that time.
19 Just tell us, what is Mark like during that time?
20   A. Pretty much his own person. Just not a lot of
21 discipline. Gene would try to discipline him for, like,
22 Donna. I don't think Donna knew how, but -- I don't
23 think Donna knew how to discipline him, but he pretty
24 much would just run. Like I say, he would be on the
25 train. He would be in the woods. He would stand at the

256

1  top of the freeway in the middle. The freeway had, like,
2  two big, you know, signs, and he would be standing in the
3  middle, just standing there. I don't know for what
4  reason, but he would.
5    Q. How old is he when he's doing that?
6    A. 8 or 9.
7    Q. And is it at nighttime? Is it daytime?
8    A. Daytime, nighttime. We would always have to go
9  looking for him because he wouldn't come home before dark
10 or we would have to go looking for him.
11   Q. So this, this is Luella Street. That's that
12 main, main bridge that goes over the freeway?
13   A. Is that 35 up and down?
14   Q. Yes.
15   A. Okay.
16   Q. So is this what you're talking about, he would
17 stand here on the overpass?
18   A. But on the opposite side of that right there
19 where your finger was just at, right, the opposite side.
20 There was two big signs. I don't know what they said
21 because I don't remember, but there was two big signs
22 that were there, and he would stand there.
23   Q. What, and lean over the freeway?
24   A. Uh-huh.
25   Q. Did you ever see him choke himself?

257

1    A.  Yes, sir.
2    Q.  Tell us about that.
3    A.  At the house on Luella -- I mean on the
4  apartment on Waters Street, he would just put his hands
5  around his throat and just -- till he got red and choke
6  his self.
7    Q.  And how old is he when he's doing that?
8    A.  8 or 9.
9    Q.  How did you react to that?
10   A.  We would call somebody or we would just look at
11  him and tell him to stop, stop doing that to his self.
12  And somebody would be coming, he'll stop, and then
13  he'll -- they leave, he'll do it again, you know.  Just
14  what he did.
15   Q.  So he would continuously choke himself?
16   A.  Uh-huh.
17   Q.  Please tell us more about riding the trains.
18  What do you mean by that?
19   A.  There was a -- well, in the picture there's a
20  train.  Right now I think it's a Amtrak.  And the train
21  used to go by there by that Glass Key liquor store, and
22  he used to get on there and ride to the north side, just
23  everywhere pretty much.  Sometimes we wouldn't even know
24  where he was, but we knew that he got on the train
25  because we seen him go on, or he'll say I'm gonna go ride

258

1  the train.  And we would think he would be playing, but
2  he was serious.
3    Q.  He would?
4    A.  He would get on, and as the train is going, he
5  would jump on it and he would ride the train.
6    Q.  Did you sniff paint?
7    A.  I have before.
8    Q.  How many times do you think?
9    A.  Twice.
10   Q.  And did you -- did you do drugs?
11   A.  I used to smoke marijuana before I had my
12  daughter, before I had any of my kids.
13   Q.  You stopped when you had your kids?
14   A.  When I had my daughter, I knew I couldn't --
15   Q.  Right.
16   A.  -- do that.  I knew that would be interfering
17  with raising her.
18   Q.  And now you -- well, you're very religious,
19  aren't you?
20   A.  Yes, sir.
21   Q.  Do you recognize this house at the corner of
22  Northwest 23rd and Refugio?
23   A.  Yes, sir.
24   Q.  Whose house is that?
25   A.  My Aunt Cynthia's house.

259

1    Q.  I'm going to go ahead and talk to you about
2  Vicky.  Can you tell us what was it about Vicky?
3        (Pause in proceeding.)
4    A.  She...(crying.)
5        (Pause in proceeding.)
6        THE COURT:  Can you ask a question.
7    Q.  Would you like to come back to it?
8    A.  It's okay.
9    Q.  Okay.  When Mark would go riding these trains,
10  and would he be -- how long would he be gone when he
11  would go out at night or would he be gone a number of
12  days?
13   A.  Sometimes he would be gone a day or two or he
14  would be gone hours.  I want to say about a day.
15   Q.  And did Donna ever go look for him?
16   A.  I don't recall.  I know that Gene would
17  sometimes.
18   Q.  I want to talk to you about an incident where --
19  that happened at Cynthia's house, I think happened at
20  Cynthia's house, where Donna became like a baby.
21   A.  Yes, sir.
22   Q.  Did that happen at Cynthia's house?
23   A.  Yes, sir, in that house right there, if I'm not
24  mistaken.  Either that or Prospect, because couple
25  streets down was Prospect.

260

1    Q.  And what is Prospect?
2    A.  Um.
3    Q.  Who lived there?
4    A.  Cynthia.
5    Q.  Cynthia.  Okay.  So Cynthia had this house at
6  Northwest Refugio and also the house on --
7    A.  Prospect, yeah.
8    Q.  At different times?
9    A.  Yes.
10   Q.  What happened in that incident?
11   A.  Um, she was high, and she was talking out of
12  her head, and pretty much came out her clothes naked.
13  And we seen her running around the house like that.
14  And I remember seeing her in the bathtub, and they were,
15  you know, trying to keep us away from it, but we seen.
16  And she would -- was in the bathtub, you know, splashing
17  the water like she was a baby.  Pretty much just high,
18  talking out of her head.
19   Q.  And she was high from sniffing paint?
20   A.  Yes, sir.
21   Q.  And was this another deal where everyone was in
22  the house?
23   A.  Yes.
24   Q.  And was Mark there as well?
25   A.  Yes, sir.

STATE VS. MARK ANTHONY SOLIZ          MARCH 14, 2012

261

1    Q. So can you demonstrate for us what she was
2  doing?
3    A. When she was walking around the house, she was,
4  you know, like goo-goo, ga-ga, like a baby, and like
5  running around naked. And I want to say the grownups
6  grabbed her and took her to the restroom so that the kids
7  can be away, you know, to get us away, but we still seen
8  because the restroom door was open. And there was water
9  in the bathtub, and she was in there sucking her thumb,
10  rocking, acting like she was a baby, and splashing water,
11  like she was a baby.
12    Q. And was an ambulance called to come pick her up?
13    A. I don't remember that.
14    Q. Was Mark there to see that?
15    A. I want to say I remember we all were there. Is
16  this house right here Refugio?
17    Q. Uh-huh.
18    A. Just looks different, of course.
19    Q. Yeah.
20    A. But I remember the fence right here.
21    Q. Right. The fence over on this side?
22    A. Yes.
23    Q. Now, on the day that Vicky was killed, what had
24  y'all been doing?
25    A. We were at a park. Not sure if it was Easter.

262

1  I want to say it was Easter, but I know it was some
2  holiday. And we were at the park, and she was there. We
3  were all at the park. And we left the park. Her and her
4  boyfriend were arguing.
5    Q. This same boyfriend had shot her some month
6  before, right?
7    A. Yes, sir.
8    Q. In front of all the kids?
9    A. Uh-huh.
10    Q. Did Mark ever live with you-all with Kathryn?
11  Did he ever live with any of the other aunts besides
12  Donna?
13    A. With Sharon.
14    Q. With Sharon?
15    A. Yeah. Kind of like we all stayed with each
16  other because we always were from either Refugio or
17  Prospect or Chambers or -- so I can't really tell you
18  that we had a steady home, because, like I say, East
19  Chambers was one of the places we would be at or we would
20  be on Waters or it'd just be different places.
21    Q. And Chambers in Butler also?
22    A. Yes, sir.
23         THE COURT: At this time we're going to
24  recess until tomorrow morning at 9. Court will reconvene
25  about 8:45. Please remember all the instructions that

263

1  I've given you while this trial has been going on, and
2  you may be dismissed with the bailiff at this time.
3         (Court adjourned.)

```
 1  THE STATE OF TEXAS )

 2  COUNTY OF JOHNSON   )

 3           I, Pamela K. Waits, Official Court Reporter

 4  in and for the 413th District Court of Johnson County,

 5  State of Texas, do hereby certify that the above and

 6  foregoing contains a true and correct transcription of all

 7  portions of evidence and other proceedings requested in

 8  writing by counsel for the parties to be included in the

 9  volume of the Reporter's Record, in the above-styled and

10  numbered cause, all of which occurred in open court or in

11  chambers and were reported by me.

12           I further certify that this Reporter's Record

13  of the proceedings truly and correctly reflects the

14  exhibits, if any, admitted by the respective parties.

15           WITNESS MY OFFICIAL HAND this the 3/__ day

16  of __December__ 2012.

17

18           _____
             Pamela K. Waits, Texas CSR #4991
19           Expiration Date:  12/31/13
             Official Court Reporter
20           413th Judicial District
             Johnson County, Texas
21           204 S. Buffalo Avenue
             Cleburne, Texas 76033
22           (817) 556-6041

23

24

25
```