IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARK ANTHONY SOLIZ, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:14-CV-4556-K |
| | § | ECF |
| LORIE DAVIS, Director, | § | *DEATH PENALTY CASE* |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| Respondent. | § | |

## RESPONDENT'S ANSWER WITH BRIEF IN SUPPORT

Petitioner Mark Anthony Soliz was properly convicted and sentenced to die for the cruel and callous murder of Nancy Weatherly. He now challenges his presumptively valid conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. For the reasons discussed below, Soliz fails to demonstrate that he is entitled to federal habeas relief. Accordingly, the Director respectfully requests that this Court deny Soliz's petition for a writ of habeas corpus and deny him a certificate of appealability.

## SOLIZ'S ALLEGATIONS

Soliz alleges the following grounds for federal habeas relief:

1. He was deprived of constitutionally effective counsel at trial because his trial counsel failed to:

   a. Present expert testimony regarding the reliability of Soliz's confession during the trial court's hearing

on Soliz's motion to suppress the confession (Petition at 20-26);[1]

b. Impeach Elizabeth Estrada's testimony with her prior inconsistent statements (Petition at 31-42);

c. Object to the admission of hearsay testimony of Detective Danny Paine regarding statements made by Jose Ramos (Petition at 42-49);

d. Object to the admission during the guilt/innocence phase of trial of evidence that Soliz was a member of a gang (Petition at 53-59);

e. Object to the admission during the guilt/innocence phase of trial of extraneous offense evidence (Petition at 59-71);

f. Object to the State's improper closing argument during the guilt/innocence and punishment phases of trial (Petition at 71-81);

g. Object during the punishment phase of trial to the admission of extraneous offense victim-impact testimony (Petition at 91-95);

h. Object on relevance grounds to the admission of a letter Soliz wrote from jail to a veniremember (Petition at 99-111);

i. Present testimony regarding the effect Soliz's placement in foster care had on Soliz (Petition at 111-31);

---

[1]    Soliz filed a federal habeas petition followed by an amended federal habeas petition. Docket Entry (DE) 16, 17. The Director will cite only to the amended petition and will cite to it as "Petition."

2. The cumulative effect of trial counsels' errors deprived him of his right to effective assistance of counsel (Petition at 95-99);

3. He was deprived of constitutionally effective assistance of counsel on direct appeal because his appellate counsel:

   a. Failed to argue that Soliz was improperly denied the right to cross-examine Detective Danny Paine regarding bias (Petition at 49-53);

   b. Failed to argue that the trial court improperly overruled Soliz's objection to the admission during the guilt/innocence phase of trial of victim-impact testimony (Petition at 81-89);

4. His death sentence violates his right to due process and to be free from cruel and unusual punishment because he suffers from fetal alcohol spectrum disorder (Petition at 131-53, 192-94);

5. The trial court erred by:

   a. Denying his motion to declare the "10/12" rule unconstitutional (Petition at 153-171);

   b. Providing the jury during the punishment phase of trial with an instruction that restricted the type of evidence the jury could consider mitigating (Petition at 177-86);

   c. Providing the jury during the punishment phase of trial with a future dangerousness instruction that is unconstitutionally vague (Petition at 187-92);

6. His death sentence is unconstitutional because the death penalty is arbitrarily administered (Petition at 171-77); and

7.     His rights under the Fourth, Fifth, and Fifteenth Amendments were violated by the introduction of his videotaped interview with police (Petition at 194-200).[2]

As demonstrated below, Soliz has not established the state courts were objectively unreasonable in their rejection of the claims he raised on direct appeal and in his state habeas corpus application. Further, Soliz's claim seven (as listed above) is procedurally defaulted. The Director denies all allegations of fact made by Soliz, except those supported by the record and those specifically admitted herein.[3]

## STATEMENT OF THE CASE

Soliz was convicted and sentenced to death in 2012 for the murder of Nancy Weatherly. 47 RR 77; 57 RR 94;[4] 1 CR 38; 11 CR 2086, 2130-32, 2195-98. The Texas Court of Criminal Appeals (CCA) upheld Soliz's conviction and

---

[2]     Soliz also argues that his state habeas counsel was ineffective for failing to argue that Soliz's trial counsel were ineffective for opening the door to the admissibility of Soliz's confession. Petition at 26-30. As explained below, such an argument does not constitute a claim for habeas relief. Rather, such an argument seeks to establish cause and prejudice for the procedural default of the underlying ineffective-assistance-of-trial-counsel (IATC) claim.

[3]     A copy of Soliz's state court records was previously filed with the Court. DE 24.

[4]     "RR" refers to the "Reporter's Record," the state record of transcribed trial and punishment proceedings, preceded by the volume number and followed by the internal page number(s). "CR" refers to the "Clerk's Record," the transcript of pleadings and documents filed in the trial court, preceded by the volume number and followed by the internal page number(s). The State's exhibits will be cited to as "SX" and the Defense's exhibits will be cited to as "DX."

4

death sentence on direct appeal. *Soliz v. State*, 432 S.W.3d 895, 905 (Tex. Crim. App. 2014), *cert. denied*, 135 S. Ct. 1154 (2015). Soliz filed a state application for a writ of habeas corpus. *Ex parte Soliz*, No. 82,429-01. The trial court entered findings of fact and conclusions of law. SHCR-01 at 729-69.[5] The CCA denied Soliz's state habeas application based on the trial court's findings of fact and conclusions of law and based on its own review. *Ex parte Soliz*, No. 82,429-01 (Tex. Crim. App. 2015) (unpublished order), *cert. denied*, . Soliz then filed a federal habeas petition on December 11, 2015, and an amended federal habeas petition on February 5, 2016. DE 16, 17. The instant Answer follows.

## STATEMENT OF FACTS

### I.   The Facts of the Crime

The CCA summarized the facts of Nancy Weatherly's murder, as well as Soliz's crime spree that preceded Ms. Weatherly's murder and the police investigation into those crimes:

> The instant offense was one of numerous offenses that [Soliz] and his accomplice, Jose Ramos, committed during an eight-day crime spree that ended when [Soliz] and Ramos were arrested. . . . This offense was discovered when Ramos mentioned it in response to a Fort Worth police detective's question about another offense that [Soliz] and Ramos had committed.
>
> [Soliz's] and Ramos's crime spree began with a June 22, 2010 burglary in which they took several long guns and a Hi-Point 9-

---

[5]      "SHCR" refers to the Clerk's Record of pleadings and documents filed with the state habeas court. *See generally Ex parte Soliz*, No. 82,429-01.

millimeter semiautomatic handgun, among other items. Later that evening, [Soliz] showed the stolen weapons to a potential buyer, Ramon Morales. Morales wanted to buy all five weapons, but [Soliz] was not willing to part with a rifle and the handgun. [Soliz] told Morales that he had plans for them.

. . .

On the morning of June 24, 2010, [Soliz] approached a stranger, Justin Morris, in the parking lot of a shopping mall, pointed a gun at him, and demanded his wallet. . . . [Soliz] was later videotaped by a convenience-store security camera as he attempted to use Morris's debit card at an ATM.

Later that morning, after witnessing an argument between Luis Luna and a female friend of [Soliz's], Soliz asked his friend if she wanted him to "get [Luna] wet," which was street talk for drawing Luna's blood or killing him. [Soliz] fired the gun in the direction of Luna's head, but the bullet passed through Luna's ear lobe without seriously injuring him.

That afternoon, [Soliz] and Ramos held Jorge Contreras at gunpoint in a store parking lot while they stole his green Dodge pickup truck. Later the same day, [Soliz] approached Sammy Abu-Lughod in a different store parking lot as Abu-Lughod was getting into his green Dodge Stratus. [Soliz] pointed a black handgun at Abu-Lughod and demanded his wallet, cell phone, and car.

. . .

Around 2:00 a.m. on June 28, 2010, Soliz and Ramos approached four people who were leaving a bar and demanded their money and wallets.

. . .

At 3:30 a.m. on June 29, 2010, Ramos and [Soliz] committed a "drive-by" shooting. Ramos drove the car while [Soliz] fired shots into a house where they thought a rival gang member might be

6

staying. At about 5:00 a.m., [Soliz] and Ramos approached Enrique Samaniego as he was walking to his pickup truck to leave for work. Either [Soliz] or Ramos shot Samaniego four or five times in the stomach. Samaniego sustained life-threatening injuries, but he survived.

Around 5:30 a.m., [Soliz] and Ramos approached Ruben Martinez, a delivery truck driver who had just completed a beer delivery at a Texaco gas station, as Martinez was walking back to his truck. [Soliz] pointed the gun at Martinez and demanded his wallet. Martinez complied, offering his cell phone as well. Disappointed that Martinez's wallet contained only ten dollars, [Soliz] shot him in the neck. Martinez later died from complications of this injury.

Less than an hour after shooting Martinez, [Soliz] approached Kenny Dodgin as Dodgin was exiting his car in the parking lot of a Lowe's store. [Soliz] pointed a gun wrapped in a blue bandanna at Dodgin. Upon seeing [Soliz], Dodgin locked his car and ran toward the store. He heard three gun shots behind him.

Around 7:00 a.m., [Soliz] burglarized two homes in Benbrook. . . . Later that morning, [Soliz] and Ramos drove to Weatherly's home and committed the instant offense.

. . .

Eventually [officers] observed [Abu-Lughod's] Stratus . . . closely following a Jeep Liberty. The two vehicles appeared to be traveling together. Officers identified the Stratus by its license plate as the vehicle they were searching for and radioed for a marked patrol unit to initiate a stop. With lights and siren activated, a marked unit began following the Stratus. Instead of stopping, however, the Stratus accelerated and passed the Liberty. After a brief pursuit, the Stratus crashed into a parked eighteen-wheeler.

[Soliz] exited through the passenger side window and ran through parking lots and across a freeway before officers stopped and arrested him.

7

. . .

[W]hen detectives questioned Ramos about the aggravated robbery in which Contreras's green pickup truck had been stolen, Ramos provided information that was inconsistent with the information detectives had already obtained about that offense. Specifically, Ramos indicated that the offense had ended badly and stated that it did not have to "end that way." This statement puzzled detectives because no one had been hurt and no shots had been fired during the offense. Ramos also referred to a female victim rather than a male victim. After some initial confusion, detectives ascertained that Ramos was describing a previously unknown offense committed in Johnson County. Ramos indicated that a female victim had been shot during a burglary or robbery and her green Toyota Tundra pickup truck had been stolen.

Ramos provided directions to the stolen Tundra. . . . Detectives checked the truck's registration and obtained the name and address of its owner, Nancy Weatherly. They then contacted the Johnson County Sheriff's Office and drove to Weatherly's house. A sheriff's deputy joined them at the house. They observed that the gate and garage door were open, and the back door of the house was partially open. The interior had been ransacked. Weatherly's body was lying in the kitchen area next to a table and chair. She had been shot once in the back of the head.

The investigation of this offense was ongoing when Fort Worth Detectives William "Danny" Paine and Thomas Boetcher began questioning [Soliz] at the police station. The interview was recorded. Boetcher advised [Soliz] of his rights and [Soliz] stated that he understood them. When asked if he was willing to talk about the offenses, [Soliz] answered, "All right." . . . Later, as they received information about the Johnson County investigation, they questioned [Soliz] about that offense as well.

Paine and Boetcher also obtained two typed and signed statements from [Soliz] that summarized his oral statement. The first typed statement concerned the Fort Worth offenses. In it,

[Soliz] admitted his involvement in the Abu-Lughod, Contreras, Morris, Martinez, Dodgin, and bar patron robberies, as well as the Luna shooting. He also acknowledged that Ramos did not participate in all of these offenses.

[Soliz's] second typed statement concerned the instant offense. In it, [Soliz] admitted that he and Ramos had driven to Godley, where [Soliz] had threatened Weatherly with a gun and had burglarized her house. [Soliz] denied shooting Weatherly, stating that after he and Ramos had loaded what they wanted into the Tundra, [Soliz] left the gun inside with Ramos and went outside to start the car. He then heard a shot and saw Ramos walking out of the house.

. . .

After [Soliz] signed the second typed statement, detectives questioned him further. [Soliz] wavered about whether he or Ramos was the person who shot Weatherly. Eventually, [Soliz] stated that he would confess to the shooting just to "get this over with," and admitted that he shot Weatherly. He also wrote and initialed a sentence at the end of his second typed statement: "It was me that shot that wom[a]n!!!"

[Soliz's] statements were not the only evidence that [Soliz] committed the instant offense. Estrada, who was riding in the Stratus with [Soliz] when it crashed, testified that [Soliz] bragged to her about killing an "old lady" in a house in Godley. [Soliz] told Estrada that he knocked on the door, and when the lady opened it, he pointed the gun at her. The lady backed up, and [Soliz] made her sit down. . . . She begged for her life and prayed. When [Soliz] showed the lady that he was stealing her jewelry box, she asked him not to take it because it had been a gift from her mother, who was now deceased. [Soliz] then told her to go with her mother and shot her in the head. He demonstrated for Estrada how he held out the gun and fired. He laughed about the incident and ridiculed the lady's "country" accent. He said that later, while taking methamphetamine, he had flashbacks about killing the lady and "seeing her brains go everywhere."

9

. . .

[A] law-enforcement officer testified that, while he was transporting [Soliz] and Ramos from Fort Worth to Johnson County for pretrial proceedings, he overheard [Soliz] telling Ramos that all they needed to do was "play dumb," and authorities would "get" the man who pawned the guns (presumably a reference to Morales) on capital murder.

Forensic evidence also connected [Soliz] to the instant offense. Jennifer Nollkamper, a forensic scientist with the Fort Worth Police Department crime laboratory, determined that the shell casing recovered from Weatherly's home had been fired through the Hi-Point 9-millimeter semi-automatic handgun recovered from the Stratus. Nollkamper testified that the bullet recovered from Weatherly's home was too damaged for her to state affirmatively that it was fired from the recovered weapon, but she could state affirmatively that it was fired from a Hi-Point 9-millimeter semi-automatic handgun. Lannie Emanuel, a tool mark and firearm examiner for a private forensic laboratory, agreed with Nollkamper's determination that the shell casing had been fired through the recovered weapon. Emanuel, however, did not think that the bullet was too damaged for a positive comparison. He testified affirmatively that the bullet recovered from Weatherly's home was fired from the recovered weapon.

William Walker, a fingerprint examiner with the Tarrant County Medical Examiner, positively identified a latent fingerprint on an audiocassette case in Weatherly's spare bedroom as [Soliz's] fingerprint. A trace analyst from the Tarrant County Medical Examiner's Office identified gunshot residue on [Soliz's] clothing and hands.

*Soliz v. State*, 432 S.W.3d at 896-900.

10

## II.     Facts Relating to Punishment

### A.     The State's evidence

The CCA summarized the evidence presented by the State at the punishment phase of trial:

> [T]he evidence in this case shows that [Soliz] had a long history of violent conduct that began during his childhood and continued after his arrest and during his trial for the instant offense. At the age of ten, [Soliz] acted as an armed lookout for drug dealers in his apartment complex. When he entered the juvenile-justice system, [Soliz] was committed to the inpatient psychiatric unit of John Peter Smith hospital because of his out-of-control behaviors, which included fighting and carrying guns. [Soliz] also abused spray paint, cocaine, and alcohol. [Soliz's] treating psychiatrist at the hospital reported that [Soliz] had antisocial traits: he deflected blame, had difficulty accepting responsibility, and was aggressive, unremorseful, and unempathetic.
>
> . . .
>
> Records of the Tarrant County Juvenile Probation Department reflect that, when [Soliz] was eleven years old, he self-reported his gang affiliation. The records of a group home where [Soliz] resided for approximately two years showed that he destroyed property, assaulted children and staff, and sexually assaulted younger boys. At times, [Soliz] had to be placed in restraints because he posed a danger to himself and others.
>
> When [Soliz] committed the instant offense, he had at least ten prior felony convictions for offenses including theft, burglary, evading arrest in a vehicle, unlawful restraint, and possession of a prohibited weapon. . . . He had been out of prison for less than a month when he acquired a handgun during a burglary on June 22, 2010. From June 24[th] to June 29[th], [Soliz] used the stolen handgun in numerous aggravated robberies and shootings, including the instant offense.

11

[Soliz's] violent conduct continued after the instant offense. Estrada testified that shortly before they left Gonzales's house, [Soliz] stated that he needed to obtain more ammunition so that he could kill a girl who had seen him shoot Luna because [Soliz] had heard that she had talked to a detective. After Estrada and [Soliz] left Gonzales's house in the Stratus and [Soliz] saw the police car behind them, he sped up, telling Estrada that he would kill one of the "laws" or die trying. He aimed his handgun at the pursuing police car, but Estrada hit his hand and the gun fell onto the floor of the Stratus just before the crash. While waiting to be questioned at the police station, Estrada overheard [Soliz] . . . reiterating that he would rather "ride or die," meaning he would rather die fighting than go to jail.

After his arrest, [Soliz] was placed in administrative segregation. . . . Notwithstanding the heightened security of administrative segregation, [Soliz's] disciplinary offenses while in jail included possessing weapons and contraband and damaging property. On several occasions he flooded his cell, covered his windows, refused to let himself be handcuffed, and refused to follow orders. He once threatened a jail supervisor who would not let him into the general population, saying, "You know who I am. You know what I can do.  I will get you." . . . On one occasion, [Soliz] wrestled with an officer who was escorting him from the courthouse until other officers intervened and physically restrained him.

*Id.* at 901-02.

## B.   Soliz's mitigation case

The defense presented testimony of Soliz's family members, individuals who had treated or cared for Soliz when he was young, and experts who described to the jury Soliz's upbringing and fetal alcohol spectrum disorder (FASD). Krisha Flores, Soliz's cousin, testified that when Soliz was young, his

mother, aunts, and uncles lived together in one house along with their children. 50 RR 138, 142. The adults frequently sniffed paint in front of the children and did drugs inside the home. 50 RR 143, 163, 192. Soliz's mother prostituted herself in order to buy drugs. 50 RR 194-96. Soliz began sniffing paint at about age ten. 50 RR 183. Leticia Herrera, another cousin of Soliz, testified that when Soliz was seven or eight years old, he would "run[ ] the streets," and was not disciplined by his parents. 50 RR 245, 254-55. Soliz's family moved to the Butler Housing Projects when Soliz was between six and nine-years old where a significant amount of violence and drug dealing occurred in their neighborhood. 50 RR 164, 167, 175, 217. One of Soliz's aunts was stabbed to death by her boyfriend in Soliz's presence when Soliz was young. 50 RR 194-96.

Dr. Prema Manjunath was a child and adolescent psychiatrist at the John Peter Smith Hospital (JPS) in Fort Worth, Texas. 51 RR 39-40. Dr. Manjunath testified regarding Soliz's admission to JPS when Soliz was ten-years old due to his "out-of-control" behaviors such as stealing cars, stealing from parking meters, selling drugs, fighting, drug use, and carrying guns. 51 RR 44-47, 51. Soliz was "roaming out on the streets in the early hours of the morning" and associating with children who were much older than he was, which indicated a lack of supervision from his parents. 51 RR 83. Soliz had

13

"acted out" sexually, which Dr. Manjunath believed could be indicative of Soliz having been sexually abused. 51 RR 54. Soliz's social history presented to Dr. Manjunath indicated that Soliz's mother drank heavily during her pregnancy with Soliz. 51 RR 53. Soliz's mother was only "superficially" involved with his treatment at JPS. 51 RR 69.

Dr. Manjunath performed a mental status examination of Soliz, which indicated that Soliz had "difficulties in paying attention" and was of "low average to borderline intelligence." 51 RR 57-58. Soliz "externalized" blame for his actions by blaming others and refusing to accept responsibility; he lacked empathy for others and was aggressive to hospital staff and his peers. 51 RR 60-61. Dr. Manjunath diagnosed Soliz with conduct disorder, mixed substance abuse, and attention deficit hyperactivity disorder (ADHD). 51 RR 63. Dr. Manjunath also diagnosed Soliz as having antisocial traits and noted that he had reading and language problems and suffered from a "chaotic home." 51 RR 64. She testified that neglect of a child can interfere with the child's "normal growth and development." 51 RR 114. Dr. Manjunath suspected that Soliz may have FASD due to his poor behavior and his mother's substance abuse during pregnancy. 51 RR 67. At the time Soliz was discharged from JPS his behavior, attention, and concentration "had definitely improved," although he continued

14

to "seek attention and affection of others through manipulation and impulsive behaviors." 51 RR 68-69, 91.

Dr. Manjunath also testified regarding FASD. She testified that a fetus's exposure to alcohol may cause a number of neurological abnormalities including impulsive behavior, social ineptness, and difficulty learning from experience. 51 RR 118. FASD is a "broad" group of disorders that includes "full blown" fetal alcohol syndrome (FAS) as well as other diagnoses that may be made when the individual was exposed to alcohol in utero and presents with the same behavioral deficits as an individual with FAS but does not possess the physical characteristics required for a diagnosis of FAS.[6] 51 RR 116-17.

Dr. Manjunath testified that the International Classification of Diseases (ICD) included diagnostic criteria for FAS, but did not include diagnostic criteria for other diagnoses on the spectrum of FASD. 51 RR 96. Dr. Manjunath also testified that FAS is not included in the Diagnostic and Statistics Manual of Mental Disorders (DSM). 51 RR 128. As mandated under the ICD and by the Centers for Disease Control (CDC), a diagnosis of FAS requires a "definitive history" of prenatal exposure of the fetus to alcohol and the presence

---

[6]     In order to diagnose an individual with FAS, the individual must possess three characteristic facial abnormalities: (1) a smooth philtrum (the vertical ridges between the upper lip and nose); (2) a flat upper lip; and (3) a palpebral fissure (the opening between the eyelids) that is shortened horizontally by two or more standard deviations from the norm. 53 RR 46, 61, 142, 144-45.

of the three facial characteristics. 51 RR 96-97, 126. Dr. Manjunath did not note in Soliz, the presence of those facial characteristics. 51 RR 97-98, 126. Nor did Dr. Manjunath note that Soliz had poor coordination, which is often present in individuals with FAS. 51 RR 99. Dr. Manjunath testified that the conduct disorder, with which Soliz was diagnosed, could be caused by biological, genetic, or environmental factors. 51 RR 104. Similarly, brain damage could be caused by fighting, sniffing paint, and hypoxia. 51 RR 104. Nonetheless, Dr. Manjunath noted in Soliz the behavioral characteristics typically seen in individuals with FAS. 51 RR 118. Dr. Manjunath acknowledged that conduct disorder, ADHD, chaotic family environment, and substance abuse could have been "alternative explanations" to FAS for Soliz's behavior. 51 RR 127.

Kevin Walling was a caseworker with the Tarrant County Mental Health and Mental Retardation (MHMR) organization. 51 RR 130. Soliz was referred to Tarrant County MHMR when he was ten-years old due to his living in the "projects" where drugs and prostitution were prevalent. 51 RR 133-34. Mr. Walling worked with Soliz from 1992 until 1994, at which time Soliz lived in the Buckner Children's Home.[7] 51 RR 151. Mr. Walling visited Soliz's family's house and saw Soliz's mother with paint on her hands and around her mouth.

---

[7]    Soliz was removed from his mother's custody and placed into the custody of the State at about age twelve due to his "chaotic" home environment. DX 62. Soliz was at that time placed into the care of the Buckner Children's Home. DX 62; 51 RR 144.

51 RR 146. He was told that the family's house had only one bedroom and that both Soliz and his mother slept in the bedroom. 51 RR 135. Soliz's mother also prostituted herself in that bedroom, which was witnessed by Soliz. 51 RR 135. Mr. Walling described Soliz as a follower, but testified that Soliz knew the difference between right and wrong. 51 RR 144, 154. During that time, Soliz was a lookout for drug dealers. 51 RR 137. Mr. Walling testified that Soliz's mother was often unaware of where Soliz was and he did not believe that Soliz's family would look for him when he was missing. 51 RR 138.

LeAnna Judd was a Juvenile Probation Officer for Tarrant County. 51 RR 161. She first met Soliz in 1994, when he was twelve-years old and was detained for burglary of a building. 51 RR 164. Soliz was arrested three months after his initial detention for burglary of a building when he attempted to burglarize a vehicle and was arrested again a short time later for burglary of a habitation. 51 RR 177. Ms. Judd noted that Soliz suffered from a family situation that was "very chaotic and detrimental to his ever getting better." 51 RR 190. Soliz's records indicated that he was, at the time Ms. Judd supervised him, two grades behind in school and had been suspended due to his committing a burglary of the school. 51 RR 201. Soliz was in special education classes. 51 RR 201. A therapist at the Buckner Children's Home recommended keeping Soliz in treatment because she was concerned about Soliz's mother's

17

poor parenting skills and that Soliz's behavior would deteriorate if he was returned to his mother's home. 51 RR 202.

Ms. Judd also testified regarding Soliz's "attention seeking behavior" while living in the Buckner Children's Home such as choking himself. 52 RR 17-18. Soliz "acted out" sexually when he was twelve and thirteen by having sex with younger boys in the Buckner Children's Home. 52 RR 21. Soliz was moved to a higher security facility at which he had to be restrained several times due to the staff's concern that he would hurt others. 52 RR 25. Ms. Judd testified on cross-examination that Soliz joined the Boy Scouts during his time at the Buckner Children's Home and that he developed leadership skills. 52 RR 44. She believed that Soliz knew the difference between right and wrong but would not take responsibility for his actions. 52 RR 44-45, 52. Ms. Judd described Soliz as an "engaging" child but also a manipulative one. 52 RR 43, 55. She stated, for example, that Soliz claimed to be suicidal and to have hallucinations in order to get a response from personnel at the Buckner Children's Home. 52 RR 55-56.

Soliz presented testimony from three experts, Drs. Richard Adler, Paul Connor, and Natalie Brown, regarding FASD. Dr. Adler is a child and adolescent psychiatrist. 53 RR 7, 36. He is the founding "director of a group called the Fetal Alcohol Spectrum Disorder Experts," of which Drs. Connor and

18

Brown are also members. 53 RR 9, 38. Dr. Adler testified that alcohol is a teratogen, i.e., a substance that is harmful to a developing fetus. 53 RR 54. Dr. Adler's group, the Fetal Alcohol Spectrum Disorder Experts, developed protocol for diagnosing FASD. 53 RR 10, 75. That protocol was published in a psychiatric journal in 2010.[8] 53 RR 9, 75. Dr. Adler testified that the protocol involves the patient being evaluated by a neuropsychologist who determines whether there are neuropsychological findings consistent with FASD, a medical doctor, and a psychologist who evaluates the patient's life history and adaptive behaviors. 53 RR 12-13.

Dr. Adler testified that FASD is an "umbrella term" that refers to five diagnoses an individual might receive after having been exposed in utero to alcohol. 53 RR 59. The first diagnosis is FAS with confirmed maternal exposure. 53 RR 59. In order to make that diagnosis, there must be "adequate reason" to believe that the fetus was exposed to alcohol. 53 RR 60. Moreover, "there has to be evidence of a characteristic pattern of the facial abnormalities" as well as growth retardation. 53 RR 61. Finally, there must be "evidence of central nervous system, neurodevelopmental abnormalities," such as a

---

[8] Dr. Adler identified only one other group in the world that applies the protocol Dr. Adler's group developed. 53 RR 11.

decreased cranial size, impaired motor skills, hearing loss, or poor gait. 53 RR 62-63.

The second diagnosis within FASD is FAS without confirmed maternal exposure. 53 RR 64. That diagnosis may be made where an individual presents with the behavioral and physical features characteristic of FAS but whose prenatal exposure to alcohol cannot be confirmed. 53 RR 65.

The third diagnosis within FASD is partial fetal alcohol syndrome (PFAS). 53 RR 66. That diagnosis may be made when the individual had confirmed prenatal exposure to alcohol, some components of the facial abnormalities characteristic of FAS, and either growth retardation, central nervous system developmental abnormalities, or brain impairment. 53 RR 66-67.

The fourth diagnosis within FASD is alcohol related birth defects (ARBD). 53 RR 70. That diagnosis may be made when an individual was exposed in utero to alcohol and suffers from physical impairment but does not suffer from related neurological or behavioral impairment. 53 RR 70-71.

The fifth diagnosis within FASD is alcohol related neurodevelopmental disorder (ARND). 53 RR 71. That diagnosis may be made when an individual

was exposed in utero to alcohol, suffers from related neurological impairments, but does not exhibit the facial abnormalities characteristic of FAS.[9] 53 RR 71.

Impairments associated with FASD include difficulty eating and sleeping, poor muscle coordination, low I.Q., poor attention, inappropriate social and sexual behavior, difficulty finding employment, and difficulty in school. 53 RR 72-73. These impairments often cause individuals with FASD to become incarcerated or hospitalized. 53 RR 72. Individuals with FASD also suffer from adaptive behavior deficits, auditory or visual hallucinations, and delinquency. 53 RR 101-02. Further, individuals with FASD who commit crime tend to repeatedly commit "the same stupid . . . , petty . . . crimes." 53 RR 126. The severity of their crimes does not increase over time. 53 RR 126. Individuals with FASD also tend to be susceptible to suggestion and would likely "over-confess" or falsely confess to a crime when under questioning by police. 53 RR 140.

---

[9]     Dr. Adler acknowledged on cross-examination that the international scientific community has not reached a consensus "regarding evidence-based diagnostic criteria for any prenatal alcohol related condition other than FAS," and that "the only diagnostic category with scientific evidence to support clinical criteria is FAS." 53 RR 163; *see* 53 RR 212-15. Dr. Adler testified that the most recent version of the ICD, a publication of the United Nations and World Health Organization, does not include a classification for PFAS. 53 RR 159-61, 167; *see* 55 RR 39.

Dr. Adler performed a clinical interview with, and a physical examination of, Soliz.[10] 53 RR 15, 78. Dr. Adler testified that Soliz did not have a sufficiently shortened palpebral fissure in order to be diagnosed with FAS, nor did Soliz have a flat upper lip or a smooth philtrum. 53 RR 109-10, 145, 148. Dr. Adler reviewed Soliz's medical records and interviewed Soliz's mother. 53 RR 15, 79, 188. Dr. Adler diagnosed Soliz with PFAS, cognitive disorder, polysubstance abuse, physical and sexual abuse of child, and neglect of child. 53 RR 16, 86-87.

Dr. Connor is a clinical neuropsychologist. 53 RR 220; 54 RR 13. Dr. Connor completed a postdoctoral fellowship during which he researched FASD. 54 RR 14. From that research, Dr. Connor found that individuals who had been exposed in utero to alcohol had difficulties in their neuropsychological functioning. 54 RR 16. Those difficulties include lower intelligence, lower

---

[10]     Dr. Adler testified on cross-examination that when Soliz met him for the clinical interview Dr. Adler asked Soliz regarding his understanding of the purpose of the interview. Soliz stated that the interview was being conducted in order to "try to see if I can be diagnosed or something, try to get the death penalty off me." 53 RR 149. Dr. Adler also testified on cross-examination that Soliz admitted to inhaling paint starting at age ten, he began drinking alcohol at age fifteen, used crack from age twenty-one to twenty-three, and auto-asphyxiated with others present as a form of fun from age eleven to fourteen. 53 RR 181-82. Dr. Adler testified that auto-asphyxiation as recreation is common among children. 53 RR 182. Auto-asphyxiation can cause hypoxia, which can cause brain damage. 53 RR 183.

academic functioning, difficulty paying attention, and impulsive behavior. 54 RR 19.

Dr. Connor performed a series of neuropsychological tests on Soliz "to assess a broad range of cognitive functioning." 53 RR 223. Dr. Connor testified that Soliz's cognitive functioning was consistent with the CDC guidelines for FASD. 53 RR 224; 54 RR 69. Dr. Connor also testified that Soliz's cognitive functioning was consistent with cognitive disorder and that Soliz suffers from a learning disorder and "attention deficit problems."[11] 53 RR 226.

Dr. Brown is a clinical and forensic psychologist. 54 RR 72; 55 RR 133. As part of her work with the Fetal Alcohol Spectrum Disorder Experts group, Dr. Brown performs a "lifelong functional assessment" of individuals who are being assessed for FASD. 54 RR 76; 55 RR 138-39. A lifelong functional assessment includes a comprehensive examination of the individual's life

---

[11]    Dr. Connor testified on cross-examination that he administered an I.Q. test to Soliz on which Soliz scored a ninety. 55 RR 46. Dr. Connor also testified on cross-examination that Soliz earned grades in the eighth grade of ninety-five in language arts, seventy-nine in reading improvement, eighty-five in history, seventy-nine in math, and seventy-two in science. 55 RR 22. Dr. Connor also acknowledged that Soliz's records from the Buckner Children's Home indicated that Soliz was "able to take responsibility for his actions," displayed a mild manner, "demonstrated better social skills," and consistently attended Boy Scout activities and learned leadership skills. 55 RR 24. Dr. Connor testified that those records demonstrated that Soliz was able to conform his behavior well in a highly-structured environment. 55 RR 25-26. Dr. Connor admitted that "[t]here are multiple factors that could have had an impact on Mr. Soliz's neuropsychological functioning," including neglect. 55 RR 100, 124.

23

history to determine whether the individual has displayed behaviors that are consistent with or contradict FASD. 54 RR 77; 55 RR 139-40. Behaviors and characteristics that are consistent with FASD include having mental health disorders, having a disruptive school experience, violating the law, being confined (e.g., in a psychiatric hospital or jail), an inability to live independently, substance abuse, and displaying inappropriate sexual behavior. 54 RR 78-80, 84. "Sophisticated behavior," e.g., having a successful work or school history, would be inconsistent with an FASD diagnosis. 55 RR 141.

Based on her lifelong functional assessment of Soliz, Dr. Brown concluded that Soliz's behaviors during his life were consistent with FASD and that he did not display any behavior that was inconsistent with FASD. 54 RR 94, 97. Dr. Brown testified that, "there is evidence across [Soliz's] life span of significant impairment in . . . adaptive behavior," and evidence that Soliz lived in an "adverse environment."[12] 55 RR 228-29.

---

[12]    Dr. Brown testified that an individual's behavior "really has everything to do with extrinsic factors, the environment, because . . . the case for people who are born with FAS or partial FAS . . . , if they're raised in a protective, nurturing, positive environment, . . . their risk of secondary disabilities goes way down because of that protection and all the interventions that are afforded." 55 RR 176. Dr. Brown acknowledged that Soliz was subjected to a chaotic home and family life, did not have a protective environment when he was young, and was raised in a "gang environment." 55 RR 184-85. Dr. Brown conceded on cross-examination that she could not eliminate the possibility that Soliz's "environmental trauma" (i.e. substance

## STANDARD OF REVIEW

Confined pursuant to a state court judgment, Soliz is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, any claims Soliz raises that are based solely on alleged violations of state law should be denied as a matter of law.

Habeas relief is also inappropriate for claims that are either unexhausted and procedurally defaulted, or claims that were exhausted but were dismissed pursuant to an independent and adequate state procedural rule. Indeed, under AEDPA, a federal habeas application shall not be granted unless:

(A)  the applicant has exhausted the remedies available in the courts of the State; or

(B)  (i)  there is an absence of available State corrective process; or

(ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.

---

abuse, fighting, auto-asphyxiation) contributed to Soliz's behavior. 54 RR 118, 120. She also admitted that Soliz knows the difference between right and wrong and FASD would not prevent Soliz knowing the difference between right and wrong. 55 RR 229, 279. Dr. Brown also acknowledged that there is no scientific method by which to determine whether a particular crime or criminal behavior was caused by FASD. 54 RR 134-35; 55 RR 278.

25

28 U.S.C. § 2254(b)(1). Moreover, a claim may be denied on the merits, notwithstanding any failure to exhaust available state court remedies. 28 U.S.C. § 2254(b)(2). A claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial on a state procedural default. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).

Regarding exhausted claims, under AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless that adjudication:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has explained that a state court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent but reaches an opposite result.[13] (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

---

[13]    "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. To this end, a state court unreasonably applies Supreme Court precedent *only if* it correctly identifies the governing precedent but unreasonably applies it to the facts of the particular case. *Id.* at 407-09. And as the Supreme Court stated, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree* that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.*

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2002)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002)

---

decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citing (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court reaches its decision." *Id.* at 71-72 (citing (*Terry*) *Williams*, 529 U.S. at 405, 413, and *Bell v. Cone*, 535 U.S. 685, 698 (2002)).

(federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway the courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 664; *see also Richter*, 562 U.S. at 100-01 (discussing the application of § 2254(d)'s "relitigation bar" to state court decisions applying *Strickland v. Washington*, 466 U.S. 668 (1984)).

It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Richter*, 562 U.S. at 102.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court litigation of claims already rejected in state proceedings. It preserves the authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with this Court's precedents. It goes no farther. [28 U.S.C. §] 2254(d) reflects the view that habeas corpus is a "guard against *extreme malfunctions* in the state court criminal justice systems, *not a substitute for ordinary error correction through appeal*."

*Id.* (emphasis added, internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th

Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion the state court reached and not on whether the state court considered and discussed every angle of the evidence"); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review only the state court's decision, not its reasoning or written opinion[.]"). And a state court's decision need not expressly cite any federal law or even be aware of applicable Supreme Court precedent in order to be insulated from relitigation. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *Early v. Packer*, 537 U.S. 3, 8 (2002) (state court decision must be upheld so long as the result does not contradict Supreme Court precedent). A state court's decision also need not specifically address the federal constitutional claim. *See Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) ("When a state court rejects a federal claim without expressly addressing the claim, a federal court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted.").

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the "contrary to" or "unreasonable application" standard. (*Terry*) *Williams*, 529 U.S. at 381; *see also Marshall v. Rodgers*, 133 S. Ct. 1446, 1450-

451 (2013) ("Although an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent, . . . , it may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct.") (citations omitted). Stated differently:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there *was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Richter*, 562 U.S. at 103 (emphasis added). And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply it to the facts at hand" because such a process suggests the proposed rule is not "clearly established." *Alvarado*, 541 U.S. at 666.

Regarding questions of fact, federal courts must presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "This presumption of correctness not only applies to explicit

findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state court finding must have been presented to the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011) (explaining that § 2254(d)(1) "refers in the past tense, to a state court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the time, i.e., the record before the state court."). Further, because a federal habeas court is also prohibited from granting relief unless a decision was based on an "unreasonable determination of the facts in light of the evidence *presented in the state court proceeding*," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner. 28 U.S.C. § 2254 (d)(2) (emphasis added).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual

development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; *and* (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found him guilty. 28 U.S.C. § 2254(e)(2). A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Beazley v. Johnson*, 242 F.3d 248, 272-73 (5th Cir. 2001). For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2). (*Michael*) *Williams*, 529 U.S. at 433; *Beazley*, 242 F.3d at 273. But even if a petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits. *See Schriro v. Landrigan*, 550 U.S. 465, 474-75 (2007) ("It follows that if the record refutes applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *see also Clark v. Johnson*, 227 F.3d 273, 284-85 (5th Cir. 2000).

# ARGUMENT

## I.  Soliz was Not Denied Constitutionally Effective Counsel at Trial.

Soliz first argues that he was denied constitutionally effective counsel at trial for a number of reasons.[14] Specifically, he argues his trial counsel were ineffective for failing to (1) present expert testimony regarding the reliability of Soliz's confession during the trial court's hearing on Soliz's motion to suppress the confession, (2) impeach Elizabeth Estrada's testimony with her prior inconsistent statements, (3) object to the admission of hearsay testimony of Detective Danny Paine regarding statements made by Jose Ramos, (4) object to the admission during the guilt/innocence phase of trial of evidence that Soliz was a member of a gang, (5) object to the admission during the guilt/innocence phase of trial of extraneous offense evidence, (6) object to the State's improper closing argument during the guilt/innocence and punishment phases, (7) object during the punishment phase of trial to the admission of extraneous offense victim-impact testimony, (8) object on relevance grounds to the admission of a letter Soliz wrote to a veniremember, and (9) present testimony regarding the effect Soliz's placement in foster care had on Soliz. Petition at 20-131. He also claims that he was denied effective assistance of counsel due to the cumulative

---

[14]    Soliz's attorneys at trial were Michael Heiskell and Greg Westfall.

effect of the alleged instances of ineffective assistance. Petition at 95-99. Soliz's claims are without merit.

### A.   Standard of review

The Sixth Amendment guarantees a defendant the right to effective assistance of counsel at trial. *Strickland*, 466 U.S. at 684-86. A defendant's claim that he was denied constitutionally effective assistance of counsel requires him to prove both that: (1) counsel rendered deficient performance, and (2) counsel's actions resulted in actual prejudice. *Id.* at 687-88, 690. Importantly, failure to prove either deficient performance or prejudice will defeat an ineffective-assistance-of-counsel claim, making it unnecessary to examine the other prong. *Id.* at 687.

In order to demonstrate deficient performance, Soliz must show that, in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms." *Id.* at 689-90; *see also Nix v. Whiteside*, 475 U.S. 157, 165 (1986). The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight."[15] *Strickland*, 466 U.S.

---

[15]   "Representation of a capital defendant calls for a variety of skills. Some involve technical proficiency connected with the science of law. Other demands relate to the art of advocacy. The proper exercise of judgment with respect to the tactical and

at 689-90; *see also Richter*, 131 S. Ct. at 788 ("It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'"); *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.") (citations omitted). Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. If there is *any* "reasonable argument that counsel satisfied *Strickland*'s deferential standard," the state court's denial will be upheld. *Richter*, 131 S. Ct. at 788.

Even if deficient performance can be established, Soliz must still affirmatively prove prejudice that is "so serious as to deprive him of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This requires him to show a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability" is one sufficient to undermine confidence in the outcome. *Id.* Thus, the mere possibility of a different outcome is insufficient to prevail on the prejudice prong. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999). As recently explained by the Supreme Court, "the question in conducting

---

strategic choices that must be made in the conduct of a defense cannot be neatly plotted in advance by appellate courts." *Stanley v. Zant*, 697 F.2d 955, 970 & n.12 (11th Cir. 1983).

*Strickland*'s prejudice analysis is *not* whether a court can be certain [that] counsel's performance had no effect on the outcome or whether it is possible [that] a reasonable doubt might have been established [had] counsel acted differently." *Richter*, 131 S. Ct. at 791 (emphasis added). Rather, the "likelihood of a different result must be substantial, not just conceivable." *Id.* at 792.

With respect to errors at the sentencing phase of a death penalty trial, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer [ ] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) ("If the petitioner brings a claim of ineffective assistance with regard to the sentencing phase, he has the difficult burden of showing a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel.") (internal quotation marks omitted)). "In assessing prejudice, [the reviewing court] reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

Where a petitioner claims that his trial counsel was ineffective for failing to adequately investigate his case, the petitioner has the burden of

36

demonstrating that counsel's investigation or trial decisions were professionally unreasonable. *Strickland*, 466 U.S. at 689 (emphasizing "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"). Counsel "has a duty to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary." *Ransom v. Johnson*, 123 F.3d 716, 723 (5th Cir. 1997) (citation omitted); *see also Rompilla v. Beard*, 545 U.S. 374 (2005) (emphasizing counsel's duty under *Strickland* to make reasonable investigation); *Wiggins*, 539 U.S. at 510 (same). But "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 383.

To meet this burden, a defendant must do more than merely allege a failure to investigate; he must affirmatively prove that the investigation counsel actually conducted fell below minimum professional standards. *Strickland*, 466 U.S. at 690 ("A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."); *see also id.* at 687 (explaining that as to deficient performance, "the defendant

37

must show . . . that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"). He must also state with specificity what additional evidence would have resulted from further investigation and how such evidence would have altered the outcome of the case. *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998); *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994); *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

And, more specifically, to prevail on a claim of ineffective assistance of counsel based on counsel's failure to interview and call a witness, the petitioner must (1) name the witness, (2) demonstrate that the witness was available to testify and would have done so, (3) set out the content of the witness's proposed testimony, and (4) show that the testimony would have been favorable to a particular defense. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986). Complaints of uncalled witnesses are not favored on federal habeas corpus. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). Where the only evidence of a missing witness's testimony is from the defendant, the court must view the petitioners claim of ineffective assistance of counsel with great caution. *Schwander v. Blackburn*, 750 F.2d 494, 500 (5th Cir. 1985).

Further, the decision of whether to call certain witnesses to testify is a matter of trial strategy, entitled to a strong degree of deference. *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984) (stating that a petitioner must overcome a strong presumption that trial counsel's decision in not calling a particular witness was a strategic decision); *see Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *see also Williams v. Collins*, 16 F.3d 626, 632 (5th Cir. 1994) (finding defense attorneys were not ineffective for deciding not to call certain witnesses because of their concern that the testimony would have opened the door to more damaging evidence under cross-examination). The Fifth Circuit has stated that, a "court might even disagree with such a decision, viewing the case in hindsight, and still determine that the decision was not so seriously inept as to have been professionally unreasonable." *Williams*, 16 F.3d at 632. Finally, counsel's failure to investigate will not rise to the level of ineffective assistance where the evidence in question is either cumulative, unknown, or possibly harmful to the defense. *See Anderson*, 18 F.3d at 1220-21.

**B.      Trial counsel made the reasonable strategic decision to not present expert testimony regarding false confessions during the hearing on Soliz's motion to suppress his confession.**

Soliz claims that his trial counsel were ineffective for failing to present testimony of an expert on false confessions during the trial court's hearing on Soliz's motion to suppress his confession. Petition at 20-26. The claim is without merit.

### 1.      Factual background

Prior to trial, Soliz filed a motion for a hearing on the admissibility of his statements he had made to the police. 2 CR 264-67. The trial court held a hearing over two days on Soliz's motion to suppress. *See generally* 5 RR; 6 RR. The State called Detective Danny Paine, Detective Tim Boetcher, and Martha Fralia of the Fort Worth Police Department to testify. *See generally* 5 RR; 6 RR.

Detective Paine testified regarding the police department's investigation into several robberies that had taken place between June 24 and June 29, 2010. 5 RR 26-42. Soliz became a suspect in the robberies based on the officers' investigation. 5 RR 26. During the investigation, Detective Paine learned that a green Dodge Stratus had been stolen from Sammy Abu-Lughod. 5 RR 35. Victims of later robberies described a similar car being used by the assailant

in those offenses. 5 RR 35. Officers eventually located and tried to pull over the Stratus, which Soliz was driving, but Soliz fled from police. 5 RR 49-56. Soliz was arrested after he wrecked during his attempt to flee. 5 RR 55. He was then transported to the homicide department of the Fort Worth Police Department. 5 RR 57. Jose Ramos was arrested near in time to Soliz's arrest when officers pulled over a car in which Ramos and several passengers were traveling close to the Stratus.

The police officers first interviewed Ramos, who was a suspect along with Soliz in several of the robberies the officers were investigating. 5 RR 82. The officers also interviewed Whitney Lewis, Cathy Richardson, Elizabeth Estrada, and Arturo Gonzalez (who had been arrested along with Ramos) before they interviewed Soliz. 6 RR 5. Detectives Paine and Boetcher then interviewed Soliz.[16] 5 RR 59. The interview was recorded on video.

Detective Paine testified that Soliz had not been injured by police officers during his arrest. 5 RR 57. The detectives asked Soliz several times if he wanted food or a drink. 5 RR 62. Soliz appeared nervous and tired, but was able to answer questions in detail and recall events and did not appear to be under the influence of drugs. 5 RR 63-64. Detective Boetcher advised Soliz of

---

[16]    Detective Boetcher had been assigned to investigate the Ruben Martinez murder. 5 RR 59.

his rights and Soliz waived them. 5 RR 66. Detective Paine testified that Soliz was not coerced or threatened during the interview. 5 RR 67.

Detective Boetcher testified next. He testified that he had received training in various interrogation techniques. 5 RR 179. During Soliz's interview, Detective Boetcher looked to see whether Soliz had any injuries, and he did not see any. 6 RR 8. Detective Boetcher testified that Soliz understood the questions he was asked and was able to give details in addition to what the officers knew regarding the robberies and murders. 6 RR 14.

Trial counsel extensively cross-examined the detectives regarding training they had received on conducting interrogations. 5 RR 84-91. For example, Detective Paine completed a course in the Reid Technique of Interviewing and Interrogation.[17] 5 RR 85. Trial counsel indicated that a book titled "Criminal Interrogation and Confessions," written by the authors of the

---

[17]     Trial counsel had issued a subpoena duces tecum on Detective Paine requiring Detective Paine to provide trial counsel manuals and books the detective had read during his training on interrogation techniques. 5 RR 83. Detective Paine provided trial counsel a copy of books titled "Essentials of the Reid Technique: Criminal Investigation and Confessions," "Criminal Investigation: Law and Practice, Second Edition," "Criminal Investigation: The Art and the Science." "Reid Technique of Interviewing and Interrogation," "The Advanced Course on the Reid Technique of Interviewing and Interrogation," "Interview and Interrogation Techniques," and "The Investigator Anthology: A Compilation of Articles and Essays about the Reid Technique of Interviewing and Interrogation." 5 RR 84-85. Detective Paine also provided trial counsel certificates of completion of courses he had taken in interrogation techniques. 5 RR 85-86.

"Reid Technique" of interrogation, suggested that officers determine whether the suspect has any known physical, mental, or emotional impairments or has been taking medication. 5 RR 128. The authors of the Reid Technique indicated that doing so is important because such impairments can cause a suspect to engage in misleading behavior. 5 RR 128. Detective Paine testified that he and Detective Boetcher asked Soliz only whether he used drugs, and did not ask Soliz whether he suffered from any other impairment discussed by the Reid Technique authors. 5 RR 131. Trial counsel also attempted to elicit testimony that Soliz was lethargic, which could be a symptom of withdrawal from methamphetamine. 5 RR 131-32. Detective Paine conceded the he did not ask Soliz regarding his educational attainment,[18] how much sleep he had gotten recently, or whether Soliz was taking any medication, had ever attempted suicide, or had any psychiatric history. 5 RR 133-35. Trial counsel asked Detective Paine whether he was aware that methamphetamine use can cause an individual to be suggestible and emphasized that Soliz admitted to killing Ms. Weatherly "just to get [the interview] over with." 5 RR 149-52; 11 CR 2192. Trial counsel also asked Detective Paine whether he or Detective Boetcher

---

[18]     Soliz's first written confession indicates that he completed nine years of school. SX 2.

misled Soliz regarding the evidence they had that incriminated him, which Detective Paine denied. 5 RR 153-55.

Trial counsel also cross-examined Detective Boetcher regarding the officers' efforts to ensure the veracity of Soliz's confession. Trial counsel asked Detective Boetcher whether he asked Soliz how often he used drugs, whether he was suffering from withdrawal, or whether Soliz used any medications or had any psychiatric history. 6 RR 33-36. Detective Boetcher testified that he did not ask Soliz those questions. 6 RR 33-36. Trial counsel also asked Detective Boetcher whether he was aware that an individual suffering from withdrawal from methamphetamine is likely to be suggestible. 6 RR 56. Detective Boetcher answered that whether an individual experiences such a symptom of withdrawal "would depend on the person." 6 RR 56.

Trial counsel also elicited testimony that Soliz was brought to the homicide department shortly before midnight on June 29, 2010, and was not interviewed until 5:00 a.m. on June 30, 2010. 5 RR 117. Trial counsel also asked Detective Paine whether he had experience in detecting if a suspect was under the influence of drugs. 5 RR 121. Detective Paine answered that he did not, but he had experience with people who admitted to being under the influence of drugs. 5 RR 121. Detective Paine testified that an individual "coming down" from methamphetamine is typically lethargic. 5 RR 126.

44

After the witnesses testified at the hearing, trial counsel argued to the court that Soliz's statements should be suppressed because he was handcuffed in a hallway for five to six hours before being interviewed, had not recently been able to sleep, and the officers did not determine Soliz's educational attainment or whether Soliz's waiver of his rights could be valid in light of his mental and physical state due to his methamphetamine use. 6 RR 115-19. Trial counsel argued that Soliz's waiver of his rights was invalid due to "his inability to comprehend, understand, and voluntarily, intelligently and knowingly waive his basic Fifth Amendment rights." 6 RR 119-20.

After the hearing, the trial court entered findings of fact and conclusions of law, denying Soliz's request to suppress the videotape of his interview, SX 1, and his written statements, SX 2, 3; 9 CR 1746-50. The trial court found that Soliz's waiver of his rights was voluntary and that Soliz "had the sufficient mental capacity to understand the rights and warnings given him," and the mental capacity to make a knowing and intelligent waiver. 9 CR 1747, 1750.

### 2. Trial counsel elicited the same testimony that a false confessions expert would have provided.

Soliz argues that trial counsel were ineffective for failing to present expert testimony at the suppression hearing regarding the "specific risk factors relevant to Soliz's confession, such as his FASD, suggestibility, and sleep

45

deprivation." Petition at 24. A false confessions expert, Soliz argues, could have testified regarding the detectives' "repeated minimizing of Ms. Weatherly's death and insistence that Soliz was lying." Petition at 24. He does not, however, provide this Court with an affidavit of an expert he argues could have, and would have, testified at the suppression hearing regarding the reliability of Soliz's statements. As a result, Soliz's claim necessarily fails. *Day*, 566 F.3d at 538.

Soliz did, however, submit to the state habeas court an affidavit of Dr. Gregory DeClue, a purported expert regarding false confessions. SHCR-01 at 169-83. In his affidavit, Dr. DeClue discussed various factors that can contribute to an individual providing a false confession. SHCR-01 at 170-75. He asserted that Soliz was diagnosed with FAS,[19] and that individuals diagnosed with fetal alcohol spectrum disorder tend to be impulsive, naïve, suggestible, followers, and exhibit poor judgment. SHCR-01 at 175. He also stated that Soliz obtained a high score on a scale of suggestibility that was administered by the defense experts. SHCR-01 at 176. Further, Soliz was sleep deprived at the time he was interviewed. SHCR-01 at 176. Dr. DeClue also asserted that the detectives did not use proper safeguards to ensure that Soliz's

---

[19]    This is incorrect. Soliz was not diagnosed with fetal alcohol syndrome. The defense experts diagnosed Soliz with partial fetal alcohol syndrome (PFAS). 53 RR 16.

confession was accurate because they did not ask Soliz questions aimed at having Soliz independently corroborate details of Ms. Weatherly's murder. SHCR-01 at 176, 179. Further, Dr. DeClue stated that police told Soliz that he would not face any additional consequences if he admitted to shooting Ms. Weatherly, rather than stating that he was outside of the house when Ms. Weatherly was shot. SHCR-01 at 177. Assuming that Soliz's claim in this Court is also premised upon Dr. DeClue's affidavit, the claim is without merit.

Trial counsel, Michael Heiskell, provided the state habeas court with an affidavit explaining the defense team's decision to not hire a false confession expert. SHCR-01 at 556. Mr. Heiskell stated, "[w]e did not hire an expert on false confessions because we felt it totally unnecessary in light of the totality of the circumstances surrounding the confession, and the corroborating evidence that existed connected Mr. Soliz to the crimes." SHCR-01 at 556. Trial counsels' filings with the trial court are also elucidating. Trial counsel filed several motions for appointment of experts and obtained orders approving same. 1 CR 44 (order appointing Dr. Jolie Brams), 47 (order appointing Dr. John Roach), 83 (motion for appointment of expert for FASD), 86 (order appointing Dr. Connor), 109 (order appointing Dr. Brown), 110 (order appointing Dr. Adler), 112 (order appointing Dr. Singer), 142 (motion for appointment of expert on TDCJ classification), 145, 147 (motion for

47

appointment of forensic psychologist, Emily Fallis), 149; 4 CR 648 (motion for appointment of DNA expert, Robert Benjamin); 9 CR 1628 (the defense's preliminary list of expert witnesses naming twenty-seven witnesses). After the trial concluded, Mr. Heiskell submitted an affidavit to the trial court along with invoices for payment of experts. 12 CR 2213-14. Mr. Heiskell stated in the affidavit,

> This case [was] an unprecedented death penalty case as it involved litigating four (4) other shootings, two capital murders, and multiple other offenses in multiple jurisdictions. *Furthermore, Mr. Soliz's family and life history revealed an array of problems that mandated an extensive mitigation investigation, and an eventual week-long presentation during the punishment phase of trial. I had to engage numerous experts in the field of Fetal Alcohol Spectrum Disorder, as well as experts in attachment, neglect, and exposure to toxins.*

12 CR 2213 (emphasis in original). Mr. Heiskell listed the defense's experts and their compensation as follows:

- Trinity Mitigation (Mary Burdette) $13,008.88
- John Ladd, Investigator $10,203.36
- Dr. Natalie Brown $36,217.20
- Dr. Emily Fallis $12,900.00
- Dr. Paul Connor $12,802.53
- Dr. Richard Adler $17,441.70
- Larry Fitzgerald $4,151.39

12 CR 2213.

When Soliz raised this claim in his state habeas application, SHCR-01 at 36-48, the state court rejected the claim because it found that trial counsel

48

made a reasonable strategic decision to not expend limited resources on a false confessions expert.[20] SHCR-01 at 729. The state court found that trial counsel presented a similar case for suppression that a false confessions expert would have made without the assistance of a false confessions expert. SHCR-01 at 730. For example, trial counsel elicited testimony regarding the detectives' failure to ensure that Soliz was not suffering from the effects of sleep deprivation or drug use, which could have rendered him "more susceptible to suggestion by law enforcement." SHCR-01 at 730. The state court concluded that trial counsel were not deficient and that Soliz was not prejudiced by their performance because the suppression motion would have failed even with the benefit of the proffered expert testimony and because trial counsel made a reasonable strategic decision to not expend limited resources on a false confessions expert. SHCR-01 at 749-50. Rather, trial counsel reasonably expended effort and financial resources to develop a mitigation case centered on Soliz's FASD diagnosis. SHCR -01 at 750.

Soliz has not shown that the state court's rejection of this claim was unreasonable. Most importantly, as the Supreme Court has held, trial counsel

---

[20]   Importantly, the trial judge (the Honorable William C. Bosworth, Jr.) who presided over Soliz's trial also presided over Soliz's state habeas proceedings. Consequently, the judge was ideally situated to make credibility determinations. *Schriro v. Landrigan*, 550 U.S. 465, 476 (2007).

are "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107. As Mr. Heiskell's affidavit to the state habeas court makes clear, the defense team made a deliberate choice to not retain a false confessions expert because doing so was unnecessary in light of the "totality of the circumstances" of Soliz's confession. SHCR-01 at 556. Further, as Mr. Heiskell's filings with the trial court makes clear, trial counsel conducted an extensive investigation into the case, resulting in (at least preliminary) consultation with twenty-seven experts and payment to experts totalling more than $90,000. 9 CR 1628; 12 CR 2213. Soliz cannot demonstrate that trial counsels' strategic decision in regard to the allocation of limited resources was unreasonable. Consequently, he fails to show that trial counsel were deficient.

Soliz also fails to establish that he was prejudiced by trial counsels' failure to present testimony of a false confessions expert. As the state court found, trial counsel elicited the same type of testimony from the State's witnesses regarding the reliability of Soliz's confession as a false confessions expert would have presented. SHCR-01 at 730. As noted above, trial counsel extensively questioned Detectives Paine and Boetcher regarding methods of interrogation in which they had been trained and trial counsel made effective use of several books that covered the same topics addressed by Dr. DeClue. 5

50

RR 84-91. For example, trial counsel elicited testimony that the Reid Technique instructed officers to ask questions of a suspect to ensure the veracity of any statements the suspect might make. 5 RR 128. Trial counsel elicited testimony from the detectives that they did not ask Soliz whether he was sleep deprived, was taking any medication, or had any psychiatric history. 5 RR 131, 133-35. Trial counsel also elicited testimony that Soliz's drug use could render him suggestible. 5 RR 149-52; 6 RR 56. Further, trial counsel attempted to show that the detectives misled Soliz regarding the incriminating evidence they were in possession of, but Detective Paine testified that they did not mislead Soliz about the state of the evidence. 5 RR 154-55.

Further, Dr. DeClue asserted in his affidavit that Soliz's confession was unreliable because the detectives did not ask Soliz to provide details of Ms. Weatherly's murder in order to verify the confession and that the detectives told Soliz he would not face any more serious consequences if he admitted to shooting Ms. Weatherly rather than only admitting to having been present. SHCR-01 at 176-77, 179. But Soliz's confession was corroborated by extensive physical evidence as well as Elizabeth Estrada's testimony. Notably, Deputy Chief Medical Examiner Marc Krouse, testified that Ms. Weatherly was shot in the back of the head by a gun located from eight to ten inches away. 40 RR 216-18. That testimony was entirely consistent with Elizabeth Estrada's

testimony that Soliz admitted to her that he shot Ms. Weatherly in the head as she begged for her life. 44 RR 197.

Moreover, one of the detectives stated to Soliz during the interview that "it doesn't make a difference" whether Soliz or Ramos shot Ms. Weatherly. 11 CR 2183. One of the detectives also stated, "the main question that they want to clarify is that, if you shot the woman in Godley or he did. I don't know why it's important, but they think it is." 11 CR 2191. While Dr. DeClue takes issue with the detectives' questioning, the detectives were correct because Soliz's admissions already subjected himself to charges of capital murder. Even assuming Soliz's first version of the murder of Ms. Weatherly was accurate, Soliz had implicated himself as a party to the capital murder, which subjected Soliz to a charge of capital murder even if he did not commit the shooting. Tex. Penal Code § 7.02 (West 2016). Additionally, Soliz had already admitted to murdering Ruben Martinez. 11 CR 2158. That murder also constituted a capital murder, as Soliz admitted to stealing Mr. Martinez's wallet. 11 CR 2159; Tex. Penal Code § 19.03(a)(2).

But even if Soliz's confession was suppressed, there was extensive evidence implicating Soliz.[21] Physical evidence placed Soliz inside Nancy

---

[21]    Importantly, Soliz was charged with Nancy Weatherly's murder both as a principal and a party. 11 CR 2061-64.

Weatherly's home. 43 RR 120 (police officer's testimony that he collected a fingerprint from cassette tape case found in Ms. Weatherly's home); 44 RR 126 (medical examiner's testimony that the fingerprint on the cassette tape case was Soliz's). The gun that was used to kill Ms. Weatherly was found inside the stolen car in which Soliz fled from police prior to his arrest. 42 RR 121; 45 RR 150. Gunshot residue was found on Soliz's hands and clothing as well as inside the stolen car Soliz was driving when he fled from police and on the blue bandana recovered from inside that car. 45 RR 73-88. Elizabeth Estrada testified that Soliz admitted to her that he killed Nancy Weatherly and explained in detail how he did so. 44 RR 190, 195-97. Consequently, Soliz not only fails to show that his confession was false, he also fails to show that testimony from a false confessions expert during the suppression hearing would have resulted in a different outcome at trial. Therefore, he fails to show he was prejudiced by trial counsels' alleged deficiency.

Lastly, Soliz makes a cursory assertion that "trial counsel failed to specifically challenge the handwritten annotation that Soliz added to his second statement in which he claimed to have shot Weatherly. This annotation was particularly suspect because it contradicted the typed statement and was only added after repeated, insisted prodding by the interrogators." Petition at 24-25. Assuming Soliz intends to raise this argument as a claim, it is without

merit. He does not provide a basis on which trial counsel should have, or could have, successfully suppressed the handwritten confession. Consequently, Soliz's claim is conclusory and without merit.

Soliz has not rebutted the presumption that trial counsels' strategy was reasonable or the presumption afforded to the state court's findings. The state court's rejection of Soliz's claim was plainly reasonable under *Richter*. The state court rejected Soliz's claim that his trial counsel were ineffective for failing to present testimony of a false confessions expert and, for the reasons discussed above, Soliz has failed to show that the state court's rejection of the claim was unreasonable. Therefore, the claim should be denied. *Richter*, 562 U.S. at 99-102.

### C. Trial counsel effectively cross-examined Elizabeth Estrada.

Soliz next claims that trial counsel were ineffective for failing to impeach Elizabeth Estrada with her prior inconsistent statements. Petition at 31-42. Specifically, he claims that Estrada's trial testimony conflicted in various ways with her statement she provided to the police on October 28, 2010, the night Soliz and Estrada were arrested and that trial counsel should have impeached her testimony with the October 28, 2010 statement. Petition at 38-39. The claim is without merit.

54

### 1. Factual background

Elizabeth Estrada was a passenger in the stolen Stratus, which Soliz was driving when he attempted to flee from the police. 44 RR 176. Estrada testified that she was in the Varrio North Side gang, which was based in the north-side of Fort Worth. 44 RR 170. Soliz was in the Texas Syndicate gang but also associated with other gangs in the north-side of Fort Worth. 44 RR 173-74. Estrada testified that she was sexually involved with Soliz. 44 R 185. She was interviewed by the police after her arrest, but she did not tell the police everything she knew regarding Soliz's recent criminal activity because she was concerned for her safety and her two sons' safety. 44 RR 179-80, 208-09. Estrada testified that Soliz told her that he was committing crimes in the week prior to their arrest. 44 RR 183. She noticed blood on the passenger door of a truck Soliz had recently driven. 44 RR 184.

Prior to Soliz's and Estrada's arrest, Soliz told her he had shot a person at a Texaco gas station during a robbery because the victim only had ten dollars. 44 RR 190. Soliz told Estrada that he drove to the Texaco and that Ramos was in the passenger seat. 44 RR 190. Soliz said that he shot the victim (Ruben Martinez) in the neck. 44 RR 192. Soliz also told Estrada that he recently committed a drive-by shooting. 44 RR 193. Soliz also told Estrada that he had shot an "old lady." 44 RR 190. Regarding Soliz's murder of Ms.

Weatherly, Soliz told Estrada that he knocked on Ms. Weatherly's door while holding a gun. 44 RR 195. He said that he and Ramos took a jewelry box from Ms. Weatherly's home and that he killed Ms. Weatherly's horse. 44 RR 195. Soliz said that Ms. Weatherly was crying and begging for her life, but he told her to shut up. 44 RR 197. Ms. Weatherly begged Soliz to not take the jewelry because her mother had given it to her and her mother was dead. 44 RR 197. Soliz told her to go with her mother and shot Ms. Weatherly in the head. 44 RR 197.

Estrada also testified that during Soliz's attempt to flee from the police in the Stratus, Soliz held a gun and said he was going to shoot an officer or himself. 44 R 206. Estrada knocked the gun out of Soliz's hand. 44 RR 206. While at the police station, Soliz said he wanted to "ride or die" and called Estrada a "dumb ass bitch." 44 RR 208.

Estrada was released from police custody after giving a statement on the night of her arrest on June 30, 2010. 44 RR 209. She was later subpoenaed to testify in front of a grand jury, but she failed to appear and was subsequently arrested. 44 RR 209. Estrada testified that she was under the influence of drugs when she made her court appearance for failing to appear. 44 RR 210. She also had two pending unrelated misdemeanor charges at that time. 44 RR 210. An assistant district attorney (the same assistant district attorney who

56

prosecuted Soliz's capital murder case) later interviewed Estrada. 44 RR 212. The assistant district attorney recommended to the trial court that Estrada be released to probation with requirements to obtain treatment for bipolar disorder and to maintain contact with the district attorney's office. 44 RR 212. Instead, Estrada "disappeared." 44 RR 213. She was later charged with theft of a firearm, but she testified that she did not have a plea agreement regarding that charge. 44 RR 214.

On cross-examination, Estrada testified that she joined a gang at a young age and starting using drugs at that time. 44 RR 218-20. She denied that she testified against Soliz as part of an agreement with the district attorney's office regarding the charge of theft of a firearm. 44 RR 225, 255. She testified that she had known Ramos longer than she had known Soliz, and that Ramos had written her a letter saying he loved her. 44 RR 229, 233. She admitted to lying to the police when she provided a written statement on the night she was arrested. 44 RR 229-30. She admitted that her written June 30, 2010 statement amounted to perjury, but that she had not been charged with that offense. 44 RR 230-31.

### 2.   Trial counsel effectively cross-examined Estrada.

Soliz argues that trial counsel were ineffective in their cross-examination of Estrada for failing to elicit conflicts between her October 28,

2010, interview with the assistant district attorney and her testimony. Petition at 37-39. He argues trial counsel should have cross-examined Estrada on the following alleged inconsistences:

- Soliz telling her about the Ruben Martinez incident in a phone call changed to an in-person telling at Rosie Medina's home. (Compare Ex. 8 at 2 [Elizabeth Estrada Interview Transcript], with (44 RR at 194).)

- Soliz telling her that Ramos was sitting in the driver's seat of the car as a lookout for the Ruben Martinez incident changed to Ramos getting out of the car with Soliz during the incident. (Compare Ex. 8 at 2-3 [Elizabeth Estrada Interview Transcript], with (44 RR at 192, 267).)

- Soliz and Ramos going to the Texaco to get cigarettes changed to them going to Texaco because they were "gonna get Ruben." (Compare Ex. 8 at 2 [Elizabeth Estrada Interview Transcript], with (44 RR at 191).)

- Soliz telling her that he shot Ruben Martinez in the head changed to him telling her that he shot Martinez in the neck. (Compare Ex. 8 at 3 [Elizabeth Estrada Interview Transcript], with (44 RR at 192, 268).)

- Soliz telling her about the Ruben Martinez and Nancy Weatherly incidents in two separate conversations changed to Soliz telling her in one conversation. (Compare Ex. 8 at 3 [Elizabeth Estrada Interview Transcript], with (44 RR at 194).)

- Soliz telling Ramos to get a horse at Weatherly's house changed to Soliz saying that they had killed a horse. (Compare Ex. 8 at 4 [Elizabeth Estrada Interview Transcript], with (44 RR at 196).)

- Soliz "bust[ing] in the door" at Nancy Weatherly's home changed to him knocking at the door. (Compare Ex. 8 at 4 [Elizabeth Estrada Interview Transcript], with (44 RR at 195).)

58

- Estrada knowing someone named "Tat Man" as a person who lived on the west side of Fort Worth in an apartment who did tattoos— and who was supposed to tattoo Soliz the day of the arrest— changed to her not knowing "Tat Man" at all. (Compare Ex. 8 at 25-26 [Elizabeth Estrada Interview Transcript], with (44 RR at 199).)

- Soliz not saying who the shooter at the Pearl Street incident was and her specifically saying Soliz only said "they shot" changed to Soliz stating that he was the shooter at the Pearl Street Incident. (Compare Ex. 8 at 28-29 [Elizabeth Estrada Interview Transcript], with (44 RR at 193-94).)

Petition at 38-39. Soliz's claim is without merit.

In support of his claim, Soliz cites to two non-binding opinions where the courts found trial counsel to be ineffective for entirely foregoing cross-examination of prosecution witnesses. Petition at 39-40. But Soliz also concedes that "trial counsel attempted to discredit Estrada's testimony through other means." Petition at 37. Consequently, the authorities Soliz cites are inapposite.

Nonetheless, the manner in which trial counsel engages in cross-examination is a matter of trial strategy that is given a strong degree of deference. *Richter*, 562 U.S. at 109 ("There is a strong presumption that counsel's attention to certain issues to the exclusion reflects trial tactics rather than sheer neglect.") (quotation marks and citation omitted); *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983) (rejecting claim that trial counsel

were ineffective for failing to impeach witness with allegation of perjury because trial counsel's decision was a matter of trial strategy and the decision was not "so ill chosen that it permeated the entire trial with obvious unfairness"); *United States v. Hughes*, 635 F.2d 449, 452 (5th Cir. 1981) ("A defense counsel's strategy, which would include his asking or refraining from asking certain questions of witnesses, does not reach constitutional proportions."); *Thomas v. Thaler*, 520 F. App'x 276, 281 (5th Cir. 2013) ("[T]he district court in this case failed to indulge the possibility that counsel's silence during . . . cross-examination . . . might have been based on calculated trial strategy."). Soliz fails to show that trial counsels' cross-examination of Estrada was a matter of reasonable trial strategy.

As Soliz concedes, trial counsel attempted to discredit Estrada through cross-examination. Petition at 37. Trial counsel elicited testimony that Estrada began using drugs and inhaling paint when she was twelve-years old. 44 RR 221. Trial counsel impeached Estrada with her prior convictions. 44 RR 223. Further, trial counsel questioned Estrada regarding her relationship with Ramos in order to demonstrate that she was closer to Ramos than with Soliz and was motivated to testify in favor of Ramos. 44 RR 225-29. Indeed, trial counsel elicited testimony from Estrada that she and Ramos would do anything

for each other.[22] 44 RR 233, 246-47. Moreover, Estrada testified that she did not have a good memory due to her past drug use. 44 RR 248, 279. Trial counsel also asked Estrada whether her testimony was based on what she had been told by Ramos regarding Ms. Weatherly's murder. 44 RR 278. Estrada denied that her testimony was based on what Ramos had told her. 44 RR 278.

Trial counsel's cross-examination of Estrada was also consistent with their strategy of focusing on presenting a strong case in mitigation based on Soliz's chaotic upbringing, which led to Soliz joining a gang and using drugs at a young age. For example, trial counsel elicited testimony from Estrada regarding growing up in a gang environment, which often leads to drug use at a young age, and the effects of methamphetamine use. 44 RR 243. She testified that young people in gangs often do not have adult supervision. 44 RR 219. Trial counsel also questioned Estrada regarding her comment during the October 28, 2010 interview that Soliz was mentally "sick." 44 RR 237-38.

In light of the above, Soliz has failed to show that trial counsel's cross-examination of Estrada was the product of sheer neglect. Rather, as the record shows, trial counsel engaged in an effective cross-examination of Estrada in an attempt to discredit her based on (1) her pending criminal charges, (2) her prior

---

[22]     Estrada testified that she and Ramos would "cut for" each other, meaning they would do anything for each other. 44 RR 173.

61

convictions, (3) her poor memory caused by drug use, and (4) her close relationship with Ramos.

Additionally, Estrada's October 28, 2010 interview was highly incriminating of Soliz and included several details of Soliz's offenses. It would have been entirely reasonable for trial counsel to forego impeaching Estrada's testimony with minor inconsistencies with the October 28, 2010 statement, in order to avoid encouraging the prosecutor to, in turn, bolster Estrada's testimony with the numerous incriminating comments in Estrada's interview. *Pinholster*, 563 U.S. at 196 (stating that a court must "affirmatively entertain the range of possible" reasons trial counsel "may have had for proceeding as they did"). Soliz fails to show that such a strategy would have been unreasonable.

Moreover, Soliz fails to show that the proffered cross-examination would have changed the outcome of his trial. Petition at 38-39. Most importantly, the purported inconsistencies between Estrada's October 28, 2010 interview and her testimony were either not inconsistent or were minimal and peripheral. For example, Soliz asserts that Estrada's interview and testimony were inconsistent in that Estrada changed her account of what Soliz told her happened prior to Soliz's murder of Ruben Martinez. Petition at 38. But in Estrada's October 28, 2010 interview, she stated that Soliz told her that he,

Ramos, and Rosie drove to the gas station. SHCR-01 at 258. Soliz told Ramos to drive the car into an alley. SHCR-01 at 258. Soliz then left the car and "Joe and Rosie were looking out." SHCR-01 at 258-59. Estrada testified at trial that Soliz told her that he and Ramos both left the car. 44 RR 192. Estrada was not asked, and did not state during her October 28, 2010 interview, whether Soliz told her that Ramos eventually did leave the car during the robbery and murder of Ruben Martinez. SHCR-01 at 258-59. Moreover, Soliz's stated in his first written statement that Ramos exited the car. SX 2.

Soliz also asserts that Estrada's interview and testimony were inconsistent in that she stated during her interview that Soliz told her that he and Ramos went to the Texaco gas station to get cigarettes, but testified at trial that Soliz told her that he and Ramos went to the Texaco gas station to "get Ruben," who Soliz called the "Budweiser man." Petition at 38. Estrada stated during her interview that Soliz told her that he and Ramos went to the gas station to get cigarettes, but Soliz noticed the delivery truck parked there and Soliz decided to rob the delivery driver. SHCR-01 at 258. The exculpating value of Estrada's statement during her interview that Soliz and Ramos were initially intending to buy cigarettes is simply non-existent. Indeed, Estrada stated later in her interview that Soliz told her that he and Ramos only planned to rob Ms. Martinez after they saw the Budweiser man." SHCR-01 at

63

284. Moreover, Soliz stated in his first written statement that he and Ramos went to the gas station to get cigarettes but then developed the plan to rob the delivery truck driver. SX 2. Regardless of whether Soliz and Ramos initially intended to only buy cigarettes, the fact is that Soliz and Ramos stopped at the gas station with the intent to rob Ruben Martinez.

Similarly, Soliz asserts that Estrada's interview and testimony were inconsistent in that she stated during her interview that Soliz told her that he shot Ruben Martinez in the head, but testified that Soliz told her he shot Ruben Martinez in the neck. Petition at 38. Again, the impeaching, exculpating, or mitigating value of such an inconsistency is exceedingly minimal. Indeed, the jury was aware that Soliz had been similarly inconsistent because he told the police during *his* interview that he shot Ruben Martinez "in the neck" or the "[h]ead area." 11 CR 2173.

Soliz also asserts that Estrada's interview and testimony were inconsistent in that she stated during her interview that Soliz did not tell her who the shooter was in the Pearl Street shooting, but testified at trial that Soliz told her he was the shooter. Petition at 38-39. But Estrada stated in her interview that "everybody" knew Mark was involved in that shooting "[b]ecause he bragged about everything he did." SHCR-01 at 29-30. And she

64

testified that Soliz, Ramos, and Ponza were involved in the shooting. 44 RR 194.

Further, some of Estrada's testimony was less harmful to Soliz than her October 28, 2010 interview. For instance, she stated during the interview that Ramos did not want to participate in the burglary of Ms. Weatherly's home but Soliz made Ramos participate. SHCR-01 at 260. Estrada also stated during her interview that Soliz "busted in" Ms. Weatherly's door, but testified at trial that Soliz knocked on the door. SHCR-01 at 260; 44 RR 195. Estrada also talked at length during her interview regarding her fear that Soliz would kill her and Ramos because Soliz feared they would "snitch." SHCR-01 at 263-67, 288.

More importantly, none of the alleged inconsistencies casts any doubt as to the veracity of Estrada's testimony regarding Soliz's involvement in either murder or any of the numerous other offenses. Estrada provided details in her interview with the assistant district attorney that she could have only learned from Soliz.[23] The minor inconsistencies would not have caused the jury to doubt that Soliz was involved in the offenses or doubt that Soliz was the shooter in

---

[23]   For example, Estrada stated during her interview that Soliz told her that he and Ramos stole a jewelry box from Ms. Weatherly and that Ms. Weatherly was shot in the head. SHCR-01 at 260. Further, Estrada stated during her interview that Soliz told her that he shot Mr. Martinez because he only had ten dollars in his wallet. SHCR-01 at 259. Estrada also knew that Ms. Weatherly's stolen property had been pawned. SHCR-01 at 279.

the murders of Mr. Martinez or Ms. Weatherly. That is especially true where the physical evidence and Soliz's statements to the police corroborated Estrada's testimony regarding Soliz's criminal activity, including his shooting of Mr. Martinez and Ms. Weatherly. As a result, trial counsel could not have been deficient for not impeaching Estrada's testimony with her statements during her October 28, 2010 interview where the impeaching value of those statements was minimal and where doing so likely would have caused the prosecutor to further bolster Estrada's testimony with her prior consistent statements from that interview. For the same reasons, Soliz cannot show that he was prejudiced by trial counsels' failure to elicit minimal inconsistencies between Estrada's testimony and earlier interview.

The state habeas court rejected this claim. SHCR-01 at 731, 750-51. For the reasons discussed above, Soliz has failed to show that the state court's rejection of the claim was unreasonable. Therefore, the claim should be denied. *Richter*, 562 U.S. at 99-102.

### D. Trial counsel were not ineffective for failing to object to Detective Paine's testimony on the ground that the testimony violated Soliz's right to confrontation.

Soliz next claims that trial counsel were ineffective for failing to object on confrontation grounds to Detective Paine's testimony regarding statements Ramos made to him that led to the police's discovery of Ms. Weatherly's stolen

truck and, later, her body. Petition at 42-49. Specifically, Soliz claims that Detective Paine provided inadmissible hearsay testimony when he testified that Ramos responded to questions regarding the Jorge Contreras truck robbery by referring to a female victim and by saying that the robbery "didn't have to end that way." Petition at 43-46. The claim is without merit.

### 1.    Factual background

Detective Paine testified regarding the investigation into Soliz's offenses and how the police came to learn of Ms. Weatherly's murder. 40 RR 165-97; 41 RR 7-33. As a part of Detective Paine's investigation, he interviewed Ramos and Soliz following their arrests. 41 RR 25-29. Ramos was interviewed first. 5 RR 82. Detective Paine testified that, prior to interviewing Ramos and Soliz, the police were unaware of Ms. Weatherly's murder. 41 RR 26.

Detective Paine testified that he reviewed offense reports of recent robberies with Ramos in order to determine whether Ramos was involved in the offenses. 41 RR 26. Detective Paine asked Ramos if he was involved in the Jorge Contreras truck robbery, and Ramos answered that he was and that the robbery "didn't have to end that way." 41 RR 27. Detective Paine reviewed that offense report and noted that no one had been injured during that robbery. 41 RR 27-28. Ramos's answers confused Detective Paine due to the discrepancy between the Jorge Contreras offense report and Ramos's answers. 41 RR 28.

Detective Paine asked Ramos to explain what happened, and Ramos referred to a female. 41 RR 29. Detective Paine again noted a discrepancy, because no female victim was involved in the Jorge Contreras truck robbery. 41 RR 29. He then asked Ramos where the stolen truck was located, and officers were later able to locate the truck based on Ramos's answer. 41 RR 29. After locating the truck, officers then determined that the truck belonged to Ms. Weatherly. 41 RR 32. Officers were then sent to Ms. Weatherly's home, where her body was found. 41 RR 32-36.

## 2.    The Confrontation Clause

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The Confrontation Clause generally bars witnesses from reporting the out-of-court testimonial statements of nontestifying declarants." *Taylor v. Cain*, 545 F.3d 327, 335 (5th Cir. 2008) (citing *Crawford v. Washington*, 541 U.S. 36, 54-56 (2004)). Statements taken during police officers in the court of interrogations are testimonial. *Davis v. Washington*, 547 U.S. 813, 822 (2006). Further, statements made in the course of a police interrogation are testimonial where the "primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id*. But the Confrontation Clause does not bar witnesses from reporting nontestimonial statements of

68

nontestifying declarants. *United States v. Holmes*, 406 F.3d 337, 348 (5th Cir. 2005).

Moreover, the Supreme Court has held that the Confrontation Clause does not bar testimonial statements that are used for purposes other than to establish the truth of the matter asserted. *Michigan v. Bryant*, 562 U.S. 344, 367 (2011); *Crawford*, 541 U.S. at 59 n.9 ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."); *Tennessee v. Street*, 471 U.S. 409, 414 (1985); *see United States v. Acosta*, 475 F.3d 677, 683 (5th Cir. 2007). Thus, no confrontation violation occurs where, for example, a police officer testifies as to a hearsay statement, not for the purpose of establishing the truth of the matter asserted, but for the purpose of showing what actions the police officer took after hearing the statement. *Street*, 471 U.S. at 414; *United States v. Evans*, 950 F.2d 187, 190-91 (5th Cir. 1991); *United States v. Martin*, 897 F.2d 1368, 1371 (6th Cir. 1990) ("The context of [Special Agent] Bell's testimony supports the determination that the assertion of the other person was offered for the limited purpose of explaining how and why the investigation began."); *United States v. Durham*, 176 F.3d 478 (5th Cir. 1999) (unpublished) (holding that admission of statements of confidential informant did not violate the Confrontation Clause because the statements were "offered to show only why

69

law enforcement officials took certain actions"). Indeed, the Fifth Circuit has "consistently held" that out of court statements providing background information to explain the actions of investigators are not hearsay as they are not offered for the truth of the matter asserted.[24] *United States v. Smith*, 822 F.3d 755, 761 (5th Cir. 2016); *see United States v. Carrillo*, 20 F.3d 617, 620 (5th Cir. 1994).

Further, while "[p]olice officers cannot, through their trial testimony, refer to the substance of statements given to them by nontestifying witnesses in the course of their investigation, when those statements inculpate the defendant," the Confrontation Clause is only implicated where the statement is offered for the truth of the matter asserted. *Taylor*, 545 F.3d at 335. Additionally, the Supreme Court has held that no Confrontation Clause violation occurs through the introduction of a non-testifying co-defendant's confession where the confession does not, on its face, implicate the defendant and where the co-defendant's confession incriminates the defendant only when linked with other evidence introduced at trial. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987); *Smith*, 822 F.3d at 761.

---

[24]     Texas law has also long recognized that statements are not hearsay if they are not admitted to explain how a defendant became a suspect or how the investigation focused on the defendant. *Dinkins v. State,* 894 S.W.2d 330, 347 (Tex. Crim. App. 1995).

70

### 3. Detective Paine's testimony was not objectionable because it did not violate the Confrontation Clause.

Trial counsel were not ineffective because Detective Paine's testimony was not objectionable. First, Detective Paine's testimony did not violate the Confrontation Clause because Ramos's statements to Detective Paine were not offered for the truth of the matter asserted. Ramos's complained-of statements as relayed by Detective Paine were his reference to a female and his statement that the Jorge Contreras truck robbery "didn't have to end that way." Petition at 43-45. It goes without saying that Ramos's mere reference to a female could not have been offered for the truth of the matter asserted. Further, Ramos's statement "it didn't have to end that way" could not have been offered for its truth because Ramos's statement was incorrect. Critically, Detective Paine had asked Ramos about the Jorge Contreras truck robbery, which did not involve a shooting or murder. Ramos's response that "it didn't have to end that way," then, necessarily could not have been offered to prove the truth of the matter asserted because Ramos was mistaken as to the offense Detective Paine had referred. *See United States v. Holmes*, 406 F.3d 337, 349 (5th Cir. 2005) (holding that no confrontation violation occurred where out-of-court testimonial statement was offered to establish its falsity rather than its

truthfulness). Consequently, Detective Paine's testimony was not objectionable because it did not violate the Confrontation Clause.

Further, the purpose of the introduction of Ramos's statements was to show how the police came to learn for the first time of the capital murder, not to prove the truth of the matters asserted. Again, no confrontation violation occurs where a statement is offered the purpose of showing what actions the police officer took after hearing the statement. *Street*, 471 U.S. at 414; *Smith*, 822 F.3d at 761; *Carrillo*, 20 F.3d 617, 620; *Evans*, 950 F.2d at 190-91; *Martin*, 897 F.2d at 1371; *Durham*, 176 F.3d at 478. Consequently, Detective Paine's testimony was not objectionable because it did not implicate the Confrontation Clause.

Additionally, Ramos's statements as relayed by Detective Paine did not inculpate Soliz. The statements did not on their face identify Soliz as the shooter in Ms. Weatherly's murder, let alone identify Soliz as being involved at all in that offense. Ramos's statements, taken alone, did not implicate Soliz in any way. The only implication of Soliz through the statements required linkage to other evidence introduced at the trial. As a result, no Confrontation Clause error occurred. *Marsh*, 481 U.S. at 208; *Smith*, 822 F.3d at 761. Further, Ramos's statement "it didn't have to end that way" could be taken to mean that he had committed a robbery by himself that had gone wrong.

72

Consequently, Detective Paine's testimony was not objectionable because it did not implicate the Confrontation Clause.

For these reasons, trial counsel were not deficient for failing to make a futile objection to Detective Paine's testimony. Therefore, Soliz's claim fails.

Lastly, Soliz fails to show that he was prejudiced by trial counsels' failure to object to Detective Paine's testimony on confrontation grounds. As noted above, Ramos's statements as relayed by Detective Paine did not implicate Soliz in Ms. Weatherly's murder. Ramos's statements could only implicate Soliz in conjunction with other evidence showing Soliz's guilt. And as discussed above, the evidence of Soliz's guilt was overwhelming. Consequently, he cannot show that he was prejudiced by trial counsels' failure to object to Detective Paine's testimony.

The state habeas court rejected this claim, finding that an objection to Detective Paine's testimony on confrontation grounds would have been futile. SHCR-01 at 732, 742-43. For the reasons discussed above, Soliz fails to show that the state court's rejection of this claim was unreasonable. Therefore, Soliz's claim should be denied. *Richter*, 562 U.S. at 99-102.

### E.   Trial counsel were not ineffective for failing to object during the guilt/innocence phase of trial to testimony that Soliz belonged to a gang.

Soliz claims that trial counsel were ineffective for failing to object during Detective Jesus Alaniz's testimony that Soliz was a member of a gang. Petition at 53-59. For the reasons discussed below, the claim should be denied.

### 1.   Factual background

Detective Alaniz testified that at the time of Ms. Weatherly's murder, he worked in the Fort Worth Police Department's Gang Enforcement Unit and was assigned to the north-side of Fort Worth. 39 RR 40-41. In the time shortly before Soliz's arrest, Detective Alaniz became involved in the investigation into several robberies that had occurred in north Fort Worth. 39 RR 52. He was informed that the individual committing the robberies may have had "gang ties" and may be known by the nickname Kilo. 39 RR 53. Detective Alaniz searched the Gang Intelligence files and found two matches for the nickname Kilo: Soliz and Ramos. 39 RR 54-55. He learned that Soliz was affiliated with the gangs Varrio North Side and Texas Syndicate. 39 RR 63. Detective Alaniz later assisted in the search for Soliz and the Dodge Stratus he stole from Sammy Abu-Lughod. 39 RR 59-60. Detective Alaniz learned that the car had been seen but soon lost near the location of a house belonging to a known gang member, Arturo Gonzalez. 39 RR 61-63. Detective Alaniz waited near that

74

house and soon saw the Stratus and another car driving from the location. 39 RR 65-66. He and other officers effectuated a traffic stop soon thereafter during which Ramos was arrested. 39 RR 68-71.

### 2. Trial counsel were not ineffective for failing to object to Detective Alaniz's testimony.

Soliz's claim that trial counsel were ineffective for failing to object to Detective Alaniz's testimony that Soliz belonged to a gang fails for several reasons. First, Soliz's claim fails because the state court's conclusion that trial counsel were not deficient was based on its binding interpretation of state law. Specifically, the state court held that the testimony that Soliz belonged to a gang was admissible under Texas Rules of Evidence 401 and 404. SHCR-01 at 754-55. The state court's determination of state law in this regard is dispositive of Soliz's claim of ineffective assistance. *Charles v. Thaler*, 629 F.3d 494, 500-01 (5th Cir. 2011) (rejecting claim that trial counsel were ineffective for failing to object to testimony because state court held that the testimony was admissible under state law and "a federal habeas court may not conclude otherwise"). Consequently, Soliz's IATC claim necessarily fails.

Second, to the extent Soliz's claim in this Court is premised on the argument that trial counsel were ineffective for failing to object to the evidence of Soliz's gang membership on the basis that it was inadmissible under federal

law, such an argument is unexhausted because it was not raised in Soliz's state habeas application.[25] SHCR-01 at 65-70; *Baldwin v. Reeese*, 541 U.S. 27, 29-32 (2004) (rejecting the argument that a petitioner "fairly presents" to the state court a federal claim despite failing to give any indication in his appellate brief of the federal nature of the claim through reference to any source of law). Soliz only argued in his state habeas application that the evidence of his gang membership was inadmissible, and therefore objectionable, under state law. SHCR-01 at 67-69. Consequently, this claim is unexhausted to the extent it is based on the argument that trial counsel were ineffective for failing to object to Detective Alaniz's testimony as being inadmissible under federal law.

Nonetheless, Soliz's claim is without merit. Soliz complains that trial counsel were ineffective for failing to object to Detective Alaniz's testimony that Soliz was a member of a gang on the basis that the testimony was inadmissible because it was irrelevant and only offered to prove Soliz's bad character. Petition at 56-58 (citing Tex. R. Evid. 402, 404). On the contrary, the testimony was admissible and trial counsel exercised reasonable trial strategy in deciding not to object to it.

---

[25]    For example, Soliz did not (and does not in this Court) argue that evidence of his gang membership violated his First Amendment rights.

"Under Texas law, to prove the relevance of a defendant's membership in an organization or group, the State must show (1) proof of the group's violent and illegal activities and (2) the defendant's membership in the organization." *Tamez v. Director*, 550 F. Supp.2d 639, 655 (E.D. Tex. 2008) (citing *Mason v. State*, 905 S.W.2d 570, 577 (Tex. Crim. App. 1995)). Detective Alaniz testified that the Gang Enforcement Unit routinely patrolled the north side of Forth Worth at night from 6:00 p.m. to 4:00 a.m. because "that was the time when most of [the] violent crimes or most of [the] gang-related crimes were more likely to occur." 39 RR 48. The gang activity in the north side of Fort Worth involved gang-on-gang robberies, drive-by shootings, and retaliations. 39 RR 49. Thus, Detecive Alaniz's testimony showed the gangs' violent and illegal activities. *Tamez*, 550 F.Supp.2d at 655. Further, Detective Alaniz testified that Soliz belonged to the Varrio North Side and Texas Syndicate gangs. 39 RR 63. Therefore, Detective Alaniz's testimony established Soliz's gang membership. Consequently, Detective Alaniz's testimony was admissible. *Tamez*, 550 F.Supp. 2d at 655. Additionally, Detective Alaniz's testimony was offered to show how Soliz was identified and became a suspect in Ms. Weatherly's murder. Therefore, Detective Alaniz's testimony was not objectionable. SHCR-01 at 754. Trial counsel cannot have been ineffective for failing to make a futile objection.

77

Moreover, it is clear that trial counsel chose to not object to Detective Alaniz's testimony as a part of their strategy to present as compelling a case in mitigation as possible. SHCR-01 at 556-57. As Mr. Heiskell averred in his affidavit to the state habeas court, trial counsel were aware that the evidence against Soliz was overwhelming.[26] SHCR-01 at 556. Knowing that, trial counsel pursued a strategy of demonstrating to the jury that Soliz suffered from FASD and a chaotic upbringing and detailing to the jury the effects on Soliz. SHCR-01 at 556; 12 CR 2213. Trial counsel sought to explain that Soliz was exceptionally vulnerable to the influences of gang life at a young age due to his family members' drug use and neglect. This strategy ran through both phases of trial. 38 RR 38-43 (trial counsels' opening statement at guilt/innocence regarding Soliz's PFAS, his chaotic upbringing, and his drug use and asserting that those factors caused Soliz to engage in criminal activity), 231-36 (trial counsel's cross-examination of Sammy Abu-Lughod emphasizing that Soliz's robbery of Abu-Lughod took place in daylight with

---

[26]     Although trial counsel's affidavit does not explicitly reference their decision to not object to the admission of evidence that Soliz was a member of a gang, the record reflects their strategy to use that evidence to bolster their mitigation case. *See Richter*, 562 U.S. at 109 ("Although courts may not indulge post hoc rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect.") (citation and quotation marks omitted).

witnesses nearby and that Soliz made a "crazy" comment as he drove away in Abu-Lughod's car); 39 RR 11-13 (trial counsel's cross-examination of Officer Jerry Cedillo asking whether the abuse of drugs can lead an individual to become delusional or commit crimes); 39 RR 85-95, 110-13, 119-20 (trial counsel's cross-examination of Detective Alaniz regarding the risk factors that lead a young person to join a gang); 41 RR 89-90 (Detective Paine's testimony on cross-examination that Ramos invoked his right to counsel and refused to sign a statement and that Ramos said that Soliz was "not all there mentally"), 100 (Detective Paine's testimony that criminals take advantage of others to act on their behalf); 42 RR 32-38 (Detective Paine's testimony on cross-examination that Ramos gave the gun used in the shootings to Soliz and that Ramos was an active participant in the offenses); 45 RR 215 (trial counsel stating during cross-examination of Detective John Lewallen that Soliz's breaking glass with his hand while breaking into a house was "not the brightest thing to do"); 47 RR 56-62 (trial counsel's closing argument that Ramos was more intelligent than Soliz and that the police talked Soliz into confessing).

A review of trial counsels' cross-examination of Detective Alaniz also bears out this strategy. For example, trial counsel elicited testimony that gangs prey on young people and typically exploit youths who do not have a father and

individuals with mental health problems. 39 RR 89-90, 119-29. Further, a young person with siblings in gangs or are neglected by their parents are at risk of joining a gang because they seek confirmation from others and gang membership provides them confirmation. 39 RR 90. Young people who are bullied are also at risk for joining a gang because a gang might provide them protection. 39 RR 110-13. Trial counsel also elicited testimony from Detective Alaniz that the Forth Worth Police Department has a program aimed at intervening in at-risk youths to prevent them from joining a gang. 39 RR 92.

Trial counsel used the fact that Soliz belonged to a gang to bolster its case in mitigation by arguing that Soliz's upbringing and PFAS led him to join a gang and that he was essentially helpless from the influence of gang culture. Such a strategy was entirely consistent with trial counsels' effort to focus on a compelling and overwhelming showing of mitigation during the punishment phase of trial by showing the effects of Soliz's upbringing and FASD. In light of the overwhelming evidence of Soliz's guilt, Soliz fails to rebut the presumption that trial counsels' strategy was reasonable.

Further, Soliz fails to show he was prejudiced by trial counsels' failure to object to the testimony that Soliz was a member of a gang. As discussed above, the evidence of Soliz's guilt was overwhelming. Consequently, this claim should be denied. *Henderson v. Cockrell*, 333 F.3d 592, 602-03 (5th Cir. 2003)

(rejecting claim that trial counsel were ineffective for failing to object to gang-membership testimony because petitioner failed to establish prejudice in light of overwhelming evidence of guilt).

The state habeas court rejected this claim, concluding that trial counsel were not deficient and that Soliz was not prejudiced by the alleged deficiency. For the reasons discussed above, Soliz fails to show that the state court's denial of this claim was unreasonable. Consequently, the claim should be denied. *Richter*, 562 U.S. at 99-102.

### F.   Trial counsel were not ineffective for failing to object to the admission during the guilt/innocence phase of trial of extraneous offense evidence.

Soliz next claims that trial counsel were ineffective for failing to object to the introduction during the guilt/innocence phase of trial of extraneous offense evidence. Petition at 59-71. The claim is without merit.

### 1.   Factual background

Prior to trial, the State indicated it intended to introduce evidence regarding three extraneous offenses Soliz had committed during his crime spree leading to his murder of Ms. Weatherly: (1) the Circelli's home burglary during which Soliz stole the gun he used to kill Ms. Weatherly, (2) the Sammy Abu-Lughod armed robbery during which he stole the car the police later sought and identified as the car Soliz had been driving during several offenses,

and (3) Soliz's evading arrest in the stolen car. 38 RR 12-13. Trial counsel stated they had no objection to the introduction of those offenses. 38 RR 13. Trial counsel also stated they were not making a motion in limine regarding Soliz's other extraneous offenses. 38 RR 14. During opening argument, trial counsel told the jury that Soliz "went on a crime spree." 38 RR 42.

The evidence introduced during the guilt/innocence phase of trial regarding Soliz's extraneous offenses was introduced as follows: the State presented the testimony of Chelsea and Vincent Circelli, who testified that several guns were stolen from their house during a burglary. 38 RR 55, 95-96. Several witnesses testified regarding Soliz's robbery of Sammy Abu-Lughod and the police investigation into that offense. 38 RR 182-87, 192-95, 210-36, 243-50. Officer Jerry Cedillo testified that he was dispatched to investigate the Ruben Martinez and Enrique Samaniego shootings and was later dispatched to search for Sammy Abu-Lughod's stolen Stratus. 38 RR 254-75. Later, Officer Cedillo assisted in the search for Ms. Weatherly's stolen truck and was dispatched to Ms. Weatherly's home where he found her body. 38 RR 269-75. On cross-examination, trial counsel asked Officer Cedillo questions regarding the Justin Morris, Luis Luna, Enrique Samaniego, and Kenny Dodgin shootings, the Ruben Martinez murder, the Sammy Abu-Lughod and Jorge Contreras robberies, a drive-by shooting, and a robbery that occurred outside

of a bar. 39 RR 15-24. Officer Robert Presney testified regarding his assistance in the investigations of the Jorge Contreras robbery, a drive-by shooting, and the Kenny Dodgin shooting. 39 RR 248-61; 40 RR 9-40.

Detective Danny Paine then testified as to his involvement in the investigation of several robberies and shootings that were connected to Soliz. 40 RR 165-71, 81-97. Detective Paine testified that the investigation eventually showed that eleven offenses had been "linked together." 40 RR 197; 41 RR 7-8. The State introduced a timeline of events that listed offenses that Soliz committed. SX 184. Trial counsel did not object. 41 RR 46.

Jennifer Nollkamper, a forensic scientist, testified that the gun recovered from the stolen Stratus Soliz was driving prior to his arrest was the same gun used in the Kenny Dodgin and Enrique Samaniego shootings and the drive-by shooting. 42 RR 121. Lannie Emanuel, a firearm examiner testified that the same gun was used in both the Enrique Samaniego shooting and the murder of Ms. Weatherly. 45 RR 138, 150. Elizabeth Estrada testified that Soliz admitted to her that he killed Ruben Martinez. 44 RR 190. Officer David Wallace and Detective John Lewallen testified that they investigated a burglary of an unoccupied home and that Soliz's blood was recovered from that crime scene. 45 RR 168, 206.

During closing argument, trial counsel admitted that Soliz was present during the offenses and was not innocent. 47 RR 60. Rather, trial counsel argued to the jury that it should find Soliz guilty of only murder and not capital murder because the State relied heavily on the testimony of Ramon Morales and Elizabeth Estrada, both of whom were unreliable witnesses. 47 RR 60-61. Further, trial counsel argued that the jury should find Soliz guilty of only murder because the evidence showed that Ramos was the more "cunning" and conniving" of the two. 47 RR 62.

During the state habeas proceedings, Mr. Heiskell provided an affidavit explaining trial counsels' decision to not object to the admission of Soliz's extraneous offenses. SHCR-01 at 556-57. As noted above, trial counsel recognized that the evidence of Soliz's guilt was overwhelming. SHCR-01 at 556. As a result, trial counsel focused on presenting a compelling case in mitigation. SHCR-01 556. Further, trial counsel "did not object to the extraneous offenses coming in during the guilt/not guilty phase as [they] wanted to set the stage for [their] mitigating evidence and, therefore, not dilute [their] mitigation presentation during the punishment phase." SHCR-01 at 557.

### 2. Trial counsel were not ineffective for failing to object to the extraneous-offense evidence.

Soliz's claim that trial counsel were ineffective for failing to object to the indtroduction of extraneous offense evidence fails for several reasons. First, Soliz's claim fails because the state court's conclusion that trial counsel were not deficient was based on its binding interpretation of state law. Specifically, the state court held that the testimony that Soliz belonged to a gang was admissible under Texas Rule of Evidence 404. SHCR-01 at 755-56. The state court's determination of state law in this regard is dispositive of Soliz's claim of ineffective assistance. *Charles*, 629 F.3d at 500-01 (rejecting claim that trial counsel were ineffective for failing to object to testimony because state court held that the testimony was admissible under state law and "a federal habeas court may not conclude otherwise"). Consequently, Soliz's IATC claim necessarily fails.

Further, Soliz has failed to show that the state court unreasonably rejected this claim. As noted above, trial counsel made a deliberate decision not to object to the admission during the guilt/innocence phase of trial of the extraneous-offense evidence. SHCR-01 at 756-57. As the Supreme Court has stated, "[a]ttorneys representing capital defendants face daunting challenges in developing trial strategies, not the least because the defendant's guilt is

85

often clear." *Florida v. Nixon*, 543 U.S. 175, 191 (2004). In such cases, "the gravity of the potential sentence . . . and the proceeding's two-phase structure vitally affect counsel's strategic calculus" such that "avoiding execution [may be] the best and only realistic result possible."[27] *Id.* at 190-91 (citation omitted). Further, a "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Woodward v. Epps*, 580 F.3d 318, 329 (5th Cir. 2009) (citation omitted); *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir. 1997).

In light of this, counsel is not ineffective for permitting the admission of evidence of the defendant's extraneous offenses in order to "defuse the impact of that evidence when it would have otherwise been admitted during the punishment phase of trial." *Brown v. Dretke*, 2004 WL 2793266, at *35 (W.D. Tex. 2004) (unpublished). Counsel may even be effective while *conceding* the defendant's guilt during the guilt/innocence phase of trial. *See Woodward*, 580 F.3d at 328; *Stenson v. Lambert*, 504 F.3d 873, 891 (9th Cir. 2007) ("When the evidence against a defendant in a capital case is overwhelming and counsel

---

[27] The Supreme Court in *Nixon* noted that "defense counsel must strive at the guilt phase to avoid a counterproductive course." 543 U.S. at 192. An example of such a "counterproductive course" would be logically inconsistent presentations arguing during the guilt/innocence phase that the defendant "didn't do it" but then arguing in mitigation that the defendant was "sorry he did it." *Id.* 191-92.

concedes guilt in an effort to avoid the death penalty, 'counsel cannot be deemed ineffective for attempting to impress the jury with his candor.'") (citation omitted).

As discussed above, trial counsels' overarching strategy was to demonstrate to the jury that Soliz suffered from FASD and a chaotic upbringing and to detail to the jury the effects on Soliz. SHCR-01 at 556; 12 CR 2213. Trial counsel sought to show the jury that his FASD and his upbringing led directly to his criminal behavior and sought to utilize the extent of his criminal behavior as a means of demonstrating how horrendous his upbringing was. Moreover, trial counsel sought to prevent the State from "diluting" its mitigation presentation by front-loading the extraneous-offense evidence during the guilt/innocence phase of trial. SHCR-01 at 557. Indeed, trial counsels' strategy proved effective in that the State presented only six witnesses during the punishment phase to testify regarding Soliz's extraneous offenses that were committed prior to Ms. Weatherly's murder. 48 RR 156-59 (Officer Presney's testimony regarding Soliz's shooting of Luis Luna); 49 RR 5-12 (Kenny Dodgin's testimony regarding Soliz's attempted robbery of him in a parking lot), 19-28, 67 (Officer Kenneth Robinson's testimony regarding Ruben Martinez and Enrique Samaniego's conditions following their shootings), 73-88 (Arnold Dominquez's testimony regarding Soliz's shooting of Ruben

87

Martinez); 50 RR 9-26 (testimony of trauma director at JPS hospital regarding Ruben Martinez's injuries and death); 56 RR 30-37 (Lisa Martinez's testimony regarding her husband, Ruben's, murder), 42-49. Approximately twenty witnesses testified during the guilt/innocence phase regarding Soliz's extraneous offenses. The State's punishment-phase witnesses also provided comparatively limited testimony regarding the extraneous offenses when compared to the testimony at the guilt/innocence phase of trial.

Trial counsels' strategy was a plainly reasonable attempt to desensitize the jury to Soliz's extraneous offenses of which they would undoubtedly be informed in the punishment phase. The jury's learning of those extraneous offenses in the guilt/innocence phase, as discussed above, provided trial counsel with a less "diluted" mitigation presentation that gave Soliz a greater chance of receiving a more favorable verdict during the punishment phase. That the jury's verdict was not more favorable does not demonstrate that trial counsel were deficient. *Strickland*, 466 U.S. at 689 (stating that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight"). Even if trial counsels' strategy would likely not result in a more favorable guilt/innocence verdict, the strategy was a plainly reasonable one in attempting to secure a life sentence. Trial

counsels' strategy was plainly reasonable. *See Brown*, 2004 WL 2793266, at *35. Soliz's claim should, therefore, be denied.

Further, Soliz fails to show that he was prejudiced by trial counsels' decision to not object to the admission of the extraneous offense evidence. As discussed above, the evidence of Soliz's guilt was overwhelming. Even without the extraneous-offense evidence, the jury knew Soliz had confessed to killing Ms. Weatherly and had admitted the same to Elizabeth Estrada. Soliz's fingerprint was found inside Ms. Weatherly's home. Additionally, the gun that was used to kill Ms. Weatherly was found in the stolen car that Soliz was driving prior to his arrest and gunshot residue was found on Soliz's body and clothing. Consequently, Soliz's claim fails.

The state habeas court rejected this claim, concluding that trial counsel were not deficient and that Soliz was not prejudiced by the alleged deficiency. SHCR-01 at 755-56. For the reasons discussed above, Soliz fails to show that the state court's denial of this claim was unreasonable. Consequently, the claim should be denied. *Richter*, 562 U.S. at 99-102.

### G. Trial counsel were not ineffective for failing to object to the State's closing arguments during the guilt/innocence and punishment phases of trial.

Soliz next argues that trial counsel were ineffective for failing to object to the State's closing arguments during the guilt/innocence and punishment

phases of trial on the grounds that the arguments called for the jury to meet the community's expectation by finding Soliz guilty of capital murder and by sentencing Soliz to death and that the arguments inflamed the jury's passion and prejudice. Petition at 71-81. The claim is without merit.

### 1.    Factual background

Soliz identifies several statements by the prosecutor during closing argument at the guilt/innocence and punishment phases of trial that he claims were objectionable. For instance, during closing argument at the guilt/innocence phase of trial, the State argued

> [t]his is a problem for Tarrant County. This is a problem for Johnson County; a problem for everyone to have something horrific like this happen in both counties. It's a problem.
>
> But I'll tell you something else. As soon as you're put on that Jury, it becomes your problem as well. It does. Because something has got to be done. Something has got to be done about this. Sit back, wonder what's going to happen; let somebody else take care of this. It's before us right now. And that's where we are.
>
> And so what I'm going to ask you to do is do what the law and the evidence demand. And that is to solve this problem once and for all. No more. No more robbing people, no more killing people, no more stealing from people, no more burglarizing from people. No more. It stops today.
>
> The only one that hasn't had a problem this whole time is Mark Soliz. It's about time this became his problem, not just all of ours. And if you follow the evidence that you've seen and everything before you, the only answer in this case, based on the evidence, right here, very top line. And you will get this. We, the Jury, find

90

the Defendant, Mark Anthony Soliz, guilty of the offense of capital murder, as alleged in the Indictment.

. . .

It's become a problem; this thing is a horrible nightmare for the family and a problem for the entire county and Tarrant County both. And in just a few minutes, I'm going to sit down. Because you're on this Jury, it's your problem too. And the question is going to be, what are you going to do about this problem.

Evidence in this case, the most powerful you will ever see, all points to him, him, being guilty of exactly what he did, shooting Nancy Weatherly in the back of the head to shut her up, to take her stuff. And it wasn't because she put up a fight. Nothing under her fingernails. She didn't fight anybody. She didn't try to keep her stuff. She put her head down hoping that they would leave, and praying and begged they would not kill her or her animals. And what she got instead was "that" laughing at her and shooting her in the back of the head in the most cowardly act you will ever see in your life. That's what she got.

47 RR 69-70, 74. Further, the prosecutor stated that Ms. Weatherly was experiencing "[t]he perfect time in her life, and 'that' killed her for her TV. That's what happened in this case. That's what happened." 47 RR 72.

The State also argued during the guilt/innocence phase,

Arturo Gonzales had nothing to do with this. Yes, his DNA was on a straw in Nancy's cup. Yes, that's probably his DNA on a beer bottle in the back of the bed of her truck. Yes, his fingerprint is on a CD in her car. What does that mean? He was in her car. And what did [Elizabeth Estrada] tell you? Stolen cars, and I imagine sadly like girls, get passed around like party favors. And it's tragic that people's things, stolen though they may be, are currency when you want drugs.

91

47 RR 33.

During the punishment phase of trial, the prosecutor stated, "[t]his courtroom is full of police officers and citizens and friends and family members who loved Nancy Weatherly, who loved Ruben Martinez, and they await your justice and they await your verdict." 57 RR 30. Later, the prosecutor stated,

> [y]ou know, there's a big new road coming out of Fort Worth coming down to Cleburne. Everybody talks about it, talked about it for years. The world is watching this case. Question you've got to decide, why did—why did he kill Nancy? Why did he kill Ruben? Blood thirsty. Do you think the message might go back to the north side of Fort Worth, to the Tango Blast, and to the North Side Varrios, and the Texas Syndicate, do you think the message might go back coming out of this courtroom that we're not going to tolerate this conduct? We are not going to tolerate it. The world is watching.

57 RR 90.

## 2.   Trial counsel were not ineffective because the State's closing arguments were not objectionable.

With regard to the State's closing argument during the guilt/innocence phase of trial, Soliz complains that the closing argument called for the jury to meet the community's expectations, de-humanized Soliz by referring to him as "that," and insinuated that Soliz was a "womanizer."[28] Petition at 75-76. The closing argument was not objectionable.

---

[28]   It should be noted that, to the extent Soliz's claim is premised on the argument that the State's closing argument was impermissible under state law, such a claim necessarily fails because the state court held that the argument was permissible.

First, Soliz argues that the prosecutor called on the jury to "lend its ear to the community" by considering the community's expectation of a guilty verdict. Petition at 75 (citing *Cortez v. State*, 683 S.W.3d 419, 421 (Tex. Crim. App. 1984)). But contrary to Soliz's assertion, the prosecutor did not argue that the community "wanted" or "expected" the jury to find Soliz guilty. Petition at 75. Rather, the prosecutor argued more than once during the complained-of remarks that the jury should find Soliz guilty because the law and evidence compelled that finding. 47 RR 70 ("I'm going to ask you to do is do what the law and the evidence demand. . . . [A]nd if you follow the evidence that you've seen and everything before you, the only answer in this case, based on the evidence, right here, very top line. And you will get this. We, the Jury, find the Defendant, Mark Anthony Soliz, guilty of the offense of capital murders, as alleged in the Indictment."). Consequently, Soliz's claim is refuted by the record.

Further, the Fifth Circuit has held that "the prosecution may appeal to the jury to act as the conscience of the community." *Jackson v. Johnson*, 194 F.3d 641, 655 (5th Cir. 1999); *see United States v. Ebron*, 683 F.3d 105, 146

SHCR-01 at 756 (citing *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973)). The state court's decision in that regard cannot be overturned by a federal court and is dispositive of Soliz's IATC claim to the extent it is premised on the assertion that the State's closing argument was improper under state law. *Charles*, 629 F.3d at 500-01.

(5th Cir. 2012); *United States v. Ruiz*, 987 F.2d 243, 248-49 (5th Cir. 1993) (holding that closing argument was permissible where prosecutor stated "[y]ou are the ones who stand between the citizens of this country and an injustice," because "[i]t is well-settled that, unless the prosecutor intended to inflame, an appeal to the jury to act as the conscience of the community is not impermissible.") (internal quotation marks omitted); *United States v. Brown*, 887 F.2d 537, 542 (5th Cir. 1989). Here, the prosecutor's argument was plainly an appeal to the jury to act as the conscience of the community and to find Soliz guilty of capital murder based on the law and evidence. Consequently, the prosecutor's statements were proper and not objectionable. *Ruiz*, 987 F.3d at 248-49 (holding that prosecutor's closing argument was not intended to inflame the jury where the complained-of argument was immediately preceded by the prosecutor telling the jury to base its verdict on the law and evidence); *Bell v. Lynaugh*, 828 F.2d 1085, 1095 (5th Cir. 1987) ("Read in context, . . . [t]he prosecutor never urged the jury to ignore the evidence presented, nor did he intimate that the jurors were responsible for carrying out the dictates of the general public. Rather, . . . the prosecutor's comments were directed at imploring the jury to return a verdict based on logical consideration of evidence and not on emotion.").

Nor was the prosecutor's reference to Soliz as "that" objectionable. 47 RR 72, 74. The Fifth Circuit has held that "[c]olorful pejoratives are not improper. *Ebron*, 683 F.3d at 147 (holding that prosecutor's reference to the defendant as "the grim reaper" was not improper); *United States v. Fields*, 483 F.3d 313, 360 (5th Cir. 2007) (holding that prosecutor's reference to the defendant as a "con" was not improper); *United States v. Malatesta*, 582 F.2d 748, 759 (5th Cir. 1978) (holding that prosecutor's reference to the defendant as a "hoodlum" was not improper). Further, the prosecutor's characterization of Soliz was a reasonable deduction from the evidence, as his callous murder of Ms. Weatherly was particularly heinous and cruel. 47 RR 70 ("She put her head down hoping that they would leave, and praying and begged they would not kill her or her animals. And what she got instead was "that" laughing at her and shooting her in the back of the head in the most cowardly act you will ever see in your life."); *see Malatesta*, 582 F.2d at 759 ("Unflattering characterizations of a defendant do not require a new trial when such descriptions are supported by the evidence."). The evidence showed that Soliz murdered Ms. Weatherly after she asked him not to take her jewelry because it had belonged to her deceased mother. In response to Ms. Weatherly's plea, Soliz told Ms. Weatherly to join her mother and shot her in the head.

95

Similarly, the prosecutor's statement that, "[s]tolen cars, and I imagine sadly like girls, get passed around like party favors" was not improper because it was a reasonable deduction from the evidence. 47 RR 33. Prior to that statement, the prosecutor argued that Soliz, and not Arturo Gonzalez, was the shooter of Ms. Weatherly. 47 RR 33. The prosecutor argued that the presence of Gonzalez's DNA in Ms. Weatherly's stolen truck only showed that Gonzalez had been inside the truck, not that Gonzalez had committed the murder. 47 RR 33. Indeed, as Elizabeth Estrada testified, gang members often sell or pawn stolen goods for drugs or money and when a car is stolen the car gets "passed around." 44 RR 198-200. She also testified that stolen property will often be given to a "fence" who will then sell the stolen property. 44 RR 199-200. Further, Estrada testified that she had a sexual relationship with Soliz, 44 RR 185, but also testified that Ramos had written her letters telling her he loved her, which brought up "good memories" of Ramos, and that she would do anything for Ramos. 44 RR 173, 233, 278-79.

The prosecutor's comment was intended to refute the suggestion that Arturo Gonzalez was responsible for Ms. Weatherly's murder. The comment was not intended to disparage Soliz as a "womanizer" and did not imply that Soliz should be found guilty of capital murder based on anything but the

96

evidence. Consequently, the prosecutor's statement was an accurate summation of the evidence and was not objectionable.

With regard to the State's closing argument during the punishment phase of trial, Soliz complains that the closing argument called for the jury to meet the community's and victim's families' expectations by sentencing him to death. Petition at 80. As with the prosecutor's closing argument at the guilt/innocence phase of trial, the prosecutor's argument during the punishment phase only called on the jury to "act as the conscience of the community." *Ebron*, 683 F.3d at 145-46. The prosecutor did not argue to the jury that the victims' families, the community, or the police expected a certain verdict.[29] Consequently, the prosecutor's closing argument was not objectionable.

Further, the decision to not object to the complained-of statements could very well have been based on a reasoned trial strategy to not draw the jury's

---

[29]     Soliz cites to the CCA's opinion in *Cortez* for support of his claim. Petition at 75. While the CCA in this case held that the prosecutor's closing argument was proper, and this Court is unable to hold that the state court improperly interpreted its own law, it should be noted that *Cortez* is plainly distinguishable. In *Cortez*, the CCA held that the prosecutor improperly stated, "the only punishment that you can assess that would be any satisfaction at all to the people of [Nueces] county would be life." 683 S.W.2d at 421. Unlike *Cortez*, the prosecutor did not argue to the jury that the community or anyone else expected Soliz to be sentenced to death or would be unsatisfied with Soliz receiving a life sentence.

attention to the prosecutor's statements.[30] *Charles*, 629 F.3d at 501-02 (holding that trial counsel's decision not to object to adverse witness testimony was reasonable when objecting would draw undue attention to harmful testimony); *Drew v. Collins*, 965 F.2d 411, 423 (5th Cir. 1992) ("A decision not to object to a closing argument is a matter of trial strategy."); *Vasquez v. Thaler*, 505 F. App'x 319, 330 (5th Cir. 2013) (unpublished) (holding that counsel's decision not to object to prosecutor's mischaracterization of witness testimony during closing argument was not unreasonable when objecting would draw undue attention to that testimony); *Hernandez v. Thaler*, 398 F. App'x 81, 87 (5th Cir. 2010) (unpublished) (same). Soliz has not rebutted the presumption that trial counsels' decision not to object to the complained-of testimony was based upon a reasoned trial strategy.

For the reasons discussed above, the prosecutor's closing argument was proper and not objectionable. Trial counsel could not have been deficient for failing to make a futile objection. *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990). Therefore, Soliz's claim is without merit.

---

[30]    Although trial counsel's affidavit does not explicitly reference their decision not to object to the prosecutor's closing argument, this Court must presume that counsels' decision was reasonable and not the product of "sheer neglect." *Richter*, 562 U.S. at 109.

### 3. Soliz fails to show prejudice from trial counsels' failure to object to any of the complained-of closing agument.

Even assuming the complained-of closing arguments were objectionable, Soliz has failed to show that he was prejudiced. First, Soliz's jury was instructed that "it is only from the witness stand that the jury is permitted to receive evidence regarding the case, or any witness therein." 11 CR 2084. Consequently, Soliz cannot show that he was prejudiced by the lack of an objection to the prosecutor's closing argument because jurors are presumed to follow their instructions. *See Ebron*, 683 F.3d at 142 (rejecting claim of prosecutorial misconduct where, *inter alia*, the trial court instructed the jury that arguments made by the lawyers are not evidence).

Moreover, the evidence in support of the jury's verdicts was overwhelming. As discussed above, the evidence of Soliz's guilt included his confession to the police, Elizabeth Estrada's testimony relaying Soliz's admission to killing Ms. Weatherly, and physical evidence showing Soliz was in Ms. Weatherly's home and later in possession of the gun that was used to shoot Ms. Weatherly. Further, the evidence supporting the jury's punishment verdict was equally overwhelming. The State presented a considerable case demonstrating Soliz's long history of engaging in violent criminal conduct. *Soliz*, 432 S.W.3d at 901-02 (discussing the State's evidence showing Soliz's

99

future dangerousness). In the week preceding Soliz's murder of Ms. Weatherly, Soliz murdered Ruben Martinez, shot Luis Luna, fired shots at Kenny Dodgin during an attempted robbery, committed along with Ramos a drive-by shooting and the shooting of Enrique Samaniego, robbed numerous others at gunpoint, and committed several burglaries. During Soliz's attempt to evade arrest, he told Elizabeth Estrada that he would kill a police officer or "die trying," before Estrada knocked the gun out of Soliz's hand. The State also presented evidence of Soliz's offenses while confined in administrative segregation in jail pending trial. *Id*. at 902. Soliz simply cannot show that the jury would have sentenced him to life if only trial counsel had objected to the prosecutor's closing argument at punishment. *See Leal v. Dretke*, 5:99-CV-1301, 2004 WL 2603736, at *26-27 (W.D. Tex. 2004) (unpublished) (holding that closing argument urging the jury to "consider the victim's family's need for vengeance" did not prejudice the petitioner in light of the overwhelming evidence of his violent propensity). Consequently, his IATC claim fails.

Importantly, the complained-of statements during closing argument by the prosecutor were not pervasive and were isolated instances during a lengthy closing argument that focused almost exclusively on the evidence demonstrating Soliz's guilt. As noted above, the complained-of prosecutor's statement during closing argument at the guilt/innocence phase of trial was

100

immediately preceded and succeeded by pleas to the jury to base its verdict on the law and evidence. 47 RR 69-70. Further, the prosecutor's references to Soliz as "that" were isolated. Similarly, the prosecutor's reference to stolen property and women being "passed around" by gang members was a reasonable deduction from Elizabeth Estrada's testimony and was an isolated comment. Lastly, the complained-of argument during the punishment phase of trial was not pervasive.

The state habeas court rejected this claim, concluding that trial counsel were not deficient and that Soliz was not prejudiced by the alleged deficiency. SHCR-01 at 757. For the reasons discussed above, Soliz fails to show that the state court's denial of this claim was unreasonable. Consequently, the claim should be denied. *Richter*, 562 U.S. at 99-102.

### H. Trial counsel were not ineffective for failing to object during the punishment phase of trial to the admission of extraneous offense victim-impact testimony.

Soliz argues that trial counsel were ineffective for failing to object during the punishment phase of trial to the admission of extraneous offense victim-impact testimony of Arnold Dominguez, Ruben Martinez's co-worker, and Lisa Martinez, Ruben's wife.[31] Petition at 89-95. Soliz's claim is without merit.

---

[31] It should be noted that Soliz does not claim that trial counsel were ineffective for failing to object to the testimony of either Arnold Dominguez or Lisa Martinez on the ground that their testimony constituted inadmissible victim *character* testimony.

## 1.    Factual background

During the punishment phase of trial, the State presented the testimony of Arnold Dominguez. 49 RR 72-88. Mr. Dominguez had known Ruben since they were both young and they both grew up in the Diamond Hill area of north Fort Worth. 49 RR 73. Ruben and Mr. Dominguez worked together as delivery truck drivers and often made deliveries together. 49 RR 74. Mr. Dominguez testified that Ruben spoke to his wife on the telephone often and that family was very important to Ruben. 49 RR 76. On the morning of Ruben's murder at the Texaco gas station, Mr. Dominguez was also making a delivery to the gas station. 49 RR 81. He spoke briefly with Ruben during the delivery, and as Mr. Dominguez walked away from Ruben, he heard a gunshot. 49 RR 81. Mr. Dominguez testified regarding the aftermath of the shooting, including his efforts to help Ruben. 49 RR 82-83. He testified that, as a result of Ruben's gunshot wound to the neck, Ruben was unable to speak or move and could only communicate through blinking. 49 RR 83-84. The prosecutor published the surveillance video from the gas station, which showed Soliz walking out from

---

Petition at 89-95; *see Haley v. State*, 173 S.W.3d 510, 517 (Tex. Crim. App. 2010) (explaining that "[v]ictim-impact evidence is evidence concerning the effect the victim's death will have on others, particularly the victim's family members; whereas victim-character evidence is defined as evidence concerning the good qualities of the victim."). Soliz alleges only that their testimony constituted inadmissible victim *impact* testimony.

behind a dumpster where he had been hiding near where Mr. Dominguez was walking. 49 RR 86-92. Lastly, Mr. Dominguez testified that Ruben was healthy before he was shot by Soliz. 49 RR 92-93.

The State presented during its rebuttal presentation the testimony of Ruben's wife, Lisa. 56 RR 30-37. Mrs. Martinez testified that she met Ruben when she was sixteen-years old.[32] 56 RR 30-31. They had a son together and she was eight-months pregnant at the time Ruben was murdered. 56 RR 31-32. She later gave birth to their second son. 56 RR 31-32. She testified regarding the last time she had seen Ruben on the night before he was murdered. 56 RR 32-33. She learned of Ruben's murder the next morning and later saw him in the hospital in the intensive care unit. 56 RR 34-35. Ruben looked "scared" when she saw him in the hospital. 56 RR 35. He was only able to communicate with her by blinking and raising his eyebrows. 56 RR 35. Mrs. Martinez testified that she was "numb" and felt like a "zombie" during the time Ruben was hospitalized prior to his death. 56 RR 35. Ruben initially refused to accept that he would die but later came to accept it. 56 RR 35-36. Mrs. Martinez testified that she and Ruben grew up in the Diamond Hill area of north Fort Worth, Ruben did not have much while he grew up, Ruben worked full-time,

---

[32]      Trial counsel objected at this point to Mrs. Martinez's testimony on the ground that it was improper rebuttal testimony. 56 RR 31. The objection was overruled but trial counsel was permitted a running objection. 56 RR 31.

and Ruben's family was the most important thing to him. 56 RR 37. Lastly, she

testified that she missed Ruben every day. 56 RR 38.

> **2.    Trial counsel were not ineffective for failing to object to the testimony of Arnold Dominguez or Lisa Martinez on the ground that the testimony constituted extraneous offense victim-impact testimony.**

Soliz's IATC claim fails for several reasons. First, Soliz's claim fails

because the state court's conclusion that trial counsel were not deficient was

based on its binding interpretation of state law. Specifically, the state court

held that Mr. Dominguez's and Mrs. Martinez's testimony was admissible.

SHCR-01 at 759-60. The state court's determination of state law in this regard

is dispositive of Soliz's claim of ineffective assistance. *Charles*, 629 F.3d at 500-

01; *Thompson v. Thaler*, 432 F. App'x 376, 378-79 (5th Cir. 2011) (unpublished)

(holding that state habeas court's conclusion that purported extraneous offense

victim-impact testimony was admissible was binding on the federal court, and

that the state court's conclusion was dispositive of the petitioner's claim that

trial counsel were ineffective for failing to object to the testimony).

Consequently, Soliz's IATC claim necessarily fails.

Second, to the extent Soliz's claim in this Court is premised on the

argument that trial counsel were ineffective for failing to object to the

purported extraneous offense victim impact testimony on the basis that it was

104

inadmissible under federal law, such an argument is unexhausted because it was not raised in Soliz's state habeas application. Petition at 93 ("Therefore, under the Federal Constitution, victim impact evidence from Martinez's wife and coworker were not admissible at the punishment phase of Soliz's trial."); SHCR-01 at 99 ("Therefore, under Texas law, victim impact evidence from Martinez's wife and coworker were not admissible at the punishment phase of Soliz's trial."); *see Baldwin*, 541 U.S. at 29-32. Soliz only argued in his state habeas application that the testimony was inadmissible, and therefore objectionable, under state law. SHCR-01 at 99. Consequently, this claim is unexhausted to the extent it is based on the argument that trial counsel were ineffective for failing to object to Mrs. Martinez's and Mr. Dominguez's testimony as being inadmissible under federal law.

Nonetheless, trial counsel were not ineffective for failing to object to the complained-of testimony. In *Payne v. Tennessee*, the Supreme Court held that the Eighth Amendment does not bar testimony about the victim of a murder or testimony about the impact of the murder on the victim's family. 501 U.S. 808, 822 (1991). The Court held that the State has a legitimate interest in countering the individualization of the defendant by reminding the jury that the victim was also an individual whose death represents a unique loss to society and to the victim's family. *Id*. at 826-28. As a result, the Court left it to

105

the States to determine whether such testimony is relevant under their individual punishment schemes. *Id.*

Texas has applied *Payne* so as to hold that "introduction of 'victim impact' evidence with respect to a victim not named in the indictment on which [the defendant] is being tried" is inadmissible. *Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997). However, testimony of a victim of an extraneous offense regarding the effect of that offense on the victim himself or herself is admissible. *Mays v. State*, 318 S.W.3d 368, 393 (Tex. Crim. App. 2010); *Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007). As noted above, "victim-impact" testimony is testimony "concerning the effect the victim's death will have on others, particularly the victim's family members." *Haley*, 173 S.W.3d at 517.

Mr. Dominguez did not present victim-impact testimony. Mr. Dominguez's testimony consisted almost entirely of his account of the circumstances surrounding Ruben's murder. 49 RR 81-93. His testimony recounted the moments leading up to the murder, including Soliz's hiding behind a dumpster unbeknownst to Mr. Dominguez. 49 RR 81-93. Further, Mr. Dominguez's testimony demonstrated that he grew up in the same poor area of Forth Worth as Soliz but was nonetheless able to live a productive life. 49 RR 73. Moreover, Mr. Dominguez's testimony that Ruben was "healthy" before

106

he was murdered simply answered any doubt the jury might have had that Ruben might have succumbed to his wounds because he was not, in fact, healthy. Indeed, Ruben was hospitalized for thirteen days prior to his death. 50 RR 9. Finally, Mr. Dominguez provided testimony regarding Ruben's dedication to work and his family. None of Mr. Dominguez's testimony relayed any information to the jury regarding the impact Ruben's murder had on Mr. Dominguez or anyone else. Consequently, the testimony did not constitute extraneous offense victim-impact testimony and was not objectionable on that basis.

Similarly, Mrs. Martinez's testimony recounted the events following Soliz's shooting of Ruben and the injuries Ruben sustained. Her testimony also demonstrated that she and Ruben had grown up in the same poor area of north Fort Worth as Soliz but had been able to become productive members of society. Such testimony rebutted the defense's evidence that sought to excuse Soliz's criminal behavior based on his being raised in a poor neighborhood. Almost none of Mrs. Martinez's testimony could be considered extraneous offense victim-impact testimony. Only her testimony that she was "numb" while Ruben was hospitalized and that she missed him every day could conceivably be considered extraneous offense victim impact testimony. But the Fifth Circuit has held that such testimony does not constitute victim-impact

107

testimony. *Mosley v. Quarterman*, 306 F. App'x 40, 46-47 (5th Cir. 2008) (unpublished) (affirming district court's conclusion that victim's wife's testimony that she felt "numb" after learning of her husband's death was not victim-impact testimony). For these reasons, Soliz fails to show that trial counsel were ineffective for failing to object to the witnesses' testimony.

Importantly, Soliz identifies no clearly established law from the Supreme Court that indicates that testimony like that of Mr. Dominguez and Mrs. Martinez was objectionable. Indeed, the only holding of the Supreme Court that Soliz identifies is *Payne*. But, as noted above, the Court in *Payne* held that there is no per se bar to victim impact testimony. 501 U.S. at 827. Consequently, his claim impermissibly calls for the creation of a new rule of constitutional law holding that such testimony is inadmissible. The claim is, therefore, barred by principles of non-retroactivity. *Teague v. Lane*, 489 U.S. 288, 311 (1989).

Nonetheless, Soliz fails to show that he was prejudiced by trial counsels' failure to object to the complained-of testimony. Again, none of Mr. Dominguez's testimony was objectionable. And the only testimony of Mrs. Martinez that could conceivably have constituted extraneous offense victim-impact testimony was her testimony that she was "numb" while Ruben was hospitalized and that she missed Ruben every day. But Soliz fails to show that

108

the limited testimony could have had an effect on the jury's verdict. *See Mosley*, 306 F. App'x at 46-47 (assuming that victim's wife's testimony that she was "numb" after learning of her husband's murder constituted victim-impact testimony and concluding that the petitioner had not shown that he was prejudiced by trial counsel's failure to object to the testimony); *Guevara v. Thaler*, Civ. Act. No. 4:08-CV-1604, 2011 WL 4455261, at *23 (S.D. Tex. 2011) (unpublished) (rejecting claim that counsel were ineffective for failing to object to extraneous offense victim-impact testimony because petitioner failed to show prejudice in light of the evidence of his violent criminal history, his having committed an "escalating crime spree" in the months before the murder, and evidence that he was "cruel").

The state habeas court rejected this claim, concluding that trial counsel were not deficient and that Soliz was not prejudiced by the alleged deficiency. SHCR-01 at 759-60. For the reasons discussed above, Soliz fails to show that the state court's denial of this claim was unreasonable. Consequently, the claim should be denied. *Richter*, 562 U.S. at 99-102.

# I.   Trial counsel were not ineffective for failing to object to the admission of a letter Soliz wrote from jail to a veniremember.

Soliz argues that trial counsel were ineffective for failing to object to the admission during the punishment phase of trial of a letter Soliz wrote from jail to a veniremember. Petition at 99-111. The claim is without merit.

## 1.   Factual background

During the State's rebuttal presentation at the punishment phase of trial, the State called Jimmy Johnson of the Johnson County Sheriff's Office to testify. 56 RR 6-28. Officer Johnson worked at the Johnson County Jail. 56 RR 6. Officer Johnson's office inspected all of Soliz's mail and provided a copy to the District Attorney's Office. 56 RR 8. The State offered into evidence two letters written by Soliz that had been intercepted by jail staff. 56 RR 7; SX 509, 510.[33] One letter was written to Priscilla Guerrero and one was written to L. Vela. 56 RR 9. Trial counsel asked to discuss the admissibility of the two letters outside the presence of the jury. 56 RR 10. Trial counsel objected to the admission of Soliz's letter to L. Vela because she was a veniremember who was dismissed during voir dire. 56 RR 10. Trial counsel argued that Officer Johnson's testimony regarding that letter would force trial counsel to withdraw

---

[33]    The copy of State's Exhibit 510 appears to be illegible in the Reporter's Record. However, Soliz attached a legible copy of the letter and the redacted letter to his state habeas application. SHCR-01 at 299-306.

and to testify as to how Soliz could have obtained the address of a veniremember. 56 RR 10-16. Trial counsel stated that they were not objecting generally to the admission of Soliz's letters. 56 RR 15. The prosecutor argued that the letter rebutted Soliz's mitigating evidence that he functions at the level of a two-year old and was evidence that Soliz is a future danger. 56 RR 13.

Following a break in the proceedings, the prosecutor stated that she had reached an agreement with trial counsel whereby the letter to L. Vela would be redacted so that the letter would not identify L. Vela as a veniremember. 56 RR 17; SX 510. The State then offered into evidence Soliz's letters to Priscilla Guerrero and L. Vela. 56 RR 18-20. On cross-examination, trial counsel offered into evidence the jail visitation log for Soliz and asked Officer Johnson whether he was aware that Soliz's mother had not visited him in jail because she was on parole. 56 RR 28-29.

### 2. Trial counsel were not ineffective for failing to object to the admission of Soliz's letter to L. Vela as being irrelevant.

Soliz's IATC claim fails for several reasons. First, Soliz's claim fails because the state court's conclusion that trial counsel were not deficient was based on its binding interpretation of state law. Specifically, the state court held that the letter written by Soliz to L. Vela was admissible. SHCR-01 at

760-61 ("Had defense counsel made suchan objection, the evidence would still have survived a Rule 403 analysis. . . . As such, because the complained-of evidence was admissible under Rule 403, an objection on this basis would have been a futile act."). The state court's determination of state law in this regard is dispositive of Soliz's claim of ineffective assistance. *Charles*, 629 F.3d at 500-01. Soliz's IATC claim is premised only on the argument that the complained-of evidence was inadmissible under state law. Petition at 105 ("Trial counsel would have succeeded in objecting pursuant to Texas Rules of Evidence 403. . . . Trial counsel's failure to advise the court of the prejudicial, inflammatory nature of this letter and object under Texas Rules of Evidence 403 constituted deficient performance as it fell below an objective standard of reasonableness."). Consequently, Soliz's IATC claim necessarily fails.

Importantly, Soliz identifies no clearly established law from the Supreme Court that indicates that the complained-of evidence was objectionable. Consequently, his claim impermissibly calls for the creation of a new rule of constitutional law holding that such testimony is inadmissible. The claim is, therefore, barred by principles of non-retroactivity and his claim necessarily fails to meet the standard of AEDPA by showing the state court unreasonably applied controlling precedent from the Supreme Court. *Teague*, 489 U.S. at 311.

112

Nonetheless, Soliz fails to show the complained-of evidence was irrelevant. First, as the prosecutor argued, the evidence was relevant as rebuttal evidence where Soliz's expert, Dr. Connor, testified that Soliz functioned on the level of a two-and-a-half-year old in his ability for "receptive communication" and as a six-year old in his ability for "expressive communication." 55 RR 5-6. Soliz's ability to effectively communicate, attempt to flatter a woman, and even mail a letter rebutted the experts' testimony regarding the extent of Soliz's purported adaptive deficits and rendered the testimony (including Dr. Connor's testimony that Soliz did not malinger) less credible.

Lastly, Soliz fails to show that he was prejudiced by trial counsels' failure to object to the admission of his letter to L. Vela. Soliz supports this IATC claim by reference to an affidavit of one of his jurors. Petition at 111. Soliz did not provide this affidavit to this Court. He did, however, submit the affidavit to the state habeas court. SHCR-01 at 185-86. The juror's affidavit is, however, inadmissible in these proceedings. Fed. R. Evid. 606(b); *Adams*, 421 Fed. Appx. at 328 n.2 (5th Cir. Mar. 31, 2011) (unpublished); *Parr v. Quarterman*, 472 F.3d 245, 258 (5th Cir. 2006); *United States v. Straach*, 987 F.2d 232, 241-42 (5th Cir. 1993). Nonetheless, even if the juror's affidavit was admissible, Soliz fails to show prejudice.

To demonstrate prejudice, Soliz argues that the jury were aware the complained-of letter was written to a veniremember because they requested to view the letter during its deliberations. Petition at 110. But the jury's simply viewing the letter during deliberations does not make it any more likely that they would have concluded the letter was written to a veniremember. Moreover, the jury requested to view all of Soliz's correspondence that was admitted into evidence. 57 RR 92-93; SX 505, 508, 509, 510. It is, therefore, altogether likely that the jury considered Soliz's letter to L. Vela in conjunction with his other correspondence as evidence of Soliz's adaptive behvaiors. And while juror J.U. states in the affidavit provided to the state habeas court that the jury was aware the letter was written to a veniremember, the jury's letter to the trial court asking to view Soliz's correspondence stated, "[w]e would like to see the last three letters from Mark Soli[z] to his girlfriend and the missionary." 11 CR 2133. There is simply no (admissible) proof that the jury was aware that L. Vela was a veniremember or that they considered the letter for any improper purpose.

Further, the State's evidence supporting the jury's finding of future dangerousness was overwhelming. There is no probability that the jury answered the future dangerousness special issue affirmatively only because of the admission of Soliz's letter to L. Vela. Nor is there any probability that the

jury answered the mitigation special issue negatively only because of the admission of Soliz's letter to L. Vela.

The state habeas court rejected this claim, concluding that trial counsel were not deficient and that Soliz was not prejudiced by the alleged deficiency. SHCR-01 at 760-61. For the reasons discussed above, Soliz fails to show that the state court's denial of this claim was unreasonable. Consequently, the claim should be denied. *Richter*, 562 U.S. at 99-102.

### J.   Trial counsel adequately presented the jury with mitigating evidence.

Lastly, Soliz argues that his trial counsel were ineffective for failing to present expert testimony regarding the effects of foster care on Soliz and to explain the significance of Soliz's Child Protective Services (CPS) records. Petition at 111-31. Specifically, he argues such an expert could have testified that Soliz's experience in foster care caused him to suffer from post-traumatic stress disorder and could have testified as to the effects on Soliz of his frequent relocations, the abuse and neglect he suffered while in foster care, and his "aging out" of the foster care system. Petition at 115-20. Alternatively, Soliz argues that trial counsel should have presented the testimony of Laura Flores, Soliz's CPS caseworker from 1997 to 1999. Petition at 112, 130. The claim is without merit.

### 1. Mitigating evidence presented at trial

The defense put forth an extensive mitigation presentation, including the testimony of two of Soliz's family members, a doctor and a caseworker who provided care to Soliz when he was young, expert testimony regarding Soliz's FASD, and thousands of pages of records demonstrating his chaotic upbringing. The mitigating evidence detailed Soliz's chaotic upbringing, the severe neglect he experienced at home, and the effects of his FASD.

Krisha Flores, Soliz's cousin, testified that when Soliz was young, his mother, aunts, and uncles lived together in one house along with their children. 50 RR 138, 142. The adults frequently sniffed paint in front of the children and used drugs inside their home. 50 RR 143, 163, 192. Soliz began sniffing paint at about age ten. 50 RR 183. Krisha Flores also testified that Soliz's family moved to the Butler Housing Projects when Soliz was between six and nine-years old and that a significant amount of violence and drug dealing occurred in that neighborhood. 50 RR 164, 167, 175, 217. One of Soliz's aunts was stabbed to death by her boyfriend in Soliz's presence. 50 RR 194-96. Further, Soliz's mother prostituted herself in order to buy drugs. 50 RR 194-96. Leticia Herrera, another cousin of Soliz, testified that when Soliz was seven or eight years old, he would "run[ ] the streets," and was not disciplined by his parents. 50 RR 245, 254-55.

116

Dr. Prema Manjunath was a child and adolescent psychiatrist at the JPS Hospital in Fort Worth, Texas. 51 RR 39-40. Dr. Manjunath testified regarding Soliz's admission to JPS when Soliz was ten years old due to his "out-of-control" behaviors such as stealing cars, stealing from parking meters, selling drugs, fighting, drug use, and carrying guns. 51 RR 44-47, 51. Soliz's social history presented to Dr. Manjunath indicated that Soliz's mother drank heavily during her pregnancy with Soliz. 51 RR 53. Soliz was "roaming out on the streets in the early hours of the morning" and associating with children who were much older than he was, which indicated a lack of supervision from his parents. 51 RR 83. Soliz had "acted out" sexually, which Dr. Manjunath believed could be indicative of Soliz having been sexually abused. 51 RR 54. Soliz's mother was only "superficially" involved with Soliz's treatment at JPS. 51 RR 69.

Dr. Manjunath performed a mental status examination of Soliz, which indicated that Soliz had "difficulties in paying attention" and was of "low average to borderline intelligence." 51 RR 57-58. Soliz "externalized" blame for his actions by blaming others and refusing to accept responsibility, he lacked empathy for others, and he was aggressive to hospital staff and his peers. 51 RR 60-61. Dr. Manjunath diagnosed Soliz with conduct disorder, mixed substance abuse, and ADHD. 51 RR 63. Dr. Manjunath also diagnosed Soliz as having antisocial traits, noted that he had reading and language problems, and

117

noted that he suffered from a "chaotic home." 51 RR 64. She testified that neglect of a child can interfere with the child's "normal growth and development." 51 RR 114. At the time Soliz was discharged from JPS his behavior, attention, and concentration "had definitely improved," although he continued to "seek attention and affection of others through manipulation and impulsive behaviors." 51 RR 68-69, 91.

Dr. Manjunath testified that conduct disorder, with which Soliz was diagnosed, could be caused by biological, genetic, or environmental factors. 51 RR 104. Similarly, brain damage could be caused by fighting, sniffing paint, and hypoxia. 51 RR 104. Nonetheless, Dr. Manjunath noted in Soliz the behavioral characteristics typically seen in individuals with FAS. 51 RR 118.

Kevin Walling was a caseworker with the Tarrant County Mental Health and Mental Retardation (MHMR) organization. 51 RR 130. Soliz was referred to Tarrant County MHMR when he was ten years old. 51 RR 133-34. Mr. Walling worked with Soliz from 1992 until 1994, at which time Soliz lived in the Buckner Children's Home.[34] 51 RR 151. Mr. Walling visited Soliz's house and saw Soliz's mother with paint on her hands and around her mouth. 51 RR

---

[34]   Soliz was removed from his mother's custody and placed into the custody of the State at about age twelve due to his "chaotic" home environment. DX 62. Soliz was at that time placed into the care of the Buckner Children's Home. DX 62.

146. Mr. Walling described Soliz as a follower, but testified that Soliz knew the difference between right and wrong. 51 RR 144, 154.

LeAnna Judd was a Juvenile Probation Officer for Tarrant County. 51 RR 161. She first met Soliz in 1994, when he was twelve years old and was detained for burglary of a building. 51 RR 164. Soliz was arrested three months after his initial detention for burglary of a building when he attempted to burglarize a vehicle, and was arrested again a short time later for burglary of a habitation. 51 RR 177. Ms. Judd noted that Soliz suffered from a family situation that was "very chaotic and detrimental to his ever getting better." 51 RR 190. Soliz's records indicated that he was, at the time Ms. Judd supervised him, two grades behind in school and had been suspended due to his committing a burglary of the school. 51 RR 201. Soliz was in special education classes. 51 RR 201. A therapist at the Buckner Children's Home recommended keeping Soliz in treatment because she was concerned about Soliz's mother's poor parenting skills and that Soliz's behavior would deteriorate if he was returned to his mother's home. 51 RR 202.

Ms. Judd also testified regarding Soliz's "attention seeking behavior" while living in the Buckner Children's Home such as choking himself. 52 RR 17-18. Soliz "acted out" sexually when he was twelve and thirteen by having sex with younger boys in the Buckner Children's Home. 52 RR 21. Soliz was

119

moved to a higher security facility at which he had to be restrained several times due to the staff's concern that he would hurt others. 52 RR 25. Ms. Judd testified on cross-examination that Soliz joined the Boy Scouts during his time at the Buckner Children's Home and that he developed leadership skills. 52 RR 44.

Soliz presented testimony from three experts, Drs. Adler, Connor, and Brown, regarding FASD. Dr. Adler is a child and adolescent psychiatrist. 53 RR 7, 36. He is the founding "director of a group called the Fetal Alcohol Spectrum Disorder Experts," of which Drs. Connor and Brown are also members. 53 RR 9, 38. Dr. Adler testified that alcohol is a teratogen, i.e., a substance that is harmful to a developing fetus. 53 RR 54. Impairments associated with FASD include difficulty eating and sleeping, poor muscle coordination, low I.Q., poor attention, inappropriate social and sexual behavior, difficulty finding employment, and difficulty in school. 53 RR 72-73. These impairments often cause individuals with FASD to become incarcerated or hospitalized. 53 RR 72. Individuals with FASD also suffer from adaptive behavior deficits, auditory or visual hallucinations, and delinquency. 53 RR 101-02. Individuals with FASD also tend to be susceptible to suggestion and would likely "over-confess" or falsely confess when under questioning by police. 53 RR 140.

Dr. Adler performed a clinical interview with, and a physical examination of, Soliz. 53 RR 15, 78. Dr. Adler testified that Soliz did not have a sufficiently shortened palpebral fissure in order to be diagnosed with FAS, nor did Soliz have a flat upper lip or a smooth philtrum. 53 RR 109-10, 145, 148. Dr. Adler reviewed Soliz's medical records and interviewed Soliz's mother. 53 RR 15, 79, 188. Dr. Adler diagnosed Soliz with PFAS, cognitive disorder, polysubstance abuse, physical and sexual abuse of child, and neglect of child. 53 RR 16, 86-87.

Dr. Connor is a clinical neuropsychologist. 53 RR 220; 54 RR 13. Dr. Connor completed a postdoctoral fellowship during which he researched FASD. 54 RR 14. From that research, Dr. Connor found that individuals who had been exposed in utero to alcohol had difficulties in their neuropsychological functioning. 54 RR 16. Those difficulties included lower intelligence, lower academic functioning, difficulty paying attention, and impulsive behavior. 54 RR 19. Dr. Connor performed a series of neuropsychological tests on Soliz "to assess a broad range of cognitive functioning." 53 RR 223. Dr. Connor testified that Soliz's cognitive functioning was consistent with the CDC guidelines for FASD. 53 RR 224; 54 RR 69. Dr. Connor also testified that Soliz's cognitive functioning was consistent with cognitive disorder and that Soliz suffers from a learning disorder and "attention deficit problems." 53 RR 226.

121

Dr. Brown is a clinical and forensic psychologist. 54 RR 72; 55 RR 133. As part of her work with the Fetal Alcohol Spectrum Disorder Experts group, Dr. Brown performs a "lifelong functional assessment" of individuals who are being assessed for FASD. 54 RR 76; 55 RR 138-39. A lifelong functional assessment includes a comprehensive examination of the individual's life history to determine whether the individual has displayed behaviors that are consistent with or contradict FASD.  54 RR 77; 55 RR 139-40. Behaviors and characteristics that are consistent with FASD include having mental health disorders, having a disruptive school experience, violating the law, being confined (e.g., in a psychiatric hospital or jail), an inability to live independently, substance abuse, and displaying inappropriate sexual behavior. 54 RR 78-80, 84.

Based on her lifelong functional assessment of Soliz, Dr. Brown concluded that Soliz's behaviors during his life were consistent with FASD and that he did not display any behavior that was inconsistent with FASD. 54 RR 94, 97. Dr. Brown testified that, "there is evidence across [Soliz's] life span of significant impairment in . . . adaptive behavior," and evidence that Soliz lived in an "adverse environment." 55 RR 228-29.

## 2. Trial counsel adequately presented mitigating evidence.

As Soliz conceded during his state habeas proceedings,

> [t]rial counsels['] representation of Soliz was in many ways commendable, particularly regarding several aspects of their punishment phase presentation. . . . They presented a significant amount of evidence detailing that Soliz was afflicted with Partial Fetal Alcohol Syndrom ("PFAS") and the deleterious effects it had on Soliz. . . . [T]rial counsel presented a significant amount of testimony regarding Soliz's difficult, chaotic upbringing, in which he was surrounded by adults—including his own mother—that were more concerned with drinking and substance abuse than providing a supportive, nurturing environment.

SHCR-01 at 22. Nonetheless, he argues that trial counsel were failing to present expert testimony regarding the effects on Soliz of his placement in foster care or, alternatively, testimony of his CPS caseworker from 1997 to 1999. His claim is without merit.

First, Soliz's claim that trial counsel were ineffective for failing to present testimony of an expert regarding the effects on Soliz  of the foster care system fails because he does not, and did not during his state habeas proceedings, provide an affidavit of an expert who would have been willing and able to testify in such a manner. And while Soliz asserts in his petition that an expert could have informed the jury that the foster care system often leads "foster youth[s] to suffer from" PTSD, he does not provide any evidence that he suffers from PTSD or that any expert was willing or able to testify at his trial

that he suffers from PTSD. Consequently, his claim that his trial counsel were ineffective for failing to present expert testimony fails entirely. *Day*, 566 F.3d at 538-39.

Soliz's claim that trial counsel were ineffective for failing to present expert testimony on the foster care system is also meritless because he has failed to rebut the presumption that trial counsel made the reasonable strategic decision to not hire such an expert. As discussed in more detail above, trial counsel obtained more than $90,000 in expert funds from the trial court and consulted or retained approximately twenty-seven experts. 9 CR 1628; 12 CR 2213. Soliz does not attempt to rebut the presumption that trial counsels' informed, strategic decisions as to how to allocate their limited resources were reasonable. *Richter*, 562 U.S. at 107 (trial counsel are "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies").

Mr. Heiskell also provided an affidavit to the state habeas court explaining the defense team's decision to not present expert testimony regarding the effects on Soliz of the foster care system. SHCR-01 at 556-57. Mr. Heiskell stated,

> [w]e did not seek retention of any expert on the evils/ills of foster care, and its negative effects on Mr. Soliz, because we wanted to keep the eyes of the jury on our main mitigation evidence—Fetal

124

Alcohol Spectrum Disorder ("FASD"). FASD, and its resulting negative effects, was diagnosed in Mr. Soliz after his birth and its intense negative characteristics were revealed in Mr. Soliz at a very young age. It was also exacerbated by his mother's highly dysfunctional lifestyle and habits. These two paramount factors demonstrated Mr. Soliz's lack of moral blameworthiness that should have resulted in a life sentence.

SCHR-01 at 557. Soliz does not attempt to rebut the presumption that the strategy articulated by trial counsel was reasonable.

Moreover, as the Fifth Circuit has explained, a federal court "must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel presente enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000). In light of the extensive mitigation presentation detailed above, and in light of his concession that trial counsels' performance at the punishment phase of trial was "commendable," Soliz's IATC claim that his trial counsel should have presented *more* mitigating evidence rings hollow. SHCR-01 at 22. This is especially true where, as trial counsel indicated, the additional mitigating evidence Soliz complains was not presented would have "diluted" the mitigating evidence focusing on Soliz's family and his chaotic upbringing. Importantly, Soliz's claim does not allege that trial counsel failed to adequately

*investigate*,[35] but rather his claim focuses on trial counsels' decision about which evidence to *present* to the jury. That being the case, Soliz's claim fails because it calls for the exercise of hindsight the Supreme Court has explicitly discouraged. *Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

Second, Soliz argues that trial counsel should have, alternatively, presented the testimony of Laura Flores, Soliz's CPS caseworker from 1997 to 1999, "to explain the contents of the CPS records to the jury."[36] Petition at 112. Ms. Flores stated in her affidavit to the state habeas court that she was available to testify at Soliz's trial and that, had she been called, she "would have testified to the authenticity of the contents of the records [she] kept and had personal knowledge of while working as [Soliz's] caseworker." SHCR-01 at 438. She did not state in her affidavit, however, that she could have or would have testified regarding the effects on Soliz of foster care experience. SHCR-01 at 438. Soliz argues only that Ms. Flores could have testified "to the contents

---

[35]     Any claim predicated on an allegation that trial counsel failed to adequately investigate would be entirely undermined by the extensive mitigation presentation put forth at trial, as well as by the fact that Soliz's IATC claim is founded on the very same thousands of pages of CPS records that trial counsel admitted into evidence.

[36]     Soliz did not provide this Court with an affidavit from Laura Flores. He did, however, submit her affidavit to the state habeas court. SHCR-01 at 438.

and accuracy of" the CPS records. Petition at 130. Neither Soliz nor Ms. Flores identify, however, the purportedly mitigating evidence in the CPS records that was unpresented at trial that she would have testified to. Consequently, Soliz's claim fails. *Day*, 566 F.3d at 538 ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, *set out the content of the witness's purported testimony, and show that the testimony would have been favorable to a particular defense*.") (emphasis added).

For the reasons discussed above, Soliz fails to show that trial counsel were deficient for failing to present the expert testimony of Ms. Flores regarding Soliz's foster care experience. Trial counsel employed a reasonable trial strategy that was informed by an extensive (and well-funded) investigation. Soliz has entirely failed to rebut the presumption that trial counsels' strategy was reasonable. Therefore, Soliz's IATC claim fails.

Further, Soliz fails to show prejudice. As detailed above, trial counsel presented an extensive mitigation case. He now argues that his trial counsel should have also presented testimony regarding the foster care system and its effects on Soliz. He makes several assertions regarding the foster care system generally. Petition at 122-23 (discussing 1995 and 2000 reports regarding

127

deficiencies in the Texas foster care system), 124 (discussing study showing foster children are more likely to suffer abuse than children in the general public). But while he makes broad generalizations about the foster care system, he identifies scant examples from the thousands of pages of records that reflect that Soliz suffered from the foster care experience.

For example, Soliz cites one example of alleged abuse, wherein a staff member at a foster care home and Soliz engaged in a confrontation. SHCR-01 at 356. The staff member pushed Soliz on the throat and the staff member was later disciplined. SHCR-01 at 356-64. The record shows, however, that Soliz said that he tried to kill a staff member during the incident. SHCR-01 at 356.

As another example, he asserts that "he was physically restrained on several occasions for seemingly harmless offenses, such as 'eating an apple in his room' and 'hanging his arm over the bed.'" Petition at 121. But the record Soliz cites also states that he was physically restrained during those instances because "[b]oth incidents e[s]calated into having Mark restrained." SHCR-01 at 342-43.

Also, while Soliz argues that an expert could have testified that youths in foster care often lose school credit due to frequent relocations, the jury was aware that Soliz was far behind in grade level. 51 RR 201. The jury was also aware that Soliz received no assistance from his family in his education.

128

Further, while Soliz argues that an expert could have testified that Soliz's frequent relocations and changes of schools caused him to be unable to develop friendships and attachments, such testimony blaming the foster care system for Soliz's lack of attachment would have been inconsistent with trial counsels' strategy to assign blame for Soliz's joining a gang at a young age due to his being at-risk because of his FASD and his neglectful family.

Soliz has failed to show that he was prejudiced by trial counsels' failure to present expert testimony or the testimony of Ms. Flores to explain the foster care system or its effects on Soliz. Soliz's jury was well aware of his chaotic upbringing and his total lack of familial support. Further, as discussed in more detail above, the aggravating evidence in this case was substantial. That being the case, Soliz's IATC claim fails. *See Sonnier v. Quarterman*, 476 F.3d 349, 356-57 (5th Cir. 2007) ("To find prejudice, there must be a reasonable probability that, absent the error, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."). As the state court found, trial counsel did not present testimony seeking to blame the foster care system for Soliz's criminal behavior because such testimony would have been inconsistent with trial counsels' strategy to focus the blame on Soliz's mother and other family for neglecting Soliz and on his mother for drinking heavily and using inhalants while pregnant. SHCR-01 at

129

761-63. For the reasons discussed above, Soliz fails to rebut the state court's findings or show that the state court's denial of this claim was unreasonable. Consequently, the claim should be denied. *Richter*, 562 U.S. at 99-102.

### K. Soliz's claim of cumulative ineffective assistance of counsel cannot afford him habeas relief.

Soliz argues that he was denied effective assistance of counsel due to the cumulative effect of the above alleged instances of ineffective assistance of counsel. Petition at 95-99. But, as discussed above, all of Soliz's claims of ineffective assistance of counsel are without merit. Consequently, Soliz's attempt to cumulate any "error" is fruitless. *United States v. Hall*, 455 F.3d 508, 521 (5th Cir. 2006).

The state habeas court rejected this claim. SHCR-01 at 758. For the reasons discussed above, the state court's rejection of Soliz's claim was reasonable. Consequently, the claim should be denied. *Richter*, 562 U.S. at 99-102.

## II.   Soliz was not Denied Effective Assistance of Appellate Counsel

Soliz claims he was denied effective assistance of appellate counsel. Specifically, he argues that his appellate counsel was ineffective for failing to argue (1) that Soliz was improperly denied the right to cross-examine Detective Danny Paine regarding bias and (2) that the trial court improperly overruled

Soliz's objection to the admission of victim-impact testimony during the guilt/innocence phase of trial. Petition at 49-53, 81-89. The claims are without merit.

## A.   Standard of review

The Fifth Circuit has held that appellate counsel's failure to raise certain issues on appeal does not deprive an appellant of effective assistance of counsel where the petitioner did not show the existence of any trial errors with even arguable merit. *Hooks v. Roberts*, 480 F.2d 1196, 1198 (5th Cir. 1973). The Fifth Circuit has also stated that, "[i]t is not only reasonable but effective for counsel on appeal to winnow out weaker arguments and focus on a few key issues. *Mayo v. Lynaugh*, 882 F.2d 134, 139 (5th Cir. 1989).

Further, in *Jones v. Barnes,* 463 U.S. 745, 749 (1983), the Supreme Court noted the federal district court's holding on this issue, as follows: "[i]t is not required that an attorney argue every conceivable issue on appeal, especially when some may be without merit. Indeed, it is his professional duty to choose among potential issues, according to his judgment as to their merit and his tactical approach." The Supreme Court went on to hold that "[n]either *Anders*[37] nor any other decision of this Court suggests, however, that the indigent defendant has a constitutional right to compel appointed counsel to press

---

[37]     *Anders v. California*, 386 U.S. 738 (1967).

nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Barnes*. 463 U.S. at 751.

### B.     Soliz was properly denied the ability to cross-examine Detective Paine regarding bias.

Soliz argues that his appellate counsel was ineffective for failing to raise on direct appeal the argument that Soliz was improperly denied the right under Texas Rule of Evidence 806 to cross-examine Detective Paine regarding Ramos's potential bias in providing the police his June 30, 2010 statement.[38] Petition at 49-53. Soliz argues that he was entitled to cross-examine Detective Paine on this issue of Ramos's bias because Ramos entered into a plea agreement with the State almost two years after making the statement. Petition at 49. The claim is without merit.

---

[38]     Texas Rule of Evidence 806 provides in relevant part,

When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported by any evidence, which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, offered to impeach the witness, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain.

### 1.    Factual background

Detective Paine testified regarding statements Ramos made to police when Ramos was interrogated. 41 RR 26-29. Detective Paine testified that Ramos made statements indicating there had been a murder the police were not yet aware of. 41 RR 26-28. During cross-examination, trial counsel moved under Texas Rule of Evidence 806 for permission to cross-examine Detective Paine regarding Ramos's plea agreement. 42 RR 5. Trial counsel stated that Ramos had agreed to a life sentence in exchange for his testimony. 42 RR 6. The trial court noted that no plea agreement had been approved by the court and the prosecutor stated that no plea offer had been made at the time of Ramos's statements to the police. 42 RR 7, 9. The trial court then denied trial counsels' request to cross-examine Detective Paine on the issue of Ramos's bias. 42 RR 11.

### 2.    Appellate counsel was not ineffective for failing to argue on direct appeal that the trial court improperly denied Soliz's request to cross-examine Detective Paine on the issue of bias.

Soliz raised this claim of ineffective-assistance-of-appellate-counsel (IAAC) in his state habeas application. SHCR-01 at 61-64. The state court denied the claim on the grounds that there was no evidence Detective Paine was aware Ramos had entered into a plea agreement and any plea offer was

not relevant because it was made almost two years after Ramos's statement to the police. SHCR-01 at 525-26. As a result, any testimony from Detective Paine on the issue of Ramos's bias would have been inadmissible under state law. SHCR-01 at 525. For the same reasons, the state court concluded that Soliz's appellate counsel was not deficient and that Soliz was not prejudiced. SHCR-01 at 753.

First, Soliz's claim fails because the state court's conclusion that appellate counsel was not deficient was based on its binding interpretation of state law. Specifically, the state court held that testimony by Detective Paine on the issue of Ramos's bias would have been inadmissible under Texas Rules of Evidence 601 and 806. SHCR-01 at 753. The state court's determination of state law in this regard is dispositive of Soliz's claim of ineffective assistance. *Charles*, 629 F.3d at 500-01. Consequently, Soliz's IAAC claim necessarily fails.

Second, Soliz cites to no relevant clearly established federal law that supports his claim. While he cites to *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986), for the proposition that "[e]vidence that the declarant is facing criminal charges is particularly probative of bias," that opinion is inapposite. Petition at 51-52. The Supreme Court in that case stated that the defendant has the right to elicit through cross-examination a witness's motivation for

134

testifying. *Van Arsdall*, 475 U.S. at 679. The Court went on to hold, however, that a trial court maintains wide latitude in placing reasonable limits on the defendant's cross-examination where the purported testimony would be "marginally relevant." *Id*. The Court's opinion does not indicate that a trial court must provide a party in a situation like this the opportunity to cross-examine a witness on the issue of bias where the underlying basis for the purported bias did not exist. Consequently, Soliz's claim fails under AEDPA and impermissibly calls for retroactive application of a new rule of constitutional law. *See Teague*, 489 U.S. at 311.

Further, Soliz was not prevented from questioning Detective Paine regarding criminal charges Ramos faced. The jury was well aware of Ramos's involvement in several of the offenses and that Ramos was a suspect in those offenses, including the murder of Nancy Weatherly. Rather, Soliz was not allowed to cross-examine Detective Paine specifically regarding a plea offer that was made to Ramos almost two years after he was interrogated. As the state court found, the plea offer simply had no bearing on the credibility of Ramos's statement to police. Ramos did not testify. Had he testified, trial counsel would have been permitted to cross-examine Ramos regarding the existence at that time of a plea offer or plea agreement. But no such plea offer or agreement existed at the time of Ramos's June 30, 2010 interview with the

police. And Detective Paine had no personal knowledge regarding any plea offer that was made to Ramos. As a result, the trial court properly limited trial counsels' cross-examination of Detective Paine.

Further, Soliz cannot show that he was prejudiced (i.e., that his conviction would have been overturned) by appellate counsel's failure to raise the claim on direct appeal. As discussed above, the claim would have been futile. Further, the purported claim would have been subject to harmless error analysis. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998) (citing Tex. R. App. P. 44.2(b)). And Ramos's statements to Detective Paine during the interrogation were harmless in light of the extensive evidence implicating Soliz including his confession, Elizabeth Estrada's testimony, and the physical evidence placing him in Ms. Weatherly's home.

Soliz argues that Detective Paine's testimony regarding Ramos's interview prejudiced him because Ramos's comment that "it was wrong" and "it didn't have to end that way," 41 RR 27, implied that it was Soliz who had killed Nancy Weatherly. Petition at 52. Taken in isolation, however, Ramos's comment could just as easily be interpreted as implying that Ms. Weatherly was shot by Ramos by accident during a burglary gone wrong. But, again, Soliz admitted to shooting Ms. Weatherly.

136

Soliz also argues that he was prejudiced because he was prevented from presenting "evidence that Ramos had arranged a plea deal with the State and that his statements were therefore unreliable." Petition at 52. But, again, Ramos had not been given a plea offer at the time he was interviewed by Detective Paine. 42 RR 7-10. The fact that Ramos was given a plea offer almost two years after his interview with Detective Paine is not probative as to the credibility of the statements Ramos made to Detective Paine.

The state court determined that the trial court properly denied his request to cross-examine Detective Paine on the issue of Ramos's bias. SHCR-01 at 753. Consequently, Soliz's appellate counsel could not have been ineffective for failing to raise a meritless claim. For the reasons discussed above, the state court's rejection of Soliz's claim was reasonable. Therefore, Soliz's claim should be denied. *Richter*, 562 U.S. at 99-102.

### C. Soliz's appellate counsel was not ineffective for failing to argue that the trial court erred in denying Soliz's objection to the admission of victim-impact testimony.

Soliz argues that his appellate counsel was ineffective for failing to argue on direct appeal that the trial court improperly overruled Soliz's objection to

the admission during the guilt/innocence phase of trial of victim-impact testimony.[39] Petition at 81-89. The claim is without merit.

### 1.    Factual background

During the guilt/innocence phase of trial, the State presented the testimony of Mary Smith (an aunt of Nancy Weatherly's daughter-in-law) and Kila Davis (Nancy Weatherly's daughter-in-law). 46 RR 6-16; 17-24. Mary Smith testified that she saw Ms. Weatherly often, that Ms. Weatherly was a private person, and that Ms. Weatherly lived close to her son. 46 RR 7.

Ms. Smith received a phone call from her husband stating that there were police officers at Ms. Weatherly's home. 46 RR 9. She went to Ms. Weatherly's home but was not allowed inside even though she told the police that she was the "nearest thing to family [Ms. Weatherly] has here right now."[40] 46 RR 9. Ms. Smith's husband called Ms. Weatherly's son, who was on a cruise ship, to inform him of Ms. Weatherly's death. 46 RR 11. The police

---

[39]    Soliz does not claim that his appellate counsel was ineffective for failing to argue that the trial court improperly overruled Soliz's objection to the admission during the guilt/innocence phase of trial of victim-character testimony. Petition at 81-89. Further, such a claim, if raised, would be unexhausted because he did not raise it in his state habeas application.

[40]    Trial counsel objected at that point on relevance grounds and asked for a continuing objection. 46 RR 9. The trial court overruled the objection, but granted the request for a continuing objection. 46 RR 9.

later turned the house over to Ms. Smith and her husband. 46 RR 13. She and her husband cleaned up where Ms. Weatherly's body had laid. 46 RR 13.

Ms. Smith testified that, based on her knowledge of Ms. Weatherly's habits and the state of Ms. Weatherly's belongings in the kitchen, she was able to tell that Ms. Weatherly had been eating cake and drinking coffee soon before she was murdered. 46 RR 14. Ms. Smith also noticed that Ms. Weatherly's two televisions and her computer were missing and that Ms. Weatherly's dentures were in the bathroom. 46 RR 14-15. Ms. Smith testified that Ms. Weatherly would never answer the door while wearing her pajamas and without her dentures. 46 RR 15. Lastly, Ms. Smith testified that she had last talked to Ms. Weatherly one week before she was murdered. 46 RR 16.

Kila Davis testified that she was Ms. Weatherly's daughter-in-law, she had known Ms. Weatherly for thirty years, and Ms. Weatherly was her best friend.[41] 46 RR 17. Mrs. Davis met Ms. Weatherly's son when she was in the seventh grade. 46 RR 18. Mrs. Davis and her husband built a home, and Ms. Weatherly moved next door to them. 46 RR 18. Mrs. Davis testified that Ms. Weatherly did not own a gun and did not lock her doors or gate. 46 RR 20. Mrs. Davis testified that there were several items missing from Ms. Weatherly's

---

[41]    Trial counsel requested at that point a continuing objection on relevance grounds. 46 RR 17. The trial court overruled the objected, but granted the request for a continuing objection. 46 RR 17.

home: two televisions, one computer, jewelry, cell phones, a truck, and a jar of change. 46 RR 21. The last time she spoke to Ms. Weatherly was to give her emergency contact information for when Mrs. Davis and her family were on vacation, and they told each other "I love you." 46 RR 22. Mrs. Davis then testified that she was on a cruise with her husband and children when they got an emergency phone call from her uncle. 46 RR 23. Mrs. Davis's husband took the phone call and she saw her husband with his head down on the table, distraught, and bawling. 46 RR 24. Mrs. Davis also identified the cassette case on which Soliz's fingerprint had been found as belonging to Ms. Weatherly. 46 RR 25.

> **2.  Appellate counsel was not ineffective for failing to argue on direct appeal that the trial court improperly allowed the admission of victim-impact evidence during the guilt/innocence phase of trial.**

Soliz raised this IAAC claim during his state habeas proceedings. SHCR-01 at 86-92. The state court rejected the claim, concluding that the complaint had not been preserved for appeal. SHCR-01 at 757. Further, the state court concluded that "the complained-of testimony did not constitute improper victim-impact testimony evidence in that [it] did not speak of the effect that Nancy Weatherly's murder had, and would continue to have, on others." SHCR-01 at 757. Rather, the state court found Ms. Smith and Mrs. Davis's

140

testimony established their qualifications to testify by showing they were acquainted with Ms. Weatherly, detailed the property that was stolen and showed that Soliz's entry into the home was without Ms. Weatherly's consent. SHCR-01 at 757-58.

Soliz argues that error with regard to the admission of victim-impact testimony was preserved for appeal. Petition at 87. But he does not acknowledge that the state court concluded that such error was not preserved. SHCR-01 at 757; SHCR-01 at 757 n.38 (citing Tex. R. App. P. 33.1 and *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009)). Nor does he attempt to show that the state court's conclusion was incorrect.[42] Consequently, he fails to show that appellate counsel were deficient for failing to raise a futile argument on appeal.

Nonetheless, Soliz argues that Ms. Smith gave victim-impact testimony when she testified regarding the "presumed impact on Weatherly's family when they heard the news" and "the impact on Smith herself including when

---

[42]    It should be noted that it has been held that objecting to testimony at trial on the grounds the testimony is irrelevant does not preserve an appellate challenge on the ground that the testimony constituted inadmissible victim-impact testimony. *Karnes v. State*, 127 S.W.3d 184, 195 (Tex. App.-Fort Worth 2003, pet. ref'd); *see Mays v. State*, 318 S.W.3d 368, 391-92 (Tex. Crim. App. 2010); *Guevara v. State*, 97 S.W.3d 579, 583 (Tex. Crim. App.) (holding that complaint regarding admission of victim-impact testimony was not preserved because the objection at trial did not comport with the complaint raised on appeal).

she later cleaned up the crime scene." Petition at 87-88. This testimony does not constitute victim-impact testimony. *See Mosley*, 983 S.W.2d at 266 ("Victim impact evidence is evidence of the effect the death of the complainant has had on his or her family and friends.") (Mansfield, J., concurring). None of the complained-of testimony from Ms. Smith told the jury of the impact Ms. Weatherly's murder had on her. In particular, her recalling cleaning up Ms. Weatherly's home did not convey the impact Ms. Weatherly's death had, or would continue to have, on her or anyone else. Ms. Smith's testimony was relevant to inform the jury of the items Soliz had stolen from Ms. Weatherly's home and to demonstrate that Soliz had entered Ms. Weatherly's home forcefully and without her consent. Consequently, appellate counsel could not have been ineffective for failing to raise this futile argument on appeal.

Soliz also argues that Mrs. Davis gave victim-impact testimony when she testified that Ms. Weatherly cared for her family and related the impact Ms. Weatherly's death had on her family. Petition at 88. The only testimony of Ms. Davis that could be characterized as victim-impact testimony, however, is her testimony that her husband was distraught and bawling when he was informed of Ms. Weatherly's death. 46 RR 24. Nonetheless, the admission of victim-impact testimony is subject to harmless error review on appeal. *Haley v. State*, 173 S.W.3d 510, 518-19 (Tex. Crim. App. 2005) (reviewing admission

142

of victim-impact testimony for harm by considering the likelihood the jury's decision was adversely affected by the error in light of the evidence admitted at trial, the nature of the evidence supporting the verdict, and the character of the alleged error). As noted above, the evidence implicating Soliz in Ms. Weatherly's murder was overwhelming. For that reason, Soliz has not shown that his appeal would have been successful if this issue had been raised. Consequently, Soliz's appellate counsel could not have been ineffective for failing to raise a futile argument on appeal.

## III.   Soliz has not Established Cause and Prejudice for the Default of His IATC Claim that Trial Counsel Were Ineffective for Opening the Door to the Admissibility of Soliz's Videotaped Confession.

Soliz argues that his state habeas counsel was ineffective for failing to raise an IATC claim alleging that trial counsel were ineffective for opening the door to the admissibility of Soliz's videotaped interview with police.[43] Petition at 26-30. He argues that the underlying IATC claim is defaulted because it was not presented in his initial state habeas application, that the IATC claim is substantial, and that his state habeas counsel's failure to raise the claim amounted to ineffective assistance. As a result, he argues, he has established

---

[43]     Soliz's argument is not a claim for relief, but rather an effort to establish cause and prejudice for the default of his underlying defaulted IATC claim. *Martinez*, 132 S. Ct. at 1319-20 (holding that its rule is "equitable," not "constitutional," and that a claim of ineffective assistance of state habeas counsel is not a claim because it does not provide "an independent basis for overturning his conviction")

cause and prejudice under *Martinez* for the default of the IATC claim. As discussed below, Soliz's argument fails because he has failed to show either that his state habeas counsel was ineffective or that the underlying IATC claim is substantial.

### A.     Standard of review under *Martinez v. Ryan*

It is Soliz's burden to establish cause and prejudice under *Martinez* for the default of his IATC claim. 132 S. Ct. at 1318; *McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991). In determining whether Soliz has met his burden under *Martinez*, this Court must determine whether Soliz's state habeas counsel was ineffective by applying the strictures of *Strickland* and its progeny to counsel's performance during the initial state habeas proceedings. *Martinez*, 132 S. Ct. at 1318. Consequently, Soliz must show "that [state habeas counsel] was objectively unreasonable . . . in failing to" raise the particular claim he argues should have been raised. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

It is "possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Id*. at 288; *see Jones v. Barnes*, 463 U.S. 745, 751-53 (1983).  For a court "to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy that underlies

144

*Anders*. Nothing in the Constitution or [the Court's] interpretation of that document requires such a standard." *Barnes*, 463 U.S. at 754; *see also Mayo v. Lynaugh*, 882 F.2d 134, 139 (5th Cir. 1989); *Hooks v. Roberts*, 480 F.2d 1196, 1198 (5th Cir. 1973). Appellate counsel's deliberate choice to not raise a particular claim does not constitute cause for the procedural default of that claim. *Smith v. Murray*, 477 U.S. 527, 533-34 (1986). If this Court finds that state habeas counsel was ineffective for failing to raise the underlying IATC claim, the Court must determine whether the underlying claim is "substantial," i.e., "has some merit." *Martinez*, 132 S. Ct. at 1318-19 (citing *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that jurists of reason could . . . conclude the issues presented are adequate to deserve encouragement to proceed further")).

Further, as discussed above, a petitioner's claim that he was denied constitutionally effective assistance of trial counsel requires him to prove both that (1) counsel rendered deficient performance, and (2) counsel's actions resulted in actual prejudice. *Strickland*, 466 at 687-88, 690. Failure to prove either deficient performance or prejudice will defeat an ineffective-assistance-of-counsel claim, making it unnecessary to examine the other prong. *Id*. at 687.

If this Court finds that Soliz has established that state habeas counsel was ineffective for failing to raise the underlying IATC claim and that the IATC claim is substantial, the Court must then determine whether Soliz was prejudiced by state habeas counsel's failure to raise the claim, i.e., whether the state habeas court would have granted Soliz relief on the underlying IATC claim if it had been raised. *See Strickland*, 466 U.S. at 694; *see also Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012) ("In applying this standard, *Martinez* made clear that a reviewing court must determine whether the petitioner's attorney in the first collateral proceeding was ineffective under *Strickland*, whether the petitioner's claim of ineffective assistance of trial counsel is substantial, *and* whether there is prejudice.") (emphasis in original). Finally, if this Court finds that Soliz was prejudiced, the Court will conduct a merits review of the IATC claim. *Martinez*, 132 S. Ct. at 1320 ("A finding of cause and prejudice . . . merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted.").

### B.   Soliz has failed to show that state habeas counsel was ineffective.

Soliz makes no attempt to demonstrate that state habeas counsel performed deficiently. Petition at 26-30. For example, Soliz does not attempt to rebut the presumption that state habeas counsel performed effectively by

making a deliberate decision to weed-out the underlying IATC claim and focus on other stronger claims.[44] *See Robbins*, 528 U.S. at 288-89; *United States v. Williamson*, 183 F.3d 458, 462-63 (5th Cir. 1999) (stating that review of appellate counsel's performance is deferential and presumes that counsel's conduct fell "within the ride range of reasonable professional assistance"). As a result, Soliz's effort to establish cause and prejudice under *Martinez* fails because *Martinez* requires a showing that state habeas counsel performed deficiently.

Further, state habeas counsel filed a 141-page application, raising eighteen claims for relief including ten IATC claims and supported the claims with several exhibits. SHCR-01 at 8-444. In light of the lengthy application filed by state habeas counsel, Soliz fails to rebut the presumption that state habeas counsel performed reasonably. Nonetheless, as discussed below the underlying IATC claim is insubstantial and without merit.

### C.   **Soliz has failed to show that the underlying IATC claim is substantial.**

Soliz's underlying IATC claim is that his trial counsel were ineffective for "opening the door" to the admission of his videotaped interview with police.

---

[44]    As noted below, Soliz's argument requires him to overcome two presumptions of reasonableness, i.e., that his state habeas counsel performed reasonably and that trial counsel made the reasonable strategic decision to offer Soliz's videotaped interview into evidence.

Petition at 26-30. But as discussed below, the IATC claim is insubstantial and, for the same reason, Soliz cannot show that he was prejudiced by state habeas counsel's failure to raise an insubstantial claim.

As discussed above, trial counsel filed a pre-trial motion to suppress Soliz's statements to police. 2 CR 264-67. The trial court held a two-day hearing, after which it entered findings and denied the motion to suppress. 9 CR 1746-50. During the cross-examination of Detective Paine, trial counsel offered into evidence Soliz's videotaped interview with police. 41 RR 135; DX 8. At that time, the trial judge excused the jury and asked trial counsel whether they indeed intended to offer the evidence. 41 RR 134-35. Trial counsel confirmed that they so intended, and trial counsel then published the videotape to the jury. 41 RR 138. After publishing the videotape to the jury, trial counsel asked Detective Paine questions about his earlier assertion on direct examination that Soliz was smarter than his cohort Ramos. 41 RR 100-01, 138-39. Trial counsel asked Detective Paine whether "smart criminals" use drugs and then commit crimes (as Soliz had admitted in the interview), engage in high-speed car chases with police (as Soliz had admitted in the interview), waive their rights and speak to the police (as Soliz did in the interview), or implicate themselves on videotape (as Soliz did in the interview). 41 RR 138-39. Trial counsel also asked Detective Paine whether smart criminals invoke

148

their rights like Ramos did. 41 RR 139. Lastly, Detective Paine asked whether smart criminals use "dumb criminals to do their dirty work." 41 RR 140. Thereafter, the State offered into evidence Soliz's two written statements. 41 RR 148-49. Trial counsel stated that the defense has "[n]o additional objections" to the admission of the written statements. 41 RR 150.

During the state habeas proceedings, trial counsel, Michael Heiskell, provided the court with an affidavit. SHCR-01 at 556-57. Mr. Heiskell responded to Soliz's claim that trial counsel were ineffective for failing to hire a false confession expert to testify at the hearing on the motion to suppress. SHCR-01 at 556-57. Mr. Heiskell explained that they did not hire a false confession expert "because [they] felt it was totally unnecessary in light of the totality of the circumstances surrounding the confession, and the corroborating evidence that existed connecting Mr. Soliz to the crimes." SHCR-01 at 556. As the affidavit makes clear, trial counsel believed that Soliz's statements were admissible. Trial counsel also acknowledged that the evidence of Soliz's guilt was "overwhelming," and they proceeded with a "strategy of focusing on the equally compelling and overwhelming nature of mitigation." SHCR-01 at 556. And at the time trial counsel offered Soliz's videotaped interview into evidence, the trial court had denied the motion to suppress the statements. It is clear

149

that trial counsel made the strategic decision to then use Soliz's confessions in order to support their case in mitigation.

This strategy was borne out throughout the trial. Trial counsel attempted to show that the effects of Soliz's FASD, drug use, and chaotic upbringing caused him to act irrationally and impulsively, that Ramos was the leader in the commission of the robberies and murders, and that Soliz was the follower. Indeed, trial counsel laid the groundwork for its mitigation case during the guilt/innocence phase of trial. 38 RR 231-36 (trial counsel's cross-examination of Sammy Abu-Lughod emphasizing that Soliz's robbery of Abu-Lughod took place in daylight with witnesses nearby and that Soliz made a "crazy" comment as he drove away in Abu-Lughod's car); 39 RR 11 (trial counsel's cross-examination of Officer Jerry Cedillo asking whether the abuse of drugs can lead an individual to commit crimes); 39 RR 85-95, 110-13, 119-20 (trial counsel's cross-examination of Officer Jesus Alaniz regarding the risk factors that lead a young person to join a gang); 41 RR 89-90 (Detective Paine's testimony on cross-examination that Ramos invoked his right to counsel and refused to sign a statement and that Ramos said that Soliz was "not all there mentally"), 100 (Detective Paine's testimony that criminals take advantage of others to act on their behalf); 42 RR 32-38 (Detective Paine's testimony on cross-examination that Ramos gave the gun used in the shootings to Soliz and

that Ramos was an active participant in the offenses); 45 RR 215 (trial counsel stating during cross-examination of Detective John Lewallen that Soliz's breaking glass with his hand while breaking into a house was "not the brightest thing to do"); 47 RR 56-62 (trial counsel's closing argument that Ramos was more intelligent than Soliz, and that the police talked Soliz into confessing). Trial counsel used Soliz's confession to bolster this strategy by showing that Soliz was gullible and did things that were not "smart," as compared to Ramos. Such a strategy was entirely consistent with trial counsels' effort to focus on a compelling and overwhelming showing of mitigation during the punishment phase of trial by showing the effects of Soliz's upbringing and FASD. Even if trial counsels' strategy would likely not result in a more favorable guilt/innocence verdict, the strategy was a plainly reasonable one in attempting to secure a life sentence. In light of the overwhelming evidence of Soliz's guilt, Soliz fails to rebut the presumption that trial counsels' strategy was reasonable.

Moreover, Soliz complains only that trial counsel waived any error in the admission of the videotaped interview with police by offering that evidence. Petition at 26-30. He does not allege that trial counsel were ineffective for failing to object to the admission of Soliz's two written statements. Petition at 26-30. Again, Soliz's written confessions detail his involvement in several

extraneous aggravated robberies and his murder of Ms. Weatherly. SX 2, 3. As a result, Soliz cannot show that he was prejudiced by trial counsels' offering into evidence the videotape of the interview because Soliz's statements in the interview, SX 1-A, are cumulative of his two written statements. SX 2, 3.

For the reasons discussed above, Soliz's attempt to establish cause and prejudice for the procedural default of the underlying IATC claim fails. Therefore, the IATC claim should be dismissed as procedurally defaulted.

### D.    Alternatively, Soliz's underlying IATC claim is meritless.

For the same reasons discussed above, Soliz's IATC claim is meritless. Consequently, even if this Court were to review the merits of the IATC claim, the claim would be subject to denial.

## IV.   Soliz's Claim that His Death Sentence Violates His Rights to Due Process and to Be Free from Cruel and Unusual Punishment because He Suffers from Fetal Alcohol Spectrum Disorder Is without Merit.

Soliz argues that his death sentence violates his rights to due process and to be free from cruel and unusual punishment because he suffers from FASD.[45] Petition at 131-53, 192-94. He argues that individuals who suffer from FASD suffer from similar deficits as the intellectually disabled and,

---

[45]    Notably, Soliz raised this claim in his petition for a writ of certiorari on direct appeal. *Soliz v. Texas*, No. 14-6320 (2015). The Supreme Court denied the petition. *Id*.

consequently, the Supreme Court's holding in *Atkins v. Virginia*,[46] should be extended to such individuals from capital punishment. Petition at 131-53, 192-94. The claim is without merit.

### A. There is no consensus or emerging consensus in favor of prohibiting the execution of capital offenders with FASD, as no state legislature has enacted such a prohibition.

The Court in *Atkins*, held that the Eighth Amendment prohibits the execution of the intellectually disabled. 536 U.S. at 321. Individuals who are not intellectually disabled, however, "are unprotected by the [*Atkins*] exemption and will continue to face the threat of execution." *Id*. at 320. Soliz does not contend that he is intellectually disabled. Indeed, Soliz's experts acknowledged at trial that Soliz is not intellectually disabled because he has an I.Q. of ninety, which is well above the threshold I.Q. score of seventy (or seventy-five, accounting for the standard error of measurement). 55 RR 45-46; *see Hall v. Florida*, 134 S. Ct. 1986, 1994-99 (2014). But Soliz argues that he should be exempt from the death penalty on the basis of his diagnosis of PFAS. Petition at 131-53, 192-94. He argues that individuals with FASD should be exempt from execution because FASD causes cognitive and adaptive deficits similar to those of an intellectually disabled individual and that the reasoning underlying the Court's *Atkins* decision mandates that individuals with FASD

---

[46]     536 U.S. 304 (2002).

also be exempted from execution. Petition at 132-37. Soliz's request to extend the *Atkins* holding should be rejected.

The Eighth Amendment draws its meaning from "the evolving standards of decency that mark the progress of a maturing society." *Atkins*, 536 U.S. at 311-12. In considering whether to impose a categorical bar to the death penalty, the Court first considers "'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue." *Graham v. Florida*, 560 U.S. 48, 61 (2010) (quoting *Roper v. Simmons*, 543 U.S. 551, 572 (2005)). "[T]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Atkins*, 536 U.S. at 312 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 331 (1989)).

In *Atkins*, the Court revisited its earlier decision in *Penry*, in which the Court had determined that there was no national consensus against executing an intellectually disabled individual. 536 U.S. at 314. The Court noted in *Atkins*, "[m]uch has changed since" *Penry* was decided. 536 U.S. at 314. Only two state legislatures had enacted prohibitions against executing intellectually disabled individuals at the time *Penry* was decided, but eighteen states had banned such executions and similar legislation was pending in several other states at the time the Court decided *Atkins*. *Id.* at 314-15. The Court noted that

154

it was "not so much the number of these States that [was] significant, but the consistency of the direction of change," *id*. at 315, and further noted that its conclusion was bolstered by the increasingly infrequent execution of such individuals even in states without bans. *Id*. at 316.

In *Simmons*, the Court likewise relied on a "national consensus" to determine the scope of the categorical ban on the execution of a juvenile capital offender. 543 U.S. at 574. The Court described the national consensus against the death penalty for juveniles as "similar, and in some respects parallel" to the national consensus relied upon in *Atkins*. *Id*. at 565. Specifically, eighteen of the states that imposed the death penalty had prohibited the "juvenile death penalty." *Id*. The Court also noted that even in states without the prohibition, only three had executed offenders in the previous ten years for crimes committed as juveniles. *Id*. The Court summarized that

> the objective indicia of consensus in this case—the rejection of the juvenile death penalty in the majority of States; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice—provide sufficient evidence that today our society views juveniles . . . as categorically less culpable than the average criminal.

*Id*. at 567 (internal quotation marks omitted).

*Hall v. Florida* reaffirmed that *Atkins* "did not give the States unfettered discretion to define the full scope of the constitutional protection." 134 S. Ct. at

155

1998. *Hall* made clear that the "national consensus" identified in *Atkins* defined that scope. Thus, in assessing whether Florida's strict cutoff of a seventy I.Q. in identifying capital offenders with intellectual disability was permissible, the Court once again looked to state legislatures to determine the prevailing "national consensus." *Id.* at 1996-98. Finding that only one other state imposed a strict I.Q. cutoff, the Court concluded, "[t]he rejection of the strict [seventy] cutoff in the vast majority of States and the 'consistency in the trend' toward recognizing the [standard error of measurement] provide strong evidence of consensus that our society does not regard this strict cutoff as proper or humane." *Id.* at 1998 (quoting *Simmons*, 543 US at 572).

Thus, each of the Court's decisions adopting a categorical ban on the death penalty has done so based on a clearly identifiable "national consensus" that executions of a person in that particular category should be prohibited. Soliz does not even attempt to demonstrate that a national consensus currently exists against imposing the death penalty on individuals with FASD. Indeed, no legislature has prohibited the execution of capital offenders with FASD. Accordingly, it has been held that the *Atkins* exemption does not extend to individuals with FASD. *Faulkner v. State*, 2014 WL 4267460, at *83-85 (Tenn. Crim. App. 2014); *Trevino v. Thaler*, 678 F. Supp. 2d 445, 479-80 (W.D. Tex. 2009), *vacated and remanded on other grounds*, 133 S. Ct. 1911 (2013).

Notably, courts have repeatedly refused to extend the *Atkins* holding to the mentally ill based on the assertion that they suffer from similar impairments as the intellectually disabled. *Ward v. Stephens*, 777 F.3d 250, 269 (5th Cir. 2015); *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014); *Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir. 2012); *People v. Boyce*, 330 P.3d 812, 849-53 (Cal. 2014) ("[T]here is no objective evidence that a national consensus has developed against executing persons with intellectual impairment *short* of intellectual disability or insanity.") (emphasis in original); *State v. Mammone*, 13 N.E.3d 1051, 1089-90 (Ohio 2014) (noting that no court "has ever recognized the seriously mentally ill as a category of offenders who cannot be constitutionally executed"); *State v. Dunlap*, 313 P.3d 1, 35-36 (Idaho 2013) (collecting cases); *Malone v. State*, 293 P.3d 198, 216 and n.10 (Okla. Crim. App. 2013); *id.* at 216 n.10 (collecting cases); *Commonwealth v. Robinson*, 82 A.3d 998, 1019-22 (Pa. 2013); *Carroll v. State*, 114 So.3d 883, 886-88 (Fla. 2013); *Schoenwetter v. State*, 46 So.3d 535, 562-63 (Fla. 2010) (refusing to extend *Atkins* to capital offender with Asperger's Syndrome, ADHD, or frontal lobe damage); *Mays v. State*, 318 S.W.3d 368, 379-80 (Tex. Crim. App. 2010); *State v. Irick*, 320 S.W.3d 284, 297-98 (Tenn. 2010); *Johnston v. State*, 27 So.3d 11, 26-27 (Fla. 2010); *Commonwealth v. Baumhammers*, 960 A.2d 59,

96-97 (Pa. 2008);[47] *Lawrence v. State*, 969 So.2d 294, 300 n.9 (Fla. 2007); *State v. Hancock*, 840 N.E.2d 1032, 1059-60 (Ohio 2006); *Matheney v. State*, 833 N.E.2d 454, 456-58 (Ind. 2005); *Lewis v. State*, 620 S.E.2d 778, 786 (Ga. 2005); *Battaglia v. State*, 2005 WL 1208949, at *10 (Tex. Crim. App. 2005) (refusing to extend *Atkins* to capital offender with bipolar disorder). Consequently, Soliz has not demonstrated that a national consensus exists in favor of prohibiting the execution of individuals with FASD and his Eighth Amendment claim necessarily fails.

To be sure, the Court in *Atkins* discussed the "reduced capacity" of intellectually disabled individuals as a "justification" for the categorical ban on executing such individuals. *Atkins*, 536 US at 320. But the Court did so in the context of providing "reasons consistent with the legislative consensus that the mentally retarded should be categorically excluded from execution," and in the context of making an "independent evaluation" of the issue. *Id.* at 318, 320. *Atkins* does not suggest that in the absence of a national consensus, the

---

[47]    The concurring opinion in *Baumhammers* noted that only one state, Connecticut, had implemented legislation prohibiting the execution of a mentally ill capital offender. 960 A.2d at 105 n.4 (Todd, J. concurring). That legislation prohibited the execution of an offender whose "mental capacity was significantly impaired" or "ability to conform [his] conduct to the requirements of the law was significantly impaired but not so impaired . . . as to constitute a defense to prosecution." Conn. Gen. Stat. Ann. § 53a-46a(h) (2012). Connecticut subsequently repealed the death penalty. *See State v. Roszkowski*, 2013 WL 5614585, at *7 (Conn. Super. Ct. 2013).

reduced capacity of a group of individuals who are not intellectually disabled provides grounds for a new categorical ban on their execution. Indeed, the Court undertakes such an independent evaluation only after finding that a consensus exists. *Id.* at 313 ("[I]n *cases involving a consensus*, our own judgment is 'brought to bear' by asking whether there is reason to disagree with the judgment reached by the citizenry and its legislators.") (quoting *Coker v. Georgia*, 433 US 584, 597 (1977)) (emphasis added; internal citation omitted). Nonetheless, as discussed below, Soliz has failed entirely to demonstrate that individuals with FASD should be categorically exempt from the death penalty.

No national consensus exists against executing an individual with FASD. Consequently, the Eighth Amendment does not prohibit the execution of individuals with FASD and the issue is not worthy of the Court's attention.

**B.   Soliz has failed to demonstrate that the penological purposes of the death penalty are not served by permitting the execution of individuals with FASD.**

Soliz asserts that his FASD renders him unable to act with the level of moral culpability that characterizes the most serious adult criminal conduct. Petition at 132-36. Accordingly, Soliz argues, his impairments (e.g., impulsivity, inability to plan or learn from mistakes) caused by FASD reduce

his moral culpability and reduce the deterrent effect of the death penalty. Petition at 132-37, 192-94. Soliz is incorrect.

First, it should be noted again that Soliz does not suffer from FAS. 53 RR 214; 55 RR 36. Soliz's experts, Drs. Adler, Connor, and Brown, testified regarding FASD. The experts testified that Soliz's mother frequently drank alcohol and sniffed paint during her pregnancy with Soliz. *See, e.g.*, 53 RR 88-90, 104. They testified that her ingestion of those substances during pregnancy adversely affected the development of Soliz's brain. *See, e.g.*, 53 RR 54. Dr. Adler described the spectrum of FASD, which includes the following categories: (1) FAS with confirmed maternal exposure; (2) FAS without confirmed maternal exposure; (3) PFAS; (4) ARND; and (5) ARBD. 53 RR 59-61, 70-71. In order to diagnose an individual with FAS, the individual must possess, *inter alia*, three characteristic facial abnormalities: (1) a smooth philtrum; (2) a flat upper lip; and (3) a palpebral fissure that is shortened horizontally by two or more standard deviations from the norm. 53 RR 46, 61, 142, 144-45. Soliz lacked those facial abnormalities and, consequently, could not be diagnosed with FAS. *See, e.g.*, 53 RR 109-10, 145, 148. But Soliz's experts diagnosed him with PFAS due to his deficits in cognitive and executive functioning and prenatal exposure to alcohol. *See, e.g.*, 54 RR 69. Soliz's experts acknowledged, however, that the international scientific community has not reached a

consensus "regarding evidence-based diagnostic criteria for any prenatal alcohol related condition other than FAS," and that "the only diagnostic category with scientific evidence to support clinical criteria is FAS." 53 RR 163; *see* 53 RR 159-61; 55 RR 39.

Therefore, in light of the absence of a scientific consensus as to the diagnostic criteria of the different conditions within the FASD spectrum, Soliz's request to impose a blanket and categorical prohibition on the execution of individuals with FASD is entirely overbroad. Soliz essentially asks the Court to "establish a new, ill-defined category of murderers who would receive a blanket exemption from capital punishment without regard to the individualized balance between aggravation and mitigation in a specific case." *Hancock*, 840 N.E.2d at 1059-60. It would be seemingly impossible to say that individuals with FASD are necessarily and categorically less morally culpable without even having agreed-upon criteria with which to diagnose those individuals. The inability of scientists to delineate, based upon scientific criteria, between the different diagnoses under FASD is an important reason to reject Soliz's request for a blanket and categorical prohibition of the execution of individuals with FASD.

Moreover, Dr. Adler testified that a diagnosis of ARBD, one of the diagnoses within the spectrum of FASD, may be made where the individual

161

was exposed in utero to alcohol but does not suffer from neurological and behavioral impairment, although the individual may suffer from physical impairments caused by the prenatal exposure to alcohol. 53 RR 70-71. Soliz's request that the Court prohibit the execution of individuals who suffer from FASD is, therefore, entirely overbroad where such a prohibition would exempt from the death penalty individuals who do not have "reduced capacity."

Nonetheless, Soliz has not shown that the penological goals of retribution and deterrence are not furthered by permitting the execution of individuals with FASD. The Court stated in *Atkins* that intellectually disabled individuals "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." 536 U.S. at 318. Those deficiencies "diminish [the intellectually disabled's] personal culpability" such that their execution does not "measurably contribute" to either penological goal of the death penalty, retribution or deterrence. *Id.* For example, the Court stated that the execution of the intellectually disabled would not serve as a deterrent because intellectually disabled individuals are, due to their diminished ability to engage in logical reasoning or control impulses, unable to premeditate and deliberate prior to committing a murder by controlling their conduct based on

162

the possibility of receiving the death penalty. *Id*. at 320. Moreover, the Court stated that the intellectually disabled's "reduced capacity" creates a risk that those individuals will falsely confess, fail to make a persuasive showing in mitigation, or be able to assist their counsel. *Id*. at 320-21.

According to Soliz's witnesses, he was, unlike intellectually disabled individuals, able to conform his conduct despite his alleged PFAS. 55 RR 25-26; *see Atkins*, 536 U.S. at 320. Soliz's PFAS also did not prevent him from knowing right from wrong. 51 RR 154; 52 RR 44-45, 52; 55 RR 229, 279. Moreover, Soliz has not shown that his PFAS caused him to commit this capital murder or to falsely confess to it, that he was unable to give meaningful assistance to his counsel, or that his PFAS was a "double-edged sword." *Id*. 320-21; *see Boyce*, 330 P.3d at 851. Indeed, the substantial amount of evidence presented by the defense during both phases of trial belies any suggestion that Soliz was unable to adequately assist his counsel in presenting his case. Further, unlike intellectually disabled individuals, who the Court noted in *Atkins* are not "more likely than others to engage in criminal conduct than others," *Atkins*, 536 U.S. at 318, Soliz's experts testified that over half, "about sixty percent," of individuals with FASD have "trouble with the law." 53 RR72; 54 RR 78, 83-84.

Moreover, the evidence presented at trial showed that Soliz was not a follower in this crime and his crime spree showed his ability to plan and premeditate. Detective Paine testified that in his opinion, Soliz was more sophisticated, calculated, and dangerous than Ramos. 41 RR 100-01. Detective Paine testified that, in his sixteen years as a police officer, Soliz was the most dangerous person with whom he had come into contact. *Id.* at 101. Prior to the crime spree, Soliz told Ramon Morales, to whom Soliz sold guns he had stolen, that he would not sell Morales some of the guns he had because he had "plans for them." *Soliz*, 432 S.W.3d at 897. Notably, Soliz's cohort, Ramos, did not participate in all of Soliz's crimes. 41 RR 48. After committing the instant capital murder, Soliz planned to obtain more ammunition "so that he could kill a girl who had seen him shoot [Luis] Luna because [Soliz] had heard that she had talked to a detective." *Soliz v. State*, 432 S.W.3d at 902. Further, Soliz targeted Ruben Martinez because he believed he would have a significant amount of money, and he then lay-in-wait behind a dumpster to rob Ruben. This evidence, and the evidence that Soliz planned and intended to silence a witness to one of his crimes entirely contradicts the suggestion that Soliz's PFAS prevented him from being able to plan or premeditate such that he is less morally culpable than other murderers.

Soliz presented extensive amounts of testimony and documentary evidence of FASD and his upbringing. That evidence was fully before the jury, and the jury properly considered it when it answered the special issues. The jury is the proper arbiter in a case like this to weigh the evidence and make the determination of whether the death penalty is warranted. Soliz has failed to show that the penological purposes served by the death penalty do not apply to him or generally to individuals with FASD. For these reasons, Soliz fails to justify a blanket and categorical ban on executions of individuals with FASD. And because the Supreme Court has not extended *Atkins* to exempt individuals suffering from FASD from capital punishment, the state court's rejection of Soliz's claim was reasonable. Consequently, his claim should be denied.

## V.   Soliz's Challenges to the Texas Death Penalty Scheme Are without Merit.

Soliz makes several arguments challenging the constitutionality of the Texas death penalty scheme. Specifically, he argues that the trial court erred in (1) denying his motion to declare the "10-12" rule unconstitutional, (2) providing the jury during the punishment phase of trial with an instruction that restricted the type of evidence the jury could consider mitigating, and (3) providing the jury during the punishment phase of trial with a future dangerousness instruction that is unconstitutionally vague. Petition at 153-71,

165

177-92. He also argues that the death penalty is unconstitutional because it is arbitrarily administered. Petition at 171-77. Soliz's claims are without merit.

### A. Soliz's claim that the "10-12" rule is unconstitutional is without merit.

Soliz argues that the "10-12" rule prevents jurors from considering and giving effect to mitigating evidence.[48] Petition at 154. The claim is foreclosed by precedent and without merit.

Under the so-called "10-12" Rule, juror unanimity is required during the punishment phase to find that the defendant poses a future danger. *See* Article 37.071, § 2(d). To answer "no" to the future dangerousness issue, at least ten jurors must agree. *See* Article 37.071, § 2(b)(1), (d)(2). Next, when the jurors are asked whether they find mitigation sufficient to assess a punishment other than death, unanimity is required for a "no" answer and a vote of ten is required for a "yes" answer. Article 37.071, § 2(e)(1), (f). If, however, the jurors are not unanimous in voting "yes" on future danger and are not unanimous in voting "no" on mitigation, the trial court, regardless of whether ten jurors agree to vote "no" on future danger and "yes" on mitigation, will sentence the defendant to life in prison. Article 37.071, § 2(g). Neither the court nor the

---

[48]    Soliz notes that he does not argue that the jury must be instructed of the consequences of a single holdout juror. Petition at 155.

attorneys may tell the jurors the legal consequence of their failure to achieve unanimity leading to a death sentence. Article 37.071, § 2(a)(1).

Soliz argues that the Texas system violates those principles set out in *Mills v. Maryland*,[49] and re-emphasized in *McKoy v. North Carolina*.[50] But the principles set out in *Mills* are inapposite. There, the Maryland statute had been written such that an individual would be sentenced to death unless the jurors unanimously agreed which mitigating factor justified a life sentence. 486 U.S. at 371. Hence, even if all jurors agreed that the individual should receive a life sentence, but disagreed about which specific mitigating factor was sufficient, the individual would be sentenced to death. *Id*. The Supreme Court held that the system violated the Eighth Amendment. *Id*. at 375.

In *McKoy*, the Supreme Court reviewed a similar North Carolina statute. 494 U.S. 433. Again, before the jurors could give effect to the defendant's mitigating evidence, they had to agree unanimously about which mitigating factor had been proven. *See id*. at 439. Hence, a single holdout juror would lead to a death sentence. *See id*.

Under the Texas system, the jurors need not agree about any specific mitigating factor. Before a defendant receives a death sentence, the jurors

---

[49]     486 U.S. 367 (1988).

[50]     494 U.S. 433 (1990).

must be unanimous that he poses a future danger and must be unanimous that there is insufficient mitigation. Any lack of unanimity—any juror holdout—will lead to a life sentence. The Texas system, therefore, does not violate those principles set out in *Mills* and *McKoy*.

The Fifth Circuit has consistently determined that the "10-12" Rule does not violate the Eighth Amendment or the Fourteenth Amendment. *Reed v. Stephens*, 739 F.3d 753, 779 (5th Cir. 2014); *Sprouse v. Stephens*, 748 F.3d 609, 623 (5th Cir. 2014); *Blue v. Thaler*, 665 F.3d 647, 669-70 (5th Cir. 2011); *Druery v. Thaler*, 647 F.3d 535, 544 (5th Cir. 2011) (rejecting petitioner's argument that *Caldwell v. Mississippi*, 472 U.S. 320 (1985) provided a basis upon which to challenge the 10-12 rule); *Hughes v. Dretke*, 412 F.3d 582, 594 (5th Cir. 2005); *Miller v. Johnson*, 200 F.3d 274, 288-89 (2000); *Parr v. Thaler*, 481 F. App'x 872, 878-79 (5th Cir. 2012) (unpublished). Soliz has not shown that the state court's resolution of this issue involved an unreasonable application of Supreme Court precedent, i.e., *Mills*, *McKoy*, and *Jones*. *See* § 2254(d). Any attempt to extend the holding of *Mills*, *McKoy*, or *Jones* to the Texas system is barred by the rules against retroactive application of a new constitutional rule in habeas proceedings. *See Teague*, 489 U.S. at 311. Consequently, Soliz's claim must be denied.

Relatedly, Soliz argues that opinions of the Sixth and Seventh Circuits "show that clearly established federal law requires that capital jurors be made aware of their individual power to prevent the death penalty by giving effect to mitigating circumstances absent an agreement of the other jurors regarding the presence of those mitigating circumstances. Petition at 161-64 (citing *Davis v. Mitchell*, 318 F.3d 682, 690 (6th Cir. 2003); *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir. 1989)) (internal quotation marks omitted). But as the Supreme Court has stated, "AEDPA permits habeas relief only if a state court's decision is 'contrary to, or involved an unreasonable application of, clearly established Federal law' as determined by this Court, *not by the courts of appeals.*" *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (quoting 28 U.S.C. § 2254(d)(1)) (emphasis added). Consequently, Soliz's claim fails to meet the standard of AEDPA because he does not point to clearly established law from the Supreme Court that supports his claim. Further, this Court in *Druery* explicitly rejected the extension of *Kubat*. *Druery*, 647 F.3d at 543. This Court in *Allen v. Stephens*, 805 F.3d 617, 632 n.3 (5th Cir. 2015), also rejectedthe argument that *Davis* and *Kubat* call into question this Court's jurisprudence. Therefore, the claim should be denied.

Finally, while Soliz "concedes that this claim has been consistently rejected" by the Fifth Circuit because it is both meritless and barred by *Teague*,

169

he argues that the court's precedent has not addressed whether the claim was affected by the 1991 change in law in light of *Penry v. Lynaugh*, 492 U.S. 302 (1989). Petition at 165-71. But the Fifth Circuit has also rejected this argument. *Davila v. Davis*, --- F. App'x ---, 2016 WL 3171870, at *7-8 (5th Cir. 2016) (citing *Allen*, 805 F.3d at 624, 631-33). As noted in *Allen*, the Fifth Circuit has rejected this very claim in numerous cases involving capital murders committed after 1991. 805 F.3d at 632-33. For example, the Fifth Circuit has rejected the *Mills* argument in *Reed*, *Parr*, *Druery*, and *Hughes*, cited above.

*Mills* continues to have no application to states like Texas that do not require the jury to make threshold factual determinations that limit the mitigating evidence available to be weighed by the jury on the ultimate sentencing issues. *Mills* found Eighth Amendment error because jury-unanimity instructions created a "substantial probability that individual jurors . . . may well have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills*, 486 U.S. at 384. But Texas does not require jurors to agree on what evidence they deem mitigating before they can consider that factor in the ultimate sentencing issues. As the Fifth Circuit has concluded, the Texas system "is completely different from that in *Mills*." *Jacobs*, 31 F.3d at 1328. "Under the Texas system, all jurors can take into account any

170

mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance." *Id*. at 1329.

This holding is no less true under the post-1991 statute, which created the mitigation special issue in response to the *Penry* decision that jurors may have been precluded from considering some evidence as mitigating under the former statute. The current mitigation special issue was created to solve this problem. *See Blue*, 665 F.3d at 665. Therefore, Soliz's attempt to distinguish his case from the Fifth Circuit's precedent fails.

Soliz argued on direct appeal and during his state habeas proceedings that his constitutional rights were violated because the 10-12 rule created confusion among the jurors regarding the effect of their vote. Brief at 77-83; SHCR-01 at 136-42. The claim was rejected in both instances. *Soliz v. State*, 432 S.W.3d at 904; SHCR-01 at 766. For the reasons discussed above, the state court's rejection of this claim was reasonable and Soliz's claim improperly calls for application of a new rule of constitutional law in violation of *Teague*. Therefore, the claim should be denied.

## B. The punishment phase jury instructions did not restrict the type of evidence the jury could consider mitigating.

Soliz next claims that the trial court's instruction to the jury was unconstitutional because it limited the definition of mitigating evidence to

evidence that made Soliz less morally blameworthy. Petition at 177-86. He argues that a jury must also be permitted to consider a defendant's background and character as mitigating evidence. Petition at 184. Soliz's claim is without merit.

Soliz argues that the Supreme Court held in *Skipper v. South Carolina*,[51] that mitigating evidence includes any mitigating evidence to a defendant's character and background that militates in favor of a life sentence. Petition at 184. But as the Fifth Circuit has recognized, "nothing in *Skipper* lends any support to . . . the broader contention that it is unconstitutional to define mitigating evidence as evidence that reduces moral blameworthiness." *Blue*, 665 F.3d at 667; *see Sprouse*, 748 F.3d at 622; *Beazley*, 242 F.d at 260 ("[O]ur reading of the statute leads us to conclude that the amended statute does not unconstitutionally preclude[ ] [the jury] from considering, as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death."). Soliz does not identify any change in law pertinent to this claim.

Soliz raised this claim on direct appeal and during his state habeas proceedings. Brief at 75-76; SHCR-01 at 152-57. The claim was rejected in both instances. *Soliz v. State*, 432 S.W.3d at 904; SHCR-01 at 768. For the reasons

---

[51]    476 U.S. 1 (1986).

discussed above, the state court's rejection of this claim was reasonable and the claim is foreclosed by controlling precedent. Lastly, Soliz's claim impermissibly calls for application of a new rule on collateral review, which is barred by the prohibition against retroactivity. *See Teague*, 489 U.S. at 311. Therefore, the claim should be denied.

### C.   The definitions of the terms in the future dangerousness special issue provided to Soliz's jury were constitutionally adequate.

Soliz argues that "[t]he future dangerousness special issue is unconstitutionally vague, fails to narrow the class of death-eligible defendants, leads to the arbitrary and capricious imposition of the death penalty, and limits the jury's ability to give full consideration to evidence that may serve as a basis for a sentence less than death." Petition at 188. Soliz seems to complain specifically regarding the lack of a statutory definition of the terms "probability" and "criminal acts of violence." Petition at 190. The claim is without merit.

The Fifth Circuit has held that the terms used in the future dangerousness instruction are permissible because they "have a plain meaning of sufficient content that the discretion left to the jury [is] no more than that inherent in the jury system itself." *See, e.g., Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009). The Fifth Circuit has specifically rejected challenges

with regard to the instructions' failure to define the terms complained of by Soliz. *Blue*, 665 F.3d at 665-68; *Paredes*, 574 F.3d at 294 (holding that the lack of a definition for the terms criminal acts of violence and continuing threat to society did not render the future dangerousness and mitigation instructions constitutionally infirm); *Scheanette v. Quarterman*, 482 F.3d 815, 827-28 (5th Cir. 2007); *Hughes v. Johnson*, 191 F.3d 607, 615-16 (5th Cir. 1999) (holding that the lack of a definition for the term probability in future dangerousness instruction did not render the instruction constitutionally infirm); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996) (collecting cases).

Terms that are reasonably within the common understanding of juries, and that are not technical or ambiguous, need not be defined in the trial court's charge. *United States v. Anderton*, 629 F.2d 1044, 1048–49 (5th Cir. 1980). "Where terms used are words simple in themselves, and are used in their ordinary meaning, jurors are supposed to know such common meaning and terms and under such circumstances such common words are not necessarily to be defined in the charge to the jury." *Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *see Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning."); *Castro v. Collecto, Inc.*, 634 F.3d 779, 786 (5th Cir. 2011) (same); *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex.

174

2011) ("Undefined terms in a statute are typically given their ordinary meaning . . . ."). A reviewing court must presume that the jurors understood the terms at issue in the terms' ordinary meaning. Soliz cites no constitutional authority that would have required the trial court to give any express definition to the terms of which he complains.

Soliz fails to cite Supreme Court precedent suggesting that the Constitution requires that Texas define the terms at issue expressly. Because the lack of detailed precedent gave the state court wide latitude applying constitutional principles, *see Alvarado*, 541 U.S. at 664, Soliz fails to show that the state court applied clearly established federal law unreasonably. *See* § 2254(d). Further, Soliz's claim amounts to a request for a new rule and would be barred by the rules against retroactivity. *Kerr v. Thaler*, 384 F. App'x 400, 404 (5th Cir. 2010) (unpublished) (citing *Teague*, 489 U.S. at 310). Therefore, Soliz's claim should be denied.

### D. Soliz's claim that his death sentence is unconstitutional because capital punishment is arbitrarily administered is without merit.

Soliz next argues (without evidentiary support) that his death sentence is unconstitutional because his sentence was imposed based on Texas's arbitrary system of administering capital punishment. Petition at 171-77. Specifically, Soliz argues that the death penalty in Texas is sought and

imposed more often in large counties that have greater funding and, therefore, greater ability to devote resources to pursuing the death penalty in a capital case. Petition at 175-77. The claim is without merit.

The Fifth Circuit has previously rejected the claim that the Constitution prohibits imposition of the death penalty because it is imposed disparately depending on the county in which the capital murder was committed. *Allen*, 805 F.3d at 628-31. The Fifth Circuit in *Allen* held that the claim was without merit because "no Supreme Court case has held that the Constitution prohibits geographically disparate application of the death penalty due to varying resources across jurisdictions." *Id*. at 629. Indeed, the Supreme Court has expressly acknowledged prosecutorial discretion and varying law-enforcement capabilities and held that capital punishment is nonetheless permissible. *Id*. at 631 (citing *McCleskey v. Kemp*, 481 U.S. 279, 307 n.28 (1987)).

Additionally, the Supreme Court has also held that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). So long as the crime fits within a constitutionally valid definition of a chargeable offense, "'the conscious exercise of some selectivity in enforcement is not in itself a federal

176

constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Hayes,* 434 U.S. at 364 (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Prosecutorial discretion is essential to the criminal justice process. *See McCleskey*, 481 U.S. at 297.

The decision to seek the death penalty ultimately boils down to prosecutor discretion, based upon an examination of all the facts. In *Jurek v. Texas,* the Supreme Court rejected an argument alleging "that arbitrariness still pervades the entire criminal justice system of Texas from the prosecutor's decision whether to charge a capital offense in the first place and then whether to engage in plea bargaining, through the jury's consideration of lesser included offenses, to the Governor's ultimate power to commute death sentences" finding that "[t]his contention fundamentally misinterprets the *Furman*[52] decision." In *Gregg v. Georgia*, the Supreme Court noted:

> The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution.

---

[52]     *Furman v. Georgia*, 408 U.S. 238 (1972).

428 U.S. 153, 199 (1976). The Supreme Court went on to say that "*Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Id.* at 199. In a footnote, the court explained that,

> [i]n order to repair the alleged defects pointed to by [Gregg], it would be necessary to require that prosecuting authorities charge a capital offense whenever arguably there had been a capital murder and that they refuse to plea bargain with the defendant. If a jury refused to convict even though the evidence supported the charge, its verdict would have to be reversed and a verdict of guilty entered or a new trial ordered, since the discretionary act of jury nullification would not be permitted. Finally, acts of executive clemency would have to be prohibited.

*Id.* at 199 n.50. The Court rejected such a system as it "would have the vices of the mandatory death penalty statutes" held unconstitutional in *Woodson v. North Carolina*[53] and *Roberts v. Louisiana*.[54] *Id.*

The Supreme Court also acknowledged the concerns of *Furman* that the imposition of the death penalty not be "arbitrary or capricious" and said that "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance" will alleviate such. *Gregg,* 428 U.S. at 195.

---

[53]   428 U.S. 280 (1976).

[54]   428 U.S. 325 (1976).

178

The *Furman* concerns were "best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Id*. Soliz received a trial that comported with these requirements. Consequently, Soliz's claim fails because he cannot show, in light of the Supreme Court precedent discussed above, that the state court unreasonably rejected the claim. *Allen*, 805 F.3d at 631.

Soliz does not dispute that the prosecutor has discretion to seek or not seek the death penalty. He argues instead that the inclusion of financial considerations in the prosecutor's discretionary determination impermissibly injects arbitrariness into the Texas capital sentencing scheme. Petition at 171-77. Soliz suggests the defendants are treated differently based "solely on the jurisdiction" in which they are prosecuted. Petition at 177. But Soliz fails to prove disparate treatment or that the financial status of Johnson County had any impact on the determination whether to seek the death penalty. The fact remains, Soliz committed an act for which the United States Constitution and Texas laws permit the imposition of the death penalty. *McCleskey*, 481 U.S. at 297.  And Soliz chose to commit this crime in Johnson County. The decision to seek the death penalty was clearly within the prosecutor's discretion, and Soliz fails to demonstrate that budgetary concerns played any part, or that a

179

prosecutor would not have sought the death penalty if Soliz had only committed this callous murder of Ms. Weatherly (Soliz's second murder in one day and only one of about a dozen burglaries, aggravated robberies or shootings Soliz committed in the week preceding Ms. Weatherly's murder) in a different county.

Finally, Soliz presents no evidence that the prosecutors in *his* case based their decision to seek the death penalty was based on anything other than the gravity of Soliz's crime and his demonstrated penchant for violence that was on display during his crime spree. Soliz also does not even acknowledge that he was prosecuted in rural Johnson County, Texas.[55] While Soliz complains that large counties like Harris County, Texas are more likely to seek the death penalty because they have greater funding and resources, he does not explain how his death sentence could have been arbitrarily sought in a county with more limited resources.

The state court rejected this claim when it was raised in Soliz's state habeas proceedings. SHCR-01 at 767. For the reasons discussed above, Soliz has failed to show that the state court's rejection of the claim was

---

[55]   By way of comparison, according to the 2010 United States census, Johnson County, Texas was home to 150,934 people. http://www.census.gov/quickfacts/table/POP010210/48251. According to the same census, Harris County, Texas was home to 308,745,538 people. http://www.census.gov/quickfacts/table/POP010210/48251.

unreasonable. Therefore, the claim should be denied. *Richter*, 562 U.S. at 99-102.

## VI. Soliz's Claim that His Constitutional Rights Were Violated by the Admission of His Confession Is Procedurally Defaulted and without Merit.

Lastly, Soliz argues that his constitutional rights were violated by the admission of his videotaped interview with police.[56] Petition at 194-200. Specifically, Soliz argues that the videotape of the interview was inadmissible because he did not state on the videotape that he waived his rights and because the confession was obtained after he invoked his right to remain silent. Petition at 198-99. The claim is procedurally defaulted and without merit.

### A. The claim is procedurally defaulted.

Soliz argued on direct appeal that the trial court improperly denied his motion to suppress his videotaped and written confessions. Brief at 32-43. Specifically, Soliz argued that the admission of his confessions violated his constitutional rights because they were involuntary (because he did not state on the videotaped interview that he waived his rights) and because the

---

[56]    Trial counsel introduced into evidence a videotape of Soliz's interview with police. 41 RR 135; DX 8. Afterwards, the State introduced into evidence Soliz's first written confession and Soliz's second written confession onto which Soliz handwrote "[i]t was me that shot that wom[a]n." 41 RR 148-49; SX 2, 3. Trial counsel did not object to the admission of Soliz's written confessions. 41 RR 150. Soliz only complains regarding the admission of the videotaped interview. Petition at 198-200.

confessions were obtained after he invoked his right to remain silent. Brief at 41-42. The CCA rejected the argument because Soliz waived any error in the admission of the videotaped confession by offering into evidence the videotaped interview during his cross-examination of Detective Paine.[57] *Soliz v. State*, 432 S.W.3d at 902-03; 41 RR 135; DX 8. The CCA also held that, because Soliz waived error with regard to the videotaped statement, the admission of the written statements did not constitute reversible error. *Soliz v. State*, 432 S.W.3d at 903; SX 2, 3. Consequently, Soliz's claim is now procedurally defaulted.[58] *See Allen*, 805 F.3d at 635-36 (holding that rejection of claim based on the contemporaneous objection rule is an independent and adequate state-law procedural ground sufficient to bar federal habeas review of federal claims); *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999); *Amos v. Scott*, 61 F.3d 333, 337-43 (5th Cir. 1995). Soliz does not attempt to show cause or

---

[57]     Soliz did not claim in his state habeas application that the trial court improperly denied his motion to suppress his confession or that the admission of his confession violated his constitutional rights. *See generally* SHCR-01.

[58]     Soliz argues that he has established cause and prejudice for the default of his related IATC claim that his trial counsel were ineffective for opening the door to the admissibility of Soliz's confessions. Petition at 26-30 (citing *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)). The *Martinez* exception to a procedural default applies only to IATC claims. *Reed*, 739 F.3d at 778 n.16. Consequently, the exception does not apply to Soliz's independent claim that his constitutional rights were violated by the admission of his confession. *Id*. Further, as discussed above, Soliz has failed to show cause and prejudice for the default of his IATC claim.

prejudice for the default. The claim is, therefore, procedurally defaulted. *See Frazier v. Dretke*, 145 F. App'x 866, 872 (5th Cir. 2005) (unpublished) (holding that claim rejected by the state court based on the contemporaneous objection rule was procedurally defaulted in federal court where petitioner failed to demonstrate cause and prejudice from the default).

While the CCA did not cite the contemporaneous objection rule in holding that Soliz had waived error with regard to the admission of his confession, the basis of the waiver of error and the consequent default in this case is the same. *See Frazier*, 145 F. App'x at 870 (stating that under the contemporaneous objection rule, "a petitioner is deemed to have waived any error by failing to raise an objection"). The Fifth Circuit has held that Texas's contemporaneous objection rule serves the "important state interest" of "giving trial courts the chance to correct their own errors." *Allen*, 805 F.3d at 635 (citing *Osborne v. Ohio*, 495 U.S. 103 (1990)). The CCA in this case rejected Soliz's complaint regarding the admission of his confession for the same reason: his offering the videotaped confession into evidence waived any error and precluded the state courts from reviewing whether the admission of the confession was proper. The CCA's rejection of the claim clearly and expressly relied on Texas's procedural bar and did not rest upon federal law. *Amos*, 61 F.3d at 338 ("Procedural default does not bar federal court review of a federal

claim raised in a habeas petition unless the last state court rendering a judgment in the case has 'clearly and expressly' indicated that its judgment is independent of federal law, e.g., rests on a state procedural bar."). Therefore, Soliz's claim is procedurally defaulted. Nonetheless, as discussed below, the claim is without merit.

### B. Soliz's claim is without merit.

Soliz argues that the videotape of his interview with police was inadmissible because the interview was not voluntary and because the interview continued after he invoked his right to remain silent. Petition at 198-200. Neither challenge to the admissibility of Soliz's confession has merit.

### 1. Soliz's confession was voluntary.

Soliz first complains that his interview with the police was involuntary because he did not state on the videotaped interview that he waived his *Miranda* rights. Petition at 198. The claim is without merit.

An accused is deprived of due process if his conviction rests wholly or partially on an involuntary confession. *Sims v. Georgia*, 385 U.S. 538 (1967); *Williams v. Maggio*, 727 F.2d 1387, 1389 (5th Cir. 1984). For the confession to be involuntary there must be coercion by government agents. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986); *Self v. Collins*, 973 F.2d 1198, 1205 (5th Cir. 1992). A habeas petitioner has the burden of proving facts that would lead

184

the court to conclude that the confession was not voluntary. *Uresti v. Lynaugh*, 821 F.2d 1099, 1103 (5th Cir. 1987). The voluntariness of a confession is a mixed question of law and fact. State court factual findings upon which a finding of voluntariness is based are entitled to a presumption of correctness. However, the ultimate question of whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination. *Evans v. McCotter*, 790 F.2d 1232, 1235 n.1 (5th Cir. 1986).

"Even absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [*Miranda*] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). The "waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and must be made with full awareness of the nature of the right being waived and the consequences of the wavier. *Id*. at 382-83. Such a waiver can be established "even absent formal or express statements of waiver." *Id*. at 383. Therefore, an implicit waiver of the right to remain silent is sufficient to render a suspect's statement admissible. *Id*. at 384.

Prior to trial, Soliz filed a motion for a hearing on the admissibility of his statements he had made to the police. 2 CR 264-67. The trial court held a hearing over two days on Soliz's motion to suppress. *See generally* 5 RR; 6 RR. Following the hearing, the trial court entered findings of fact and conclusions of law holding that Soliz's videotaped statement was admissible. 9 CR 1746-48. The trial court specifically found that Soliz was properly warned prior to giving the statement and that he voluntarily waived his rights. 9 CR 1747. The trial court also entered findings of fact and conclusions of law holding that Soliz's two written statements were admissible. 9 CR 1749-50.

Soliz argues that he did not waive his rights prior to his interview with police. Petition at 198. He argues that, as a result, the admission of the videotape of his interview with police officers violated *Miranda*. Petition at 198. Soliz is incorrect. At the outset of Soliz's interview with police, the officers provided the appropriate warnings. SX 1-A at 1. Soliz was advised of his right to remain silent, his right to counsel, and his right to terminate the interview at any time. SX 1-A at 1; 5 RR 65-66, 183. The officers asked Soliz if he understood his rights. SX 1-A at 1. Soliz responded, "[y]es, sir." SX 1-A at 1. The officers then asked Soliz if he was "willing to talk to [them]." SX 1-A at 2. Soliz responded, "[a]lright." SX 1-A at 2. Soliz proceeded to engage the officers in a lengthy interview. *See generally*, SX 1-A. Consequently, Soliz's claim is

186

refuted by the record. Soliz affirmatively waived his rights prior to being interviewed. SX 1-A at 2; *Thompkins*, 560 U.S. at 383 ("The course of decisions since *Miranda*, informed by the application of *Miranda* warnings in the whole course of law enforcement, demonstrates that waivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered.").

Soliz provides no other basis on which this Court could conclude his videotaped confession was involuntary, such as coercion or threats. Therefore, the claim is without merit.[59] *Thompkins*, 560 U.S. at 388-89 (holding "a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police"); *Miranda*, 384 U.S. at 444.

### 2.    Soliz did not invoke his right to remain silent.

Soliz also challenges the admissibility of his videotaped interview with police on the ground that the interview continued after he invoked his right to remain silent. Petition at 198-99. This claim is also without merit.

---

[59]    The Supreme Court in *Thompkins* held that a suspect may even waive his right to remain silent where he does not explicitly waive his rights but then, through his "course of conduct," indicates he understood and waived his right to remain silent. 560 U.S. at 384-86 (holding that an individual can waive his rights by his silence coupled with a course of conduct indicating waiver) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). Notably, Soliz does not assert that he did not understand his rights. Petition at 198-200.

An individual subjected to custodial investigation has the right to remain silent. *Miranda*, 384 U.S. at 444. The right to remain silent, however, must be invoked "unambiguously." *Thompkins*, 560 U.S. at 381. The Court in *Thompkins* stated that, in the context of invoking the right to counsel, a statement that is ambiguous or equivocal does not require officers to cease questioning and "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel." *Id*. The Court also stated that there are practical reasons for not requiring the cessation of questioning upon an ambiguous invocation of the *Miranda* rights. *Id*. For example, the Court stated that police would be required to cease an interrogation even if the suspect's intent was "unclear" and nonetheless "face the consequence of suppression 'if they guess wrong.'" *Id*. at 382 (quoting *Davis v. United States*, 512 U.S. 452, 461 (1994)). Suppression in such a case would significantly burden "society's interest in prosecuting criminal activity." *Id*.

Here, Soliz did not invoke his right to remain silent. At most Soliz made an ambiguous statement that he wished to terminate the interview. SX 1-A at 14 ("I wish I could get up and leave . . . but I can't . . . guys got me shackled here."). But the context of Soliz's remark indicates that he did not intend to invoke his right to remain silent. Immediately prior to that remark, a police

188

officer stated he would leave the interview because he would not "waste time" with people who do not have remorse. SX 1-A at 14. After Soliz remarked "I wish I could get up and leave," the officer stated "I said I." SX 1-A at 14. Soliz stated, "[o]h." SX 1-A at 15. The officer continued, "[I] am gonna get up and leave . . . because I don't waste time on people that don't feel sorry . . . so . . . we'll start with . . . the house on Pearl." SX 1-A at 15. As the exchange indicates, Soliz's remark reflected a misunderstanding of the officer's statement that the officer would leave the interview. *See Barnes v. Johnson*, 160 F.3d 218, 224-25 (5th Cir. 1998) (holding that suspect's right to silence was not violated where police officer attempted to clarify with "a few explanatory, noncoercive questions" whether the suspect wished to invoke the right and the suspect chose to keep talking with the officer).

But even reading Soliz's remark in isolation, the remark that he wished he "could get up and leave" was insufficient to invoke his right to remain silent. *See Davis*, 512 U.S. at 462 (holding that suspect's statement "[m]aybe I should talk to a lawyer" was insufficient to invoke the right to counsel); *Hopper v. Dretke*, 106 F. App'x 221, 231-32 (5th Cir. 2004) (unpublished) (holding that suspect's asking "[c]an I go back and think about it" was an ambiguous statement that did not require cessation of questioning); *Burket v. Angelone*, 208 F.3d 172, 200 (4th Cir. 2000) (holding that suspect's statements "I just

189

don't think I should say anything" and "I need somebody that I can talk to" were insufficient to invoke the right to remain silent); *Caldwell v. Bell*, 9 F. App'x 472, 480 (6th Cir. 2001) (unpublished) (holding that suspect's stating he would "rather not" speak to the police was ambiguous). Soliz's remark was not sufficiently clear "that a reasonable police officer in the circumstances would understand the statement to be" an invocation of the right to remain silent. *Davis*, 512 U.S. at 459. Consequently, this claim is without merit.

Further, the Supreme Court has stated that police are not *required* to ask questions to clarify whether the suspect wants to invoke his *Miranda* rights. *Thompkins*, 560 U.S. at 381. But the police officer here clarified Soliz's remark by explaining the officer was referring to himself leaving the interview if Soliz was not remorseful. SX 1-A at 14-15. And as the Fifth Circuit has held, a police officer does not violate a suspect's right to remain silent by attempting to clarify whether the suspect wishes to remain silent and where the suspect continues speaking. *Barnes*, 160 F.3d at 224-25. Even if Soliz's remark was sufficient to invoke his right to remain silent, he subsequently waived the right by continuing uninterrupted to speak with the police officers. *Johnson v. Stephens*, 617 F. App'x 293, 300-301 (5th Cir. 2015) (unpublished) (holding that state court's rejection of *Miranda* claim was reasonable where defendant unambiguously invoked his right to counsel but waived the right by

190

immediately reinitiating contact with the police officers and continuing to speak with the officers).

For these reasons, Soliz did not invoke his right to remain silent. Consequently, Soliz's claim is without merit.

### C.   Even if the admission of Soliz's videotaped statement was error, the error was harmless.

As noted above, Soliz complains only of the admission into evidence of his videotaped interview with police. Petition at 194-200. The allegedly improper admission of a statement in violation of *Miranda* is subject to harmless-error analysis. *See Arizona v. Fulminante*, 499 U.S. 279, 309 (1991); *United States v. Salinas*, 543 F. App'x 458, 465 (5th Cir. 2013) (unpublished) (reviewing for harmless error the admission of statements allegedly obtained in violation of *Miranda*); *Barnes*, 160 F.3d at 225 n.3. Even assuming the admission of the videotape of Soliz's interview with police was error, the error was harmless.

Soliz does not claim that his two written statements were inadmissible. Petition at 194-200. In Soliz's first written statement, he admitted murdering Ruben Martinez, stealing Abu-Lughod's Dodge Stratus and wallet at gunpoint, stealing Jorge Contreras's truck and wallet at gunpoint, committing an aggravated assault, robbing Justin Morris at gunpoint and later attempting to

use Mr. Morris's debit card, robbing four individuals outside of a bar at gunpoint, and robbing Kenny Dodgin at gunpoint. SX 2. In Soliz's second written statement, he admitted murdering Ms. Weatherly. SX 3. Soliz cannot show harm in the admission of the videotaped interview with police where he does not complain regarding the admission of the two written statements in which he admitted committing the extraneous offenses and murdering Ms. Weatherly.

Similarly, Soliz cannot show harm because the State presented extensive evidence implicating him in the murder of Ms. Weatherly.[60] As discussed bove, physical evidence placed Soliz inside Ms. Weatherly's home. 43 RR 120 (police officer's testimony that he collected fingerprint from cassette tape case found in Ms. Weatherly's home); 44 RR 126 (medical examiner's testimony that Soliz's fingerprint was found on the cassette tape case). The gun that was used to kill Ms. Weatherly was found inside the stolen car in which Soliz fled from police prior to his arrest. 42 RR 121; 45 RR 150. Gunshot residue was found on Soliz's hands and clothing as well as inside the stolen car Soliz was driving when he fled from police and on the blue bandana recovered from inside that car. 45 RR 73-88. Elizabeth Estrada testified that Soliz had admitted to her

---

[60]     Importantly, Soliz was charged with Ms. Weatherly's murder both as a principal and a party. 11 CR 2061-64.

that he killed Ms. Weatherly. 44 RR 190, 195-97. Soliz's videotaped interview with the police was cumulative of the extensive evidence showing he murdered Ms. Weatherly. Consequently, any error in the admission of the videotaped interview was harmless. *Salinas*, 543 F. App'x at 465 ("The statements that Salinas asserts were obtained in violation of *Miranda* were cumulative and their admission, if in error, was harmless."). Therefore, this claim should be denied.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that this Court deny Soliz's petition and deny a certificate of appealability on all claims.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

s/ Jay Clendenin
JAY CLENDENIN*
*Lead Counsel for        State Bar No. 24059589
Respondent*              Assistant Attorney General

193

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1400
Facsimile: (512) 936-1280
email: *jay.clendenin@texas
attorneygeneral.gov*

*Attorneys for Respondent*

## CERTIFICATE OF SERVICE

I do hereby certify that on August 17, 2016, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Filing" to the following attorney of record, who consented in writing to accept this Notice as service of this document by electronic means.

Seth Kretzer
Law Office of Seth Kretzer
The Lyric Center
440 Louisiana Street, Suite 200
Houston, Texas 77002
seth@kretzerfirm.com

Carlo D'Angelo
100 East Ferguson, Suite 1210
Tyler, Texas 75702
carlo@dangelolegal.com

s/ Jay Clendenin
JAY CLENDENIN
Assistant Attorney General

194