IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARK ANTHONY SOLIZ, | § | |
| *Petitioner,* | § | |
| | § | |
| V. | § | |
| | § | Cause No. 3:14-CV-4556-K |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal | § | (death-penalty case) |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| *Respondent.* | § | |

**MEMORANDUM OPINION AND ORDER**
**DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

Mark Anthony Soliz, a Texas prisoner sentenced to death for capital murder, petitions the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. A jury convicted Soliz for shooting Nancy Weatherly in the head during a home invasion and robbery. *See State v. Soliz*, No. F-45059 (413th District Court, Johnson County, Texas, Mar. 23, 2012). The Texas Court of Criminal Appeals ("CCA") affirmed the judgment on direct appeal and denied habeas corpus relief. *Soliz v. State*, 432 S.W.3d 895 (Tex. Crim. App. 2014), *cert. denied*, 135 S. Ct. 1154 (2015); *Ex parte Soliz*, No. WR-82,429-01 (Tex. Crim. App. Dec. 17, 2014) (order). Soliz has filed an amended federal petition raising twenty-one grounds for relief.

All of the claims except one were previously presented in state court. The claims in large part involve trial counsel's strategy to "front load" aggravating and incriminating evidence at the guilt phase of trial. Soliz also challenges counsel's use of experts,

counsel's decisions not to object to evidence and argument, the admission of his confession, counsel's choice of claims on appeal, and the constitutionality of the Texas death penalty statute.

A claim adjudicated on the merits in state court may not be relitigated in federal habeas court unless it (1) is "contrary to" federal law then clearly established in the holdings of the Supreme Court or "involved an unreasonable application of" such law, or (2) "is based on an unreasonable determination of the facts" in light of the record before the state court. See § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 100 (2011). This standard will be discussed further where necessary below.

In the following discussion, the record is cited as follows, with each abbreviation preceded by volume number, if any, and followed by the page number:

SHCR:    State Habeas Clerk's Record. Pages 740 to 750 are out of order.

CR:    trial court clerk's record (12 volumes)

RR:    trial court reporter's record (74 volumes). Volumes 58 through 74 are not paginated, so the .pdf pagination is used.

SX, DX:    trial exhibits of the State and the Defense, respectively.

## I. FACTUAL BACKGROUND

The opinion on direct appeal contains the following summary of facts, which are presumed correct under 28 U.S.C. § 2254(e)(1):

[The Crime Spree:]
The instant offense was one of numerous offenses that appellant and his accomplice, Jose Ramos, committed during an eight-day crime spree that

ended when appellant and Ramos were arrested. Most of these offenses were committed in the Fort Worth area, but the instant offense took place in Godley, which is in Johnson County. This offense was discovered when Ramos mentioned it in response to a Fort Worth police detective's question about another offense that appellant and Ramos had committed.

Appellant's and Ramos's crime spree began with a June 22, 2010 burglary in which they took several long guns and a Hi–Point 9–millimeter semiautomatic handgun, among other items. Later that evening, appellant showed the stolen weapons to a potential buyer, Ramon Morales. Morales wanted to buy all five weapons, but appellant was not willing to part with a rifle and the handgun. Appellant told Morales that he had plans for them. Morales bought the three long guns and pawned them the following day.

On the morning of June 24, 2010, appellant approached a stranger, Justin Morris, in the parking lot of a shopping mall, pointed a gun at him, and demanded his wallet. Morris complied, and appellant took Morris's wallet and left. Appellant was later videotaped by a convenience-store security camera as he attempted to use Morris's debit card at an ATM.

Later that morning, after witnessing an argument between Luis Luna and a female friend of appellant's, appellant asked his friend if she wanted him to "get [Luna] wet," which was street talk for drawing Luna's blood or killing him. Appellant fired the gun in the direction of Luna's head, but the bullet passed through Luna's ear lobe without seriously injuring him.

That afternoon, appellant and Ramos held Jorge Contreras at gunpoint in a store parking lot while they stole his green Dodge pickup truck. Later the same day, appellant approached Sammy Abu–Lughod in a different store parking lot as Abu–Lughod was getting into his green Dodge Stratus. Appellant pointed a black handgun at Abu–Lughod and demanded his wallet, cell phone, and car. After taking Abu–Lughod's personal items, appellant told him to walk away. Abu–Lughod complied while appellant drove away in the Stratus.

Around 2:00 a.m. on June 28, 2010, appellant and Ramos approached four people who were leaving a bar and demanded their money and wallets. The victims complied. After taking their wallets, appellant and Ramos left in the Stratus.

At 3:30 a.m. on June 29, 2010, Ramos and appellant committed a "drive-by" shooting. Ramos drove the car while appellant fired shots into a house where they thought a rival gang member might be staying. At about 5:00 a.m., appellant and Ramos approached Enrique Samaniego as he was walking to his pickup truck to leave for work. Either appellant or Ramos shot Samaniego four or five times in the stomach. Samaniego sustained life-threatening injuries, but he survived.

Around 5:30 a.m., appellant and Ramos approached Ruben Martinez, a delivery truck driver who had just completed a beer delivery at a Texaco gas station, as Martinez was walking back to his truck. Appellant pointed the gun at Martinez and demanded his wallet. Martinez complied, offering his cell phone as well. Disappointed that Martinez's wallet contained only ten dollars, appellant shot him in the neck. Martinez later died from complications of this injury.

Less than an hour after shooting Martinez, appellant approached Kenny Dodgin as Dodgin was exiting his car in the parking lot of a Lowe's store. Appellant pointed a gun wrapped in a blue bandanna at Dodgin. Upon seeing appellant, Dodgin locked his car and ran toward the store. He heard three gun shots behind him.

Around 7:00 a.m., appellant burglarized two homes in Benbrook, a town southwest of Fort Worth. Later that morning, appellant and Ramos drove to Weatherly's home and committed the instant offense.

[The Arrests:]

The Fort Worth Police Department's Communications Division received the call when appellant robbed Abu–Lughod of his green Stratus, as well as later calls reporting robberies and shootings involving a green or teal sedan. A 9–1–1 call-taker supervisor informed detectives that the stolen Stratus might be the green or teal sedan involved in the later offenses. Detectives subsequently reviewed offense reports and compared notes. Based on the close physical and temporal proximity of some offenses as well as similarities in the descriptions of the suspect, weapon, vehicle, and modus operandi, they determined that approximately thirteen burglaries, aggravated robberies, and shootings in the Fort Worth area, dating from June 22 to June 29, were likely to be connected. Because of the escalation of violence in the Samaniego and Martinez offenses, all Fort Worth police officers were instructed to be on the lookout for the stolen Stratus.

Around 10:30 p.m. on June 29, officers in an unmarked vehicle established surveillance on the house of a known gang member, Arturo Gonzales, which was near the last known location of the Stratus. Eventually they observed the Stratus leaving Gonzales's house, closely following a Jeep Liberty. The two vehicles appeared to be traveling together. Officers identified the Stratus by its license plate as the vehicle they were searching for and radioed for a marked patrol unit to initiate a stop. With lights and siren activated, a marked unit began following the Stratus. Instead of stopping, however, the Stratus accelerated and passed the Liberty. After a brief pursuit, the Stratus crashed into a parked eighteen-wheeler.

Appellant exited through the passenger side window and ran through parking lots and across a freeway before officers stopped and arrested him. The other occupant of the Stratus, Elizabeth Estrada, exited the Stratus and ran behind the eighteen-wheeler, where officers quickly arrested her. The stolen handgun and the blue bandanna were found inside the Stratus. Meanwhile, police officers stopped the Liberty for an equipment violation and transported its occupants, including Ramos, to the police station for questioning.

[Police Interviews and Investigation:]
Ramos admitted his participation in some of the offenses and provided useful information about them. However, when detectives questioned Ramos about the aggravated robbery in which Contreras's green pickup truck had been stolen, Ramos provided information that was inconsistent with the information detectives had already obtained about that offense. Specifically, Ramos indicated that the offense had ended badly and stated that it did not have to "end that way." This statement puzzled detectives because no one had been hurt and no shots had been fired during the offense. Ramos also referred to a female victim rather than a male victim. After some initial confusion, detectives ascertained that Ramos was describing a previously unknown offense committed in Johnson County. Ramos indicated that a female victim had been shot during a burglary or robbery and her green Toyota Tundra pickup truck had been stolen.

Ramos provided directions to the stolen Tundra, which detectives found parked about a block from Gonzales's house. Detectives checked the truck's registration and obtained the name and address of its owner, Nancy Weatherly. They then contacted the Johnson County Sheriff's Office and

drove to Weatherly's house. A sheriff's deputy joined them at the house. They observed that the gate and garage door were open, and the back door of the house was partially open. The interior had been ransacked. Weatherly's body was lying in the kitchen area next to a table and chair. She had been shot once in the back of the head.

The investigation of this offense was ongoing when Fort Worth Detectives William "Danny" Paine and Thomas Boetcher began questioning appellant at the police station. The interview was recorded. Boetcher advised appellant of his rights and appellant stated that he understood them. When asked if he was willing to talk about the offenses, appellant answered, "All right." Paine and Boetcher initially questioned appellant about the Fort Worth offenses. Later, as they received information about the Johnson County investigation, they questioned appellant about that offense as well.

Paine and Boetcher also obtained two typed and signed statements from appellant that summarized his oral statement. The first typed statement concerned the Fort Worth offenses. In it, appellant admitted his involvement in the Abu–Lughod, Contreras, Morris, Martinez, Dodgin, and bar patron robberies, as well as the Luna shooting. He also acknowledged that Ramos did not participate in all of these offenses.

Appellant's second typed statement concerned the instant offense. In it, appellant admitted that he and Ramos had driven to Godley, where appellant had threatened Weatherly with a gun and had burglarized her house. Appellant denied shooting Weatherly, stating that after he and Ramos had loaded what they wanted into the Tundra, appellant left the gun inside with Ramos and went outside to start the car. He then heard a shot and saw Ramos walking out of the house. With Ramos driving the Tundra and appellant driving the car, they returned to Fort Worth.

After appellant signed the second typed statement, detectives questioned him further. Appellant wavered about whether he or Ramos was the person who shot Weatherly. Eventually, appellant stated that he would confess to the shooting just to "get this over with," and admitted that he shot Weatherly. He also wrote and initialed a sentence at the end of his second typed statement: "It was me that shot that wom[a]n!!!"

[Trial Evidence:]

6

Appellant's statements were not the only evidence that appellant committed the instant offense. Estrada, who was riding in the Stratus with appellant when it crashed, testified that appellant bragged to her about killing an "old lady" in a house in Godley. Appellant told Estrada that he knocked on the door, and when the lady opened it, he pointed the gun at her. The lady backed up, and appellant made her sit down. Appellant told Estrada that he killed one of the lady's horses, which made the lady cry. She begged for her life and prayed. When appellant showed the lady that he was stealing her jewelry box, she asked him not to take it because it had been a gift from her mother, who was now deceased. Appellant then told her to go with her mother and shot her in the head. He demonstrated for Estrada how he held out the gun and fired. He laughed about the incident and ridiculed the lady's "country" accent. He said that later, while taking methamphetamine, he had flashbacks about killing the lady and "seeing her brains go everywhere."

Weatherly's neighbor testified that she passed Weatherly's house around 10:30 a.m. on June 29 and saw a green Stratus parked by the house, facing the road. The next day, when she watched the news, she recognized the car that had been recovered in Fort Worth as the car she had seen at Weatherly's house. Further, a law-enforcement officer testified that, while he was transporting appellant and Ramos from Fort Worth to Johnson County for pretrial proceedings, he overheard appellant telling Ramos that all they needed to do was "play dumb," and authorities would "get" the man who pawned the guns (presumably a reference to Morales) on capital murder.

Forensic evidence also connected appellant to the instant offense. Jennifer Nollkamper, a forensic scientist with the Fort Worth Police Department crime laboratory, determined that the shell casing recovered from Weatherly's home had been fired through the Hi–Point 9–millimeter semi-automatic handgun recovered from the Stratus. Nollkamper testified that the bullet recovered from Weatherly's home was too damaged for her to state affirmatively that it was fired from the recovered weapon, but she could state affirmatively that it was fired from a Hi–Point 9–millimeter semi-automatic handgun. Lannie Emanuel, a tool mark and firearm examiner for a private forensic laboratory, agreed with Nollkamper's determination that the shell casing had been fired through the recovered weapon. Emanuel, however, did not think that the bullet was too damaged

for a positive comparison. He testified affirmatively that the bullet recovered from Weatherly's home was fired from the recovered weapon.

William Walker, a fingerprint examiner with the Tarrant County Medical Examiner, positively identified a latent fingerprint on an audiocassette case in Weatherly's spare bedroom as appellant's fingerprint. A trace analyst from the Tarrant County Medical Examiner's Office identified gunshot residue on appellant's clothing and hands, the interior of the Stratus, and a blue bandanna and towel that were recovered from the Stratus.

*Soliz*, 432 S.W.3d at 896-900.

## II. COUNSEL'S DECISION NOT TO RETAIN A FALSE-CONFESSION EXPERT (CLAIM 1)

Trial counsel moved to suppress all of the oral and written the statements made by Soliz. 2 CR 264-67. The trial court denied the motion after a hearing. 9 CR 1746. In his state habeas corpus application, Soliz argued that trial counsel were ineffective for failing to present testimony from a false-confession expert during the suppression hearing. He supported the claim with an affidavit from psychologist Gregory DeClue. SHCR 36-48, 169. The state court overruled the claim. *See* SHCR 730, 749-50 (Respondent's proposed findings of fact and conclusions of law), 771 (Order adopting Respondent's proposed findings and conclusions).

A. Clearly established federal law

The clearly established law for ineffective-assistance claims begins with *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must demonstrate that counsel's representation was deficient, meaning that it fell below an objective standard of reasonableness. *Id.* at 687-88. A petitioner must also demonstrate preju-

8

dice, meaning a reasonable probability, sufficient to undermine confidence in the outcome, that but for counsel's unprofessional errors the result of the proceeding would have been different. *Id*. at 694. The failure to prove either deficient performance or actual prejudice is fatal to an ineffective-assistance claim. *Strickland*, 466 U.S. at 700.

In addressing *Strickland* claims that have been adjudicated in state court, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," not whether trial counsel's performance fell below the *Strickland* standard. *Richter*, 562 U.S. at 101. This review is "doubly deferential," meaning the Court takes a "highly deferential" look at counsel's performance through the "deferential lens of § 2254(d)." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). Here, Soliz must demonstrate, based on the state-court record, that it was unreasonable for the CCA to conclude (1) he did not overcome the strong presumption of competence and (2) he did not undermine confidence in the verdict. *See id.* at 190; § 2254(d)(2).

B.    <u>Facts before the state court</u>

Soliz's confession was admitted in audiovisual format, such that the trial judge could see and hear the interview as it took place. 5 RR 200-201. During the suppression hearing, counsel addressed suggestibility through cross-examination and highlighted multiple risk factors for a false confession. *See* 5 RR 120-26, 149-51, 169-70 and 6 RR 30-35, 47-49, 55-56, 66 (drug use, drug withdrawal, mental health history,

and suggestibility); 5 RR 84-90, 127-35, 140, 153-55 and 6 RR 19-22, 24 (interrogation techniques), 5 RR 142, 147-48 and 6 RR 26-29, 63 (sleep deprivation).

The habeas record included Dr. DeClue's affidavit, in which he stated he would have identified the following risk factors for an involuntary confession: Fetal Alcohol Spectrum Disorder ("FASD"), suggestibility, and sleep deprivation in Soliz, plus interrogation techniques that included minimizing the offense, pressuring Soliz to change his story, and failing to ask Soliz details that only a person who had witnessed the shooting would know. SHCR 175-80. Dr. DeClue said he would have testified about these factors, and he would have provided research, literature, and "an expert opinion to aid the trial judge's evaluation of the confession," but he did not opine that Soliz's confession was false. SHCR 180-81, ¶ 42.

Trial counsel Michael Heiskell also provided an affidavit to the habeas court. He said that the case-in-chief "painted a picture of overwhelming guilt," and that a false-confession expert was "totally unnecessary in light of the totality of the circumstances surrounding the confession and the corroborating evidence that existed connecting Mr. Soliz to the crimes." SHCR 443, ¶ 2, 3. Trial counsel otherwise spent $193,737.23 on experts in this case, according to the Johnson County Auditor. *See* 12 CR 2328. Three experts on FASD and a prison classification expert testified at the punishment phase, in addition to the following consulting experts: $7,500 for Dr. John Roache (1 CR 47); $30,000 for mitigation specialist Dr. Jolie Brams (1 CR 48; 4 CR 721); $5,000 for Dr.

Raymond Singer (1 CR 112); $12,900 for Dr. Emily A. Fallis (1 CR 149; 12 CR 2213); $5,000 for DNA expert Robert Benjamin, Ph.D. (4 CR 650); $13,008.88 for mitigation specialist Mary Burdette (12 CR 2213); and $2,500 for jury consultant Bret Dillingham (10 CR 1797). Counsel even used an expert, Dr. Brams, to coordinate his many mitigation experts. 4 CR 719.

C.     Counsel's alleged deficiency

A reasonable argument exists that trial counsel met *Strickland's* objective standard of reasonableness. Counsel was clearly capable and willing to acquire expert assistance when he believed it was necessary. Given the strength of the State's case and the circumstances of the confession, counsel could reasonably conclude that a confession expert was not worth the expense and that expert fees were better spent on punishment mitigation. Counsel did not overlook the suggestibility issues, but adequately developed false-confession risk factors through cross-examination. He could reasonably conclude that the trial judge's ability to view the police interview in audiovisual format also reduced the need or impact of an expert opinion. *See* 6 RR 116 (counsel's argument that the trial court "clearly heard and saw the demeanor of the Defendant"). Further, the expert offered by Soliz, Dr. DeClue, did not opine that his confession was false. Such an expert could be harmful to the defense in that the factfinder might presume that the expert withheld his opinion because it would not support the defense. Soliz fails to demonstrate that the state court's ruling as to counsel's choice of experts was

unreasonable. *See Richter*, 562 U.S. at 107 (holding that counsel is entitled to balance limited resources in accord with effective trial tactics and strategies).

D.    <u>*Strickland* prejudice analysis</u>

The state court also reasonably rejected Soliz's assertion of prejudice. The expert upon whom this claim is based did not conclude that Soliz's confession was false. Dr. DeClue states that, "proving conclusively that a confession is, in fact, false requires the existence of verifiable contrary evidence," but DeClue does not discuss any evidence that contradicts Soliz's confession. *See* SHCR 171, ¶ 11, 180 ¶ 40-42. The expert's opinion would have simply been cumulative "risk factor" evidence, albeit somewhat more detailed than what trial counsel established through cross-examination without an expert. And given that the trial judge viewed the confession for himself, the state court could reasonably conclude that more "risk factor" information would not have changed the outcome of the suppression hearing.

The confession aside, trial evidence includes testimony from Elizabeth Estrada that Soliz bragged about shooting an "old lady" in the head in Godley. 44 RR 194-97. Soliz gave Estrada details about the crime and told her he had flashbacks about killing the lady and "seeing her brains go everywhere," which describes the crime scene accurately. 43 RR 43-45 (description of crime scene); 44 RR 276-77 (Estrada's testimony). Weatherly's neighbor also testified that a green Stratus was parked at Weatherly's house, facing the road, on the day her body was discovered. 44 RR 91-92.

A law enforcement officer who transported Soliz and Ramos to Johnson County overheard Soliz tell Ramos that all they needed to do was "play dumb," and authorities would "get" the man who had pawned the guns (presumably, Ramon Morales) on capital murder. 38 RR 123-24 (Morales's testimony); 43 RR 226 (officer's testimony). The physical evidence included a shell casing and a bullet recovered from Weatherly's home that had been fired through the handgun recovered from the Stratus that Soliz used to flee the police. 42 RR 121; 45 RR 139, 149-50. Soliz's fingerprint was found on an audiocassette case in Weatherly's spare bedroom. 44 RR 126. Gunshot residue was found on Soliz's pants and hands, the interior of the Stratus, and the bandanna and towel recovered from the Stratus. 45 RR 117. This evidence of guilt corroborates the confession and is overwhelming.

The state court could reasonably reject the assertion that counsel's failure to hire an expert to provide more "risk factor" information undermines confidence in the verdict. *E.g., Leal v. Dretke*, 428 F.3d 543, 549 (5th Cir. 2005) (finding no *Strickland* prejudice where expert's testimony was "not definitive" and State produced over-whelming evidence of guilt). The Court denies claim 1.

### III. COUNSEL'S DECISION TO OFFER THE CONFESSION INTO EVIDENCE (CLAIM 1A)

Soliz challenges trial counsel's decision to offer his recorded confession into evidence. Trial counsel offered the confession without qualification and for all purposes on the fourth day of trial, during the recross-examination of Detective Paine. 41 RR

134-35. Soliz contends trial counsel were ineffective for doing so because they waived any error in its admission for purposes of appeal. Pet. 26-30. Soliz acknowledges that this claim was not raised in state court and is subject to procedural bar. He argues, however, that state habeas counsel's failure to raise the claim amounted to ineffective assistance that excuses any procedural bar under *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). *See* Reply 1-2.

The absence or ineffectiveness of initial-review state habeas counsel can establish cause for the procedural default of an unexhausted ineffective-assistance claim against trial counsel. *Martinez*, 566 U.S. at 17; *Trevino*, 133 S. Ct. at 1921. To establish this procedural-bar exception, petitioner must show (1) he had no initial state habeas counsel or his initial state habeas counsel was ineffective under *Strickland*, and (2) the underlying ineffective-assistance claim against trial counsel is "substantial," meaning it has "some merit." *Martinez*, 566 U.S. at 14.

A.    The claim against trial counsel

Soliz asserts "there can be no tactical justification whatsoever for trial counsel offering Soliz's confession into evidence." Pet. 28. As noted in the previous discussion, however, trial counsel believed, "[a]fter a thorough and exhausting review of all the evidence," that the evidence "painted a picture of overwhelming guilt." SHCR 443, ¶ 2. Counsel identified the mitigation issue as paramount in the "all but certain punishment phase." *Id.* With counsel's mitigation strategy in mind, the Court turns to the record

to "affirmatively entertain the range of possible reasons" trial counsel may have had for introducing the confession. *See Pinholster*, 563 U.S. at 196 (internal quotes and citations omitted) (holding that federal court is required not simply to give the attorneys the benefit of the doubt, but to entertain the range of possible reasons they may have had for proceeding as they did).

The record demonstrates that trial counsel offered the confession to introduce the defense theory that Ramos was the leader of their week-long crime spree, while Soliz, due to cognitive deficits and FASD, was the "dumb criminal" who allowed himself to be used and then confessed in writing. Counsel introduced this theory during opening remarks when he said that Soliz "went on a crime spree" due to fetal alcohol syndrome, which he described as "a brain damaging medical diagnosis," mixed in with neglect and drug abuse. 38 RR 42. Counsel said that FASD is a medical condition associated with "law breaking" and "aggressive behaviors." 38 RR 43. He asked the jury to pay close attention to the role that Ramos played during the offense because the jury would hear evidence that Soliz, due to his medical disorder, was "a follower." 38 RR 43. Counsel said that, while some of the crimes committed are unspeakable and heartbreaking, the jury would see evidence of an "unspeakable, heartbreaking childhood," and that Soliz "is what he learned," "is what he lived." 38 RR 43-44. Trial counsel then developed this theory during cross-examination of Detective Paine by showing:

•    Ramos and Arturo Gonzles were in the same gang and had known each other longer than Ramos had known Soliz (41 RR 64);

- Ramos sold or gave the murder weapon to Soliz (42 RR 32-33);

- Ramos's girlfriend, Maria Rivera, owned the car used in the first burglary, where the murder weapon was procured (41 RR 79-80);

- Ramos subsequently distanced himself by calling the police and reporting Rivera's vehicle "borrowed and not returned" (41 RR 81-82);

- Ramos refused to sign a written statement and invoked his right to counsel (41 RR 89);

- Soliz's cohorts described him as psychotic and said he "wasn't all there mentally" (41 RR 90-91);

- Ramos was very familiar with the criminal justice system and had prior convictions for burglary, theft, evading arrest, solicitation of prostitution, assault of a family member, and possession of a controlled substance (41 RR 92-94);

- Ramos took possession of the jewelry proceeds from their crimes (41 RR 97);

- Ramos made significant decisions during the Weatherly robbery, including electing to drive Weatherly's truck, and used his acquaintances to pawn stolen items (41 RR 98-100); and

- sometimes, criminals take advantage of and cause others to act on their behalf in order to insulate themselves from liability (41 RR 100).

Trial counsel then introduced the confession and continued his cross-examination of Detective Paine, contrasting Soliz to "smart criminals" who do not flee the police, do not waive their rights, and do not implicate themselves on videotape. At the end of the examination, Detective Paine admitted that sometimes "smart criminals" use "dumb criminals" to do their dirty work. 41 RR 140.

During closing argument, counsel reminded the jury that the defense, not the State, had introduced the confession. 47 RR 57. He argued that, because of Soliz's

many impairments and the police tactics, the confession did not rise to the level of evidence expected in a capital murder trial. 47 RR 58-59. He asked the jury to convict Soliz of murder, not capital murder, because Soliz was "not the smart one here," and the because the State had failed to prove he had the intent to kill. 47 RR 60-62.

A reasonable argument exists that trial counsel met *Strickland's* objective standard. Reasonable counsel could have decided that the chance of success on appeal was slim given the circumstances of the confession and other, strong evidence of guilt. *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (establishing that erroneous admission of confession is harmless if State can establish beyond a reasonable doubt that it did not contribute to the conviction). By offering the confession rather than waiting for the State to do it, counsel diluted its negative impact and presented himself to the jury as forthright and honest. In doing so, counsel did not give up his adversarial role, but used the confession to support the mitigation theory, undermine the reliability of the confession, and argue for a murder conviction.

There are "countless ways" to provide effective assistance in any given case. *Strickland*, 466 U.S. at 689. "Attorneys representing capital defendants often face daunting challenges in developing strategies, not least because the defendant's guilt is often clear." *Florida v. Nixon*, 543 U.S. 175, 191 (2004). In such cases, "avoiding execution may be the best and only realistic result possible." *Id*. (internal quotations and brackets omitted). Such strategic choices, made after a thorough investigation of

the law and facts relevant to plausible options, are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. "Such tactical decisions, made on an informed and reasoned basis, do not fall below *Strickland* standards simply because they do not succeed as planned." *See Jones v. Butler*, 837 F.2d 691, 693-94 (5th Cir. 1988).

While Soliz takes issue with counsel's chosen strategy, he does not address the reasons for it that are obvious in the record and does not show that counsel's approach was inconsistent with the standards of professional competence. Moreover, Soliz does not attempt to show he would have prevailed on an appeal of the suppression issue but for trial counsel's alleged error. Pet. 29. He states that "a confession by its nature creates more potential for harm" than other types of evidence (Reply, p. 2-3), but does not argue harm under the facts of this case. Accordingly, Soliz does not show that the ineffective-assistance claim against trial counsel has "some merit."

B.    State habeas counsel's alleged deficiency

Soliz was represented in state habeas proceedings by the Office of Capital Writs ("OCW"), a Texas public defender's office that specializes in post-conviction capital litigation. OCW filed an application raising eighteen claims for relief supported by an extra-record investigation. SHCR 8-439. Asserting that the confession was "powerful and ultimately devastating" evidence, Soliz concludes that OCW's failure to challenge trial counsel's waiver of the suppression issue resulted in a "total deprivation of Mr. Soliz's right to counsel under the Sixth Amendment" that satisfies *Martinez*. Pet. 29-30.

The record does not, however, support the assertion that Soliz was "totally deprived" of counsel – at either at trial or on habeas review. As for showing prejudice, the amended petition concludes without explanation that this very high burden is met. Pet. 30.

In an all-too-common approach, Soliz assumes that if he can show some merit to the claim against trial counsel, then he has met his burden under *Martinez* to show that state habeas counsel was ineffective in failing to challenge trial counsel's representation. This approach improperly pretermits a discussion of habeas counsel's representation, which would include the facts known to the attorneys at OCW and the reasons they had for proceeding as they did. Soliz's failure to address OCW's representation under the first prong of *Strickland* is fatal to his *Martinez* argument. *Matthews v. Davis*, 665 F. App'x 315, 321 (5th Cir. Nov. 3, 2016) (holding that procedural default is not excused under *Martinez* simply because the ineffective-assistance-of-trial-counsel claim is substantial; petitioner must show state habeas counsel was ineffective for failing to bring it).

Claim 1A is procedurally barred because the claim against trial counsel has no merit and, alternatively, because Soliz does not attempt to show that OCW was ineffective. *See Martinez*, 566 U.S. at 17. In the alternative, the Court finds the record is sufficient to address this claim on the merits. For the reasons discussed *de novo* above, claim 1A against trial counsel is denied on the merits. *See* § 2254(b)(2).

## IV. ADMISSION OF SOLIZ'S CONFESSION (CLAIM 20)

Claim 20 challenges the trial court's ruling to admit Soliz's confession. Pet. 194-200. Soliz raised this claim on direct appeal. He argued that the confession was involuntary because he did not affirmatively waive his *Miranda* rights, and he made a request to terminate the interview that the police ignored. *See* Appellant's Opening Brief, 32, 41-42 (points of error 3, 4); *Miranda v. Arizona*, 384 U.S. 436 (1966). As discussed in the previous claim, the CCA ruled that Soliz waived any error with respect to his confession when trial counsel offered it into evidence. *Soliz*, 432 S.W.3d at 902-03.

### A. Procedural default

A federal court will not review a question of federal law decided by a state court if the state court decision rests on a state-law ground that is independent of the merits of the claim and adequate to support that judgment. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991), *modified by Martinez*, 566 U.S. 1. Respondent contends this claim is procedurally defaulted because the state court ruling was based on a version of the contemporaneous-objection rule, which is an independent and adequate state procedural bar precluding federal habeas relief. The CCA ruling is repeated below:

> By offering his oral statement into evidence, appellant waived error concerning the trial court's ruling on his motion to suppress this statement. *See Decker v. State*, 717 S.W.2d 903, 908 (Tex. Crim. App. 1986) (stating that, when appellant offered his confession into evidence before the jury and the trial court admitted it as a defense exhibit, appellant waived his objection to the admission of his confessions); *see also Ex parte Moore*, 395

> S.W.3d 152, 157 (Tex. Crim. App. 2013) (stating that when a defendant affirmatively asserts during trial that he has "no objection" to the admission of evidence, he waives any error in its admission despite a pre-trial ruling denying his motion to suppress).
>
> Appellant's written statements were offered by the prosecutor and admitted into evidence after appellant's oral statement had been admitted and published to the jury. These written statements were summaries of the oral statement. Because appellate waived error with respect to his oral statement, the admission of his written statements does not constitute reversible error. *See Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010).

*Soliz*, 432 S.W.3d at 903.

The contemporaneous objection rule, if that is what the CCA applied, is adequate to preclude federal review. *See Allen v. Stephens*, 805 F.3d 617, 635 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 2382 (2016). The CCA did not, however, cite Texas Rule of Appellate Procedure 33.1, which is the contemporaneous objection rule for preservation of error on appeal. *See Grado v. State*, 445 S.W.3d 736, 738-39 (Tex. Crim. App. 2014). To the extent the opinion appears to rest on trial counsel's assertion that he had "no objection" to the written confessions, the record does bear this out. Trial counsel actually stated, "No *additional* objections" to the written statements. 41 RR 150 (emphasis added). Neither did the CCA rely on the fact that trial counsel did not assert the particular *Miranda* objections upon which the claim is based. Rather, it was counsel's decision to offer the oral statement into evidence that "waived" the appellate claim.

Based on the trial record and the CCA reasoning, it appears that the CCA might have applied the invited-error doctrine. *See Woodall v. State*, 336 S.W.3d 634, 644 (Tex.

Crim. App. 2011) ("the law of invited error provides that a party cannot take advantage of an error that it invited or caused, even if such error is fundamental"). *But see Prystash v. State*, 3 S.W.3d 552, 531 (Tex. Crim. App. 1999) (explaining that invited error is a type of "estoppel" not "waiver"). Like the contemporary objection rule, the invited-error doctrine qualifies as a state procedural bar which may preclude federal review. *See Druery v. Thaler*, 647 F.3d 535, 545-46 (5th Cir. 2011), *cert. denied*, 565 U.S. 1207 (2012).

Whichever procedural bar the state court applied, Soliz may overcome it by showing cause for the default and actual prejudice, or demonstrating that the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Soliz does not make an argument to overcome the default. Pet. 194-200; Reply 1-3. It is therefore barred. *See Druery*, 647 F.3d at 545 (refusing to address alleged error in omission of jury instruction where Druery's attorney rejected the instruction at trial and Druery did not show trial counsel was ineffective in doing so).

Alternatively, the invited-error doctrine applies on federal habeas review as well. *Id.* at 545 (citing *United States v. Green*, 272 F.3d 748 (5th Cir. 2001); *Fields v. Bagley*, 275 F.3d 478 (6th Cir. 2001); *Parker v. Champion*, 148 F.3d 1219 (10th Cir. 1998); *Wilson v. Lindler*, 8 F.3d 173 (4th Cir. 1993)). Regardless of any state-court ruling, this claim is procedurally barred in this Court under *Druery* because trial counsel invited any error by introducing the oral confession at trial.

B.      _Miranda_ analysis

In the alternative, the Court addresses the merits of the claim _de novo_.  Soliz contends his confession was inadmissible because the police did not comply with _Miranda_, 384 U.S. 436.  Under _Miranda_, a statement made by a person during custodial interrogation is not admissible unless the person was informed that he has the right to remain silent, that any statement he makes may be used against him, and that he has the right to the presence of an attorney.  _Id._ at 444.  The accused may waive these rights provided the waiver is made voluntarily, knowingly, and intelligently.  _Id._

Soliz first complains that, while he stated he understood his _Miranda_ rights and wanted to talk, he did not state specifically that he "waived" those rights.  Pet. 198.  But federal law does not require a formal or express statement of waiver.  _Berghuis v. Thompkins_, 560 U.S. 370, 383 (2010).  A waiver of _Miranda_ rights may be implied through "the defendant's silence coupled with an understanding of his rights and a course of conduct indicating waiver."  _Id._ at 384 (citing _North Carolina v. Butler_, 441 U.S. 369 (1979)).  Soliz explicitly stated he was willing to talk to the detectives after confirming that he knew his rights, and he participated in the interview.  58 RR 8-9 (SX 1A, interview transcript).  This course of conduct sufficiently shows that he understood and knowingly waived his rights.  _See Thompkins_, 560 U.S. at 388-89 (holding that suspect who has received and understood _Miranda_ warnings and has not invoked his rights, waives the right to remain silent by making an uncoerced statement to police).

Soliz next contends that his confession was involuntary because the police ignored his request to terminate the interview when he said, "I wish I could get up and leave . . . but I can't . . . guys got me shackled here." 58 RR 21. As Soliz asserts, the accused's right to cut off questioning must be scrupulously honored or his statement will be inadmissible. *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (citing *Miranda*). The invocation of the right to remain silent must, however, be unambiguous. *Thompkins*, 560 U.S. 381-82.

Were the record limited to the portion of the written transcript relied upon by Soliz, his argument might hold some sway. 58 RR 21-22. But the recording shows that, thirty minutes into the interview, Detective Paine was running out of patience. He said that, if he were Soliz, he would want people to know if he felt sorry for what he did. Paine stated, "[B]ut you know what. . . if you don't feel sorry for it, Mark. . . ***then I'd just as soon get up and leave*** . . . because I don't . . . I don't waste time with people who don't feel sorry. . ." (DVD time stamp 5:44:00) (emphasis added). Soliz then made the statement: "I wish I ***could*** get up and leave . . . but I can't . . . guys got me shackled here," with an emphasis on "could." In response, Paine clarified that he said "I," not "you," would get up and leave. Soliz replied, "Oh," and the interview continued. After about twenty minutes, Soliz agreed to sign a statement admitting to several of the extraneous offenses. This was followed by another forty minutes of interview and another written statement about Weatherly's murder.

The recording shows that Soliz misheard the detective say that he, Soliz, could get up and leave. Soliz's response that he wished he could get up and leave – with an emphasis on "could"– was not a request to terminate the interview. It was a statement regretfully acknowledging that he was shackled and under arrest. Soliz did not say that he wanted to stop talking. The fact that he immediately continued his conversation with the detective supports the interpretation that he simply misheard the detective say he could get up and leave if he was not sorry. *See Davis v. United States,* 512 U.S. 452, 462 (holding that the statement, "Maybe I should talk to a lawyer" was not a request for counsel); *Hopper v. Dretke*, 106 F. App'x 221, 231-32 (5th Cir. 2004) (holding that question, "Can I go back and think about it?" was ambiguous invocation of right to remain silent and did not require cessation of questioning). Because the underlying factual assertions are not supported by the record, claim 20 is denied.

C.    Certificate of Appealability

The Court concludes, however, that jurists of reason could debate the Court's application of a procedural bar. The Court also concludes that reasonable jurists might differ in their interpretation of Soliz's comment, "I wish I could get up and leave." The Court therefore grants a certificate of appealability as to claim 20. *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## V. TRIAL COUNSEL'S IMPEACHMENT OF
## ELIZABETH ESTRADA (CLAIM 2)

As discussed, Elizabeth Estrada testified for the prosecution about incriminating statements made to her by Soliz, particularly regarding the murders of Weatherly and Martinez. In her testimony, Estrada admitted that she gave the police a statement in June of 2010 that had omitted this incriminating information. 44 RR 179-80. Estrada then explained how she came to agree to testify for the State. She said she had been subpoenaed by the grand jury but failed to appear, resulting in a criminal misdemeanor charge. 44 RR 209. She then entered into a plea bargain agreement with the prosecutor in exchange for testifying in this case. In October of 2010, Estrada met with the prosecutor as part of the plea agreement and told the prosecutor the same incriminating information that was in her trial testimony. Estrada was then placed on probation but she violated her probation and disappeared. She was re-arrested on a felony charge, which was pending at the time she testified. 44 RR 209-14. Estrada stated she was testifying to make good on a promise she had made to the prosecutor to do the right thing. When asked if it was a "safe thing" for her to testify, Estrada replied, "Hell, no." 44 RR 215. It is apparent from the prosecutor's closing argument that Estrada was handcuffed and shackled during her testimony. 47 RR 27.

On cross-examination, trial counsel emphasized that Estrada had a motive to please the prosecutor for various reasons, including maintaining her current probation, obtaining a favorable disposition of the pending felony, and regaining custody of her

children from CPS. 44 RR 216-17, 222-25, 234-37, 255-56. Estrada admitted under cross-examination that she had been angry with Soliz during the October interview with the prosecutor because he had disrespected her and Ramos. 44 RR 272-73. Counsel also established that Estrada did not tell the prosecutor about a letter Ramos had written her, reminding her of their friendship. 44 RR 226-28, 252-54.

In state habeas court, Soliz argued that trial counsel was ineffective for failing to further impeach Estrada with inconsistencies in the October statement. SHCR 48, 51-54. The state court misconstrued the claim, however, as pertaining to inconsistencies with the prior statement she made *to the police in June of 2010*. SHCR 750-51. The claim before this Court is ineffective assistance for failing to impeach Estrada with her October statement. Pet. 37; SHCR 257 (Ex. 8, Estrada's statement to prosecutor). Thus, this claim was presented in state court but not decided on the merits. The AEDPA standard therefore does not apply, and the Court addresses the claim *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)); *Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir. 2003) (holding that AEDPA standards do not apply to claims not adjudicated on the merits in state court).

A.    Counsel's alleged deficiency

Soliz acknowledges that trial counsel (1) cross-examined Estrada about her desire to testify in exchange for favorable treatment on the felony charge, (2) highlighted how she was better friends with Ramos and may have been protecting Ramos at Soliz's

expense, (3) attacked her credibility based on her criminal history and drug abuse, and (4) noted that none of Estrada's testimony matched her initial statement to the police. Pet. 35-36. Soliz nevertheless argues that counsel should have done more to identify discrepancies between her testimony and what she told the prosecutor in October of 2010. Pet. 38-39. The discrepancies are identified as follows: (1) whether Soliz told her about the Ruben Martinez murder in person or by telephone, (2) the extent of Ramos's participation in Martinez's murder, as told by Soliz, (3) whether Soliz and Ramos verbalized their intent to "get Ruben [Martinez]," (4) whether Soliz said he shot Martinez in the head or in the neck, (5) whether Soliz told Estrada about the Weatherly murder and the Martinez murder in one conversation or two, (6) whether Soliz told Estrada that they killed Weatherly's horse or that he only told Ramos to "get" the horse, (7) whether Soliz was "busting" on Weatherly's door or simply knocked, (8) whether Estrada knew "Tat Man," the man found in possession of Weatherly's television, and (9) who fired the gun in the drive-by shooting on Pearl Street. *See* Pet. 38.

Soliz relies on case law holding counsel to be ineffective when, as Soliz describes it, counsel "declines to cross-examine a witness at all or in near entirety." Pet. 40. As he recognizes, this is not a case where counsel declined to cross-examine a witness. Pet. 35-36. Counsel's approach to impeaching Estrada was comprehensive, and Estrada's motivation to please the prosecution was made apparent by her handcuffs and shackles. Trial counsel could reasonably decide that there was no benefit to be gained from

28

additional impeachment based on the October statement because the inconsistencies enumerated above pale in comparison to the potential harm. Specifically, Estrada's October statement contained evidence of Soliz's retaliatory nature that could have been emphasized through re-direct examination and would have undermined the defense theory that Soliz was just a follower in the crime spree. The October statement discusses Soliz's reputation for killing people who snitch, Estrada's estrangement from her family due their fear of her association with Soliz, and Estrada's belief that Soliz caused her house to be "shot up" while her children were there. SHCR 261, 269, 289.

Furthermore, trial counsel used Estrada to benefit the defense. Estrada was a contemporary of Soliz; her upbringing on the north side of Fort Worth was similar to his. Estrada described her experience with ice, marijuana and inhalants, joining a gang at age twelve, dropping out of school, and living on the streets. 44 RR 218-22, 248-49, 251. This testimony lent credibility to defense testimony later presented at the punishment phase that would echo these same themes regarding Soliz's childhood. 50 RR 136-263; 51 RR 6-31. Estrada related other helpful information that Soliz was mentally sick, "tripping," having flashbacks, and beating his head against the wall before his arrest, which tended to support the theory that Soliz struggled with mental health problems. 44 RR 237-39. Given this useful information, counsel could have reasonably decided that attempting to destroy Estrada's credibility by quibbling about minor inconsistencies with her October statement would yield little benefit. This strategy was reasonable, and

"[s]peculating about the effect of tinkering with the cross-examination questions is exactly the sort of hindsight that *Strickland* warns against." *See Castillo v. Stephens*, 640 F. App'x 283, 292 (5th Cir. Feb. 8, 2016) (citing *Strickland*, 466 U.S. at 689). Soliz fails to overcome the presumption that counsel's cross-examination was sound trial strategy.

B.    <u>*Strickland* prejudice analysis</u>

The Court alternatively considers the question of prejudice *de novo* and concludes that the inconsistencies Soliz contends counsel should have emphasized are not the type that would alter the trial outcome. Some of the inconsistencies concern details that are insignificant or possibly even harmful if highlighted through impeachment (whether there was one conversation or two, whether Soliz shot Martinez in the head or the neck, whether the horse was shot, whether they busted on Weatherly's door or knocked). Other inconsistencies relate to extraneous offenses (the Martinez murder, the drive-by on Pearl Street) which, other than their minimal impeachment value, would not have yielded a benefit in the guilt phase of trial. To the extent impeachment would have highlighted Estrada's inconsistent statements about what Soliz told her, it would have emphasized the fact that Soliz could have cleared up these inconsistencies by testifying, but did not do so. Finally, as noted, impeachment would have revealed harmful information in the October statement about Soliz's violent, retaliatory nature.

Soliz fails to demonstrate a reasonable probability, sufficient to undermine confidence in the outcome, that but for counsel's alleged error the result of the proceeding

would have been different.  *See generally Leal*, 428 F.3d at 549 (finding no *Strickland* prejudice when evidence of guilt is overwhelming).  The Court overrules claim 2.

## VI.  COUNSEL'S FAILURE TO LODGE HEARSAY OR CONFRONTATION CLAUSE OBJECTION (CLAIM 3)

Trial evidence showed that, by the time they were arrested, Soliz and Ramos had been connected to multiple crimes in and around Fort Worth, including an aggravated robbery involving Jorge Contreras and his green Dodge pickup.  39 RR 249; 40 RR 60, 188.  When Detective Paine questioned Ramos about the Contreras robbery, Ramos confused the offense with a previously unknown offense involving a Toyota truck.  Based on information he provided, the police located the Toyota truck and identified the owner as Nancy Weatherly.  38 RR 269; 41 RR 27-29, 31-35.  They contacted the Johnson County Sheriff, who went to Weatherly's home and discovered her body.  41 RR 35-36; 42 RR 56.

In state habeas proceedings, Soliz argued that trial counsel rendered ineffective assistance when he failed to make a hearsay or confrontation-clause objection to Detective Paine's testimony describing this interview with Ramos.  The state habeas court denied the claim on the merits.  SHCR 55, 751-52.  The state court appears to have held that the testimony was "technically" hearsay "in the academic sense," but non-prejudicial, even as it concluded it was not offered for the truth of the matter asserted.  SHCR 752.  As discussed below, the Court concludes that the testimony was *not* hearsay precisely because it was *not* offered to prove the truth of the matter asserted.

*See* Tex. R. Evid. 801(d) (defining hearsay). But this disagreement does not change the reasonableness of the state court's ultimate ruling denying the claim. *See Charles v. Stephens*, 736 F.3d 380, 387-88 (5th Cir. 2013) (holding that AEDPA review involves only the state court's ultimate legal determination, not every link in its reasoning).

In claim 3, Soliz asserts the state court unreasonably analyzed the facts against *Strickland.* Pet. 43. Citing *Crawford v. Washington*, 541 U.S. 36 (2004), he contends that counsel should have objected to Paine's testimony on hearsay or Confrontation Clause grounds because Paine relayed testimonial, out-of-court statements by Ramos. Soliz argues that counsel's failure was highly prejudicial because Ramos's statements were the first link in the investigation tying Soliz to the capital murder. Pet. 46-49.

The trial judge would have properly overruled an objection under *Crawford* because *Crawford* applies only to out-of-court statements that are used to establish the truth of the matter asserted. *Id.* at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985) (non-hearsay use of co-defendant's confession raises no Confrontation Clause concerns)); *see Williams v. Illinois,* 567 U.S. 50, 79 (2012) (noting *Crawford* proviso that Confrontation Clause applies only to out-of-court statements used to establish truth of the matter asserted). Detective Paine's brief description of Ramos's statements were not hearsay and did not violate Soliz's confrontation rights because they were not used to prove the truth of the matter asserted, i.e., to prove that the crime "should not have ended that way" or that the Toyota truck was located on a certain street. Paine's

testimony was used to show how the Weatherly murder came to the attention of the police. *See United States v. Smith*, 822 F.3d 755, 762 (5th Cir. 2016) (no *Crawford* violation where out-of-court statements were introduced to show how law enforcement developed suspects, rather than for the truth of matter asserted). Further, while the complained-of testimony led to the discovery of Weatherly's body, it did not on its face incriminate Soliz. *See Richardson v. Marsh*, 481 U.S. 200, 208 (1987) (statement of non-testifying co-defendant admissible where it does not implicate defendant on its face and any implication required linkage with other trial evidence).

A reasonable state court could have denied this ineffective-assistance claim against trial counsel based on the conclusion that the complained-of testimony was not hearsay and did not violate the Confrontation Clause and that, therefore, a trial objection would have been futile. *See Koch v. Pucket*, 907 F.2d 524, 527 (5th Cir. 1990) (recognizing that counsel is not required to make futile motions or objections). Alternatively, because the complained-of testimony did not, standing alone, incriminate Soliz but only led the police to a previously unknown murder, the state court could reasonably conclude there was no *Strickland* prejudice. The Court overrules claim 3.

## VII. APPELLATE COUNSEL'S REPRESENTATION REGARDING RAMOS'S DECLARATION (CLAIM 4)

Claim 4 also relates to Detective Paine's testimony about how Ramos inadvertently informed him of Weatherly's murder. During cross-examination of Paine, trial counsel sought to inquire about a plea bargain that Ramos allegedly made with the

prosecution eighteen months later, whereby Ramos received a life sentence in the case. Trial counsel argued that the existence of the plea bargain was admissible under Texas evidence rule 806 to show Ramos's lack of credibility and bias at the time he was interviewed by Detective Paine. 42 RR 5-11.

Rule 806 provides in pertinent part:

> **When a hearsay statement–or a statement described in Rule 801(e)(2)(C), (D), or (E) [including a coconspirator's statement made during and in furtherance of the conspiracy]** . . . –has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness. The court may admit evidence of the declarant's statement or conduct, offered to impeach the declarant, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it. If the party against whom the statement was admitted calls the declarant as a witness, the party may examine the declarant on the statement as if on cross-examination.

Tex. R. Evid. 806 (emphasis added). The trial court overruled "without prejudice" the request to cross-examine Paine about the existence of a plea agreement. 42 RR 11.

Appellate counsel, John Stickels, did not challenge this particular ruling on appeal, and the habeas petition asserted that this was ineffective assistance. SHCR 61. The state court rejected the claim because (1) there was no evidence that Paine had personal knowledge of any plea agreement, as required by Texas evidence rule 602, and (2) a plea agreement made in December of 2011 was irrelevant in that it had no bearing on the truthfulness or credibility of a statement made by Ramos in June of 2010. SHCR 753.

In claim 4, Soliz assumes Ramos's declaration is hearsay and argues that proof of bias, including pending criminal charges, is always relevant. Pet. 51-52. Soliz asserts he was harmed by Mr. Stickels's ineffective representation because Paine's testimony that Ramos said "it was wrong that–how it ended, it didn't have to end that way," implies that Soliz shot Weatherly. Pet. 52.

For *Strickland* claims of ineffective assistance against appellate counsel, Soliz must show (1) that appellate counsel unreasonably failed to discover and brief a nonfrivolous issue and (2) a reasonable probability that, but for counsel's unreasonable failure, he would have prevailed on his appeal. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). This Court may grant relief only if the state court was unreasonable in making this determination.

A.     Factual and legal analysis under *Strickland/Robbins*

The amended petition does not articulate a clear argument to surpass the bar to federal review in § 2254(d). To the extent Soliz is complaining that the state court's determination of the relevant facts was unreasonable in light of the evidence, Soliz does not meet his burden to rebut the factual findings by clear and convincing evidence. *See* § 2254(e)(1); *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). The record shows that Ramos *inadvertently* alerted the police to Weatherly's murder by confusing Weatherly's Toyota truck with Contreras's Dodge truck. 41 RR 29 ("He indicated that he thought we were talking about the same truck, but he kept saying 'she'"). There is no suggestion that

Ramos intentionally told Detective Paine about Weatherly's murder, let alone that he did so in order to reap the benefits of a future plea bargain. And since Ramos's statements were not offered to prove the truth of the matter asserted, but only to show what was said to Paine, Ramos's credibility was not an issue at trial. Thus, Soliz fails to demonstrate that the state court made an objectively unreasonable determination of the facts in ruling that the plea bargain agreement was irrelevant.

To the extent Soliz may be complaining that the state court unreasonably applied *Strickland/Robbins*, the Court notes that the error that Mr. Stickels is alleged to have overlooked on appeal is grounded in Texas evidence rule 806, which allows the impeachment of a hearsay declarant. The trial judge observed that there were no hearsay statements identified that would trigger rule 806. 42 RR 11. The state court's ruling was also based on Texas evidence rule 602, which requires a testifying witness to have personal knowledge of the matter about which he testifies. *See* 42 RR 8-9; SHCR 753.

The state court's interpretation of its own rules may not be overruled by this Court. *See Charles v. Thaler*, 629 F.3d 494, 500-01 (5th Cir. 2011) (holding that federal habeas court lacks authority to rule that a state court incorrectly interpreted its own law). Because the state court ruled there was no error in the trial court's application of the Texas rules, it follows that Soliz cannot show that appellate counsel overlooked a nonfrivolous issue on appeal. Alternatively, because the state court concluded there was

no state-law error, Soliz cannot demonstrate *Strickland* prejudice, that is, a reasonable probability of success on direct appeal.

Soliz fails to demonstrate an unreasonable determination of facts or an unreasonable application of *Strickland/Robbins*. *See Amador v. Quarterman*, 458 F.3d 397, 412 (5th Cir. 2006) (ruling that, because state habeas court held evidence admissible under Texas law, the result of petitioner's appeal would not have been different had appellate counsel raised the claim, and the state court's rejection of ineffective assistance claim against appellate counsel was not unreasonable); *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir. 2004) (holding in context of *Strickland* claim that court could not review correctness of state court's interpretation of state law).

B.      Other federal law

The Court has addressed this claim as a *Strickland* claim against appellate counsel for failing to raise an allegation of trial error under the Texas evidence rules. To the extent the amended petition relies on a Constitutional right to inform the jury that Ramos was a suspect in the offense on trial (Pet. 51), the Court rejects this claim as well. The jurors knew that Ramos was a suspect in the crime spree, a co-defendant in Weatherly's murder, and a gang member with an extensive criminal history. They learned this from the opening statements (38 RR 27, 29, 35, 36, 42-43) and from the trial testimony (38 RR 153, 192-94; 39 RR 19, 30-33, 55, 70-71, 97, 106; 40 RR 40,

52, 125-26, 185; 41 RR 10, 91-94). Defense counsel even gave a hypothetical closing argument for the State's case against Ramos. 47 RR 40-41.

Soliz's citation to *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) does not avail him. There, the Supreme Court held that it was error under the Confrontation Clause to deny counsel's request to cross-examine a witness about his agreement to testify in exchange for the dismissal of a criminal charge. *Id.* at 679-80. The Court explained that an important and proper function of the confrontation and cross-examination right is to expose a witness's motivation in testifying. *Id.* at 678-79. Unlike the witness in *Van Arsdall*, Ramos's potential bias was not relevant because he did not testify and his statements, as related by the witness Detective Paine, were not used to prove the truth of the matter asserted. *See Williams,* 567 U.S. at 79 (holding that, if trial judge did not rely on statement for its truth, there is no way around the proviso in *Crawford* that the Confrontation Clause applies only to out-of-court statements used to establish the truth of the matter asserted). Also unlike *Van Arsdall*, there is no evidence that Ramos agreed to cooperate with the police in exchange for a life sentence. Indeed, a ruling by the trial court allowing the requested "impeachment" of Ramos as a hearsay declarant would have conflicted with circuit law by improperly informing the jury of Ramos's life sentence. *See Cordova v. Johnson*, 157 F.3d 380, 383 (5th Cir. 1998). Soliz fails to show an unreasonable application of federal law or an unreasonable determination of facts. The Court denies claim 4.

## VIII.  COUNSEL'S STRATEGY FOR THE ADMISSION OF
## GANG EVIDENCE DURING THE GUILT PHASE (CLAIM 5)

At the guilt phase of trial, the prosecution presented testimony from Officer Alaniz with the Fort Worth Gang Unit indicating that the police had connected a rash of robberies to a gang member with the street name, "Kilo."  39 RR 53.  Alaniz learned that both Soliz and Ramos used the street name Kilo, although they belonged to different gangs.  39 RR 55.  With defense counsel's agreement, Alaniz also described photographs of Soliz's gang tattoos.  39 RR 77-84.

In state habeas proceedings, Soliz argued that counsel were ineffective for failing to object to this testimony under Texas evidence rule 404(b), which restricts the use of crimes, wrongs, or other acts to prove a person's character.  SHCR 65, 67; *see* Tex. R. Evid. 404(b).  The state court disagreed, finding the evidence was relevant for a non-character purpose because it was through his gang name "Kilo" that Soliz became a suspect.  The court also reasoned that the gang evidence supported counsel's overarching mitigation theme regarding Soliz's character and upbringing.  SHCR 754.  In claim 5, Soliz contends the state court unreasonably denied the claim.  Pet. 53-59.

### A.    Counsel's alleged deficiency

Soliz reasserts the state-law based argument that he made in state court.  SHCR 67-70.  This Court lacks authority, however, to conclude that the state court incorrectly applied its own law.  *See Charles*, 629 F.3d at 500-01.  Because the state court concluded the gang evidence was admissible under Texas evidence rule 404(b) for a non-character

purpose, it follows that reasonable trial counsel could choose not to object. *Koch*, 907 F.2d at 527 (counsel is not required to make futile motions or objections).

The amended petition also includes a citation to *United States v. Hamilton*, 723 F.3d 542, 546 (5th Cir. 2013), a federal authority that was not cited or argued in state court. Pet. 57, 58; SHCR 65-70. *Hamilton* holds that testimony by an arresting officer elaborating on the defendant's probable, but unproven, current gang membership was inadmissible under the federal evidence rules. Respondent contends the argument based on *Hamilton* is unexhausted. The Court agrees and concludes that relief under *Hamilton* is precluded by the failure to exhaust. *See* § 2254(b)(1)(A). Alternatively, *Hamilton* is a circuit court opinion based on circuit precedent and provides no basis for habeas relief under § 2254. *See White v. Woodall*, 134 S. Ct 1697, 1702 n.2 (2014)(stating that clearly established federal law for purposes of § 2254 is the actual holdings of the Supreme Court, not circuit case law).

Furthermore, the record upholds the state court's conclusion that the gang evidence supported the overarching defense mitigation theme. Trial counsel wanted to "set the stage" for the mitigation evidence early in the case, and that mitigation evidence included "intense negative characteristics" from a very young age due to FASD, "exacerbated by his mother's highly dysfunctional lifestyle and habits." *See* SHCR 443-44; *e.g.,* 53 RR 84-88, 205. One of those characteristics was an early fascination with gangs. 51 RR 206, 212; 55 RR 219-20. Through cross-examination of Officer Alaniz, trial

counsel identified the risk factors for gang membership that the defense would later show applied to Soliz: lack of a father in the home, older sibling in a gang, childhood neglect, lack of parental attachment, a need for protection, and mental health issues. Alaniz discussed the prevalence of gangs in north Fort Worth where Soliz grew up, why people join gangs, and how gangs prey on vulnerable young males and entice them with drugs, alcohol, and guns. 39 RR 84-87, 109-13, 119-21. Alaniz, who also grew up on the north side, never joined a gang. He attributed his good fortune to the fact that his father worked and his mother stayed home, in stark contrast to Soliz's childhood. 39 RR 87-88, 95. The discussion of gangs also provided trial counsel with the opportunity to inform the jury of *Ramos's* gang membership, specifically, his affiliation with the gang house they were in immediately prior to arrest and his association with "the biggest gang within the Texas Department of Corrections." 39 RR 97-101, 107, 110.

Trial counsel's cross-examination of Alaniz provided a sympathetic explanation for Soliz's gang affiliation. It also supported the theory that Ramos was the person in charge. Soliz provides no clearly established federal law demonstrating that this strategy was in any way outside the wide range of reasonable professional assistance.

B.      *Strickland* prejudice analysis

Alternatively, Soliz fails to demonstrate an unreasonable ruling regarding prejudice. Soliz contends the gang testimony harmed him because of the likelihood that the jury presumed he was acting in conformity with his bad character by killing

Weatherly. Pet. 58. But the trial court's charge contained the following instruction, which did not allow the jury to consider the gang testimony as character evidence:

> You are instructed that if there is testimony before you regarding the defendant having committed offenses, wrongs, or acts other than the offense charged in the indictment in this case, now on trial before you, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such conduct, if any were committed, and even then *you may only consider the same in determining the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident of this defendant now on trial before you, or rebuttal of a defensive theory, and for no other purpose.*

11 CR 2082-83 (emphasis added); *see* Tex. R. Evid. 404(b). Juries are presumed to follow their instructions. *See Blueford v. Arkansas*, 132 S. Ct. 2044, 2051 (2012).

Moreover, given the strong evidence of guilt previously discussed, the state court could reasonably conclude that the gang evidence did not cause *Strickland* prejudice. *See Henderson*, 333 F.3d at 603 (admission of gang evidence at guilt phase did not prejudice Henderson where evidence of guilt was overwhelming). The Court overrules claim 5.

## IX. COUNSEL'S STRATEGY FOR THE ADMISSION OF EXTRANEOUS-OFFENSE EVIDENCE AT THE GUILT PHASE (CLAIM 6)

Claim 6 concerns evidence of the week-long crime spree that was introduced during the guilt phase of trial. Prior to trial, the parties stipulated under *Devoe v. State*, 354 S.W.3d 457, 469-70 (Tex. Crim. App. 2011) that three unadjudicated extraneous offenses – Soliz's evasion of arrest, the robbery of Sammy Abu-Lughod, and the burglary of the Circelli home – were admissible as "same-transaction contextual evidence" under rule 404(b). 38 RR 12-14. The Circellis first testified that they lost several guns in a

home burglary on June 22, 2010. 38 RR 47-108. Ramon Morales bought some of those guns from Soliz, who refused to sell a 9-mm handgun, saying he had plans for it. 38 RR 116-21. Witnesses testified about the aggravated robbery of Sammy Abu-Lughod, in which his green Dodge Stratus and cell phone were taken. 38 RR 191. Abu-Lughod testified that he replaced his stolen phone and received a call on the new phone from a woman looking for "Kilo." 38 RR 218. This information was relayed to the police, who connected the street name Kilo to both Soliz and Ramos. 38 RR 191-92. Abu-Lughod identified Soliz from a photographic lineup with ninety-percent certainty that he was the individual who had robbed him. 38 RR 195-96. Later, a 9-1-1 employee suspected that a "teal four-door sedan" reported in a carjacking on June 29th was the green Stratus stolen from Abu-Lughod. 38 RR 251-52. When the police spotted the Stratus, they initiated a traffic stop and eventually arrested Soliz. 38 RR 256-67; 39 RR 128-57.

This was the general extent of the prosecution's extraneous-offense evidence. During the cross-examination of Detective Cedillo, however, trial counsel asked the detective about the robbery of Justin Morris in a mall parking lot, the shooting of Luis Luna through the ear, the attempted robbery of Kenny Dodgin in a Lowe's parking lot, the robbery of Jorge Contreras's pickup, a drive-by shooting at the Ramirez residence, a robbery of two couples outside a bar, and the Samaniego and Martinez shootings. 39 RR 15-24. On redirect examination, the prosecution elicited more details regarding the

circumstances of the extraneous offenses plus two burglaries in Benbrook, for a total of thirteen separate events. 39 RR 26-35; 45 RR 196, 204-05.

In the state habeas proceedings, Soliz complained that trial counsel's strategy not to object to and to affirmatively introduce the extraneous offense evidence was ineffective assistance. Soliz argued that counsel opened the door to what would have been inadmissible evidence at the guilt stage and that the jury convicted him based on a perceived propensity for violence. Soliz argued that counsel misread Texas case law regarding same-transaction contextual evidence and that counsel's strategy of "front-loading" damaging evidence at the guilt phase has been deemed unreasonable by Texas courts. SHCR 78. The state court rejected the claim because the evidence was either admissible under evidence rule 404(b) or served the defense theory that FASD plus the lack of parental supervision had a devastating effect on Soliz's physical, mental, and psychological development. SHCR 755-56. In claim 6, Soliz contends the state court's ruling was an unreasonable application of *Strickland.* Pet. 59-71.

A.    Counsel's alleged deficiency

To the extent this claim is based on a disagreement with the state court's interpretation of state law governing the admission of "same-transaction contextual evidence," the Court lacks authority to conclude that the state court incorrectly applied its own evidentiary law. *See Charles*, 629 F.3d at 500-01. Trial counsel is not ineffective for failing to object to evidence deemed admissible as same-transaction contextual

44

evidence by the state court under state law. *Koch*, 907 F.2d at 527 (recognizing that counsel is not required to make futile motions or objections).

The record also supports the reasonableness of counsel's "frontloading" strategy, whereby counsel introduced the remaining extraneous offenses. As previously noted, when the defendant's guilt is clear, the best and most realistic strategy available to counsel may be avoiding execution. *See Nixon*, 543 U.S. at 191. Such "conscious and informed" decisions on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance "unless it is so ill-chosen that it permeates the entire trial with obvious unfairness." *Woodward v. Epps*, 580 F.3d 318, 329 (5th Cir. 2009).

Because trial counsel believed the evidence against Soliz and Ramos was more than sufficient to convict, he decided to focus the jury on the compelling and overwhelming nature of his mitigation evidence. SHCR 443. Counsel used the extraneous offense evidence at the guilt phase to "set the stage" for the mitigation theory and prevent the prosecution from diluting the defense presentation at punishment. *See* SHCR 444, ¶ 4. During opening remarks, counsel prepared the jury to hear this defense theory by stating that his client went on a crime spree with Ramos as a result of brain damage caused by FASD "mixed in with neglect . . . mixed in with his drug of choice at this time, methamphetamine or ice. . . mixed in with alcohol." 38 RR 42. Counsel then used the State's witnesses to develop the defense theory during the guilt phase.

His cross-examination of Officer Alaniz about risk factors for gang membership is one example.  39 RR 84-121.  Counsel also elicited testimony about Ramos's and Soliz's original desire to trade the guns for "ice."  38 RR 133.  Counsel questioned Detective Cedillo about the increased use of methamphetamine in the Fort Worth area.  39 RR 12-13.  Cedillo agreed that the extraneous offenses occurred in the early morning hours, when methamphetamine would cause "a person to be delusional and up all night."  39 RR 37.  Counsel elicited testimony from Detective Paine that people under the influence of methamphetamine can appear delusional and psychotic, which is exacerbated in people with mental health issues.  41 RR 130-31.  Counsel questioned Estrada about growing up, like Soliz, in north Fort Worth, with access to methamphetamine, inhalants, and marijuana, and about how, unlike Soliz, she had received counseling to cope.  44 RR 221-22, 243, 279-80.  Estrada also supported the defense theory of mental disability by testifying that Soliz beat his head against the wall and had flashbacks before his arrest.  44 RR 237-38.  A second aspect of the defense strategy was to demonstrate that Soliz was not as smart or savvy as Ramos and that Ramos had used Soliz.  The testimony supporting this strategy was enumerated in claim 1A and will not be repeated here.  *See* 41 RR 64, 79-82, 89-94, 97-100, 140; 42 RR 32-33.

Trial counsel could reasonably conclude that a strategy focused on obtaining a not-guilty verdict would be fruitless, given the strength of the State's evidence and the availability of the law of parties.  *See* Tex. Penal Code Ann. § 7.02(a) (parties) and

7.02(b) (parties-conspiracy); 11 CR 2079-80 (jury charge). Trial counsel presented mitigation evidence that painted a vivid and sympathetic picture of Soliz as a child whose upbringing left him no chance for a normal life. Its impact was due not only to its content, but to the fact that the prosecution's most aggravating evidence had been presented days earlier, at the guilt phase. In doing so, counsel re-characterized what was arguably the State's most aggravating evidence – Soliz's criminal history – into a symptom of his medical diagnosis. This strategy allowed counsel to introduce the jury to his mitigation theory early in the case, and it established a foundation to argue that Soliz was Ramos's pawn, while explaining and desensitizing the jury to his extensive criminal history. Soliz presents no authority condemning this strategy as "so ill-chosen that it permeates the entire trial with obvious unfairness." *See Woodward*, 580 F.3d at 329. In truth, counsel presented a comprehensive narrative in support of the case for life that connected both the guilt phase and the penalty phase, while minimizing the inconsistencies between them. *See Nixon*, 543 U.S. at 191-92 (holding that counsel may reasonably focus on penalty phase rather than put on a "he didn't do it" defense and a "he is sorry he did it" mitigation case at sentencing). Thus, a reasonable argument exists that counsel satisfied *Strickland*.

B.      *Strickland* prejudice analysis

Soliz contends he was harmed because the jury convicted him based on the assumption that he acted in conformity with his character for violence. As noted earlier,

the jury was instructed otherwise, 11 CR 2082, and juries are presumed to follow their instructions. *See Blueford*, 132 S. Ct. at 2051. Further, the evidence of guilt was overwhelming. The state court could have reasonably rejected Soliz's assertion of prejudice. *E.g., Wilson v. Cockrell*, 75 F. App'x 983, *13-14 (5th Cir. 2003) (affirming that admission of extraneous misconduct at guilt was harmless, given the substantial evidence supporting conviction). The Court denies claim 6.

## X. PROSECUTOR'S CLOSING ARGUMENTS (CLAIM 7 & 13)

In his state habeas application, Soliz asserted that trial counsel rendered ineffective assistance for failing to object to the prosecutor's argument (1) calling for the jury to meet the expectations of the victim's family and the community, (2) referring to Soliz as "that," and (3) insinuating he was a womanizer. SHCR 80-86; 126-29. The state court held that the complained-of arguments were proper under state law and denied the claims. SHCR 756 (claim 7), 763 (claim 13). Soliz disagrees and argues that the remarks violated Texas law by asking the jury to "lend its ear to the community and the victim's family," arguing facts outside the record, and engaging in argument calculated to inflame the passion and prejudice of the jury. He asserts counsel was ineffective for failing to object. Pet. 75-81.

### A.    Appeal to the community and victim's families(both phases of trial)

Soliz argues in claim 7 and 13 that, at both phases of trial, the prosecutor improperly asked the jury to consider the expectations and desires of the community and

48

the victim's family.  Pet. 75-76.  The Court disagrees with this characterization of the prosecution's argument and concludes the state court ruling was reasonable.

Most of Soliz's crime spree occurred in and around the city of Fort Worth, Tarrant County.  But Weatherly's murder and, therefore, the trial, occurred in rural Johnson County.  A Tarrant County assistant district attorney, Elizabeth Jack, was deputized to assist Johnson County officials in prosecuting the case.  1 CR 49, 76.  In his jury argument, defense counsel implied that Ms. Jack had to come from Fort Worth to assist the Johnson County district attorney because the State's evidence was weak. 47 RR 52 ("It's not just a matter of bringing the best Prosecutor.  You've got to bring the best evidence."), 59-60, 63.

Claim 7 involves the rebuttal to this argument, wherein the Johnson County prosecutor explained that they do not have a lot of capital murders in Johnson County, that Soliz's crimes were problems for both counties, and that the jury got the best effort from both counties.  47 RR 68-69, 74-75.  He did not argue that the community or the victim's family expected a guilty verdict, but rather, he asked the jury to "do what the law and the evidence demand." 47 RR 69.  Claim 13 involves the continuation of this theme at the punishment phase.  57 RR 29-30, 90.  But again, the prosecution did not assert that the community or the victim's family expected a death sentence.  The complained-of arguments were legitimate responses to the defense argument criticizing the use of another county's "best" prosecutor.

To the extent the state court concluded the prosecutor's arguments were permissible under state law, this Court may not overturn its decision that counsel was not ineffective. *See Koch*, 907 F.2d at 527 (recognizing that counsel is not required to make futile motions or objections); *Charles*, 629 F.3d at 500–01 (holding that federal court lacks authority to conclude that the state court incorrectly applied its own law). Further, the arguments are permissible under circuit law. *See Jackson v. Johnson*, 194 F.3d 641, 655 (5th Cir. 1999) (holding that the prosecution may appeal to the jury to act as the conscience of the community and emphasize the importance of deterrence and seriousness of the charges). Soliz does not demonstrate that the state court's ruling was an unreasonable determination of the facts or an unreasonable application of clearly established federal law. *See* Pet. 75–76 (claim 7), 80 (claim 13).

B.      Passing girls around "like party favors" (guilt phase of trial)

In claim 7, Soliz complains that Ms. Jack argued irrelevant facts outside of the record and inflamed the jury by speculating that Soliz was a womanizer. Pet. 76-77. Soliz cites to state law and to *Johnson* for support, which holds that the prosecution "may not appeal to the jury's passions and prejudices." *Johnson*, 194 F.3d at 655. Again, the record does not support Soliz's characterization of the argument.

While processing Nancy Weatherly's truck for evidence, the police collected a drinking straw, a beer bottle, and a compact disc from the CD player. A fingerprint on the compact disc and DNA profiles on the straw and beer bottle were all connected to

Arturo Gonzales. 44 RR 48, 63-64, 133. In closing argument, Ms. Jack argued that Gonzales had nothing to do with Weatherly's murder. To explain how his fingerprint and DNA ended up in Weatherly's truck, Ms. Jack stated, "What did Pipa [Estrada] tell you? Stolen cars, and I imagine sadly like girls, get passed around like party favors." 47 RR 33. This was an overt reference to Estrada's testimony that stolen cars get passed around and also to her testimony describing her romantic relationships with both Ramos and Soliz. 44 RR 200-29, 233, 266, 272-74, 278-79. If anything, the comment portrayed Estrada, not Soliz, as a person who enters into casual sexual relationships. The argument was based on testimony in the record, and the state court could reasonably conclude it did not condemn Soliz as a womanizer.

C.    "That" (guilt phase of trial)

In claim 7, Soliz asserts that the prosecutor's reference to him as "that" rather than by his name attempted to dehumanize him and improperly inflamed the jurors to base their verdict on emotion rather than evidence. Pet. 77-78. However, the trial evidence supports this characterization. In response to Weatherly praying, begging for her life, and pleading Soliz not take her deceased mother's jewelry box, Soliz told her to join her mother and shot her in the back of the head. He laughingly retold the story to Estrada while making fun of Weatherly's "country" accent and embellished it by suggesting he had killed Weatherly's horse. Given the cruel nature of the crime and Soliz's inability to empathize with his helpless victim's terror, the state court could reasonably

51

conclude that the prosecutor's colorful reference to Soliz as "that" rather than by name was a reasonable deduction from the evidence.

Further, this claim relies on an unpublished state-court opinion; it fails to identify an unreasonable application of clearly established Supreme Court law. Circuit law, in fact, compels the denial of relief. *See United States v. Ebron*, 683 F.3d 105, 147 (5th Cir. 2012) (holding that pejoratives like "shark" and "grim reaper" are not plainly improper*); United States v. Malatesta*, 583 F.2d 748, 759 (5th Cir. 1978) (holding that unflattering characterizations of defendant as "con man" and "hoodlum" do not require a new trial when supported by the evidence); *see also United States v. Bourgeois*, No. C-02-CR-216, 2011 WL 1930684, *104 (S.D. Tex. May 19, 2011) (holding that Government's isolated reference to capital murder defendant as a "thing" was not improper).

D.    *Strickland* prejudice analysis

Alternatively, Soliz fails to demonstrate that the state court's rejection of *Strickland* prejudice was unreasonable. Assuming the foregoing arguments were improper, the jury was told that the lawyer's statements were not evidence. *See* 11 CR 2084 ("it is only from the witness stand that the jury is permitted to receive evidence regarding the case, or any witness therein"). Further, the arguments were made, in part, as a response to defense counsel's arguments. They did not misstate the evidence. The Court disagrees with Soliz's assessment of the strength of the evidence against him at the guilt stage, nor was this a close case at punishment, considering the sheer amount

of violent conduct committed by Soliz in a week's time (including another capital murder) and his extensive criminal history. The state court could reasonably conclude that *Strickland* prejudice was not shown at either stage of trial. *See Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (holding that prosecutor's argument, while improper, did not render trial unfair where argument did not misstate the evidence, did not implicate a specific right, was responsive to the defense, and the jury was instructed that counsel's arguments were not evidence, and the weight of evidence against defendant was heavy). The Court denies claims 7 and 13.

## XI. VICTIM-IMPACT EVIDENCE CLAIMS (CLAIMS 8 & 10)

Claims 8 and 10 are based on the alleged improper admission of victim-impact evidence at both phases of trial.

A.    Claim 8 - assistance of appellate counsel

At the guilt phase of trial, the State introduced testimony from Mary Smith and her niece, Kila Davis, who was married to Weatherly's son. Defense counsel lodged a "relevance" objection to their testimony, but the trial court overruled it. 46 RR 9, 17. Smith described going to Weatherly's home and talking to police during the murder investigation. Smith said the police left Weatherly's house in her care when they completed the investigation because Weatherly's son was on vacation with his family. Smith and her husband cleaned the home prior to the family's return. 46 RR 6-16. Kila Davis described Weatherly, her mother-in-law, as her best friend. She provided personal

information about Weatherly and identified items missing from her home and truck. Davis said her family left for vacation two days before Weatherly's murder, and she described how her family heard the news of Weatherly's death. Davis identified a picture of Weatherly in life, posing with her grandchildren. 46 RR 17-27.

In his state habeas application, Soliz argued that appellate counsel was ineffective for failing to appeal these two rulings because they improperly allowed victim-impact testimony at the guilt stage. SHCR 86-92. The state court denied the claim because the issue was not preserved for appellate review as required by Texas Rule of Appellate Procedure 33.1 and *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009). It also held that the testimony was not victim-impact evidence because it did not speak to the effect that Weatherly's murder had on others. SHCR 757-58. Soliz contends the state court unreasonably denied the claim because the trial rulings were preserved for appellate review and because victim-impact testimony is inadmissible at the guilt stage under Texas law and *Payne v. Tennessee,* 501 U.S. 808 (1991). Pet. 83-88.

As noted previously, Soliz must show that appellate counsel unreasonably failed to discover and brief a nonfrivolous issue and show a reasonable probability that, but for counsel's unreasonable failure, he would have prevailed on his appeal. *See Robbins*, 528 U.S. at 285. This Court may grant relief only if the state court was unreasonable in making this determination.

1.       *State law analysis*

*Strickland* does not require counsel to make futile arguments. *See Koch*, 907 F.2d at 527. Therefore, if the claim was not preserved for appeal, it follows that appellate counsel would not be ineffective for failing to raise it on appeal. The state court here ruled that the relevance objections did not preserve the issue under Texas appellate rule 33.1 and *Pena*, which states that the complaining party must clearly convey to the trial judge the particular complaint, "including the precise and proper application of the law as well as the underlying rationale." *Pena*, 285 S.W.3d at 463-64. Soliz does not elucidate why this ruling is incorrect, and this Court is not authorized to conclude that the state court incorrectly applied its own appellate rules. *See Charles*, 629 F.3d at 500-01. The state court could reasonably decide that appellate counsel was not deficient in foregoing the unpreserved claim on appeal.

2. *Federal law analysis*

Alternatively, the state court could reasonably decide that appellate counsel was not ineffective because any error in the admission of the evidence would have likely been deemed harmless on appeal. Soliz references *Payne v. Tennessee,* which lifted the *per se* bar against victim-impact testimony under the Eighth Amendment and delegated to the states whether to admit such evidence at sentencing. Pet. 83. The Supreme Court reasoned that victim-impact testimony may be admitted *at sentencing* to counteract the mitigating evidence that the defendant is entitled to present by "reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an

individual whose death represents a unique loss to society and in particular to his family." *Payne*, 501 U.S. at 825. The Supreme Court described victim-impact testimony as testimony "about the victim and about the impact of the murder on the victim's family." *See Payne*, 501 U.S. at 827.

Soliz does not provide any clearly established federal law regarding the admission of such evidence at the guilt phase. But to the extent that the testimony imparted details about Weatherly as a person and to the extent that Davis described her family's reaction to the news of Weatherly's death, this testimony was probably admitted at the guilt phase in error. Though such testimony is often necessary as a preliminary matter to explain the facts and circumstances of the crime, in the broadest sense, it was testimony "about the victim and about the impact of the murder on the victim's family." *See id. But see Mosley v. Quarterman*, 306 F. App'x 40, 46 (5th Cir. 2008) (affirming district court ruling that testimony describing wife receiving news of husband's death, feeling "numb" and falling apart, and going to the hospital to see her husband was *not* victim-impact evidence).

Nevertheless, the descriptions of Weatherly were brief and closely tied to the investigation of the murder scene. The testimony describing her family's reaction related what happened only at the time the family learned of the murder; it describes how any family might react. The testimony did not have the same effect or purpose as the victim-impact testimony contemplated by *Payne*, which is to show the family's loss due to the

56

uniqueness of the victim. *Payne*, 501 U.S. at 823. By way of contrast, the victim-impact testimony Davis and her sons provided later, at the punishment phase, discussed details of Weatherly's childhood, her battle with cancer, and the activities she enjoyed with her grandsons. 56 RR 42-59. Furthermore, the prosecutor did not rely on the complained-of testimony during her guilt-phase argument. 47 RR 23-40, 63-75.

Under these circumstances, a state court could reasonably conclude that any claim of error asserted on appeal would have been deemed harmless. In other words, a state court could reasonably decide that there was no reversible error under *Payne*, and that, therefore, appellate counsel could reasonably decide not to press such a claim on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) (defendant has no right to compel counsel to press non-frivolous points on appeal if counsel, as a matter of professional judgment, decides not to present those points); *Mosley*, 306 F. App'x at 46-47 (denying COA where district court held that failure to object to similar testimony did not cause prejudice due to overwhelming evidence of guilt); *see generally Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997) (holding that erroneous admission of extraneous victim-impact testimony at punishment was harmless beyond a reasonable doubt where testimony comprised less than 20 pages out of 700 pages of testimony, the state did not mention the testimony during argument, and the overwhelming focus during punishment phase was on Cantu's behavior and the circumstances of the offense). Because Soliz fails to

show that the state court ruling involved an unreasonable application of clearly established federal law, the Court denies claim 8.

B.      Claim 10 - assistance of trial counsel

Soliz next complains that trial counsel failed to object to punishment-phase victim-impact testimony about Ruben Martinez, a murder victim not named in the indictment.    Specifically, Arnold Dominguez, a lifelong friend and co-worker of Martinez, testified that Martinez was driving the delivery truck that he should have been driving that day.   Dominguez also said that Martinez's family was important to him, that Martinez was expecting another child, and that he visited Martinez in the hospital every day until he died.   Martinez was paralyzed and could only communicate by blinking.   Dominguez identified a picture of Martinez in his hospital bed.  49 RR 73-93.

Martinez's wife, Lisa, testified at punishment as a rebuttal witness.  She described meeting and marrying her husband, the occasion she last saw him, her pregnancy, their extended family, and how she learned of the shooting.   She said her mother drove her and her son to the hospital, where she visited her husband every day.   He communicated by moving his eyebrows and blinking his eyes.   The doctors told her almost immediately that her husband would die, but she refused to believe it at first.   During this time, she was numb with shock, "basically just a zombie."   She showed the jury a family picture and described their childhood in north Fort Worth, his work ethic, the importance of family to him, and how she missed him every day.   56 RR 30-38.

In his state habeas application, Soliz argued that trial counsel were ineffective for failing to object to the foregoing testimony on the ground that it was improper "extraneous victim-impact testimony" because Martinez was not the victim named in the indictment. SHCR 95-101. The state court overruled the claim, holding that the evidence was relevant under the Texas capital punishment statute because it had some bearing on Soliz's personal responsibility and moral culpability and rebutted the defensive mitigation evidence. The state court did not address the fact that Martinez was not the victim named in the indictment. SHCR 758-60.

In claim 10, Soliz asserts that no reasonable jurist could countenance the state court's conclusions. There are two problems in the presentation of this claim, however. First, the argument relates only to the testimony regarding "the effect of an offense on people other than the victim." Pet. 92. The claim does not differentiate the medical testimony describing Martinez's injuries, which is permissible under Texas law. *See Garcia v. State*, 126 S.W.3d 921, 929 (Tex. Crim. App. 2004) (holding that medical records of injured bystander were not improper victim-impact evidence); *Guevara v. State*, 97 S.W.3d 579, 583-84 (Tex. Crim. App. 2003) (distinguishing *Cantu* because third party testimony only described unindicted victim's head injuries and resulting mental impairment); *Mathis v. State*, 67 S.W.3d 918, 927-28 (Tex. Crim. App. 2002). The claim also does not differentiate the "victim-character" testimony, which may have different rules of admissibility due to the fact that Texas allows such testimony from

unindicted victims who survive. *See Mays v. State*, 318 S.W.3d 368, 393 (Tex. Crim. App. 2010) (unindicted victims injured in same transaction may testify about their own injuries, losses, and changes in their lives that resulted from shoot-out with police officers)*; Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007) (extraneous robbery victim may testify about impact of robbery on her life); *Mosley v. State*, 983 S.W.2d 249, 262 (Tex. Crim. App. 1998) (noting that jurisprudence in this area has been inconsistent and confusing but holding that the introduction of victim-character evidence is admissible at a capital sentencing proceeding). In short, the claim requires the Court to sift through the evidence and identify the offending testimony using "inconsistent" and "confusing" state law which was not addressed by the state court in the first instance.

Second, other than *Payne*, Soliz cites no federal authority. Soliz acknowledges that *Payne* left the states to decide what, if any, victim-impact statements may be made during the punishment phase of a capital trial. Pet. 89-95. *Payne* does not address the circumstances where a witness testifies about a victim who is not named in the indict-ment. Although Soliz states that *Payne* forbids such testimony, he does not explain how. Pet. 92. The Court will not make Soliz's arguments for him. Because of the problems in the presentation of this claim, Soliz has not met his burden to show the state court's "prong 1" ruling under *Strickland* was unreasonable. *See* § 2254(d).

Alternatively, Soliz does not demonstrate the prejudice ruling was unreasonable. When assessing prejudice, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Richter*, 562 U.S. at 111. The question is whether it is "reasonably likely" the result would have been different. *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

Soliz contends that, but for a proper objection by trial counsel, the jury would not have heard the inflammatory testimony and would have voted in favor of a life sentence. Pet. 94-95. He also points out that the prosecution highlighted Mrs. Martinez's testimony by saving it for rebuttal and emphasizing it during argument as follows:

> When I think of Ruben Martinez, and you heard from his—from Lisa yesterday. Oh, what hard testimony to listen to. You saw the video. The word I think of when I think of Ruben, "Daddy", "Dad." A daddy, dad, father. You know there was no chance to really effectively say goodbye. You know that he was locked in, encased in that body that didn't work anymore. You recognize, I know, the agonizing, suffering that took place, trying so hard to communicate, just being able to blink. But Daddy. You know those children. You know there are two. Daddy. They'll never be able to run to the hugs of their daddy. They will never be able to see his proud smile. They'll never be able to hear his words of comfort. They'll never be able to learn from his words of wisdom. All because of this man over there. His choices. A thief who comes in the night. A coward, a bully, who comes to steal, a few pieces of silver, a few dollars. Thank you.

57 RR 28-29.

Soliz also complains that the prosecution argued that the friends and family members "who loved Ruben Martinez . . . await your justice and they await your verdict." 57 RR 30.

Soliz's assertion of prejudice relies on *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005), which held that the admission of victim-impact evidence relating to an extraneous murder offense was harmful error. This case is vastly different from *Haley*, however. Haley was convicted of cocaine possession in a joint trial with a co-defendant. Haley and her co-defendant had previously participated in an unrelated murder that the State introduced at the punishment phase of their drug trial, including victim-impact testimony from the murder victim's mother. Haley received a 65-year sentence for cocaine possession. *Id.* at 512, 517. In reversing the sentence, the CCA noted that the cocaine indictment did not name a victim. The CCA concluded the victim-impact testimony was harmful because the State made an extended argument concerning the suffering of the murder victim's family, and it was a "prominent piece" of the State's case for a weighty sentence in the cocaine trial. *Id.* at 518-19.

In contrast, the offense in this case is capital murder, a more serious and violent crime than drug possession, not a "victimless" crime. Unlike the jury in *Haley*, which heard no victim-impact testimony related to the crime on trial, the jury here heard such testimony from Weatherly's daughter-in-law, Davis, who testified at the punishment phase (as well as at the guilt phase, as previously discussed). Davis provided significant

victim-character and victim-impact evidence regarding Weatherly's difficult childhood, the loss of Davis's husband's business due to grief and depression, Weatherly's loving relationship with two grandsons, and the fact that Weatherly had survived a rare form of cancer only to be murdered six weeks after being declared cancer-free. 56 RR 42-49. Weatherly's 18- and 13-year-old grandsons also testified about their relationship with Weatherly and what they would miss without her. 56 RR 50-59.

The complained-of testimony from Mr. Dominguez and Mrs. Martinez was brief, comprising about fourteen pages out of seven volumes of punishment-phase testimony. And while the State mentioned the testimony in its argument, it was not the focus of the State's punishment case. The State's punishment evidence focused on the week-long crime spree which included, in addition to the Martinez murder: three home burglaries, a drive-by shooting at a residence, an attempted shooting of a Lowe's employee, two carjackings, the aggravated robbery of four people at a bar, the shooting of Luis Luna through the earlobe, the attempted capital murder of Mr. Samaniego, and, of course, the capital murder of Nancy Weatherly.

Nor was Mr. Martinez the only extraneous victim the jury heard about. Kenny Dodgin, the Lowe's employee, tearfully testified to being shot at multiple times and thinking he would never see his family again. 49 RR 14. The jury saw pictures of Mr. Samaniego recovering from life-saving surgery in the hospital, including graphic pictures

of his wound from sternum to naval.  49 RR 70-71.  They saw pictures of the hole in

Mr. Luna's ear lobe.  48 RR 164-65.  None of this testimony is challenged by Soliz.

The State's punishment case also rested on Soliz's juvenile history, including

burglary of a coin-operated machine, theft, attempted burglary of a motor vehicle,

burglary of a habitation, burglary of a building, and criminal mischief, as well as a

history of aggressiveness, sexually inappropriate behaviors, conduct disorder, and

substance abuse.  48 RR 32-33; SX 404, 405, 406.  The State introduced his adult

criminal history, including unauthorized use of a motor vehicle, four vehicle thefts,

evading arrest or detention, felony theft, burglary of a motor vehicle, criminal trespass,

burglary of a habitation, unlawful restraint, and possession of a prohibited weapon.  48

RR 34-37; SX 407-424.  The State introduced testimony of Soliz's misbehavior in jail,

including possession of sharpened metal, possession of a shard from a broken coffee cup,

flooding his cell on multiple occasions, refusing to allow his hands to be cuffed behind

his back, threatening a jail officer, breaking the telephone, and "bumping" the officers

who escorted him to court.  48 RR 54, 58, 62, 69-70; 49 RR 131-32, 160-67, 191-97.

The jury viewed jail recordings of him being subdued with pepper spray.  48 RR 60, 62,

65.  A jail officer testified that Soliz had trapped her hands by pulling his hands through

the food slot in his cell door while she was tightening his handcuffs.  49 RR 149-52.

Another jail officer testified that Soliz broke his cell light, wrestled with an officer,

played with his penis during a medical visit, and slipped out of a handcuff during a

medical visit, which caused the jail to invest in new handcuffs with a box cover. 48 RR

135-53. On the second day of trial, Soliz freed himself from the box and laughingly

admitted it to the guard. 49 RR 175-86.

Unlike *Haley,* where the state relied primarily on the extraneous murder to get a

65-year sentence for drug possession, the complained-of testimony in this case was a very

small part of the overall case against Soliz that supported a death sentence. The state

court could reasonably conclude that Soliz did not show a substantial likelihood of a

different result at sentencing. The Court overrules claim 10.

## XII. CUMULATIVE DEFICIENT PERFORMANCE (CLAIM 9)

Soliz argues that claims 1, 2, 3, 5, 6, and 7 collectively deprived Soliz of

constitutionally effective counsel during the guilt phase and create a reasonable

probability that, taken as a whole, they affected the trial outcome. Pet. 95-99; *Strickland*,

466 U.S. at 686. The state habeas court denied this claim. SHCR 758.

The Court has denied these claims individually, based on a lack of *Strickland*

deficiency or prejudice, under the applicable standard. Accordingly, there is nothing to

cumulate. *See United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006) (recognizing that

ineffective assistance cannot be created from the accumulation of acceptable decisions

and actions). It bears repeating that most of these claims implicate counsel's strategy

to offer at the guilt stage of trial aggravating information about Soliz because it

supported the overarching mitigation theme of FASD and counsel believed a guilty

verdict was a foregone conclusion. The Court agrees with this assessment of the evidence, and counsel did not lose anything by this strategy. Counsel used the mitigation theory to undermine the reliability of the confession and argue for a lesser-included murder conviction. Counsel gave the jury a preview of his mitigation case and forced the State to present a significant portion of its punishment case at guilt, thereby leaving Soliz's punishment presentation substantially "undiluted" by the State's evidence.

In other words, counsel presented a comprehensive narrative in support of the case for life that connected both the guilt phase and the penalty phase, while minimizing the inconsistencies between them. *See Nixon*, 543 U.S. at 192 (holding that counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a useless charade by presenting a run-of-the-mill strategy challenging the prosecution's case at the guilt phase). Claim 9 is denied.

## XIII. SOLIZ'S LETTER TO A PROSPECTIVE JUROR (CLAIM 11)

During its rebuttal case in punishment, the prosecution offered a letter Soliz had written to a prospective juror who had been excused during jury selection. The State offered the letter to refute a defense expert who testified that Soliz had deficits in adaptive and mental functioning and that he was equivalent to a child under six years of age in some respects. *See* 54 RR 37-40, 46-47, 53-62; 55 RR 5-6 (testimony of Dr. Connor); 56 RR 11-13. Defense counsel objected to the letter in part because it might

force counsel to testify on the issue of how Soliz had obtained the prospective juror's mailing address. 56 RR 10, 12, 15.

The trial judge stated that he did not want to end up in a situation where counsel had to testify. 56 RR 13. The State agreed not to present testimony that the addressee was a prospective juror, and the parties agreed to redact the portion of the letter identifying the addressee as a prospective juror. 56 RR 16-17. The redacted letter was admitted without further objection. 56 RR 17. The redacted letter states:

> Hey, how are you doing? But first let me start this letter off by sayin that you get this letter In da Best of Health & Highest of Spirit, that you and your love ones are in good hand.

> Well, as you know you don't know me but my name is (Mark Anthony Soliz). [redaction] At da same time, I was caught up in that smile of yours. Had me smileing myself on which I uselly don't. There was something about you that got my attention. You keep wavein your hand up I don't know if that was a sign to say that you was married or it was a Engagement Ring. I don't know. So I'm asken R U with anyone?

> You said something about your a missionary. What kind of work do you do? In how far R U into it? As of me self I'm Catholic. I do understand why you left da Catholic Religions. I'm kind of been thinken about taking da same path as you. Been thinken about it for some years now. I'm sorry but I'm 30 years old. Just turn 30 this year. Any suggestion on it? I'm in to readen alot of book that got to do with scientific term of da bible. If you don't understand, there is this person that write books. His name is Jame P. Gill. That write [illegible] Religion but in Scientific terms. I would like to know if there any way that you can send me any booklet that will help me cause here at the Jail they don't have much info. We just read with we got. Its hard for me to put what I got to say in words. Cause I'm not good at spelling that [illegible].

> I realized that I'm taken up to much of your time. You probably got to much Responsibility on your hand to be worrien about some Inmate

67

that lock up.  By any way, if you do answer back I would like to keep a line of Communications [illegible] to get more knowledge on da word of God.

> Thank you for readen this letter!
> Hope to hear from you!
> In God name!
> [Mark Anthony Soliz]

P.S. Take care & God Bless You & your love ones.  I'm out!

SHCR 300; 62 RR 84-85; Ans. 110, n.33.

In his state habeas application, Soliz argued that trial counsel were ineffective for failing to object to the letter under Texas Evidence Rule 403, which states:

> The court may exclude evidence if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.

Tex. R. Evid. 403.  The state court overruled the claim, concluding that the evidence would have survived a rule-403 analysis under state law.  SHCR 760.

In claim 11, Soliz reasserts his state court argument that a rule-403 objection would have been successful in excluding the evidence at trial.  He argues that the probative value was substantially outweighed by the risk that the jury would panic about Soliz's ability to contact them and base their verdict on emotions rather than the evidence.  The argument is based on Soliz's assertion that, despite the redactions, it was "clear from its face that the letter was sent to a prospective juror."  Pet. 108.

First, to the extent the state court concluded the evidence would have survived an objection under Texas evidence rule 403, a federal habeas court may not conclude

otherwise.  *See Charles*, 629 F.3d at 500-01.  And as noted in previous claims, *Strickland* does not require counsel to make futile objections.   *See Koch*, 907 F.2d at 527.

Second, Soliz's argument that it is "obvious" the letter was sent to a prospective juror is unpersuasive.  In support, he notes that it (1) was sent by Soliz from his prison address, (2) to an apartment address, (3) during the voir dire phase of trial, and (4) states that the addressee does not know Soliz and (5) makes it apparent that Soliz could see and listen to the addressee speak about personal religious matters.  These facts could fit a number of possible addressees, however, including any employee or visitor at the jail or courthouse.  It would not have been unreasonable for the state court to find that the jury did not know the addressee was a prospective juror.  After all, that was the purpose of the redaction and the State's withdrawal of the live testimony.

As an alternative argument, Soliz points to a juror affidavit obtained by his habeas counsel, which states:

> 4.  Soliz wrote a love letter to one of the potential jurors during jury selection.  I was shocked when I found out about it.  We were told about this letter during the punishment phase.  I was very concerned about how he got that juror's address.  It made me think Soliz was more dangerous.

SCHR 185.   Soliz argued in state court that the above affidavit indicates the jury was "actually aware" that the addressee was a prospective juror.  SHCR 110.  Here, he asserts  that it proves the letter made the jury believe Soliz was more dangerous.  Pet. 111.

Absent certain exceptions that do not apply here, a juror may not testify about (1) any statement made or incident that occurred during the jury's deliberations, (2) the effect of anything on that juror's or another juror's vote, or (3) any juror's mental processes concerning the verdict or indictment. *See* Fed. R. Evid. 606(b)(1); *Young v. Davis*, 835 F.3d 520, 529 n. 44 (5th Cir. 2016), *cert. denied,* 137 S. Ct. 1224 (2017) (holding that the district court may exclude juror affidavits that are offered to challenge the punishment verdict in a capital murder trial, citing *Summers v. Dretke*, 431 F.3d 861, 873 (5th Cir. 2005)). This Court may not consider the affidavit as evidence of what the juror believed during deliberations, as Soliz proposes.

Soliz fails to demonstrate that the state court unreasonably applied *Strickland* or made a ruling based on an unreasonable determination of facts. Claim 11 is denied.

## XIV.  FOSTER-CARE EXPERT(CLAIM 12)

Soliz contends trial counsel were ineffective for failing to present expert testimony to explain the effects of the foster care system on him and to expound on the CPS records introduced. Pet. 111. The following is a summary of the relevant evidence.

A.    The punishment evidence

The State's evidence at punishment is summarized in claim 10 and will not be repeated here. As for the defense, trial counsel first presented testimony from two of Soliz's older female cousins who described a chaotic life growing up with ten aunts and two uncles and thirty-five cousins in various homes, apartments, and housing projects.

50 RR 138-43, 148, 164, 166-67, 174, 191, 249-51; 51 RR 14.  The adults would sniff paint, drink, and party in front of the children, and go to clubs from Thursday to Sunday.  50 RR 144-49, 163, 248; 51 RR 8.  Their aunt Cynthia was a "bootlegger" who sold beer and cocaine out of her house, where the family regularly congregated.  50 RR 191-92; 51 RR 7.  Cynthia's daughter was once taken by her father at gunpoint and held hostage.  51 RR 8-9.  Their aunt Vicky was stabbed to death by her boyfriend in Cynthia's house.  Vicky died in front of Soliz, who was seven.  50 RR 194-96, 228, 231-32, 241; 51 RR 11-12.  One of the cousins described a vicious attack on her mother and stepfather by a drug dealer to whom Soliz's mother, Donna, owed money.  50 RR 239-41.  High from sniffing paint, Donna once took off her clothes and walked around the house saying "goo-goo" and "ga-ga," and splashed around in the bathtub like a baby.  50 RR 260-61.  Eleven of the thirty-five cousins had been to prison, all of them had sniffed a "fair share" of paint, and only a couple of them knew their biological fathers.  50 RR 197, 211; 51 RR 29-31.  One of the cousins testified she had lost her vision and became paralyzed from abusing paint since the age of thirteen.  50 RR 145, 207.  Soliz started sniffing paint when he was ten.  50 RR 183.

Donna and her husband, Gene, were always moving from place to place until Gene left, and Donna lost the apartment.  Donna once sold all of her furniture to buy crack cocaine.  She also prostituted herself for drugs.  50 RR 171-72.  Soliz had a half-brother who did not live in Donna's house because of the drugs, prostitution, and lack

of furniture. 50 RR 170, 178. Donna did not discipline Soliz, and he would often run through the woods and streets, play on freeway signs, jump onto moving trains, and leave for days at a time when he was eight or nine. 50 RR 179, 254-59; 51 RR 17-19. For fun, the cousins would swim in the water gardens in downtown Fort Worth, steal money from parking meters, and break into cars. Donna had a relationship with a woman who helped them cut the locks off of parking meters, and they would share the proceeds with Donna. 50 RR 168-69, 177, 182. Soliz was allowed to come along because he had small hands and could reach into cars. They would use the money to buy food. 50 RR 237. They would also sneak off to the park, which had a lot of gang activity. 50 RR 175. They avoided a nearby vacant school building, however, because girls were raped there and thieves used the property to strip stolen cars. 50 RR 176.

Dr. Prema Manjunath testified next. She was the Child and Adolescent Psychiatrist at John Peter Smith Hospital ("JPS") when Soliz was admitted at age ten for "completely out of control behaviors." Those behaviors included stealing from parking meters to buy junk food, selling crack-cocaine, breaking into cars, shoplifting, sniffing paint, and drinking whisky. 51 RR 49, 51; 71 RR 39 (DX 69). Soliz was brought to the hospital by his mother and his MHMR caseworker, Kevin Walling, and he stayed for six weeks. 51 RR 78-79, 88; 71 RR 50. Dr. Manjunath explained information in the records indicating that Soliz was small for his age, that Donna drank heavily during her pregnancy, that Soliz was acting out sexually, and that he was reportedly the victim of

sexual abuse from an older male cousin. 51 RR 53, 56; 71 RR 30, 35. Soliz had been taking Ritalin for hyperactivity, was involved in a gang, had a poor sense of danger, wandered the streets "at all hours of nights," fought and associated with older boys, was often allowed to stay home from school, was arrested three times for stealing and running away, smoked marijuana, and carried a gun. 71 RR 29-38. Dr. Manjunath testified that, after Soliz had completed his initial treatment at JPS, Donna was hospitalized for an overdose and her involvement in his treatment waned. 51 RR 59, 82. Donna never attended family therapy and did not meet Soliz's emotional needs. As a result, he sought attention and affection through manipulative and impulsive behaviors. 51 RR 69, 82.

Dr. Majunath diagnosed Soliz with conduct disorder mixed with substance abuse, mild attention deficit hyperactivity disorder, antisocial traits, developmental reading disorder, possible borderline intelligence, possible fetal alcohol syndrome, and "psycho-social stressors moderate with a chaotic home, drug abuse and dependence in the mother." 71 RR 31-32; 51 RR 57-58, 63-64, 66. She suspected fetal alcohol syndrome because of Soliz's various behavioral problems, concentration difficulties, and the fact that his mother drank during the pregnancy. 51 RR 67. She recommended that Soliz be discharged to a long-term care facility, but he was nevertheless released to his mother's care. 51 RR 54, 71. Dr. Majunath also testified about how brain development and resiliency is affected by neglect and alcohol. 51 RR 108-19.

MHMR caseworker Kevin Walling testified next. Soliz was referred to him at age ten because there was a report that he was living with drugs and prostitution. 51 RR 134. The report stated that Donna was "turning tricks" on a bed she shared with Soliz, that Soliz had broken into parking meters, acted as a lookout for drug dealers, and was carrying a gun. 51 RR 135-37, 157-58. Walling said that, at any given time of the day or night, Donna might not know where he was. 51 RR 137-38. Walling attended meetings at Soliz's school, made sure he had food and clothes, and visited the home often. 51 RR 138-42. Walling worked with Soliz for two years, until Soliz moved into Buckner Baptist Children's Home ("Buckner") in 1994. 51 RR 144. Walling described Soliz as a follower. 51 RR 144. He had only one other child on his caseload who was in more need than Soliz. 51 RR 149.

Soliz's juvenile probation officer, Leanna Judd, also testified. She met Soliz in 1994 when he was detained for a burglary. It was a month before Judd could reach Donna. 51 RR 164-67; 52 RR 6–8. Judd explained the probation records showing that Soliz had been referred to probation three times in 1992 for burglary of a coin-operated machine, attempted burglary of a motor vehicle, and burglary of a habitation. 51 RR 176-79. The records showed that Donna did not appear for an intake interview, fell asleep during another interview, and did not sign placement paperwork. 51 RR 182-84. According to the records, Soliz did well when he was placed with his Aunt Sharon for a period time but went "haywire" when Donna spent time with him. 51 RR 185-86.

While on probation, Soliz was diagnosed with conduct disorder, cultural familial delinquency, substance abuse history, residual attention deficit disorder, and mixed developmental disabilities. 51 RR 191. Judd described Soliz as a follower who craved adult attention. 51 RR 193-94. The records showed that Soliz had set fires and accidentally burned the upstairs of his aunt's home, burglarized a school building, took walkie talkies from a classroom, and admitted affiliation with two gangs. 51 RR 195-96. Donna physically abused Soliz and gave him access to paint, beer, and whisky, and Soliz possibly suffered sexual abuse by an uncle. 51 RR 197-99. Judd described Soliz as "very much a follower looking for a place." 51 RR 200. The records discussed Soliz's excessive school absences, his academic performance below grade level, his special education classes, a therapist's fear that his behavior would deteriorate rapidly if he returned home, his ability to do well in a structured residential setting, and the fact that he followed an older brother and cousin into criminal activities. 51 RR 201-09, 212.

Judd said that, after some progress at Buckner, Soliz became worse between the ages of twelve and thirteen. He was treated for depression, hallucinations, aggressive-ness, sexual acting out, and suicidal gestures. 51 RR 209-17; 52 RR 17, 21. Donna used heroin and cocaine, engaged in crime, missed court dates, and repeatedly failed to follow through on plans to visit him or make changes that would allow him to visit her at home. 51 RR 216-18; 52 RR 9-13, 19-23, 29. At one point, Donna discussed giving up Soliz for adoption. 52 RR 13. Judd believed that CPS should have been involved in the

case, but they refused. 52 RR 11-12, 39. Judd described occasions when Soliz ran away from Buckner for a couple of hours, tried selling road salt as crack-cocaine, and threw gang signs in church. 52 RR 14-16. He was moved to a lock-down facility in April of 1995, and for a six-month period of time, he did not see his mother and became angry. 52 RR 24-27. Donna ignored a subsequent court order to visit her son and lied about attempts to visit him. 52 RR 28, 31.

Judd acknowledged Soliz's good qualities, saying he was playful and charming and loved to eat. But he had suffered a "death by a thousand cuts" from his mother's repeated neglect. 52 RR 32-34. At the end of his probation and two-year stay at Buckner, a judge ordered him into CPS care and CPS arranged for his continued placement at Buckner. 52 RR 38. Judd cried when she spoke about the capital murder charges against Soliz, because she "never expected it from him." 52 RR 41.

The defense called prison classification expert Larry Fitzgerald to testify, essentially, that the Texas prison system is in good operating condition and in good operating hands. 52 RR 92-119. The last three defense witnesses were a team of mental health experts, psychiatrist Richard Adler, neuropsychologist Paul Connor, and psychologist Natalie Brown. Together, they are in private practice as F.A.S.D. Experts and, at the time of trial, were the only practice of its kind in the country. 53 RR 131-32.

Dr. Adler diagnosed Soliz with Partial Fetal Alcohol Syndrome ("PFAS"), a sub-diagnosis of FASD. 53 RR 59-61, 86. The diagnosis was based on confirmed maternal

alcohol exposure, some evidence of facial deformity, and a complex pattern of behavior or cognitive abnormalities not explained by family background or environment alone (such as difficulties in school or learning, poor impulse control, problems in social perception, deficits in receptive and expressive language, poor capacity for abstraction or metacognition, deficits in math skills, and memory, attention or judgment problems). 53 RR 66-67; 74 RR 94 (DX 84, p. 76). Soliz was found to have all seven of these impairments, but only three are required for the diagnosis. 53 RR 111, 114; 55 RR 109. Dr. Adler also diagnosed cognitive disorder, "polysubstance abuse v. polysubstance dependence," physical abuse of a child, sexual abuse of a child, neglect of a child, and prenatal exposure to alcohol, toluene, cocaine and, likely, nicotine. 53 RR 87. Dr. Adler testified that a diagnosis of antisocial personality disorder is often improperly given to people with FASD, and that FASD is a medical condition and not a personality or mental disorder. 53 RR 84-85, 205. He testified that children with PFAS are "hit the hardest" in the spectrum because, lacking the classic facial features of FASD, they are not identified, diagnosed, or treated until later in life. 53 RR 91-92. On average, people with FASD have the adaptive functioning of seven-year-olds and, like Soliz, the majority do not have IQ scores in the mentally retarded range. 53 RR 98-101. He said that alcohol-affected kids have problems with intellectual development, delinquent behavior, and psychosis, and that Soliz suffered from all these issues by age ten. 53 RR 101-03. He emphasized that this was not a "close case" and that Soliz's prenatal exposure, due

to his mother binging on alcohol, huffing paint every day, shooting cocaine, and smoking cigarettes, was more than he had ever seen in his career.  53 RR 104, 115.

Neuropsychologist Paul Connor testified about the difficulties that FASD victims face, such as a lower IQ and difficulties with academic functioning, learning and remembering information, paying attention, impulsivity, problem-solving, and applying what they know to day-to-day life.  54 RR 16-19.  Dr. Connor described a 28-point difference between Soliz's verbal IQ score and his non-verbal IQ score, a rare pattern that was also present when Soliz was tested at age eleven and thirteen.  54 RR 37-38.  Dr. Connor described Soliz's test scores, most of which were below the fifth grade level or below the tenth percentile, although Soliz also did very well on some of them.  54 RR 38-40, 43-60.  Dr. Connor explained that fetal alcohol exposure leads to frustrating discrepancies in brain functioning, depending on the brain's stage of development when alcohol is introduced.  54 RR 42-43, 53.  He also explained that Soliz, like most people with FASD, had an "okay-ish" IQ, with lower academic skills (especially in math), and adaptive skills that are within the range of mental retardation.  54 RR 66-67.

Psychologist Natalie Brown testified last.  She conducted a lifelong functional assessment, which she described as a "comprehensive, meticulous process of examining every bit of information you can about life history that's been documented."  55 RR 139.  Soliz had a full-scale IQ of 92, which is average.  55 RR 159.  His achievement tests were well below average as early as age six, which ruled out drugs and head injuries

as a cause for his problems. 55 RR 166-67, 199. Dr. Brown concluded that Soliz was born with seven areas of biological or cognitive deficits due to PFAS, including hyperactivity, attention problems, and learning disabilities. 55 RR 167-68 174-75. His executive-function deficits manifested as antisocial and disruptive behaviors and evolved into "secondary disabilities" of substance abuse and legal trouble. 55 RR 172-73. Dr. Brown discussed his other secondary disabilities, including mental health problems, a disrupted school experience, incarceration and/or hospitalization, inappropriate sexual behavior, dependent living, and problems with employment. 55 RR 181-83, 198.

By age ten, Soliz had adjustment disorder, conduct disorder, depression, psychosis, and hallucinations. 55 RR 189-90. At 23 and 28, he was diagnosed with psychosis and depressive disorder. 55 RR 192. He had truancies and disrupted school experiences. 55 RR 194-95. Soliz used alcohol, cocaine, and marijuana at age nine, his mother taught him how to sniff paint at age ten, and he used crack and methamphetamine as an adult. 55 RR 195-96. His legal troubles began at age ten, and he had more problems at age eleven, twelve, thirteen, and fifteen. There was evidence of inappropriate sexual behaviors and sexual aggression in some of the residential placements; Soliz was also sexually abused. Soliz had no real job history and no ability to live independently. 55 RR 197-98. Soliz tested as "hyper-suggestible," which resulted in his manipulation by gangs at an early age. 55 RR 220. Dr. Brown discussed his placements, including the hospitalization at age ten, Buckner home at age twelve through fifteen, the

Azleway agency, drug treatment at "Choices," the Desert Hills residential treatment center, and finally, the Contreras Home, a therapeutic group home. At age seventeen, he was placed with a relative. 55 RR 196.

Dr. Brown described the protective factors that can prevent the development of these secondary disabilities. 55 RR 184-88. On the other hand, she explained the effects of the severe, continued neglect that Soliz endured, including Post-Traumatic Stress Disorder and Complex Post-Traumatic Stress disorder, development delay, odd eating habits and self-soothing behaviors, emotional problems, indiscriminate attachment, empathy deficits, inability to relate to people, and aggressive behavior. 55 RR 208-13. Dr. Brown described missed opportunities to help Soliz, where CPS should have gotten involved but did not and counselors made observations that no one pursued. 55 RR 221-22, 224-26, 227. Dr. Brown described more missed opportunities at MHMR, his school, Bucker, Azleway, Choices, and Desert Hills. 55 RR 227-28. She stated that CPS was finally awarded conservatorship at age thirteen, and Soliz continued in their care through his eighteenth birthday, when the case was closed while he was on runaway status. 55 RR 228. She said children always respond better to structure, that Soliz "was no exception," and that he did relatively well when he was in a structured environment. 55 RR 222-23. In fact, Soliz's home life was so deprived that Soliz preferred the placement facilities. 55 RR 223. While at JPS, Soliz said, "I want to live in a place just like this." 55 RR 223-34. Dr. Brown concluded that Soliz was born with

brain damage and suffered more brain damage from his childhood environment and lack of intervention; she had never seen a more tragic case. 55 RR 229.

Defense exhibits included: prison classification procedures, policies, and photographs (50 RR 68-69, 85-89); photographs of Soliz's family and the places they grew up (50 RR 141, 152, 155, 166, 173, 185); a photograph of Soliz and his MHMR caseworker, Kevin Walling (51 RR 135); prison crime statistics (52 RR 90); a study on Fetal Alcohol Syndrome (53 RR 54; DX 84); 1,451 pages of records from Buckner's Children's Home (DX 62); records from JPS hospital (DX 63); 1,488 pages of records from CPS (DX 64A-D); records from Harris Methodist Hospital (DX 61); special education records from Johnson County Shared Services Arrangement (DX 65); and records from MHMR (DX 66). *See* 51 RR 32-33, 77; 52 RR 72 (exhibits admitted).

B.     The state court claim

In his state habeas application, Soliz argued that trial counsel should have presented expert testimony to walk the jury through the CPS records, especially as they relate to his time in foster care after leaving Buckner. SHCR 111. Soliz argued that counsel should have hired a foster care expert to inform the jury about the "harrowing aspects of foster care" that lead to post-traumatic stress disorder, the effects of moving frequently between placements, the effects of substandard foster facilities, including abuse and neglect in care, and the realities of "aging out" of the foster care system. Soliz asserted that an expert could have explained these hardships on Soliz in light of the

traumatic early childhood that led to his removal from the family in the first place, and that the failure to do so left the jury without little or no explanation of how this traumatic time in Soliz's life affected him. SHCR 112-13. He argued that defense counsel at least could have called his CPS caseworker, Laura Flores, to explain the CPS records. SCHR 126. Soliz presented an affidavit from Flores stating that she was Soliz's CPS Conservatorship Caseworker from January 1997 to October 1999 and that, if she had been asked by trial counsel, she would have testified to the contents of the CPS records and her personal knowledge. SHCR 438 (Ex. 19).

Trial counsel presented an affidavit to the state court explaining that he did not seek to retain any foster care expert because he wanted to keep the jury's eyes on the main mitigation evidence, FASD. Counsel believed that the FASD, exacerbated by his mother's highly dysfunctional lifestyle and habits, were two paramount factors demonstrating a lack of moral blameworthiness that should have resulted in a life sentence. SHCR 444. The state court rejected the claim, concluding that Soliz failed to show both deficient performance and harm. SHCR 761-63.

C.    Discussion

1.    *Counsel's alleged deficiency*

Citing counsel's duty to "consider and investigate the basis for all possible legal claims" under the ABA Guidelines as well as the Supreme Court opinion in *Wiggins*, 539 U.S. 510, Soliz reasserts his state-court argument that counsel should have presented a

foster-care expert or at least his caseworker to explain the CPS records. Pet. 113-14, 115-130. The ABA Guidelines are not the controlling constitutional standards for ineffective-assistance claims, however. *See Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (appeals court erred by treating ABA Guidelines "as inexorable commands with which all capital defense counsel 'must fully comply'"). They are only guides to what reasonableness means, not its definition. *Id.* (citing *Strickland*, 466 U.S. at 688). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688-89. The Constitution imposes one general requirement: that counsel make objectively reasonable choices. *Van Hook*, 558 U.S. at 9. A court must determine whether, in light of all the circumstances, counsel's alleged error was outside the wide range of professionally competent assistance, keeping in mind that counsel's function "is to make the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690. Judicial scrutiny must be highly deferential and strive to eliminate the "distorting effect of hindsight." *Id.* at 689.

The Court begins by noting that, to the extent this claim is based on counsel's failure to call Laura Flores to testify, it does not allege a failure to investigate. Flores was known to trial counsel. Flores was listed as a possible expert witness on the Defendant's Preliminary List of Experts. 9 CR 1630 (expert no. 25). Further, approximately 1,500

pages of CPS documents and nearly 1,500 pages of records from Buckner's Children's Home were admitted into evidence by the defense, many of which were case notes written by Flores. This is not a situation where counsel overlooked an area of investigation, as in *Wiggins*. *See Wiggins*, 539 U.S. at 534 (holding that counsel's decision to limit his investigation of Wiggins' background was unreasonable).

This is also not a situation where counsel overlooked the use of experts. As discussed in claim 1, trial counsel was unquestionably capable of acquiring expert assistance when he wanted it. Rather, this claim involves a strategic choice not to expound with live testimony the foster care records that were in evidence. Such strategic choices, when made following a thorough investigation, are "virtually unchallengeable." *Strickland*, 466 U.S. at 690*; see also Richter*, 562 U.S. at 106 (recognizing that counsel is not limited to any one technique or approach and that appeals court erred in holding counsel ineffective for failing to consult blood experts). Counsel conducted a thorough investigation into Soliz's various hospitalizations, residential placements, foster care, and his time with CPS. His witnesses discussed most of the early records admitted in evidence. Counsel's strategy in presenting the foster-care records to the jury without discussing them through an expert witness is, therefore, virtually unchallengeable.

Nevertheless, the record supports the reasonableness of counsel's strategy to keep the jury's focus on FASD as the mitigation theory. Soliz argues that highlighting his time in foster care and its accompanying disabilities would have mitigated his criminal

conduct in the jury's eyes and humanized his teenaged years. But Soliz's delinquent behavior began long before he was placed in foster care. Foster care could not explain his multiple arrests prior to entering foster care, including three arrests and other "out of control" behaviors before his psychiatric placement at age ten. Defense counsel's chosen theory, on the other hand, explained the early onset of antisocial behavior as a result of *prenatal* brain damage, as well as postnatal brain damage caused by neglect, which resulted in many secondary disabilities that eventually led to his life of crime. A strategy to highlight the teenaged foster-care years could have undermined this strategy: A jury could view delinquent acts committed when he was between six and ten years old as symptomatic of his FASD and home environment and therefore mitigating. But criminal behavior committed by Soliz as a teenager, while in the structured and therapeutic environment of a foster-care facility, would not likely evoke the same response. There are many instances of damaging information in the foster-care records that could have been highlighted on cross-examination of an expert.

For example, during his time in foster care, he was on probation or facing charges in at least four different counties (including felony unauthorized use of a motor vehicle in Johnson County, leading Dallas police on an 85-m.p.h. car chase, and assaulting staff at the City House Shelter in Collin County). SHCR 321, 326-28, 338-39, 409. Attention on Soliz's connection to Johnson County alone risked undermining counsel's attempts to show that Soliz was a mere follower in Weatherly's murder which, unlike

the rest of the crime spree, occurred in Johnson County. The records also show that an aunt changed her mind about having Soliz come live with her because, while visiting her home, Soliz made $200 worth of calls to a "phone-sex" telephone number and ordered $80 worth of Playboy channel movies, which caused her great financial strain. SHCR 354-56. Such behavior shows that he took advantage of the only person who was willing to help him.

As for the mitigating value of multiple school transfers, at least one change in school attendance was due to Soliz being discharged for bringing a knife on campus. SHCR 399. Likewise, the mitigating impact of Soliz having lived in multiple foster residences could be readily undermined by showing that, with the exception of the Desert Hills facility that was shut down, Soliz's transfer from facility to facility was due to his defiant attitude, fighting, lack of remorse, and repeated running away and/or getting arrested. *See* SHCR 321 (theft of Buckner car and other Dallas County charges), 327 (notation that outcome of Dallas County charges is uncertain and caseworker "will continue to search for a placement that can adequately address Soliz's anti-social behaviors"), 330-31 (Buckner to Azleway Boys Ranch), 338-39 (Azleway to Choices Adolescent Center), 340-41 (Choices to Desert Hills), 372 (Desert Hills to CASA emergency shelter), 374 (Soliz goes "AWOL" from emergency shelter). While Soliz emphasizes two incidents of illegal restraint against him at Desert Hills that resulted in the discharge of an employee, Soliz at the time told Flores "that he actually tried to kill

the staff member and wants to go to another placement." SHCR 356. The notes also show that, when Desert Hills closed, Soliz was so attached to some of the staff that he wanted to move with them to a new facility, Los Hermanos, and keep them on his visiting list. SHCR 373. This information dilutes the allegations of mistreatment at Desert Hills and would be a likely subject for cross-examination of any expert.

Soliz's proposed strategy would have required counsel to contend with the fact that Soliz's placements became more structured as time went on, and yet Soliz could not follow the facility rules. This would have refuted the testimony that Soliz did well in a structured environment, and it would have neutralized counsel's argument that Soliz could behave in a prison environment if given a life sentence. *See* SHCR 328 (notation that "New Encounters" cannot accept Soliz because he may need more structure), 340 (note that Flores told Soliz that Choices has more structured setting than Azleway), 344 (note that Desert Hills appears to be appropriate because his needs are being met in a therapeutic and structured setting), 348 (note that placement at Desert Hills should be maintained to address Soliz's defiant and aggressive behaviors and provide him with a structured environment), 404 (note by Flores that Contreras Foster Home provides Soliz with a structured environment).

The records show that his final placement at the less-restrictive Contreras home was a positive experience. He was in a program ("PAL") to prepare him for independent adult living and expressed an interest in attending college. *See* SHCR 393, 397, 401,

403, 425. Nevertheless, Soliz ran away, absconded from probation, and never returned to foster care. SHCR 420, 422-25. The prosecution would likely argue that such behavior indicates a willingness to make wrong choices, even when the right choice is repeatedly made available, and suggests an inability to conform to a structured prison environment.

Soliz's theory that foster care is an overall harmful, damaging experience that mitigates his life of crime could have also been refuted by specific instances in his own records. The records show, for example, that foster care offered Soliz psychiatric therapy, karate lessons, driver's education, a GED, and vocational training. He also flew on an airplane for the first time, visited a university, and was encouraged by his caseworker to plan for the future. SHCR 348, 352, 397, 403, 420-21. In other words, the prosecution could have readily argued that, while foster care was not perfect, it was better than his family home, and he chose to reject every opportunity to overcome the disadvantages of his early childhood. This would have undermined Dr. Brown's testimony blaming the adults in his life who missed or ignored opportunities to help him. 55 RR 221-24.

In sum, the proposed strategy is a double-edged sword at best. It would have exposed his inability to conform to a structured environment and undermined the mitigation theme that Soliz's criminal behavior was not a product of choice. Soliz has not shown that the state court was unreasonable in its conclusion that trial counsel was

not deficient for failing to hire a foster care expert. *See Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997) (tactical decision not to present potentially mitigating evidence on grounds that it is double-edged in nature is objectively reasonable).

### 2. Strickland *prejudice analysis*

Alternatively, Soliz fails to demonstrate that the state court's ruling as to a lack of prejudice was unreasonable. To prevail upon a claim based on an uncalled witness, the petitioner must demonstrate prejudice by showing that the witness was available to testify and that the testimony would have been favorable to the defense. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). Soliz's claim fails to the extent he does not identify a foster-care expert, state their availability, and proffer their proposed testimony. *Day v. Quarterman*, 566 F.3d 527, 538-39 (5th Cir. 2009) (rejecting uncalled expert witness claim where affidavit does not show expert would have testified or that his testimony would be in accord with the opinion stated in his affidavit).

Even assuming that the jury had heard the opinions proposed by Soliz, such additional information does not create a reasonable probability of a different outcome when compared to the evidence actually presented at sentencing. *See Kunkle v. Dretke*, 352 F.3d 980, 991 (5th Cir. 2003) (holding that court compares evidence actually presented at sentencing with additional mitigating evidence presented in habeas proceeding to determine prejudice). As discussed, trial counsel presented evidence of a chaotic early childhood, marked by transient housing accommodations, physical and

sexual abuse, severe neglect, and drug abuse, and accompanied by prenatal brain damage due to extreme exposure to alcohol, toluene, and other substances, which resulted in cognitive and adaptive disabilities. The anecdotal evidence included witnessing the murder of a beloved aunt, having to steal money for food, exploitation by gangs, and a mother who prostituted herself for drugs and was complicit in his downfall. *Cf. Wiggins*, 539 U.S. at 534-35 (describing the following as "powerful" mitigation evidence: severe privation and abuse while in the care of an alcoholic and absentee mother, physical torment, sexual molestation, and repeated rape in foster care, periods of homelessness and hunger, and diminished mental capacities). The defense experts described a myriad of secondary disabilities they believed were caused by this combination of brain damage and severe neglect that led to a life of crime. Nevertheless, the experts believed Soliz was able to thrive in a structured environment.

Emphasis on the foster care years would have risked focusing the jury on Soliz's development into a dangerous teenager with no remorse, who repeatedly chose to reject help, defy the rules and structure, and run away when things were not to his liking. Such evidence would have undermined the defense by showing his potential for future dangerousness and inability to live in a structured environment. *E,g., Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (concluding that counsel's decision not to offer evidence of defendant's disadvantaged background was reasonable because it could suggest he was a product of his environment and therefore likely to be dangerous in the

future).  Difficulties imposed by foster care paled in comparison to what Soliz had experienced before foster care.  Indeed, Soliz said he preferred the placement facilities to his home environment.  Considering the evidence in its totality, Soliz has not demonstrated that it was unreasonable for the state court to conclude that trial counsel's alleged deficiency did not undermine confidence in the jury's sentence of death.  Claim 12 is denied.

## XV.  FASD AS A BAR TO EXECUTION (CLAIM 14 & 19)

In claim 14 and 19, Soliz seeks to expand the Supreme Court holding in *Atkins v. Virginia*, 536 U.S. 304 (2002) to bar the execution of people with FASD.  Pet. 136-153; Pet. 192-94.  The state court rejected variations of this claim on direct appeal and again in state habeas proceedings.  *Soliz*, 432 S.W.3d at 903-04; SHCR 764.

Soliz does not attempt to show that the state court ruling was an unreasonable application of clearly established federal law; rather, he seeks to expand federal law.  Soliz points to no Supreme Court decision barring the execution of people with FASD.  The Court has no basis upon which to conclude that the state court unreasonably applied clearly established federal law.  The Court denies claims 14 and 19.  *See* § 2254(d)(2).

## XVI.  THE 12/10 RULE (CLAIM 15)

In claim 15, Soliz argues that the Texas death penalty statute misleads jurors about their individual ability to give effect to mitigating evidence while answering the

special punishment issues, in violation of the Eighth and Fourteenth Amendments and *Mills v. Maryland*, 486 U.S. 376 (1988). This claim was denied by the CCA on direct appeal. *Soliz*, 432 S.W.3d at 904. Respondent contends the claim is foreclosed by precedent and that any extension of existing precedent would be an improper retroactive application of a new constitutional rule, in violation of *Teague v. Lane*, 489 U.S. 288, 310 (1989) (holding that, with certain exceptions, new constitutional rules of criminal procedure will not be applicable to those cases which become final before the new rules are announced). Ans. 166-68.

In *Mills*, the Supreme Court held invalid a capital sentencing statute that required juries to disregard mitigating factors not found unanimously. *See Mills*, 486 U.S. at 371, 378-79. The 12/10 Rule is the threshold voting requirement for the Texas special punishment issues. Specifically, the jury cannot answer the special issues in favor of a death sentence unless all twelve jurors agree. They cannot answer in favor of a life sentence unless ten jurors agree. *See* art. 37.071, § 2(d)(2) and § 2(f)(2). If the requisite number of jurors fail to agree, the default sentence is life imprisonment, but the jurors are not told this. *See* art. 37.071, § 2(a)(1) and § 2(g). This claim focuses on the mitigation issue, which was added to the statute in 1991 following the Supreme Court ruling in *Penry v. Lynaugh*, 492 U.S. 302 (1989).

Soliz acknowledges Fifth Circuit precedent rejecting this argument both on the merits and as *Teague*-barred. He asserts, however, that the post-1991 precedent relies

upon pre-1991 case law without addressing the 1991 statutory amendment that added the mitigation special issue.  He contends that the mitigation special issue is much closer to the sentencing scheme struck down in *Mills* than the previous statute because it does not allow each juror to consider and "give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death."  Pet. 164-70 (citing *McKoy v. North Carolina*, 494 U.S. 433 (1990)).  Specifically, he contends it misleads jurors in favor of a life sentence into believing that their vote is immaterial unless they are able to persuade nine of their fellow jurors that their view is correct.

For support, he presents two cases from the Sixth and Seventh Circuits, *Davis v. Mitchell*, 318 F.3d 682 (6th Cir. 2003) and *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989).  Pet. 161-62.  The Fifth Circuit has, in fact, rejected Soliz's argument based on this Sixth and Seventh Circuit precedent in *Allen*, 805 F.3d at 632-633 n.3.

Furthermore, the 1991 amendment (enacted *after* the opinion issued in *Mills*) specifically requires the jurors to be instructed that they "need not agree on what particular evidence supports an affirmative finding" on the mitigation issue.  *See* art. 37.071, § 2(f)(3).  The jury was instructed accordingly that they need not agree on what particular evidence supports an affirmative finding to Special Issue Number 3.  11 CR 2127.  And they were told, "[D]o not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, *or for the mere purpose of answering the special issues.*"  11 CR  2128 (emphasis added).  In light of these

instructions, the Court is not persuaded that the jury was induced to change their votes because they were misled into believing a "life" vote was immaterial without the concurrence of nine fellow jurors.

Despite his assertion to the contrary, Soliz's arguments are substantially the same arguments that have been rejected in this Circuit on multiple occasions. *E.g., Blue v. Thaler*, 665 F.3d 647, 670 (5th Cir. 2011) (holding that *Jones* insulates the 12/10 Rule from constitutional attack); *Druery v. Thaler*, 647 F.3d 535, 543-44 (5th Cir. 2011) (rejecting argument that 12/10 Rule violates Sixth and Eighth Amendments and Due Process and stating that *Mills* is not applicable to Texas sentencing statute). Soliz fails to show that the state court unreasonably applied federal law. Alternatively, expanding *Mills* to invalidate the Texas statute would violate *Teague. See Druery*, 647 F.3d at 543 (citing *Hughes v. Dretke*, 412 F.3d 582 (5th Cir. 2005)). Claim 15 is denied.

## XVII. THE ADMINISTRATION OF THE DEATH PENALTY IN TEXAS (CLAIM 16)

In claim 16, Soliz asserts that larger Texas counties with larger budgets are free to pursue the death penalty in circumstances where smaller counties cannot. He argues that this difference renders the administration of the death penalty in Texas arbitrary and capricious, in violation of *Gregg v. Georgia*, 428 U.S. 153 (1976). Pet. 172-77. Soliz then asserts, however, that he was tried in a relatively small Texas county where, under this theory, he would have been *less* likely to face the death penalty. He argues nevertheless that his harm is clear because "his chances of being sentenced to death were

greater than a similarly situated defendant who was charged in a larger county where death penalty prosecutions are more common." Pet. 176. As such, the law presented in this claim pertains to the constitutionality of injecting funding considerations into the county's "selection process," but Soliz's actual complaint is that small town juries are more likely to assess death, which is not a "selection process" complaint. The claim was denied by the CCA on direct appeal. *Soliz*, 432 S.W.3d at 905.

There is no factual support for the claim that the Johnson County jury was more likely to impose the death penalty due to the size of Johnson County. There is also no budgetary information in the record to support Soliz's assertion that larger counties seek the death penalty more because they have more financial resources. Moreover, "no Supreme Court case has held that the Constitution prohibits geographically disparate application of the death penalty due to varying resources across jurisdictions." *Allen*, 805 F.3d at 629 (rejecting claim under *Gregg* that lack of uniformity in prosecutorial discretion across Texas counties due to disparate state funding violates the Constitution). Soliz fails to show that the state court ruling involved an unreasonable determination of facts or an unreasonable application of clearly established federal law. *See* § 2254. The Court denies claim 16.

## XVIII.  CONSTITUTIONALITY OF THE MITIGATION SPECIAL ISSUE (CLAIM 17)

Soliz contends that the Texas definition of "mitigation evidence" is unconstitutionally narrow and prohibited the jury from considering evidence he had offered in

mitigation, specifically, his disadvantaged background. Pet. 177-86; *see* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(f)(4). This claim was raised in Soliz's state habeas application and rejected. SHCR 767-68. The relevant portions of the jury charge are as follows:

> SPECIAL ISSUE NUMBER 3: Whether, taking into consideration all of the evidence, including the circumstances of the offense, *the defendant's character and background*, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.
>
> \* \* \* \* \*
>
> In deliberating on Special Issue Number 3, *you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness*.

11 CR 2126, 2127, and 2132 (verdict form) (emphasis added).

The first instruction unquestionably requires the jury to consider Soliz's background when answering the mitigation issue. The question presented therefore is whether the subsequent definition of mitigating evidence as "evidence that a juror might regard as reducing the defendant's moral blameworthiness" nullifies the prior instructions to consider the defendant's background. Circuit precedent has repeatedly answered this question in the negative. *Blue*, 665 F.3d at 666 n.92. Soliz has not shown that the CCA's ruling unreasonably applies clearly established federal law. To the extent that Soliz urges this Court to adopt a new rule requiring a different definition of mitigating evidence, such a rule would violate *Teague*. *See Teague*, 489 U.S. at 310. Claim 17 is denied.

## XIX. THE FUTURE DANGEROUSNESS SPECIAL ISSUE (CLAIM 18)

In claim 18, Soliz argues that the future dangerousness special issue violates the Eighth and Fourteenth Amendments because it is a *de facto* determinant of death-eligibility that fails to appropriately narrow the class of death-eligible defendants. The future dangerousness issue asks the jury: "Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?" 11 CR 2130; Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1). Soliz asserts that its key terms are unconstitutionally vague and that "every person has a non-zero probability of committing future acts of violence." He also complains that the jury must decide this issue before it considers the mitigation special issue. Pet. 187-92. This claim was rejected by the state habeas court. SHCR 768. Respondent asserts that the claim lacks merit and is *Teague*-barred. Ans. 173-75.

Circuit precedent has repeatedly rejected such challenges to the future dangerousness issue. *See Sprouse v. Stephens*, 748 F.3d 609, 622-23 (5th Cir. 2014) (holding that Texas does not run afoul of *Maynard v. Cartwright*, 486 U.S. 356 (1988) or *Godfrey v. Georgia*, 446 U.S. 420 (1980) by not explicitly defining terms in the future dangerousness issue); *Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007) (recognizing that Texas juries make the eligibility decision at the guilt phase and the future dangerousness terms are not invoked until after the defendant has been judged death

eligible); *James v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir. 1993) (acknowledging that future dangerousness terms are not so vague as to require clarifying instructions and "[t]o the extent that the words strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system") (quoting *Milton v. Procunier*, 744 F .2d 1091, 1096 (5th Cir. 1984)).

Soliz has not shown that the CCA's ruling unreasonably applies clearly established federal law. To the extent that Soliz urges this Court to adopt a new rule requiring Texas to define terms in the future dangerousness special issue, such a rule would violate *Teague*. *See Teague*, 489 U.S. at 310. The Court denies Claim 18.

## XX. CONCLUSION

The Court denies Soliz's amended petition for a writ of habeas corpus. In accordance with Federal Rule of Appellate Procedure 22(b) and 28 U.S.C. § 2253(c), and after considering the record in this case, the Court GRANTS a certificate of appealability with regard to claim 20, as discussed above. *See Miller-El*, 537 U.S. at 338; *Slack*, 529 U.S. at 483–84. If Soliz files a notice of appeal, he may proceed *in forma pauperis* on appeal. 18 U.S.C. § 3006A(7). All relief not expressly granted is denied, and this case is DISMISSED with prejudice.

SO ORDERED.

Signed September 6th, 2017.

*Ed Kinkeade*
ED KINKEADE
UNITED STATES DISTRICT JUDGE