Filed: 8/9/2019 12:43 PM
David R. Lloyd, District Clerk
Johnson County, Texas
By: Celeste Cooley, Deputy

# IN THE 413TH JUDICIAL DISTRICT COURT
# JOHNSON COUNTY, TEXAS

## <u>CAPITAL CASE</u>

|  |  |  |
|---|---|---|
| _____ | § | |
| **EX PARTE** | § | **Trial Cause No. F45059** |
| | § | |
| | § | |
| **Mark Anthony Soliz** | § | |
| **Applicant.** | § | |
| _____ | § | |

## SUBSEQUENT APPLICATION FOR WRIT OF HABEAS CORPUS
## UNDER TEX. CODE CRIM. P. ART. 11.071 §5

### (Mr. Soliz's Scheduled Execution Date is September 10, 2019.)

Carlo D'Angelo
CARLO D'ANGELO,PC
100 East Ferguson; Suite 1210
Tyler, TX 75702
Caro@dangelolegal.com
(903) 595-6776 (work)
(903) 407-4119 (FAX)

Seth Kretzer
LAW OFFICES OF SETH KRETZER
440 Louisiana Street; Suite 1440
Houston, TX 77002
seth@kretzerfirm.com
[Tel.] (713) 775-3050
[Fax] (713) 929-2019

COURT-APPOINTED ATTORNEYS FOR APPLICANT MARK ANTHONY SOLIZ

**APPLICATION FOR WRIT OF HABEAS CORPUS**

**This is a CAPITAL CASE.**

**Mr. Soliz's scheduled execution date is September 10, 2019.**

**INTRODUCTION**

This is a subsequent application for writ of habeas corpus in a capital case. Mr. Soliz suffers from Fetal Alcohol Syndrome Disorder ("FASD"). As a consequence, Mr. Soliz has a number of behavioral and cognitive impairments—including impulsivity, learning problems, and serious adaptive deficits.  These cognitive deficits place Mr. Soliz's overall IQ dangerously close to levels proscribed under *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that executions of mentally retarded criminals were "cruel and unusual punishments" prohibited by Eighth Amendment). Accordingly, putting Mr. Soliz to death would violate the spirit of the Supreme Court's holding in *Atkins* because those afflicted with FASD should be categorically ineligible for the death penalty just as the intellectually disabled are. As a consequence, Soliz's death sentence violates his Eighth Amendment protection against cruel and unusual punishment.  *See Atkins*, 536 U.S. at 321.

Mr. Soliz therefore seeks relief under Article 11.071, Section (5)(a)(3) of the Texas Code of Criminal Procedure because he can establish by clear and convincing evidence that, but for a violation of the United States Constitution, no rational juror would have voted to put him to death under Article 37.071 of the Texas Penal Code.  Moreover, Mr. Soliz would submit it would violate the Eighth Amendment prohibition against cruel and unusual punishment to put an offender to death who falls within the functionally equivalent range of intellectual deficiency proscribed under *Atkins*.

Mr. Soliz seeks review of the merits of his claim under Section 5(a)(1) of Article 11.071,

Tex. Code Crim. Proc., which provides:

> If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient facts establishing that . . . the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application . . . because the factual or legal basis for the claim was unavailable [on] the date the applicant filed the previous application .

Section 5(e) of the same Article defines "factual unavailability" as follows:

> A factual basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the factual basis was not ascertainable through the exercise of reasonable diligence on or before [the date of the filing of the original petition].

Although this claim was previously raised, expansion of the Supreme Court's holding in *Atkins* to

protect offenders suffering from FASD is a constantly evolving doctrine that merits further

consideration by this Court. *See Carroll v. Crosby*, No. 605-CV-857-ORL-31KRS, 2008 WL

2557555, at *19 (M.D. Fla. June 20, 2008), *aff'd sub nom. Carroll v. Sec'y, DOC*, 574 F.3d 1354

(11th Cir. 2009) ("**[p]erhaps someday, law and medical science will develop to a point where

mental illness is recognized as providing an exemption from the death penalty**") (emphasis

added); *see also Hall v.* Florida, 572 U.S. 701 (2014) (noting that because "an IQ test score

represents a range rather than a fixed number," the Court observed that "when a defendant's IQ

test score falls within the test's acknowledged and inherent margin of error, the defendant must be

able to present additional evidence of intellectual disability, including testimony regarding

adaptive deficits") *Id.*  The Supreme Court in *Hall* concluded that because of a $+/-$ 5 standard of

error, "an individual with an IQ test score 'between 70 and 75 or lower' ... may show intellectual

disability by presenting additional evidence regarding difficulties in adaptive

functioning." *Hall,* 134 S.Ct. at 2000 (quoting *Atkins v. Virginia,* 536 U.S. 304, 309 n. 5, (2002));

*but see Ex parte Carlos Trevino,* WR–48,153–02, 2005 WL 3119064 (Tex. Crim. App. November

23, 2005) (dismissing Trevino's successor claim that *Atkins* should be extended to include offenders who suffer from fetal alcohol syndrome).

## CLAIM FOR RELIEF PRESENTED

Because Mr. Soliz suffers from Fetal Alcohol Spectrum Disorder (FASD) he should be categorically exempted from the death penalty on the grounds that FASD is the "functional equivalent" of conditions already recognized as disqualifying exemptions to the death penalty, such as intellectual disability, *Atkins v. Virginia*, 536 U.S. 304 (2002).

## STATEMENT OF THE CASE

### A. Procedural History

Mark Anthony Soliz is confined under a sentence of death pursuant to the judgment of the 413th District Court, Johnson County, Texas, cause number F45059, which was rendered on March 23, 2012 (57 RR at 95) and entered on March 26, 2012 (CR at 2195).[1] The Texas Court of Criminal Appeals (CCA) upheld Soliz's conviction and death sentence on direct appeal. ROA.1058–77. Soliz filed a state application for a writ of habeas corpus. ROA.10862–11293. The trial court entered findings of fact and conclusions of law. ROA.11583–625. The CCA denied Soliz's state habeas application based on the trial court's findings of fact and conclusions of law and based on its own review. ROA.11651.

Soliz then filed an amended federal habeas petition. ROA.279–482. The district court denied habeas corpus relief but granted a COA with regard to one claim. *Soliz v. Davis,* 750 Fed. Appx. 282 (5th Cir. 2018). The United States Court of Appeals for the Fifth Circuit denied relief. *Id.*

---

[1] "CR" refers to the Clerk's Record of Soliz's capital trial. "RR" refers to the Reporter's Record of Soliz's capital trial.

### B. Factual Background

On December 16, 2010, a grand jury indicted Soliz with capital murder for intentionally causing the death of Nancy Weatherly while committing the offenses of robbery or burglary. (CR at 38.). The Court appointed Michael Heiskell and Greg Westfall to represent Soliz during his capital trial. Tarrant County Assistant District Attorney Christy Jack was sworn in as an Assistant District Attorney in Johnson County to assist in the prosecution, along with the Johnson County District Attorney's Office. (CR at 49.)

Voir dire began on January 10, 2012, and concluded on February 20, 2012. (7 RR at 4; 36 RR at 28.) Soliz was arraigned on February 27, 2012, and entered a plea of not guilty. (38 RR at 19-20.) Later that day, the State gave its opening statement and called its first witness. (*Id.* at 21, 47.) The State rested its case for guilt on March 8, 2012. (46 RR at 28.) Defense counsel did not present any witnesses. (*Id.*) Both sides gave closing arguments the following day, and the case was submitted to the jury for deliberation. (47 RR at 23-76.) The jury returned with a verdict finding Soliz guilty of capital murder that same day. (*Id.* at 77.)

The punishment phase began on March 12, 2012, with the State and the defense giving opening statements. (48 RR at 8-32.) The State then presented its case over the course of three days. (*Id.* at 3 to 50 RR at 135.) Defense counsel called a number of witnesses over the course of six days, before resting on March 21, 2012. (50 RR at 136 to 55 RR at 281.). Defense counsel presented three experts regarding Soliz's diagnosis of Partial Fetal Alcohol Syndrome ("PFAS"). (53 RR at 36-215; 54 RR at 13-70; 55 RR at 4-280.). The experts confirmed the Soliz endured prenatal alcohol exposure and cognitive abnormalities, and that he was diagnosed with PFAS due his facial abnormalities.

In rebuttal, the State presented five witnesses, primarily to provide victim impact testimony. (56 RR at 6-59.) On March 23, 2012, both sides presented closing arguments before

the case was given to the jury for deliberation. (57 RR at 14-92.) Later that day, the jury returned with a verdict, answering "Yes" to Special Issue One, "Yes" to Special Issue Two, and "No" to Special Issue Three. (*Id.* at 94-95.) Soliz was then formally sentenced to death by the Court. (*Id.* at 95.).

Soliz's court appointed State habeas counsel filed a state application for a writ of habeas corpus. ROA.10862–11293. State habeas counsel argued that it would violate the Eighth Amendment's prohibition against cruel and unusual punishment to execute Solize because he is intellectually impaired due to his diagnosis of FASD. The trial court denied relief and entered findings of fact and conclusions of law to that effect. ROA.11583–625. The CCA denied Soliz's state habeas application based on the trial court's findings of fact and conclusions of law and based on its own review. ROA.11651.

Soliz's post-conviction counsel raised a claim in his federal habeas petition that it violates the Eight Amendment to the United States Constitution to execute an inmate who suffers from FASD and has overall IQ deficits that fall within the bounds of mental retardation as defined in *Atkins*. Federal Application at 12 -15. The State opposed Soliz's claim and stressed that there is presently "no consensus or emerging consensus in favor of prohibiting the execution of capital offenders with FASD." State's Reply at 38.

The United States District Court for the Northern District of Texas denied all of Soliz's claims, including the *Atkins*/FASD claim. Soliz filed motion with the United States Court of Appeals for the Fifth Circuit seeking issuance of a certificate of appealability as to several claims, including the *Atkins*/FASD claim. The Fifth Circuit denied Soliz's motion for certificate of appealability. *See Soliz,* 750 Fed. Appx. 282 at 283 (5th Cir. 2018) (holding that petitioner was ineligible for a COA with respect to the denial of habeas relief on a claim that death sentence constituted cruel and unusual punishment).

On April 8, 2019, the 413 District Court in and for Johnson County, Texas issued a death warrant scheduling Mr. Soliz for execution on September 10, 2019.

## LEGAL STANDARDS

This is a subsequent application for a writ of habeas corpus in a capital case.  Under Article 11.071 of the Texas Code of Criminal Procedure, a court can consider the merits of a subsequent application for habeas relief if:

> the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application.

TEX. CODE CRIM. PROC. art. 11.071, § 5(a)(1). Alternatively, a court may consider the merits of a subsequent application for habeas corpus if:

> by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

TEX. CODE CRIM. PROC. art. 11.071, § 5(a)(2).

## CLAIM FOR RELIEF

**BECAUSE MR. SOLIZ SUFFERS FROM FETAL ALCOHOL SPECTRUM DISORDER (FASD) HE SHOULD BE CATEGORICALLY EXEMPTED FROM THE DEATH PENALTY UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION ON THE GROUNDS THAT FASD IS THE "FUNCTIONAL EQUIVALENT" OF CONDITIONS ALREADY RECOGNIZED AS DISQUALIFYING EXEMPTIONS TO THE DEATH PENALTY, SUCH AS INTELLECTUAL DISABILITY UNDER ATKINS V. VIRGINIA, 536 U.S. 304 (2002).**

### A.  *Atkins v. Virginia* and Diminished Culpability eighth

In *Atkins v. Virginia*, the Supreme Court held that the Eighth Amendment's ban on cruel and unusual punishment prohibited the execution of mentally retarded individuals.  536 U.S. at 321.  The Court determined that society recognized the lesser moral culpability of criminal offenders with mental retardation, as evidenced by a national consensus prohibiting the execution of persons with mental retardation.  *Id*. at 320-21.  Because of their diminished culpability, the

execution of a person with mental retardation would not serve any valid retributive or deterrent function. *Id*. It also highlighted several factors indicating that persons with mental retardation were at much greater risk of wrongfully receiving a sentence of death. *Id.*

The underlying rationale behind the national consensus observed by the Court was the lowered individual culpability of a person with mental retardation. In *Atkins*, the Court noted that persons with mental retardation, by definition, have "diminished capacities to understand and process information, . . . to engage in logical reasoning, [and] to control their impulses." *Atkins*, 536 U.S. at 318. Recognizing these cognitive deficits, the Court then held that "the large number of States prohibiting the execution of mentally retarded persons . . . provides powerful evidence that . . . our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id*. at 315-16. The Court has subsequently reaffirmed the importance of decision-making and impulse control on culpability when it extended immunity from execution to juveniles in *Roper v. Simmons*. 543 U.S. 551, 571 (2005).

The Court also observed that the reduced capacity of mentally retarded offenders increases the risk that "the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . ." *Atkins,* 536 U.S. at 320 (internal quotation omitted). Mentally retarded individuals are less able to "make a persuasive showing of mitigation[,] . . . . are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse . . . ." *Id.* a 320-21. Mental retardation is often inaccurately viewed by juries as an aggravating factor, rather than as mitigating. Such defendants are also less able to give meaningful assistance to their counsel. Each of these factors demonstrated that persons with mental retardation "face a special risk of wrongful execution." *Id.* at 321.

### A. Atkins should be expanded to include FASD

Those afflicted with FASD should be categorically ineligible for the death penalty just as the intellectually disabled are. As a consequence, Soliz's death sentence violates his Eighth Amendment protection against cruel and unusual punishment. *See Atkins*, 536 U.S. at 321. Both the medical and mental health fields recognize that children exposed to alcohol during fetal development can suffer a variety of negative effects. *See United States v. Fell*, 2016 WL 11550800 (D. Vt. 2016). One medical dictionary defines FASD as synonymous with fetal alcohol syndrome, which it defines as "a pattern of malformation with growth deficiency, craniofacial abnormalities, and functional deficits including mental retardation that can result when a woman drinks alcohol during pregnancy." *Stedman's Medical Dictionary* 879690 (28th ed. 2006) (Westlaw). The Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) describes "[n]eurodevelopmental disorder associated with prenatal alcohol exposure" (ND-PAE) as an example of a presentation that can be designated as an "Other Specified Neurodevelopmental Disorder." *Fell*, 2016 WL 11550800 at *1.

Although the Court in *Atkins* was very clear in holding that it is unconstitutional to execute a mentally retarded person, they reserved the power to define and determine mental retardation in the individual states. *Atkins*, 536 U.S. at 320-21. Instead of adopting a definition of mental retardation, explaining a multi-step test for determining mental retardation, or even listing a number of factors to consider that could guide the states in their determinations, the Court simply left it to the states to enforce this constitutional limitation on the death penalty. *Id.* The Court did, however, point to clinical definitions of mental retardation from the American Association of Mental Retardation and the American Psychiatric Association. *Id.* at note 22. Both definitions require (1) sub-average intellectual functioning, and (2) limited adaptive skills in at least two areas of functioning. *Id.* at note 3.

The explanations for overturning *Penry* illustrate rational justifications for exempting

mentally retarded defendants. However, by vesting the power to define "mental retardation" in the states and supplying them with definitions to guide this determination, the Court may have inadvertently undermined the larger policy concerns that they clearly expressed in the *Atkins* decision. Namely discouraging the execution of offenders who suffer from sub-average intellectual functioning.

Applicant would stress that at least three states have implemented programs to identify and assist juvenile offenders who suffer from fetal-alcohol-spectrum disorders. *See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3860556/.* Although not yet successful, there is an emerging national consensus in favor of barring the execution of adult offenders convicted of capital murder who are not mentally retarded but who have permanent brain damage resulting from partial fetal- alcohol syndrome. *See, e.g., Mays v. State*, 318 S.W.3d 368, 379-80 (Tex. Crim. App. 2010); *see also Roper v. Simmons*, 543 U.S. 551, 564-68, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *Atkins v. Virginia*, 536 U.S. 304, 312-16, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

The most problematic result of the *Atkins* decision was that the Supreme Court reserved the ability to define "mentally retarded" as it pertains to capital punishment in the individual states. *Atkins*, 536 U.S. at 317. Although they cited two similar definitions, the Supreme Court did not provide definite guidance and apparently assumed that the state's definitions would reflect contemporary definitions of intellectual disabilities *Id.* This decision appears to have overlooked the very real possibility of disparities between definitions of mental retardation. By not emphasizing the reasoning for finding that executing the mentally handicapped is unconstitutional, the Supreme Court inadvertently allowed states to adopt definitions that may overlook certain individuals with intellectual disabilities, such as FASD, who should not face the death penalty.

Texas courts previously "follow[ed] an American Association on Mental Retardation (AAMR) definition of mental retardation, adopted by [the Texas Court of Criminal Appeals]

in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004). The *Briseno* test required " 'significantly sub-average' general intellectual functioning ... usually evidenced by an IQ 'of about 70' or below[.]". The *Briseno* case, and its IQ standards, were ultimately abrogated by Texas Court of Criminal Appeals holding in *Ex parte Moore*, 548 S.W.3d 552, 559–62 (Tex. Crim. App. 2018), cert. granted, judgment vacated sub nom. *Moore v. Texas*, 139 S. Ct. 666 (2019). The court in *Moore* noted that:

> The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework." In *Moore*, the Supreme Court indicated that the DSM–5 embodies "current medical diagnostic standards" for determining intellectual disability. When observing that the *Briseno* factors were inconsistent with Texas's own practices in other contexts, the Court referred to Texas's reliance on "the latest edition of the DSM." The Supreme Court also observed that the DSM–5 retains a requirement that adaptive deficits be related to intellectual functioning deficits—a requirement no longer explicitly retained by the AAIDD manual. Given Texas's reliance on the DSM–5 in other contexts, and the logic of requiring that adaptive deficits be related to deficient intellectual functioning, we conclude that the DSM–5 should control our approach to resolving the issue of intellectual disability. Although we retain a "relatedness" requirement in conformity with the DSM–5, we abandon reliance on the *Briseno* evidentiary factors in determining whether such a requirement is met.

> The DSM–5 retains the three-pronged approach to intellectual disability but refines it. The three criteria for finding someone to be intellectually disabled are: (A) deficits in general mental abilities, (B) impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioculturally matched peers, and (C) onset during the developmental period.

> "Criterion A refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding." Components of these functions include "verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficacy."

> The typical method of assessing these functions is through "individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence." **A score is indicative of intellectual disability if it is "approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points)." When the standard deviation of the test is 15 and the mean is 100, a score that is two standard deviations below the mean will be "a score of 65–75**

**(70 ±5)."** Practice effects and the "Flynn effect"[2] may affect test scores. Invalid scores may result from brief screening tests or group administered tests or when there are highly discrepant individual subtest scores. Tests must also be normed for the individual's sociocultural background and native language.

Criterion B, deficits in adaptive functioning, refers to "how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background." This involves adaptive reasoning in three domains: "conceptual, social, and practical." The conceptual domain is also referred to as "academic" and involves things like "competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations." The social domain involves things such as "awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities, and social judgment." The practical domain involves such things as "learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization."

Adaptive functioning is assessed by both clinical evaluation and testing. Testing should be culturally appropriate and psychometrically sound. Such tests should use standardized measures with knowledgeable informants such as family members, teachers, counselors, and care providers, as well as the individual being assessed, if possible. Other sources of information include "educational, developmental, medical, and mental health evaluations." All of this information "must be interpreted using clinical judgment." "Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained."

Criterion B is met "when at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." For school-age children and adults with mild intellectual disability, "there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations." In adults with mild intellectual disability, "abstract thinking, executive function (i.e., planning, strategizing, priority setting, and cognitive flexibility) and short-term memory, as well as functional use of academic skills (e.g. reading, money management), are impaired." Individuals with mild intellectual disability may have difficulty perceiving peers' social cues, tend to use more concrete or immature language in communicating, and are at risk of being manipulated by others. "To meet diagnostic criteria for intellectual

---

[2] The Flynn Effect "is a phenomenon positing that, over time, standardized IQ test scores tend to increase with the age of the test without a corresponding increase in actual intelligence in the general population. Those who follow the Flynn effect adjust for it by deducting from the IQ score a specified amount for each year since the test was normalized." *See In re Cathey*, 857 F.3d 221, 227–28 (5th Cir. 2017).

disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A."

(emphasis added).

In *Atkins*, the Court identified two definitions of mental retardation from the American Association of Mental Retardation and the American Psychiatric Association that both contained three criteria to establish a diagnosis of mental retardation. *Id.* at n.3. The definitions characterize mental retardation as (1) sub-average intellectual functioning, coupled with (2) limitations in at least two adaptive skill areas, all of which must (3) manifest before the age of eighteen years. Generally speaking, the various definitions of mental retardation amongst the individual states share the same qualities as the two definitions that were cited in the *Atkins* decision. To qualify as mentally retarded, most states require that the defendant demonstrate sub-average intellectual function and limitations with adaptive skills before a certain age.  Although each state is different, a common characteristic amongst the individual definitions is an IQ requirement or guideline.

The overwhelming majority of states require that the defendant be able to demonstrate that their mental disabilities be documented before a certain age. *Id.* Although this may be an important classification criteria in the medical profession, within the realm of capital punishment age requirements pay no attention to the possibility that someone may suffer some other catastrophic injury or the reality that some people will suffer from intellectual disabilities  that remain undiagnosed until they are much older. For those people, although they would not necessarily meet the clinical definition of mental retardation, they nonetheless suffer from the limitations that the Supreme Court cited in *Atkins* and should be exempt from capital punishment.

The problem with requiring that the intellectual disability manifest before a certain age is that there is no guarantee that the problem will be noticed, diagnosed or treated. For example, in *Commonwealth v. VanDivner*, the Supreme Court of Pennsylvania determined the appellant did not prove his mental impairments had manifested before the age of eighteen despite expert

testimony that he functioned within the mild range of mental retardation, was deficient in social skills, read at a second grade level, spelled at a first grade level, had problems with impulse control, and had been enrolled in special education classes until he dropped out of school in the tenth grade. *Commonwealth v. VanDivner*, 962 A.2d 1170, 1184 (Pa. 2009). In determining that there was not enough evidence to show that his disabilities manifested before the age of eighteen, the Court cited the fact that there had been no testing done on Mr. VanDivner before he was eighteen and that, although he had been in special education classes, he could have been placed in those classes simply for behavioral problems. *Id.*

In should be noted that in the present case, Dr. Perma Manjunath, a child and adolescent psychiatrist at John Peter Smith Hospital in Fort Worth, Texas evaluated Soliz when he was 10 years of age and concluded that his mother drank heavily during her pregnancy. 51 RR 53. Dr. Manjunath further concluded Soliz had "difficulties in paying attention" and was of "low average to borderline intelligence." 51 RR 57-58. Dr. Manjunath also suspected that Soliz may have FASD due to his poor behavior and his mother's substance abuse during pregnancy. 51 RR 67.

An unfortunate consequence of the Supreme Court's holding in *Akins* that allows the state's to retain some control over how they enforce their laws, is that it has created a situation where the majority of states, including Texas, have overlooked characteristics of certain intellectually-challenged people. For those individuals, although they do not fit within these specific clinically-based definitions of mental retardation, they nevertheless struggle with the same problems that the Court cited in *Atkins* as reasons for exempting other individuals from capital punishment. This problem is especially apparent in the case of FASD.

### B. *Atkins v. Virginia* and Diminished Culpability

In *Atkins,* the Supreme Court held that the Eighth Amendment's ban on cruel and unusual punishment prohibited the execution of mentally retarded individuals.  536 U.S. at 321.  The Court determined that society recognized the lesser moral culpability of criminal offenders with mental

retardation, as evidenced by a national consensus prohibiting the execution of persons with mental retardation. *Id.* at 320-21. Because of their diminished culpability, the execution of a person with mental retardation would not serve any valid retributive or deterrent function. *Id.* It also highlighted several factors indicating that persons with mental retardation were at much greater risk of wrongfully receiving a sentence of death. *Id.*

The underlying rationale behind the national consensus observed by the Court was the lowered individual culpability of a person with mental retardation. In *Atkins*, the Court noted that persons with mental retardation, by definition, have "diminished capacities to understand and process information, . . . to engage in logical reasoning, [and] to control their impulses." *Atkins*, 536 U.S. at 318. Recognizing these cognitive deficits, the Court then held that "the large number of States prohibiting the execution of mentally retarded persons . . . provides powerful evidence that . . . our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id.* at 315-16. The Court has subsequently reaffirmed the importance of decision-making and impulse control on culpability when it extended immunity from execution to juveniles in *Roper v. Simmons*. 543 U.S. 551, 571 (2005).

The Court also observed that the reduced capacity of mentally retarded offenders increases the risk that "the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . ." *Atkins*, 536 U.S. at 320 (internal quotation omitted). Mentally retarded individuals are less able to "make a persuasive showing of mitigation[,] . . . . are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse . . . ." *Id.* a 320-21. Mental retardation is often inaccurately viewed by juries as an aggravating factor, rather than as mitigating. Such defendants are also less able to give meaningful assistance to their counsel. Each of these factors demonstrated that persons with mental retardation "face a special risk of wrongful execution." *Id.* at 321.

### C. Similar to Intellectual Disability,[3] Persons with FASD Have Diminished Moral Culpability

The concerns highlighted by the Supreme Court in *Atkins* regarding the culpability of intellectually disabled individuals apply with equal force to those afflicted with FASD. Both the intellectually disabled and those with FASD have serious problems in learning and processing information. (*Atkins*, 536 U.S. at 318; 53 RR at 68-82; 54 RR at 37-39.) Both have difficulty in logical reasoning and problem solving. (*Atkins*, 536 U.S. at 318; 54 RR at 18-19.) Both have a diminished capacity to control their impulses. (*Atkins*, 536 U.S. at 318; 53 RR at 94-95; 54 RR at 18-19.) Problematically, both may display characteristics that increase the risk of an inappropriate death sentence, such as their demeanor making them look unremorseful. (*Atkins*, 536 U.S. 320-21; 55 RR at 152-53.)

There are striking parallels between the diagnostic criteria for intellectual disability and FASD. *See* American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 33 (5th ed. 2013) ("DSM-5"). Intellectual disability requires a showing of deficits in intellectual and adaptive functioning whose onset occurs during the developmental period. *Id.* Regarding intellectual functioning, clinicians evaluate possible deficits in "reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding." *Id.* at 37. Deficits in adaptive functioning are measured in the academic, social, and practical domains. *Id.* They include competence in basic subjects such as math, reading, and writing, as well as the ability to empathize, social skills, and communication skills. *Id.* The DSM notes that gullibility is one of the most common features of intellectual disability. *Id.* at 38.

---

[3] Post-*Atkins*, mental retardation is clinically defined as "intellectual disability." As such, this Application will use that terminology, although the two terms are synonymous.

Similar signs are looked for when diagnosing a person with FASD.  Neuropsychological testing is conducted, similar to the testing done to determine whether a person is intellectually disabled.  (53 RR at 101; 54 RR at 21.)  This testing showed that Soliz had significant cognitive deficits and problems in numerous academic areas.  (54 RR at 37-43, 68-69.)  Adaptive functioning tests are administered—both in testing for intellectual disability and FASD—and again Soliz scored poorly.  (54 RR at 62-67.)  Furthermore, testing showed that Soliz was "hyper-suggestible," one of the most common features of the intellectually disabled.  (55 RR at 216-20; DSM-5 at 38.)

The difficulties faced by the intellectually disabled and those with FASD are similar, reducing the moral culpability of those with either affliction.  While those with FASD often have an IQ score that disqualifies them from receiving a diagnosis of intellectual disability, their actual functioning places them in that range.  (53 RR at 101.)  Thus, those afflicted with FASD should be categorically ineligible for the death penalty just as the intellectually disabled are, and Soliz's death sentence violates his Eighth Amendment protection against cruel and unusual punishment. *See Atkins*, 536 U.S. at 321.]

Soliz suffers from FASD because of his mother's drinking during her pregnancy, which has resulted in a number of behavioral and cognitive impairments—including impulsivity, learning problems, and serious adaptive deficits.  FASD therefore renders Soliz less culpable for his actions and categorically excludes him from a sentence of death.  As such, Soliz's conviction and sentence of death were unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights and United States Supreme Court case law.

### D.  Soliz Suffers From FASD, Lowering His Moral Culpability

Three experts were called by the defense during the punishment phase to explain to the jury that Soliz suffered from FASD and how that impacted his life and actions—Dr. Richard Adler, Dr. Paul Connor, and Dr. Natalie Novick Brown.  FASD is a medical diagnosis that requires both

medical and neuropsychological testing to accurately diagnose.  (53 RR at 76-79.)  The disorder can be responsible for a host of cognitive, behavioral, and developmental problems which vary from individual to individual.  *Id.* at 68-82.  These issues include higher rates of psychiatric disorders, inappropriate social behavior, learning problems, increased risk for criminal behavior and substance abuse, among other problems.  (*Id.*)  In conjunction, the experts diagnosed Soliz with Partial Fetal Alcohol Syndrome ("PFAS") and noted that they had **never seen "a case of this kind of seriousness, severity, neglect, [and] abuse" in their years of practice.**  (*Id.* at 115.) (emphasis added).

FASD is caused by a mother drinking during pregnancy.  (53 RR at 54-57, 80.)  It is an umbrella term that encompasses five different diagnoses, including Fetal Alcohol Syndrome ("FAS") and PFAS.  To diagnose FAS, there must be confirmed prenatal alcohol exposure, specific facial abnormalities, central nervous system abnormalities, and growth problems.  (Id. at 61-63.) If the facial abnormalities are not as severe, a person can be diagnosed with PFAS.  (Id. at 66-67.) PFAS should not be considered a lessened version of FAS; instead, PFAS can actually cause more serious problems than FAS because it is more likely to go undetected but the person will still have cognitive abnormalities that can be as serious as those of someone with FAS.  (Id. 91-93.)

FASD can be the root cause of a wide variety of cognitive, behavioral, and adaptive problems.  Deficits vary because the alcohol damages the area of the brain that is developing when it is consumed by the mother.  (55 RR at 148.)  It can cause problems in executive functioning, decision making, behavior control, and cause a lack of empathy for others.  (Id. at 152-54.)  People with FASD are generally followers and their impairment makes it difficult, if not impossible, for them to take responsibility for their actions.  (Id. at 153-57.)  Additionally, they are generally extremely impulsive and have problems applying what they have learned to real-life scenarios, in addition to displaying a variety of other adaptive functioning deficits.  (54 RR at 18-19.)

Cognitive impairments caused by FASD are also varied.   While persons with FASD frequently have IQ's above 70, their functioning places them in the mentally retarded range.   (53 RR at 101.)   On average, someone with FASD functions at the same level as the average seven year old.   (Id. at 98, 101.)   Not surprisingly, people afflicted with FASD have difficulty learning and retaining information.   (54 RR at 18.)   A person afflicted with FASD is expected to have poor academic achievement, particularly in the area of mathematics.   (Id. at 28.)

Dr. Adler testified as a psychiatrist specializing in FASD.   (53 RR at 36, 42.)   He conducted a physical examination of Soliz, took photographs of his face and hands, and reviewed testing done by other members of the diagnostic team.   (*Id.* at 78-79.)   Based on Soliz's confirmed prenatal exposure to alcohol, facial abnormalities, and cognitive abnormalities, Dr. Adler diagnosed him with partial FAS.   (*Id.* at 86-90.)   The diagnosis was PFAS because Soliz's facial abnormalities were mild.   (*Id*. at 109-10.)   Soliz clearly suffered from PFAS and it was the most serious case Dr. Adler had ever seen.   (*Id*. at 115.)

Dr. Connor, a neuropsychologist, tested Soliz to determine whether he had cognitive deficits consistent with FASD.   (54 RR at 21.)   Soliz's twenty-eight point difference between his verbal and nonverbal IQ score was extremely rare; only approximately two percent of the population has such a disparity.   (Id. at 37; see also 55 RR at 44-46 (**noting that Soliz's Full Scale IQ score of 90 would not be an accurate representation of his cognitive functioning because of the disparity**) (emphasis added).   This disparity was consistent with prior IQ testing of Soliz. (*Id.* at 37-38.)   Soliz scored extremely low in many academic areas: the second percentile in reading and pronunciation, the fifth percentile in sentence comprehension, the second percentile in spelling, and in the eighth percentile in math.   (Id. at 37-43.)   In total, Soliz was deficient in seven of the nine domains of cognitive functioning—and a FASD diagnosis only requires deficits

in three domains.  (Id. at 68-69.)  Soliz also had serious adaptive deficits, as measured by the Vineland Adaptive Behavior Scale.  (*Id*. at 62-67.)

Dr. Brown testified in her capacity as a forensic and clinical psychologist.  (55 RR at 133.) Her role was to conduct a lifelong assessment of Soliz to determine whether there was anything that would contradict a PFAS diagnosis, such as sophisticated behavior or success in important domains.   (*Id*. at 141-42.)   Dr. Brown found that Soliz's prior IQ testing, his academic functioning—including being in special education classes—and his behavior history all were consistent with FASD.  (*Id*. at 158-74.)  Soliz's records showed that, at age six, he was having problems with concentration and school performance—prior to his documented drug and inhalant abuse, so that could not be its cause.  (*Id*. at 166.)  Dr. Brown also administered the Gudjonsson Suggestibility Scale, which showed that Soliz was hyper-suggestible, a common trait of those with FASD.  (*Id*. at 216-20.)

Studies indicate that protective factors can mitigate against the deleterious effects of FASD. (55 RR at 183-86.)  The most important factor is a quality, well-structured home life—one without abuse, neglect, and poverty.  (Id. at 184.) A chaotic, unsupportive home life allows the negative effects of FASD to flourish because there is nothing moderating them.  (Id. at 184-85.)  Another protective factor is an early diagnosis of the disorder, which can facilitate treatment through developmental disabilities services.  (Id. at 185-86.)  Soliz had neither of these protective factors. (Id. at 184-86.)  The combination of extreme neglect at home and the deficits from PFAS made Soliz's story particularly tragic.  (Id. at 214-15.).

### E.  Subsequent Testing of Soliz

Mr. Soliz would submit that because he suffers from an intellectual disability, namely FASD, he is ineligible for the death penalty pursuant to *Atkins* and *Hall*. In *Hall*, the United States Supreme Court revisited its decision in *Atkins*, and "transformed the jurisprudential landscape for

analyzing and developing the necessary factual evidence in support of an *Atkins* claim." *Hall*, 134 S.Ct. at 1986. The Court in *Hall* noted that the "national consensus" identified in *Atkins* limited the unfettered discretion individual states had to set the bar for determining mental retardation. *Id.*

In support of this claim, the undersigned submitted Mr. Soliz for examination by a neuropsychologist. On July 1, 2019, Dr. Shawanda Williams-Anderson, Ph.D., HSPP, met with Mr. Soliz at the TDCJ Polunsky Unit in Livingston, Texas. Dr. Williams-Anderson conducted a diagnostic and clinical interview of Mr. Soliz utilizing the Weschsler Adult Intelligence Scale-4th Edition (WAIS-IV). *See* Appendix A filed under seal with this Court.

Dr. Williams-Anderson noted that:

> Given Ms. Soliz's overall presentation, confirmed history including medical and developmental, and measurable cognitive abilities, he produced a code of 1134 which would indicate sentinel physical findings/neurobehavioral disorder. That is, Mr. Soliz does have characteristics of an FASD, but may not meet full criteria for FAS. These are similar findings to prior evaluations that indicated Mr. Soliz had a "mild" form of FAS.

*See* Sealed Appendix A.

Accordingly, all of Soliz's testing and life history were consistent with FAS.  Soliz's life story is that of a person afflicted with cognitive and behavioral deficits due to his mother's decisions during her pregnancy with him.  These problems were then compounded by a chaotic and unsupportive home environment.  His mother's actions and the effect of those choices on Soliz lower his moral culpability for his actions.  The ultimate penalty of death cannot be constitutionally applied in light of this diminished culpability.

Mr. Soliz was also presented with an IQ test utilizing the WAIS-IV method.  WAIS-IV is a widely utilized assessment that measures levels of cognitive functioning across multiple dimensions in adults ages 16-90. *Id.* The WAIS-IV includes subtests that range from assessing verbal, nonverbal, and spatial reasoning to short-term memory and speeded processing. *Id.* The WAIS consists of 10 subtests that are combined to yield an overall Full Scale IQ score and 4

composite scores that all have an average (mean) of 100 and a standard deviation of 15. *Id.*  That is, most people obtain scores between 85 and 115, with higher scores indicating a stronger performance.   *Id.* The test administered by Dr. Williams-Anderson therefore took into consideration the "Flynn factor" when assessing Mr. Soliz's overall IQ score. Dr. Williams-Anderson concluded that:

> On the WAIS-IV, Mr. Soliz achieved a Verbal Comprehension Index (VCI) score of 78 (7th percentile). The Verbal Comprehension Index assesses the individual's ability to use receptive and expressive skills, use learned and crystallized knowledge, reason abstractly and use such skills to draw conclusions and understand one's environment.  Mr. Soliz's score falls in the borderline impaired range.
>
> He achieved a Perceptual Reasoning Index (PRI) score of 98 (45th percentile), which falls in the average range. The Perceptual Reasoning Index assesses the individual's ability to examine a problem, draw upon visual-motor and visual-spatial skills, organize their thoughts, and create solutions. His score falls in the average range. The difference between his VCI and PRI is 20 points which is statistically and clinically significant.  This discrepancy indicates that verbal abilities are more impoverished than his problem-solving abilities.
>
> Mr. Soliz achieved a Working Memory Index (WMI) score of 71 (3rd percentile). The Working Memory Index assesses an individual's ability to attend to new information, switch categorical sets, concentrate, and perform mathematical calculations without the aid of paper and pencil.  His score falls in the mildly impaired range.
>
> Mr. Soliz achieved a Processing Speed Index (PSI) score of 65 (1st percentile). The Processing Speed Index assesses an individual's abilities to sustain attention, quickly scan and discriminate between stimuli, and sequentially order visual information. His demonstrated ability on this task was in the moderately impaired range.  The difference between PRI, his highest domain, and PSI was 33 points. This difference is statistically and clinically significant. This domain is an absolute and relative weakness for Mr. Soliz, and falls in the moderately impaired range.

*Id.*

Dr. Williams-Anderson made an ultimate finding that Mr. Soliz had an IQ of 75. *Id.*  "This score falls more than 1.5 standard deviations below the mean and is considered borderline impaired. Generally, scores between 70-84 are considered borderline intellectual functioning." *Id.*

Dr. Williams-Anderson added that:

Given the nature and pattern of impoverished scores, an analysis of subtest scores was warranted. Subtest scores revealed that Mr. Soliz has great difficulty sustaining attention and interpreting information when presented quickly. These deficits are very likely due to Mr. Soliz's self-reported chronic substance use. Slowed processing is a common characteristic of continued substance use. Deficits were also observed on a subtest of working memory. Similarly, these deficits are more likely than not from chronic substance use rather than organic or congenital cognitive deficits. This is especially so given that some of his scores fall in the average range, and organic impairments are typically seen across all domains.

Lastly, Mr. Soliz produced impaired scores on the Vocabulary subtest. Vocabulary abilities have been shown to be positively correlated with academic prowess, general intelligence, and continued experiences in a learning environment. Specific to Mr. Soliz, he reported a truncated learning experience, hampered by inconsistency, residential placements, and neglect during his formative years. Therefore, it is more likely than not that his general fund of knowledge and academic attainment adversely impacted his vocabulary and overall verbal skills.
In sum, Mr. Soliz's cognitive abilities produced a Full Scale IQ of 75. There is a 95% confidence interval that his score would fall between 71-80 if retested. **His score falls in a borderline impaired range, and is hampered by his slowed processing speed, problems with working memory and low verbal skills.** The overall IQ for Mr. Soliz includes average abilities as well. His observed deficits are similar to those persons that function in a low, but non-impaired range of functioning. On previous assessment, **Mr. Soliz produced a discrepancy between scores that were in excess of 20 points.** On the current assessment, his differences in abilities were more pronounced and have progressed to a 33-point split. **This suggest that his deficits are likely developmental in nature and his abilities would be more discrepant as he ages.**

*Id. (emphasis added).*

As noted in Dr. Williams-Anderson's report, it is well settled that in cases of intellectual disability arising from fetal alcohol syndrome, deficits in adaptive functioning are likely to become more severe with age. *See* Carmen Rasmussen, et al., Neurobehavioural outcomes of children with fetal alcohol spectrum disorders: A Canadian perspective, 13 Paediatrics & Child Health 185, 188 (2008) (collecting studies).

At trial, Mr. Soliz's counsel offered testimony for numerous witnesses, as well as thousands of pages of records demonstrating that he had a chaotic upbringing, suffered severe neglect at home and had significant adaptive deficits. 50 RR 138-217.  Mr. Soliz was referred to the Tarrant County Mental Health and Mental Retardation organization when he was ten years of

age for services. 51 RR 130. At the age of twelve, Mr. Soliz was removed from his mother's custody by the State and he placed at the Buckner Children's Home. DX 62.  Following his time at Buckner Children's Home, Soliz was placed in at least six different foster homes and attended numerous schools.  First, he spent approximately nine weeks split between City House Shelter in Plano, Texas and the Dallas County Juvenile Detention Center.  Ex. 15 at 4-14 (Excerpts from Soliz CPS Records).  With each of the new placements following his time at Buckner Children's Home, Soliz was shuffled around different school districts.  Based on Soliz's transfer history between placements, he would have gone to two different schools in Spring 1997, three different schools in Fall 1997, one school in Spring 1998, three schools in Fall 1998, and one school in Spring 1999.  In addition, Soliz's limited education records indicate that he was enrolled in special education courses throughout and that he had been held back in school at least once.  *See* Ex. 17 [Keene ISD Education Records].  He finally aged out of foster care in January 2000 and entered adult life ill-prepared due to his unstable childhood. *Id.* at 92-107.

As noted at trial, although persons with FASD frequently have IQ's above 70, their functioning places them in the mentally retarded range.  53 RR at 101.  On average, someone with FASD functions at the same level as the average seven-year-old.  53 RR at 98, 101.  Not surprisingly, people afflicted with FASD have difficulty learning and retaining information.  54 RR at 18.  A person afflicted with FASD is expected to have poor academic achievement, particularly in the area of mathematics.  *Id.* at 28. As noted in his recent evaluation report, Mr. Soliz falls squarely within these deficits. Dr. Williams-Anderson concludes in her report that:

> These developmental deficits are more likely than not from FASD traits garnered from Mr. Soliz's in vitro, perinatal environment which was exposed and susceptible to teratogens via the mother's substance abuse. Being that these type deficits are lifelong, they would certainly have been contributing factors on the day in question.

*See* Sealed Appendix A.

Mr. Soliz's limited adaptive functioning and his near borderline IQ of 75 strongly correlate with an intellectually impaired individual. Dr. Williams-Anderson's report notes in her report that Mr. Soliz's developmental deficits are linked to his prenatal exposure to intoxicants and his diagnosis of FASD. This impaired functioning due to FASD places Mr. Soliz squarely within the mentally retarded range. Mr. Soliz has therefore presented substantial evidence, both in his initial petition and in this subsequent writ, that he is intellectually impaired. This evidence includes the trial testimony noted supra from three expert witnesses who surmised that Mr. Soliz's intellectual deficits and fetal alcohol syndrome evince significantly sub-average intellectual functioning and suggest adaptive behavior deficits, with an onset prior to age eighteen. This prior testimony, in conjunction with the recent findings in Dr. Williams-Anderson's report, make a compelling case that it would be violate the Eighth Amendment's prohibition against cruel and unusual punishment to put to death an inmate who falls so dangerously close to the range of intellectual impairment prescribed in *Atkins*.  Given the nature of the right at stake, and the finality that comes with Mr. Soliz's impending execution, his successor claim under *Atkins* is deserving of immediate further review by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Soliz asks this Court to hold hearings, make its findings of fact and conclusions of law, and find that he was denied rights.  He requests the Court to vacate his conviction and issue a writ ordering his release from custody, or alternatively, to reverse his conviction and order a new trial, or alternatively, to vacate his sentence of death and order a new trial on sentencing.

Respectfully submitted,

*Seth Kretzer*

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street
Suite 1440
Houston, TX 77002
(713) 775-3050 (work)
(713) 929-2019 (FAX)
seth@kretzerfirm.com


Carlo D'Angelo, P.C.
Attorney at Law
100 East Ferguson, Suite 1210
Tyler, Texas 75702
903.595.6776
903.407.4119 Fax
carlo@dangelolegal.com


By:    /s/ Carlo D'Angelo
       Carlo D'Angelo
       Texas Bar No. 24052664


## ART. 11.14(5) OATH

I, Carlo D'Angelo, affirm that I represent Applicant Mark Anthony Soliz. I further affirm that I have discussed this case with Mr. Soliz and investigated the facts contained in this Application. I prepared and reviewed this Application, and to my knowledge, all facts and allegations in this Application are true.

Carlo D'Angelo

SUBSCRIBED AND SWORN TO BEFORE ME on this ___9th___ day of
_August_ 2019.

Notary Public

SHELLY STEPHENS
NOTARY PUBLIC
State of Texas
Comm. Exp. 08-18-2019